1 | **DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2 | **COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
3 | 165 Fell Street
San Francisco, CA 94102
4 | Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
5 | Tel: (415) 989-4730
Fax: (415) 989-0491
6 | File No. 52,759

7 | Attorneys for Plaintiffs
DEBORAH D. PETERSON, Personal Representatives
8 | of the Estate of James C. Knipple (Dec.), et al.

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 |

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), et al., | ) CASE NO. CV 08-80030 MISC JSW (BZ) ) |
| | ) MEMORANDUM OF POINTS AND ) AUTHORITIES PURSUANT TO ORDER FOR ) FURTHER BRIEFING (DOCUMENT 16) |
| Plaintiffs, | ) |
| vs. | ) |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) |
| Defendants. | ) |
| | ) |

18 | COMES NOW Plaintiffs DEBORAH D. PETERSON, Personal Representative of the

19 | Estate of James C. Knipple (Dec.), et al. ("Plaintiffs"), who hereby comply and respond to the

20 | ORDER FOR FURTHER BRIEFING, as follows:

21 | **I. INTRODUCTION.**

22 | Plaintiffs have brought an action in the United States District Court, for the District of

23 | Columbia, against The Islamic Republic of Iran ("Iran"), seeking damages arising out of the 1983

24 | Marines Barracks Bombing in Beirut, Lebanon, leading to the death of 240 Marines and

25 | servicemen. The action was filed on 10/3/01 in the United States District Court, District of

26 | Columbia, Consolidated Civil Actions: 01-2094 (RCL) & 01-2684 (RCL), leading ultimately to a

27 | judgment rendered on 9/7/07. Copies of the underlying memorandum in support of the judgment

28 |

1  and form of judgment are marked *Exhibits "A" and "B."* [1]  The sole named Defendant is THE

2  ISLAMIC REPUBLIC OF IRAN, and no other party.

3       Plaintiffs registered this judgment under 28 U.S.C. § 1963 in the United States District

4  Court, Northern District of California, on 3/11/08, the basis of which is a good faith that assets are

5  located in this judicial district. The basis of the registration is the good faith belief that assets may

6  be available for levy and execution in the Northern District of California, which in fact may come

7  to fruition, in that Plaintiffs have levied upon Boeing Company, who may have a license under the

8  Office of Foreign Asset Control for the sale to Iran of spare parts for maintenance of the fleet of

9  Boeing Aircraft flown by Iran Air, the civilian airline of Iran.  Plaintiffs have also levied upon a

10  series of Japanese and European banks who may hold deposits and the like, on behalf of various

11  Iranian financial institutions, such as the Central Bank of Iran, which likewise may be subject to

12  levy and execution therein.  These banks include, but are not limited to, the Bank of Tokyo,

13  Mitsubishi UFJ, Mizuho Corporate Bank, Sumitomo Mitsui Banking Corporation, UBS AG Credit

14  Suisse, among others.  Parenthetically, Iran is the second largest importer of gasoline supplies, and

15  engages European and Asian banks to issue letters and credit and other trade facilities, to enable

16  third party wholesales to ship on a "credit basis" gasoline stocks to Iran.  For the court's general

17  edification, this is more particularly set forth in various reports, including but not limited to,

18  various reports such as the Congressional Research Service Report, and the like.

19                      **II.  INTERVENING LEGISLATION.**

20       Up to 2008, collection against a foreign sovereign, even a terrorist nation, was extremely

21  difficult.  The Foreign Sovereignty Immunities Act ("FSIA") essentially prohibited virtually all

22  levy and execution against a foreign sovereign, save and except that the foreign sovereign was a

23  terrorist state as designated by the Secretary of State, and those assets subject to levy and

24  execution had to be classified as "blocked."  This led to a series of difficult actions, in which

25  judgment creditors would attempt to reach these assets, claiming that they were blocked.

26  _____

27       [1]  All exhibits are incorporated by reference as though fully set forth in this Memorandum
in their entirety and are attached to the Declaration of David J. Cook, Esq. which is filed
28  contemporaneously herein.

1     In the face of the Marines judgment, Congress authorized for the abolition of the FSIA as

2 to certain countries, which after certain legislative jousting, was generally limited to Iran, Libya,

3 Syria, Cuba, North Korea, Sudan, among others. (Iraq was originally subject to levy and

4 execution, but after jockeying between the President and Congress, ultimately still remains subject

5 to FSIA.)  The key legislation is 28 U.S.C. § 1605A.  The key parts of that new section permitting

6 meaningful collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1), which provides as

7 follows:

8     "(a) IN GENERAL. --
       "(1) NO IMMUNITY. – A foreign state shall not be immune from the
9 jurisdiction of courts of the United States or of the States in any case not otherwise
covered by this chapter in which money damages are sought against a foreign state
10 for personal injury or death that was caused by an act of torture, extrajudicial
killing, aircraft sabotage, hostage taking, or the provision of material support or
11 resources for such an act if such act or provision of material support or resources is
engaged in by an official, employee, or agent of such foreign state while acting
12 within the scope of his or her office, employment, or agency."

13     "(g) PROPERTY IN CERTAIN ACTIONS –
       "(1) IN GENERAL. – subject to paragraph (3), the property of a foreign
14 state against which a judgment is entered under section 1605A, and **the property
of an agency or instrumentality** of such a state, including property that is a
15 separate juridical entity or is an interest held directly or indirectly in a separate
juridical entity, is subject to attachment in aid of execution, and execution, upon
16 that judgment as provided in this section, regardless of –
       "(A) the level of economic control over the property by the
17 government of a foreign state;
       "(B) whether the profits of the property go to that government;
18        "( C) the degree to which officials of that government manage the
property or otherwise control its daily affairs;
19        "(D) whether that government is the sole beneficiary in interest of
the property; or
20        "(E) whether establishing the property as a separate entity would
entitle the foreign state to benefits in United States courts while
21 avoiding its obligations.

22       "(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE.
Any property of a foreign state, or agency or instrumentality of a foreign state, to
23 which paragraph (1) applies shall not be immune from attachment in aid of
execution, or execution, upon a judgement entered under section 1605A because
24 the property is regulated by the United States Government by reason of action
taken against that foreign state under the Trading With the Enemy Act or the
25 International Emergency Economic Powers Act." (Emphasis added)

26     Paramount is the fact that the "agencies and instrumentalities" and deemed to be part of the

27 "sovereign state" as set forth in subparagraph 1605A(g)(1).

28

1    With all of this background in mind, this creditor now seeks an order amending the Writ of

2    Execution, for the purpose of adding the "agencies and instrumentalities."

3    ### III.  RIGHT TO AMEND.

4    This creditor proceeds under C.C.P. § 680.135, which provides in relevant portion, as

5    follows:

6    § 680.135.
    "Affidavit of Identity" means an affidavit or declaration executed by a judgment
7    creditor, under penalty of perjury, that is filed with the clerk of the court in which
    the judgment is entered at the time the judgment creditor files for a writ of
8    execution or an abstract of judgment. The affidavit of identity shall set forth the
    case name and number, the name of the judgment debtor stated in the judgment, the
9    additional name or names by which the judgment debtor is known, and the facts
    upon which the judgment creditor has relied in obtaining the judgment debtor's
10   additional name or names. The affidavit of identity shall not include the name or
    names of persons, including any corporations, partnerships, or any legal entities not
11   separately named in the judgment in which the judgment debtor is a partner,
    shareholder, or member, other than the judgment debtor.

12   The order from the court seeks to distinguish the difference between obtaining an order

13   amending the Writ to permit a judgment creditor to describe the judgment debtor by all names by

14   which the judgment debtor may use.  C.C.P. § 680.135, however, does not permit a judgment

15   creditor to add a new person or party.  California courts has already addressed these issues in

16   partially permitting a judgment creditor to amend a judgment in the case of *Dow Jones vs. Avenel*

17   151 Cal.App.3d 144 at pages 148 to 149 (Cal.App.1 Dist. 1984), in which the court stated as

18   follows:

19
20   "Dow Jones maintains, nonetheless, that a trial court may add a post-judgment
    debtor, pursuant to Code of Civil Procedure section 187,[11] subject only to due
    process considerations.

21
22   We agree. A trial court has the authority to amend a judgment in order to add
    additional judgment debtors. Code of Civil Procedure section 187 has often served
    as the basis for such an amendment of a judgment, pursuant to the alter ego
23   doctrine. (E.g., see Alexander v. Abbey of the Chimes (1980) 104 Cal.App.3d 39,
    44, 163 Cal.Rptr. 377; Schoenberg v. Romike Properties (1967) 251 Cal.App.2d
24   154, 168, 59 Cal.Rptr. 359. See also 1 Witkin, Procedure (2d ed. 1970) Courts, §§
    123-124, pp. 392-394; 2 Witkin, Actions, § 3, pp. 881-882, § 6, pp. 884-885.) And,
25   the general rule is that "a court may amend its judgment at any time so that the
    judgment will properly designate the real defendants." (Alexander v. Abbey of the
26   Chimes, supra, 104 Cal.App.3d 39, 45, 163 Cal.Rptr. 377.)"

27
28

1   Plaintiffs do not seek to amend the underlying judgment, but rather seek to "retitle" the

2   judgment debtor to show all of the names by which the judgment debtor is known. Plaintiffs do

3   not assert that the "agencies and instrumentalities" are separate parties, but assert that they are

4   names by which Iran conducts its business and therefore avoid the requirements implicit in *Dow*

5   *Jones vs. Avenel, supra*, and its predecessor. *Alexander vs. Abbey of the Chimes*, 104 Cal.

6   App.3d 39 (1980).

## IV. FACTUAL BASIS.

8   Plaintiffs through reasonable diligence have determined that Iran goes by multiple names.

9   They are set forth by way of the proposed amendments. Plaintiffs have already laid out a factual

10  basis to show that the entities are "agencies and instrumentalities" being precisely entities of the

11  government. This is found not only in the Ministry of Petroleum of Iran and their website marked

12  *Exhibit "C,"* but moreover, the OFAC Statement of Iran entitled "What Do You Need To Know

13  About U.S. Economic Sanctions" marked *Exhibit "D,"* which lists all of the banks and financial

14  institutions, which are specifically described. The Central Bank of Iran website also identified

15  and tracks the same banks as listed on the OFAC list (*Exh. "D")* by way of the Central Bank

16  download, marked *Exhibit "E."*

17  The names of the oil agencies and instrumentalities, principally consisting of the various

18  named national oil companies and related entities, and their subsidiaries, (listed in great detail on

19  the Ministry of Petroleum website marked *Exhibit "C"* ) is confirmed by the EIA Department of

20  Energy Report marked *Exhibit "F"* and at pages 2-4.

21  Plaintiffs have therefore met their reasonable burden of proof to show that the oil entities

22  are in fact part and parcel of the government of Iran, and accordingly, Plaintiffs are entitled to an

23  order amending the Writ of Execution, to show that Iran does business under the name of "Iran,"

24  and does business, e.g., under the name of Ministry of Oil, National Iranian Oil Company, and the

25  like. Plaintiffs likewise have reasonably identified the banks as agencies and instrumentalities,

26  again predicated upon the Central Bank of Iran website and the OFAC report.

27  Accordingly, Plaintiffs have shown a sufficient factual basis to demonstrate that Iran does

28

1  business under its oil and financial agencies and instrumentalities.

2  ### V. WHY IS THIS IMPORTANT?

3  Iran imports gasoline and other refined petroleum products, demonstrated by the EIA

4  Report on page 4 under the title of "Gasoline." As a general business proposition. the sellers of

5  these products wish to insure payment upon delivery (or other terms) and the traditional means of

6  assuring payment for any international transaction is a letter of creditor, or other trade facility,

7  either in favor of seller, or the exporting country's Import Export Bank.  Typically. the risk of the

8  seller to a foreign sovereign is nonpayment and marginal (or no) recourse to civil means for

9  collection. To assure payment. the seller (a foreign sovereign oil company. entitled typically

10 National Oil Company or NOC) or commercial International Oil Company ("IOC")) will demand

11 and receive a letter of credit issued by the exporter's domiciled bank to avoid any risk of

12 nonpayment from the importer's domiciled bank, which is frequently government- owned or

13 controlled, which is the case in Iran.  In inducing the exporter's country bank to issue a letter of

14 credit (or the local Import Export Bank to guaranty payment), they would demand and receive a

15 large deposit of money from the importer's national bank serving as collateral supporting the letter

16 of credit.  The deposit in the hands of the exporter's bank (issuing the letter of credit) emanates

17 from the importer's bank (Iran's bank).  The exporter draws down on the letter of credit for

18 payment of the gasoline stock. and the issuing bank(obligor under the letter of credit) is paid from

19 the deposit on hand. or alternatively, Iran (probably the National Iranian Oil Company) directly

20 reimburses the issuing bank.

21 This fact pattern leads to the conclusion that the government-owned banks of Iran on their

22 own may have account with many international banks, such as BNP-Paribas, Credit Suisse. UBS

23 AG. if not others.

24 ### VI. CONCLUSION.

25 Plaintiffs do not seek to add additional parties. but better identify Iran through its agencies

26 and instrumentalities which under 28 U.S.C. § 1605A constitute Iran itself, and are no longer

27 separate entities. Enabling Plaintiffs to amend the Writ will permit Plaintiffs to reach assets titled

28

1  in the name of Iran's "agencies and instrumentalities" and reduce the barrier potentially proffered

2  by any garnishee that no funds are held in the name of "Iran," while billions of dollars might be

3  held in the name of the banks and oil companies of Iran.

4  DATED:  April 20, 2008                    COOK COLLECTION ATTORNEYS

5
                                            By:    /s/ David J. Cook
6                                           DAVID J. COOK, ESQ. (SB# 060859)
                                            Attorneys for Plaintiffs
7                                           DEBORAH D. PETERSON, Personal
                                            Representatives of the Estate of James C. Knipple
8                                           (Dec.), et al.

9
   F:\USERS\DJCNEW\peterson.mpabriefing
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES PURSUANT TO ORDER FOR FURTHER BRIEFING
(DOCUMENT 16) - CASE NO. CV 08-80030 MISC JSW (BZ)                              7

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco. CA  94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11
    DEBORAH D. PETERSON. Personal      )    CASE NO. CV 08-80030 MISC
12  Representative of the Estate of James C.  )
    Knipple (Dec.), et al.,            )    DECLARATION OF DAVID J. COOK. ESQ.
13                                     )    PURSUANT TO ORDER FOR FURTHER
           Plaintiffs.                 )    BRIEFING (DOCUMENT 16)
14                                     )
    vs.                                )
15                                     )
    ISLAMIC REPUBLIC OF IRAN. et al.,  )
16                                     )
           Defendants.                 )
17  _____  )

18        I. DAVID J. COOK. hereby declare and state as follows:

19        1. I am one of the attorneys of record for Plaintiffs in the above-entitled action, am duly

20  authorized to practice before all courts in the State of California, and am familiar with the facts

21  and circumstances in this action.

22        2. Plaintiffs have brought an action in the United States District Court, for the District of

23  Columbia, against The Islamic Republic of Iran ("Iran"). seeking damages arising out of the 1983

24  Marines Barracks Bombing in Beirut. Lebanon, leading to the death of 240 Marines and

25  servicemen.  The action was filed on 10/3/01, leading ultimately to a judgment rendered on 9/7/07.

26  The underlying memorandum in support of the judgment and form of judgment are marked

27  *Exhibits "A" and "B."*  The sole named Defendant is the The Islamic Republic of Iran, and no

28

DECLARATION OF DAVID J. COOK, ESQ. PURSUANT TO ORDER FOR FURTHER BRIEFING (DOCUMENT
16) - CASE NO. CV 08-80030 MISC JSW (BZ)                                                    1

1    other party.

2       3. Plaintiffs through reasonable diligence have determined that Iran goes by multiple

3    names. They are set forth by way of the proposed amendments. Plaintiffs have already laid out a

4    factual basis to show that the entities are "agencies and instrumentalities" being precisely entities

5    of the government. This is found not only in the Ministry of Petroleum of Iran and their website

6    attached hereto marked *Exhibit "C,"* but moreover, the OFAC Statement of Iran entitled "What

7    Do You Need To Know About U.S. Economic Sanctions" attached hereto marked *Exhibit "D,"*

8    which lists all of the banks and financial institutions, which are specifically described. The

9    Central Bank of Iran website also identified and tracks the same banks as listed on the OFAC list

10    (*Exh. "D"*) by way of the Central Bank download, attached hereto marked *Exhibit "E."*

11       4. Plaintiffs seek to amend the judgment through two lines of attack. First, Plaintiffs seek

12    to add the names of the oil agencies and instrumentalities, principally consisting of the various

13    named national oil companies and related entities, and their subsidiaries, which are listed in great

14    detail on the Ministry of Petroleum website marked *Exhibit "C."* This is further confirmed by the

15    EIA Department of Energy Report attached hereto marked *Exhibit "F"* and at pages 2-4.

16       I declare under penalty of perjury that the foregoing is true and correct.

17       Executed on April 20, 2008.

18

19                        /s/ David J. Cook
                            DAVID J. COOK, ESQ. (SB# 060859)

20    F:\USERS\DJCNEW\peterson.mpabriefing

21

22

23

24

25

26

27

28

**EXHIBIT "A"**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of the<br>Estate of James C. Knipple (Dec.),  *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>Defendants. | Consolidated Civil Actions:<br>01-2094 (RCL)<br>01-2684 (RCL) |

## MEMORANDUM OPINION

## BACKGROUND

These actions arise from the October 23, 1983, bombing of a United States Marine

barracks in Beirut, Lebanon. in which 241 American servicemen operating under peacetime rules

of engagement were murdered by a suicide bomber.  This attack was regarded as the most deadly

state-sponsored terrorist attack made against American citizens, until the tragic attacks on

September 11, 2001.

The nearly one thousand plaintiffs in this consolidated action are many of the family

members and estates of the 241 servicemen killed in the attack.   Plaintiffs allege that the Islamic

Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are

liable for damages from the attack because they provided material support and assistance to

Hezbollah,[1] the terrorist organization that orchestrated and carried out the bombing. Plaintiffs have relied upon causes of action founded upon provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7).

## PROCEDURAL HISTORY

On March 17-18, 2003, this Court conducted a bench trial to determine the defendants' liability for their part in the perpetration of this attack. After reviewing the evidence presented by plaintiffs at trial, including testimony from lay and expert witnesses, this Court issued an opinion finding that the defendants were legally responsible for providing material financial and logistical support to help carry out this tragic attack on the 241 servicemen in Beirut in 1983. *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 61 (D.D.C. 2003). In that opinion, this Court also found that the surviving family members have suffered and will continue to suffer mental anguish and loss of society. *Id.* Finally, this Court directed special masters to consider each claim brought by plaintiffs, and indicated that it would make a determination on the amount of compensatory and punitive damages for each claim after the Court received reports from the special masters.[2] The Court reaches this determination on the issue of damages in this opinion.

---

[1] According to the Oxford English Dictionary, the term "Hezbollah" is synonymous with the terms "Hizbollah" and "Hizbullah," all of which are English transliterations of the Arabic term referring to the extremist Shiite Muslim group also known as the "Party of God." *See* Oxford English Dictionary (2d ed. 1989). Accordingly, to the extent that any of these terms are used within this opinion, they shall be used interchangeably.

[2] In a prior case where this Court held Iran responsible under the Foreign Sovereign Immunities Act as a state sponsor of terrorism, this Court noted that its statutory duty is clear and that there is no danger of inadvertent interference with foreign relations. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 16 (D.D.C. Mar. 11, 1998) (Lamberth, J.). "Article 1 of the Constitution establishes that Congress has 'authority to enact laws applicable to conduct beyond the territorial boundaries of the United States.'" *Id.* (quoting *EEOC v. Aramco*, 499 U.S. 244, 260-61 (1991). The Foreign Sovereign Immunities Act not only applies to extraterritorial

The Court reviews the determinations made by the special masters *de novo*. *See* Fed. R. Civ. P.

53(g)(3).

## DISCUSSION

*I.    Assessment of Validity of Each Plaintiff's Cause of Action*

In order to ensure that the Court determines the appropriate amount of damages available

to each plaintiff under the law, it must first ensure that each plaintiff has a valid claim under state

law. The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to

substantive causes of action against private individuals that may exist in federal, state or

international law." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. Sept. 29,

2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005

WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates,

J.)).

In order to determine the applicable state law to each action, the Court must look to the

choice of law rules of the forum, in this case, the choice of law rules of the District of Columbia.

*See Blais*, 459 F. Supp. 2d at 54. Under District of Columbia choice of law rules, courts employ

a modified government interest analysis under which they "evaluate the governmental policies

underlying the applicable laws and determine which jurisdiction's policy would be most

---

conduct, but one of its express purposes is to affect the conduct of terrorist states outside the
United States, in order to promote the safety of United States citizens overseas. Congress
specifically restricted application of the statute to foreign state defendants which the Executive
Branch, via the State Department, has determined are foreign state sponsors of terrorism. *See id.*
This Court is aware that the judgment entered today may be the largest ever entered by a court of
the United States against a foreign nation. The President has not filed a suggestion of interest
indicating that actions by this Court will in any way interfere with the foreign relations of the
United States. This Court is properly performing its duty under a constitutional statute.

advanced by having its law applied to the facts of the case under review." *Hercules & Co. v.*

*Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted).

Application of this governmental interest test generally points to the law of plaintiff's domicile as

having the greatest interest in providing redress to its citizens. Accordingly, the validity of each

of the plaintiffs' claims shall be determined by the state in which they were domiciled at the time

of the attack.

In this action, three types of claims have been sought. First, the personal representatives

and estates of the servicemen killed in the attack have brought claims for wrongful death, in

which the plaintiffs and beneficiaries seek compensation in the form of the present value of the

decedent's lost wages and earnings that he would have earned but for his untimely death.

Second, the surviving servicemen have brought claims for battery against the defendants. Third,

the family members of both the deceased and surviving servicemen have brought claims for

intentional infliction of emotional distress ("IIED") against the defendants for their part in

materially bringing about the attack. The Court will assess the relative merits of each of the

claims separately.

    *A.*   *Wrongful Death Claims*

Wrongful death claims were brought by the personal representatives and estates of the

following deceased servicemen:

> Terry Abbott, John Robert Allman, Ronny Kent Bates, James Baynard, Jess W.
> Beamon, Alvin Burton Belmer, Richard D. Blankenship, John W. Blocker, Joseph
> John Boccia Jr., Leon Bohannon, John Bonk Jr., Jeffrey James Boulos, John
> Norman Boyett, William Burley, Paul Callahan, Mecot Camara, Bradley Campus,
> Johnnie Ceaser, Robert Allen Conley, Charles Dennis Cook, Johnny Len
> Copeland, David Cosner, Kevin Coulman, Rick Crudale, Russell Cyzick, Michael
> Devlin, Nathaniel Dorsey, Frederick Douglass, Timothy Dunnigan, Bryan Earle,

Danny R. Estes, Richard Andrew Fluegel, Michael D. Fulcher, Sean Gallagher,
George Gangur, Randall Garcia, Harold Ghumm, Timothy Giblin, Michael
Gorchinski, Richard Gordon, Davin M. Green, Thomas Hairston, Michael
Haskell, Mark Anthony Helms, Stanley G. Hester, Donald Wayne Hildreth,
Richard Holberton. Dr. John Hudson, Maurice Edward Hukill, Edward Iacovino
Jr., Paul Innocenzi III, James Jackowski, Jeffrey Wilbur James. Nathaniel Walter
Jenkins, Edward Anthony Johnston. Stephen Jones, Thomas Adrian Julian,
Thomas Keown. Daniel Kluck, James C. Knipple. Freas H. Kreischer III, Keith
Laise, James Langon IV, Michael Scott LaRiviere, Steven LaRiviere, Richard
Lemnah, Joseph Raymond ("Joel") Livingston III. Paul D. Lyon Jr., John
Macroglou. Samuel Maitland Jr.. Charlie Robert Martin, David Massa, John
McCall, James E. McDonough, Timothy R. McMahon, Richard Menkins II,
Ronald Meurer. Joseph Peter Milano. Joseph Moore, Harry Douglas Myers, David
Nairn, John Arne Olson, Joseph Albert Owens. Connie Ray Page. Ulysses
Gregory Parker. John L. Pearson, Thomas S. Perron, John Arthur Phillips Jr.,
William Ray Pollard, Victor Mark Prevatt, James Price, Patrick Kerry Prindeville,
Diomedes J. Quirante, Warren Richardson, Luis J. Rotondo, Michael Caleb Sauls,
Charles Jeffrey Schnorf, Scott Lee Schultz, Peter Scialabba, Gary Randall Scott,
Thomas Alan Shipp, Jerryl Shropshire. Larry H. Simpson Jr.. Kirk Hall Smith,
Thomas Gerard Smith, Vincent Smith. William Scott Sommerhof, Stephen
Eugene Spencer. William Stelpflug. Horace Renardo ("Ricky") Stephens Jr.,
Craig Stockton. Jeffrey Stokes. Eric D. Sturghill, Devon Sundar, Thomas Paul
Thorstad, Stephen Tingley, Donald H. Vallone Jr., Eric Glenn Washington,
Dwayne Wigglesworth, Rodney J. Williams, Scipio Williams Jr.. Johnny Adam
Williamson. William Ellis Winter. Donald Elberan Woollett, Craig Wyche,
Jeffrey D. Young.[3]

Out of the 128 deceased servicemen, 123 were domiciled in North Carolina at the time of

the attack.[4]  The servicemen who were not domiciled in North Carolina at the time of the attack

---

[3] In association with their wrongful death claims, the respective estates of Alvin Burton
Belmer. Nathaniel Walter Jenkins. Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley
have sought damages for pain and suffering incurred during the time at which they were alive
after the attack and the time at which they died.  The measure of damages for each of these
servicemen will be assessed in the damages portion of this opinion, *see infra* Section II.B.1, and
does not affect the validity of their wrongful death claims.

