**DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ (State Bar # 62386)**
**COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
165 Fell Street
San Francisco. CA 94102
Mailing Address: P.O. Box 270
San Francisco. CA 94104-0270
Tel: (415) 989-4730
Fax: (415) 989-0491
File No. 52,759

Attorneys for Plaintiffs
DEBORAH D. PETERSON, Personal Representatives
of the Estate of James C. Knipple (Dec.), et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.). et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ISLAMIC REPUBLIC OF IRAN, et al., <br><br> Defendants. | CASE NO. 3:08-mc-80030-JSW <br><br> NOTICE OF MOTION AND MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) <br><br> **[LANDING RIGHTS]** <br><br> Date:  May 30, 2008 <br> Time: 9:00 a.m. <br> Courtroom: 17, 16th Floor <br> Judge: Jeffrey S. White |

TO THE ISLAMIC REPUBLIC OF IRAN. AND ALL OF ITS AGENCIES AND INSTRUMENTALITIES, INCLUDING BUT NOT LIMITED TO IRAN AIR. AND TO ALL OF ITS REPRESENTATIVES. AND ALL THIRD PARTIES HEREIN:

PLEASE TAKE NOTICE that on the 30th day of May, 2008 at the hour of a.m.. or as soon thereafter as the matter can be heard in Courtroom 17, before the Honorable Jeffrey S. White, Judge of the United States District Court, at the courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), et al., will and do hereby move this court for the following relief, for purposes of enforcement of the judgment in their favor rendered in the above-

1    entitled action dated 9/7/07 in the amount of $2,656,944,877, as follows:

2         1. For the issuance of an order for assignment of rights, accounts, accounts receivable,

3    rights to payment of money, and general intangibles, owed and in favor of THE ISLAMIC

4    REPUBLIC OF IRAN, and all of its agencies and instrumentalities, including Iran Air,

5    (hereinafter collectively "Iran") due from various airlines as set forth below, consisting of landing

6    rights, gate fees, fuel fees, food charges, rental of or use of any hanger facility, gate, terminal use,

7    or other facility made available by and on behalf if Iran for and on behalf of the below-listed

8    airlines in the operation of any airport, or other transportation facility, as follows:

9         A.    QATAR AIRLINES.
          B.    AIR FRANCE.
10        C.    BMI (British Midlands).
          D.    TURKISH AIRLINES.
11        E.    EMIRATES AIRLINES.
          F.    BRITISH AIRWAYS.
12        G.    AUSTRALIAN AIRLINES.
          H.    GULF AIR.
13        I.    LUFTHANSA.
          J.    ALITALIA.
14        K.    SWISS INTERNATIONAL AIRLINES.
          L.    AEROFLOT.
15        M.    KLM (Royal Dutch Airlines).
          N.    JAL (Japan Airlines).
16        O.    KUWAIT AIRLINES.
          P.    P.I.A. AIR (Pakistani Air).
17        Q.    ROYAL JORDANIAN.
          R.    SAFFAT AVIATION SERVICES.
18        S.    SYRIAN AIRLINES.
          T.    CHINA SOUTHERN AIRLINES
19        (And all others, hereinafter collectively "Airlines".)

20        2. For an order compelling the assignment of all of the monies due Iran from the various

21   Airlines, the transaction as set forth therein, and that the payments otherwise due Iran, shall be

22   paid to and on behalf of Plaintiffs, by a check, draft, money order or wire transfer, payable to the

23   order of DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple

24   (Dec.), as a representative for and on behalf of the Plaintiffs in the above-entitled action, that such

25   funds be forwarded to David J. Cook, Esq., Cook Collection Attorneys, P.L.C., 165 Fell Street,

26   San Francisco, CA 94102, and/or P.O. Box 270, San Francisco, CA 94104, Telephone No. (877)

27   989-4730, until the total of the judgment in the above-entitled action be paid in full herein.

28

1    The basis of this motion is that Iran owns and operates a series of national and

2    international airports; that the Airlines service these airports, by daily, weekly, or other periodic

3    flights; that common experience indicates that these Airlines pay for and on behalf of the privilege

4    of landing for gate fees, landing fees, food and fuel charges, fees due Iran for the rental or use of

5    any hanger facility, repair facility, storage facility, or other facilities required from time to time,

6    for purposes of servicing aircraft herein.  Given the repeal of the Foreign Sovereignty Immunities

7    Act and that Iran is now subject to levy and execution, all of the payment and each of the same

8    due from the Airlines should therefore be paid to Plaintiffs for the outstanding judgment herein.

9    This motion is based upon this Notice, the attached Motion, Memorandum of Points and

10   Authorities, the Declaration of David J. Cook, Esq., upon all pleadings, papers and other matters

11   on file herein, all matters which this court may take judicial notice hereof, which include but are

12   not limited to, all papers, pleadings and other matters on file herein in that certain action known as

13   *DEBORAH D. PETERSON, Personal Representatives of the Estate of James C. Knipple (Dec.), et*

14   *al., vs. ISLAMIC REPUBLIC OF IRAN, et al.*, United States District Court for the District of

15   Columbia, Consolidated Civil Actions: 01-2094 (RCL) and 01-2684 (RCL), all other matters

16   which the court may take judicial notice thereof, and upon all oral evidence and argument which

17   may be presented at the hearing hereof.

18   DATED:  April 25, 2008                 COOK COLLECTION ATTORNEYS

19
                                           By: ___ /s/ David J. Cook _____
20                                         DAVID J. COOK, ESQ. (SB# 060859)
                                           Attorneys for Plaintiffs
21                                         DEBORAH D. PETERSON, Personal
                                           Representatives of the Estate of James C. Knipple
22                                         (Dec.), et al.

23
     F:\USERS\DJCNEW\peterson.assignlanding
24

25

26

27

28

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco. CA  94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.). et al.

9             UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12
   DEBORAH D. PETERSON, Personal      )     CASE NO. 3:08-mc-80030-JSW
13 Representative of the Estate of James C. )
   Knipple (Dec.). et al..             )     MOTION FOR ASSIGNMENT OF RIGHTS
14                                      )     PURSUANT TO C.C.P. § 708.510(a) AND
              Plaintiffs,              )     F.R.C.P. 69(a)
15                                      )
   vs.                                 )     **[LANDING RIGHTS]**
16                                      )
   ISLAMIC REPUBLIC OF IRAN, et al..   )     Date:  May 30, 2008
17                                      )     Time: 9:00 a.m.
              Defendants.             )     Courtroom: 17. 16th Floor
18 _____     )     Judge: Jeffrey S. White

19
20        Plaintiffs DEBORAH D. PETERSON. Personal Representative of the Estate of James C.

21 Knipple (Dec.). et al.. hereby move this court for the following relief. for purposes of enforcement

22 of the judgment in their favor rendered in the above-entitled action dated 9/7/07 in the amount of

   $2.656.944.877. as follows:

23        1. For the issuance of an order for assignment of rights, accounts, accounts receivable,

24 rights to payment of money, and general intangibles, owed and in favor of THE ISLAMIC

25 REPUBLIC OF IRAN, and all of its agencies and instrumentalities, including Iran Air,

26 (hereinafter collectively "Iran") due from various airlines as set forth below. consisting of landing

27 rights. gate fees. fuel fees, food charges. rental of or use of any hanger facility, gate, terminal use.

28

1   or other facility made available by and on behalf if Iran for and on behalf of the below-listed

2   airlines in the operation of any airport, or other transportation facility, as follows:

3     A. QATAR AIRLINES.
  B. AIR FRANCE.
4     C. BMI (British Midlands).
  D. TURKISH AIRLINES.
5     E. EMIRATES AIRLINES.
  F. BRITISH AIRWAYS.
6     G. AUSTRALIAN AIRLINES.
  H. GULF AIR.
7     I. LUFTHANSA.
  J. ALITALIA.
8     K. SWISS INTERNATIONAL AIRLINES.
  L. AEROFLOT.
9     M. KLM (Royal Dutch Airlines).
  N. JAL (Japan Airlines).
10    O. KUWAIT AIRLINES.
  P. P.I.A. AIR (Pakistani Air).
11    Q. ROYAL JORDANIAN.
  R. SAFFAT AVIATION SERVICES.
12    S. SYRIAN AIRLINES.
  T. CHINA SOUTHERN AIRLINES
13    (And all others, hereinafter collectively "Airlines".)

14    2. For an order compelling the assignment of all of the monies due Iran from the various

15  Airlines, the transaction as set forth therein, and that the payments otherwise due Iran, shall be

16  paid to and on behalf of Plaintiffs, by a check, draft, money order or wire transfer, payable to the

17  order of DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple

18  (Dec.), as a representative for and on behalf of the Plaintiffs in the above-entitled action, that such

19  funds be forwarded to David J. Cook, Esq., Cook Collection Attorneys, P.L.C., 165 Fell Street,

20  San Francisco, CA 94102, and/or P.O. Box 270, San Francisco, CA 94104, Telephone No. (877)

21  989-4730, until the total of the judgment in the above-entitled action be paid in full herein.

22    The basis of this motion is that Iran owns and operates a series of national and international

23  airports; that the Airlines service these airports, by daily, weekly, or other periodic flights; that

24  common experience indicates that these Airlines pay for and on behalf of the privilege of landing

25  for gate fees, landing fees, food and fuel charges, fees due Iran for the rental or use of any hanger

26  facility, repair facility, storage facility, or other facilities required from time to time, for purposes

27  of servicing aircraft herein. Given the repeal of the Foreign Sovereignty Immunities Act and that

28

1  Iran is now subject to levy and execution, all of the payment and each of the same due from the

2  Airlines should therefore be paid to Plaintiffs for the outstanding judgment herein.

3      This motion is based upon this Motion, the attached Notice, Memorandum of Points and

4  Authorities. Declaration of David J. Cook, Esq., upon all pleadings, papers and other matters on

5  file herein, all matters which this court may take judicial notice hereof, which include but are not

6  limited to, all papers, pleadings and other matters on file herein in that certain action known as

7  *DEBORAH D. PETERSON, Personal Representatives of the Estate of James C. Knipple (Dec.), et*

8  *al., vs. ISLAMIC REPUBLIC OF IRAN, et al.*, United States District Court for the District of

9  Columbia, Consolidated Civil Actions: 01-2094 (RCL) and 01-2684 (RCL), all other matters

10  which the court may take judicial notice thereof, and upon all oral evidence and argument which

11  may be presented at the hearing hereof.

12  DATED:  April 25, 2008            COOK COLLECTION ATTORNEYS

13
                               By:  ___/s/ David J. Cook_____
14                             DAVID J. COOK, ESQ. (SB# 060859)
                               Attorneys for Plaintiffs
15                             DEBORAH D. PETERSON, Personal
                               Representatives of the Estate of James C. Knipple
16                             (Dec.), et al.

17
    F:\USERS\DJCNEW\peterson.assignlanding
18

19

20

21

22

23

24

25

26

27

28

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.). et al.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12
   DEBORAH D. PETERSON, Personal    )    CASE NO. 3:08-mc-80030-JSW
13 Representative of the Estate of James C.  )
   Knipple (Dec.). et al.,          )    MEMORANDUM OF POINTS AND
14                                   )    AUTHORITIES IN SUPPORT OF MOTION
              Plaintiffs,            )    FOR ASSIGNMENT OF RIGHTS PURSUANT
15                                   )    TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
   vs.                               )
16                                   )    **[LANDING RIGHTS]**
   ISLAMIC REPUBLIC OF IRAN. et al.,  )
17                                   )    Date:  May 30, 2008
              Defendants.            )    Time: 9:00 a.m.
18 _____   )    Courtroom: 17, 16th Floor
                                          Judge: Jeffrey S. White
19
                    I. **INTRODUCTION.**
20
21         Plaintiffs have filed this action to seek redress for the bombing of the Marine Barracks in

22 Beirut, Lebanon in 1983.  Suit was filed on 10/3/01 and service of process was effectuated, in

23 which Iran defaulted.  This court conducted a number of hearings and entered a series of Opinions,

24 including the MEMORANDUM OPINION of 5/30/03, marked *Exhibit "A,"* Judge Lamberth

25 wrote in that Opinion, as follows:[1]

26 _____

27 [1]  All exhibits are incorporated by reference as though fully set forth in this Memorandum
   in their entirety and are attached to the Declaration of David J. Cook, Esq. which is filed
   contemporaneously herein.
28
   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
   RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[LANDING RIGHTS]**
   CASE NO. 3:08-mc-80030-JSW                                                              1

1    "These actions arise from the most deadly state-sponsored terrorist attack made
     against American citizens prior to September 11, 2001: the Marine barracks
2    bombing in Beirut, Lebanon on October 23, 1983. In the early morning hours of
     that day, 241 American servicemen were murdered in their sleep by a suicide
3    bomber. On that day, an unspeakable horror invaded the lives of those who
     survived the attack and the family members whose loved ones had been stolen from
4    them. The memory of that horror continues to this day." (Exh. A, ¶ 1.)

5    Thereafter on 9/7/07, the court entered a second MEMORANDUM OPINION and

6    JUDGMENT marked *Exhibits "B" and "C,"* the court granted judgment on behalf of Plaintiffs in

7    the amount of $2,656,944,877.00. Individual parties in fact appealed, but these appeals were

8    dismissed without prejudice by an order from the Court of Appeal, District of Columbia on

9    February 23, 2008. The court stated as follows:

10        "C.    The Attack
                As testified by Mahmoud, after the meeting in Baalbek, a 19-ton truck was
11   disguised so that it would resemble a water delivery truck that routinely arrived at
     the Beirut International Airport, which was located near the U.S. Marine barracks in
12   Beirut, and modified the truck so that it could transport an explosive device. On the
     morning of October 23, 1983, members of Hezbollah ambushed the real water
13   delivery truck before it arrived at the barracks. An observer was placed on a hill
     near the barracks to monitor the operation. The fake water delivery truck then set
14   out for the barracks, driven by Ismalal Ascar, an Iranian.

15            At approximately 6.25 a.m. Beirut time, the truck drove past the Marine
     barracks. As the truck circled in the large parking lot behind the barracks, it
16   increased its speed. The truck crashed through a concertina wire barrier and a wall
     of sandbags, and entered the barracks.[21] When the truck reached the center of the
17   barracks, the bomb in the truck detonated.

18            The resulting explosion was the largest non-nuclear explosion that had ever
     been detonated on the face of the Earth. The force of its impact ripped locked doors
19   from their doorjambs at the nearest building, which was 256 fee away. Trees
     located 370 fee away were shredded and completely exfoliated. At the traffic
20   control tower of the Beirut International Airport, over half a mile away, all of the
     windows shattered. The support columns of the Marine barracks, which were made
21   of reinforced concrete, were stretched, as an expert witness described, "like rubber
     bands," the explosion created a crater in the earth over eight feet deep. The four-
22   story Marine barracks was reduced to fifteen feet of rubble.

23            The force of the explosion was equal to between 15,000 to 21,000 pounds of
     TNT. FBI and ATF explosives experts both concluded that the explosive material
24   was "bulk form" pentaerythritol tetranitrate, or PETN. Danny A. Defenbaugh, the
     on-scene FBI forensic explosive investigator, testified as to his findings:
25
                [W]e were able to, through the forensic residue analysis, identify the
26              explosive material, and it was unconsumed particles of PETN
                . . . .
27

28

PETN is a primary explosive that is manufactured commercially and primarily for U.S. military purposes. It is a primary explosive that is used in detonating cord. Detonating cord is nothing more than a plastic and fiber-wrapped cord that has the PETN, which looks like a white power . . . that is then extruded inside that cord . . . .

In this case, it was not [consumed]: we found unconsumed particles of PETN. That was just like we had found also in the American Embassy bombing. What that means is that it had to have been from a bulk explosive, it had to have been from a manufacturer." (P. 16 of 30)

## II. THE ASSETS OF IRAN ARE NOW SUBJECT TO ENFORCEMENT OF A CIVIL JUDGMENT.

Prior to approximately January 2008. a Judgment Creditor of a foreign state such as Iran was greatly hobbled in any attempt by which to recover, based upon the Foreign Sovereignty Immunities Act ("FSIA") and various exceptions, in which. e.g., "blocked assets" might be subject to levy and execution.  Unfortunately. blocked assets were "few and far between." making collection of any judgment like this extremely problematical, at best.

Congress, recognizing that the Marines needed to be compensated, ultimately enacted an amendment of the FSIA designed to facilitate the collection through enactment to 28 U.S.C. § 1605A.  The key parts of that new section permitting meaningful collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1). which provides as follows:

"(a) IN GENERAL. --
"(1) NO IMMUNITY.  – A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing. aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official. employee, or agent of such foreign state while acting within the scope of his or her office. employment. or agency."

"(g) PROPERTY IN CERTAIN ACTIONS –
"(1) IN GENERAL. – subject to paragraph (3). the property of a foreign state against which a judgment is entered under section 1605A. and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity. is subject to attachment in aid of execution. and execution. upon that judgment as provided in this section, regardless of –
"(A) the level of economic control over the property by the government of a foreign state;
"(B) whether the profits of the property go to that government;

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [LANDING RIGHTS]
CASE NO. 3:08-mc-80030-JSW

3

1    "( C) the degree to which officials of that government manage the
     property or otherwise control its daily affairs;
2    "(D) whether that government is the sole beneficiary in interest of
     the property; or
3    "(E) whether establishing the property as a separate entity would
     entitle the foreign state to benefits in United States courts while
4    avoiding its obligations.

5    "(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE. Any
     property of a foreign state, or agency or instrumentality of a foreign state, to which
6    paragraph (1) applies shall not be immune from attachment in aid of execution, or
     execution, upon a judgement entered under section 1605A because the property is
7    regulated by the United States Government by reason of action taken against that
     foreign state under the Trading With the Enemy Act or the International Emergency
8    Economic Powers Act."

9    Accordingly, the FSIA no longer serves as a bar, and the assets of Iran are now subject to

10   clear levy and execution.

11                    **III.  LOCAL DOCKETING.**

12   Plaintiffs have registered the judgment with the United States District Court, Northern

13   District of California, Case No. CV 08 80030 MISC, a copy of an ABSTRACT OF JUDGMENT

14   marked *Exhibit "D."* The basis of registering the judgment under 28 U.S.C. § 1963 is the good

15   faith belief that in fact assets of Iran might be subject to levy and execution in the Northern

16   District of California. Plaintiffs have in fact commenced a campaign of levies upon, among others,

17   UBS AG, Credit Suisse, Bank of Tokyo Mitsubishi UFJ, Mizuho Corporate Bank, Sumitomo

18   Mitsui Banking Company, along with a series of other banks, and along with a levy upon the

19   Boeing Company. The purpose of these levies is to reach any and all monies (or property) which

20   may be due and owing Iran. Plaintiffs have already served the bulk of these levies, and is

21   receiving partial responses.

22               **IV.  NATURE OF ASSETS SUBJECT TO LEVY AND EXECUTION.**

23   Plaintiffs have determined through a multitude of sources, which include the individual

24   airline schedules, various tourist and other websites, the information available through various

25   Iranian airports (online), that the following airlines generally service Iranian airports:

26       A.    QATAR AIRLINES.
         B.    AIR FRANCE.
27       C.    BMI (British Midlands).

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [LANDING RIGHTS]
CASE NO. 3:08-mc-80030-JSW                                                          4

D.    TURKISH AIRLINES.
E.    EMIRATES AIRLINES.
F.    BRITISH AIRWAYS.
G.    AUSTRALIAN AIRLINES.
H.    GULF AIR.
I.    LUFTHANSA.
J.    ALITALIA.
K.    SWISS INTERNATIONAL AIRLINES.
L.    AEROFLOT.
M.    KLM (Royal Dutch Airlines).
N.    JAL (Japan Airlines).
O.    KUWAIT AIRLINES.
P.    P.I.A. AIR (Pakistani Air).
Q.    ROYAL JORDANIAN.
R.    SAFFAT AVIATION SERVICES.
S.    SYRIAN AIRLINES.
T.    CHINA SOUTHERN AIRLINES.
(And all others, hereinafter collectively "Airlines".)

A further examination of the websites indicate that the bulk (but not all) of these Airlines service the United States. Based upon common business experience, these Airlines pay the airport facility fees for landing rights. gate fees, fuel charges, food charges, maintenance, repair and other related services, hanger accommodations. and other goods and services which may be provided by the airport facility from time to time. Accordingly, any one or all of these Airlines would be indebted to Iran for payment for these related services, whether by goods or for all of the services. Iran is no longer protected by the FSIA. and therefore any amounts due from these Airlines are subject to assignment under C.C.P. § 708.510(a).

## V. **WHICH LAW APPLIES.**

Plaintiffs seek to enforce the judgment under F.R.C.P. 69(a)(1) amended as of 12/1/07, and employ the laws of the domicile. specifically being the laws of the State of California, which provides as follows:

Rule 69. Execution
(a) In General.
(1) Money Judgment; Applicable Procedure.
A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution — and in proceedings supplementary to and in aid of judgment or execution — must accord with the procedure of the state where the court is located. but a federal statute governs to the extent it applies.

This entire issue was discussed in detail in *Clark vs. Wilbur, supra,* in which the court was faced

1    with the issue whether the laws of the original domicile applied, or the "transplanted domicile." in

2    which the judgment was being enforced.  The court answered this at 913 F.Supp. 463 at page 467.

3    in which the court stated as follows:

4    > "Defendants assert Florida law should be applied in determining if the assets in
     > question are exempt from a turnover order. Plaintiff seeks application of West
5    > Virginia law. *Rule* 69(a) provides in pertinent part as follows:

6    > The procedure on execution, in proceedings supplementary to and in aid of
     > judgment, and in proceedings on and in aid of execution *shall be in accordance*
7    > *with the practice and procedure of the state in which the district court is held,*
     > *existing at the time the remedy is sought....* *Id.* (emphasis added). The mandate
8    > requiring resort to the law of the state where the district court is held applies to
     > questions relating to whether assets are exempt from collection. [8] *See, e.g.,*
9    > *Chicago, Rock Island & Pac. Ry. Co. v. Sturm,* 174 U.S. 710, 717, 19 S.Ct. 797.
     > 800, 43 L.Ed. 1144 (1899) (stating "[e]xemption laws are ... part of the remedy and
10   > subject to the law of the forum"); *Johns v. Rozet,* 826 F.Supp. 565, 567
     > (D.D.C.1993); *Pallante v. Int'l Venture Invs., Ltd.,* 622 F.Supp. 667, 668 (N.D.Ohio
11   > 1985) (stating "[g]enerally ... questions of exemption are determined solely by the
     > laws of the forum"); *Marine Midland Bank v. Surfbelt, Inc.,* 532 F.Supp. 728, 729
12   > (W.D.Pa.1982) (stating "the law of the forum governs questions of exemption"); 11
     > Thomas J. Goger et al., *Federal Procedure* § 31:21 (1982). Defendants have cited
13   > no authority to the contrary in support of their position and the Court has located
     > none. Accordingly. the Court concludes West Virginia law controls the question of
14   > whether the requested assets are exempt. The Court must now determine whether
     > the requested assets are exempt under West Virginia law."

15   Traditional choice of law principles mandate, along with F.R.C.P. 69(a)(1). that the

16   judgment creditor is entitled to exercise the rights and remedies of the forum jurisdiction. rather

17   than the original jurisdiction.  The Restatement of Conflicts of Laws rejects this claim as follows:

18   > "The majority of courts agree with Mr. Justice McKenna and hold that in a garnishment
19   > proceeding, as elsewhere, *only the exemption laws of the forum are applicable.*" (Page
     > 1617).[2] (Emphasis added)

20   Here. Plaintiffs seek to enforce the remedies permitted under California. as opposed to District of

21   Columbia law.

22   ## VI.  MECHANISM OF AN ASSIGNMENT MOTION.

23   Plaintiff seeks to employ the remedies permitted under C.C.P. § 708.510(a) which provides

24   as follows:

25

26

27   ---
     [2] Exemptions do not travel.

28

"Except as otherwise provided by law, upon application of the judgment creditor on noticed motion, the court may order the judgment debtor to assign to the judgment creditor, or to a receiver appointed pursuant to Article 7 (commencing with section 708.610) all or part of a right to payment due or to become due, whether or not the right is conditional upon future developments, including but not limited to, the following types of payment:

1.    Wages due from the federal government that are not subject to withholding under an earnings withholding order.
2.    Rents.
3.    Commissions.
4.    Royalties.
5.    Payments due from a patent or copyright.
6.    Insurance policy loan value."

This assignment motion would reach all accounts, accounts receivable and rights to payment of money, whether owed now or owed in the future, from "account debtors" who may owe money to the underlying judgment debtor.

The Legislative Comment under C.C.P. § 708.510 indicates that the court has great flexibility in fashioning relief, which itself would enable Plaintiffs to serve the assignment order and obtain payment of amounts which are due or may be due in the future. The Legislative Comment provides as follows:

**Legislative Committee Comment – Assembly 1982 Addition**
        Section 708.510 provides a new procedure for reaching certain forms of property that cannot be reached by levy under a writ of execution, such as the nonexempt loan value of an unmatured life insurance, endowment, or annuity policy. See Sections 699.720(a)(6), 704.100. It also provides an optional procedure for reaching assignable forms of property that are subject to levy, such as accounts receivable, general intangibles, judgments, and instruments. This section does not make any property assignable that is not already assignable. This remedy may be used alone or in conjunction with other remedies provided in this title for reaching rights to payment, such as execution, orders in examination proceedings, creditors' suits, and receivership. The use of this remedy is subject to limitations on the time for enforcement of judgment. See Sections 683.010-683.220.

The purpose of the assignment order is the same as a contractual assignment under C.C.P. § 708.530, which provides as follows:

**§ 708.530.**
(a) Except as provided in subdivision (b), the effect and priority of an assignment ordered pursuant to this article is governed by Section 955.1 of the Civil Code. For the purpose of priority, an assignee of a right to payment pursuant to this article shall be deemed to be a bona fide assignee for value under the terms of Section 955.1 of the Civil Code.
(b) An assignment of the right to future rent ordered under this article is recordable

as an instrument affecting real property and the priority of such an assignment is governed by Section 1214 of the Civil Code.

The effect on the obligor's rights is found under C.C.P. § 708.540, which provides as follows:

> § 708.540.
> The rights of an obligor are not affected by an order assigning the right to payment until notice of the order is received by the obligor. For the purpose of this section, "obligor" means the person who is obligated to make payments to the judgment debtor or who may become obligated to make payments to the judgment debtor depending upon future developments.

Assignments are found under Civ.C. § 955.1, likewise which provides as follows:

> § 955.1.
> (a) Except as provided in Sections 954.5 and 955 and subject to subdivisions (b) and ( c), a transfer other than one intended to create a security interest (paragraph (1) or (3) of subdivision (a) of Section 9109 of the Commercial Code) of any payment intangible (Section 9102 of the Commercial Code) and any transfer of accounts, chattel paper, payment intangibles, or promissory notes excluded from the coverage of Division 9 of the Commercial Code by paragraph (4) of subdivision (d) of Section 9109 of the Commercial Code shall be deemed perfected as against third persons upon there being executed and delivered to the transferee an assignment thereof in writing.
> (b) As between bona fide assignees of the same right for value without notice, the assignee first giving notice thereof to the obligor in writing has priority.

An assignment order permit the judgment creditor to reach receivable due now, or due in the future, receivables which might be contingent, or uncertain, or receivables in which performance might still be due, as provided by the exact language of C.C.P. § 708.510(a). On the other hand a levy would only reach accounts which are due at the time of the levy as indicated by such as cases as *FIRST CENTRAL COAST BANK, etc. vs. CUESTA TITLE GUARANTEE COMPANY, et al.*, 143 Cal.App.3d 12, 191 Cal.Rptr. 433 (Cal.App.2 Dist. 1983), the appellate court held that a premature [or late] levy did not reach the monies which were due at the time of a levy in that a levy constitutes a "snapshot" of any funds immediately due the debtor. The court stated as page 16 as follows:

> "A debt which is uncertain and contingent in the sense that it may never come due and payable is not subject to garnishment. (Brunskill v. Stutman, supra, 186 Cal.App.2d 97, 8 Cal.Rptr. 910: *Clecak v. Dunn* (1928) 95 Cal.App. 537.)"

1  An assignment order reaches a broader range of property rights, including accounts which are

2  contingent, or some performance is due in the futures. A levy, on the other hand, only reaches

3  monies which are non contingent and in which the accounts are immediately due and payable. and

4  without a defense.[3]

5      An assignment order permits the judgment creditor to serve the order through the mails (or

6  process server) with the concurrent expense of individual levy and execution. An assignment

7  order reaches money which is now due or might be due in the future, or in which payment is

8  contingent (C.C.P. § 708.510(a)). while on the other hand a levy only reaches money due at the

9  time and without condition.

10                     **VII. <u>CONCLUSION.</u>**

11      Plaintiffs are Judgment Creditors, based upon their murder of their daughter at the hands of

12  Iran, through its puppet Hamas, as determined by Judge Lamberth. Plaintiffs are entitled to seek

13  payment for this judgment, as ultimately Iran will never face criminal justice for its heinous acts.

14  and accordingly, the Plaintiffs only have civil justice in their favor.

15      Plaintiffs are therefore entitled to such relief.

16  DATED: April 25, 2008              COOK COLLECTION ATTORNEYS

17
                                      By: ___/s/ David J. Cook_____
18                                    DAVID J. COOK, ESQ. (SB# 060859)
                                      Attorneys for Plaintiffs
19                                    DEBORAH D. PETERSON, Personal
                                      Representatives of the Estate of James C. Knipple
20                                    (Dec.), et al.

21
    F:\USERS\DJCNEW\peterson.assignlanding
22

23

24

25

26  _____

27      [3] Parenthetically serving account debtors with an assignment order also reduces the cost of
    enforcement given a large number of actual and/or potential obligors.
28
    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
    RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[LANDING RIGHTS]**
    CASE NO. 3:08-mc-80030-JSW                                                    9

**DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ (State Bar # 62386)**
**COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
165 Fell Street
San Francisco. CA  94102
Mailing Address: P.O. Box 270
San Francisco. CA  94104-0270
Tel.: (415) 989-4730
Fax: (415) 989-0491
File No. 52.759

Attorneys for Plaintiffs
DEBORAH D. PETERSON. Personal Representatives
of the Estate of James C. Knipple (Dec.), et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEBORAH D. PETERSON. Personal Representative of the Estate of James C. Knipple (Dec.). et al., <br><br> Plaintiffs. <br><br> vs. <br><br> ISLAMIC REPUBLIC OF IRAN, et al., <br><br> Defendants. | CASE NO. 3:08-mc-80030-JSW <br><br> DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) <br><br> **[LANDING RIGHTS]** <br><br> Date:  May 30, 2008 <br> Time: 9:00 a.m. <br> Courtroom: 17, 16th Floor <br> Judge: Jeffrey S. White |

I, DAVID J. COOK. hereby declare and state as follows:

1. I am one of the attorneys of record for Plaintiffs in the above-entitled action. am duly authorized to practice before all courts in the State of California, and am familiar with the facts and circumstances in this action.

2. Plaintiffs have filed this action to seek redress for the bombing of the Marine Barracks in Beirut, Lebanon in 1983.  Suit was filed on 10/3/01 and service of process was effectuated, in which Iran defaulted.  This court conducted a number of hearings and entered a series of Opinions, including the MEMORANDUM OPINION of 5/30/03. a true and correct which is attached hereto

1 │ marked *Exhibit "A."*

2 │     3. Thereafter on 9/7/07, the court entered a second MEMORANDUM OPINION and

3 │ JUDGMENT, true and correct copies which are attached hereto marked *Exhibits "B" and "C,"* in

4 │ which the court granted judgment on behalf of Plaintiffs in the amount of $2,656,944,877.00.

5 │     4. Plaintiffs have registered the judgment with the United States District Court, Northern

6 │ District of California, Case No. CV 08 80030 MISC, a true and correct copy of an ABSTRACT

7 │ OF JUDGMENT is attached hereto marked *Exhibit "D."* The basis of registering the judgment

8 │ under 28 U.S.C. § 1963 is the good

9 │     I declare under penalty of perjury that the foregoing is true and correct.

10 │     Executed on April 25, 2008.

