**EXHIBIT "A"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEBORAH D. PETERSON,<br>    Personal Representative of<br>    the Estate of James C. Knipple,<br>    et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>    et al.,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 01-2094 (RCL) |
| JOSEPH AND MARIE BOULOS,<br>    Personal Representatives of the<br>    Estate of Jeffrey Joseph Boulos,<br>    et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br>    et al.,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **FILED**<br><br>MAY 3 0 2003<br><br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT<br><br>Civil Action No. 01-2684 (RCL) |

## MEMORANDUM OPINION

These actions arise from the most deadly state-sponsored terrorist attack made against American citizens prior to September 11, 2001: the Marine barracks bombing in Beirut, Lebanon on October 23, 1983. In the early morning hours of that day, 241 American servicemen were murdered in their sleep by a suicide bomber. On that day, an unspeakable horror invaded the

1

lives of those who survived the attack and the family members whose loved ones had been stolen from them. The memory of that horror continues to this day.

On March 17-18, 2003, this Court conducted a bench trial to determine the liability of the defendants for this inhuman act. Having reviewed the extensive evidence presented during that trial by both lay and expert witnesses, the Court has determined that the plaintiffs have established their right to obtain judicial relief against the defendants. The Court's findings of fact and conclusions of law are set forth below.

## I. PROCEDURAL BACKGROUND

The plaintiffs in these two actions are family members of the 241 deceased servicemen (hereafter, "the servicemen") and the injured survivors of the attack. Plaintiffs have brought these actions in their own right, as administrators of the estates of the servicemen, and on behalf of the servicemen's heirs-at-law. All decedents and injured survivors of the attack were serving in the U.S. armed forces at the time of their injuries or death. All plaintiffs are nationals of the United States.[1]

On October 3 and December 28, 2001, plaintiffs filed separate complaints with this

---

[1] In an action under the Foreign Sovereign Immunities Act ("FSIA") for claims based on personal injury or death resulting from an act of state-sponsored terrorism, either the claimant or the victim must be an American national. See 28 U.S.C. § 1605(a)(7)(B)(ii). Although during the bench trial, the Court only received testimony that identified one of the decedents, James R. Knipple, as an American national, plaintiffs' counsel has represented that each and every service member injured or killed on October 23, 1983, or a beneficiary of that service member, is a national of the United States. The Court's findings are therefore subject to proof of American nationality during the damages phase of these proceedings. This may be accomplished either though direct testimony of any competent witness, or through the submission of relevant documentation.

2

Court. The complaints included statutory claims for wrongful death and common-law claims for battery, assault, and intentional infliction of emotional distress, all resulting from an act of state-sponsored terrorism. Plaintiffs sought relief in the form of compensatory and punitive damages. Although defendants were served with the two complaints on May 6 and July 17, 2002, defendants failed to file any response to either complaint, and on December 18, 2002, this Court entered defaults against defendants in both cases.

However, despite the entries of default, this Court is required to make a further inquiry prior to entering any judgment against defendants. FSIA mandates that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e); see also Flatow v. The Islamic Republic of Iran, 999 F. Supp. 1, 6 (D.D.C. 1998). As in Flatow, the Court will require plaintiffs to establish their right to relief by clear and convincing evidence. The "clear and convincing" standard of proof is the standard required in the District of Columbia to support a claim for punitive damages, and is sufficient to establish a prima facie case in a contested proceeding.

## II. FINDINGS OF FACT

As stated above, this Court received testimony from plaintiffs on March 17 and 18, 2003, defendants having failed to enter an appearance. The Court now enters its findings of fact, based upon the sworn testimony and documentary evidence presented during the March trial, and received in accordance with the Federal Rules of Evidence. This Court finds these facts to be established by clear and convincing evidence.

3

A.  Historical Background[2]

The Republic of Lebanon is a mountainous country of approximately 3,800,000 people bordered by Israel, Syria, and the eastern shore of the Mediterranean Sea. Although it contains some of the oldest human settlements in the world, including the Phoenician port cities of Tyre and Sidon, it did not become an independent nation until 1944.

Lebanon did not participate militarily in the 1967 and 1973 Arab-Israeli wars. However, by 1973, approximately one out of every ten person living in Lebanon was a Palestinian refugee, many of whom supported the efforts of the Palestine Liberation Organization (PLO) against Israel. Some of these refugees engaged in guerilla warfare and terrorist activity against Israel from bases established in southern Lebanon. Beginning in 1968, Israel engaged in reprisals against these Palestinian strongholds in southern Lebanon. In 1975, civil war broke out in Lebanon between its Muslim inhabitants and Palestinian refugees, who supported the PLO, and its Christian inhabitants, who opposed the PLO's actions. The war would not come to a complete end for another fifteen years, during which approximately twenty thousand Lebanese were killed, and approximately the same number of Lebanese were wounded.

