During this meeting, Kanani and the Hezbollah members formed a plan to carry out simultaneous attacks against the American and French barracks in Lebanon.[20] Mahmoud described the meeting and its aftermath:

> They got the order. They met and adopted the operation against the Marines and the French barracks in the same time. The Marines operation was done. They moved – they moved with one Iranian and one Shiite from the – Southern Lebanon over the mountain road to Hartareq Biralabin [phonetic spelling]. They stayed two days there.
> The – the cars were built, equipped, in Biralabin in a warehouse near a – gas station ... underground. They built the cars. They equipped the cars there. That's their center.
> One Dodge, one red Dodge, that was painted exactly like the other – the real Dodge that was providing water and other stuff to the Marines, and they moved it to the airport road where they put the hold on – ambush and hold the real car when she arrived. They stopped the real car and they moved with the fake one that was built with explosives toward the Marine barracks.

---

leveled the Israeli Embassy in Buenos Aires, killing 29 persons and wounding 242. Hezbollah said the attack was intended to avenge the killing of Lebanese Hezbollah leader Sheik Abbas Musawi, whose convoy was obliterated by Israeli helicopter gunships in South Lebanon one month earlier."); Gareth Smyth, Sheikh Hassan Nasrallah's Holy War, FIN. TIMES, Aug. 30, 2001, available at 2001 WL 26065111 ("On February 16, 1992, Israeli helicopter gunships flew into south Lebanon and ambushed a convoy of cars, killing Abbas Musawi, the general secretary of Hizbollah. . . . [I]t brought to Hizbollah's top position Israel's most effective adversary of the next decade. With his beard, turban and black-rimmed glasses, Sheikh Hassan Nasrallah is recognised well beyond Lebanon's borders.").

[19] See Hikmat Chreif, Hezbollah Dissidents Demonstrate Against Normalization with Israel, AGENCE FRANCE-PRESSE, Jan. 7, 2000, available at 2000 WL 2708811 ("About 3,000 supporters of Lebanese Hezbollah dissident Sobhi Tufaili demonstrated in Baalbek Friday against any normalization with Israel and visits by Israeli tourists to Lebanon. . . . Tufaili, who used to be secretary general of Hezbollah, criticized the group's leadership for neglecting the needs of the 'underprivileged,' especially in the Baalbek-Hermel area, which had been a major drug-growing area until a crackdown in 1992.").

[20] Approximately eight minutes after the attack on the Marine barracks, a similar attack was attempted against the French barracks. Although the driver of the vehicle carrying the explosive device was shot and killed before the vehicle could enter the barracks, the device was detonated by remote control, killing 56 French soldiers.

15

C.   The Attack

As testified by Mahmoud, after the meeting in Baalbek, a 19-ton truck was disguised so that it would resemble a water delivery truck that routinely arrived at the Beirut International Airport, which was located near the U.S. Marine barracks in Beirut, and modified the truck so that it could transport an explosive device. On the morning of October 23, 1983, members of Hezbollah ambushed the real water delivery truck before it arrived at the barracks. An observer was placed on a hill near the barracks to monitor the operation. The fake water delivery truck then set out for the barracks, driven by Ismalal Ascari, an Iranian.

At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks. As the truck circled in the large parking lot behind the barracks, it increased its speed. The truck crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks.[21] When the truck reached the center of the barracks, the bomb in the truck detonated.

The resulting explosion was the largest non-nuclear explosion that had ever been detonated on the face of the Earth. The force of its impact ripped locked doors from their doorjambs at the nearest building, which was 256 feet away. Trees located 370 feet away were shredded and completely exfoliated. At the traffic control tower of the Beirut International Airport, over half a mile away, all of the windows shattered. The support columns of the Marine barracks, which were made of reinforced concrete, were stretched, as an expert witness described, "like rubber bands." The explosion created a crater in the earth over eight feet deep. The four-story Marine barracks was reduced to fifteen feet of rubble.

---

[21] Concertina wire is a length of barbed wire that is extended into a spiral for use as a barrier, as on a fence. It is employed by the U.S. armed forces to prevent entry into restricted areas by unauthorized persons.

