**DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ (State Bar # 62386)**
**COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
165 Fell Street
San Francisco, CA 94102
Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
Tel.: (415) 989-4730
Fax: (415) 989-0491
File No. 52,759

Attorneys for Plaintiffs
DEBORAH D. PETERSON, Personal Representatives
of the Estate of James C. Knipple (Dec.), et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ISLAMIC REPUBLIC OF IRAN, et al.,<br><br>Defendants. | CASE NO. 3:08-mc-80030-JSW<br><br>DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)<br><br>**[SHIPPING AND DOCK FEES and BUNKERED FUEL SALES]**<br><br>Date: May 30, 2008<br>Time: 9:00 a.m.<br>Courtroom: 17, 16th Floor<br>Judge: Jeffrey S. White |

I, DAVID J. COOK, hereby declare and state as follows:

1. I am one of the attorneys of record for Plaintiffs in the above-entitled action, am duly authorized to practice before all courts in the State of California, and am familiar with the facts and circumstances in this action.

2. Plaintiffs have filed this action to seek redress for the bombing of the Marine Barracks in Beirut, Lebanon in 1983. Suit was filed on 10/3/01 and service of process was effectuated, in which Iran defaulted. This court conducted a number of hearings and entered a series of Opinions, including the MEMORANDUM OPINION of 5/30/03, a true and correct which is attached hereto

DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[SHIPPING AND DOCK FEES AND BUNKERED FUEL SALES]** - CASE NO. 3:08-mc-80030-JSW 1

marked *Exhibit "A."*

3. Thereafter on 9/7/07, the court entered a second MEMORANDUM OPINION and JUDGMENT, true and correct copies which are attached hereto marked *Exhibits "B" and "C,"* in which the court granted judgment on behalf of Plaintiffs in the amount of $2,656,944,877.00.

4. Plaintiffs have registered the judgment with the United States District Court, Northern District of California, Case No. 3:08-mc-80030-JSW, and a true and correct copy of an ABSTRACT OF JUDGMENT is attached hereto marked *Exhibit "D."*

5. The Ministry of Roads and Transportation generally oversees the PORTS & SHIPPING ORGANIZATION (P.S.O.)of Iran who manage the docks, harbors and related facilities, which is confirmed by the website the P.S.O., a true and correct copy which is attached hereto marked *Exhibit "E."*

6. Iran charges these SHIPPING COMPANIES an entire array of charges for the privilege of utilizing Iranian docks, harbors, terminals and other maritime facilities, all hereinafter collectively "DOCK FEES." This label is illustrative as seen by, for example, the entire range of charges imposed by Iran through its Manual of Tariffs Applicable to Vessels and Cargo in the Ports of the Islamic Republic of Iran, which is attached hereto marked *Exhibit "F."*

7. These Tariffs, per *Exhibit "F"* are in addition to rates and charges of "SPECIAL ECONOMIC ZONE FOR THE PORT OF AMIRABAD," a true and correct copy which is attached hereto marked *Exhibit "G"*; the rates and charges of Port of Bushehr, a true and correct copy attached hereto marked *Exhibit "H"*; the rates and charges of the Port of Nowshadr, a true and correct copy attached hereto marked *Exhibit "I."*

8. This information comes from P.S.O. News, dated Sept. October, 2007, No 2, at page 12, a true and correct copy of which is attached hereto, marked *Exhibit "J"* and incorporated by reference which states as follows:

> "According to the National Iranian Oil Products Distribution Co.'s plans Islamic Republic of Iran set a goal to boost its incom[e] deriv[d] from ship bunkering to 1 billion USD annually.

DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [SHIPPING AND DOCK FEES AND BUNKERED FUEL SALES] - CASE NO. 3:08-mc-80030-JSW

2

> Eng. Ahmadinezhad Vice president of National Iranian Oil Products Distribution Company stated: "According to P.S.O. statistics 3,500 foreign ship and 2,200 domestic ships of above 1000 DWT call the Iranian souther ports annually and as a result Iran enjoys the lucrative regional market of the Persian Gulf and the Oman Sea." He added "by the end of the current year with 2000 foreign ships added to the Iranian ships now bunkering by NIOPD Company, ***2 million tons of BUNKERED fuel will be sell by the company which will generate 640 million USD of income to the country."*** (Emphasis added)
>
> He continued: NIOPDC has set a goal to boost the country's income from bunkering to 1 billion USD annually by 2010."

The National Iranian Oil Products Distribution Company is a subsidiary of the National Iranian Oil Refining and Distributing Co., which is part of the Ministry of Petroleum of the Islamic Republic of Iran per the attached download, a true and correct copy which is attached hereto marked ***Exhibit "K"***.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2008.

/s/ David J. Cook
DAVID J. COOK, ESQ. (SB# 060859)

F:\USERS\DJCNEW\peterson.assign.dockfees

**EXHIBIT "A"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple, et al., Plaintiffs, v. THE ISLAMIC REPUBLIC OF IRAN, et al., Defendants.** | ) | **Civil Action No. 01-2094 (RCL)** |
| **JOSEPH AND MARIE BOULOS, Personal Representatives of the Estate of Jeffrey Joseph Boulos, et al., Plaintiffs, v. THE ISLAMIC REPUBLIC OF IRAN, et al., Defendants.** | ) | **Civil Action No. 01-2684 (RCL)** |

FILED
MAY 30 2003
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION

These actions arise from the most deadly state-sponsored terrorist attack made against American citizens prior to September 11, 2001: the Marine barracks bombing in Beirut, Lebanon on October 23, 1983. In the early morning hours of that day, 241 American servicemen were murdered in their sleep by a suicide bomber. On that day, an unspeakable horror invaded the

24/14

lives of those who survived the attack and the family members whose loved ones had been stolen from them. The memory of that horror continues to this day.

On March 17-18, 2003, this Court conducted a bench trial to determine the liability of the defendants for this inhuman act. Having reviewed the extensive evidence presented during that trial by both lay and expert witnesses, the Court has determined that the plaintiffs have established their right to obtain judicial relief against the defendants. The Court's findings of fact and conclusions of law are set forth below.

## I. PROCEDURAL BACKGROUND

The plaintiffs in these two actions are family members of the 241 deceased servicemen (hereafter, "the servicemen") and the injured survivors of the attack. Plaintiffs have brought these actions in their own right, as administrators of the estates of the servicemen, and on behalf of the servicemen's heirs-at-law. All decedents and injured survivors of the attack were serving in the U.S. armed forces at the time of their injuries or death. All plaintiffs are nationals of the United States.[1]

On October 3 and December 28, 2001, plaintiffs filed separate complaints with this

---

[1] In an action under the Foreign Sovereign Immunities Act ("FSIA") for claims based on personal injury or death resulting from an act of state-sponsored terrorism, either the claimant or the victim must be an American national. See 28 U.S.C. § 1605(a)(7)(B)(ii). Although during the bench trial, the Court only received testimony that identified one of the decedents, James R. Knipple, as an American national, plaintiffs' counsel has represented that each and every service member injured or killed on October 23, 1983, or a beneficiary of that service member, is a national of the United States. The Court's findings are therefore subject to proof of American nationality during the damages phase of these proceedings. This may be accomplished either though direct testimony of any competent witness, or through the submission of relevant documentation.

Court. The complaints included statutory claims for wrongful death and common-law claims for battery, assault, and intentional infliction of emotional distress, all resulting from an act of state-sponsored terrorism. Plaintiffs sought relief in the form of compensatory and punitive damages. Although defendants were served with the two complaints on May 6 and July 17, 2002, defendants failed to file any response to either complaint, and on December 18, 2002, this Court entered defaults against defendants in both cases.

However, despite the entries of default, this Court is required to make a further inquiry prior to entering any judgment against defendants. FSIA mandates that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e); see also Flatow v. The Islamic Republic of Iran, 999 F. Supp. 1, 6 (D.D.C. 1998). As in Flatow, the Court will require plaintiffs to establish their right to relief by clear and convincing evidence. The "clear and convincing" standard of proof is the standard required in the District of Columbia to support a claim for punitive damages, and is sufficient to establish a prima facie case in a contested proceeding.

## II. FINDINGS OF FACT

As stated above, this Court received testimony from plaintiffs on March 17 and 18, 2003, defendants having failed to enter an appearance. The Court now enters its findings of fact, based upon the sworn testimony and documentary evidence presented during the March trial, and received in accordance with the Federal Rules of Evidence. This Court finds these facts to be established by clear and convincing evidence.

A. Historical Background[2]

The Republic of Lebanon is a mountainous country of approximately 3,800,000 people bordered by Israel, Syria, and the eastern shore of the Mediterranean Sea. Although it contains some of the oldest human settlements in the world, including the Phoenician port cities of Tyre and Sidon, it did not become an independent nation until 1944.

Lebanon did not participate militarily in the 1967 and 1973 Arab-Israeli wars. However, by 1973, approximately one out of every ten person living in Lebanon was a Palestinian refugee, many of whom supported the efforts of the Palestine Liberation Organization (PLO) against Israel. Some of these refugees engaged in guerilla warfare and terrorist activity against Israel from bases established in southern Lebanon. Beginning in 1968, Israel engaged in reprisals against these Palestinian strongholds in southern Lebanon. In 1975, civil war broke out in Lebanon between its Muslim inhabitants and Palestinian refugees, who supported the PLO, and its Christian inhabitants, who opposed the PLO's actions. The war would not come to a complete end for another fifteen years, during which approximately twenty thousand Lebanese were killed, and approximately the same number of Lebanese were wounded.

B. The Arrival of the 24th Marine Amphibious Unit

In late 1982, with the concurrence of the United Nations, a multinational peacekeeping coalition consisting of American, British, French, and Italian soldiers arrived in the Lebanese capital of Beirut. In May of 1983, the 24th Marine Amphibious Unit of the U.S. Marines ("the

---

[2] The Court has taken judicial notice of the facts contained in the following subsection, pursuant to Rule 201 of the Federal Rules of Civil Procedure.

24th MAU") joined this coalition.[3] The rules of engagement issued to the servicemen of the 24th

MAU made clear that the servicemen possessed neither combatant nor police powers. In fact,

under the rules, the servicemen were ordered not to carry weapons with live rounds in their

chambers, and were not authorized to chamber the rounds in their weapons unless (1) they were

directly ordered to do so by a commissioned officer or (2) they found themselves in a situation

requiring the immediate use of deadly force in self-defense.[4] As pointed out during trial, the

---

[3] A Marine Amphibious Unit (now "Marine Expeditionary Unit") is a combined air / ground force unit of approximately two thousand U.S. Marines. See Marine Expeditionary Units, at http://www.usmc.mil/marinelink/ind.nsf/meus.

[4] In the present context, "rules of engagement" are directions issued by a competent military authority that set out the limitations and circumstances under which the forces under its command may initiate and prosecute combat engagement with other forces that they encounter. Following are the rules of engagement that were issued to the members of the 24th MAU:

1.   When on post, mobile or foot patrol, keep loaded magazine in weapon, bolt closed, weapon on safe, no round in the chamber.

2.   Do not chamber a round unless told to do so by a commissioned officer unless you must act in immediate self-defense where deadly force is authorized.

3.   Keep ammo for crew-served weapons readily available, but not loaded. Weapon is on safe.

4.   Call local forces [LAF] to assist in self-defense effort. Notify headquarters.

5.   Use only minimum degree of force to accomplish any mission.

6.   Stop the use of force when it is no longer needed to accomplish the mission.

7.   If you receive effective hostile fire, direct your fire at the source. If possible, use friendly snipers.

8.   Respect civilian property; do not attack it unless absolutely necessary to protect friendly forces.

9.   Protect innocent civilians from harm.

members of the 24th MAU were more restricted in their use of force than an ordinary U.S. citizen walking down a street in Washington, D.C.

The restrictive rules of engagement are consistent with the testimony of Col. Timothy Geraghty, the commander of the 24th MAU, about the mission of the multinational peacekeeping force:

> [E]ssentially what it was, it was primarily a peacekeeping mission and it was to show [our] presence, and when I say ours, and this is throughout all the forces, is that we were out showing a presence, [primarily] to provide stability to the area. And I might add that there's no doubt in just about anyone involved at the time, we saved a lot of lives by our presence there for awhile. And that was part of, I might add, in my judgment, the success of that, our presence mission there, and [that] it was working is the primary reason why we were targeted. . . .
>
> The rules – these were geared primarily again with the peacekeeping mission [in mind] and the sensitivities of killing or maiming someone accidentally. That could be a tinderbox. That could start a whole chain of events.

Col. Geraghty further testified that the location and security of the 24th MAU's position was not tactical in nature, and was only acceptable to the commanding officer in the context of the unit's mission to "provide a presence."

Based on the testimony of Col. Geraghty and other witnesses, the Court finds that on October 23, 1983, the members of the 24th MAU, and the service members supporting the unit,

---

10. Respect and protect recognized medical agencies such as Red Cross, Red Crescent, etc.

These ten rules were printed on cards distributed to every service member of the 24th MAU and were discussed at length with every member.

were clearly non-combatants operating under peacetime rules of engagement.[5]

C. The Iranian Government and the October 23 Attack[6]

Following the 1979 revolution spearheaded by the Ayatollah Ruhollah Khomeini, the nation of Iran was transformed into an Islamic theocracy. The new government promptly drafted a constitution, which is still in effect today. The preamble to the 1979 constitution sets forth the mission of the post-revolutionary Iranian state:

> The mission of the Constitution is to realize the ideological objectives of the movement and to create conditions conducive to the development of man in accordance with the noble and universal values of Islam.
>
> With due attention to the Islamic content of the Iranian Revolution, the Constitution provides the necessary basis for ensuring the continuation of the Revolution at home and abroad. In particular, in the development of international relations, the Constitution will strive with other Islamic and popular movements to prepare the way for the formation of a single world community . . . to assure the continuation of the struggle for the liberation of all deprived and oppressed peoples in the world.

The post-revolutionary government in Iran thus declared its commitment to spread the goals of the 1979 revolution to other nations. Towards that end, between 1983 and 1988, the government of Iran spent approximately $50 to $150 million financing terrorist organizations in the Near East.[7] One of the nations to which the Iranian government directed its attention was the war-torn

---

[5] It should also be noted that the death certificates issued for the victims of the October 23, 1983 attack did not represent that the victims were killed in action. Instead, the cause of death was listed as "terrorist attack."

[6] The facts contained in the following subsection are based on the trial testimony of Dr. Reuven Paz, director of the Project for the Research of Islamist Movements in Herzliya, Israel, and Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy.

[7] Since January 19, 1984, Iran has been designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j). This designation arose in part as a result of the October 23, 1983 attack.

republic of Lebanon.

"Hezbollah" is an Arabic word meaning "the party of God." It is also the name of a group of Shi'ite Muslims in Lebanon that was formed under the auspices of the government of Iran. Hezbollah began its existence as a faction within a group of moderate Lebanese Shi'ites known as Amal. Following the 1982 Israeli invasion of Lebanon, the Iranian government sought to radicalize the Lebanese Shi'ite community, and encouraged Hezbollah to split from Amal. Having established the existence of Hezbollah as a separate entity, the government of Iran framed the primary objective of Hezbollah: to engage in terrorist activities in furtherance of the transformation of Lebanon into an Islamic theocracy modeled after Iran.

During the March trial in these cases, Dr. Patrick Clawson, a widely-renowned expert on Iranian affairs over the past 25 years, testified that in 1983, Hezbollah was a creature of the Iranian government:

> Both from the accounts of Hezbollah members and from the accounts of the Iranians and of every academic study that I'm aware of, certainly at this time, Hezbollah is largely under Iranian orders. It's almost entirely acting at the – under the order of the Iranians and being financed almost entirely by the Iranians. It comes to be an organization with Lebanese roots and Lebanese activities and more independence from Iran, but that's years past this time frame.
>
> * * * * * * * * * * *
>
> THE COURT: In the '83 time frame, it was essentially a tool of Iran.
>
> THE WITNESS: Correct, sir. Indeed, both Iranian and Lebanese observers have described it as being established at Iran's orders and as being a creature of Iran when it began. Hezbollah leaders today will sometimes describe that as the roots of their party and say that it has evolved away from being that.
>
> Q: Was there any other major means of support for Hezbollah other than the Islamic Republic of Iran?

A:    Not at this time, no, sir.[8]

Dr. Clawson's testimony was corroborated by Dr. Reuven Paz,[9] who has researched

Islamist terrorist groups for the last 25 years:

Q:    Now, as of the time of this attack, in October 1983, to what extent was Hezbollah, at that precise moment, dependent upon the support of Iran, and particularly the Iranian Revolutionary Guards, who had been brought in in order to carry out any type of major [military] operation?

A:    Well, I would say that they were, at that time, totally relied upon, the Iranian support. We are talking about composing a new group, of Hezbollah, out of people who had very little military experience. They were members, before '82, in groups that actually did not deal with military issues or terrorism. And most of the members during this process of unification that created Hezbollah started to be trained in training camps in the Bekaa Valley, where the main Iranian forces were located.

        *    *    *    *    *    *    *    *    *    *    *

Q:    Do you have an opinion, within a reasonable degree of certainty, as an expert on Islamist terrorism, whether this attack was carried out by Hezbollah, in response to the order which was the subject of the communications intercept in late September 1983?

A:    Yes, especially at that time – even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon and [against] Israel.

Q:    Do you have an opinion, again within a reasonable degree of certainty, as an expert in Islamist terrorist groups, as to whether Hezbollah, at that time, the fall of 1983, would have had the capacity to carry out an attack of the dimension of the

---

[8] Dr. Michael Ledeen, a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, testified at trial that "Iran invented, created, funded, trained, and runs to this day Hezbollah, which is arguably the world's most dangerous terrorist organization."

[9] Dr. Paz is the director of the Project for the Research of Islamist Movements and a senior research fellow at The International Policy Institute for Counterterrorism, both of which are based in Herzliya, Israel.

attack around the Marine barracks, in the absence of Iranian scientific, financial, and material assistance?

A: No, I don't think they could have carried out such an attack without Iranian training, without Iranian – Iranian supply of the explosives even, and without directions from the Iranian forces in Lebanon itself.[10]

* * * * * * * * * * *

Q: Dr. Paz, can you describe the – the source of – of this technique of suicide bombing, which was used in the attack on the Marine barracks and since, unfortunately, many other incidents?

A: Yes, this – this modus operandi actually was initiated in Iran and it was – it was not, at that time, used in anywhere in – in the Sunni Muslim world. It was at that time a Shi'ite ideology of self-sacrifice by suicide bombing. It started during the Iran-Iraq war in the '80s, and then under Iranian training and influence and instructions, it started as a modus operandi of terrorist groups – first in Lebanon, by Hezbollah, and then later on it moved to the Palestinian arena, mainly during the '90s.

It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities. The primary agency through which the Iranian government both established and exercised operational control over Hezbollah was the Iranian Ministry of Information and Security ("MOIS"). MOIS had formerly served as the secret police of the Shah of Iran prior to his overthrow in 1979. Despite the revolutionary government's complete break with the old regime, it did not disband MOIS, but

---

[10] Robert Baer, a case officer in the Directorate of Operations of the CIA from 1976-97, testified at trial that "Hezbollah wasn't 'formally' created until 1985. What happened was before it was a bunch of agents of Iran. But none of these agents, based on our intelligence, which was . . . outstanding, were operating on their own. One time there was a case where a Hezbollah member went out and kidnapped some children. But that was done independently, and the moment he was caught, he was executed by Hezbollah because he wasn't operating with authority from Iran."

instead allowed it to continue its operations as the intelligence organization of the new government. Based on the evidence presented at trial, the Court finds that MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided explosives to Hezbollah and, at all times relevant to these proceedings, exercised operational control over Hezbollah.

It is clear that MOIS was no rogue agency acting outside of the control and authority of the Iranian government. Indeed, as Dr. Clawson testified at trial, the October 23 attack would have been impossible without the express approval of Iranian government leaders at the highest level:

> Q: In the fall of 1983, was there anything of a significant nature, and especially a terrorist attack the dimensions of the attack on the Marine barracks of October 23rd, 1983, which would or could have been undertaken by Hezbollah without material support from Iran?
>
> A: Iran's material support would have been absolutely essential for any activities at that time, and furthermore, the politics of the organization [was such] that no one in the organization would have thought about carrying out an activity without Iranian approval and almost certainly Iranian orders.
>
> Q: Is that opinion within a reasonable degree of certainty as an expert on Iran?
>
> A: Oh, absolutely, sir.
>
> Q: Would any operation such as the October 23rd, 1983 attack require the approval within Iran of the Ministry of Information and Security?
>
> Q: Yes, sir.
>
> A: What about Mr. Rafsanjani?
>
> Q: There would have been a discussion in the National Security Council which would involve the prime minister, Mr. Rafsanjani, and it would also have required the approval of Iran's supreme religious leader, Ayatollah Khomeini. We have

many detailed accounts about the approval process from other attacks at this time, and, indeed, from a number of Iranians who became disillusioned within this process and later left.

Q: Doctor, your opinion within a reasonable degree of certainty as an expert on Iran, what was the foreign policy objective of the October 23rd, 1983, attack and other like attacks by Iran during this period?

A: Both to end the Western, especially the American presence in Lebanon, and to establish Iran's image as the leader of the world's radical, anti-Western, anti-American Muslim movement.

The two officials named by Dr. Clawson, the Ayatollah Ruhollah Khomeini and Ali Akbar Hashemi Rafsanjani, were high government officials in the Iranian government, occupying the positions of Supreme Leader and President.[11] The approval of both the Ayatollah Khomeini and President Rafsanjani was absolutely necessary to carry out the continuing economic commitment of Iran to Hezbollah, and to execute the October 23 attack. Given their positions of authority, any act of these two officials must be deemed an act of the government of Iran.

The complicity of Iran in the 1983 attack was established conclusively at trial by the testimony of Admiral James A. Lyons, Deputy Chief of Naval Operations for Plans, Policy and Operation from 1983-85. As deputy chief, Admiral Lyons routinely received intelligence information about American military forces. On October 25, 1983, the chief of naval intelligence notified Admiral Lyons of an intercept of a message between Tehran and Damascus that had been made on or about September 26, 1983. The message had been sent from MOIS to the

[11] Under the 1979 constitution, the Supreme Leader is the highest government official of Iran, followed by the President. The powers of the Supreme Leader include the authority to delineate the general policies of Iran and supervise their execution, assume the supreme command of the armed forces, declare war, mobilize the armed forces, appoint and dismiss key government officials, and issue decrees for national referenda. Arts. 110, 113, Constitution of Iran, 1979.

Iranian ambassador to Syria, Ali Akbar Mohtashemi, who presently serves as an adviser to the president of Iran, Mohammad Khatami.[12] The message directed the Iranian ambassador to contact Hussein Musawi, the leader of the terrorist group Islamic Amal, and to instruct him to have his group instigate attacks against the multinational coalition in Lebanon, and "to take a spectacular action against the United States Marines." Admiral Lyons testified that he has absolutely no doubt of the authenticity or reliability of the message, which he took immediately to the secretary of the navy and chief of naval operations, who viewed it, as he did, as a "24-karat gold document."[13]

Although it is not presently known whether Ambassador Mohtashemi contacted Musawi, evidence was presented at trial that Mohtashemi did proceed to contact a member of the Iranian Revolutionary Guard ("IRG"), and instructed him to instigate the Marine barracks bombing.[14] The Court heard the videotaped deposition testimony of a Hezbollah member known by the pseudonym "Mahmoud," who was a member of the group that carried out the October 23

---

[12] Mohtashemi's last name is sometimes given as "Mohtashemi-Pur."

[13] Dr. Michael Ledeen testified at trial that the message intercept was "one of the most impressive works of intelligence analysis that I saw [about the Marine barracks bombing], and it was absolutely convincing." Dr. Reuven Paz testified that he had read and analyzed the message intercept, which he described as "an order to attack the foreign powers on Lebanese soil, meaning the United States, the French paramilitary power, and of course, the Israeli military forces in south Lebanon."

[14] The Iranian Revolutionary Guard, also known as the Pasdaran, has been described as an "elite security and military force that was formed to protect the ideological purity of the Ayatullah Khomeini's Islamic Revolution and [that] has since developed considerable expertise in covert actions overseas." See Paul Quinn-Judge, Stalking Satan: As Their Leader Offers Friendship, Iran's Revolutionary Guards Keep a Menacing Watch over Their Backyard, TIME, March 30, 1998, available at http://www.time.com/time/magazine/1998/int/980330/ terrorism.stalking_satan15.html.

attack.[15] Mahmoud, a Lebanese Shi'ite Muslim, testified that Ambassador Mohtashemi contacted a man named Kanani, the leader of the Lebanese headquarters of the IRG. Mohtashemi instructed Kanani to go forward with attacks that had been planned against the 24th MAU and the French paratroopers.[16] Mahmoud testified that a meeting was later held in Baalbek, Lebanon, which was attended by Kanani and Sheik Sobhi Tufaili, Sheik Abbas Musawi, and Sheik Hassan Nasrallah. Nasrallah is the present leader of Hezbollah.[17] Musawi, Nasrallah's immediate predecessor as the leader of Hezbollah, was killed in a February 16, 1992 Israeli attack.[18] Tufaili is a former secretary general of Hezbollah.[19]

---

[15] The reliability of Mahmoud's testimony was established by an individual who has worked for the United States government in an intelligence capacity for thirty years, and who is known by the pseudonym "Joseph Salam." The Court admitted Salam as an expert on Islamic terrorist groups, based upon the quality and quantity of knowledge contained in his curriculum vita, which was filed under seal to protect Salam's identity. According to Salam, Mahmoud has provided information to him in the past, and, after later comparison with known objective facts, his information has always been determined to be accurate.

[16] Mahmoud's testimony about Ambassador Mohtashemi is confirmed by Joseph Salam, who testified that although Mohtashemi held the title of Iranian ambassador to Syria, he performed no actual diplomatic function and was "highly placed in the supervision and origination of covert terrorist operations by Iran." It is also independently confirmed by Dr. Michael Ledeen, who testified at trial that "Mr. Mohtashemi-Pur, his nickname in Iran is the Father of Hezbollah. He's the person who created Hezbollah. So of course he had a major involvement in [the Marine barracks bombing] since those were the people who did it." Dr. Ledeen also testified that "there was information of every imaginable type that enabled [the intelligence community] to reconstruct a picture which showed very clearly the Iranian involvement [in the Marine barracks bombing]. I don't know anyone who looked at that information who came to any other conclusion."

[17] See Talks with France Bridge the Diplomatic Gap, TIMES (London), May 26, 2003, at 13, available at 2003 WL 3134823 ("[Israeli Foreign Minister Sylvan Shalom's] warning came as the leader of Hezbollah, Sheikh Hassan Nasrallah, urged all anti-Israeli groups in Lebanon to take up arms in preparation for a possible Israeli attack.").

[18] See Kenneth R. Timmerman, Likely Mastermind Of Tower Attacks, INSIGHT, Dec. 31, 2001, at 18, available at 2001 WL 29585000 ("On March 17, 1992, a Hezbollah strike team

During this meeting, Kanani and the Hezbollah members formed a plan to carry out simultaneous attacks against the American and French barracks in Lebanon.[20] Mahmoud described the meeting and its aftermath:

> They got the order. They met and adopted the operation against the Marines and the French barracks in the same time. The Marines operation was done. They moved – they moved with one Iranian and one Shiite from the – Southern Lebanon over the mountain road to Hartareq Biralabin [phonetic spelling]. They stayed two days there.
>
> The – the cars were built, equipped, in Biralabin in a warehouse near a – gas station . . . underground. They built the cars. They equipped the cars there. That's their center.
>
> One Dodge, one red Dodge, that was painted exactly like the other – the real Dodge that was providing water and other stuff to the Marines, and they moved it to the airport road where they put the hold on – ambush and hold the real car when she arrived. They stopped the real car and they moved with the fake one that was built with explosives toward the Marine barracks.

---

leveled the Israeli Embassy in Buenos Aires, killing 29 persons and wounding 242. Hezbollah said the attack was intended to avenge the killing of Lebanese Hezbollah leader Sheik Abbas Musawi, whose convoy was obliterated by Israeli helicopter gunships in South Lebanon one month earlier."); Gareth Smyth, Sheikh Hassan Nasrallah's Holy War, FIN. TIMES, Aug. 30, 2001, available at 2001 WL 26065111 ("On February 16, 1992, Israeli helicopter gunships flew into south Lebanon and ambushed a convoy of cars, killing Abbas Musawi, the general secretary of Hizbollah. . . . [I]t brought to Hizbollah's top position Israel's most effective adversary of the next decade. With his beard, turban and black-rimmed glasses, Sheikh Hassan Nasrallah is recognised well beyond Lebanon's borders.").

[19] See Hikmat Chreif, Hezbollah Dissidents Demonstrate Against Normalization with Israel, AGENCE FRANCE-PRESSE, Jan. 7, 2000, available at 2000 WL 2708811 ("About 3,000 supporters of Lebanese Hezbollah dissident Sobhi Tufaili demonstrated in Baalbek Friday against any normalization with Israel and visits by Israeli tourists to Lebanon. . . . Tufaili, who used to be secretary general of Hezbollah, criticized the group's leadership for neglecting the needs of the 'underprivileged,' especially in the Baalbek-Hermel area, which had been a major drug-growing area until a crackdown in 1992.").

[20] Approximately eight minutes after the attack on the Marine barracks, a similar attack was attempted against the French barracks. Although the driver of the vehicle carrying the explosive device was shot and killed before the vehicle could enter the barracks, the device was detonated by remote control, killing 56 French soldiers.

C. The Attack

As testified by Mahmoud, after the meeting in Baalbek, a 19-ton truck was disguised so that it would resemble a water delivery truck that routinely arrived at the Beirut International Airport, which was located near the U.S. Marine barracks in Beirut, and modified the truck so that it could transport an explosive device. On the morning of October 23, 1983, members of Hezbollah ambushed the real water delivery truck before it arrived at the barracks. An observer was placed on a hill near the barracks to monitor the operation. The fake water delivery truck then set out for the barracks, driven by Ismalal Ascari, an Iranian.

At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks. As the truck circled in the large parking lot behind the barracks, it increased its speed. The truck crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks.[21] When the truck reached the center of the barracks, the bomb in the truck detonated.

The resulting explosion was the largest non-nuclear explosion that had ever been detonated on the face of the Earth. The force of its impact ripped locked doors from their doorjambs at the nearest building, which was 256 feet away. Trees located 370 feet away were shredded and completely exfoliated. At the traffic control tower of the Beirut International Airport, over half a mile away, all of the windows shattered. The support columns of the Marine barracks, which were made of reinforced concrete, were stretched, as an expert witness described, "like rubber bands." The explosion created a crater in the earth over eight feet deep. The four-story Marine barracks was reduced to fifteen feet of rubble.

[21] Concertina wire is a length of barbed wire that is extended into a spiral for use as a barrier, as on a fence. It is employed by the U.S. armed forces to prevent entry into restricted areas by unauthorized persons.

The force of the explosion was equal to between 15,000 to 21,000 pounds of TNT. FBI and ATF explosives experts both concluded that the explosive material was "bulk form" pentaerythritol tetranitrate, or PETN. Danny A. Defenbaugh, the on-scene FBI forensic explosive investigator, testified as to his findings:

> [W]e were able to, through the forensic residue analysis, identify the explosive material, and it was unconsumed particles of PETN . . . .
>
> PETN is a primary explosive that is manufactured commercially and primarily for U.S. military purposes. It is a primary explosive that is used in detonating cord. Detonating cord is nothing more than a plastic and fiber-wrapped cord that has the PETN, which looks like a white powder . . . that is then extruded inside of that cord . . . .
>
> In this case, it was not [consumed]; we found unconsumed particles of PETN. That was just like we had found also in the American Embassy bombing. What that means is that it had to have been from a bulk explosive, it had to have been from a manufacturer.

Defenbaugh explained that when the commercially-manufactured form of PETN is detonated, it is completely consumed in the ensuing explosion. The presence of unconsumed particles of PETN at the Marine barracks blast site, therefore, indicated that the PETN used in the bomb had not been the standard commercially-available form of the explosive. Instead, it had been the raw "bulk form" of PETN, which is not generally sold commercially. In the Middle East, the bulk form of PETN is produced by state-sponsored manufacturers for military purposes. In 1983, bulk form PETN was not manufactured in the nation of Lebanon. However, at that time, bulk form PETN was manufactured within the borders of Iran.

Warren Parker, who served as an explosives expert with the Army and the ATF for forty years, testified that the effectiveness of the attack demonstrated that it had been the result of careful planning.[22] Parker also concluded, based on the degree of planning and sophistication

---

[22] Parker testified at trial:

that went into the attack, that a group of individuals without specialized training in explosives

could not have carried it out:

Q:    Mr. Parker, in your opinion, within a reasonable degree of certainty as an expert in
      explosives, could this bombing have been successfully carried out by a group of
      individuals with limited education, possessing minimal literacy and no specialized
      training in explosives?

A:    No, sir.

Q:    And what do you base that opinion on?

A:    The degree of planning, the degree of sophistication of this bombing. . . . The fact
      that it was a significant amount of a military-type explosive. These are not things
      that you just go down to the drugstore and buy a pound of, these are not things
      [for which] you buy innocuous materials and manufacture in your backyard.
      PETN is manufactured in factories that have specialized tools and equipment and
      knowledge.
             I think that I will concur with Mr. Defenbaugh's conclusion that it
      is a state- or military-run factory that produces this type of material, and I think
      the fact that it was carried out so successfully and not bungled really enhances the
      fact that somebody had practiced this before. . . .
             [D]uring the, say, late '60s, early '70s, clear up into the '80s, there
      were state-sponsored training camps involving the use of explosives for political
      gain, and these training camps used as part of their training, and I have seen

---

In the Marine barracks [attack], we have considerable planning that had to occur. They
had to know what the interior of the building looked like, and, in my background and
experience, I believe that the placement of that in the center of the building with the
atrium opening up to the top was probably key in causing most of the deaths.

    So it took someone getting in there, doing a lot of pre-scouting, making sure that
they could, in fact, penetrate the barriers, the barbed-wire barriers, negotiate the pipes that
were placed in the way to deter traffic. They had to use a site that had a direct line
because they couldn't afford to take a long time. The Marines were all armed. While
they didn't have ammunition ready, and that was probably known, they would have likely
not made it inside. So if they had tried to come through some sort of a circuitous route
rather than a direct attack down through those barrier pipes right over [the] top of what I
believe to be the only place that you could have gotten a truck of that size into the
building without it being impinged or stopped by some part of the building itself – so they
knew that that was a good entrance. They knew that the truck could negotiate those pipes
and that the weak part for entrance was there at the sandbag guard barricade and that the
interior of the building was the vulnerable spot of that building.

       materials seized from those that included pages from military manuals, U.S.
       military as well as English and French military manuals, as part of their training in
       calculating the explosive charges.

Q:    I believe this Court in [Eisenfeld v. Islamic Republic of Iran] received testimony
       with regard to a training camp with regard to handling explosives just outside
       Tehran, Iran, run by the Iranian government. Would this be the kind of thing
       you're talking about, an intensive course over three or four months?

A:    Yes, sir, those are exactly the kinds. There were several of those. The one in Iran
       was just one of several but typical of that.

Based on the evidence presented by the expert witnesses at trial, the Court finds that it is

beyond question that Hezbollah and its agents received massive material and technical support

from the Iranian government. The sophistication demonstrated in the placement of an explosive

charge in the center of the Marine barracks building and the devastating effect of the detonation

of the charge indicates that it is highly unlikely that this attack could have resulted in such loss of

life without the assistance of regular military forces, such as those of Iran.

As a result of the Marine barracks explosion, 241 servicemen were killed, and many

others suffered severe injuries. Steve Russell, the sergeant of the guard at the time of the

explosion, testified that he had observed several victims of the bombing who were in severe pain

before their deaths. Sgt. Russell stated that death was not instantaneous for many of the victims,

and that many of the victims of the explosion endured extreme pain and suffering.

During the trial, family members of the victims testified about the anguish they endured

when they learned of the attack. Deborah Peterson described what happened when she received

word of the attack on the Marine barracks, where her brother, Corporal James Knipple, was

stationed:

It was Sunday morning and I was sleeping and I got a phone call from my father. He had

a frantic sound to his voice that I had never heard before and he said – he just screamed, "Debbie, our worst nightmare has been realized. And I turned on the television and saw what was happening. . . .

It seemed like an awful long time [before word of his death was received]. We waited and waited and waited. We watched every television, we were – I mean, the house was filled with people. We watched the television, we got every newspaper, photograph, magazine we could. We looked for his face among the survivors. We even thought we saw him a couple of times. All of his friends gathered, neighbors, and we held out hope even though the count was rising. . . .

I think around November 7th or 8th, we got a phone call . . . They wanted dental information and identifying marks, anything we could give them, and my father told them about a scar on his forearm. The next day, they told us that he was identified.

We brought him home on the 9th, on his 21st birthday, and we buried him on the 10th, the Marine Corps birthday. I remember the casualty officer, he was all by himself, he came to the house. We were all gathered around, and he told us that Jim was among the dead. It was official.

I remember the casualty officer sitting next to my father and they both seemed really quiet while everybody else was screaming and yelling and crying, and my dad just sat there really quiet. And then when everybody left, he went downstairs and started to scream Jim's name over and over and over again at the top of his lungs.

## III. CONCLUSIONS OF LAW

Having made the above-listed findings of fact, the Court now enters the following conclusions of law:

1. An action brought against a foreign state, its intelligence service acting as its agent, and its officials, acting in their official capacity, must be brought under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 et seq. The FSIA must be applied in every action involving a foreign state defendant. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489; 28 U.S.C. § 1330. The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated

exceptions to immunity. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). This Court lacks subject matter jurisdiction over the present actions unless they fall within one of the FSIA's enumerated exceptions to foreign sovereign immunity. See Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). The FSIA has been construed to apply to individuals for acts performed in their official capacity on behalf of either a foreign state or its agency or instrumentality. El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir.1996) (citing Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101-1103 (9th Cir. 1990).

2. When it passed the Antiterrorism and Effective Death Penalty Act of 1996, Congress lifted the immunity of foreign states for certain sovereign acts that are repugnant to the United States and the international community, and created a right of civil action based upon the commission of terrorist acts. Pub. L. 104-132, Title II, § 221(a), (April 24, 1996), 110 Stat. 1214, codified at 28 U.S.C.A. § 1605 (West 1997 Supp.). That Act created an exception to the immunity of those foreign states officially designated by the State Department as state sponsors of terrorism, if the foreign state so designated commits a terrorist act, or provides material support and resources to an individual or entity which commits a terrorist act, which results in the death or personal injury of a United States citizen. See 28 U.S.C. § 1605(a)(7); see also H. R. REP. NO. 104-383, at 137-38 (1995).

3. Iran has continuously been designated a state sponsor of terrorism by the U.S. Department of State since January 19, 1984.

4. Applying the above-mentioned law, as a consequence of the actions of the defendants, this Court concludes that it possesses subject matter jurisdiction over the defendants in these actions, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

5. 28 U.S.C. § 1605(a)(7) provides for personal jurisdiction over foreign state sponsors of terrorism. As this Court has noted in a previous case involving the government of Iran, "[because] international terrorism is subject to universal jurisdiction, Defendants had adequate notice that their actions were wrongful and susceptible to adjudication in the United States." Flatow, 999 F. Supp. at 14 (citing Eric S. Kobrick, The Ex Post Facto Prohibition and the Exercise of Universal Jurisdiction over International Crimes, 87 COLUM. L. REV. 1515, 1528-30 (1987)); see also Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 88-89 (D.C. Cir. 2002) ("In enacting [28 U.S.C. § 1605(a)(7)], Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future.")

6. Applying the above-mentioned law, this Court concludes that it possesses personal jurisdiction over the defendants in these actions, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.

7.      28 U.S.C. § 1605(f) provides for a statute of limitations of "10 years after the date on

which the cause of action arose," and provides for equitable tolling during the "period

during which the foreign state was immune from suit."

8.      The state of Iran was immune from suit until passage of Pub. L. 104-132, which was

made effective on April 24, 1996. Accordingly, the Court concludes that the statute of

limitations contained in 28 U.S.C. § 1605(f) does not bar these actions.

9.      In a memorandum opinion issued December 18, 2002, this Court stated that if the

plaintiffs in these actions proved that the U.S. military service members at issue in these

cases were part of a peacekeeping mission and that they operated under peacetime rules

of engagement, they would qualify for recovery. As set forth in the above findings of

fact, the plaintiffs have demonstrated that the U.S. military service members at issue were

part of a peacekeeping mission, and that they were operating under peacetime rules of

engagement. Therefore, the Court concludes that the military service members at issue in

these cases qualify for recovery.

10.     A foreign state is liable for money damages under the FSIA "for personal injury or death

that was caused by an act of . . . extrajudicial killing, or the provision of material support

or resources . . . for such an act if such act or provision of material support is engaged in

by an official, employee, or agent of such foreign state while acting within the scope of

his or her office, employment, or agency." 28 U.S.C. § 1605(a)(7). The foreign state

must be designated as a state sponsor of terrorism under either section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. 2405(j) or section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. 2371, at the time that the act occurred, unless the foreign state is thus designated later as a result of that act. Id. Either the victim or the plaintiff must have been a United States national at the time of the act. Id. Additionally, the act must be such that it would be actionable if the United States, its agents, officials or employees within the United States engaged in similar conduct. The Court concludes, based on the above findings of fact, that plaintiffs in these actions have established all of these elements by clear and convincing evidence.

11. The FISA utilizes the same definition of "extrajudicial killing" as the Torture Victim Protection Act of 1991, which defines an "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples. . . ." Pub. L. 102-256, 106 Stat. 73 (1992). The Court concludes that the act undertaken by agents of Hezbollah – the development and detonation of an explosive charge in the barracks of the 24th MAU on October 23, 1983, which resulted in the deaths of over 241 peacekeeping American servicemen – satisfies the FISA's definition of an "extrajudicial killing."

12. The Court finds that MOIS, acting as an agent of the Islamic Republic of Iran, performed acts on or about October 23, 1983, within the scope of its agency (within the meaning of

28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note), which acts caused the deaths of over 241 peacekeeping servicemen at the Marine barracks in Beirut, Lebanon. Specifically, the deaths of these servicemen were the direct result of an explosion of material that was transported into the headquarters of the 24th MAU and intentionally detonated at approximately 6:25 a.m., Beirut time by an Iranian MOIS operative. The Court therefore concludes that MOIS actively participated in the attack on October 23, 1983, which was carried out by MOIS agents with the assistance of Hezbollah.

13. The Court concludes that the deaths of over 241 peacekeeping servicemen at the Marine barracks in Beirut, Lebanon were caused by a willful and deliberate act of extrajudicial killing.

14. As the result of the deaths of the 241 American servicemen in Beirut, Lebanon, their parents, surviving siblings, children, and spouses have suffered and will continue to suffer severe mental anguish and loss of society.

15. It is beyond dispute that if officials of the United States, acting in their official capacities, provided material support to a terrorist group to carry out an attack of this type, they would be civilly liable and would have no defense of immunity. See 42 U.S.C. § 1983; Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

16. The Court concludes that the defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security, are jointly and severally liable to the plaintiffs for compensatory and punitive damages.

17. As to each claim of each Complaint, the Court will make a determination of the proper amount of compensatory damages after its receipt of reports from the special masters appointed by the Court. The Court will also make a determination as to punitive damages at that time.

## IV. CONCLUSION

The Court is mindful that some may question the utility of the present suit. During the March trial, the Court heard testimony from a number of witnesses as to the reasons why this suit was brought, and as to its potential efficacy.

Dr. Patrick Clawson, deputy director of the Washington Institute for Near East Policy, described the manner in which civil judgments for acts of state-sponsored terrorism have had a noticeable impact upon the present regime in Iran:

> Q: To what extent since its creation in 1979 has the Islamic Republic of Iran been susceptible to influence because of economic sanctions? By sanctions, I don't mean something that was stated, but simply having to pay out bucks, whether it's in damages in personal injury cases or damages awarded by a tribunal, punitive damages, anything of that sort?
>
> A: To begin with, the release of those held hostage at the American Embassy in Tehran, most Iranian observers think that the American freezing of billions of dollars of Iranian assets and the eventual negotiations which really hinged around

how much money Iran was going to get back is a good example from the very beginning of this process of Iran's susceptibility to economic pressure, and there have been a number of situations since in which Iran has been deflected from its main course by economic pressures. For instance, the Europeans [were] successful at doing that in the early 1990s, deflecting Iran from terrorist activities in European soil.

* * * * * * * * * * *

Q: Given the enormity of the offense committed on October 23rd, 1983, in the attack of the Marine barracks, how much of that sum in the pockets of Iran would have to be subtracted before – in order to give some indication that they would start to change policy?

A: Well, sir, I would – the larger the sum, the more of an impact this is going to have on the Iranians, and if this court case results in a large judgment, be it for compensatory or punitive damages, that is very likely to receive the attention of a fair number of policymakers in Iran, and I have great confidence that the Iranian leaders will consider that in deciding which way to proceed.

* * * * * * * * * **

I think, sir, that the Iranians have been extraordinarily sensitive to court actions, whether it was in Germany or in Argentina or in the United States, which make any references to the top leadership of the country being involved in these cases. That has been a matter of greatest sensitivity in Iran, and there have been several cases in which the Iranians reacted extremely strongly, particularly to suggestions that the supreme religious leader was involved in any way in these activities. . . . I have to say that I think that they pay quite detailed attention to these judgments . . . .

* * * * * * * * * *

I would say that based on the past precedent about the way that these court cases have been viewed, what will be looked at very closely is two things. One is the size of the dollars involved, and the other is whether or not there is any change in the way that the court views the matter. So this case, if it involves a much larger judgment in dollar terms than previous cases, will be regarded as a toughening of the American stance.

On the other hand, there will be close examination of whether or not this case in its legal reasoning or in the application or non-application of punitive damages involves any change in the way in which a court rules. So, for instance, a lack of punitive damages would be regarded as an indication that the United States Government is making a gesture towards Iran.

Q: A softening of our position.

A: Correct, sir. . . .

Q: So as I read you correctly, less in punitive damages than has been awarded in cases before would be to the Iranians a softening of the American resolve; more would be a hardening of the American resolve?

A: Correct, sir.

The Court also heard the testimony of Dr. Michael Ledeen[23] as to the likely effect of an award of damages in the present actions:

THE COURT: From your experience dealing all these years now with Iran, have you seen, from the court cases where punitive damages have been entered by the courts, what impact, if any, that has had in Iran and on the government, and what do you think of that?

A: Well, it hurts the government because it stings them, and the people see – what the Iranian people need to reach the point where they are willing to risk their lives to bring down this regime is that the civilized world understands what kind of regime it is and therefore would welcome that kind of event; and consequently, in my opinion, every time that regime is condemned and punished in a Western court, that hastens the moment of the downfall of that regime.[24]

---

[23] As noted above, Dr. Ledeen served as a consultant to the U.S. Defense Department at the time of the October 23, 1983 bombing, and is one of the premier experts in the nation on the subject of U.S. foreign relations. He is presently a resident scholar at the American Enterprise Institute.

[24] Regarding the tension between the Iranian government and the populace, Dr. Ledeen testified that

> the people of Iran hate the regime. Even the public opinion polls taken by the regime itself show that 70-plus percent of the Iranian people don't like the regime, would like a national referendum, deplore the foreign policy of the regime and want better relations with the United States, and you would have to figure that if 70 percent of Iranians will tell people that they know are coming from the Ministry of Information that they hate the regime, that the real number must be something higher than that.

The Court also heard testimony from the men and women who have brought the present actions about their reasons for so doing. During the trial, Lt. Col. Howard Gerlach, who was paralyzed in the October 23 attack, was asked about what he hoped to achieve by participating in these actions:

> Well, I guess there's three words: accountability, deterrence and justice. And they are interrelated. The accountability, and I swear it was on Sunday, I was listening to a rerun of one of the TV – I don't know, Meet the Press or whatever, but Vice President Cheney was talking and he was saying that they, the terrorists feel that they can do things with impunity, and he said ever since the Marines in '83. Yes, there hasn't been any accountability.
>
> Deterrence effect is, in some way, and this is also what he was talking about, was one thing we have to go after – and I think I'm stating this correctly; this is what I heard, is the funding. It's the funding. Even on the radio coming over here, we heard some talk about funding for terrorist organizations.
>
> Then the third thing is the justice, and this refers to the people, a good portion of [whom] are in this room. . . . They lost a large chunk of their lives, young Marines, sons, husbands, fathers, brothers. They were attempting to do a noble thing. They went as peacekeepers in the tradition of this country. . . [W]e weren't trying to conquer land, we weren't trying to get anything for ourselves; we were really trying in a humanitarian way to help those people in Lebanon. I think this is . . . the day in court, literally and figuratively speaking, for recognition of just how great these guys were.

The Court also heard the testimony of Lynn Smith Derbyshire, whose brother, Capt. Vincent Smith, was killed in the October 23 attack:

> I'm not sure it's true that time heals wounds, but even so, a wound which has healed over time is not the same thing as not having a wound. Even a healing wound gets reopened from time to time.
>
> * * * * * * * * * *
>
> [A]s I have talked to so many of the Beirut families, I believe that many of them would concur with me when I say that the pain does not stop when you bury the dead; it is only the very beginning. We feel this loss over and over and over again. It does not go away and it does not lessen with time; that is a myth. It is more like teaching someone who has a chronic pain disorder how to manage and embrace their pain than it is a lessening of pain.

* * * * * * * * * *

I have spoken to quite a number of the family member and I think we're all – I think they would all agree with me when I tell you that what Vince would have wanted was justice.

Vince was a fair-minded man. Vince was a man of integrity, as I know so many of the men who were lost that day were. It's the kind of men Marines are. That's what the Marine Corps produces. And Vince would have wanted us to fight.

Vince would have said . . . we must hold these men accountable. Vince would have said that it is time for justice, that it is time for compensation, that it is time to make it – to make them pay enough to make them stop, because Vince was a man who believed in what was right, and if he had lived, he would be sitting here in my place and he would be saying, "Come on, sis, let's go get them."

But he can't be here, and in his name, and in his honor, and with the permission of some of the other family members here . . . in their names and in their honor, I salute them, and we stand together to do what they cannot do for themselves.

There is little that the Court can add to the eloquent words of these witnesses. No order from this Court will restore any of the 241 lives that were stolen on October 23, 1983. Nor is this Court able to heal the pain that has become a permanent part of the lives of their mothers and fathers, their spouses and siblings, and their sons and daughters. But the Court can take steps that will punish the men who carried out this unspeakable attack, and in so doing, try to achieve some small measure of justice for its survivors, and for the family members of the 241 Americans who never came home.

A separate order accompanies this opinion.

Date: 5-30-03

Royce C. Lamberth
United States District Judge

**EXHIBIT "B"**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DEBORAH D. PETERSON,** **Personal Representative of the Estate of James C. Knipple (Dec.),** ***et al.*****,** **Plaintiffs,** **v.** **ISLAMIC REPUBLIC OF IRAN,** ***et al.*****,** **Defendants.** | **Consolidated Civil Actions:** **01-2094 (RCL)** **01-2684 (RCL)** |

## MEMORANDUM OPINION

## BACKGROUND

These actions arise from the October 23, 1983, bombing of a United States Marine barracks in Beirut, Lebanon, in which 241 American servicemen operating under peacetime rules of engagement were murdered by a suicide bomber. This attack was regarded as the most deadly state-sponsored terrorist attack made against American citizens, until the tragic attacks on September 11, 2001.

The nearly one thousand plaintiffs in this consolidated action are many of the family members and estates of the 241 servicemen killed in the attack. Plaintiffs allege that the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are liable for damages from the attack because they provided material support and assistance to

B

Hezbollah,[1] the terrorist organization that orchestrated and carried out the bombing. Plaintiffs have relied upon causes of action founded upon provisions of the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7).

**PROCEDURAL HISTORY**

On March 17-18, 2003, this Court conducted a bench trial to determine the defendants' liability for their part in the perpetration of this attack. After reviewing the evidence presented by plaintiffs at trial, including testimony from lay and expert witnesses, this Court issued an opinion finding that the defendants were legally responsible for providing material financial and logistical support to help carry out this tragic attack on the 241 servicemen in Beirut in 1983. *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 61 (D.D.C. 2003). In that opinion, this Court also found that the surviving family members have suffered and will continue to suffer mental anguish and loss of society. *Id.* Finally, this Court directed special masters to consider each claim brought by plaintiffs, and indicated that it would make a determination on the amount of compensatory and punitive damages for each claim after the Court received reports from the special masters.[2] The Court reaches this determination on the issue of damages in this opinion.

---

[1] According to the Oxford English Dictionary, the term "Hezbollah" is synonymous with the terms "Hizbollah" and "Hizbullah," all of which are English transliterations of the Arabic term referring to the extremist Shiite Muslim group also known as the "Party of God." *See* Oxford English Dictionary (2d ed. 1989). Accordingly, to the extent that any of these terms are used within this opinion, they shall be used interchangeably.

[2] In a prior case where this Court held Iran responsible under the Foreign Sovereign Immunities Act as a state sponsor of terrorism, this Court noted that its statutory duty is clear and that there is no danger of inadvertent interference with foreign relations. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 16 (D.D.C. Mar. 11, 1998) (Lamberth, J.). "Article I of the Constitution establishes that Congress has 'authority to enact laws applicable to conduct beyond the territorial boundaries of the United States.'" *Id.* (quoting *EEOC v. Aramco*, 499 U.S. 244, 260-61 (1991). The Foreign Sovereign Immunities Act not only applies to extraterritorial

The Court reviews the determinations made by the special masters *de novo*. *See* Fed. R. Civ. P. 53(g)(3).

## DISCUSSION

### I. *Assessment of Validity of Each Plaintiff's Cause of Action*

In order to ensure that the Court determines the appropriate amount of damages available to each plaintiff under the law, it must first ensure that each plaintiff has a valid claim under state law. The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. Sept. 29, 2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.)).

In order to determine the applicable state law to each action, the Court must look to the choice of law rules of the forum, in this case, the choice of law rules of the District of Columbia. *See Blais*, 459 F. Supp. 2d at 54. Under District of Columbia choice of law rules, courts employ a modified government interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most

---

conduct, but one of its express purposes is to affect the conduct of terrorist states outside the United States, in order to promote the safety of United States citizens overseas. Congress specifically restricted application of the statute to foreign state defendants which the Executive Branch, via the State Department, has determined are foreign state sponsors of terrorism. *See id.* This Court is aware that the judgment entered today may be the largest ever entered by a court of the United States against a foreign nation. The President has not filed a suggestion of interest indicating that actions by this Court will in any way interfere with the foreign relations of the United States. This Court is properly performing its duty under a constitutional statute.

advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted). Application of this governmental interest test generally points to the law of plaintiff's domicile as having the greatest interest in providing redress to its citizens. Accordingly, the validity of each of the plaintiffs' claims shall be determined by the state in which they were domiciled at the time of the attack.

In this action, three types of claims have been sought. First, the personal representatives and estates of the servicemen killed in the attack have brought claims for wrongful death, in which the plaintiffs and beneficiaries seek compensation in the form of the present value of the decedent's lost wages and earnings that he would have earned but for his untimely death. Second, the surviving servicemen have brought claims for battery against the defendants. Third, the family members of both the deceased and surviving servicemen have brought claims for intentional infliction of emotional distress ("IIED") against the defendants for their part in materially bringing about the attack. The Court will assess the relative merits of each of the claims separately.

*A. Wrongful Death Claims*

Wrongful death claims were brought by the personal representatives and estates of the following deceased servicemen:

> Terry Abbott, John Robert Allman, Ronny Kent Bates, James Baynard, Jess W. Beamon, Alvin Burton Belmer, Richard D. Blankenship, John W. Blocker, Joseph John Boccia Jr., Leon Bohannon, John Bonk Jr., Jeffrey James Boulos, John Norman Boyett, William Burley, Paul Callahan, Mecot Camara, Bradley Campus, Johnnie Ceaser, Robert Allen Conley, Charles Dennis Cook, Johnny Len Copeland, David Cosner, Kevin Coulman, Rick Crudale, Russell Cyzick, Michael Devlin, Nathaniel Dorsey, Frederick Douglass, Timothy Dunnigan, Bryan Earle,

Danny R. Estes, Richard Andrew Fluegel, Michael D. Fulcher, Sean Gallagher, George Gangur, Randall Garcia, Harold Ghumm, Timothy Giblin, Michael Gorchinski, Richard Gordon, Davin M. Green, Thomas Hairston, Michael Haskell, Mark Anthony Helms, Stanley G. Hester, Donald Wayne Hildreth, Richard Holberton, Dr. John Hudson, Maurice Edward Hukill, Edward Iacovino Jr., Paul Innocenzi III, James Jackowski, Jeffrey Wilbur James, Nathaniel Walter Jenkins, Edward Anthony Johnston, Stephen Jones, Thomas Adrian Julian, Thomas Keown, Daniel Kluck, James C. Knipple, Freas H. Kreischer III, Keith Laise, James Langon IV, Michael Scott LaRiviere, Steven LaRiviere, Richard Lemnah, Joseph Raymond ("Joel") Livingston III, Paul D. Lyon Jr., John Macroglou, Samuel Maitland Jr., Charlie Robert Martin, David Massa, John McCall, James E. McDonough, Timothy R. McMahon, Richard Menkins II, Ronald Meurer, Joseph Peter Milano, Joseph Moore, Harry Douglas Myers, David Nairn, John Arne Olson, Joseph Albert Owens, Connie Ray Page, Ulysses Gregory Parker, John L. Pearson, Thomas S. Perron, John Arthur Phillips Jr., William Ray Pollard, Victor Mark Prevatt, James Price, Patrick Kerry Prindeville, Diomedes J. Quirante, Warren Richardson, Luis J. Rotondo, Michael Caleb Sauls, Charles Jeffrey Schnorf, Scott Lee Schultz, Peter Scialabba, Gary Randall Scott, Thomas Alan Shipp, Jerryl Shropshire, Larry H. Simpson Jr., Kirk Hall Smith, Thomas Gerard Smith, Vincent Smith, William Scott Sommerhof, Stephen Eugene Spencer, William Stelpflug, Horace Renardo ("Ricky") Stephens Jr., Craig Stockton, Jeffrey Stokes, Eric D. Sturghill, Devon Sundar, Thomas Paul Thorstad, Stephen Tingley, Donald H. Vallone Jr., Eric Glenn Washington, Dwayne Wigglesworth, Rodney J. Williams, Scipio Williams Jr., Johnny Adam Williamson, William Ellis Winter, Donald Elberan Woollett, Craig Wyche, Jeffrey D. Young.[3]

Out of the 128 deceased servicemen, 123 were domiciled in North Carolina at the time of the attack.[4] The servicemen who were not domiciled in North Carolina at the time of the attack

[3] In association with their wrongful death claims, the respective estates of Alvin Burton Belmer, Nathaniel Walter Jenkins, Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley have sought damages for pain and suffering incurred during the time at which they were alive after the attack and the time at which they died. The measure of damages for each of these servicemen will be assessed in the damages portion of this opinion, *see infra* Section II.B.1, and does not affect the validity of their wrongful death claims.

[4] Deceased serviceman, Diomedes J. Quirante, was born in the Phillippines in 1958, and was not a United States citizen. Therefore, an issue exists as to whether Diomedes J. Quirante has standing to recover against Iran and MOIS under the FSIA's "state sponsored terrorism" exception. In order for a plaintiff to so recover, he or she must show that: (1) the State

were domiciled in California, Oklahoma, South Carolina, and Vermont.[5] This difference in domicile is of no moment, however, because the wrongful death statutes of each of the servicemen's respective states of domicile imposes liability on an actor when his "wrongful act, neglect, or default" causes a person's death, and had that person lived, he could have recovered damages from the actor. Cal Civ. Proc. Code § 377.60(a) (2007); N.C. Gen. Stat. § 28A-18-2(a) (2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. § 15-51-10 (2006); Vt. Stat. Ann. tit. 14, § 1491 (2007). Each statute provides for recovery of numerous categories of damages, including

---

Department had previously designated the foreign sovereign as a "state sponsor of terrorism" or did so based on the event in question; (2) the victim or plaintiff was a U.S. national when the event took place; and (3) "the foreign sovereign engaged in conduct that falls within the ambit of the statute." *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28, 2006).

As this Court has already found in its Memorandum Opinion establishing the defendants' liability for this attack, the first and third requirements are satisfied. Therefore, the only issue remaining is whether Diomedes qualifies as a United States national. The term "U.S. national" embraces both United States citizens and non-citizens who owe permanent allegiance to the United States. 8 U.S.C. § 1101(a)(22) (2006). In this case, the evidence shows that Diomedes clearly was a U.S. national. First, though a citizen of the Phillippines, Diomedes enlisted in the United States Army when he was twenty one years old. As a part of his commitment to becoming a member of the United States Armed Forces, Diomedes was required to take an oath to defend and uphold the Constitution of the United States. Once enlisted, he was assigned to the 2nd Marine Division, Fleet Marine Force (FMF) in Camp Lejeune, North Carolina. He remained a member of the United States Army in North Carolina from that time until his death in Beirut, Lebanon in 1983. His oath, and ultimate heroic act of dying while a member of the United States Army establishes beyond any doubt that Diomedes J. Quirante's allegiance to the United States was permanent. Therefore, this Court finds that Diomedes J. Quirante was a United States national at the time he was killed. Accordingly, Diomedes has standing under the FSIA to recover against the defendants.

There still remains the issue of what law governs Diomedes' claims. In light of the fact that he was stationed in Camp LeJeune, North Carolina before being sent to Lebanon, this Court finds that North Carolina is the state with which Diomedes had the closest and most substantial connection. Therefore, the law of North Carolina shall govern Diomedes' wrongful death claim.

[5] The Court could not determine the domicile of one serviceman, Frederick Douglass, because no evidence was presented on behalf of his estate. For this reason, the Court will dismiss the claim brought by the personal representative of his estate without prejudice.

pecuniary loss in the form of the present monetary value of the decedent to the persons entitled to receive the damages recovered, expenses for care, treatment and hospitalization incident to the injury resulting in death; and reasonable funeral expenses. *See* Cal Civ. Proc. Code § 377.61 (2007); N.C. Gen. Stat. § 28A-18-2(b) (2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. § 15-51-20 (2006); Vt. Stat. Ann. tit. 14, § 1491 (2007). Additionally, North Carolina allows for the recovery of compensation for pain and suffering of the decedent. N.C. Gen. Stat. § 28A-18-2(b).[6]

Based upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for wrongful death under North Carolina law. Accordingly, those valid heirs and beneficiaries under North Carolina's intestate statute are entitled to share in the recovery of the damages awarded as a result of each serviceman's untimely death.

*B. Battery Claims*

Claims of battery were brought against the defendants by the following servicemen who ultimately survived the attack:

> Marvin Albright, Pablo Arroyo, Anthony Banks, Rodney Darrell Burnette, Frank Comes Jr., Glenn Dolphin, Frederick Daniel Eaves, Charles Frye, Truman Dale Garner, Larry Gerlach, John Hlywiak, Orval Hunt, Joseph P. Jacobs, Brian Kirkpatrick, Burnham Matthews, Timothy Mitchell, Lovell "Darrell" Moore,. Jeffrey Nashton, John Oliver, Paul Rivers, Stephen Russell, Dana Spaulding,

[6] The servicemen who seek pain and suffering during the survival period between the attack and their deaths were each domiciled in North Carolina at the time of the attack. Therefore, the Court need only concern itself with North Carolina law on the issue of pain and suffering.

Craig Joseph Swinson, Michael Toma, Danny Wheeler, Thomas D. Young[7]

Out of the twenty six surviving servicemen seeking damages for battery, twenty five of them were domiciled in North Carolina at the time of the attack. The one remaining surviving serviceman, Charles Frye, was domiciled in California at the time of the attack. Both states, however, recognize that a battery is deemed to be an offensive touching of the person by another without consent. *See Rains v. Superior Court*, 198 Cal. Rptr. 249, 252 (Cal. Ct. App. 1984); *Ormond v. Crampton*, 191 S.E.2d 405, 410 (N.C. App. 1972). Therefore, the battery claims for each of the servicemen can be assessed evenly.

Based upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for battery under North Carolina and California law. Therefore, each may recover the appropriate amount of compensatory damages as determined by this Court.

C. *Intentional Infliction of Emotional Distress Claims*

The remaining 753 plaintiffs have sought claims for intentional infliction of emotional distress, and awards for pain and suffering incurred as a result of their extreme emotional grief and psychological anguish associated with the knowledge that their family members are either deceased or alive but permanently scarred both physically and mentally. Each of these plaintiffs were domiciled in a number of different states–and in one family's case, the Phillippines–at the time of the attack. Accordingly, this Court must determine whether each of these plaintiffs has brought a valid cause of action under each state's respective law.

---

[7] Because these individuals can recover for their mental anguish and suffering under their respective battery claims, the Court need not consider each plaintiff's intentional infliction of emotional distress claim, which would result in an impermissible double recovery.

In order to accomplish this, the Court must first analyze whether such a cause exists under each state's laws. Next, to the extent that a state recognizes IIED claims, this Court must determine which family members have standing to recover for IIED under each state's laws. Then this Court must assess whether the plaintiffs have established the essential elements of the claim.

*1. Intentional Infliction of Emotional Distress: State Law Analysis*

The states of domicile for these 753 plaintiffs are: Alabama, California, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, and Wisconsin. The family of serviceman Diomedes J. Quirante was domiciled in the Phillippines.[8]

Each of the states mentioned above recognize the existence of a cause of action for intentional infliction of emotional distress, rooted in Section 46 of the Restatement (Second) of

[8] Though the surviving immediate family members of Diomedes J. Quirante are not United States citizens, the Court finds that they have standing under the FSIA to bring claims for intentional infliction of emotional distress under North Carolina law. The "state sponsored terrorism" exception to the FSIA requires only that either the plaintiffs *or the victim* be a United States national at the time of the attack. *Prevatt*, 421 F. Supp. 2d at 158. Therefore, the Quirante family members' intentional infliction of emotional distress claims may be brought because Diomedes was a United States national at the time he was killed. *See supra* note 3. Applying District of Columbia choice of law principles, North Carolina is the state with the strongest interest in determining the claims brought by Diomedes' family members because their claims are intertwined with–and result from–Diomedes' death. Therefore, this Court finds that the claims brought by the Quirante family are governed by North Carolina law.

Torts.[9]    Though each state has its own particular means of describing intentional infliction of emotional distress, upon inspection of each state's laws the elements of intentional infliction of emotional distress are met in each state if it can be demonstrated that: (1) the defendant engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress.[10]

There still remains the issue of whether each plaintiff has standing to recover under state

---

[9] *See, e.g., American Rd. Serv. Co. v. Inmon*, 394 So.2d 361 (Ala. 1980); *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982); *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970); *Murray v. Bridgeport Hosp.*, 480 A.2d 610, 614 (Conn. 1984); *Johnathan Woodner Co. v. Breeden*, 665 A.2d 929, 934-35 (D.C. 1995); *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985); *Yarbray v. Southern Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 837 (Ga. 1991); *Palmateer v. International Harvester Co.*, 406 N.E.2d 595, 598 (Ill. App. Ct. 1980), *rev'd on other grounds*, 421 N.E.2d 876 (Ill. 1981); *Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002); *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984); *White v. Monsanto Co.*, 585 So.2d 1205, 1208-1210 (La. 1991); *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *George v. Jordan Marsh Co.*, 258 N.E.2d 958, 921 (Mass. 1971); *Dornfeld v. Oberg*, 503 N.W.2d 115, 117 (Minn. 1993); *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. 1993); *Morrison v. Means*, 680 So. 2d803, 805-06 (Miss. 1996); *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981); *Gall v. Great Western Sugar Co.*, 363 N.W.2d 373, 376 (Neb. 1985); *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988); *Mantz v. Follingstad*, 505 P.2d 68, 74-75 (N.M. App. 1972); *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983); *Yeager v. Local Union 20,Teamsters, Chauffeurs, Warehousemen, & Helpers of America*, 453 N.E.2d 666, 671 (Ohio 1983); *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978); *Forster v. Manchester*, 189 A.2d 147, 151-52 (Pa. 1963); *Champlin v. Washington Trust Co.*, 478 A.2d 985, 988 (R.I. 1984); *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981); *Christians v. Christians*, 637 N.W.2d 377, 382 (S.D. 2001); *Levy v. Franks*, 159 S.W.3d 66, 82-83 (Tenn. Ct. App. 2004); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *Sheltra v. Smith*, 392 A.2d 431, 433 (Vt. 1978); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974); *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Wayne County Bank v. Hodges*, 338 S.E.2d 202, 205 (W. Va. 1985).

[10] *See supra* note 7.

law for the defendant's attack on the plaintiffs' respective family members. Section 46(2) of the Restatement (Second) of Torts governs the ability of plaintiffs to recover for intentional infliction of emotional distress where the defendant's conduct is directed at a third party. Restatement (Second) of Torts § 46(2). Section 46(2) of the Restatement specifically states that only present third parties may recover for an IIED claim. Nonetheless, the Caveat to the section leaves open the possibility of other possible situations where a defendant could be liable for intentional infliction of emotional distress under this section.

Each state has interpreted this ambiguity differently. Some states have explicitly allowed for situations where the presence requirement is unnecessary to establish an IIED claim. Florida, for example, has acknowledged that an immediate family member may recover for intentional infliction of emotional distress even if he or she was not present at the time of the outrageous conduct. *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App.1991). Along the same lines, California has found that a plaintiffs presence is not always required, and is deemed unnecessary in situations where the defendant is aware of the high probability that the defendant's acts will cause a plaintiff severe emotional distress. *Christensen v. Superior Court*, 820 P.2d 181, 203-204 (Cal. 1992).[11] Therefore, as this Court found in *Heiser*, when a terrorist attack occurs, the presence element is not required to bring a valid IIED claim under either Florida or California law, and that plaintiffs domiciled in these states at the time of the attack may bring a

---

[11] Applying this standard, this Court found in *Heiser* that, given the extreme nature of a terrorist attack, the presence element for an IIED claim under California law did not need to be proven. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 305 (D.D.C. Dec. 22, 2006) (Lamberth, J.).

claim for IIED without establishing their presence at the scene of the injury.[12] Much like Florida

and California, Vermont has no presence requirement for plaintiffs to recover for the intentional

or reckless infliction of emotional distress. *Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990).

Additionally, there are a number of states at issue in this action whose Supreme Courts

have not specifically addressed the issue of whether a plaintiff's presence is required. Some of

the laws of these states–Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, and Kansas–were previously analyzed by this Court in *Heiser*, in which this Court

found that no such presence requirement was necessary in these states given the severe nature of

terrorist attacks. *See Heiser*, 466 F. Supp. 2d at 328-29, 333 (Tex.), 341 (Minn.), 343-44 (Wisc.),

345-46 (N.Y.), 349 (N.C.), 352 (Ind.), 354 (Okla.), 355 (Kans.).[13]   In this case, the respective

---

[12] This finding, of course, is on the assumption that those plaintiffs have standing to
recover in the first place. Those plaintiffs without standing to recover under the law of their
respective domiciliary states may not recover, regardless of whether a plaintiff with standing
could so recover.

[13] The Oklahoma Supreme Court has rejected recovery for mental anguish and suffering
under an IIED claim brought by bystanders. See *Slaton v. Vansickle*, 872 P.2d 929, 931-32
(Okla. 1994). According to Oklahoma's Supreme Court, it is long recognized that "recovery for
mental anguish is restricted to such mental pain or suffering as arises from an injury or wrong to
the person rather than from another's suffering or wrongs committed against another person."
*Vansickle*, 872 P.2d at 931. Following this logic, the Oklahoma Supreme Court limited recovery
when a plaintiff's IIED claim rests on conduct directed at a third party to situations where: "1) the
plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from
actually viewing the injury to another rather than from learning of the accident later; and 3) a
familial or other close personal relationship existed between the plaintiff and the party whose
injury gave rise to the plaintiff's mental anguish." *Kraszewski v. Baptist Med. Ctr. Of Okla.,
Inc.*, 916 P.2d 241, 248 (Okla. 1996). This limitation on third party recovery is of no moment,
however, due to the simple fact that it has been repeatedly found that "a terrorist attack-by its
nature-is directed not only at the victims but also at the victims' families." *Heiser*, 466 F. Supp.
2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C.
2005) (Bates, J.)). Therefore, the decedents' near relatives are also direct victims of this
horrendous attack. Accordingly, this Court finds that the limitations imposed by the Oklahoma
Supreme Court on recovery for pain and suffering due to injuries sustained by a third party do not

state supreme courts of a number of states–Alabama, Connecticut, District of Columbia, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey, New Mexico, Rhode Island, Tennessee, Virginia–have not specifically addressed whether a plaintiff's presence is required to establish a viable IIED claim. Accordingly,"in light the severity of [a terrorist attack,] and the obvious range of potential grief and distress that directly results from such a heinous act,"[14] and because "a terrorist attack-by its nature-is directed not only at the victims but also at the victims' families,"[15] this Court adopts the rationale it set forth in *Heiser* regarding the presence element for IIED claims in states that have been silent on the issue. *See Heiser*, 466 F. Supp. 2d at 328-29. Therefore, this Court finds that claims for intentional infliction of emotional distress may be brought by family members without having to establish a presence requirement under Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana, Oklahoma, Kansas, Alabama, Connecticut, District of Columbia, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey, New Mexico, Rhode Island, Tennessee, and Virginia laws.[16]

Other states at issue in this case–Georgia, Missouri, South Carolina, South Dakota, Washington, and West Virginia–have allowed third party plaintiffs to recover, but only when the defendant's conduct is "directed at" the third party plaintiffs themselves.[17] As this Court and

---

apply to the family members seeking redress before this Court today.

[14] *Heiser*, 466 F. Supp. 2d at 328.

[15] *Id.* (quoting *Salazar*, 370 F.Supp.2d at 115 n. 12).

[16] *See supra* note 10.

[17] *See, e.g.*, *Ryckeley v. Callaway*, 412 S.E.2d 826, 827 (Ga. 1992); *Samsonetti v. City of St. Joseph*, 976 S.W.2d 572, 580 (Mo. App. W.D. 1998) (citing *Gibson v. Brewer*, 952 S.W.2d

others within this district have noted, "a terrorist attack–by its nature–is directed not only at the victims but also at the victims' families." *Heiser*, 466 F. Supp. 2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)). Therefore, this Court finds that those plaintiffs domiciled in Georgia, Missouri, South Carolina, South Dakota, Washington, and West Virginia at the time of the attack, may bring a claim for IIED under the laws of those states because the attack was directed at them as well as those killed in the attack.[18]

Two other states at issue in this case–Louisiana and Pennsylvania–have narrowly construed their interpretation of what constitutes a valid IIED claim, and have expressly found that the presence element is required for third party plaintiffs to recover.[19] Accordingly, this Court finds those plaintiffs who were not contemporaneously present at the site of the attack would not be able to recover under either Louisiana or Pennsylvania law for a claim of IIED. Without a valid cause of action under state law, the plaintiffs domiciled in Louisiana and Pennsylvania lack a viable means to redress their injury, and therefore lack standing.

---

239, 249 (Mo. 1997) (en banc)); *Upchurch v. New York Times Co.*, 431 S.E.2d 558, 561 (S.C. 1993) (citing *Christensen v. Superior Court*, 820 P.2d 181 (Cal. 1991)); *Hayes v. Northern Hills General Hospital*, 628 N.W.2d 739, 744 (S.D. 2001); *Reid v. Pierce County*, 961 P.2d 333, 337 (Wash. 1988); *Courtney v. Courtney*, 413 S.E.2d 418, 422 (W. Va. 1991).

[18] *See supra* note 10.

[19] *See Daigrepont v. State Racing Com'n*, 663 So.2d 840, 841 (La. App.1995) (requiring plaintiff's actual presence at the scene of the injury, and not allowing any further interpretation of the provision in the Louisiana Code establishing a cause of action for IIED); *Taylor v. Albert Einstein Medical Center*, 754 A.2d 650, 652-53 (Pa. 2000) (limiting IIED recovery to those plaintiffs "who were present at the time, as distinguished from those who discover later what has occurred," even in those situations where the defendant may be substantially certain that the plaintiff will suffer severe emotional distress as a result of the offensive act).

Accordingly, this Court must regrettably deny and dismiss the claims of those plaintiffs who were domiciled in Louisiana and Pennsylvania at the time of the attack.[20] The claims brought by the following individuals must be DISMISSED due to lack of standing:

> Deborah Spencer Rhosto, Catherine Bonk, John Bonk Sr., Thomas Bonk, Patricia Kronenbitter, Catherine Bonk Hunt, Kevin Bonk, Marilou Fluegel, Thomas A. Fluegel, Penni Joyce, Robert Fluegel, Julia Bell Hairston, Felicia Hairston, Evans Hairston, Virginia Ellen Hukill, Henry Durban Hukill, Melissa Hukill, Meredith Anne Hukill, Mark Andrew Hukill, Matthew Scott Hukill, Mitchell Charles Hukill, Monte Hukill, Bill Laise, Betty Laise, Kris Laise, Lorraine Macroglou, Bill Macroglou, James Macroglou, Shirley Kirkwood, Carl Kirkwood Sr., Kathy McDonald, Sally Jo Wirick, Storm Jones (a/k/a Shirley Ann Storm Pettry), Edward Joseph McDonough, Sean McDonough, Edward W. McDonough, Carl Arnold Kirkwood Jr., Jeff Kirkwood, Marion DiGiovanni, (Estate of) Luis Rotondo (father), (Estate of) Rose Rotondo, Danielle DiGiovanni, Lisa DiGiovanni, Robert DiGiovanni, (Estate of) Phyllis Santoserre, Larry H. Simpson Sr., Anna Marie Simpson, Renee Eileen Simpson, Sherry Lynn Fiedler, Robert Simpson.

2. *Intentional Infliction of Emotional Distress: Extent of Family Members' Respective Recovery*

Though many of the states at issue in this case have recognized the existence of IIED claims for family members who were not present at the scene of the injury, this does not necessarily extend the ability to bring an IIED claim to *all* family members. As the D.C. Circuit has noted previously, Section 46 of the Restatement (Second) of Torts does not extend causes of action beyond members of the victim's "immediate family." *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 334-35 (D.C. Cir. 2003) (refusing to extend "direct victims" under § 46(1)

---

[20] To the extent that these plaintiffs are relatives to any of the deceased servicemen, it should be noted that the dismissal of these plaintiffs' IIED claims does not hinder these individuals' ability to recover any portion of a wrongful death damages awarded to the estates of those servicemen to which these dismissed plaintiffs may be entitled under North Carolina law.

and "third party victims" under § 46(2) to include nieces and nephews not present at the scene of injury). Accordingly, this Court finds that those members of the families of the servicemen who are not within the immediate family of the serviceman *at the time of the attack* may not recover.

This Court has previously deemed near relatives to include only the victim's spouse, parents, children, and siblings. *See Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2002) (Lamberth, J.), *affirmed sub nom.*, *Bettis*, 315 F.3d at 335. Though the Court does not deny the extreme pain and suffering felt by those outside of this class of individuals, it is necessary to draw such a line at immediate family members in order "to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress." *Heiser*, 466 F. Supp. 2d at 329. Moreover, such a delineation is consistent with the provisions of Section 46 of the Restatement. *See* Restatement (Second) of Torts § 46, cmt. l; *cf. Bettis*, 315 F.3d at 335 (finding that permitting nieces and nephews to recover under § 46(1) would undermine the limitations on recovery of "immediate family" members under § 46(2)). Therefore, those plaintiffs who are not members of this class of individuals in relation to the servicemen cannot recover.[21] Accordingly, the Court must dismiss the claims of the following plaintiffs: Ashley Tutwiler Beamon, David Clark, Michael Clark, Jr., Rebecca Iverson Green, Geraldine Morgan, Pamela Nashton, Natalie Rochwell, (Estate of) Lula Mae Watkins,[22] and

---

[21] Current spouses who were not yet married to an injured servicemen at the time of the attack are not considered "immediate family" for the purposes of recovery. These individuals are therefore among the group of plaintiffs who cannot recover damages sustained as a result of the attack.

[22] According to the special master's report, Lula Mae Watkins was the legal guardian of Jerryl Shropshire. There is no evidence, however, of a formal order terminating the rights of Jerryl's natural parents. *See* Ga. Stat. Ann. 15-11-93 (2007). Absent such an order, "there is no Georgia law under which the loss of parental power also results in the parent's loss of a right to

Simon Watkins.

*3. Claims That Must Be Dismissed Due to Lack of Evidence and Participation*

"[T]he entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Personal Jurisdiction must still be determined before entering default judgment against an absent defendant. *Id.* As standing must be determined prior to and independent of any determination of a court's jurisdiction,[23] so too must standing be determined before a court enters default judgment against an absent defendant.

With respect to standing, the trial court has power "to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

After an evidentiary hearing before this Court establishing the defendants' complicity in bringing about the attacks, the Court designated special masters to hear each of the plaintiffs' respective claims, so that damages might be determined. As is unfortunately sometimes the case in a situation with as far-reaching an effect as this, certain family members of the deceased and

---

inherit as an heir from a child's estate." *Blackstone v. Blackstone*, 639 S.E.2d 369, 370 (Ga. Ct. App. Nov. 21, 2006). This is true even if the parents have failed to provide any support for the child during the child's lifetime. *Id.* at 371. Accordingly, the estate of Lula Mae Watkins may not recover for damages arising out of Jerryl's death because she is not a parent or other immediate family member under Georgia law. Likewise, Geraldine Morgan and Simon Watkins–as Lula Mae's granddaughter and son, respectively–may also not recover.

[23] *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. at 91.

injured servicemen–family members who undoubtedly shared equally in the grief and suffering caused by the tragic deaths of their loved ones–could not be located or were unable to present evidence before this Court and its designated special masters to establish a valid claim for damages. Without evidence supporting their claims of intentional infliction of emotional distress, the Court cannot determine at this time whether these individuals have sufficient standing to bring a claim. Accordingly, the claims from the following individuals shall be DISMISSED WITHOUT PREJUDICE due to lack of evidence:

> Marvin Albright, Jr., Mirequrn Albright, Shertara Albright, Anthony Banks (son), Michael Banks, Taiarra Banks, Lori Berry, Christopher Burnette, Gwen D. Burnette, Mecot Camara Jr., Dale Comes, Tommy Comes, Kimberly Crop, Connie Burnette Decker, Erin Dolphin, Frederick Douglass, Christopher Eaves, India Eaves, Sylvia Jean Eaves, Charles Frye Jr., Gina Frye, Lialani Frye, Lincoln Frye, Randall Frye, Gerald Foister, Joseph Garner, Justina Garner, Penny Garner, Reva Garner, Karl Goodman, Barbara Haskell, Richard Haskell, Jordan Hlywiak, Taylor Hlywiak, Mendy Leigh Hunt, Jack Darrell Hunt, Marcy Elizabeth Hunt, Molly Faye Hunt, Carol Livingston, (Estate of) Manuel Massa Sr., Chadwick Matthews, Debra Matthews, Drew Matthews, Deborah Meurer, Shirley Douglass Miller, Elvera Mitchell, Robert Mitchell, (Estate of) Betty Lou Price, Timothy Price, Jeremy Rivers, Paul Rivers (son), Sandra Rivers, Carol Schak, George Schak, Lynne M. Spencer, Patrice Washington, (Estate of) Dorothy Williams, George Robinson Williams, Kevin Coker Williams, Bill Williamson, Debra Wise, Gwen Woodcock.

The Court will now turn its attention to those remaining claims that must be dismissed for reasons not yet specified within this opinion.

4. *Other Remaining Claims That Must Be Dismissed*

a. *Claim of Bobby Wallace*

Under Oklahoma law, a non-adopted stepchild is not considered "issue" or a "child" for purposes of inheritance. *See* Okla. Stat. Ann. tit. 84, § 213 (2007); *cf.* Green v. Wilson, 240 P. 1051, 1052 (Okla. 1925) (finding that, under § 213, estate of deceased intestate is inherited by

surviving spouse and legitimate children, *and adopted child* surviving inherits as if born in wedlock). In light of the disparate treatment of adoptive and non-adoptive children in terms of inheritance, it stands to reason that non-adoptive stepparents of stepchildren would be treated differently under Oklahoma law than stepparents who adopt those stepchildren. Accordingly, under Oklahoma law, a stepfather would not be able to inherit from or through his non-adopted stepson; likewise, nor would he be able to recover damages as a result of the stepson's death. Accordingly, this Court finds that Bobby Wallace, as Stephen Eugene Spencer's non-adoptive stepfather, may not recover for IIED resulting from Stephen's death in the attack, and his claim must be DISMISSED.

*b. Claim of Herbert Persky*

As the stepfather to Timothy R. McMahon, Herbert Persky has brought an IIED claim against the defendants. Based on the evidence presented to the Court, however, Mr. Persky may not recover for IIED due to the fact that, as a stepparent, Mr. Persky lacks standing to bring such a claim.

As this Court has previously noted, Texas has adopted Section 46 of the Restatement (Second) of Torts in establishing a cause of action for IIED. *Heiser*, 466 F. Supp. 2d at 333. Moreover, the Texas Supreme Court has remained silent on the issue of whether a plaintiff's presence is required in order for a third party to recover for IIED. *Id.* Accordingly, this Court has found that the near relatives of a victim who were not present at the time of the attack would still be able to recover for IIED under Texas law. *Id.* Therefore, Mr. Persky may only recover for IIED if he is considered a near relative under Texas law.

Under Texas law, however, stepparents that do not adopt a child are not deemed the same

as natural parents for purposes of inheriting from that child. Tex. Civ. Prac. & Rem.Code Ann. § 71.004(a) (Vernon 1997) (stating that only the victim's surviving spouse, children, and parents of the deceased may recover for the victim's wrongful death). "A stepparent who takes no steps to legally adopt his stepchild does not qualify as a parent for purposes of Texas's wrongful death statute." *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 578 (S.D. Tex. 2003) (citing *Boudreaux v. Texas & N.O.R. Co.*, 78 S.W.2d 641 (Tex.Civ.App.-Beaumont 1935, writ ref'd)).

In this case, notwithstanding the relationship that Mr. Persky had with Mr. McMahon, there is no evidence that Mr. Persky legally adopted Mr. McMahon. Accordingly, Mr. Persky is not considered a parent for purposes of being able to recover for pain and suffering as a result of his stepson's untimely death. Therefore, Mr. Persky does not have standing to bring a claim for IIED in this case, and his claim must be DISMISSED.

*c. Claims of Sandra Bianco and Sandra Karen Bianco*

Under New Jersey law, a natural birth parent may recover for and inherit from and through their child. Once that child is legally adopted by another parent, however, the natural parent's privileges and obligations cease, "including the right of the natural parents and their kindred to take and inherit intestate personal and real property from and through the person adopted." N.J. Stat. Ann. 2A: 22-3(b) (2007) (emphasis added). Moreover, upon adoption all rights, privileges and obligations normally bestowed upon natural parents-including the right to take and inherit from and through the adopted child-become bestowed upon the adoptive parent instead, who is treated in the eyes of the law "as if the person adopted had been born to them in lawful wedlock . . . ." N.J. Stat. Ann. 2A: 22-3(c) (2007).

Here, Sandra Bianco (natural mother to serviceman Richard Andrew Fluegel) and Ms.

Bianco's daughter Sandra Karen Bianco (Richard's half-sister) seek under respective IIED claims to recover pain and suffering damages arising out of Richard's death. Richard, however, is survived by his natural father Thomas A. Fluegel, his adoptive mother Marilou Fluegel, and his full blood siblings Penni Joyce and Robert Fluegel. Therefore, though Ms. Bianco is Richard's natural mother, she may nonetheless not recover for pain and suffering from Richard's death because, under New Jersey law, Ms. Bianco's entitlement to take and recover from or through her son ceased once Richard was adopted by Marilou Fluegel. Therefore, the privilege of recovering as a mother to Richard for the pain and suffering associated with Richard's death has been bestowed upon Marilou Fluegel due to the fact that she legally adopted Richard. Therefore, this Court must DISMISS Sandra Bianco's claim for IIED for lack of standing.

For similar reasons, this Court must also dismiss Sandra Karen Bianco's claim for IIED for lack of standing. As noted previously, the privileges and obligations of the natural parent and their kindred ceases upon the child's adoption by another parent. Therefore, as kindred to Sandra Bianco, Sandra Karen Bianco may not recover damages associated with Richard Fluegel's death, and her claim must also be DISMISSED.

*d. Claims of Donald Rockwell, Charles Corry and Michael Clark Jr.*

Donald Rockwell (stepbrother to Michael Caleb Sauls), Charles Corry (brother-in-law to Eric Glenn Washington), and Michael Clark, Jr. (brother-in-law to James Baynard) seek to recover for IIED in this case as step-siblings of the deceased servicemen. Under Virginia law, however, only blood siblings and adoptive step-siblings qualify as siblings for purposes of recovering damages resulting from a victim's wrongful death. *See Brown v. Brown*, 309 S.E.2d 586, 590 (Va. 1983). Individuals are siblings to another individual only if they are of the same

parental origin as their sibling, or if they are adopted by a shared parent. *Id.* (citing *Jones v. Jones*, 530 P.2d 34 (Ore. 1974) (declining to expand class entitled to recovery as direct beneficiaries under wrongful death statute beyond spouse and children of decedent so as to include as dependents-such as non-adopted stepchildren-a person to whom decedent had no legal obligation of support). Non-adopted step-siblings do not qualify as siblings because they are not of the same origin as their step-sibling, nor deemed of the same origin as their step-sibling under the law because they were not legally adopted. *Brown*, 309 S.E.2d at 590. Therefore, in Virginia non-adoptive step-siblings may not recover for pain and suffering arising out of an IIED claim because they are not deemed siblings under the law. *Cf. id. A fortiori*, a sibling-in-law-who has virtually no chance of being either adopted or of the same parental origin as the victim-may not recover for pain and suffering arising out of an IIED claim.

In this case, there is no evidence that Donald Rockwell was an adopted stepbrother to Michael Caleb Sauls. Therefore, Mr. Rockwell's claim for IIED fails for lack of standing, and must therefore be denied. Similarly, Messrs. Corry and Clark's claims must also be denied because, as a siblings-in-law, neither is deemed a sibling under the law. Accordingly, this Court finds that none of these three plaintiffs may recover for IIED as a sibling under Virginia law, and each of their IIED claims must be DISMISSED.

*e. Victoria Prevatt-Wood*

Victoria Prevatt-Wood has already brought a claim against the defendants for conduct arising out of this attack. *See Prevatt*, 421 F. Supp. 2d at 152. Ms. Prevatt-Wood was awarded $2.5 million by this Court for her pain and suffering associated with the loss of her brother, Victor Mark Prevatt. *Id.* at 161. To allow her to seek additional damages would grant her

impermissible double recovery. Accordingly, her claim in this action must be DISMISSED.

*f. Mary Jackowski*

Mary Jackowski, stepmother to deceased serviceman James Jackowski, seeks to recover for IIED for the death of James. Under New York law, however, "[n]either step-children nor step-parents inherit property from each other." Erie County Bd. of Social Welfare v. Schneider 163 N.Y.S.2d 184, 186 (N.Y. Child Ct. 1957). Therefore, Mary Jackowski may only recover for the death of James if she legally adopted James. There is no evidence in this case, however, indicating that James was legally adopted by Mary. Therefore, she has no standing to bring a claim for damages arising out of the death of her stepson. Accordingly, the claim brought by Mary Jackowski must be DISMISSED.

*g. Stepparents and Step-siblings of Donald H. Vallone, Jr.*

Charles Phelps (stepfather to Donald H. Vallone, Jr.) and Charles Phelps, Jr. (stepbrother to Donald H. Vallone, Jr.), Donna Beresford Vallone (stepmother to Donald H. Vallone, Jr.), William Beresford (stepbrother to Donald H. Vallone, Jr.), Susan Beresford Vallone (stepsister to Donald H. Vallone, Jr.), Natalie Lewis (stepsister to Donald H. Vallone, Jr.), and Michael Beresford (stepbrother to Donald H. Vallone, Jr.) each seek recovery for IIED associated with the death of serviceman Donald H. Vallone, Jr. in the attack at issue. As this Court has previously found in *Heiser*, however, under California law, a stepparent lacks standing to recover for intentional infliction of emotional distress in connection with a stepchild's death, where the stepparent had not legally adopted the stepchild, and there was no indication that the stepparent would have adopted the stepchild but for a legal impediment. *Heiser*, 466 F. Supp. 2d at 309-10 (citing Cal Civ. Proc. Code § 377.60; Cal. Prob. Code § 6402).

In this case, there is no evidence that either of the stepparents of Donald H. Vallone, Jr. legally adopted Donald H. Vallone, Jr., nor is there evidence that either would have adopted Donald but for a legal impediment. Accordingly, neither Charles Phelps nor Donna Beresford Vallone has standing to bring a claim for damages arising out of the death of their stepson, Donald H. Vallone, Jr. Therefore, the claim brought by Charles Phelps and Donna Beresford Vallone must be DISMISSED. By this same logic, and because the viability of the claims brought by the birth children of stepparents of the deceased (consequently, stepsiblings to the deceased) is dependent upon the viability of their parents' claim, the claims brought by Charles Phelps, Jr., William Beresford, Susan Beresford Vallone, Natalie Lewis Vallone, and Michael Beresford must also be DISMISSED due to a lack of standing to bring the claim.

*h. Donald Calloway*

Donald Calloway, brother-in-law to deceased serviceman Jess W. Beamon, seeks recovery for IIED arising out of his brother-in-law's death in the attack. Under Florida law, however, only plaintiffs who are the spouse, child, sibling, or parent of a decedent have standing to recover for intentional infliction of emotional distress even though plaintiffs were not present at the scene. *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App. 1991). Siblings-in-law do not fall within this category of eligible plaintifs. Accordingly, the claim brought by Donald Calloway must be DISMISSED for lack of standing.

*i. Richard Mason*

Richard Mason, stepfather to deceased serviceman Russell Cyzick, seeks to recover for IIED arising out of his stepson's death in the attack. Under West Virginia law, damages arising out of the death of an individual may be awarded to the surviving spouse and children of the

decedent, including adopted children and stepchildren, as well as the decedent's siblings, parents and any persons who were financially dependent upon the decedent at the time of his or her death. *See* W. Va. Code §§ 55-7-5, 55-7-6(b) (2007). Further, under West Virginia law, an individual qualifies as a "legal parent" if that individual is "defined as a parent, by law, on the basis of biological relationship, presumed biological relationship, legal adoption or other recognized grounds, [such as financial dependence]." W. Va. Code, § 48-1-232 (2007). In this case, the evidence shows that Russell Cyzick's birth mother married Richard Mason when Russell was nearly eighteen years old. There is no evidence that Russell was either legally adopted or financially dependent upon Richard Mason during what was left of his minor years. Accordingly, Richard Mason lacks standing to bring a claim because he is not a "legal parent" under West Virginia law. Therefore, this Court finds that Richard Mason's IIED claim must be DISMISSED.

*5. Individuals with Valid Intentional Infliction of Emotional Distress Claims*

Accordingly, the Court finds that the individuals listed in Appendix A to this opinion may bring intentional infliction of emotional distress claims. *See* Appendix A.

The Court will now turn its attention to damages for these IIED claims, as well as those claims for battery and wrongful death.

*II. Damages*

A. Damages Framework

The validity of each claim having been assessed, the Court can now turn to the respective amounts of damages associated with each valid claim before this Court. Under the FSIA, a "foreign state shall be liable in the same manner and to the same extent as a private individual

under like circumstances." 28 U.S.C. § 1606. Therefore, plaintiffs are entitled to the typical array of compensatory damages that may be awarded against tortfeasors in the plaintiffs' respective domiciliary states. "In determining the appropriate compensatory damages for each plaintiff's pain and suffering, this Court is guided not only by prior decisions awarding damages for pain and suffering, but also by those which awarded damages for solatium." *Haim*, 425 F. Supp. 2d at 71. This Court has previously looked to the nature of the relationship between the family member and the victim in order to help determine the amount of each award. *See Blais*, 459 F. Supp. 2d at 59-60; *Haim* 425 F. Supp. 2d at 75.[24] Parents of victims typically receive awards similar in amount to those awarded to children of the victim. *See generally Heiser*, 466 F. Supp. 2d at 271-356 (awarding children and parents of a terrorist attack decedents $5 million in pain and suffering damages). This award for parents and children of the decedents is typically smaller than the award for pain and suffering damages provided to spouses, but is larger than awards of pain and suffering damages to siblings. *See id.* (awarding spouses of decedents $8 million in pain and suffering damages, while awarding siblings to decedents $2.5 million). Moreover, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Blais*, 459 F. Supp. 2d at 60 (quoting *Haim*, 425 F. Supp. 2d at 75).

This Court finds that the damages framework set forth in *Heiser* to be an appropriate

[24] As noted previously, damages for pain and suffering have traditionally been available to those members of the decedent serviceman's near relatives, which consists of his or her immediate family. *See supra* Section I.C.2. "This Court defines one's immediate family as his spouse, parents, siblings, and children. This definition is consistent with the traditional understanding of one's immediate family." *Jenco*, 154 F. Supp. 2d at 36 n.8.

measure of damages for those family members of victims who died in this attack.[25] The Court finds that the framework detailed in *Blais* is appropriate to help determine damages for those surviving servicemen and their families seeking redress. *See Blais*, 459 F. Supp. 2d at 59.[26]

Accordingly, unless otherwise specifically addressed in Section B below, *see infra* Section II.B., the Court finds that the following damages amounts for pain and suffering shall be awarded to the plaintiffs who this Court deems to have standing to bring a valid cause of action. First, in terms of lost wages due the servicemen in this case, the Court hereby ADOPTS all of the financial calculations and recommendations made by the special masters as to lost wages.[27] Those calculations for lost wages shall be specified in Appendix B to this opinion. Second, unless otherwise specified in Section B below, the Court finds that the awards for pain and suffering to the servicemen are appropriate and hereby ADOPTS them. Third, the Court finds

---

[25] In *Heiser*, family members of the servicemen who were killed in the 1996 Khobar Towers bombing brought various claims against the Islamic Republic of Iran, MOIS, and IRGC for their part in providing material financial and logistical support in bringing about the attack. *Heiser*, 466 F. Supp. 2d at 248-51. This Court awarded the valid claims brought by spouses of deceased servicemen $8 million in pain and suffering, parents and children of deceased servicemen $5 million, and siblings of deceased servicemen $2.5 million. *See generally Heiser*, 466 F. Supp. 2d at 271-356.

[26] As this Court stated in *Blais*:

> In cases that involve an attack where the victim survives, and where no captivity occurred, courts typically award a lump sum award based in large part on an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."

*Id.*

[27] As mentioned above, *see supra* note 2, there are a few servicemen who have sought damages for pain and suffering incurred during the time at which they were alive after the attack and the time at which they died. Those claims will be addressed in Section II.B.1, *infra*.

that the appropriate amount of pain and suffering damages for the spouse of a deceased serviceman to be $8 million. Fourth, the Court finds that the appropriate amount of pain and suffering damages for the parents and children of a deceased serviceman to be $5 million, per individual.[28] Fifth, the Court finds that the appropriate pain and suffering damages award for each sibling in this case to be $2.5 million, per sibling. Siblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would–that is, they are entitled to $2.5 million–unless the law of the state in which they were domiciled at the time of the attack states that they are not entitled to so recover.[29] Next, the Court finds that the appropriate amount of damages for family members of surviving servicemen are as follows: spouse ($4 million); parents ($2.5 million); children ($2.5 million); siblings ($1.25 million).[30] Unless otherwise specified below in Section B, to the extent that the special masters have awarded a plaintiff more or less than the aforementioned respective award amounts based upon the plaintiff's relation to the serviceman, those amounts shall be altered so as to conform with the respective award amounts set forth in this paragraph.

---

[28] Each parent and child shall receive this amount. *See Heiser*, 466 F. Supp. 2d at 271-356.

[29] This Court will address the claims of those half-blood siblings whose award recommendations differ from the permissible awards under the respective state laws, *infra*. *See infra* Section II.B.3.

[30] The Court recognizes that the parents in *Blais* received $3.5 million for their IIED claims for pain and suffering damages associated with the aftermath of taking care of their son, who survived the attack on the Khobar Towers in 1996. *See Blais*, 459 F. Supp. 2d at 60. This exceptional award was given in light of the extremely severe and continuing nature of their son's maladies, and in light of the facts that their son was in a coma and vegetative state for a period of over five weeks. *Id.* at 59-60. Attention was also given to the fact that the parents in *Blais* gave up their jobs in order to take full-time care of their son. *Id.* at 60.

B. Special Damages Cases

1. Pain and Suffering Amount for Deceased Servicemen Who Initially Survived Attack

The personal representatives and estates of deceased servicemen Alvin Burton Belmer, Nathaniel Walter Jenkins, Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley have each sought damages for pain and suffering incurred during the time at which they were alive after the attack and the time at which they died, in addition to the damages for lost wages and earnings arising out of their respective wrongful death claims. Several cases have awarded damages for the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter. *Haim*, 425 F. Supp. 2d at 71-72 (citing *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 8 (D.D.C.2000) (Lamberth, J.); *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 112-13 (D.D.C.2000) (Green, J.). When the victim endured extreme pain and suffering for a period of several hours or less, courts in these cases have rather uniformly awarded $1 million. *Haim*, 425 F.Supp.2d at 71-72. This award increases when the period of the victim's pain is longer. *Id.* at 72. In line with this precedent, this Court recently awarded $500,000 to a serviceman who survived a terrorist attack for 15 minutes, and was in conscious pain for 10 minutes.

The estate of Alvin Burton Belmer established before the special master that serviceman Belmer was alive and conscious for nearly eight days (7 days and 20 hours). The special master recommended an award of pain and suffering of $15 million. Though the Court recognizes Mr. Belmer was under excruciating pain during that period of time, it is not prepared to adopt such a recommendation. In light of his nearly eight days of pain and suffering, this Court finds that the

estate of Alvin Burton Belmer should be awarded $7.5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

Similarly, the estate of Nathaniel Walter Jenkins established before a special master that serviceman Jenkins was alive for seven days after the attack. The special master recommended that Mr. Jenkins be awarded $7 million for pain and suffering undergone by Mr. Jenkins during this period of time. The Court finds this award amount is appropriate and finds that the estate of Nathaniel Walter Jenkins should be awarded $7 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Luis J. Rotondo established before a special master that serviceman Rotondo was alive for six hours after the attack. The special master recommended a pain and suffering damages award of $250,000. In keeping with the precedent set forth in *Haim*, the Court finds that Luis J. Rotondo is entitled to $1 million in pain and suffering damages, in addition to the amount of lost wages he is awarded.

The estate of Larry H. Simpson, Jr. established before a special master that serviceman Simpson was alive for nine years after the attack, living with severe injuries throughout that time. The special master recommended an award of pain and suffering damages of $2 million. In light of the fact that Mr. Simpson was saddled with injuries from this attack that plagued him until his death, but conscious of the fact that Mr. Simpson appears to have led a somewhat functional life after the attack, the Court finds that Mr. Simpson should be awarded $5 million in pain and suffering, in addition to the amount of lost wages he is awarded.

The estate of Stephen Tingley established before a special master that serviceman Tingley was alive for a short but unknown amount of time. The special master recommended a pain and

suffering damages award of $1 million. Though the Court is certain that Mr. Tingley endured a great deal of pain during the minimal time he survived the attack, the Court is reluctant to grant such an award without any definitive proof of a duration of time that Mr. Tingley was alive. Therefore, this Court finds that Stephen Tingley is entitled to $500,000 in pain and suffering damages, in addition to the amount of lost wages he is awarded.

2. Pain and Suffering Amount for Surviving Servicemen

Each of the twenty six surviving servicemen have sought pain and suffering awards associated with their claims for battery. In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards. Due to the large number of plaintiffs represented in this action, the Court needed to enlist the help of many different special masters to help calculate damages for each of the plaintiffs. Understandably, each special master calculated pain and suffering damages differently, which resulted in varying awards for varying maladies suffered by the surviving servicemen. Upon examination of the nature of the injuries of each of the servicemen, the Court makes the following findings about the pain and suffering damages for the twenty six surviving servicemen arising out of their respective battery claims:

- Marvin Albright suffered compound fracture of his right leg, injuries to the toes on his left foot, wounds and scars from shrapnel, in addition to lasting and severe psychological harm as a result of the attack. Therefore, this Court finds that he is entitled to $5 million in pain and suffering;
- Pablo Arroyo suffered a broken jaw, severe flesh wounds and scars on his arms, legs and face, a loss of teeth, and lasting and severe psychological harm as a result

of the attack. Therefore, this Court finds that he is entitled to $5 million in pain and suffering;

- Anthony Banks suffered as a result of this attack loss of sight in one eye, a perforated right eardrum resulting in some hearing loss, and a shrapnel injury to the back of his right thigh. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering;

- Rodney Darrell Burnette was initially thought dead as a result of the attack, and was placed in a body bag, buried alive in the morgue for four days until someone heard him moaning in pain. His injuries from the attack include a closed head injury, a basilar skull fracture, a facial nerve palsy, rib injuries, a rupturing to the timpanic membrane in both ears, and injuries to both feet. He also suffered lasting and severe psychological problems from the attack. Accordingly, this Court finds that he is entitled to $8 million in pain and suffering;

- Glenn Dolphin suffered injuries in the back, arm and head from being hit with shrapnel from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, the Court finds that he is entitled to $3 million in pain and suffering;

- Charles Frye was minimally injured from small arms fire occurring just after the initial bomb explosion, and has experienced resulting nerve pain and foot numbness. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $2 million in pain and

suffering, plus $200,000 in loss of earnings suffered;[31]

- Truman Dale Garner suffered as a result of the attack a shrapnel injury to the head, a subdural hematoma, a perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering damages;

- Larry Gerlach suffered severe injuries including a broken neck, which has resulted in permanent quadriplegia. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $12 million in pain and suffering damages;[32]

- Orval Hunt suffered skull fractures, brain bruising, various broken bones in his leg, and an exposed Achilles tendon as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages;

- Joseph P. Jacobs suffered a shoulder injury, and still suffers from neck, shoulder and back pain to this day. He also suffered lasting and severe psychological problems from the attack, and has admitted to having problems with alcohol abuse. Therefore, this Court finds that he is entitled to $5 million in pain and

---

[31] Charles Frye admits that his physical injuries were minimal, and that he suffered severe psychological harm from the attack.

[32] *Cf. Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 12-13 (D.D.C. 2001) (Bryant, J.) (awarding $12 million to plaintiff with permanent and debilitating injuries, including complete deafness and blindness in one eye).

suffering damages;

- Brian Kirkpatrick suffered an eye injury, a perforated left ear drum, broken ribs, various shrapnel wounds, and the lining of his lungs were burned as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages;

- Burnham Matthews suffered a shrapnel wound in the forehead that destroyed the middle part of his nose, cuts to the head and back, and a perforated eardrum as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7 million in pain and suffering damages;

- Timothy Mitchell suffered lacerations to the back of his head, back injuries, and has resulting chronic back pain and headaches as a result of the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $3 million in pain and suffering damages, in addition to $1,555,099 in lost wages;

- Lovelle "Darrell" Moore suffered a torn ear, broken leg, damaged foot, and cuts from shrapnel from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7 million in pain and suffering damages, in addition to $1,314,513 in lost wages;

- Jeffrey Nashton suffered a skull fracture, a shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed

lungs, burns on his arms and back, and internal bleeding. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $9 million in pain and suffering damages, in addition to $2,776,632 in lost wages;

- Paul Rivers suffered two broken eardrums, skin lacerations, burned skin, and knee damage from the attack. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7 million in pain and suffering damages;
- Stephen Russell suffered a broken femur, hand and pelvis bone, and was covered in cuts and bruises from the attack. His left foot was turned completely backwards. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering damages, in addition to $1,752,749 in lost wages;
- Dana Spaulding suffered two broken clavicles, a broken middle ear which caused internal bleeding and continued vertigo, a punctured lung, bruised kidney, broken ribs, a severe laceration across his back, and a loss of his eyelashes. Moreover in the ten days after the attack, Dana was in a coma. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $8 million in pain and suffering damages, in addition to $1,559,609 in lost wages;
- Michael Toma suffered various cuts from shrapnel, internal bleeding in his urinary system, a deflated left lung, and a permanently damaged right ear drum.

He also suffered lasting and severe psychological problems from the attack.
Therefore, this Court finds that he is entitled to $7.5 million in pain and suffering damages;

- Danny Wheeler suffered soft tissue damage to the chest and sternum area, flash burns, and lingering back problems, internal maladies and physical scarring. He also suffered lasting and severe psychological problems from the attack. Therefore, this Court finds that he is entitled to $5 million in pain and suffering damages.

In addition, Frank Comes Jr., Frederick Daniel Eaves, John Hlywiak, John Oliver, and Craig Joseph Swinson, and Thomas D. Young suffered no physical injuries, and are not required to do so to recover for IIED under North Carolina law. *See Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981). Still, each has demonstrated that he has suffered severe and lasting psychological harm, and may recover damages for that. Accordingly, the Court finds that each is entitled to $1.5 million in pain and suffering damages.[33]

3.     Individual Family Member Cases

In certain instances, the special masters were presented with claims from individuals who were related by half-blood to a deceased serviceman in this case. This section addresses those claims under which the special master awarded the half-blood siblings an amount different than would be permissible under the laws of the half-blood siblings respective states of domicile at the time of the attack.

---

[33] In addition to his award for pain and suffering, John Oliver is entitled to $1,777,542 in lost wages.

a. Richard J. Wallace

Under Oklahoma law, "[k]indred of the half-blood inherit equally with those of the whole blood in the same degree, unless the inheritance come [sic] to the intestate by descent, devise or gift of some one of his ancestors, in which case all those who are not of the blood of such ancestors must be excluded from such inheritance." Okla. Stat. Ann. tit. 84, § 222 (2007). Stephen Eugene Spencer's half-brother, Richard J. Wallace, was awarded $1.25 million for pain and suffering arising out of his IIED claim. By contrast, Stephen's full-blooded brother, Douglas Spencer, was awarded $2.5 million. Richard J. Wallace did not come into this damages award as a result of descent, devise or a gift of one of his ancestors. Therefore, this disparity in awards is impermissible under Oklahoma law. Richard J. Wallace is entitled to the same amount as Douglas Spencer, his half-brother, and therefore should be awarded $2.5 million.

b. Hilton and Arlington Ferguson

Under Florida law, "[w]hen property descends to the collateral kindred of the intestate and part of the collateral kindred are of the whole blood to the intestate and the other part of the half blood, those of the half blood shall inherit only half as much as those of the whole blood . . . ." Fla. Stat. Ann. § 732.105 (2007). Half blood siblings may recover a whole amount only "if all [remaining siblings] are of the half blood . . . ." Fla. Stat. Ann. § 732.105 (2007).

In this case, Hilton and Arlington Ferguson are half-brothers to serviceman Rodney J. Williams. Therefore, each may recover only half as much as Mr. Williams' full blood siblings, if there are any. If there are no full blood siblings, then Hilton and Arlington may recover whole amounts, each. Here, Mr. Williams is survived by two full blood siblings: Rhonda and Ronald Williams. Accordingly, though Hilton and Arlington Ferguson are entitled to recover for pain

and suffering under an IIED claim for the loss of their half-brother, they may only recover half the amount of damages as will be awarded to Rhonda and Ronald Williams. Therefore, Hilton and Arlington Ferguson may recover $1.25 million each because Rhonda and Ronald Williams are each entitled to recover $2.5 million for pain and suffering damages associated with the untimely loss of their brother.

c.    Damien Briscoe and Kia Briscoe Jones

Under Maryland law, half-blood siblings are given the same status as full blood siblings of the same degree. Md. Code Ann., Estates & Trusts § 1-204 (2007). The special master charged with determining the appropriate amount of pain and suffering damages for relatives of serviceman Davin M. Green, however, recommended that Mr. Green's half-siblings Damien Briscoe and Kia Briscoe Jones be awarded $1.25 million for their pain and suffering associated with Mr. Green's death, while at the same time awarding Mr. Green's full blood siblings $2.5 million for pain and suffering.

This Court finds that this recommended disparity in award does not conform to the requirement that full blood and half blood siblings of the same degree be treated equally under the law. Accordingly, this Court finds that under Maryland law, Mr. Green's half-siblings are entitled to the same amount of recovery as their full blood sibling counterparts. This Court has typically found $2.5 million to be an appropriate level of pain and suffering damages under an IIED claim arising out of a terrorist attack. Accordingly, this Court adopts the special master's damages recommendation of $2.5 million for Mr. Green's full blood siblings, and finds that Mr. Green's half-siblings-Damien Briscoe and Kia Briscoe Jones-are also entitled to $2.5 million in pain and suffering damages in connection with their IIED claim against the defendants.

d. Darren Keown

Darren Keown is the half-brother of deceased serviceman Thomas Keown. Darren was domiciled in Tennessee at the time of the attack. It has long been recognized under Tennessee law that full and half-blood siblings may share equally in inheritance and intestate distribution. *Kyle v. Moore*, 35 Tenn. 183 (3 Sneed) (Tenn. 1855). The special master charged with determining the appropriate amount of pain and suffering damages for relatives of Thomas Keown recommended awarding Darren $4 million for pain and suffering, which was similar to the recommended award for Thomas' full-blooded brothers, Adam, Bobby Jr., and William, which was also $4 million. In light of the fact that full-blooded siblings in this case shall be awarded $2.5 million, however, the award for Adam, Bobby Jr., and William must be reduced to $2.5 million. Darren's award must be similarly lowered. Accordingly, this Court finds that the pain and suffering award for Darren Keown is $2.5 million.

e. Kenty Maitland & Alex Griffin

Kenty Maitland is the half-brother of Samuel Maitland, Jr. Alex Griffin is Samuel Maitland Jr.'s legally adopted brother. Both were domiciled in New York at the time of the attack. Under New York law, both half-blood siblings and adopted siblings are treated as equals to full-blooded siblings for purposes of inheritance and recovery. *See* N.Y. Est. Powers & Trusts § 4-1.1(b) (2007); N.Y. Dom. Rel. § 117 (2007). Accordingly both Kenty Maitland and Alex Griffin are entitled to recover in the same manner as Samuel's actual full-blooded siblings. The special master recommended that Kenty and Alex receive $1 million, each, for pain and suffering damages. Samuel's full-blood sister, Shirla Maitland, is entitled to recover $2.5 million in pain and suffering arising from her IIED claim against the defendants. Accordingly, this Court finds

that both Kenty Maitland and Alex Griffin are entitled to recover $2.5 million, each, in pain and suffering damages arising out of their respective IIED claims in this case.

f. Florene Martine Carter

Florene Martin Carter is the half-sister of deceased serviceman Charlie Robert Martin. Florene was domiciled in North Carolina at the time of the attack. Under North Carolina law, half-blood siblings may inherit and recover in the same manner as full-blood siblings. *Peel v. Corey*, 144 S.E. 559, 562 (N.C. 1928); *Univ. of North Carolina v. Markham*, 93 S.E. 845, 846 (N.C. 1917). Accordingly, Florene Martin Carter is entitled to recover in the same manner as Charlie's full-blooded siblings would have recovered. The special master recommended that Florene receive $1.25 million in pain and suffering damages. Charlie Robert Martin does not have full-blooded siblings. Still, siblings of deceased servicemen in this action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims against the defendants. Accordingly, the Court finds that Florene Martin Carter is entitled to $2.5 million in pain and suffering damages arising out of her IIED claim in this action.

g. Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, Mary Ellen Thompson

Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are also half-siblings of deceased serviceman Charlie Robert Martin. Each was domiciled in Georgia at the time of the attack. Under Georgia law, half-blood siblings inherit equally with whole-blood siblings. *Bacon v. Smith*, 474 S.E.2d 728, 731-32 (Ga. Ct. App. 1996). Accordingly, Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are entitled to recover in the same manner as Charlie's full-

blooded siblings would have recovered. The special master recommended that Linda, Corene, John, Gussie, and Mary Ellen each receive $1.25 million in pain and suffering damages. Charlie Robert Martin does not have full-blooded siblings. Still, siblings of deceased servicemen in this action are entitled to $2.5 million in pain and suffering damages arising out of their IIED claims against the defendants. Accordingly, the Court finds that Linda Martin Johnson, Corene Martin Jones, John Martin, Gussie Martin Williams, and Mary Ellen Thompson are entitled to $2.5 million in pain and suffering damages, each, arising out of their respective IIED claims in this action.

h. Sybil Caeser

Under Florida law, "[w]hen property descends to the collateral kindred of the intestate and part of the collateral kindred are of the whole blood to the intestate and the other part of the half blood, those of the half blood shall inherit only half as much as those of the whole blood . . . ." Fla. Stat. Ann. § 732.105 (2007). Half blood siblings may recover a whole amount only "if all [remaining siblings] are of the half blood . . . ." Fla. Stat. Ann. § 732.105 (2007).

Here, Sybil Caeser is the half-sister of deceased serviceman Johnnie Caesar. Johnnie, however, has full-blooded siblings who have also survived him. Therefore, Sybil Caesar is entitled to one-half of what Johnnie's full-blooded siblings received. The full-blood siblings of Johnnie Caeser received $2.5 million. Therefore, this Court finds that Sybil Caeser is entitled to $1.25 million in pain and suffering damages arising out of her IIED claim in this action.

*C. Punitive Damages*

Punitive damages, however, are not available against foreign states such as the Islamic Republic of Iran. *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 71 (D.D.C. Mar. 24,

2006) (Lamberth, J.). Therefore, plaintiffs' claim for punitive damages against the Islamic Republic of Iran is DENIED. Moreover, this Court has previously found on a number of occasions that punitive damages are not available against MOIS because MOIS is a governmental entity, and part of the state of Iran itself. *Heiser*, 466 F. Supp. 2d at 270-71; *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 105 & n.1 (D.D.C. Aug. 10, 2006) (Lamberth, J.) (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003); *Haim*, 425 F. Supp. 2d at 71 n.2. Accordingly, plaintiffs' claim for punitive damages against defendant MOIS is also DENIED.

## CONCLUSION

This Court is sadly aware that there is little it can do to heal the physical wounds and emotional scars suffered by the servicemen in this case and their family members. Though the attack on the Marine barracks in Beirut, Lebanon occurred nearly twenty four years ago from this date, it is clear from the testimony presented to this Court and the special masters that the intense suffering experienced on that day has had a tragically lasting effect on the plaintiffs who have brought this action. The fact that almost 1000 individuals sought redress in this action confirms the sheer number of individuals whose lives were forever altered as a result of this senseless attack on these courageous servicemen.

Indeed, at a time like this and an era such as ours, it is important to acknowledge the selfless courage that these–and all–servicemen demonstrated by choosing to take action and make this world a safer and better place in which to live. The fact that the servicemen in this action made the ultimate sacrifice to pursue such a noble cause only serves to further establish the legacy of these courageous individuals in the annals of history.

Not to be forgotten is the courage demonstrated by the family members who have come forth in bringing this claim. These individuals, whose hearts and souls were forever broken on October 23, 1983, have waited patiently for nearly a quarter of a century for justice to be done, and to be made whole again. And though this Court can neither bring back the husbands, sons, fathers and brothers who were lost in this heinous display of violence, nor undo the tragic events of that day, the law offers a meager attempt to make the surviving family members whole, through seeking monetary damages against those who perpetrated this heinous attack. The Court hopes that this extremely sizeable judgment will serve to aid in the healing process for these plaintiffs, and simultaneously sound an alarm to the defendants that their unlawful attacks on our citizens will not be tolerated.

A separate Order and Judgment consistent with these findings shall issue this date.


SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, September 7, 2007.

**EXHIBIT "C"**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), *et al.*,** | |
| **Plaintiffs,** | **Consolidated Civil Actions: 01-2094 (RCL) 01-2684 (RCL)** |
| **v.** | |
| **ISLAMIC REPUBLIC OF IRAN, *et al.*,** | |
| **Defendants.** | |

**JUDGMENT**

In accord with the Memorandum Opinion issued this date, it is hereby

ORDERED that Default Judgment be entered in favor of plaintiffs and against defendants, jointly and severally, in the amount of $2,656,944,877.00, which shall be allocated in the following manner:

1. *Wrongful Death Claims Brought by the Personal Representatives and Estates of Deceased Servicemen*

| | |
|---|---|
| Abbott, Terry | $1,485,243.00 |
| Allman, John Robert | $545,937.00 |
| Bates, Ronny Kent | $2,991,659.00 |
| Baynard, James | $626,517.00 |
| Beamon, Jess W. | $988,897.00 |
| Belmer, Alvin Burton | $8,384,746.00 |
| Blankenship, Richard D. | $1,421,889.00 |
| Blocker, John W. | $975,621.00 |
| Boccia, Joseph John Jr. | $1,276,641.00 |
| Bohannon, Leon | $706,549.00 |

| | |
|---|---|
| Bonk, John Jr. | $904,220.00 |
| Boulos, Jeffrey Joseph | $1,154,112.00 |
| Boyett, John Norman | $2,235,375.00 |
| Burley, William | $170,847.00 |
| Callahan, Paul | $974,546.00 |
| Camara, Mecot | $1,882,308.00 |
| Campus, Bradley | $433,959.00 |
| Ceasar, Johnnie | $313,593.00 |
| Conley, Robert Allen | $962,677.00 |
| Cook, Charles Dennis | $837,147.00 |
| Copeland, Johnny Len | $541,325.00 |
| Cosner, David | $1,105,668.00 |
| Coulman, Kevin | $1,287,092.00 |
| Crudale, Rick | $1,004,731.00 |
| Cyzick, Russell | $575,554.00 |
| Devlin, Michael | $939,887.00 |
| Dorsey, Nathaniel | $638,703.00 |
| Dunnigan, Timothy | $709,232.00 |
| Earle, Bryan | $1,286,372.00 |
| Estes, Danny R. | $1,000,157.00 |
| Fluegel, Richard Andrew | $1,089,811.00 |
| Fulcher, Michael D. | $1,257,150.00 |
| Gallagher, Sean | $674,382.00 |
| Gangur, George | $1,000,935.00 |
| Garcia, Randall | $1,127,694.00 |
| Ghumm, Harold | $1,260,508.00 |
| Giblin, Timothy | $1,301,526.00 |
| Gorchinski, Michael | $1,931,668.00 |
| Gordon, Richard | $965,609.00 |
| Green, Davin M. | $1,025,050.00 |
| Hairston, Thomas | $1,489,395.00 |
| Haskell, Michael | $2,871,058.00 |
| Helms, Mark Anthony | $1,028,509.00 |
| Hester, Stanley G. | $1,493,349.00 |
| Hildreth, Donald Wayne | $1,425,177.00 |
| Holberton, Richard | $1,818,176.00 |
| Hudson, Dr. John | $4,072,010.00 |
| Hukill, Maurice Edward | $3,038,258.00 |
| Iacovino, Edward Jr. | $407,196.00 |
| Innocenzi, Paul III | $1,715,253.00 |
| Jackowski, James | $463,355.00 |
| James, Jeffrey Wilbur | $251,607.00 |
| Jenkins, Nathaniel Walter | $7,599,314 |

| | |
|---|---|
| Johnston, Edward Anthony | $1,246,535.00 |
| Jones, Steven | $801,721.00 |
| Julian, Thomas Adrian | $415,311.00 |
| Keown, Thomas | $1,013,901.00 |
| Kluck, Daniel | $922,630.00 |
| Knipple, James C. | $1,018,665.00 |
| Kreischer, Freas H. III | $1,059,185.00 |
| Laise, Keith | $447,984.00 |
| Langon, James IV | $1,066,903.00 |
| LaRiviere, Michael Scott | $1,056,282.00 |
| LaRiviere, Steven | $986,622.00 |
| Lemnah, Richard | $1,842,869.00 |
| Livingston, Joseph R. ("Joel") III | $1,762,193.00 |
| Lyon, Paul D. Jr. | $1,034,459.00 |
| Macroglou, John | $2,183,935.00 |
| Maitland, Samuel Jr. | $970,700.00 |
| Martin, Charlie Robert | $1,316,085.00 |
| Massa, David | $674,558.00 |
| McCall, John | $853,420.00 |
| McDonough, James E. | $952,847.00 |
| McMahon, Timothy R. | $984,020.00 |
| Menkins, Richard II | $850,938.00 |
| Meurer, Ronald | $1,855,272.00 |
| Milano, Joseph Peter | $674,258.00 |
| Moore, Joseph | $980,150.00 |
| Myers, Harry Douglas | $891,144.00 |
| Nairn, David | $1,562,682.00 |
| Olson, John Arne | $1,010,497.00 |
| Owens, Joseph Albert | $502,237.00 |
| Page, Connie Ray | $1,012,211.00 |
| Parker, Ulysses Gregory | $641,523.00 |
| Pearson, John L. | $1,816,369.00 |
| Perron, Thomas S. | $424,110.00 |
| Phillips, John Arthur Jr. | $1,030,308.00 |
| Pollard, William Roy | $1,111,556.00 |
| Prevatt, Victor Mark | $862,635.00 |
| Price, James | $989,921.00 |
| Prindeville, Patrick Kerry | $305,675.00 |
| Quirante, Diomedes J. | $2,178,822.00 |
| Richardson, Warren | $796,673.00 |
| Rotondo, Louis J. | $2,276,348.00 |
| Sauls, Michael Caleb | $974,601.00 |
| Schnorf, Charles Jeffrey | $2,790,541.00 |

| | |
|---|---|
| Schultz, Scott Lee | $675,361.00 |
| Scialabba, Peter | $2,462,179.00 |
| Scott, Gary Randall | $432,024.00 |
| Shipp, Thomas Alan | $738,895.00 |
| Shropshire, Jerryl | $212,061.00 |
| Simpson, Larry H. Jr. | $5,995,660.00 |
| Smith, Kirk Hall | $710,042.00 |
| Smith, Thomas Gerard | $980,543.00 |
| Smith, Vincent | $1,285,915.00 |
| Sommerhof, William Scott | $1,361,062.00 |
| Spencer, Stephen Eugene | $974,298.00 |
| Stelpflug, William | $1,094,429.00 |
| Stephens, Horace Renardo Jr. ("Ricky") | $446,107.00 |
| Stockton, Craig | $1,007,526.00 |
| Stokes, Jeffrey | $1,599,994.00 |
| Sturghill, Eric D. | $725,378.00 |
| Sundar, Devon | $1,394,608.00 |
| Thorstad, Thomas Paul | $1,921,086.00 |
| Tingley, Stephen | $1,439,655.00 |
| Vallone, Donald H. Jr. | $462,193.00 |
| Washington, Eric Glenn | $1,069,270.00 |
| Wigglesworth, Dwayne | $1,001,122.00 |
| Williams, Rodney J. | $671,206.00 |
| Williams, Scipio Jr. | $1,635,994.00 |
| Williamson, Johnny Adam | $443,409.00 |
| Winter, William Ellis | $2,534,910.00 |
| Woollett, Donald Elberan | $2,021,565.00 |
| Wyche, Craig | $1,025,860.00 |
| Young, Jeffrey D. | $618,891.00 |

2.    *Battery Claims Brought by Injured Servicemen*

| | |
|---|---|
| Albright, Marvin | $5,000,000.00 |
| Arroyo, Pablo | $5,000,000.00 |
| Banks, Anthony | $7,500,000.00 |
| Burnette, Rodney Darrell | $8,000,000.00 |
| Comes, Frank Jr. | $1,500,000.00 |
| Dolphin, Glenn | $3,000,000.00 |
| Eaves, Frederick Daniel | $1,500,000.00 |
| Frye, Charles | $2,200,000.00 |
| Garner, Truman Dale | $7,500,000.00 |
| Gerlach, Larry | $12,000,000.00 |
| Hlywiak, John | $1,500,000.00 |

| | |
|---|---|
| Hunt, Orval | $8,000,000.00 |
| Jacobs, Joseph P. | $5,000,000.00 |
| Kirkpatrick, Brian | $8,000,000.00 |
| Matthews, Burnham | $7,000,000.00 |
| Mitchell, Timothy | $4,555,099.00 |
| Moore, Lovelle "Darrell" | $8,314,513.00 |
| Nashton, Jeffrey | $11,776,632.00 |
| Oliver, John | $3,277,542.00 |
| Rivers, Paul | $7,000,000.00 |
| Russell, Stephen | $9,252,749.00 |
| Spaulding, Dana | $9,559,609.00 |
| Swinson, Craig Joseph | $1,500,000.00 |
| Toma, Michael | $7,500,000.00 |
| Wheeler, Danny | $5,000,000.00 |
| Young, Thomas D. | $1,500,000.00 |

3.    *Claims Brought by Family Members of Deceased Servicemen*

| | |
|---|---|
| Abbey, Lilla Woollett | $2,500,000.00 |
| Abbott, James | $5,000,000.00 |
| Abbott, Mary (Estate of) | $5,000,000.00 |
| Adams, Elizabeth | $2,500,000.00 |
| Ahlquist, Eileen Prindeville | $2,500,000.00 |
| Alarcon, Miralda (Judith Maitland) | $8,000,000.00 |
| Allman, Anne | $5,000,000.00 |
| Allman, Robert | $5,000,000.00 |
| Allman, Theodore (Estate of) | $2,500,000.00 |
| Allman, DiAnne Margaret ("Maggie") | $2,500,000.00 |
| Alvarez, Margaret E. | $2,500,000.00 |
| Angus, Kimberly F. | $2,500,000.00 |
| Bates, Donnie | $2,500,000.00 |
| Bates, Johnny | $2,500,000.00 |
| Bates, Laura | $5,000,000.00 |
| Bates, Margie | $5,000,000.00 |
| Bates, Monty | $2,500,000.00 |
| Bates, Thomas Jr. | $2,500,000.00 |
| Bates, Thomas C., Sr. | $5,000,000.00 |
| Baumgartner, Mary E. | $2,500,000.00 |
| Baynard, Anthony | $2,500,000.00 |
| Baynard, Barry | $2,500,000.00 |
| Baynard, Emerson | $2,500,000.00 |
| Baynard, Philip | $2,500,000.00 |
| Baynard, Thomasine | $8,000,000.00 |

| | |
|---|---|
| Baynard, Timothy | $2,500,000.00 |
| Baynard, Wayne | $2,500,000.00 |
| Baynard, Stephen | $5,000,000.00 |
| Beard, Anna | $2,500,000.00 |
| Beck, Mary Ann | $2,500,000.00 |
| Belmer, Alue | $5,000,000.00 |
| Belmer, Annette | $2,500,000.00 |
| Belmer, Clarence | $2,500,000.00 |
| Belmer, Colby Keith | $5,000,000.00 |
| Belmer, Denise | $2,500,000.00 |
| Belmer, Donna | $2,500,000.00 |
| Belmer, Faye | $8,000,000.00 |
| Belmer, Kenneth | $2,500,000.00 |
| Belmer, Luddie | $5,000,000.00 |
| Biellow, Shawn | $2,500,000.00 |
| Black, Mary Frances | $2,500,000.00 |
| Blankenship, Donald Jr. | $2,500,000.00 |
| Blankenship, Donald Sr. | $5,000,000.00 |
| Blankenship, Mary (Estate of) | $5,000,000.00 |
| Blocker, Alice | $5,000,000.00 |
| Blocker, Douglas | $2,500,000.00 |
| Blocker, John R. | $5,000,000.00 |
| Blocker, Robert | $2,500,000.00 |
| Boccia, James | $2,500,000.00 |
| Boccia, Joseph Sr. | $5,000,000.00 |
| Boccia, Patricia | $5,000,000.00 |
| Boccia, Raymond | $2,500,000.00 |
| Boccia, Richard | $2,500,000.00 |
| Boccia, Ronnie (Veronica) | $2,500,000.00 |
| Boddie, Leticia | $2,500,000.00 |
| Bohannon, Angela | $2,500,000.00 |
| Bohannon, Anthony | $2,500,000.00 |
| Bohannon, Carrie | $5,000,000.00 |
| Bohannon, David | $2,500,000.00 |
| Bohannon, Edna | $8,000,000.00 |
| Bohannon, Leon Sr. | $5,000,000.00 |
| Bohannon, Ricki | $2,500,000.00 |
| Bolinger, Billie Jean | $5,000,000.00 |
| Boulos, Joseph | $5,000,000.00 |
| Boulos, Lydia | $2,500,000.00 |
| Boulos, Marie | $5,000,000.00 |
| Bowler, Rebecca | $2,500,000.00 |
| Boyett, Lavon | $5,000,000.00 |
| Boyett, Norman E. Jr. (Estate of) | $5,000,000.00 |

| | |
|---|---|
| Boyett, Theresa U. Roth | $8,000,000.00 |
| Boyett, William A. | $2,500,000.00 |
| Breeden, Susan Schnorf | $2,500,000.00 |
| Briscoe, Damion | $2,500,000.00 |
| Brown, Christine | $5,000,000.00 |
| Brunette, Rosanne | $2,500,000.00 |
| Buckner, Mary Lynn | $8,000,000.00 |
| Burley, Claude (Estate of) | $5,000,000.00 |
| Burley, William Douglas (Estate of) | $2,500,000.00 |
| Burley, Myra | $2,500,000.00 |
| Calabro, Kathleen | $2,500,000.00 |
| Caldera, Rachel | $2,500,000.00 |
| Callahan, Avenell | $5,000,000.00 |
| Callahan, Michael | $2,500,000.00 |
| Calloway, Patricia (Patsy Ann) | $2,500,000.00 |
| Camara, Elisa Rock | $2,500,000.00 |
| Camara, Theresa Riggs | $2,500,000.00 |
| Campbell, Candace | $2,500,000.00 |
| Campus, Clare | $5,000,000.00 |
| Capobianco, Elaine | $2,500,000.00 |
| Carter, Florene Martin | $2,500,000.00 |
| Cash, Phyllis A. | $2,500,000.00 |
| Catano, Theresa | $2,500,000.00 |
| Ceasar, Bruce | $2,500,000.00 |
| Ceasar, Franklin | $2,500,000.00 |
| Ceasar, Fredrick | $2,500,000.00 |
| Ceasar, Robbie Nell | $5,000,000.00 |
| Ceasar, Sybil | $1,250,000.00 |
| Cecca, Christine Devlin | $2,500,000.00 |
| Chapman, Tammy | $2,500,000.00 |
| Cherry, James | $2,500,000.00 |
| Cherry, Sonia | $2,500,000.00 |
| Chios, Adele H. | $2,500,000.00 |
| Christian, Jana M. | $2,500,000.00 |
| Christian, Sharon Rose | $2,500,000.00 |
| Ciupaska, Susan | $2,500,000.00 |
| Clark, LeShune Stokes | $2,500,000.00 |
| Clark, Rosemary | $2,500,000.00 |
| Cobble, Mary Ann | $5,000,000.00 |
| Collard, Karen Shipp | $2,500,000.00 |
| Collier, Jennifer | $5,000,000.00 |
| Collier, Melia Winter | $8,000,000.00 |
| Coltrane, Deborah M. | $8,000,000.00 |
| Conley, James N. Jr. | $5,000,000.00 |

| | |
|---|---|
| Conley, Roberta Li | $5,000,000.00 |
| Cook, Charles F. | $5,000,000.00 |
| Cook, Elizabeth A. | $2,500,000.00 |
| Cook, Mary A. (Estate of) | $5,000,000.00 |
| Copeland, Alan Tracy | $2,500,000.00 |
| Copeland, Betty | $5,000,000.00 |
| Copeland, Donald | $5,000,000.00 |
| Corry, Blanche | $2,500,000.00 |
| Cosner, Harold | $5,000,000.00 |
| Cosner, Jeffrey | $2,500,000.00 |
| Cosner, Leanna | $5,000,000.00 |
| Cosner, Marva Lynn (Estate of) | $5,000,000.00 |
| Cossaboom, Cheryl | $2,500,000.00 |
| Coulman, Bryan Thomas | $2,500,000.00 |
| Coulman, Christopher J. | $2,500,000.00 |
| Coulman, Dennis P. | $2,500,000.00 |
| Coulman, Lorraine M. | $5,000,000.00 |
| Coulman, Robert D. | $2,500,000.00 |
| Coulman, Robert Louis | $5,000,000.00 |
| Covington, Charlita Martin | $5,000,000.00 |
| Crouch, Amanda | $5,000,000.00 |
| Crudale, Marie | $5,000,000.00 |
| Cyzick, Eugene | $2,500,000.00 |
| Dallachie, Lynn | $8,000,000.00 |
| Deal, Anne | $2,500,000.00 |
| Derbyshire, Lynn Smith | $2,500,000.00 |
| Desjardins, Theresa | $5,000,000.00 |
| Devlin, Christine | $5,000,000.00 |
| Devlin, Daniel | $2,500,000.00 |
| Devlin, Gabrielle | $2,500,000.00 |
| Devlin, Richard | $2,500,000.00 |
| Devlin, Sean | $2,500,000.00 |
| Donahue (Milano), Rosalie | $2,500,000.00 |
| Doray, Ashley | $5,000,000.00 |
| Doss, Rebecca | $2,500,000.00 |
| Dunnigan, Chester | $2,500,000.00 |
| Dunnigan, Elizabeth Ann | $2,500,000.00 |
| Dunnigan, Michael | $2,500,000.00 |
| Dunnigan, William | $2,500,000.00 |
| Dunnigan, Claudine | $5,000,000.00 |
| Edquist, Janice Thorstad | $2,500,000.00 |
| Ervin, Mary Ruth | $5,000,000.00 |
| Estes, Barbara | $5,000,000.00 |
| Estes, Charles | $5,000,000.00 |

| | |
|---|---|
| Estes, Frank | $2,500,000.00 |
| Fansler, Lori | $2,500,000.00 |
| Farthing, Angela Dawn | $2,500,000.00 |
| Ferguson, Arlington | $1,250,000.00 |
| Ferguson, Hilton | $1,250,000.00 |
| Fish, Linda Sandback | $8,000,000.00 |
| Fox, Nancy Brocksbank | $5,000,000.00 |
| Fox, Tia | $2,500,000.00 |
| Freshour, Tammy | $8,000,000.00 |
| Fulcher, Ruby | $5,000,000.00 |
| Gallagher, Barbara | $5,000,000.00 |
| Gallagher, Brian | $2,500,000.00 |
| Gallagher, James (Estate of) | $5,000,000.00 |
| Gallagher, James Jr. | $2,500,000.00 |
| Gallagher, Kevin | $2,500,000.00 |
| Gallagher, Michael | $2,500,000.00 |
| Gangur, Dimitri | $5,000,000.00 |
| Gangur, Mary | $5,000,000.00 |
| Garcia, Jess | $5,000,000.00 |
| Garcia, Ronald | $2,500,000.00 |
| Garcia, Roxanne | $2,500,000.00 |
| Garcia, Russell | $2,500,000.00 |
| Garcia, Violet | $5,000,000.00 |
| Garza, Suzanne Perron | $2,500,000.00 |
| Gattegno, Jeanne | $2,500,000.00 |
| Ghumm, Arlene | $8,000,000.00 |
| Ghumm, Ashley | $5,000,000.00 |
| Ghumm, Bill | $2,500,000.00 |
| Ghumm, Edward | $2,500,000.00 |
| Ghumm, Hildegard | $5,000,000.00 |
| Ghumm, Jedaiah (Estate of) | $5,000,000.00 |
| Ghumm, Jesse | $2,500,000.00 |
| Ghumm, Leroy | $5,000,000.00 |
| Ghumm, Moronica | $5,000,000.00 |
| Giblin, Donald | $2,500,000.00 |
| Giblin, Jeanne | $5,000,000.00 |
| Giblin, Michael | $2,500,000.00 |
| Giblin, Tiffany | $5,000,000.00 |
| Giblin, Valerie | $8,000,000.00 |
| Giblin, William | $2,500,000.00 |
| Gilford-Smith, Thad | $2,500,000.00 |
| Gintonio, Rebecca | $2,500,000.00 |
| Goff, Dawn | $2,500,000.00 |
| Gorchinski, Christina | $5,000,000.00 |

| | |
|---|---|
| Gorchinski, Judy | $8,000,000.00 |
| Gorchinski, Kevin | $5,000,000.00 |
| Gorchinski, Valerie | $5,000,000.00 |
| Gordon, Alice | $5,000,000.00 |
| Gordon, Joseph | $2,500,000.00 |
| Gordon, Linda | $2,500,000.00 |
| Gordon, Norris (Estate of) | $5,000,000.00 |
| Gordon, Paul | $2,500,000.00 |
| Grant, Andrea | $2,500,000.00 |
| Graves, Deborah | $2,500,000.00 |
| Green, Deborah | $8,000,000.00 |
| Gregg, Liberty Quirante | $2,500,000.00 |
| Griffin, Alex | $2,500,000.00 |
| Grimsley, Catherine E. | $2,500,000.00 |
| Gummer, Megan | $2,500,000.00 |
| Guz, Lyda Woollett | $2,500,000.00 |
| Hairston, Darlene | $8,000,000.00 |
| Hanrahan, Tara | $2,500,000.00 |
| Hart, Mary Clyde | $2,500,000.00 |
| Haskill, Brenda | $2,500,000.00 |
| Haskell, Jeffrey | $2,500,000.00 |
| Hedge, Kathleen S. | $8,000,000.00 |
| Helms, Christopher Todd | $2,500,000.00 |
| Helms, Marvin R. | $5,000,000.00 |
| Hester, Doris | $8,000,000.00 |
| Hildreth, Clifton | $5,000,000.00 |
| Hildreth, Julia | $5,000,000.00 |
| Hildreth, Mary Ann | $8,000,000.00 |
| Hildreth, Michael Wayne | $5,000,000.00 |
| Hilton, Sharon A. | $2,500,000.00 |
| Holberton, Donald | $2,500,000.00 |
| Holberton, Patricia Lee | $5,000,000.00 |
| Holberton, Thomas | $2,500,000.00 |
| Hollifield, Tangie | $2,500,000.00 |
| Horner, Debra | $8,000,000.00 |
| House, Elizabeth | $2,500,000.00 |
| Houston, Joyce A. | $5,000,000.00 |
| Howell, Tammy Camara | $8,000,000.00 |
| Hudson, Lisa H. | $8,000,000.00 |
| Hudson, Lorenzo | $2,500,000.00 |
| Hudson, Lucy | $5,000,000.00 |
| Hudson, Ruth | $2,500,000.00 |
| Hudson, Samuel (Estate of) | $5,000,000.00 |
| Hudson, William J. | $5,000,000.00 |

| | |
|---|---|
| Hugis, Susan Thorstad (Estate of) | $2,500,000.00 |
| Hurlburt, Nancy Tingley | $2,500,000.00 |
| Hurston, Cynthia Perron | $2,500,000.00 |
| Iacovino, Edward Sr. (Estate of) | $5,000,000.00 |
| Iacovino, Elizabeth | $5,000,000.00 |
| Innocenzi, Deborah | $8,000,000.00 |
| Innocenzi, Kristin | $5,000,000.00 |
| Innocenzi, Mark | $2,500,000.00 |
| Innocenzi, Paul IV | $5,000,000.00 |
| Jaccom, Bernadette | $2,500,000.00 |
| Jackowski, John Jr. | $2,500,000.00 |
| Jackowski, John Sr. | $5,000,000.00 |
| Jacobus, Victoria | $2,500,000.00 |
| James, Elaine | $5,000,000.00 |
| Jenkins, Nathalie C. | $5,000,000.00 |
| Jenkins, Stephen | $2,500,000.00 |
| Jewett, Rebecca | $2,500,000.00 |
| Johnson, Linda Martin | $2,500,000.00 |
| Johnson, Ray | $2,500,000.00 |
| Johnson, Rennitta Stokes | $2,500,000.00 |
| Johnson, Sherry | $5,000,000.00 |
| Johnston, Charles | $2,500,000.00 |
| Johnston, Edwin | $5,000,000.00 |
| Johnston, Mary Ann | $5,000,000.00 |
| Johnston, Zandra LaRiviere | $2,500,000.00 |
| Jones, Alicia | $2,500,000.00 |
| Jones, Corene Martin | $2,500,000.00 |
| Jones, Kia Briscoe | $2,500,000.00 |
| Jones, Mark | $2,500,000.00 |
| Jones, Ollie | $5,000,000.00 |
| Jones, Sandra D. | $5,000,000.00 |
| Jones, Synovure (Estate of) | $2,500,000.00 |
| Jordan, Robin Copeland | $2,500,000.00 |
| Jordan, Susan Scott | $2,500,000.00 |
| Julian, Joyce | $5,000,000.00 |
| Julian, Karl | $5,000,000.00 |
| Jurist, Nada | $2,500,000.00 |
| Keown, Adam | $2,500,000.00 |
| Keown, Bobby Jr. | $2,500,000.00 |
| Keown, Bobby Sr. | $5,000,000.00 |
| Keown, Darren | $2,500,000.00 |
| Keown, William | $2,500,000.00 |
| Kirker, Mary Joe | $2,500,000.00 |
| Kluck, Kelly | $2,500,000.00 |

| | |
|---|---|
| Kluck, Michael | $2,500,000.00 |
| Knipple, John D. (Estate of) | $5,000,000.00 |
| Knipple, John R. | $2,500,000.00 |
| Knipple, Pauline (Estate of) | $5,000,000.00 |
| Knox, Shirley L. | $2,500,000.00 |
| Kreischer, Doreen | $5,000,000.00 |
| Kreischer, Freas H. Jr. | $5,000,000.00 |
| Lake, Cynthia D. | $2,500,000.00 |
| Lange, Wendy L. | $2,500,000.00 |
| Langon, James III | $5,000,000.00 |
| LaRiviere, Eugene | $2,500,000.00 |
| LaRiviere, Janet | $5,000,000.00 |
| LaRiviere, John M. | $2,500,000.00 |
| LaRiviere, Lesley | $2,500,000.00 |
| LaRiviere, Michael | $2,500,000.00 |
| LaRiviere, Nancy | $2,500,000.00 |
| LaRiviere, Richard | $2,500,000.00 |
| LaRiviere, Richard G. (Estate of) | $5,000,000.00 |
| LaRiviere, Robert | $2,500,000.00 |
| LaRiviere, William | $2,500,000.00 |
| Lawton, Cathy L. | $2,500,000.00 |
| LeGault, Heidi Crudale | $8,000,000.00 |
| Lemnah, Clarence (Estate of) | $5,000,000.00 |
| Lemnah, Etta | $5,000,000.00 |
| Lemnah, Fay | $2,500,000.00 |
| Lemnah, Harold | $2,500,000.00 |
| Lemnah, Marlys | $8,000,000.00 |
| Lemnah, Robert | $2,500,000.00 |
| Lemnah, Ronald | $2,500,000.00 |
| Livingston, Annette R. | $8,000,000.00 |
| Livingston, Joseph R. IV | $5,000,000.00 |
| Livingston, Joseph R. Jr. (Estate of) | $5,000,000.00 |
| Lynch, Robin M. | $2,500,000.00 |
| Lyon, Earl | $2,500,000.00 |
| Lyon, Francisco | $2,500,000.00 |
| Lyon, June | $2,500,000.00 |
| Lyon, Maria | $5,000,000.00 |
| Lyon, Paul D. Sr. | $5,000,000.00 |
| Lyon, Valerie | $2,500,000.00 |
| Macroglou, Heather | $5,000,000.00 |
| Mahoney, Kathleen Devlin | $2,500,000.00 |
| Maitland, Kenty | $2,500,000.00 |
| Maitland, Leysnal | $5,000,000.00 |
| Maitland, Samuel Sr. | $5,000,000.00 |

| | |
|---|---|
| Maitland, Shirla | $2,500,000.00 |
| Marshall, Virginia Boccia | $2,500,000.00 |
| Martin, John | $2,500,000.00 |
| Martin, Pacita | $8,000,000.00 |
| Martin, Renerio | $5,000,000.00 |
| Martin, Ruby | $5,000,000.00 |
| Martin, Shirley | $5,000,000.00 |
| Mason, Mary | $5,000,000.00 |
| Massa, Cristina | $5,000,000.00 |
| Massa, Edmund | $2,500,000.00 |
| Massa, Joao ("John") | $2,500,000.00 |
| Massa, Jose ("Joe") | $2,500,000.00 |
| Massa, Manuel Jr. | $2,500,000.00 |
| Massa, Ramiro | $2,500,000.00 |
| McCall, Mary | $5,000,000.00 |
| McCall, Thomas (Estate of) | $5,000,000.00 |
| McCall, Valerie | $2,500,000.00 |
| McDermott, Gail | $2,500,000.00 |
| McFarlin, Julia A. | $2,500,000.00 |
| McMahon, George | $2,500,000.00 |
| McMahon, Michael | $2,500,000.00 |
| McPhee, Patty | $5,000,000.00 |
| Menkins, Darren | $2,500,000.00 |
| Menkins, Gregory | $2,500,000.00 |
| Menkins, Margaret | $5,000,000.00 |
| Menkins, Richard H. | $5,000,000.00 |
| Meurer, Jay T. | $2,500,000.00 |
| Meurer, John | $5,000,000.00 |
| Meurer, John Thomas | $2,500,000.00 |
| Meurer, Mary Lou | $5,000,000.00 |
| Meurer, Michael | $2,500,000.00 |
| Meyer, Penny | $2,500,000.00 |
| Milano, Angela | $5,000,000.00 |
| Milano, Peter Jr. | $5,000,000.00 |
| Miller, Earline | $5,000,000.00 |
| Miller, Henry | $2,500,000.00 |
| Miller, Patricia | $2,500,000.00 |
| Montgomery, Helen | $2,500,000.00 |
| Moore, Betty | $5,000,000.00 |
| Moore, Harry | $5,000,000.00 |
| Moore, Kimberly | $2,500,000.00 |
| Moore, Mary | $8,000,000.00 |
| Moore, Melissa Lea | $2,500,000.00 |
| Moore, Michael (Estate of) | $2,500,000.00 |

| | |
|---|---|
| Moy, Elizabeth Phillips | $2,500,000.00 |
| Myers, Debra | $2,500,000.00 |
| Myers, Geneva | $5,000,000.00 |
| Myers, Harry A. | $5,000,000.00 |
| Nairn, Billie Ann | $5,000,000.00 |
| Nairn, Campbell J. III | $2,500,000.00 |
| Nairn, Campbell J. Jr. (Estate of) | $5,000,000.00 |
| Nairn, William P. | $2,500,000.00 |
| Norfleet, Richard | $5,000,000.00 |
| O'Connor, Deborah | $2,500,000.00 |
| Olaniji, Pearl | $5,000,000.00 |
| Olson, Bertha (Estate of) | $5,000,000.00 |
| Olson, Karen L. | $2,500,000.00 |
| Olson, Randal D. | $2,500,000.00 |
| Olson, Roger S. | $2,500,000.00 |
| Olson, Ronald J. | $2,500,000.00 |
| Olson, Sigurd (Estate of) | $5,000,000.00 |
| Owens, David | $2,500,000.00 |
| Owens, Deanna | $2,500,000.00 |
| Owens, Frances | $5,000,000.00 |
| Owens, James (Estate of) | $5,000,000.00 |
| Owens, Steven | $2,500,000.00 |
| Page, Connie Mack | $5,000,000.00 |
| Page, Judith K. | $5,000,000.00 |
| Palmer, Lisa Menkins | $2,500,000.00 |
| Paolozzi, Geraldine | $2,500,000.00 |
| Pare, Maureen | $2,500,000.00 |
| Parker, Henry James | $2,500,000.00 |
| Parker, Sharon | $2,500,000.00 |
| Pearson, Helen M. | $5,000,000.00 |
| Pearson, John L. Jr. | $5,000,000.00 |
| Pearson, Sonia | $8,000,000.00 |
| Perron, Brett | $2,500,000.00 |
| Perron, Deborah Jean | $2,500,000.00 |
| Perron, Michelle | $2,500,000.00 |
| Perron, Ronald R. | $5,000,000.00 |
| Persky, Muriel | $5,000,000.00 |
| Peterson, Deborah D. | $2,500,000.00 |
| Petry, Sharon Conley | $2,500,000.00 |
| Petrick, Sandra | $2,500,000.00 |
| Phelps, Donna Vallone | $5,000,000.00 |
| Phillips, Harold | $2,500,000.00 |
| Phillips, John Arthur Sr. | $5,000,000.00 |
| Plickys, Donna Tingley | $2,500,000.00 |

| | |
|---|---|
| Pollard, Margaret Aileen | $8,000,000.00 |
| Pollard, Stacey Yvonne | $5,000,000.00 |
| Prevatt, Lee Hollan | $2,500,000.00 |
| Prevatt, Victor Thornton | $5,000,000.00 |
| Price, John | $5,000,000.00 |
| Price, Joseph | $2,500,000.00 |
| Prindeville, Barbara D. (Estate of) | $5,000,000.00 |
| Prindeville, Kathleen Tara | $2,500,000.00 |
| Prindeville, Michael | $2,500,000.00 |
| Prindeville, Paul | $5,000,000.00 |
| Prindeville, Sean | $2,500,000.00 |
| Quirante, Belinda J. | $5,000,000.00 |
| Quirante, Edgar | $2,500,000.00 |
| Quirante, Godofredo (Estate of) | $5,000,000.00 |
| Quirante, Milton | $2,500,000.00 |
| Quirante, Sabrina | $2,500,000.00 |
| Ray, Susan | $2,500,000.00 |
| Reininger, Laura M. | $2,500,000.00 |
| Richardson, Alan | $2,500,000.00 |
| Richardson, Beatrice | $5,000,000.00 |
| Richardson, Clarence | $5,000,000.00 |
| Richardson, Eric | $2,500,000.00 |
| Richardson, Lynette | $2,500,000.00 |
| Richardson, Vanessa | $2,500,000.00 |
| Richardson-Mills, Philiece | $5,000,000.00 |
| Ricks, Melrose | $5,000,000.00 |
| Riva, Belinda Quirante | $2,500,000.00 |
| Rockwell, Barbara | $5,000,000.00 |
| Rooney, Linda | $2,500,000.00 |
| Rose, Tara Smith | $2,500,000.00 |
| Ruark, Tammi | $2,500,000.00 |
| Rudkowski, Juliana | $2,500,000.00 |
| Russell, Marie McMahon | $2,500,000.00 |
| Sanchez, Alicia Lynn | $5,000,000.00 |
| Sauls, Andrew | $2,500,000.00 |
| Sauls, Henry Caleb | $2,500,000.00 |
| Sauls, Riley A. | $2,500,000.00 |
| Schnorf, Margaret Medler | $5,000,000.00 |
| Schnorf, Richard (brother) | $2,500,000.00 |
| Schnorf, Richard (father) | $5,000,000.00 |
| Schnorf, Robert | $2,500,000.00 |
| Schultz, Beverly | $5,000,000.00 |
| Schultz, Dennis James | $2,500,000.00 |
| Schultz, Dennis Ray | $5,000,000.00 |

| | |
|---|---|
| Scialabba, Frank | $5,000,000.00 |
| Scialabba, Jacqueline | $8,000,000.00 |
| Scialabba, Samuel Scott | $5,000,000.00 |
| Scott, Jon Christopher | $2,500,000.00 |
| Scott, Kevin James | $2,500,000.00 |
| Scott, Larry L. (Estate of) | $5,000,000.00 |
| Scott, Mary Ann | $5,000,000.00 |
| Scott, Sheria | $2,500,000.00 |
| Scott, Stephen Allen | $2,500,000.00 |
| Seguerra, Jacklyn | $2,500,000.00 |
| Shipp, Bryan Richard | $5,000,000.00 |
| Shipp, James David | $2,500,000.00 |
| Shipp, Janice | $2,500,000.00 |
| Shipp, Maurice | $2,500,000.00 |
| Shipp, Pauline | $8,000,000.00 |
| Shipp, Raymond Dennis | $2,500,000.00 |
| Shipp, Russell | $2,500,000.00 |
| Sinsioco, Susan J. | $2,500,000.00 |
| Smith-Ward, Ana | $8,000,000.00 |
| Smith, Angela Josephine (Estate of) | $5,000,000.00 |
| Smith, Bobbie Ann | $5,000,000.00 |
| Smith, Cynthia | $2,500,000.00 |
| Smith, Donna Marie | $2,500,000.00 |
| Smith, Erma | $2,500,000.00 |
| Smith, Holly | $2,500,000.00 |
| Smith, Ian | $5,000,000.00 |
| Smith, Janet | $2,500,000.00 |
| Smith, Joseph K. III | $2,500,000.00 |
| Smith, Joseph K. Jr. | $5,000,000.00 |
| Smith, Keith | $5,000,000.00 |
| Smith, Kelly B. | $2,500,000.00 |
| Smith, Shirley L. | $5,000,000.00 |
| Smith, Tadgh | $2,500,000.00 |
| Smith, Terrence | $2,500,000.00 |
| Smith, Timothy B. | $2,500,000.00 |
| Sommerhof, Jocelyn J. | $5,000,000.00 |
| Sommerhof, John | $2,500,000.00 |
| Sommerhof, William J. | $5,000,000.00 |
| Spencer, Douglas | $2,500,000.00 |
| Stelpflug, Christy Williford | $2,500,000.00 |
| Stelpflug, Joseph | $2,500,000.00 |
| Stelpflug, Kathy Nathan | $2,500,000.00 |
| Stelpflug, Laura Barfield | $2,500,000.00 |
| Stelpflug, Peggy | $5,000,000.00 |

| | |
|---|---|
| Stelpflug, William | $5,000,000.00 |
| Stephens, Horace Sr. | $5,000,000.00 |
| Stephens, Joyce | $5,000,000.00 |
| Stephens, Keith | $2,500,000.00 |
| Stockton, Dona | $5,000,000.00 |
| Stockton, Donald (Estate of) | $5,000,000.00 |
| Stockton, Richard | $2,500,000.00 |
| Stokes, Irene | $5,000,000.00 |
| Stokes, Nelson Jr. | $2,500,000.00 |
| Stokes, Nelson Sr. (Estate of) | $5,000,000.00 |
| Stokes, Robert | $2,500,000.00 |
| Stokes-Graham, Gwenn | $2,500,000.00 |
| Sturghill, Marcus D. | $2,500,000.00 |
| Sturghill, Marcus L. Jr. | $5,000,000.00 |
| Sturghill, NaKeisha Lynn | $2,500,000.00 |
| Sundar, Doreen | $8,000,000.00 |
| Tella, Margaret | $2,500,000.00 |
| Terlson, Susan L. | $2,500,000.00 |
| Thompson, Mary Ellen | $2,500,000.00 |
| Thorstad, Adam | $5,000,000.00 |
| Thorstad, Barbara | $5,000,000.00 |
| Thorstad, James Jr. | $2,500,000.00 |
| Thorstad, James Sr. | $5,000,000.00 |
| Thorstad, John | $2,500,000.00 |
| Thorstad, Ryan | $5,000,000.00 |
| Thurman, Betty Ann | $2,500,000.00 |
| Tingley, Barbara | $5,000,000.00 |
| Tingley, Richard L. | $5,000,000.00 |
| Tingley, Russell | $2,500,000.00 |
| Tolliver, Keysha | $5,000,000.00 |
| Turek, Mary Ann | $5,000,000.00 |
| Valenti, Karen | $5,000,000.00 |
| Vallone, Anthony | $2,500,000.00 |
| Vallone, Donald H. | $5,000,000.00 |
| Vallone, Timothy | $2,500,000.00 |
| Vargas, Leona Mae | $2,500,000.00 |
| Voyles, Denise | $2,500,000.00 |
| Wallace, Ila | $5,000,000.00 |
| Wallace, Kathryn Thorstad | $2,500,000.00 |
| Wallace, Richard J. | $2,500,000.00 |
| Warwick, Barbara Thorstad | $2,500,000.00 |
| Washington, Linda | $2,500,000.00 |
| Washington, Vancine | $2,500,000.00 |
| Watson, Kenneth | $2,500,000.00 |

| | |
|---|---|
| Whitener, Diane | $2,500,000.00 |
| Wigglesworth, Daryl | $2,500,000.00 |
| Wigglesworth, Darrin A. | $2,500,000.00 |
| Wigglesworth, Henry | $5,000,000.00 |
| Wigglesworth, Mark | $2,500,000.00 |
| Wigglesworth, Robyn | $2,500,000.00 |
| Wigglesworth, Sandra | $5,000,000.00 |
| Wigglesworth, Shawn | $2,500,000.00 |
| Williams, Dianne Stokes | $2,500,000.00 |
| Williams, Gussie Martin | $2,500,000.00 |
| Williams, Janet | $5,000,000.00 |
| Williams, Johnny | $2,500,000.00 |
| Williams, Rhonda | $2,500,000.00 |
| Williams, Ronald | $2,500,000.00 |
| Williams, Ruth | $5,000,000.00 |
| Williams, Scipio J. | $5,000,000.00 |
| Williams, Wesley | $5,000,000.00 |
| Williams-Edwards, Delma | $2,500,000.00 |
| Williamson, Tony | $2,500,000.00 |
| Williamson, Jewelene | $5,000,000.00 |
| Winter, Michael | $5,000,000.00 |
| Wiseman, Barbara | $8,000,000.00 |
| Woodford, Phyllis | $2,500,000.00 |
| Woodle, Joyce | $2,500,000.00 |
| Woollett, Beverly | $5,000,000.00 |
| Woollett, Paul | $5,000,000.00 |
| Wright, Melvina Stokes | $2,500,000.00 |
| Wright, Patricia | $5,000,000.00 |
| Wyche, Glenn | $2,500,000.00 |
| Wyche, John | $2,500,000.00 |
| Young, John F. | $5,000,000.00 |
| Young, John W. | $2,500,000.00 |
| Young, Judith Carol | $5,000,000.00 |
| Young, Sandra Rhodes | $5,000,000.00 |
| Zimmerman, Joanne | $2,500,000.00 |
| Zone, Stephen Thomas | $2,500,000.00 |
| Zosso, Patricia Thorstad | $2,500,000.00 |

4.    *Claims Brought by Family Members of Injured Servicemen*

| | |
|---|---|
| Ali, Jamaal Muata | $1,250,000.00 |
| Angeloni, Margaret | $1,250,000.00 |
| Arroyo, Jesus | $1,250,000.00 |
| Arroyo, Milagros | $1,250,000.00 |

| | |
|---|---|
| Carletta, Olympia | $2,500,000.00 |
| Carpenter, Kimberly | $4,000,000.00 |
| Comes, Joan | $2,500,000.00 |
| Comes, Patrick | $1,250,000.00 |
| Comes, Christopher | $1,250,000.00 |
| Comes, Frank Sr. | $2,500,000.00 |
| Crawford, Deborah | $1,250,000.00 |
| Davis, Barbara | $4,000,000.00 |
| Franklin, Alice Warren | $1,250,000.00 |
| Gerlach, Patricia | $4,000,000.00 |
| Gerlach, Travis | $2,500,000.00 |
| Gerlach, Megan | $2,500,000.00 |
| Hernandez, Arminda | $1,250,000.00 |
| Hlywiak, Margaret | $2,500,000.00 |
| Hlywiak, Peter Jr. | $1,250,000.00 |
| Hlywiak, Peter Sr. | $2,500,000.00 |
| Hlywiak, Paul | $1,250,000.00 |
| Hlywiak, Joseph | $1,250,000.00 |
| Hunt, Cynthia Lou | $4,000,000.00 |
| Ibarro, Rosa | $2,500,000.00 |
| Jacobs, Andrew Scott | $2,500,000.00 |
| Jacobs, Daniel Joseph | $2,500,000.00 |
| Jacobs, Danita | $4,000,000.00 |
| Kirkpatrick, Kathleen | $4,000,000.00 |
| Lewis, Grace | $2,500,000.00 |
| Magnotti, Lisa | $1,250,000.00 |
| Mitchell, Wendy | $4,000,000.00 |
| Moore, James Otis (Estate of) | $1,250,000.00 |
| Moore, Johnney S. (Estate of) | $2,500,000.00 |
| Moore, Marvin S. | $1,250,000.00 |
| Moore, Alie Mae | $2,500,000.00 |
| Moore-Jones, Jonnie Mae | $1,250,000.00 |
| Nashton, Alex W. (Estate of) | $2,500,000.00 |
| Oliver, Paul | $2,500,000.00 |
| Oliver, Riley | $2,500,000.00 |
| Oliver, Michael John | $2,500,000.00 |
| Oliver, Ashley E. | $2,500,000.00 |
| Oliver, Patrick S. | $2,500,000.00 |
| Oliver, Kayley | $2,500,000.00 |
| Russell, Tanya | $2,500,000.00 |
| Russell, Wanda | $4,000,000.00 |
| Russell, Jason | $2,500,000.00 |
| Shaver, Clydia | $1,250,000.00 |
| Spaulding, Scott | $1,250,000.00 |

| | |
|---|---|
| Stanley, Cecilia | $2,500,000.00 |
| Stilpen, Mary | $1,250,000.00 |
| Swank, Kelly | $1,250,000.00 |
| Swinson, Kenneth J. (Estate of) | $2,500,000.00 |
| Swinson, Ingrid M. (Estate of) | $2,500,000.00 |
| Swinson, Daniel | $1,250,000.00 |
| Swinson, William | $1,250,000.00 |
| Swinson, Dawn | $1,250,000.00 |
| Swinson, Teresa | $1,250,000.00 |
| Warren, Bronzell | $1,250,000.00 |
| Watson, Jessica | $1,250,000.00 |
| Webb, Audrey | $1,250,000.00 |
| Wheeler, Jonathan | $2,500,000.00 |
| Wheeler, Benjamin | $2,500,000.00 |
| Wheeler, Marlis "Molly" (Estate of) | $2,500,000.00 |
| Wheeler, Kerry | $1,250,000.00 |
| Wheeler, Andrew | $2,500,000.00 |
| Wheeler, Brenda June | $4,000,000.00 |
| Wold, Jill | $1,250,000.00 |
| Young, Nora (Estate of) | $2,500,000.00 |
| Young, James | $1,250,000.00 |
| Young, Robert (Estate of) | $2,500,000.00 |

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are hereby DISMISSED WITHOUT PREJUDICE:

Albright, Marvin Jr.
Albright, Mirequm
Albright, Shertara
Banks, Anthony (son)
Banks, Michael
Banks, Taiarra
Berry, Lori
Burnette, Christopher
Burnette, Gwen
Camara, Mecot Jr.
Comes, Dale
Comes, Tommy
Crop, Kimberly
Decker, Connie
Dolphin, Erin
Douglass, Frederick (Estate of)
Eaves, Christopher

Eaves, India
Eaves, Sylvia Jean
Foister, Gerald
Frye, Charles Jr.
Frye, Gina
Frye, Lialani
Frye, Lincoln
Frye, Randall
Garner, Joseph
Garner, Justina
Garner, Penny
Garner, Reva
Goodman, Karl
Haskell, Barbara
Haskell, Richard
Hlywiak, Jordan
Hlywiak, Taylor
Hunt, Jack Darrell
Hunt, Marcy Elizabeth
Hunt, Mendy Leigh
Hunt, Molly Faye
Livingston, Carol
Massa, Manuel Sr. (Estate of)
Matthews, Chadwick
Matthews, Debra
Matthews, Drew
Meurer, Deborah
Miller, Shirley D.
Mitchell, Elvera
Mitchell, Robert
Price, Betty Lou (Estate of)
Price, Timothy
Rivers, Jeremy
Rivers, Paul (son)
Rivers, Sandra
Schak, Carol
Schak, George
Spencer, Lynne M.
Washington, Patrice
Williams, Kevin Coker
Williams, George Robinson
Williams, Dorothy (Estate of)
Williamson, Bill
Wise, Debra

Woodcock, Gwen

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are hereby DISMISSED WITH PREJUDICE:

Beamon, Ashley Tutwiler
Beresford, Michael
Beresford, Susan
Beresford, William
Bianco, Sandra Karen
Bianco, Sandra
Bonk, Catherine
Bonk, John Sr.
Bonk, Kevin
Bonk, Thomas
Calloway, Donald
Clark, Michael Jr.
Corry, Charles
DiGiovanni, Lisa
DiGiovanni, Marion
DiGiovanni, Robert
DiGiovanni, Danielle
Fiedler, Sherry Lynn
Fluegel, Robert
Fluegel, Thomas A.
Fluegel, Marilou
Green, Rebecca Iverson
Hairston, Evans
Hairston, Felicia
Hairston, Julia Bell
Hukill, Henry Durban
Hukill, Mark Andrew
Hukill, Matthew Scott
Hukill, Melissa
Hukill, Meredith Anne
Hukill, Mitchell Charles
Hukill, Monte
Hukill, Virginia Ellen
Jackowski, Mary
Jones, Storm
Joyce, Penni
Kirkwood, Carl Sr.
Kirkwood, Jeff

Kirkwood, Shirley
Kirkwood, Carl Arnold Jr.
Kronenbitter, Patricia
Laise, Kris
Laise, Bill
Laise, Betty
Lewis, Natalie
Macroglou, James
Macroglou, Lorraine
Macroglou, Bill
Mason, Richard
McDonald, Kathy
McDonough, Edward W.
McDonough, Sean
McDonough, Edward Joseph
Morgan, Geraldine
Nashton, Pamela J.
Persky, Herbert
Phelps, Charles Jr.
Phelps, Charles Sr.
Prevatt-Wood, Victoria
Rhosto, Deborah Spencer
Rochwell, Natalie
Rockwell, Donald
Rotondo, Rose (Estate of)
Rotondo, Luis (Estate of) (father)
Santoserre, Phyllis (Estate of)
Simpson, Robert
Simpson, Renee Eileen
Simpson, Larry H. Sr.
Simpson, Anna Marie
Vallone, Donna Beresford
Wallace, Bobby L.
Watkins, Lula Mae (Estate of)
Watkins, Simon
Wirick, Sally Jo

IT IS FURTHER ORDERED that plaintiffs, at their own cost and consistent with the requirements of 28 U.S.C. § 1608(e), send a copy of this Judgment and the Findings of Fact and Conclusions of Law issued this date to defendants.

IT IS FURTHER ORDERED that the Clerk of this Court shall terminate this case from

the dockets of this Court.

     SO ORDERED.

     Signed by Royce C. Lamberth, United States District Judge, September 7, 2007.

# EXHIBIT "D"

EJ-001

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and address): TEL NO.:

[XX] Recording requested by and return to:

DAVID J. COOK, Esq. SBC: 060859
SARAH TESCONI, Esq. SBC: 251248
COOK COLLECTION ATTORNEYS, PLC.
165 Fell Street, San Francisco, California 94102

[XX] ATTORNEY FOR [XXX] JUDGMENT CREDITOR [ ] ASSIGNEE OF RECORD

SUPERIOR COURT OF CALIFORNIA, COUNTY OF UNITED STATES DISTRICT COURT
STREET ADDRESS: NORTHERN DISTRICT OF CALIFORNIA
MAILING ADDRESS: 450 California Street
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

FOR RECORDER'S USE ONLY

PLAINTIFF: DEBORAH D. PETERSON. Personal Representative etc. et. al.

DEFENDANT: ISLAMIC REBUBLIC OF IRAN etc. et. al.

**ABSTRACT OF JUDGMENT** [ ] Amended

CASE NUMBER: CV 08 80030MISC

FOR COURT USE ONLY

JSW

1. The [XX] judgment creditor [ ] assignee of record applies for an abstract of judgment and represents the following:

a. Judgment debtor's

Name and last known address

Islamic Republic Of Iran
Pasadaran Avenue
Golestan Yekom, Teheran, Iran

b. Driver's license No. and state: [x] Unknown

c. Social security No.: [x] Unknown

d. Summons or notice of entry of sister-state judgment was personally served or mailed to (name and address): See Above

e. [ ] Original abstract recorded in this county:
(1) Date:
(2) Instrument No.:

f. [ ] Information on additional judgment debtors is shown on page two.

Date: March 11, 2008

David J. Cook, Esq., SBN 060859

(TYPE OR PRINT NAME)

(SIGNATURE OF APPLICANT OR ATTORNEY)

2. a. [XX] I certify that the following is a true and correct abstract of the judgment entered in this action.

b. [ ] A certified copy of the judgment is attached.

3. Judgment creditor (name and address): Deborah D. Peterson, and others listed on Exhibit "A", c/o Cook Collection Attorneys, P.L.C. 165 Fell St., San Francisco, CA 94102.

4. Judgment debtor (full name as it appears in judgment):

Islamic Republic Of Iran

[SEAL]

5. a. Judgment entered on (date): 9-7-2007

b. Renewal entered on (date):

This abstract issued on (date):

MAR 11 2008

6. Total amount of judgment as entered or last renewed:
$ 2,656,944,877.00

7. [ ] An [ ] execution lien [ ] attachment lien is endorsed on the judgment as follows:

a. Amount: $

b. In favor of (name and address):

8. A stay of enforcement has

a. [x] not been ordered by the court.

b. [ ] been ordered by the court effective until (date):

9. [ ] This judgment is an installment judgment.

Clerk, by BETTY FONG, Deputy

Form Adopted for Mandatory Use
Judicial Council of California
EJ-001 [Rev. January 1, 2003]

**ABSTRACT OF JUDGMENT**
(CIVIL)

Page 1 of 2
Code of Civil Procedure, §§ 488.480, 674, 700.190

American LegalNet, Inc.
www.USCourtForms.com

| PLAINTIFF: Deborah D. Peterson, et al.,<br>DEFENDANT: Islamic Republic of Iran | CASE NUMBER: |
|---|---|

INFORMATION ON ADDITIONAL JUDGMENT DEBTORS

10. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

11. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

12. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

13. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

14. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

15. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

16. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

17. Name and last known address

Driver's license No. & state: ☐ Unknown
Social security No.: ☐ Unknown
Summons was personally served at or mailed to *(address)*:

18. ☐ Continued on Attachment 18.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.),** ***et al.*****,** | ) | |
| **Plaintiffs,** | ) | **Consolidated Civil Actions:** |
| **v.** | ) | **01-2094 (RCL)** |
| | ) | **01-2684 (RCL)** |
| **ISLAMIC REPUBLIC OF IRAN,** ***et al.*****,** | ) | |
| **Defendants.** | ) | |

**JUDGMENT**

In accord with the Memorandum Opinion issued this date, it is hereby

ORDERED that Default Judgment be entered in favor of plaintiffs and against defendants, jointly and severally, in the amount of $2,656,944,877.00, which shall be allocated in the following manner:

1. *Wrongful Death Claims Brought by the Personal Representatives and Estates of Deceased Servicemen*

| | |
|---|---|
| Abbott, Terry | $1,485,243.00 |
| Allman, John Robert | $545,937.00 |
| Bates, Ronny Kent | $2,991,659.00 |
| Baynard, James | $626,517.00 |
| Beamon, Jess W. | $988,897.00 |
| Belmer, Alvin Burton | $8,384,746.00 |
| Blankenship, Richard D. | $1,421,889.00 |
| Blocker, John W. | $975,621.00 |
| Boccia, Joseph John Jr. | $1,276,641.00 |
| Bohannon, Leon | $706,549.00 |

ECF DOCUMENT
I hereby attest and certify that this is a printed copy of a document which was electronically filed with the United States District Court for the District of Columbia.
Date Filed: 9/7/07
NANCY MAYER-WHITTINGTON, CLERK
By: Cathy J. Craney
3/6/08

EXHIBIT A

| | |
|---|---|
| Bonk, John Jr. | $904,220.00 |
| Boulos, Jeffrey Joseph | $1,154,112.00 |
| Boyett, John Norman | $2,235,375.00 |
| Burley, William | $170,847.00 |
| Callahan, Paul | $974,546.00 |
| Camara, Mecot | $1,882,308.00 |
| Campus, Bradley | $433,959.00 |
| Ceasar, Johnnie | $313,593.00 |
| Conley, Robert Allen | $962,677.00 |
| Cook, Charles Dennis | $837,147.00 |
| Copeland, Johnny Len | $541,325.00 |
| Cosner, David | $1,105,668.00 |
| Coulman, Kevin | $1,287,092.00 |
| Crudale, Rick | $1,004,731.00 |
| Cyzick, Russell | $575,554.00 |
| Devlin, Michael | $939,887.00 |
| Dorsey, Nathaniel | $638,703.00 |
| Dunnigan, Timothy | $709,232.00 |
| Earle, Bryan | $1,286,372.00 |
| Estes, Danny R. | $1,000,157.00 |
| Fluegel, Richard Andrew | $1,089,811.00 |
| Fulcher, Michael D. | $1,257,150.00 |
| Gallagher, Sean | $674,382.00 |
| Gangur, George | $1,000,935.00 |
| Garcia, Randall | $1,127,694.00 |
| Ghumm, Harold | $1,260,508.00 |
| Giblin, Timothy | $1,301,526.00 |
| Gorchinski, Michael | $1,931,668.00 |
| Gordon, Richard | $965,609.00 |
| Green, Davin M. | $1,025,050.00 |
| Hairston, Thomas | $1,489,395.00 |
| Haskell, Michael | $2,871,058.00 |
| Helms, Mark Anthony | $1,028,509.00 |
| Hester, Stanley G. | $1,493,349.00 |
| Hildreth, Donald Wayne | $1,425,177.00 |
| Holberton, Richard | $1,818,176.00 |
| Hudson, Dr. John | $4,072,010.00 |
| Hukill, Maurice Edward | $3,038,258.00 |
| Iacovino, Edward Jr. | $407,196.00 |
| Innocenzi, Paul III | $1,715,253.00 |
| Jackowski, James | $463,355.00 |
| James, Jeffrey Wilbur | $251,607.00 |
| Jenkins, Nathaniel Walter | $7,599,314 |

| | |
|---|---|
| Johnston, Edward Anthony | $1,246,535.00 |
| Jones, Steven | $801,721.00 |
| Julian, Thomas Adrian | $415,311.00 |
| Keown, Thomas | $1,013,901.00 |
| Kluck, Daniel | $922,630.00 |
| Knipple, James C. | $1,018,665.00 |
| Kreischer, Freas H. III | $1,059,185.00 |
| Laise, Keith | $447,984.00 |
| Langon, James IV | $1,066,903.00 |
| LaRiviere, Michael Scott | $1,056,282.00 |
| LaRiviere, Steven | $986,622.00 |
| Lemnah, Richard | $1,842,869.00 |
| Livingston, Joseph R. ("Joel") III | $1,762,193.00 |
| Lyon, Paul D. Jr. | $1,034,459.00 |
| Macroglou, John | $2,183,935.00 |
| Maitland, Samuel Jr. | $970,700.00 |
| Martin, Charlie Robert | $1,316,085.00 |
| Massa, David | $674,558.00 |
| McCall, John | $853,420.00 |
| McDonough, James E. | $952,847.00 |
| McMahon, Timothy R. | $984,020.00 |
| Menkins, Richard II | $850,938.00 |
| Meurer, Ronald | $1,855,272.00 |
| Milano, Joseph Peter | $674,258.00 |
| Moore, Joseph | $980,150.00 |
| Myers, Harry Douglas | $891,144.00 |
| Nairn, David | $1,562,682.00 |
| Olson, John Arne | $1,010,497.00 |
| Owens, Joseph Albert | $502,237.00 |
| Page, Connie Ray | $1,012,211.00 |
| Parker, Ulysses Gregory | $641,523.00 |
| Pearson, John L. | $1,816,369.00 |
| Perron, Thomas S. | $424,110.00 |
| Phillips, John Arthur Jr. | $1,030,308.00 |
| Pollard, William Roy | $1,111,556.00 |
| Prevatt, Victor Mark | $862,635.00 |
| Price, James | $989,921.00 |
| Prindeville, Patrick Kerry | $305,675.00 |
| Quirante, Diomedes J. | $2,178,822.00 |
| Richardson, Warren | $796,673.00 |
| Rotondo, Louis J. | $2,276,348.00 |
| Sauls, Michael Caleb | $974,601.00 |
| Schnorf, Charles Jeffrey | $2,790,541.00 |

| | |
|---|---|
| Schultz, Scott Lee | $675,361.00 |
| Scialabba, Peter | $2,462,179.00 |
| Scott, Gary Randall | $432,024.00 |
| Shipp, Thomas Alan | $738,895.00 |
| Shropshire, Jerryl | $212,061.00 |
| Simpson, Larry H. Jr. | $5,995,660.00 |
| Smith, Kirk Hall | $710,042.00 |
| Smith, Thomas Gerard | $980,543.00 |
| Smith, Vincent | $1,285,915.00 |
| Sommerhof, William Scott | $1,361,062.00 |
| Spencer, Stephen Eugene | $974,298.00 |
| Stelpflug, William | $1,094,429.00 |
| Stephens, Horace Renardo Jr. ("Ricky") | $446,107.00 |
| Stockton, Craig | $1,007,526.00 |
| Stokes, Jeffrey | $1,599,994.00 |
| Sturghill, Eric D. | $725,378.00 |
| Sundar, Devon | $1,394,608.00 |
| Thorstad, Thomas Paul | $1,921,086.00 |
| Tingley, Stephen | $1,439,655.00 |
| Vallone, Donald H. Jr. | $462,193.00 |
| Washington, Eric Glenn | $1,069,270.00 |
| Wigglesworth, Dwayne | $1,001,122.00 |
| Williams, Rodney J. | $671,206.00 |
| Williams, Scipio Jr. | $1,635,994.00 |
| Williamson, Johnny Adam | $443,409.00 |
| Winter, William Ellis | $2,534,910.00 |
| Woollett, Donald Elberan | $2,021,565.00 |
| Wyche, Craig | $1,025,860.00 |
| Young, Jeffrey D. | $618,891.00 |

2.  *Battery Claims Brought by Injured Servicemen*

| | |
|---|---|
| Albright, Marvin | $5,000,000.00 |
| Arroyo, Pablo | $5,000,000.00 |
| Banks, Anthony | $7,500,000.00 |
| Burnette, Rodney Darrell | $8,000,000.00 |
| Comes, Frank Jr. | $1,500,000.00 |
| Dolphin, Glenn | $3,000,000.00 |
| Eaves, Frederick Daniel | $1,500,000.00 |
| Frye, Charles | $2,200,000.00 |
| Garner, Truman Dale | $7,500,000.00 |
| Gerlach, Larry | $12,000,000.00 |
| Hlywiak, John | $1,500,000.00 |

| | |
|---|---|
| Hunt, Orval | $8,000,000.00 |
| Jacobs, Joseph P. | $5,000,000.00 |
| Kirkpatrick, Brian | $8,000,000.00 |
| Matthews, Burnham | $7,000,000.00 |
| Mitchell, Timothy | $4,555,099.00 |
| Moore, Lovelle "Darrell" | $8,314,513.00 |
| Nashton, Jeffrey | $11,776,632.00 |
| Oliver, John | $3,277,542.00 |
| Rivers, Paul | $7,000,000.00 |
| Russell, Stephen | $9,252,749.00 |
| Spaulding, Dana | $9,559,609.00 |
| Swinson, Craig Joseph | $1,500,000.00 |
| Toma, Michael | $7,500,000.00 |
| Wheeler, Danny | $5,000,000.00 |
| Young, Thomas D. | $1,500,000.00 |

3.    *Claims Brought by Family Members of Deceased Servicemen*

| | |
|---|---|
| Abbey, Lilla Woollett | $2,500,000.00 |
| Abbott, James | $5,000,000.00 |
| Abbott, Mary (Estate of) | $5,000,000.00 |
| Adams, Elizabeth | $2,500,000.00 |
| Ahlquist, Eileen Prindeville | $2,500,000.00 |
| Alarcon, Miralda (Judith Maitland) | $8,000,000.00 |
| Allman, Anne | $5,000,000.00 |
| Allman, Robert | $5,000,000.00 |
| Allman, Theodore (Estate of) | $2,500,000.00 |
| Allman, DiAnne Margaret ("Maggie") | $2,500,000.00 |
| Alvarez, Margaret E. | $2,500,000.00 |
| Angus, Kimberly F. | $2,500,000.00 |
| Bates, Donnie | $2,500,000.00 |
| Bates, Johnny | $2,500,000.00 |
| Bates, Laura | $5,000,000.00 |
| Bates, Margie | $5,000,000.00 |
| Bates, Monty | $2,500,000.00 |
| Bates, Thomas Jr. | $2,500,000.00 |
| Bates, Thomas C., Sr. | $5,000,000.00 |
| Baumgartner, Mary E. | $2,500,000.00 |
| Baynard, Anthony | $2,500,000.00 |
| Baynard, Barry | $2,500,000.00 |
| Baynard, Emerson | $2,500,000.00 |
| Baynard, Philip | $2,500,000.00 |
| Baynard, Thomasine | $8,000,000.00 |

| | |
|---|---|
| Baynard, Timothy | $2,500,000.00 |
| Baynard, Wayne | $2,500,000.00 |
| Baynard, Stephen | $5,000,000.00 |
| Beard, Anna | $2,500,000.00 |
| Beck, Mary Ann | $2,500,000.00 |
| Belmer, Alue | $5,000,000.00 |
| Belmer, Annette | $2,500,000.00 |
| Belmer, Clarence | $2,500,000.00 |
| Belmer, Colby Keith | $5,000,000.00 |
| Belmer, Denise | $2,500,000.00 |
| Belmer, Donna | $2,500,000.00 |
| Belmer, Faye | $8,000,000.00 |
| Belmer, Kenneth | $2,500,000.00 |
| Belmer, Luddie | $5,000,000.00 |
| Biellow, Shawn | $2,500,000.00 |
| Black, Mary Frances | $2,500,000.00 |
| Blankenship, Donald Jr. | $2,500,000.00 |
| Blankenship, Donald Sr. | $5,000,000.00 |
| Blankenship, Mary (Estate of) | $5,000,000.00 |
| Blocker, Alice | $5,000,000.00 |
| Blocker, Douglas | $2,500,000.00 |
| Blocker, John R. | $5,000,000.00 |
| Blocker, Robert | $2,500,000.00 |
| Boccia, James | $2,500,000.00 |
| Boccia, Joseph Sr. | $5,000,000.00 |
| Boccia, Patricia | $5,000,000.00 |
| Boccia, Raymond | $2,500,000.00 |
| Boccia, Richard | $2,500,000.00 |
| Boccia, Ronnie (Veronica) | $2,500,000.00 |
| Boddie, Leticia | $2,500,000.00 |
| Bohannon, Angela | $2,500,000.00 |
| Bohannon, Anthony | $2,500,000.00 |
| Bohannon, Carrie | $5,000,000.00 |
| Bohannon, David | $2,500,000.00 |
| Bohannon, Edna | $8,000,000.00 |
| Bohannon, Leon Sr. | $5,000,000.00 |
| Bohannon, Ricki | $2,500,000.00 |
| Bolinger, Billie Jean | $5,000,000.00 |
| Boulos, Joseph | $5,000,000.00 |
| Boulos, Lydia | $2,500,000.00 |
| Boulos, Marie | $5,000,000.00 |
| Bowler, Rebecca | $2,500,000.00 |
| Boyett, Lavon | $5,000,000.00 |
| Boyett, Norman E. Jr. (Estate of) | $5,000,000.00 |

| | |
|---|---|
| Boyett, Theresa U. Roth | $8,000,000.00 |
| Boyett, William A. | $2,500,000.00 |
| Breeden, Susan Schnorf | $2,500,000.00 |
| Briscoe, Damion | $2,500,000.00 |
| Brown, Christine | $5,000,000.00 |
| Brunette, Rosanne | $2,500,000.00 |
| Buckner, Mary Lynn | $8,000,000.00 |
| Burley, Claude (Estate of) | $5,000,000.00 |
| Burley, William Douglas (Estate of) | $2,500,000.00 |
| Burley, Myra | $2,500,000.00 |
| Calabro, Kathleen | $2,500,000.00 |
| Caldera, Rachel | $2,500,000.00 |
| Callahan, Avenell | $5,000,000.00 |
| Callahan, Michael | $2,500,000.00 |
| Calloway, Patricia (Patsy Ann) | $2,500,000.00 |
| Camara, Elisa Rock | $2,500,000.00 |
| Camara, Theresa Riggs | $2,500,000.00 |
| Campbell, Candace | $2,500,000.00 |
| Campus, Clare | $5,000,000.00 |
| Capobianco, Elaine | $2,500,000.00 |
| Carter, Florene Martin | $2,500,000.00 |
| Cash, Phyllis A. | $2,500,000.00 |
| Catano, Theresa | $2,500,000.00 |
| Ceasar, Bruce | $2,500,000.00 |
| Ceasar, Franklin | $2,500,000.00 |
| Ceasar, Fredrick | $2,500,000.00 |
| Ceasar, Robbie Nell | $5,000,000.00 |
| Ceasar, Sybil | $1,250,000.00 |
| Cecca, Christine Devlin | $2,500,000.00 |
| Chapman, Tammy | $2,500,000.00 |
| Cherry, James | $2,500,000.00 |
| Cherry, Sonia | $2,500,000.00 |
| Chios, Adele H. | $2,500,000.00 |
| Christian, Jana M. | $2,500,000.00 |
| Christian, Sharon Rose | $2,500,000.00 |
| Ciupaska, Susan | $2,500,000.00 |
| Clark, LeShune Stokes | $2,500,000.00 |
| Clark, Rosemary | $2,500,000.00 |
| Cobble, Mary Ann | $5,000,000.00 |
| Collard, Karen Shipp | $2,500,000.00 |
| Collier, Jennifer | $5,000,000.00 |
| Collier, Melia Winter | $8,000,000.00 |
| Coltrane, Deborah M. | $8,000,000.00 |
| Conley, James N. Jr. | $5,000,000.00 |

| | |
|---|---|
| Conley, Roberta Li | $5,000,000.00 |
| Cook, Charles F. | $5,000,000.00 |
| Cook, Elizabeth A. | $2,500,000.00 |
| Cook, Mary A. (Estate of) | $5,000,000.00 |
| Copeland, Alan Tracy | $2,500,000.00 |
| Copeland, Betty | $5,000,000.00 |
| Copeland, Donald | $5,000,000.00 |
| Corry, Blanche | $2,500,000.00 |
| Cosner, Harold | $5,000,000.00 |
| Cosner, Jeffrey | $2,500,000.00 |
| Cosner, Leanna | $5,000,000.00 |
| Cosner, Marva Lynn (Estate of) | $5,000,000.00 |
| Cossaboom, Cheryl | $2,500,000.00 |
| Coulman, Bryan Thomas | $2,500,000.00 |
| Coulman, Christopher J. | $2,500,000.00 |
| Coulman, Dennis P. | $2,500,000.00 |
| Coulman, Lorraine M. | $5,000,000.00 |
| Coulman, Robert D. | $2,500,000.00 |
| Coulman, Robert Louis | $5,000,000.00 |
| Covington, Charlita Martin | $5,000,000.00 |
| Crouch, Amanda | $5,000,000.00 |
| Crudale, Marie | $5,000,000.00 |
| Cyzick, Eugene | $2,500,000.00 |
| Dallachie, Lynn | $8,000,000.00 |
| Deal, Anne | $2,500,000.00 |
| Derbyshire, Lynn Smith | $2,500,000.00 |
| Desjardins, Theresa | $5,000,000.00 |
| Devlin, Christine | $5,000,000.00 |
| Devlin, Daniel | $2,500,000.00 |
| Devlin, Gabrielle | $2,500,000.00 |
| Devlin, Richard | $2,500,000.00 |
| Devlin, Sean | $2,500,000.00 |
| Donahue (Milano), Rosalie | $2,500,000.00 |
| Doray, Ashley | $5,000,000.00 |
| Doss, Rebecca | $2,500,000.00 |
| Dunnigan, Chester | $2,500,000.00 |
| Dunnigan, Elizabeth Ann | $2,500,000.00 |
| Dunnigan, Michael | $2,500,000.00 |
| Dunnigan, William | $2,500,000.00 |
| Dunnigan, Claudine | $5,000,000.00 |
| Edquist, Janice Thorstad | $2,500,000.00 |
| Ervin, Mary Ruth | $5,000,000.00 |
| Estes, Barbara | $5,000,000.00 |
| Estes, Charles | $5,000,000.00 |

| | |
|---|---|
| Estes, Frank | $2,500,000.00 |
| Fansler, Lori | $2,500,000.00 |
| Farthing, Angela Dawn | $2,500,000.00 |
| Ferguson, Arlington | $1,250,000.00 |
| Ferguson, Hilton | $1,250,000.00 |
| Fish, Linda Sandback | $8,000,000.00 |
| Fox, Nancy Brocksbank | $5,000,000.00 |
| Fox, Tia | $2,500,000.00 |
| Freshour, Tammy | $8,000,000.00 |
| Fulcher, Ruby | $5,000,000.00 |
| Gallagher, Barbara | $5,000,000.00 |
| Gallagher, Brian | $2,500,000.00 |
| Gallagher, James (Estate of) | $5,000,000.00 |
| Gallagher, James Jr. | $2,500,000.00 |
| Gallagher, Kevin | $2,500,000.00 |
| Gallagher, Michael | $2,500,000.00 |
| Gangur, Dimitri | $5,000,000.00 |
| Gangur, Mary | $5,000,000.00 |
| Garcia, Jess | $5,000,000.00 |
| Garcia, Ronald | $2,500,000.00 |
| Garcia, Roxanne | $2,500,000.00 |
| Garcia, Russell | $2,500,000.00 |
| Garcia, Violet | $5,000,000.00 |
| Garza, Suzanne Perron | $2,500,000.00 |
| Gattegno, Jeanne | $2,500,000.00 |
| Ghumm, Arlene | $8,000,000.00 |
| Ghumm, Ashley | $5,000,000.00 |
| Ghumm, Bill | $2,500,000.00 |
| Ghumm, Edward | $2,500,000.00 |
| Ghumm, Hildegard | $5,000,000.00 |
| Ghumm, Jedaiah (Estate of) | $5,000,000.00 |
| Ghumm, Jesse | $2,500,000.00 |
| Ghumm, Leroy | $5,000,000.00 |
| Ghumm, Moronica | $5,000,000.00 |
| Giblin, Donald | $2,500,000.00 |
| Giblin, Jeanne | $5,000,000.00 |
| Giblin, Michael | $2,500,000.00 |
| Giblin, Tiffany | $5,000,000.00 |
| Giblin, Valerie | $8,000,000.00 |
| Giblin, William | $2,500,000.00 |
| Gilford-Smith, Thad | $2,500,000.00 |
| Gintonio, Rebecca | $2,500,000.00 |
| Goff, Dawn | $2,500,000.00 |
| Gorchinski, Christina | $5,000,000.00 |

| | |
|---|---|
| Gorchinski, Judy | $8,000,000.00 |
| Gorchinski, Kevin | $5,000,000.00 |
| Gorchinski, Valerie | $5,000,000.00 |
| Gordon, Alice | $5,000,000.00 |
| Gordon, Joseph | $2,500,000.00 |
| Gordon, Linda | $2,500,000.00 |
| Gordon, Norris (Estate of) | $5,000,000.00 |
| Gordon, Paul | $2,500,000.00 |
| Grant, Andrea | $2,500,000.00 |
| Graves, Deborah | $2,500,000.00 |
| Green, Deborah | $8,000,000.00 |
| Gregg, Liberty Quirante | $2,500,000.00 |
| Griffin, Alex | $2,500,000.00 |
| Grimsley, Catherine E. | $2,500,000.00 |
| Gummer, Megan | $2,500,000.00 |
| Guz, Lyda Woollett | $2,500,000.00 |
| Hairston, Darlene | $8,000,000.00 |
| Hanrahan, Tara | $2,500,000.00 |
| Hart, Mary Clyde | $2,500,000.00 |
| Haskill, Brenda | $2,500,000.00 |
| Haskell, Jeffrey | $2,500,000.00 |
| Hedge, Kathleen S. | $8,000,000.00 |
| Helms, Christopher Todd | $2,500,000.00 |
| Helms, Marvin R. | $5,000,000.00 |
| Hester, Doris | $8,000,000.00 |
| Hildreth, Clifton | $5,000,000.00 |
| Hildreth, Julia | $5,000,000.00 |
| Hildreth, Mary Ann | $8,000,000.00 |
| Hildreth, Michael Wayne | $5,000,000.00 |
| Hilton, Sharon A. | $2,500,000.00 |
| Holberton, Donald | $2,500,000.00 |
| Holberton, Patricia Lee | $5,000,000.00 |
| Holberton, Thomas | $2,500,000.00 |
| Hollifield, Tangie | $2,500,000.00 |
| Horner, Debra | $8,000,000.00 |
| House, Elizabeth | $2,500,000.00 |
| Houston, Joyce A. | $5,000,000.00 |
| Howell, Tammy Camara | $8,000,000.00 |
| Hudson, Lisa H. | $8,000,000.00 |
| Hudson, Lorenzo | $2,500,000.00 |
| Hudson, Lucy | $5,000,000.00 |
| Hudson, Ruth | $2,500,000.00 |
| Hudson, Samuel (Estate of) | $5,000,000.00 |
| Hudson, William J. | $5,000,000.00 |

| | |
|---|---|
| Hugis, Susan Thorstad (Estate of) | $2,500,000.00 |
| Hurlburt, Nancy Tingley | $2,500,000.00 |
| Hurston, Cynthia Perron | $2,500,000.00 |
| Iacovino, Edward Sr. (Estate of) | $5,000,000.00 |
| Iacovino, Elizabeth | $5,000,000.00 |
| Innocenzi, Deborah | $8,000,000.00 |
| Innocenzi, Kristin | $5,000,000.00 |
| Innocenzi, Mark | $2,500,000.00 |
| Innocenzi, Paul IV | $5,000,000.00 |
| Jaccom, Bernadette | $2,500,000.00 |
| Jackowski, John Jr. | $2,500,000.00 |
| Jackowski, John Sr. | $5,000,000.00 |
| Jacobus, Victoria | $2,500,000.00 |
| James, Elaine | $5,000,000.00 |
| Jenkins, Nathalie C. | $5,000,000.00 |
| Jenkins, Stephen | $2,500,000.00 |
| Jewett, Rebecca | $2,500,000.00 |
| Johnson, Linda Martin | $2,500,000.00 |
| Johnson, Ray | $2,500,000.00 |
| Johnson, Rennitta Stokes | $2,500,000.00 |
| Johnson, Sherry | $5,000,000.00 |
| Johnston, Charles | $2,500,000.00 |
| Johnston, Edwin | $5,000,000.00 |
| Johnston, Mary Ann | $5,000,000.00 |
| Johnston, Zandra LaRiviere | $2,500,000.00 |
| Jones, Alicia | $2,500,000.00 |
| Jones, Corene Martin | $2,500,000.00 |
| Jones, Kia Briscoe | $2,500,000.00 |
| Jones, Mark | $2,500,000.00 |
| Jones, Ollie | $5,000,000.00 |
| Jones, Sandra D. | $5,000,000.00 |
| Jones, Synovure (Estate of) | $2,500,000.00 |
| Jordan, Robin Copeland | $2,500,000.00 |
| Jordan, Susan Scott | $2,500,000.00 |
| Julian, Joyce | $5,000,000.00 |
| Julian, Karl | $5,000,000.00 |
| Jurist, Nada | $2,500,000.00 |
| Keown, Adam | $2,500,000.00 |
| Keown, Bobby Jr. | $2,500,000.00 |
| Keown, Bobby Sr. | $5,000,000.00 |
| Keown, Darren | $2,500,000.00 |
| Keown, William | $2,500,000.00 |
| Kirker, Mary Joe | $2,500,000.00 |
| Kluck, Kelly | $2,500,000.00 |

| | |
|---|---|
| Kluck, Michael | $2,500,000.00 |
| Knipple, John D. (Estate of) | $5,000,000.00 |
| Knipple, John R. | $2,500,000.00 |
| Knipple, Pauline (Estate of) | $5,000,000.00 |
| Knox, Shirley L. | $2,500,000.00 |
| Kreischer, Doreen | $5,000,000.00 |
| Kreischer, Freas H. Jr. | $5,000,000.00 |
| Lake, Cynthia D. | $2,500,000.00 |
| Lange, Wendy L. | $2,500,000.00 |
| Langon, James III | $5,000,000.00 |
| LaRiviere, Eugene | $2,500,000.00 |
| LaRiviere, Janet | $5,000,000.00 |
| LaRiviere, John M. | $2,500,000.00 |
| LaRiviere, Lesley | $2,500,000.00 |
| LaRiviere, Michael | $2,500,000.00 |
| LaRiviere, Nancy | $2,500,000.00 |
| LaRiviere, Richard | $2,500,000.00 |
| LaRiviere, Richard G. (Estate of) | $5,000,000.00 |
| LaRiviere, Robert | $2,500,000.00 |
| LaRiviere, William | $2,500,000.00 |
| Lawton, Cathy L. | $2,500,000.00 |
| LeGault, Heidi Crudale | $8,000,000.00 |
| Lemnah, Clarence (Estate of) | $5,000,000.00 |
| Lemnah, Etta | $5,000,000.00 |
| Lemnah, Fay | $2,500,000.00 |
| Lemnah, Harold | $2,500,000.00 |
| Lemnah, Marlys | $8,000,000.00 |
| Lemnah, Robert | $2,500,000.00 |
| Lemnah, Ronald | $2,500,000.00 |
| Livingston, Annette R. | $8,000,000.00 |
| Livingston, Joseph R. IV | $5,000,000.00 |
| Livingston, Joseph R. Jr. (Estate of) | $5,000,000.00 |
| Lynch, Robin M. | $2,500,000.00 |
| Lyon, Earl | $2,500,000.00 |
| Lyon, Francisco | $2,500,000.00 |
| Lyon, June | $2,500,000.00 |
| Lyon, Maria | $5,000,000.00 |
| Lyon, Paul D. Sr. | $5,000,000.00 |
| Lyon, Valerie | $2,500,000.00 |
| Macroglou, Heather | $5,000,000.00 |
| Mahoney, Kathleen Devlin | $2,500,000.00 |
| Maitland, Kenty | $2,500,000.00 |
| Maitland, Leysnal | $5,000,000.00 |
| Maitland, Samuel Sr. | $5,000,000.00 |

| | |
|---|---|
| Maitland, Shirla | $2,500,000.00 |
| Marshall, Virginia Boccia | $2,500,000.00 |
| Martin, John | $2,500,000.00 |
| Martin, Pacita | $8,000,000.00 |
| Martin, Renerio | $5,000,000.00 |
| Martin, Ruby | $5,000,000.00 |
| Martin, Shirley | $5,000,000.00 |
| Mason, Mary | $5,000,000.00 |
| Massa, Cristina | $5,000,000.00 |
| Massa, Edmund | $2,500,000.00 |
| Massa, Joao ("John") | $2,500,000.00 |
| Massa, Jose ("Joe") | $2,500,000.00 |
| Massa, Manuel Jr. | $2,500,000.00 |
| Massa, Ramiro | $2,500,000.00 |
| McCall, Mary | $5,000,000.00 |
| McCall, Thomas (Estate of) | $5,000,000.00 |
| McCall, Valerie | $2,500,000.00 |
| McDermott, Gail | $2,500,000.00 |
| McFarlin, Julia A. | $2,500,000.00 |
| McMahon, George | $2,500,000.00 |
| McMahon, Michael | $2,500,000.00 |
| McPhee, Patty | $5,000,000.00 |
| Menkins, Darren | $2,500,000.00 |
| Menkins, Gregory | $2,500,000.00 |
| Menkins, Margaret | $5,000,000.00 |
| Menkins, Richard H. | $5,000,000.00 |
| Meurer, Jay T. | $2,500,000.00 |
| Meurer, John | $5,000,000.00 |
| Meurer, John Thomas | $2,500,000.00 |
| Meurer, Mary Lou | $5,000,000.00 |
| Meurer, Michael | $2,500,000.00 |
| Meyer, Penny | $2,500,000.00 |
| Milano, Angela | $5,000,000.00 |
| Milano, Peter Jr. | $5,000,000.00 |
| Miller, Earline | $5,000,000.00 |
| Miller, Henry | $2,500,000.00 |
| Miller, Patricia | $2,500,000.00 |
| Montgomery, Helen | $2,500,000.00 |
| Moore, Betty | $5,000,000.00 |
| Moore, Harry | $5,000,000.00 |
| Moore, Kimberly | $2,500,000.00 |
| Moore, Mary | $8,000,000.00 |
| Moore, Melissa Lea | $2,500,000.00 |
| Moore, Michael (Estate of) | $2,500,000.00 |

| | |
|---|---|
| Moy, Elizabeth Phillips | $2,500,000.00 |
| Myers, Debra | $2,500,000.00 |
| Myers, Geneva | $5,000,000.00 |
| Myers, Harry A. | $5,000,000.00 |
| Nairn, Billie Ann | $5,000,000.00 |
| Nairn, Campbell J. III | $2,500,000.00 |
| Nairn, Campbell J. Jr. (Estate of) | $5,000,000.00 |
| Nairn, William P. | $2,500,000.00 |
| Norfleet, Richard | $5,000,000.00 |
| O'Connor, Deborah | $2,500,000.00 |
| Olaniji, Pearl | $5,000,000.00 |
| Olson, Bertha (Estate of) | $5,000,000.00 |
| Olson, Karen L. | $2,500,000.00 |
| Olson, Randal D. | $2,500,000.00 |
| Olson, Roger S. | $2,500,000.00 |
| Olson, Ronald J. | $2,500,000.00 |
| Olson, Sigurd (Estate of) | $5,000,000.00 |
| Owens, David | $2,500,000.00 |
| Owens, Deanna | $2,500,000.00 |
| Owens, Frances | $5,000,000.00 |
| Owens, James (Estate of) | $5,000,000.00 |
| Owens, Steven | $2,500,000.00 |
| Page, Connie Mack | $5,000,000.00 |
| Page, Judith K. | $5,000,000.00 |
| Palmer, Lisa Menkins | $2,500,000.00 |
| Paolozzi, Geraldine | $2,500,000.00 |
| Pare, Maureen | $2,500,000.00 |
| Parker, Henry James | $2,500,000.00 |
| Parker, Sharon | $2,500,000.00 |
| Pearson, Helen M. | $5,000,000.00 |
| Pearson, John L. Jr. | $5,000,000.00 |
| Pearson, Sonia | $8,000,000.00 |
| Perron, Brett | $2,500,000.00 |
| Perron, Deborah Jean | $2,500,000.00 |
| Perron, Michelle | $2,500,000.00 |
| Perron, Ronald R. | $5,000,000.00 |
| Persky, Muriel | $5,000,000.00 |
| Peterson, Deborah D. | $2,500,000.00 |
| Petry, Sharon Conley | $2,500,000.00 |
| Petrick, Sandra | $2,500,000.00 |
| Phelps, Donna Vallone | $5,000,000.00 |
| Phillips, Harold | $2,500,000.00 |
| Phillips, John Arthur Sr. | $5,000,000.00 |
| Plickys, Donna Tingley | $2,500,000.00 |

| | |
|---|---|
| Pollard, Margaret Aileen | $8,000,000.00 |
| Pollard, Stacey Yvonne | $5,000,000.00 |
| Prevatt, Lee Hollan | $2,500,000.00 |
| Prevatt, Victor Thornton | $5,000,000.00 |
| Price, John | $5,000,000.00 |
| Price, Joseph | $2,500,000.00 |
| Prindeville, Barbara D. (Estate of) | $5,000,000.00 |
| Prindeville, Kathleen Tara | $2,500,000.00 |
| Prindeville, Michael | $2,500,000.00 |
| Prindeville, Paul | $5,000,000.00 |
| Prindeville, Sean | $2,500,000.00 |
| Quirante, Belinda J. | $5,000,000.00 |
| Quirante, Edgar | $2,500,000.00 |
| Quirante, Godofredo (Estate of) | $5,000,000.00 |
| Quirante, Milton | $2,500,000.00 |
| Quirante, Sabrina | $2,500,000.00 |
| Ray, Susan | $2,500,000.00 |
| Reininger, Laura M. | $2,500,000.00 |
| Richardson, Alan | $2,500,000.00 |
| Richardson, Beatrice | $5,000,000.00 |
| Richardson, Clarence | $5,000,000.00 |
| Richardson, Eric | $2,500,000.00 |
| Richardson, Lynette | $2,500,000.00 |
| Richardson, Vanessa | $2,500,000.00 |
| Richardson-Mills, Philiece | $5,000,000.00 |
| Ricks, Melrose | $5,000,000.00 |
| Riva, Belinda Quirante | $2,500,000.00 |
| Rockwell, Barbara | $5,000,000.00 |
| Rooney, Linda | $2,500,000.00 |
| Rose, Tara Smith | $2,500,000.00 |
| Ruark, Tammi | $2,500,000.00 |
| Rudkowski, Juliana | $2,500,000.00 |
| Russell, Marie McMahon | $2,500,000.00 |
| Sanchez, Alicia Lynn | $5,000,000.00 |
| Sauls, Andrew | $2,500,000.00 |
| Sauls, Henry Caleb | $2,500,000.00 |
| Sauls, Riley A. | $2,500,000.00 |
| Schnorf, Margaret Medler | $5,000,000.00 |
| Schnorf, Richard (brother) | $2,500,000.00 |
| Schnorf, Richard (father) | $5,000,000.00 |
| Schnorf, Robert | $2,500,000.00 |
| Schultz, Beverly | $5,000,000.00 |
| Schultz, Dennis James | $2,500,000.00 |
| Schultz, Dennis Ray | $5,000,000.00 |

| | |
|---|---|
| Scialabba, Frank | $5,000,000.00 |
| Scialabba, Jacqueline | $8,000,000.00 |
| Scialabba, Samuel Scott | $5,000,000.00 |
| Scott, Jon Christopher | $2,500,000.00 |
| Scott, Kevin James | $2,500,000.00 |
| Scott, Larry L. (Estate of) | $5,000,000.00 |
| Scott, Mary Ann | $5,000,000.00 |
| Scott, Sheria | $2,500,000.00 |
| Scott, Stephen Allen | $2,500,000.00 |
| Seguerra, Jacklyn | $2,500,000.00 |
| Shipp, Bryan Richard | $5,000,000.00 |
| Shipp, James David | $2,500,000.00 |
| Shipp, Janice | $2,500,000.00 |
| Shipp, Maurice | $2,500,000.00 |
| Shipp, Pauline | $8,000,000.00 |
| Shipp, Raymond Dennis | $2,500,000.00 |
| Shipp, Russell | $2,500,000.00 |
| Sinsioco, Susan J. | $2,500,000.00 |
| Smith-Ward, Ana | $8,000,000.00 |
| Smith, Angela Josephine (Estate of) | $5,000,000.00 |
| Smith, Bobbie Ann | $5,000,000.00 |
| Smith, Cynthia | $2,500,000.00 |
| Smith, Donna Marie | $2,500,000.00 |
| Smith, Erma | $2,500,000.00 |
| Smith, Holly | $2,500,000.00 |
| Smith, Ian | $5,000,000.00 |
| Smith, Janet | $2,500,000.00 |
| Smith, Joseph K. III | $2,500,000.00 |
| Smith, Joseph K. Jr. | $5,000,000.00 |
| Smith, Keith | $5,000,000.00 |
| Smith, Kelly B. | $2,500,000.00 |
| Smith, Shirley L. | $5,000,000.00 |
| Smith, Tadgh | $2,500,000.00 |
| Smith, Terrence | $2,500,000.00 |
| Smith, Timothy B. | $2,500,000.00 |
| Sommerhof, Jocelyn J. | $5,000,000.00 |
| Sommerhof, John | $2,500,000.00 |
| Sommerhof, William J. | $5,000,000.00 |
| Spencer, Douglas | $2,500,000.00 |
| Stelpflug, Christy Williford | $2,500,000.00 |
| Stelpflug, Joseph | $2,500,000.00 |
| Stelpflug, Kathy Nathan | $2,500,000.00 |
| Stelpflug, Laura Barfield | $2,500,000.00 |
| Stelpflug, Peggy | $5,000,000.00 |

| | |
|---|---|
| Stelpflug, William | $5,000,000.00 |
| Stephens, Horace Sr. | $5,000,000.00 |
| Stephens, Joyce | $5,000,000.00 |
| Stephens, Keith | $2,500,000.00 |
| Stockton, Dona | $5,000,000.00 |
| Stockton, Donald (Estate of) | $5,000,000.00 |
| Stockton, Richard | $2,500,000.00 |
| Stokes, Irene | $5,000,000.00 |
| Stokes, Nelson Jr. | $2,500,000.00 |
| Stokes, Nelson Sr. (Estate of) | $5,000,000.00 |
| Stokes, Robert | $2,500,000.00 |
| Stokes-Graham, Gwenn | $2,500,000.00 |
| Sturghill, Marcus D. | $2,500,000.00 |
| Sturghill, Marcus L. Jr. | $5,000,000.00 |
| Sturghill, NaKeisha Lynn | $2,500,000.00 |
| Sundar, Doreen | $8,000,000.00 |
| Tella, Margaret | $2,500,000.00 |
| Terlson, Susan L. | $2,500,000.00 |
| Thompson, Mary Ellen | $2,500,000.00 |
| Thorstad, Adam | $5,000,000.00 |
| Thorstad, Barbara | $5,000,000.00 |
| Thorstad, James Jr. | $2,500,000.00 |
| Thorstad, James Sr. | $5,000,000.00 |
| Thorstad, John | $2,500,000.00 |
| Thorstad, Ryan | $5,000,000.00 |
| Thurman, Betty Ann | $2,500,000.00 |
| Tingley, Barbara | $5,000,000.00 |
| Tingley, Richard L. | $5,000,000.00 |
| Tingley, Russell | $2,500,000.00 |
| Tolliver, Keysha | $5,000,000.00 |
| Turek, Mary Ann | $5,000,000.00 |
| Valenti, Karen | $5,000,000.00 |
| Vallone, Anthony | $2,500,000.00 |
| Vallone, Donald H. | $5,000,000.00 |
| Vallone, Timothy | $2,500,000.00 |
| Vargas, Leona Mae | $2,500,000.00 |
| Voyles, Denise | $2,500,000.00 |
| Wallace, Ila | $5,000,000.00 |
| Wallace, Kathryn Thorstad | $2,500,000.00 |
| Wallace, Richard J. | $2,500,000.00 |
| Warwick, Barbara Thorstad | $2,500,000.00 |
| Washington, Linda | $2,500,000.00 |
| Washington, Vancine | $2,500,000.00 |
| Watson, Kenneth | $2,500,000.00 |

| | |
|---|---|
| Whitener, Diane | $2,500,000.00 |
| Wigglesworth, Daryl | $2,500,000.00 |
| Wigglesworth, Darrin A. | $2,500,000.00 |
| Wigglesworth, Henry | $5,000,000.00 |
| Wigglesworth, Mark | $2,500,000.00 |
| Wigglesworth, Robyn | $2,500,000.00 |
| Wigglesworth, Sandra | $5,000,000.00 |
| Wigglesworth, Shawn | $2,500,000.00 |
| Williams, Dianne Stokes | $2,500,000.00 |
| Williams, Gussie Martin | $2,500,000.00 |
| Williams, Janet | $5,000,000.00 |
| Williams, Johnny | $2,500,000.00 |
| Williams, Rhonda | $2,500,000.00 |
| Williams, Ronald | $2,500,000.00 |
| Williams, Ruth | $5,000,000.00 |
| Williams, Scipio J. | $5,000,000.00 |
| Williams, Wesley | $5,000,000.00 |
| Williams-Edwards, Delma | $2,500,000.00 |
| Williamson, Tony | $2,500,000.00 |
| Williamson, Jewelene | $5,000,000.00 |
| Winter, Michael | $5,000,000.00 |
| Wiseman, Barbara | $8,000,000.00 |
| Woodford, Phyllis | $2,500,000.00 |
| Woodle, Joyce | $2,500,000.00 |
| Woollett, Beverly | $5,000,000.00 |
| Woollett, Paul | $5,000,000.00 |
| Wright, Melvina Stokes | $2,500,000.00 |
| Wright, Patricia | $5,000,000.00 |
| Wyche, Glenn | $2,500,000.00 |
| Wyche, John | $2,500,000.00 |
| Young, John F. | $5,000,000.00 |
| Young, John W. | $2,500,000.00 |
| Young, Judith Carol | $5,000,000.00 |
| Young, Sandra Rhodes | $5,000,000.00 |
| Zimmerman, Joanne | $2,500,000.00 |
| Zone, Stephen Thomas | $2,500,000.00 |
| Zosso, Patricia Thorstad | $2,500,000.00 |

4.    *Claims Brought by Family Members of Injured Servicemen*

| | |
|---|---|
| Ali, Jamaal Muata | $1,250,000.00 |
| Angeloni, Margaret | $1,250,000.00 |
| Arroyo, Jesus | $1,250,000.00 |
| Arroyo, Milagros | $1,250,000.00 |

| | |
|---|---|
| Carletta, Olympia | $2,500,000.00 |
| Carpenter, Kimberly | $4,000,000.00 |
| Comes, Joan | $2,500,000.00 |
| Comes, Patrick | $1,250,000.00 |
| Comes, Christopher | $1,250,000.00 |
| Comes, Frank Sr. | $2,500,000.00 |
| Crawford, Deborah | $1,250,000.00 |
| Davis, Barbara | $4,000,000.00 |
| Franklin, Alice Warren | $1,250,000.00 |
| Gerlach, Patricia | $4,000,000.00 |
| Gerlach, Travis | $2,500,000.00 |
| Gerlach, Megan | $2,500,000.00 |
| Hernandez, Arminda | $1,250,000.00 |
| Hlywiak, Margaret | $2,500,000.00 |
| Hlywiak, Peter Jr. | $1,250,000.00 |
| Hlywiak, Peter Sr. | $2,500,000.00 |
| Hlywiak, Paul | $1,250,000.00 |
| Hlywiak, Joseph | $1,250,000.00 |
| Hunt, Cynthia Lou | $4,000,000.00 |
| Ibarro, Rosa | $2,500,000.00 |
| Jacobs, Andrew Scott | $2,500,000.00 |
| Jacobs, Daniel Joseph | $2,500,000.00 |
| Jacobs, Danita | $4,000,000.00 |
| Kirkpatrick, Kathleen | $4,000,000.00 |
| Lewis, Grace | $2,500,000.00 |
| Magnotti, Lisa | $1,250,000.00 |
| Mitchell, Wendy | $4,000,000.00 |
| Moore, James Otis (Estate of) | $1,250,000.00 |
| Moore, Johnney S. (Estate of) | $2,500,000.00 |
| Moore, Marvin S. | $1,250,000.00 |
| Moore, Alie Mae | $2,500,000.00 |
| Moore-Jones, Jonnie Mae | $1,250,000.00 |
| Nashton, Alex W. (Estate of) | $2,500,000.00 |
| Oliver, Paul | $2,500,000.00 |
| Oliver, Riley | $2,500,000.00 |
| Oliver, Michael John | $2,500,000.00 |
| Oliver, Ashley E. | $2,500,000.00 |
| Oliver, Patrick S. | $2,500,000.00 |
| Oliver, Kayley | $2,500,000.00 |
| Russell, Tanya | $2,500,000.00 |
| Russell, Wanda | $4,000,000.00 |
| Russell, Jason | $2,500,000.00 |
| Shaver, Clydia | $1,250,000.00 |
| Spaulding, Scott | $1,250,000.00 |

| | |
|---|---|
| Stanley, Cecilia | $2,500,000.00 |
| Stilpen, Mary | $1,250,000.00 |
| Swank, Kelly | $1,250,000.00 |
| Swinson, Kenneth J. (Estate of) | $2,500,000.00 |
| Swinson, Ingrid M. (Estate of) | $2,500,000.00 |
| Swinson, Daniel | $1,250,000.00 |
| Swinson, William | $1,250,000.00 |
| Swinson, Dawn | $1,250,000.00 |
| Swinson, Teresa | $1,250,000.00 |
| Warren, Bronzell | $1,250,000.00 |
| Watson, Jessica | $1,250,000.00 |
| Webb, Audrey | $1,250,000.00 |
| Wheeler, Jonathan | $2,500,000.00 |
| Wheeler, Benjamin | $2,500,000.00 |
| Wheeler, Marlis "Molly" (Estate of) | $2,500,000.00 |
| Wheeler, Kerry | $1,250,000.00 |
| Wheeler, Andrew | $2,500,000.00 |
| Wheeler, Brenda June | $4,000,000.00 |
| Wold, Jill | $1,250,000.00 |
| Young, Nora (Estate of) | $2,500,000.00 |
| Young, James | $1,250,000.00 |
| Young, Robert (Estate of) | $2,500,000.00 |

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are hereby DISMISSED WITHOUT PREJUDICE:

Albright, Marvin Jr.
Albright, Mirequm
Albright, Shertara
Banks, Anthony (son)
Banks, Michael
Banks, Taiarra
Berry, Lori
Burnette, Christopher
Burnette, Gwen
Camara, Mecot Jr.
Comes, Dale
Comes, Tommy
Crop, Kimberly
Decker, Connie
Dolphin, Erin
Douglass, Frederick (Estate of)
Eaves, Christopher

**EXHIBIT "E"**

Ports & Shipping Organization Case 3:08-mc-80030-JSW Document 21-7 Filed 04/29/2008 Page 2 of 7 Page 1 of 1

IR IRAN's
Ports & Shipping Organization

> Home > SiteMap > Feedback > FAQ > Search > E-Mail

Monday, April 28, 2008

Menu > About the PSO > History

About the PSO
Tender
Port Tariff
Publications
Links
Port profiles
Portal List

**History**

**The history of ports & shipping organization**

The history of PSO,the maritime administration of Iran, dates back to 1914 . At that time a dipartment called " South Coustoms Branch " was stablished at the port of Bushehr. Its duty was to monitor Iranian coasts and seaports to prevent smuggling of goods into and out of the country.The function of marine and port affairs were also fulfilled by South Customs Branch.On Feb, 6th, 1927 the control and administration of the port of Anzali on the northern part of the country was transferred by the Russian government of Iran. In the same year , Iran's railway network connected port of Torkaman on the east coast of Caspian sea to the port of Imam Khomeini on the coast of Persian Gulf.

In 1928, after completion of Tehran- Khorramshahr highway the port of Khorramshahr in the southern part of the country gained great importance and its sea trade began to develop. On Feb. 4th in order to manage the affairs of the ports of the country the " General Directorate of ports was stablished in Tehran in which all the affairs of ports were concentrated. At this time, a new port was constructed in Noshahr and the berths of the port of Khorramshahr were developed. Necessary port facilities were also constructed in other Northern and southern ports of the country.

In Jan. 1938 Cabinet approved the " port regulations " which had been formulated and recommended by the Ministry of Roads. It was decided that the " General Directorate of the Customs " should put the regulations into effect in those ports where the Ministry of Roads had no representative.

In Aug. 26th,1946,according to the decree of the Council of Ministries, the revenue from operating port facilities was to be collected in special fund for the development of port facilities.

In 1949, the " General Corporation of Ports and Shipping " took the place of the " General Directorate of ports ".

On May 28th, 1952, a decree comprising 18 articles for registration and utilization of vessels was approved by the Cabinet. Based on these regulations, using vessels in domestic and coastal waters was depended on their registration and issuance of their certificate of registration in one of the Iranian ports. In 1959, following an agreement reached between the Ministry of Roads and Ministry of Customs & Monopolies, " General Agency of ports and Shipping " was transferred from the Ministry of Roads and Transportation to the Ministry of Customs & Monopolies. On May 25th, 1960, the title of the " General Directorate of Ports and Shipping " was changed to " Ports and Shipping Organization " and its responsibilities and functions were expanded. Based on these developments, the organization was assigned the task of exercising the authority of the Government to control all ports and maritime affairs, implementation of port and coastal shipping regulations, promoting shipping and commerce, collecting port duties and taxes and registering Iranian vessels.

On Oct. 31st,1964, the maritime law of Iran including 914 articles was put into effects, and on Jul. 3rd, 1966, the present ports and shipping organization together with its staff, budget and properties was separated from the Ministry of Economy and Finance. On Feb. 2nd, 1969, the organization gained the status of a legal entity and its functions, rights, and organizational chart were formally declared. Internal regulations on financials transactions and on the employment of staff of the organization were approved respectively on 14 Jun. and 28 Jul, 1970. The organization was separated again from the Ministry of Finance and was transferred to the Ministry of Roads and transportation in 1974.

P.S.O
DOURAN Portal V3.8.2.2

EXHIBIT E

http://www.pso.ir/Portal/HomePage.aspx?TabID=3638&Site=DouranPortal&Lang=en-US 4/27/2008

IR IRAN's
Ports & Shipping Organization
Home
SiteMap
Feedback
FAQ
Search
E-Mail
Monday, April 28, 2008
Menu > About the PSO > Organizational Chart
About the PSO
Tender
Port Tariff
Publications
Links
Port profiles
Portal List
Organization Chart
Supreme Council
Vice Managing Director
General Director of Statistics & IT
General Director of Research Center
Head of Legal office
Managing Director
General Director of Managing Director Bureau
Selection & Employment
Director of Security Department
Head of Guard Office
Board of Executives
Deputy Managing Director for Finance & Administration
Deputy Managing Director for Technical & Engineering
Deputy Managing Director for Ports & Special Zones
Deputy Managing Director for Maritime Affairs
General Director of Administration
General Director of Budget & Planning
General Director of Finance
General Director of Ports & Coasts Engineering
General Director of Building & Installation Maintenance
General Director of Supply & Equipment Maintenance
General Director of Special Econmic Zones
General Director of Port Affairs
General Director of Transit & Tariff
General Director of Safety & Marine Protection
General Director of Maritime Affairs
General Director of Specialized & Int'l Agencies
General Director of Standards,Training & Maritime Certificates
General Director of Ports & Shipping Provinces
P.S.O
DOURAN Portal V3.8.2.2

Ports & Shipping Organization Case 3:08-mc-80030-JSW Document 21-7 Filed 04/29/2008 Page 4 of 7 Page 1 of 1

IR IRAN's
Ports & Shipping Organization

> Home > SiteMap > Feedback > FAQ > Search > E-Mail

Monday, April 28, 2008

Menu > About the PSO > Managing Director's Message

About the PSO >
Tender
Port Tariff
Publications >
Links >
Port profiles >
Portal List >

Managing Director's Message

**In the name of GOD**

**Ali Taheri**
Deputy Minister & Managing Director

Today, shipping industry plays a strategic and significant role in the sustainable development of global, reginal and national economies. It is clear that the expansion of infrastructures for operation in the regional transit corridors would not only promise peace and prosperity within the political and economical structures of the world and the region, but would also boost shipping and relevant services towards a fully integrated world economy. Therefore as an important factor in shipping, ports play a prominent role in global trade.The availability and wide use of modern equipment and IT systems in ports are among the most significant indicators of economical, industrial and social development of any country.

The location of iran, as the transit axis linking the Caspian Sea to the southern seas,has assigned a determining role to the country in regional and international trade.

11commercial ports are now operating in Iran, covering a total port land area of 42000 hectares and offering the advantages of easy access to regional markets and industrial zones, high investment potential and great opportunities for procurement, production and re-exporting of goods.

Also noteworthy is the successful establishment of special economic zones in five ports, this has provided a plethora of prospects in foreign investment, development of transportation and transshipment of goods.

To this end major investments have been made by the government over three socio-economical development plans in all technical and engineering aspects of the ports to increase infrastructural facilities, providing a great opportunity for domestic and foreign private parties to benefit from safe and economical routes in the country for their activities. The undertakings in ports during the third development plan have been so impressive that not only have they accomplished the set targets, but in many instances have surpassed expectations and have greatly enhanced Iran's position in the international market.

The above-mentioned initatives and other activities are achieved through the efforts of managers, planners, executives and our dear colleagues in the PSO, for whom I wish all the best.

P.S.O
DOURAN Portal V3.8.2.2

http://www.pso.ir/Portal/HomePage.aspx?TabID=3572&Site=DouranPortal&Lang=en-US 4/27/2008

IR IRAN's
Ports & Shipping Organization

Terms of Reference

## Administration of ports as well as commercial maritime affairs of the country;

- Construction, completion, and development of building, repair yards, and related equipment in ports and their utilization;
- Preparation, formulation, and enforcement of port, maritime, and commercial shipping regulations according to respective laws;
- Regulation of pilotage subject to the approval of the Supreme Council of the Organization ;
- Administration of loading, discharging, and handling of cargo in port areas and warehousing in the ports of the country where the Organization has a department or branch;
- Administration of telecommunication networks (radio, telegraphy, telephone, teletype, etc.) at sea and on land for making contact with vessels and affiliate ports as well as preparation and supply of related equipment in collaboration with the Ministry of Post, Telegraph, and Telephone;
- Through control of coastal and commercial shipping and striving to develop them and securing safety of traffic and coastal shipping activities;
- Erection and operation of navigational lights and buoys to secure the safety of maritime traffic;
- Registration of Iranian commercial, cruise and other vessels and implementation of related regulations;
- Granting technical certificates of competency to seamen and vessels according to related regulations;
- Collection of port and river duties and charges for loading, warehousing, and other port dues normally collected by PSO or other governmental organizations on behalf of PSO;
- Putting into effect the Iranian Maritime Law and performing the functions laid down in the law establishing the PSO and other related laws;
- Determining the manner and rate of exploiting port facilities and equipment as well as moveable and immoveable properties of the organization an implementing the decisions taken subject to Supreme Council's approval'
- Conducting studies and research on maritime and port affairs as well as commercial navigation;
- Preparation and formulation of the next year's plan as well as long-term plans to be implemented after approval by the Supreme Council;

- Examination of draft international agreements and treaties concerning port and maritime affairs, and commercial navigation in order to present them to the relevant authorities;

- Membership in international organizations related to port and maritime affairs subject to approval by the Supreme Council and the Islamic Consultative Assembly;

- Participation in international conferences and meetings concerning port and maritime affairs;

- Determination of Free Trade zones, if necessary, and formulation of regulations and conditions of their use subject to the agreement of the Supreme Council and approval by the Islamic Consultative Assembly;

- Control of railways from the point of entrance into the port areas to the point of exit from the port, and dispatching wagons and locomotives to open storage areas and sheds;

- Establishment of a training institute of pilots or those engaged in commercial navigation, and sending students abroad to study in specialized courses which the organization deems necessary;

- Issuing permits to construct berths or other installations or equipment while approving the relevant plan and reserving the right to monitor the construction and operation;

- Issuing permits for establishing offices, seamen's clubs, restaurants, and warehouses and other necessary facilities upon the request of authorized persons. The organization, taking into account its capabilities at ports, can lease out land for the construction of the above-mentioned facilities;

- Transferring part of the tasks of the organization to the qualified private bodies;

- Taking measures to reduce freights for the transport of cargoes to Iranian ports, and expediting the process of loading and discharging cargo, and reducing the waiting time of vessels to supportthe economy

of the country

**Governing authorities of the organization are as follows:**

1- The Supreme Council
2- The Board of Directors
3- The Managing Director

**The Supreme Council consists of the following Ministers:**

1- Minister of Financial and Economic Affairs
2- Minister of Roads and Transportation
3- Minister of Defence
4- Deputy president and Head of Planning and Budget Organization "PBO"
5- Commander of the Navy

The Supreme Council is presided over by the Minister of the Roads and Transportation, and in his absence, the members will select the president among themselves. Ports & Shipping Organization has the jurisdiction over free Trade zones in ports of Shahid Rajaee, Bushehr, Anzali, Amirabad and Khorramshahr.

P.S.O
DOURAN Portal V3.8.2.2

IR IRAN's
# Ports & Shipping Organization

> Home > SiteMap > Feedback > FAQ > Search > E-Mail

**Sunday, April 27, 2008**

- About the PSO
- Tender
- Port Tariff
- Publications
- Links
- Port profiles
- Portal List

**Marketing Online Brochure**

**Sign in**

User Name:

Password:

Remember Login

Sign-in

Send Password

**Useful Information**

- Search & Rescue
- Marine Environment Protection
- Port State Control
- Notice to Mariners
- ISPS Port Facilities
- International Protocols
- Special Economic Zones
- Free Trade Zone
- Investment
- Rules for Cargo Stay at SEZ
- NWR and CEO at SEZ
- International Organizations
- Research Commitee
- R&D Programmes
- Publications
- Marine Structures
- On-Shore Structures
- Banned & Conditional Ships

**News**

**3/30/2008**
**International News - To strengthen ports and maritime relations and co-operation between I.R. Iran and UAE**

**10/27/2007**
**International News - Iranian Study Group Visit Indian transportation Infrastructure**

**2/13/2008**
**Maritime News - To Develop & Expand Iran-Libya Maritime Activities**

**9/18/2007**
**Oil Pollution Reached Anzali's Eastern & Western Coasts**

**2/13/2008**
**Interview - Electronic Database on Financial Regulations Launched in PSO**

**9/18/2007**
**Maritime News - Concentrated Inspection Campaign (CIC) on ISM Code 2007**

**1/30/2008**
**Maritime News - National Exercise on Oil Pollution Preparedness,**

**9/9/2007**
**Maritime News - Iran Will Celebrate World Maritime Day on Sept. 25**

**12/1/2007**
**Port News - Iranian Delegation participate in 25th Assembly of IMO**

**9/17/2007**
**Maritime News - Enforcement of MARPOL Annex VI in the North Sea SECA**

Next

**Tendes**

uptime 96.27%

**language**

FA فارسی EN English

**.:: P.S.O**

- Safety & Maritime Protection
- Specialized & int'L Agencies
- Maritime Affairs
- Standards,Training & Maritime Certificates
- Special Econmic Zones
- Building & Installation Maintenance
- Research Center

**.:: P.S.O**

- Investment Application System

- PSO News

**Links**

- IRI Custom Administration
- Iran Department of the Environment
- Iran Ministry of Road and Transportation

**Contact Us**

South Didar St.Shahid Haghani Highway.Vanak Sq.Tehran-Iran

Tel:(+9821)84931

Fax:(+9821)88651191-2

P.O.Box:158754574-158753754

**EXHIBIT "F"**

In the name of God

**Ports and Shipping Organization**
**Ports and Special Economic Zones Affairs Deputy**

# MANUAL OF

## Tariffs applicable to vessels and cargo

in

## Ports of the Islamic Republic of Iran

March 21 , 2007 to March 20 , 2008

Prepared by :
Directorate General of Transit and Tariffs
Port Tariffs Department

EXHIBIT F

# Contents

Title Pages
Introduction ........................................ 5

**Chapter one**
Dues , duties and port charges applicable to ships

**Section 1**
Definitions related to vessels ........................................ 7

General conditions ........................................ 9

**Section 2**
Dues, duties and port charges applicable to vessels ........................................ 10
- Dues , duties and port charges applicable to container, Ro/Ro, non-container / non-oil-cargo vessels in southern ports and non-oil-tanker ships entering ports and wharfs that are built or will be with completely private investment in southern coasts and special wharfs of Qeshm and Kish Island free ports (table 1) ........................................ 11

Explanations ........................................ 11
- Dues , duties and port charges applicable to ships (vessels) with Iranian flag, working as local feeders to transship container or non-container cargo between ports of Islamic Republic of Iran (IRI) and other ports of the region belonging to Iran, also passenger ships, Iranian and foreign passengers and cargo at domestic or international trips, Iranian barges and tugboat carrying vehicles, all Iranian vessels less than 1500 GRT, entering special wharfs that travel between Iranian islands (table 2) ........................................ 13
- Tariff of dues , duties and port charges applicable to Iranian and foreign Tanker vessels in southern ports and all vessels in northern ports (table 3) ........................................ 14
- Explanations ........................................ 15
- Tariff of charges of towage for pilotage operations of Iranian and foreign tanker vessels in southern ports and all vessels in northern ports, in a single berthing/unearthing operation of a vessel (table 4) ........................................ 15
- Explanations ........................................ 15
- Exemptions and discounts ........................................ 16
- Method of application of exemptions and discounts for Iranian ships and vessels less than 1500 GRT, including passenger, fishing, cabotage and commercial vessels(table 5) ........................................ 19
- Method of discounting for Iranian and foreign vessels in northern ports ( table 6 ) ..... 20
- Method of discounting for vessels carrying liquefied gases in the service port and petro-chemical special economic energy zone of southern Pars (Asalooyeh) and SBM and SPM in southern ports (tables 7 and 8) ........................................ 21

## Chapter 2
Duties and charges pertaining to cargo

**Secretion 1**

Definitions related to cargo ........ 23

General conditions ........ 24

**Section 2**

Port duties and charges pertaining to non-container cargo ........ 26
- Tariff of non-container cargo transfer (table 9) ........ 26
- Tariff of light cargo transfer in normal, special economic and free zones northern ports (table 9-1) ........ 27
- Tariff of transfer in Chabahar port (table 9-2) ........ 27
- Explanations on transfer operations ........ 27
- Tariff of stevedoring for general and bulk cargo (table 10) ........ 28
- Explanations of stevedoring operations ........ 29
- Tariff of storage on non-container import - cabotage and returned cargo (table 11) ..... 29
- Tariff of storage of non-container (export - foreign transit and transshipment cargo) (table 11-1) ........ 30
- Tariff of storage of non-container import and export cargo in Chabahar port (table 11-2) ........ 30
- Tariff of storage of non-container carton boxes cargo in Khorramshahr and Bushehr port (table 11-3, 11-4) ........ 31
- Explanations on storage ........ 31
- Port duties and charges pertaining to cargo (table 12) ........ 32

**Section 3**

Port duties and charges pertaining to container cargo ........ 33
- General conditions and definitions ........ 34
- Tariff of loading and unloading container (THC) and volumetric discounts (table 13) ........ 35
- THC tariff of containers in non-container terminals using port equipments (table 13-1) ........ 36
- THC tariff of containers in non-container terminals using equipments of the ship (table 13-2) ........ 37
- General explanations on methods of receiving and granted discounts of THC tariffs .. 38
- Tariff of container cargo' transfer in normal, especial economic and free zone northern ports (table 14) ........ 39
- Tariff of container cargo' stevedoring in normal, especial economic and free zone northern ports (table 15) ........ 40
- Tariff of storage of containers according to container type ........ 40
- Tariff of storage of import containers (table 16) ........ 40

- Tariff of storage of foreign transit, export and transship containers (table 16-1) ........ 40
- Tariff of storage of transshipment containers in Imam Khomeini and Shahid Rajaii ports (table 16-2) ........ 41
- Tariff of storage of containers of dangerous cargo of all classes except classes 1 and 7 (table 16-3)........ 41
- Tariff of storage of out of standard containers (table 16-4)........ 41
- Explanations on storage ........ 42
- Tariff of storage of containers in normal, especial economic and free zone northern ports (table 16-5)........ 43
- Tariff of storage of export and transit containers in normal, especial economic and free zone northern ports (table 16-5-1)........ 43
- Tariff of storage of container in Boshehr Special Economic zone port (table 16-6)...... 43
- Tariff of containers carrying dangerous cargo ........ 44
- Tariff of repositioning of container on the vessel (table 17) ........ 44
- Container terminal operations (table 18) ........ 45
- Method of exploitation of special equipment ........ 45
- Tariff of heavy weight containers ........ 45
- Tariff of stripping of containers (table 19) ........ 46
- Tariff of storage in CFS (table 20) ........ 46
- Tariff of loading and unloading of cars in/out of container (table 21) ........ 47
- Tariff of monitoring and refer container services (table 22) ........ 47
- Tariff of accessory services (table 23)........ 48

Attachment ........ 49

- Costs receivable from ships and vessels for quarantine services expenses ........ 50
- A) cargo and passenger ships and vessels (table 24) ........ 50
- B) Tankers (table 25)........ 50
- C) Cost of rodent removal and issuing certificate (table 26)........ 51
- Tariff of communication costs ........ 51
  A) Land line charges (table 27) ........ 51
- B)Coast station charges (table 28)........ 52
- Diving operation charges ( table 29 ) ........ 53
- Tariff of charges of collecting and cleaning of oil materials per hour (table 30)........ 54
- Tariff of registry duties of ships and vessels (table 31)........ 55
- Tariff of registry duties of transactions on ships and vessels (table 32)........ 56
- Note of protest for vessels carrying Iranian flag (table 33)........ 56
- Note of protest for vessels carrying foreign flag (table 34)........ 56
- Table of re-inspection services expenses for vessels carrying foreign flag (table 35)... 56

**Introduction**

Ports and shipping organization , in addition to being the marine reference of the country and a representative of the International Maritime Organization for implementation of marine conventions , also owns the responsibility of managing and leading of all ports of the country .

All commercial ports of the country in north and south are administered as administration generals affiliated to this organization .

This organization is affiliated to ministry of roads and transportation and its general manager is considered one of deputies of the said ministry . The managing board of ports and shipping organization , as a representative of high council the organization , which is composed of the ministers of roads and transportation , defense , economy and finance , chief commander of navy , president of the planning and budget organization , enacts executive laws and regulations of the ports in the domain of authorities delegated to it .

**Tariff determination**

One of the duties of the high council of ports and shipping organization is to determine port tariffs, which can be delegated to the managing board of the organization . These tariffs are composed of two main sections of vessels and cargo . The tariffs consist of lines including dues, duties and port charges .

**Dues:** are part of tariffs that are acquired from vessels and cargo entering regions under sovereignty of the Iranian government as sovereignty right , without provision of any services .

**Duties:** are part of tariffs that are acquired from vessels and cargo as compensation for the expenses of construction and maintenance of port infrastructures .

**Charges:** are part of tariffs that are acquired from vessels and cargo for covering the expenses pertaining to provided services . Of course , this part of the tariff will be received in return of the service provided .

**Validity:**

This manual has been prepared as the manual of port tariffs of the country on the basis of provisions of the enactments of the high council and managing board and will act as reference for all operations of all ports throughout the solar year of 1386 ( March 21 2007 to March 20 2008 ) . These tariffs (charges) determine the maximum amounts receivable from customers of the ports and considering the provision of many of the services by private sector , acquiring less amounts in the competitive market will be feasible .

# Chapter one

## TARIFF OF DUES , DUTIES AND PORT CHARGES PERTAINING TO VESSELS

**Section 1**

- Definitions related to vessels
- General conditions

**Section 2**

- Dues , duties and port charges pertaining to vessels

# Section 1

**Definitions related to vessel**

**Vessel**

Is a commercial floating body with a gross tonnage of over 500 that is permitted to travel in all waterways permitted for shipping .

**Gross registered tonnage(GRT)**

Is the whole capacity of spaces of the trunk and board of a vessel including hold stores . all reservoirs and tanks for fuels and water and so on , powerhouse , spaces required for passengers and crews . spaces over the shipboard having capability of being loaded . This capacity is volumetric and each 100 cubic feet or 2.83 cubic meter of it is equal to one ton of gross capacity .

**Net registered tonnage(NRT)**

Is equal to gross registered tonnage(GRT) minus spaces allocated for crews . powerhouse . passengers and also navigational bridge .

**Dead weight (DWT)**

The maximum loadable weight of a vessel . the total weight of cargo , supplies . fuel . crews . and passengers that a vessel is allowed to carry in a loading condition of up to the maximum loading line in summer . Its measurement unit is metric ton

**Nationality , flag**

Is the country where the vessel has been registered and is allowed to carry its flag .

**Liner vessels**

Are those traveling in regular lines between specific ports of a route , carrying cargo at definite fares usually determined by international or regional conferences .

**Charter vessel**

Is one working as hired . This hiring can be time based or trip wise .

**Container ( full container ) vessel**

Is a vessel capable of carrying containers only .

**Semi-container vessel**

Is one capable of carrying containers together with other miscellaneous cargo .

**Dry bulk carrier vessel**

Is a vessel used for carrying dry bulk cargo like wheat , barley . corn . and coal .

**Service vessel**

Is a vessel used for provision of marine services like tugboats . boats and ...

**Passenger vessel**

Is a vessel specifically used for carrying passengers .

**Research vessel**

Is a vessel used for marine , meteorological and scientific researches .

**Cargo vessel**

Is a vessel used for carrying different types of cargo .

**Fishing vessel**

Is a vessel used for fishing .

**Ro/Ro vessel**

Is a vessel that land vehicles can directly get on and off of it .

**Tanker vessel**

Is a vessel used for carrying liquid materials ( oil or non-oil ) .

**Refer vessel**

Is a vessel whose load spaces' temperature is under control and is used for carrying cargo like

meat , dairy products and ...

**Barges**

Are water vehicles bigger than usual boats , which do not possess any motors , but are towed by tugboats . Barge is the most commonly used water vehicle for loading and unloading of huge ocean cruiser vessels that can not berth at the wharfs and are to stay at anchor . Barge is a vessel with a small draft and is used for service affairs like water supplying , fuel supplying and cargo transferring ( lighterage ) .

**Tugboat**

Is a vessel with a high motor power for service affairs and helping vessels berthing or unberthing the port or towing barges in free waters .

**Dredger**

Is a vessel for dredging waterways and entrance canals and wharfs of the ports .

**Traditional wooden vessel**

Small wooden units traditionally being used for carrying cargo in Persian gulf region . ( vessels smaller than ships performing cargo transportation between local ports and sometimes to neighboring countries )

**Fuel supplier**

Vessels with fuel reservoirs being exclusively used for fuel supplying to vessels , whether in territorial or international waters .

**Buoy layer**

Vessels with special equipment for laying buoys .

**Supply boat, crew carrying boat**

Special vessels for carrying foodstuffs and things needed by vessels that transfer the needed materials and tools and also the crews to and from vessels .

**Basin**

A space inside the break water being used for maneuvering of vessels in order to get berthed to or unberthed from wharfs .

**External anchorage area**

A safe region outside the domain of the port for anchoring and staying of vessels .

**Internal anchorage area**

A safe region near the port for anchoring and short term staying of vessels .

**Pilot**

A person knowing the navigation routes nearby the port assigned to offer consultations to the ship captain in order to enter the port and get berthed to or unberthed from the wharf , who has the related certificate .

**Cargo-and-passenger vessels**

Vessels capable of accepting passengers and carrying cargo in association .

**OP- vessel**

Vessel that have required equipment for collecting oil contaminations of the water surface .

**Emergency condition or force major**

Refer to conditions in which , the affairs get out of normal and regular state due to natural factors like floods , earthquakes , storms , ...

**SPM and SBM**

SPM ( single point mooring ) and SBM ( single buoy mooring ) are types of mooring with one buoy in deep waters generally for supplying fuel for tankers as an underwater oil pipe terminal and a device for mooring a tanker or loading and unloading of gas liquefactions

**Northern ports**

Ports of Anzali , Noshahr and Amirabad and other ports built by ports and shipping organization or other governmental organizations on the shores of Caspian sea .

**Southern ports**

Imam Khomeini . Shahid Rajaii ( Bandar Abbas ) , Chabahar . Booshehr and other ports built by ports and shipping organization or other governmental organizations on the shores of Oman sea and Persian Gulf .

## General Conditions

**1. Domain of territory**

Territorial domain of ports and shipping organization includes all port areas determined by laws of Islamic Republic of Iran .

**2. Basis for tariff acquisition**

Dues , duties and port charges applicable to Iranian ships and vessels are calculated and received in Rials . on the basis of Dollars and at the rate of deposit letters of the central bank . and in regard of foreign ships and vessels . they are calculated and received on the basis of US Dollars .

**3. Prepayment**

Port authorities are authorized to estimate and receive the whole or a part of charges due to cargo or vessel . before berthing of the vessel and not to let such vessels to wharf as long as they have not paid the mentioned expenses .

**4. Working hours of the port ( administrative . non-administrative , nights and holidays )**

Working days of the port authorities are from Saturday to Wednesday and administrative working hours from 7 to 15 . non-administrative working hours 15 to 19 and night working hours from 19 to 7 in the morning of the next day . Loading and unloading operations in bulk . miscellaneous and container terminals will be nonstop 24 hours a day . In addition . Thursdays and Fridays of each week together with official holidays of the country will be considered holiday . on which . loading and unloading operations will be charged as overtime work . Iranian new year day . Norooz or 1st of Farvardin ( 21st of March ) and the 10th of Moharram of lunar calendar . Ashoora ( circulating in solar calendar ) are the official holidays of the ports and no loading and unloading operations will be done on these days .

**5. Documentation**

The following documents should be submitted to the port authority by the related shipping agency at least 48 hours before the vessels enters the port :

- General declaration of the vessel
- Cargo declaration / manifest
- Dangerous cargo declaration
- Crew list of the ship
- Cargo plan and stowage plan
- Ship store declaration of consumables
- Marine health declaration
- A copy of international tonnage measurement certificate
- Original permit of departure from the last loading port

**Explanations :**

1. All vessels carrying no dangerous cargo . whether container or non-container . should declare not carrying dangerous cargo in separate declarations .

2. Manifests of transshipment and transit foreign cargo and containers should be submitted to the port authority separately .

## Section 2

# Dues , duties and port charges applicable to vessels in southern and northern ports

## ( container , non-container , oil tanker , Ro/Ro , passenger )

**A. Dues , duties and port charges applicable to vessels include the following :**

1.1. Vessel entry into port entrance duties
1.2. Vessel entry into port duties
1.3. loading and unloading duties in wharf
1.4. Loading and unloading duties in berth
1.5. Light duties

**B. Port charges pertaining to vessels :**
**1. Port charges pertaining to vessel**

1.1. Pilotage charges including :
1.1.1. Anchoring and disanchoring
1.1.2. Steering of vessel
1.1.3. Berthing to and unberthing from wharfs
1.2. Dredging charges
1.3. Wharfage charges
1.4. Charges of towage
1.5. Charges of garbage collection from vessel
1.6. Charges of bilge water collection from vessel
1.7. Over time, demands

**Table 1**

Tariff of dues , duties and port charges pertaining to container , non-container/non-oil-carrying , and Ro/Ro vessels entering southern ports or non-oil-carrying vessels entering ports and wharfs already constructed or to be constructed completely with private sector investment in southern coasts or special wharfs of free ports of Qeshm and Kish *

Unit : US$ Cents per ton of GRT

<table>
<tr><th>No</th><th colspan="3">Title of tariff</th><th>Container , non-container/non-oil-carrying , and Ro/Ro vessels of less than 30,000 GRT</th><th>Container and Ro/Ro vessels with capacity equal to or over 30.000 GRT</th></tr>
<tr><td rowspan="4">1</td><td rowspan="4">Port duties</td><td colspan="2">Port entrance entry duties</td><td>0.5 C/GRT</td><td>0.25 C/GRT</td></tr>
<tr><td colspan="2">Port entry duties</td><td>0.5 C/GRT</td><td>0.25 C/GRT</td></tr>
<tr><td rowspan="2">Loading and unloading duties</td><td>On wharfs</td><td>1.5 Cents per ton of cargo</td><td>0.75 Cents per ton of cargo</td></tr>
<tr><td>On anchor</td><td>0.75 Cents per ton of cargo</td><td>0.25 Cents per ton of cargo</td></tr>
<tr><td>2</td><td colspan="3">Light duties</td><td>2.5 C/GRT</td><td>1.5 C/GRT</td></tr>
<tr><td>3</td><td colspan="3">Pilotage charges of a round tour</td><td>5 C/GRT</td><td>2.5 C/GRT</td></tr>
<tr><td>4</td><td colspan="3">Charges of garbage collection from wharf</td><td>1.5 C/GRT</td><td>0.5 C/GRT</td></tr>
<tr><td>5</td><td colspan="3">Dredging charges</td><td>3 C/GRT</td><td>1.5 C/GRT</td></tr>
<tr><td>6</td><td colspan="3">Wharfage charges</td><td>1 C/GRT per norm of unloading</td><td>1 C/GRT per norm of unloading</td></tr>
<tr><td>7</td><td colspan="3">Charges of towage</td><td>10 C/GRT</td><td>9 C/GRT</td></tr>
<tr><td>8</td><td colspan="3">Charges of bilge water collection</td><td colspan="2">300 Dollars for each vessel over 5000 tons of GRT</td></tr>
<tr><td>9</td><td colspan="5">Overtime : tariff of loading and unloading duties and pilotage charges out of working hours will be 10% and on holidays and Fridays . 20% higher .</td></tr>
</table>

Explanations :

*Enactments of the session numbers 1428 dated 6.9.1384 , 1435 dated 1.12.1384 and 1470 dated 15.8.1385

1. Basis of calculation will be GRT ( Gross registered tonnage ) or in case a vessel holds both GRT and GT , the criterion and basis would be the one with higher tonnage .
2. Charges for towage in the operation of berthing to and unberthing from wharf will be received together with pilotage charges . and in case no towage were used in the operation of berthing to and unberthing from wharf, towage charges will be calculated and received in any way .
3. If the vessel lacks driving force . then . the towage charges will increase 100% .
4. For transferring the pilot to ships and vessels , no expenses will be charged for the services of vessels ( pilot boats , tugboats .... )
5. In tariffs of line 6 , the basis for calculation will be norms of loading and unloading of any kind of vessel and will be classified in regard with the type of its consignment as follow :
   - One cent for one day of stay of container and Ro/Ro vessels
   - One cent for three days of stay of general cargo , passenger and fishing vessels
   - One cent for five days of stay of bulk vessels
   - ➢ If the unloading time and staying of the vessel at the wharf exceeds the above mentioned norms , the extra stay of the vessel at the wharf ( extraordinary ) , will be calculated and acquired at the rate of 5 cents for each day and 5 out of 24 cents for each hour for stays of less than one day duration .
   - ➢ In case of ships and vessels of less than 1500 ton GRT , for stays of more than 24 hours at the wharf . 1 cent per GRT for each day of stay and for stays less than a day , 1 out of 24 cents per GRT for each hour of stay will be calculated and acquired . It is worth mentioning that these kinds of ships and vessels are exempted from paying the wharfage charges for the first 24 hours of stay ( in accordance with the enactment of the session number 1354 dated 26.6.1382 ) .
6. For repositioning ( shifting ) by using a pilot , 3 cents per GRT , and 1 cent per GRT for shifting using the vessel's rope . has been considered , which will be calculated and acquired according to the table 1 if the towage has taken place .

**Note 1** - shifting means repositioning of the vessel at wharfs or from wharf to berth and vice-versa .

**Note 2** - if the shifting takes place in on the basis of administrative requirements , then . no charges will be received .

7. From ships and vessels traveling to Iranian ports in one trip . light duties will be acquired only once and solely at the first entrance into an Iranian port .

**Note** - by "one trip" is meant the length of time from entering of the vessel into the IRI territorial waters till leaving the last port , although the vessel may berth at several ports .

8. All ships and vessels berthing at the mooring buoys in the port or at another vessel as double bank. will be subject to all tariff lines of table 1 . "dues . duties and port charges" .
9. From combined vessels ( tugboats towing another vessel ) dues , duties and port charges will be calculated and acquired on the basis of the sum of the GRTs of the said vessels .
10. In case of accomplishment of garbage collection in anchor or both in anchor and wharf . the related tariff (garbage collection charges ) will be received only once . but in two folds .

**Note** - receiving trash collection charges from vessels will be contingent upon provision of the related services . In case a port is not able to provide such services due to medical or environmental reasons or either inaccessibility to the vessel in anchor due to climatic reasons and

also lack of required facilities and devices to collect garbage . then it is not allowed to receive these charges . Otherwise , all vessels are obliged to pay the charges related to garbage collection tariff , whether they deliver the garbage or not .

11. Vessels halted at the wharf for unloading and intend to load export cargo , can only do so if their agents have requested from port for loading export cargo to the same vessel at least 12 hours before ending of the unloading of imported cargo . This will be contingent upon that the export cargo be ready at the port and loading start immediately. Otherwise the ship will unberthed and will be charged for that.

**Note** - the staying time at the wharf for two operations of loading and unloading will be calculated separately and on the basis of the types of cargo loaded or unloaded .

12. In case a port states its readiness for berthing at wharf after receiving the NOR of a vessel , but the vessel refrains from berthing for any reason , 500 dollars for each hour of delay ( after a one hour respite elapsing the time that the port has stated its readiness till the time that the vessel states its renunciation and it is recorded in the events registration book ) will be calculated and received .
13. Not exploiting a pilot on passenger vessels (except passenger and-cargo-vessels ) , service vessels like tugboats , dredgers , oil pollution vessels , fuel and water supplying vessels will be permitted only in following conditions , provided that all responsibilities have been accepted by the related shipping company and coordination have been made with the control tower . For such vessels , no pilotage charges will be calculated .

Obviously , acquiring undertaking of acceptance of all responsibilities from the related shipping company is mandatory.

**Conditions provided for the paragraph 13 :**
A. The vessel is owned or leased by organizations or private sector ( regardless of the nationality ) .
B. The vessel provides services up to the territory of external anchorage area.
C. The vessel has had at least three trips to the port in a six month period .
D. The vessel has Iranian master.
E. The master of the vessel has applied for entering the port without presence of a pilot .

**14. Hourly rental rates for marine equipment** :
The hourly renal rates for marine equipment used in operations other than giving berthing/unberthing to vessel will be calculated and received on the basis of mutually agreed rates .

**Table 2**
Tariff of dues , duties and port charges pertaining to carrying Iranian flag and belonging to Iranian shipping companies transshipping container and non-container cargo from Iran to other ports of the region as local feeders , also Iranian and foreign passenger and passenger-and-cargo vessels making domestic and international trips , Iranian barges and tugboats carrying vehicles , and all Iranian vessels less than1500 GRT, entering special wharfs and traveling between Iranian islands , and also all vessels traveling between Iranian ports and islands with Iranian flag carrying cargo as cabotage .

Unit : per ton of GRT

| No | Title of tariff | | | Amount of tariff |
|---|---|---|---|---|
| 1 | Port duties | Port entrance entry duties | | 0.05 C/GRT |
| | | Port entry duties | | 0.05 C/GRT |
| | | Loading and unloading duties | On wharfs | 0.15 Cents per ton of cargo |
| | | | On berths | 0.075 Cents per ton of cargo |
| 2 | Light duties | | | 0.25 C/GRT |
| 3 | Pilotage charges of a round tour | | | 0.5 C/GRT |
| 4 | Charges of garbage collection from wharf | | | 0.15 C/GRT |
| 5 | Dredging charges | | | 0.3 C/GRT |
| 6 | Wharfage charges | | | 0.1 C/GRT per norm of unloading |
| 7 | Charges of towage | | | 1 C/GRT |

**Explanations :**
The above table has been framed on the basis of the enactments of the session numbers 1335 dated 19.12.82 , 1345 dated 24.6.82 , 1372 dated 4.3.83 and 1394 dated 26.11.83 .
Invoices issued for vessels will be at a minimum amount of 100,000 Rials and in case the due amount is less than 100,000 Rials , the same amount of 100,000 will be charged .

**Table 3**
Tariff of dues , duties and port charges pertaining to oil tankers ( Iranian and foreign ) in southern ports and all vessels on northern ports
Unit : USS Cents per ton of GRT

| No | Tariff title | | Calculation unit | Tariff amount | Remarks |
|---|---|---|---|---|---|
| 1 | Port entrance entry duties | | Per ton of GRT | 6 Cents | |
| 2 | Port entry duties | | Per ton of GRT | 10 Cents | |
| 3 | Dredging charges | | Per ton of GRT | 41 Cents | |
| 4 | Pilotage charges of a round tour of a vessel | | Per ton of GRT | 40 Cents | |
| 5 | Light duties | | Per ton of GRT | 4 Cents | |
| 6 | Loading and unloading duties | On wharfs | Per ton of cargo | 22 Cents | |
| | | On berths | Per ton of cargo | 11 Cents | |
| 7 | Wharfage charges | | Per ton of GRT Per hour | 0.45 Cents * | |
| 8 | Charges of garbage collection from wharf | | | 5 Dollars | Traditional wooden vessel |
| | | | | 20 Dollars | Metal body vessels to 800 ton of GRT |
| | | | | 125 Dollars | vessels of 801 to 5000 ton of GRT |
| | | | | 700 Dollars | vessels of 5000 ton of GRT upward |
| 9 | Overtime : tariff of items 4 and 6 out of working hours will be 10% and on holidays and Fridays , 20% higher . | | | | |
| | Charges of bilge water collection from ship | | | 300 Dollars for each vessel over 5000 tons of GRT | |

* (enactments of the session numbers 1246 dated 79.4.16)

**Explanation 1 - regarding item 8 :**
A. The stated tariffs are for up to 7 days of stay at the wharfs .
B. For each day of stay over 7 days , one seventh of the above tariffs will be received .
C. In ports lacking the required equipment for collecting bildge from the hold water of the vessel , the tariff of 65 dollars will be received from ships and vessels of 801 to 5000 GRT .
D. In case the garbage collection service was performed in berth or both in berth and wharf , the above tariffs will be received in two folds .
E. The tariff for receiving water used for washing of reservoirs for oil-tankers in southern ports (if the service is done) will be 2000 dollars .
**Explanation 2** - the charges for repositioning ( shifting in the wharf ) with the use of a pilot will be 7 cents per ton of GRT and 3 cents if it is done with ship's rope . and if towage takes place , the related charges will be calculated and received according to table 4 .
**Explanation 3** - the pilotage tariff will include steering the vessel . dropping and raising anchor , tying the vessel to the wharf and untying it . So . if the vessel is transferred from wharf to internal anchorage area and then given berthing in accordance with the order of the shipping services company . then , one shifting charges should be calculated and received , provided that it has not been due to administrative exigencies . In case a towage has been done . the related charges will be calculated and received according to table 4 .
**Explanation 4** - the towage charges in berthing of vessels to wharfs and unearthing from them will be received separately in accordance with table 4 .

**Table 4**
Tariff of towage charges for pilotage operations of oil-tankers ( Iranian and foreign ) in southern ports and all vessels in northern ports . in a single berthing and unberthing operation of a vessel*

| No | Vessel tonnage | Vessel towage charges | |
|---|---|---|---|
| | | Foreign vessels | Iranian vessels |
| 1 | Up to 1500 ton of GRT | 300 dollars | 50 dollars |
| 2 | From 1501 to 5000 ton of GRT | 800 dollars | 100 dollars |
| 3 | From 5001 to 10000 ton of GRT | 1500 dollars | 150 dollars |
| 4 | From 10001 to 15000 ton of GRT | 2200 dollars | 200 dollars |
| 5 | From 15001 to 20000 ton of GRT | 2900 dollars | 250 dollars |
| 6 | From 20001 to 25000 ton of GRT | 3600 dollars | 300 dollars |
| 7 | From 25001 ton of GRT upward | 4500 dollars | 400 dollars |

* enactment of the managing board of ports and shipping organization dated 1372.10.1

**Explanations :**
1. Type and number of tugboats and hours of use for berthing/unberthing the vessel to or from the wharf it have no effect on the mentioned tariff .
2. Towage charges for operations other than berthing to and unberthing from wharf will be acquired separately and in accordance with the current tariffs in use .
3. If no tugboats are used in the pilotage operations for berthing to or unberthing from the wharf . the towage charges will be calculated and acquired in any case , in accordance with the above table .
4. The pilotage and towage operations will be carried out in accordance with the current laws .

regulations and instructions and in case no towage and pilotage are used during , berthing or untying , no towage and pilotage charges will be acquired .

5. No charges for the service of vessels ( pilot boat , tugboat , and so on ) will be acquired for transferring of the pilot to vessel .

**Exemptions and discounts**

1. All ships and vessels belonging to the Red Crescent Association of the Islamic Republic of Iran , whether for hospital usage or for other charity purposes will be exempted from all dues , duties and port charges ( the law related to amendment of a part of the tariff for port duties and dues annexed to the law of establishment of the ports and shipping organization approved on December 11 , 1972 ) .
2. All war ships and vessels belonging to military or police forces of the Islamic Republic of Iran and ports and shipping organization acting for noncommercial purposes are exempted from all dues , duties and port charges ( the law related to the establishment permit of the ports and shipping organization approved in June , 1960 ) , and in relation with war ships , only the charges for any services provided will be subject to calculation and acquisition .
3. All service providing vessels including tugboats active in pilotage operations , dredgers , oil pollution vessels , fuel and water supplying and buoy laying vessels , supply and crew carrying boats traveling in the limits of the port basin and the external anchorage area , for whom no port clearance is issued ( regardless of the nationality and flags ) are exempted from paying the duties for entering the port entrance and entering the port , the dredging and light charges in later trips after the first entry . Of course , the said vessels at the first entry and also later entries before leaving the port , for which , port clearance have been issued , are bound to pay the mentioned duties and charges in accordance with the approved rates .
4. All ships and vessels entering anchorage areas of the ports of Islamic Republic of Iran for noncommercial purposes like bunkering , exchange of crews , getting provision , repairing the vessel , getting medical helps , seeking refuge , research affairs , training and similar affairs , are exempted from all the tariffs table number one , except garbage charges.

**Note 1** - in case the mentioned vessels are given berthing in addition to medical helps , they will only pay for pilotage , garbage collection , towage and staying at the wharf , if the services have been provided .

**Note 2** - vessel berthed to the wharf for getting medical helps under emergency ( force major ) conditions are exempted from all the tariff for dues , duties and port charges pertaining to vessels ( table 1 ) for the first 72 hours and in case they stay for more than 72 hours , they will pay only for the charges of pilotage ,garbage collection , towage and staying at the wharf .

5. Vessel inflicted with marine accidents or caught fire and in need of help , search and rescue :
   A. Saving the lives of people in the sea is mandatory and gratuitous .
   B. Salvage of cargo and vessels are arbitrary and if the port accepts the salvage , all charges of equipments and services used or provided ( including towage , boats , barges , water evacuation pumps , fire fighting cylinders and materials , transferring of cargo and vessels , wages of people , ... ) will be calculated and received in accordance with the agreement between the vessel owner or his legal representative and the port ) .
   C. In cases where the vessel is sank or damaged or their remnants cause trouble for shipping operations and their owners refrain from removing the obstacle , ports and shipping organization can move them to a suitable place at its own expenses and if the owners do not

pay the expenses , the organization can seize and sell them and procure its claims observing the provisions of the articles 29 and 36 of the marine law in priority to other creditors ( according to the article 37 of the marine law ) .

6. All service vessels equipped with loading and unloading equipment being used for lighterage of big vessels in internal and external anchorage areas are exempted from all dues and port duties and will only pay for charges of pilotage . garbage collection , towage and wharfage .
7. If in an occasion , the loading and unloading equipment present in the port did not have sufficient power to move some special bales . and another vessel enters the port ( alone or accompanying a tugboat ) to provide this service at the request of the owner of cargo or the shipping company . both the vessel and the tugboat will be exempted from paying the port duties ( line 1 ) . light duties ( line 2 ) and dredging charges ( line 5 ) listed in the table of tariff for dues . duties and port charges ( table 1 ) and will pay only charges related to pilotage , towage . garbage collection and wharfage .
8. All vessels carrying illegal consignment of oil materials from neighboring countries discovered in Iranian waters . provided that the illegitimacy of the consignment is declared as indisputable by the legal authorities ( through enactment of the session number 1397 dated 8.10.1384 ) and with regard to the note 5 of article 20 of the executive by-law of the act of application method of governmental chastisements approved by the respected board of ministers regarding sales of illegal petroleum products discovered from ships and vessels at the governmental rates in order to hasten the process and uniformity of approaching such vessels in the ports , are subject to 95 percent discount on port dues and duties .
9. All vessels carrying relief supplies to disaster stricken areas ( caused from unexpected incidents ) which enter Iranian ports are exempted from all dues , duties and port charges ( on the basis of enactment of the session number 1429 dated 14.9.1384 ) .
10. All vessels ( whether with Iranian or foreign flag ) from origin or to destination of Qeshm free zone carrying non-oil import , export , or transit cargo are subject to 50 percent discount on dues, duties and port charges ( excluding towage charges ) ( enactment of the session number 1480 dated 23.11.85 ) .
11. Dues. duties and port charges pertaining to vessels entering the new container terminal of Shahid Rajaii Port . whose capacities are 7000 TEU or more are subject to discounts as follow :

| Vessel capacity TEU | Method and rate of discounts on dues. duties and port charges pertaining to vessels entering the new container terminal of Shahid Rajaii Port ( in a one year period ) | | | | | |
|---|---|---|---|---|---|---|
| | First shipping line | | Second shipping line | | Third shipping line | |
| | Trip number | Discount percent | Trip number | Discount percent | Trip number | Discount percent |
| 7000 TEU upward | First trip | 80 | First trip | 60 | First trip | 40 |
| | From the second trip to the end of a one year period | 40 | From the second trip to the end of a one year period | 40 | From the second trip to the end of a one year period | 40 |

* The criteria for calculation of discount for a one year period is the entry date of the first vessel for any of the above mentioned shipping lines .
* The above mentioned discount will be calculated on the basis of the GT of the vessel .
* The towage charges will not be subject to any discount .

( enactment of the session number 1473 of the managing board dated 13.9.85 )

12. All vessels carrying transit cargo ( non-oil ) to the destination of Iraq entering southern ports of the country are entitled to 50 percent discount on dues, duties and port charges ( excluding towage charges ) ( enactment of the session number 1481 dated 9.12.85 ) .
13. Vessels of Iranian nationality with gross capacity of up to 200 GRT being used for fishing and cabotage cargo between Iranian ports are only entitled to pay for loading and unloading of cargo at the port dues and wharfage , being exempted from all other dues, duties and port charges tariffs ; with the explanation that such vessels are also exempted from wharfage charges for the first 24 hours , but if the stay exceeds 24 hours , then the whole staying time will be calculated and received ( enactment of the high council of ports and shipping organization dated 17.7.1362 ) and subject of the enactment of the session number 1335 dated 19.3.1382 of the managing board with the corrected table as attached :

Table 5
Method of application of exemptions and discounts for Iranian ships and vessels less than 1500GRT , including passenger , fishing , cabotage and commercial ships and vessels

| No | tariff | | Iranian cargo and/or cargo-passenger vessels of 60 ton GRT or lower | | | | Iranian cargo and/or cargo-passenger vessels of 61 to 200 ton GRT | | | | Iranian cargo and/or cargo-passenger vessels of 201 to 1500 ton GRT | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | commercial | cabotage | fishing | Passenger | commercial | cabotage | fishing | passenger | commercial | cabotage | fishing | passenger |
| 1 | Port duties | Port entrance entry duties | - | - | - | - | - | - | - | - | - | - | - | - |
| | | Port entry duties | - | - | - | - | - | - | - | - | - | - | - | - |
| | | Loading and unloading duties | - | - | - | - | + | + | + | + | + | + | + | + |
| 2 | Light duties | | - | - | - | - | - | - | - | - | - | - | - | - |
| 3 | Pilotage charges of a round tour | | *+ | - | - | *+ | *+ | - | - | *+ | *+ | *+ | *+ | *+ |
| 4 | Charges of garbage collection from wharf | | ***+ | ***+ | ***+ | ***+ | ***+ | - | - | ***+ | ***+ | ***+ | ***+ | ***+ |
| 5 | Dredging charges | | + | - | - | + | + | - | - | + | + | + | + | + |
| 6 | Wharfage charges | | **+ | **+ | **+ | **+ | **+ | **+ | **+ | **+ | **+ | **+ | **+ | **+ |
| 7 | Charges of towage | | - | - | - | - | ***+ | ***+ | ***+ | ***+ | ***+ | ***+ | ***+ | ***+ |

Explanations : port charges relating to passengers' cargo not accompanied with the passenger in passenger ships and vessels will be calculated and received in accordance with the contents of the manifest .
(-) means exemption and not receiving of the related tariff .
(+) means not exemption and receiving of the related tariff .
(*) means that in case of using pilot , pilotage charges should be received .
(**) means that in case of staying of the vessel at the wharf for more than 24 hours , the staying charges will be calculated and received on the basis of 1 C/GRT per day and for less than 1 day , on the basis of one twenty fourth of C/GRT per hour .
(***) means receivable in case of provision of the service .

14. Table related to discounts for vessels , whether Iranian or foreign , in northern ports , whose tariffs have been presented in table 3 . Discounts will be calculated and received in the following ways :

**Table 6**

| Description | Discount |
|---|---|
| Passenger vessels including ships and traditional wooden vessels<br>Iranian fishing vessels in territorial waters fishing for domestic uses | 50%<br>90% |
| **Export :**<br>Commercial vessels of 1500 GRT or more , entering the port for loading cargo like clinkers , gravels , sand and grit , cement , sulfur , and bulk concentrates of mineral materials .<br>Commercial vessels entering the port for loading other non-oil cargo except those contained in the above paragraph .<br>In case the above mentioned vessels were also carrying imported cargo , only 50% of the charges will be subject to discount . | 75%<br><br>50% |
| **Transit :**<br>Non-oil-carrying container and non-container commercial vessels whose total loads are foreign transit cargo entering the port for loading and unloading . | 75% |
| Non-oil-carrying container and non-container commercial vessels carrying both imported and foreign transit cargo together , will be discounted to a degree proportionate with the ratio of the foreign transit cargo to the total amount of the cargo and to a maximum amount of | 75% |
| In case the vessel enters the port for carrying export and transit cargo together without unloading any cargo , it will be subject to 75% discount on the basis of proportion of foreign transit cargo and 50% for proportion of export cargo . | |
| **Explanation :**<br>In case of being subject to multiple discounts , the highest rate of discount from the viewpoint of total amount payable for the cargo owners will be used as criteria for calculation of discount for ships and vessels . | |

15. To all tankers carrying oil products which enter northern ports of the country 25 percent and to all tankers transferring oil consignments through STS operations 35 percent discount is granted ( in proportion with the table 3 ) ( enactment of the session number 1459 dated 16.5.85 ) .
16. To all items of dues, duties and port charges for Iranian vessels which have joined the marine fleet of the country in Caspian sea since March 21 , 2006 or will join it in future , 50% discount is granted for 5 years from the date of registration ( enactment of the session number 1483 dated 22.12.85 ) .
17. To all items of dues, duties and port charges for Iranian non-oil-carrying vessels now operating in Caspian sea , 30% discount is granted ( enactment of the session number 1483 dated 22.12.85 ) .
18. For commercial vessels ( non-oil/non-gas-carrying ) in service ports and petro-chemistry of special economic energy zone of southern Pars ( Asalooyeh ) , tables 1 of this manual will apply , without considering dredging charges , wharfage , and no discounts will be granted . The above

tariff will apply to all vessels carrying export cargo from special economic energy zone of southern Pars and all vessels carrying import cargo to be consumed in the area itself ( enactment of the session number 1498 dated 25.4.86 ).

19. For vessels carrying gas liquefactions in service ports and petro-chemistry of special economic energy zone of southern Pars ( Asalooyeh ) and all SBM and SPM in southern ports of the country . tables 7 and 8 will act as criteria ( enactment of the session number 1498 dated 25.4.86 ).

**Table 7**
Table of tariff of dues, duties and port charges pertaining to vessels carrying gas liquefactions in service ports of Pars and special petrochemical zone of southern Pars ( Asalooyeh )
Unit : Cents of American dollars

| No | Title | Tariff |
|---|---|---|
| 1 | Port entrance entry duties | 0.5 C/GRT |
| 2 | Port entry duties | 0.5 C/GRT |
| 3 | Loading and unloading duties | 1.5 C/Per ton of cargo |
| 4 | Light duties | 2.5 C/GRT |
| 5 | Pilotage charges of a round tour | 20 C/GRT |
| 6 | Charges of garbage collection | 1.5 C/GRT |
| 7 | Towage charges | 18 C/GRT |

**Explanation :**
1 - no discounts will apply to the above tariffs .

**Table 8**
Table of tariff of dues, duties and port charges pertaining to vessels carrying gas liquefactions in SBM and SPM of all southern ports of the country

| No | Title | Tariff |
|---|---|---|
| 1 | Port entrance entry duties | 0.5 C/GRT |
| 2 | Port entry duties | 0.5 C/GRT |
| 3 | Loading and unloading duties in SBM or SPM | 0.75 C/Per ton of cargo |
| 4 | Light duties | 2.5 C/GRT |
| 5 | Pilotage charges of a round tour | 40 C/GRT |
| 6 | Charges of garbage collection | 3 C/GRT |
| 7 | Towage charges | 18 C/GRT |

**Explanation :**
1 - no discounts will apply to the above tariffs .
2 - the above tariffs are applicable only to vessels performing loading and unloading operations through SBM and SPM .

# Chapter 2
## Duties and charges pertaining to cargo

**Section 1 :**
-    General conditions and definitions

**Section 2 :**
-    Duties and port charges pertaining to non-container cargo

**Section 3 :**
-    Duties and port charges pertaining to container cargo

## Section 1

**Definitions related to cargo :**

**Definite import cargo**

is a cargo released from customhouse for being used inside the country .

**Definite export cargo**

Is a cargo being sent to abroad for sale or being used .

**Cabotage cargo**

Is a cargo being carried from one point of the country to another through sea or borderline rivers.

**Foreign transit cargo**

Is a foreign cargo coming into country from one border point and going out from another in order to pass through the soil of Islamic Republic of Iran .

**Internal transit cargo**

Is a non-custom-cleared good being carried and delivered from one authorized customhouse to another .

**Transship cargo**

Is a cargo being transferred from one vessel to another in the berths or ports of the country . The transfer may be carried out directly ( ship to ship ) or indirectly ( being unloaded on the port or in the customhouse and then loaded to a ship ) .

**Especial Economic Zone Ports**

The ports are located in the Especial Economic Zones defined by Especial Economic Zones Code.

**Free Zone Ports**

The ports are located in the Free Zones defined by Free Zones Code.

**Imported cargo to the zone**

The cargos that are entered to the Especial Economic or Free Zones to use, process, consume in production, evaluate, up grade, repair, ..... .

**Returned cargo**

The imported cargo present in port customs sites can be released for being returned to abroad . The returned good is not considered as either definite import or definite export cargo.

**Voluminous and traffic cargo**

Is a cargo whose dimensions are greater than 12x2.5x2.5 meters and for loading and unloading of which in port sites , special equipments are used .

**Light vehicles**

Include passenger cars . vans . motorcycles ...

**Semi-heavy vehicles**

Include mini-buses , small trucks ...

**Heavy vehicles**

Include trucks , buses . trailers and port equipments and all road building and agricultural equipments . railroad wagons and locomotives ...

**Container**

A big chamber made from wood or metal . which frequently can accommodate a full load of a big truck or trailer

**20 feet container**

A standard container whose dimensions have been determined as 20x8x8 feet by ISO .

**40 feet container**

A standard container whose dimensions have been determined as 40x8x8 feet by ISO .
**TEU**
Twenty feet Equivalent Container.
**Nonstandard container**
Any container out of the above mentioned dimensions is considered as nonstandard .
**Heavy weight container**
Is a container too heavy to be unloaded by a gentry crane and requiring special equipment .

**THC**
(Terminal Handling Charge) including unloading a container from vessel . moving it to the
container yard , unloading and stowing in the CY . loading to the owner's transportation means
and stowing or unloading in the CY and stowing , loading to the transportation means and
stowing , moving to the side of the vessel and loading to vessel .
**Move**
Means the operation of unloading a container from vessel or loading it to vessel . whether 20 or
40 feet .
**Strip container**
Is emptying the contents of a container in accordance with the request of the cargo owner or the
shipping agent .
**FCL container**
Is a container whose contents belong to one custom license .
**LCL container**
Is a container whose contents belong to more than one custom license .
**CFS store**
Is a special place for emptying and storing of cargo related to FCL or LCL .
**Administrative transit**
Transferring of consignments from one customhouse in a port to another
**Relocation**
Transfer of good from its first storage place to another place in the port .
**Non-palletized cargo**
Are cargo which have come out of its original packaging form or are carried in an unusual
condition and without suitable packing .
**Special bales**
Consignments whose volumes and weights are extraordinary and special equipments are needed
for their transfer .
**Oil products**
Include cargo like crude oil . gasoline , gas oil and fuel oil .

**General conditions :**
**1. Basis for calculation and receiving of tariffs pertaining to cargo and containers :**
1.1. Duties and port charges pertaining to cargo ( except THC ) will be calculated and received in
Rials .
1.2. The basis for calculation of THC is American dollar , which will be changed into Rials and
received at the exchange rate of central bank on the day of loading or unloading of the container
to or from the vessel .
**2. Working hours of the port ( official , nonofficial , nights and holidays ) :**

Working days of the port authorities are Saturday through Wednesday with official working hours being 7 to 15 . nonofficial hours 15 to 19 and nights from 19 to 7 in the next morning . Loading and unloading operations in bulk cargo terminal, general cargo, miscellaneous and container terminals will be in action 24 hours a day . In addition , Thursdays and Fridays of all weeks and formal holidays of the country will be considered holidays and loading and unloading works on these days will be treated and calculated as overtime works . Iranian new year day , "Norooz" or 1st of Farvardin ( 21st of March ) and the 10th of Moharram of lunar calendar , Ashoora ( circulating in solar calendar ) are also the official holidays of the ports and no operations will be done on these two days .

**3. Safety :**

All groups using ports are obliged to obey the routine laws and instructions and essentially comply with regulations .

**4. Charges of repositioning of consignments in the administrative transit section :**

A. Port authority reserves for itself the right of control , reloading , unloading and repositioning of the whole consignment and will take steps to administrative transit of cargo and containers to other domestic customhouses ( Sirjan . western Tehran . Shahriar . ... ) upon agreement and cooperation with the port , in case of extraordinary condensation of cargo and containers in the customhouse places . sites and stores . and the cargo and container owners will be incumbent to pay all charges for repositioning , storage , loading and unloading . preservation , transportation . and so on in customhouses .

B. Port authority will have the right to displace or inspect and move to another place any consignment or container with the risk and expenses of the owner or the agent of cargo or vessel owner increase they appear damaging other consignments or properties in surveillance .

**5. Dangerous , hazardous or harming cargo :**

Dangerous . hazardous or harming cargo should be stated to the port at least 48 hours in advance of their entry to the port or arrival of the vessel by the shipping agencies . Such cargo have been classified and listed as following by International Maritime Organization (IMO) under published codes of dangerous cargo ( IMDG CODE ) :

1. Explosive substances
2. High pressure gases , fluids and pressurized liquids
3. Flammable liquids
4. Flammable solids and substances with spontaneous flammability characters
5. Oxidizing substances and organic peroxides
6. Toxic and infectious substances
7. Radioactive materials
8. Corrosive substances
9. Miscellaneous dangerous substances

**Note 1 :** the executive method in respect of the dangerous cargo titles will be acted upon as before until further notice and no new title is being added in this regard . Obviously , any changes in the titles of the subject will be brought to notice of the ports .

**Note 2 :** the chemical substance of "Soda-ash" or sodium carbonate , which has not been included in the book of IMDG Code . is not considered dangerous substance .

**6- These tariffs are applicable on all Iranian ports including normal, free zone and especial economic zones ports.**

# Section 2 :

## Duties and port charges pertaining to non-container cargo

Table 9 - Transfer Tariff of non-container cargo in normal, free and special economic zone ports
Unit : Rials

| Tariff of transfer rate per ton of cargo / per unit ( non-container ) | | | | | | |
|---|---|---|---|---|---|---|
| Cargo group | | Import and cabotage in destination port | Export | Transit and foreign transshipment | Returned | Cabotage in origin port |
| Light cargo of each bale weighing less than 30 tons | Misc. | 41.600 | 9,000 | 18.000 | 35.300 | 10,400 |
| | Metal ware | 37,000 | 8,000 | 16,000 | 31,400 | 9.200 |
| | Bags ( pallets ) | 41,600 | 9,000 | 18,000 | 35,300 | 10,400 |
| Heavy cargo | From 30 to 60 tons | 138.600 | 30,000 | 60.000 | 117,800 | 34.700 |
| | From 61 to 120 tons | 277,200 | 60,000 | 120,000 | 235,600 | 69.300 |
| | From 120 tons upward | 369,600 | 80,000 | 160,000 | 314,200 | 92,400 |
| Dry bulk | | 9.200 | 2.000 | 4,000 | 7,900 | 2.300 |
| Liquid bulk | | 4.600 | 1,000 | 2.000 | 3.900 | 1.200 |
| Livestock ( per each ) | | 4,600 | 1,000 | 2,000 | 3,900 | 1.200 |
| Cold store and frozen cargo | | 27.700 | 6,000 | 12.000 | 23,600 | 6.900 |
| Junk cargo and scrap materials (direct delivery) | | 27,700 | 6,000 | 12,000 | 23,600 | 6.900 |
| Dangerous good | | 92.400 | 20.000 | 40,000 | 78.500 | 23.100 |
| Light vehicles , per unit | | 138,600 | 30,000 | 60.000 | 117.800 | 34.700 |
| Semi-heavy vehicles , per unit | | 231,000 | 50,000 | 100.000 | 196,400 | 57.800 |
| Heavy vehicles , per unit | | 462,000 | 100,000 | 200,000 | 392.700 | 115.500 |
| Wheat | | 1.900 | 410 | 830 | 1.600 | 500 |

Table 9-1- Transfer Tariff of light cargo in normal, free and special economic zone northern ports of the country

Unit: Rails

| Description | | Import and cabotage in destination port | Export | Transit and foreign transship | Returned | Cabotage in origin port |
|---|---|---|---|---|---|---|
| Light cargo of each bale weighing less than 30 tons | Miscellaneous cargo | 18.700 | 4,100 | 8.100 | 15.900 | 4.700 |
| | Bags ( pallets ) | 18,700 | 4,100 | 8,100 | 15,900 | 4,700 |
| Light cargo of each bale weighing less than 30 tons | Less than 5 tons | 11,600 | 2,500 | 5,000 | 9,800 | 2,900 |
| | 5 to 15 tons | 34.700 | 7.500 | 15,000 | 29.500 | 8,700 |

Explanation :
* transfer tariff of other cargo in normal. free and special economic zone northern ports of the country will be received in accordance with table 9 .

Table 9-2 - Tariff of port charges pertaining to cargo in Chabahar port ( transfer charges )

unit : Rials

| Tariff type | Import | Export | cabotage | Transit | transship | Returned |
|---|---|---|---|---|---|---|
| Transfer charge | 1650 | 412 | Origin port : 412 Destination port :1650 | 1650 | 1650 | 1650 |

**Explanations on transfer operations :**

- The transfer operation consists of transportation , unloading , stowing and loading operations , the tariffs of each operation being 40% . 25% . 10% and 25% of the transfer tariff respectively .
- Transfer tariff of non-palletized cargo which are unloaded and kept in cargo terminals ( indirect delivery ) will be 100% higher . that is two folds of the transfer table rates , 1650 Rials of which pertains to fine and the rest is for the charges of non-palletized cargo.

**Note 1 :** in southern ports , non-palletized cargo being loaded and unloaded by traditional wooden vessels or floating units of less than 200 ton capacity will be exempted from inclusion of the above paragraph .

**Note 2 :** in Noshahr port , non-palletized cargo being unloaded and kept in cargo terminals (indirect delivery) will be charged two folds of the transfer tariff from shipping lines and one fold from the cargo owners , 3300 Rials of which pertaining to fines from shipping lines and 1650 Rials fine from the cargo owners and the rest is considered as the charges of non-palletized cargo

- Transfer tariff of non-container voluminous and traffic cargo is 138,600 Rials per ton .
- Transfer tariff of direct delivery of cargo in wharfs equipped with special facilities and equipments for import and export cargo and their loading and unloading are done by using the installed facilities and equipments , will be calculated and received on the basis of 20% and in other wharfs of the port , on the basis of 40% ( table 9 and 9-1 ) .
- Transfer tariff of direct delivery of cargo in Boushehr port being transferred to number 2 special economic zone with the use of special equipments will be subject to 50% discount ( enactment no 1397 dated 8.1.84 ) .
- Scrap cargo will be unloaded from vessel only as direct delivery .
- In order to modify some tariffs pertaining to cargo in normal, free and special economic zone in northern ports of the country, transfer tariffs in the said ports will be acquired as described in table 9-1 .

Table 10 - Tariff of stevedoring for general and bulk cargo

Unit : Rials

| Tariff rates of stevedoring per ton of cargo / unit | | | |
|---|---|---|---|
| Cargo group | Import and cabotage | Returned | Export , Transit and foreign transship |
| Miscellaneous cargo | 27,700 | 23,600 | 12,000 |
| Metal ware | 23,100 | 19,600 | 10,000 |
| Bags ( pallets ) | 46,200 | 39,300 | 20.000 |
| Dry bulk | 11.600 | 9,800 | 5,000 |
| Livestock ( per each ) | 4,600 | 3.900 | 2.000 |
| Cold store and frozen cargo | 55,400 | 47,100 | 24,000 |
| Junk and scrap materials ( direct delivery ) | 55.400 | 47,100 | 24,000 |
| Dangerous good | 92.400 | 78,500 | 40.000 |
| Light vehicles , per unit | 92,400 | 78,500 | 40,000 |
| Semi-heavy vehicles , per unit | 184,800 | 157,100 | 80,000 |
| Heavy vehicles , per unit | 277,200 | 235,600 | 120.000 |

**Explanations on stevedoring operations :**

**Stevedoring in two operations of loading and unloading are classified as follow :**

**A. Stevedoring in unloading operation include :**

1. Handling the cargo inside the hold
2. Transferring of the cargo from vessel to transportation means
3. Stowing of the cargo on the transportation means / warfe

The tariffs of the above mentioned operations constitute 25% . 50% and 25% of the stevedoring tariff respectively .

**B. Stevedoring in loading operation include :**

1. Loading of the cargo from transportation means to vessel
2. Handling the cargo inside the hold
3. Stowing of the cargo in the hold of vessel

The tariffs of the above mentioned operations constitute 50% . 25% and 25% of the stevedoring tariff respectively .

Transfer tariff of non-palletized cargo will be 100% higher , i.e. two folds of the rates on stevedoring table , 1650 Rials of which pertains to fine and the rest is considered as the charges of non-palletized cargo .

**Note 1:** in northern ports , since the non-palletized cargo charges have been included in transfer tariffs . they will be exempted from inclusion of the above paragraph .

**Note 2 :** in southern ports , non-palletized cargo being loaded and unloaded by traditional wooden vessels or boats of less than 200 ton capacity will be exempted from inclusion of the above paragraph .

Stevedoring tariff of cargo with bales of over 50 tons weight will be received at 50% higher rates , i.e. , 1.5 folds of the rates on stevedoring table .

In southern ports of the country , shipping lines and cargo owners can take steps to select contractors for unloading of cargo from vessel hold and act in accordance with the contract in between in respect with stevedoring operations .

Table 11 - Tariff of storage of non-container cargo ( import - cabotage and returned ) in the normal, free and special economic zone ports

Unit : ton or package or set / day

Rate : Rials

| Storage duration / Cargo group | | From the 1st day to the 10th day | From the 11th day to the 20th day | From the 21st day to the 30th day | From the 31st day to the 40th day | From the 41st day to the 50th day | After the 50th day |
|---|---|---|---|---|---|---|---|
| Miscellaneous and bags ( ton per day ) | | Exempted | 870 | 1,160 | 1,620 | 2.310 | 3.470 |
| Metal ware ( ton per day ) | | Exempted | 690 | 920 | 1.160 | 1.850 | 2.310 |
| Any kind of packaging , cartoons , cases (package per day ) | Weight of each package up to 50 kg | Exempted | 230 | 350 | 460 | 810 | 920 |
| | Weight of each package over 50 kg | Exempted | 690 | 1,040 | 1,390 | 2,080 | 2.770 |
| Light vehicles ( passenger cars , vans , ... ) unit per day | | Exempted | 13,860 | 18,480 | 23,100 | 27,720 | 36,960 |
| Semi-heavy and heavy vehicles ( trucks . tractors , minibuses . buses . ... ) unit per day | | Exempted | 23,100 | 27,720 | 32,340 | 36,960 | 46,200 |

Table 11-1 - Tariff of storage of non-container cargo (foreign transit and transshipment) in the normal, free and special economic zone ports

Unit : ton or package or set / day
Rate : Rials

| Storage duration / Cargo group | | From the 1st day to the 10th day | From the 11th day to the 20th day | From the 21st day to the 30th day | From the 31st day to the 40th day | From the 41st day to the 50th day | After the 50th day |
|---|---|---|---|---|---|---|---|
| Miscellaneous and bags ( ton per day ) | | Exempted | 375 | 500 | 700 | 1,000 | 1.500 |
| Metal ware ( ton per day ) | | Exempted | 300 | 400 | 500 | 800 | 1.000 |
| Any kind of packaging , cartoons , cases (package per day ) | Weight of each package up to 50 kg | Exempted | 100 | 150 | 200 | 350 | 400 |
| | Weight of each package over 50 kg | Exempted | 300 | 450 | 600 | 900 | 1.200 |
| Light vehicles ( passenger cars , vans , ... ) unit per day | | Exempted | 6,000 | 8,000 | 10,000 | 12,000 | 16,000 |
| Semi-heavy and heavy vehicles ( trucks , tractors , minibuses , buses , ... ) unit per day | | Exempted | 10,000 | 12,000 | 14.000 | 16,000 | 20,000 |

* for Export cargo refer to note 2 of explanation of storage page :31

Table 11-2 - Tariff of storage of non-container import and export cargo in Chabahar port

| Storage duration | Unit of calculations | Storekeeping rate |
|---|---|---|
| Up to full 15 days | Each ton per day | 5 Rials |
| 16 to full 30 days | Each ton per day | 10 Rials |
| 31 to full 45 days | Each ton per day | 40 Rials |
| 46 to full 60 days | Each ton per day | 60 Rials |
| 61 to full 90 days | Each ton per day | 100 Rials |
| 90 days upward | Each ton per day | 200 Rials |

Enactment of the thirtieth session of the high council of ports and shipping organization 25.10.1355

Table 11-3 Tariff of storage of carton boxes in Khorramshahr and Bushehr ports ( import, cabotage and returned cargo)

| Cargo group / Storage duration | | From the 1st day to the 10th day | From the 11th day to the 20th day | From the 21st day to the 30th day | From the 31st day to the 40th day | From the 41st day to the 50th day | After the 50th day |
|---|---|---|---|---|---|---|---|
| Any kind of packaging , cartons , cases (package per day ) | Up to 15 kg | Exempted | 70 | 80 | 90 | 100 | 120 |
| | Up to 30 kg | Exempted | 90 | 120 | 140 | 170 | 230 |
| | Up to 50 kg | Exempted | 230 | 350 | 460 | 810 | 920 |
| | More than 50 kg | Exempted | 690 | 1,040 | 1,390 | 2,080 | 2.770 |

Table 11-4 Tariff of storage of carton boxes in Khorramshahr and Bushehr ports ( export, foreign transit and transship)

| Cargo group / Storage duration | | From the 1st day to the 10th day | From the 11th day to the 20th day | From the 21st day to the 30th day | From the 31st day to the 40th day | From the 41st day to the 50th day | After the 50th day |
|---|---|---|---|---|---|---|---|
| Any kind of packaging , cartons , cases (package per day ) | Up to 15 kg | Exempted | 30 | 35 | 40 | 45 | 50 |
| | Up to 30 kg | Exempted | 40 | 50 | 60 | 75 | 100 |
| | Up to 50 kg | Exempted | 100 | 150 | 200 | 350 | 400 |
| | More than 50 kg | Exempted | 300 | 450 | 600 | 900 | 1,200 |

**Explanations on storage :**

1. After expiry of the exempted period . storage charges will be calculated and received from the first day of unloading up to the last day the cargo are in the store .
2. Export cargo are exempted from storage charges for 30 days and after expiry of this period , the storage charges will be calculated and received from the first day of entering .

**Note :** in order to promote the export and provide suitable facilities to support this matter . a secondary exemption of export cargo from storage charges for 15 days ( in addition to the primary 30 days ) will be applied with the observation of the following conditions :

A. The secondary exemption will apply only when the cargo owner has played no roles in the stay . clearance or exit of his cargo from the store and the delay in timely clearance has happened only as a result of performing the customs , standards and quarantine formalities and the events have been attested in writing by pertinent organizations .

B. In cases where the loading conditions and possibility are not prepared in the port ( so that the delivery of the cargo is not possible ) .

C. The execution of the mentioned exemption should be applied immediately after the first storage exemption and the legal conditions on the day of declaration of cargo should be observed in the context of the law .

D. It is obvious that if the storage period exceeds the granted 15-day exemption , the whole storage charges will be calculated and received for the entire period after the clearance document issuance date .

3. The storage charges of cargo like wood and paper will be calculated and received at 1.5 folds and for dangerous cargo listed in the IMDG Code and other flammable cargo at 3 folds of the rates of the first line of the table group number 11 .

**Note :** the storage charges of wood and paper in normal, free and special economic zone northern ports of the country will be calculated and received as equal to the rates contained in the first line of the table group number 11 .

4. The storage charges of the cargo kept in open spaces and in hangar stores of regular areas will be 75% of the storage charges in the closed warehouses.

Table 12 - duties and port charges pertaining to cargo

Index : tons of cargo and rate in Rials

| Cargo / Tariff type | Import | Export | Cabotage | Transit | Transship | Returned |
|---|---|---|---|---|---|---|
| Port duties pertaining to cargo | 50 | 12 | -- | -- | -- | -- |
| Charges of loading or unloading on the wharf | 1,000 | 250 | Origin port : 250 Destination port : 1000 | 1,000 | 1,000 | 1,000 |
| Port health duties | 5 | -- | -- | -- | -- | -- |

**Explanation :**

- Charges of loading on or unloading from wharf of Grains are 18% of the figures of the above table .
- In dedicated wharfs and installations no charges for loading and unloading on the wharf will be acquired , but , port duties for import or export cargo will be calculated and received in accordance with the above table .
- For all non-insured cargo , insurance costs will be calculated and received for each month according to the following formula ( customs affairs law ) .

**CIF value of the good x 0.55 / 1000**

Cargo sent as relief supplies to disaster stricken areas ( caused from unexpected incidents ) which enter Iranian ports are exempted from all dues , duties and port charges ( on the basis of enactment of the session number 1429 dated 14.9.1384 ) .

# Section 3 :
## Dues, duties and port charges pertaining to containers

A. General conditions and definitions
B. THC
C. Storage of containers
D. Accessory services

**General conditions and definitions :**

1. Transship is unloading and transfer of a container from vessel to the container yard of terminal and then , transfer and loading of it to vessel .
2. Internal transship container: is a container that imported from a foreign port and exported to a domestic port.
3- foreign transship container: is a container that imported from a foreign port and exported to another foreign port.
4- Foreign transit container is a container with a content of foreign transit cargo.
5- Terminal operator: is an enterprise to provide services on a port terminal and is responsible for running terminal.

**Container terminal working hours and overtime works :**

Container terminal provides a 24-hour service 363 days in year .

- ❖ The holidays of the ports include Iranian new year day ( Aid-e-Norooz ) , the first day of Farvardin month in solar calendar ( 21st of March ) and 10th of Moharram ( Ashoora ) in lunar calendar , from 18:00 o'clock on the 9th to 18:00 o'clock on the 10th day of Moharram .

- On official holidays including Fridays , for each hour of work of Gang ( including gantry crane , GRTs and tracks ) 60 dollars will be received from shipping lines or the agent of container vessel as overtime demand .

**Table 13**

Rates of loading and unloading of containers (THC) and applicable discounts on the basis of yearly operations volume ( import - foreign transit - transship - export )

In American Dollars per TEU

| Container size | | | Basic rate | Rates from 6001 to 9999 | Rates from 10000 to 14,999 | Rates from 15000 to 19999 | Rates from 20,000 to 39999 | Rates from 40,000 to 59999 | Rates from 60000 to 79999 | Rates from 80.000 upward |
|---|---|---|---|---|---|---|---|---|---|---|
| 20 | Full | Import | 110 | 100 | 90 | 80 | 69 | 66 | 64 | 62 |
| | | Internal transit | 110 | 100 | 90 | 80 | 69 | 66 | 64 | 62 |
| | | Export | 45 | 41 | 37 | 33 | 28 | 27 | 26 | 25 |
| | | foreign transit | 80 | 72 | 66 | 58 | 50 | 48 | 46 | 45 |
| | | Internal Transshipment | 100 | 90 | 82 | 72 | 62 | 60 | 58 | 56 |
| | | Foreign Transshipment | 120 | 108 | 98 | 86 | 75 | 73 | 68 | 65 |
| | | Returned | 94 | 85 | 76 | 68 | 59 | 56 | 54 | 53 |
| | Empty | Incoming /outgoing | 58 | 56 | 52 | 50 | 46 | 42 | 41 | 40 |
| | | Empty transshipment | 84 | 79 | 74 | 68 | 63 | 60 | 55 | 53 |
| 40 | Full | Import | 165 | 149 | 133 | 116 | 99 | 95 | 91 | 88 |
| | | Internal transit | 165 | 149 | 133 | 116 | 99 | 95 | 91 | 88 |
| | | Export | 67/5 | 60 | 54 | 47 | 41 | 39 | 37 | 36 |
| | | foreign transit | 100 | 97 | 90 | 84 | 72 | 69 | 66 | 64 |
| | | Internal Transshipment | 150 | 135 | 121 | 105 | 90 | 86 | 83 | 80 |
| | | Foreign Transshipment | 171 | 154 | 141 | 124 | 107 | 103 | 101 | 95 |
| | | Returned | 140 | 127 | 113 | 99 | 84 | 81 | 77 | 75 |
| | Empty | Incoming /outgoing | 80 | 75 | 68 | 67 | 64 | 60 | 59 | 58 |
| | | Empty transshipment | 110 | 105 | 103 | 99 | 94 | 90 | 87 | 82 |

The rates for transship of both 20 and 40 feet containers include two operations of loading and unloading

**Table 13-1**
THC tariffs of containers in non-container terminals using port equipments at 120 percent of the preliminary table
In American Dollars per TEU

| Container size | | | Basic rate | Rates from 6001 to 9999 | Rates from 10000 to 14,999 | Rates from 15000 to 19999 | Rates from 20,000 to 39999 | Rates from 40,000 to 59999 | Rates from 60000 to 79999 | Rates from 80,000 upward |
|---|---|---|---|---|---|---|---|---|---|---|
| 20 | Full | Import | 132 | 120 | 108 | 96 | 83 | 79 | 77 | 74 |
| | | Internal transit | 132 | 120 | 108 | 96 | 83 | 79 | 77 | 74 |
| | | Export | 54 | 49 | 44 | 40 | 33 | 32 | 31 | 30 |
| | | foreign transit | 96 | 86 | 79 | 70 | 60 | 58 | 55 | 54 |
| | | Internal Transshipment | 120 | 108 | 98 | 86 | 74 | 72 | 70 | 67 |
| | | Foreign Transshipment | 144 | 130 | 118 | 103 | 90 | 88 | 82 | 78 |
| | | Returned | 112 | 102 | 91 | 82 | 71 | 67 | 65 | 64 |
| | Empty | Incoming /outgoing | 70 | 67 | 62 | 59 | 55 | 50 | 49 | 48 |
| | | Empty transshipment | 101 | 95 | 89 | 82 | 76 | 72 | 66 | 64 |
| 40 | Full | Import | 198 | 178 | 160 | 139 | 119 | 114 | 110 | 106 |
| | | Internal transit | 198 | 178 | 160 | 139 | 119 | 114 | 110 | 106 |
| | | Export | 81 | 72 | 65 | 57 | 49 | 46 | 45 | 43 |
| | | foreign transit | 120 | 116 | 108 | 101 | 86 | 83 | 7 | 77 |
| | | Internal Transshipment | 180 | 162 | 145 | 126 | 108 | 103 | 100 | 96 |
| | | Foreign Transshipment | 205 | 185 | 169 | 149 | 128 | 124 | 121 | 114 |
| | | Returned | 168 | 152 | 136 | 119 | 101 | 96 | 92 | 90 |
| | Empty | Incoming /outgoing | 96 | 90 | 82 | 81 | 77 | 72 | 71 | 70 |
| | | Empty transshipment | 132 | 126 | 124 | 119 | 113 | 108 | 104 | 98 |

Table 13-2
THC tariffs of containers in non-container terminals using vessel equipments at 70 percent of the preliminary table
In American Dollars per TEU

| Container size | | | Basic rate | Rates from 6001 to 9999 | Rates from 10000 to 14,999 | Rates from 15000 to 19999 | Rates from 20,000 to 39999 | Rates from 40,000 to 59999 | Rates from 60000 to 79999 | Rates from 80,000 upward |
|---|---|---|---|---|---|---|---|---|---|---|
| 20 | Full | Import | 77 | 70 | 63 | 56 | 48 | 46 | 45 | 43 |
| | | Internal transit | 77 | 70 | 63 | 56 | 48 | 46 | 45 | 43 |
| | | Export | 32 | 29 | 26 | 23 | 20 | 19 | 18 | 18 |
| | | foreign transit | 56 | 50 | 46 | 41 | 35 | 34 | 32 | 32 |
| | | Transshipment | 70 | 63 | 57 | 50 | 43 | 42 | 41 | 39 |
| | | Returned | 84 | 76 | 69 | 60 | 53 | 51 | 48 | 46 |
| | Empty | Incoming /outgoing | 65 | 60 | 53 | 48 | 41 | 39 | 38 | 37 |
| | | Empty transshipment | 41 | 39 | 36 | 35 | 32 | 29 | 28 | 28 |
| 40 | Full | Import | 59 | 55 | 52 | 48 | 44 | 42 | 39 | 37 |
| | | Internal transit | 116 | 104 | 93 | 81 | 69 | 66 | 64 | 62 |
| | | Export | 116 | 104 | 93 | 81 | 69 | 66 | 64 | 62 |
| | | foreign transit | 47 | 42 | 38 | 33 | 28 | 27 | 26 | 25 |
| | | Transshipment | 70 | 68 | 63 | 59 | 50 | 48 | 46 | 45 |
| | | Returned | 105 | 95 | 85 | 74 | 63 | 60 | 58 | 56 |
| | Empty | Incoming /outgoing | 120 | 108 | 99 | 87 | 75 | 72 | 71 | 67 |
| | | Empty transshipment | 98 | 89 | 79 | 69 | 59 | 57 | 54 | 52 |
| | | | 56 | 52 | 48 | 47 | 45 | 42 | 42 | 41 |
| | | | 77 | 74 | 72 | 69 | 66 | 63 | 61 | 57 |

**General explanations , receiving method and granted discounts regarding THC tariffs**

1. Discounts based on performance volume do not cover repositioning of the container on the vessel .
2. Delivery or transfer of the direct delivery containers are performed in the special site of direct delivery of container terminal .
3. Lashing and unlashing refers to all types of quick release or manual lashings .
4. All transship containers in discounts system based on performance volume are only considered one move .
5. All empty containers entering the port through vessels and leaving it through vessels as empty are only considered one move in discounts system based on performance volume .
6. The charges for handling containers unloaded in out of container terminal should be paid by cargo owners on the basis of related tariffs .
7. THC of up to 6000 moves is calculated on the basis of basic rates . The said charges for operations bigger than 6000 moves , will be calculated and received after subtraction of the amount of each column and on the basis of the scope of the related columns ( in a graded manner ) in respect with performance of the shipping line to which the container belongs . In calculation of volume related discounts , only the following containers will be counted :

A. Containers transported to the port directly and by the same shipping line .

B. The leased containers of the container shipping lines have been carried to the port by the lines and it has been recorded in manifests and B/Ls issued by the shipping line .

C. The containers carried to the port by container shipping lines who have also carried containers of two or more container lines to the port and are traveling in that route .

Note 1 of paragraph C : all shipping lines including carrying container , owner of the container or the agent of the owner are obliged to determine the authentic container owner's name loading in the lists sent as EDI to the computer system of Shahid Rajaii container terminal at the time of sending the information of the entrance manifest of the vessels .

Note 2 of paragraph C : in case that the Note 1 of paragraph C is not realized , the THC bills related to containers whose owners' names have not been specified in the sent information of the manifest (EDI) ,will be calculated and claimed from the carrying shipping line on the basis of maximum ( basic ) rates .

Note 3 of paragraph C : statements and bills of THC issued by the container terminal operator of each port will be issued and sent separately to each of the owners or hirers of containers through their related agents in Iran for confirmation and payment of the related charges .

D. The vessels coming from origins other than the Persian gulf and Oman Sea region as roundtrip carrying containers from this region to Iranian ports .

Note 1 : Volume based discounts do not include vessels coming from ports of Persian Gulf and Oman Sea ports ( Dubai , Salaleh , Pakistani ports , ... )

8. No discounts on the THC table will be considered out of the above conditions or under miscellaneous conditions of container entry .
9. Any container shipping line signing a contract with the port committing to perform at least 20,000 moves in a year will enjoy THC discounts on each related column of the table group number 13 .

In this case , the THC calculation and exaction at the discounted rates will be carried out from the first day of the contract year to the last container of the one year period .

At the end of the contract year , if the performance of the shipping line is less than the amount

committed , then , in addition to exaction of the THC at the rate of the table , a difference will be acquired from the shipping line as penalty , whose amount will be calculated from the following formula :
( the amount committed - the amount performed ) x committed THC rate = penalty difference
Note 1: If the shipping line contracted with the private terminal operator, limit of 20000 teu can be avoided.
Note 2: The penalty will be calculated on that base, if the counteract signed with port authority: otherwise it will be depend on items of conteract.
If the shipping line performance exceeds the committed amount in the contract year , the basis for calculation will be the related columns of the table group number 13 .
Note - provision of a written commitment and valid cheque of the company party to the contract instead of bank guarantee will be acceptable in order to ensure the implementation of the contract in case of signing contract with port authority otherwise it will be depend on terminal operator acceptance.

10. The THC charges of the full container will be undertaken by the cargo owners or their legal representatives , but these charges are exacted from shipping lines by the port or its contractor as its agent , just for facilitation of the affairs . And consequently , the shipping line will receive the sailed charges from the cargo owner .

Note : all shipping lines are obliged to receive the same amount paid to the port from the cargo owners , and exaction of any amount exceeding the basic rates of the THC tables from the cargo owners is forbidden .

11. The THC charges of the empty containers will be due to the shipping line .
12. The THC tariffs at the time of unloading will include the following operations as separated by the operation : unloading from vessel (50%) , moving to the yard (20%) , unloading and stowing in the yard (15%) and loading to the cargo owner's means and stowing (15%) and the THC tariffs at the time of loading will consist the following operations as separated by the operation : unloading and stowing in CY (15%) , loading to the carrying means and stowing (15%) , moving to the side of vessel (20%) , and loading to vessel (50%) .
13. The THC charges include lashing and unlashing charges of the container .

**Note :** if the lashing and unlashing operation is other than the THC operations , then the related charges will be calculated and received on the basis of the pertaining tariffs ( table 23 ) .
14. In order to modify some tariffs pertaining to containers in normal, free and special economic zone northern ports of the country, the THC charges are calculated and received in accordance with the transfer tariff and stevedoring tariff as per the following tables .

**Table 14 - Tariff of container cargo' transfer in normal, free and special economic zone northern ports of the country**

**Unit : Rials**

| Cargo type | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| Imported Containers per unit | 181.300 | 126,900 | 226,600 | 158,600 |
| Export and transshipment containers per unit | 72.110 | 103.014 | 57.688 | 82.412 |

**Table 15 - Tariff of container cargo' stevedoring in normal, free and special economic zone northern ports of the country**

Unite: Rails

| | |
|---|---|
| 20 and 40 feet container per ton | 12,800 |
| Export and Transit containers cargo per ton | 5,800 |

**Tables of tariffs of storage of containers according to container type**
**Table 16 - Tariff of storage of internal transit and imported containers**

set/day/Rails

| Storage duration | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| From day 1 to day 10 | Exempted | Exempted | Exempted | Exempted |
| From day 11 to day 30 | 35,200 | 17,600 | 70,400 | 35,200 |
| From day 31 to day 60 | 48,400 | 30,800 | 83.600 | 44,000 |
| From day 61 to day 90 | 61,600 | 35.200 | 96,800 | 52,800 |
| From day 90 onward | 88,000 | 44.000 | 123.200 | 61,600 |

**Table 16-1 - Tariff of storage of foreign transit, export and transshipment containers**

set/day/Rails

| Storage duration | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| From day 1 to day 10 | Exempted | Exempted | Exempted | Exempted |
| From day 11 to day 30 | 16.000 | 8.000 | 32,000 | 16,000 |
| From day 31 to day 60 | 22,000 | 14.000 | 38,000 | 20.000 |
| From day 61 to day 90 | 28.000 | 16,000 | 44,000 | 24,000 |
| From day 90 onward | 40,000 | 20,000 | 56.000 | 28,000 |

Note: only tranship empty containers

**Table 16-2 - Tariff of storage of transship containers in Imam Khomeini and Bandar Abbas ports**

set/day/Rails

| Storage duration | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| From day 1 to day 20 | Exempted | Exempted | Exempted | Exempted |
| From day 21 to day 30 | 16,000 | 8.000 | 32,000 | 16.000 |
| From day 31 to day 60 | 22,000 | 14.000 | 38,000 | 20.000 |
| From day 61 to day 90 | 28.000 | 16,000 | 44.000 | 24,000 |
| From day 90 onward | 40.000 | 20,000 | 56,000 | 28,000 |

*According to the enactment number E_H/315/31107 dated 83.3.12 of the honorable managing board of the organization , the exemption period from storage tariffs of transshipment containers in Imam Khomeini and Shahid Rajaii ports is 20 days .

**Table 16-3 - Tariff of storage of containers of dangerous cargo of all classes except classes 1 and 7**

set/day/Rails

| Storage duration | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| From day 1 to day 10 | Exempted | Exempted | Exempted | Exempted |
| From day 11 to day 30 | 105,600 | 17.600 | 211.200 | 35,200 |
| From day 31 to day 60 | 145.200 | 30.800 | 250.800 | 44,000 |
| From day 61 to day 90 | 184,800 | 35.200 | 290.400 | 52.800 |
| From day 90 onward | 264,000 | 44.000 | 369.600 | 61.600 |

**Table 16-4 - Tariff of storage of non standard containers** set/day/Rails

| Storage duration | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| From day 1 to day 10 | Exempted | Exempted | Exempted | Exempted |
| From day 11 to day 30 | 70.400 | 35,200 | 140,800 | 70.400 |
| From day 31 to day 60 | 96.800 | 61,600 | 167.200 | 88.000 |
| From day 61 to day 90 | 123.200 | 70,400 | 193,600 | 150,600 |
| From day 90 onward | 176.000 | 88,000 | 246.400 | 123,200 |

**Explanations on storage :**

1. Payment of the storage charges of the empty and full containers will be due to the shipping line or its agent .
2. Export cargo are exempted from storage charges for 30 days and after expiry of this period , the storage charges will be calculated and received from the first day of unloading .

**Note 1 :** in order to promote the export and provide suitable facilities to support this matter , a secondary exemption of export cargo from storage charges for 15 days ( in addition to the primary 30 days ) will be applied with observation of the following conditions :

A. The secondary exemption will apply only when the cargo owner has played no roles in the stay , clearance or exit of his cargo from the store and the delay in timely clearance has happened only as a result of performing the customs , standard and quarantine formalities and the instances have been attested in writing by pertinent organizations .

B. In cases where the loading conditions and possibility are not prepared in the port ( so that the delivery of the cargo is not possible ) .

C. The execution of the mentioned exemption should be applied immediately after the first storage exemption and the legal conditions on the day of declaration of cargo should be observed in the context of the law .

D. It is obvious that if the storage period exceeds the granted 15-day exemption , the whole storage charges will be calculated and received for the entire period after the clearance document issuance date .

3. After expiry of the exemption period , the storage charges will be calculated and received for the whole period of stay in the terminal ( from the unloading day up to the last day of stay ) and on the basis of the related column rates .
4. At the discretion of the port and agreement of the customhouse , containers with the stay length of more than 30 days in container terminal which have entered through sea , will be transited administeredly to other customhouses of the country ( Sirjan , Tehran western , Shahriar , Esfahan , ... ) and the remaining storage and other pertaining charges plus handling charges will be received from the cargo owner at the final release and the port's share will be deposited to the incomes account of the port . transportation and storage charges in the destination customhouses will also be incumbent upon the cargo owner .
5. Containers left from license are subject to storage charges which will be received from the cargo owner or his legal representative at the time of issuance of the final bill .
6. Containers transferred to CFS stores for strip operations or assessment , will be subject to full container storage charges until the time of stripping or exiting terminal . In addition , the stripped cargo transferred to CFS will also be subject to storage charges in accordance with the storage tariff table in CFS ( table 20 ) .
7. Any changes in the rates of the above table will be feasible only with the agreement of the port and the contractor and approval of the honorable managing board of the ports and shipping organization .
8. In order to modify some rates pertaining to container in Noshahr port , and free or special economic zones in northern ports storage charges of the containers in the said port will be calculated and received as described below :

**Table 16-5 - Tariff of container storage in normal, free and special economic zone northern ports of the country**

set/day/Rails

| Storage duration | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| From day 1 to day 10 | Exempted | Exempted | Exempted | Exempted |
| From day 11 to day 30 | 9,630 | 4.820 | 19.260 | 9,630 |
| From day 31 to day 60 | 12,470 | 6.230 | 24.930 | 12,470 |
| From day 61 to day 90 | 13,600 | 6.800 | 27.200 | 13,600 |
| From day 90 onward | 15,860 | 7,930 | 31.730 | 15,860 |

**Table 16-5 -1 Tariff of export and transit container storage in normal, free and special economic zone northern ports of the country**

set/day/Rails

| Storage duration | 20 feet | | 40 feet | |
|---|---|---|---|---|
| | Full | Empty | Full | Empty |
| From day 1 to day 10 | Exempted | Exempted | Exempted | Exempted |
| From day 11 to day 30 | 4,378 | 2,189 | 8,756 | 4,378 |
| From day 31 to day 60 | 5,666 | 2.833 | 11.333 | 5.666 |
| From day 61 to day 90 | 6,181 | 3,090 | 12.362 | 6.181 |
| From day 90 onward | 7,112 | 3.606 | 14,432 | 7,212 |

Note: With reference to paragraph number 1.2 Explanations on storage page no:42

**Table 16-6 Tariff of import container storage in Bushehr Special Economic Zone port**

set/day/Rails

| Storage duration | 20 feet | 40 feet |
|---|---|---|
| From day 1 to day 30 | 18,130 | 31,728 |
| From day 31 to day 60 | 15,864 | 27.196 |
| From day 61 to day 120 | 13,598 | 24.930 |
| From day 121 onward | 15,864 | 19,264 |

**3. Containers carrying dangerous cargo :**

- The rates of the table 13 (THC) for import or export containers carrying dangerous cargo will be calculated and received at 50% higher and for transit and transship containers carrying dangerous cargo at 20% higher .
- For containers carrying dangerous cargo, whose statements of being dangerous are not submitted to the Shahid Rajaee port 6 hours and for other ports 24 hours before delivering the container or wrongly stated or their stowing of the contents are not in accordance with stowing or packing bases, 400 dollars for each unit of 20 feet container and 800 dollars for each 40 feet container will be received from the shipping line in addition to the total amount of THC .

It is obvious that all charges of inspection . laboratory , environmental and port sites cleaning , service equipments and tools , relief , safety and security used in this regard in addition to other related charges will be acquired from the shipping line or its agent .

Consignments of dangerous (class 1) and radioactive (class 7) in IMDG Code classification should get out of the port as direct delivery and other containers carrying dangerous cargo (specially of classes 3 and 5) are also permitted to stay in the port only for 48 to 72 hours at the discretion of the port and have to leave the port thereafter , and in case of not doing so , the port will take steps to transfer such cargo to other places and all pertaining charges will be borne by the cargo owner .

**4. Handling of container on the vessel**

**Table 17 - Tariff of repositioning of container on the vessel**

Per each unit

| No | Description of the operations in repositioning containers | Amount in dollars |
|---|---|---|
| 1 | Repositioning of container from hold to hold (bay to bay) or changing the situation of container inside the hold without using wharf | 33 |
| 2 | Repositioning of container from a hold to another hold (bay to bay) or changing the situation of container inside the hold with using wharf | 55 |
| 3 | Opening of each hatch cover and putting it over another hatch cover and closing the hatch cover again | 55 |
| 4 | Opening of each hatch cover and putting it over the wharf and closing the hatch cover again | 110 |
| 5 | Repositioning of the stock box on the basis of each repositioning stage | 33 |

**5. Container terminal operations**

**Table 18**

Per each unit

| No | | Description of the operations in container terminals | Amount in Rails |
|---|---|---|---|
| 20 feet container | Full | Each move of loading or unloading of container or each move of transfer in container terminal | 33,000 |
| | Empty | Each move of loading or unloading of container or each move of transfer in container terminal | 77,000 |
| 40 feet container | Full | Each move of loading or unloading of container or each move of transfer in container terminal | 55,000 |
| | Empty | Each move of loading or unloading of container or each move of transfer in container terminal | 100,000 |

**6. Exploitation of special equipments :**
- For exploitation of wire , chain and other similar extra devices for repositioning , loading or unloading of a container 55 dollars extra to the THC tariffs will be charged .

**7. Heavy weight containers :**
For loading and unloading or repositioning of such containers only allowed and special equipments of the port will be used and all changes will be received in accordance with the functioning hours of the special equipments and on the basis of the mutually agreed tariffs .

**8. Stripping of containers :**

- Charges of the complete stripping of a 20feet FCL container will be 880,000 Rials and 40feet container 1,100,000 Rials which will be done on request of the cargo owner and will also be incumbent on the cargo owner.
- Charges of the complete stripping of a 20 feet LCL container will be 110 Dollars and 40 feet container 132 Dollars which will be done after the container enters the operations terminal site and its payment is incumbent upon the shipping line or its agent .

**Note :** if the shared ownership of LCL containers is not stated before entry of the vessel , 132 dollars for 20feet container and 165 dollars for 40feet container will be acquired from the shipping line or its agent .

- For provision of extra services and operations in stripping of containers into a wagon , an extra amount of 77,000 Rials for 20feet container and 99,000 Rials for 40feet container will be exacted by the contractor of the port in addition to the container stripping charges .
- Charges of stripping a part of the container space will be determined as follow :

**Tariff of stripping of containers on the basis of the cargo volume**
**Table 19**

| Container size | Cargo volume | Amount in Rails |
|---|---|---|
| 20feet container | Up to 3 cubic meters | 220,000 |
| | Up to 10 cubic meters | 310,000 |
| | Over 10 cubic meters | 440,000 |
| 40feet container | Up to 3 cubic meters | 220,000 |
| | Up to 10 cubic meters | 310.000 |
| | Up to 15 cubic meters | 440.000 |
| | Over 15 cubic meters | 660,000 |

**9. CFS storage including :**
Table of charges of keeping cargo in CFS of unloaded cargo from shared containers (LCL) in container terminal ( in tons per day )

**Tariff of cargo storage in CFS**

**Table 20**

Unit : ton / day / Rails

| Storage period | From unloading date up to 10 days | From 11 to 30 days | From 31 to 45 days | From 46 to 60 days | From 61 to 75 days | From 76 to 90 days | From 91 days onward |
|---|---|---|---|---|---|---|---|
| Import | Exempted | 2,970 | 4,400 | 6,600 | 8.800 | 13.200 | 17.600 |
| Foreign transit and transship | Exempted * | 1,350 | 2.000 | 3,000 | 4,000 | 6.000 | 8,000 |
| Export | Exempted | Exempted | 2,000 | 3.000 | 4,000 | 6,000 | 8.000 |

*transsphipment cargo exemption period is 20 days

- After expiry of the exemption period , the storage charges will be calculated and received on the basis of the whole period of stay in the terminal ( from the unloading day up to the last day of stay ) and on the basis of the related column rates .

**10. Loading and unloading of cars in/out of container :**

**Table 21**

| | |
|---|---|
| Loading and unloading of cars in/out of container | 265,000 Rials |
| lashing of cars in the container | 615,000 Rials |

**Table 22**

**11. Monitoring and services of refer containers**

For monitoring and services of refer containers . the following charges will be received in addition to the THC and related storage charges .

| | | |
|---|---|---|
| Refer 20 feet container in the yard | 88.000 Rials | Every 24 hours |
| Refer 40 feet container in the yard | 132,000 Rials | Every 24 hours |

- These services include plugging and unplugging and temperature control too .
- Container terminal will not be held liable for any technical and repairing problems of refer containers and will only report the situation to the shipping line or its agent .
- The plugging and unplugging services for refer containers on vessel board will be done at the requests and needs and will cost 22 dollars for each container .
- The repositioning changes of the refer containers stripped into special storage areas will be due to the container terminal operator of the ports .

**Accessory services**

**Table 23**

| No | Description | Amount |
|---|---|---|
| 12 | **Crane standby :** After 30 minutes standby , for each hour or a portion of an hour of gantry crane | 220 Dollars |
| 13 | **Label :** Removing label from container | 44.000 Rails |
| | Sticking label to container | 44.000 Rails |
| 14 | **Flat rocking of the container ( per wall )** | 44,000 Rails |
| 15 | **Tarpaulin covering of open top containers :** 20feet container | 90,000 Rails |
| | 40feet container | 135.000 Rails |
| 16 | **Administrative and current changes :** Changing the container's status from import to transship and vice versa | 90,000 Rails |
| | Changing the destination port of container delivered to CY | 135.000 Rails |
| | Container loaded on trailer for being loaded to vessel , but brought back to CY at the request of the shipping agency | 33 Dollars |
| | Issuing of manifest for each unit of container | 4,400 Rails |
| | Issuing of interchange between lines | 132.000 Rails |
| | Amendment or attachment of data at the request of the agency or cargo owner , per unit | 26,400 Rails |
| | Manual data entry of the loading list , per unit of container | 4.400 Rails |
| | Preparing and issuing of the final stowing plan ( bay plan ) , per unit of container | 4,400 Rails |
| | Correcting and changing of position of the container when the container door orientation is not correct | 11 Dollars |
| | Container delivered to port without statement of destination | 132.000 Rails |
| 17 | **Plumbing charges ( in sealing and unsealing ) :** For each number of seal used | 17,500 Rails |
| 18 | **Time renting of equipments :** Each hour of gantry crane | 297 Dollar |
| 19 | **Lashing and unlashing charges ( in operations other than THC ) :** Per unit of container | 1 Dollar |

# Attachment :

# Other tariffs

**Charges receivable from ships and vessels for quarantine services expenses**

From all ships and vessels entering Islamic Republic of Iran's territorial waters from foreign ports and stay in Iranian berths and ports are charged some amounts as "quarantine service charges" for each marine trip on the basis of the following table which are deposited in the account of ministry of health , treatment and medical education .

**Table 24**
A. cargo and passenger vessel

| No | Gross capacity of vessel | Quarantine service charges |
|---|---|---|
| 1 | Up to 500 tons | Exempted |
| 2 | From 501 to 1000 tons | Each unit 26/4 Dollars |
| 3 | From 1001 to 2500 tons | Each unit 34/1 Dollars |
| 4 | From 2501 to 4000 tons | Each unit 41/8 Dollars |
| 5 | From 4001 to 5000 tons | Each unit 45/1 Dollars |
| 6 | From 5001 to 7000 tons | Each unit 49/5 Dollars |
| 7 | From 7001 to 10000 tons | Each unit 52/8 Dollars |
| 8 | From 10001 to 20000 tons | Each unit 57/2 Dollars |
| 9 | From 20001 to 30000 tons | Each unit 60/5 Dollars |
| 10 | From 30001 tons upward | Each unit 64/9 Dollars |

( Enactment of the board of ministers under number 37954 dated 16.6.1379 )

**Table 25**
B. Oil Tankers

| No | Gross capacity of vessel | Quarantine service charges |
|---|---|---|
| 1 | Up to 5000 tons | Each unit 26/4 Dollars |
| 2 | From 5001 to 15000 tons | Each unit 31/9 Dollars |
| 3 | From 15001 to 25000 tons | Each unit 37/4 Dollars |
| 4 | From 25001 to 35000 tons | Each unit 41/8 Dollars |
| 5 | From 35001 to 45000 tons | Each unit 45/1 Dollars |
| 6 | From 45001 to 55000 tons | Each unit 49/5 Dollars |
| 7 | From 55001 to 65000 tons | Each unit 52/8 Dollars |
| 8 | From 65001 to 75000 tons | Each unit 57/2 Dollars |
| 9 | From 75001 to 100000 tons | Each unit 60/5 Dollars |
| 10 | From 100001 to 150000 tons | Each unit 64/9 Dollars |
| 11 | From 150001 to 250000 tons | Each unit 68/2 Dollars |
| 12 | From 250001 tons upward | Each unit 72/6 Dollars |

C. In addition to the amounts mentioned for health care measures , some amounts are also acquired as charges of rodent removal and issuing international certificates from vessels lacking credible certificates according to their registered net weights as described below :

**Table 26**

| No | Registered net weight of vessel | Charges of rodent removal and issuing international certificates |
|---|---|---|
| 1 | Up to 100 tons | Exempted |
| 2 | From 101 to 1500 tons | Each unit 113/3 Dollars |
| 3 | From 1501 to 2500 tons | Each unit 189/2 Dollars |
| 4 | From 2501 to 3500 tons | Each unit 211/2 Dollars |
| 5 | From 3501 to 4500 tons | Each unit 284/9 Dollars |
| 6 | From 4501 to 5500 tons | Each unit 322/3 Dollars |
| 7 | From 5501 to 6500 tons | Each unit 379/5 Dollars |
| 8 | From 6501 to 7500 tons | Each unit 455/4 Dollars |
| 9 | From 7501 to 8500 tons | Each unit 492/8 Dollars |
| 10 | From 8501 tons upward | Each unit 531/3 Dollars |

**Explanation :**
Costs of the amounts of poisons used will be calculated and added to the above amounts with respect to the temporal values .

**Tariff of communication charges**

**Table 27**
A. Land line charges (LL)

| From Iran to | Charges in Gold Franc | | |
|---|---|---|---|
| | Each word of telegram | Telephone per minute | Telex per minute |
| **Islamic Republic of Iran** | | | |
| Coastal station region | 0.00 | 0.00 | 0.00 |
| Others regions | 0.20 | 1.00 | 0.60 |
| **Europe** | | | |
| Turkey | 1.30 | 6.00 | 3.70 |
| Other countries | 1.50 | 6.30 | 4.40 |
| **Africa** | | | |
| Algeria , Egypt , Morocco , Tunisia | 1.50 | 4.50 | 4.40 |
| Other countries | 1.60 | 8.60 | 5.80 |
| **Asia** | | | |
| Pakistan | 0.30 | 2.80 | 1.58 |
| Iraq , Bahrain , Kuwait , Oman , Qatar | 0.35 | 2.90 | 2.90 |
| UAE , Bangladesh , Cypress , Yemen , Saudi Arabia , Syria , Lebanon | 0.37 | 4.00 | 4.40 |
| Japan , Hong Kong , Indonesia , Korea , Malaysia , China , Maldives , Singapore , Sri Lanka , Thailand , Philippines , Taiwan | 0.40 | 7.50 | 5.90 |
| Australia and Oceania | 1.30 | 10.00 | 5.90 |
| America | 1.00 | 5.00 | 4.40 |

**Table 28**
B. Coast station charges (CC)

| | Charges in Gold Franc | | |
|---|---|---|---|
| | Each word of telegram | Telephone per minute | Telex per minute |
| **Telegrams** | 1.00 | | |
| **Telephone contacts ( minimum 3 minutes )**<br>VHF<br>MF<br>HF | | <br><br>2.00<br>2.34<br>2.34 | |
| **Radio telex contacts ( minimum 3 minutes )** | | | 3.00 |

**Explanations :**
Vessel to coast radio charges calculations :

**A. Coast station charges (CC)**

If the vessel asks for a radiotelephone communication or sending a radio telegram or radio telex to the port's operation district and the city where the radio station is located , the basis for calculations will be only the CC amount .

**B. Land line charges (LL)**

If the vessel asks for a radiotelephone communication or sending a radio telegram or radio telex to other parts of Iran or out of country from the coastal station , the basis for calculations will be only the sum of CC and LL amounts .

**Note 1 :**

All messages of vessel to the HARBOR , QUARANTINE , PORT CONTROL , PORT HEALTH , and MASTER addresses through VHF - telegram or radio telex will be allowable .
Radio charges from coast to vessel for all telephone communications , sending telegrams or radio telex from coast to vessel will include only LL charges .

**Note 2 :**

1. In order to persuade Iranian vessels to use coastal stations of the country , all radio communications ( vessel to port and port to vessel ) including radiotelephone , telegram and radio telex will be calculated at 50% discounted rates .

Clarifying that for the communication requests of Iranian vessels through coastal stations to outside the country , the basis of calculations will be the tariff and such communications will not be subject to the 50% discount .

2. On the day of victory of Islamic revolution ( February 11 ) , first of Farvardin ( Iranian new year day = March 21 ) , and religious feasts of Qorban , Qadir and Fitr , 5 days in total , providing radio services to Iranian vessels on HF band will be free of charge .
3. Provision of medical services to all vessels through contact of the vessel with a physician on the coast , having contract with the organization , is also free .
4. In order to encourage and persuade foreign vessels to contact marine communication stations of Iranian ports , for all radiotelephone services between 22 o'clock and 4 o'clock

in the morning of next day of the 25th of December only land line charges (LL) will be calculated .

**Note 3** -

1. Radiotelephone : minimum time calculated will be 3 minutes including 1 minute of operator's charge .
2. Radio telex : minimum time calculated will be 3 minutes including 1 minute of operator's charge .
3. Minimum amount for regular telegram will be 7 words . and it will be calculated at two folds if it is urgent .
4. Minimum amount for telegram received as SLT will be 22 words .
5. All figures listed on the related tables are in GOLDEN FRANC .
6. The exchange rate being used for calculations of each month will be the formal exchange rate of Dollar against Rial on the last day of the previous month .

*C. Provision of navigation safety ( Navtex ) services including broadcasting of meteorological messages , seafaring warnings , primary emergency messages and navigation signs are free of charge .*

**Tariffs of diving operations charges**

**Table 29**

Tariffs of diving operations charges are as per the following table

| No | Operation type | Depth in feet | Rate for man-hour |
|---|---|---|---|
| 1 | Underwater inspection and search operation | 0 to 60<br>60 to 120<br>120 upward | 9,000 Rails<br>13,500 Rails<br>18.000 Rails |
| 2 | Recovering and floatation operation | 0 to 60<br>60 to 120<br>120 upward | 12,000 Rails<br>18.000 Rails<br>24.000 Rails |
| 3 | Underwater technical operation like welding , cutting , scraping , dredging , underwater washing , taking pictures or video , repairing and so on . | 0 to 60<br>60 to 120<br>120 upward | 15,000 Rails<br>22,500 Rails<br>30.000 Rails |
| 4 | Destruction , explosions and detonation operations | 0 to 60<br>60 to 120<br>120 upward | 20.000 Rails<br>30,000 Rails<br>40.000 Rails |

(enactment of the high commission of the ports and shipping organization under number 1/8861 dated 16.10.74)

**Method of calculation of diving operations charges**

A. Diving operations charges are equal to multiplication of the hours of work by the number of people participated in the operation by the amount stipulated on the above table .

B. Charge of tugboat or vessel is equal to the working hours multiplied by the rate of hourly rental of the unit used .

C. 50% of the charges of the paragraph A will be added to the sum of charges as amortization of the equipments , consumed materials and mission charges of personnel involved in diving operation .
D. Charges of accommodation of the diving personnel in missions not using tugboats of the port will be borne by the applicant .

**Tariff of charges of collecting and cleaning of oil materials per hour**

**Table 30**

For each hour

| No | Equipment needed | Number | Iranian vessels | Foreign vessels |
|---|---|---|---|---|
| 1 | Tugboat | 1 unit | In accordance with tariff | |
| 2 | Boat | 1 unit | In accordance with tariff | |
| 3 | 500 ton barge without engine | 1 unit | In accordance with tariff | |
| 4 | Oil patches harnessing boom | For each 20 meters | Rails 480,000 | Dollars 300 |
| 5 | Skimmer | Up to capacity of 20 cubic meters per hour | 400,000 | 250 |
| 6 | Skimmer | From capacity of 21 to 50 cubic meters per hour | 640,000 | 400 |
| 7 | Chemical cleaning materials | For each liter | 80.000 | 50 |
| 8 | Separator exploitation | Per cubic meter of collected materials | 80,000 | 50 |
| 9 | Port institutions washing device | Not including Chemical cleaning materials | 240.000 | 150 |
| 10 | Wages of technicians and casual workers | Each man-hour | 80,000 | 50 |
| 11 | Expert consultancy charges | Each man-hour | 340,000 | 150 |

**( enactment of the high commission of the ports and shipping organization under number 1/8861 dated 16.10.74 )**

**Note** - if the pollution place is located in a distance farther than 17 nautical miles , then , 30% is added to the rates of the equipments .

**Tariff of registry duties of a vessel ***

Article 13 - registry duties and other duties applicable to registration of title documents of a vessel are as follow :

**Table 31**
A. Registry duties tariff

| No | Gross registered capacity of vessel | Registry duties tariff in Rails |
|---|---|---|
| 1 | Under 500 tons | Each unit 30,000 |
| 2 | From 501 to 1000 tons | Each unit 40,000 |
| 3 | From 1001 to 1500 tons | Each unit 50,000 |
| 4 | From 1501 to 2000 tons | Each unit 70,000 |
| 5 | From 2001 to 2500 tons | Each unit 90,000 |
| 6 | From 2501 to 3000 tons | Each unit 110,000 |
| 7 | From 3001 to 40000 tons | Each unit 130,000 |
| 8 | From 4001 to 5000 tons | Each unit150,000 |
| 9 | From 5001 to 6000 tons | Each unit 170,000 |
| 10 | From 6001 to 7000 tons | Each unit 190.000 |
| 11 | From 7001 to 8000 tons | Each unit 210,000 |
| 12 | From 8001 to 9000 tons | Each unit 230,000 |
| 13 | From 9001 to 10000 tons | Each unit 250,000 |
| 14 | From 10001 tons upward | Each unit 300,000 |

B. Renewal registry duties of vessels will be on the basis of 50% of the registry duties listed in the article A above .
C. Charges of registration of changes in certificates are 5000 Rials per change in specifications or characteristics of the vessel or its components .
D. Charges of issuing duplicate certificate for registration of a vessel will be 30% of the registry duties of the same vessel .
*( articles extracted from the marine law of Iran approved by common commission of the parliament on 29.6.1342 )

## Registry duties of transactions on ships and vessels

**Table 32**

Registry duties of all transactions related to ships and vessels (including mortgage or else)

| No | Net registered capacity | Registry duties |
|---|---|---|
| 1 | Under 500 tons | 30,000 Rials |
| 2 | From 501 to 1000 tons | 50,000 Rials |
| 3 | From 1001 to 5000 tons | 100,000 Rials |
| 4 | From 5001 to 10000 tons | 150,000 Rials |
| 5 | From 10001 tons upward | 250,000 Rials |

**Table 33 Note of protest**

Vessels carrying Iranian flag

| No | Registered gross capacity | Amount payable |
|---|---|---|
| 1 | Up to 10000 tons | 30,000 Rials |
| 2 | Over 10000 tons | 50,000 Rials |

**Table 34 Vessels carrying foreign flag**

| No | Registered gross capacity | Amount payable |
|---|---|---|
| 1 | Up to 10000 tons | 300 Dollars |
| 2 | Over 10000 tons | 500 Dollars |

**Table 35**

Table of calculation of expenses for provision of re-inspection services for vessels carrying foreign flag

| Vessel capacity | Re-inspection service provision charges in working hours |
|---|---|
| Gross capacity of less than 500 GT | 80 Dollars |
| Gross capacity of 500 GT to 1000 GT | 120 Dollars |
| Gross capacity of 1001 GT to 3000 GT | 200 Dollars |
| Gross capacity of 3000 GT to 4000 GT | 400 Dollars |
| Gross capacity of over 40000 GT | 600 Dollars |
| In case of provision of inspection out of working hours and on holidays, the amount of 50 dollars will be added to the charges of above table. | |

**(Enactment of the session number 1470 of the managing board dated 1385.8.15)**

**EXHIBIT "G"**



Special Economic Zone
AmirAbad
of
Port
AMIRABAD PORT

> Home > SiteMap > Contact Us > Feed back > Search

Menue > Tariff

Language
فارسی
English
Menu
Introduction
Statistics
Facilities
Development infrastructures
Tariff
Special Economic Zone
Links

|< < 1 > >| / 8

Tariff

## Tariff

:: Tariff & Dues on ships

:: Tug boat tariff on ships in the Northern Port

:: Non-Container Tariff of Loading & Discharging cargo

:: Discharging & Charging of Bulk and General Cargoes

:: Container tariff of charging & Discharging

:: Non-Container Cargo tariff of warehouses

:: Container warehouses tariff

Tariff of Port dues on ships

«in the Northern port»

## Tariff of Port dues on ships and vessels

## (Iranian and Foreign)

| Row | Tittle of tariff | Calculation unit | Charges |
|---|---|---|---|
| 1 | Entrance to the Port mouth | Per ton GRT | 6 cents |
| 2 | Entrance to the Port | Per ton GRT | 10 cents |
| 3 | Dredging | Per ton GRT | 41 cents |
| 4 | Pilotage for one operation | Per ton GRT | 40 cents |
| 5 | Lighthous | Per ton GRT | 4 cents |
| 6 | Loading & unloading<br>Berth<br>Anchorage | Per ton cargo<br>Per ton cargo | 22 cents<br>11 cents |
| 7 | Wharfage | Per ton GRT in an hour | 45 cents |
| 8 | Garbage Collection ships with 5000 GRT for 7 days | | 125 Dollar |
| | | | Non-office 10% |

EXHIBIT G

| 9 | Tariff of row 4,6 overtimes increase by this field | | Fridays and Holidays 20% |
|---|---|---|---|
| *Tariff of 6 & 4 row in overtime work 40 percent and in Holidays 20 percent will be increased. | | | |

(( NOTES )) :

1- Per ton GRT is the amount of GRT registered on International Certificate tonnage of ship.

2- Pilotage tariff includes : Directing , Mooring , unmooring , Berthing and unberthing of ship.

3- Charges of shifting by using a pilot is 7 cent/GRT and by using a Vessel rope is 3 Cent/GRT.

4- Tugboat charges for berthing and unberthing will be offered according to the next chart pages.

5- Ships with Transit and Export cargo will be offered 75 percent discount on mentioned rows.

6- Calculating and receiving charges for Foreign ships.

Tugboat tariff for each operation of

Berthing & Unberthing ship according to approved laws by PSO Board of Directors

| Row | Tonnage | Iranian Ship | Foreign Ship |
|---|---|---|---|
| 1 | To 1500 GT | 50 Dollar | 300 Dollar |
| 2 | 1501-5000 GT | 100 Dollar | 800 Dollar |
| 3 | 5001-10000 GT | 150 Dollar | 1500 Dollar |
| 4 | 10001-15000 GT | 200 Dollar | 2200 Dollar |
| 5 | 15001-20000 GT | 250 Dollar | 2900 Dollar |
| 6 | 20001-25000 GT | 300 Dollar | 3600 Dollar |
| 7 | 25001-Upper | 400 Dollar | 4500 Dollar |

(( NOTES )) :

1- Type, Number and Time of using Tug boats for berthing and unberthing aren't included in above-mentioned tariff.

2- Tug Boat charges for other operation than Berthing / Unberthing , will be collected according to its current Tariff.

3- If the Tug boat is not used during the pilotage for berthing / unberthing operation, however all the charges will be collected according to the above- mentioned table.

4- The Tug boat and pilotage operation will be done according to the common rules but if during directing , berthing and unberthing , the pilot and tug boat are not used, charges won't be collected.

5- For carring pilot to ship nothing will be collected.

6- Calculation for Foreign ships is dollar.

Tariff for Non-container loading and disloading

in Amirabad Port S.E.Z for per ton of cargo

| Row | Discription | Cargo | Import | Export | Transit | Note |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Light Cargo | General:palet-carton-Balecloth-disjointed parts of mechanical devices ,... | 19038 | 8241 | 8241 | Rials |
| | | Iron stuff : Roles-sheets-ingot-Bar-Angle-Angleiron,... | 11900 | 5151 | 5151 | Rials |
| | | Bag : Rice – Suger – Chemical material,... | 23799 | 10302 | 10302 | Rials |
| | | Dry bulk : Wheat-Barely-Corn-Rawsuger-seed-remains of squeezed seed-chemical fertilizer-sulphur-Kalinger-coalAluminumpowder gatch-sand, gravel, ... | 11900 | 5151 | 5151 | Rials |
| 2 | Semi-heavy cargoes Over 5 Ton-15 Ton | All cargoes | 35695 | 15452 | 15452 | Rials |
| 3 | Heavy cargoes 15 ton to 50 ton | All cargoes | 71390 | 30905 | 30905 | Rials |
| 4 | Dangerous Goods | | 59492 | 25754 | 25754 | Rials |
| 5 | Car for each set | | 190371 | 82411 | 82411 | Rials |
| 6 | Mini-bus for each set | | 285555 | 123617 | 123617 | Rials |
| 7 | Truck and Bus for each set | | 345045 | 149370 | 149370 | Rials |

(( NOTES )) :

1- All exemption (Export & Transit) are in respect of PSO, letter's N: 5873 dated on 4th Azar 82 (25/11/2003)

2- Cargoes which are shipped in direct way 40 percent of above-mentioned charges will be collected.

3- Calculating charges for handling cargoes over 50 ton and Non-Paletized will be determined by the aaaport manager and informed to port terminal.

4- In calculation a ton deduction,is assinged a ton.

5- Calculating charges for handling vehicles over 5 ton and chain-wheel will be determined by the Port manager.

6- Handling dry bulk for wheat is 1907 Rials and direct way shippment of wheat with 40% tarrif is 763 Rials.

Tarrif on counting/ handling for General And Bulk cargoes in Amirabad Port

S.E.Z for each Ton

(Tranship, Transit, Export, Import)

| Row | Cargo | Import | Export | Transit | Tranship | Notes |
|---|---|---|---|---|---|---|
| 1 | General | 27720 | 12000 | 12000 | 12000 | Rials |
| 2 | Iron | 23100 | 10000 | 10000 | 10000 | |
| | | | | | | |

| 3 | Bag | 46200 | 20000 | 20000 | 20000 | |
|---|---|---|---|---|---|---|
| 4 | Dry Bulk | 11550 | 5000 | 5000 | 5000 | |
| 5 | Animal(each Cattle) | 4200 | 2000 | 2000 | 2000 | |
| 6 | Fridge-Freezed Cargoes | 55440 | 24000 | 24000 | 24000 | |
| 7 | Scrap Cargo | 55440 | 24000 | 24000 | 24000 | |
| 8 | Dangrous Cargo | 92400 | 40000 | 40000 | 40000 | |
| 9 | Car for each set | 92400 | 40000 | 40000 | 40000 | |
| 10 | Mini-bus for each set | 184800 | 80000 | 80000 | 80000 | |
| 11 | Truck & Bus for each set | 277200 | 120000 | 120000 | 120000 | |

(( NOTES )) :

1- Tariff on counting / Handling above- mentioned table in Amirabad S.E.Z are in respect of PSO , letter's N: 1/31712 dated on 15 shahrivar 1383 (5/9/2004)

2- Counting / Handling in disloading includes: shifting cargoes in hole, cargoes movement from ship to vehicles/ jetty, cargoes arrangment on vehicles/cjetty which their tariff are orderly 25% , 50% and 25% for each operation.

3- Counting / Handling in loading includes: loading cargoes from vehicles on jetty , movement of cargoes from vehicles/ jetty to ships, Cargoes arrangment in hole , which their tariff are orderly 25% , 50% and 25% for each operation.

4- Tariff on Counting / Handling for cargoes over 50 ton in each bundle, 50% will increase, that is 1/5 as much of above-mentioned table will be collected.

5- In calculation a Ton deduction is assigned a Ton.

Tariff on Containers loading / disloading

in Amirabad Port S.E.Z

(Transit, Export, Import)

| Row | Description | Container 20 feet | Container 40 feet | Note |
|---|---|---|---|---|
| 1 | Container discharging from ship and carriage andArrangment to port and container Terminal or vice versa | 164824 | 206031 | Rials |
| 2 | Container carriage from container terminal for loading on wagons in container terminal or vice versa | 164824 | 206031 | |
| 3 | Cintainer loading on trucks in container | 41208 | 61811 | |

| | | | | |
|---|---|---|---|---|
| | terminal area or vice versa | | | |
| 4 | Container Transportation in every place by the request of the customer | 41208 | 61811 | |
| 5 | Container Transportation from port Container Termined to assasment area or CFS warehouse and vice versa. | 164824 | 206031 | |
| 6 | Discharging from joint containers and arranging in CFS warehouse or vice versa for each ton | 41208 | 61811 | |
| 7 | Discharging from Container and then loading to vehicles or vice versa for each ton | 41208 | 61811 | |

(( NOTES )) :

1- 50 Percent discount will be granted to the charges of loading and disloading to export and Transit Container according to PSO letter's No:1/45873 dated on 4th Azar 1382 (25/11/2003)

2- on above-mentioned tariff for empty Container 30% percent discount will be granted.

3- For Non-standard Container 50% percent extra expense will be added to the above-mentioned tariff.

4- 100 percent expense will be added to the row 6,7 if the cargoes are non-paletized.

5- The calculating. of power consuming by Fridge Container at 24 hour will be collected on the basis of approved rate.

6- For calculation expenses, a ton deduction is assigned a ton.

7- 40 percent of handling cargo of above mentioned expenses will be collected from the cargoes and containersjjwhich are carried in direct way.

8- Every extra services for above-mentioned table or other will be determined by the port manager.

Tariff on warehouse for Non-container

Cargoes in Amirabad port S.E.Z For per ton cargo/set

(Transit, Export, Import)

| Wharfage/Cargo Description | first day of discharging untile 30 days | From 30 days to 60 days | From 61th day to 120 days | From 120th day and over |
|---|---|---|---|---|
| General cargoes for per ton a day | 1428 Rials | 1192 Rials | 1073 Rials | 954 Rials |
| Dangerous goods for per ton a day | 2380 Rials | 2142 Rials | 1904 Rials | 1666 Rials |
| Semi-Heavy, Heavy,light | | | | |

| vehicles and etc... for each set a day | 23798 Rials | 21714 Rials | 19037 Rials | 16658 Rials |
|---|---|---|---|---|

(( NOTES )) :

1- 50 percent discount will be granted to the warehouse expenses for export & Transit according to PSO letter's N:1/45873 dated on 4th Azar 1382 (25/11/2003)

2- warehouse expense for closed warehouse 100% , Hangar 80% and for opened warehouse 60% will be collected on the basis of above-mentioned table.

3- Warehouse expense for Export cargoes (Non-container) until 30 days from the first date of discharging is exempted and after that expense will be collected from the first day of discharging.

3-1- whereas the condition and facilities of loading cargoes are impossible with proved documents and port viewpoint second tax exemption for 15 days more than first 30 days will be granted according to the P.S.O Board of Directors council No: 1362 dated on 6th Bahman 82 (26/1/2004)

4- 10 days tax exemption will be offered for warehouse expense of transit goods (Non-container).

5- In calculation a Ton deduction is assigned a Ton.

Container warehouses Tariff in

Amirabad Port S.E.Z

for each set/day (Transit, Export, Import)

| Cargo description | From the first day of discharging untile 30 days | From 30 days to 60 days | From 61th day to 120 days | From 120th day and over |
|---|---|---|---|---|
| Container 20 feet each set/day | 16482 Rials | 14422 Rials | 12362 Rials | 14422 Rials |
| Container 40 feet each set/day | 28844 Rials | 24724 Rials | 22664 Rials | 17513 Rials |

(( NOTES )) :

1- 50 percent discount will be granted to the charges of warehouse (export/Transit) according to P.S.O letter's No: 1/45873 dated on 4th Azar 1382 (25/11/2003)

2- warehouses expense for closed warehouse 100% in Hangar 80% and in opened 60% will be collected according to above-mentioned table.

3- Exemption will be granted to the full export container for 30 days and of warehouse expense after that (30 days exemption) the expenses wil lbe collected from the first day of discharging.

3-1- Whereas the condition and facilities of loading export cargoes are impossible with proved documents and port viewpoint second tax exemption for 15 days more than first 30 days will be granted according to P.S.O Board of Directores council No: 1362 dated on 6th Bahman 82(26/1/2004)

4- Ten/10 days exemption of warehouse expense for Foreign Transit cargoes is granted.

**EXHIBIT "H"**



سازمان بنادر و کشتیرانی
بندر بوشهر
Bushehr Port
Home
Photo Gallery
Search
Contact us
Introduction
Facilities
Tarrifs
Special Economic Zone
General Information
IT & ICT
Login
User Name:
Password:
Remember Login
Send Password
Bushehr
Select Language
English
فارسی

**BUSHEHR** is a province south west of IRAN, with 625 KM of coastline in the north of the Persian Gulf.

Besides bigger petroleum and non-petroleum comercial ports , several traditional ports are also active along the coastline,namely DEILAM , GENAVEH and RIG in the north and DELVAR , BOLKHEIR , DAYYER , KANGAN , NAKHL-TAGHI in the south,most of which also play host to fishing activities.

Bushehr Port Portal

DOURAN Portal V3.8.2.2

EXHIBIT H



Bushehr Port-بندر بوشهر Case 3:08-mc-80030-JSW Document 21-10 Filed 04/29/2008 Page 10 of 25 Page 1 of 2

سازمان بنادر و کشتیرانی
بندر بوشهر

Bushehr Port

Home Photo Gallery Search Contact us

Menu > Tarrifs > Port Tarrifs > Charges of goods

Introduction
Facilities
Tarrifs
Special Economic Zone
General Information
IT & ICT

Charges of goods

0987

**Carriage inward for every ton of goods/ Machines in 2007**

**Especial Economic Zone of Bushehr (Price at Rial)**

| Description | | | Carrying to yard | Unloading and Stacking in the yard | Re-loading goods to truck | Whole charges of special zone |
|---|---|---|---|---|---|---|
| Light goods less than 5 tons | Varied goods | Box- Carton- Box of Cloth- Machines Equipment | 19037 | 11550 | 10993 | 41580 |
| | Iron | Roll- Sheet- Bar- Reinforcement bar- Beam-Spout-Angle iron ,... | 11899 | 17325 | 7736 | 36960 |
| | packed | Rice- Sugar- Chemical Substances | 23797 | 11550 | 6233 | 41580 |
| | Dry-Unpacked | Wheat – Barley – Sugar- Chemical fertilizers- Clinker- Coal- aluminum powder- Stucco – Sand and gravel | 11899 | - | - | 11899 |
| Semi – heavy goods more 5 to 15 (ton) | All goods | | 35694 | 2310 | 2035 | 39972 |
| Heavy goods more 15 to 50 (ton) | | | 71390 | 11550 | 6380 | 89320 |
| Dangerous goods | | | 59490 | 17325 | 15585 | 92400 |
| Cars | Car | | 190369 | - | - | 190369 |
| | Mini vehicle | | 285555 | - | - | 285555 |
| | Truck and bus | | 345045 | 80850 | 36105 | 462000 |

Explanation:

1. In case of carrying directly from the ship 40 percent of foresaid tariff will be received.
2. The first row to fourth row are by ton and fifth one is by machine.
3. Forty percent will be received by cars carried directly.
4. The foresaid charges are according to ton.
5. at the beginning of every year by inquiring from central

http://www.pso.ir/Portal/HomePage.aspx?TabID=4042&Site=Bushehr&Lang=en-US 4/26/2008

bank, inflation rate in country will be added to foresaid charges

6.  41/8 percent as port share and 58/2 as company share are out of carriage of goods charges.

Bushehr Port Portal

DOURAN Portal V3.8.2.2



Bushehr Port

Home Photo Gallery Search Contact us

Menu > Tarrifs > Comunication Tarrifs

Introduction
Facilities
Tarrifs
Special Economic Zone
General Information
IT & ICT

Comunication Tarrifs 0987

## Communication Tariffs

| LAND LINE CHARGE(LL) | | |
|---|---|---|
| **Charges in Gold Francs** | | |
| Asia | Full charge from 4 AM to 10 PM | Discounted charge from 10 PM to 4 AM |
| Jordan, The United Arab Emirates, Bahrain, Iraq, Saudi Arabia, Oman, Qatar, Kuwait, Lebanon, Yemen Republic | 1.93 | 1.70 |
| Indonesia, Brunei Darussalam, Greece, Pakistan, Thailand, Taiwan, China, Japan, Singapore, Syria, South Korea, Maldives, Malaysia, Hong Kong | 2.53 | 2.17 |
| Bangladesh, Sri Lanka, Philippines, India | 2.60 | 2.23 |
| Afghanistan, Cambodia, North Korea, Laos, Mongolia, Nepal, Vietnam | 2.93 | 2.65 |
| Burma (Myanmar) | 3.53 | 3.15 |
| Common wealth countries (previously included in USSR ) | 6.30 | 6 |
| Azerbaijan, Armenia, Uzbekistan, Tajikistan, Turkmenistan, Kirgyzstan, Kazakhstan, Ukraine, Belarus, Moldova, Estonia, Lithuania, Russian, Gorjistan | 6.30 | 6 |
| Europe | 2.53 | 2.17 |
| Turkey | 1.93 | 1.70 |
| Other European countries | 2.53 | 2.17 |
| Africa | 2.53 | 2.17 |
| Algeria, Libya, Morocco, Tunisia, | 1.93 | 1.70 |
| Kenya, Gabon, Guinea-Bissau, Guinea | 3.80 | 3.53 |
| Other African countries | 2.53 | 2.17 |
| America (USA) | --- | --- |
| Uruguay, Dominican, Chilly, Guatemala, Granada, Nicaragua, Haiti, Honduras | 3.80 | 3.53 |
| Other American countries | 2.53 | 2.17 |
| Australasia | --- | --- |
| Australia, New Zealand, and other Australasian countries | 2.53 | 2.17 |

| COAST STATION CHARGES(CC) |
|---|

| Charges in Gold Francs | | | |
|---|---|---|---|
| | Per Word Telegram | Per Min. Telephone | Per Min. Telex |
| Telegrams | 1.00 | --- | --- |
| Radio Telephone Calls (minimum 3 min) | --- | --- | --- |
| Waves: V.H.F. | 2.00 | --- | --- |
| M.F. | 2.34 | --- | --- |
| H.F. | 2.34 | --- | --- |
| Radio Telex Calls (minimum 3 min) | --- | --- | 3.00 |

**Descriptions:**

***Ship to shore Radio Charges***

**A. CC (COAST STATION CHARGES)**

**In case the ship requests to make a radiotelephone contact or send a radiotelegram or radiotelex message to the port or the city in which the radio station is located, the only payable cost would be coast charge (CC).**

**B. LL (LAND LINE CHARGE)**

In case the ship requests to make a radio telephone or to send a radio telegram or radio telex message to other parts of the country or to overseas destinations from the coastal station the related charge would be the sum of CC and LL.

:Note1
All the messages to the QUARANTINE, PORT CONTROL, PORT HEALTH or HARBOUR MASTER through VHF-telegram or radio telex are free of charge.

Shore to Ship Radio Calls' Cost:

For the telephone, telegram and radiotelex contact or messages from shore to ship the payable cost would only be Land Line Charges (LL).

**Note 2:**
1. To encourage Iranian ships to make contact via Marine telecommunication stations of the country, all radio communication (ship to shore and shore to ship) including radiotelephone, telegram or radiotelex message is calculated with 50% discount.

2. On the anniversary of the victory of the Islamic 22 nd of Bahman as well as the first of Farvardin Calender-first month), Eidul Adha, Qudir, Fitre days all the services rendered to the Iranian MF would be free of charge.

3. Contacts made between ships and the P.S.O physician in the coast to get medical help and services are free of charge.

4. To encourage Foreign ships to make contact Marine telecommunication stations in Iranian radiotelephone services made between 10 PM to 4 AM also 25 th of December payable cost would only be LL (Land Line charge).

**Note 3:**
1. Radiotelephone contacts: minimum calculable time is 3 minutes including one minute for operator.
2. Radio-telex: minimum calculable time is 3 minutes including one minute for operator.
3. The minimum calculable time for usual telegrams is 7 words in case of emergency, it will be doubled.
4. The minimum calculable SLT telegraphs is 22 words.
5. All the figures included in the relevant tables are in GOLD FRANC.

6. The operator's rate for calculating the identical value of dollar and Rial will be the one announced by Bank-e- Markazi (Central Bank) on the last day of the previous month.

**C.** Navtex safety services including metrological messages, navigational warnings, primary distress message and movement of navigational pilot signs, would be rendered free of charge.

Editor

نماینده مخابرات

Bushehr Port Portal

DOURAN Portal V3.8.2.2

# EXHIBIT "I"





بندر نوشهر-Nowshahr Port Case 3:08-mc-80030-JSW Document 21-10 Filed 04/29/2008 Page 16 of 25 Page 1 of 7

سازمان بنادر و کشتیرانی
بندر نوشهر

Nowshahr Port

> Home > Introduction > Relative Sites > Site Map > آلبوم بندر > ارتباط با ما

Sunday, April 27, 2008

menu > Tariffs > Goods Tariffs

معرفی
Operations Statistics
Capacities Operational
Tariffs
Infrastructure Projects
Marine and Port Agents
ارائه خدمات

**Goods Tariffs**

**Table of tariff costs of holding for general cargo and bulk goods**

| Description | Tariff rate of holding per ton/per machine-day |
|---|---|
| Miscellaneous | 24000 Rials |
| IronWorks | 20000 Rials |
| Bag | 40000 Rials |
| Dry bulk | 10000 Rials |
| Cattle (per head) | 4000 Rials |
| Frozen and refrigerating goods | 48000 Rials |
| Wrecks and junks | 48000 Rials |
| Hazardous goods | 80000 Rials |
| Passenger car (per vehicle) | 80000 Rials |
| Minibus (per vehicle) | 160000 Rials |
| Truck and bus (per vehicle) | 240000 Rials |

- For tariff of holding goods with a weight of more than 50 tons per negleh, and amount equal to 50% of the rate of related table (the first and the second rows) is added, that is, 1.5 times the rates of the above table is collected.

- For tariff of holding export, transit and foreign transship goods an amount equal to 50% of the above rate is collected.

- For tariff of holding returned goods an amount equal to 85% of the above rate is collected. A fraction of a ton is considered as a ton in calculations.

- Since the year 1384 (March 21, 2005) the rates mentioned in above table are increased by 10% at the beginning of each solar year.

**Table of tariff costs of holding for general cargo and bulk goods**

| Description | | Tariff rate of holding per ton/ per machine-day |
|---|---|---|
| Light weight goods of less than 30 tons per Negleh | Miscellaneous | 16200 Rials |
| | Bag (Pallet) | 16200 Rials |
| Ironworks | little than 5 tons | 10000 Rials |
| | 5 to 15 tons | 30000 Rials |
| | 15 to 30 tons | 320000 Rials |
| Heavy goods | 30 to 60 tons | 120000 Rials |
| | 60 to 120 tons | 240000 Rials |
| | 120 tons and more | 320000 Rials |
| Dry bulk | | 8000 Rials |
| Liquid bulk | | 4000 Rials |
| Cattle (per head) | | 4000 Rials |
| Frozen and refrigerating goods | | 24000 Rials |
| Wrecks and junks | | 24000 Rials |
| Hazardous goods | | 80000 Rials |
| Passenger car (per vehicle) | | 120000 Rials |
| Minibus (per vehicle) | | 200000 Rials |
| Truck and bus (per vehicle) | | 400000 Rials |

1.Transportation operations include shipment, unlading, consolidation and loading, the tariff of which are equal to 40%, 25%, 10% and 25%, respectively.

2.The tariff of non palletized goods (for stop shipment) an amount twice the shipping tariff is collected from shipping lanes and once the shipping tariff from the owners of the goods.

3.The shipping tariff for voluminous and traffic non-container goods (goods with dimensions of 12 x 2.5 x 2.5 square meters) is 120.000 Rials per tons.

4.Shipping tariffs for export goods is 25% of the rates of the above table.

5.Shipping tariffs for transit and foreign transship goods is 50% of the rates of the above table.

6.Shipping tariffs for returned goods is 85% of the rates of the above table.

7.Shipping tariffs for capitation at the port of origin is 25% and at the port of destination is 100% of the rates of the above table.

8.In case of non-stop shipment, 40% of the rates of the above table is collected.

9.Loading wheat1650 Rials per ton and in case of non-stop shipment 660 Rials per ton is collected

EXHIBIT I

http://www.pso.ir/Portal/HomePage.aspx?TabID=4131&Site=NowshahrPort&Lang=en-US 4/26/2008



10.Scrap and waste goods and materials are only unloaded and loaded in non-stop form.

11.A fraction of a ton is considered as a ton in calculations.

12.Since the year 1384 (March 21, 2005) the rates mentioned in above table are increased by 10% at the beginning of each solar year.

**Table of storage (warehousing) tariff costs for non-container goods**(transit and transship)

| **Storage (Warehousing)** | | **1st to 10th day** | **11th to 20th day** | **21st to 30th day** | **31st to 40th day** | **41st to 50th day** | **After 50 days** |
|---|---|---|---|---|---|---|---|
| Miscellaneous & bag per ton/day | | Exempted | 750 | 1000 | 1400 | 2000 | 3000 |
| Ironworks per ton/day | | Exempted | 600 | 800 | 1000 | 1600 | 2000 |
| Home appliances, tea box and carton goods per package/day | Each package up to 50 kg | Exempted | 200 | 300 | 400 | 700 | 800 |
| | Each package from 50 to 200 kg | Exempted | 600 | 900 | 1200 | 1800 | 2400 |
| Light vehicles(passenger – van) | | Exempted | 12000 | 16000 | 20000 | 24000 | 32000 |
| Heavy-duty vehicles (truck, tractor, minibus, bus, etc.) per vehicle/day | | Exempted | 20000 | 24000 | 28000 | 32000 | 40000 |

1- Storage cost is calculated and collected after the period of exemption and based on the last day of the goods stoppage.

2- Export, transit and transship goods enjoy a period of 30 days of storage exemption and after the lapse of this period, the storage cost is calculated and collected from the date of unloading.

3- Storage cost for transit and transship goods is 40% of the above-mentioned figures.

4- Storage cost for goods like wood and paper is 1/5 times and hazardous goods mentioned in IMDG Code table and other flammables is 6 times the rates mentioned in the first raw of the above table.

5- Storage cost for storing in open warehouses is 75% of storage cost for storing in roofed warehouses.

6- A fraction of a ton is considered as one ton in calculations.

7- Rates mentioned in above table increase by 10% at the beginning of every solar year.

**Table of port duties for goods**

| Tariff/Good | Import | Export | Capitation | Transit | Tranship | Returned |
|---|---|---|---|---|---|---|
| Port duties on goods | 5 | 12 | - | - | - | - |
| Unloading and Loading duties on/from Dock | 1000 | 250 | Port of Origin:250<br>Port of Destination:1000 | 1000 | 1000 | 1000 |

1.Port duties for grains is equal to 40 Rials per ton.

2.The unloading and loading on/from dock is 180 Rials per ton of grains.

3.Since the year 1384 (March 21, 2005) the rates mentioned in above table are increased by 10% at the beginning of each solar year.

**Other issues:**

Fire insurance premium is equal to 55 hundredth in thousand of the safe value of the good or the value confirmed by customhouse and mentioned in custom permit per month, considering the duration of storage of good in yard or port areas.
Demand for each ton is 400 Rials.Port health duty is 5 Rals per ton.

**Table of Container shipping costs since March 14, 2004**

| Type of Good | 20-Foot | | 40-Foot | |
|---|---|---|---|---|
| | Filled | Empty | Filled | Empty |
| Container for each set | 164823 | 115376 | 206028 | 144220 |

**Table of holding container goods**

Unit : Rials

| 20-Foot and 40-Foot Container per ton | 11600 |
|---|---|

| Duration of warehousing in day | 20-Foot | | 40-Foot | |
|---|---|---|---|---|
| | Filled | Empty | Filled | Empty |
| 1 to 10 | Exemted | Exemted | Exemted | Exemted |
| 11 to 30 | 8756 | 4378 | 17512 | 8756 |
| 31 to 60 | 11333 | 5666 | 22666 | 11333 |
| 61 to 90 | 12362 | 6181 | 24723 | 12362 |
| 91 days and more | 14423 | 7212 | 28846 | 14423 |

**Table of warehousing container goods**(imported and returned)

**Remarks:**

1. Filled export containers enjoy 30-day warehousing exemption.

2. Expenses of export, transit and transship containers are collected by 50% of the above amounts.

3. After expiration of exemption period, warehousing expenses are collected as calculated from the first day of unloading based on the rate of the last day of stoppage.

**تعرفه کالاهاي صادراتي**

جدول تعرفه هاي حنكاري ،باربري ،حقوق عوارض بندري بر كالاهاي صادراتي در بندر نوشهر

بازاي هر تن كالا ، هر دستگاه / روز

نرخ : ريال

| رديف | نوع تعرفه گروه كالا | حنكاري | باربري | عوارض بندري | هزينه بارگيري برروي اسكله | ديماند | عوارض بهداشت بندري |
|---|---|---|---|---|---|---|---|
| 1 | متفرقه ( كاغد ، مقوا ، ... ) | 12000 | 4050 | 12 | 250 | 400 | 5 |
| 2 | آهن آلات | 11000 | كمتر از 5 تن 2500<br>5-45 تن 7500<br>16-30 تن 8000 | 12 | 250 | 400 | 5 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | 30000 تن 60-31<br>60000 تن 120-61<br>از 120 تن به بالا 80000 | | | | |
| 3 | كيسه اي ( پالت ) | 20000 | 4050 | 12 | 250 | 400 | 5 |
| 4 | فله خشك جو ، ذرت ،سويا، .... ) | 5000 | 2000 | 12 | 45 | 400 | 5 |
| 5 | فله خشك ( گندم ) | 5000 | 413 | 12 | 45 | 400 | 5 |
| 6 | فله خشك ( ذغال سنگ ، .... ) | 5000 | 2000 | 12 | 250 | 400 | 5 |
| 7 | احشام ( هر راس ) | 2000 | 1000 | 12 | 250 | 400 | 5 |
| 8 | كالاي سردخانه اي و يخ زده | 24000 | 6000 | 12 | 250 | 400 | 5 |
| 9 | كالاي اوراقي و قراضه | 24000 | 6000 | 12 | 250 | 400 | 5 |
| 10 | كالاي خطرناك ( آزبست ، ... ) | 40000 | 20000 | 12 | 250 | 400 | 5 |
| 11 | وسايل نقليه سبك | 40000 | 30000 | 12 | 250 | 400 | 5 |
| 12 | وسايل نقليه نيمه سنگين | 8000 | 50000 | 12 | 250 | 400 | 5 |
| 13 | وسايل نقليه سنگين | 120000 | 10000 | 12 | 250 | 400 | 5 |

****************************************************************************

**جدول تعرفه انبار داري كالاهاي صادراتي در بندر نوشهر**

**بازاي هر تن يا بسته يا دستگاه / روز ريال**

| رديف | مدت انبار داري گروه كالاها | | از روز اول تا روز سي ام | از روز سي و يكم تا روز چهلم | از روز چهل و يكم تا روز پنجاهم | بعد از پنجاه روز |
|---|---|---|---|---|---|---|
| 1 | متفرقه و كيسه اي كاغذ و چوب | | معاف | 700 | 1000 | 1500 |
| 2 | آهن آلات | | معاف | 500 | 800 | 1000 |
| 3 | كالاي خطرناك و ساير كالاي آتش زا | | معاف | 2100 | 3000 | 4500 |
| 4 | هر نوع بسته بندي كارتني و صندوقي هر بسته در روز | وزن هر بسته تا 50 كيلوگرم | معاف | 200 | 350 | 400 |
| | | وزن هر بسته بيش از 50 كيلو گرم | معاف | 600 | 900 | 1200 |
| 5 | وسايل نقليه سبك سواري ،وانت ) و ... هر ( دستگاه در روز | | معاف | 10000 | 12000 | 16000 |
| 6 | وسايل نقليه نيمه سنگين و سنگين ( كاميون ، تراكتور ،ميني بوس اتوبوس و ... ) هر دستگاه، در روز | | معاف | 14000 | 16000 | 20000 |

**توضيحات :**

-1 هزينه انبارداري در محوطه و هانگار 75 % ارقام فوق دريافت مي شود .

-2 هزينه انبارداري به مدت 30 روز از تاريخ تخليه معاف مي باشد . و پس از گذشت مدت معافيت از روز اول تخليه و بر اساس آخرين روز توقف كالا محاسبه و دريافت مي گردد .

****************************************************************************

جدول تعرفه هاي خنكاري ، باربري ، حقوق عوارض بندري بر كانتينرهاي صادراتي در بندر نوشهر

بازاي هر تن * هر دستگاه / روز    نرخ : ريال

| رديف | نوع تعرفه گروه كانتينر | خنكاري به ازاي هر تن | باربري به ازاي هر دستگاه | عوارض بندري | هزينه بارگيري بر روي اسكله | ديماند | عوارض بهداشت بندري |
|---|---|---|---|---|---|---|---|
| 1 | كانتينر پر 20 فوت | 5800 | 82412 | 12 | 250 | 400 | 5 |
| 2 | كانتينر خالي 20 فوت | 5800 | 57688 | 12 | 250 | 400 | 5 |
| 3 | كانتينر پر 40 فوت | 5800 | 103014 | 12 | 250 | 400 | 5 |
| 4 | كانتينر خالي 40 فوت | 5800 | 72110 | 12 | 250 | 400 | 5 |

توضيحات:

1- هزينه خنكاري ، باربري براي كانتينر حمل يكسره 50 % ارقام فوق دريافت مي شود.

2- هزينه خنكاري باربري كانتينرهاي حاوي كالاي خطرناك 50 % افزايش مي يابد.

*****************************************************************************

جدول تعرفه انبار داري كانتينري هاي صادراتي در بندر نوشهر

بازاي هر دستگاه / روز    نرخ : ريال

| رديف | مدت انبار داري / گروه كانتينر | از روز اول تا روز سي ام | از روز سي و يكم تا روز شصتم | از روز شصتم و يكم تا روز نودم | از 91 روز به بالا |
|---|---|---|---|---|---|
| 1 | كانتينر پر 20 فوت | معاف | 5666 | 6181 | 7212 |
| 2 | كانتينر خالي 20 فوت | معاف | 2833 | 3090 | 3606 |
| 3 | كانتينر پر 40 فوت | معاف | 11333 | 12362 | 14423 |
| 4 | كانتينر خالي 40 فوت | معاف | 5666 | 6181 | 7212 |

توضيحات :

1 - هزينه انبارداري كانتينرهاي حاوي كالاي خطرناك كليه كلاسها ( به جز كلاس 1 و 7 رده بندي IM DG CODE ) 3 برابر ارقام جدل فوق محاسبه مي شود و كلاسهاي 1 و 7 بصورت يكسره تحويل صاحب كالا مي گردد .

2 – كانتينرهاي پر صادراتي از تاريخ تخليه به مدت 30 روز از پرداخت انبارداري معاف مي باشد . و پس ازگذشت مدت معافيت از روز اول تخليه و بر اساس آخرين روز توقف كا نتينر محاسبه و دريافت مي گردد .

تعرفه كالاهاي ترانزيت خارجي

جدول تعرفه هاي خنكاري ، باربري ، حقوق عوارض بندري بر كالاهاي ترانزيت خارجي در بندر نوشهر

بازاي هر تن كالا - هر دستگاه / روز    نرخ : ريال

| رديف | نوع تعرفه گروه كالا | خنكاري | باربري | عوارض بندري | هزينه تخليه برروي اسكله | ديماند | عوارض بهداشت بندري |
|---|---|---|---|---|---|---|---|
| 1 | متفرقه ( كاغذ ،مقوا ، ... ) | 12000 | 8100 | معاف | 1000 | 400 | 5 |
| 2 | آهن آلات | 10000 | كمتر از 5 تن 5000<br>از 5-15 تن 15000<br>از 16-30 تن 16000<br>از 31-60 تن 60000<br>از 61-120 تن | معاف | 1000 | 400 | 5 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | 120000<br><br>از 120 تن به بالا 160000 | | | | |
| 3 | ( کیسه ای ( پالت ) | 20000 | 8100 | معاف | 1000 | 400 | 5 |
| 4 | فله خشك ( جو ، ذرت ، سویا ، .... ) | 5000 | 4000 | معاف | 180 | 400 | 5 |
| 5 | ( فله خشك ( گندم ) | 5000 | 825 | معاف | 180 | 400 | 5 |
| 6 | فله خشك ( ذغال سنگ ) | 5000 | 4000 | معاف | 180 | 400 | 5 |
| 7 | ( احشام ( هر راس ) | 2000 | 2000 | معاف | 1000 | 400 | 5 |
| 8 | كالاي سردخانه اي و يخ زده | 24000 | 120000 | معاف | 1000 | 400 | 5 |
| 9 | كالا اوراقي و قراضه | 24000 | 12000 | معاف | 1000 | 400 | 5 |
| 10 | كالاي خطرناك ( آزبست .... ) | 40000 | 40000 | معاف | 1000 | 400 | 5 |
| 11 | وسايل نقليه سبك | 40000 | 60000 | معاف | 1000 | 400 | 5 |
| 12 | وسايل نقليه نيمه سنگين | 80000 | 10000 | معاف | 1000 | 400 | 5 |
| 13 | وسايل نقليه سنگين | 120000 | 200000 | معاف | 1000 | 400 | 5 |

.....................................................................................

جدول تعرفه انبارداري كالاهاي ترانزيت خارجي در بندر نوشهر

بازاي هر تن يا بسته يا دستگاه / روز نرخ : ريال

| بعد از پنجاه روز | از روز چهل و يكم تا روز پنجاهم | از روز سي و يكم تا روز چهلم | از روز بيست و يكم تا روز سي ام | از روزيازدهم تا روز بيستم | از روز اول تا روز دهم | مدت انبار داري گروه كالاها | | رديف |
|---|---|---|---|---|---|---|---|---|
| 1500 | 1000 | 700 | 500 | 375 | معاف | متفرقه و كيسه اي كاغذ و چوب | | 1 |
| 1000 | 800 | 500 | 400 | 300 | معاف | آهن آلات | | 2 |
| 4500 | 3000 | 2100 | 1500 | 1125 | معاف | كالاي خطرناك و ساير كالاي آتش زا | | 3 |
| 400 | 350 | 200 | 150 | 110 | معاف | وزن هر بسته تا 50 كيلو گرم | هر نوع بسته بندي كارتني و صندوقي هر بسته در روز | 4 |
| 1300 | 900 | 600 | 450 | 300 | معاف | وزن هر بسته بيش از 50 كيلو گرم | | |
| 16000 | 12000 | 10000 | 8000 | 6000 | معاف | وسايل نقليه سبك سواري ،وانت ) ) و ... هر دستگاه در روز | | 5 |
| 20000 | 16000 | 14000 | 12000 | 10000 | معاف | وسايل نقليه نيمه سنگين و سنگين كامیون ، تراكتور ) مینی بوس ،اتوبوس، و ... ) هر دستگاه در روز | | 6 |

**توضيحات :**

1-هزينه انبارداري در محوطه و هانگار 75 % ارقام فوق دريافت مي شود .

2-هزينه انبارداري به مدت 10 روز از تاريخ تخليه معاف مي باشد . و پس از گذشت مدت معافيت از روز اول تخليه و بر اساس آخرين روز توقف

كالا محاسبه و دريافت مي گردد .

*************************************************************************

**جدول تعرفه هاي خنكاري ، باربري ،حقوق عوارض بندري بر كانتينرهاي ترانزيت خارجي در بندر نوشهر**

**بازاي هر تن - هر دستگاه / روز نرخ : ريال**

| رديف | نوع تعرفه گروه كانتينر | خنكاري به ازاي هر تن | باربري به ازاي هر دستگاه | عوارض بندري به ازاي هر تن | هزينه بارگيري بر روي اسكله به ازاي هر تن | ديماند | عوارض بهداشت بندري |
|---|---|---|---|---|---|---|---|
| 1 | كانتينر پر 20 فوت | 5800 | 82412 | معاف | 1000 | 400 | 5 |
| 2 | كانتينر خالي 20 فوت | 5800 | 57688 | معاف | 1000 | 400 | 5 |
| 3 | كانتينر پر 40 فوت | 5800 | 103014 | معاف | 1000 | 400 | 5 |
| 4 | كانتينر خالي 40 فوت | 5800 | 72110 | معاف | 1000 | 400 | 5 |

**توصيحات:**

1. هزينه خنكاري ، باربري براي كانتينرهاي حمل يكسره 50 % ارقام فوق محاسبه مي شود.
2. هزينه خنكاري ، باربري كانتينرهاي حاوي كالاي خطرناك 50 % افزايش مي يابد.

*************************************************************************

**جدول تعرفه انبار داري كانتينري هاي ترانزيت خارجي در بندر نوشهر**

**بازاي هر دستگاه / روز نرخ : ريال**

| رديف | مدت انبار داري / گروه كانتينر | از روز اول تا روز دهم ام | از روز يازدهم تا روز سي ام | از روز سي و يكم تا روز شصتم | از روز شصت و يكم تا روز نودم | از 91 روز به بالا |
|---|---|---|---|---|---|---|
| 1 | كانتينر پر 20 فوت | معاف | 4378 | 5666 | 6181 | 7112 |
| 2 | كانتينر خالي 20 فوت | معاف | 2189 | 2833 | 3090 | 3606 |
| 3 | كانتينر پر 40 فوت | معاف | 8756 | 11333 | 12362 | 14423 |
| 4 | كانتينر خالي 40 فوت | معاف | 4378 | 5666 | 6181 | 7212 |

**توصيحات :**

1- هزينه انبارداري كانتينرهاي حاوي كالاي خطرناك كليه كلاسها ( به جز كلاس 1 و 7 رده بندي IM DG CODE ) ح 3 برابر ارقام جدول فوق محاسبه مي شود و كلاسهاي 1 و 7 بصورت يكسره تحويل صاحب كالا مي گردد .

2- كانتينرهاي پر ترانزيت خارجي تخليه به مدت 10 روز از پرداخت انبارداري معاف مي باشد و پس از گذشت مدت معافيت از روز اول تخليه و بر اساس آخرين روز توقف كانتينر محاسبه و دريافت گرديد .



**Ship Tariffs**

**Tariff for port rights, duties and cost for ship and vessels (Iranian and non-Iranian)**

| No | Title of Tariff | Unit of Calculation | Amount of Tarrif |
|---|---|---|---|
| 1 | port gate admission fee | per ton GRT | 6 Cents |
| 2 | port admission fee | per ton GRT | 10 Cents |
| 3 | dredging cost | per ton GRT | 41 Cents |
| 4 | guidance fee in one round trip of unit floater | per ton GRT | 40 Cents |
| 5 | lighthouse duty | per ton GRT | 4 Cents |
| 6 | unloading and loading fee on dock at anchorage | per ton good<br>per ton good | 22 Cents<br>11 Cents |
| 7 | Tarifs of row 4,6 overtime,increase by this fields : | Non-Office | 10% |
| | | saturdays,thursdays,fridays and holidays | 20% |
| 8 | cost of stoppage at the dock | per ton GRT per hour | 0.45 Cents |

**Remarks:**

1. Guidance tariff includes ship guidance, casting anchor, weighing anchor, fastening the ship to dock and releasing the ship from dock.

2. Displacement expenses (shifting on dock) by using guidance is 7 cent per GRT ton and 3 cent by using ship rope.

3. No cost shall be received for overtime unloading and loading at Neka port.

**Table of tariff for collecting qarbage and watests of ship,commercial floaters and oil tankers upto 7 days of stoppage beside the dock**

| | |
|---|---|
| A. Wooden-haul floaters (barges) | $5 |
| B. Metal-haul floaters up to 800 tons | $20 |
| C. Ship and floaters from 801 tons to 5000 tons | $125 |
| D. Ship and floaters from 5000 tons and more | $700 |

**Remarks:**

1. An amount equal to 1/7 of the above tariffs is collected for each day of stoppage in addition to 7 days.

2. In case of doing garbage collection services in anchorage or simultaneously in dock and anchorage, the above tariffs will be received in double.

3. No cost shall be received for collecting garbage at Neka port.

**Table of tariff for towing for guiding in one fastening and closing operation**

**Remarks:**

1. The type and number of togs and usage hours for fastening to dock or opening from dock has no effect on mentioned tariff.

2. Cost of towing used for operations other than docking or leaving the dock, are collected separately according to current tariffs.

3. In case togs are not used in guiding operations for docking or leaving the dock, however, the towing costs are calculated and collected on the basis of the above table.

4. Guiding and towing operations are carried out according to current laws, regulations and directions. In case togs and guides are not used in guiding and docking operations, no towing and guiding costs are calculated and collected.

5. No cost shall be collected for transferring the guide to ship for floating units services (guide, tog, etc.).

**Tariffs for quarantine services costs**

Approved by the Cabinet under no. 27954, dated

For all ships and floaters entering the waters of the Islamic Republic of Iran from foreign ports and stop at Iranian ports and anchorage, an amount is collected as "Quarantine services costs" and paid to the account of the Ministry of Health, treatment and Medical Education according to the following table.

| No | Ship Tonnage (ton GRT) | Towing cost in dollar | |
|---|---|---|---|
| | | Foreign ships | Iranian ships |
| 1 | Up to 1500 Tons GRT | 300 | 50 |
| 2 | From 1501 to 5000 Tons GRT | 800 | 100 |
| 3 | From 5001 to 10000 Tons GRT | 1500 | 150 |
| 4 | From 10001 to 15000 Tons GRT | 2200 | 200 |
| 5 | From 15001 to 20000 Tons GRT | 2900 | 250 |
| 6 | From 20001 to 25000 Tons GRT | 3600 | 300 |
| 7 | From 25001 Tons GRT and more | 4500 | 400 |

**1st.** Cargo and passenger ships or floaters

| No | Gross capacity of ship or floating unit | Quarantine services costs |
|---|---|---|
| 1 | Up to 100 Tons | Exempted |
| 2 | From 101 to 1000 Tons | $26.4 per sail (ship) |
| 3 | From 1001 to 2500 Tons | $34,1 per sail (ship) |
| 4 | From 2501 to 4000 Tons | $41.8 per sail (ship) |
| 5 | From 4001 to 5500 Tons | $45,1 per sail (ship) |
| 6 | From 5501 to 7000 Tons | $49.5 per sail (ship) |
| 7 | From 7001 to104000 Tons | $52.8 per sail (ship) |
| 8 | From 10001 to 20000 Tons | $57.2 per sail (ship) |
| 9 | From 20001 to 30000 Tons | $60.5 per sail (ship) |
| 10 | From 30001 and More | $64.9 per sail (ship) |

**2st.** Oil and tunker ships or floaters

| No | Gross capacity of ship or floating unit | Quarantine services costs |
|---|---|---|
| 1 | Up to 5000 Tons | $26.4 per sail (ship) |
| 2 | From 5001 to 15000 Tons | $31.9 per sail (ship) |
| 3 | From 15001 to 25000 Tons | $37.4 per sail (ship) |
| 4 | From 25001 to 35000 Tons | $41.8 per sail (ship) |
| 5 | From 35001 to 45000 Tons | $45.1 per sail (ship) |
| 6 | From 45001 to 55000 Tons | $49.5 per sail (ship) |
| 7 | From 55001 to 65000 Tons | $52.8 per sail (ship) |
| 8 | From 65001 to 75000 Tons | $57.2 per sail (ship) |
| 9 | From 75001 to 100000 Tons | $60.5 per sail (ship) |
| 10 | From 100001 to 150000 Tons | $64.9 per sail (ship) |
| 11 | From 150001 to 250000 Tons | $68.2 per sail (ship) |
| 12 | From 250001 and More | $72.6 per sail (ship) |

**3st.** In addition to mentioned amounts, an amount is collected from ships for health measures of warding off rodents and issuing international certificate for ships not holding valid certificates.

| No | Gross capacity of ship or floating unit | Quarantine services costs |
|---|---|---|
| 1 | Up to 100 Tons | Exempted |
| 2 | From 101 to 1500 Tons | $113.3 per sail (ship) |
| 3 | From 1501 to 2500 Tons | $189.2 per sail (ship) |
| 4 | From 2501 to 3500 Tons | $211.2 per sail (ship) |
| 5 | From 3501 to 4500 Tons | $284.9 per sail (ship) |
| 6 | From 4501 to 5500 Tons | $323.3 per sail (ship) |
| 7 | From 5501 to 6500 Tons | $379.5 per sail (ship) |
| 8 | From 6501 to 7500 Tons | $455.4 per sail (ship) |
| 9 | From 7501 to 8500 Tons | $492.8 per sail (ship) |
| 10 | From 8501 and More | $531.3 per sail (ship) |

**Remark:**
- The cost of the amount of poisons used shall be calculated according to time value and shall be added to above cost.

**Table of hourly fare of marine equipment**

| Description | Discount |
|---|---|
| Commercial ships carrying import goods including oil and non-oil | - |
| ships including ship and barge | 50% |
| Roro ships, foreign passenger ships, not collecting drainage cost and also not collecting guidance and tugboat (in case of not offering these services) in southern ports of the country | 90% |
| Roro ships under representation of investing companies in northern ports | 90% |
| Roro ships traveling between ports in north of and other countries including tugboat cost | 85% |
| Iranian fishing ships which fish in local waters for local consumption | 90% |
| **Export** | |
| Commercial ships from 1500 GRT and more which enter ports for loading goods like clinker, gravel, sand, grit, cement, sulfur and concentrates of bulk minerals | 75% |
| Commercial ships which enter the port for loading no-oil goods except items mentioned in above paragraph | 50% |
| **Transit** | |
| Container and non-container non-oil commercial ships the whole of consignment of which are foreign transit and enter the port for unloading and loading | 75% |
| In case a ship enters the port for shipping export and transit goods simultaneously without any unloading, it will enjoy a 75% discount proportionate to foreign transit goods and 50% discount for export goods | 75% |
| Remark 1:In cases where ships and floaters are subject to several discounts, the highest approved discount is considered for mentioned ships and floaters. Remark 2:All discounts offered in above tables are for all ships for which old port costs and duty tariffs are applied. | |

Nowshahr Port Portal
DOVRAN Portal V3.8.2.2

# EXHIBIT "J"



In The Name of God
Supplement to Port & Sea Magazine
No.2/Sep- Oct,2007

# PSO news

ISSN : 1023-5957

# Private Sector's Largest Investment in Port Sector

Private sector's largest investment deal has been clinched between 'Shekar-Novin-e Khalij-e Fars' Company and the Ports and Shipping General Directorate of Khuzestan Province, southern Iran. The two parties have signed a contract for construction of a sugar purification complex at Imam Khomeini Port, with the annual capacity of 1 million tons and with an investment amounting to Rls. 1,896 billion. This complex includes a sugar purification and packaging factory, a 50,000 square meter warehouse, a berth with the operational capacity of 2 million tons per year, and an 18-megawatt power plant, as well as a mechanized transference system. According to recent studies, with the construction of this complex 600 direct and indirect jobs will be created. This project will lead to construction of one of the most important sugar purification, packaging and distributing centers in the Persian Gulf region, while the majority of its products will be exported.

Ali Reza Sate'i, Deputy M.D. of the Ports and Shipping Organization (PSO) said the Organization has tried, since 2005, to change the usage of ports from a place for loading and discharging commodities to centers for industrial and logistic activities. "To achieve this objective, we need private investments. So the Organization provided investors with incentives and made the regulations easier."

The result, he said, was investment of over Rls. 8,500 billion in projects by private entrepreneurs in the past two years. According to him, negotiations are under way with private sector for another Rls. 1,500 billion of investments.

Referring to the Rls.-4,000-billion target set in the Fourth Five-Year Development Plan (2005-2010), Sate'i said the Organization is ahead of the target by 150 percent. Moreover, the director of the project, Aref Rezaei said that his company reached an agreement with one of Europe's leading sugar companies, the German BMA AG, six months ago to import equipments and know-how to construct the factory.

Rezaei promised that products of the factory in Imam Khomeini Port will have the highest quality. The factory, with an annual production capacity of one million tons, is expected to take three years to complete.

**Contents**

- Chabahar Expansion Project Launched....2
- Six New Tugboats Join PSO Fleet....3
- Iran-Turkey Agreed on Developing Marine Transit Ties....4
- Private Investments in Ports Increase....5
- Iran and Denmark Insist on Joint Maritime Cooperation....8
- Caspian Sea: the Largest Inland Reservoir....9
- IMO's Response to Current Environmental Challenges....11

EXHIBIT J

# Chabahar Expansion Project Launched

The operations of Phase One to expand the Chabahar Port got officially on the way during a ceremony attended by the Minister of Roads and Transportation and the Managing Director of the Ports and Shipping Organization.

The project included dredging of 17.5 million $m^3$ of material from the seabed to form a deep-water approach channel and harbor basin, reclamation of 200 hectares for the terminal area, approximately 1600m of breakwater extension, construction of a 600m multi-purpose berth and a 600m container berth, paving of 64 hectares for terminal together with supplying of four post-panamax quayside container cranes and 12 rubber tyred gantry cranes.

During the ceremony, the Minister of Roads and Transportation stressed the importance of reactivating the Chabahar Port and said: "Access to open waters depends on the reactivation of this region, and through this we can develop the southeast region of the country and the Province of Sistan and Baluchistan."

He announced that the plan would be operative in three years and stressed: "If funds are made available sooner, we would be in a position to finish the project in two years."

Ali Taheri, the Managing Director of the Ports and Shipping Organization pointed to the advantages and the increasing transit potentials of the country in view of the need to have access to open seas for added contacts with the outside world and growth of export and said: "On this basis it was decided to transform Chabahar into the fourth economical pole of the country."

He said: "The Ports and Shipping Organization has engaged domestic and foreign consultants to undertake studies essential for preparing the Chahbahar Port's Master Plan. These included the studies on market, port design, models for loading and discharge systems and project phasing, leading finally to a Master Plan until the target year of 2030."

According to Taheri, following the completion of studies, the project was tendered as International Competitive Bidding according to international standards, and the Khatam Ol Anbia Base won the contract at a price of USD 340 million beating domestic and international consortiums from Japan, China and South Korea. Quoting the figure for project implementation as USD 340 million, he added: "The implementation of the plan, the construction of piers and breakwaters, dredging and removing sediments will

increase the port's capacity, allowing even ships of up to 100,000 DWT to berth."

Stressing the deployment of appropriate cargo handling equipment in the region, Taheri said: "This amount of investment is unique in the region and this type of action was unprecedented in the Province." He expressed hope that the plan to develop and prosper Chabahar would transform it into the Gateway to Iran.

Taheri also announced the news of the Indians' and Russians' interest to invest in the Corridor and hoped that it would be realized soon. The Managing Director of the Ports and Shipping Organization said: "The Port of Chabahar has been designed and founded on the basis of its transit situation, and will achieve the objectives of 6 million tons capacity set for Phase One in the market studies, playing a major role in facilitating business between Central and Southeast Asia."

# MEPC 56 Names Persian Gulf and Gulf of Oman Special Sea Area

During its 56th Session held from 13 July 2007 in London, the Marine Environment Protection Committee (MEPC) named the Persian Gulf and the Gulf of Oman as Special Sea Area. A Special Sea Area refers to an area where strict control of shipping activities is needed due to particular oceanic conditions, heavy shipping movements and high environmental sensitivity.

The United Nations Convention on the Law of the Sea (UNCLOS, 1982) has provided the coastal countries the right to clearly define their Special (sensitive) Sea Areas within their exclusive-economical territory, by submitting the full details.

Given the annual movement of approximately 40,000 vessels, the extensive exploration of oil reserves from the sea, the sensitive marine habitats including the mangrove forests and the coral reefs, and the existence of precious shallow water fishes, shrimps, turtles, marine mammals such as dolphins and valuable migrating and indigenous birds, the International Maritime Organization (IMO) accepted the littoral states' requests and agreed to enforce special regulations to prevent pollution in the Persian Gulf and the Oman Sea.

To enforce the special regulation of these areas, the littoral states must adopt the regulations in Annexes I and V to MARPOL 73/78.

The two main criteria in this respect are the ratification of MARPOL 73/78 by the Persian Gulf States and the provision of reception facilities for wastes, oil and oily mixtures and waste water from the ships in the region.

Through conditions created in the Conventions, the regional states including Iran, Qatar, Bahrain, the United Arab Emirates, the Saudi Arabia and Kuwait have, through the document MEPC56/8/2, jointly requested the IMO's Main Committee known as MEPC as the main authority for handling requests for SA Status to review the case and take the necessary action after having verified the compliance with conditions stated in the Convention.

The regulations stipulated in articles 15 and 34 of the Annex I and Article 5 of Annex V to MARPOL 73/78 set stricter restrictions on discharge of oily wastes and other materials by ships, which are not applied outside the Special Area. Nonetheless, the new regulations are considered as an important and valuable accomplishment towards protection of the regional environment.

Witnessed by Roads and Transportation and Defense Ministers:

# Six New Tugboats Join PSO Fleet

With the completion of design and construction of six 1200 HP tugboats by the Maritime Industries Division of the Ministry of Defense (Shahid Tamjidi), the launching ceremonies of these boasts were held in the Port of Anzali in the presence of the Minister of Defense, the Minister of Roads and Transportation, the Managing Director of Ports and Shipping Organization and a number of people's representatives in the Islamic Consultative Council. The mentioned tugs have three functions of "berthing ships", "towing vessels" and "maritime fire fighting", and are fully equipped with the state-of-the-art safety equipment and navigation-communication systems. The six boats named FEREIDOONKENAR, ALAM KOOH, MIANKALEH, MASOOLEH, VALASHT and CASPIAN, built on special order of the Ports and Shipping Organization in the Shahid Tamjidi Maritime Industries will be deployed in the northern ports of Iran (in the Caspian Sea). It is worth mentioning that the tugboats were built by Iranian experts and engineers under the supervision and approval of B.V., the French Classification Society. Mostafa Najjar – the Minister of Defense – said during the launching ceremony of the tugboats: "Each boat has a length of 25m, width of 7.25m and draught of 2.65m. They are equipped with 2 engines reaching a top speed of 11 knots. A sum of 12,280,000 Euros was invested to build these boats."

The Minister of Defense added that the boats are equipped with VHS–SSB–GPS and NAVTEX communication system, echo sounder, radar and direction finders. The tugboats' engines were built by MANN Co. of Germany, and their motors and generators by VOLVO of Sweden and STAMFORD UK. Each boat is equipped with two generators of 60,127 A power. He also stressed the importance of developing and strengthening the national maritime fleet in the Caspian Sea.

In the ceremony, Ali Taheri guaranteed PSO's support of the maritime industries and cited the construction of over 116 vessels either through joint venture with foreign concems or built 100% domestically at a total value of Rls. 2,720 billion as the proof of the Organization's commitment towards maritime industries.

Stating that the Shahid Tamjidi Maritime Industries Group have proven their worth in this domain, Taheri referred to the PSO's privatization drive and said: "In the last two decades, PSO has shown to be the leading organization in privatization, and one can mention the construction of the first buoy laying vessel, passenger ships and tugboats by the private sector."

He added: "Moreover, 97 passenger ships were built or are under construction through administered funds, out of which 15 ships have been delivered and 16 more are due for delivery by September."

With the Objective of Activating NOSTRAC:

# Iranian Study Group Visit Indian Transportation Infrastructure

The NOSTRAC Study Group of Iran met with representative of India's marine, rail and road transportation brokerage companies and inspected the ports and transportation infrastructure during an 8-day visit to India.

This trip follows a decision made by the NOSTRAC Planning Council to dispatch study groups from India, the Islamic Republic of Iran and Russia to member States to inspect the transportation infrastructures as well as the transportation and transit potentials of the relevant countries.

Accordingly each study group is to prepare a report for activation of the NOSTRAC Corridor after studying the potential transit capacities of each country and identification of obstacles and issues related to the Corridor and to provide applicable solutions to these problems.

In this context, the Iranian Study Group composed of representatives from the Ports and Shipping Organization, the Road Transportation and Maintenance Organization and the Islamic Republic of Iran Shipping Lines presented the NOSTRAC Secretariat with their report on their eight-day visit to India, with the objective of removing obstacles facing the NOSTRAC Corridor towards the implementation of the Iran – India bilateral agreement for transportation of Indian export goods to Russia, North Europe and Scandinavia through Iran, as well as expansion of ties among NOSTRAC member states.

It should be mentioned that at the first stage, the Indian Study Group visited Iran in the year 2004 to prepare a comprehensive report on the facilities and the rail, road and port infrastructures on the Bandar Abbas to Amirabad and Anzali route on the path of cargo transited from the Indian Subcontinent to Russia, North Europe and Scandinavia.

The result of the findings in the report was submitted to the Iranian transportation organizations and stakeholders to remove the obstacles and increase the facilities and the road, rail and port capacities.

# Iran-Turkey Agreed on Developing Marine Transit Ties

Iran and Turkish maritime officials attended the First Port-Maritime Cooperation Joint Committee on September 4-6 2007.

The Conference was held according to the articles of the MoU of 19th Joint Commission between the IR of Iran and Republic of Turkey.

The Iranian delegation, headed by Eng. Gh. Sasani, Director General of Transit & Tariff of the Ports and Shipping Organization (PSO) of Iran, and the Turkish delegation, Headed by Sn. Sami Kabas, Director General of the Shipbuilding and Shipyards of the Republic of Turkey stress the necessity of expanding commercial marine transportation and transit ties. Both sides after evaluating the level of ties in ports and maritime cooperation between the two countries, discussed and exchanged information based on the Joint Committee's program.

During the meeting The Iranian side introduced general information and specifications of Iranian ports and foreign investment opportunities in ports and port development projects such as vast back-up areas; berth and basin construction projects; the construction of oil and petrochemical import and export facilities; developing container, refer, general cargo and transit terminals and added value activities; building, processing and reexport products as well as ship building and repair yards.

During the meeting the Iranian side handed over a draft MoU "Concerning the recognition of certificates of competency for service", and delivered a report about joint cooperation between the Islamic Republic of Iran and the Republic of Turkey for the development of transit transportation. In this report, investment opportunities and advantages of Transit between Europe, the Indian Sub-Continent, South East Asia through corridors, Iranian Transit ports and Turkey was introduced.

The Turkish side introduced the facilities in the Lake Van, including the rail around the lake and the two ferry boat quays for the transport of vehicles.

The private companies representatives also effectively attended the meeting's discussion :

During the meeting Sadra Company, as one of the active Iranian private companies in the construction of commercial and service vessels and tankers and also in the supply of parts and repairing of vessels was introduced and It was proposed that active Turkish vessel construction and repair companies have bilateral cooperation with Sadra Co.

This cooperation can be on a particular agreement basis or joint agreements to use the facilities of one another.

The Iranian side introduced the Asia Classification Society as the classification company of the Islamic Republic of Iran and requested a bilateral meeting between the mentioned company and Turkey's classification company (Turk Loydu Vakfi) within the next three months. The two parties expressed support for further cooperation and signing an MoU between the two classification companies.

In the meeting National Iranian Tanker Company (NITC) requested Turkish ship building companies to deliver better services in repairing oil tankers of NITC.

Moreover the Bana Gostare-Karaneh (BGK) Marine Bunkering Company as one of the active companies in Bunkering and trading expressed readiness in providing facilities in the following fields:

-To invest in the Tank Farm storage tanks.

-To invest in chartering & buying vessels

-To make a joint venture company and commence business abruptly

-To facilitate the L.S.G.O & H.S.F.O bunkering of the vessels

The Turkish side also visited the Shahid Rajaee Port Complex and ship building companies in Bandar Abbas.







## Private Investments in Ports Increase

Ali Reza Sate'i, Member of the Board and PSO Deputy M.D. for Ports and Special Zones Affairs in a news conference predicted the volume of private investment to reach Rls. 25,000 billion by the end of the Fourth Plan.

He added: "According to the Fourth Economic Plan, PSO must increase the investment of the private sector from Rls. 2,000 billion to Rls. 4,000 billion by the end of the Plan. In this context and through facilities and creating trust, PSO has been able to attract Rls. 10,000 billion in investment, which means we are in advance at a rate of 1.5 times the planned schedule."

He stressed: "Our ports have a high potential to attract investment and the mentioned figures can be increased five times over, since only 20% of the potentials have been used."

Sate'i pointed to the new regulation on the Special Economic Zones and added: "The new regulations allow 100% investment by foreign firms on national port projects."

Referring to PSO's position on privatization, Sate'i said: "Currently, all the PSO's terminals are being managed by the private sector and from now on, PSO will no longer purchase any port equipment."

He added: "A sum of Rls. 520 billion has been allotted from the Administered Funds for the benefit of private firms interested in investment on port equipment.

"According to the mentioned plan, PSO is trying to obtain the Organization Council's approval for conceding the titles of 400 port related machines and equipment to active private companies."

The Member of PSO Board of Directors stressed: "In the context of Government privatization policies, we intend to hand over the management of small ports to the private sector and therefore the management of the Port of Fereidoonkenar will soon be privatized."

He continued by announcing the news of wheat export from ports for the first time and said: "Since Iran has been a wheat importer so far, Iranian ports lack wheat export equipments. Therefore, following the announcement of news of wheat export by the Ministry of Commerce, PSO has initiated the move to equip the ports for the purpose."

Sate'i said: "Through planning and action plans, and after agreement between the Commercial Services Company and Tidewater Terminal Operators, the cereal silo has been prepared by the Company at Imam Khomeini Port and they are decontaminating the silo for export of wheat by the end of August."

He said: "The necessary investments have been made to export an annual amount of one million tons of wheat from the Port of Imam Khomeini, and it is now possible to export 10,000 tons of wheat per day on board of 45,000 DWT vessels."

## The First Health, Safety and Environment (HSE) Training Center in Orumieh

The Ports and Shipping Organization (PSO) has set up the first Health, Safety and Environment (HSE) Training Center along the coasts of Orumieh Lake, in cooperation with the private sector and under the license of international colleges. PSO has established the first HSE Training Center in Orumieh in the context of the Organization's objectives of enhancing safety, protecting the environment and reducing accidents at sea and ports.

Accordingly, the Organization, in collaboration with international colleges, has developed special programs for navigation safety, consisting of the four safety measures, maritime search and rescue, fire fighting at sea, and special port safety.

The courses to be offered are the firefighting training programs (including the safety of hazardous cargoes, terminals and oil platforms, fighting fires caused by hazardous materials, safety and firefighting for port equipment and installations), the environmental training programs (including environmental management systems, ballast water, oil pollution at sea, recycling waste materials), and health programs (including health of port staff and seafarers, health protection and first aid, decontamination of cargo transportation equipment, emergency units and health crises at ports and sea).

It should be mentioned that after the establishment and initial phases and the provision of training materials, the Center will admit HSE trainees from regional countries such as Azerbaijan, CIS, Iraq, Turkey and Afghanistan.

Educating Iranian trainers in the field of HSE is among the objectives of the Center. For this reason, the initial training sessions will be conducted by foreign lecturers, and then a number of Iranian specialists will be dispatched to relevant colleges for further education.

## National Marine Pollution Response and Maritime Search and Rescue Exercises in Anzali

The Ports and Shipping Organization, in collaboration with the Department of Environment, the Iranian Fisheries Organization, the National Iranian Tanker Company, the Islamic Republic of Iran Shipping Lines, the Oil Products Exports Terminals, the Iranian Offshore Oil Company, the IRI Navy, the IRI Police, the Islamic Revolutionary Guards Naval Force and the Red Crescent Society, organized the national marine pollution response and maritime search and rescue exercises in the Port of Anzali.

The mentioned exercises were undertaken with the objective of accurate implementation of the national plan for preparedness, resposne and cooperation against pollution, enhancing national readiness at times of major incidents leading to marine pollution, improving coordination among national organizations in conducting marine pollution response, improving the marine pollution reporting systems, self assessment and determination of the weaknesses and strengths of the oil spill response system and enhancing the quality of the maritime search and rescue system in the country.

The exercises were held by the PSO teams trained in combating oil pollution and maritime search and rescue deploying over 17 vessels, flying units and mechanical systems for collecting oil from the sea surface.

## The CSC Training Session Held in Collaboration with Germanisher Lloyd

In a move to implement the International Convention for Safe Containers (CSC) in ports and in view of the need for creating the proper grounds for promoting the culture of the mentioned Convention among terminal operators, shipping lines, container owners, charterers and classification societies, the Ports and Shipping Organization initiated a number of training sessions to introduce the Convention.

Accordingly PSO opened negotiations with the Germanicher Lloyd Classification Society (GL), and Mr. Guido Hoege Boeck traveled to Iran to lecture on the International Convention for Safe Containers (CSC) during the mentioned training sessions. Mr. Boeck has 11 years of experience as container surveyor in the GL and has been responsible for container certificate approval and awarding for 8 years.

As the Islamic Republic of Iran is the only regional country joining the Convention and given the special procedures for enforcing the Convention in ports, it would be beneficial to learn from the experiences of member States in its correct implementation. Representatives from important shipping lines, port and terminal operators, port experts and the domestic and foreign classification societies attended the course.

### News in Brief

## Maritime Experts Trained to Review Maritime Accidents

Given the importance of accurate reviewing of the maritime accidents in preventing similar cases, and enhancing the know-how of PSO's experts on sea accidents, the Organization organized a 5-day training course on reviewing the maritime accidents .

Subjects discussed during the training session included the history of sea accidents, introduction to different types of sea accidents and the main factors in sea accidents, including human and technical factors. Moreover the regulations, conventions, guidelines and international references for review of accidents were introduced and the different procedures and stages of review and analysis of sea accidents through a systematic method and application of scientific methodology based on IMO Model Course were presented. It should be mentioned that these courses, which were provided previously by foreign lecturers, were conducted for the first time by Iranian professors.

## Initiatives Taken for North–South Oil Transit

Alexander S. Bobreshov, the Vice-President and Member of the Board of the Russian Railways and his accompanying delegation discussed ways of mutual cooperation in transiting oil and related products during a meeting with officials from the Ports and Shipping Organization and the IRI Railways. Given the existing potentials and capacities, the parties agreed to set up an expert committee to review the feasibility of transiting oil and related products from CIS and Central Asia to Southeast Asia. They further agreed to set up a center to study, remove obstacles and propose practical solutions for the purpose.

## Port of Chabahar Awarded IMS Certificate

The Port of Chabahar succeeded in obtaining the Certificate for Quality Management, Environment, Occupational Safety and Health Systems based on OHSAS 18001:1999, ISO 14001:2004 and ISO 9001:2000 standards from the R-TUV International Company in Iran.

The scope of the certificate includes maritime and port services consisting of cargo loading, discharge and storage, ship registration and inspection, seafarer's examination and certification, repair and maintenance of equipment and installations, and safety and protection of the marine environment. Following a review of the provincial ports in accordance with the conditions of the integrated management system during a 14-month project, and through training the specialists and implementation of the management system, the Directorate General of the Sistan and Baluchistan Ports and Shipping was able to obtain the Integrated Management System (IMS) Certificate following an audit by the issuing company.

# Who's Who in PSO

S. M. Momeni
Member of the Board & Deputy Managing Director for Maritime Affairs
Tel: + 98 21 88651110
Fax: + 98 21 88651112
E-mail:momeni@pso.ir

E. Azizabadi
Director General of Seafarers Standards, Training and Certification
Tel: + 98 21 22288037
Fax: + 98 21 22802500
E-mail:azizabadi@pso.ir

Davood Sharifi
Director General for International Maritime Specialized Agencies
Tel: + 98 21 88651120
Fax: + 98 21 84932187
E-mail:dsharifi@pso.ir

S.Ali Estiri
Director General for Maritime Affairs
Tel: + 98 21 88651116
Fax: + 98 21 84932675
E-mail:stiri@pso.ir

M. Ghaderi
Director General of Safety & Marine Protection
Tel: + 98 21 88651118
Fax: + 98 21 84932190
E-mail:ghaderi@pso.ir

N.Alipour
Head of Seafarer Standards Directorate
Tel : 98 21 22281522
Fax : 98 21 22802500
E-mail:alipour@pso.ir

M. Asiabanpoor
Head of Training Department
Tel: + 98 21 84932630
Fax: + 98 21 84932633
E-mail:asiabanpoor@pso.ir

Naser Ajorlou
Head of Marine Communication Department
Tel: + 98 21 84932145
Fax: + 98 21 88651191-2
E-mail:ajorlou@pso.ir

Ahmad Parhizi
Head of Search and Rescue & Marine Environment Protection
Tel: + 98 21 84932172
Fax: + 98 21 84932190
E-mail:parhizi@pso.ir

Nader Pasandeh
Head of Seafarer's Examination & Certification Department
Tel: + 98 21 22802501
Fax: + 98 21 22280103
E-mail:pasandeh@pso.ir

Ahmad Foroughi
Head of Ship Registration & Certification Department
Tel: + 98 2184932144
Fax: + 98 21 88651191-2
E-mail:foroughi@pso.ir

Jamal Jafaripour
Heah of Maritime Operation Department
Tel: + 98 21 84932143
Fax: + 98 21 84932675
E-mail:jafarpour@pso.ir

Iraj Roozkhosh
Head of PSC Division
Tel: + 98 21 84932173
Fax: + 98 21 84932190
E-mail:roozkhosh@pso.ir

## News in Brief

### Khoramshahr Awarded the IMS Certificate

In the year named for productivity in the Ports and Shipping Organization, the Khoramshahr Ports and Shipping succeeded in obtaining the Integrated Management System (IMS) Certificate , after two years of constant effort of officials and experts towards standardization of processes.

The mentioned system includes the Quality Management System based on ISO 9001:2000 standards, the Environmental Management System based on ISO 14001:2004 standards and the Occupational Safety and Health based on OHSAS 18001: 1999 as defined by the French Bureau Veritas (BV).

### Journalists Trained on "Port and Maritime Concepts"

Considering the vast dimension of shipping industry and dynamic word of maritime transportation and with aview to the public medias significant responsibility to announce correct and valid news to the public, Ports and Shipping Organization held a training course for journalists on port and maritime concepts .

The course aimed at promoting the knowledge of the journalists in port operation and maritime transportation fields.

P.S.O Managing Director, the Board of Directors and Director Generals of Port, Maritime,and Engineering Departments introduce P.S.O. scope of activities to the participant during a 3-day course. In the final day of the course journalists visited the southern port of Shahid Rajaee and witness the port operation from close distance.

## Iran and Denmark Insist on Joint Maritime Cooperation

Ali Taheri, the Managing Director of the Ports and Shipping Organization and Soren Haslund, the Danish Ambassador discussed the means of maritime cooperation during a meeting in the PSO's headquarters.

Accompanied by the Embassy's Advisor Mr. Peter Ivertsen and the Commercial Attaché, the Danish Ambassador met with Mr. Taheri and A.Satei,PSO Deputy for Port Affairs and S.E.Z . Stressing the importance of shipping industry for his country, the Danish Ambassador stated: "Despite being a small country, the coastlines and the surrounding seas have made the sea and shipping activities an important feature of the Danish economy and Denmark possesses the most credited shipping lines and the most modern fleet in the world."

He pointed to the movement of the Danish ships, including the Maersk Lines, the world's largest container liners in Iranian ports and stressed the need for expanding cooperation between the two countries in shipping petroleum products, chemicals and LNG.

Taheri, referring to Maersk activities in the port of Shahid Rajaee, said: "During meetings held with this Company's representatives in Iran, they expressed their satisfaction of the services provided in the Port, and we hope that once the works on expansion of the Shahid Rajaee Port Complex as well as the development plans are completed and the modern equipment is in place, the port's service would be further improved, allowing the berthing of larger ships of 10–12 thousands TEU in capacity."

Referring to the Shahid Rajaee Expansion Project, the largest container port of the country, to be implemented in three phases, he reiterated: "The current capacity of the port's container terminal currently stands at 1.5 million TEUs, and once the Phase I of the project is completed, this capacity will be doubled reaching to 3 million TEUs, and for this reason 8 Super Panamax container cranes have been installed in the terminal."

He added: "During the phase II of the project the capacity of the container terminal of Shahid Rajaee Complex will reach 6 million TEUs in two and half years' time."

Taheri announced the news of PSO's interest in attracting foreign and domestic investment in the form of BOT contracts for implementing the Organization's development plans and added: "In the context of the Government's privatization policies, the Ports and Shipping Organization has been one of the pioneers of handing over operations to the private sector and so far the management of all the port terminals in the country and most of the ports operations have been handed over to the private sector. Moreover some of the smaller ports are planned to be administered completely by private operators.

" He further announced the PSO's readiness to hand over the construction of infrastructural facilities and port operations to domestic and foreign investors.

## UAE Looks for Investment Opportunities in Iranian Ports

Following the visit by Mahmood Ahmadi Nezhad, the President of Islamic Republic of Iran to the United Arab Emirates (UAE) and positive discussions with the political and economical authorities, which have created the necessary grounds for future economic and executive interactions and planning, the representatives of Ghantoot Groups, one of the leading economic investment corporations in UAE arrived in Tehran to explore opportunities for investment in the country.

Ali Mohammad Sadeq Al Balushi, the President of Ghantoot Group and his accompanying delegation held numerous meetings with the officials of different organizations and ministries, including the Ports and Shipping Organization, the Tehran Municipality, the Ministry of Energy, the Ministry of Petroleum and the Tidewater Company.

The UAE delegation also visited the Persian Gulf Petroleum Port and the Shahid Rajaee Expansion Project during a trip to Bandar Abbas, and was informed in details of the Shahid Rajaee Expansion Project and the development plans for the Persian Gulf Port during a meeting with officials of the Hormozgan Ports and Shipping. The Ghantoot Group is active in various development projects, road construction, marine, electronic, transportation and other projects.





# Caspian Sea: the Largest Inland Reservoir

Spread over an area of 436,000 km$^2$, the Caspian Sea is the world's largest inland reservoir, located in the frontier between Europe and Asia. The coastline of this sea extends over 6400km, with Kazakhstan having the longest coast of 1600km, with Iran (820km), Russia (695km), Turkmenistan (650km) and Azerbaijan (600km) coming next in line.

The deepest point in this lake reaches down to 1025m and the sea has an average depth of 208m, increasing from north to south. There are a number of islands in the sea covering a total area of approximately 2,000 meters. The Sea is fed by over 130 large and small rivers. The largest of these are in the northern coasts, while the small ones are to be found in the western and the southern coasts of the Sea. Volga is the largest river in the Caspian Basin, supplying 80% of the Caspian water alone. The Caspian has no connection to open seas, although ships pass through Volga and then to the Volga-Don Canal to reach the Black Sea and the Baltic. The Caspian Sea can be compared to an aquarium, which holds a wealth of fossil reserves on its bed and a large collection of marine vegetation and species in her heart. Despite being an inland reservoir, the Caspian Sea possesses a rich biodiversity and is the habitat for approximately 1,600 marine species. Sturgeon is the main marine species of the Caspian and over 70% of the world's Caviar is supplied from this Sea. The marshlands and lagoons along the coasts of the Sea constitute suitable habitats for millions of indigenous and migrating birds.

### The Caspian Economy

Archeological studies around the Caspian Sea show traces of settlements along the western regions of Turkmenistan, north of Iran and the eastern regions of Azerbaijan dating back to around 12,000 years ago. It appears that the territory surrounding the sea was the breeding grounds for many civilizations.

Although the Sea has always provided the means of income and trade for the coastal residents, in recent centuries and particularly from the 19th century, it gained a new international significance with the industrial exploration of oil in Baku. Before then, the Sea's importance was limited to fishing and shipping, but in recent decades, the issues of exploring the seabed's resources and protection of the environment and the marine environment has also found a new significance.

Russia possesses the largest fleet in the Caspian Sea, although in recent year the Iranian companies have tried to gain a larger share of cargo shipping in this area.

Oil and fuel transfer in the Caspian is mainly realized through pipelines. Along these, tankers carry crude oil from Russia and Kazakhstan to the Port of Neka in Iran, to be taken by the Neka-Rey Pipeline to Tehran Refinery.

The rush for economical exploration of the Sea by some littoral States has resulted in a serious ecological crisis, and according to witnesses, many marine and bird species will become extinct in a near future, transforming the Caspian into a dead sea.

### The Caspian Environment

Due to her enclosed environment and lack of access to open sea, the Caspian ecosystem is quite vulnerable and the protection and conservation of the Caspian environment is therefore a serious responsibility that should be shouldered by all the littoral States. Given the current load of pollution from industrial activities, drilling and explorations, shipping movement and discharge of waste, the invasion of foreign species and illegal fishing, the accomplishment of a sustainable ecosystem would seem impossible without a specific strategy to protect and revive this unique environment. Generally speaking, the sustainable development of the Caspian Sea depends on the conservation of her bio-diversity, which can only be realized through rational and responsible operation of the sea by all the coastal governments concerned. To this end, it is important for all the states to maintain effective national and regional interactions to preserve the sea.

Under the title of cooperation among states having common frontiers with enclosed or semi-enclosed seas, Article 123 of the United Nations Convention on the Law of the Sea stipulates: "countries having a common frontier in form of enclosed or semi-enclosed sea must cooperate with each other when discharging their duties under this Convention."

The other feature of the Caspian Sea as an inland reservoir is that it is excluded from the principles and regulations on seas related to the division of maritime regions such as territorial waters, continental shelves, etc. The lack of a legal system governing the Caspian environment can in no way justify the negligence from the international laws governing the seas by the littoral States.

Considering this special characteristics, it is necessary and imperative for the five littoral States to compile and implement special rules and regulations for conservation and protection of the marine environment.

## Iran and Georgia to Develop Marine Ties

The final draft of the agreement on commercial shipping was finalized during the visit of the Ports and Shipping Organization (PSO) delegation to Georgia.

Mohsen Sadeghifar, PSO Director General of Port Affairs announced the news and said: "Considering the existing potentials in Georgia, the draft agreement on commercial-maritime shipping was agreed by the two countries' experts during the fourth Iran-Georgia joint commission in 2005." He added: "The follow-ups by the two countries have resulted in a draft agreement, which was reviewed and finalized by the Iranian and Georgian delegations



during the trip of the PSO delegation to Tiflis."

The Iranian delegation headed by Mohsen Sadeghifar attended several meetings with Georgian transportation officials during their two-day trip, negotiating the terms of the agreement.

The draft of the agreement was finally approved by both parties, making it ready for official signature by the high officials of the Islamic Republic of Iran and Georgia during the future meeting of the two countries' economic commission.

Located in the northwest of Asia on the side of the Caspian Sea, Georgia also has a considerable waterline in the Black Sea (310km) and neighbors the countries of Armenia, Azerbaijan, Russia and Turkey, thus enjoying an ideal situation as a transportation link both on land and the sea through the Black Sea and the Mediterranean. This country imports the bulk of its energy needs including natural gas and petroleum products. The expansion of Georgia's marine transportation sector would be possible by the development of international transportation corridors through the strategic ports of Pouty and Batumi in the Black Sea.




## Anzali Visited by Representatives from 24 Countries

The Director General of Guilan Ports and Shipping Organization (PSO) invited the Ambassadors and representatives of 24 countries to invest in Anzali Free Trade Zone, during their visit to the Port of Anzali.

During the gathering of ambassadors and attachés of the Central Asian and European countries, Farhad Montassar Koohsari said: "The Anzali Free Trade Zone extends over 200 hectares and at present consists of the three port, industrial and tourist zones."

Pointing to the maritime transportation sector, he said: "The Anzali Free Trade Zone is an ideal place for investment on production units for the purpose of processing, packaging and creating added value." He added: "In this context, the Government of Islamic Republic of Iran has taken great strides in guaranteeing capital investments by foreigners."

Koohsari affirmed: "Due to its position on the NOSTRAC Corridor and its proximity to Central Asian countries, Anzali constitutes an ideal bridge for other countries." Referring to other attractions of Anzali such as trade, tourism, aquaculture, agriculture, etc., he stressed: "In case of investment and activation of this Corridor, we would soon

witness the realization of common interest for all the countries."

Koohsari stressed: "Currently the Guilan ports and customs are among the most important ports and customs of the Caspian region due to their advanced software systems."

He added: "Considering the volume of investment and the ongoing plans, the port's capacity as defined in the Master Plan is predicted to reach 10 million tons with 24 harbors spread over an area of 102 hectares." He cited the development of infrastructure,




tax exemptions, land concessions and special facilities for investors and project owners as among the port's future programs.

Koohsari reiterated: "The high speed of port operations has resulted in the activities of 66 cargo transportation companies, 20 shipping companies, 40 custom clearance firms and 20 cargo survey companies in this district."

He further cited the indicators for developed countries as attention to the sea and shipping, and expansion of ports, roads and railways and said: "In this context we have moved towards the expansion of the port to improve trade in the region."

Koohsari described the tourist attractions of Guilan and Anzali, due to its special location between the sea and the lagoon as unique and stated: "The city has great potentials and can become the most beautiful tourist center in the country and the region if proper investments are made."

Bandar Anzali has a population of 140,000. It is located at a distance of 333km from the national capital. It has currently 37km of coastal stretch, and the Anzali Lagoon is one of the most important attractions of the city.



# IMO's Response to Current Environmental Challenges

Every year IMO celebrates World Maritime Day during the last week in September. The day is used to focus attention on the importance of shipping safety, maritime security and the marine environment and to emphasize a particular aspect of IMO's work.

World Maritime Day was set up by the IMO in 1978 and national governments commemorate it during the last week of September. Various themes were covered in the past 29 years such as safety and welfare of seafarers, cleaner seas and safer oceans, search and rescue and telecommunications in shipping. The theme chosen by IMO this year is Focus on Marine Environment. The IMO Council, at its 97th session in November 2006, endorsed the proposal of Secretary-General, Mr. Efthimios Mitropoulos, that the theme for World Maritime Day 2007 would be **"IMO's response to current environmental challenges".**

The theme was chosen to give IMO the opportunity to focus on its environmental work (both of the past and present) and thus intensify its efforts to add our contribution to that of the international community to protect and preserve the environment before it is too late.

In his message marking the occasion, IMO Secretary-General Efthimios Mitropoulos,pointing to today's growing concern for the environment and sharper scrutiny and pressure on environmental credentials of every country and industry to which the transport industry is no exception and said: " certainly enough environmental concerns are now high on the agenda in all of its sectors"

"Although statistics reveal that, of all modes of transport, shipping is the least environmentally damaging, there is no doubt that the shipping industry, and IMO, still have more to do in this respect, there is, nevertheless, an impressive track record of continued environmental awareness, concern, action, response and overall success scored by the Organization and the maritime community and industry, which cannot go unnoticed. over many years, IMO adopted a wide range of measures to prevent and control pollution caused by ships and to mitigate the effects of any damage that may occur as a result of maritime operations." Mr.Mitropoulus said. According to Mitropoulos The most serious problem at the time IMO began to address environmental issues was the spillage of oil into the seas, either through accidents or poor operating practices.

"To address these effectively, the Organization embarked on a multi-faceted, ambitious programme of work which culminated successfully in the adoption of International Convention for the Prevention of Pollution from Ships (MARPOL) in1973 which laid the foundation for substantial and continued reductions in pollution from ships despite a massive increase in world seaborne trade, So that tanker owners take pride in statistics that show that 99.9996 per cent of all oil transported by sea is delivered safely and without impact on the marine environment. "he noted.

"MARPOL, nevertheless, recognizes that some areas need protection over and above that sought under normal circumstances. To this end, it defines certain sea areas as .Special Areas and Particularly Sensitive Sea Areas".IMO Secretary General added. He continued:"IMO's environmental work in recent years has covered a remarkably broad canvas including: the adoption, of the Ballast Water Management Convention(2004), entry into force of the 1996 Protocol to the 1972 Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter, and Other IMO Conventions deal with issues such as the use of harmful anti-fouling paint on ship hulls; preparedness, response and co-operation in tackling pollution from oil and from hazardous and noxious substances; the right of States to intervene on the high seas to prevent, mitigate or eliminate danger to their coastlines."

According to him the issue of ship recycling, removal of wrecks, atmospheric pollution have also been IMO's major environmental concern over the past recent years. IMO's Secretary General express concern over delayed implementation of IMO instrument after its entry in to force and further delay in tackling the issues regulated by such instruments which may spur unilateral or regional measures by individual countries or groups of countries and prolongation of the situation which may lead to ambiguities, which, in the final analysis, may count against seafarers, the maritime industry and the environment.

Appreciating IMO's decision to select environmental issues to take centre stage this year, He finally express hope that the theme will play centrepiece in a host of activities and initiatives, which will form part of a concerted action plan that we have been undertaking to educate people; increase their awareness about the true, and deteriorating, state of the planet; and help us all to become responsible citizens, in its fullest sense.



## Irano-Hind Shipping Signs Contract for Building 160,000 DWT Ship

The Irano-Hind Shipping Company has signed a contract for construction of one 160,000 DWT Suezmax vessel with South Korea's Hyundai. During the contract signing ceremony, Dr. Gholam Hossein Golparvar, the IRISL Deputy for Commercial Affairs said that the tanker would increase the Irano-Hind capacity to 800,000 DWT and added: "Through , investments on new ships and the use of foreign loans, the Company has been able to increase its capacity 5.5 times since 2001, which is a unique feat among domestic companies and constitutes an exceptional leap in the development of commercial fleet." He added: "With this contract, which is for the construction of the third Suezmax tanker, the Company will be the owner of 4 vessels of this type."





Dr. Golparvar stressed: "The Irano-Hind Shipping is trying to increase its fleet capacity to 1 million tons by the year 2010." The IRISL Commercial Deputy stated: "The strategies and investments made by IRISL have directed the national fleet towards capacity expansion, which is the most certain way and tool for economical growth and non-oil export of the country. The Vice-President of the South Korean Hyundai assured the gathering of the high quality of the ships ordered and added: "Hyundai has a close relationship with Iranian shipping companies."

It should be mentioned that the contract is worth USD 80 million, and Hyundai is scheduled to deliver the ships by the year 2009 to the Irano-Hind Shipping Company. Hyundai is currently constructing two similar ships ordered by Irano-Hind shipping.

## Iran Will Earn 1 Billion USD from Bunkering

According to the National Iranian Oil Products Distribution Co.'s plans Islamic Republic of Iran set a goal to boost its incom, derive from ship bunkering to 1 billion USD annually.
Eng. Ahmadinezhad Vice

president of National Iranian Oil Produts Distribution Company stated:"According to P.S.O. statistics 3500 foreign ships and 2200 domestic ships of above 1000 DWT call the Iranian southern ports annually and as a result Iran enjoys the lucrative

regional market of the Persian Gulf and the Oman Sea." He added:"by the end of the current year with 2000 foreign ships added to the Iranian ships now bunkering by NIOPD Company, 2 million tons of bunker fuel will be sell by the

company which will generate 640 million USD of income to the country."
He countinued: NIOPDC has set a goal to boost the country's income from bunkering to 1 billion USD annually by 2010.

## Iran and Saudi Arabia to Boost Maritime Cooperation

The cabinet has approved a bill on Iran-Saudi marine transportation cooperation, easing transportation between the two countries.
The agreement, including an introduction and 13 articles signed by the two governments, aims to establish a legal framework for cooperation in

facilitating marine transportation of goods between the two countries,
The bill, ratified by the Iranian Parliament and approved by the Guardian Council, is now forwarded to Iran's Ministry of Roads and Transportation as the responsible body for implementation.

According to the MoU the two sides vowed to boost bilateral marine transportation through the ports of the two countries and remove any obstacles, as well as to facilitate the transportation with the third country.
According to the article 3 of the memo the ships under the flag

of the two countries should observe the provisions of the international conventions and agreements the other party had joined and the other country port codes regarding marine safety, environment, dangerous goods and seafarers work and life conditions.

## Korean Crew Saved by Bonyad Shipping Co.

The crew of a Korean Ship in distress near the gulf of Oman due to flooding of the engine room were saved by M/V SAHAR, belonging to Bonyad Shipping.
After being informed of the call for assistance from Korean Ship "DARIAN", which was facing difficulties after water had penetrated the engine room, the Bonyad Shipping owned SAHAR succeeded in rescuing all the distressed ship's officers and crew.
According to the report, the 15 crew members including 10 Syrians and 5 Indians were handed over safely to Omani officials.

It should be mentioned that after the accident, which occurred in the morning of 10 August 2007, DARIAN sent distress alerts through VHF asking for assistance from ships present in the region. Being at a distance of 11 miles from the distressed ship, SAHAR immediately changed her course towards the announced position and was able to save the crew of the Korean ship and transfer them on the deck and conduct them to the nearest coast.
According to SAHAR Master, the weather at the time of the accident was stormy and the ship was in a very dangerous



situation.
According to him, such a situation puts also the aiding ship at risk, but the necessity to rescue the Korean ship's crew impelled the Iranian ship

to accept the risks and carefully plan and implement the rescue operation with success. At the time of accident, the Korean ship was carrying cement from Karachi to Iraq.

## 1st International Conference on Persian Gulf, the Marine Silk Road

The First International Conference on Persian Gulf, the Marine Silk Road titled: "Yesterday's Silk Road, Today's Energy Highway" will be held in December 6-9,2007 in Tehran, with the objective of reviewing and studying the historical identity of the Persian Gulf and its special and unique role in the marine silk road, as the economical highway of this strategic region.

The Conference is divided into six specialized commissions including: "Foreign Business and Trade", "Historical and Touristic Geography", "Environment and Environmental Resources", "Economy and Investment", "Evaluation of Global Strategy for the Persian Gulf", "Transit of Oil, Gas and Petrochemicals" and "Connections between the East, West, North and South Corridors".

In addition to presenting the cultural, commercial, political and geographical history of the marine silk road in the Persian Gulf, the Conference plans to introduce and review the existing and future potentials and conditions of the marine silk road, particularly in the vital highway of the Persian Gulf.

www.persiangulfsilkroad.com

## 4th Marine Photo Festival Introducing National Maritime Society

In a move to promote the national marine culture, to introduce the Iranian maritime society (the military and defense fleet, the petroleum fleet, the commercial fleet, the fishing community, the passenger fleet and the maritime industries), and to pave the way for closer awareness of the sea and related subject by the general public and photographers, the Ports and Shipping Organization will hold the 4th Iranian Marine Photo Festival.

The Festival includes the 4 sections of "Nature", "The Environment and the Sea", "Man and the Sea" and "Open (in subject related to sea) " and 4 other sections aimed at introducing the maritime society of the country through such subjects as:

a)The activities of Iranian ports;

b)The activities of Iranian defense and military fleet;

c)The activities of Iranian tanker fleet;

d)The activities of Iranian commercial fleet;

e)The activities of Iranian fishing fleet;

f)The activities of Iranian passenger fleet; and

g)The activities of Iranian ship repairs and maritime industries.

www.seaphoto.ir

## 7th Conference of Maritime Science and Technology

The Iranian Association of Maritime Science and Technology, in collaboration with the Imam Khomeini University of Noshahr and maritime organizations will hold the 7th National Conference on Maritime Science and Technology for two days starting on 28 November 2007 with the objective of introducing the scientific, research and industrial capacities of the country, expanding relations among the relevant researchers and introducing the latest national accomplishments in this field.

The Conference, which focuses on "Marine Trainings, Military and Defense Issues", "Maritime Engineering and Technology", "The Rights and Management of Marine Resources" and all the biological and non-biological fields of marine sciences will be held in Noshahr. Moreover, in order to increase the awareness of researchers and scientists of the maritime field of the producers and latest technologies, an exhibition of products from various companies and organizations will be held as the side event to the Conference.

www.ismst.ir

## September 25th, World Maritime Day

According to a report issued by the Public Relations and International Affairs Department of the Ports and Shipping Organization, this year's World Maritime Day, themed as "the Maritime Organizations Response to Environmental Challenges" will be held on September 25th attended by officials, organizations and companies active in the maritime industry as well as seafarers. As in the past, the exemplary seafarers will also be awarded during this year's ceremonies.

## Calander of Events

**International Maritime-Port Technology and Development Conference**
26-28 September
Singapore
www.mtec2007.org

**4th Thai Ports and Shipping 2007**
27-28 September 2007
Bangkok
www.transportevent.com

**Inmex India 2007**
3-5 October 2007
Mumbai India
www.inmexindia.com

**Port and Terminal Technology**
9-10 October 2007
Antwerp, Belgium
www.milleniumconferences.com

**JOC 1st Automotive Maritime Logistic Conference**
15-16 October
Baltimore, USA
www.joc.com

**2nd Southern Asia Ports, Logistics and Shipping**
18-19 October 2007
Mumbai, India
www.transportevents.com

**Maritime Africa 2007**
24-26 October 2007
Cape Town
www.martimeafrica.net

**MEDITERANEAN NARITIME**
24-26October 2007
Marseille, France
www.baird-online.com

**Portech Asia 2007**
24-26 October 2007
Shanghai, China
www.globaler.com

**2nd European Conference on „Production Technologies in Shipbuilding**
October 25-26, 2007
The armoury of the Hanseatic City of Wismar
Germany
www.ecpts.de

**Kormarine 2007**
24-27 October 2007
Busan S. Korea
www.kormarine.net

**Malaysia Ports 2007 Conference**
29-30 October
Kuala Lumpur, Malaysia
www.abf-asia.com

**SCM Logistics Middle East 2007**
29-31 October 2007
Shangri-La Hotel, Dubai, UAE
www.trrapinn.com/2007/scmme

**Marine Indonesia**
31 October - 3 November 2007
Jakata
www.pamerindo.com

**TOC2007 Americans**
6-8 November
Panama
www.toc-events.com

**Europort 2007**
6-10 November 2007
Rotterdam
www.europortmaitime.nl

**Container Tracking & Security 2007**
7-8 November
Dubai, UAE
www.telematicsupdate.com

**ShortSea Conference**
15-16 November 2007
City Halls Bruges
Belgium
www.europoint-bv.com

**Med Freight 2007**
22-23 November
Starhotel President, Genoa
www.lloydslistevents.com/lm1931

**The All China Maritime Conference and Exhibition**
27- 30 November 2007
Shanghai, China
www.marintecchina.com

**Marine Fuel & Emission Conference**
27-28 November
Rotterdam, Netherlands
www.motorship.com

**3rd Trans Middle East 2007**
28-29 November 2007
Cairo
www.transportevents.com

**Intermodal 2007**
4-6 December 2007
Amsterdam
www.intermodal-events.com

# The Port of Imam Khomeini



With a record of 70 years of activity, the Port of Imam Khomeini is the largest port of the country, located within 11 million m$^2$ of area in the northwest of Persian Gulf and at the extremity of the natural waterway of Khormousa.

Stretching 7km in length, a minimum of 250m in width and an average depth of 20m, the Khormousa waterway provides a calm and assured bed for the movement of the oceangoing commercial vessels and tankers. The Port's excellent equipment and installations have allowed an annual cargo handling capacity of over 35 million tons, equivalent to 30% of the total capacity of the Iranian ports. Moreover, half of the annual oil exchanges are carried out through this port.

**Advantages of Imam Khomeini Port:**

This port is the most important and closest southern port to the main agricultural centers, domestic markets and populated regions of the country, and has the shortest distance to Iraq through Shalamcheh border. It has provided the appropriate conditions to activate the East-West Corridor and it enjoys the shortest land and rail route to the north for activating the NOSTRAC Corridor. The proximity of Imam Khomeini Port to the petrochemical complexes of Imam Khomeini Port, Razi, Farabi and the largest petrochemical special zone of Iran, which will be fully operative by the end of current Iranian year with an annual production volume of 11 million tons of solid and liquid products are among the other advantages provided by the Imam Khomeini Port. This port is also located in the proximity of largest industrial centers in the west, north and central parts of the country including the Khuzestan industries, Abadan refineries, Esfahan, Shiraz, Tehran, Tabriz, Arak, as well as the most important petrochemical, automotive and heavy machines industries in Tehran, Tabriz and Arak. Ships carrying export and transit goods from this port are subject to special rates and port charges. Another important feature of the Port is the availability of 100 km of internal railways, which link the harbors, warehouses and docks and provide the facility of direct transportation of cargo from ship to the business and industrial centers of Iran and neighboring countries.

**Investment in support premises:**

Though land concessions to the private sector during the period of 2002–2006, over 30 companies and organizations have invested in construction of warehouses, terminals, silos, workshops, etc. The volume of investments made on over 1,000,000 m$^2$ of support premises is equivalent to Rls. 1,177 billion.

Moreover, the privatization of port's operations has attracted over 60 companies and firms with contracts for discharge, loading and clearing cargo, and about 40 shipping companies acting on behalf of international shipping companies in the fields of imports and exports. The appropriate facilities are available for investment in construction of piers as well as port equipment and installations, liquid oil and petroleum product reservoirs and warehouses.

**Port equipment:**

220-ton crane:........1
Beach crane:........10
Yard crane:........38
Trailers:........6
Gantry crane:........4 (40 tons)
Transtainer:........5
Reach stacker:........5
Cereal suction:........7

**Port operations:**

Due to the expanse of the port yard and the number of piers as well as the availability of large petrochemical complexes in the area, the Port of Imam Khomeini has a large throughput. In recent years the port's performance has improved significantly. www.bik.ir

**Distance between Imam Khomeini Port and neighboring ports**

| Route | Distance |
|---|---|
| Imam Khomeini – Dubai | 493 |
| Imam Khomeini – Umm Al Quasar | 290 |
| Imam Khomeini – Sharjah | 510 |
| Imam Khomeini – Kuwait | 180 |
| Imam Khomeini – Fujairah | 662 |
| Imam Khomeini – Dammam | 279 |
| Imam Khomeini – Masqat | 775 |
| Imam Khomeini – Bahrain | 317 |
| Imam Khomeini – Qatar | 425 |

**Imam Khomeini Terminals**

| Name | No. of berths | Area (m$^2$) | Draught (m) | Capacity |
|---|---|---|---|---|
| Container Terminal | 5 | 1037 | 14 | 250,000 TEU |
| Bulk cargo Terminal | 10 | 3471 | 11-13 | 10,000,000 tons |
| General Cargo Terminal | 17 | 1691 | 11.5-12.5 | 11,000,000 |
| Building Materials | 2 | 400 | 11-12 | 4,000,000 |
| Industrial Powders | 2 | 400 | 11-12 | 1,000,000 |
| Cereal Silos | 2 | 400 | 11-12 | 70,000 + 150,000 |
| Liquid Oil | 2 | 400 | 11-12 | 2,000,000 |





## Islamic Republic of Iran Shipping Lines a Global Partner

With the aim of responding to the increasing demands for transportation of cargo and considering the need and importance of regular carriage of goods by sea due to the Iran's long coastlines and accessibility to open seas, Islamic Republic of Iran Shipping Lines (IRISL) commenced its shipping activities with two 2500 Dwt vessels in 1967.

Today, after nearly 40 years, the IRISL Group has been qualified to address itself as a Global Partner and is able to transport 22 million tonnes of cargo annually.

The increasing importance of oceans as the most cost-effective mode for transportation of commercial cargos resulted in the continuous growth of manufacturers' satisfaction to transfer their products by means of vessels to obtain secure facilities and supports.

Understanding this situation, the IRISL Group has provided the customers with new services by expanding its activities in the international sphere at the end of 2005.

According to categorization of prominent international shipping companies of the world, the IRISL Group has been nominated as the largest shipping fleet in the Middle East, and in relation to its fleet expansion, as the second shipping company in the world. The IRISL Group has established 13 subsidiary companies within the country and overseas, and four regional offices in Europe, Far East, and Middle East as well. It has also established 180 International Offices and Agencies all over the world.

Moreover, the IRISL Group has 120 vessels and the potentiality of handling a total capacity of more than 3.9 million tons of cargo in the international routes. Today, the GROUP has 60% of its role playing on international routes, through cargo transportation to most of the major ports all over the world, together with outstanding display of various state-of-the-art loading and discharging services at ports, where it has regional agents as well as offering quality door-to-door services to its customers.

IRISL services and activities are divided and categorized in to different types of bulk, container & break bulk services.

### IRISL CONTAINER SERVICES

The container services of IRISL are strongly active in the routes from Asia and Europe to Persian Gulf, Asia to Europe and Indian sub-continent and provide full scope coverage of "port to port" as well as "multimodal" shipments within and between the two continents.

There are over 40,4000 owned and around 10,000 chartered sea born slots available in these services and by carrying around 950,000 TEUs during the year 2006, IRISL ranked 22nd in the world in terms of volume.

M.H.Dajmar
IRISL Managing Director

### IRISL BULK SERVICE

IRISL, through ownership of 46 bulk carriers with total deadweight capacity of about 2.3 million tons, is able to carry all kinds of dry clean and unclean bulk cargoes such as grain, coal, iron ore, etc. The IRISL fleet utilizes two other clean product tankers capable of transporting vegetable oils and other products of similar nature.

### IRISL Break Bulk Service

17 oceangoing vessels of modern General Cargo and Multipurpose Cargo ships with a capacity of 300 thousand DWT carry various general cargoes such as machinery, equipment, pipe, timber and steel products from East and South Asia to the Middle East and Persian Gulf ports.

www.irisl.net

**IRISL FLEET**

| Type of Vessel | No. of Vessels | CAPACITY | |
|---|---|---|---|
| | | DWT | TEU |
| Bulk Carrier | 46 | 2,299,749 | - |
| Container Carrier | 11 | 409,194 | 30,848 |
| General Cargo Carrier | 11 | 204,185 | 4,147 |
| Multi-purposeCarrier | 15 | 349,066 | 8,127 |
| Tanker | 2 | 80,650 | - |
| Total | 85 | 3,342,864 | 43,122 |

## Iran and Russia Agree to Solve Problems of Iranian Ships

The Managing Director of Ports and Shipping Organization announced the news of an agreement to solve the problems of ships flying the Iranian flag in Russian ports. Referring to the initiative taken by PSO to solve the problem of lengthy lay-up time for loading and discharge of Iranian ships and the dissatisfaction of cargo owners, Ali Taheri said: "We have recently held positive talks with the Russians and their port officials have had a good cooperation with PSO during this time."

He added: "Currently, the PSO experts are reviewing and planning the appropriate grounds to solve the problems of Iranian ships in Russian ports."

The PSO Managing Director said that these problems would be reviewed and discussed between the Organization and the private sector and added: "Through these initiatives in a very near future, the Iranian ships would be able to load and discharge their cargo in Russian ports without any problem."

## IMO Meetings

83rd meeting of Maritime Safety Committee (MSC)
3-12 Oct
Copenhagen, Denmark

93rd meeting of Legal Committee (LEG)
22-26 Oct
Panama City, Panama

24th meeting of Council Extraordinary Session
15-16 Nov
Royal Lancaster Hotel, London

25th meeting of Assembly
19-30 Nov
Royal Lancaster Hotel, London

99th meeting of Council
30-30 Nov
Royal Lancaster Hotel, London

# Kish: Pearl of the Persian Gulf

Spread over an area of approximately 91 $km^2$ at a distance of 18km from the southern coast of Iran (300km west of Bandar Abbas), the Island of Kish with unique natural vistas, calm sea and beautiful beaches offers many attractions for tourism.

In the pre-Christianity period (550-320 BC) Kish was a major center for pearl diving. Around 8 centuries ago, Kish became a commercial hub, during which the small island linked Iran to China, Africa and Europe. In 1970, given the natural features of the Island, the beautiful coral beaches, the limpid waters surrounding the island and finally the strategic location, the Island was selected as an international tourist center. In the years following the Revolution, Kish was named as the country's first Free Trade Zone to take advantage of its tourism and trade attractions. The selection of Kish as a FTZ and the 15-years tax and excise exemption, as well as other legal facilities governing such zones, including free entry to the Island for foreigners, have transformed it into a haven for economical activities.

Tourism and trade are the main economical activities of Kish. With a multitude of large and small markets and malls, approximately 8,500 beds in hotels and diverse leisure activities on offer, Kish hosts 1.5 million travelers per year. There are a limited number of non-polluting and controlled industries established in the Island as well.

The Kish climate is hot, with the average temperature reaching 26-27° C and a relatively high average humidity of 76%. Despite a low rainfall, Kish is considered as one of the greenest islands in the Persian Gulf. The island's flora can withstand the severe heat and humidity and consists mainly of lean forests, shrubs and bushes.

During the last two decades of forestation, over 2000 hectares of the island's lands were planted. Moabed Fig Tree, Manna Tree, Mimosa, Eucalyptus and Palms form the dominant flora in Kish. The enclosed land environment has limited the bio-diversity of the island, nonetheless a number of mammal species live here, with the most important being the Iranian Gazelle. Moreover Kish is the habitat for diverse birds and marine species. Various types of beautiful and colorful fishes, corals, shellfishes, dolphins, turtles, etc. can be found in waters surrounding the Island.

The main tourist attractions of Kish are the hidden city, the ancient town of Harireh, the large leisure pier, the Dolphin Park, the Bird Garden, the Greek Ship, the aquarium, the traditional water stores and aquatic sports such as swimming, scuba diving, jet skiing etc., as well as other activities such as cycling, riding etc.

## The Ancient Town of Harireh

Dating back to 800 years ago, the Ancient Town of Harireh is among the unique attractions of Kish. This town was once the hub port linking Iran to India and China and Europe.

## The Green Tree

At the extreme of the longest ancient alluvial course, one finds the "Green Tree Collections" with beautiful huts. The pavements dotted with lanterns in the perpetual green area created with colorful money plants take one to the main attraction consisting of the oldest Moabed Fig Trees of the Island. The collection is located in the oldest fertile and the greenest area of Kish.

## The Mysterious Greek Ship

This ship was stranded in the year 1966 on her return journey from Iran to Greece. The mystery of the ship's misfortune is still unresolved after these years. Many efforts were made to free the ship but failed. Finally the crew had to abandon her as the efforts proved uneconomical. The sun setting slowly behind the Greek Ship in the azure waters of the Persian Gulf creates an unforgettable and everlasting sight.

## The Dolphin Park

So far thousands of palm trees have been planted in the park and a large collection of exceptional cactus trees have been gathered. A collection of rarest and most beautiful animals are kept in the dolphinarium and bird garden of this complex, where dolphins and other sea mammals greet the visitors with their beautiful displays.

## Water Sports

Kish is the ideal place to experience water sports. The clubs and leisure centers of Kish offer such services as diving, jet ski, water ski, fast boat trips, parasols, jet boats, pedal boats, banana boats and wind surfs. These centers are located in the eastern coasts of the Island.

www.kish.ir

| | | |
|---|---|---|
| DARIUS | ***** | 4444900 |
| SHAYAN | ***** | 4422771-5 |
| PARMIS | ***** | 4446223-5 |
| SHAYGAN | **** | 4422444 |
| SADAF | **** | 4420590-7 |
| FLAMINGO | **** | 4424130-7 |
| MARYAM | **** | 4421111-7 |
| ANA | **** | 4424120-4 |
| HELIA | **** | 4424501-5 |
| GRAND HOTEL | *** | 4424860-6 |
| ARIAN | *** | 4424951-5 |
| VENUS | *** | 4424025-30 |

PSO
news

Concessionaire: Ports And Shipping Organization
Published by: Public Relations, P.S.O
Legal Manager: Hossein Porsan
Editor-in-Chief: Saeedeh Pazooki
Artworks Manager: Gh. Mohammadi
Translator: Mojtaba Ahmadkhan
Editor: Ehsan Esmaili
Photographer: H.Kamkari,D.Tahari
Address: P.S.O Building, South Didar St., Haghani Highway, Vanak Sq. Tehran, Iran
Tel:+98 21 84932602
Fax: + 98 21 88651012





# EXHIBIT "K"

# National Iranian Oil Refining & Distribution Company

Projects
Members
Top Chart
About Us

## History

Although National Iranian Oil Refining and Distribution Company ( NIORDC ) is formed nearly in the past decade and began its activities within a new framework, the company is actually inherited 90 years of Iran's Oil Industries experiences in the fields of refining, transferring and distributing of oil products, as well as, engineering and construction of installations of oil industries.

NIORDC and its subordinate companies has been established to separate oil upstream activities from downstream activities.NIORDC was established on March 08 / 1992 and undertook to perform all the operations related to refining crude oil and transfer and distribution of oil products.

## Task & Goals
## Responsibilities And Duties Of NIORDC:

- Refining crude oil and producing variety of oil products in the refineries.
- Transferring crude oil from production bases and "Khazar Terminal" to the refineries and also transferring oil products from refineries and import bases to distribution procurement depots and distribution centres.
- Main provider of energy and distributor of oil products.
- Performing all refining projects and schemes, transfer and storing.
- Production, transfer and distribution of 250 million litres of oil products per day.
- Daily export of around 60 million litres of oil products abroad via oil terminals.
- Providing different sectors – industry, agriculture and power plants – with fuel and feed regularly e.g. petrochemical complexes to help them continue production in the country.
- Providing consuming fuel in residential sector, business sector in urban and the peasantry communities all over the country.
- Providing more than 4 million vehicles – heavy and light – existing in the transportation cycle with their required daily fuel.

## Installations And Capabilities Of NIORDC:

- Nine crude oil refineries in **Tehran** , **Tabriz** , **Isfahan** , Abadan , Kermanshah , Shiraz , **Bandar Abbas** , **Arak** and **Lavan Island** .

## Our Policy

- Providing desirable fuel supplying services and supplying feed of industries and factories all over the country in due time.
- Reducing consumption rate through employing energy consumption management and raising export rate to make foreign currency.
- Reducing waste materials through improving efficiency in refining and distribution system.
- Reducing enviroment pollution to reach stable development.
- Rasing human force productivity and promoting level of training.
- Increasing output of refinery facilities and transfer are distribution of oil products.
- Reducing cost of production, transfer and distribution of oil products.

## Subsidiary Companies:

The NIORDC subsidiariesare as follows:

- National Iranian Oil Products Distribution Co.
- Management of Construction & Development of "CNG" Stations Co.
- National Iranian Oil Engineering and Construction Co.
- Oil Pipeline and Telecommunication Co.
- Oil Refining Co.

## Contact Informations and Links:

**Tehran HQ. :**

**Opposite of Arak Alley - Ostad Nejatollahi Ave.**

**Tel : +98-21-88801001-14 , 66465488**

**Fax : +98-21-66152138 , 66466007**

**Zip Code :15989**

**P.O.Box : 15815/3499**

**Email :** info@niordc.ir

**Web Site :** www.niordc.ir

EXHIBIT K

- Fourteen thousand kilometers of crude oil and oil product transfer pipelines.
- 150 pumping stations.
- Oil industry telecommunication network.
- Operational zones for pipelines and telecommunication.
- 35 operational zones for NIOPDC.
- 194 operational areas for NIOPDC.
- Storage tank installations with 8 milliard litre capacity.

   

Please send all comments and suggestions to : **Webmaster@mop.ir**
@ copyright 2004 Islamic Republic of IRAN Petroleum Ministry of IRAN all rights reserved.



Islamic Republic of Iran

National Iranian
Oil Company
NIOC

Companies Affiliated To NIOC

Companies Affiliated To
## The Ministry Of Petroleum

NIOC.COM Subsidiary Companies

### Ministry of Petroleum of IRAN Subsidiaries:

- National Iranian Oil Company
- National Iranian Gas Company
- National Iranian Petrochemical Company
- National Iranian Oil Refining and Distribution Company

NIOC Subsidiary Companies

### Preface:

The National Iranian Oil Company (NIOC) was established in February 1948 with the objective of exploration, development, production, marketing of crude oil and natural gas. Having in possession huge hydrocarbon reserves, NIOC is the fourth largest state oil firm in the world.

NIOC's oil and gas in place reserves are 137 bn barrels and 28.17 trillion cubic meters, respectively which gives it a unique status on the global energy supply map. In fact, in recent years, NIOC has been invariably ranked as the world's fourth largest oil company.

Current NIOC production capacities include over 4 million barrels of crude oil and in excess of 437 million cubic meters of natural gas per day. On the export side, the company benefits from its modern extensive facilities on the three islands of Kharg, Lavan and Siri consisting of 17 jetties capable of berthing tankers of all sizes to lift and export its crude oil.

**National Iranian Gas Export Company**
- Website: www.nigec.ir
- email: info@nigec.ir

**National Iranian South Oil Company**
- Website: www.nisoc.com
- email: info@nisoc.com

**National Iranian Offshore Oil Company**
- Website: www.iooc.co.ir
- email: webmaster@iooc.co.ir

**National Iranian Central Oil Fields Co.**
- Website: www.icofc.ir
- email: info@icofc.ir

**Khazar Exploration & Production Co.**

**Petroleum Engineering & Development Co.**
- Website: www.pedec.ir
- email: info@pedec.net

**Pars Oil and Gas Company**
- Website: www.pogc.org
- email: info@pogc.ir

**Pars Special Economic Energy Zone Co.**
- Website: www.pseez.com
- email: Info@pseez.com

**National Iranian Oil Terminals Company**
- Website: www.nioc-otc.com
- email: Info@nioc-otc.com

**National Iranian Drilling Company**
- Website: www.nidc.ir
- email: webmaster@nidc.ir

**North Drilling Company**

## Organizational Structure:

NIOC's General Assembly (consisting of the President, Vice President, Director General of the Management and Planning Organization, Ministers of Oil, Energy, Industries and Mines, Labor and Social Affairs, Economy and Finance) is its highest decision marking body.
It determines the company's general policy guidelines, and approves annual budgets, operations, financial statements and balance sheets. The company's Board of Directors has the authority and major responsibilities to approve operational schemes within the general framework ratified by the General Assembly. It approves transactions and contracts, and prepares budgets and Board reports and annual balance sheets for presentation to the General Assembly. The Board supervises the implementation of general policy guidelines defined by the General Assembly, and pursues executive operations via the company's Managing Director.

## Subsidiary Companies:

With appropriate division of tasks and delegation of responsibilities to subsidiaries-affiliates, NIOC has been able to establish acceptable degrees of coordination within its organizational set up. In fact, NIOC's "Directors" act primarily in policy making and supervision while subsidiaries act as their executive arm in coordinating an array of operations such as exploration, drilling, production and delivery of crude oil and natural gas, for export and domestic consumption.

•Website: www.northdrilling.com
•email:info@northdrilling.com

**PetroIran Development Company**
•Website: www.petroiran.com
•email:info@petroiran.com

**Ahwaz Pipe Mills Company**
•Website: www.apm-ir.com
•email: tabibi@apm-ir.com

**Petropars**
•Website: www.petropars.com
•email:webadmin@ppars.com

**Fuel Consumption Optimization Co.**
•Website: www.ifco.ir
•email:info@ifco.ir

**National Iranian Tanker Co.**
•Website: www.nitc.co.ir
•email:administrator@nitc.co.ir

**Exploration Service Company (ESC)**
•Website: www.oeoc.ir
•email: info@oeoc.ir

**Kala Naft London Ltd.**
•Website: www.kalaltd.com
•email:admin@kalaltd.com

**MSP Kala Naft Co. Tehran**
•Website: www.kalanaft.com
•email:info@kalanaft.com

**Arvandan Oil and Gas Company**
•Website: www.arvandan.org
•email:info@arvandan.org

NIOC Today
National Iranian Oil Company Today.
.wmv Format
4.37 MB

|Home| Subsidiaries| Tenders| Auctions| |Seminars| News| Organization Chart| Contact|

© 2003, NIOC - National Iranian Oil Company. All Rights Reserved.
email: webmaster@nioc.ir



Ministry of Petroleum

Islamic Republic Of IRAN

Monday, April 28, 2008

**WWW.MOP.IR**

**Home** **About** **Subcompanies** **Publications** **Main Links** **Contact Us**

Last Update : 12/10/2003

Home→Subcompanies→NIORDC

# National Iranian Oil Refining & Distribution Company





Projects    Members    Top Chart    About Us

### History

Although National Iranian Oil Refining and Distribution Company ( NIORDC ) is formed nearly in the past decade and began its activities within a new framework, the company is actually inherited 90 years of Iran's Oil Industries experiences in the fields of refining, transferring and distributing of oil products, as well as, engineering and construction of installations of oil industries.

NIORDC and its subordinate companies has been established to separate oil upstream activities from downstream activities.NIORDC was established on March 08 / 1992 and undertook to perform all the operations related to refining crude oil and transfer and distribution of oil products.

### Task & Goals
### Responsibilities And Duties Of NIORDC:

* Refining crude oil and producing variety of oil products in the refineries.
* Transferring crude oil from production bases and "Khazar Terminal" to the refineries and also transferring oil products from refineries and import bases to distribution procurement depots and distribution centres.
* Main provider of energy and distributor of oil products.
* Performing all refining projects and schemes, transfer and storing.
* Production, transfer and distribution of 250 million litres of oil products per day.
* Daily export of around 60 million litres of oil products abroad via oil terminals.
* Providing different sectors – industry, agriculture and power plants – with fuel and feed regularly e.g. petrochemical complexes to help them continue production in the country.
* Providing consuming fuel in residential sector, business sector in urban and the peasantry communities all over the country.
* Providing more than 4 million vehicles – heavy and light – existing in the transportation cycle with their required daily fuel.

### Installations And Capabilities Of NIORDC:

* Nine crude oil refineries in **Tehran** , **Tabriz** , **Isfahan** , Abadan , Kermanshah , Shiraz , **Bandar Abbas** , **Arak** and **Lavan Island** .

### Our Policy

* Providing desirable fuel supplying services and supplying feed of industries and factories all over the country in due time.
* Reducing consumption rate through employing energy consumption management and raising export rate to make foreign currency.
* Reducing waste materials through improving efficiency in refining and distribution system.
* Reducing enviroment pollution to reach stable development.
* Rasing human force productivity and promoting level of training.
* Increasing output of refinery facilities and transfer are distribution of oil products.
* Reducing cost of production, transfer and distribution of oil products.

### Subsidiary Companies:

The NIORDC subsidiariesare as follows:
▸ National Iranian Oil Products Distribution Co.
▸ Management of Construction & Development of "CNG" Stations Co.
▸ National Iranian Oil Engineering and Construction Co.
▸ Oil Pipeline and Telecommunication Co.
▸ Oil Refining Co.

### Contact Informations and Links:

#### Tehran HQ. :

**Opposite of Arak Alley - Ostad Nejatollahi Ave.**

**Tel : +98-21-88801001-14 , 66465488**

**Fax : +98-21-66152138 , 66466007**

**Zip Code :15989**

**P.O.Box : 15815/3499**

**Email :** info@niordc.ir

**Web Site :** www.niordc.ir

- Fourteen thousand kilometers of crude oil and oil product transfer pipelines.
- 150 pumping stations.
- Oil industry telecommunication network.
- Operational zones for pipelines and telecommunication.
- 35 operational zones for NIOPDC.
- 194 operational areas for NIOPDC.
- Storage tank installations with 8 milliard litre capacity.






Please send all comments and suggestions to : **Webmaster@mop.ir**

© copyright 2004 Islamic Republic of IRAN Petroleum Ministry of IRAN all rights reserved.