# EXHIBIT "B"

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DEBORAH D. PETERSON,**<br>**Personal Representative of the**<br>**Estate of James C. Knipple (Dec.),** *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>**ISLAMIC REPUBLIC OF IRAN,** *et al.,*<br><br>Defendants. | **Consolidated Civil Actions:**<br>**01-2094 (RCL)**<br>**01-2684 (RCL)** |

## MEMORANDUM OPINION

### BACKGROUND

These actions arise from the October 23, 1983, bombing of a United States Marine

barracks in Beirut, Lebanon, in which 241 American servicemen operating under peacetime rules

of engagement were murdered by a suicide bomber. This attack was regarded as the most deadly

state-sponsored terrorist attack made against American citizens, until the tragic attacks on

September 11, 2001.

The nearly one thousand plaintiffs in this consolidated action are many of the family

members and estates of the 241 servicemen killed in the attack. Plaintiffs allege that the Islamic

Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are

liable for damages from the attack because they provided material support and assistance to



Hezbollah,[1] the terrorist organization that orchestrated and carried out the bombing. Plaintiffs

have relied upon causes of action founded upon provisions of the Foreign Sovereign Immunities

Act ("FSIA"), *inter alia,* 28 U.S.C. § 1605(a)(7).

## PROCEDURAL HISTORY

On March 17-18, 2003, this Court conducted a bench trial to determine the defendants'

liability for their part in the perpetration of this attack. After reviewing the evidence presented by

plaintiffs at trial, including testimony from lay and expert witnesses, this Court issued an opinion

finding that the defendants were legally responsible for providing material financial and logistical

support to help carry out this tragic attack on the 241 servicemen in Beirut in 1983. *Peterson v.*

*Islamic Republic of Iran*, 264 F. Supp. 2d 46, 61 (D.D.C. 2003). In that opinion, this Court also

found that the surviving family members have suffered and will continue to suffer mental

anguish and loss of society. *Id.* Finally, this Court directed special masters to consider each

claim brought by plaintiffs, and indicated that it would make a determination on the amount of

compensatory and punitive damages for each claim after the Court received reports from the

special masters.[2] The Court reaches this determination on the issue of damages in this opinion.

---

[1] According to the Oxford English Dictionary, the term "Hezbollah" is synonymous with the terms "Hizbollah" and "Hizbullah," all of which are English transliterations of the Arabic term referring to the extremist Shiite Muslim group also known as the "Party of God." *See* Oxford English Dictionary (2d ed. 1989). Accordingly, to the extent that any of these terms are used within this opinion, they shall be used interchangeably.

[2] In a prior case where this Court held Iran responsible under the Foreign Sovereign Immunities Act as a state sponsor of terrorism, this Court noted that its statutory duty is clear and that there is no danger of inadvertent interference with foreign relations. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 16 (D.D.C. Mar. 11, 1998) (Lamberth, J.). "Article I of the Constitution establishes that Congress has 'authority to enact laws applicable to conduct beyond the territorial boundaries of the United States.'" *Id.* (quoting *EEOC v. Aramco*, 499 U.S. 244, 260-61 (1991). The Foreign Sovereign Immunities Act not only applies to extraterritorial

The Court reviews the determinations made by the special masters *de novo*. *See* Fed. R. Civ. P. 53(g)(3).

## DISCUSSION

### *I.    Assessment of Validity of Each Plaintiff's Cause of Action*

In order to ensure that the Court determines the appropriate amount of damages available to each plaintiff under the law, it must first ensure that each plaintiff has a valid claim under state law. The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C. Sept. 29, 2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.)).

In order to determine the applicable state law to each action, the Court must look to the choice of law rules of the forum, in this case, the choice of law rules of the District of Columbia. *See Blais*, 459 F. Supp. 2d at 54. Under District of Columbia choice of law rules, courts employ a modified government interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most

---

conduct, but one of its express purposes is to affect the conduct of terrorist states outside the United States, in order to promote the safety of United States citizens overseas. Congress specifically restricted application of the statute to foreign state defendants which the Executive Branch, via the State Department, has determined are foreign state sponsors of terrorism. *See id.* This Court is aware that the judgment entered today may be the largest ever entered by a court of the United States against a foreign nation. The President has not filed a suggestion of interest indicating that actions by this Court will in any way interfere with the foreign relations of the United States. This Court is properly performing its duty under a constitutional statute.

advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted). Application of this governmental interest test generally points to the law of plaintiff's domicile as having the greatest interest in providing redress to its citizens. Accordingly, the validity of each of the plaintiffs' claims shall be determined by the state in which they were domiciled at the time of the attack.

In this action, three types of claims have been sought. First, the personal representatives and estates of the servicemen killed in the attack have brought claims for wrongful death, in which the plaintiffs and beneficiaries seek compensation in the form of the present value of the decedent's lost wages and earnings that he would have earned but for his untimely death. Second, the surviving servicemen have brought claims for battery against the defendants. Third, the family members of both the deceased and surviving servicemen have brought claims for intentional infliction of emotional distress ("IIED") against the defendants for their part in materially bringing about the attack. The Court will assess the relative merits of each of the claims separately.