[4] Deceased serviceman, Diomedes J. Quirante, was born in the Phillippines in 1958, and
was not a United States citizen.  Therefore, an issue exists as to whether Diomedes J. Quirante
has standing to recover against Iran and MOIS under the FSIA's "state sponsored terrorism"
exception.  In order for a plaintiff to so recover, he or she must show that: (1) the State

were domiciled in California, Oklahoma, South Carolina, and Vermont.[5]  This difference in

domicile is of no moment, however, because the wrongful death statutes of each of the

servicemen's respective states of domicile imposes liability on an actor when his "wrongful act,

neglect, or default" causes a person's death, and had that person lived, he could have recovered

damages from the actor. Cal Civ. Proc. Code § 377.60(a) (2007); N.C. Gen. Stat. § 28A-18-2(a)

(2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. § 15-51-10 (2006); Vt. Stat. Ann. tit. 14,

§ 1491 (2007).  Each statute provides for recovery of numerous categories of damages, including

---

Department had previously designated the foreign sovereign as a "state sponsor of terrorism" or
did so based on the event in question; (2) the victim or plaintiff was a U.S. national when the
event took place; and (3) "the foreign sovereign engaged in conduct that falls within the ambit of
the statute." *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28,
2006).

 As this Court has already found in its Memorandum Opinion establishing the defendants'
liability for this attack, the first and third requirements are satisfied. Therefore, the only issue
remaining is whether Diomedes qualifies as a United States national. The term "U.S. national"
embraces both United States citizens and non-citizens who owe permanent allegiance to the
United States. 8 U.S.C. § 1101(a)(22) (2006). In this case, the evidence shows that Diomedes
clearly was a U.S. national. First, though a citizen of the Phillippines, Diomedes enlisted in the
United States Army when he was twenty one years old. As a part of his commitment to
becoming a member of the United States Armed Forces, Diomedes was required to take an oath
to defend and uphold the Constitution of the United States. Once enlisted, he was assigned to the
2nd Marine Division, Fleet Marine Force (FMF) in Camp Lejeune, North Carolina. He remained
a member of the United States Army in North Carolina from that time until his death in Beirut,
Lebanon in 1983. His oath, and ultimate heroic act of dying while a member of the United States
Army establishes beyond any doubt that Diomedes J. Quirante's allegiance to the United States
was permanent. Therefore, this Court finds that Diomedes J. Quirante was a United States
national at the time he was killed. Accordingly, Diomedes has standing under the FSIA to
recover against the defendants.

 There still remains the issue of what law governs Diomedes' claims. In light of the fact
that he was stationed in Camp LeJeune, North Carolina before being sent to Lebanon, this Court
finds that North Carolina is the state with which Diomedes had the closest and most substantial
connection. Therefore, the law of North Carolina shall govern Diomedes' wrongful death claim.

 [5] The Court could not determine the domicile of one serviceman, Frederick Douglass,
because no evidence was presented on behalf of his estate. For this reason, the Court will
dismiss the claim brought by the personal representative of his estate without prejudice.

pecuniary loss in the form of the present monetary value of the decedent to the persons entitled to

receive the damages recovered, expenses for care, treatment and hospitalization incident to the

injury resulting in death; and reasonable funeral expenses. *See* Cal Civ. Proc. Code § 377.61

(2007); N.C. Gen. Stat. § 28A-18-2(b) (2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. §

15-51-20 (2006); Vt. Stat. Ann. tit. 14, § 1491 (2007). Additionally, North Carolina allows for

the recovery of compensation for pain and suffering of the decedent. N.C. Gen. Stat. § 28A-18-

2(b).[6]

Based upon the evidence presented to the special masters and the Court, each of the

deceased servicemen has made out a valid claim for wrongful death under North Carolina law.

Accordingly, those valid heirs and beneficiaries under North Carolina's intestate statute are

entitled to share in the recovery of the damages awarded as a result of each serviceman's untimely

death.

B.    *Battery Claims*

Claims of battery were brought against the defendants by the following servicemen who

ultimately survived the attack:

> Marvin Albright, Pablo Arroyo, Anthony Banks, Rodney Darrell Burnette, Frank
> Comes Jr., Glenn Dolphin, Frederick Daniel Eaves, Charles Frye, Truman Dale
> Garner, Larry Gerlach, John Hlywiak, Orval Hunt, Joseph P. Jacobs, Brian
> Kirkpatrick, Burnham Matthews, Timothy Mitchell, Lovell "Darrell" Moore,
> Jeffrey Nashton, John Oliver, Paul Rivers, Stephen Russell, Dana Spaulding,

---

[6] The servicemen who seek pain and suffering during the survival period between the
attack and their deaths were each domiciled in North Carolina at the time of the attack.
Therefore, the Court need only concern itself with North Carolina law on the issue of pain and
suffering.

Craig Joseph Swinson, Michael Toma, Danny Wheeler, Thomas D. Young[7]

Out of the twenty six surviving servicemen seeking damages for battery, twenty five of them were domiciled in North Carolina at the time of the attack. The one remaining surviving serviceman, Charles Frye, was domiciled in California at the time of the attack. Both states, however, recognize that a battery is deemed to be an offensive touching of the person by another without consent. *See Rains v. Superior Court*, 198 Cal. Rptr. 249, 252 (Cal. Ct. App. 1984); *Ormond v. Crampton*, 191 S.E.2d 405, 410 (N.C. App. 1972). Therefore, the battery claims for each of the servicemen can be assessed evenly.

Based upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for battery under North Carolina and California law. Therefore, each may recover the appropriate amount of compensatory damages as determined by this Court.

C.     *Intentional Infliction of Emotional Distress Claims*

The remaining 753 plaintiffs have sought claims for intentional infliction of emotional distress, and awards for pain and suffering incurred as a result of their extreme emotional grief and psychological anguish associated with the knowledge that their family members are either deceased or alive but permanently scarred both physically and mentally. Each of these plaintiffs were domiciled in a number of different states–and in one family's case, the Phillippines–at the time of the attack. Accordingly, this Court must determine whether each of these plaintiffs has brought a valid cause of action under each state's respective law.

---

[7] Because these individuals can recover for their mental anguish and suffering under their respective battery claims, the Court need not consider each plaintiff's intentional infliction of emotional distress claim, which would result in an impermissible double recovery.

In order to accomplish this, the Court must first analyze whether such a cause exists

under each state's laws. Next, to the extent that a state recognizes IIED claims, this Court must

determine which family members have standing to recover for IIED under each state's laws.

Then this Court must assess whether the plaintiffs have established the essential elements of the

claim.

### 1.    Intentional Infliction of Emotional Distress: State Law Analysis

The states of domicile for these 753 plaintiffs are: Alabama, California, Connecticut,

District of Columbia, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland,

Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New

Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South

Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, and

Wisconsin. The family of serviceman Diomedes J. Quirante was domiciled in the Phillippines.[8]

Each of the states mentioned above recognize the existence of a cause of action for

intentional infliction of emotional distress, rooted in Section 46 of the Restatement (Second) of

---

[8] Though the surviving immediate family members of Diomedes J. Quirante are not
United States citizens, the Court finds that they have standing under the FSIA to bring claims for
intentional infliction of emotional distress under North Carolina law. The "state sponsored
terrorism" exception to the FSIA requires only that either the plaintiffs *or the victim* be a United
States national at the time of the attack. *Prevatt*, 421 F. Supp. 2d at 158. Therefore, the Quirante
family members' intentional infliction of emotional distress claims may be brought because
Diomedes was a United States national at the time he was killed. *See supra* note 3. Applying
District of Columbia choice of law principles, North Carolina is the state with the strongest
interest in determining the claims brought by Diomedes' family members because their claims are
intertwined with—and result from—Diomedes' death. Therefore, this Court finds that the claims
brought by the Quirante family are governed by North Carolina law.

Torts.[9]     Though each state has its own particular means of describing intentional infliction of

emotional distress, upon inspection of each state's laws the elements of intentional infliction of

emotional distress are met in each state if it can be demonstrated that: (1) the defendant engaged

in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the

probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional

distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's

emotional distress.[10]

    There still remains the issue of whether each plaintiff has standing to recover under state

---

[9] *See, e.g., American Rd. Serv. Co. v. Inmon*, 394 So.2d 361 (Ala. 1980); *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982); *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970); *Murray v. Bridgeport Hosp.*, 480 A.2d 610, 614 (Conn. 1984); *Johnathan Woodner Co. v. Breeden*, 665 A.2d 929, 934-35 (D.C. 1995); *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985); *Yarbray v. Southern Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 837 (Ga. 1991); *Palmateer v. International Harvester Co.*, 406 N.E.2d 595, 598 (Ill. App. Ct. 1980), *rev'd on other grounds*, 421 N.E.2d 876 (Ill. 1981); *Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002); *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984); *White v. Monsanto Co.*, 585 So.2d 1205, 1208-1210 (La. 1991); *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *George v. Jordan Marsh Co.*, 258 N.E.2d 958, 921 (Mass. 1971); *Dornfeld v. Oberg*, 503 N.W.2d 115, 117 (Minn. 1993); *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. 1993); *Morrison v. Means*, 680 So. 2d803, 805-06 (Miss. 1996); *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981); *Gall v. Great Western Sugar Co.*, 363 N.W.2d 373, 376 (Neb. 1985); *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988); *Mantz v. Follingstad*, 505 P.2d 68, 74-75 (N.M. App. 1972); *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983); *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of America*, 453 N.E.2d 666, 671 (Ohio 1983); *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978); *Forster v. Manchester*, 189 A.2d 147, 151-52 (Pa. 1963); *Champlin v. Washington Trust Co.*, 478 A.2d 985, 988 (R.I. 1984); *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981); *Christians v. Christians*, 637 N.W.2d 377, 382 (S.D. 2001); *Levy v. Franks*, 159 S.W.3d 66, 82-83 (Tenn. Ct. App. 2004); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *Sheltra v. Smith*, 392 A.2d 431, 433 (Vt. 1978); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974); *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Wayne County Bank v. Hodges*, 338 S.E.2d 202, 205 (W. Va. 1985).

[10] *See supra* note 7.

law for the defendant's attack on the plaintiffs' respective family members. Section 46(2) of the Restatement (Second) of Torts governs the ability of plaintiffs to recover for intentional infliction of emotional distress where the defendant's conduct is directed at a third party. Restatement (Second) of Torts § 46(2). Section 46(2) of the Restatement specifically states that only present third parties may recover for an IIED claim. Nonetheless, the Caveat to the section leaves open the possibility of other possible situations where a defendant could be liable for intentional infliction of emotional distress under this section.

Each state has interpreted this ambiguity differently. Some states have explicitly allowed for situations where the presence requirement is unnecessary to establish an IIED claim. Florida, for example, has acknowledged that an immediate family member may recover for intentional infliction of emotional distress even if he or she was not present at the time of the outrageous conduct. *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App.1991). Along the same lines, California has found that a plaintiff's presence is not always required, and is deemed unnecessary in situations where the defendant is aware of the high probability that the defendant's acts will cause a plaintiff severe emotional distress. *Christensen v. Superior Court*, 820 P.2d 181, 203-204 (Cal. 1992).[11] Therefore, as this Court found in *Heiser*, when a terrorist attack occurs, the presence element is not required to bring a valid IIED claim under either Florida or California law, and that plaintiffs domiciled in these states at the time of the attack may bring a

---

[11] Applying this standard, this Court found in *Heiser* that, given the extreme nature of a terrorist attack, the presence element for an IIED claim under California law did not need to be proven. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 305 (D.D.C. Dec. 22, 2006) (Lamberth, J.).

claim for IIED without establishing their presence at the scene of the injury.[12]  Much like Florida

and California, Vermont has no presence requirement for plaintiffs to recover for the intentional

or reckless infliction of emotional distress.  *Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990).

Additionally, there are a number of states at issue in this action whose Supreme Courts

have not specifically addressed the issue of whether a plaintiff's presence is required.  Some of

the laws of these states–Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, and Kansas–were previously analyzed by this Court in *Heiser*, in which this Court

found that no such presence requirement was necessary in these states given the severe nature of

terrorist attacks.  *See Heiser*, 466 F. Supp. 2d at 328-29, 333 (Tex.), 341 (Minn.), 343-44 (Wisc.),

345-46 (N.Y.), 349 (N.C.), 352 (Ind.), 354 (Okla.), 355 (Kans.).[13]  In this case, the respective

---

[12] This finding, of course, is on the assumption that those plaintiffs have standing to
recover in the first place.  Those plaintiffs without standing to recover under the law of their
respective domiciliary states may not recover, regardless of whether a plaintiff with standing
could so recover.

[13] The Oklahoma Supreme Court has rejected recovery for mental anguish and suffering
under an IIED claim brought by bystanders.  See *Slaton v. Vansickle*, 872 P.2d 929, 931-32
(Okla. 1994).  According to Oklahoma's Supreme Court, it is long recognized that "recovery for
mental anguish is restricted to such mental pain or suffering as arises from an injury or wrong to
the person rather than from another's suffering or wrongs committed against another person."
*Vansickle*, 872 P.2d at 931.  Following this logic, the Oklahoma Supreme Court limited recovery
when a plaintiff's IIED claim rests on conduct directed at a third party to situations where: "1) the
plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from
actually viewing the injury to another rather than from learning of the accident later; and 3) a
familial or other close personal relationship existed between the plaintiff and the party whose
injury gave rise to the plaintiff's mental anguish."  *Kraszewski v. Baptist Med. Ctr. Of Okla.,
Inc.*, 916 P.2d 241, 248 (Okla. 1996).  This limitation on third party recovery is of no moment,
however, due to the simple fact that it has been repeatedly found that "a terrorist attack-by its
nature-is directed not only at the victims but also at the victims' families."  *Heiser*, 466 F. Supp.
2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 105, 115 n.12 (D.D.C.
2005) (Bates, J.)).  Therefore, the decedents' near relatives are also direct victims of this
horrendous attack.  Accordingly, this Court finds that the limitations imposed by the Oklahoma
Supreme Court on recovery for pain and suffering due to injuries sustained by a third party do not

-12-

state supreme courts of a number of states–Alabama, Connecticut, District of Columbia, Illinois.

Indiana, Kansas, Kentucky. Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New

Jersey, New Mexico. Rhode Island, Tennessee. Virginia–have not specifically addressed whether

a plaintiff's presence is required to establish a viable IIED claim.  Accordingly,"in light the

severity of [a terrorist attack,] and the obvious range of potential grief and distress that directly

results from such a heinous act,"[14] and because "a terrorist attack-by its nature-is directed not

only at the victims but also at the victims' families,"[15] this Court adopts the rationale it set forth in

*Heiser* regarding the presence element for IIED claims in states that have been silent on the issue.

*See Heiser*, 466 F. Supp. 2d at 328-29.  Therefore, this Court finds that claims for intentional

infliction of emotional distress may be brought by family members without having to establish a

presence requirement under Texas. Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, Kansas, Alabama, Connecticut, District of Columbia, Illinois, Indiana, Kansas,

Kentucky. Maryland, Massachusetts, Michigan, Mississippi, Nebraska. New Jersey, New

Mexico, Rhode Island, Tennessee, and Virginia laws.[16]

    Other states at issue in this case–Georgia, Missouri, South Carolina, South Dakota.

Washington, and West Virginia–have allowed third party plaintiffs to recover, but only when the

defendant's conduct is "directed at" the third party plaintiffs themselves.[17]  As this Court and

---

apply to the family members seeking redress before this Court today.

[14] *Heiser*, 466 F. Supp. 2d at 328.

[15] *Id.* (quoting *Salazar*, 370 F.Supp.2d at 115 n. 12).

[16] *See supra* note 10.

[17] *See, e.g., Ryckeley v. Callaway*, 412 S.E.2d 826, 827 (Ga. 1992); *Samsonetti v. City of
St. Joseph*, 976 S.W.2d 572, 580 (Mo. App. W.D. 1998) (citing *Gibson v. Brewer*, 952 S.W.2d

others within this district have noted, "a terrorist attack–by its nature–is directed not only at the victims but also at the victims' families." *Heiser*, 466 F. Supp. 2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*. 370 F. Supp. 2d 105. 115 n.12 (D.D.C. 2005) (Bates. J.)). Therefore. this Court finds that those plaintiffs domiciled in Georgia, Missouri. South Carolina, South Dakota, Washington, and West Virginia at the time of the attack, may bring a claim for IIED under the laws of those states because the attack was directed at them as well as those killed in the attack.[18]

Two other states at issue in this case–Louisiana and Pennsylvania–have narrowly construed their interpretation of what constitutes a valid IIED claim. and have expressly found that the presence element is required for third party plaintiffs to recover.[19]  Accordingly, this Court finds those plaintiffs who were not contemporaneously present at the site of the attack would not be able to recover under either Louisiana or Pennsylvania law for a claim of IIED. Without a valid cause of action under state law. the plaintiffs domiciled in Louisiana and Pennsylvania lack a viable means to redress their injury, and therefore lack standing.

---

239. 249 (Mo. 1997) (en banc)): *Upchurch v. New York Times Co.*, 431 S.E.2d 558. 561 (S.C. 1993) (citing *Christensen v. Superior Court*, 820 P.2d 181 (Cal. 1991)): *Hayes v. Northern Hills General Hospital*, 628 N.W.2d 739, 744 (S.D. 2001); *Reid v. Pierce County*, 961 P.2d 333. 337 (Wash. 1988): *Courtney v. Courtney*, 413 S.E.2d 418. 422 (W. Va. 1991).

[18] *See supra* note 10.

[19] *See Daigrepont v. State Racing Com'n*. 663 So.2d 840, 841 (La. App.1995) (requiring plaintiff's actual presence at the scene of the injury. and not allowing any further interpretation of the provision in the Louisiana Code establishing a cause of action for IIED); *Taylor v. Albert Einstein Medical Center*. 754 A.2d 650. 652-53 (Pa. 2000) (limiting IIED recovery to those plaintiffs "who were present at the time. as distinguished from those who discover later what has occurred." even in those situations where the defendant may be substantially certain that the plaintiff will suffer severe emotional distress as a result of the offensive act).

Accordingly, this Court must regrettably deny and dismiss the claims of those plaintiffs who

were domiciled in Louisiana and Pennsylvania at the time of the attack.[20]  The claims brought by

the following individuals must be DISMISSED due to lack of standing:

> Deborah Spencer Rhosto, Catherine Bonk, John Bonk Sr., Thomas Bonk,
> Patricia Kronenbitter, Catherine Bonk Hunt, Kevin Bonk, Marilou Fluegel,
> Thomas A. Fluegel, Penni Joyce, Robert Fluegel, Julia Bell Hairston, Felicia
> Hairston, Evans Hairston. Virginia Ellen Hukill, Henry Durban Hukill,
> Melissa Hukill. Meredith Anne Hukill, Mark Andrew Hukill, Matthew Scott
> Hukill, Mitchell Charles Hukill. Monte Hukill, Bill Laise, Betty Laise, Kris
> Laise, Lorraine Macroglou, Bill Macroglou, James Macroglou, Shirley
> Kirkwood, Carl Kirkwood Sr.. Kathy McDonald, Sally Jo Wirick. Storm
> Jones (a/k/a Shirley Ann Storm Pettry), Edward Joseph McDonough. Sean
> McDonough, Edward W. McDonough. Carl Arnold Kirkwood Jr.. Jeff
> Kirkwood, Marion DiGiovanni, (Estate of) Luis Rotondo (father), (Estate of)
> Rose Rotondo, Danielle DiGiovanni. Lisa DiGiovanni, Robert DiGiovanni,
> (Estate of) Phyllis Santoserre. Larry H. Simpson Sr., Anna Marie Simpson,
> Renee Eileen Simpson, Sherry Lynn Fiedler. Robert Simpson.

> 2.     *Intentional Infliction of Emotional Distress: Extent of Family Members'*
>
>        *Respective Recovery*

Though many of the states at issue in this case have recognized the existence of IIED

claims for family members who were not present at the scene of the injury, this does not

necessarily extend the ability to bring an IIED claim to *all* family members.  As the D.C. Circuit

has noted previously, Section 46 of the Restatement (Second) of Torts does not extend causes of

action beyond members of the victim's "immediate family."  *See Bettis v. Islamic Republic of*

*Iran*, 315 F.3d 325, 334-35 (D.C. Cir. 2003) (refusing to extend "direct victims" under § 46(1)

---

[20] To the extent that these plaintiffs are relatives to any of the deceased servicemen, it
should be noted that the dismissal of these plaintiffs' IIED claims does not hinder these
individuals' ability to recover any portion of a wrongful death damages awarded to the estates of
those servicemen to which these dismissed plaintiffs may be entitled under North Carolina law.

and "third party victims" under § 46(2) to include nieces and nephews not present at the scene of injury). Accordingly, this Court finds that those members of the families of the servicemen who are not within the immediate family of the serviceman *at the time of the attack* may not recover.

This Court has previously deemed near relatives to include only the victim's spouse, parents, children, and siblings. *See Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2002) (Lamberth, J.), *affirmed sub nom.*, *Bettis*, 315 F.3d at 335. Though the Court does not deny the extreme pain and suffering felt by those outside of this class of individuals, it is necessary to draw such a line at immediate family members in order "to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress." *Heiser*, 466 F. Supp. 2d at 329. Moreover, such a delineation is consistent with the provisions of Section 46 of the Restatement. *See* Restatement (Second) of Torts § 46, cmt. l; *cf. Bettis*, 315 F.3d at 335 (finding that permitting nieces and nephews to recover under § 46(1) would undermine the limitations on recovery of "immediate family" members under § 46(2)). Therefore, those plaintiffs who are not members of this class of individuals in relation to the servicemen cannot recover.[21] Accordingly, the Court must dismiss the claims of the following plaintiffs: Ashley Tutwiler Beamon, David Clark, Michael Clark, Jr., Rebecca Iverson Green, Geraldine Morgan, Pamela Nashton, Natalie Rochwell, (Estate of) Lula Mae Watkins,[22] and

---

[21] Current spouses who were not yet married to an injured servicemen at the time of the attack are not considered "immediate family" for the purposes of recovery. These individuals are therefore among the group of plaintiffs who cannot recover damages sustained as a result of the attack.

[22] According to the special master's report, Lula Mae Watkins was the legal guardian of Jerryl Shropshire. There is no evidence, however, of a formal order terminating the rights of Jerryl's natural parents. *See* Ga. Stat. Ann. 15-11-93 (2007). Absent such an order, "there is no Georgia law under which the loss of parental power also results in the parent's loss of a right to

Simon Watkins.

       3.    *Claims That Must Be Dismissed Due to Lack of Evidence and*
           *Participation*

"[T]he entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6

(D.C. Cir. 2005). Personal Jurisdiction must still be determined before entering default judgment

against an absent defendant. *Id.* As standing must be determined prior to and independent of any

determination of a court's jurisdiction,[23] so too must standing be determined before a court enters

default judgment against an absent defendant.

With respect to standing, the trial court has power "to allow or to require the plaintiff to

supply, by amendment to the complaint or by affidavits, further particularized allegations of fact

deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does

not adequately appear from all materials of record, the complaint must be dismissed." *Warth v.

Seldin*, 422 U.S. 490, 501-02 (1975).