11 │

12 │               /s/ David J. Cook
                 DAVID J. COOK, ESQ. (SB# 060859)

13 │

14 │ F:\USERS\DJCNEW\peterson.assignlanding

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS
PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [LANDING RIGHTS]
CASE NO. 3:08-mc-80030-JSW         2

EXHIBIT "A"

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DEBORAH D. PETERSON,           )
    Personal Representative of     )
    the Estate of James C. Knipple, )
    et al.,                        )
                      )
           Plaintiffs,          )
                      )
           v.                   )    Civil Action No. 01-2094 (RCL)
                      )
THE ISLAMIC REPUBLIC OF IRAN,  )
    et al.,                        )
           Defendants.          )
_____ )

JOSEPH AND MARIE BOULOS,       )
    Personal Representatives of the )
    Estate of Jeffrey Joseph Boulos, )
    et al.,                        )
                      )
           Plaintiffs,          )    Civil Action No. 01-2684 (RCL)
                      )
           v.                   )
                      )
THE ISLAMIC REPUBLIC OF IRAN,  )
    et al.,                        )
           Defendants.          )
_____ )

**FILED**

MAY 3 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

These actions arise from the most deadly state-sponsored terrorist attack made against

American citizens prior to September 11, 2001: the Marine barracks bombing in Beirut, Lebanon

on October 23, 1983. In the early morning hours of that day, 241 American servicemen were

murdered in their sleep by a suicide bomber. On that day, an unspeakable horror invaded the

1

lives of those who survived the attack and the family members whose loved ones had been stolen

from them. The memory of that horror continues to this day.

On March 17-18, 2003, this Court conducted a bench trial to determine the liability of the

defendants for this inhuman act. Having reviewed the extensive evidence presented during that

trial by both lay and expert witnesses, the Court has determined that the plaintiffs have

established their right to obtain judicial relief against the defendants. The Court's findings of

fact and conclusions of law are set forth below.

## I.    PROCEDURAL BACKGROUND

The plaintiffs in these two actions are family members of the 241 deceased servicemen

(hereafter, "the servicemen") and the injured survivors of the attack. Plaintiffs have brought

these actions in their own right, as administrators of the estates of the servicemen, and on behalf

of the servicemen's heirs-at-law. All decedents and injured survivors of the attack were serving

in the U.S. armed forces at the time of their injuries or death. All plaintiffs are nationals of the

United States.[1]

On October 3 and December 28, 2001, plaintiffs filed separate complaints with this

---

[1] In an action under the Foreign Sovereign Immunities Act ("FSIA") for claims based on personal injury or death resulting from an act of state-sponsored terrorism, either the claimant or the victim must be an American national. See 28 U.S.C. § 1605(a)(7)(B)(ii). Although during the bench trial, the Court only received testimony that identified one of the decedents, James R. Knipple, as an American national, plaintiffs' counsel has represented that each and every service member injured or killed on October 23, 1983, or a beneficiary of that service member, is a national of the United States. The Court's findings are therefore subject to proof of American nationality during the damages phase of these proceedings. This may be accomplished either though direct testimony of any competent witness, or through the submission of relevant documentation.

Court. The complaints included statutory claims for wrongful death and common-law claims for

battery, assault, and intentional infliction of emotional distress, all resulting from an act of state-

sponsored terrorism. Plaintiffs sought relief in the form of compensatory and punitive damages.

Although defendants were served with the two complaints on May 6 and July 17, 2002,

defendants failed to file any response to either complaint, and on December 18, 2002, this Court

entered defaults against defendants in both cases.

However, despite the entries of default, this Court is required to make a further inquiry

prior to entering any judgment against defendants. FSIA mandates that a default judgment

against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by

evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e); see also Flatow v. The Islamic

Republic of Iran, 999 F. Supp. 1, 6 (D.D.C. 1998). As in Flatow, the Court will require plaintiffs

to establish their right to relief by clear and convincing evidence. The "clear and convincing"

standard of proof is the standard required in the District of Columbia to support a claim for

punitive damages, and is sufficient to establish a prima facie case in a contested proceeding.


## II.  FINDINGS OF FACT

As stated above, this Court received testimony from plaintiffs on March 17 and 18, 2003,

defendants having failed to enter an appearance. The Court now enters its findings of fact, based

upon the sworn testimony and documentary evidence presented during the March trial, and

received in accordance with the Federal Rules of Evidence. This Court finds these facts to be

established by clear and convincing evidence.

A.    Historical Background[2]

The Republic of Lebanon is a mountainous country of approximately 3,800,000 people

bordered by Israel, Syria, and the eastern shore of the Mediterranean Sea. Although it contains

some of the oldest human settlements in the world, including the Phoenician port cities of Tyre

and Sidon, it did not become an independent nation until 1944.

Lebanon did not participate militarily in the 1967 and 1973 Arab-Israeli wars. However,

by 1973, approximately one out of every ten person living in Lebanon was a Palestinian refugee,

many of whom supported the efforts of the Palestine Liberation Organization (PLO) against

Israel. Some of these refugees engaged in guerilla warfare and terrorist activity against Israel

from bases established in southern Lebanon. Beginning in 1968, Israel engaged in reprisals

against these Palestinian strongholds in southern Lebanon. In 1975, civil war broke out in

Lebanon between its Muslim inhabitants and Palestinian refugees, who supported the PLO, and

its Christian inhabitants, who opposed the PLO's actions. The war would not come to a

complete end for another fifteen years, during which approximately twenty thousand Lebanese

were killed, and approximately the same number of Lebanese were wounded.

B.    The Arrival of the 24th Marine Amphibious Unit

In late 1982, with the concurrence of the United Nations, a multinational peacekeeping

coalition consisting of American, British, French, and Italian soldiers arrived in the Lebanese

capital of Beirut. In May of 1983, the 24th Marine Amphibious Unit of the U.S. Marines ("the

---

[2] The Court has taken judicial notice of the facts contained in the following subsection,
pursuant to Rule 201 of the Federal Rules of Civil Procedure.

4

24th MAU") joined this coalition.[3] The rules of engagement issued to the servicemen of the 24th

MAU made clear that the servicemen possessed neither combatant nor police powers. In fact,

under the rules, the servicemen were ordered not to carry weapons with live rounds in their

chambers, and were not authorized to chamber the rounds in their weapons unless (1) they were

directly ordered to do so by a commissioned officer or (2) they found themselves in a situation

requiring the immediate use of deadly force in self-defense.[4] As pointed out during trial, the

---

[3] A Marine Amphibious Unit (now "Marine Expeditionary Unit") is a combined air / ground force unit of approximately two thousand U.S. Marines. See Marine Expeditionary Units, at http://www.usmc.mil/marinelink/ind.nsf/meus.

[4] In the present context, "rules of engagement" are directions issued by a competent military authority that set out the limitations and circumstances under which the forces under its command may initiate and prosecute combat engagement with other forces that they encounter. Following are the rules of engagement that were issued to the members of the 24th MAU:

1. When on post, mobile or foot patrol, keep loaded magazine in weapon, bolt closed, weapon on safe, no round in the chamber.

2. Do not chamber a round unless told to do so by a commissioned officer unless you must act in immediate self-defense where deadly force is authorized.

3. Keep ammo for crew-served weapons readily available, but not loaded. Weapon is on safe.

4. Call local forces [LAF] to assist in self-defense effort. Notify headquarters.

5. Use only minimum degree of force to accomplish any mission.

6. Stop the use of force when it is no longer needed to accomplish the mission.

7. If you receive effective hostile fire, direct your fire at the source. If possible, use friendly snipers.

8. Respect civilian property; do not attack it unless absolutely necessary to protect friendly forces.

9. Protect innocent civilians from harm.

5

members of the 24th MAU were more restricted in their use of force than an ordinary U.S.

citizen walking down a street in Washington, D.C.

The restrictive rules of engagement are consistent with the testimony of Col. Timothy

Geraghty, the commander of the 24th MAU, about the mission of the multinational peacekeeping

force:

> [E]ssentially what it was, it was primarily a peacekeeping mission and it was to show
> [our] presence, and when I say ours, and this is throughout all the forces, is that we were
> out showing a presence, [primarily] to provide stability to the area. And I might add that
> there's no doubt in just about anyone involved at the time, we saved a lot of lives by our
> presence there for awhile. And that was part of, I might add, in my judgment, the success
> of that, our presence mission there, and [that] it was working is the primary reason why
> we were targeted. . . .
>         The rules – these were geared primarily again with the peacekeeping mission [in
> mind] and the sensitivities of killing or maiming someone accidentally. That could be a
> tinderbox. That could start a whole chain of events.

Col. Geraghty further testified that the location and security of the 24th MAU's position was not

tactical in nature, and was only acceptable to the commanding officer in the context of the unit's

mission to "provide a presence."

Based on the testimony of Col. Geraghty and other witnesses, the Court finds that on

October 23, 1983, the members of the 24th MAU, and the service members supporting the unit,

---

10.    Respect and protect recognized medical agencies such as Red Cross, Red
Crescent, etc.

These ten rules were printed on cards distributed to every service member of the 24th MAU and
were discussed at length with every member.

were clearly non-combatants operating under peacetime rules of engagement.[5]

C.    The Iranian Government and the October 23 Attack[6]

Following the 1979 revolution spearheaded by the Ayatollah Ruhollah Khomeini, the

nation of Iran was transformed into an Islamic theocracy. The new government promptly drafted

a constitution, which is still in effect today. The preamble to the 1979 constitution sets forth the

mission of the post-revolutionary Iranian state:

> The mission of the Constitution is to realize the ideological objectives of
> the movement and to create conditions conducive to the development of man in
> accordance with the noble and universal values of Islam.
>        With due attention to the Islamic content of the Iranian Revolution, the
> Constitution provides the necessary basis for ensuring the continuation of the Revolution
> at home and abroad. In particular, in the development of international relations, the
> Constitution will strive with other Islamic and popular movements to prepare the
> way for the formation of a single world community . . . to assure the continuation of the
> struggle for the liberation of all deprived and oppressed peoples in the world.

The post-revolutionary government in Iran thus declared its commitment to spread the goals of

the 1979 revolution to other nations. Towards that end, between 1983 and 1988, the government

of Iran spent approximately $50 to $150 million financing terrorist organizations in the Near

East.[7] One of the nations to which the Iranian government directed its attention was the war-torn

---

[5] It should also be noted that the death certificates issued for the victims of the October
23, 1983 attack did not represent that the victims were killed in action. Instead, the cause of
death was listed as "terrorist attack."

[6] The facts contained in the following subsection are based on the trial testimony of Dr.
Reuven Paz, director of the Project for the Research of Islamist Movements in Herzliya, Israel,
and Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy.

[7] Since January 19, 1984, Iran has been designated as a state sponsor of terrorism
pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j). This
designation arose in part as a result of the October 23, 1983 attack.

republic of Lebanon.

"Hezbollah" is an Arabic word meaning "the party of God." It is also the name of a

group of Shi'ite Muslims in Lebanon that was formed under the auspices of the government of

Iran. Hezbollah began its existence as a faction within a group of moderate Lebanese Shi'ites

known as Amal. Following the 1982 Israeli invasion of Lebanon, the Iranian government sought

to radicalize the Lebanese Shi'ite community, and encouraged Hezbollah to split from Amal.

Having established the existence of Hezbollah as a separate entity, the government of Iran framed

the primary objective of Hezbollah: to engage in terrorist activities in furtherance of the

transformation of Lebanon into an Islamic theocracy modeled after Iran.

During the March trial in these cases, Dr. Patrick Clawson, a widely-renowned expert on

Iranian affairs over the past 25 years, testified that in 1983, Hezbollah was a creature of the

Iranian government:

> Both from the accounts of Hezbollah members and from the accounts of the Iranians and
> of every academic study that I'm aware of, certainly at this time, Hezbollah is largely
> under Iranian orders. It's almost entirely acting at the – under the order of the Iranians
> and being financed almost entirely by the Iranians. It comes to be an organization with
> Lebanese roots and Lebanese activities and more independence from Iran, but that's years
> past this time frame.

     *    *    *    *    *    *    *    *    *    *

THE COURT:        In the '83 time frame, it was essentially a tool of Iran.

THE WITNESS:       Correct, sir. Indeed, both Iranian and Lebanese observers have
described it as being established at Iran's orders and as being a
creature of Iran when it began. Hezbollah leaders today will
sometimes describe that as the roots of their party and say that it
has evolved away from being that.

Q:      Was there any other major means of support for Hezbollah other than the Islamic
Republic of Iran?

A:    Not at this time, no, sir.[8]

Dr. Clawson's testimony was corroborated by Dr. Reuven Paz,[9] who has researched

Islamist terrorist groups for the last 25 years:

Q:    Now, as of the time of this attack, in October 1983, to what extent was Hezbollah, at that precise moment, dependent upon the support of Iran, and particularly the Iranian Revolutionary Guards, who had been brought in in order to carry out any type of major [military] operation?

A:    Well, I would say that they were, at that time, totally relied upon, the Iranian support. We are talking about composing a new group, of Hezbollah, out of people who had very little military experience. They were members, before '82, in groups that actually did not deal with military issues or terrorism. And most of the members during this process of unification that created Hezbollah started to be trained in training camps in the Bekaa Valley, where the main Iranian forces were located.

        *    *    *    *    *    *    *    *    *    *    *

Q:    Do you have an opinion, within a reasonable degree of certainty, as an expert on Islamist terrorism, whether this attack was carried out by Hezbollah, in response to the order which was the subject of the communications intercept in late September 1983?

A:    Yes, especially at that time – even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon and [against] Israel.

Q:    Do you have an opinion, again within a reasonable degree of certainty, as an expert in Islamist terrorist groups, as to whether Hezbollah, at that time, the fall of 1983, would have had the capacity to carry out an attack of the dimension of the

---

[8] Dr. Michael Ledeen, a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, testified at trial that "Iran invented, created, funded, trained, and runs to this day Hezbollah, which is arguably the world's most dangerous terrorist organization."

[9] Dr. Paz is the director of the Project for the Research of Islamist Movements and a senior research fellow at The International Policy Institute for Counterterrorism, both of which are based in Herzliya, Israel.

attack around the Marine barracks, in the absence of Iranian scientific, financial, and material assistance?

A:    No, I don't think they could have carried out such an attack without Iranian training, without Iranian – Iranian supply of the explosives even, and without directions from the Iranian forces in Lebanon itself.[10]

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Q:    Dr. Paz, can you describe the – the source of – of this technique of suicide bombing, which was used in the attack on the Marine barracks and since, unfortunately, many other incidents?

A:    Yes, this – this modus operandi actually was initiated in Iran and it was – it was not, at that time, used in anywhere in – in the Sunni Muslim world. It was at that time a Shi'ite ideology of self-sacrifice by suicide bombing. It started during the Iran-Iraq war in the '80s, and then under Iranian training and influence and instructions, it started as a modus operandi of terrorist groups – first in Lebanon, by Hezbollah, and then later on it moved to the Palestinian arena, mainly during the '90s.

It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities. The primary agency through which the Iranian government both established and exercised operational control over Hezbollah was the Iranian Ministry of Information and Security ("MOIS"). MOIS had formerly served as the secret police of the Shah of Iran prior to his overthrow in 1979. Despite the revolutionary government's complete break with the old regime, it did not disband MOIS, but

---

[10] Robert Baer, a case officer in the Directorate of Operations of the CIA from 1976-97, testified at trial that "Hezbollah wasn't 'formally' created until 1985. What happened was before it was a bunch of agents of Iran. But none of these agents, based on our intelligence, which was . . . outstanding, were operating on their own. One time there was a case where a Hezbollah member went out and kidnapped some children. But that was done independently, and the moment he was caught, he was executed by Hezbollah because he wasn't operating with authority from Iran."

instead allowed it to continue its operations as the intelligence organization of the new

government. Based on the evidence presented at trial, the Court finds that MOIS acted as a

conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided explosives

to Hezbollah and, at all times relevant to these proceedings, exercised operational control over

Hezbollah.

It is clear that MOIS was no rogue agency acting outside of the control and authority of

the Iranian government. Indeed, as Dr. Clawson testified at trial, the October 23 attack would

have been impossible without the express approval of Iranian government leaders at the highest

level:

> Q:    In the fall of 1983, was there anything of a significant nature, and especially a
> terrorist attack the dimensions of the attack on the Marine barracks of October
> 23rd, 1983, which would or could have been undertaken by Hezbollah without
> material support from Iran?
>
> A:    Iran's material support would have been absolutely essential for any activities at
> that time, and furthermore. the politics of the organization [was such] that no one
> in the organization would have thought about carrying out an activity without
> Iranian approval and almost certainly Iranian orders.
>
> Q:    Is that opinion within a reasonable degree of certainty as an expert on Iran?
>
> A:    Oh, absolutely. sir.
>
> Q:    Would any operation such as the October 23rd, 1983 attack require the approval
> within Iran of the Ministry of Information and Security?
>
> Q:    Yes, sir.
>
> A:    What about Mr. Rafsanjani?
>
> Q:    There would have been a discussion in the National Security Council which
> would involve the prime minister, Mr. Rafsanjani, and it would also have required
> the approval of Iran's supreme religious leader, Ayatollah Khomeini. We have

> many detailed accounts about the approval process from other attacks at this time,
> and, indeed, from a number of Iranians who became disillusioned within this
> process and later left.

Q:    Doctor, your opinion within a reasonable degree of certainty as an expert on Iran,
      what was the foreign policy objective of the October 23rd, 1983, attack and other
      like attacks by Iran during this period?

A:    Both to end the Western, especially the American presence in Lebanon, and to
      establish Iran's image as the leader of the world's radical, anti-Western, anti-
      American Muslim movement.

The two officials named by Dr. Clawson, the Ayatollah Ruhollah Khomeini and Ali

Akbar Hashemi Rafsanjani, were high government officials in the Iranian government, occupying

the positions of Supreme Leader and President.[11] The approval of both the Ayatollah Khomeini

and President Rafsanjani was absolutely necessary to carry out the continuing economic

commitment of Iran to Hezbollah, and to execute the October 23 attack. Given their positions of

authority, any act of these two officials must be deemed an act of the government of Iran.

The complicity of Iran in the 1983 attack was established conclusively at trial by the

testimony of Admiral James A. Lyons, Deputy Chief of Naval Operations for Plans, Policy and

Operation from 1983-85. As deputy chief, Admiral Lyons routinely received intelligence

information about American military forces. On October 25, 1983, the chief of naval intelligence

notified Admiral Lyons of an intercept of a message between Tehran and Damascus that had

been made on or about September 26, 1983. The message had been sent from MOIS to the

---

[11] Under the 1979 constitution, the Supreme Leader is the highest government official of
Iran, followed by the President. The powers of the Supreme Leader include the authority to
delineate the general policies of Iran and supervise their execution, assume the supreme
command of the armed forces, declare war, mobilize the armed forces, appoint and dismiss key
government officials, and issue decrees for national referenda. Arts. 110, 113, Constitution of
Iran, 1979.

Iranian ambassador to Syria, Ali Akbar Mohtashemi, who presently serves as an adviser to the

president of Iran, Mohammad Khatami.[12]  The message directed the Iranian ambassador to

contact Hussein Musawi, the leader of the terrorist group Islamic Amal, and to instruct him to

have his group instigate attacks against the multinational coalition in Lebanon, and "to take a

spectacular action against the United States Marines." Admiral Lyons testified that he has

absolutely no doubt of the authenticity or reliability of the message, which he took immediately

to the secretary of the navy and chief of naval operations, who viewed it, as he did, as a "24-karat

gold document."[13]

Although it is not presently known whether Ambassador Mohtashemi contacted Musawi,

evidence was presented at trial that Mohtashemi did proceed to contact a member of the Iranian

Revolutionary Guard ("IRG"), and instructed him to instigate the Marine barracks bombing.[14]

The Court heard the videotaped deposition testimony of a Hezbollah member known by the

pseudonym "Mahmoud," who was a member of the group that carried out the October 23

---

[12] Mohtashemi's last name is sometimes given as "Mohtashemi-Pur."

[13] Dr. Michael Ledeen testified at trial that the message intercept was "one of the most impressive works of intelligence analysis that I saw [about the Marine barracks bombing], and it was absolutely convincing." Dr. Reuven Paz testified that he had read and analyzed the message intercept, which he described as "an order to attack the foreign powers on Lebanese soil, meaning the United States, the French paramilitary power, and of course, the Israeli military forces in south Lebanon."

[14] The Iranian Revolutionary Guard, also known as the Pasdaran, has been described as an "elite security and military force that was formed to protect the ideological purity of the Ayatullah Khomeini's Islamic Revolution and [that] has since developed considerable expertise in covert actions overseas." See Paul Quinn-Judge, Stalking Satan: As Their Leader Offers Friendship, Iran's Revolutionary Guards Keep a Menacing Watch over Their Backyard, TIME, March 30, 1998, available at http://www.time.com/time/magazine/1998/int/980330/ terrorism.stalking_satan15.html.

attack.[15] Mahmoud, a Lebanese Shi'ite Muslim, testified that Ambassador Mohtashemi

contacted a man named Kanani, the leader of the Lebanese headquarters of the IRG.

Mohtashemi instructed Kanani to go forward with attacks that had been planned against the 24th

MAU and the French paratroopers.[16] Mahmoud testified that a meeting was later held in

Baalbek, Lebanon, which was attended by Kanani and Sheik Sobhi Tufaili, Sheik Abbas

Musawi, and Sheik Hassan Nasrallah. Nasrallah is the present leader of Hezbollah.[17] Musawi,

Nasrallah's immediate predecessor as the leader of Hezbollah, was killed in a February 16, 1992

Israeli attack.[18] Tufaili is a former secretary general of Hezbollah.[19]

---

[15] The reliability of Mahmoud's testimony was established by an individual who has worked for the United States government in an intelligence capacity for thirty years, and who is known by the pseudonym "Joseph Salam." The Court admitted Salam as an expert on Islamic terrorist groups, based upon the quality and quantity of knowledge contained in his curriculum vita, which was filed under seal to protect Salam's identity. According to Salam, Mahmoud has provided information to him in the past, and, after later comparison with known objective facts, his information has always been determined to be accurate.

[16] Mahmoud's testimony about Ambassador Mohtashemi is confirmed by Joseph Salam, who testified that although Mohtashemi held the title of Iranian ambassador to Syria, he performed no actual diplomatic function and was "highly placed in the supervision and origination of covert terrorist operations by Iran." It is also independently confirmed by Dr. Michael Ledeen, who testified at trial that "Mr. Mohtashemi-Pur, his nickname in Iran is the Father of Hezbollah. He's the person who created Hezbollah. So of course he had a major involvement in [the Marine barracks bombing] since those were the people who did it." Dr. Ledeen also testified that "there was information of every imaginable type that enabled [the intelligence community] to reconstruct a picture which showed very clearly the Iranian involvement [in the Marine barracks bombing]. I don't know anyone who looked at that information who came to any other conclusion."

[17] See Talks with France Bridge the Diplomatic Gap, TIMES (London), May 26, 2003, at 13, available at 2003 WL 3134823 ("[Israeli Foreign Minister Sylvan Shalom's] warning came as the leader of Hezbollah, Sheikh Hassan Nasrallah, urged all anti-Israeli groups in Lebanon to take up arms in preparation for a possible Israeli attack.").

[18] See Kenneth R. Timmerman, Likely Mastermind Of Tower Attacks, INSIGHT, Dec. 31, 2001, at 18, available at 2001 WL 29585000 ("On March 17, 1992, a Hezbollah strike team

During this meeting, Kanani and the Hezbollah members formed a plan to carry out

simultaneous attacks against the American and French barracks in Lebanon.[20] Mahmoud

described the meeting and its aftermath:

> They got the order. They met and adopted the operation against the Marines and the
> French barracks in the same time. The Marines operation was done. They moved – they
> moved with one Iranian and one Shiite from the – Southern Lebanon over the mountain
> road to Hartareq Biralabin [phonetic spelling]. They stayed two days there.
>
> The – the cars were built, equipped, in Biralabin in a warehouse near a – gas
> station . . . underground. They built the cars. They equipped the cars there. That's their
> center.
>
> One Dodge, one red Dodge, that was painted exactly like the other – the real
> Dodge that was providing water and other stuff to the Marines, and they moved it to the
> airport road where they put the hold on – ambush and hold the real car when she arrived.
> They stopped the real car and they moved with the fake one that was built with explosives
> toward the Marine barracks.

---

leveled the Israeli Embassy in Buenos Aires, killing 29 persons and wounding 242. Hezbollah
said the attack was intended to avenge the killing of Lebanese Hezbollah leader Sheik Abbas
Musawi, whose convoy was obliterated by Israeli helicopter gunships in South Lebanon one
month earlier."); Gareth Smyth, Sheikh Hassan Nasrallah's Holy War, Fin. Times, Aug. 30,
2001, available at 2001 WL 26065111 ("On February 16, 1992, Israeli helicopter gunships flew
into south Lebanon and ambushed a convoy of cars, killing Abbas Musawi, the general secretary
of Hizbollah. . . . [I]t brought to Hizbollah's top position Israel's most effective adversary of the
next decade. With his beard, turban and black-rimmed glasses, Sheikh Hassan Nasrallah is
recognised well beyond Lebanon's borders.").

[19] See Hikmat Chreif, Hezbollah Dissidents Demonstrate Against Normalization with
Israel, Agence France-Presse, Jan. 7, 2000, available at 2000 WL 2708811 ("About 3,000
supporters of Lebanese Hezbollah dissident Sobhi Tufaili demonstrated in Baalbek Friday
against any normalization with Israel and visits by Israeli tourists to Lebanon. . . . Tufaili, who
used to be secretary general of Hezbollah, criticized the group's leadership for neglecting the
needs of the 'underprivileged,' especially in the Baalbek-Hermel area, which had been a major
drug-growing area until a crackdown in 1992.").

[20] Approximately eight minutes after the attack on the Marine barracks, a similar attack
was attempted against the French barracks. Although the driver of the vehicle carrying the
explosive device was shot and killed before the vehicle could enter the barracks, the device was
detonated by remote control, killing 56 French soldiers.

C.    The Attack

As testified by Mahmoud, after the meeting in Baalbek, a 19-ton truck was disguised so

that it would resemble a water delivery truck that routinely arrived at the Beirut International

Airport, which was located near the U.S. Marine barracks in Beirut, and modified the truck so

that it could transport an explosive device.  On the morning of October 23, 1983, members of

Hezbollah ambushed the real water delivery truck before it arrived at the barracks.  An observer

was placed on a hill near the barracks to monitor the operation.  The fake water delivery truck

then set out for the barracks, driven by Ismalal Ascari, an Iranian.

At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks.  As the

truck circled in the large parking lot behind the barracks, it increased its speed.  The truck

crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks.[21]

When the truck reached the center of the barracks, the bomb in the truck detonated.

The resulting explosion was the largest non-nuclear explosion that had ever been

detonated on the face of the Earth.  The force of its impact ripped locked doors from their

doorjambs at the nearest building, which was 256 feet away.  Trees located 370 feet away were

shredded and completely exfoliated.  At the traffic control tower of the Beirut International

Airport, over half a mile away, all of the windows shattered.  The support columns of the Marine

barracks, which were made of reinforced concrete, were stretched, as an expert witness

described, "like rubber bands."  The explosion created a crater in the earth over eight feet deep.

The four-story Marine barracks was reduced to fifteen feet of rubble.

---

[21] Concertina wire is a length of barbed wire that is extended into a spiral for use as a
barrier, as on a fence.  It is employed by the U.S. armed forces to prevent entry into restricted
areas by unauthorized persons.

16

The force of the explosion was equal to between 15,000 to 21,000 pounds of TNT. FBI

and ATF explosives experts both concluded that the explosive material was "bulk form"

pentaerythritol tetranitrate, or PETN. Danny A. Defenbaugh, the on-scene FBI forensic

explosive investigator, testified as to his findings:

> [W]e were able to, through the forensic residue analysis, identify the explosive material, and it was unconsumed particles of PETN . . . .
> PETN is a primary explosive that is manufactured commercially and primarily for U.S. military purposes. It is a primary explosive that is used in detonating cord. Detonating cord is nothing more than a plastic and fiber-wrapped cord that has the PETN, which looks like a white powder . . . that is then extruded inside of that cord . . . .
> In this case, it was not [consumed]; we found unconsumed particles of PETN. That was just like we had found also in the American Embassy bombing. What that means is that it had to have been from a bulk explosive, it had to have been from a manufacturer.

Defenbaugh explained that when the commercially-manufactured form of PETN is detonated, it

is completely consumed in the ensuing explosion. The presence of unconsumed particles of

PETN at the Marine barracks blast site, therefore, indicated that the PETN used in the bomb had

not been the standard commercially-available form of the explosive. Instead, it had been the raw

"bulk form" of PETN, which is not generally sold commercially. In the Middle East, the bulk

form of PETN is produced by state-sponsored manufacturers for military purposes. In 1983, bulk

form PETN was not manufactured in the nation of Lebanon. However, at that time, bulk form

PETN was manufactured within the borders of Iran.

Warren Parker, who served as an explosives expert with the Army and the ATF for forty

years, testified that the effectiveness of the attack demonstrated that it had been the result of

careful planning.[22] Parker also concluded, based on the degree of planning and sophistication

---

[22] Parker testified at trial:

that went into the attack, that a group of individuals without specialized training in explosives

could not have carried it out:

Q:    Mr. Parker, in your opinion, within a reasonable degree of certainty as an expert in
      explosives, could this bombing have been successfully carried out by a group of
      individuals with limited education, possessing minimal literacy and no specialized
      training in explosives?

A:    No, sir.

Q:    And what do you base that opinion on?

A:    The degree of planning, the degree of sophistication of this bombing. . . . The fact
      that it was a significant amount of a military-type explosive. These are not things
      that you just go down to the drugstore and buy a pound of, these are not things
      [for which] you buy innocuous materials and manufacture in your backyard.
      PETN is manufactured in factories that have specialized tools and equipment and
      knowledge.
              I think that I will concur with Mr. Defenbaugh's conclusion that it
      is a state- or military-run factory that produces this type of material, and I think
      the fact that it was carried out so successfully and not bungled really enhances the
      fact that somebody had practiced this before. . . .
              [D]uring the, say, late '60s, early '70s, clear up into the '80s, there
      were state-sponsored training camps involving the use of explosives for political
      gain, and these training camps used as part of their training, and I have seen

---

In the Marine barracks [attack], we have considerable planning that had to occur. They
had to know what the interior of the building looked like, and, in my background and
experience, I believe that the placement of that in the center of the building with the
atrium opening up to the top was probably key in causing most of the deaths.
        So it took someone getting in there, doing a lot of pre-scouting, making sure that
they could, in fact, penetrate the barriers, the barbed-wire barriers, negotiate the pipes that
were placed in the way to deter traffic. They had to use a site that had a direct line
because they couldn't afford to take a long time. The Marines were all armed. While
they didn't have ammunition ready, and that was probably known, they would have likely
not made it inside. So if they had tried to come through some sort of a circuitous route
rather than a direct attack down through those barrier pipes right over [the] top of what I
believe to be the only place that you could have gotten a truck of that size into the
building without it being impinged or stopped by some part of the building itself – so they
knew that that was a good entrance. They knew that the truck could negotiate those pipes
and that the weak part for entrance was there at the sandbag guard barricade and that the
interior of the building was the vulnerable spot of that building.

materials seized from those that included pages from military manuals, U.S. military as well as English and French military manuals, as part of their training in calculating the explosive charges.

Q:    I believe this Court in [Eisenfeld v. Islamic Republic of Iran] received testimony with regard to a training camp with regard to handling explosives just outside Tehran, Iran, run by the Iranian government. Would this be the kind of thing you're talking about, an intensive course over three or four months?

A:    Yes, sir, those are exactly the kinds. There were several of those. The one in Iran was just one of several but typical of that.

Based on the evidence presented by the expert witnesses at trial, the Court finds that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. The sophistication demonstrated in the placement of an explosive charge in the center of the Marine barracks building and the devastating effect of the detonation of the charge indicates that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran.

As a result of the Marine barracks explosion, 241 servicemen were killed, and many others suffered severe injuries. Steve Russell, the sergeant of the guard at the time of the explosion, testified that he had observed several victims of the bombing who were in severe pain before their deaths. Sgt. Russell stated that death was not instantaneous for many of the victims, and that many of the victims of the explosion endured extreme pain and suffering.

During the trial, family members of the victims testified about the anguish they endured when they learned of the attack. Deborah Peterson described what happened when she received word of the attack on the Marine barracks, where her brother, Corporal James Knipple, was stationed:

It was Sunday morning and I was sleeping and I got a phone call from my father. He had

19

a frantic sound to his voice that I had never heard before and he said – he just screamed, "Debbie, our worst nightmare has been realized. And I turned on the television and saw what was happening. . . .