B.  The Arrival of the 24th Marine Amphibious Unit

In late 1982, with the concurrence of the United Nations, a multinational peacekeeping coalition consisting of American, British, French, and Italian soldiers arrived in the Lebanese capital of Beirut. In May of 1983, the 24th Marine Amphibious Unit of the U.S. Marines ("the

---

[2] The Court has taken judicial notice of the facts contained in the following subsection, pursuant to Rule 201 of the Federal Rules of Civil Procedure.

4

24th MAU") joined this coalition.[3] The rules of engagement issued to the servicemen of the 24th MAU made clear that the servicemen possessed neither combatant nor police powers. In fact, under the rules, the servicemen were ordered not to carry weapons with live rounds in their chambers, and were not authorized to chamber the rounds in their weapons unless (1) they were directly ordered to do so by a commissioned officer or (2) they found themselves in a situation requiring the immediate use of deadly force in self-defense.[4] As pointed out during trial, the

---

[3] A Marine Amphibious Unit (now "Marine Expeditionary Unit") is a combined air / ground force unit of approximately two thousand U.S. Marines. See Marine Expeditionary Units, at http://www.usmc.mil/marinelink/ind.nsf/meus.

[4] In the present context, "rules of engagement" are directions issued by a competent military authority that set out the limitations and circumstances under which the forces under its command may initiate and prosecute combat engagement with other forces that they encounter. Following are the rules of engagement that were issued to the members of the 24th MAU:

1. When on post, mobile or foot patrol, keep loaded magazine in weapon, bolt closed, weapon on safe, no round in the chamber.

2. Do not chamber a round unless told to do so by a commissioned officer unless you must act in immediate self-defense where deadly force is authorized.

3. Keep ammo for crew-served weapons readily available, but not loaded. Weapon is on safe.

4. Call local forces [LAF] to assist in self-defense effort. Notify headquarters.

5. Use only minimum degree of force to accomplish any mission.

6. Stop the use of force when it is no longer needed to accomplish the mission.

7. If you receive effective hostile fire, direct your fire at the source. If possible, use friendly snipers.

8. Respect civilian property; do not attack it unless absolutely necessary to protect friendly forces.

9. Protect innocent civilians from harm.

5

members of the 24th MAU were more restricted in their use of force than an ordinary U.S. citizen walking down a street in Washington, D.C.

The restrictive rules of engagement are consistent with the testimony of Col. Timothy Geraghty, the commander of the 24th MAU, about the mission of the multinational peacekeeping force:

> [E]ssentially what it was, it was primarily a peacekeeping mission and it was to show [our] presence, and when I say ours, and this is throughout all the forces, is that we were out showing a presence, [primarily] to provide stability to the area. And I might add that there's no doubt in just about anyone involved at the time, we saved a lot of lives by our presence there for awhile. And that was part of, I might add, in my judgment, the success of that, our presence mission there, and [that] it was working is the primary reason why we were targeted. . . .
> The rules – these were geared primarily again with the peacekeeping mission [in mind] and the sensitivities of killing or maiming someone accidentally. That could be a tinderbox. That could start a whole chain of events.

Col. Geraghty further testified that the location and security of the 24th MAU's position was not tactical in nature, and was only acceptable to the commanding officer in the context of the unit's mission to "provide a presence."

Based on the testimony of Col. Geraghty and other witnesses, the Court finds that on October 23, 1983, the members of the 24th MAU, and the service members supporting the unit,

---

10. Respect and protect recognized medical agencies such as Red Cross, Red Crescent, etc.

These ten rules were printed on cards distributed to every service member of the 24th MAU and were discussed at length with every member.

6

were clearly non-combatants operating under peacetime rules of engagement.[5]

    C.   The Iranian Government and the October 23 Attack[6]

Following the 1979 revolution spearheaded by the Ayatollah Ruhollah Khomeini, the nation of Iran was transformed into an Islamic theocracy. The new government promptly drafted a constitution, which is still in effect today. The preamble to the 1979 constitution sets forth the mission of the post-revolutionary Iranian state:

> The mission of the Constitution is to realize the ideological objectives of the movement and to create conditions conducive to the development of man in accordance with the noble and universal values of Islam.
>     With due attention to the Islamic content of the Iranian Revolution, the Constitution provides the necessary basis for ensuring the continuation of the Revolution at home and abroad. In particular, in the development of international relations, the Constitution will strive with other Islamic and popular movements to prepare the way for the formation of a single world community . . . to assure the continuation of the struggle for the liberation of all deprived and oppressed peoples in the world.