16

The force of the explosion was equal to between 15,000 to 21,000 pounds of TNT. FBI and ATF explosives experts both concluded that the explosive material was "bulk form" pentaerythritol tetranitrate, or PETN. Danny A. Defenbaugh, the on-scene FBI forensic explosive investigator, testified as to his findings:

> [W]e were able to, through the forensic residue analysis, identify the explosive material, and it was unconsumed particles of PETN . . . .
> PETN is a primary explosive that is manufactured commercially and primarily for U.S. military purposes. It is a primary explosive that is used in detonating cord. Detonating cord is nothing more than a plastic and fiber-wrapped cord that has the PETN, which looks like a white powder . . . that is then extruded inside of that cord . . . .
> In this case, it was not [consumed]; we found unconsumed particles of PETN. That was just like we had found also in the American Embassy bombing. What that means is that it had to have been from a bulk explosive, it had to have been from a manufacturer.

Defenbaugh explained that when the commercially-manufactured form of PETN is detonated, it is completely consumed in the ensuing explosion. The presence of unconsumed particles of PETN at the Marine barracks blast site, therefore, indicated that the PETN used in the bomb had not been the standard commercially-available form of the explosive. Instead, it had been the raw "bulk form" of PETN, which is not generally sold commercially. In the Middle East, the bulk form of PETN is produced by state-sponsored manufacturers for military purposes. In 1983, bulk form PETN was not manufactured in the nation of Lebanon. However, at that time, bulk form PETN was manufactured within the borders of Iran.

Warren Parker, who served as an explosives expert with the Army and the ATF for forty years, testified that the effectiveness of the attack demonstrated that it had been the result of careful planning.[22] Parker also concluded, based on the degree of planning and sophistication

---

[22] Parker testified at trial:

17

that went into the attack, that a group of individuals without specialized training in explosives could not have carried it out:

> Q:  Mr. Parker, in your opinion, within a reasonable degree of certainty as an expert in explosives, could this bombing have been successfully carried out by a group of individuals with limited education, possessing minimal literacy and no specialized training in explosives?
>
> A:  No, sir.
>
> Q:  And what do you base that opinion on?
>
> A:  The degree of planning, the degree of sophistication of this bombing. . . . The fact that it was a significant amount of a military-type explosive. These are not things that you just go down to the drugstore and buy a pound of, these are not things [for which] you buy innocuous materials and manufacture in your backyard. PETN is manufactured in factories that have specialized tools and equipment and knowledge.
>      I think that I will concur with Mr. Defenbaugh's conclusion that it is a state- or military-run factory that produces this type of material, and I think the fact that it was carried out so successfully and not bungled really enhances the fact that somebody had practiced this before. . . .
>      [D]uring the, say, late '60s, early '70s, clear up into the '80s, there were state-sponsored training camps involving the use of explosives for political gain, and these training camps used as part of their training, and I have seen

---

In the Marine barracks [attack], we have considerable planning that had to occur. They had to know what the interior of the building looked like, and, in my background and experience, I believe that the placement of that in the center of the building with the atrium opening up to the top was probably key in causing most of the deaths.

So it took someone getting in there, doing a lot of pre-scouting, making sure that they could, in fact, penetrate the barriers, the barbed-wire barriers, negotiate the pipes that were placed in the way to deter traffic. They had to use a site that had a direct line because they couldn't afford to take a long time. The Marines were all armed. While they didn't have ammunition ready, and that was probably known, they would have likely not made it inside. So if they had tried to come through some sort of a circuitous route rather than a direct attack down through those barrier pipes right over [the] top of what I believe to be the only place that you could have gotten a truck of that size into the building without it being impinged or stopped by some part of the building itself – so they knew that that was a good entrance. They knew that the truck could negotiate those pipes and that the weak part for entrance was there at the sandbag guard barricade and that the interior of the building was the vulnerable spot of that building.

18

       materials seized from those that included pages from military manuals, U.S. military as well as English and French military manuals, as part of their training in calculating the explosive charges.