### A.    *Wrongful Death Claims*

Wrongful death claims were brought by the personal representatives and estates of the following deceased servicemen:

> Terry Abbott, John Robert Allman, Ronny Kent Bates, James Baynard, Jess W. Beamon, Alvin Burton Belmer, Richard D. Blankenship, John W. Blocker, Joseph John Boccia Jr., Leon Bohannon, John Bonk Jr., Jeffrey James Boulos, John Norman Boyett, William Burley, Paul Callahan, Mecot Camara, Bradley Campus, Johnnie Ceaser, Robert Allen Conley, Charles Dennis Cook, Johnny Len Copeland, David Cosner, Kevin Coulman, Rick Crudale, Russell Cyzick, Michael Devlin, Nathaniel Dorsey, Frederick Douglass, Timothy Dunnigan, Bryan Earle,

-4-

Danny R. Estes, Richard Andrew Fluegel, Michael D. Fulcher, Sean Gallagher, George Gangur, Randall Garcia, Harold Ghumm, Timothy Giblin, Michael Gorchinski, Richard Gordon, Davin M. Green, Thomas Hairston, Michael Haskell, Mark Anthony Helms, Stanley G. Hester, Donald Wayne Hildreth, Richard Holberton, Dr. John Hudson. Maurice Edward Hukill, Edward Iacovino Jr., Paul Innocenzi III, James Jackowski, Jeffrey Wilbur James, Nathaniel Walter Jenkins, Edward Anthony Johnston, Stephen Jones, Thomas Adrian Julian, Thomas Keown, Daniel Kluck, James C. Knipple, Freas H. Kreischer III, Keith Laise, James Langon IV, Michael Scott LaRiviere, Steven LaRiviere, Richard Lemnah, Joseph Raymond ("Joel") Livingston III, Paul D. Lyon Jr., John Macroglou, Samuel Maitland Jr., Charlie Robert Martin, David Massa, John McCall, James E. McDonough, Timothy R. McMahon, Richard Menkins II, Ronald Meurer, Joseph Peter Milano, Joseph Moore, Harry Douglas Myers, David Nairn, John Arne Olson, Joseph Albert Owens, Connie Ray Page, Ulysses Gregory Parker, John L. Pearson, Thomas S. Perron, John Arthur Phillips Jr., William Ray Pollard, Victor Mark Prevatt, James Price, Patrick Kerry Prindeville, Diomedes J. Quirante, Warren Richardson, Luis J. Rotondo, Michael Caleb Sauls, Charles Jeffrey Schnorf, Scott Lee Schultz, Peter Scialabba, Gary Randall Scott, Thomas Alan Shipp, Jerryl Shropshire, Larry H. Simpson Jr., Kirk Hall Smith, Thomas Gerard Smith, Vincent Smith, William Scott Sommerhof, Stephen Eugene Spencer, William Stelpflug, Horace Renardo ("Ricky") Stephens Jr., Craig Stockton, Jeffrey Stokes, Eric D. Sturghill, Devon Sundar, Thomas Paul Thorstad, Stephen Tingley, Donald H. Vallone Jr., Eric Glenn Washington, Dwayne Wigglesworth, Rodney J. Williams, Scipio Williams Jr., Johnny Adam Williamson, William Ellis Winter, Donald Elberan Woollett, Craig Wyche, Jeffrey D. Young.[3]

Out of the 128 deceased servicemen, 123 were domiciled in North Carolina at the time of

the attack.[4] The servicemen who were not domiciled in North Carolina at the time of the attack

---

[3] In association with their wrongful death claims, the respective estates of Alvin Burton Belmer, Nathaniel Walter Jenkins, Luis J. Rotondo, Larry H. Simpson, Jr., and Stephen Tingley have sought damages for pain and suffering incurred during the time at which they were alive after the attack and the time at which they died. The measure of damages for each of these servicemen will be assessed in the damages portion of this opinion, *see infra* Section II.B.1, and does not affect the validity of their wrongful death claims.

[4] Deceased serviceman, Diomedes J. Quirante, was born in the Phillippines in 1958, and was not a United States citizen. Therefore, an issue exists as to whether Diomedes J. Quirante has standing to recover against Iran and MOIS under the FSIA's "state sponsored terrorism" exception. In order for a plaintiff to so recover, he or she must show that: (1) the State

were domiciled in California, Oklahoma, South Carolina, and Vermont.[5] This difference in

domicile is of no moment, however, because the wrongful death statutes of each of the

servicemen's respective states of domicile imposes liability on an actor when his "wrongful act,

neglect, or default" causes a person's death, and had that person lived, he could have recovered

damages from the actor. Cal Civ. Proc. Code § 377.60(a) (2007); N.C. Gen. Stat. § 28A-18-2(a)

(2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. § 15-51-10 (2006); Vt. Stat. Ann. tit. 14,

§ 1491 (2007). Each statute provides for recovery of numerous categories of damages, including

---

Department had previously designated the foreign sovereign as a "state sponsor of terrorism" or
did so based on the event in question; (2) the victim or plaintiff was a U.S. national when the
event took place; and (3) "the foreign sovereign engaged in conduct that falls within the ambit of
the statute." *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar. 28,
2006).