After an evidentiary hearing before this Court establishing the defendants' complicity in

bringing about the attacks, the Court designated special masters to hear each of the plaintiffs'

respective claims, so that damages might be determined. As is unfortunately sometimes the case

in a situation with as far-reaching an effect as this, certain family members of the deceased and

---

inherit as an heir from a child's estate." *Blackstone v. Blackstone*, 639 S.E.2d 369, 370 (Ga. Ct.
App. Nov. 21, 2006). This is true even if the parents have failed to provide any support for the
child during the child's lifetime. *Id.* at 371. Accordingly, the estate of Lula Mae Watkins may
not recover for damages arising out of Jerryl's death because she is not a parent or other
immediate family member under Georgia law. Likewise, Geraldine Morgan and Simon
Watkins–as Lula Mae's granddaughter and son, respectively–may also not recover.

[23] *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. at 91.

injured servicemen–family members who undoubtedly shared equally in the grief and suffering

caused by the tragic deaths of their loved ones–could not be located or were unable to present

evidence before this Court and its designated special masters to establish a valid claim for

damages. Without evidence supporting their claims of intentional infliction of emotional

distress, the Court cannot determine at this time whether these individuals have sufficient

standing to bring a claim. Accordingly, the claims from the following individuals shall be

DISMISSED WITHOUT PREJUDICE due to lack of evidence:

> Marvin Albright, Jr., Mirequrn Albright, Shertara Albright, Anthony Banks
> (son), Michael Banks, Taiarra Banks, Lori Berry, Christopher Burnette, Gwen
> D. Burnette, Mecot Camara Jr., Dale Comes, Tommy Comes, Kimberly Crop,
> Connie Burnette Decker, Erin Dolphin, Frederick Douglass, Christopher
> Eaves, India Eaves, Sylvia Jean Eaves, Charles Frye Jr., Gina Frye, Lialani
> Frye, Lincoln Frye, Randall Frye, Gerald Foister, Joseph Garner, Justina
> Garner, Penny Garner, Reva Garner, Karl Goodman, Barbara Haskell,
> Richard Haskell, Jordan Hlywiak, Taylor Hlywiak, Mendy Leigh Hunt, Jack
> Darrell Hunt, Marcy Elizabeth Hunt, Molly Faye Hunt, Carol Livingston,
> (Estate of) Manuel Massa Sr., Chadwick Matthews, Debra Matthews, Drew
> Matthews, Deborah Meurer, Shirley Douglass Miller, Elvera Mitchell, Robert
> Mitchell, (Estate of) Betty Lou Price, Timothy Price, Jeremy Rivers, Paul
> Rivers (son), Sandra Rivers, Carol Schak, George Schak, Lynne M. Spencer,
> Patrice Washington, (Estate of) Dorothy Williams, George Robinson
> Williams, Kevin Coker Williams, Bill Williamson, Debra Wise, Gwen
> Woodcock.

The Court will now turn its attention to those remaining claims that must be dismissed for

reasons not yet specified within this opinion.

### 4. *Other Remaining Claims That Must Be Dismissed*

#### a. *Claim of Bobby Wallace*

Under Oklahoma law, a non-adopted stepchild is not considered "issue" or a "child" for

purposes of inheritance. *See* Okla. Stat. Ann. tit. 84, § 213 (2007); *cf.* Green v. Wilson, 240 P.

1051, 1052 (Okla. 1925) (finding that, under § 213, estate of deceased intestate is inherited by

surviving spouse and legitimate children, *and adopted child* surviving inherits as if born in

wedlock). In light of the disparate treatment of adoptive and non-adoptive children in terms of

inheritance, it stands to reason that non-adoptive stepparents of stepchildren would be treated

differently under Oklahoma law than stepparents who adopt those stepchildren. Accordingly,

under Oklahoma law, a stepfather would not be able to inherit from or through his non-adopted

stepson; likewise, nor would he be able to recover damages as a result of the stepson's death.

Accordingly, this Court finds that Bobby Wallace, as Stephen Eugene Spencer's non-adoptive

stepfather, may not recover for IIED resulting from Stephen's death in the attack, and his claim

must be DISMISSED.

> b.    *Claim of Herbert Persky*

As the stepfather to Timothy R. McMahon, Herbert Persky has brought an IIED claim

against the defendants. Based on the evidence presented to the Court, however, Mr. Persky may

not recover for IIED due to the fact that, as a stepparent, Mr. Persky lacks standing to bring such

a claim.

As this Court has previously noted, Texas has adopted Section 46 of the Restatement

(Second) of Torts in establishing a cause of action for IIED. *Heiser*, 466 F. Supp. 2d at 333.

Moreover, the Texas Supreme Court has remained silent on the issue of whether a plaintiff's

presence is required in order for a third party to recover for IIED. *Id.* Accordingly, this Court

has found that the near relatives of a victim who were not present at the time of the attack would

still be able to recover for IIED under Texas law. *Id.* Therefore, Mr. Persky may only recover

for IIED if he is considered a near relative under Texas law.

Under Texas law, however, stepparents that do not adopt a child are not deemed the same

as natural parents for purposes of inheriting from that child. Tex. Civ. Prac. & Rem.Code Ann. §

71.004(a) (Vernon 1997) (stating that only the victim's surviving spouse, children, and parents of

the deceased may recover for the victim's wrongful death). "A stepparent who takes no steps to

legally adopt his stepchild does not qualify as a parent for purposes of Texas's wrongful death

statute." *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 578 (S.D. Tex. 2003) (citing

*Boudreaux v. Texas & N.O.R. Co.*, 78 S.W.2d 641 (Tex.Civ.App.-Beaumont 1935, writ ref'd)).

In this case, notwithstanding the relationship that Mr. Persky had with Mr. McMahon,

there is no evidence that Mr. Persky legally adopted Mr. McMahon. Accordingly, Mr. Persky is

not considered a parent for purposes of being able to recover for pain and suffering as a result of

his stepson's untimely death. Therefore, Mr. Persky does not have standing to bring a claim for

IIED in this case, and his claim must be DISMISSED.

### c. *Claims of Sandra Bianco and Sandra Karen Bianco*

Under New Jersey law, a natural birth parent may recover for and inherit from and

through their child. Once that child is legally adopted by another parent, however, the natural

parent's privileges and obligations cease, "including the right of the natural parents and their

kindred to take and inherit intestate personal and real property from and through the person

adopted." N.J. Stat. Ann. 2A: 22-3(b) (2007) (emphasis added). Moreover, upon adoption all

rights, privileges and obligations normally bestowed upon natural parents-including the right to

take and inherit from and through the adopted child-become bestowed upon the adoptive parent

instead, who is treated in the eyes of the law "as if the person adopted had been born to them in

lawful wedlock . . . ." N.J. Stat. Ann. 2A: 22-3(c) (2007).

Here, Sandra Bianco (natural mother to serviceman Richard Andrew Fluegel) and Ms.

-20-

Bianco's daughter Sandra Karen Bianco (Richard's half-sister) seek under respective IIED claims

to recover pain and suffering damages arising out of Richard's death. Richard, however, is

survived by his natural father Thomas A. Fluegel, his adoptive mother Marilou Fluegel, and his

full blood siblings Penni Joyce and Robert Fluegel. Therefore, though Ms. Bianco is Richard's

natural mother, she may nonetheless not recover for pain and suffering from Richard's death

because, under New Jersey law, Ms. Bianco's entitlement to take and recover from or through her

son ceased once Richard was adopted by Marilou Fluegel. Therefore, the privilege of recovering

as a mother to Richard for the pain and suffering associated with Richard's death has been

bestowed upon Marilou Fluegel due to the fact that she legally adopted Richard. Therefore, this

Court must DISMISS Sandra Bianco's claim for IIED for lack of standing.

For similar reasons, this Court must also dismiss Sandra Karen Bianco's claim for IIED

for lack of standing. As noted previously, the privileges and obligations of the natural parent and

their kindred ceases upon the child's adoption by another parent. Therefore, as kindred to Sandra

Bianco, Sandra Karen Bianco may not recover damages associated with Richard Fluegel's death,

and her claim must also be DISMISSED.

        *d.*     *Claims of Donald Rockwell, Charles Corry and Michael Clark Jr.*

Donald Rockwell (stepbrother to Michael Caleb Sauls), Charles Corry (brother-in-law to

Eric Glenn Washington), and Michael Clark, Jr. (brother-in-law to James Baynard) seek to

recover for IIED in this case as step-siblings of the deceased servicemen. Under Virginia law,

however, only blood siblings and adoptive step-siblings qualify as siblings for purposes of

recovering damages resulting from a victim's wrongful death. *See Brown v. Brown*, 309 S.E.2d

586, 590 (Va. 1983). Individuals are siblings to another individual only if they are of the same

-21-

parental origin as their sibling, or if they are adopted by a shared parent. *Id.* (citing *Jones v. Jones*, 530 P.2d 34 (Ore. 1974) (declining to expand class entitled to recovery as direct beneficiaries under wrongful death statute beyond spouse and children of decedent so as to include as dependents-such as non-adopted stepchildren-a person to whom decedent had no legal obligation of support). Non-adopted step-siblings do not qualify as siblings because they are not of the same origin as their step-sibling, nor deemed of the same origin as their step-sibling under the law because they were not legally adopted. *Brown*, 309 S.E.2d at 590. Therefore, in Virginia non-adoptive step-siblings may not recover for pain and suffering arising out of an IIED claim because they are not deemed siblings under the law. *Cf. id. A fortiori,* a sibling-in-law-who has virtually no chance of being either adopted or of the same parental origin as the victim-may not recover for pain and suffering arising out of an IIED claim.

In this case, there is no evidence that Donald Rockwell was an adopted stepbrother to Michael Caleb Sauls. Therefore, Mr. Rockwell's claim for IIED fails for lack of standing, and must therefore be denied. Similarly, Messrs. Corry and Clark's claims must also be denied because, as a siblings-in-law, neither is deemed a sibling under the law. Accordingly, this Court finds that none of these three plaintiffs may recover for IIED as a sibling under Virginia law, and each of their IIED claims must be DISMISSED.

### e. *Victoria Prevatt-Wood*

Victoria Prevatt-Wood has already brought a claim against the defendants for conduct arising out of this attack. *See Prevatt,* 421 F. Supp. 2d at 152. Ms. Prevatt-Wood was awarded $2.5 million by this Court for her pain and suffering associated with the loss of her brother, Victor Mark Prevatt. *Id.* at 161. To allow her to seek additional damages would grant her

impermissible double recovery. Accordingly, her claim in this action must be DISMISSED.

### f. Mary Jackowski

Mary Jackowski, stepmother to deceased serviceman James Jackowski, seeks to recover for IIED for the death of James. Under New York law, however, "[n]either step-children nor step-parents inherit property from each other." Erie County Bd. of Social Welfare v. Schneider 163 N.Y.S.2d 184, 186 (N.Y. Child Ct. 1957). Therefore, Mary Jackowski may only recover for the death of James if she legally adopted James. There is no evidence in this case, however, indicating that James was legally adopted by Mary. Therefore, she has no standing to bring a claim for damages arising out of the death of her stepson. Accordingly, the claim brought by Mary Jackowski must be DISMISSED.

### g. Stepparents and Step-siblings of Donald H. Vallone, Jr.

Charles Phelps (stepfather to Donald H. Vallone, Jr.) and Charles Phelps, Jr. (stepbrother to Donald H. Vallone, Jr.), Donna Beresford Vallone (stepmother to Donald H. Vallone, Jr.), William Beresford (stepbrother to Donald H. Vallone, Jr.), Susan Beresford Vallone (stepsister to Donald H. Vallone, Jr.), Natalie Lewis (stepsister to Donald H. Vallone, Jr.), and Michael Beresford (stepbrother to Donald H. Vallone, Jr.) each seek recovery for IIED associated with the death of serviceman Donald H. Vallone, Jr. in the attack at issue. As this Court has previously found in *Heiser*, however, under California law, a stepparent lacks standing to recover for intentional infliction of emotional distress in connection with a stepchild's death, where the stepparent had not legally adopted the stepchild, and there was no indication that the stepparent would have adopted the stepchild but for a legal impediment. *Heiser*, 466 F. Supp. 2d at 309-10 (citing Cal Civ. Proc. Code § 377.60; Cal. Prob. Code § 6402).

-23-

In this case, there is no evidence that either of the stepparents of Donald H. Vallone, Jr.

legally adopted Donald H. Vallone, Jr., nor is there evidence that either would have adopted

Donald but for a legal impediment. Accordingly, neither Charles Phelps nor Donna Beresford

Vallone has standing to bring a claim for damages arising out of the death of their stepson,

Donald H. Vallone, Jr. Therefore, the claim brought by Charles Phelps and Donna Beresford

Vallone must be DISMISSED. By this same logic, and because the viability of the claims

brought by the birth children of stepparents of the deceased (consequently, stepsiblings to the

deceased) is dependent upon the viability of their parents' claim, the claims brought by Charles

Phelps, Jr., William Beresford, Susan Beresford Vallone, Natalie Lewis Vallone, and Michael

Beresford must also be DISMISSED due to a lack of standing to bring the claim.

> h.    *Donald Calloway*

Donald Calloway, brother-in-law to deceased serviceman Jess W. Beamon, seeks

recovery for IIED arising out of his brother-in-law's death in the attack. Under Florida law,

however, only plaintiffs who are the spouse, child, sibling, or parent of a decedent have standing

to recover for intentional infliction of emotional distress even though plaintiffs were not present

at the scene. *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App. 1991). Siblings-in-

law do not fall within this category of eligible plaintifs. Accordingly, the claim brought by

Donald Calloway must be DISMISSED for lack of standing.

> i.    *Richard Mason*

Richard Mason, stepfather to deceased serviceman Russell Cyzick, seeks to recover for

IIED arising out of his stepson's death in the attack. Under West Virginia law, damages arising

out of the death of an individual may be awarded to the surviving spouse and children of the

-24-

decedent, including adopted children and stepchildren, as well as the decedent's siblings, parents

and any persons who were financially dependent upon the decedent at the time of his or her

death. *See* W. Va. Code §§ 55-7-5, 55-7-6(b) (2007). Further, under West Virginia law, an

individual qualifies as a "legal parent" if that individual is "defined as a parent, by law, on the

basis of biological relationship, presumed biological relationship, legal adoption or other

recognized grounds, [such as financial dependence]." W. Va. Code, § 48-1-232 (2007). In this

case, the evidence shows that Russell Cyzick's birth mother married Richard Mason when

Russell was nearly eighteen years old. There is no evidence that Russell was either legally

adopted or financially dependent upon Richard Mason during what was left of his minor years.

Accordingly, Richard Mason lacks standing to bring a claim because he is not a "legal parent"

under West Virginia law. Therefore, this Court finds that Richard Mason's IIED claim must be

DISMISSED.

                5.     *Individuals with Valid Intentional Infliction of Emotional Distress Claims*

        Accordingly, the Court finds that the individuals listed in Appendix A to this opinion may

bring intentional infliction of emotional distress claims. *See* Appendix A.

        The Court will now turn its attention to damages for these IIED claims, as well as those

claims for battery and wrongful death.

II.    *Damages*

        A.    Damages Framework

        The validity of each claim having been assessed, the Court can now turn to the respective

amounts of damages associated with each valid claim before this Court. Under the FSIA, a

"foreign state shall be liable in the same manner and to the same extent as a private individual

under like circumstances." 28 U.S.C. § 1606. Therefore, plaintiffs are entitled to the typical

array of compensatory damages that may be awarded against tortfeasors in the plaintiffs'

respective domiciliary states. "In determining the appropriate compensatory damages for each

plaintiff's pain and suffering, this Court is guided not only by prior decisions awarding damages

for pain and suffering, but also by those which awarded damages for solatium." *Haim*, 425 F.

Supp. 2d at 71. This Court has previously looked to the nature of the relationship between the

family member and the victim in order to help determine the amount of each award. *See Blais*,

459 F. Supp. 2d at 59-60; *Haim* 425 F. Supp. 2d at 75.[24]    Parents of victims typically receive

awards similar in amount to those awarded to children of the victim. *See generally Heiser*, 466

F. Supp. 2d at 271-356 (awarding children and parents of a terrorist attack decedents $5 million

in pain and suffering damages). This award for parents and children of the decedents is typically

smaller than the award for pain and suffering damages provided to spouses, but is larger than

awards of pain and suffering damages to siblings. *See id.* (awarding spouses of decedents $8

million in pain and suffering damages, while awarding siblings to decedents $2.5 million).

Moreover, "families of victims who have died are typically awarded greater damages than

families of victims who remain alive." *Blais*, 459 F. Supp. 2d at 60 (quoting *Haim*, 425 F. Supp.

2d at 75).

    This Court finds that the damages framework set forth in *Heiser* to be an appropriate

---

    [24] As noted previously, damages for pain and suffering have traditionally been available
to those members of the decedent serviceman's near relatives, which consists of his or her
immediate family. *See supra* Section I.C.2. "This Court defines one's immediate family as his
spouse, parents, siblings, and children. This definition is consistent with the traditional
understanding of one's immediate family." *Jenco*, 154 F. Supp. 2d at 36 n.8.

measure of damages for those family members of victims who died in this attack.[25]  The Court

finds that the framework detailed in *Blais* is appropriate to help determine damages for those

surviving servicemen and their families seeking redress. *See Blais.* 459 F. Supp. 2d at 59.[26]

Accordingly, unless otherwise specifically addressed in Section B below, *see infra*

Section II.B., the Court finds that the following damages amounts for pain and suffering shall be

awarded to the plaintiffs who this Court deems to have standing to bring a valid cause of action.

First, in terms of lost wages due the servicemen in this case, the Court hereby ADOPTS all of the

financial calculations and recommendations made by the special masters as to lost wages.[27]

Those calculations for lost wages shall be specified in Appendix B to this opinion.  Second,

unless otherwise specified in Section B below, the Court finds that the awards for pain and

suffering to the servicemen are appropriate and hereby ADOPTS them.  Third, the Court finds

---

[25] In *Heiser*, family members of the servicemen who were killed in the 1996 Khobar
Towers bombing brought various claims against the Islamic Republic of Iran, MOIS, and IRGC
for their part in providing material financial and logistical support in bringing about the attack.
*Heiser.* 466 F. Supp. 2d at 248-51.  This Court awarded the valid claims brought by spouses of
deceased servicemen $8 million in pain and suffering, parents and children of deceased
servicemen $5 million, and siblings of deceased servicemen $2.5 million. *See generally Heiser*,
466 F. Supp. 2d at 271-356.

[26] As this Court stated in *Blais*:

> In cases that involve an attack where the victim survives, and where
> no captivity occurred, courts typically award a lump sum award based
> in large part on an assessment of the following factors: "the severity
> of the pain immediately following the injury, the length of
> hospitalization, and the extent of the impairment that will remain with
> the victim for the rest of his or her life."

*Id.*

[27] As mentioned above, *see supra* note 2, there are a few servicemen who have sought
damages for pain and suffering incurred during the time at which they were alive after the attack
and the time at which they died.  Those claims will be addressed in Section II.B.1, *infra*.

that the appropriate amount of pain and suffering damages for the spouse of a deceased

serviceman to be $8 million. Fourth, the Court finds that the appropriate amount of pain and

suffering damages for the parents and children of a deceased serviceman to be $5 million, per

individual.[28] Fifth, the Court finds that the appropriate pain and suffering damages award for

each sibling in this case to be $2.5 million, per sibling. Siblings of half-blood to the servicemen

in this case are presumed to recover as a full-blood sibling would—that is, they are entitled to $2.5

million—unless the law of the state in which they were domiciled at the time of the attack states

that they are not entitled to so recover.[29] Next, the Court finds that the appropriate amount of

damages for family members of surviving servicemen are as follows: spouse ($4 million);

parents ($2.5 million); children ($2.5 million); siblings ($1.25 million).[30] Unless otherwise

specified below in Section B, to the extent that the special masters have awarded a plaintiff more

or less than the aforementioned respective award amounts based upon the plaintiff's relation to

the serviceman, those amounts shall be altered so as to conform with the respective award

amounts set forth in this paragraph.

---

[28] Each parent and child shall receive this amount. *See Heiser*, 466 F. Supp. 2d at 271-
356.

[29] This Court will address the claims of those half-blood siblings whose award
recommendations differ from the permissible awards under the respective state laws, *infra*. *See
infra* Section II.B.3.

[30] The Court recognizes that the parents in *Blais* received $3.5 million for their IIED
claims for pain and suffering damages associated with the aftermath of taking care of their son,
who survived the attack on the Khobar Towers in 1996. *See Blais*, 459 F. Supp. 2d at 60. This
exceptional award was given in light of the extremely severe and continuing nature of their son's
maladies, and in light of the facts that their son was in a coma and vegetative state for a period of
over five weeks. *Id.* at 59-60. Attention was also given to the fact that the parents in *Blais* gave
up their jobs in order to take full-time care of their son. *Id.* at 60.

B.    Special Damages Cases

1.    Pain and Suffering Amount for Deceased Servicemen Who Initially

Survived Attack

The personal representatives and estates of deceased servicemen Alvin Burton Belmer.

Nathaniel Walter Jenkins, Luis J. Rotondo. Larry H. Simpson, Jr.. and Stephen Tingley have

each sought damages for pain and suffering incurred during the time at which they were alive

after the attack and the time at which they died. in addition to the damages for lost wages and

earnings arising out of their respective wrongful death claims. Several cases have awarded

damages for the victim's pain and suffering that occurred between the attack and the victim's

death shortly thereafter. *Haim*, 425 F. Supp. 2d at 71-72 (citing *Eisenfeld v. Islamic Republic of

Iran*, 172 F.Supp.2d 1, 8 (D.D.C.2000) (Lamberth. J.); *Elahi v. Islamic Republic of Iran*. 124

F.Supp.2d 97, 112-13 (D.D.C.2000) (Green, J.). When the victim endured extreme pain and

suffering for a period of several hours or less. courts in these cases have rather uniformly

awarded $1 million. *Haim*, 425 F.Supp.2d at 71-72. This award increases when the period of the

victim's pain is longer. *Id.* at 72. In line with this precedent, this Court recently awarded

$500,000 to a serviceman who survived a terrorist attack for 15 minutes. and was in conscious

pain for 10 minutes.

The estate of Alvin Burton Belmer established before the special master that serviceman

Belmer was alive and conscious for nearly eight days (7 days and 20 hours). The special master

recommended an award of pain and suffering of $15 million. Though the Court recognizes Mr.

Belmer was under excruciating pain during that period of time. it is not prepared to adopt such a

recommendation. In light of his nearly eight days of pain and suffering. this Court finds that the

estate of Alvin Burton Belmer should be awarded $7.5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

Similarly, the estate of Nathaniel Walter Jenkins established before a special master that serviceman Jenkins was alive for seven days after the attack. The special master recommended that Mr. Jenkins be awarded $7 million for pain and suffering undergone by Mr. Jenkins during this period of time. The Court finds this award amount is appropriate and finds that the estate of Nathaniel Walter Jenkins should be awarded $7 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Luis J. Rotondo established before a special master that serviceman Rotondo was alive for six hours after the attack. The special master recommended a pain and suffering damages award of $250,000. In keeping with the precedent set forth in *Haim*, the Court finds that Luis J. Rotondo is entitled to $1 million in pain and suffering damages, in addition to the amount of lost wages he is awarded.

The estate of Larry H. Simpson, Jr. established before a special master that serviceman Simpson was alive for nine years after the attack, living with severe injuries throughout that time. The special master recommended an award of pain and suffering damages of $2 million. In light of the fact that Mr. Simpson was saddled with injuries from this attack that plagued him until his death, but conscious of the fact that Mr. Simpson appears to have led a somewhat functional life after the attack, the Court finds that Mr. Simpson should be awarded $5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Stephen Tingley established before a special master that serviceman Tingley was alive for a short but unknown amount of time. The special master recommended a pain and

suffering damages award of $1 million. Though the Court is certain that Mr. Tingley endured a

great deal of pain during the minimal time he survived the attack, the Court is reluctant to grant

such an award without any definitive proof of a duration of time that Mr. Tingley was alive.

Therefore, this Court finds that Stephen Tingley is entitled to $500,000 in pain and suffering

damages, in addition to the amount of lost wages he is awarded.