It seemed like an awful long time [before word of his death was received]. We waited and waited and waited. We watched every television, we were – I mean, the house was filled with people. We watched the television, we got every newspaper, photograph, magazine we could. We looked for his face among the survivors. We even thought we saw him a couple of times. All of his friends gathered, neighbors, and we held out hope even though the count was rising. . . .

I think around November 7th or 8th, we got a phone call . . . They wanted dental information and identifying marks, anything we could give them, and my father told them about a scar on his forearm. The next day, they told us that he was identified.

We brought him home on the 9th, on his 21st birthday, and we buried him on the 10th, the Marine Corps birthday. I remember the casualty officer, he was all by himself, he came to the house. We were all gathered around, and he told us that Jim was among the dead. It was official.

I remember the casualty officer sitting next to my father and they both seemed really quiet while everybody else was screaming and yelling and crying, and my dad just sat there really quiet. And then when everybody left, he went downstairs and started to scream Jim's name over and over and over again at the top of his lungs.

### III.    CONCLUSIONS OF LAW

Having made the above-listed findings of fact, the Court now enters the following conclusions of law:

1.    An action brought against a foreign state, its intelligence service acting as its agent, and its officials, acting in their official capacity, must be brought under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 et seq. The FSIA must be applied in every action involving a foreign state defendant. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489; 28 U.S.C. § 1330. The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated

exceptions to immunity. <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 488 U.S.
428, 434 (1989). This Court lacks subject matter jurisdiction over the present actions
unless they fall within one of the FSIA's enumerated exceptions to foreign sovereign
immunity. <u>See</u> <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349, 355 (1993). The FSIA has been
construed to apply to individuals for acts performed in their official capacity on behalf of
either a foreign state or its agency or instrumentality. <u>El-Fadl v. Central Bank of Jordan</u>,
75 F.3d 668, 671 (D.C. Cir.1996) (citing <u>Chuidian v. Philippine Nat'l Bank</u>, 912 F.2d
1095, 1101-1103 (9th Cir. 1990).

2.      When it passed the Antiterrorism and Effective Death Penalty Act of 1996, Congress
lifted the immunity of foreign states for certain sovereign acts that are repugnant to the
United States and the international community, and created a right of civil action based
upon the commission of terrorist acts. Pub. L. 104-132, Title II, § 221(a), (April 24,
1996). 110 Stat. 1214, <u>codified at</u> 28 U.S.C.A. § 1605 (West 1997 Supp.). That Act
created an exception to the immunity of those foreign states officially designated by the
State Department as state sponsors of terrorism, if the foreign state so designated commits
a terrorist act, or provides material support and resources to an individual or entity which
commits a terrorist act, which results in the death or personal injury of a United States
citizen. <u>See</u> 28 U.S.C. § 1605(a)(7); <u>see also</u> H. R. REP. NO. 104-383, at 137-38 (1995).

3.      Iran has continuously been designated a state sponsor of terrorism by the U.S. Department
of State since January 19, 1984.

21

4.   Applying the above-mentioned law, as a consequence of the actions of the defendants,

     this Court concludes that it possesses subject matter jurisdiction over the defendants in

     these actions, the Islamic Republic of Iran and the Iranian Ministry of Information and

     Security.

5.   28 U.S.C. § 1605(a)(7) provides for personal jurisdiction over foreign state sponsors of

     terrorism.  As this Court has noted in a previous case involving the government of Iran,

     "[because] international terrorism is subject to universal jurisdiction, Defendants had

     adequate notice that their actions were wrongful and susceptible to adjudication in the

     United States." Flatow, 999 F. Supp. at 14 (citing Eric S. Kobrick, The Ex Post Facto

     Prohibition and the Exercise of Universal Jurisdiction over International Crimes, 87

     COLUM. L. REV. 1515, 1528-30 (1987)); see also Price v. Socialist People's Libyan Arab

     Jamahiriya, 294 F.3d 82, 88-89 (D.C. Cir. 2002) ("In enacting [28 U.S.C. § 1605(a)(7)],

     Congress sought to create a judicial forum for compensating the victims of terrorism, and

     in so doing to punish foreign states who have committed or sponsored such acts and deter

     them from doing so in the future.")

6.   Applying the above-mentioned law, this Court concludes that it possesses personal

     jurisdiction over the defendants in these actions, the Islamic Republic of Iran and the

     Iranian Ministry of Information and Security.

7.    28 U.S.C. § 1605(f) provides for a statute of limitations of "10 years after the date on

which the cause of action arose," and provides for equitable tolling during the "period

during which the foreign state was immune from suit."

8.    The state of Iran was immune from suit until passage of Pub. L. 104-132, which was

made effective on April 24, 1996. Accordingly, the Court concludes that the statute of

limitations contained in 28 U.S.C. § 1605(f) does not bar these actions.

9.    In a memorandum opinion issued December 18, 2002, this Court stated that if the

plaintiffs in these actions proved that the U.S. military service members at issue in these

cases were part of a peacekeeping mission and that they operated under peacetime rules

of engagement, they would qualify for recovery. As set forth in the above findings of

fact, the plaintiffs have demonstrated that the U.S. military service members at issue were

part of a peacekeeping mission, and that they were operating under peacetime rules of

engagement. Therefore, the Court concludes that the military service members at issue in

these cases qualify for recovery.

10.    A foreign state is liable for money damages under the FSIA "for personal injury or death

that was caused by an act of . . . extrajudicial killing, or the provision of material support

or resources . . . for such an act if such act or provision of material support is engaged in

by an official, employee, or agent of such foreign state while acting within the scope of

his or her office, employment, or agency." 28 U.S.C. § 1605(a)(7). The foreign state

must be designated as a state sponsor of terrorism under either section 6(j) of the Export

Administration Act of 1979, 50 U.S.C. app. 2405(j) or section 620A of the Foreign

Assistance Act of 1961, 22 U.S.C. 2371, at the time that the act occurred, unless the

foreign state is thus designated later as a result of that act. Id. Either the victim or the

plaintiff must have been a United States national at the time of the act. Id. Additionally,

the act must be such that it would be actionable if the United States, its agents, officials or

employees within the United States engaged in similar conduct. The Court concludes,

based on the above findings of fact, that plaintiffs in these actions have established all of

these elements by clear and convincing evidence.

11.    The FISA utilizes the same definition of "extrajudicial killing" as the Torture Victim

Protection Act of 1991, which defines an "extrajudicial killing" as "a deliberated killing

not authorized by a previous judgment pronounced by a regularly constituted court

affording all judicial guarantees which are recognized as indispensable by civilized

peoples. . . ." Pub. L. 102-256, 106 Stat. 73 (1992). The Court concludes that the act

undertaken by agents of Hezbollah – the development and detonation of an explosive

charge in the barracks of the 24th MAU on October 23, 1983, which resulted in the

deaths of over 241 peacekeeping American servicemen – satisfies the FISA's definition

of an "extrajudicial killing."

12.    The Court finds that MOIS, acting as an agent of the Islamic Republic of Iran, performed

acts on or about October 23, 1983, within the scope of its agency (within the meaning of

24

28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note), which acts caused the deaths of

over 241 peacekeeping servicemen at the Marine barracks in Beirut, Lebanon.

Specifically, the deaths of these servicemen were the direct result of an explosion of

material that was transported into the headquarters of the 24th MAU and intentionally

detonated at approximately 6:25 a.m., Beirut time by an Iranian MOIS operative. The

Court therefore concludes that MOIS actively participated in the attack on October 23,

1983, which was carried out by MOIS agents with the assistance of Hezbollah.

13.    The Court concludes that the deaths of over 241 peacekeeping servicemen at the Marine

barracks in Beirut, Lebanon were caused by a willful and deliberate act of extrajudicial

killing.

14.    As the result of the deaths of the 241 American servicemen in Beirut, Lebanon, their

parents, surviving siblings, children, and spouses have suffered and will continue to

suffer severe mental anguish and loss of society.

15.    It is beyond dispute that if officials of the United States, acting in their official capacities,

provided material support to a terrorist group to carry out an attack of this type, they

would be civilly liable and would have no defense of immunity. See 42 U.S.C. § 1983;

Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388

(1971).

16.    The Court concludes that the defendants, the Islamic Republic of Iran and the Iranian

Ministry of Information and Security, are jointly and severally liable to the plaintiffs for

compensatory and punitive damages.

17.    As to each claim of each Complaint, the Court will make a determination of the proper

amount of compensatory damages after its receipt of reports from the special masters

appointed by the Court. The Court will also make a determination as to punitive damages

at that time.

## IV.    CONCLUSION

The Court is mindful that some may question the utility of the present suit. During the

March trial, the Court heard testimony from a number of witnesses as to the reasons why this suit

was brought, and as to its potential efficacy.

Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy,

described the manner in which civil judgments for acts of state-sponsored terrorism have had a

noticeable impact upon the present regime in Iran:

> Q:    To what extent since its creation in 1979 has the Islamic Republic of Iran been
> susceptible to influence because of economic sanctions? By sanctions, I don't
> mean something that was stated, but simply having to pay out bucks, whether it's
> in damages in personal injury cases or damages awarded by a tribunal, punitive
> damages, anything of that sort?
>
> A:    To begin with, the release of those held hostage at the American Embassy in
> Tehran, most Iranian observers think that the American freezing of billions of
> dollars of Iranian assets and the eventual negotiations which really hinged around

how much money Iran was going to get back is a good example from the very
beginning of this process of Iran's susceptibility to economic pressure, and there
have been a number of situations since in which Iran has been deflected from its
main course by economic pressures. For instance, the Europeans [were]
successful at doing that in the early 1990s, deflecting Iran from terrorist activities
in European soil.

 * * * * * * * * * * *

Q: Given the enormity of the offense committed on October 23rd, 1983, in the attack
of the Marine barracks, how much of that sum in the pockets of Iran would have
to be subtracted before – in order to give some indication that they would start to
change policy?

A: Well, sir, I would – the larger the sum, the more of an impact this is going to have
on the Iranians, and if this court case results in a large judgment, be it for
compensatory or punitive damages, that is very likely to receive the attention of a
fair number of policymakers in Iran, and I have great confidence that the Iranian
leaders will consider that in deciding which way to proceed.

 *  * * * * * * * * **

I think, sir, that the Iranians have been extraordinarily sensitive to court actions, whether
it was in Germany or in Argentina or in the United States, which make any references to
the top leadership of the country being involved in these cases. That has been a matter of
greatest sensitivity in Iran, and there have been several cases in which the Iranians reacted
extremely strongly, particularly to suggestions that the supreme religious leader was
involved in any way in these activities. . . . I have to say that I think that they pay quite
detailed attention to these judgments . . . .

 * * * * * * * * * *

I would say that based on the past precedent about the way that these court cases have
been viewed, what will be looked at very closely is two things. One is the size of the
dollars involved, and the other is whether or not there is any change in the way that the
court views the matter. So this case, if it involves a much larger judgment in dollar terms
than previous cases, will be regarded as a toughening of the American stance.

  On the other hand, there will be close examination of whether or not this case in
its legal reasoning or in the application or non-application of punitive damages involves
any change in the way in which a court rules. So, for instance, a lack of punitive damages
would be regarded as an indication that the United States Government is making a gesture
towards Iran.

Q:      A softening of our position.

A:      Correct, sir. . . .

Q:      So as I read you correctly, less in punitive damages than has been awarded in
        cases before would be to the Iranians a softening of the American resolve; more
        would be a hardening of the American resolve?

A:      Correct. sir.

The Court also heard the testimony of Dr. Michael Ledeen[23] as to the likely effect of an

award of damages in the present actions:

> THE COURT:      From your experience dealing all these years now with Iran, have
> you seen, from the court cases where punitive damages have been
> entered by the courts, what impact, if any, that has had in Iran and
> on the government, and what do you think of that?

A:      Well, it hurts the government because it stings them. and the people see – what
        the Iranian people need to reach the point where they are willing to risk their lives
        to bring down this regime is that the civilized world understands what kind of
        regime it is and therefore would welcome that kind of event; and consequently, in
        my opinion, every time that regime is condemned and punished in a Western
        court, that hastens the moment of the downfall of that regime.[24]

---

[23] As noted above, Dr. Ledeen served as a consultant to the U.S. Defense Department at
the time of the October 23, 1983 bombing. and is one of the premier experts in the nation on the
subject of U.S. foreign relations.  He is presently a resident scholar at the American Enterprise
Institute.

[24] Regarding the tension between the Iranian government and the populace, Dr. Ledeen
testified that

> the people of Iran hate the regime.  Even the public opinion polls taken by the regime
> itself show that 70-plus percent of the Iranian people don't like the regime, would like a
> national referendum, deplore the foreign policy of the regime and want better relations
> with the United States, and you would have to figure that if 70 percent of Iranians will tell
> people that they know are coming from the Ministry of Information that they hate the
> regime, that the real number must be something higher than that.

The Court also heard testimony from the men and women who have brought the present actions about their reasons for so doing. During the trial, Lt. Col. Howard Gerlach, who was paralyzed in the October 23 attack, was asked about what he hoped to achieve by participating in these actions:

> Well, I guess there's three words: accountability, deterrence and justice. And they are interrelated. The accountability, and I swear it was on Sunday, I was listening to a rerun of one of the TV – I don't know, Meet the Press or whatever, but Vice President Cheney was talking and he was saying that they, the terrorists feel that they can do things with impunity, and he said ever since the Marines in '83. Yes, there hasn't been any accountability.
>      Deterrence effect is, in some way, and this is also what he was talking about, was one thing we have to go after – and I think I'm stating this correctly; this is what I heard, is the funding. It's the funding. Even on the radio coming over here, we heard some talk about funding for terrorist organizations.
>      Then the third thing is the justice, and this refers to the people, a good portion of [whom] are in this room. . . . They lost a large chunk of their lives, young Marines, sons, husbands, fathers, brothers. They were attempting to do a noble thing. They went as peacekeepers in the tradition of this country. . . [W]e weren't trying to conquer land, we weren't trying to get anything for ourselves; we were really trying in a humanitarian way to help those people in Lebanon. I think this is . . . the day in court, literally and figuratively speaking, for recognition of just how great these guys were.

The Court also heard the testimony of Lynn Smith Derbyshire, whose brother, Capt.

Vincent Smith, was killed in the October 23 attack:

> I'm not sure it's true that time heals wounds, but even so, a wound which has healed over time is not the same thing as not having a wound. Even a healing wound gets reopened from time to time.

$$* \quad * \quad * \quad * \quad * \quad * \quad * \quad * \quad * \quad *$$

> [A]s I have talked to so many of the Beirut families, I believe that many of them would concur with me when I say that the pain does not stop when you bury the dead; it is only the very beginning. We feel this loss over and over and over again. It does not go away and it does not lessen with time; that is a myth. It is more like teaching someone who has a chronic pain disorder how to manage and embrace their pain than it is a lessening of pain.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

I have spoken to quite a number of the family member and I think we're all – I think they would all agree with me when I tell you that what Vince would have wanted was justice.

Vince was a fair-minded man. Vince was a man of integrity, as I know so many of the men who were lost that day were. It's the kind of men Marines are. That's what the Marine Corps produces. And Vince would have wanted us to fight.

Vince would have said . . . we must hold these men accountable. Vince would have said that it is time for justice, that it is time for compensation, that it is time to make it – to make them pay enough to make them stop, because Vince was a man who believed in what was right. and if he had lived, he would be sitting here in my place and he would be saying, "Come on, sis. let's go get them."

But he can't be here, and in his name, and in his honor, and with the permission of some of the other family members here . . . in their names and in their honor, I salute them, and we stand together to do what they cannot do for themselves.

There is little that the Court can add to the eloquent words of these witnesses. No order from this Court will restore any of the 241 lives that were stolen on October 23, 1983. Nor is this Court able to heal the pain that has become a permanent part of the lives of their mothers and fathers, their spouses and siblings, and their sons and daughters. But the Court can take steps that will punish the men who carried out this unspeakable attack, and in so doing, try to achieve some small measure of justice for its survivors, and for the family members of the 241 Americans who never came home.

A separate order accompanies this opinion.

Date: ___5-30-03___

Royce C. Lamberth
United States District Judge

**EXHIBIT "B"**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

)
**DEBORAH D. PETERSON,** )
**Personal Representative of the** )
**Estate of James C. Knipple (Dec.),** *et al.*, )
)
Plaintiffs, )
) **Consolidated Civil Actions:**
v. ) **01-2094 (RCL)**
) **01-2684 (RCL)**
)
**ISLAMIC REPUBLIC OF IRAN,** *et al.*, )
)
Defendants. )
_____ )

### MEMORANDUM OPINION

### BACKGROUND

These actions arise from the October 23, 1983, bombing of a United States Marine

barracks in Beirut, Lebanon, in which 241 American servicemen operating under peacetime rules

of engagement were murdered by a suicide bomber. This attack was regarded as the most deadly

state-sponsored terrorist attack made against American citizens, until the tragic attacks on

September 11, 2001.

The nearly one thousand plaintiffs in this consolidated action are many of the family

members and estates of the 241 servicemen killed in the attack. Plaintiffs allege that the Islamic

Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are

liable for damages from the attack because they provided material support and assistance to

-1-

EXHIBIT __B__

Hezbollah,[1] the terrorist organization that orchestrated and carried out the bombing.  Plaintiffs

have relied upon causes of action founded upon provisions of the Foreign Sovereign Immunities

Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7).

## PROCEDURAL HISTORY

On March 17-18, 2003, this Court conducted a bench trial to determine the defendants'

liability for their part in the perpetration of this attack.  After reviewing the evidence presented by

plaintiffs at trial, including testimony from lay and expert witnesses, this Court issued an opinion

finding that the defendants were legally responsible for providing material financial and logistical

support to help carry out this tragic attack on the 241 servicemen in Beirut in 1983.  *Peterson v.

Islamic Republic of Iran.* 264 F. Supp. 2d 46. 61 (D.D.C. 2003).  In that opinion, this Court also

found that the surviving family members have suffered and will continue to suffer mental

anguish and loss of society.  *Id.*  Finally, this Court directed special masters to consider each

claim brought by plaintiffs, and indicated that it would make a determination on the amount of

compensatory and punitive damages for each claim after the Court received reports from the

special masters.[2]  The Court reaches this determination on the issue of damages in this opinion.

---

[1] According to the Oxford English Dictionary, the term "Hezbollah" is synonymous with
the terms "Hizbollah" and "Hizbullah," all of which are English transliterations of the Arabic
term referring to the extremist Shiite Muslim group also known as the "Party of God."  *See*
Oxford English Dictionary (2d ed. 1989).  Accordingly, to the extent that any of these terms are
used within this opinion, they shall be used interchangeably.

[2] In a prior case where this Court held Iran responsible under the Foreign Sovereign
Immunities Act as a state sponsor of terrorism, this Court noted that its statutory duty is clear and
that there is no danger of inadvertent interference with foreign relations.  *See Flatow v. Islamic
Republic of Iran*, 999 F. Supp. 1, 16 (D.D.C. Mar. 11, 1998) (Lamberth, J.).  "Article I of the
Constitution establishes that Congress has 'authority to enact laws applicable to conduct beyond
the territorial boundaries of the United States.'" *Id.* (quoting *EEOC v. Aramco*, 499 U.S. 244,
260-61 (1991).  The Foreign Sovereign Immunities Act not only applies to extraterritorial

The Court reviews the determinations made by the special masters *de novo*. *See* Fed. R. Civ. P. 53(g)(3).

## DISCUSSION

*I.*    *Assessment of Validity of Each Plaintiff's Cause of Action*

In order to ensure that the Court determines the appropriate amount of damages available to each plaintiff under the law, it must first ensure that each plaintiff has a valid claim under state law. The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. Sept. 29, 2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.)).

In order to determine the applicable state law to each action, the Court must look to the choice of law rules of the forum, in this case, the choice of law rules of the District of Columbia. *See Blais*, 459 F. Supp. 2d at 54. Under District of Columbia choice of law rules, courts employ a modified government interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most

---

conduct, but one of its express purposes is to affect the conduct of terrorist states outside the United States, in order to promote the safety of United States citizens overseas. Congress specifically restricted application of the statute to foreign state defendants which the Executive Branch, via the State Department, has determined are foreign state sponsors of terrorism. *See id.* This Court is aware that the judgment entered today may be the largest ever entered by a court of the United States against a foreign nation. The President has not filed a suggestion of interest indicating that actions by this Court will in any way interfere with the foreign relations of the United States. This Court is properly performing its duty under a constitutional statute.

advanced by having its law applied to the facts of the case under review." *Hercules & Co. v.*

*Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted).

Application of this governmental interest test generally points to the law of plaintiff's domicile as

having the greatest interest in providing redress to its citizens. Accordingly, the validity of each

of the plaintiffs' claims shall be determined by the state in which they were domiciled at the time

of the attack.

In this action, three types of claims have been sought. First, the personal representatives

and estates of the servicemen killed in the attack have brought claims for wrongful death, in

which the plaintiffs and beneficiaries seek compensation in the form of the present value of the

decedent's lost wages and earnings that he would have earned but for his untimely death.

Second, the surviving servicemen have brought claims for battery against the defendants. Third,

the family members of both the deceased and surviving servicemen have brought claims for

intentional infliction of emotional distress ("IIED") against the defendants for their part in

materially bringing about the attack. The Court will assess the relative merits of each of the

claims separately.

### A.    *Wrongful Death Claims*

Wrongful death claims were brought by the personal representatives and estates of the

following deceased servicemen:

> Terry Abbott, John Robert Allman, Ronny Kent Bates, James Baynard, Jess W.
> Beamon, Alvin Burton Belmer, Richard D. Blankenship, John W. Blocker, Joseph
> John Boccia Jr., Leon Bohannon, John Bonk Jr., Jeffrey James Boulos, John
> Norman Boyett, William Burley, Paul Callahan, Mecot Camara, Bradley Campus,
> Johnnie Ceaser, Robert Allen Conley, Charles Dennis Cook, Johnny Len
> Copeland, David Cosner, Kevin Coulman, Rick Crudale, Russell Cyzick, Michael
> Devlin, Nathaniel Dorsey, Frederick Douglass, Timothy Dunnigan, Bryan Earle,

-4-

Danny R. Estes, Richard Andrew Fluegel, Michael D. Fulcher, Sean Gallagher,
George Gangur, Randall Garcia, Harold Ghumm, Timothy Giblin, Michael
Gorchinski, Richard Gordon, Davin M. Green, Thomas Hairston, Michael
Haskell, Mark Anthony Helms, Stanley G. Hester, Donald Wayne Hildreth,
Richard Holberton, Dr. John Hudson, Maurice Edward Hukill, Edward Iacovino
Jr., Paul Innocenzi III, James Jackowski, Jeffrey Wilbur James, Nathaniel Walter
Jenkins, Edward Anthony Johnston, Stephen Jones, Thomas Adrian Julian,
Thomas Keown, Daniel Kluck, James C. Knipple, Freas H. Kreischer III, Keith
Laise, James Langon IV, Michael Scott LaRiviere, Steven LaRiviere, Richard
Lemnah, Joseph Raymond ("Joel") Livingston III, Paul D. Lyon Jr., John
Macroglou, Samuel Maitland Jr., Charlie Robert Martin, David Massa, John
McCall, James E. McDonough, Timothy R. McMahon, Richard Menkins II,
Ronald Meurer, Joseph Peter Milano, Joseph Moore, Harry Douglas Myers, David
Nairn, John Arne Olson, Joseph Albert Owens, Connie Ray Page, Ulysses
Gregory Parker, John L. Pearson, Thomas S. Perron, John Arthur Phillips Jr.,
William Ray Pollard, Victor Mark Prevatt, James Price, Patrick Kerry Prindeville,
Diomedes J. Quirante, Warren Richardson, Luis J. Rotondo, Michael Caleb Sauls,
Charles Jeffrey Schnorf, Scott Lee Schultz, Peter Scialabba, Gary Randall Scott,
Thomas Alan Shipp, Jerryl Shropshire, Larry H. Simpson Jr., Kirk Hall Smith,
Thomas Gerard Smith, Vincent Smith, William Scott Sommerhof, Stephen
Eugene Spencer, William Stelpflug, Horace Renardo ("Ricky") Stephens Jr.,
Craig Stockton, Jeffrey Stokes, Eric D. Sturghill, Devon Sundar, Thomas Paul
Thorstad, Stephen Tingley, Donald H. Vallone Jr., Eric Glenn Washington,
Dwayne Wigglesworth, Rodney J. Williams, Scipio Williams Jr., Johnny Adam
Williamson, William Ellis Winter, Donald Elberan Woollett, Craig Wyche,
Jeffrey D. Young.[3]

Out of the 128 deceased servicemen, 123 were domiciled in North Carolina at the time of

the attack.[4] The servicemen who were not domiciled in North Carolina at the time of the attack

---

[3] In association with their wrongful death claims, the respective estates of Alvin Burton
Belmer, Nathaniel Walter Jenkins, Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley
have sought damages for pain and suffering incurred during the time at which they were alive
after the attack and the time at which they died. The measure of damages for each of these
servicemen will be assessed in the damages portion of this opinion, *see infra* Section II.B.1. and
does not affect the validity of their wrongful death claims.

[4] Deceased serviceman, Diomedes J. Quirante, was born in the Phillippines in 1958, and
was not a United States citizen. Therefore, an issue exists as to whether Diomedes J. Quirante
has standing to recover against Iran and MOIS under the FSIA's "state sponsored terrorism"
exception. In order for a plaintiff to so recover, he or she must show that: (1) the State

were domiciled in California, Oklahoma, South Carolina, and Vermont.[5] This difference in

domicile is of no moment, however, because the wrongful death statutes of each of the

servicemen's respective states of domicile imposes liability on an actor when his "wrongful act,

neglect, or default" causes a person's death, and had that person lived, he could have recovered

damages from the actor. Cal Civ. Proc. Code § 377.60(a) (2007); N.C. Gen. Stat. § 28A-18-2(a)

(2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. § 15-51-10 (2006); Vt. Stat. Ann. tit. 14,

§ 1491 (2007). Each statute provides for recovery of numerous categories of damages, including

---

Department had previously designated the foreign sovereign as a "state sponsor of terrorism" or
did so based on the event in question; (2) the victim or plaintiff was a U.S. national when the
event took place; and (3) "the foreign sovereign engaged in conduct that falls within the ambit of
the statute." *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28,
2006).

    As this Court has already found in its Memorandum Opinion establishing the defendants'
liability for this attack, the first and third requirements are satisfied. Therefore, the only issue
remaining is whether Diomedes qualifies as a United States national. The term "U.S. national"
embraces both United States citizens and non-citizens who owe permanent allegiance to the
United States. 8 U.S.C. § 1101(a)(22) (2006). In this case, the evidence shows that Diomedes
clearly was a U.S. national. First, though a citizen of the Phillippines, Diomedes enlisted in the
United States Army when he was twenty one years old. As a part of his commitment to
becoming a member of the United States Armed Forces, Diomedes was required to take an oath
to defend and uphold the Constitution of the United States. Once enlisted, he was assigned to the
2nd Marine Division, Fleet Marine Force (FMF) in Camp Lejeune, North Carolina. He remained
a member of the United States Army in North Carolina from that time until his death in Beirut,
Lebanon in 1983. His oath, and ultimate heroic act of dying while a member of the United States
Army establishes beyond any doubt that Diomedes J. Quirante's allegiance to the United States
was permanent. Therefore, this Court finds that Diomedes J. Quirante was a United States
national at the time he was killed. Accordingly, Diomedes has standing under the FSIA to
recover against the defendants.

    There still remains the issue of what law governs Diomedes' claims. In light of the fact
that he was stationed in Camp LeJeune, North Carolina before being sent to Lebanon, this Court
finds that North Carolina is the state with which Diomedes had the closest and most substantial
connection. Therefore, the law of North Carolina shall govern Diomedes' wrongful death claim.

    [5] The Court could not determine the domicile of one serviceman, Frederick Douglass,
because no evidence was presented on behalf of his estate. For this reason, the Court will
dismiss the claim brought by the personal representative of his estate without prejudice.

pecuniary loss in the form of the present monetary value of the decedent to the persons entitled to

receive the damages recovered, expenses for care, treatment and hospitalization incident to the

injury resulting in death; and reasonable funeral expenses. *See* Cal Civ. Proc. Code § 377.61

(2007); N.C. Gen. Stat. § 28A-18-2(b) (2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. §

15-51-20 (2006); Vt. Stat. Ann. tit. 14, § 1491 (2007). Additionally, North Carolina allows for

the recovery of compensation for pain and suffering of the decedent. N.C. Gen. Stat. § 28A-18-

2(b).[6]

Based upon the evidence presented to the special masters and the Court, each of the

deceased servicemen has made out a valid claim for wrongful death under North Carolina law.

Accordingly, those valid heirs and beneficiaries under North Carolina's intestate statute are

entitled to share in the recovery of the damages awarded as a result of each serviceman's untimely

death.

B.    *Battery Claims*

Claims of battery were brought against the defendants by the following servicemen who

ultimately survived the attack:

> Marvin Albright, Pablo Arroyo, Anthony Banks, Rodney Darrell Burnette, Frank
> Comes Jr., Glenn Dolphin, Frederick Daniel Eaves, Charles Frye, Truman Dale
> Garner, Larry Gerlach, John Hlywiak, Orval Hunt, Joseph P. Jacobs, Brian
> Kirkpatrick, Burnham Matthews, Timothy Mitchell, Lovell "Darrell" Moore,
> Jeffrey Nashton, John Oliver, Paul Rivers, Stephen Russell, Dana Spaulding,

---

[6] The servicemen who seek pain and suffering during the survival period between the
attack and their deaths were each domiciled in North Carolina at the time of the attack.
Therefore, the Court need only concern itself with North Carolina law on the issue of pain and
suffering.

Craig Joseph Swinson, Michael Toma, Danny Wheeler, Thomas D. Young[7]

Out of the twenty six surviving servicemen seeking damages for battery, twenty five of them were domiciled in North Carolina at the time of the attack. The one remaining surviving serviceman, Charles Frye, was domiciled in California at the time of the attack. Both states, however, recognize that a battery is deemed to be an offensive touching of the person by another without consent. *See Rains v. Superior Court*, 198 Cal. Rptr. 249, 252 (Cal. Ct. App. 1984); *Ormond v. Crampton*, 191 S.E.2d 405, 410 (N.C. App. 1972). Therefore, the battery claims for each of the servicemen can be assessed evenly.

Based upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for battery under North Carolina and California law. Therefore, each may recover the appropriate amount of compensatory damages as determined by this Court.

### C.     *Intentional Infliction of Emotional Distress Claims*

The remaining 753 plaintiffs have sought claims for intentional infliction of emotional distress, and awards for pain and suffering incurred as a result of their extreme emotional grief and psychological anguish associated with the knowledge that their family members are either deceased or alive but permanently scarred both physically and mentally. Each of these plaintiffs were domiciled in a number of different states–and in one family's case, the Phillippines–at the time of the attack. Accordingly, this Court must determine whether each of these plaintiffs has brought a valid cause of action under each state's respective law.

---

[7] Because these individuals can recover for their mental anguish and suffering under their respective battery claims, the Court need not consider each plaintiff's intentional infliction of emotional distress claim, which would result in an impermissible double recovery.

In order to accomplish this. the Court must first analyze whether such a cause exists under each state's laws. Next. to the extent that a state recognizes IIED claims. this Court must determine which family members have standing to recover for IIED under each state's laws. Then this Court must assess whether the plaintiffs have established the essential elements of the claim.

### 1.    Intentional Infliction of Emotional Distress: State Law Analysis

The states of domicile for these 753 plaintiffs are: Alabama, California, Connecticut. District of Columbia. Florida. Georgia, Illinois, Indiana. Kansas, Kentucky, Louisiana, Maryland. Massachusetts, Michigan, Minnesota. Mississippi. Missouri, Nebraska, New Jersey, New Mexico. New York. North Carolina. Ohio. Oklahoma. Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee. Texas, Vermont, Virginia. Washington, West Virginia, and Wisconsin. The family of serviceman Diomedes J. Quirante was domiciled in the Phillippines.[8]

Each of the states mentioned above recognize the existence of a cause of action for intentional infliction of emotional distress. rooted in Section 46 of the Restatement (Second) of

---

[8] Though the surviving immediate family members of Diomedes J. Quirante are not United States citizens. the Court finds that they have standing under the FSIA to bring claims for intentional infliction of emotional distress under North Carolina law. The "state sponsored terrorism" exception to the FSIA requires only that either the plaintiffs *or the victim* be a United States national at the time of the attack. *Prevatt*, 421 F. Supp. 2d at 158. Therefore. the Quirante family members' intentional infliction of emotional distress claims may be brought because Diomedes was a United States national at the time he was killed. *See supra* note 3. Applying District of Columbia choice of law principles. North Carolina is the state with the strongest interest in determining the claims brought by Diomedes' family members because their claims are intertwined with–and result from–Diomedes' death. Therefore. this Court finds that the claims brought by the Quirante family are governed by North Carolina law.