The post-revolutionary government in Iran thus declared its commitment to spread the goals of the 1979 revolution to other nations. Towards that end, between 1983 and 1988, the government of Iran spent approximately $50 to $150 million financing terrorist organizations in the Near East.[7] One of the nations to which the Iranian government directed its attention was the war-torn

---

[5] It should also be noted that the death certificates issued for the victims of the October 23, 1983 attack did not represent that the victims were killed in action. Instead, the cause of death was listed as "terrorist attack."

[6] The facts contained in the following subsection are based on the trial testimony of Dr. Reuven Paz, director of the Project for the Research of Islamist Movements in Herzliya, Israel, and Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy.

[7] Since January 19, 1984, Iran has been designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j). This designation arose in part as a result of the October 23, 1983 attack.

7

republic of Lebanon.

"Hezbollah" is an Arabic word meaning "the party of God." It is also the name of a group of Shi'ite Muslims in Lebanon that was formed under the auspices of the government of Iran. Hezbollah began its existence as a faction within a group of moderate Lebanese Shi'ites known as Amal. Following the 1982 Israeli invasion of Lebanon, the Iranian government sought to radicalize the Lebanese Shi'ite community, and encouraged Hezbollah to split from Amal. Having established the existence of Hezbollah as a separate entity, the government of Iran framed the primary objective of Hezbollah: to engage in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran.

During the March trial in these cases, Dr. Patrick Clawson, a widely-renowned expert on Iranian affairs over the past 25 years, testified that in 1983, Hezbollah was a creature of the Iranian government:

> Both from the accounts of Hezbollah members and from the accounts of the Iranians and of every academic study that I'm aware of, certainly at this time, Hezbollah is largely under Iranian orders. It's almost entirely acting at the – under the order of the Iranians and being financed almost entirely by the Iranians. It comes to be an organization with Lebanese roots and Lebanese activities and more independence from Iran, but that's years past this time frame.

\* \* \* \* \* \* \* \* \* \* \*

THE COURT: In the '83 time frame, it was essentially a tool of Iran.

THE WITNESS: Correct, sir. Indeed, both Iranian and Lebanese observers have described it as being established at Iran's orders and as being a creature of Iran when it began. Hezbollah leaders today will sometimes describe that as the roots of their party and say that it has evolved away from being that.

Q: Was there any other major means of support for Hezbollah other than the Islamic Republic of Iran?

8

A:    Not at this time, no, sir.[8]

Dr. Clawson's testimony was corroborated by Dr. Reuven Paz,[9] who has researched Islamist terrorist groups for the last 25 years:

Q:    Now, as of the time of this attack, in October 1983, to what extent was Hezbollah, at that precise moment, dependent upon the support of Iran, and particularly the Iranian Revolutionary Guards, who had been brought in in order to carry out any type of major [military] operation?

A:    Well, I would say that they were, at that time, totally relied upon, the Iranian support. We are talking about composing a new group, of Hezbollah, out of people who had very little military experience. They were members, before '82, in groups that actually did not deal with military issues or terrorism. And most of the members during this process of unification that created Hezbollah started to be trained in training camps in the Bekaa Valley, where the main Iranian forces were located.

\* \* \* \* \* \* \* \* \* \* \*

Q:    Do you have an opinion, within a reasonable degree of certainty, as an expert on Islamist terrorism, whether this attack was carried out by Hezbollah, in response to the order which was the subject of the communications intercept in late September 1983?

A:    Yes, especially at that time – even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon and [against] Israel.

Q:    Do you have an opinion, again within a reasonable degree of certainty, as an expert in Islamist terrorist groups, as to whether Hezbollah, at that time, the fall of 1983, would have had the capacity to carry out an attack of the dimension of the

---

[8] Dr. Michael Ledeen, a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, testified at trial that "Iran invented, created, funded, trained, and runs to this day Hezbollah, which is arguably the world's most dangerous terrorist organization."

[9] Dr. Paz is the director of the Project for the Research of Islamist Movements and a senior research fellow at The International Policy Institute for Counterterrorism, both of which are based in Herzliya, Israel.

9

attack around the Marine barracks, in the absence of Iranian scientific, financial, and material assistance?

A: No, I don't think they could have carried out such an attack without Iranian training, without Iranian – Iranian supply of the explosives even, and without directions from the Iranian forces in Lebanon itself.[10]

\* \* \* \* \* \* \* \* \* \* \*

Q: Dr. Paz, can you describe the – the source of – of this technique of suicide bombing, which was used in the attack on the Marine barracks and since, unfortunately, many other incidents?