Q:      I believe this Court in [Eisenfeld v. Islamic Republic of Iran] received testimony with regard to a training camp with regard to handling explosives just outside Tehran, Iran, run by the Iranian government. Would this be the kind of thing you're talking about, an intensive course over three or four months?

A:      Yes, sir, those are exactly the kinds. There were several of those. The one in Iran was just one of several but typical of that.

Based on the evidence presented by the expert witnesses at trial, the Court finds that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. The sophistication demonstrated in the placement of an explosive charge in the center of the Marine barracks building and the devastating effect of the detonation of the charge indicates that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran.

As a result of the Marine barracks explosion, 241 servicemen were killed, and many others suffered severe injuries. Steve Russell, the sergeant of the guard at the time of the explosion, testified that he had observed several victims of the bombing who were in severe pain before their deaths. Sgt. Russell stated that death was not instantaneous for many of the victims, and that many of the victims of the explosion endured extreme pain and suffering.

During the trial, family members of the victims testified about the anguish they endured when they learned of the attack. Deborah Peterson described what happened when she received word of the attack on the Marine barracks, where her brother, Corporal James Knipple, was stationed:

    It was Sunday morning and I was sleeping and I got a phone call from my father. He had

19

a frantic sound to his voice that I had never heard before and he said – he just screamed, "Debbie, our worst nightmare has been realized. And I turned on the television and saw what was happening. . . .

It seemed like an awful long time [before word of his death was received]. We waited and waited and waited. We watched every television, we were – I mean, the house was filled with people. We watched the television, we got every newspaper, photograph, magazine we could. We looked for his face among the survivors. We even thought we saw him a couple of times. All of his friends gathered, neighbors, and we held out hope even though the count was rising. . . .

I think around November 7th or 8th, we got a phone call . . . They wanted dental information and identifying marks, anything we could give them, and my father told them about a scar on his forearm. The next day, they told us that he was identified.

We brought him home on the 9th, on his 21st birthday, and we buried him on the 10th, the Marine Corps birthday. I remember the casualty officer, he was all by himself, he came to the house. We were all gathered around, and he told us that Jim was among the dead. It was official.

I remember the casualty officer sitting next to my father and they both seemed really quiet while everybody else was screaming and yelling and crying, and my dad just sat there really quiet. And then when everybody left, he went downstairs and started to scream Jim's name over and over and over again at the top of his lungs.

### III. CONCLUSIONS OF LAW

Having made the above-listed findings of fact, the Court now enters the following conclusions of law:

1. An action brought against a foreign state, its intelligence service acting as its agent, and its officials, acting in their official capacity, must be brought under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 et seq. The FSIA must be applied in every action involving a foreign state defendant. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489; 28 U.S.C. § 1330. The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated

20

exceptions to immunity. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). This Court lacks subject matter jurisdiction over the present actions unless they fall within one of the FSIA's enumerated exceptions to foreign sovereign immunity. See Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). The FSIA has been construed to apply to individuals for acts performed in their official capacity on behalf of either a foreign state or its agency or instrumentality. El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir.1996) (citing Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101-1103 (9th Cir. 1990).

2.  When it passed the Antiterrorism and Effective Death Penalty Act of 1996, Congress lifted the immunity of foreign states for certain sovereign acts that are repugnant to the United States and the international community, and created a right of civil action based upon the commission of terrorist acts. Pub. L. 104-132, Title II, § 221(a), (April 24, 1996), 110 Stat. 1214, codified at 28 U.S.C.A. § 1605 (West 1997 Supp.). That Act created an exception to the immunity of those foreign states officially designated by the State Department as state sponsors of terrorism, if the foreign state so designated commits a terrorist act, or provides material support and resources to an individual or entity which commits a terrorist act, which results in the death or personal injury of a United States citizen. See 28 U.S.C. § 1605(a)(7); see also H. R. REP. NO. 104-383, at 137-38 (1995).

3.  Iran has continuously been designated a state sponsor of terrorism by the U.S. Department of State since January 19, 1984.