　　As this Court has already found in its Memorandum Opinion establishing the defendants'
liability for this attack, the first and third requirements are satisfied. Therefore, the only issue
remaining is whether Diomedes qualifies as a United States national. The term "U.S. national"
embraces both United States citizens and non-citizens who owe permanent allegiance to the
United States. 8 U.S.C. § 1101(a)(22) (2006). In this case, the evidence shows that Diomedes
clearly was a U.S. national. First, though a citizen of the Phillippines, Diomedes enlisted in the
United States Army when he was twenty one years old. As a part of his commitment to
becoming a member of the United States Armed Forces, Diomedes was required to take an oath
to defend and uphold the Constitution of the United States. Once enlisted, he was assigned to the
2nd Marine Division, Fleet Marine Force (FMF) in Camp Lejeune, North Carolina. He remained
a member of the United States Army in North Carolina from that time until his death in Beirut,
Lebanon in 1983. His oath, and ultimate heroic act of dying while a member of the United States
Army establishes beyond any doubt that Diomedes J. Quirante's allegiance to the United States
was permanent. Therefore, this Court finds that Diomedes J. Quirante was a United States
national at the time he was killed. Accordingly, Diomedes has standing under the FSIA to
recover against the defendants.

　　There still remains the issue of what law governs Diomedes' claims. In light of the fact
that he was stationed in Camp LeJeune, North Carolina before being sent to Lebanon, this Court
finds that North Carolina is the state with which Diomedes had the closest and most substantial
connection. Therefore, the law of North Carolina shall govern Diomedes' wrongful death claim.

　　[5] The Court could not determine the domicile of one serviceman, Frederick Douglass,
because no evidence was presented on behalf of his estate. For this reason, the Court will
dismiss the claim brought by the personal representative of his estate without prejudice.

pecuniary loss in the form of the present monetary value of the decedent to the persons entitled to

receive the damages recovered, expenses for care, treatment and hospitalization incident to the

injury resulting in death; and reasonable funeral expenses. *See* Cal Civ. Proc. Code § 377.61

(2007); N.C. Gen. Stat. § 28A-18-2(b) (2007); 12 Okl. St. Ann. § 1053 (2007); S.C. Code Ann. §

15-51-20 (2006); Vt. Stat. Ann. tit. 14, § 1491 (2007). Additionally, North Carolina allows for

the recovery of compensation for pain and suffering of the decedent. N.C. Gen. Stat. § 28A-18-

2(b).[6]

Based upon the evidence presented to the special masters and the Court, each of the

deceased servicemen has made out a valid claim for wrongful death under North Carolina law.

Accordingly, those valid heirs and beneficiaries under North Carolina's intestate statute are

entitled to share in the recovery of the damages awarded as a result of each serviceman's untimely

death.

B.      *Battery Claims*

Claims of battery were brought against the defendants by the following servicemen who

ultimately survived the attack:

> Marvin Albright, Pablo Arroyo, Anthony Banks, Rodney Darrell Burnette, Frank
> Comes Jr., Glenn Dolphin, Frederick Daniel Eaves, Charles Frye, Truman Dale
> Garner, Larry Gerlach, John Hlywiak, Orval Hunt, Joseph P. Jacobs, Brian
> Kirkpatrick, Burnham Matthews, Timothy Mitchell, Lovell "Darrell" Moore,
> Jeffrey Nashton, John Oliver, Paul Rivers, Stephen Russell, Dana Spaulding,

---

[6] The servicemen who seek pain and suffering during the survival period between the
attack and their deaths were each domiciled in North Carolina at the time of the attack.
Therefore, the Court need only concern itself with North Carolina law on the issue of pain and
suffering.

Craig Joseph Swinson, Michael Toma, Danny Wheeler, Thomas D. Young[7]

Out of the twenty six surviving servicemen seeking damages for battery, twenty five of them were domiciled in North Carolina at the time of the attack. The one remaining surviving serviceman, Charles Frye, was domiciled in California at the time of the attack. Both states, however, recognize that a battery is deemed to be an offensive touching of the person by another without consent. *See Rains v. Superior Court*, 198 Cal. Rptr. 249, 252 (Cal. Ct. App. 1984); *Ormond v. Crampton*, 191 S.E.2d 405, 410 (N.C. App. 1972). Therefore, the battery claims for each of the servicemen can be assessed evenly.

Based upon the evidence presented to the special masters and the Court, each of the deceased servicemen has made out a valid claim for battery under North Carolina and California law. Therefore, each may recover the appropriate amount of compensatory damages as determined by this Court.

C.     *Intentional Infliction of Emotional Distress Claims*

The remaining 753 plaintiffs have sought claims for intentional infliction of emotional distress, and awards for pain and suffering incurred as a result of their extreme emotional grief and psychological anguish associated with the knowledge that their family members are either deceased or alive but permanently scarred both physically and mentally. Each of these plaintiffs were domiciled in a number of different states–and in one family's case, the Phillippines–at the time of the attack. Accordingly, this Court must determine whether each of these plaintiffs has brought a valid cause of action under each state's respective law.

---

[7] Because these individuals can recover for their mental anguish and suffering under their respective battery claims, the Court need not consider each plaintiff's intentional infliction of emotional distress claim, which would result in an impermissible double recovery.