> 2.    Pain and Suffering Amount for Surviving Servicemen

Each of the twenty six surviving servicemen have sought pain and suffering awards

associated with their claims for battery. In awarding pain and suffering damages, the Court must

take pains to ensure that individuals with similar injuries receive similar awards. Due to the

large number of plaintiffs represented in this action, the Court needed to enlist the help of many

different special masters to help calculate damages for each of the plaintiffs. Understandably,

each special master calculated pain and suffering damages differently, which resulted in varying

awards for varying maladies suffered by the surviving servicemen. Upon examination of the

nature of the injuries of each of the servicemen, the Court makes the following findings about the

pain and suffering damages for the twenty six surviving servicemen arising out of their respective

battery claims:

- Marvin Albright suffered compound fracture of his right leg, injuries to the toes on his left foot, wounds and scars from shrapnel, in addition to lasting and severe psychological harm as a result of the attack. Therefore, this Court finds that he is entitled to $5 million in pain and suffering;

- Pablo Arroyo suffered a broken jaw, severe flesh wounds and scars on his arms, legs and face, a loss of teeth, and lasting and severe psychological harm as a result

of the attack. Therefore, this Court finds that he is entitled to $5 million in pain and suffering;

- Anthony Banks suffered as a result of this attack loss of sight in one eye, a perforated right eardrum resulting in some hearing loss, and a shrapnel injury to the back of his right thigh. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering;

- Rodney Darrell Burnette was initially thought dead as a result of the attack, and was placed in a body bag, buried alive in the morgue for four days until someone heard him moaning in pain. His injuries from the attack include a closed head injury, a basilar skull fracture, a facial nerve palsy, rib injuries, a rupturing to the timpanic membrane in both ears, and injuries to both feet. He also suffered lasting and severe psychological problems from the attack. Accordingly, this Court finds that he is entitled to $8 million in pain and suffering;

- Glenn Dolphin suffered injuries in the back, arm and head from being hit with shrapnel from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, the Court finds that he is entitled to $3 million in pain and suffering;

- Charles Frye was minimally injured from small arms fire occurring just after the initial bomb explosion, and has experienced resulting nerve pain and foot numbness. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $2 million in pain and

suffering. plus $200.000 in loss of earnings suffered;[31]

- Truman Dale Garner suffered as a result of the attack a shrapnel injury to the head, a subdural hematoma, a perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering damages;

- Larry Gerlach suffered severe injuries including a broken neck, which has resulted in permanent quadriplegia. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $12 million in pain and suffering damages;[32]

- Orval Hunt suffered skull fractures. brain bruising, various broken bones in his leg, and an exposed Achilles tendon as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages;

- Joseph P. Jacobs suffered a shoulder injury, and still suffers from neck, shoulder and back pain to this day. He also suffered lasting and severe psychological problems from the attack. and has admitted to having problems with alcohol abuse. Therefore, this Court finds that he is entitled to $5 million in pain and

---

[31] Charles Frye admits that his physical injuries were minimal, and that he suffered severe psychological harm from the attack.

[32] *Cf. Mousa v. Islamic Republic of Iran.* 238 F. Supp. 2d 1, 12-13 (D.D.C. 2001) (Bryant. J.) (awarding $12 million to plaintiff with permanent and debilitating injuries, including complete deafness and blindness in one eye).

suffering damages;

- Brian Kirkpatrick suffered an eye injury, a perforated left ear drum, broken ribs. various shrapnel wounds. and the lining of his lungs were burned as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages;

- Burnham Matthews suffered a shrapnel wound in the forehead that destroyed the middle part of his nose. cuts to the head and back. and a perforated eardrum as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore. this Court finds that he is entitled to $7 million in pain and suffering damages;

- Timothy Mitchell suffered lacerations to the back of his head, back injuries, and has resulting chronic back pain and headaches as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore. this Court finds that he is entitled to $3 million in pain and suffering damages. in addition to $1.555,099 in lost wages;

- Lovelle "Darrell" Moore suffered a torn ear. broken leg. damaged foot, and cuts from shrapnel from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore. this Court finds that he is entitled to $7 million in pain and suffering damages. in addition to $1,314,513 in lost wages;

- Jeffrey Nashton suffered a skull fracture, a shattered cheekbone. eyebrow and right eye orbit, crushed arms. a broken left leg. bruised right leg. two collapsed

lungs, burns on his arms and back, and internal bleeding. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $9 million in pain and suffering damages, in addition to $2,776,632 in lost wages;

- Paul Rivers suffered two broken eardrums, skin lacerations, burned skin, and knee damage from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7 million in pain and suffering damages;

- Stephen Russell suffered a broken femur, hand and pelvis bone, and was covered in cuts and bruises from the attack. His left foot was turned completely backwards. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering damages, in addition to $1,752,749 in lost wages;

- Dana Spaulding suffered two broken clavicles, a broken middle ear which caused internal bleeding and continued vertigo, a punctured lung, bruised kidney, broken ribs, a severe laceration across his back, and a loss of his eyelashes. Moreover in the ten days after the attack, Dana was in a coma. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages, in addition to $1,559,609 in lost wages;

- Michael Toma suffered various cuts from shrapnel, internal bleeding in his urinary system, a deflated left lung, and a permanently damaged right ear drum.

He also suffered lasting and severe psychological problems from the attack.

Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering

damages;

- Danny Wheeler suffered soft tissue damage to the chest and sternum area, flash

  burns. and lingering back problems, internal maladies and physical scarring. He

  also suffered lasting and severe psychological problems from the attack.

  Therefore, this Court finds that he is entitled to $5 million in pain and suffering

  damages.

In addition, Frank Comes Jr., Frederick Daniel Eaves, John Hlywiak, John Oliver. and

Craig Joseph Swinson. and Thomas D. Young suffered no physical injuries, and are not required

to do so to recover for IIED under North Carolina law. *See Dickens v. Puryear*. 276 S.E.2d 325.

332 (N.C. 1981). Still. each has demonstrated that he has suffered severe and lasting

psychological harm, and may recover damages for that. Accordingly, the Court finds that each is

entitled to $1.5 million in pain and suffering damages.[33]

    3.    Individual Family Member Cases

In certain instances. the special masters were presented with claims from individuals who

were related by half-blood to a deceased serviceman in this case. This section addresses those

claims under which the special master awarded the half-blood siblings an amount different than

would be permissible under the laws of the half-blood siblings respective states of domicile at the

time of the attack.

---

[33] In addition to his award for pain and suffering, John Oliver is entitled to $1,777,542 in
lost wages.

a.   Richard J. Wallace

Under Oklahoma law, "[k]indred of the half-blood inherit equally with those of the whole blood in the same degree, unless the inheritance come [sic] to the intestate by descent, devise or gift of some one of his ancestors, in which case all those who are not of the blood of such ancestors must be excluded from such inheritance." Okla. Stat. Ann. tit. 84, § 222 (2007). Stephen Eugene Spencer's half-brother, Richard J. Wallace, was awarded $1.25 million for pain and suffering arising out of his IIED claim. By contrast, Stephen's full-blooded brother, Douglas Spencer, was awarded $2.5 million. Richard J. Wallace did not come into this damages award as a result of descent, devise or a gift of one of his ancestors. Therefore, this disparity in awards is impermissible under Oklahoma law. Richard J. Wallace is entitled to the same amount as Douglas Spencer, his half-brother, and therefore should be awarded $2.5 million.

b.   Hilton and Arlington Ferguson

Under Florida law, "[w]hen property descends to the collateral kindred of the intestate and part of the collateral kindred are of the whole blood to the intestate and the other part of the half blood, those of the half blood shall inherit only half as much as those of the whole blood . . . ." Fla. Stat. Ann. § 732.105 (2007). Half blood siblings may recover a whole amount only "if all [remaining siblings] are of the half blood . . . ." Fla. Stat. Ann. § 732.105 (2007).

In this case, Hilton and Arlington Ferguson are half-brothers to serviceman Rodney J. Williams. Therefore, each may recover only half as much as Mr. Williams' full blood siblings, if there are any. If there are no full blood siblings, then Hilton and Arlington may recover whole amounts, each. Here, Mr. Williams is survived by two full blood siblings: Rhonda and Ronald Williams. Accordingly, though Hilton and Arlington Ferguson are entitled to recover for pain

-37-

and suffering under an IIED claim for the loss of their half-brother, they may only recover half the amount of damages as will be awarded to Rhonda and Ronald Williams. Therefore, Hilton and Arlington Ferguson may recover $1.25 million each because Rhonda and Ronald Williams are each entitled to recover $2.5 million for pain and suffering damages associated with the untimely loss of their brother.

        c.     Damien Briscoe and Kia Briscoe Jones

Under Maryland law, half-blood siblings are given the same status as full blood siblings of the same degree. Md. Code Ann., Estates & Trusts § 1-204 (2007). The special master charged with determining the appropriate amount of pain and suffering damages for relatives of serviceman Davin M. Green, however, recommended that Mr. Green's half-siblings Damien Briscoe and Kia Briscoe Jones be awarded $1.25 million for their pain and suffering associated with Mr. Green's death, while at the same time awarding Mr. Green's full blood siblings $2.5 million for pain and suffering.

This Court finds that this recommended disparity in award does not conform to the requirement that full blood and half blood siblings of the same degree be treated equally under the law. Accordingly, this Court finds that under Maryland law, Mr. Green's half-siblings are entitled to the same amount of recovery as their full blood sibling counterparts. This Court has typically found $2.5 million to be an appropriate level of pain and suffering damages under an IIED claim arising out of a terrorist attack. Accordingly, this Court adopts the special master's damages recommendation of $2.5 million for Mr. Green's full blood siblings, and finds that Mr. Green's half-siblings-Damien Briscoe and Kia Briscoe Jones-are also entitled to $2.5 million in pain and suffering damages in connection with their IIED claim against the defendants.

-38-

d.    Darren Keown

Darren Keown is the half-brother of deceased serviceman Thomas Keown. Darren was

domiciled in Tennessee at the time of the attack. It has long been recognized under Tennessee

law that full and half-blood siblings may share equally in inheritance and intestate distribution.

*Kyle v. Moore*, 35 Tenn. 183 (3 Sneed) (Tenn. 1855). The special master charged with

determining the appropriate amount of pain and suffering damages for relatives of Thomas

Keown recommended awarding Darren $4 million for pain and suffering, which was similar to

the recommended award for Thomas' full-blooded brothers, Adam, Bobby Jr., and William,

which was also $4 million. In light of the fact that full-blooded siblings in this case shall be

awarded $2.5 million, however, the award for Adam, Bobby Jr., and William must be reduced to

$2.5 million. Darren's award must be similarly lowered. Accordingly, this Court finds that the

pain and suffering award for Darren Keown is $2.5 million.

e.    Kenty Maitland & Alex Griffin

Kenty Maitland is the half-brother of Samuel Maitland, Jr. Alex Griffin is Samuel

Maitland Jr.'s legally adopted brother. Both were domiciled in New York at the time of the

attack. Under New York law, both half-blood siblings and adopted siblings are treated as equals

to full-blooded siblings for purposes of inheritance and recovery. *See* N.Y. Est. Powers & Trusts

§ 4-1.1(b) (2007); N.Y. Dom. Rel. § 117 (2007). Accordingly both Kenty Maitland and Alex

Griffin are entitled to recover in the same manner as Samuel's actual full-blooded siblings. The

special master recommended that Kenty and Alex receive $1 million, each, for pain and suffering

damages. Samuel's full-blood sister, Shirla Maitland, is entitled to recover $2.5 million in pain

and suffering arising from her IIED claim against the defendants. Accordingly, this Court finds

that both Kenty Maitland and Alex Griffin are entitled to recover $2.5 million, each, in pain and suffering damages arising out of their respective IIED claims in this case.

f.    Florene Martine Carter

Florene Martin Carter is the half-sister of deceased serviceman Charlie Robert Martin. Florene was domiciled in North Carolina at the time of the attack. Under North Carolina law, half-blood siblings may inherit and recover in the same manner as full-blood siblings. *Peel v. Corey*, 144 S.E. 559, 562 (N.C. 1928); *Univ. of North Carolina v. Markham*, 93 S.E. 845, 846 (N.C. 1917). Accordingly, Florene Martin Carter is entitled to recover in the same manner as Charlie's full-blooded siblings would have recovered. The special master recommended that Florene receive $1.25 million in pain and suffering damages. Charlie Robert Martin does not have full-blooded siblings. Still, siblings of deceased servicemen in this action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims against the defendants. Accordingly, the Court finds that Florene Martin Carter is entitled to $2.5 million in pain and suffering damages arising out of her IIED claim in this action.

g.    Linda Martin Johnson, Corene Martin Jones, John Martin,
Gussie Martin Williams, Mary Ellen Thompson

Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are also half-siblings of deceased serviceman Charlie Robert Martin. Each was domiciled in Georgia at the time of the attack. Under Georgia law, half-blood siblings inherit equally with whole-blood siblings. *Bacon v. Smith*, 474 S.E.2d 728, 731-32 (Ga. Ct. App. 1996). Accordingly, Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are entitled to recover in the same manner as Charlie's full-

-40-

blooded siblings would have recovered. The special master recommended that Linda, Corene,

John, Gussie, and Mary Ellen each receive $1.25 million in pain and suffering damages. Charlie

Robert Martin does not have full-blooded siblings. Still, siblings of deceased servicemen in this

action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims

against the defendants. Accordingly, the Court finds that Linda Martin Johnson, Corene Martin

Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are entitled to $2.5

million in pain and suffering damages, each, arising out of their respective IIED claims in this

action.

### h.    Sybil Caeser

Under Florida law, "[w]hen property descends to the collateral kindred of the intestate

and part of the collateral kindred are of the whole blood to the intestate and the other part of the

half blood, those of the half blood shall inherit only half as much as those of the whole blood . . .

." Fla. Stat. Ann. § 732.105 (2007). Half blood siblings may recover a whole amount only "if all

[remaining siblings] are of the half blood . . . ." Fla. Stat. Ann. § 732.105 (2007).

Here, Sybil Caeser is the half-sister of deceased serviceman Johnnie Caesar. Johnnie,

however, has full-blooded siblings who have also survived him. Therefore, Sybil Caesar is

entitled to one-half of what Johnnie's full-blooded siblings received. The full-blood siblings of

Johnnie Caeser received $2.5 million. Therefore, this Court finds that Sybil Caeser is entitled to

$1.25 million in pain and suffering damages arising out of her IIED claim in this action.

### C.    *Punitive Damages*

Punitive damages, however, are not available against foreign states such as the Islamic

Republic of Iran. *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 71 (D.D.C. Mar. 24,

2006) (Lamberth, J.). Therefore, plaintiffs' claim for punitive damages against the Islamic

Republic of Iran is DENIED. Moreover, this Court has previously found on a number of

occasions that punitive damages are not available against MOIS because MOIS is a governmental

entity, and part of the state of Iran itself. *Heiser*, 466 F. Supp. 2d at 270-71; *Greenbaum v.*

*Islamic Republic of Iran*, 451 F. Supp. 2d 90, 105 & n.1 (D.D.C. Aug. 10, 2006) (Lamberth, J.)

(citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003); *Haim*, 425 F.

Supp. 2d at 71 n.2. Accordingly, plaintiffs' claim for punitive damages against defendant MOIS

is also DENIED.

## CONCLUSION

This Court is sadly aware that there is little it can do to heal the physical wounds and

emotional scars suffered by the servicemen in this case and their family members. Though the

attack on the Marine barracks in Beirut, Lebanon occurred nearly twenty four years ago from this

date, it is clear from the testimony presented to this Court and the special masters that the intense

suffering experienced on that day has had a tragically lasting effect on the plaintiffs who have

brought this action. The fact that almost 1000 individuals sought redress in this action confirms

the sheer number of individuals whose lives were forever altered as a result of this senseless

attack on these courageous servicemen.

Indeed, at a time like this and an era such as ours, it is important to acknowledge the

selfless courage that these–and all–servicemen demonstrated by choosing to take action and

make this world a safer and better place in which to live. The fact that the servicemen in this

action made the ultimate sacrifice to pursue such a noble cause only serves to further establish

the legacy of these courageous individuals in the annals of history.

Not to be forgotten is the courage demonstrated by the family members who have come forth in bringing this claim. These individuals, whose hearts and souls were forever broken on October 23, 1983, have waited patiently for nearly a quarter of a century for justice to be done, and to be made whole again. And though this Court can neither bring back the husbands, sons, fathers and brothers who were lost in this heinous display of violence, nor undo the tragic events of that day, the law offers a meager attempt to make the surviving family members whole, through seeking monetary damages against those who perpetrated this heinous attack. The Court hopes that this extremely sizeable judgment will serve to aid in the healing process for these plaintiffs, and simultaneously sound an alarm to the defendants that their unlawful attacks on our citizens will not be tolerated.

A separate Order and Judgment consistent with these findings shall issue this date.


SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, September 7, 2007.

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of the<br>Estate of James C. Knipple (Dec.), *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>Defendants. | Consolidated Civil Actions:<br>01-2094 (RCL)<br>01-2684 (RCL) |

## JUDGMENT

In accord with the Memorandum Opinion issued this date. it is hereby

ORDERED that Default Judgment be entered in favor of plaintiffs and against

defendants, jointly and severally, in the amount of $2.656,944.877.00, which shall be allocated

in the following manner:

1.    *Wrongful Death Claims Brought by the Personal Representatives and Estates of*

    *Deceased Servicemen*

| | |
|---|---|
| Abbott. Terry | $1.485.243.00 |
| Allman. John Robert | $545.937.00 |
| Bates. Ronny Kent | $2.991.659.00 |
| Baynard, James | $626.517.00 |
| Beamon, Jess W. | $988.897.00 |
| Belmer, Alvin Burton | $8,384,746.00 |
| Blankenship. Richard D. | $1.421,889.00 |
| Blocker. John W. | $975,621.00 |
| Boccia, Joseph John Jr. | $1,276.641.00 |
| Bohannon, Leon | $706,549.00 |

-1-

| | |
|---|---|
| Bonk, John Jr. | $904,220.00 |
| Boulos, Jeffrey Joseph | $1,154.112.00 |
| Boyett, John Norman | $2,235,375.00 |
| Burley, William | $170.847.00 |
| Callahan, Paul | $974,546.00 |
| Camara, Mecot | $1.882.308.00 |
| Campus, Bradley | $433.959.00 |
| Ceasar, Johnnie | $313,593.00 |
| Conley. Robert Allen | $962,677.00 |
| Cook. Charles Dennis | $837.147.00 |
| Copeland. Johnny Len | $541.325.00 |
| Cosner. David | $1.105,668.00 |
| Coulman, Kevin | $1.287,092.00 |
| Crudale. Rick | $1,004,731.00 |
| Cyzick, Russell | $575.554.00 |
| Devlin. Michael | $939,887.00 |
| Dorsey, Nathaniel | $638,703.00 |
| Dunnigan, Timothy | $709.232.00 |
| Earle, Bryan | $1,286,372.00 |
| Estes. Danny R. | $1.000.157.00 |
| Fluegel. Richard Andrew | $1,089.811.00 |
| Fulcher, Michael D. | $1.257,150.00 |
| Gallagher. Sean | $674.382.00 |
| Gangur, George | $1.000.935.00 |
| Garcia, Randall | $1.127.694.00 |
| Ghumm, Harold | $1.260.508.00 |
| Giblin. Timothy | $1,301,526.00 |
| Gorchinski, Michael | $1,931.668.00 |
| Gordon, Richard | $965,609.00 |
| Green, Davin M. | $1.025.050.00 |
| Hairston. Thomas | $1,489,395.00 |
| Haskell. Michael | $2.871.058.00 |
| Helms. Mark Anthony | $1,028.509.00 |
| Hester. Stanley G. | $1.493.349.00 |
| Hildreth. Donald Wayne | $1.425.177.00 |
| Holberton. Richard | $1.818.176.00 |
| Hudson. Dr. John | $4.072.010.00 |
| Hukill, Maurice Edward | $3.038.258.00 |
| Iacovino, Edward Jr. | $407,196.00 |
| Innocenzi, Paul III | $1,715,253.00 |
| Jackowski, James | $463,355.00 |
| James, Jeffrey Wilbur | $251,607.00 |
| Jenkins, Nathaniel Walter | $7,599,314 |

| | |
|---|---|
| Johnston, Edward Anthony | $1,246,535.00 |
| Jones, Steven | $801,721.00 |
| Julian, Thomas Adrian | $415,311.00 |
| Keown, Thomas | $1,013,901.00 |
| Kluck, Daniel | $922,630.00 |
| Knipple, James C. | $1,018,665.00 |
| Kreischer, Freas H. III | $1,059,185.00 |
| Laise, Keith | $447,984.00 |
| Langon, James IV | $1,066,903.00 |
| LaRiviere, Michael Scott | $1,056,282.00 |
| LaRiviere, Steven | $986,622.00 |
| Lemnah, Richard | $1,842,869.00 |
| Livingston, Joseph R. ("Joel") III | $1,762,193.00 |
| Lyon, Paul D. Jr. | $1,034,459.00 |
| Macroglou, John | $2,183,935.00 |
| Maitland, Samuel Jr. | $970,700.00 |
| Martin, Charlie Robert | $1,316,085.00 |
| Massa, David | $674,558.00 |
| McCall, John | $853,420.00 |
| McDonough, James E. | $952,847.00 |
| McMahon, Timothy R. | $984,020.00 |
| Menkins, Richard II | $850,938.00 |
| Meurer, Ronald | $1,855,272.00 |
| Milano, Joseph Peter | $674,258.00 |
| Moore, Joseph | $980,150.00 |
| Myers, Harry Douglas | $891,144.00 |
| Nairn, David | $1,562,682.00 |
| Olson, John Arne | $1,010,497.00 |
| Owens, Joseph Albert | $502,237.00 |
| Page, Connie Ray | $1,012,211.00 |
| Parker, Ulysses Gregory | $641,523.00 |
| Pearson, John L. | $1,816,369.00 |
| Perron, Thomas S. | $424,110.00 |
| Phillips, John Arthur Jr. | $1,030,308.00 |
| Pollard, William Roy | $1,111,556.00 |
| Prevatt, Victor Mark | $862,635.00 |
| Price, James | $989,921.00 |
| Prindeville, Patrick Kerry | $305,675.00 |
| Quirante, Diomedes J. | $2,178,822.00 |
| Richardson, Warren | $796,673.00 |
| Rotondo, Louis J. | $2,276,348.00 |
| Sauls, Michael Caleb | $974,601.00 |
| Schnorf, Charles Jeffrey | $2,790,541.00 |

| | |
|---|---|
| Schultz, Scott Lee | $675,361.00 |
| Scialabba, Peter | $2,462,179.00 |
| Scott, Gary Randall | $432,024.00 |
| Shipp, Thomas Alan | $738,895.00 |
| Shropshire, Jerryl | $212,061.00 |
| Simpson, Larry H. Jr. | $5,995,660.00 |
| Smith, Kirk Hall | $710,042.00 |
| Smith, Thomas Gerard | $980,543.00 |
| Smith, Vincent | $1,285,915.00 |
| Sommerhof, William Scott | $1,361,062.00 |
| Spencer, Stephen Eugene | $974,298.00 |
| Stelpflug, William | $1,094,429.00 |
| Stephens, Horace Renardo Jr. ("Ricky") | $446,107.00 |
| Stockton, Craig | $1,007,526.00 |
| Stokes, Jeffrey | $1,599,994.00 |
| Sturghill, Eric D. | $725,378.00 |
| Sundar, Devon | $1,394,608.00 |
| Thorstad, Thomas Paul | $1,921,086.00 |
| Tingley, Stephen | $1,439,655.00 |
| Vallone, Donald H. Jr. | $462,193.00 |
| Washington, Eric Glenn | $1,069,270.00 |
| Wigglesworth, Dwayne | $1,001,122.00 |
| Williams, Rodney J. | $671,206.00 |
| Williams, Scipio Jr. | $1,635,994.00 |
| Williamson, Johnny Adam | $443,409.00 |
| Winter, William Ellis | $2,534,910.00 |
| Woollett, Donald Elberan | $2,021,565.00 |
| Wyche, Craig | $1,025,860.00 |
| Young, Jeffrey D. | $618,891.00 |

2.    *Battery Claims Brought by Injured Servicemen*

| | |
|---|---|
| Albright, Marvin | $5,000,000.00 |
| Arroyo, Pablo | $5,000,000.00 |
| Banks, Anthony | $7,500,000.00 |
| Burnette, Rodney Darrell | $8,000,000.00 |
| Comes, Frank Jr. | $1,500,000.00 |
| Dolphin, Glenn | $3,000,000.00 |
| Eaves, Frederick Daniel | $1,500,000.00 |
| Frye, Charles | $2,200,000.00 |
| Garner, Truman Dale | $7,500,000.00 |
| Gerlach, Larry | $12,000,000.00 |
| Hlywiak, John | $1,500,000.00 |