Torts.[9]   Though each state has its own particular means of describing intentional infliction of

emotional distress, upon inspection of each state's laws the elements of intentional infliction of

emotional distress are met in each state if it can be demonstrated that: (1) the defendant engaged

in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the

probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional

distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's

emotional distress.[10]

    There still remains the issue of whether each plaintiff has standing to recover under state

---

[9] *See, e.g., American Rd. Serv. Co. v. Inmon,* 394 So.2d 361 (Ala. 1980); *Davidson v. City of Westminster,* 649 P.2d 894, 901 (Cal. 1982); *Rugg v. McCarty,* 476 P.2d 753, 756 (Colo. 1970); *Murray v. Bridgeport Hosp.,* 480 A.2d 610, 614 (Conn. 1984); *Johnathan Woodner Co. v. Breeden,* 665 A.2d 929, 934-35 (D.C. 1995); *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278-79 (Fla. 1985); *Yarbray v. Southern Bell Tel. & Tel. Co.,* 409 S.E.2d 835, 837 (Ga. 1991); *Palmateer v. International Harvester Co.,* 406 N.E.2d 595, 598 (Ill. App. Ct. 1980), *rev'd on other grounds,* 421 N.E.2d 876 (Ill. 1981); *Creel v. I.C.E. & Assocs., Inc.,* 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002); *Craft v. Rice,* 671 S.W.2d 247, 251 (Ky. 1984); *White v. Monsanto Co.,* 585 So.2d 1205, 1208-1210 (La. 1991); *Harris v. Jones,* 380 A.2d 611, 614 (Md. 1977); *George v. Jordan Marsh Co.,* 258 N.E.2d 958, 921 (Mass. 1971); *Dornfeld v. Oberg,* 503 N.W.2d 115, 117 (Minn. 1993); *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 (Mo. 1993); *Morrison v. Means,* 680 So. 2d803, 805-06 (Miss. 1996); *Dickens v. Puryear,* 276 S.E.2d 325, 332 (N.C. 1981); *Gall v. Great Western Sugar Co.,* 363 N.W.2d 373, 376 (Neb. 1985); *Buckley v. Trenton Saving Fund Soc.,* 544 A.2d 857, 863 (N.J. 1988); *Mantz v. Follingstad,* 505 P.2d 68, 74-75 (N.M. App. 1972); *Murphy v. Am. Home Prods. Corp.,* 448 N.E.2d 86, 90 (N.Y. 1983); *Yeager v. Local Union 20,Teamsters, Chauffeurs, Warehousemen, & Helpers of America,* 453 N.E.2d 666, 671 (Ohio 1983); *Breeden v. League Servs. Corp.,* 575 P.2d 1374, 1376 (Okla. 1978); *Forster v. Manchester,* 189 A.2d 147, 151-52 (Pa. 1963); *Champlin v. Washington Trust Co.,* 478 A.2d 985, 988 (R.I. 1984); *Ford v. Hutson,* 276 S.E.2d 776, 778 (S.C. 1981); *Christians v. Christians,* 637 N.W.2d 377, 382 (S.D. 2001); *Levy v. Franks,* 159 S.W.3d 66, 82-83 (Tenn. Ct. App. 2004); *Hoffmann-La Roche Inc. v. Zeltwanger,* 144 S.W.3d 438, 445 (Tex. 2004); *Sheltra v. Smith,* 392 A.2d 431, 433 (Vt. 1978); *Womack v. Eldridge,* 210 S.E.2d 145, 148 (Va. 1974); *Robel v. Roundup Corp.,* 59 P.3d 611, 619 (Wash. 2002); *Wayne County Bank v. Hodges,* 338 S.E.2d 202, 205 (W. Va. 1985).

[10] *See supra* note 7.

law for the defendant's attack on the plaintiffs' respective family members. Section 46(2) of the

Restatement (Second) of Torts governs the ability of plaintiffs to recover for intentional infliction

of emotional distress where the defendant's conduct is directed at a third party. Restatement

(Second) of Torts § 46(2). Section 46(2) of the Restatement specifically states that only present

third parties may recover for an IIED claim. Nonetheless, the Caveat to the section leaves open

the possibility of other possible situations where a defendant could be liable for intentional

infliction of emotional distress under this section.

Each state has interpreted this ambiguity differently. Some states have explicitly allowed

for situations where the presence requirement is unnecessary to establish an IIED claim. Florida,

for example, has acknowledged that an immediate family member may recover for intentional

infliction of emotional distress even if he or she was not present at the time of the outrageous

conduct. *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App.1991). Along the same

lines, California has found that a plaintiff's presence is not always required, and is deemed

unnecessary in situations where the defendant is aware of the high probability that the defendant's

acts will cause a plaintiff severe emotional distress. *Christensen v. Superior Court*, 820 P.2d

181, 203-204 (Cal. 1992).[11] Therefore, as this Court found in *Heiser*, when a terrorist attack

occurs, the presence element is not required to bring a valid IIED claim under either Florida or

California law, and that plaintiffs domiciled in these states at the time of the attack may bring a

---

[11] Applying this standard, this Court found in *Heiser* that, given the extreme nature of a
terrorist attack, the presence element for an IIED claim under California law did not need to be
proven. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 305 (D.D.C. Dec. 22, 2006)
(Lamberth, J.).

claim for IIED without establishing their presence at the scene of the injury.[12] Much like Florida and California, Vermont has no presence requirement for plaintiffs to recover for the intentional or reckless infliction of emotional distress. *Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990).

Additionally, there are a number of states at issue in this action whose Supreme Courts have not specifically addressed the issue of whether a plaintiff's presence is required. Some of the laws of these states–Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana, Oklahoma, and Kansas–were previously analyzed by this Court in *Heiser*, in which this Court found that no such presence requirement was necessary in these states given the severe nature of terrorist attacks. *See Heiser*, 466 F. Supp. 2d at 328-29, 333 (Tex.), 341 (Minn.), 343-44 (Wisc.), 345-46 (N.Y.), 349 (N.C.), 352 (Ind.), 354 (Okla.), 355 (Kans.).[13] In this case, the respective

---

[12] This finding, of course, is on the assumption that those plaintiffs have standing to recover in the first place. Those plaintiffs without standing to recover under the law of their respective domiciliary states may not recover, regardless of whether a plaintiff with standing could so recover.

[13] The Oklahoma Supreme Court has rejected recovery for mental anguish and suffering under an IIED claim brought by bystanders. See *Slaton v. Vansickle*, 872 P.2d 929, 931-32 (Okla. 1994). According to Oklahoma's Supreme Court, it is long recognized that "recovery for mental anguish is restricted to such mental pain or suffering as arises from an injury or wrong to the person rather than from another's suffering or wrongs committed against another person." *Vansickle*, 872 P.2d at 931. Following this logic, the Oklahoma Supreme Court limited recovery when a plaintiff's IIED claim rests on conduct directed at a third party to situations where: "1) the plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from actually viewing the injury to another rather than from learning of the accident later; and 3) a familial or other close personal relationship existed between the plaintiff and the party whose injury gave rise to the plaintiff's mental anguish." *Kraszewski v. Baptist Med. Ctr. Of Okla., Inc.*, 916 P.2d 241, 248 (Okla. 1996). This limitation on third party recovery is of no moment, however, due to the simple fact that it has been repeatedly found that "a terrorist attack-by its nature-is directed not only at the victims but also at the victims' families." *Heiser*, 466 F. Supp. 2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)). Therefore, the decedents' near relatives are also direct victims of this horrendous attack. Accordingly, this Court finds that the limitations imposed by the Oklahoma Supreme Court on recovery for pain and suffering due to injuries sustained by a third party do not

state supreme courts of a number of states–Alabama, Connecticut, District of Columbia, Illinois,

Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New

Jersey, New Mexico, Rhode Island, Tennessee, Virginia–have not specifically addressed whether

a plaintiff's presence is required to establish a viable IIED claim. Accordingly,"in light the

severity of [a terrorist attack,] and the obvious range of potential grief and distress that directly

results from such a heinous act,"[14] and because "a terrorist attack-by its nature-is directed not

only at the victims but also at the victims' families."[15] this Court adopts the rationale it set forth in

*Heiser* regarding the presence element for IIED claims in states that have been silent on the issue.

*See Heiser*, 466 F. Supp. 2d at 328-29. Therefore, this Court finds that claims for intentional

infliction of emotional distress may be brought by family members without having to establish a

presence requirement under Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, Kansas, Alabama, Connecticut, District of Columbia, Illinois, Indiana, Kansas,

Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey, New

Mexico, Rhode Island, Tennessee, and Virginia laws.[16]

    Other states at issue in this case–Georgia, Missouri, South Carolina, South Dakota,

Washington, and West Virginia–have allowed third party plaintiffs to recover, but only when the

defendant's conduct is "directed at" the third party plaintiffs themselves.[17]  As this Court and

---

apply to the family members seeking redress before this Court today.

    [14] *Heiser*, 466 F. Supp. 2d at 328.

    [15] *Id.* (quoting *Salazar*, 370 F.Supp.2d at 115 n. 12).

    [16] *See supra* note 10.

    [17] *See, e.g., Ryckeley v. Callaway*, 412 S.E.2d 826, 827 (Ga. 1992); *Samsonetti v. City of St. Joseph*, 976 S.W.2d 572, 580 (Mo. App. W.D. 1998) (citing *Gibson v. Brewer*, 952 S.W.2d

others within this district have noted, "a terrorist attack–by its nature–is directed not only at the victims but also at the victims' families." *Heiser*, 466 F. Supp. 2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*. 370 F. Supp. 2d 105. 115 n.12 (D.D.C. 2005) (Bates. J.)). Therefore. this Court finds that those plaintiffs domiciled in Georgia, Missouri. South Carolina, South Dakota. Washington, and West Virginia at the time of the attack, may bring a claim for IIED under the laws of those states because the attack was directed at them as well as those killed in the attack.[18]

Two other states at issue in this case–Louisiana and Pennsylvania–have narrowly construed their interpretation of what constitutes a valid IIED claim, and have expressly found that the presence element is required for third party plaintiffs to recover.[19] Accordingly. this Court finds those plaintiffs who were not contemporaneously present at the site of the attack would not be able to recover under either Louisiana or Pennsylvania law for a claim of IIED. Without a valid cause of action under state law. the plaintiffs domiciled in Louisiana and Pennsylvania lack a viable means to redress their injury, and therefore lack standing.

---

239, 249 (Mo. 1997) (en banc)); *Upchurch v. New York Times Co.*, 431 S.E.2d 558, 561 (S.C. 1993) (citing *Christensen v. Superior Court*. 820 P.2d 181 (Cal. 1991)); *Hayes v. Northern Hills General Hospital*, 628 N.W.2d 739, 744 (S.D. 2001); *Reid v. Pierce County*. 961 P.2d 333. 337 (Wash. 1988); *Courtney v. Courtney*, 413 S.E.2d 418, 422 (W. Va. 1991).

[18] *See supra* note 10.

[19] *See Daigrepont v. State Racing Com'n*, 663 So.2d 840, 841 (La. App.1995) (requiring plaintiff's actual presence at the scene of the injury, and not allowing any further interpretation of the provision in the Louisiana Code establishing a cause of action for IIED); *Taylor v. Albert Einstein Medical Center*. 754 A.2d 650. 652-53 (Pa. 2000) (limiting IIED recovery to those plaintiffs "who were present at the time, as distinguished from those who discover later what has occurred." even in those situations where the defendant may be substantially certain that the plaintiff will suffer severe emotional distress as a result of the offensive act).

Accordingly, this Court must regrettably deny and dismiss the claims of those plaintiffs who were domiciled in Louisiana and Pennsylvania at the time of the attack.[20]  The claims brought by the following individuals must be DISMISSED due to lack of standing:

> Deborah Spencer Rhosto, Catherine Bonk, John Bonk Sr., Thomas Bonk, Patricia Kronenbitter, Catherine Bonk Hunt, Kevin Bonk, Marilou Fluegel, Thomas A. Fluegel, Penni Joyce, Robert Fluegel, Julia Bell Hairston, Felicia Hairston, Evans Hairston, Virginia Ellen Hukill, Henry Durban Hukill, Melissa Hukill, Meredith Anne Hukill, Mark Andrew Hukill, Matthew Scott Hukill, Mitchell Charles Hukill, Monte Hukill, Bill Laise, Betty Laise, Kris Laise, Lorraine Macroglou, Bill Macroglou, James Macroglou, Shirley Kirkwood, Carl Kirkwood Sr., Kathy McDonald, Sally Jo Wirick, Storm Jones (a/k/a Shirley Ann Storm Pettry), Edward Joseph McDonough, Sean McDonough, Edward W. McDonough, Carl Arnold Kirkwood Jr., Jeff Kirkwood, Marion DiGiovanni, (Estate of) Luis Rotondo (father), (Estate of) Rose Rotondo, Danielle DiGiovanni, Lisa DiGiovanni, Robert DiGiovanni, (Estate of) Phyllis Santoserre, Larry H. Simpson Sr., Anna Marie Simpson, Renee Eileen Simpson, Sherry Lynn Fiedler, Robert Simpson.

### 2.    Intentional Infliction of Emotional Distress: Extent of Family Members' Respective Recovery

Though many of the states at issue in this case have recognized the existence of IIED claims for family members who were not present at the scene of the injury, this does not necessarily extend the ability to bring an IIED claim to *all* family members.  As the D.C. Circuit has noted previously, Section 46 of the Restatement (Second) of Torts does not extend causes of action beyond members of the victim's "immediate family."  *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 334-35 (D.C. Cir. 2003) (refusing to extend "direct victims" under § 46(1)

---

[20] To the extent that these plaintiffs are relatives to any of the deceased servicemen, it should be noted that the dismissal of these plaintiffs' IIED claims does not hinder these individuals' ability to recover any portion of a wrongful death damages awarded to the estates of those servicemen to which these dismissed plaintiffs may be entitled under North Carolina law.

and "third party victims" under § 46(2) to include nieces and nephews not present at the scene of injury). Accordingly, this Court finds that those members of the families of the servicemen who are not within the immediate family of the serviceman *at the time of the attack* may not recover.

This Court has previously deemed near relatives to include only the victim's spouse, parents, children, and siblings. *See Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2002) (Lamberth, J.), *affirmed sub nom.. Bettis*. 315 F.3d at 335. Though the Court does not deny the extreme pain and suffering felt by those outside of this class of individuals, it is necessary to draw such a line at immediate family members in order "to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress." *Heiser*, 466 F. Supp. 2d at 329. Moreover, such a delineation is consistent with the provisions of Section 46 of the Restatement. *See* Restatement (Second) of Torts § 46. cmt. l: *cf. Bettis*, 315 F.3d at 335 (finding that permitting nieces and nephews to recover under § 46(1) would undermine the limitations on recovery of "immediate family" members under § 46(2)). Therefore, those plaintiffs who are not members of this class of individuals in relation to the servicemen cannot recover.[21] Accordingly, the Court must dismiss the claims of the following plaintiffs: Ashley Tutwiler Beamon, David Clark, Michael Clark, Jr., Rebecca Iverson Green, Geraldine Morgan, Pamela Nashton. Natalie Rochwell, (Estate of) Lula Mae Watkins,[22] and

---

[21] Current spouses who were not yet married to an injured servicemen at the time of the attack are not considered "immediate family" for the purposes of recovery. These individuals are therefore among the group of plaintiffs who cannot recover damages sustained as a result of the attack.

[22] According to the special master's report. Lula Mae Watkins was the legal guardian of Jerryl Shropshire. There is no evidence, however, of a formal order terminating the rights of Jerryl's natural parents. *See* Ga. Stat. Ann. 15-11-93 (2007). Absent such an order. "there is no Georgia law under which the loss of parental power also results in the parent's loss of a right to

Simon Watkins.

> 3.    *Claims That Must Be Dismissed Due to Lack of Evidence and*
>       *Participation*

"[T]he entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6

(D.C. Cir. 2005). Personal Jurisdiction must still be determined before entering default judgment

against an absent defendant. *Id.* As standing must be determined prior to and independent of any

determination of a court's jurisdiction,[23] so too must standing be determined before a court enters

default judgment against an absent defendant.

With respect to standing, the trial court has power "to allow or to require the plaintiff to

supply, by amendment to the complaint or by affidavits, further particularized allegations of fact

deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does

not adequately appear from all materials of record, the complaint must be dismissed." *Warth v.

Seldin*, 422 U.S. 490, 501-02 (1975).

After an evidentiary hearing before this Court establishing the defendants' complicity in

bringing about the attacks, the Court designated special masters to hear each of the plaintiffs'

respective claims, so that damages might be determined. As is unfortunately sometimes the case

in a situation with as far-reaching an effect as this, certain family members of the deceased and

---

inherit as an heir from a child's estate." *Blackstone v. Blackstone*, 639 S.E.2d 369, 370 (Ga. Ct.
App. Nov. 21, 2006). This is true even if the parents have failed to provide any support for the
child during the child's lifetime. *Id.* at 371. Accordingly, the estate of Lula Mae Watkins may
not recover for damages arising out of Jerryl's death because she is not a parent or other
immediate family member under Georgia law. Likewise, Geraldine Morgan and Simon
Watkins–as Lula Mae's granddaughter and son, respectively–may also not recover.

[23] *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. at 91.

-17-

injured servicemen–family members who undoubtedly shared equally in the grief and suffering

caused by the tragic deaths of their loved ones–could not be located or were unable to present

evidence before this Court and its designated special masters to establish a valid claim for

damages. Without evidence supporting their claims of intentional infliction of emotional

distress. the Court cannot determine at this time whether these individuals have sufficient

standing to bring a claim. Accordingly. the claims from the following individuals shall be

DISMISSED WITHOUT PREJUDICE due to lack of evidence:

> Marvin Albright. Jr., Mirequrn Albright, Shertara Albright. Anthony Banks (son), Michael Banks. Taiarra Banks, Lori Berry, Christopher Burnette. Gwen D. Burnette, Mecot Camara Jr.. Dale Comes, Tommy Comes, Kimberly Crop. Connie Burnette Decker. Erin Dolphin, Frederick Douglass. Christopher Eaves. India Eaves, Sylvia Jean Eaves, Charles Frye Jr., Gina Frye. Lialani Frye, Lincoln Frye, Randall Frye. Gerald Foister, Joseph Garner, Justina Garner, Penny Garner, Reva Garner, Karl Goodman. Barbara Haskell. Richard Haskell, Jordan Hlywiak. Taylor Hlywiak, Mendy Leigh Hunt, Jack Darrell Hunt. Marcy Elizabeth Hunt, Molly Faye Hunt. Carol Livingston. (Estate of) Manuel Massa Sr.. Chadwick Matthews, Debra Matthews, Drew Matthews. Deborah Meurer. Shirley Douglass Miller. Elvera Mitchell, Robert Mitchell, (Estate of) Betty Lou Price. Timothy Price. Jeremy Rivers, Paul Rivers (son), Sandra Rivers. Carol Schak, George Schak, Lynne M. Spencer. Patrice Washington, (Estate of) Dorothy Williams. George Robinson Williams. Kevin Coker Williams, Bill Williamson, Debra Wise. Gwen Woodcock.

The Court will now turn its attention to those remaining claims that must be dismissed for

reasons not yet specified within this opinion.

### 4.    *Other Remaining Claims That Must Be Dismissed*

#### a.    *Claim of Bobby Wallace*

Under Oklahoma law, a non-adopted stepchild is not considered "issue" or a "child" for

purposes of inheritance. *See* Okla. Stat. Ann. tit. 84, § 213 (2007): *cf.* Green v. Wilson. 240 P.

1051. 1052 (Okla. 1925) (finding that, under § 213, estate of deceased intestate is inherited by

surviving spouse and legitimate children, *and adopted child* surviving inherits as if born in wedlock). In light of the disparate treatment of adoptive and non-adoptive children in terms of inheritance, it stands to reason that non-adoptive stepparents of stepchildren would be treated differently under Oklahoma law than stepparents who adopt those stepchildren. Accordingly, under Oklahoma law, a stepfather would not be able to inherit from or through his non-adopted stepson; likewise, nor would he be able to recover damages as a result of the stepson's death. Accordingly, this Court finds that Bobby Wallace, as Stephen Eugene Spencer's non-adoptive stepfather, may not recover for IIED resulting from Stephen's death in the attack, and his claim must be DISMISSED.

### b.   Claim of Herbert Persky

As the stepfather to Timothy R. McMahon, Herbert Persky has brought an IIED claim against the defendants. Based on the evidence presented to the Court, however, Mr. Persky may not recover for IIED due to the fact that, as a stepparent, Mr. Persky lacks standing to bring such a claim.

As this Court has previously noted, Texas has adopted Section 46 of the Restatement (Second) of Torts in establishing a cause of action for IIED. *Heiser,* 466 F. Supp. 2d at 333. Moreover, the Texas Supreme Court has remained silent on the issue of whether a plaintiff's presence is required in order for a third party to recover for IIED. *Id.* Accordingly, this Court has found that the near relatives of a victim who were not present at the time of the attack would still be able to recover for IIED under Texas law. *Id.* Therefore, Mr. Persky may only recover for IIED if he is considered a near relative under Texas law.

Under Texas law, however, stepparents that do not adopt a child are not deemed the same

as natural parents for purposes of inheriting from that child. Tex. Civ. Prac. & Rem.Code Ann. §
71.004(a) (Vernon 1997) (stating that only the victim's surviving spouse, children, and parents of
the deceased may recover for the victim's wrongful death). "A stepparent who takes no steps to
legally adopt his stepchild does not qualify as a parent for purposes of Texas's wrongful death
statute." *Garcia v. BRK Brands, Inc.*. 266 F. Supp. 2d 566. 578 (S.D. Tex. 2003) (citing
*Boudreaux v. Texas & N.O.R. Co.*, 78 S.W.2d 641 (Tex.Civ.App.-Beaumont 1935, writ ref'd)).

In this case. notwithstanding the relationship that Mr. Persky had with Mr. McMahon.
there is no evidence that Mr. Persky legally adopted Mr. McMahon. Accordingly, Mr. Persky is
not considered a parent for purposes of being able to recover for pain and suffering as a result of
his stepson's untimely death. Therefore. Mr. Persky does not have standing to bring a claim for
IIED in this case. and his claim must be DISMISSED.

### c.    *Claims of Sandra Bianco and Sandra Karen Bianco*

Under New Jersey law, a natural birth parent may recover for and inherit from and
through their child. Once that child is legally adopted by another parent, however, the natural
parent's privileges and obligations cease. "including the right of the natural parents and their
kindred to take and inherit intestate personal and real property from and through the person
adopted." N.J. Stat. Ann. 2A: 22-3(b) (2007) (emphasis added). Moreover, upon adoption all
rights, privileges and obligations normally bestowed upon natural parents-including the right to
take and inherit from and through the adopted child-become bestowed upon the adoptive parent
instead. who is treated in the eyes of the law "as if the person adopted had been born to them in
lawful wedlock . . . ." N.J. Stat. Ann. 2A: 22-3(c) (2007).

Here, Sandra Bianco (natural mother to serviceman Richard Andrew Fluegel) and Ms.

-20-

Bianco's daughter Sandra Karen Bianco (Richard's half-sister) seek under respective IIED claims

to recover pain and suffering damages arising out of Richard's death. Richard, however, is

survived by his natural father Thomas A. Fluegel, his adoptive mother Marilou Fluegel, and his

full blood siblings Penni Joyce and Robert Fluegel. Therefore, though Ms. Bianco is Richard's

natural mother, she may nonetheless not recover for pain and suffering from Richard's death

because, under New Jersey law, Ms. Bianco's entitlement to take and recover from or through her

son ceased once Richard was adopted by Marilou Fluegel. Therefore, the privilege of recovering

as a mother to Richard for the pain and suffering associated with Richard's death has been

bestowed upon Marilou Fluegel due to the fact that she legally adopted Richard. Therefore, this

Court must DISMISS Sandra Bianco's claim for IIED for lack of standing.

For similar reasons, this Court must also dismiss Sandra Karen Bianco's claim for IIED

for lack of standing. As noted previously, the privileges and obligations of the natural parent and

their kindred ceases upon the child's adoption by another parent. Therefore, as kindred to Sandra

Bianco, Sandra Karen Bianco may not recover damages associated with Richard Fluegel's death,

and her claim must also be DISMISSED.

d.    *Claims of Donald Rockwell, Charles Corry and Michael Clark Jr.*

Donald Rockwell (stepbrother to Michael Caleb Sauls), Charles Corry (brother-in-law to

Eric Glenn Washington), and Michael Clark, Jr. (brother-in-law to James Baynard) seek to

recover for IIED in this case as step-siblings of the deceased servicemen. Under Virginia law,

however, only blood siblings and adoptive step-siblings qualify as siblings for purposes of

recovering damages resulting from a victim's wrongful death. *See Brown v. Brown,* 309 S.E.2d

586, 590 (Va. 1983). Individuals are siblings to another individual only if they are of the same

parental origin as their sibling, or if they are adopted by a shared parent. *Id.* (citing *Jones v. Jones,* 530 P.2d 34 (Ore. 1974) (declining to expand class entitled to recovery as direct beneficiaries under wrongful death statute beyond spouse and children of decedent so as to include as dependents-such as non-adopted stepchildren-a person to whom decedent had no legal obligation of support). Non-adopted step-siblings do not qualify as siblings because they are not of the same origin as their step-sibling, nor deemed of the same origin as their step-sibling under the law because they were not legally adopted. *Brown,* 309 S.E.2d at 590. Therefore, in Virginia non-adoptive step-siblings may not recover for pain and suffering arising out of an IIED claim because they are not deemed siblings under the law. *Cf. id. A fortiori,* a sibling-in-law-who has virtually no chance of being either adopted or of the same parental origin as the victim-may not recover for pain and suffering arising out of an IIED claim.

In this case, there is no evidence that Donald Rockwell was an adopted stepbrother to Michael Caleb Sauls. Therefore, Mr. Rockwell's claim for IIED fails for lack of standing, and must therefore be denied. Similarly, Messrs. Corry and Clark's claims must also be denied because, as a siblings-in-law, neither is deemed a sibling under the law. Accordingly, this Court finds that none of these three plaintiffs may recover for IIED as a sibling under Virginia law, and each of their IIED claims must be DISMISSED.

### e. *Victoria Prevatt-Wood*

Victoria Prevatt-Wood has already brought a claim against the defendants for conduct arising out of this attack. *See Prevatt,* 421 F. Supp. 2d at 152. Ms. Prevatt-Wood was awarded $2.5 million by this Court for her pain and suffering associated with the loss of her brother, Victor Mark Prevatt. *Id.* at 161. To allow her to seek additional damages would grant her

impermissible double recovery. Accordingly. her claim in this action must be DISMISSED.

### f.    Mary Jackowski

Mary Jackowski. stepmother to deceased serviceman James Jackowski. seeks to recover

for IIED for the death of James. Under New York law, however, "[n]either step-children nor

step-parents inherit property from each other." Erie County Bd. of Social Welfare v. Schneider

163 N.Y.S.2d 184. 186 (N.Y. Child Ct. 1957). Therefore, Mary Jackowski may only recover for

the death of James if she legally adopted James. There is no evidence in this case, however.

indicating that James was legally adopted by Mary. Therefore. she has no standing to bring a

claim for damages arising out of the death of her stepson. Accordingly. the claim brought by

Mary Jackowski must be DISMISSED.

### g.    Stepparents and Step-siblings of Donald H. Vallone, Jr.

Charles Phelps (stepfather to Donald H. Vallone, Jr.) and Charles Phelps, Jr. (stepbrother

to Donald H. Vallone. Jr.). Donna Beresford Vallone (stepmother to Donald H. Vallone. Jr.).

William Beresford (stepbrother to Donald H. Vallone, Jr.), Susan Beresford Vallone (stepsister to

Donald H. Vallone, Jr.). Natalie Lewis (stepsister to Donald H. Vallone. Jr.). and Michael

Beresford (stepbrother to Donald H. Vallone. Jr.) each seek recovery for IIED associated with the

death of serviceman Donald H. Vallone. Jr. in the attack at issue. As this Court has previously

found in *Heiser*, however. under California law. a stepparent lacks standing to recover for

intentional infliction of emotional distress in connection with a stepchild's death, where the

stepparent had not legally adopted the stepchild. and there was no indication that the stepparent

would have adopted the stepchild but for a legal impediment. *Heiser*. 466 F. Supp. 2d at 309-10

(citing Cal Civ. Proc. Code § 377.60; Cal. Prob. Code § 6402).

-23-

In this case, there is no evidence that either of the stepparents of Donald H. Vallone, Jr.

legally adopted Donald H. Vallone, Jr., nor is there evidence that either would have adopted

Donald but for a legal impediment. Accordingly, neither Charles Phelps nor Donna Beresford

Vallone has standing to bring a claim for damages arising out of the death of their stepson,

Donald H. Vallone, Jr. Therefore, the claim brought by Charles Phelps and Donna Beresford

Vallone must be DISMISSED. By this same logic, and because the viability of the claims

brought by the birth children of stepparents of the deceased (consequently, stepsiblings to the

deceased) is dependent upon the viability of their parents' claim, the claims brought by Charles

Phelps, Jr., William Beresford, Susan Beresford Vallone, Natalie Lewis Vallone, and Michael

Beresford must also be DISMISSED due to a lack of standing to bring the claim.

### h.    *Donald Calloway*

Donald Calloway, brother-in-law to deceased serviceman Jess W. Beamon, seeks

recovery for IIED arising out of his brother-in-law's death in the attack. Under Florida law,

however, only plaintiffs who are the spouse, child, sibling, or parent of a decedent have standing

to recover for intentional infliction of emotional distress even though plaintiffs were not present

at the scene. *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App. 1991). Siblings-in-

law do not fall within this category of eligible plaintifs. Accordingly, the claim brought by

Donald Calloway must be DISMISSED for lack of standing.

### i.    *Richard Mason*

Richard Mason, stepfather to deceased serviceman Russell Cyzick, seeks to recover for

IIED arising out of his stepson's death in the attack. Under West Virginia law, damages arising

out of the death of an individual may be awarded to the surviving spouse and children of the

decedent, including adopted children and stepchildren, as well as the decedent's siblings, parents and any persons who were financially dependent upon the decedent at the time of his or her death. *See* W. Va. Code §§ 55-7-5, 55-7-6(b) (2007). Further, under West Virginia law, an individual qualifies as a "legal parent" if that individual is "defined as a parent, by law, on the basis of biological relationship, presumed biological relationship, legal adoption or other recognized grounds, [such as financial dependence]." W. Va. Code, § 48-1-232 (2007). In this case, the evidence shows that Russell Cyzick's birth mother married Richard Mason when Russell was nearly eighteen years old. There is no evidence that Russell was either legally adopted or financially dependent upon Richard Mason during what was left of his minor years. Accordingly, Richard Mason lacks standing to bring a claim because he is not a "legal parent" under West Virginia law. Therefore, this Court finds that Richard Mason's IIED claim must be DISMISSED.

>    5.    *Individuals with Valid Intentional Infliction of Emotional Distress Claims*

Accordingly, the Court finds that the individuals listed in Appendix A to this opinion may bring intentional infliction of emotional distress claims. *See* Appendix A.

The Court will now turn its attention to damages for these IIED claims, as well as those claims for battery and wrongful death.

## II.    *Damages*

### A.    Damages Framework

The validity of each claim having been assessed, the Court can now turn to the respective amounts of damages associated with each valid claim before this Court. Under the FSIA, a "foreign state shall be liable in the same manner and to the same extent as a private individual

under like circumstances." 28 U.S.C. § 1606. Therefore. plaintiffs are entitled to the typical

array of compensatory damages that may be awarded against tortfeasors in the plaintiffs'

respective domiciliary states. "In determining the appropriate compensatory damages for each

plaintiff's pain and suffering. this Court is guided not only by prior decisions awarding damages

for pain and suffering, but also by those which awarded damages for solatium." *Haim*. 425 F.