A: Yes, this – this modus operandi actually was initiated in Iran and it was – it was not, at that time, used in anywhere in – in the Sunni Muslim world. It was at that time a Shi'ite ideology of self-sacrifice by suicide bombing. It started during the Iran-Iraq war in the '80s, and then under Iranian training and influence and instructions, it started as a modus operandi of terrorist groups – first in Lebanon, by Hezbollah, and then later on it moved to the Palestinian arena, mainly during the '90s.

It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities. The primary agency through which the Iranian government both established and exercised operational control over Hezbollah was the Iranian Ministry of Information and Security ("MOIS"). MOIS had formerly served as the secret police of the Shah of Iran prior to his overthrow in 1979. Despite the revolutionary government's complete break with the old regime, it did not disband MOIS, but

---

[10] Robert Baer, a case officer in the Directorate of Operations of the CIA from 1976-97, testified at trial that "Hezbollah wasn't 'formally' created until 1985. What happened was before it was a bunch of agents of Iran. But none of these agents, based on our intelligence, which was ... outstanding, were operating on their own. One time there was a case where a Hezbollah member went out and kidnapped some children. But that was done independently, and the moment he was caught, he was executed by Hezbollah because he wasn't operating with authority from Iran."

10

instead allowed it to continue its operations as the intelligence organization of the new government. Based on the evidence presented at trial, the Court finds that MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided explosives to Hezbollah and, at all times relevant to these proceedings, exercised operational control over Hezbollah.

It is clear that MOIS was no rogue agency acting outside of the control and authority of the Iranian government. Indeed, as Dr. Clawson testified at trial, the October 23 attack would have been impossible without the express approval of Iranian government leaders at the highest level:

> Q: In the fall of 1983, was there anything of a significant nature, and especially a terrorist attack the dimensions of the attack on the Marine barracks of October 23rd, 1983, which would or could have been undertaken by Hezbollah without material support from Iran?
>
> A: Iran's material support would have been absolutely essential for any activities at that time, and furthermore. the politics of the organization [was such] that no one in the organization would have thought about carrying out an activity without Iranian approval and almost certainly Iranian orders.
>
> Q: Is that opinion within a reasonable degree of certainty as an expert on Iran?
>
> A: Oh, absolutely, sir.
>
> Q: Would any operation such as the October 23rd, 1983 attack require the approval within Iran of the Ministry of Information and Security?
>
> Q: Yes, sir.
>
> A: What about Mr. Rafsanjani?
>
> Q: There would have been a discussion in the National Security Council which would involve the prime minister, Mr. Rafsanjani, and it would also have required the approval of Iran's supreme religious leader, Ayatollah Khomeini. We have

11

many detailed accounts about the approval process from other attacks at this time, and, indeed, from a number of Iranians who became disillusioned within this process and later left.

Q: Doctor, your opinion within a reasonable degree of certainty as an expert on Iran, what was the foreign policy objective of the October 23rd, 1983, attack and other like attacks by Iran during this period?

A: Both to end the Western, especially the American presence in Lebanon, and to establish Iran's image as the leader of the world's radical, anti-Western, anti-American Muslim movement.

The two officials named by Dr. Clawson, the Ayatollah Ruhollah Khomeini and Ali Akbar Hashemi Rafsanjani, were high government officials in the Iranian government, occupying the positions of Supreme Leader and President.[11] The approval of both the Ayatollah Khomeini and President Rafsanjani was absolutely necessary to carry out the continuing economic commitment of Iran to Hezbollah, and to execute the October 23 attack. Given their positions of authority, any act of these two officials must be deemed an act of the government of Iran.

The complicity of Iran in the 1983 attack was established conclusively at trial by the testimony of Admiral James A. Lyons, Deputy Chief of Naval Operations for Plans, Policy and Operation from 1983-85. As deputy chief, Admiral Lyons routinely received intelligence information about American military forces. On October 25, 1983, the chief of naval intelligence notified Admiral Lyons of an intercept of a message between Tehran and Damascus that had been made on or about September 26, 1983. The message had been sent from MOIS to the

---

[11] Under the 1979 constitution, the Supreme Leader is the highest government official of Iran, followed by the President. The powers of the Supreme Leader include the authority to delineate the general policies of Iran and supervise their execution, assume the supreme command of the armed forces, declare war, mobilize the armed forces, appoint and dismiss key government officials, and issue decrees for national referenda. Arts. 110, 113, Constitution of Iran, 1979.