4.  Applying the above-mentioned law, as a consequence of the actions of the defendants, this Court concludes that it possesses subject matter jurisdiction over the defendants in these actions, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

5.  28 U.S.C. § 1605(a)(7) provides for personal jurisdiction over foreign state sponsors of terrorism. As this Court has noted in a previous case involving the government of Iran, "[because] international terrorism is subject to universal jurisdiction, Defendants had adequate notice that their actions were wrongful and susceptible to adjudication in the United States." Flatow, 999 F. Supp. at 14 (citing Eric S. Kobrick, The Ex Post Facto Prohibition and the Exercise of Universal Jurisdiction over International Crimes, 87 COLUM. L. REV. 1515, 1528-30 (1987)); see also Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 88-89 (D.C. Cir. 2002) ("In enacting [28 U.S.C. § 1605(a)(7)], Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future.")

6.  Applying the above-mentioned law, this Court concludes that it possesses personal jurisdiction over the defendants in these actions, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

7.  28 U.S.C. § 1605(f) provides for a statute of limitations of "10 years after the date on which the cause of action arose," and provides for equitable tolling during the "period during which the foreign state was immune from suit."

8.  The state of Iran was immune from suit until passage of Pub. L. 104-132, which was made effective on April 24, 1996. Accordingly, the Court concludes that the statute of limitations contained in 28 U.S.C. § 1605(f) does not bar these actions.

9.  In a memorandum opinion issued December 18, 2002, this Court stated that if the plaintiffs in these actions proved that the U.S. military service members at issue in these cases were part of a peacekeeping mission and that they operated under peacetime rules of engagement, they would qualify for recovery. As set forth in the above findings of fact, the plaintiffs have demonstrated that the U.S. military service members at issue were part of a peacekeeping mission, and that they were operating under peacetime rules of engagement. Therefore, the Court concludes that the military service members at issue in these cases qualify for recovery.

10. A foreign state is liable for money damages under the FSIA "for personal injury or death that was caused by an act of . . . extrajudicial killing, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605(a)(7). The foreign state

must be designated as a state sponsor of terrorism under either section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. 2405(j) or section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. 2371, at the time that the act occurred, unless the foreign state is thus designated later as a result of that act. Id. Either the victim or the plaintiff must have been a United States national at the time of the act. Id. Additionally, the act must be such that it would be actionable if the United States, its agents, officials or employees within the United States engaged in similar conduct. The Court concludes, based on the above findings of fact, that plaintiffs in these actions have established all of these elements by clear and convincing evidence.

11. The FISA utilizes the same definition of "extrajudicial killing" as the Torture Victim Protection Act of 1991, which defines an "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples. . . ." Pub. L. 102-256, 106 Stat. 73 (1992). The Court concludes that the act undertaken by agents of Hezbollah – the development and detonation of an explosive charge in the barracks of the 24th MAU on October 23, 1983, which resulted in the deaths of over 241 peacekeeping American servicemen – satisfies the FISA's definition of an "extrajudicial killing."

12. The Court finds that MOIS, acting as an agent of the Islamic Republic of Iran, performed acts on or about October 23, 1983, within the scope of its agency (within the meaning of

28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note), which acts caused the deaths of over 241 peacekeeping servicemen at the Marine barracks in Beirut, Lebanon. Specifically, the deaths of these servicemen were the direct result of an explosion of material that was transported into the headquarters of the 24th MAU and intentionally detonated at approximately 6:25 a.m., Beirut time by an Iranian MOIS operative. The Court therefore concludes that MOIS actively participated in the attack on October 23, 1983, which was carried out by MOIS agents with the assistance of Hezbollah.

13. The Court concludes that the deaths of over 241 peacekeeping servicemen at the Marine barracks in Beirut, Lebanon were caused by a willful and deliberate act of extrajudicial killing.

14. As the result of the deaths of the 241 American servicemen in Beirut, Lebanon, their parents, surviving siblings, children, and spouses have suffered and will continue to suffer severe mental anguish and loss of society.

15. It is beyond dispute that if officials of the United States, acting in their official capacities, provided material support to a terrorist group to carry out an attack of this type, they would be civilly liable and would have no defense of immunity. See 42 U.S.C. § 1983; Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

16. The Court concludes that the defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security, are jointly and severally liable to the plaintiffs for compensatory and punitive damages.