-8-

In order to accomplish this, the Court must first analyze whether such a cause exists under each state's laws. Next, to the extent that a state recognizes IIED claims, this Court must determine which family members have standing to recover for IIED under each state's laws. Then this Court must assess whether the plaintiffs have established the essential elements of the claim.

        *1.*     *Intentional Infliction of Emotional Distress: State Law Analysis*

The states of domicile for these 753 plaintiffs are: Alabama, California, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, and Wisconsin. The family of serviceman Diomedes J. Quirante was domiciled in the Phillippines.[8]

Each of the states mentioned above recognize the existence of a cause of action for intentional infliction of emotional distress, rooted in Section 46 of the Restatement (Second) of

---

[8] Though the surviving immediate family members of Diomedes J. Quirante are not United States citizens, the Court finds that they have standing under the FSIA to bring claims for intentional infliction of emotional distress under North Carolina law. The "state sponsored terrorism" exception to the FSIA requires only that either the plaintiffs *or the victim* be a United States national at the time of the attack. *Prevatt*, 421 F. Supp. 2d at 158. Therefore, the Quirante family members' intentional infliction of emotional distress claims may be brought because Diomedes was a United States national at the time he was killed. *See supra* note 3. Applying District of Columbia choice of law principles, North Carolina is the state with the strongest interest in determining the claims brought by Diomedes' family members because their claims are intertwined with–and result from–Diomedes' death. Therefore, this Court finds that the claims brought by the Quirante family are governed by North Carolina law.

Torts.[9]    Though each state has its own particular means of describing intentional infliction of emotional distress, upon inspection of each state's laws the elements of intentional infliction of emotional distress are met in each state if it can be demonstrated that: (1) the defendant engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress.[10]

There still remains the issue of whether each plaintiff has standing to recover under state

---

[9] *See, e.g., American Rd. Serv. Co. v. Inmon*, 394 So.2d 361 (Ala. 1980); *Davidson v. City of Westminster*, 649 P.2d 894, 901 (Cal. 1982); *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970); *Murray v. Bridgeport Hosp.*, 480 A.2d 610, 614 (Conn. 1984); *Johnathan Woodner Co. v. Breeden*, 665 A.2d 929, 934-35 (D.C. 1995); *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985); *Yarbray v. Southern Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 837 (Ga. 1991); *Palmateer v. International Harvester Co.*, 406 N.E.2d 595, 598 (Ill. App. Ct. 1980), *rev'd on other grounds*, 421 N.E.2d 876 (Ill. 1981); *Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002); *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984); *White v. Monsanto Co.*, 585 So.2d 1205, 1208-1210 (La. 1991); *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977); *George v. Jordan Marsh Co.*, 258 N.E.2d 958, 921 (Mass. 1971); *Dornfeld v. Oberg*, 503 N.W.2d 115, 117 (Minn. 1993); *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. 1993); *Morrison v. Means*, 680 So. 2d803, 805-06 (Miss. 1996); *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981); *Gall v. Great Western Sugar Co.*, 363 N.W.2d 373, 376 (Neb. 1985); *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988); *Mantz v. Follingstad*, 505 P.2d 68, 74-75 (N.M. App. 1972); *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983); *Yeager v. Local Union 20,Teamsters, Chauffeurs, Warehousemen, & Helpers of America*, 453 N.E.2d 666, 671 (Ohio 1983); *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978); *Forster v. Manchester*, 189 A.2d 147, 151-52 (Pa. 1963); *Champlin v. Washington Trust Co.*, 478 A.2d 985, 988 (R.I. 1984); *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981); *Christians v. Christians*, 637 N.W.2d 377, 382 (S.D. 2001); *Levy v. Franks*, 159 S.W.3d 66, 82-83 (Tenn. Ct. App. 2004); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *Sheltra v. Smith*, 392 A.2d 431, 433 (Vt. 1978); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974); *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002); *Wayne County Bank v. Hodges*, 338 S.E.2d 202, 205 (W. Va. 1985).

[10] *See supra* note 7.

law for the defendant's attack on the plaintiffs' respective family members.  Section 46(2) of the

Restatement (Second) of Torts governs the ability of plaintiffs to recover for intentional infliction

of emotional distress where the defendant's conduct is directed at a third party.  Restatement

(Second) of Torts § 46(2).  Section 46(2) of the Restatement specifically states that only present

third parties may recover for an IIED claim.  Nonetheless, the Caveat to the section leaves open

the possibility of other possible situations where a defendant could be liable for intentional

infliction of emotional distress under this section.

Each state has interpreted this ambiguity differently.  Some states have explicitly allowed

for situations where the presence requirement is unnecessary to establish an IIED claim.  Florida,

for example, has acknowledged that an immediate family member may recover for intentional

infliction of emotional distress even if he or she was not present at the time of the outrageous

conduct.  *Williams v. City of Minneola*, 575 So.2d 683, 690 (Fla. App.1991).  Along the same

lines, California has found that a plaintiff's presence is not always required, and is deemed

unnecessary in situations where the defendant is aware of the high probability that the defendant's

acts will cause a plaintiff severe emotional distress.  *Christensen v. Superior Court*, 820 P.2d

181, 203-204 (Cal. 1992).[11]  Therefore, as this Court found in *Heiser*, when a terrorist attack

occurs, the presence element is not required to bring a valid IIED claim under either Florida or

California law, and that plaintiffs domiciled in these states at the time of the attack may bring a

---

[11] Applying this standard, this Court found in *Heiser* that, given the extreme nature of a
terrorist attack, the presence element for an IIED claim under California law did not need to be
proven.  *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 305 (D.D.C. Dec. 22, 2006)
(Lamberth, J.).

claim for IIED without establishing their presence at the scene of the injury.[12]  Much like Florida

and California, Vermont has no presence requirement for plaintiffs to recover for the intentional

or reckless infliction of emotional distress.  *Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990).