-4-

| | |
|---|---|
| Hunt, Orval | $8.000.000.00 |
| Jacobs, Joseph P. | $5,000,000.00 |
| Kirkpatrick, Brian | $8,000,000.00 |
| Matthews, Burnham | $7,000,000.00 |
| Mitchell, Timothy | $4,555.099.00 |
| Moore, Lovelle "Darrell" | $8.314,513.00 |
| Nashton, Jeffrey | $11,776,632.00 |
| Oliver, John | $3.277,542.00 |
| Rivers. Paul | $7,000,000.00 |
| Russell, Stephen | $9.252.749.00 |
| Spaulding, Dana | $9.559,609.00 |
| Swinson, Craig Joseph | $1,500,000.00 |
| Toma, Michael | $7.500.000.00 |
| Wheeler, Danny | $5.000.000.00 |
| Young. Thomas D. | $1,500.000.00 |

3.    *Claims Brought by Family Members of Deceased Servicemen*

| | |
|---|---|
| Abbey. Lilla Woollett | $2.500.000.00 |
| Abbott. James | $5.000.000.00 |
| Abbott, Mary (Estate of) | $5.000.000.00 |
| Adams, Elizabeth | $2.500.000.00 |
| Ahlquist, Eileen Prindeville | $2,500.000.00 |
| Alarcon, Miralda (Judith Maitland) | $8.000.000.00 |
| Allman. Anne | $5.000.000.00 |
| Allman, Robert | $5,000,000.00 |
| Allman. Theodore (Estate of) | $2.500.000.00 |
| Allman, DiAnne Margaret ("Maggie") | $2.500.000.00 |
| Alvarez, Margaret E. | $2,500,000.00 |
| Angus, Kimberly F. | $2,500.000.00 |
| Bates, Donnie | $2,500.000.00 |
| Bates, Johnny | $2.500.000.00 |
| Bates. Laura | $5,000,000.00 |
| Bates, Margie | $5,000,000.00 |
| Bates. Monty | $2,500.000.00 |
| Bates, Thomas Jr. | $2,500,000.00 |
| Bates, Thomas C., Sr. | $5,000,000.00 |
| Baumgartner, Mary E. | $2.500.000.00 |
| Baynard, Anthony | $2,500,000.00 |
| Baynard. Barry | $2.500.000.00 |
| Baynard, Emerson | $2.500.000.00 |
| Baynard. Philip | $2.500.000.00 |
| Baynard, Thomasine | $8,000,000.00 |

| | |
|---|---|
| Baynard, Timothy | $2,500,000.00 |
| Baynard, Wayne | $2,500,000.00 |
| Baynard, Stephen | $5,000,000.00 |
| Beard, Anna | $2,500,000.00 |
| Beck, Mary Ann | $2,500,000.00 |
| Belmer, Alue | $5,000,000.00 |
| Belmer, Annette | $2,500,000.00 |
| Belmer, Clarence | $2,500,000.00 |
| Belmer, Colby Keith | $5,000,000.00 |
| Belmer, Denise | $2,500,000.00 |
| Belmer, Donna | $2,500,000.00 |
| Belmer, Faye | $8,000,000.00 |
| Belmer, Kenneth | $2,500,000.00 |
| Belmer, Luddie | $5,000,000.00 |
| Biellow, Shawn | $2,500,000.00 |
| Black, Mary Frances | $2,500,000.00 |
| Blankenship, Donald Jr. | $2,500,000.00 |
| Blankenship, Donald Sr. | $5,000,000.00 |
| Blankenship, Mary (Estate of) | $5,000,000.00 |
| Blocker, Alice | $5,000,000.00 |
| Blocker, Douglas | $2,500,000.00 |
| Blocker, John R. | $5,000,000.00 |
| Blocker, Robert | $2,500,000.00 |
| Boccia, James | $2,500,000.00 |
| Boccia, Joseph Sr. | $5,000,000.00 |
| Boccia, Patricia | $5,000,000.00 |
| Boccia, Raymond | $2,500,000.00 |
| Boccia, Richard | $2,500,000.00 |
| Boccia, Ronnie (Veronica) | $2,500,000.00 |
| Boddie, Leticia | $2,500,000.00 |
| Bohannon, Angela | $2,500,000.00 |
| Bohannon, Anthony | $2,500,000.00 |
| Bohannon, Carrie | $5,000,000.00 |
| Bohannon, David | $2,500,000.00 |
| Bohannon, Edna | $8,000,000.00 |
| Bohannon, Leon Sr. | $5,000,000.00 |
| Bohannon, Ricki | $2,500,000.00 |
| Bolinger, Billie Jean | $5,000,000.00 |
| Boulos, Joseph | $5,000,000.00 |
| Boulos, Lydia | $2,500,000.00 |
| Boulos, Marie | $5,000,000.00 |
| Bowler, Rebecca | $2,500,000.00 |
| Boyett, Lavon | $5,000,000.00 |
| Boyett, Norman E. Jr. (Estate of) | $5,000,000.00 |

| | |
|---|---|
| Boyett, Theresa U. Roth | $8,000,000.00 |
| Boyett, William A. | $2,500,000.00 |
| Breeden, Susan Schnorf | $2,500,000.00 |
| Briscoe, Damion | $2,500,000.00 |
| Brown, Christine | $5,000,000.00 |
| Brunette, Rosanne | $2,500,000.00 |
| Buckner, Mary Lynn | $8,000,000.00 |
| Burley, Claude (Estate of) | $5,000,000.00 |
| Burley, William Douglas (Estate of) | $2,500,000.00 |
| Burley, Myra | $2,500,000.00 |
| Calabro, Kathleen | $2,500,000.00 |
| Caldera, Rachel | $2,500,000.00 |
| Callahan, Avenell | $5,000,000.00 |
| Callahan, Michael | $2,500,000.00 |
| Calloway, Patricia (Patsy Ann) | $2,500,000.00 |
| Camara, Elisa Rock | $2,500,000.00 |
| Camara, Theresa Riggs | $2,500,000.00 |
| Campbell, Candace | $2,500,000.00 |
| Campus, Clare | $5,000,000.00 |
| Capobianco, Elaine | $2,500,000.00 |
| Carter, Florene Martin | $2,500,000.00 |
| Cash, Phyllis A. | $2,500,000.00 |
| Catano, Theresa | $2,500,000.00 |
| Ceasar, Bruce | $2,500,000.00 |
| Ceasar, Franklin | $2,500,000.00 |
| Ceasar, Fredrick | $2,500,000.00 |
| Ceasar, Robbie Nell | $5,000,000.00 |
| Ceasar, Sybil | $1,250,000.00 |
| Cecca, Christine Devlin | $2,500,000.00 |
| Chapman, Tammy | $2,500,000.00 |
| Cherry, James | $2,500,000.00 |
| Cherry, Sonia | $2,500,000.00 |
| Chios, Adele H. | $2,500,000.00 |
| Christian, Jana M. | $2,500,000.00 |
| Christian, Sharon Rose | $2,500,000.00 |
| Ciupaska, Susan | $2,500,000.00 |
| Clark, LeShune Stokes | $2,500,000.00 |
| Clark, Rosemary | $2,500,000.00 |
| Cobble, Mary Ann | $5,000,000.00 |
| Collard, Karen Shipp | $2,500,000.00 |
| Collier, Jennifer | $5,000,000.00 |
| Collier, Melia Winter | $8,000,000.00 |
| Coltrane, Deborah M. | $8,000,000.00 |
| Conley, James N. Jr. | $5,000,000.00 |

| | |
|---|---|
| Conley, Roberta Li | $5.000,000.00 |
| Cook, Charles F. | $5.000,000.00 |
| Cook, Elizabeth A. | $2.500,000.00 |
| Cook, Mary A. (Estate of) | $5.000,000.00 |
| Copeland, Alan Tracy | $2.500,000.00 |
| Copeland, Betty | $5.000,000.00 |
| Copeland, Donald | $5.000,000.00 |
| Corry, Blanche | $2.500,000.00 |
| Cosner, Harold | $5.000,000.00 |
| Cosner, Jeffrey | $2.500,000.00 |
| Cosner, Leanna | $5.000,000.00 |
| Cosner, Marva Lynn (Estate of) | $5.000,000.00 |
| Cossaboom, Cheryl | $2.500,000.00 |
| Coulman, Bryan Thomas | $2.500,000.00 |
| Coulman, Christopher J. | $2.500,000.00 |
| Coulman, Dennis P. | $2,500,000.00 |
| Coulman, Lorraine M. | $5.000,000.00 |
| Coulman, Robert D. | $2.500,000.00 |
| Coulman, Robert Louis | $5.000,000.00 |
| Covington, Charlita Martin | $5.000,000.00 |
| Crouch, Amanda | $5,000,000.00 |
| Crudale, Marie | $5,000,000.00 |
| Cyzick, Eugene | $2,500,000.00 |
| Dallachie, Lynn | $8,000,000.00 |
| Deal, Anne | $2,500,000.00 |
| Derbyshire, Lynn Smith | $2.500,000.00 |
| Desjardins, Theresa | $5.000,000.00 |
| Devlin, Christine | $5.000,000.00 |
| Devlin, Daniel | $2,500,000.00 |
| Devlin, Gabrielle | $2.500,000.00 |
| Devlin, Richard | $2.500,000.00 |
| Devlin, Sean | $2.500,000.00 |
| Donahue (Milano), Rosalie | $2,500,000.00 |
| Doray, Ashley | $5.000,000.00 |
| Doss, Rebecca | $2.500,000.00 |
| Dunnigan, Chester | $2,500,000.00 |
| Dunnigan, Elizabeth Ann | $2,500,000.00 |
| Dunnigan, Michael | $2.500,000.00 |
| Dunnigan, William | $2,500,000.00 |
| Dunnigan, Claudine | $5.000,000.00 |
| Edquist, Janice Thorstad | $2.500,000.00 |
| Ervin, Mary Ruth | $5.000,000.00 |
| Estes, Barbara | $5,000,000.00 |
| Estes, Charles | $5.000,000.00 |

| | |
|---|---|
| Estes, Frank | $2,500,000.00 |
| Fansler, Lori | $2,500,000.00 |
| Farthing, Angela Dawn | $2,500,000.00 |
| Ferguson, Arlington | $1,250,000.00 |
| Ferguson, Hilton | $1,250,000.00 |
| Fish, Linda Sandback | $8,000,000.00 |
| Fox, Nancy Brocksbank | $5,000,000.00 |
| Fox, Tia | $2,500,000.00 |
| Freshour, Tammy | $8,000,000.00 |
| Fulcher, Ruby | $5,000,000.00 |
| Gallagher, Barbara | $5,000,000.00 |
| Gallagher, Brian | $2,500,000.00 |
| Gallagher, James (Estate of) | $5,000,000.00 |
| Gallagher, James Jr. | $2,500,000.00 |
| Gallagher, Kevin | $2,500,000.00 |
| Gallagher, Michael | $2,500,000.00 |
| Gangur, Dimitri | $5,000,000.00 |
| Gangur, Mary | $5,000,000.00 |
| Garcia, Jess | $5,000,000.00 |
| Garcia, Ronald | $2,500,000.00 |
| Garcia, Roxanne | $2,500,000.00 |
| Garcia, Russell | $2,500,000.00 |
| Garcia, Violet | $5,000,000.00 |
| Garza, Suzanne Perron | $2,500,000.00 |
| Gattegno, Jeanne | $2,500,000.00 |
| Ghumm, Arlene | $8,000,000.00 |
| Ghumm, Ashley | $5,000,000.00 |
| Ghumm, Bill | $2,500,000.00 |
| Ghumm, Edward | $2,500,000.00 |
| Ghumm, Hildegard | $5,000,000.00 |
| Ghumm, Jedaiah (Estate of) | $5,000,000.00 |
| Ghumm, Jesse | $2,500,000.00 |
| Ghumm, Leroy | $5,000,000.00 |
| Ghumm, Moronica | $5,000,000.00 |
| Giblin, Donald | $2,500,000.00 |
| Giblin, Jeanne | $5,000,000.00 |
| Giblin, Michael | $2,500,000.00 |
| Giblin, Tiffany | $5,000,000.00 |
| Giblin, Valerie | $8,000,000.00 |
| Giblin, William | $2,500,000.00 |
| Gilford-Smith, Thad | $2,500,000.00 |
| Gintonio, Rebecca | $2,500,000.00 |
| Goff, Dawn | $2,500,000.00 |
| Gorchinski, Christina | $5,000,000.00 |

| | |
|---|---|
| Gorchinski, Judy | $8.000.000.00 |
| Gorchinski, Kevin | $5.000.000.00 |
| Gorchinski, Valerie | $5,000,000.00 |
| Gordon, Alice | $5,000,000.00 |
| Gordon, Joseph | $2.500.000.00 |
| Gordon, Linda | $2.500.000.00 |
| Gordon, Norris (Estate of) | $5.000.000.00 |
| Gordon, Paul | $2.500.000.00 |
| Grant, Andrea | $2,500,000.00 |
| Graves, Deborah | $2.500,000.00 |
| Green, Deborah | $8,000,000.00 |
| Gregg, Liberty Quirante | $2.500.000.00 |
| Griffin. Alex | $2,500.000.00 |
| Grimsley, Catherine E. | $2.500.000.00 |
| Gummer, Megan | $2.500.000.00 |
| Guz, Lyda Woollett | $2,500,000.00 |
| Hairston. Darlene | $8,000,000.00 |
| Hanrahan, Tara | $2.500.000.00 |
| Hart, Mary Clyde | $2.500.000.00 |
| Haskill, Brenda | $2.500.000.00 |
| Haskell, Jeffrey | $2,500,000.00 |
| Hedge. Kathleen S. | $8.000.000.00 |
| Helms, Christopher Todd | $2,500,000.00 |
| Helms, Marvin R. | $5,000,000.00 |
| Hester. Doris | $8,000,000.00 |
| Hildreth. Clifton | $5.000.000.00 |
| Hildreth. Julia | $5.000.000.00 |
| Hildreth, Mary Ann | $8,000,000.00 |
| Hildreth, Michael Wayne | $5,000,000.00 |
| Hilton, Sharon A. | $2,500,000.00 |
| Holberton, Donald | $2.500.000.00 |
| Holberton, Patricia Lee | $5.000.000.00 |
| Holberton, Thomas | $2,500,000.00 |
| Hollifield. Tangie | $2.500.000.00 |
| Horner, Debra | $8,000,000.00 |
| House, Elizabeth | $2,500,000.00 |
| Houston, Joyce A. | $5,000,000.00 |
| Howell, Tammy Camara | $8.000.000.00 |
| Hudson, Lisa H. | $8,000,000.00 |
| Hudson. Lorenzo | $2.500.000.00 |
| Hudson, Lucy | $5,000,000.00 |
| Hudson, Ruth | $2.500.000.00 |
| Hudson, Samuel (Estate of) | $5,000,000.00 |
| Hudson, William J. | $5,000.000.00 |

| | |
|---|---|
| Hugis, Susan Thorstad (Estate of) | $2,500,000.00 |
| Hurlburt, Nancy Tingley | $2,500,000.00 |
| Hurston, Cynthia Perron | $2,500,000.00 |
| Iacovino, Edward Sr. (Estate of) | $5,000,000.00 |
| Iacovino, Elizabeth | $5,000,000.00 |
| Innocenzi, Deborah | $8,000,000.00 |
| Innocenzi, Kristin | $5,000,000.00 |
| Innocenzi, Mark | $2,500,000.00 |
| Innocenzi, Paul IV | $5,000,000.00 |
| Jaccom, Bernadette | $2,500,000.00 |
| Jackowski, John Jr. | $2,500,000.00 |
| Jackowski, John Sr. | $5,000,000.00 |
| Jacobus, Victoria | $2,500,000.00 |
| James, Elaine | $5,000,000.00 |
| Jenkins, Nathalie C. | $5,000,000.00 |
| Jenkins, Stephen | $2,500,000.00 |
| Jewett, Rebecca | $2,500,000.00 |
| Johnson, Linda Martin | $2,500,000.00 |
| Johnson, Ray | $2,500,000.00 |
| Johnson, Rennitta Stokes | $2,500,000.00 |
| Johnson, Sherry | $5,000,000.00 |
| Johnston, Charles | $2,500,000.00 |
| Johnston, Edwin | $5,000,000.00 |
| Johnston, Mary Ann | $5,000,000.00 |
| Johnston, Zandra LaRiviere | $2,500,000.00 |
| Jones, Alicia | $2,500,000.00 |
| Jones, Corene Martin | $2,500,000.00 |
| Jones, Kia Briscoe | $2,500,000.00 |
| Jones, Mark | $2,500,000.00 |
| Jones, Ollie | $5,000,000.00 |
| Jones, Sandra D. | $5,000,000.00 |
| Jones, Synovure (Estate of) | $2,500,000.00 |
| Jordan, Robin Copeland | $2,500,000.00 |
| Jordan, Susan Scott | $2,500,000.00 |
| Julian, Joyce | $5,000,000.00 |
| Julian, Karl | $5,000,000.00 |
| Jurist, Nada | $2,500,000.00 |
| Keown, Adam | $2,500,000.00 |
| Keown, Bobby Jr. | $2,500,000.00 |
| Keown, Bobby Sr. | $5,000,000.00 |
| Keown, Darren | $2,500,000.00 |
| Keown, William | $2,500,000.00 |
| Kirker, Mary Joe | $2,500,000.00 |
| Kluck, Kelly | $2,500,000.00 |

| | |
|---|---|
| Kluck, Michael | $2,500,000.00 |
| Knipple, John D. (Estate of) | $5,000,000.00 |
| Knipple, John R. | $2,500,000.00 |
| Knipple, Pauline (Estate of) | $5,000,000.00 |
| Knox, Shirley L. | $2,500,000.00 |
| Kreischer, Doreen | $5,000,000.00 |
| Kreischer, Freas H. Jr. | $5,000,000.00 |
| Lake, Cynthia D. | $2,500,000.00 |
| Lange, Wendy L. | $2,500,000.00 |
| Langon, James III | $5,000,000.00 |
| LaRiviere, Eugene | $2,500,000.00 |
| LaRiviere, Janet | $5,000,000.00 |
| LaRiviere, John M. | $2,500,000.00 |
| LaRiviere, Lesley | $2,500,000.00 |
| LaRiviere, Michael | $2,500,000.00 |
| LaRiviere, Nancy | $2,500,000.00 |
| LaRiviere, Richard | $2,500,000.00 |
| LaRiviere, Richard G. (Estate of) | $5,000,000.00 |
| LaRiviere, Robert | $2,500,000.00 |
| LaRiviere, William | $2,500,000.00 |
| Lawton, Cathy L. | $2,500,000.00 |
| LeGault, Heidi Crudale | $8,000,000.00 |
| Lemnah, Clarence (Estate of) | $5,000,000.00 |
| Lemnah, Etta | $5,000,000.00 |
| Lemnah, Fay | $2,500,000.00 |
| Lemnah, Harold | $2,500,000.00 |
| Lemnah, Marlys | $8,000,000.00 |
| Lemnah, Robert | $2,500,000.00 |
| Lemnah, Ronald | $2,500,000.00 |
| Livingston, Annette R. | $8,000,000.00 |
| Livingston, Joseph R. IV | $5,000,000.00 |
| Livingston, Joseph R. Jr. (Estate of) | $5,000,000.00 |
| Lynch, Robin M. | $2,500,000.00 |
| Lyon, Earl | $2,500,000.00 |
| Lyon, Francisco | $2,500,000.00 |
| Lyon, June | $2,500,000.00 |
| Lyon, Maria | $5,000,000.00 |
| Lyon, Paul D. Sr. | $5,000,000.00 |
| Lyon, Valerie | $2,500,000.00 |
| Macroglou, Heather | $5,000,000.00 |
| Mahoney, Kathleen Devlin | $2,500,000.00 |
| Maitland, Kenty | $2,500,000.00 |
| Maitland, Leysnal | $5,000,000.00 |
| Maitland, Samuel Sr. | $5,000,000.00 |

| | |
|---|---|
| Maitland. Shirla | S2.500,000.00 |
| Marshall, Virginia Boccia | S2.500,000.00 |
| Martin, John | S2,500,000.00 |
| Martin, Pacita | S8.000.000.00 |
| Martin, Renerio | S5.000.000.00 |
| Martin, Ruby | S5.000.000.00 |
| Martin, Shirley | S5,000.000.00 |
| Mason, Mary | S5,000.000.00 |
| Massa, Cristina | S5.000.000.00 |
| Massa. Edmund | S2,500.000.00 |
| Massa, Joao ("John") | S2.500.000.00 |
| Massa, Jose ("Joe") | S2.500,000.00 |
| Massa, Manuel Jr. | S2,500,000.00 |
| Massa, Ramiro | S2,500.000.00 |
| McCall, Mary | S5,000.000.00 |
| McCall, Thomas (Estate of) | S5,000.000.00 |
| McCall, Valerie | S2.500,000.00 |
| McDermott, Gail | S2.500.000.00 |
| McFarlin. Julia A. | S2,500.000.00 |
| McMahon. George | S2,500,000.00 |
| McMahon. Michael | S2,500,000.00 |
| McPhee. Patty | S5,000.000.00 |
| Menkins, Darren | S2.500.000.00 |
| Menkins, Gregory | S2,500,000.00 |
| Menkins. Margaret | S5,000.000.00 |
| Menkins, Richard H. | S5,000.000.00 |
| Meurer, Jay T. | S2,500,000.00 |
| Meurer, John | S5.000.000.00 |
| Meurer. John Thomas | S2.500.000.00 |
| Meurer, Mary Lou | S5.000.000.00 |
| Meurer, Michael | S2.500.000.00 |
| Meyer, Penny | S2.500.000.00 |
| Milano, Angela | S5.000.000.00 |
| Milano, Peter Jr. | S5.000.000.00 |
| Miller, Earline | S5.000.000.00 |
| Miller, Henry | S2.500.000.00 |
| Miller. Patricia | S2,500.000.00 |
| Montgomery. Helen | S2.500.000.00 |
| Moore, Betty | S5.000.000.00 |
| Moore. Harry | S5.000.000.00 |
| Moore. Kimberly | S2.500.000.00 |
| Moore, Mary | S8.000.000.00 |
| Moore, Melissa Lea | S2.500.000.00 |
| Moore. Michael (Estate of) | S2,500.000.00 |