Supp. 2d at 71. This Court has previously looked to the nature of the relationship between the

family member and the victim in order to help determine the amount of each award. *See Blais*,

459 F. Supp. 2d at 59-60: *Haim* 425 F. Supp. 2d at 75.[24]    Parents of victims typically receive

awards similar in amount to those awarded to children of the victim. *See generally Heiser*. 466

F. Supp. 2d at 271-356 (awarding children and parents of a terrorist attack decedents $5 million

in pain and suffering damages). This award for parents and children of the decedents is typically

smaller than the award for pain and suffering damages provided to spouses, but is larger than

awards of pain and suffering damages to siblings. *See id.* (awarding spouses of decedents $8

million in pain and suffering damages. while awarding siblings to decedents $2.5 million).

Moreover, "families of victims who have died are typically awarded greater damages than

families of victims who remain alive." *Blais*. 459 F. Supp. 2d at 60 (quoting *Haim*, 425 F. Supp.

2d at 75).

This Court finds that the damages framework set forth in *Heiser* to be an appropriate

---

[24] As noted previously. damages for pain and suffering have traditionally been available
to those members of the decedent serviceman's near relatives. which consists of his or her
immediate family. *See supra* Section I.C.2. "This Court defines one's immediate family as his
spouse, parents, siblings, and children. This definition is consistent with the traditional
understanding of one's immediate family." *Jenco*, 154 F. Supp. at 36 n.8.

measure of damages for those family members of victims who died in this attack.[25] The Court

finds that the framework detailed in *Blais* is appropriate to help determine damages for those

surviving servicemen and their families seeking redress. *See Blais*, 459 F. Supp. 2d at 59.[26]

Accordingly. unless otherwise specifically addressed in Section B below. *see infra*

Section II.B., the Court finds that the following damages amounts for pain and suffering shall be

awarded to the plaintiffs who this Court deems to have standing to bring a valid cause of action.

First. in terms of lost wages due the servicemen in this case, the Court hereby ADOPTS all of the

financial calculations and recommendations made by the special masters as to lost wages.[27]

Those calculations for lost wages shall be specified in Appendix B to this opinion. Second,

unless otherwise specified in Section B below, the Court finds that the awards for pain and

suffering to the servicemen are appropriate and hereby ADOPTS them. Third. the Court finds

---

[25] In *Heiser*, family members of the servicemen who were killed in the 1996 Khobar
Towers bombing brought various claims against the Islamic Republic of Iran, MOIS. and IRGC
for their part in providing material financial and logistical support in bringing about the attack.
*Heiser*, 466 F. Supp. 2d at 248-51. This Court awarded the valid claims brought by spouses of
deceased servicemen $8 million in pain and suffering. parents and children of deceased
servicemen $5 million. and siblings of deceased servicemen $2.5 million. *See generally Heiser*,
466 F. Supp. 2d at 271-356.

[26] As this Court stated in *Blais*:

> In cases that involve an attack where the victim survives. and where
> no captivity occurred. courts typically award a lump sum award based
> in large part on an assessment of the following factors: "the severity
> of the pain immediately following the injury, the length of
> hospitalization, and the extent of the impairment that will remain with
> the victim for the rest of his or her life."

*Id.*

[27] As mentioned above. *see supra* note 2. there are a few servicemen who have sought
damages for pain and suffering incurred during the time at which they were alive after the attack
and the time at which they died. Those claims will be addressed in Section II.B.1. *infra*.

that the appropriate amount of pain and suffering damages for the spouse of a deceased

serviceman to be $8 million. Fourth, the Court finds that the appropriate amount of pain and

suffering damages for the parents and children of a deceased serviceman to be $5 million, per

individual.[28] Fifth, the Court finds that the appropriate pain and suffering damages award for

each sibling in this case to be $2.5 million, per sibling. Siblings of half-blood to the servicemen

in this case are presumed to recover as a full-blood sibling would–that is, they are entitled to $2.5

million–unless the law of the state in which they were domiciled at the time of the attack states

that they are not entitled to so recover.[29] Next, the Court finds that the appropriate amount of

damages for family members of surviving servicemen are as follows: spouse ($4 million);

parents ($2.5 million); children ($2.5 million); siblings ($1.25 million).[30] Unless otherwise

specified below in Section B, to the extent that the special masters have awarded a plaintiff more

or less than the aforementioned respective award amounts based upon the plaintiff's relation to

the serviceman, those amounts shall be altered so as to conform with the respective award

amounts set forth in this paragraph.

---

[28] Each parent and child shall receive this amount. *See Heiser*, 466 F. Supp. 2d at 271-356.

[29] This Court will address the claims of those half-blood siblings whose award recommendations differ from the permissible awards under the respective state laws, *infra*. *See infra* Section II.B.3.

[30] The Court recognizes that the parents in *Blais* received $3.5 million for their IIED claims for pain and suffering damages associated with the aftermath of taking care of their son, who survived the attack on the Khobar Towers in 1996. *See Blais*, 459 F. Supp. 2d at 60. This exceptional award was given in light of the extremely severe and continuing nature of their son's maladies, and in light of the facts that their son was in a coma and vegetative state for a period of over five weeks. *Id.* at 59-60. Attention was also given to the fact that the parents in *Blais* gave up their jobs in order to take full-time care of their son. *Id.* at 60.

B.   Special Damages Cases

    1.   Pain and Suffering Amount for Deceased Servicemen Who Initially Survived Attack

The personal representatives and estates of deceased servicemen Alvin Burton Belmer, Nathaniel Walter Jenkins, Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley have each sought damages for pain and suffering incurred during the time at which they were alive after the attack and the time at which they died, in addition to the damages for lost wages and earnings arising out of their respective wrongful death claims. Several cases have awarded damages for the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter. *Haim*, 425 F. Supp. 2d at 71-72 (citing *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 8 (D.D.C.2000) (Lamberth, J.); *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 112-13 (D.D.C.2000) (Green, J.). When the victim endured extreme pain and suffering for a period of several hours or less, courts in these cases have rather uniformly awarded $1 million. *Haim*, 425 F.Supp.2d at 71-72. This award increases when the period of the victim's pain is longer. *Id.* at 72. In line with this precedent, this Court recently awarded $500,000 to a serviceman who survived a terrorist attack for 15 minutes, and was in conscious pain for 10 minutes.

The estate of Alvin Burton Belmer established before the special master that serviceman Belmer was alive and conscious for nearly eight days (7 days and 20 hours). The special master recommended an award of pain and suffering of $15 million. Though the Court recognizes Mr. Belmer was under excruciating pain during that period of time, it is not prepared to adopt such a recommendation. In light of his nearly eight days of pain and suffering, this Court finds that the

estate of Alvin Burton Belmer should be awarded $7.5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

Similarly, the estate of Nathaniel Walter Jenkins established before a special master that serviceman Jenkins was alive for seven days after the attack. The special master recommended that Mr. Jenkins be awarded $7 million for pain and suffering undergone by Mr. Jenkins during this period of time. The Court finds this award amount is appropriate and finds that the estate of Nathaniel Walter Jenkins should be awarded $7 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Luis J. Rotondo established before a special master that serviceman Rotondo was alive for six hours after the attack. The special master recommended a pain and suffering damages award of $250,000. In keeping with the precedent set forth in *Haim*, the Court finds that Luis J. Rotondo is entitled to $1 million in pain and suffering damages, in addition to the amount of lost wages he is awarded.

The estate of Larry H. Simpson, Jr. established before a special master that serviceman Simpson was alive for nine years after the attack, living with severe injuries throughout that time. The special master recommended an award of pain and suffering damages of $2 million. In light of the fact that Mr. Simpson was saddled with injuries from this attack that plagued him until his death, but conscious of the fact that Mr. Simpson appears to have led a somewhat functional life after the attack, the Court finds that Mr. Simpson should be awarded $5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Stephen Tingley established before a special master that serviceman Tingley was alive for a short but unknown amount of time. The special master recommended a pain and

-30-

suffering damages award of $1 million. Though the Court is certain that Mr. Tingley endured a

great deal of pain during the minimal time he survived the attack, the Court is reluctant to grant

such an award without any definitive proof of a duration of time that Mr. Tingley was alive.

Therefore, this Court finds that Stephen Tingley is entitled to $500.000 in pain and suffering

damages, in addition to the amount of lost wages he is awarded.

       2.     Pain and Suffering Amount for Surviving Servicemen

     Each of the twenty six surviving servicemen have sought pain and suffering awards

associated with their claims for battery. In awarding pain and suffering damages, the Court must

take pains to ensure that individuals with similar injuries receive similar awards. Due to the

large number of plaintiffs represented in this action, the Court needed to enlist the help of many

different special masters to help calculate damages for each of the plaintiffs. Understandably,

each special master calculated pain and suffering damages differently, which resulted in varying

awards for varying maladies suffered by the surviving servicemen. Upon examination of the

nature of the injuries of each of the servicemen, the Court makes the following findings about the

pain and suffering damages for the twenty six surviving servicemen arising out of their respective

battery claims:

      •     Marvin Albright suffered compound fracture of his right leg. injuries to the toes

           on his left foot, wounds and scars from shrapnel, in addition to lasting and severe

           psychological harm as a result of the attack. Therefore, this Court finds that he is

           entitled to $5 million in pain and suffering:

      •     Pablo Arroyo suffered a broken jaw, severe flesh wounds and scars on his arms.

           legs and face, a loss of teeth, and lasting and severe psychological harm as a result

of the attack. Therefore. this Court finds that he is entitled to S5 million in pain and suffering;

- Anthony Banks suffered as a result of this attack loss of sight in one eye. a perforated right eardrum resulting in some hearing loss, and a shrapnel injury to the back of his right thigh. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to S7.5 million in pain and suffering:

- Rodney Darrell Burnette was initially thought dead as a result of the attack. and was placed in a body bag. buried alive in the morgue for four days until someone heard him moaning in pain. His injuries from the attack include a closed head injury, a basilar skull fracture. a facial nerve palsy, rib injuries. a rupturing to the timpanic membrane in both ears, and injuries to both feet. He also suffered lasting and severe psychological problems from the attack. Accordingly. this Court finds that he is entitled to S8 million in pain and suffering:

- Glenn Dolphin suffered injuries in the back, arm and head from being hit with shrapnel from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, the Court finds that he is entitled to S3 million in pain and suffering:

- Charles Frye was minimally injured from small arms fire occurring just after the initial bomb explosion. and has experienced resulting nerve pain and foot numbness. He also suffered lasting and severe psychological problems from the attack. Therefore. this Court finds that he is entitled to S2 million in pain and

suffering. plus $200.000 in loss of earnings suffered:[31]

- Truman Dale Garner suffered as a result of the attack a shrapnel injury to the head. a subdural hematoma, a perforated right eardrum, crushed left ankle. collapsed left lung. and other shrapnel wounds that became infected. He also suffered lasting and severe psychological problems from the attack. Therefore. this Court finds that he is entitled to $7.5 million in pain and suffering damages:

- Larry Gerlach suffered severe injuries including a broken neck. which has resulted in permanent quadriplegia. He also suffered lasting and severe psychological problems from the attack. Therefore. this Court finds that he is entitled to $12 million in pain and suffering damages:[32]

- Orval Hunt suffered skull fractures, brain bruising. various broken bones in his leg. and an exposed Achilles tendon as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore. this Court finds that he is entitled to $8 million in pain and suffering damages:

- Joseph P. Jacobs suffered a shoulder injury. and still suffers from neck. shoulder and back pain to this day. He also suffered lasting and severe psychological problems from the attack, and has admitted to having problems with alcohol abuse. Therefore, this Court finds that he is entitled to $5 million in pain and

---

[31] Charles Frye admits that his physical injuries were minimal, and that he suffered severe psychological harm from the attack.

[32] *Cf. Mousa v. Islamic Republic of Iran.* 238 F. Supp. 2d 1. 12-13 (D.D.C. 2001) (Bryant, J.) (awarding $12 million to plaintiff with permanent and debilitating injuries. including complete deafness and blindness in one eye).

suffering damages:

- Brian Kirkpatrick suffered an eye injury, a perforated left ear drum, broken ribs, various shrapnel wounds, and the lining of his lungs were burned as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to S8 million in pain and suffering damages:

- Burnham Matthews suffered a shrapnel wound in the forehead that destroyed the middle part of his nose, cuts to the head and back, and a perforated eardrum as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to S7 million in pain and suffering damages:

- Timothy Mitchell suffered lacerations to the back of his head, back injuries, and has resulting chronic back pain and headaches as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to S3 million in pain and suffering damages, in addition to $1,555,099 in lost wages:

- Lovelle "Darrell" Moore suffered a torn ear, broken leg, damaged foot, and cuts from shrapnel from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to S7 million in pain and suffering damages, in addition to $1,314,513 in lost wages:

- Jeffrey Nashton suffered a skull fracture, a shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed

lungs, burns on his arms and back, and internal bleeding. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $9 million in pain and suffering damages, in addition to $2,776,632 in lost wages:

- Paul Rivers suffered two broken eardrums, skin lacerations, burned skin, and knee damage from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7 million in pain and suffering damages;

- Stephen Russell suffered a broken femur, hand and pelvis bone, and was covered in cuts and bruises from the attack. His left foot was turned completely backwards. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering damages, in addition to $1,752,749 in lost wages;

- Dana Spaulding suffered two broken clavicles, a broken middle ear which caused internal bleeding and continued vertigo, a punctured lung, bruised kidney, broken ribs, a severe laceration across his back, and a loss of his eyelashes. Moreover in the ten days after the attack, Dana was in a coma. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages, in addition to $1,559,609 in lost wages;

- Michael Toma suffered various cuts from shrapnel, internal bleeding in his urinary system, a deflated left lung, and a permanently damaged right ear drum.

He also suffered lasting and severe psychological problems from the attack.
Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering
damages:

• Danny Wheeler suffered soft tissue damage to the chest and sternum area, flash
burns, and lingering back problems, internal maladies and physical scarring. He
also suffered lasting and severe psychological problems from the attack.
Therefore, this Court finds that he is entitled to $5 million in pain and suffering
damages.

In addition, Frank Comes Jr., Frederick Daniel Eaves, John Hlywiak, John Oliver, and
Craig Joseph Swinson, and Thomas D. Young suffered no physical injuries, and are not required
to do so to recover for IIED under North Carolina law. *See Dickens v. Puryear*, 276 S.E.2d 325,
332 (N.C. 1981). Still, each has demonstrated that he has suffered severe and lasting
psychological harm, and may recover damages for that. Accordingly, the Court finds that each is
entitled to $1.5 million in pain and suffering damages.[33]

    3.    Individual Family Member Cases

In certain instances, the special masters were presented with claims from individuals who
were related by half-blood to a deceased serviceman in this case. This section addresses those
claims under which the special master awarded the half-blood siblings an amount different than
would be permissible under the laws of the half-blood siblings respective states of domicile at the
time of the attack.

---

[33] In addition to his award for pain and suffering, John Oliver is entitled to $1,777,542 in
lost wages.

a.      Richard J. Wallace

Under Oklahoma law, "[k]indred of the half-blood inherit equally with those of the whole

blood in the same degree, unless the inheritance come [sic] to the intestate by descent, devise or

gift of some one of his ancestors, in which case all those who are not of the blood of such

ancestors must be excluded from such inheritance." Okla. Stat. Ann. tit. 84, § 222 (2007).

Stephen Eugene Spencer's half-brother, Richard J. Wallace, was awarded $1.25 million for pain

and suffering arising out of his IIED claim. By contrast, Stephen's full-blooded brother, Douglas

Spencer, was awarded $2.5 million. Richard J. Wallace did not come into this damages award as

a result of descent, devise or a gift of one of his ancestors. Therefore, this disparity in awards is

impermissible under Oklahoma law. Richard J. Wallace is entitled to the same amount as

Douglas Spencer, his half-brother, and therefore should be awarded $2.5 million.

b.      Hilton and Arlington Ferguson

Under Florida law, "[w]hen property descends to the collateral kindred of the intestate

and part of the collateral kindred are of the whole blood to the intestate and the other part of the

half blood, those of the half blood shall inherit only half as much as those of the whole blood . . .

." Fla. Stat. Ann. § 732.105 (2007). Half blood siblings may recover a whole amount only "if all

[remaining siblings] are of the half blood . . . ." Fla. Stat. Ann. § 732.105 (2007).

In this case, Hilton and Arlington Ferguson are half-brothers to serviceman Rodney J.

Williams. Therefore, each may recover only half as much as Mr. Williams' full blood siblings, if

there are any. If there are no full blood siblings, then Hilton and Arlington may recover whole

amounts, each. Here, Mr. Williams is survived by two full blood siblings: Rhonda and Ronald

Williams. Accordingly, though Hilton and Arlington Ferguson are entitled to recover for pain

and suffering under an IIED claim for the loss of their half-brother, they may only recover half the amount of damages as will be awarded to Rhonda and Ronald Williams. Therefore, Hilton and Arlington Ferguson may recover $1.25 million each because Rhonda and Ronald Williams are each entitled to recover $2.5 million for pain and suffering damages associated with the untimely loss of their brother.

c.    Damien Briscoe and Kia Briscoe Jones

Under Maryland law, half-blood siblings are given the same status as full blood siblings of the same degree. Md. Code Ann., Estates & Trusts § 1-204 (2007). The special master charged with determining the appropriate amount of pain and suffering damages for relatives of serviceman Davin M. Green, however, recommended that Mr. Green's half-siblings Damien Briscoe and Kia Briscoe Jones be awarded $1.25 million for their pain and suffering associated with Mr. Green's death, while at the same time awarding Mr. Green's full blood siblings $2.5 million for pain and suffering.

This Court finds that this recommended disparity in award does not conform to the requirement that full blood and half blood siblings of the same degree be treated equally under the law. Accordingly, this Court finds that under Maryland law, Mr. Green's half-siblings are entitled to the same amount of recovery as their full blood sibling counterparts. This Court has typically found $2.5 million to be an appropriate level of pain and suffering damages under an IIED claim arising out of a terrorist attack. Accordingly, this Court adopts the special master's damages recommendation of $2.5 million for Mr. Green's full blood siblings, and finds that Mr. Green's half-siblings-Damien Briscoe and Kia Briscoe Jones-are also entitled to $2.5 million in pain and suffering damages in connection with their IIED claim against the defendants.

d.    Darren Keown

Darren Keown is the half-brother of deceased serviceman Thomas Keown. Darren was domiciled in Tennessee at the time of the attack. It has long been recognized under Tennessee law that full and half-blood siblings may share equally in inheritance and intestate distribution. *Kyle v. Moore*, 35 Tenn. 183 (3 Sneed) (Tenn. 1855). The special master charged with determining the appropriate amount of pain and suffering damages for relatives of Thomas Keown recommended awarding Darren $4 million for pain and suffering, which was similar to the recommended award for Thomas' full-blooded brothers, Adam, Bobby Jr., and William, which was also $4 million. In light of the fact that full-blooded siblings in this case shall be awarded $2.5 million, however, the award for Adam, Bobby Jr., and William must be reduced to $2.5 million. Darren's award must be similarly lowered. Accordingly, this Court finds that the pain and suffering award for Darren Keown is $2.5 million.

e.    Kenty Maitland & Alex Griffin

Kenty Maitland is the half-brother of Samuel Maitland, Jr. Alex Griffin is Samuel Maitland Jr.'s legally adopted brother. Both were domiciled in New York at the time of the attack. Under New York law, both half-blood siblings and adopted siblings are treated as equals to full-blooded siblings for purposes of inheritance and recovery. *See* N.Y. Est. Powers & Trusts § 4-1.1(b) (2007); N.Y. Dom. Rel. § 117 (2007). Accordingly both Kenty Maitland and Alex Griffin are entitled to recover in the same manner as Samuel's actual full-blooded siblings. The special master recommended that Kenty and Alex receive $1 million, each, for pain and suffering damages. Samuel's full-blood sister, Shirla Maitland, is entitled to recover $2.5 million in pain and suffering arising from her IIED claim against the defendants. Accordingly, this Court finds

-39-

that both Kenty Maitland and Alex Griffin are entitled to recover $2.5 million, each, in pain and suffering damages arising out of their respective IIED claims in this case.

      f.      Florene Martine Carter

Florene Martin Carter is the half-sister of deceased serviceman Charlie Robert Martin. Florene was domiciled in North Carolina at the time of the attack. Under North Carolina law. half-blood siblings may inherit and recover in the same manner as full-blood siblings. *Peel v. Corey.* 144 S.E. 559. 562 (N.C. 1928): *Univ. of North Carolina v. Markham*, 93 S.E. 845. 846 (N.C. 1917). Accordingly, Florene Martin Carter is entitled to recover in the same manner as Charlie's full-blooded siblings would have recovered. The special master recommended that Florene receive $1.25 million in pain and suffering damages. Charlie Robert Martin does not have full-blooded siblings. Still. siblings of deceased servicemen in this action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims against the defendants. Accordingly, the Court finds that Florene Martin Carter is entitled to $2.5 million in pain and suffering damages arising out of her IIED claim in this action.

      g.      Linda Martin Johnson, Corene Martin Jones, John Martin.
               Gussie Martin Williams. Mary Ellen Thompson

Linda Martin Johnson, Corene Martin Jones. John Martin. Gussie Martin Williams. and Mary Ellen Thompson are also half-siblings of deceased serviceman Charlie Robert Martin. Each was domiciled in Georgia at the time of the attack. Under Georgia law, half-blood siblings inherit equally with whole-blood siblings. *Bacon v. Smith.* 474 S.E.2d 728, 731-32 (Ga. Ct. App. 1996). Accordingly, Linda Martin Johnson, Corene Martin Jones, John Martin. Gussie Martin Williams. and Mary Ellen Thompson are entitled to recover in the same manner as Charlie's full-

blooded siblings would have recovered. The special master recommended that Linda. Corene.
John. Gussie, and Mary Ellen each receive $1.25 million in pain and suffering damages. Charlie
Robert Martin does not have full-blooded siblings. Still, siblings of deceased servicemen in this
action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims
against the defendants. Accordingly. the Court finds that Linda Martin Johnson. Corene Martin
Jones, John Martin, Gussie Martin Williams. and Mary Ellen Thompson are entitled to $2.5
million in pain and suffering damages, each, arising out of their respective IIED claims in this
action.

h.    Sybil Caeser

Under Florida law. "[w]hen property descends to the collateral kindred of the intestate
and part of the collateral kindred are of the whole blood to the intestate and the other part of the
half blood. those of the half blood shall inherit only half as much as those of the whole blood . . .
." Fla. Stat. Ann. § 732.105 (2007). Half blood siblings may recover a whole amount only "if all
[remaining siblings] are of the half blood . . . ." Fla. Stat. Ann. § 732.105 (2007).

Here. Sybil Caeser is the half-sister of deceased serviceman Johnnie Caesar. Johnnie.
however. has full-blooded siblings who have also survived him. Therefore, Sybil Caesar is
entitled to one-half of what Johnnie's full-blooded siblings received. The full-blood siblings of
Johnnie Caeser received $2.5 million. Therefore. this Court finds that Sybil Caeser is entitled to
$1.25 million in pain and suffering damages arising out of her IIED claim in this action.

C.    *Punitive Damages*

Punitive damages, however. are not available against foreign states such as the Islamic
Republic of Iran. *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56. 71 (D.D.C. Mar. 24.

-41-

2006) (Lamberth, J.). Therefore, plaintiffs' claim for punitive damages against the Islamic

Republic of Iran is DENIED.  Moreover, this Court has previously found on a number of

occasions that punitive damages are not available against MOIS because MOIS is a governmental

entity, and part of the state of Iran itself.  *Heiser*, 466 F. Supp. 2d at 270-71; *Greenbaum v.*

*Islamic Republic of Iran*, 451 F. Supp. 2d 90, 105 & n.1 (D.D.C. Aug. 10, 2006) (Lamberth, J.)

(citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003); *Haim*, 425 F.

Supp. 2d at 71 n.2.  Accordingly, plaintiffs' claim for punitive damages against defendant MOIS

is also DENIED.

## CONCLUSION

This Court is sadly aware that there is little it can do to heal the physical wounds and

emotional scars suffered by the servicemen in this case and their family members.  Though the

attack on the Marine barracks in Beirut, Lebanon occurred nearly twenty four years ago from this

date, it is clear from the testimony presented to this Court and the special masters that the intense

suffering experienced on that day has had a tragically lasting effect on the plaintiffs who have

brought this action.  The fact that almost 1000 individuals sought redress in this action confirms

the sheer number of individuals whose lives were forever altered as a result of this senseless

attack on these courageous servicemen.

Indeed, at a time like this and an era such as ours, it is important to acknowledge the

selfless courage that these–and all–servicemen demonstrated by choosing to take action and

make this world a safer and better place in which to live.  The fact that the servicemen in this

action made the ultimate sacrifice to pursue such a noble cause only serves to further establish

the legacy of these courageous individuals in the annals of history.

Not to be forgotten is the courage demonstrated by the family members who have come forth in bringing this claim. These individuals. whose hearts and souls were forever broken on October 23. 1983, have waited patiently for nearly a quarter of a century for justice to be done. and to be made whole again. And though this Court can neither bring back the husbands. sons, fathers and brothers who were lost in this heinous display of violence. nor undo the tragic events of that day. the law offers a meager attempt to make the surviving family members whole. through seeking monetary damages against those who perpetrated this heinous attack. The Court hopes that this extremely sizeable judgment will serve to aid in the healing process for these plaintiffs. and simultaneously sound an alarm to the defendants that their unlawful attacks on our citizens will not be tolerated.

A separate Order and Judgment consistent with these findings shall issue this date.


SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge. September 7, 2007.

**EXHIBIT "C"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **Consolidated Civil Actions:** 01-2094 (RCL) 01-2684 (RCL) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## JUDGMENT

In accord with the Memorandum Opinion issued this date, it is hereby

ORDERED that Default Judgment be entered in favor of plaintiffs and against

defendants, jointly and severally, in the amount of $2,656,944,877.00, which shall be allocated

in the following manner:

1.   *Wrongful Death Claims Brought by the Personal Representatives and Estates of*

    *Deceased Servicemen*

| | |
|---|---|
| Abbott, Terry | $1,485,243.00 |
| Allman, John Robert | $545,937.00 |
| Bates, Ronny Kent | $2,991,659.00 |
| Baynard, James | $626,517.00 |
| Beamon, Jess W. | $988,897.00 |
| Belmer, Alvin Burton | $8,384,746.00 |
| Blankenship, Richard D. | $1,421,889.00 |
| Blocker, John W. | $975,621.00 |
| Boccia, Joseph John Jr. | $1,276,641.00 |
| Bohannon, Leon | $706,549.00 |

| | |
|---|---|
| Bonk, John Jr. | $904,220.00 |
| Boulos, Jeffrey Joseph | $1,154,112.00 |
| Boyett, John Norman | $2,235,375.00 |
| Burley, William | $170,847.00 |
| Callahan, Paul | $974,546.00 |
| Camara, Mecot | $1,882,308.00 |
| Campus, Bradley | $433,959.00 |
| Ceasar, Johnnie | $313,593.00 |
| Conley, Robert Allen | $962,677.00 |
| Cook, Charles Dennis | $837,147.00 |
| Copeland, Johnny Len | $541,325.00 |
| Cosner, David | $1,105,668.00 |
| Coulman, Kevin | $1,287,092.00 |
| Crudale, Rick | $1,004,731.00 |
| Cyzick, Russell | $575,554.00 |
| Devlin, Michael | $939,887.00 |
| Dorsey, Nathaniel | $638,703.00 |
| Dunnigan, Timothy | $709,232.00 |
| Earle, Bryan | $1,286,372.00 |
| Estes, Danny R. | $1,000,157.00 |
| Fluegel, Richard Andrew | $1,089,811.00 |
| Fulcher, Michael D. | $1,257,150.00 |
| Gallagher, Sean | $674,382.00 |
| Gangur, George | $1,000,935.00 |
| Garcia, Randall | $1,127,694.00 |
| Ghumm, Harold | $1,260,508.00 |
| Giblin, Timothy | $1,301,526.00 |
| Gorchinski, Michael | $1,931,668.00 |
| Gordon, Richard | $965,609.00 |
| Green, Davin M. | $1,025,050.00 |
| Hairston, Thomas | $1,489,395.00 |
| Haskell, Michael | $2,871,058.00 |
| Helms, Mark Anthony | $1,028,509.00 |
| Hester, Stanley G. | $1,493,349.00 |
| Hildreth, Donald Wayne | $1,425,177.00 |
| Holberton, Richard | $1,818,176.00 |
| Hudson, Dr. John | $4,072,010.00 |
| Hukill, Maurice Edward | $3,038,258.00 |
| Iacovino, Edward Jr. | $407,196.00 |
| Innocenzi, Paul III | $1,715,253.00 |
| Jackowski, James | $463,355.00 |
| James, Jeffrey Wilbur | $251,607.00 |
| Jenkins, Nathaniel Walter | $7,599,314 |

| | |
|---|---|
| Johnston, Edward Anthony | $1,246.535.00 |
| Jones, Steven | $801,721.00 |
| Julian, Thomas Adrian | $415,311.00 |
| Keown, Thomas | $1,013,901.00 |
| Kluck, Daniel | $922,630.00 |
| Knipple, James C. | $1,018,665.00 |
| Kreischer, Freas H. III | $1,059,185.00 |
| Laise, Keith | $447,984.00 |
| Langon, James IV | $1,066,903.00 |
| LaRiviere, Michael Scott | $1,056,282.00 |
| LaRiviere, Steven | $986,622.00 |
| Lemnah, Richard | $1,842,869.00 |
| Livingston, Joseph R. ("Joel") III | $1,762,193.00 |
| Lyon, Paul D. Jr. | $1,034,459.00 |
| Macroglou, John | $2,183,935.00 |
| Maitland, Samuel Jr. | $970,700.00 |
| Martin, Charlie Robert | $1,316,085.00 |
| Massa, David | $674,558.00 |
| McCall, John | $853,420.00 |
| McDonough, James E. | $952,847.00 |
| McMahon, Timothy R. | $984,020.00 |
| Menkins, Richard II | $850,938.00 |
| Meurer, Ronald | $1,855,272.00 |
| Milano, Joseph Peter | $674,258.00 |
| Moore, Joseph | $980,150.00 |
| Myers, Harry Douglas | $891,144.00 |
| Nairn, David | $1,562,682.00 |
| Olson, John Arne | $1,010,497.00 |
| Owens, Joseph Albert | $502,237.00 |
| Page, Connie Ray | $1,012,211.00 |
| Parker, Ulysses Gregory | $641,523.00 |
| Pearson, John L. | $1,816,369.00 |
| Perron, Thomas S. | $424,110.00 |
| Phillips, John Arthur Jr. | $1,030,308.00 |
| Pollard, William Roy | $1,111,556.00 |
| Prevatt, Victor Mark | $862,635.00 |
| Price, James | $989,921.00 |
| Prindeville, Patrick Kerry | $305,675.00 |
| Quirante, Diomedes J. | $2,178,822.00 |
| Richardson, Warren | $796,673.00 |
| Rotondo, Louis J. | $2,276,348.00 |
| Sauls, Michael Caleb | $974,601.00 |
| Schnorf, Charles Jeffrey | $2,790,541.00 |

| | |
|---|---|
| Schultz, Scott Lee | $675,361.00 |
| Scialabba, Peter | $2.462,179.00 |
| Scott, Gary Randall | $432,024.00 |
| Shipp, Thomas Alan | $738,895.00 |
| Shropshire, Jerryl | $212,061.00 |
| Simpson, Larry H. Jr. | $5,995,660.00 |
| Smith, Kirk Hall | $710,042.00 |
| Smith, Thomas Gerard | $980,543.00 |
| Smith, Vincent | $1.285.915.00 |
| Sommerhof, William Scott | $1,361,062.00 |
| Spencer, Stephen Eugene | $974,298.00 |
| Stelpflug, William | $1,094,429.00 |
| Stephens, Horace Renardo Jr. ("Ricky") | $446.107.00 |
| Stockton, Craig | $1,007.526.00 |
| Stokes, Jeffrey | $1.599.994.00 |
| Sturghill, Eric D. | $725.378.00 |
| Sundar, Devon | $1.394.608.00 |
| Thorstad, Thomas Paul | $1,921,086.00 |
| Tingley, Stephen | $1,439,655.00 |
| Vallone, Donald H. Jr. | $462,193.00 |
| Washington, Eric Glenn | $1,069,270.00 |
| Wigglesworth, Dwayne | $1,001,122.00 |
| Williams, Rodney J. | $671,206.00 |
| Williams, Scipio Jr. | $1.635.994.00 |
| Williamson, Johnny Adam | $443,409.00 |
| Winter, William Ellis | $2.534,910.00 |
| Woollett, Donald Elberan | $2,021.565.00 |
| Wyche, Craig | $1,025.860.00 |
| Young, Jeffrey D. | $618,891.00 |