12

Iranian ambassador to Syria, Ali Akbar Mohtashemi, who presently serves as an adviser to the president of Iran, Mohammad Khatami.[12] The message directed the Iranian ambassador to contact Hussein Musawi, the leader of the terrorist group Islamic Amal, and to instruct him to have his group instigate attacks against the multinational coalition in Lebanon, and "to take a spectacular action against the United States Marines." Admiral Lyons testified that he has absolutely no doubt of the authenticity or reliability of the message, which he took immediately to the secretary of the navy and chief of naval operations, who viewed it, as he did, as a "24-karat gold document."[13]

Although it is not presently known whether Ambassador Mohtashemi contacted Musawi, evidence was presented at trial that Mohtashemi did proceed to contact a member of the Iranian Revolutionary Guard ("IRG"), and instructed him to instigate the Marine barracks bombing.[14] The Court heard the videotaped deposition testimony of a Hezbollah member known by the pseudonym "Mahmoud," who was a member of the group that carried out the October 23

---

[12] Mohtashemi's last name is sometimes given as "Mohtashemi-Pur."

[13] Dr. Michael Ledeen testified at trial that the message intercept was "one of the most impressive works of intelligence analysis that I saw [about the Marine barracks bombing], and it was absolutely convincing." Dr. Reuven Paz testified that he had read and analyzed the message intercept, which he described as "an order to attack the foreign powers on Lebanese soil, meaning the United States, the French paramilitary power, and of course, the Israeli military forces in south Lebanon."

[14] The Iranian Revolutionary Guard, also known as the Pasdaran, has been described as an "elite security and military force that was formed to protect the ideological purity of the Ayatullah Khomeini's Islamic Revolution and [that] has since developed considerable expertise in covert actions overseas." See Paul Quinn-Judge, Stalking Satan: As Their Leader Offers Friendship, Iran's Revolutionary Guards Keep a Menacing Watch over Their Backyard, TIME, March 30, 1998, available at http://www.time.com/time/magazine/1998/int/980330/terrorism.stalking_satan15.html.

13

attack.[15] Mahmoud, a Lebanese Shi'ite Muslim, testified that Ambassador Mohtashemi contacted a man named Kanani, the leader of the Lebanese headquarters of the IRG. Mohtashemi instructed Kanani to go forward with attacks that had been planned against the 24th MAU and the French paratroopers.[16] Mahmoud testified that a meeting was later held in Baalbek, Lebanon, which was attended by Kanani and Sheik Sobhi Tufaili, Sheik Abbas Musawi, and Sheik Hassan Nasrallah. Nasrallah is the present leader of Hezbollah.[17] Musawi, Nasrallah's immediate predecessor as the leader of Hezbollah, was killed in a February 16, 1992 Israeli attack.[18] Tufaili is a former secretary general of Hezbollah.[19]

---

[15] The reliability of Mahmoud's testimony was established by an individual who has worked for the United States government in an intelligence capacity for thirty years, and who is known by the pseudonym "Joseph Salam." The Court admitted Salam as an expert on Islamic terrorist groups, based upon the quality and quantity of knowledge contained in his curriculum vita, which was filed under seal to protect Salam's identity. According to Salam, Mahmoud has provided information to him in the past, and, after later comparison with known objective facts, his information has always been determined to be accurate.

[16] Mahmoud's testimony about Ambassador Mohtashemi is confirmed by Joseph Salam, who testified that although Mohtashemi held the title of Iranian ambassador to Syria, he performed no actual diplomatic function and was "highly placed in the supervision and origination of covert terrorist operations by Iran." It is also independently confirmed by Dr. Michael Ledeen, who testified at trial that "Mr. Mohtashemi-Pur, his nickname in Iran is the Father of Hezbollah. He's the person who created Hezbollah. So of course he had a major involvement in [the Marine barracks bombing] since those were the people who did it." Dr. Ledeen also testified that "there was information of every imaginable type that enabled [the intelligence community] to reconstruct a picture which showed very clearly the Iranian involvement [in the Marine barracks bombing]. I don't know anyone who looked at that information who came to any other conclusion."

[17] See Talks with France Bridge the Diplomatic Gap, TIMES (London), May 26, 2003, at 13, available at 2003 WL 3134823 ("[Israeli Foreign Minister Sylvan Shalom's] warning came as the leader of Hezbollah, Sheikh Hassan Nasrallah, urged all anti-Israeli groups in Lebanon to take up arms in preparation for a possible Israeli attack.").

[18] See Kenneth R. Timmerman, Likely Mastermind Of Tower Attacks, INSIGHT, Dec. 31, 2001, at 18, available at 2001 WL 29585000 ("On March 17, 1992, a Hezbollah strike team

14