17. As to each claim of each Complaint, the Court will make a determination of the proper amount of compensatory damages after its receipt of reports from the special masters appointed by the Court. The Court will also make a determination as to punitive damages at that time.

## IV.  CONCLUSION

The Court is mindful that some may question the utility of the present suit. During the March trial, the Court heard testimony from a number of witnesses as to the reasons why this suit was brought, and as to its potential efficacy.

Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy, described the manner in which civil judgments for acts of state-sponsored terrorism have had a noticeable impact upon the present regime in Iran:

> Q: To what extent since its creation in 1979 has the Islamic Republic of Iran been susceptible to influence because of economic sanctions? By sanctions, I don't mean something that was stated, but simply having to pay out bucks, whether it's in damages in personal injury cases or damages awarded by a tribunal, punitive damages, anything of that sort?
>
> A: To begin with, the release of those held hostage at the American Embassy in Tehran, most Iranian observers think that the American freezing of billions of dollars of Iranian assets and the eventual negotiations which really hinged around

26

how much money Iran was going to get back is a good example from the very beginning of this process of Iran's susceptibility to economic pressure, and there have been a number of situations since in which Iran has been deflected from its main course by economic pressures. For instance, the Europeans [were] successful at doing that in the early 1990s, deflecting Iran from terrorist activities in European soil.

\* \* \* \* \* \* \* \* \* \* \*

Q: Given the enormity of the offense committed on October 23rd, 1983, in the attack of the Marine barracks, how much of that sum in the pockets of Iran would have to be subtracted before – in order to give some indication that they would start to change policy?

A: Well, sir, I would – the larger the sum, the more of an impact this is going to have on the Iranians, and if this court case results in a large judgment, be it for compensatory or punitive damages, that is very likely to receive the attention of a fair number of policymakers in Iran, and I have great confidence that the Iranian leaders will consider that in deciding which way to proceed.

\* \* \* \* \* \* \* \* \* \*\*

I think, sir, that the Iranians have been extraordinarily sensitive to court actions, whether it was in Germany or in Argentina or in the United States, which make any references to the top leadership of the country being involved in these cases. That has been a matter of greatest sensitivity in Iran, and there have been several cases in which the Iranians reacted extremely strongly, particularly to suggestions that the supreme religious leader was involved in any way in these activities. . . . I have to say that I think that they pay quite detailed attention to these judgments . . . .

\* \* \* \* \* \* \* \* \* \*

I would say that based on the past precedent about the way that these court cases have been viewed, what will be looked at very closely is two things. One is the size of the dollars involved, and the other is whether or not there is any change in the way that the court views the matter. So this case, if it involves a much larger judgment in dollar terms than previous cases, will be regarded as a toughening of the American stance.

On the other hand, there will be close examination of whether or not this case in its legal reasoning or in the application or non-application of punitive damages involves any change in the way in which a court rules. So, for instance, a lack of punitive damages would be regarded as an indication that the United States Government is making a gesture towards Iran.

27

> Q: A softening of our position.
>
> A: Correct, sir. . . .
>
> Q: So as I read you correctly, less in punitive damages than has been awarded in cases before would be to the Iranians a softening of the American resolve; more would be a hardening of the American resolve?
>
> A: Correct, sir.

The Court also heard the testimony of Dr. Michael Ledeen[23] as to the likely effect of an award of damages in the present actions:

> THE COURT: From your experience dealing all these years now with Iran, have you seen, from the court cases where punitive damages have been entered by the courts, what impact, if any, that has had in Iran and on the government, and what do you think of that?
>
> A: Well, it hurts the government because it stings them, and the people see – what the Iranian people need to reach the point where they are willing to risk their lives to bring down this regime is that the civilized world understands what kind of regime it is and therefore would welcome that kind of event; and consequently, in my opinion, every time that regime is condemned and punished in a Western court, that hastens the moment of the downfall of that regime.[24]

---

[23] As noted above, Dr. Ledeen served as a consultant to the U.S. Defense Department at the time of the October 23, 1983 bombing, and is one of the premier experts in the nation on the subject of U.S. foreign relations. He is presently a resident scholar at the American Enterprise Institute.