Additionally, there are a number of states at issue in this action whose Supreme Courts

have not specifically addressed the issue of whether a plaintiff's presence is required.  Some of

the laws of these states–Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, and Kansas–were previously analyzed by this Court in *Heiser*, in which this Court

found that no such presence requirement was necessary in these states given the severe nature of

terrorist attacks.  *See Heiser*, 466 F. Supp. 2d at 328-29, 333 (Tex.), 341 (Minn.), 343-44 (Wisc.),

345-46 (N.Y.), 349 (N.C.), 352 (Ind.), 354 (Okla.), 355 (Kans.).[13]  In this case, the respective

---

[12] This finding, of course, is on the assumption that those plaintiffs have standing to
recover in the first place.  Those plaintiffs without standing to recover under the law of their
respective domiciliary states may not recover, regardless of whether a plaintiff with standing
could so recover.

[13] The Oklahoma Supreme Court has rejected recovery for mental anguish and suffering
under an IIED claim brought by bystanders.  See *Slaton v. Vansickle*, 872 P.2d 929, 931-32
(Okla. 1994).  According to Oklahoma's Supreme Court, it is long recognized that "recovery for
mental anguish is restricted to such mental pain or suffering as arises from an injury or wrong to
the person rather than from another's suffering or wrongs committed against another person."
*Vansickle*, 872 P.2d at 931.  Following this logic, the Oklahoma Supreme Court limited recovery
when a plaintiff's IIED claim rests on conduct directed at a third party to situations where: "1) the
plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from
actually viewing the injury to another rather than from learning of the accident later; and 3) a
familial or other close personal relationship existed between the plaintiff and the party whose
injury gave rise to the plaintiff's mental anguish."  *Kraszewski v. Baptist Med. Ctr. Of Okla.,
Inc.*, 916 P.2d 241, 248 (Okla. 1996).  This limitation on third party recovery is of no moment,
however, due to the simple fact that it has been repeatedly found that "a terrorist attack-by its
nature-is directed not only at the victims but also at the victims' families."  *Heiser*, 466 F. Supp.
2d. at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C.
2005) (Bates, J.)).  Therefore, the decedents' near relatives are also direct victims of this
horrendous attack.  Accordingly, this Court finds that the limitations imposed by the Oklahoma
Supreme Court on recovery for pain and suffering due to injuries sustained by a third party do not

-12-

state supreme courts of a number of states–Alabama, Connecticut, District of Columbia, Illinois,

Indiana, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New

Jersey, New Mexico, Rhode Island, Tennessee, Virginia–have not specifically addressed whether

a plaintiff's presence is required to establish a viable IIED claim.  Accordingly,"in light the

severity of [a terrorist attack,] and the obvious range of potential grief and distress that directly

results from such a heinous act,"[14] and because "a terrorist attack-by its nature-is directed not

only at the victims but also at the victims' families,"[15] this Court adopts the rationale it set forth in

*Heiser* regarding the presence element for IIED claims in states that have been silent on the issue.

*See Heiser*, 466 F. Supp. 2d at 328-29.  Therefore, this Court finds that claims for intentional

infliction of emotional distress may be brought by family members without having to establish a

presence requirement under Texas, Minnesota, Wisconsin, New York, North Carolina, Indiana,

Oklahoma, Kansas, Alabama, Connecticut, District of Columbia, Illinois, Indiana, Kansas,

Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey, New

Mexico, Rhode Island, Tennessee, and Virginia laws.[16]

Other states at issue in this case–Georgia, Missouri, South Carolina, South Dakota,

Washington, and West Virginia–have allowed third party plaintiffs to recover, but only when the

defendant's conduct is "directed at" the third party plaintiffs themselves.[17]  As this Court and

---

apply to the family members seeking redress before this Court today.

[14] *Heiser*, 466 F. Supp. 2d at 328.

[15] *Id.* (quoting *Salazar*, 370 F.Supp.2d at 115 n. 12).

[16] *See supra* note 10.

[17] *See, e.g., Ryckeley v. Callaway*, 412 S.E.2d 826, 827 (Ga. 1992); *Samsonetti v. City of St. Joseph*, 976 S.W.2d 572, 580 (Mo. App. W.D. 1998) (citing *Gibson v. Brewer*, 952 S.W.2d

others within this district have noted, "a terrorist attack–by its nature–is directed not only at the victims but also at the victims' families." *Heiser*, 466 F. Supp. 2d. at 328 (quoting *Salazar v. Islamic Republic of Iran.* 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)). Therefore, this Court finds that those plaintiffs domiciled in Georgia, Missouri, South Carolina, South Dakota, Washington, and West Virginia at the time of the attack, may bring a claim for IIED under the laws of those states because the attack was directed at them as well as those killed in the attack.[18]

Two other states at issue in this case–Louisiana and Pennsylvania–have narrowly construed their interpretation of what constitutes a valid IIED claim, and have expressly found that the presence element is required for third party plaintiffs to recover.[19] Accordingly, this Court finds those plaintiffs who were not contemporaneously present at the site of the attack would not be able to recover under either Louisiana or Pennsylvania law for a claim of IIED. Without a valid cause of action under state law, the plaintiffs domiciled in Louisiana and Pennsylvania lack a viable means to redress their injury, and therefore lack standing.