-13-

| | |
|---|---|
| Moy, Elizabeth Phillips | $2,500,000.00 |
| Myers, Debra | $2,500,000.00 |
| Myers, Geneva | $5,000,000.00 |
| Myers, Harry A. | $5,000,000.00 |
| Nairn, Billie Ann | $5,000,000.00 |
| Nairn, Campbell J. III | $2,500,000.00 |
| Nairn, Campbell J. Jr. (Estate of) | $5,000,000.00 |
| Nairn, William P. | $2,500,000.00 |
| Norfleet, Richard | $5,000,000.00 |
| O'Connor, Deborah | $2,500,000.00 |
| Olaniji, Pearl | $5,000,000.00 |
| Olson, Bertha (Estate of) | $5,000,000.00 |
| Olson, Karen L. | $2,500,000.00 |
| Olson, Randal D. | $2,500,000.00 |
| Olson, Roger S. | $2,500,000.00 |
| Olson, Ronald J. | $2,500,000.00 |
| Olson, Sigurd (Estate of) | $5,000,000.00 |
| Owens, David | $2,500,000.00 |
| Owens, Deanna | $2,500,000.00 |
| Owens, Frances | $5,000,000.00 |
| Owens, James (Estate of) | $5,000,000.00 |
| Owens, Steven | $2,500,000.00 |
| Page, Connie Mack | $5,000,000.00 |
| Page, Judith K. | $5,000,000.00 |
| Palmer, Lisa Menkins | $2,500,000.00 |
| Paolozzi, Geraldine | $2,500,000.00 |
| Pare, Maureen | $2,500,000.00 |
| Parker, Henry James | $2,500,000.00 |
| Parker, Sharon | $2,500,000.00 |
| Pearson, Helen M. | $5,000,000.00 |
| Pearson, John L. Jr. | $5,000,000.00 |
| Pearson, Sonia | $8,000,000.00 |
| Perron, Brett | $2,500,000.00 |
| Perron, Deborah Jean | $2,500,000.00 |
| Perron, Michelle | $2,500,000.00 |
| Perron, Ronald R. | $5,000,000.00 |
| Persky, Muriel | $5,000,000.00 |
| Peterson, Deborah D. | $2,500,000.00 |
| Petry, Sharon Conley | $2,500,000.00 |
| Petrick, Sandra | $2,500,000.00 |
| Phelps, Donna Vallone | $5,000,000.00 |
| Phillips, Harold | $2,500,000.00 |
| Phillips, John Arthur Sr. | $5,000,000.00 |
| Plickys, Donna Tingley | $2,500,000.00 |

| | |
|---|---|
| Pollard, Margaret Aileen | $8,000,000.00 |
| Pollard, Stacey Yvonne | $5,000,000.00 |
| Prevatt, Lee Hollan | $2,500,000.00 |
| Prevatt, Victor Thornton | $5,000,000.00 |
| Price, John | $5,000,000.00 |
| Price, Joseph | $2,500,000.00 |
| Prindeville, Barbara D. (Estate of) | $5,000,000.00 |
| Prindeville, Kathleen Tara | $2,500,000.00 |
| Prindeville, Michael | $2,500,000.00 |
| Prindeville, Paul | $5,000,000.00 |
| Prindeville, Sean | $2,500,000.00 |
| Quirante, Belinda J. | $5,000,000.00 |
| Quirante, Edgar | $2,500,000.00 |
| Quirante, Godofredo (Estate of) | $5,000,000.00 |
| Quirante, Milton | $2,500,000.00 |
| Quirante, Sabrina | $2,500,000.00 |
| Ray, Susan | $2,500,000.00 |
| Reininger, Laura M. | $2,500,000.00 |
| Richardson, Alan | $2,500,000.00 |
| Richardson, Beatrice | $5,000,000.00 |
| Richardson, Clarence | $5,000,000.00 |
| Richardson, Eric | $2,500,000.00 |
| Richardson, Lynette | $2,500,000.00 |
| Richardson, Vanessa | $2,500,000.00 |
| Richardson-Mills, Philiece | $5,000,000.00 |
| Ricks, Melrose | $5,000,000.00 |
| Riva, Belinda Quirante | $2,500,000.00 |
| Rockwell, Barbara | $5,000,000.00 |
| Rooney, Linda | $2,500,000.00 |
| Rose, Tara Smith | $2,500,000.00 |
| Ruark, Tammi | $2,500,000.00 |
| Rudkowski, Juliana | $2,500,000.00 |
| Russell, Marie McMahon | $2,500,000.00 |
| Sanchez, Alicia Lynn | $5,000,000.00 |
| Sauls, Andrew | $2,500,000.00 |
| Sauls, Henry Caleb | $2,500,000.00 |
| Sauls, Riley A. | $2,500,000.00 |
| Schnorf, Margaret Medler | $5,000,000.00 |
| Schnorf, Richard (brother) | $2,500,000.00 |
| Schnorf, Richard (father) | $5,000,000.00 |
| Schnorf, Robert | $2,500,000.00 |
| Schultz, Beverly | $5,000,000.00 |
| Schultz, Dennis James | $2,500,000.00 |
| Schultz, Dennis Ray | $5,000,000.00 |

| | |
|---|---|
| Scialabba, Frank | $5,000,000.00 |
| Scialabba, Jacqueline | $8,000,000.00 |
| Scialabba, Samuel Scott | $5,000,000.00 |
| Scott, Jon Christopher | $2,500,000.00 |
| Scott, Kevin James | $2,500,000.00 |
| Scott, Larry L. (Estate of) | $5,000,000.00 |
| Scott, Mary Ann | $5,000,000.00 |
| Scott, Sheria | $2,500,000.00 |
| Scott, Stephen Allen | $2,500,000.00 |
| Seguerra, Jacklyn | $2,500,000.00 |
| Shipp, Bryan Richard | $5,000,000.00 |
| Shipp, James David | $2,500,000.00 |
| Shipp, Janice | $2,500,000.00 |
| Shipp, Maurice | $2,500,000.00 |
| Shipp, Pauline | $8,000,000.00 |
| Shipp, Raymond Dennis | $2,500,000.00 |
| Shipp, Russell | $2,500,000.00 |
| Sinsioco, Susan J. | $2,500,000.00 |
| Smith-Ward, Ana | $8,000,000.00 |
| Smith, Angela Josephine (Estate of) | $5,000,000.00 |
| Smith, Bobbie Ann | $5,000,000.00 |
| Smith, Cynthia | $2,500,000.00 |
| Smith, Donna Marie | $2,500,000.00 |
| Smith, Erma | $2,500,000.00 |
| Smith, Holly | $2,500,000.00 |
| Smith, Ian | $5,000,000.00 |
| Smith, Janet | $2,500,000.00 |
| Smith, Joseph K. III | $2,500,000.00 |
| Smith, Joseph K. Jr. | $5,000,000.00 |
| Smith, Keith | $5,000,000.00 |
| Smith, Kelly B. | $2,500,000.00 |
| Smith, Shirley L. | $5,000,000.00 |
| Smith, Tadgh | $2,500,000.00 |
| Smith, Terrence | $2,500,000.00 |
| Smith, Timothy B. | $2,500,000.00 |
| Sommerhof, Jocelyn J. | $5,000,000.00 |
| Sommerhof, John | $2,500,000.00 |
| Sommerhof, William J. | $5,000,000.00 |
| Spencer, Douglas | $2,500,000.00 |
| Stelpflug, Christy Williford | $2,500,000.00 |
| Stelpflug, Joseph | $2,500,000.00 |
| Stelpflug, Kathy Nathan | $2,500,000.00 |
| Stelpflug, Laura Barfield | $2,500,000.00 |
| Stelpflug, Peggy | $5,000,000.00 |

| | |
|---|---|
| Stelpflug. William | $5,000,000.00 |
| Stephens, Horace Sr. | $5,000,000.00 |
| Stephens, Joyce | $5,000,000.00 |
| Stephens, Keith | $2,500,000.00 |
| Stockton, Dona | $5,000,000.00 |
| Stockton. Donald (Estate of) | $5,000,000.00 |
| Stockton. Richard | $2,500,000.00 |
| Stokes. Irene | $5,000,000.00 |
| Stokes. Nelson Jr. | $2,500,000.00 |
| Stokes. Nelson Sr. (Estate of) | $5,000,000.00 |
| Stokes, Robert | $2,500,000.00 |
| Stokes-Graham, Gwenn | $2,500,000.00 |
| Sturghill, Marcus D. | $2,500,000.00 |
| Sturghill, Marcus L. Jr. | $5,000,000.00 |
| Sturghill, NaKeisha Lynn | $2,500,000.00 |
| Sundar, Doreen | $8,000,000.00 |
| Tella. Margaret | $2,500,000.00 |
| Terlson. Susan L. | $2,500,000.00 |
| Thompson, Mary Ellen | $2,500,000.00 |
| Thorstad. Adam | $5,000,000.00 |
| Thorstad. Barbara | $5,000,000.00 |
| Thorstad, James Jr. | $2,500,000.00 |
| Thorstad. James Sr. | $5,000,000.00 |
| Thorstad, John | $2,500,000.00 |
| Thorstad. Ryan | $5,000,000.00 |
| Thurman. Betty Ann | $2,500,000.00 |
| Tingley, Barbara | $5,000,000.00 |
| Tingley, Richard L. | $5,000,000.00 |
| Tingley. Russell | $2,500,000.00 |
| Tolliver. Keysha | $5,000,000.00 |
| Turek, Mary Ann | $5,000,000.00 |
| Valenti, Karen | $5,000,000.00 |
| Vallone, Anthony | $2,500,000.00 |
| Vallone. Donald H. | $5,000,000.00 |
| Vallone. Timothy | $2,500,000.00 |
| Vargas, Leona Mae | $2,500,000.00 |
| Voyles, Denise | $2,500,000.00 |
| Wallace. Ila | $5,000,000.00 |
| Wallace. Kathryn Thorstad | $2,500,000.00 |
| Wallace. Richard J. | $2,500,000.00 |
| Warwick, Barbara Thorstad | $2,500,000.00 |
| Washington, Linda | $2,500,000.00 |
| Washington, Vancine | $2,500,000.00 |
| Watson, Kenneth | $2,500,000.00 |

-17-

| | |
|---|---|
| Whitener, Diane | $2.500.000.00 |
| Wigglesworth, Daryl | $2,500,000.00 |
| Wigglesworth, Darrin A. | $2.500,000.00 |
| Wigglesworth, Henry | $5,000,000.00 |
| Wigglesworth, Mark | $2.500.000.00 |
| Wigglesworth, Robyn | $2,500,000.00 |
| Wigglesworth, Sandra | $5,000,000.00 |
| Wigglesworth, Shawn | $2,500,000.00 |
| Williams, Dianne Stokes | $2.500.000.00 |
| Williams, Gussie Martin | $2,500,000.00 |
| Williams, Janet | $5.000.000.00 |
| Williams, Johnny | $2.500.000.00 |
| Williams, Rhonda | $2.500.000.00 |
| Williams, Ronald | $2.500.000.00 |
| Williams. Ruth | $5,000,000.00 |
| Williams, Scipio J. | $5,000,000.00 |
| Williams, Wesley | $5,000,000.00 |
| Williams-Edwards, Delma | $2.500.000.00 |
| Williamson. Tony | $2.500.000.00 |
| Williamson, Jewelene | $5,000,000.00 |
| Winter, Michael | $5,000,000.00 |
| Wiseman, Barbara | $8,000,000.00 |
| Woodford, Phyllis | $2.500.000.00 |
| Woodle. Joyce | $2.500.000.00 |
| Woollett, Beverly | $5.000.000.00 |
| Woollett, Paul | $5.000.000.00 |
| Wright. Melvina Stokes | $2.500.000.00 |
| Wright. Patricia | $5,000,000.00 |
| Wyche. Glenn | $2,500,000.00 |
| Wyche, John | $2,500,000.00 |
| Young, John F. | $5,000,000.00 |
| Young, John W. | $2,500,000.00 |
| Young. Judith Carol | $5.000.000.00 |
| Young, Sandra Rhodes | $5.000.000.00 |
| Zimmerman. Joanne | $2.500.000.00 |
| Zone, Stephen Thomas | $2,500,000.00 |
| Zosso, Patricia Thorstad | $2.500.000.00 |

4.   *Claims Brought by Family Members of Injured Servicemen*

| | |
|---|---|
| Ali. Jamaal Muata | $1.250.000.00 |
| Angeloni. Margaret | $1,250,000.00 |
| Arroyo, Jesus | $1,250,000.00 |
| Arroyo, Milagros | $1.250.000.00 |

-18-

| | |
|---|---|
| Carletta, Olympia | $2,500,000.00 |
| Carpenter, Kimberly | $4,000,000.00 |
| Comes, Joan | $2,500,000.00 |
| Comes, Patrick | $1,250,000.00 |
| Comes. Christopher | $1,250,000.00 |
| Comes. Frank Sr. | $2,500,000.00 |
| Crawford, Deborah | $1,250,000.00 |
| Davis, Barbara | $4,000,000.00 |
| Franklin, Alice Warren | $1,250,000.00 |
| Gerlach, Patricia | $4,000,000.00 |
| Gerlach. Travis | $2,500,000.00 |
| Gerlach. Megan | $2,500,000.00 |
| Hernandez, Arminda | $1,250,000.00 |
| Hlywiak, Margaret | $2,500,000.00 |
| Hlywiak, Peter Jr. | $1,250,000.00 |
| Hlywiak, Peter Sr. | $2,500,000.00 |
| Hlywiak, Paul | $1,250,000.00 |
| Hlywiak. Joseph | $1,250,000.00 |
| Hunt, Cynthia Lou | $4,000,000.00 |
| Ibarro. Rosa | $2,500,000.00 |
| Jacobs. Andrew Scott | $2,500,000.00 |
| Jacobs, Daniel Joseph | $2,500,000.00 |
| Jacobs, Danita | $4,000,000.00 |
| Kirkpatrick. Kathleen | $4,000,000.00 |
| Lewis, Grace | $2,500,000.00 |
| Magnotti. Lisa | $1,250,000.00 |
| Mitchell, Wendy | $4,000,000.00 |
| Moore. James Otis (Estate of) | $1,250,000.00 |
| Moore, Johnney S. (Estate of) | $2,500,000.00 |
| Moore, Marvin S. | $1,250,000.00 |
| Moore, Alie Mae | $2,500,000.00 |
| Moore-Jones. Jonnie Mae | $1,250,000.00 |
| Nashton. Alex W. (Estate of) | $2,500,000.00 |
| Oliver. Paul | $2,500,000.00 |
| Oliver. Riley | $2,500,000.00 |
| Oliver, Michael John | $2,500,000.00 |
| Oliver. Ashley E. | $2,500,000.00 |
| Oliver, Patrick S. | $2,500,000.00 |
| Oliver. Kayley | $2,500,000.00 |
| Russell, Tanya | $2,500,000.00 |
| Russell. Wanda | $4,000,000.00 |
| Russell. Jason | $2,500,000.00 |
| Shaver, Clydia | $1,250,000.00 |
| Spaulding, Scott | $1,250,000.00 |

-19-

| | |
|---|---|
| Stanley, Cecilia | $2,500,000.00 |
| Stilpen, Mary | $1,250,000.00 |
| Swank, Kelly | $1,250,000.00 |
| Swinson, Kenneth J. (Estate of) | $2,500,000.00 |
| Swinson, Ingrid M. (Estate of) | $2,500,000.00 |
| Swinson, Daniel | $1,250,000.00 |
| Swinson, William | $1,250,000.00 |
| Swinson, Dawn | $1,250,000.00 |
| Swinson, Teresa | $1,250,000.00 |
| Warren, Bronzell | $1,250,000.00 |
| Watson, Jessica | $1,250,000.00 |
| Webb, Audrey | $1,250,000.00 |
| Wheeler, Jonathan | $2,500,000.00 |
| Wheeler, Benjamin | $2,500,000.00 |
| Wheeler, Marlis "Molly" (Estate of) | $2,500,000.00 |
| Wheeler, Kerry | $1,250,000.00 |
| Wheeler, Andrew | $2,500,000.00 |
| Wheeler, Brenda June | $4,000,000.00 |
| Wold, Jill | $1,250,000.00 |
| Young, Nora (Estate of) | $2,500,000.00 |
| Young, James | $1,250,000.00 |
| Young, Robert (Estate of) | $2,500,000.00 |

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are

hereby DISMISSED WITHOUT PREJUDICE:

Albright, Marvin Jr.
Albright, Mirequrn
Albright, Shertara
Banks, Anthony (son)
Banks, Michael
Banks, Taiarra
Berry, Lori
Burnette, Christopher
Burnette, Gwen
Camara, Mecot Jr.
Comes, Dale
Comes, Tommy
Crop, Kimberly
Decker, Connie
Dolphin, Erin
Douglass, Frederick (Estate of)
Eaves, Christopher

Eaves, India
Eaves, Sylvia Jean
Foister, Gerald
Frye, Charles Jr.
Frye, Gina
Frye, Lialani
Frye, Lincoln
Frye, Randall
Garner, Joseph
Garner, Justina
Garner, Penny
Garner, Reva
Goodman, Karl
Haskell, Barbara
Haskell, Richard
Hlywiak, Jordan
Hlywiak, Taylor
Hunt, Jack Darrell
Hunt, Marcy Elizabeth
Hunt, Mendy Leigh
Hunt, Molly Faye
Livingston, Carol
Massa, Manuel Sr. (Estate of)
Matthews, Chadwick
Matthews, Debra
Matthews, Drew
Meurer, Deborah
Miller, Shirley D.
Mitchell, Elvera
Mitchell, Robert
Price, Betty Lou (Estate of)
Price, Timothy
Rivers, Jeremy
Rivers, Paul (son)
Rivers, Sandra
Schak, Carol
Schak, George
Spencer, Lynne M.
Washington, Patrice
Williams, Kevin Coker
Williams, George Robinson
Williams, Dorothy (Estate of)
Williamson, Bill
Wise, Debra

Woodcock, Gwen

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are

hereby DISMISSED WITH PREJUDICE:

Beamon, Ashley Tutwiler
Beresford, Michael
Beresford, Susan
Beresford, William
Bianco, Sandra Karen
Bianco, Sandra
Bonk, Catherine
Bonk, John Sr.
Bonk, Kevin
Bonk, Thomas
Calloway, Donald
Clark, Michael Jr.
Corry, Charles
DiGiovanni, Lisa
DiGiovanni, Marion
DiGiovanni, Robert
DiGiovanni, Danielle
Fiedler, Sherry Lynn
Fluegel, Robert
Fluegel, Thomas A.
Fluegel, Marilou
Green, Rebecca Iverson
Hairston, Evans
Hairston, Felicia
Hairston, Julia Bell
Hukill, Henry Durban
Hukill, Mark Andrew
Hukill, Matthew Scott
Hukill, Melissa
Hukill, Meredith Anne
Hukill, Mitchell Charles
Hukill, Monte
Hukill, Virginia Ellen
Jackowski, Mary
Jones, Storm
Joyce, Penni
Kirkwood, Carl Sr.
Kirkwood, Jeff

Kirkwood, Shirley
Kirkwood, Carl Arnold Jr.
Kronenbitter, Patricia
Laise, Kris
Laise, Bill
Laise, Betty
Lewis, Natalie
Macroglou, James
Macroglou, Lorraine
Macroglou, Bill
Mason, Richard
McDonald, Kathy
McDonough, Edward W.
McDonough, Sean
McDonough, Edward Joseph
Morgan, Geraldine
Nashton, Pamela J.
Persky, Herbert
Phelps, Charles Jr.
Phelps, Charles Sr.
Prevatt-Wood, Victoria
Rhosto, Deborah Spencer
Rochwell, Natalie
Rockwell, Donald
Rotondo, Rose (Estate of)
Rotondo, Luis (Estate of) (father)
Santoserre, Phyllis (Estate of)
Simpson, Robert
Simpson, Renee Eileen
Simpson, Larry H. Sr.
Simpson, Anna Marie
Vallone, Donna Beresford
Wallace, Bobby L.
Watkins, Lula Mae (Estate of)
Watkins, Simon
Wirick, Sally Jo

IT IS FURTHER ORDERED that plaintiffs, at their own cost and consistent with the

requirements of 28 U.S.C. § 1608(e), send a copy of this Judgment and the Findings of Fact and

Conclusions of Law issued this date to defendants.

IT IS FURTHER ORDERED that the Clerk of this Court shall terminate this case from

-23-

the dockets of this Court.

      SO ORDERED.

      Signed by Royce C. Lamberth, United States District Judge, September 7, 2007.

**EXHIBIT "C"**



Islamic Republic of Iran



**National Iranian Oil Company**

**NIOC**

Companies Affiliated To NIOC

Home > Subsidiaries



Welcome to:
WWW.NIOC.COM
7355

─ Companies Affiliated To ─
**The Ministry Of Petroleum**

NIOC.COM
Subsidiary Companies

### Ministry of Petroleum of IRAN Subsidiaries:

- National Iranian Oil Company
- National Iranian Gas Company
- National Iranian Petrochemical Company
- National Iranian Oil Refining and Distribution Company

**National Iranian Gas Export Company**
- Website: www.nigec.ir
- email: info@nigec.ir

**National Iranian South Oil Company**
- Website: www.nisoc.com
- email: info@nisoc.com

**National Iranian Offshore Oil Company**
- Website: www.iooc.co.ir
- email: webmaster@iooc.co.ir

**National Iranian Central Oil Fields Co.**
- Website: www.icofc.ir
- email: info@icofc.ir

**Khazar Exploration & Production Co.**

#### Preface:

**T**he National Iranian Oil Company (NIOC) was established in February 1948 with the objective of exploration, development, production, marketing of crude oil and natural gas. Having in possession huge hydrocarbon reserves, NIOC is the fourth largest state oil firm in the world.

NIOC's oil and gas in place reserves are 137 bn barrels and 28.17 trillion cubic meters, respectively which gives it a unique status on the global energy supply map. In fact, in recent years, NIOC has been invariably ranked as the world's fourth largest oil company.

Current NIOC production capacities include over 4 million barrels of crude oil and in excess of 437 million cubic meters of natural gas per day. On the export side, the company benefits from its modern extensive facilities on the three islands of Kharg, Lavan and Siri consisting of 17 jetties capable of berthing tankers of all sizes to lift and export its crude oil.

**Petroleum Engineering & Development Co.**
- Website: www.pedec.ir
- email: info@pedec.net

**Pars Oil and Gas Company**
- Website: www.pogc.org
- email: info@pogc.ir

**Pars Special Economic Energy Zone Co.**
- Website: www.pseez.com
- email: Info@pseez.com

**National Iranian Oil Terminals Company**
- Website: www.nioc-otc.com
- email: Info@nioc-otc.com

**National Iranian Drilling Company**
- Website: www.nidc.ir
- email: webmaster@nidc.ir

**North Drilling Company**

EXHIBIT C

## Organizational Structure:

**N**IOC's General Assembly (consisting of the President, Vice President, Director General of the Management and Planning Organization, Ministers of Oil, Energy, Industries and Mines, Labor and Social Affairs, Economy and Finance) is its highest decision marking body. It determines the company's general policy guidelines, and approves annual budgets, operations, financial statements and balance sheets. The company's Board of Directors has the authority and major responsibilities to approve operational schemes within the general framework ratified by the General Assembly. It approves transactions and contracts, and prepares budgets and Board reports and annual balance sheets for presentation to the General Assembly. The Board supervises the implementation of general policy guidelines defined by the General Assembly, and pursues executive operations via the company's Managing Director.

## Subsidiary Companies:

**W**ith appropriate division of tasks and delegation of responsibilities to subsidiaries-affiliates, NIOC has been able to establish acceptable degrees of coordination within its organizational set up. In fact, NIOC's "Directors" act primarily in policy making and supervision while subsidiaries act as their executive arm in coordinating an array of operations such as exploration, drilling, production and delivery of crude oil and natural gas, for export and domestic consumption.


- Website: www.northdrilling.com
- email: info@northdrilling.com

**PetroIran Development Company**
- Website: www.petroiran.com
- email: info@petroiran.com

**Ahwaz Pipe Mills Company**
- Website: www.apm-ir.com
- email: tabibi@apm-ir.com

**Petropars**
- Website: www.petropars.com
- email: webadmin@ppars.com

**Fuel Consumption Optimization Co.**
- Website: www.ifco.ir
- email: info@ifco.ir

**National Iranian Tanker Co.**
- Website: www.nitc.co.ir
- email: administrator@nitc.co.ir

**Exploration Service Company (ESC)**
- Website: www.oeoc.ir
- email: info@oeoc.ir

**Kala Naft London Ltd.**
- Website: www.kalaltd.com
- email: admin@kalaltd.com

**MSP Kala Naft Co. Tehran**
- Website: www.kalanaft.com
- email: info@kalanaft.com

**Arvandan Oil and Gas Company**
- Website: www.arvandan.org
- email: info@arvandan.org

**NIOC Today**
National Iranian Oil Company Today.
.wmv Format
4.37 MB

|Home| Subsidiaries| Tenders| Auctions|
|Seminars| News| Organization Chart| Contact|

© 2003, NIOC - National Iranian Oil Company. All Rights Reserved. email: webmaster@nioc.ir

# EXHIBIT "D"





**What You Need To Know About U.S. Economic Sanctions**

U.S. Department of the Treasury
Office of Foreign Assets Control

IRAN

## An overview of O.F.A.C. Regulations involving Sanctions against Iran

**Iranian Transactions Regulations - 31 C.F.R. Part 560**

As a result of Iran's support for international terrorism and its aggressive actions against non-belligerent shipping in the Persian Gulf, President Reagan, on October 29, 1987, issued Executive Order 12613 imposing a new import embargo on Iranian-origin goods and services. Section 505 of the International Security and Development Cooperation Act of 1985 ("ISDCA") was utilized as the statutory authority for the embargo which gave rise to the Iranian Transactions Regulations, Title 31 Part 560 of the U.S. Code of Federal Regulations (the "ITR").

Effective March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of weapons of mass destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran. On May 6, 1995, he signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA") as well as the ISDCA, substantially tightening sanctions against Iran.

On August 19, 1997, the President signed Executive Order 13059 clarifying Executive Orders 12957 and 12959 and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, are prohibited.

On March 17, 2000, the Secretary of State announced that sanctions against Iran would be eased to allow U.S. persons to purchase and import carpets and food products such as dried fruits, nuts, and caviar from Iran. This change was implemented through amendments to the ITR at the end of April 2000.

Corporate criminal penalties for violations of the Iranian Transactions Regulations can range up to $500,000, with individual penalties of up to $250,000 and 20 years in jail. Civil penalties of up to $50,000 may also be imposed administratively.

This fact sheet provides general information about the Iranian sanctions program imposed by Executive Orders 12957, 12959, and 13059. The sanctions are administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

• **IMPORTS FROM IRAN** - Goods or services of Iranian origin may not be imported into the United States, either directly or through third countries, with the following exceptions:

(a) Gifts valued at $100 or less.

(b) Information or informational materials.