2.   *Battery Claims Brought by Injured Servicemen*

| | |
|---|---|
| Albright, Marvin | $5,000.000.00 |
| Arroyo, Pablo | $5.000.000.00 |
| Banks, Anthony | $7.500,000.00 |
| Burnette, Rodney Darrell | $8,000.000.00 |
| Comes, Frank Jr. | $1,500,000.00 |
| Dolphin, Glenn | $3,000,000.00 |
| Eaves, Frederick Daniel | $1,500,000.00 |
| Frye, Charles | $2.200.000.00 |
| Garner, Truman Dale | $7.500,000.00 |
| Gerlach, Larry | $12,000,000.00 |
| Hlywiak, John | $1.500,000.00 |

| | |
|---|---|
| Hunt, Orval | $8,000,000.00 |
| Jacobs, Joseph P. | $5,000,000.00 |
| Kirkpatrick. Brian | $8.000,000.00 |
| Matthews, Burnham | $7,000,000.00 |
| Mitchell, Timothy | $4,555,099.00 |
| Moore. Lovelle "Darrell" | $8,314,513.00 |
| Nashton. Jeffrey | $11,776.632.00 |
| Oliver, John | $3,277.542.00 |
| Rivers. Paul | $7,000.000.00 |
| Russell, Stephen | $9,252,749.00 |
| Spaulding, Dana | $9,559,609.00 |
| Swinson. Craig Joseph | $1.500.000.00 |
| Toma. Michael | $7,500.000.00 |
| Wheeler. Danny | $5.000,000.00 |
| Young, Thomas D. | $1,500,000.00 |

3.     *Claims Brought by Family Members of Deceased Servicemen*

| | |
|---|---|
| Abbey, Lilla Woollett | $2,500,000.00 |
| Abbott, James | $5,000,000.00 |
| Abbott, Mary (Estate of) | $5.000.000.00 |
| Adams, Elizabeth | $2,500,000.00 |
| Ahlquist, Eileen Prindeville | $2,500,000.00 |
| Alarcon, Miralda (Judith Maitland) | $8.000,000.00 |
| Allman. Anne | $5.000.000.00 |
| Allman, Robert | $5.000.000.00 |
| Allman. Theodore (Estate of) | $2.500.000.00 |
| Allman. DiAnne Margaret ("Maggie") | $2,500.000.00 |
| Alvarez, Margaret E. | $2,500.000.00 |
| Angus, Kimberly F. | $2,500,000.00 |
| Bates, Donnie | $2.500.000.00 |
| Bates. Johnny | $2.500.000.00 |
| Bates. Laura | $5.000.000.00 |
| Bates. Margie | $5,000,000.00 |
| Bates, Monty | $2.500.000.00 |
| Bates, Thomas Jr. | $2,500.000.00 |
| Bates, Thomas C., Sr. | $5.000.000.00 |
| Baumgartner, Mary E. | $2,500.000.00 |
| Baynard. Anthony | $2,500.000.00 |
| Baynard, Barry | $2,500.000.00 |
| Baynard, Emerson | $2.500.000.00 |
| Baynard, Philip | $2,500.000.00 |
| Baynard, Thomasine | $8,000,000.00 |

| | |
|---|---|
| Baynard, Timothy | $2,500.000.00 |
| Baynard. Wayne | $2,500,000.00 |
| Baynard. Stephen | $5.000.000.00 |
| Beard, Anna | $2.500.000.00 |
| Beck, Mary Ann | $2,500,000.00 |
| Belmer, Alue | $5.000.000.00 |
| Belmer, Annette | $2.500.000.00 |
| Belmer. Clarence | $2,500,000.00 |
| Belmer, Colby Keith | $5,000.000.00 |
| Belmer. Denise | $2.500.000.00 |
| Belmer, Donna | $2,500,000.00 |
| Belmer. Faye | $8,000,000.00 |
| Belmer, Kenneth | $2,500,000.00 |
| Belmer. Luddie | $5.000.000.00 |
| Biellow, Shawn | $2,500.000.00 |
| Black, Mary Frances | $2,500.000.00 |
| Blankenship, Donald Jr. | $2,500,000.00 |
| Blankenship. Donald Sr. | $5.000.000.00 |
| Blankenship, Mary (Estate of) | $5,000,000.00 |
| Blocker, Alice | $5,000,000.00 |
| Blocker, Douglas | $2,500,000.00 |
| Blocker. John R. | $5.000,000.00 |
| Blocker, Robert | $2,500,000.00 |
| Boccia, James | $2,500,000.00 |
| Boccia, Joseph Sr. | $5,000,000.00 |
| Boccia. Patricia | $5.000.000.00 |
| Boccia, Raymond | $2,500,000.00 |
| Boccia, Richard | $2,500,000.00 |
| Boccia. Ronnie (Veronica) | $2.500.000.00 |
| Boddie. Leticia | $2.500.000.00 |
| Bohannon, Angela | $2.500.000.00 |
| Bohannon. Anthony | $2,500,000.00 |
| Bohannon. Carrie | $5,000,000.00 |
| Bohannon. David | $2,500,000.00 |
| Bohannon. Edna | $8.000.000.00 |
| Bohannon. Leon Sr. | $5.000.000.00 |
| Bohannon, Ricki | $2.500.000.00 |
| Bolinger. Billie Jean | $5.000.000.00 |
| Boulos. Joseph | $5.000.000.00 |
| Boulos, Lydia | $2.500.000.00 |
| Boulos. Marie | $5.000,000.00 |
| Bowler, Rebecca | $2.500.000.00 |
| Boyett, Lavon | $5.000.000.00 |
| Boyett. Norman E. Jr. (Estate of) | $5.000,000.00 |

| | |
|---|---|
| Boyett, Theresa U. Roth | $8,000,000.00 |
| Boyett, William A. | $2,500,000.00 |
| Breeden, Susan Schnorf | $2,500,000.00 |
| Briscoe, Damion | $2,500,000.00 |
| Brown, Christine | $5,000,000.00 |
| Brunette, Rosanne | $2,500,000.00 |
| Buckner, Mary Lynn | $8,000,000.00 |
| Burley, Claude (Estate of) | $5,000,000.00 |
| Burley, William Douglas (Estate of) | $2,500,000.00 |
| Burley, Myra | $2,500,000.00 |
| Calabro, Kathleen | $2,500,000.00 |
| Caldera, Rachel | $2,500,000.00 |
| Callahan, Avenell | $5,000,000.00 |
| Callahan, Michael | $2,500,000.00 |
| Calloway, Patricia (Patsy Ann) | $2,500,000.00 |
| Camara, Elisa Rock | $2,500,000.00 |
| Camara, Theresa Riggs | $2,500,000.00 |
| Campbell, Candace | $2,500,000.00 |
| Campus, Clare | $5,000,000.00 |
| Capobianco, Elaine | $2,500,000.00 |
| Carter, Florene Martin | $2,500,000.00 |
| Cash, Phyllis A. | $2,500,000.00 |
| Catano, Theresa | $2,500,000.00 |
| Ceasar, Bruce | $2,500,000.00 |
| Ceasar, Franklin | $2,500,000.00 |
| Ceasar, Fredrick | $2,500,000.00 |
| Ceasar, Robbie Nell | $5,000,000.00 |
| Ceasar, Sybil | $1,250,000.00 |
| Cecca, Christine Devlin | $2,500,000.00 |
| Chapman, Tammy | $2,500,000.00 |
| Cherry, James | $2,500,000.00 |
| Cherry, Sonia | $2,500,000.00 |
| Chios, Adele H. | $2,500,000.00 |
| Christian, Jana M. | $2,500,000.00 |
| Christian, Sharon Rose | $2,500,000.00 |
| Ciupaska, Susan | $2,500,000.00 |
| Clark, LeShune Stokes | $2,500,000.00 |
| Clark, Rosemary | $2,500,000.00 |
| Cobble, Mary Ann | $5,000,000.00 |
| Collard, Karen Shipp | $2,500,000.00 |
| Collier, Jennifer | $5,000,000.00 |
| Collier, Melia Winter | $8,000,000.00 |
| Coltrane, Deborah M. | $8,000,000.00 |
| Conley, James N. Jr. | $5,000,000.00 |

| | |
|---|---|
| Conley. Roberta Li | $5.000.000.00 |
| Cook. Charles F. | $5,000,000.00 |
| Cook, Elizabeth A. | $2,500.000.00 |
| Cook. Mary A. (Estate of) | $5,000.000.00 |
| Copeland. Alan Tracy | $2.500.000.00 |
| Copeland, Betty | $5,000,000.00 |
| Copeland. Donald | $5,000,000.00 |
| Corry, Blanche | $2,500.000.00 |
| Cosner, Harold | $5,000,000.00 |
| Cosner. Jeffrey | $2,500.000.00 |
| Cosner. Leanna | $5.000.000.00 |
| Cosner, Marva Lynn (Estate of) | $5,000.000.00 |
| Cossaboom, Cheryl | $2,500,000.00 |
| Coulman, Bryan Thomas | $2.500.000.00 |
| Coulman, Christopher J. | $2.500.000.00 |
| Coulman. Dennis P. | $2.500.000.00 |
| Coulman, Lorraine M. | $5,000,000.00 |
| Coulman, Robert D. | $2,500.000.00 |
| Coulman, Robert Louis | $5,000,000.00 |
| Covington, Charlita Martin | $5,000,000.00 |
| Crouch, Amanda | $5,000,000.00 |
| Crudale, Marie | $5.000.000.00 |
| Cyzick. Eugene | $2,500.000.00 |
| Dallachie, Lynn | $8.000.000.00 |
| Deal, Anne | $2.500.000.00 |
| Derbyshire, Lynn Smith | $2,500.000.00 |
| Desjardins. Theresa | $5,000,000.00 |
| Devlin, Christine | $5,000,000.00 |
| Devlin, Daniel | $2.500.000.00 |
| Devlin, Gabrielle | $2.500.000.00 |
| Devlin. Richard | $2.500.000.00 |
| Devlin, Sean | $2.500.000.00 |
| Donahue (Milano), Rosalie | $2,500.000.00 |
| Doray. Ashley | $5,000,000.00 |
| Doss. Rebecca | $2.500.000.00 |
| Dunnigan, Chester | $2.500.000.00 |
| Dunnigan, Elizabeth Ann | $2,500.000.00 |
| Dunnigan. Michael | $2.500.000.00 |
| Dunnigan. William | $2.500.000.00 |
| Dunnigan. Claudine | $5,000,000.00 |
| Edquist. Janice Thorstad | $2.500.000.00 |
| Ervin. Mary Ruth | $5,000,000.00 |
| Estes. Barbara | $5,000,000.00 |
| Estes. Charles | $5,000,000.00 |

| | |
|---|---|
| Estes, Frank | $2,500,000.00 |
| Fansler, Lori | $2,500,000.00 |
| Farthing, Angela Dawn | $2,500,000.00 |
| Ferguson, Arlington | $1,250,000.00 |
| Ferguson, Hilton | $1,250,000.00 |
| Fish, Linda Sandback | $8,000,000.00 |
| Fox, Nancy Brocksbank | $5,000,000.00 |
| Fox, Tia | $2,500,000.00 |
| Freshour, Tammy | $8,000,000.00 |
| Fulcher, Ruby | $5,000,000.00 |
| Gallagher, Barbara | $5,000,000.00 |
| Gallagher, Brian | $2,500,000.00 |
| Gallagher, James (Estate of) | $5,000,000.00 |
| Gallagher, James Jr. | $2,500,000.00 |
| Gallagher, Kevin | $2,500,000.00 |
| Gallagher, Michael | $2,500,000.00 |
| Gangur, Dimitri | $5,000,000.00 |
| Gangur, Mary | $5,000,000.00 |
| Garcia, Jess | $5,000,000.00 |
| Garcia, Ronald | $2,500,000.00 |
| Garcia, Roxanne | $2,500,000.00 |
| Garcia, Russell | $2,500,000.00 |
| Garcia, Violet | $5,000,000.00 |
| Garza, Suzanne Perron | $2,500,000.00 |
| Gattegno, Jeanne | $2,500,000.00 |
| Ghumm, Arlene | $8,000,000.00 |
| Ghumm, Ashley | $5,000,000.00 |
| Ghumm, Bill | $2,500,000.00 |
| Ghumm, Edward | $2,500,000.00 |
| Ghumm, Hildegard | $5,000,000.00 |
| Ghumm, Jedaiah (Estate of) | $5,000,000.00 |
| Ghumm, Jesse | $2,500,000.00 |
| Ghumm, Leroy | $5,000,000.00 |
| Ghumm, Moronica | $5,000,000.00 |
| Giblin, Donald | $2,500,000.00 |
| Giblin, Jeanne | $5,000,000.00 |
| Giblin, Michael | $2,500,000.00 |
| Giblin, Tiffany | $5,000,000.00 |
| Giblin, Valerie | $8,000,000.00 |
| Giblin, William | $2,500,000.00 |
| Gilford-Smith, Thad | $2,500,000.00 |
| Gintonio, Rebecca | $2,500,000.00 |
| Goff, Dawn | $2,500,000.00 |
| Gorchinski, Christina | $5,000,000.00 |

| | |
|---|---|
| Gorchinski, Judy | $8,000,000.00 |
| Gorchinski, Kevin | $5,000,000.00 |
| Gorchinski, Valerie | $5,000,000.00 |
| Gordon, Alice | $5,000,000.00 |
| Gordon, Joseph | $2,500,000.00 |
| Gordon, Linda | $2,500,000.00 |
| Gordon, Norris (Estate of) | $5,000,000.00 |
| Gordon, Paul | $2,500,000.00 |
| Grant, Andrea | $2,500,000.00 |
| Graves, Deborah | $2,500,000.00 |
| Green, Deborah | $8,000,000.00 |
| Gregg, Liberty Quirante | $2,500,000.00 |
| Griffin, Alex | $2,500,000.00 |
| Grimsley, Catherine E. | $2,500,000.00 |
| Gummer, Megan | $2,500,000.00 |
| Guz, Lyda Woollett | $2,500,000.00 |
| Hairston, Darlene | $8,000,000.00 |
| Hanrahan, Tara | $2,500,000.00 |
| Hart, Mary Clyde | $2,500,000.00 |
| Haskill, Brenda | $2,500,000.00 |
| Haskell, Jeffrey | $2,500,000.00 |
| Hedge, Kathleen S. | $8,000,000.00 |
| Helms, Christopher Todd | $2,500,000.00 |
| Helms, Marvin R. | $5,000,000.00 |
| Hester, Doris | $8,000,000.00 |
| Hildreth, Clifton | $5,000,000.00 |
| Hildreth, Julia | $5,000,000.00 |
| Hildreth, Mary Ann | $8,000,000.00 |
| Hildreth, Michael Wayne | $5,000,000.00 |
| Hilton, Sharon A. | $2,500,000.00 |
| Holberton, Donald | $2,500,000.00 |
| Holberton, Patricia Lee | $5,000,000.00 |
| Holberton, Thomas | $2,500,000.00 |
| Hollifield, Tangie | $2,500,000.00 |
| Horner, Debra | $8,000,000.00 |
| House, Elizabeth | $2,500,000.00 |
| Houston, Joyce A. | $5,000,000.00 |
| Howell, Tammy Camara | $8,000,000.00 |
| Hudson, Lisa H. | $8,000,000.00 |
| Hudson, Lorenzo | $2,500,000.00 |
| Hudson, Lucy | $5,000,000.00 |
| Hudson, Ruth | $2,500,000.00 |
| Hudson, Samuel (Estate of) | $5,000,000.00 |
| Hudson, William J. | $5,000,000.00 |

| | |
|---|---|
| Hugis, Susan Thorstad (Estate of) | $2,500,000.00 |
| Hurlburt, Nancy Tingley | $2,500,000.00 |
| Hurston, Cynthia Perron | $2,500,000.00 |
| Iacovino, Edward Sr. (Estate of) | $5,000,000.00 |
| Iacovino, Elizabeth | $5,000,000.00 |
| Innocenzi, Deborah | $8,000,000.00 |
| Innocenzi, Kristin | $5,000,000.00 |
| Innocenzi, Mark | $2,500,000.00 |
| Innocenzi, Paul IV | $5,000,000.00 |
| Jaccom, Bernadette | $2,500,000.00 |
| Jackowski, John Jr. | $2,500,000.00 |
| Jackowski, John Sr. | $5,000,000.00 |
| Jacobus, Victoria | $2,500,000.00 |
| James, Elaine | $5,000,000.00 |
| Jenkins, Nathalie C. | $5,000,000.00 |
| Jenkins, Stephen | $2,500,000.00 |
| Jewett, Rebecca | $2,500,000.00 |
| Johnson, Linda Martin | $2,500,000.00 |
| Johnson, Ray | $2,500,000.00 |
| Johnson, Rennitta Stokes | $2,500,000.00 |
| Johnson, Sherry | $5,000,000.00 |
| Johnston, Charles | $2,500,000.00 |
| Johnston, Edwin | $5,000,000.00 |
| Johnston, Mary Ann | $5,000,000.00 |
| Johnston, Zandra LaRiviere | $2,500,000.00 |
| Jones, Alicia | $2,500,000.00 |
| Jones, Corene Martin | $2,500,000.00 |
| Jones, Kia Briscoe | $2,500,000.00 |
| Jones, Mark | $2,500,000.00 |
| Jones, Ollie | $5,000,000.00 |
| Jones, Sandra D. | $5,000,000.00 |
| Jones, Synovure (Estate of) | $2,500,000.00 |
| Jordan, Robin Copeland | $2,500,000.00 |
| Jordan, Susan Scott | $2,500,000.00 |
| Julian, Joyce | $5,000,000.00 |
| Julian, Karl | $5,000,000.00 |
| Jurist, Nada | $2,500,000.00 |
| Keown, Adam | $2,500,000.00 |
| Keown, Bobby Jr. | $2,500,000.00 |
| Keown, Bobby Sr. | $5,000,000.00 |
| Keown, Darren | $2,500,000.00 |
| Keown, William | $2,500,000.00 |
| Kirker, Mary Joe | $2,500,000.00 |
| Kluck, Kelly | $2,500,000.00 |

| | |
|---|---|
| Kluck, Michael | $2.500,000.00 |
| Knipple, John D. (Estate of) | $5,000,000.00 |
| Knipple, John R. | $2,500,000.00 |
| Knipple, Pauline (Estate of) | $5,000,000.00 |
| Knox, Shirley L. | $2,500,000.00 |
| Kreischer, Doreen | $5,000,000.00 |
| Kreischer, Freas H. Jr. | $5,000,000.00 |
| Lake, Cynthia D. | $2.500,000.00 |
| Lange, Wendy L. | $2,500,000.00 |
| Langon, James III | $5,000,000.00 |
| LaRiviere, Eugene | $2,500,000.00 |
| LaRiviere, Janet | $5.000,000.00 |
| LaRiviere, John M. | $2.500.000.00 |
| LaRiviere, Lesley | $2.500.000.00 |
| LaRiviere, Michael | $2.500.000.00 |
| LaRiviere, Nancy | $2.500.000.00 |
| LaRiviere, Richard | $2.500.000.00 |
| LaRiviere, Richard G. (Estate of) | $5.000,000.00 |
| LaRiviere, Robert | $2.500,000.00 |
| LaRiviere, William | $2,500,000.00 |
| Lawton, Cathy L. | $2,500,000.00 |
| LeGault, Heidi Crudale | $8,000,000.00 |
| Lemnah, Clarence (Estate of) | $5,000,000.00 |
| Lemnah, Etta | $5,000,000.00 |
| Lemnah, Fay | $2,500,000.00 |
| Lemnah, Harold | $2,500,000.00 |
| Lemnah, Marlys | $8.000,000.00 |
| Lemnah, Robert | $2,500,000.00 |
| Lemnah, Ronald | $2,500,000.00 |
| Livingston, Annette R. | $8,000.000.00 |
| Livingston, Joseph R. IV | $5,000,000.00 |
| Livingston, Joseph R. Jr. (Estate of) | $5,000,000.00 |
| Lynch, Robin M. | $2,500,000.00 |
| Lyon, Earl | $2.500.000.00 |
| Lyon, Francisco | $2.500.000.00 |
| Lyon, June | $2.500.000.00 |
| Lyon, Maria | $5.000.000.00 |
| Lyon, Paul D. Sr. | $5.000.000.00 |
| Lyon, Valerie | $2.500.000.00 |
| Macroglou, Heather | $5,000,000.00 |
| Mahoney, Kathleen Devlin | $2,500,000.00 |
| Maitland, Kenty | $2.500.000.00 |
| Maitland, Leysnal | $5,000,000.00 |
| Maitland, Samuel Sr. | $5,000,000.00 |

| | |
|---|---|
| Maitland, Shirla | $2,500,000.00 |
| Marshall, Virginia Boccia | $2,500,000.00 |
| Martin, John | $2,500,000.00 |
| Martin, Pacita | $8,000,000.00 |
| Martin, Renerio | $5,000,000.00 |
| Martin, Ruby | $5,000,000.00 |
| Martin, Shirley | $5,000,000.00 |
| Mason, Mary | $5,000,000.00 |
| Massa, Cristina | $5,000,000.00 |
| Massa, Edmund | $2,500,000.00 |
| Massa, Joao ("John") | $2,500,000.00 |
| Massa, Jose ("Joe") | $2,500,000.00 |
| Massa, Manuel Jr. | $2,500,000.00 |
| Massa, Ramiro | $2,500,000.00 |
| McCall, Mary | $5,000,000.00 |
| McCall, Thomas (Estate of) | $5,000,000.00 |
| McCall, Valerie | $2,500,000.00 |
| McDermott, Gail | $2,500,000.00 |
| McFarlin, Julia A. | $2,500,000.00 |
| McMahon, George | $2,500,000.00 |
| McMahon, Michael | $2,500,000.00 |
| McPhee, Patty | $5,000,000.00 |
| Menkins, Darren | $2,500,000.00 |
| Menkins, Gregory | $2,500,000.00 |
| Menkins, Margaret | $5,000,000.00 |
| Menkins, Richard H. | $5,000,000.00 |
| Meurer, Jay T. | $2,500,000.00 |
| Meurer, John | $5,000,000.00 |
| Meurer, John Thomas | $2,500,000.00 |
| Meurer, Mary Lou | $5,000,000.00 |
| Meurer, Michael | $2,500,000.00 |
| Meyer, Penny | $2,500,000.00 |
| Milano, Angela | $5,000,000.00 |
| Milano, Peter Jr. | $5,000,000.00 |
| Miller, Earline | $5,000,000.00 |
| Miller, Henry | $2,500,000.00 |
| Miller, Patricia | $2,500,000.00 |
| Montgomery, Helen | $2,500,000.00 |
| Moore, Betty | $5,000,000.00 |
| Moore, Harry | $5,000,000.00 |
| Moore, Kimberly | $2,500,000.00 |
| Moore, Mary | $8,000,000.00 |
| Moore, Melissa Lea | $2,500,000.00 |
| Moore, Michael (Estate of) | $2,500,000.00 |

| | |
|---|---|
| Moy, Elizabeth Phillips | $2,500,000.00 |
| Myers, Debra | $2,500,000.00 |
| Myers, Geneva | $5,000,000.00 |
| Myers, Harry A. | $5,000,000.00 |
| Nairn, Billie Ann | $5,000,000.00 |
| Nairn, Campbell J. III | $2,500,000.00 |
| Nairn, Campbell J. Jr. (Estate of) | $5,000,000.00 |
| Nairn, William P. | $2,500,000.00 |
| Norfleet, Richard | $5,000,000.00 |
| O'Connor, Deborah | $2,500,000.00 |
| Olaniji, Pearl | $5,000,000.00 |
| Olson, Bertha (Estate of) | $5,000,000.00 |
| Olson, Karen L. | $2,500,000.00 |
| Olson, Randal D. | $2,500,000.00 |
| Olson, Roger S. | $2,500,000.00 |
| Olson, Ronald J. | $2,500,000.00 |
| Olson, Sigurd (Estate of) | $5,000,000.00 |
| Owens, David | $2,500,000.00 |
| Owens, Deanna | $2,500,000.00 |
| Owens, Frances | $5,000,000.00 |
| Owens, James (Estate of) | $5,000,000.00 |
| Owens, Steven | $2,500,000.00 |
| Page, Connie Mack | $5,000,000.00 |
| Page, Judith K. | $5,000,000.00 |
| Palmer, Lisa Menkins | $2,500,000.00 |
| Paolozzi, Geraldine | $2,500,000.00 |
| Pare, Maureen | $2,500,000.00 |
| Parker, Henry James | $2,500,000.00 |
| Parker, Sharon | $2,500,000.00 |
| Pearson, Helen M. | $5,000,000.00 |
| Pearson, John L. Jr. | $5,000,000.00 |
| Pearson, Sonia | $8,000,000.00 |
| Perron, Brett | $2,500,000.00 |
| Perron, Deborah Jean | $2,500,000.00 |
| Perron, Michelle | $2,500,000.00 |
| Perron, Ronald R. | $5,000,000.00 |
| Persky, Muriel | $5,000,000.00 |
| Peterson, Deborah D. | $2,500,000.00 |
| Petry, Sharon Conley | $2,500,000.00 |
| Petrick, Sandra | $2,500,000.00 |
| Phelps, Donna Vallone | $5,000,000.00 |
| Phillips, Harold | $2,500,000.00 |
| Phillips, John Arthur Sr. | $5,000,000.00 |
| Plickys, Donna Tingley | $2,500,000.00 |

| | |
|---|---|
| Pollard, Margaret Aileen | $8.000.000.00 |
| Pollard, Stacey Yvonne | $5,000.000.00 |
| Prevatt, Lee Hollan | $2.500.000.00 |
| Prevatt, Victor Thornton | $5,000.000.00 |
| Price, John | $5.000.000.00 |
| Price, Joseph | $2.500,000.00 |
| Prindeville, Barbara D. (Estate of) | $5,000.000.00 |
| Prindeville, Kathleen Tara | $2,500.000.00 |
| Prindeville, Michael | $2,500,000.00 |
| Prindeville. Paul | $5,000.000.00 |
| Prindeville. Sean | $2.500,000.00 |
| Quirante, Belinda J. | $5,000.000.00 |
| Quirante. Edgar | $2.500.000.00 |
| Quirante. Godofredo (Estate of) | $5,000.000.00 |
| Quirante, Milton | $2,500,000.00 |
| Quirante, Sabrina | $2,500,000.00 |
| Ray, Susan | $2,500,000.00 |
| Reininger, Laura M. | $2.500.000.00 |
| Richardson, Alan | $2,500,000.00 |
| Richardson. Beatrice | $5.000.000.00 |
| Richardson, Clarence | $5,000,000.00 |
| Richardson, Eric | $2,500.000.00 |
| Richardson, Lynette | $2,500,000.00 |
| Richardson, Vanessa | $2,500,000.00 |
| Richardson-Mills. Philiece | $5,000,000.00 |
| Ricks, Melrose | $5.000.000.00 |
| Riva, Belinda Quirante | $2,500.000.00 |
| Rockwell, Barbara | $5,000.000.00 |
| Rooney, Linda | $2,500,000.00 |
| Rose, Tara Smith | $2,500,000.00 |
| Ruark, Tammi | $2.500.000.00 |
| Rudkowski. Juliana | $2,500,000.00 |
| Russell. Marie McMahon | $2.500.000.00 |
| Sanchez, Alicia Lynn | $5.000.000.00 |
| Sauls, Andrew | $2.500.000.00 |
| Sauls, Henry Caleb | $2.500.000.00 |
| Sauls, Riley A. | $2.500.000.00 |
| Schnorf. Margaret Medler | $5,000,000.00 |
| Schnorf, Richard (brother) | $2,500,000.00 |
| Schnorf. Richard (father) | $5,000.000.00 |
| Schnorf. Robert | $2,500.000.00 |
| Schultz. Beverly | $5.000.000.00 |
| Schultz. Dennis James | $2.500.000.00 |
| Schultz, Dennis Ray | $5,000,000.00 |

| | |
|---|---|
| Scialabba, Frank | $5,000.000.00 |
| Scialabba, Jacqueline | $8.000,000.00 |
| Scialabba, Samuel Scott | $5,000,000.00 |
| Scott, Jon Christopher | $2,500,000.00 |
| Scott, Kevin James | $2,500,000.00 |
| Scott, Larry L. (Estate of) | $5,000,000.00 |
| Scott, Mary Ann | $5,000,000.00 |
| Scott, Sheria | $2,500,000.00 |
| Scott, Stephen Allen | $2,500,000.00 |
| Seguerra, Jacklyn | $2,500,000.00 |
| Shipp, Bryan Richard | $5,000,000.00 |
| Shipp, James David | $2,500,000.00 |
| Shipp, Janice | $2,500,000.00 |
| Shipp, Maurice | $2.500,000.00 |
| Shipp, Pauline | $8.000.000.00 |
| Shipp, Raymond Dennis | $2,500,000.00 |
| Shipp, Russell | $2.500,000.00 |
| Sinsioco, Susan J. | $2.500,000.00 |
| Smith-Ward, Ana | $8,000,000.00 |
| Smith, Angela Josephine (Estate of) | $5,000,000.00 |
| Smith, Bobbie Ann | $5,000,000.00 |
| Smith, Cynthia | $2,500.000.00 |
| Smith, Donna Marie | $2,500.000.00 |
| Smith, Erma | $2.500.000.00 |
| Smith, Holly | $2.500,000.00 |
| Smith, Ian | $5.000.000.00 |
| Smith, Janet | $2,500,000.00 |
| Smith, Joseph K. III | $2,500,000.00 |
| Smith, Joseph K. Jr. | $5,000,000.00 |
| Smith, Keith | $5.000.000.00 |
| Smith, Kelly B. | $2.500.000.00 |
| Smith, Shirley L. | $5,000,000.00 |
| Smith, Tadgh | $2.500.000.00 |
| Smith, Terrence | $2,500,000.00 |
| Smith, Timothy B. | $2.500,000.00 |
| Sommerhof, Jocelyn J. | $5,000,000.00 |
| Sommerhof, John | $2.500.000.00 |
| Sommerhof, William J. | $5.000.000.00 |
| Spencer, Douglas | $2,500,000.00 |
| Stelpflug, Christy Williford | $2,500,000.00 |
| Stelpflug, Joseph | $2.500,000.00 |
| Stelpflug, Kathy Nathan | $2,500,000.00 |
| Stelpflug, Laura Barfield | $2.500,000.00 |
| Stelpflug, Peggy | $5,000,000.00 |

| | |
|---|---|
| Stelpflug, William | $5,000,000.00 |
| Stephens, Horace Sr. | $5,000,000.00 |
| Stephens, Joyce | $5,000,000.00 |
| Stephens, Keith | $2,500,000.00 |
| Stockton, Dona | $5,000,000.00 |
| Stockton, Donald (Estate of) | $5,000,000.00 |
| Stockton, Richard | $2,500,000.00 |
| Stokes, Irene | $5,000,000.00 |
| Stokes, Nelson Jr. | $2,500,000.00 |
| Stokes, Nelson Sr. (Estate of) | $5,000,000.00 |
| Stokes, Robert | $2,500,000.00 |
| Stokes-Graham, Gwenn | $2,500,000.00 |
| Sturghill, Marcus D. | $2,500,000.00 |
| Sturghill, Marcus L. Jr. | $5,000,000.00 |
| Sturghill, NaKeisha Lynn | $2,500,000.00 |
| Sundar, Doreen | $8,000,000.00 |
| Tella, Margaret | $2,500,000.00 |
| Terlson, Susan L. | $2,500,000.00 |
| Thompson, Mary Ellen | $2,500,000.00 |
| Thorstad, Adam | $5,000,000.00 |
| Thorstad, Barbara | $5,000,000.00 |
| Thorstad, James Jr. | $2,500,000.00 |
| Thorstad, James Sr. | $5,000,000.00 |
| Thorstad, John | $2,500,000.00 |
| Thorstad, Ryan | $5,000,000.00 |
| Thurman, Betty Ann | $2,500,000.00 |
| Tingley, Barbara | $5,000,000.00 |
| Tingley, Richard L. | $5,000,000.00 |
| Tingley, Russell | $2,500,000.00 |
| Tolliver, Keysha | $5,000,000.00 |
| Turek, Mary Ann | $5,000,000.00 |
| Valenti, Karen | $5,000,000.00 |
| Vallone, Anthony | $2,500,000.00 |
| Vallone, Donald H. | $5,000,000.00 |
| Vallone, Timothy | $2,500,000.00 |
| Vargas, Leona Mae | $2,500,000.00 |
| Voyles, Denise | $2,500,000.00 |
| Wallace, Ila | $5,000,000.00 |
| Wallace, Kathryn Thorstad | $2,500,000.00 |
| Wallace, Richard J. | $2,500,000.00 |
| Warwick, Barbara Thorstad | $2,500,000.00 |
| Washington, Linda | $2,500,000.00 |
| Washington, Vancine | $2,500,000.00 |
| Watson, Kenneth | $2,500,000.00 |

| | |
|---|---|
| Whitener, Diane | $2,500,000.00 |
| Wigglesworth, Daryl | $2,500,000.00 |
| Wigglesworth, Darrin A. | $2,500,000.00 |
| Wigglesworth, Henry | $5,000,000.00 |
| Wigglesworth, Mark | $2,500,000.00 |
| Wigglesworth, Robyn | $2,500,000.00 |
| Wigglesworth, Sandra | $5,000,000.00 |
| Wigglesworth, Shawn | $2,500,000.00 |
| Williams, Dianne Stokes | $2,500,000.00 |
| Williams, Gussie Martin | $2,500,000.00 |
| Williams, Janet | $5,000,000.00 |
| Williams, Johnny | $2,500,000.00 |
| Williams, Rhonda | $2,500,000.00 |
| Williams, Ronald | $2,500,000.00 |
| Williams, Ruth | $5,000,000.00 |
| Williams, Scipio J. | $5,000,000.00 |
| Williams, Wesley | $5,000,000.00 |
| Williams-Edwards, Delma | $2,500,000.00 |
| Williamson, Tony | $2,500,000.00 |
| Williamson, Jewelene | $5,000,000.00 |
| Winter, Michael | $5,000,000.00 |
| Wiseman, Barbara | $8,000,000.00 |
| Woodford, Phyllis | $2,500,000.00 |
| Woodle, Joyce | $2,500,000.00 |
| Woollett, Beverly | $5,000,000.00 |
| Woollett, Paul | $5,000,000.00 |
| Wright, Melvina Stokes | $2,500,000.00 |
| Wright, Patricia | $5,000,000.00 |
| Wyche, Glenn | $2,500,000.00 |
| Wyche, John | $2,500,000.00 |
| Young, John F. | $5,000,000.00 |
| Young, John W. | $2,500,000.00 |
| Young, Judith Carol | $5,000,000.00 |
| Young, Sandra Rhodes | $5,000,000.00 |
| Zimmerman, Joanne | $2,500,000.00 |
| Zone, Stephen Thomas | $2,500,000.00 |
| Zosso, Patricia Thorstad | $2,500,000.00 |