[24] Regarding the tension between the Iranian government and the populace, Dr. Ledeen testified that

> the people of Iran hate the regime. Even the public opinion polls taken by the regime itself show that 70-plus percent of the Iranian people don't like the regime, would like a national referendum, deplore the foreign policy of the regime and want better relations with the United States, and you would have to figure that if 70 percent of Iranians will tell people that they know are coming from the Ministry of Information that they hate the regime, that the real number must be something higher than that.

28

The Court also heard testimony from the men and women who have brought the present actions about their reasons for so doing. During the trial, Lt. Col. Howard Gerlach, who was paralyzed in the October 23 attack, was asked about what he hoped to achieve by participating in these actions:

> Well, I guess there's three words: accountability, deterrence and justice. And they are interrelated. The accountability, and I swear it was on Sunday, I was listening to a rerun of one of the TV – I don't know, Meet the Press or whatever, but Vice President Cheney was talking and he was saying that they, the terrorists feel that they can do things with impunity, and he said ever since the Marines in '83. Yes, there hasn't been any accountability.
> Deterrence effect is, in some way, and this is also what he was talking about, was one thing we have to go after – and I think I'm stating this correctly; this is what I heard, is the funding. It's the funding. Even on the radio coming over here, we heard some talk about funding for terrorist organizations.
> Then the third thing is the justice, and this refers to the people, a good portion of [whom] are in this room. . . . They lost a large chunk of their lives, young Marines, sons, husbands, fathers, brothers. They were attempting to do a noble thing. They went as peacekeepers in the tradition of this country. . . [W]e weren't trying to conquer land, we weren't trying to get anything for ourselves; we were really trying in a humanitarian way to help those people in Lebanon. I think this is . . . the day in court, literally and figuratively speaking, for recognition of just how great these guys were.

The Court also heard the testimony of Lynn Smith Derbyshire, whose brother, Capt. Vincent Smith, was killed in the October 23 attack:

> I'm not sure it's true that time heals wounds, but even so, a wound which has healed over time is not the same thing as not having a wound. Even a healing wound gets reopened from time to time.

>      *  *  *  *  *  *  *  *  *  *

> [A]s I have talked to so many of the Beirut families, I believe that many of them would concur with me when I say that the pain does not stop when you bury the dead; it is only the very beginning. We feel this loss over and over and over again. It does not go away and it does not lessen with time; that is a myth. It is more like teaching someone who has a chronic pain disorder how to manage and embrace their pain than it is a lessening of pain.

29

   \* \* \* \* \* \* \* \* \* \*

> I have spoken to quite a number of the family member and I think we're all – I think they would all agree with me when I tell you that what Vince would have wanted was justice.
>
> Vince was a fair-minded man. Vince was a man of integrity, as I know so many of the men who were lost that day were. It's the kind of men Marines are. That's what the Marine Corps produces. And Vince would have wanted us to fight.
>
> Vince would have said . . . we must hold these men accountable. Vince would have said that it is time for justice, that it is time for compensation, that it is time to make it – to make them pay enough to make them stop, because Vince was a man who believed in what was right, and if he had lived, he would be sitting here in my place and he would be saying, "Come on, sis, let's go get them."
>
> But he can't be here, and in his name, and in his honor, and with the permission of some of the other family members here . . . in their names and in their honor, I salute them, and we stand together to do what they cannot do for themselves.

There is little that the Court can add to the eloquent words of these witnesses. No order from this Court will restore any of the 241 lives that were stolen on October 23, 1983. Nor is this Court able to heal the pain that has become a permanent part of the lives of their mothers and fathers, their spouses and siblings, and their sons and daughters. But the Court can take steps that will punish the men who carried out this unspeakable attack, and in so doing, try to achieve some small measure of justice for its survivors, and for the family members of the 241 Americans who never came home.

A separate order accompanies this opinion.

Date: 5-30-03

Royce C. Lamberth
United States District Judge