---

239, 249 (Mo. 1997) (en banc)); *Upchurch v. New York Times Co.*, 431 S.E.2d 558, 561 (S.C. 1993) (citing *Christensen v. Superior Court*, 820 P.2d 181 (Cal. 1991)); *Hayes v. Northern Hills General Hospital*, 628 N.W.2d 739, 744 (S.D. 2001); *Reid v. Pierce County*, 961 P.2d 333, 337 (Wash. 1988); *Courtney v. Courtney*, 413 S.E.2d 418, 422 (W. Va. 1991).

[18] *See supra* note 10.

[19] *See Daigrepont v. State Racing Com'n*, 663 So.2d 840, 841 (La. App.1995) (requiring plaintiff's actual presence at the scene of the injury, and not allowing any further interpretation of the provision in the Louisiana Code establishing a cause of action for IIED); *Taylor v. Albert Einstein Medical Center*, 754 A.2d 650, 652-53 (Pa. 2000) (limiting IIED recovery to those plaintiffs "who were present at the time, as distinguished from those who discover later what has occurred," even in those situations where the defendant may be substantially certain that the plaintiff will suffer severe emotional distress as a result of the offensive act).

Accordingly, this Court must regrettably deny and dismiss the claims of those plaintiffs who were domiciled in Louisiana and Pennsylvania at the time of the attack.[20] The claims brought by the following individuals must be DISMISSED due to lack of standing:

> Deborah Spencer Rhosto, Catherine Bonk, John Bonk Sr., Thomas Bonk, Patricia Kronenbitter, Catherine Bonk Hunt, Kevin Bonk, Marilou Fluegel, Thomas A. Fluegel, Penni Joyce, Robert Fluegel, Julia Bell Hairston, Felicia Hairston, Evans Hairston, Virginia Ellen Hukill, Henry Durban Hukill, Melissa Hukill, Meredith Anne Hukill, Mark Andrew Hukill, Matthew Scott Hukill, Mitchell Charles Hukill, Monte Hukill, Bill Laise, Betty Laise, Kris Laise, Lorraine Macroglou, Bill Macroglou, James Macroglou, Shirley Kirkwood, Carl Kirkwood Sr., Kathy McDonald, Sally Jo Wirick, Storm Jones (a/k/a Shirley Ann Storm Pettry), Edward Joseph McDonough, Sean McDonough, Edward W. McDonough, Carl Arnold Kirkwood Jr., Jeff Kirkwood, Marion DiGiovanni, (Estate of) Luis Rotondo (father), (Estate of) Rose Rotondo, Danielle DiGiovanni, Lisa DiGiovanni, Robert DiGiovanni, (Estate of) Phyllis Santoserre, Larry H. Simpson Sr., Anna Marie Simpson, Renee Eileen Simpson, Sherry Lynn Fiedler, Robert Simpson.

### 2. Intentional Infliction of Emotional Distress: Extent of Family Members' Respective Recovery

Though many of the states at issue in this case have recognized the existence of IIED claims for family members who were not present at the scene of the injury, this does not necessarily extend the ability to bring an IIED claim to *all* family members. As the D.C. Circuit has noted previously, Section 46 of the Restatement (Second) of Torts does not extend causes of action beyond members of the victim's "immediate family." *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 334-35 (D.C. Cir. 2003) (refusing to extend "direct victims" under § 46(1)

---

[20] To the extent that these plaintiffs are relatives to any of the deceased servicemen, it should be noted that the dismissal of these plaintiffs' IIED claims does not hinder these individuals' ability to recover any portion of a wrongful death damages awarded to the estates of those servicemen to which these dismissed plaintiffs may be entitled under North Carolina law.

and "third party victims" under § 46(2) to include nieces and nephews not present at the scene of injury). Accordingly, this Court finds that those members of the families of the servicemen who are not within the immediate family of the serviceman *at the time of the attack* may not recover.

This Court has previously deemed near relatives to include only the victim's spouse, parents, children, and siblings. *See Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2002) (Lamberth, J.), *affirmed sub nom.*, *Bettis*, 315 F.3d at 335. Though the Court does not deny the extreme pain and suffering felt by those outside of this class of individuals, it is necessary to draw such a line at immediate family members in order "to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress." *Heiser*, 466 F. Supp. 2d at 329. Moreover, such a delineation is consistent with the provisions of Section 46 of the Restatement. *See* Restatement (Second) of Torts § 46, cmt. l; *cf. Bettis*, 315 F.3d at 335 (finding that permitting nieces and nephews to recover under § 46(1) would undermine the limitations on recovery of "immediate family" members under § 46(2)). Therefore, those plaintiffs who are not members of this class of individuals in relation to the servicemen cannot recover.[21]  Accordingly, the Court must dismiss the claims of the following plaintiffs: Ashley Tutwiler Beamon, David Clark, Michael Clark, Jr., Rebecca Iverson Green, Geraldine Morgan, Pamela Nashton, Natalie Rochwell, (Estate of) Lula Mae Watkins,[22] and

---

[21] Current spouses who were not yet married to an injured servicemen at the time of the attack are not considered "immediate family" for the purposes of recovery. These individuals are therefore among the group of plaintiffs who cannot recover damages sustained as a result of the attack.