(c) Foodstuffs intended for human consumption that are classified under chapters 1-23 of the Harmonized Tariff Schedule of the United States; and

(d) Carpets and other textile floor coverings and carpets used as wall hangings that are classified under chapter 57 or heading 9706.00.0060 of the Harmonized Tariff Schedule of the United States.

U.S. persons are prohibited from providing financing for prohibited import transactions. There are restrictions on letter of credit transactions involving the Government of Iran (see FINANCIAL DEALINGS WITH IRAN, FINANCING PURCHASES FROM IRAN OR ITS GOVERNMENT, and FINANCING IRANIAN PURCHASES FROM IRAN OR ITS GOVERNMENT OTHER THAN PURCHASES OF IRANIAN-ORIGIN FOODSTUFFS AND CARPETS.)

• **EXPORTS TO IRAN** - In general, unless licensed by OFAC, goods, technology (including technical data or other information subject to Export Administration Regulations), or services may not be exported, reexported, sold or supplied, directly or indirectly, from the United States or by a U.S. person, wherever located, to Iran or the Government of Iran. The ban on providing services includes any brokering function from the United States or by U.S. persons, wherever located. For example, a U.S. person, wherever located, or any person acting within the United States, may not broker offshore transactions that benefit Iran or the Government of Iran, including sales of foreign goods or arranging for third-country financing or guarantees.

In general, a person may not export from the U.S. any goods, technology or services, if that person knows or has reason to know such items are intended specifically for supply, transshipment or reexportation to Iran. Further, such exportation is prohibited if the exporter knows or has reason to know that the U.S. items are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology or services to be directly or indirectly supplied, transshipped or reexported exclusively or predominantly to Iran or the Government of Iran. A narrow exception is created for the exportation from the United States, or reexport by U.S. persons wherever located of low-level goods or technology to third countries for incorporation or substantial transformation into foreign-made end products, provided the U.S. content is insubstantial, as defined in the regulations, and certain other conditions are met.

Donations of articles intended to relieve human suffering (such as food, clothing, and medicine), gifts valued at $100 or less, licensed exports of agricultural commodities, medicine, and medical devices, and trade in "informational materials" are permitted. "Informational materials" are defined to include publications, films, posters, phonograph records, photographs, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds, although certain Commerce Department restrictions still apply to some of those materials. To be considered

informational material, artworks must be classified under chapter subheadings 9701, 9702, or 9703 of the Harmonized Tariff Schedule of the United States.

With certain exceptions, foreign persons who are not U.S. persons are prohibited from reexporting to Iran sensitive U.S.-origin goods, technology or services to Iran or the Government of Iran. Foreign persons involved in such reexports may be placed on the U.S. Commerce Department's "Export Denial Orders" list.

U.S. persons may not approve, finance, facilitate or guarantee any transaction by a foreign person where that transaction by a foreign person would be prohibited if performed by a U.S. person or from the United States.

• DEALING IN IRANIAN-ORIGIN GOODS OR SERVICES - Except as authorized by amendments to the ITR relating to foodstuffs and carpets, which were issued at the end of April 2000, U.S. persons, including foreign branches of U.S. depository institutions and trading companies, are prohibited from engaging in any transactions, including purchase, sale, transportation, swap, financing, or brokering transactions related to goods or services of Iranian origin or goods or services owned or controlled by the Government of Iran.

Services provided in the United States by an Iranian national already resident in the United States are not considered services of Iranian origin.

These prohibitions apply to transactions by United States persons in locations outside the United States with respect to goods or services which the United States person knows, or has reason to know, are of Iranian origin or are owned or controlled by the Government of Iran. U.S. persons may not import such goods or services into or export them from foreign locations. A U.S. person may, however, engage in transactions in third countries necessary to sell, dispose of, store, or maintain goods located in a third country which were legally acquired by that U.S. person prior to May 7, 1995 on the condition that the transactions do not result in an importation into the United States of goods of Iranian origin.

• FINANCIAL DEALINGS WITH IRAN - New investments by U.S. persons, including commitments of funds or other assets, loans or any other extensions of credit, in Iran or in property (including entities) owned or controlled by the Government of Iran are prohibited. For your information, Appendix A contains a list of banks owned or controlled by the Government of Iran. While U.S. persons may continue to charge fees and accrue interest on existing Iranian loans, a specific license must be obtained to reschedule or otherwise extend the maturities of existing loans.

Payments for licensed sales of agricultural commodities, medicine and medical devices must reference an appropriate OFAC license and may not involve a debit or credit to an account of a person in Iran or the Government of Iran maintained on the books of a U.S. depository institution. Payments for and financing of such licensed sales may be accomplished by cash in advance, sales on open account (provided the account receivable is not transferred by the person extending the credit), or by third country financial institutions that are neither U.S. persons nor government of Iran entities. Any other arrangements must be specifically authorized by OFAC. U.S. depository institutions may advise and confirm letters of credit issued by third country banks covering licensed sales of agricultural commodities, medicine and medical devices.

Bank Saderat, one of the largest Iranian-government owned banks, has been found to be a significant facilitator of financial transactions between the government of Iran and Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and the Palestinian Islamic Jihad. For these reasons, the Department of the Treasury has taken steps to completely cut off Bank Saderat from the U.S. financial system.

U.S. financial institutions are prohibited from all financial transactions directly or indirectly involving Bank Saderat, including transactions that

might otherwise be permitted under the ITR. Prohibited transactions include: processing of U-turn transactions and transactions ordinarily incident to licensed or exempt transactions, including payments and financing for the exportation of licensed agricultural goods, medicine and medical devices and non-commercial payments to or from Iran. The amendments contain grace periods for the completion of certain transactions which were in effect at the time of the amendment.

• FINANCING PURCHASES FROM IRAN OR ITS GOVERNMENT - Payments for authorized imports of foodstuffs and carpets must reference the relevant section of the ITR. While U.S. depository institutions may deal with Iranian banks on a documentary collection basis [URC 522] for authorized purchases of foodstuffs or carpets, neither payments under collections, nor any other payments, may involve a debit or credit to the account of a person in Iran or the Government of Iran on the books of a U.S. depository institution. U.S. depository institutions may issue letters of credit for purchases provided that the letters of credit are not advised, negotiated, paid, or confirmed by a bank that is included within the definition of the term Government of Iran. A bank that is included in the definition of the term Government of Iran may forward letter of credit documents strictly on a documentary collection basis, either directly to a U.S. depository institution or to a third country bank that is not included within the definition of the term Government of Iran, but cannot send them on an "approval" basis since it cannot be party to a letter of credit.

• FINANCING IRANIAN-ORIGIN FOODSTUFFS AND CARPETS OTHER THAN PURCHASES FROM IRAN OR ITS GOVERNMENT - U.S. depository institutions are authorized to issue, advise, negotiate, pay, or confirm letters of credit to pay for transactions in or related to foodstuffs and carpets as referenced in amendments to the ITR issued at the end of April 2000, other than purchases from Iran or its Government, provided that such letters of credit are not issued, advised, negotiated, paid, or confirmed by a bank that is included within the definition of the term Government of Iran.

• "PRE-ZERO CONTRACTS" - Letters of credit and other financing arrangements with respect to trade contracts in force as of May 6, 1995, may be performed pursuant to their terms provided that the underlying trade transaction was completed prior to June 6, 1995 (February 2, 1996 for "agricultural commodities"), or as specifically licensed by OFAC. Standby letters of credit that serve as performance guarantees for services to be rendered after June 6, 1995, cannot be renewed and payment may not be made after that date without authorization by OFAC.

• OTHER BANKING SERVICES - U.S. depository institutions, including foreign branches, are prohibited from servicing accounts of the Government of Iran, including banks owned or controlled by the Government of Iran (as in Appendix A) or persons in Iran. However, they are authorized to pay interest, deduct reasonable and customary service charges, process transfers related to exempt transactions, such as the exportation of information or informational material, a travel-related remittance, or a payment for the shipment of a donation of articles to relieve human suffering or, at the request of an account holder, effect a lump sum closure of an account by payment to its owner. They may not otherwise directly credit or debit Iranian accounts.

U.S. depository institutions may handle "U-turn" transactions--cover payments involving Iran that are by order of a third country bank for payment to another third country bank--provided they do not directly credit or debit an Iranian account. They are also permitted to handle non-commercial family remittances involving Iran and non-commercial remittances involving humanitarian relief (such as for the victims of the earthquake in Khorasan), provided the transfers are routed to or from non-U.S., non-Iranian offshore banks.

U.S. depository institutions initiating or receiving payment orders involving Iran on behalf of customers must determine prior to processing such payments that they do not involve transactions prohibited by the Iranian Transactions Regulations.

• **TRAVEL** - All transactions ordinarily incident to travel to or from Iran, including the importation of accompanied baggage for strictly personal use, payment of maintenance and living expenses and acquisition of goods or services for personal use are permitted.

• **NON-GOVERNMENTAL ORGANIZATIONS** – Under a general license issued by OFAC, effective August 22, 2006, U.S. persons that are employees or contractors for the following international organizations - United Nations, the World Bank, the International Monetary Fund, the International Atomic Energy Agency, the International Labor Organization or the World Health Organization - are authorized to engage in transactions for the conduct of official business in or involving Iran. Authorized transactions may include leasing office space or purchasing Iranian-origin goods necessary to carry out official business, provided that the funds transfers to and from Iran do not involve a debit or credit on the books of a U.S. financial institution. The exportation or the re-exportation of US-origin or non-U.S.-origin goods or technology listed on the Commerce Control List in the Export Administration Regulations is not authorized.

• **OVERFLIGHTS PAYMENTS** - Payments to Iran for services rendered by the Government of Iran in connection with the overflight of Iran or emergency landing in Iran of aircraft owned by United States persons or registered in the U.S. are authorized.

• **PERSONAL COMMUNICATIONS, INFORMATION AND INFORMATIONAL MATERIALS** - The receipt or transmission of postal, telegraphic, telephonic or other personal communications, which does not involve the transfer of anything of value, between the United States and Iran is authorized. The exportation from the United States to Iran of information and informational materials, whether commercial or otherwise, regardless of format or medium of transmission, and any transaction incident to such exportation is authorized.

• **TRANSACTIONS INVOLVING U.S. AFFILIATES** - No U.S. person may approve or facilitate the entry into or performance of transactions or contracts with Iran by a foreign subsidiary of a U.S. firm that the U.S. person is precluded from performing directly. Similarly, no U.S. person may facilitate such transactions by unaffiliated foreign persons.

• **IRANIAN PETROLEUM INDUSTRY** - U.S. persons may not trade in Iranian oil or petroleum products refined in Iran, nor may they finance such trading. Similarly, U.S. persons may not perform services, including financing services, or supply goods or technology, that would benefit the Iranian oil industry.

### APPENDIX A - BANKS OWNED OR CONTROLLED BY THE GOVERNMENT OF IRAN

AGRICULTURAL COOPERATIVE BANK OF IRAN (a.k.a. BANK TAAVON KESHAVARZI IRAN), No. 129 Patrice Lumumba Street, Jalal-Al-Ahmad Expressway, P.O. Box 14155/6395, Tehran, Iran

AGRICULTURAL DEVELOPMENT BANK OF IRAN (a.k.a. BANK JOSIAIYI KESHAHVARZI), Farahzad Expressway, Tehran, Iran

BANK JOSIAIYI KESHAHVARZI (a.k.a. AGRICULTURAL DEVELOPMENT BANK OF IRAN), Farahzad Expressway Tehran, Iran

BANK MARKAZI JOMHOURI ISLAMI IRAN (a.k.a. THE CENTRAL BANK OF IRAN) Ferdowsi Avenue, P.O. Box 11365-8551, Tehran, Iran

BANK MASKAN (a.k.a. HOUSING BANK (of Iran)), Ferdowsi St., Tehran, Iran

BANK MELLAT, Park Shahr Varzesh Avenue, P.O. Box 11365/5964, Tehran, Iran, and all offices worldwide, including, but not limited to:

  ☐ BANK MELLAT (Branch), Ziya Gokalp Bulvari No. 12, Kizilay, Ankara, Turkey

  ☐ BANK MELLAT (Branch), Binbir Cicek Sokak, Buyukdere Caddesi, P.O. Box 67, Levant, Istanbul, Turkey

  ☐ BANK MELLAT (Branch), 48 Gresham Street, London EC2V 7AX, England

BANK MELLI, P.O. Box 11365-171, Ferdowsi Avenue, Tehran, Iran, and all offices worldwide, including, but not limited to:

  ☐ BANK MELLI (Branch), 4 Moorgate, London EC2R 6AL, England

  ☐ BANK MELLI (Branch), Schadowplatz 12, 4000 Dusseldorf 1, Germany

  ☐ BANK MELLI (Branch), Friedenstrasse 4, P.O Box 160 154, 6000 Frankfurt am Main, Germany

  ☐ BANK MELLI, P.O. Box 112129, Holtzbruecke 2, 2000 Hamburg 11, Germany

  ☐ BANK MELLI (Branch), Odeonsplatz 18, 8000 Munich 22, Germany

  ☐ BANK MELLI (Branch), 43 Avenue Montaigne, 75008 Paris, France

  ☐ BANK MELLI (Branch), 601 Gloucester Tower, The Landmark, 11 Pedder Street, P.O. Box 720, Hong Kong

  ☐ BANK MELLI (Representative Office), 333 New Tokyo Building, 3-1 Marunouchi, 3-chome, Chiyoda-ku, Tokyo, Japan

  ☐ BANK MELLI (Representative Office), 818 Wilshire Boulevard, Los Angeles, California 90017, U.S.A

  ☐ BANK MELLI (Representative Office), 767 Fifth Avenue, 44th Floor, New York, New York 10153, U.S.A

  ☐ BANK MELLI (Representative Office), Smolinsky Boulevard 22/14, Kv S., Moscow, Russia

  ☐ BANK MELLI (Branch), Flat No. 1, First Floor, 8 Al Sad El-Aaly, Dokki, P.O. Box 2654, Cairo, Egypt

  ☐ BANK MELLI (Branch), Ben Yas Street, P.O. Box No. 1894, Riga, Deira, Dubai, U.A.E

  ☐ BANK MELLI (Branch), P.O. Box 2656, Shaikha Maryam Building, Liwa Street, Abu Dhabi, U.A.E

  ☐ BANK MELLI (Branch), B.P.O. Box 1888, Clock Tower, Industrial Road, Al-Ain Club Building in from Emertel Al Ain, Al Ain, Abu Dhabi, U.A.E

  ☐ BANK MELLI (Branch), P.O. Box 1894, Riga, Ban Yas Street, Deira, Dubai, U.A.E

  ☐ BANK MELLI (Branch), Mohd-Habib Building, Al-Fahidi Street, P.O. Box 3093, Bur Dubai, Dubai, U.A.E.

  ☐ BANK MELLI (Branch), P.O. Box 248, Fujairah, U.A.E

  ☐ BANK MELLI (Branch), Sami Sagar Building Oman Street Al-Nakheel, P.O. Box 5270, Ras-Al Khaimah, U.A.E

  ☐ BANK MELLI (Branch), P.O. Box 459, Al Bory Street, Sharjah, U.A.E

  ☐ BANK MELLI (Branch), P.O. Box 785, Government Road, Shaikh Mubarak Building, Manama, Bahrain

  ☐ BANK MELLI (Branch), P.O. Box 23309, Shaikh Salman Street, Road No 1129, Muharraq 211, Bahrain

  ☐ BANK MELLI (Branch), P.O. Box 5643, Mossa Abdul Rehman Hassan Building, 238 Al Burj St., Ruwi, Muscat, Oman

BANK OF INDUSTRY AND MINE (of Iran) (a.k.a. BANK SANAT VA MADAN), Hafez Avenue, P.O. Box 11365/4978, Tehran, Iran

BANK REFAH KARGARAN (a.k.a. WORKERS WELFARE BANK (of Iran)), Mofletiah No 125, P.O. Box 15815-1866, Tehran, Iran

BANK SADERAT IRAN, Bank Saderat Tower, P.O. Box 15745-631, Somayeh Street, Tehran, Iran, and all offices worldwide, including, but not limited to:

  ☐ BANK SADERAT IRAN (Branch), Hamdam Street, Airport Road Intersection, P.O. Box 700, Abu Dhabi, U.A.E

  ☐ BANK SADERAT IRAN (Branch), Al-Am Road, P.O. Box 1140, Al Ein, Abu Dhabi, U.A.E

  ☐ BANK SADERAT IRAN (Branch), Liwara Street, P.O. Box 16, Ajman, U.A.E

  ☐ BANK SADERAT IRAN (Branch), 3rd Floor Dom Dasaf Building, Mejloka Street 7A, Ashkhabad, Turkmenistan

  ☐ BANK SADERAT IRAN (Branch), 25-29 Panepistemou Street, P.O. Box 4308, GR-10210, Athens 10672, Greece

  ☐ BANK SADERAT IRAN (Branch), Imam Ali Street, Sahat Yaghi, Ras Elain-Alektisad Building 2nd Floor, Baalbeck, Lebanon

  ☐ BANK SADERAT IRAN (Branch and Offshore Banking Unit), 106 Government Road, P.O Box 825, Manama Town 316, Bahrain

  ☐ BANK SADERAT IRAN (Branch), Hamra Pavilion Street, Savvagh and Daabout Building 1st Floor, P.O. Box 113-6717, Beirut, Lebanon

  ☐ BANK SADERAT IRAN (Branch), Alghobairi Boulevard, Beirut, Lebanon

  ☐ BANK SADERAT IRAN (Branch), 28 Sherif Street, P.O. Box 462, Cairo, Egypt

  ☐ BANK SADERAT IRAN (Branch), Old Ben-Ghanem Street (next to God Market), P.O. Box 2256, Doha, Qatar

  ☐ BANK SADERAT IRAN (Branch), Almaktoum Road, P.O. Box 4182, Deira, Dubai, U.A.E

  ☐ BANK SADERAT IRAN (Branch), Bazar Murshid, P.O. Box 4182, Deira, Dubai, U.A.E

  ☐ BANK SADERAT IRAN (Branch), Attahed Road, P.O Box 4182, Bur Dubai, Dubai, U.A.E

  ☐ BANK SADERAT IRAN (Branch), Sheraa Shekikh Zayad Street, P.O. Box 55, Fujairah, U.A.E

  ☐ BANK SADERAT IRAN (Branch), Wilhelm Leuschner Strasse 41, P.O Box 160151, W-6000 Frankfurt am Main, Germany

  ☐ BANK SADERAT IRAN (Branch), P.O. Box 112227, Hoplenhol Passage, Kiener Bustah 6-10, W-2000 Hamburg 11, Germany

  ☐ BANK SADERAT IRAN (Branch), Lothbury, London EC2R 7HD, England

  ☐ BANK SADERAT IRAN (Representative Office), 707 Wilshire Boulevard, Suite 4880, Los Angeles, California 90017, U.S.A

  ☐ BANK SADERAT IRAN (Representative Office), 55 East 59th Street, 16th Floor, New York, New York 10022, U.S.A

  ☐ BANK SADERAT IRAN (Branch), P.O. Box 4269, Murrah, Muscat, Oman

  ☐ BANK SADERAT IRAN (Branch), 16 rue de la Paix, Pans 2eme, 75002 Paris, France

  ☐ BANK SADERAT IRAN (Branch), Alaroba Road, P.O. Box 316, Sharjah, U.A.E

BANK SANAT VA MADAN (a.k.a. BANK OF INDUSTRY AND MINE (of Iran)), Hafez Avenue, P.O. Box 11365/4978, Tehran, Iran

BANK SEPAH, Emam Khomeini Square, P.O. Box 11364, Tehran, Iran, and all offices worldwide, including, but not limited to:

  ☐ BANK SEPAH (Branch), Muenchener Strasse 49, P.O. Box 10 03 47, W-6000 Frankfurt am Main 1, Germany

  ☐ BANK SEPAH (Branch), 5/7 Eastcheap, EC3M 1JT London, England

  ☐ BANK SEPAH (Representative Office), 650 Fifth Avenue, New York, New York 10019, U.S.A

  ☐ BANK SEPAH (Branch), 17 Place Vendome, 75001 Paris, France

  ☐ BANK SEPAH (Branch), Via Barberini 50, 00187 Rome, Italy

  ☐ BANK SEPAH (Representative Office), Ufficio di Rappresentan Za, Via Ugo Foscolo 1, 20121 Milan, Italy

BANK TAAVON KESHAVARZI IRAN (a.k.a. AGRICULTURAL COOPERATIVE BANK OF IRAN) No 129 Patrice Lumumba Street, Jalal-Al-Ahmad Expressway, P.O. Box 14155/6395, Tehran, Iran

BANK TEJARAT, 130 Taleghani Avenue, Hejatoullahi, P.O. Box 11365-5416, Tehran, Iran, and all offices worldwide, including, but not limited to:

⬭ BANK TEJARAT (Branch), 6/8 Clements Lane, London EC4N 7AP, England

⬭ BANK TEJARAT (Branch), 44 Avenue des Champs Elys-ee, 75008 Paris, France

DEUTSCH-IRANISCHE HANDELSBANK AG (n.k.a EUROPAEISCH-IRANISCHE HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany, and all offices worldwide, including, but not limited to:

⬭ DEUTSCH-IRANISCHE HANDELSBANK AG (n.k.a EUROPAEISCH-IRANISCHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihagh Bulvard, P.O. Box 15815/1787, Tehran 15148, Iran

EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany, and all offices worldwide, including, but not limited to:

⬭ EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihagh Bulvard, P.O. Box 15815/1787, Tehran 15148, Iran

HOUSING BANK (of Iran) (a.k.a. BANK MASKAN), Ferdowsi St., Tehran, Iran

IRAN OVERSEAS INVESTMENT BANK LIMITED (f.k.a IRAN OVERSEAS INVESTMENT CORPORATION LIMITED), 120 Moorgate, London EC2M 6TS, England, and all offices worldwide, including, but not limited to:

⬭ IRAN OVERSEAS INVESTMENT BANK LIMITED (Representative Office), 1137 Avenue Vali Asr off Park-e-Saii, P.O. Box 15115/531, Tehran, Iran

⬭ IRAN OVERSEAS INVESTMENT BANK LIMITED (Agency), Suite 3c Olympia House, 61/63 Dame Street, Dublin 2, Ireland

⬭ IRAN OVERSEAS INVESTMENT BANK LIMITED (Agency), Improgetti, Via Germanico 24, 00192 Rome, Italy

⬭ IRAN OVERSEAS TRADING COMPANY LIMITED (Subsidiary), 120 Moorgate, London EC2M 6TS, England

⬭ IRAN OVERSEAS INVESTMENT CORPORATION LIMITED (n.k.a IRAN OVERSEAS INVESTMENT BANK LIMITED), 120 Moorgate, London EC2M 6TS, England

THE CENTRAL BANK OF IRAN (a.k.a. BANK MARKAZI JOMHOURI ISLAMI IRAN), Ferdowsi Avenue, P.O. Box 11365-8551, Tehran, Iran

WORKERS WELFARE BANK (of Iran) (a.k.a. BANK REFAH KARGARAN), Mofettah No. 125, P.O. Box 15815-1866, Tehran, Iran

## Iranian Assets Control Regulations - 31 C.F.R Part 535

Separate Iranian sanctions regulations appear at 31 C.F.R. Part 535. On November 14, 1979, the assets of the Government of Iran in the United States were blocked in accordance with IEEPA following the seizure of the American Embassy in Teheran and the taking of U.S. diplomats as hostages. Under the Iranian Assets Control Regulations (Title 31 Part 535 of the U.S. Code of Federal Regulations), some US$12 billion in Iranian Government bank deposits, gold, and other properties were frozen, including $5.6 billion in deposits and securities held by overseas branches of U.S. banks. The assets freeze was eventually expanded to a full trade embargo, which remained in effect until the Algiers Accords were signed with Iran on January 19, 1981. Pursuant to the Accords, most Iranian assets in the United States were unblocked and the trade embargo was lifted. The U.S. Government also canceled any attachments that U.S. parties had secured against Iranian assets in the United States, so that the assets could be returned to Iran or transferred to escrow accounts in third countries pursuant to the Accords. This action was upheld by the Supreme Court in 1981 in Dames & Moore v. Regan. Although greatly modified in scope, the old Iranian Assets Control Regulations remain in effect. Many U.S. nationals have claims against Iran or Iranian entities for products shipped or services rendered before the onset of the 1979 embargo or for losses sustained in Iran due to expropriation during that time. These claims are still being litigated in the Iran-United States Claims Tribunal at The Hague established under the Algiers Accords. Certain assets related to these claims remain blocked in the United States and consist mainly of military and dual-use property.