4.    *Claims Brought by Family Members of Injured Servicemen*

| | |
|---|---|
| Ali, Jamaal Muata | $1,250,000.00 |
| Angeloni, Margaret | $1,250,000.00 |
| Arroyo, Jesus | $1,250,000.00 |
| Arroyo, Milagros | $1,250,000.00 |

| | |
|---|---|
| Carletta, Olympia | $2,500.000.00 |
| Carpenter. Kimberly | $4,000,000.00 |
| Comes, Joan | $2.500,000.00 |
| Comes. Patrick | $1.250,000.00 |
| Comes, Christopher | $1.250,000.00 |
| Comes. Frank Sr. | $2,500,000.00 |
| Crawford. Deborah | $1.250,000.00 |
| Davis. Barbara | $4,000,000.00 |
| Franklin, Alice Warren | $1.250.000.00 |
| Gerlach, Patricia | $4,000,000.00 |
| Gerlach, Travis | $2,500,000.00 |
| Gerlach, Megan | $2,500,000.00 |
| Hernandez. Arminda | $1.250.000.00 |
| Hlywiak, Margaret | $2,500,000.00 |
| Hlywiak, Peter Jr. | $1,250,000.00 |
| Hlywiak, Peter Sr. | $2,500,000.00 |
| Hlywiak, Paul | $1.250.000.00 |
| Hlywiak. Joseph | $1.250,000.00 |
| Hunt. Cynthia Lou | $4.000,000.00 |
| Ibarro, Rosa | $2.500,000.00 |
| Jacobs, Andrew Scott | $2.500,000.00 |
| Jacobs. Daniel Joseph | $2,500,000.00 |
| Jacobs, Danita | $4,000,000.00 |
| Kirkpatrick, Kathleen | $4.000,000.00 |
| Lewis. Grace | $2.500,000.00 |
| Magnotti, Lisa | $1.250,000.00 |
| Mitchell. Wendy | $4,000,000.00 |
| Moore, James Otis (Estate of) | $1,250,000.00 |
| Moore. Johnney S. (Estate of) | $2,500,000.00 |
| Moore, Marvin S. | $1,250,000.00 |
| Moore, Alie Mae | $2,500,000.00 |
| Moore-Jones, Jonnie Mae | $1,250,000.00 |
| Nashton, Alex W. (Estate of) | $2,500,000.00 |
| Oliver, Paul | $2.500,000.00 |
| Oliver, Riley | $2.500,000.00 |
| Oliver. Michael John | $2,500,000.00 |
| Oliver. Ashley E. | $2,500,000.00 |
| Oliver. Patrick S. | $2,500,000.00 |
| Oliver. Kayley | $2.500,000.00 |
| Russell, Tanya | $2.500,000.00 |
| Russell, Wanda | $4,000,000.00 |
| Russell, Jason | $2.500,000.00 |
| Shaver, Clydia | $1.250,000.00 |
| Spaulding, Scott | $1.250.000.00 |

| | |
|---|---|
| Stanley, Cecilia | $2,500,000.00 |
| Stilpen, Mary | $1,250,000.00 |
| Swank, Kelly | $1,250,000.00 |
| Swinson, Kenneth J. (Estate of) | $2,500,000.00 |
| Swinson, Ingrid M. (Estate of) | $2,500,000.00 |
| Swinson, Daniel | $1,250,000.00 |
| Swinson, William | $1,250,000.00 |
| Swinson, Dawn | $1,250,000.00 |
| Swinson, Teresa | $1,250,000.00 |
| Warren, Bronzell | $1,250,000.00 |
| Watson, Jessica | $1,250,000.00 |
| Webb, Audrey | $1,250,000.00 |
| Wheeler, Jonathan | $2,500,000.00 |
| Wheeler, Benjamin | $2,500,000.00 |
| Wheeler, Marlis "Molly" (Estate of) | $2,500,000.00 |
| Wheeler, Kerry | $1,250,000.00 |
| Wheeler, Andrew | $2,500,000.00 |
| Wheeler, Brenda June | $4,000,000.00 |
| Wold, Jill | $1,250,000.00 |
| Young, Nora (Estate of) | $2,500,000.00 |
| Young, James | $1,250,000.00 |
| Young, Robert (Estate of) | $2,500,000.00 |

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are

hereby DISMISSED WITHOUT PREJUDICE:

Albright, Marvin Jr.
Albright, Mirequrn
Albright, Shertara
Banks, Anthony (son)
Banks, Michael
Banks, Taiarra
Berry, Lori
Burnette, Christopher
Burnette, Gwen
Camara, Mecot Jr.
Comes, Dale
Comes, Tommy
Crop, Kimberly
Decker, Connie
Dolphin, Erin
Douglass, Frederick (Estate of)
Eaves, Christopher

Eaves, India
Eaves, Sylvia Jean
Foister, Gerald
Frye, Charles Jr.
Frye, Gina
Frye, Lialani
Frye, Lincoln
Frye, Randall
Garner, Joseph
Garner, Justina
Garner, Penny
Garner, Reva
Goodman, Karl
Haskell, Barbara
Haskell, Richard
Hlywiak, Jordan
Hlywiak, Taylor
Hunt, Jack Darrell
Hunt, Marcy Elizabeth
Hunt, Mendy Leigh
Hunt, Molly Faye
Livingston, Carol
Massa, Manuel Sr. (Estate of)
Matthews, Chadwick
Matthews, Debra
Matthews, Drew
Meurer, Deborah
Miller, Shirley D.
Mitchell, Elvera
Mitchell, Robert
Price, Betty Lou (Estate of)
Price, Timothy
Rivers, Jeremy
Rivers, Paul (son)
Rivers, Sandra
Schak, Carol
Schak, George
Spencer, Lynne M.
Washington, Patrice
Williams, Kevin Coker
Williams, George Robinson
Williams, Dorothy (Estate of)
Williamson, Bill
Wise, Debra

Woodcock, Gwen

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are

hereby DISMISSED WITH PREJUDICE:

Beamon, Ashley Tutwiler
Beresford, Michael
Beresford, Susan
Beresford, William
Bianco, Sandra Karen
Bianco, Sandra
Bonk, Catherine
Bonk, John Sr.
Bonk, Kevin
Bonk, Thomas
Calloway, Donald
Clark, Michael Jr.
Corry, Charles
DiGiovanni, Lisa
DiGiovanni, Marion
DiGiovanni, Robert
DiGiovanni, Danielle
Fiedler, Sherry Lynn
Fluegel, Robert
Fluegel, Thomas A.
Fluegel, Marilou
Green, Rebecca Iverson
Hairston, Evans
Hairston, Felicia
Hairston, Julia Bell
Hukill, Henry Durban
Hukill, Mark Andrew
Hukill, Matthew Scott
Hukill, Melissa
Hukill, Meredith Anne
Hukill, Mitchell Charles
Hukill, Monte
Hukill, Virginia Ellen
Jackowski, Mary
Jones, Storm
Joyce, Penni
Kirkwood, Carl Sr.
Kirkwood, Jeff

Kirkwood, Shirley
Kirkwood, Carl Arnold Jr.
Kronenbitter, Patricia
Laise, Kris
Laise, Bill
Laise, Betty
Lewis, Natalie
Macroglou, James
Macroglou, Lorraine
Macroglou, Bill
Mason, Richard
McDonald, Kathy
McDonough, Edward W.
McDonough, Sean
McDonough, Edward Joseph
Morgan, Geraldine
Nashton, Pamela J.
Persky, Herbert
Phelps, Charles Jr.
Phelps, Charles Sr.
Prevatt-Wood, Victoria
Rhosto, Deborah Spencer
Rochwell, Natalie
Rockwell, Donald
Rotondo, Rose (Estate of)
Rotondo, Luis (Estate of) (father)
Santoserre, Phyllis (Estate of)
Simpson, Robert
Simpson, Renee Eileen
Simpson, Larry H. Sr.
Simpson, Anna Marie
Vallone, Donna Beresford
Wallace, Bobby L.
Watkins, Lula Mae (Estate of)
Watkins, Simon
Wirick, Sally Jo

IT IS FURTHER ORDERED that plaintiffs, at their own cost and consistent with the

requirements of 28 U.S.C. § 1608(e), send a copy of this Judgment and the Findings of Fact and

Conclusions of Law issued this date to defendants.

IT IS FURTHER ORDERED that the Clerk of this Court shall terminate this case from

the dockets of this Court.


SO ORDERED.

Signed by Royce C. Lamberth. United States District Judge. September 7, 2007.

**EXHIBIT "D"**

**EJ-001**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and address)*: | TEL NO.: |
|---|---|

☒ Recording requested by and return to:

DAVID J. COOK, Esq. SBC: 060859
SARAH TESCONI, Esq. SBC: 251248
COOK COLLECTION ATTORNEYS, PLC.
165 Fell Street, San Francisco, California 94102

| ☒ ATTORNEY FOR | ☒ JUDGMENT CREDITOR | ☐ ASSIGNEE OF RECORD |
|---|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **UNITED STATES DISTRICT COURT**
STREET ADDRESS **NORTHERN DISTRICT OF CALIFORNIA**
MAILING ADDRESS **450 California Street**
CITY AND ZIP CODE **San Francisco, CA 94102**
BRANCH NAME:

FOR RECORDER'S USE ONLY

PLAINTIFF: DEBORAH D. PETERSON. Personal Representative etc. et. al.

DEFENDANT: ISLAMIC REUBLIC OF IRAN etc. et. al.

| ABSTRACT OF JUDGMENT | ☐ Amended | CASE NUMBER: CV 08 80030MISC |
|---|---|---|

JSW

1. The ☒ judgment creditor ☐ assignee of record
   applies for an abstract of judgment and represents the following:
   a. Judgment debtor's

   **Name and last known address**

   Islamic Republic Of Iran
   Pasadaran Avenue
   Golestan Yekom, Teheran, Iran

   b. Driver's license No. and state: ☒ Unknown
   c. Social security No.: ☒ Unknown
   d. Summons or notice of entry of sister-state judgment was personally served or
   mailed to *(name and address):* See Above

   e. ☐ Original abstract recorded in this county:
      (1) Date:
      (2) Instrument No.:

   f. ☐ Information on additional judgment debtors is shown on page two.

   Date: March 11, 2008
   David J. Cook, Esq., SBN 060859

   *(TYPE OR PRINT NAME)*    ▶    *(SIGNATURE OF APPLICANT OR ATTORNEY)*

2. a. ☒ I certify that the following is a true and correct abstract
      of the judgment entered in this action.
   b. ☐ A certified copy of the judgment is attached.

   6. Total amount of judgment as entered or last renewed:
      $ 2,656,944,877.00

   7. ☐ An ☐ execution lien ☐ attachment lien
      is endorsed on the judgment as follows:
      a. Amount: $
      b. In favor of *(name and address):*

3. Judgment creditor *(name and address):* Deborah D. Peterson,
   and others listed on Exhibit "A", c/o
   Cook Collection Attorneys, P.L.C.
   165 Fell St., San Francisco, CA 94102

4. Judgment debtor *(full name as it appears in judgment):*

   Islamic Republic Of Iran

   [SEAL]

5. a. Judgment entered on *(date):* 9-7-2007
   b. Renewal entered on *(date):*

   This abstract issued on *(date):*

   MAR 11 2008

6. 8. A stay of enforcement has
   a. ☒ not been ordered by the court.
   b. ☐ been ordered by the court effective until *(date):*

9. ☐ This judgment is an installment judgment.

   Clerk, by _____, Deputy
   BETTY FONG

Form Adopted for Mandatory Use
Judicial Council of California
EJ-001 [Rev. January 1, 2003]

**ABSTRACT OF JUDGMENT**
(CIVIL)

Page 1 of 2
Code of Civil Procedure, §§ 488.480,
674, 700.190

American LegalNet, Inc.
www.USCourtForms.com

PLAINTIFF: Deborah D. Peterson, et al.,

DEFENDANT: Islamic Republic of Iran

CASE NUMBER:

INFORMATION ON ADDITIONAL JUDGMENT DEBTORS

10. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

11. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

12. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

13. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

14. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

15. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

16. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

17. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address):*

18. ☐ Continued on Attachment 18.

**ABSTRACT OF JUDGMENT**
**(CIVIL)**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of the<br>Estate of James C. Knipple (Dec.), *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Consolidated Civil Actions: |
| v. | ) ) ) | 01-2094 (RCL)<br>01-2684 (RCL) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## JUDGMENT

In accord with the Memorandum Opinion issued this date, it is hereby

ORDERED that Default Judgment be entered in favor of plaintiffs and against

defendants, jointly and severally, in the amount of $2,656,944,877.00, which shall be allocated

in the following manner:

1. *Wrongful Death Claims Brought by the Personal Representatives and Estates of*

   *Deceased Servicemen*

| | |
|---|---|
| Abbott, Terry | $1,485,243.00 |
| Allman, John Robert | $545,937.00 |
| Bates, Ronny Kent | $2,991,659.00 |
| Baynard, James | $626,517.00 |
| Beamon, Jess W. | $988,897.00 |
| Belmer, Alvin Burton | $8,384,746.00 |
| Blankenship, Richard D. | $1,421,889.00 |
| Blocker, John W. | $975,621.00 |
| Boccia, Joseph John Jr. | $1,276,641.00 |
| Bohannon, Leon | $706,549.00 |

**ECF DOCUMENT**

I hereby attest and certify that this is a printed copy of a document which was electronically filed with the United States District Court for the District of Columbia.
Date Filed: 9/7/07

NANCY MAYER-WHITTINGTON, CLERK
By: _____
3/6/08

| | |
|---|---|
| Bonk, John Jr. | $904,220.00 |
| Boulos, Jeffrey Joseph | $1,154,112.00 |
| Boyett, John Norman | $2,235,375.00 |
| Burley, William | $170,847.00 |
| Callahan, Paul | $974,546.00 |
| Camara, Mecot | $1,882,308.00 |
| Campus, Bradley | $433,959.00 |
| Ceasar, Johnnie | $313,593.00 |
| Conley, Robert Allen | $962,677.00 |
| Cook, Charles Dennis | $837,147.00 |
| Copeland, Johnny Len | $541,325.00 |
| Cosner, David | $1,105,668.00 |
| Coulman, Kevin | $1,287,092.00 |
| Crudale, Rick | $1,004,731.00 |
| Cyzick, Russell | $575,554.00 |
| Devlin, Michael | $939,887.00 |
| Dorsey, Nathaniel | $638,703.00 |
| Dunnigan, Timothy | $709,232.00 |
| Earle, Bryan | $1,286,372.00 |
| Estes, Danny R. | $1,000,157.00 |
| Fluegel, Richard Andrew | $1,089,811.00 |
| Fulcher, Michael D. | $1,257,150.00 |
| Gallagher, Sean | $674,382.00 |
| Gangur, George | $1,000,935.00 |
| Garcia, Randall | $1,127,694.00 |
| Ghumm, Harold | $1,260,508.00 |
| Giblin, Timothy | $1,301,526.00 |
| Gorchinski, Michael | $1,931,668.00 |
| Gordon, Richard | $965,609.00 |
| Green, Davin M. | $1,025,050.00 |
| Hairston, Thomas | $1,489,395.00 |
| Haskell, Michael | $2,871,058.00 |
| Helms, Mark Anthony | $1,028,509.00 |
| Hester, Stanley G. | $1,493,349.00 |
| Hildreth, Donald Wayne | $1,425,177.00 |
| Holberton, Richard | $1,818,176.00 |
| Hudson, Dr. John | $4,072,010.00 |
| Hukill, Maurice Edward | $3,038,258.00 |
| Iacovino, Edward Jr. | $407,196.00 |
| Innocenzi, Paul III | $1,715,253.00 |
| Jackowski, James | $463,355.00 |
| James, Jeffrey Wilbur | $251,607.00 |
| Jenkins, Nathaniel Walter | $7,599,314 |

-2-

| | |
|---|---|
| Johnston, Edward Anthony | $1,246,535.00 |
| Jones, Steven | $801,721.00 |
| Julian, Thomas Adrian | $415,311.00 |
| Keown, Thomas | $1,013,901.00 |
| Kluck, Daniel | $922,630.00 |
| Knipple, James C. | $1,018,665.00 |
| Kreischer, Freas H. III | $1,059,185.00 |
| Laise, Keith | $447,984.00 |
| Langon, James IV | $1,066,903.00 |
| LaRiviere, Michael Scott | $1,056,282.00 |
| LaRiviere, Steven | $986,622.00 |
| Lemnah, Richard | $1,842,869.00 |
| Livingston, Joseph R. ("Joel") III | $1,762,193.00 |
| Lyon, Paul D. Jr. | $1,034,459.00 |
| Macroglou, John | $2,183,935.00 |
| Maitland, Samuel Jr. | $970,700.00 |
| Martin, Charlie Robert | $1,316,085.00 |
| Massa, David | $674,558.00 |
| McCall, John | $853,420.00 |
| McDonough, James E. | $952,847.00 |
| McMahon, Timothy R. | $984,020.00 |
| Menkins, Richard II | $850,938.00 |
| Meurer, Ronald | $1,855,272.00 |
| Milano, Joseph Peter | $674,258.00 |
| Moore, Joseph | $980,150.00 |
| Myers, Harry Douglas | $891,144.00 |
| Nairn, David | $1,562,682.00 |
| Olson, John Arne | $1,010,497.00 |
| Owens, Joseph Albert | $502,237.00 |
| Page, Connie Ray | $1,012,211.00 |
| Parker, Ulysses Gregory | $641,523.00 |
| Pearson, John L. | $1,816,369.00 |
| Perron, Thomas S. | $424,110.00 |
| Phillips, John Arthur Jr. | $1,030,308.00 |
| Pollard, William Roy | $1,111,556.00 |
| Prevatt, Victor Mark | $862,635.00 |
| Price, James | $989,921.00 |
| Prindeville, Patrick Kerry | $305,675.00 |
| Quirante, Diomedes J. | $2,178,822.00 |
| Richardson, Warren | $796,673.00 |
| Rotondo, Louis J. | $2,276,348.00 |
| Sauls, Michael Caleb | $974,601.00 |
| Schnorf, Charles Jeffrey | $2,790,541.00 |

| | |
|---|---|
| Schultz, Scott Lee | $675,361.00 |
| Scialabba, Peter | $2,462,179.00 |
| Scott, Gary Randall | $432,024.00 |
| Shipp, Thomas Alan | $738,895.00 |
| Shropshire, Jerryl | $212,061.00 |
| Simpson, Larry H. Jr. | $5,995,660.00 |
| Smith, Kirk Hall | $710,042.00 |
| Smith, Thomas Gerard | $980,543.00 |
| Smith, Vincent | $1,285,915.00 |
| Sommerhof, William Scott | $1,361,062.00 |
| Spencer, Stephen Eugene | $974,298.00 |
| Stelpflug, William | $1,094,429.00 |
| Stephens, Horace Renardo Jr. ("Ricky") | $446,107.00 |
| Stockton, Craig | $1,007,526.00 |
| Stokes, Jeffrey | $1,599,994.00 |
| Sturghill, Eric D. | $725,378.00 |
| Sundar, Devon | $1,394,608.00 |
| Thorstad, Thomas Paul | $1,921,086.00 |
| Tingley, Stephen | $1,439,655.00 |
| Vallone, Donald H. Jr. | $462,193.00 |
| Washington, Eric Glenn | $1,069,270.00 |
| Wigglesworth, Dwayne | $1,001,122.00 |
| Williams, Rodney J. | $671,206.00 |
| Williams, Scipio Jr. | $1,635,994.00 |
| Williamson, Johnny Adam | $443,409.00 |
| Winter, William Ellis | $2,534,910.00 |
| Woollett, Donald Elberan | $2,021,565.00 |
| Wyche, Craig | $1,025,860.00 |
| Young, Jeffrey D. | $618,891.00 |

2.    *Battery Claims Brought by Injured Servicemen*

| | |
|---|---|
| Albright, Marvin | $5,000,000.00 |
| Arroyo, Pablo | $5,000,000.00 |
| Banks, Anthony | $7,500,000.00 |
| Burnette, Rodney Darrell | $8,000,000.00 |
| Comes, Frank Jr. | $1,500,000.00 |
| Dolphin, Glenn | $3,000,000.00 |
| Eaves, Frederick Daniel | $1,500,000.00 |
| Frye, Charles | $2,200,000.00 |
| Garner, Truman Dale | $7,500,000.00 |
| Gerlach, Larry | $12,000,000.00 |
| Hlywiak, John | $1,500,000.00 |

-4-

| | |
|---|---|
| Hunt, Orval | $8,000,000.00 |
| Jacobs, Joseph P. | $5,000,000.00 |
| Kirkpatrick, Brian | $8,000,000.00 |
| Matthews, Burnham | $7,000,000.00 |
| Mitchell, Timothy | $4,555,099.00 |
| Moore, Lovelle "Darrell" | $8,314,513.00 |
| Nashton, Jeffrey | $11,776,632.00 |
| Oliver, John | $3,277,542.00 |
| Rivers, Paul | $7,000,000.00 |
| Russell, Stephen | $9,252,749.00 |
| Spaulding, Dana | $9,559,609.00 |
| Swinson, Craig Joseph | $1,500,000.00 |
| Toma, Michael | $7,500,000.00 |
| Wheeler, Danny | $5,000,000.00 |
| Young, Thomas D. | $1,500,000.00 |

### 3.     Claims Brought by Family Members of Deceased Servicemen

| | |
|---|---|
| Abbey, Lilla Woollett | $2,500,000.00 |
| Abbott, James | $5,000,000.00 |
| Abbott, Mary (Estate of) | $5,000,000.00 |
| Adams, Elizabeth | $2,500,000.00 |
| Ahlquist, Eileen Prindeville | $2,500,000.00 |
| Alarcon, Miralda (Judith Maitland) | $8,000,000.00 |
| Allman, Anne | $5,000,000.00 |
| Allman, Robert | $5,000,000.00 |
| Allman, Theodore (Estate of) | $2,500,000.00 |
| Allman, DiAnne Margaret ("Maggie") | $2,500,000.00 |
| Alvarez, Margaret E. | $2,500,000.00 |
| Angus, Kimberly F. | $2,500,000.00 |
| Bates, Donnie | $2,500,000.00 |
| Bates, Johnny | $2,500,000.00 |
| Bates, Laura | $5,000,000.00 |
| Bates, Margie | $5,000,000.00 |
| Bates, Monty | $2,500,000.00 |
| Bates, Thomas Jr. | $2,500,000.00 |
| Bates, Thomas C., Sr. | $5,000,000.00 |
| Baumgartner, Mary E. | $2,500,000.00 |
| Baynard, Anthony | $2,500,000.00 |
| Baynard, Barry | $2,500,000.00 |
| Baynard, Emerson | $2,500,000.00 |
| Baynard, Philip | $2,500,000.00 |
| Baynard, Thomasine | $8,000,000.00 |

| | |
|---|---|
| Baynard, Timothy | $2,500,000.00 |
| Baynard, Wayne | $2,500,000.00 |
| Baynard, Stephen | $5,000,000.00 |
| Beard, Anna | $2,500,000.00 |
| Beck, Mary Ann | $2,500,000.00 |
| Belmer, Alue | $5,000,000.00 |
| Belmer, Annette | $2,500,000.00 |
| Belmer, Clarence | $2,500,000.00 |
| Belmer, Colby Keith | $5,000,000.00 |
| Belmer, Denise | $2,500,000.00 |
| Belmer, Donna | $2,500,000.00 |
| Belmer, Faye | $8,000,000.00 |
| Belmer, Kenneth | $2,500,000.00 |
| Belmer, Luddie | $5,000,000.00 |
| Biellow, Shawn | $2,500,000.00 |
| Black, Mary Frances | $2,500,000.00 |
| Blankenship, Donald Jr. | $2,500,000.00 |
| Blankenship, Donald Sr. | $5,000,000.00 |
| Blankenship, Mary (Estate of) | $5,000,000.00 |
| Blocker, Alice | $5,000,000.00 |
| Blocker, Douglas | $2,500,000.00 |
| Blocker, John R. | $5,000,000.00 |
| Blocker, Robert | $2,500,000.00 |
| Boccia, James | $2,500,000.00 |
| Boccia, Joseph Sr. | $5,000,000.00 |
| Boccia, Patricia | $5,000,000.00 |
| Boccia, Raymond | $2,500,000.00 |
| Boccia, Richard | $2,500,000.00 |
| Boccia, Ronnie (Veronica) | $2,500,000.00 |
| Boddie, Leticia | $2,500,000.00 |
| Bohannon, Angela | $2,500,000.00 |
| Bohannon, Anthony | $2,500,000.00 |
| Bohannon, Carrie | $5,000,000.00 |
| Bohannon, David | $2,500,000.00 |
| Bohannon, Edna | $8,000,000.00 |
| Bohannon, Leon Sr. | $5,000,000.00 |
| Bohannon, Ricki | $2,500,000.00 |
| Bolinger, Billie Jean | $5,000,000.00 |
| Boulos, Joseph | $5,000,000.00 |
| Boulos, Lydia | $2,500,000.00 |
| Boulos, Marie | $5,000,000.00 |
| Bowler, Rebecca | $2,500,000.00 |
| Boyett, Lavon | $5,000,000.00 |
| Boyett, Norman E. Jr. (Estate of) | $5,000,000.00 |

| | |
|---|---|
| Boyett, Theresa U. Roth | $8,000,000.00 |
| Boyett, William A. | $2,500,000.00 |
| Breeden, Susan Schnorf | $2,500,000.00 |
| Briscoe, Damion | $2,500,000.00 |
| Brown, Christine | $5,000,000.00 |
| Brunette, Rosanne | $2,500,000.00 |
| Buckner, Mary Lynn | $8,000,000.00 |
| Burley, Claude (Estate of) | $5,000,000.00 |
| Burley, William Douglas (Estate of) | $2,500,000.00 |
| Burley, Myra | $2,500,000.00 |
| Calabro, Kathleen | $2,500,000.00 |
| Caldera, Rachel | $2,500,000.00 |
| Callahan, Avenell | $5,000,000.00 |
| Callahan, Michael | $2,500,000.00 |
| Calloway, Patricia (Patsy Ann) | $2,500,000.00 |
| Camara, Elisa Rock | $2,500,000.00 |
| Camara, Theresa Riggs | $2,500,000.00 |
| Campbell, Candace | $2,500,000.00 |
| Campus, Clare | $5,000,000.00 |
| Capobianco, Elaine | $2,500,000.00 |
| Carter, Florene Martin | $2,500,000.00 |
| Cash, Phyllis A. | $2,500,000.00 |
| Catano, Theresa | $2,500,000.00 |
| Ceasar, Bruce | $2,500,000.00 |
| Ceasar, Franklin | $2,500,000.00 |
| Ceasar, Fredrick | $2,500,000.00 |
| Ceasar, Robbie Nell | $5,000,000.00 |
| Ceasar, Sybil | $1,250,000.00 |
| Cecca, Christine Devlin | $2,500,000.00 |
| Chapman, Tammy | $2,500,000.00 |
| Cherry, James | $2,500,000.00 |
| Cherry, Sonia | $2,500,000.00 |
| Chios, Adele H. | $2,500,000.00 |
| Christian, Jana M. | $2,500,000.00 |
| Christian, Sharon Rose | $2,500,000.00 |
| Ciupaska, Susan | $2,500,000.00 |
| Clark, LeShune Stokes | $2,500,000.00 |
| Clark, Rosemary | $2,500,000.00 |
| Cobble, Mary Ann | $5,000,000.00 |
| Collard, Karen Shipp | $2,500,000.00 |
| Collier, Jennifer | $5,000,000.00 |
| Collier, Melia Winter | $8,000,000.00 |
| Coltrane, Deborah M. | $8,000,000.00 |
| Conley, James N. Jr. | $5,000,000.00 |

| | |
|---|---|
| Conley, Roberta Li | $5,000,000.00 |
| Cook, Charles F. | $5,000,000.00 |
| Cook, Elizabeth A. | $2,500,000.00 |
| Cook, Mary A. (Estate of) | $5,000,000.00 |
| Copeland, Alan Tracy | $2,500,000.00 |
| Copeland, Betty | $5,000,000.00 |
| Copeland, Donald | $5,000,000.00 |
| Corry, Blanche | $2,500,000.00 |
| Cosner, Harold | $5,000,000.00 |
| Cosner, Jeffrey | $2,500,000.00 |
| Cosner, Leanna | $5,000,000.00 |
| Cosner, Marva Lynn (Estate of) | $5,000,000.00 |
| Cossaboom, Cheryl | $2,500,000.00 |
| Coulman, Bryan Thomas | $2,500,000.00 |
| Coulman, Christopher J. | $2,500,000.00 |
| Coulman, Dennis P. | $2,500,000.00 |
| Coulman, Lorraine M. | $5,000,000.00 |
| Coulman, Robert D. | $2,500,000.00 |
| Coulman, Robert Louis | $5,000,000.00 |
| Covington, Charlita Martin | $5,000,000.00 |
| Crouch, Amanda | $5,000,000.00 |
| Crudale, Marie | $5,000,000.00 |
| Cyzick, Eugene | $2,500,000.00 |
| Dallachie, Lynn | $8,000,000.00 |
| Deal, Anne | $2,500,000.00 |
| Derbyshire, Lynn Smith | $2,500,000.00 |
| Desjardins, Theresa | $5,000,000.00 |
| Devlin, Christine | $5,000,000.00 |
| Devlin, Daniel | $2,500,000.00 |
| Devlin, Gabrielle | $2,500,000.00 |
| Devlin, Richard | $2,500,000.00 |
| Devlin, Sean | $2,500,000.00 |
| Donahue (Milano), Rosalie | $2,500,000.00 |
| Doray, Ashley | $5,000,000.00 |
| Doss, Rebecca | $2,500,000.00 |
| Dunnigan, Chester | $2,500,000.00 |
| Dunnigan, Elizabeth Ann | $2,500,000.00 |
| Dunnigan, Michael | $2,500,000.00 |
| Dunnigan, William | $2,500,000.00 |
| Dunnigan, Claudine | $5,000,000.00 |
| Edquist, Janice Thorstad | $2,500,000.00 |
| Ervin, Mary Ruth | $5,000,000.00 |
| Estes, Barbara | $5,000,000.00 |
| Estes, Charles | $5,000,000.00 |