[22] According to the special master's report, Lula Mae Watkins was the legal guardian of Jerryl Shropshire. There is no evidence, however, of a formal order terminating the rights of Jerryl's natural parents. *See* Ga. Stat. Ann. 15-11-93 (2007). Absent such an order, "there is no Georgia law under which the loss of parental power also results in the parent's loss of a right to

Simon Watkins.

> 3.    *Claims That Must Be Dismissed Due to Lack of Evidence and*
>        *Participation*

"[T]he entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6

(D.C. Cir. 2005). Personal Jurisdiction must still be determined before entering default judgment

against an absent defendant. *Id.* As standing must be determined prior to and independent of any

determination of a court's jurisdiction,[23] so too must standing be determined before a court enters

default judgment against an absent defendant.

With respect to standing, the trial court has power "to allow or to require the plaintiff to

supply, by amendment to the complaint or by affidavits, further particularized allegations of fact

deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does

not adequately appear from all materials of record, the complaint must be dismissed." *Warth v.*

*Seldin*, 422 U.S. 490, 501-02 (1975).

After an evidentiary hearing before this Court establishing the defendants' complicity in

bringing about the attacks, the Court designated special masters to hear each of the plaintiffs'

respective claims, so that damages might be determined. As is unfortunately sometimes the case

in a situation with as far-reaching an effect as this, certain family members of the deceased and

---

inherit as an heir from a child's estate." *Blackstone v. Blackstone*, 639 S.E.2d 369, 370 (Ga. Ct.
App. Nov. 21, 2006). This is true even if the parents have failed to provide any support for the
child during the child's lifetime. *Id.* at 371. Accordingly, the estate of Lula Mae Watkins may
not recover for damages arising out of Jerryl's death because she is not a parent or other
immediate family member under Georgia law. Likewise, Geraldine Morgan and Simon
Watkins–as Lula Mae's granddaughter and son, respectively–may also not recover.

[23] *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. at 91.

-17-

injured servicemen–family members who undoubtedly shared equally in the grief and suffering

caused by the tragic deaths of their loved ones–could not be located or were unable to present

evidence before this Court and its designated special masters to establish a valid claim for

damages. Without evidence supporting their claims of intentional infliction of emotional

distress, the Court cannot determine at this time whether these individuals have sufficient

standing to bring a claim. Accordingly, the claims from the following individuals shall be

DISMISSED WITHOUT PREJUDICE due to lack of evidence:

> Marvin Albright, Jr., Mirequrn Albright, Shertara Albright, Anthony Banks
> (son), Michael Banks, Taiarra Banks, Lori Berry, Christopher Burnette, Gwen
> D. Burnette, Mecot Camara Jr., Dale Comes, Tommy Comes, Kimberly Crop,
> Connie Burnette Decker, Erin Dolphin, Frederick Douglass, Christopher
> Eaves, India Eaves, Sylvia Jean Eaves, Charles Frye Jr., Gina Frye, Lialani
> Frye, Lincoln Frye, Randall Frye, Gerald Foister, Joseph Garner, Justina
> Garner, Penny Garner, Reva Garner, Karl Goodman, Barbara Haskell,
> Richard Haskell, Jordan Hlywiak, Taylor Hlywiak, Mendy Leigh Hunt, Jack
> Darrell Hunt, Marcy Elizabeth Hunt, Molly Faye Hunt, Carol Livingston,
> (Estate of) Manuel Massa Sr., Chadwick Matthews, Debra Matthews, Drew
> Matthews, Deborah Meurer, Shirley Douglass Miller, Elvera Mitchell, Robert
> Mitchell, (Estate of) Betty Lou Price, Timothy Price, Jeremy Rivers, Paul
> Rivers (son), Sandra Rivers, Carol Schak, George Schak, Lynne M. Spencer,
> Patrice Washington, (Estate of) Dorothy Williams, George Robinson
> Williams, Kevin Coker Williams, Bill Williamson, Debra Wise, Gwen
> Woodcock.

The Court will now turn its attention to those remaining claims that must be dismissed for

reasons not yet specified within this opinion.

### 4.    Other Remaining Claims That Must Be Dismissed

#### a.    Claim of Bobby Wallace

Under Oklahoma law, a non-adopted stepchild is not considered "issue" or a "child" for

purposes of inheritance. *See* Okla. Stat. Ann. tit. 84, § 213 (2007); *cf.* Green v. Wilson, 240 P.