This document is explanatory only and does not have the force of law. The Executive Orders and implementing regulations dealing with Iran contain the legally binding provisions governing the sanctions. This document does not supplement or modify those Executive Orders or regulations.

The Treasury Department's Office of Foreign Assets Control also administers sanctions programs involving the Balkans, Burma (Myanmar), Cuba, Diamond Trading, Iran, Iraq, Liberia, North Korea, Sudan, Syria, Zimbabwe as well as highly enriched uranium, designated Terrorists and international Narcotics Traffickers, Foreign Terrorist Organizations and designated foreign persons who have engaged in activities relating to the proliferation of weapons of mass destruction. For additional information about these programs or about sanctions involving Iran, please contact the:

OFFICE OF FOREIGN ASSETS CONTROL
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W. - Annex
Washington, D.C. 20220
http://www.treas.gov/ofac
202/622-2490

09-08-06

- 4 -

.

.

## EXHIBIT "E"

**CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN**

Home | Site Map | Links | Contact | **فارسی**

Search  Advanced Search

About the Bank    Press    Monetary Policy    Publications    Statistics    Laws & Regulations    Bank Supervision    Payment Systems    Banknotes & Coins

Home ·· About the Bank ·· General Information

About the Bank

General Information

Governors

# General Information

🖨 PRINT

⚑ BOOKMARK

✉ SEND

"BANK MARKAZI JOMHOURI ISLAMI IRAN" is the central bank of the Islamic Republic of Iran. The Central Bank of Iran (CBI) was established in 1960 (1339 solar year). As stated in the Monetary and Banking Act of Iran (MBAI), CBI is responsible for the design and implementation of the monetary and credit policies with due regard to the general economic policy of the country. Four major objectives of CBI as stated in the MBAI are:

- Maintaining the value of national currency
- Maintaining the equilibrium in the balance of payments
- Facilitating trade-related transactions
- Improving the growth potential of the country

To achieve the objectives as stated in the MBAI, CBI is endowed with the responsibility of fulfilling the following functions:

- Issuance of notes and coins
- Supervision of banks and credit institutions
- Formulation and regulation of foreign exchange policies and transactions
- Regulation on gold transactions
- Formulation and regulation on transactions and inflow/outflow of Domestic currency

As banker to the government, the CBI is mandated to keep government accounts, grant loans and credits to state enterprises and agencies. The CBI also covers such functions as lending facilities to banks, purchase and sale of government participation papers as well as other legal banking operations.

After the Islamic Revolution of Iran laws and regulations pertaining to money and banking institutions and monetary policy design and implementation were amended to reflect the priorities and principles as set out in the Constitution of the Islamic Republic of Iran. At present, CBI is responsible for the design and conduct of monetary policy within the context of government's five year development plan and annual budget. In line with the articles of the constitution, the monetary and credit policies are formulated and implemented in consistent with the MBAI as amended, Usury-Free Banking Act of 1983, the Banks Nationalization Act of 1979, and the Law for the Administration of Banks, of 1979.

Legal | Webmaster

Copyright © 2008 Central Bank of the Islamic Republic of Iran

EXHIBIT _E_





Home | Site Map | Links | Contact  فارسی

[                    ]  Search  Advanced Search

About the Bank    Press    Monetary Policy    Publications    Statistics    Laws & Regulations    Bank Supervision    Payment Systems    Banknotes & Coins

Home » Bank Supervision » Banks and Credit Institutions

**Bank Supervision**

# Banks and Credit Institutions

🖨 PRINT
📑 BOOKMARK
📧 SEND

Specialized Government Banks  |  Private Banks  |  Near-bank  |  Commercial
Government - Owned Banks

### Specialized Government Banks

·· Export Development Bank of Iran

·· Bank of Industry & Mine

·· Bank Keshavarzi

·· Bank Maskan

Legal | Webmaster

Copyright © 2008 Central Bank of the Islamic Republic of Iran



Home ·· Site Map · Links · Contact  فارسی

Search  Advanced Search

About the Bank    Press    Monetary Policy    Publications    Statistics    Laws & Regulations    Bank Supervision    Payment Systems    Banknotes & Coins

Home ·· Bank Supervision ·· Banks and Credit Institutions ·· Commercial Government - Owned Banks

**Banks and Credit Institutions**

# Commercial Government - Owned Banks

🖨 PRINT

📑 BOOKMARK

✉ SEND

·· Bank Mellat

·· Bank Melli Iran

·· Post Bank of Iran

·· Bank Refah

·· Bank Saderat Iran

·· Sepah Bank

·· Tejarat Bank

Legal | Webmaster

Copyright © 2008 Central Bank of the Islamic Republic of Iran

# EXHIBIT "F"



# Energy Information Administration
### Official Energy Statistics from the U.S. Government

search

Glossary

## Iran



COUNTRY ANALYSIS BRIEFS

### Oil

*Iran is OPEC's second-largest oil producer and the fourth-largest crude oil exporter in the world.*

According to *Oil and Gas Journal*, Iran has 136 billion barrels of proven oil reserves, or roughly 10 percent of the world's total proven petroleum reserves as of January 1, 2007. Iran has 40 producing fields, 27 onshore and 13 offshore, with the majority of crude oil reserves located in the southwestern Khuzestan region near the Iraqi border. Iran's crude oil is generally medium in sulfur content and in the 28°-35° API range.

October 2007

| Background |
|---|
| Oil |
| Natural Gas |
| Electricity |
| Quick Facts |
| Links |
| Sources |

Full Report
**HTML**
**PDF**

Contact Info
**cabs@eia.doe.gov**
**(202)586-8800**
**[more contacts]**



Top Proven World Oil Reserves, January 1, 2007

| | Billion Barrels |
|---|---|
| Saudi Arabia | 259.8 |
| Canada | 179.2 |
| Iran | 136.3 |
| Iraq | 115.0 |
| Kuwait | 99.0 |
| UAE | 97.6 |
| Venezuela | 80.0 |
| Russia | 60.0 |
| Libya | 41.5 |
| Nigeria | 36.2 |
| Kazakhstan | 30.0 |

Source: Oil & Gas Journal, Jan. 1, 2007

Iran is OPEC's second-largest producer after Saudi Arabia. In 2006, Iran produced an estimated 4.2 million barrels per day (bbl/d) of total liquids, of which 3.8 million bbl/d was crude oil, equal to 5 percent of global production.



OPEC Total Crude Oil Production in 2006E

| | Million Barrels Per Day |
|---|---|
| Saudi Arabia | 9.2 |
| Iran | 3.8 |
| Kuwait | 2.5 |
| Venezuela | 2.5 |
| United Arab Emirates | 2.5 |
| Nigeria | 2.2 |
| Iraq | 2.0 |
| Libya | 1.7 |
| Algeria | 1.4 |
| Indonesia | 0.9 |
| Qatar | 0.8 |

Source: EIA Short-Term Energy Outlook (May 2007)

Iran's oil consumption totaled 1.6 million bbl/d in 2006. The Iranian government heavily subsidizes the price of refined oil products which has contributed to increased domestic demand. Iran has limited refinery capacity to produce light fuels, and imports much of its gasoline supply. Iranian domestic oil demand is mainly for gasoline and automotive gasoils, but domestic demand for other oil products are declining due to the substitution of natural gas. However, it is an overall net petroleum products exporter due to large exports of residual fuel oil. Oil export revenues represent the majority of Iran's total exports earnings, but the country suffers from budget deficits due to a growing population and large government

EXHIBIT F

subsidies on gasoline and food products. In 2005, the International Monetary Fund (IMF) estimated that energy subsidies accounted for 12 percent of Iran's GDP, the highest rate in the world according to an International Energy Agency (IEA) study.

| Major Iranian Oil Field Production and Reserves, 2006 | | |
|---|---|---|
| Field | Production Capacity Thousand (bbl/d) | Reserves Millions of Barrels |
| Ahwaz-Asmari | 700 | 10,100 |
| Marun | 520 | 9,500 |
| Gachsaran | 480 | 8,500 |
| Karanj-Parsi | 250 | 4,650 |
| Agha Jari | 200 | 8,700 |
| Nowrooz and Soroosh | 200 | 6,000 |
| Doroud 1 & 2 | 200 | 600 |
| Rag-e-Safid | 180 | 2,400 |
| Bangestan | 158 | 6,500 |
| Abu Zar | 140 | 50 |
| Sirri A & E/C & D | 130 | 1,200 |
| Salman | 100 | 800 |
| **Major Field Total:** | **3,258** | **59,000** |

Source: Global Insight

Iran produced 6 million bbl/d of crude oil in 1974, but has been unable to produce at that level since the 1979 revolution due to a combination of war, limited investment, sanctions, and a high rate of natural decline in Iran's mature oil fields. Iran's oil fields need structural upgrades including enhanced oil recovery (EOR) efforts such as natural gas injection. Iran's fields have a natural annual decline rate estimated at 8 percent onshore and 10 percent offshore, while current Iranian recovery rates are 24-27 percent, 10 percent less than the world average. It is estimated that 400,000-500,000 bbl/d of crude production is lost annually due to reservoir damage and decreases in existing oil deposits.

*Upstream Projects*
The Azadegan project phases I and II represent the greatest potential increase in Iranian crude oil production. Azadegan contains 26 billion barrels of proven crude oil reserves, but is geologically complex and difficult to extract. Iran and Venezuela have agreed on a $4 billion investment in the Ayacucho 7 block, where there are an estimated 31 billion barrels of oil. Iran's Northern Drilling Company (NDC) has also worked with Russia's Lukoil on oil field development in the Caspian Sea. (See Caspian Sea Analysis Brief)

| New Major Iranian Upstream Projects through 2012 | | | |
|---|---|---|---|
| Field | Company | Thousand bbl/d | Online |
| Salman, Foroozan, Daroud | Total, Petro Iran | 200 | 2007 |
| Darkhovin, Phase II & III | ENI | 100 | 2007 |
| South Pars (Ahwaz) | NOIC | 150 | 2008 |
| Azadegan Phase I (south) | NIOC | 100 | 2009 |
| Kushk-Hosseinieh | NOIC | 300 | 2010 |
| Yadavaran | NIOC & Chinese Partners | 300 | 2011 |
| Azadegan Phase II (north) | NOIC | 110 | 2012 |
| **New Potential Total:** | | **1,260** | |

Source: OPEC, *Global Insight*

Iran plans to increase oil production to over 5 million bbl/d by 2010, but it will need foreign help. According to *Global Insight,* an estimated $25-35 billion is required to meet the government's 5.8 million bbl/d target by 2015. Investment in Iran's energy sector has been tempered due to the election of the conservative government of President Mahmoud Ahmadinejad in 2005, the international controversy surrounding the Iranian uranium enrichment and nuclear program, and economic sanctions. According to the IEA 2007 Medium-Term Oil Market Report, Iran will not be able to increase its net expansion capacity through 2012.

**U.S. Sanctions**
U.S. sanctions against Iran due to Iran's historic support for international terrorism and its actions against non-belligerent shipping in the Persian Gulf impact the development of its petroleum sector. According to the Iran Transactions Regulations, administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), U.S. persons may not directly or indirectly trade, finance, or facilitate any goods, services or technology going to or from Iran, including goods, services or technology that would benefit the Iranian oil industry. U.S. persons are also prohibited from entering into or approving any contract that includes the supervision, management or financing of the development of petroleum resources located in Iran.

**Sector Organization**
The state-owned National Iranian Oil Company (NIOC) is responsible for oil and gas production and exploration. The National Iranian South Oil Company (NISOC), a subsidiary of NIOC, accounts for 80

percent of local oil production covering the provinces of Khuzestan, Bushehr, Fars, and Kohkiluyeh va Boyer Ahamd. Though private ownership of upstream functions is prohibited under the Iranian constitution, the government has allowed for buyback contracts which allow international oil companies (IOCs) to enter exploration and development through an Iranian affiliate. The contractor receives a remuneration fee, usually an entitlement to oil or gas from the developed operation. In August 2007, President Mahmoud Ahmadinejad appointed NIOC executive Gholamhossein Nozarl to serve as Acting Oil Minister, replacing Vaziri Hamaneh and creating controversy over President Ahmadinejad's role in the energy sector.

### Exports

According to International Energy Agency's Monthly Oil Data Service and Global Trade Atlas, Iran's net crude and product exports in 2006 averaged 2.5 million bbl/d, primarily to Japan, China, India, South Korea, Italy, and other Organization for Economic Co-operation and Development (OECD) nations, making it the fourth-largest exporter of crude oil in the world. In 2006, Iran's oil export revenues amounted to $54 billion.

| Top Iranian Crude Oil Exports, 2006 | |
|---|---|
| Country | Thousand (bbl/d) |
| Japan | 448 |
| China | 335 |
| India* | 302 |
| South Korea | 204 |
| Italy | 191 |
| Turkey | 179 |
| France | 135 |
| South Africa | 127 |
| Taiwan | 117 |
| Greece | 117 |
| Other | 345 |
| **Total Exports:** | **2,500** |

*India's imports only reported for April-August 2006
Source: IEA Monthly Oil Data Service, March 2007;
Global Trade Atlas

### Iran's Oil Production and Consumption, 1976-2006E



Source: EIA *International Petroleum Monthly*
Short-Term Energy Outlook (July 2007)

*Export Terminals*
Iran has the largest oil tanker fleet in the Middle East, the National Iranian Tanker Company, which holds 29 ships including Very Large Crude Carriers. Kharg Island is the country's largest terminal with a holding capacity of 16 million barrels of oil and a loading capacity of 5 million bbl/d, followed by Lavan Island with capacity to store 5 million barrels and loading capacity of 200,000 bbl/d. Other important terminals include Kish Island, Abadan and Bandar Mahshar, and Neka, which helps facilitate imports from the Caspian region. The Strait of Hormuz, on the southeastern coast of Iran, is an important route for oil exports from Iran and other Persian Gulf countries. (See Persian Gulf Analysis Brief) At its narrowest point the Strait of Hormuz is 34 miles wide, yet an estimated 17 million barrels, or roughly two-fifths of all seaborne traded oil, flows through the Strait daily. Iranian Heavy Crude Oil is Iran's largest crude export at 1.6 million bbl/d followed by Iranian Light at 1 million bbl/d.

| National Iranian Oil Company (NIOC) Crude Exports by Blend | | | |
|---|---|---|---|
| Name | API Gravity | Sulfur content | Exports (bbl/d) |
| Iranian Heavy | 31° | 1.70% | 1.6 million |
| Iranian Light | 34.6° | 1.40% | 1 million |
| Foroozan Blend and Sirri | 29-31° | n/a | 165,000 |
| Lavan Blend | 34-35° | 1.8-2% | 75,000 |

### Refining

Iran's total refinery capacity is 1.5 million bbl/d from nine refineries operated by the National Iranian Oil Refining and Distribution Company (NIORDC), a NIOC subsidiary. Iranian refineries are unable to keep pace with domestic demand, and face major infrastructure problems. The country plans to add around 985,000 bbl/d of refining capacity by 2012, mostly through expansions and upgrades for gasoline yields at the Bandar Abbas, Bushehr, and the 90-year-old Abadan refineries. Large expansion projects at Bandar Abbas, including new catalytic reformers, distillation units, and condensate splitters will help supply the domestic demand, but it will probably not eliminate all gasoline imports. Iran has also discussed joint ventures in Asia, including China, Indonesia, Malaysia, and Singapore to expand refining activity.

| IRAN REFINERY PROJECTS (through 2012) | | | | |
|---|---|---|---|---|
| Refinery | Project Type | Online | Additional Production Capacity (thousand bbl/d) | Notes |
| Bandar Abbas | Upgrade & Expansion | 2012 | 300 | heavy crude processing |
| Bushehr | New Refinery | TBD | 170 | |
| Abadan | Upgrade | 2009 | 140 | |
| Abadan | New Refinery | 2012 | 80 | gasoline production |
| Arak | Expansion | 2009 | 80 | |
| Bandar Assaluyeh | New Refinery | TBD | 80 | |
| Bandar Abbas | Expansion | 2009 | 60 | |
| Tehran | Expansion | 2012 | 50 | gasoline production |
| Tabriz | Expansion | 2012 | 25 | gasoline production |
| Total New Refinery Capacity: | | | 985 | |

Source: PFC Energy, *Global Insight*

### Pipelines

Iran has an expansive domestic oil network including 5 pipelines, and multiple international pipeline projects under consideration. Recently, an expansion of the 150 mile pipeline from the port of Neka on the Caspian coast to Rey, Tabriz, and Tehran refineries has reached a capacity of 300,000 bbl/d according to *Global Insight*. Iran has invested in its import capacity at the Caspian port to handle increased product shipments from Russia and Azerbaijan, and enable crude swaps with Turkmenistan and Kazakhstan. In the case of crude swaps, the oil from the Caspian is consumed domestically in Iran, and an equivalent amount of oil is produced for export through the Persian Gulf with a Swiss-trading arm of NIOC for a swap fee.

*In 2006, Iran imported over 192,000 bbl/d of gasoline and relied upon imports to meet almost half of its fuel needs costing $5 billion.*

### Gasoline

Iran is the second biggest gasoline importer in the world after the United States, consuming over 400,000 bbl/d. According to FACTS Global Energy, Iran imported over 192,000 bbl/d of gasoline in 2006 costing $5 billion. The gasoline consumption growth rate has averaged ten percent annually over the past six years, and the cost of imports is expected to reach $6 billion in 2007, up from $2.8 billion in 2005. Gasoline prices are heavily subsidized, and sold below the market price at around 42 cents per gallon, which has encouraged increased consumption. An increase in vehicle sales in recent years has also contributed to the problem. According to PFC Energy, car ownership in Iran grew 250 percent between 1990 and 2006, and a majority of these vehicles are older models. Gasoline powered vehicles in Iran are expected to reach 14.9 million by the end of 2007. Iran does not have sufficient refining capacity to meets its domestic gasoline and other light fuel needs. Therefore Iran imports gasoline from India, Turkmenistan, Azerbaijan, the Netherlands, France, Singapore, and the United Arab Emirates. Iran also imports from large, multinational wholesalers such as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies.

#### New Gasoline Rationing System

In June 2007, the Iranian government instituted a gasoline rationing system. The decision followed a 25 percent price increase to 42 cents per gallon in May. NIORDC is responsible for the program which allows private cars to purchase 26 gallons per month and taxis to buy 211 gallons per month. The rations and increased costs are politically unpopular in Iran. Customers are allowed to purchase their ration six months in advance. Part-time taxis, commercial vehicles, and government vehicles also have special

Case 3:08-mc-80030-JSW   Document 17-6   Filed 04/20/2008   Page 18 of 18

allowances. Records are maintained on smart cards, and later this year the government is expected to announce the price for gasoline bought beyond quota levels.

Iran's gasoline consumption dropped 30 percent immediately after the rationing scheme was adopted. NIOC executive, Hojjatollah Ghanimifard, stated that Iranian gasoline imports for August 2007 dropped 14 percent, although an additional $1.5 billion was requested by the Iranian Oil Ministry to increase gasoline imports through March 2008. The International Energy Agency reported in its August 2007 Oil Market Update that gasoline consumption will likely increase again due to the fact that Iran allows advance purchase of gasoline at a subsidized rate. The combination of rationing, price hikes, increased refining capacity, as well as compressed natural gas (CNG) production, will reduce Iranian gasoline import demand by an estimated 30,000 bbl/d in the next three years according to FACTS Global Energy.

Contact Us □ Feedback □ Privacy/Security □ Jobs □ About Us

1    **DAVID J. COOK, ESQ. (State Bar # 060859)**
     **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2    **COOK COLLECTION ATTORNEYS**
     **A PROFESSIONAL LAW CORPORATION**
3    165 Fell Street
     San Francisco, CA 94102
4    Mailing Address: P.O. Box 270
     San Francisco, CA 94104-0270
5    Tel.: (415) 989-4730
     Fax: (415) 989-0491
6    File No. 52,759

7    Attorneys for Plaintiffs
     DEBORAH D. PETERSON, Personal Representatives
8    of the Estate of James C. Knipple (Dec.), et al.

9                UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12    DEBORAH D. PETERSON, Personal    )    CASE NO. CV 08-80030 MISC JSW (BZ)
     Representative of the Estate of James C.    )
     Knipple (Dec.), et al.,    )
13                               )
              Plaintiffs.    )    PROOF OF SERVICE
14                               )
     vs.    )
15                               )
     ISLAMIC REPUBLIC OF IRAN, et al.,    )
16                               )
             Defendants.    )
17    _____ )

18

19    *Via Email dr-ahmadinejad@president.ir*      ISLAMIC REPUBLIC OF IRAN
     PRESIDENT DR. AHMADINEJAD      Khomeini Avenue
                              United Nations Street
20    ISLAMIC REPUBLIC OF IRAN      Teheran, Iran
     acting through its      ATTN: Responsible Officer
21    MINISTRY OF DEFENSE AND
     SUPPORT FOR ARMED FORCES      1. National Iranian Gas Export Company
22    No. 1 Shahid Kaboli Street      Website: www.nigec.ir
     Beginning of Resalat Highway      Email: info@nigec.ir
23    Seyyed Khandan Bridge
     P.O. Box 16765-1479      2. National Iranian South Oil Company
24    Tehran, Iran      Website: www.nisoc.com
     Attn: Responsible Officer      Email: info@nisoc.com
25
     ISLAMIC REPUBLIC OF IRAN      3. National Iranian Offshore Oil Company
26    Pasadaran Avenue      Website: www.iooc.co.ir
     Golestan Yekom      Email: webmaster@iooc.co.ir
27    Teheran, Iran
     ATTN: Responsible Officer
28

4. National Iranian Central Oil Fields Co.
Website: www.icofc.ir
Email: info@icofc.ir

5. Khazar Exploration & Production Co.
Tehran HQ.
No.19 – 11th Alley - Vozara Ave. - Arjantin
sq.
Tehran. Iran
Tel: +98-21-88722430, 3
Fax: +98-21-88711386

6. Petroleum Engineering & Development
Co.
Website: www.pedec.ir
Email: info@pedec.net

7. Pars Oil and Gas Company
Website: www.pogc.org
Email: info@pogc.ir

8. Pars Special Economic energy Zone Co.
Website: www.pseez.com
Email: info@pseez.com

9. National Iranian Oil Terminals Company
Website: www.nioc-otc.com
Email: info@nioc-otc.com

10. National Iranian Drilling Company
Website: www.nidc.ir
Email: webmaster@nidc.ir

11. North Drilling Company
Website: www.northdrilling.com
Email: info@northdrilling.com

12. PetroIran Development Company
Website: petroiran.com
Email: info@petroiran.com

13. Ahwaz Pipe Mills Company
Website: www.apm-ir.com
Email: tabibi@apm-ir.com

14. Petropars
Website: www.petropars.com
Email: webadmin@ppars.com

15. Fuel Consumption Optimization Co.
Website: www.ifco.ir
Email: info@ifco.ir

16. National Iranian Tanker Co.
Website: www.nitc.co.ir
Email: administrator@nitc.co.ir

17. Exploration Service Company (ESC)
Website: www.oeoc.ir
Email: info@oeoc.ir

18. Kala Naft London Ltd.
Website: www.kalaltd.com
Email: admin@kalaltd.com

19. Kala Naft Canada Ltd.
Website: www.kalanaftcanada.com
Email: info@kalanaftcanada.com

20. Arvandan Oil and Gas Company
Website: www.arvandan.org
Email: info@arvandan.org

21.    National Iranian Gas Company
Website: www.nigc.org
Email: webmaster@nigc.org

22.    National Iranian Petrochemical
Company
Website: www.nipc.net
Email: webmaster@nipc.net

23. National Iranian Oil Refining and
Distribution Co.
Website: www.niordc.ir
Email: info@niordc.ir

1    I declare:

2    I am employed in the County of San Francisco, California. I am over the age of eighteen
(18) years and not a party to the within cause. My business address is 165 Fell Street, San
3    Francisco, CA 94102. On the date set forth below, I served the attached:

4    MEMORANDUM OF POINTS AND AUTHORITIES PURSUANT TO ORDER FOR
FURTHER BRIEFING (DOCUMENT 16)

5

6    DECLARATION OF DAVID J. COOK, ESQ. PURSUANT TO ORDER FOR FURTHER
BRIEFING (DOCUMENT 16)

7    on the above-named person(s) by:

8    __XXX__  (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage
thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
9    person(s) served above.

10    __XXX__  (BY EMAIL) Emailing addressed to the person's/company's email address listed
above.

11
I declare under penalty of perjury that the foregoing is true and correct.
12
Executed on April 20, 2008.
13

14                                          /s/ Karene Jen
                                           Karene Jen
15

16

17

18

19

20

21

22

23

24

25

26

27

28