| | |
|---|---|
| Estes, Frank | $2,500,000.00 |
| Fansler, Lori | $2,500,000.00 |
| Farthing, Angela Dawn | $2,500,000.00 |
| Ferguson, Arlington | $1,250,000.00 |
| Ferguson, Hilton | $1,250,000.00 |
| Fish, Linda Sandback | $8,000,000.00 |
| Fox, Nancy Brocksbank | $5,000,000.00 |
| Fox, Tia | $2,500,000.00 |
| Freshour, Tammy | $8,000,000.00 |
| Fulcher, Ruby | $5,000,000.00 |
| Gallagher, Barbara | $5,000,000.00 |
| Gallagher, Brian | $2,500,000.00 |
| Gallagher, James (Estate of) | $5,000,000.00 |
| Gallagher, James Jr. | $2,500,000.00 |
| Gallagher, Kevin | $2,500,000.00 |
| Gallagher, Michael | $2,500,000.00 |
| Gangur, Dimitri | $5,000,000.00 |
| Gangur, Mary | $5,000,000.00 |
| Garcia, Jess | $5,000,000.00 |
| Garcia, Ronald | $2,500,000.00 |
| Garcia, Roxanne | $2,500,000.00 |
| Garcia, Russell | $2,500,000.00 |
| Garcia, Violet | $5,000,000.00 |
| Garza, Suzanne Perron | $2,500,000.00 |
| Gattegno, Jeanne | $2,500,000.00 |
| Ghumm, Arlene | $8,000,000.00 |
| Ghumm, Ashley | $5,000,000.00 |
| Ghumm, Bill | $2,500,000.00 |
| Ghumm, Edward | $2,500,000.00 |
| Ghumm, Hildegard | $5,000,000.00 |
| Ghumm, Jedaiah (Estate of) | $5,000,000.00 |
| Ghumm, Jesse | $2,500,000.00 |
| Ghumm, Leroy | $5,000,000.00 |
| Ghumm, Moronica | $5,000,000.00 |
| Giblin, Donald | $2,500,000.00 |
| Giblin, Jeanne | $5,000,000.00 |
| Giblin, Michael | $2,500,000.00 |
| Giblin, Tiffany | $5,000,000.00 |
| Giblin, Valerie | $8,000,000.00 |
| Giblin, William | $2,500,000.00 |
| Gilford-Smith, Thad | $2,500,000.00 |
| Gintonio, Rebecca | $2,500,000.00 |
| Goff, Dawn | $2,500,000.00 |
| Gorchinski, Christina | $5,000,000.00 |

| | |
|---|---|
| Gorchinski, Judy | $8,000,000.00 |
| Gorchinski, Kevin | $5,000,000.00 |
| Gorchinski, Valerie | $5,000,000.00 |
| Gordon, Alice | $5,000,000.00 |
| Gordon, Joseph | $2,500,000.00 |
| Gordon, Linda | $2,500,000.00 |
| Gordon, Norris (Estate of) | $5,000,000.00 |
| Gordon, Paul | $2,500,000.00 |
| Grant, Andrea | $2,500,000.00 |
| Graves, Deborah | $2,500,000.00 |
| Green, Deborah | $8,000,000.00 |
| Gregg, Liberty Quirante | $2,500,000.00 |
| Griffin, Alex | $2,500,000.00 |
| Grimsley, Catherine E. | $2,500,000.00 |
| Gummer, Megan | $2,500,000.00 |
| Guz, Lyda Woollett | $2,500,000.00 |
| Hairston, Darlene | $8,000,000.00 |
| Hanrahan, Tara | $2,500,000.00 |
| Hart, Mary Clyde | $2,500,000.00 |
| Haskill, Brenda | $2,500,000.00 |
| Haskell, Jeffrey | $2,500,000.00 |
| Hedge, Kathleen S. | $8,000,000.00 |
| Helms, Christopher Todd | $2,500,000.00 |
| Helms, Marvin R. | $5,000,000.00 |
| Hester, Doris | $8,000,000.00 |
| Hildreth, Clifton | $5,000,000.00 |
| Hildreth, Julia | $5,000,000.00 |
| Hildreth, Mary Ann | $8,000,000.00 |
| Hildreth, Michael Wayne | $5,000,000.00 |
| Hilton, Sharon A. | $2,500,000.00 |
| Holberton, Donald | $2,500,000.00 |
| Holberton, Patricia Lee | $5,000,000.00 |
| Holberton, Thomas | $2,500,000.00 |
| Hollifield, Tangie | $2,500,000.00 |
| Horner, Debra | $8,000,000.00 |
| House, Elizabeth | $2,500,000.00 |
| Houston, Joyce A. | $5,000,000.00 |
| Howell, Tammy Camara | $8,000,000.00 |
| Hudson, Lisa H. | $8,000,000.00 |
| Hudson, Lorenzo | $2,500,000.00 |
| Hudson, Lucy | $5,000,000.00 |
| Hudson, Ruth | $2,500,000.00 |
| Hudson, Samuel (Estate of) | $5,000,000.00 |
| Hudson, William J. | $5,000,000.00 |

| | |
|---|---|
| Hugis, Susan Thorstad (Estate of) | $2,500,000.00 |
| Hurlburt, Nancy Tingley | $2,500,000.00 |
| Hurston, Cynthia Perron | $2,500,000.00 |
| Iacovino, Edward Sr. (Estate of) | $5,000,000.00 |
| Iacovino, Elizabeth | $5,000,000.00 |
| Innocenzi, Deborah | $8,000,000.00 |
| Innocenzi, Kristin | $5,000,000.00 |
| Innocenzi, Mark | $2,500,000.00 |
| Innocenzi, Paul IV | $5,000,000.00 |
| Jaccom, Bernadette | $2,500,000.00 |
| Jackowski, John Jr. | $2,500,000.00 |
| Jackowski, John Sr. | $5,000,000.00 |
| Jacobus, Victoria | $2,500,000.00 |
| James, Elaine | $5,000,000.00 |
| Jenkins, Nathalie C. | $5,000,000.00 |
| Jenkins, Stephen | $2,500,000.00 |
| Jewett, Rebecca | $2,500,000.00 |
| Johnson, Linda Martin | $2,500,000.00 |
| Johnson, Ray | $2,500,000.00 |
| Johnson, Rennitta Stokes | $2,500,000.00 |
| Johnson, Sherry | $5,000,000.00 |
| Johnston, Charles | $2,500,000.00 |
| Johnston, Edwin | $5,000,000.00 |
| Johnston, Mary Ann | $5,000,000.00 |
| Johnston, Zandra LaRiviere | $2,500,000.00 |
| Jones, Alicia | $2,500,000.00 |
| Jones, Corene Martin | $2,500,000.00 |
| Jones, Kia Briscoe | $2,500,000.00 |
| Jones, Mark | $2,500,000.00 |
| Jones, Ollie | $5,000,000.00 |
| Jones, Sandra D. | $5,000,000.00 |
| Jones, Synovure (Estate of) | $2,500,000.00 |
| Jordan, Robin Copeland | $2,500,000.00 |
| Jordan, Susan Scott | $2,500,000.00 |
| Julian, Joyce | $5,000,000.00 |
| Julian, Karl | $5,000,000.00 |
| Jurist, Nada | $2,500,000.00 |
| Keown, Adam | $2,500,000.00 |
| Keown, Bobby Jr. | $2,500,000.00 |
| Keown, Bobby Sr. | $5,000,000.00 |
| Keown, Darren | $2,500,000.00 |
| Keown, William | $2,500,000.00 |
| Kirker, Mary Joe | $2,500,000.00 |
| Kluck, Kelly | $2,500,000.00 |

-11-

| | |
|---|---|
| Kluck, Michael | $2,500,000.00 |
| Knipple, John D. (Estate of) | $5,000,000.00 |
| Knipple, John R. | $2,500,000.00 |
| Knipple, Pauline (Estate of) | $5,000,000.00 |
| Knox, Shirley L. | $2,500,000.00 |
| Kreischer, Doreen | $5,000,000.00 |
| Kreischer, Freas H. Jr. | $5,000,000.00 |
| Lake, Cynthia D. | $2,500,000.00 |
| Lange, Wendy L. | $2,500,000.00 |
| Langon, James III | $5,000,000.00 |
| LaRiviere, Eugene | $2,500,000.00 |
| LaRiviere, Janet | $5,000,000.00 |
| LaRiviere, John M. | $2,500,000.00 |
| LaRiviere, Lesley | $2,500,000.00 |
| LaRiviere, Michael | $2,500,000.00 |
| LaRiviere, Nancy | $2,500,000.00 |
| LaRiviere, Richard | $2,500,000.00 |
| LaRiviere, Richard G. (Estate of) | $5,000,000.00 |
| LaRiviere, Robert | $2,500,000.00 |
| LaRiviere, William | $2,500,000.00 |
| Lawton, Cathy L. | $2,500,000.00 |
| LeGault, Heidi Crudale | $8,000,000.00 |
| Lemnah, Clarence (Estate of) | $5,000,000.00 |
| Lemnah, Etta | $5,000,000.00 |
| Lemnah, Fay | $2,500,000.00 |
| Lemnah, Harold | $2,500,000.00 |
| Lemnah, Marlys | $8,000,000.00 |
| Lemnah, Robert | $2,500,000.00 |
| Lemnah, Ronald | $2,500,000.00 |
| Livingston, Annette R. | $8,000,000.00 |
| Livingston, Joseph R. IV | $5,000,000.00 |
| Livingston, Joseph R. Jr. (Estate of) | $5,000,000.00 |
| Lynch, Robin M. | $2,500,000.00 |
| Lyon, Earl | $2,500,000.00 |
| Lyon, Francisco | $2,500,000.00 |
| Lyon, June | $2,500,000.00 |
| Lyon, Maria | $5,000,000.00 |
| Lyon, Paul D. Sr. | $5,000,000.00 |
| Lyon, Valerie | $2,500,000.00 |
| Macroglou, Heather | $5,000,000.00 |
| Mahoney, Kathleen Devlin | $2,500,000.00 |
| Maitland, Kenty | $2,500,000.00 |
| Maitland, Leysnal | $5,000,000.00 |
| Maitland, Samuel Sr. | $5,000,000.00 |

| | |
|---|---|
| Maitland, Shirla | $2,500,000.00 |
| Marshall, Virginia Boccia | $2,500,000.00 |
| Martin, John | $2,500,000.00 |
| Martin, Pacita | $8,000,000.00 |
| Martin, Renerio | $5,000,000.00 |
| Martin, Ruby | $5,000,000.00 |
| Martin, Shirley | $5,000,000.00 |
| Mason, Mary | $5,000,000.00 |
| Massa, Cristina | $5,000,000.00 |
| Massa, Edmund | $2,500,000.00 |
| Massa, Joao ("John") | $2,500,000.00 |
| Massa, Jose ("Joe") | $2,500,000.00 |
| Massa, Manuel Jr. | $2,500,000.00 |
| Massa, Ramiro | $2,500,000.00 |
| McCall, Mary | $5,000,000.00 |
| McCall, Thomas (Estate of) | $5,000,000.00 |
| McCall, Valerie | $2,500,000.00 |
| McDermott, Gail | $2,500,000.00 |
| McFarlin, Julia A. | $2,500,000.00 |
| McMahon, George | $2,500,000.00 |
| McMahon, Michael | $2,500,000.00 |
| McPhee, Patty | $5,000,000.00 |
| Menkins, Darren | $2,500,000.00 |
| Menkins, Gregory | $2,500,000.00 |
| Menkins, Margaret | $5,000,000.00 |
| Menkins, Richard H. | $5,000,000.00 |
| Meurer, Jay T. | $2,500,000.00 |
| Meurer, John | $5,000,000.00 |
| Meurer, John Thomas | $2,500,000.00 |
| Meurer, Mary Lou | $5,000,000.00 |
| Meurer, Michael | $2,500,000.00 |
| Meyer, Penny | $2,500,000.00 |
| Milano, Angela | $5,000,000.00 |
| Milano, Peter Jr. | $5,000,000.00 |
| Miller, Earline | $5,000,000.00 |
| Miller, Henry | $2,500,000.00 |
| Miller, Patricia | $2,500,000.00 |
| Montgomery, Helen | $2,500,000.00 |
| Moore, Betty | $5,000,000.00 |
| Moore, Harry | $5,000,000.00 |
| Moore, Kimberly | $2,500,000.00 |
| Moore, Mary | $8,000,000.00 |
| Moore, Melissa Lea | $2,500,000.00 |
| Moore, Michael (Estate of) | $2,500,000.00 |

-13-

| | |
|---|---|
| Moy, Elizabeth Phillips | $2,500,000.00 |
| Myers, Debra | $2,500,000.00 |
| Myers, Geneva | $5,000,000.00 |
| Myers, Harry A. | $5,000,000.00 |
| Nairn, Billie Ann | $5,000,000.00 |
| Nairn, Campbell J. III | $2,500,000.00 |
| Nairn, Campbell J. Jr. (Estate of) | $5,000,000.00 |
| Nairn, William P. | $2,500,000.00 |
| Norfleet, Richard | $5,000,000.00 |
| O'Connor, Deborah | $2,500,000.00 |
| Olaniji, Pearl | $5,000,000.00 |
| Olson, Bertha (Estate of) | $5,000,000.00 |
| Olson, Karen L. | $2,500,000.00 |
| Olson, Randal D. | $2,500,000.00 |
| Olson, Roger S. | $2,500,000.00 |
| Olson, Ronald J. | $2,500,000.00 |
| Olson, Sigurd (Estate of) | $5,000,000.00 |
| Owens, David | $2,500,000.00 |
| Owens, Deanna | $2,500,000.00 |
| Owens, Frances | $5,000,000.00 |
| Owens, James (Estate of) | $5,000,000.00 |
| Owens, Steven | $2,500,000.00 |
| Page, Connie Mack | $5,000,000.00 |
| Page, Judith K. | $5,000,000.00 |
| Palmer, Lisa Menkins | $2,500,000.00 |
| Paolozzi, Geraldine | $2,500,000.00 |
| Pare, Maureen | $2,500,000.00 |
| Parker, Henry James | $2,500,000.00 |
| Parker, Sharon | $2,500,000.00 |
| Pearson, Helen M. | $5,000,000.00 |
| Pearson, John L. Jr. | $5,000,000.00 |
| Pearson, Sonia | $8,000,000.00 |
| Perron, Brett | $2,500,000.00 |
| Perron, Deborah Jean | $2,500,000.00 |
| Perron, Michelle | $2,500,000.00 |
| Perron, Ronald R. | $5,000,000.00 |
| Persky, Muriel | $5,000,000.00 |
| Peterson, Deborah D. | $2,500,000.00 |
| Petry, Sharon Conley | $2,500,000.00 |
| Petrick, Sandra | $2,500,000.00 |
| Phelps, Donna Vallone | $5,000,000.00 |
| Phillips, Harold | $2,500,000.00 |
| Phillips, John Arthur Sr. | $5,000,000.00 |
| Plickys, Donna Tingley | $2,500,000.00 |

-14-

| | |
|---|---|
| Pollard, Margaret Aileen | $8,000,000.00 |
| Pollard, Stacey Yvonne | $5,000,000.00 |
| Prevatt, Lee Hollan | $2,500,000.00 |
| Prevatt, Victor Thornton | $5,000,000.00 |
| Price, John | $5,000,000.00 |
| Price, Joseph | $2,500,000.00 |
| Prindeville, Barbara D. (Estate of) | $5,000,000.00 |
| Prindeville, Kathleen Tara | $2,500,000.00 |
| Prindeville, Michael | $2,500,000.00 |
| Prindeville, Paul | $5,000,000.00 |
| Prindeville, Sean | $2,500,000.00 |
| Quirante, Belinda J. | $5,000,000.00 |
| Quirante, Edgar | $2,500,000.00 |
| Quirante, Godofredo (Estate of) | $5,000,000.00 |
| Quirante, Milton | $2,500,000.00 |
| Quirante, Sabrina | $2,500,000.00 |
| Ray, Susan | $2,500,000.00 |
| Reininger, Laura M. | $2,500,000.00 |
| Richardson, Alan | $2,500,000.00 |
| Richardson, Beatrice | $5,000,000.00 |
| Richardson, Clarence | $5,000,000.00 |
| Richardson, Eric | $2,500,000.00 |
| Richardson, Lynette | $2,500,000.00 |
| Richardson, Vanessa | $2,500,000.00 |
| Richardson-Mills, Philiece | $5,000,000.00 |
| Ricks, Melrose | $5,000,000.00 |
| Riva, Belinda Quirante | $2,500,000.00 |
| Rockwell, Barbara | $5,000,000.00 |
| Rooney, Linda | $2,500,000.00 |
| Rose, Tara Smith | $2,500,000.00 |
| Ruark, Tammi | $2,500,000.00 |
| Rudkowski, Juliana | $2,500,000.00 |
| Russell, Marie McMahon | $2,500,000.00 |
| Sanchez, Alicia Lynn | $5,000,000.00 |
| Sauls, Andrew | $2,500,000.00 |
| Sauls, Henry Caleb | $2,500,000.00 |
| Sauls, Riley A. | $2,500,000.00 |
| Schnorf, Margaret Medler | $5,000,000.00 |
| Schnorf, Richard (brother) | $2,500,000.00 |
| Schnorf, Richard (father) | $5,000,000.00 |
| Schnorf, Robert | $2,500,000.00 |
| Schultz, Beverly | $5,000,000.00 |
| Schultz, Dennis James | $2,500,000.00 |
| Schultz, Dennis Ray | $5,000,000.00 |

| | |
|---|---|
| Scialabba, Frank | $5,000,000.00 |
| Scialabba, Jacqueline | $8,000,000.00 |
| Scialabba, Samuel Scott | $5,000,000.00 |
| Scott, Jon Christopher | $2,500,000.00 |
| Scott, Kevin James | $2,500,000.00 |
| Scott, Larry L. (Estate of) | $5,000,000.00 |
| Scott, Mary Ann | $5,000,000.00 |
| Scott, Sheria | $2,500,000.00 |
| Scott, Stephen Allen | $2,500,000.00 |
| Seguerra, Jacklyn | $2,500,000.00 |
| Shipp, Bryan Richard | $5,000,000.00 |
| Shipp, James David | $2,500,000.00 |
| Shipp, Janice | $2,500,000.00 |
| Shipp, Maurice | $2,500,000.00 |
| Shipp, Pauline | $8,000,000.00 |
| Shipp, Raymond Dennis | $2,500,000.00 |
| Shipp, Russell | $2,500,000.00 |
| Sinsioco, Susan J. | $2,500,000.00 |
| Smith-Ward, Ana | $8,000,000.00 |
| Smith, Angela Josephine (Estate of) | $5,000,000.00 |
| Smith, Bobbie Ann | $5,000,000.00 |
| Smith, Cynthia | $2,500,000.00 |
| Smith, Donna Marie | $2,500,000.00 |
| Smith, Erma | $2,500,000.00 |
| Smith, Holly | $2,500,000.00 |
| Smith, Ian | $5,000,000.00 |
| Smith, Janet | $2,500,000.00 |
| Smith, Joseph K. III | $2,500,000.00 |
| Smith, Joseph K. Jr. | $5,000,000.00 |
| Smith, Keith | $5,000,000.00 |
| Smith, Kelly B. | $2,500,000.00 |
| Smith, Shirley L. | $5,000,000.00 |
| Smith, Tadgh | $2,500,000.00 |
| Smith, Terrence | $2,500,000.00 |
| Smith, Timothy B. | $2,500,000.00 |
| Sommerhof, Jocelyn J. | $5,000,000.00 |
| Sommerhof, John | $2,500,000.00 |
| Sommerhof, William J. | $5,000,000.00 |
| Spencer, Douglas | $2,500,000.00 |
| Stelpflug, Christy Williford | $2,500,000.00 |
| Stelpflug, Joseph | $2,500,000.00 |
| Stelpflug, Kathy Nathan | $2,500,000.00 |
| Stelpflug, Laura Barfield | $2,500,000.00 |
| Stelpflug, Peggy | $5,000,000.00 |

-16-

| | |
|---|---|
| Stelpflug, William | $5,000,000.00 |
| Stephens, Horace Sr. | $5,000,000.00 |
| Stephens, Joyce | $5,000,000.00 |
| Stephens, Keith | $2,500,000.00 |
| Stockton, Dona | $5,000,000.00 |
| Stockton, Donald (Estate of) | $5,000,000.00 |
| Stockton, Richard | $2,500,000.00 |
| Stokes, Irene | $5,000,000.00 |
| Stokes, Nelson Jr. | $2,500,000.00 |
| Stokes, Nelson Sr. (Estate of) | $5,000,000.00 |
| Stokes, Robert | $2,500,000.00 |
| Stokes-Graham, Gwenn | $2,500,000.00 |
| Sturghill, Marcus D. | $2,500,000.00 |
| Sturghill, Marcus L. Jr. | $5,000,000.00 |
| Sturghill, NaKeisha Lynn | $2,500,000.00 |
| Sundar, Doreen | $8,000,000.00 |
| Tella, Margaret | $2,500,000.00 |
| Terlson, Susan L. | $2,500,000.00 |
| Thompson, Mary Ellen | $2,500,000.00 |
| Thorstad, Adam | $5,000,000.00 |
| Thorstad, Barbara | $5,000,000.00 |
| Thorstad, James Jr. | $2,500,000.00 |
| Thorstad, James Sr. | $5,000,000.00 |
| Thorstad, John | $2,500,000.00 |
| Thorstad, Ryan | $5,000,000.00 |
| Thurman, Betty Ann | $2,500,000.00 |
| Tingley, Barbara | $5,000,000.00 |
| Tingley, Richard L. | $5,000,000.00 |
| Tingley, Russell | $2,500,000.00 |
| Tolliver, Keysha | $5,000,000.00 |
| Turek, Mary Ann | $5,000,000.00 |
| Valenti, Karen | $5,000,000.00 |
| Vallone, Anthony | $2,500,000.00 |
| Vallone, Donald H. | $5,000,000.00 |
| Vallone, Timothy | $2,500,000.00 |
| Vargas, Leona Mae | $2,500,000.00 |
| Voyles, Denise | $2,500,000.00 |
| Wallace, Ila | $5,000,000.00 |
| Wallace, Kathryn Thorstad | $2,500,000.00 |
| Wallace, Richard J. | $2,500,000.00 |
| Warwick, Barbara Thorstad | $2,500,000.00 |
| Washington, Linda | $2,500,000.00 |
| Washington, Vancine | $2,500,000.00 |
| Watson, Kenneth | $2,500,000.00 |

-17-

| | |
|---|---|
| Whitener, Diane | $2,500,000.00 |
| Wigglesworth, Daryl | $2,500,000.00 |
| Wigglesworth, Darrin A. | $2,500,000.00 |
| Wigglesworth, Henry | $5,000,000.00 |
| Wigglesworth, Mark | $2,500,000.00 |
| Wigglesworth, Robyn | $2,500,000.00 |
| Wigglesworth, Sandra | $5,000,000.00 |
| Wigglesworth, Shawn | $2,500,000.00 |
| Williams, Dianne Stokes | $2,500,000.00 |
| Williams, Gussie Martin | $2,500,000.00 |
| Williams, Janet | $5,000,000.00 |
| Williams, Johnny | $2,500,000.00 |
| Williams, Rhonda | $2,500,000.00 |
| Williams, Ronald | $2,500,000.00 |
| Williams, Ruth | $5,000,000.00 |
| Williams, Scipio J. | $5,000,000.00 |
| Williams, Wesley | $5,000,000.00 |
| Williams-Edwards, Delma | $2,500,000.00 |
| Williamson, Tony | $2,500,000.00 |
| Williamson, Jewelene | $5,000,000.00 |
| Winter, Michael | $5,000,000.00 |
| Wiseman, Barbara | $8,000,000.00 |
| Woodford, Phyllis | $2,500,000.00 |
| Woodle, Joyce | $2,500,000.00 |
| Woollett, Beverly | $5,000,000.00 |
| Woollett, Paul | $5,000,000.00 |
| Wright, Melvina Stokes | $2,500,000.00 |
| Wright, Patricia | $5,000,000.00 |
| Wyche, Glenn | $2,500,000.00 |
| Wyche, John | $2,500,000.00 |
| Young, John F. | $5,000,000.00 |
| Young, John W. | $2,500,000.00 |
| Young, Judith Carol | $5,000,000.00 |
| Young, Sandra Rhodes | $5,000,000.00 |
| Zimmerman, Joanne | $2,500,000.00 |
| Zone, Stephen Thomas | $2,500,000.00 |
| Zosso, Patricia Thorstad | $2,500,000.00 |

4.    *Claims Brought by Family Members of Injured Servicemen*

| | |
|---|---|
| Ali, Jamaal Muata | $1,250,000.00 |
| Angeloni, Margaret | $1,250,000.00 |
| Arroyo, Jesus | $1,250,000.00 |
| Arroyo, Milagros | $1,250,000.00 |

| | |
|---|---|
| Carletta, Olympia | $2,500,000.00 |
| Carpenter, Kimberly | $4,000,000.00 |
| Comes, Joan | $2,500,000.00 |
| Comes, Patrick | $1,250,000.00 |
| Comes, Christopher | $1,250,000.00 |
| Comes, Frank Sr. | $2,500,000.00 |
| Crawford, Deborah | $1,250,000.00 |
| Davis, Barbara | $4,000,000.00 |
| Franklin, Alice Warren | $1,250,000.00 |
| Gerlach, Patricia | $4,000,000.00 |
| Gerlach, Travis | $2,500,000.00 |
| Gerlach, Megan | $2,500,000.00 |
| Hernandez, Arminda | $1,250,000.00 |
| Hlywiak, Margaret | $2,500,000.00 |
| Hlywiak, Peter Jr. | $1,250,000.00 |
| Hlywiak, Peter Sr. | $2,500,000.00 |
| Hlywiak, Paul | $1,250,000.00 |
| Hlywiak, Joseph | $1,250,000.00 |
| Hunt, Cynthia Lou | $4,000,000.00 |
| Ibarro, Rosa | $2,500,000.00 |
| Jacobs, Andrew Scott | $2,500,000.00 |
| Jacobs, Daniel Joseph | $2,500,000.00 |
| Jacobs, Danita | $4,000,000.00 |
| Kirkpatrick, Kathleen | $4,000,000.00 |
| Lewis, Grace | $2,500,000.00 |
| Magnotti, Lisa | $1,250,000.00 |
| Mitchell, Wendy | $4,000,000.00 |
| Moore, James Otis (Estate of) | $1,250,000.00 |
| Moore, Johnney S. (Estate of) | $2,500,000.00 |
| Moore, Marvin S. | $1,250,000.00 |
| Moore, Alie Mae | $2,500,000.00 |
| Moore-Jones, Jonnie Mae | $1,250,000.00 |
| Nashton, Alex W. (Estate of) | $2,500,000.00 |
| Oliver, Paul | $2,500,000.00 |
| Oliver, Riley | $2,500,000.00 |
| Oliver, Michael John | $2,500,000.00 |
| Oliver, Ashley E. | $2,500,000.00 |
| Oliver, Patrick S. | $2,500,000.00 |
| Oliver, Kayley | $2,500,000.00 |
| Russell, Tanya | $2,500,000.00 |
| Russell, Wanda | $4,000,000.00 |
| Russell, Jason | $2,500,000.00 |
| Shaver, Clydia | $1,250,000.00 |
| Spaulding, Scott | $1,250,000.00 |

-19-

| | |
|---|---|
| Stanley, Cecilia | $2,500,000.00 |
| Stilpen, Mary | $1,250,000.00 |
| Swank, Kelly | $1,250,000.00 |
| Swinson, Kenneth J. (Estate of) | $2,500,000.00 |
| Swinson, Ingrid M. (Estate of) | $2,500,000.00 |
| Swinson, Daniel | $1,250,000.00 |
| Swinson, William | $1,250,000.00 |
| Swinson, Dawn | $1,250,000.00 |
| Swinson, Teresa | $1,250,000.00 |
| Warren, Bronzell | $1,250,000.00 |
| Watson, Jessica | $1,250,000.00 |
| Webb, Audrey | $1,250,000.00 |
| Wheeler, Jonathan | $2,500,000.00 |
| Wheeler, Benjamin | $2,500,000.00 |
| Wheeler, Marlis "Molly" (Estate of) | $2,500,000.00 |
| Wheeler, Kerry | $1,250,000.00 |
| Wheeler, Andrew | $2,500,000.00 |
| Wheeler, Brenda June | $4,000,000.00 |
| Wold, Jill | $1,250,000.00 |
| Young, Nora (Estate of) | $2,500,000.00 |
| Young, James | $1,250,000.00 |
| Young, Robert (Estate of) | $2,500,000.00 |

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are

hereby DISMISSED WITHOUT PREJUDICE:

Albright, Marvin Jr.
Albright, Mirequrn
Albright, Shertara
Banks, Anthony (son)
Banks, Michael
Banks, Taiarra
Berry, Lori
Burnette, Christopher
Burnette, Gwen
Camara, Mecot Jr.
Comes, Dale
Comes, Tommy
Crop, Kimberly
Decker, Connie
Dolphin, Erin
Douglass, Frederick (Estate of)
Eaves, Christopher

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA 94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA 94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11
   DEBORAH D. PETERSON, Personal    )    CASE NO. 3:08-mc-80030-JSW
12 Representative of the Estate of James C. )
   Knipple (Dec.), et al.,          )
13                                   )    PROOF OF SERVICE
             Plaintiffs,            )
14                                   )
   vs.                              )
15                                   )
   ISLAMIC REPUBLIC OF IRAN, et al., )
16                                   )
             Defendants.           )
17 _____ )

18
   *Via Email dr-ahmadinejad@president.ir*     ISLAMIC REPUBLIC OF IRAN
19 PRESIDENT DR. AHMADINEJAD                   Khomeini Avenue
                                               United Nations Street
20 ISLAMIC REPUBLIC OF IRAN                    Teheran, Iran
   acting through its                          ATTN: Responsible Officer
21 MINISTRY OF DEFENSE AND
   SUPPORT FOR ARMED FORCES                    IRAN AIR
22 No. 1 Shahid Kaboli Street                  No.221.Second Floor,Public Relations.
   Beginning of Resalat Highway               Support Services Bld.
23 Seyyed Khandan Bridge                       IranAir H.Q.
   P.O. Box 16765-1479                         Mehrabad Airport
24 Tehran, Iran                                Tehran, Iran
   Attn: Responsible Officer                   E-mail: PR@IranAir.com
25
   ISLAMIC REPUBLIC OF IRAN
26 Pasadaran Avenue
   Golestan Yekom
27 Teheran, Iran
   ATTN: Responsible Officer
28

1    I declare:

2    I am employed in the County of San Francisco, California. I am over the age of eighteen
(18) years and not a party to the within cause. My business address is 165 Fell Street. San
3    Francisco, CA 94102. On the date set forth below, I served the attached:

4    NOTICE OF MOTION AND MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT
TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[LANDING RIGHTS]**

5
    MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND
6    F.R.C.P. 69(a) **[LANDING RIGHTS]**

7    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
8    **[LANDING RIGHTS]**

9    DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR
ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
10   **[LANDING RIGHTS]**

11   on the above-named person(s) by:

12   __XXX__   (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage
thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
13   person(s) served above.

14   __XXX__   (BY EMAIL) Emailing addressed to the person's/company's email address listed
above.
15
    I declare under penalty of perjury that the foregoing is true and correct.
16
    Executed on April 25, 2008.
17

18                              __/s/   Karene Jen_____
                                        Karene Jen
19

20

21

22

23

24

25

26

27

28