1051, 1052 (Okla. 1925) (finding that, under § 213, estate of deceased intestate is inherited by

surviving spouse and legitimate children, *and adopted child* surviving inherits as if born in

wedlock). In light of the disparate treatment of adoptive and non-adoptive children in terms of

inheritance, it stands to reason that non-adoptive stepparents of stepchildren would be treated

differently under Oklahoma law than stepparents who adopt those stepchildren. Accordingly,

under Oklahoma law, a stepfather would not be able to inherit from or through his non-adopted

stepson; likewise, nor would he be able to recover damages as a result of the stepson's death.

Accordingly, this Court finds that Bobby Wallace, as Stephen Eugene Spencer's non-adoptive

stepfather, may not recover for IIED resulting from Stephen's death in the attack, and his claim

must be DISMISSED.

            *b.      Claim of Herbert Persky*

        As the stepfather to Timothy R. McMahon, Herbert Persky has brought an IIED claim

against the defendants. Based on the evidence presented to the Court, however, Mr. Persky may

not recover for IIED due to the fact that, as a stepparent, Mr. Persky lacks standing to bring such

a claim.

        As this Court has previously noted, Texas has adopted Section 46 of the Restatement

(Second) of Torts in establishing a cause of action for IIED. *Heiser*, 466 F. Supp. 2d at 333.

Moreover, the Texas Supreme Court has remained silent on the issue of whether a plaintiff's

presence is required in order for a third party to recover for IIED. *Id.* Accordingly, this Court

has found that the near relatives of a victim who were not present at the time of the attack would

still be able to recover for IIED under Texas law. *Id.* Therefore, Mr. Persky may only recover

for IIED if he is considered a near relative under Texas law.

        Under Texas law, however, stepparents that do not adopt a child are not deemed the same

-19-

as natural parents for purposes of inheriting from that child. Tex. Civ. Prac. & Rem.Code Ann. §
71.004(a) (Vernon 1997) (stating that only the victim's surviving spouse, children, and parents of
the deceased may recover for the victim's wrongful death). "A stepparent who takes no steps to
legally adopt his stepchild does not qualify as a parent for purposes of Texas's wrongful death
statute." *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 578 (S.D. Tex. 2003) (citing
*Boudreaux v. Texas & N.O.R. Co.*, 78 S.W.2d 641 (Tex.Civ.App.-Beaumont 1935, writ ref'd)).

In this case, notwithstanding the relationship that Mr. Persky had with Mr. McMahon,
there is no evidence that Mr. Persky legally adopted Mr. McMahon. Accordingly, Mr. Persky is
not considered a parent for purposes of being able to recover for pain and suffering as a result of
his stepson's untimely death. Therefore, Mr. Persky does not have standing to bring a claim for
IIED in this case, and his claim must be DISMISSED.

c.     *Claims of Sandra Bianco and Sandra Karen Bianco*

Under New Jersey law, a natural birth parent may recover for and inherit from and
through their child. Once that child is legally adopted by another parent, however, the natural
parent's privileges and obligations cease, "including the right of the natural parents and their
kindred to take and inherit intestate personal and real property from and through the person
adopted." N.J. Stat. Ann. 2A: 22-3(b) (2007) (emphasis added). Moreover, upon adoption all
rights, privileges and obligations normally bestowed upon natural parents-including the right to
take and inherit from and through the adopted child-become bestowed upon the adoptive parent
instead, who is treated in the eyes of the law "as if the person adopted had been born to them in
lawful wedlock . . . ." N.J. Stat. Ann. 2A: 22-3(c) (2007).

Here, Sandra Bianco (natural mother to serviceman Richard Andrew Fluegel) and Ms.

-20-

Bianco's daughter Sandra Karen Bianco (Richard's half-sister) seek under respective IIED claims to recover pain and suffering damages arising out of Richard's death. Richard, however, is survived by his natural father Thomas A. Fluegel, his adoptive mother Marilou Fluegel, and his full blood siblings Penni Joyce and Robert Fluegel. Therefore, though Ms. Bianco is Richard's natural mother, she may nonetheless not recover for pain and suffering from Richard's death because, under New Jersey law, Ms. Bianco's entitlement to take and recover from or through her son ceased once Richard was adopted by Marilou Fluegel. Therefore, the privilege of recovering as a mother to Richard for the pain and suffering associated with Richard's death has been bestowed upon Marilou Fluegel due to the fact that she legally adopted Richard. Therefore, this Court must DISMISS Sandra Bianco's claim for IIED for lack of standing.

For similar reasons, this Court must also dismiss Sandra Karen Bianco's claim for IIED for lack of standing. As noted previously, the privileges and obligations of the natural parent and their kindred ceases upon the child's adoption by another parent. Therefore, as kindred to Sandra Bianco, Sandra Karen Bianco may not recover damages associated with Richard Fluegel's death, and her claim must also be DISMISSED.

       *d.*    *Claims of Donald Rockwell, Charles Corry and Michael Clark Jr.*

Donald Rockwell (stepbrother to Michael Caleb Sauls), Charles Corry (brother-in-law to Eric Glenn Washington), and Michael Clark, Jr. (brother-in-law to James Baynard) seek to recover for IIED in this case as step-siblings of the deceased servicemen. Under Virginia law, however, only blood siblings and adoptive step-siblings qualify as siblings for purposes of recovering damages resulting from a victim's wrongful death. *See Brown v. Brown,* 309 S.E.2d 586, 590 (Va. 1983). Individuals are siblings to another individual only if they are of the same

-21-