1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA 94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA 94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12
   DEBORAH D. PETERSON, Personal          )    CASE NO. 3:08-mc-80030-JSW
13 Representative of the Estate of James C. )
   Knipple (Dec.), et al.,                 )    NOTICE OF MOTION AND MOTION FOR
14                                          )    ASSIGNMENT OF RIGHTS PURSUANT TO
              Plaintiffs,                   )    C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
15                                          )
   vs.                                      )    **[FINANCIAL INSTITUTIONS]**
16                                          )
   ISLAMIC REPUBLIC OF IRAN, et al.,        )    Date:   June 20, 2008
17                                          )    Time:   9:00 a.m.
              Defendants.                   )    Courtroom: 17, 16th Floor
18 _____ )    Judge: Jeffrey S. White

19          TO THE ISLAMIC REPUBLIC OF IRAN, THE CENTRAL BANK OF IRAN, AND ALL

20  OF THE FINANCIAL INSTITUTIONS (hereinafter "BANKS") LISTED ON *EXHIBIT "E"*

21  ATTACHED HERETO, AND TO THEIR AGENT, ATTORNEYS, AND OTHER

22  REPRESENTATIVES ON THEIR BEHALF:

23          PLEASE TAKE NOTICE that on the 20th day of June, 2008 at the hour of 9:00 a.m., or as

24  soon thereafter as the matter can be heard in Courtroom 17, before the Honorable Jeffrey S. White,

25  Judge of the United States District Court, at the courthouse located at 450 Golden Gate Avenue,

26  San Francisco, California 94102, Plaintiffs DEBORAH D. PETERSON, Personal Representative

27  of the Estate of James C. Knipple (Dec.), et al., will and do hereby move this court pursuant to

28

NOTICE OF MOTION AND MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a)
AND F.R.C.P. 69(a) [FINANCIAL INSTITUTIONS] - CASE NO. 3:08-mc-80030-JSW                    1

1   F.R.C.P. 69(a)(1) and C.C.P. § 708.510(a), for the following relief:

2        1. For an order assigning to Plaintiffs, and each of the same, by and through its named

3   Plaintiff DEBORAH D. PETERSON. Personal Representative of the Estate of James C. Knipple

4   (Dec.), all deposits, deposit accounts, rights to receive payment of money, contingent rights, future

5   rights, general intangibles, rights of any refund, rights to direct, transfer or dispose of any account,

6   deposit account, rights to receive any checks, drafts or money orders, rights to transfer, use or

7   control any account, regardless of the name, (all hereinafter collectively "Accounts"), to and in

8   favor of THE ISLAMIC REPUBLIC OF IRAN, and all of its agencies and instrumentalities

9   (hereinafter collectively "Iran"), in which such accounts, and each of the same, are in the

10  possession, control, dominion, custody, care, or held by the following financial institutions as

11  listed on *Exhibit "E"* to the Declaration of David J. Cook.

12       2. For an order compelling the assignment of all of the accounts, and each of the same, to

13  DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), as

14  a representative for and on behalf of the Plaintiffs in the above-entitled action, care of David J.

15  Cook, Esq., Cook Collection Attorneys, P.L.C., 165 Fell Street, San Francisco, CA 94102, and/or

16  P.O. Box 270, San Francisco, CA 94104, for purpose of satisfaction of the outstanding judgment

17  rendered in the United States District Court, District of Columbia, entitled Peterson vs. Islamic

18  Republic of Iran. Consolidated Case Nos. 01-2094 (RCL) and 01-2684 (RCL, and that the

19  assignment order remains in full force and effect, until the judgment is paid in full herein.

20       The basis of this motion is that Plaintiffs have obtained a judgment well in excess of $2.7

21  billion; that the judgment is based upon the 1983 bombing of the Marines barracks in Beirut,

22  Lebanon; that Plaintiffs are informed and believe that the various financial institutions as set forth

23  herein may have on hand accounts, deposit accounts, rights to payment of money as described

24  herein, in which Iran have an interest or control thereunder or are the owner therein; that Plaintiffs

25  have previously levied on some, but not all of the accounts; that many of the financial institutions

26  have responded by stating that Plaintiffs' levy is limited specifically to the "bank account" in the

27  hands of the local branch; that an assignment order permits Plaintiffs to reach all obligations, and

28

1  each of the same, owed by the financial institutions, whether located in the United States, or

2  otherwise; that Plaintiffs therefore seek the issuance of a broad-based assignment order which

3  would reach all, and each of the ACCOUNTS, whether located in the United States, or located

4  overseas hereunder.

5      This motion is based upon this Notice, the attached Motion, Memorandum of Points and

6  Authorities, the Declaration of David J. Cook, Esq., upon all pleadings, papers and other matters

7  on file herein, all matters which this court may take judicial notice hereof, which include but are

8  not limited to, all papers, pleadings and other matters on file herein in that certain action known as

9  *DEBORAH D. PETERSON, Personal Representatives of the Estate of James C. Knipple (Dec.), et*

10 *al., vs. ISLAMIC REPUBLIC OF IRAN, et al.*, United States District Court for the District of

11 Columbia, Consolidated Civil Actions: 01-2094 (RCL) and 01-2684 (RCL), all other matters

12 which the court may take judicial notice thereof, and upon all oral evidence and argument which

13 may be presented at the hearing hereof.

14 DATED:  May 1, 2008                    COOK COLLECTION ATTORNEYS

15

16                                        By: ___/s/ David J. Cook_____
                                          DAVID J. COOK, ESQ. (SB# 060859)
17                                        Attorneys for Plaintiffs
                                          DEBORAH D. PETERSON, Personal
18                                        Representatives of the Estate of James C. Knipple
                                          (Dec.), et al.

19
   F:\USERS\DJCNEW\peterson.assignfinancial
20

21

22

23

24

25

26

27

28

1    **DAVID J. COOK, ESQ. (State Bar # 060859)**
     **ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2    **COOK COLLECTION ATTORNEYS**
     **A PROFESSIONAL LAW CORPORATION**
3    165 Fell Street
     San Francisco. CA  94102
4    Mailing Address: P.O. Box 270
     San Francisco. CA  94104-0270
5    Tel: (415) 989-4730
     Fax: (415) 989-0491
6    File No. 52.759

7    Attorneys for Plaintiffs
     DEBORAH D. PETERSON. Personal Representatives
8    of the Estate of James C. Knipple (Dec.). et al.

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12
     DEBORAH D. PETERSON. Personal      )    CASE NO. 3:08-mc-80030-JSW
13   Representative of the Estate of James C. )
     Knipple (Dec.). et al.,             )    MOTION FOR ASSIGNMENT OF RIGHTS
14                                        )    PURSUANT TO C.C.P. § 708.510(a) AND
              Plaintiffs,                 )    F.R.C.P. 69(a)
15                                        )
     vs.                                  )    **[FINANCIAL INSTITUTIONS]**
16                                        )
     ISLAMIC REPUBLIC OF IRAN, et al.,    )    Date:  June 20, 2008
17                                        )    Time:  9:00 a.m.
              Defendants.                 )    Courtroom: 17, 16th Floor
18   _____    )    Judge: Jeffrey S. White

19
              Plaintiffs DEBORAH D. PETERSON. Personal Representative of the Estate of James C.
20
     Knipple (Dec.), et al., hereby move this court for the following relief, for purposes of enforcement
21
     of the judgment in their favor rendered in the above-entitled action dated 9/7/07 in the amount of
22
     $2.656.944,877. as follows:
23
              1. For an order assigning to Plaintiffs. and each of the same. by and through its named
24
     Plaintiff DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple
25
     (Dec.), all deposits. deposit accounts, rights to receive payment of money, contingent rights. future
26
     rights. general intangibles. rights of any refund, rights to direct. transfer or dispose of any account.
27
     deposit account. rights to receive any checks, drafts or money orders, rights to transfer. use or
28

MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
[FINANCIAL INSTITUTIONS] - CASE NO. 3:08-mc-80030-JSW                                              1

1  control any account, regardless of the name, (all hereinafter collectively "Accounts"), to and in

2  favor of THE ISLAMIC REPUBLIC OF IRAN, and all of its agencies and instrumentalities

3  (hereinafter collectively "Iran"), in which such accounts, and each of the same, are in the

4  possession, control, dominion, custody, care, or held by the following financial institutions as

5  listed on *Exhibit "E"* to the Declaration of David J. Cook.

6        2. For an order compelling the assignment of all of the accounts, and each of the same, to

7  DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), as

8  a representative for and on behalf of the Plaintiffs in the above-entitled action, care of David J.

9  Cook, Esq., Cook Collection Attorneys, P.L.C., 165 Fell Street, San Francisco, CA 94102, and/or

10 P.O. Box 270, San Francisco, CA 94104, for purpose of satisfaction of the outstanding judgment

11 rendered in the United States District Court, District of Columbia, entitled Peterson vs. Islamic

12 Republic of Iran, Consolidated Case Nos. 01-2094 (RCL) and 01-2684 (RCL, and that the

13 assignment order remains in full force and effect, until the judgment is paid in full herein.

14        This motion is based upon this Motion, the attached Notice, Memorandum of Points and

15 Authorities, Declaration of David J. Cook, Esq., upon all pleadings, papers and other matters on

16 file herein, all matters which this court may take judicial notice hereof, which include but are not

17 limited to, all papers, pleadings and other matters on file herein in that certain action known as

18 *DEBORAH D. PETERSON, Personal Representatives of the Estate of James C. Knipple (Dec.), et*

19 *al., vs. ISLAMIC REPUBLIC OF IRAN, et al.,* United States District Court for the District of

20 Columbia, Consolidated Civil Actions: 01-2094 (RCL) and 01-2684 (RCL), all other matters

21 which the court may take judicial notice thereof, and upon all oral evidence and argument which

22 may be presented at the hearing hereof.

23 DATED: May 1, 2008                        COOK COLLECTION ATTORNEYS

24                                            By: ___/s/ David J. Cook_____
25                                            DAVID J. COOK, ESQ. (SB# 060859)
                                             Attorneys for Plaintiffs
26                                            DEBORAH D. PETERSON, Personal
                                             Representatives of the Estate of James C. Knipple
27                                            (Dec.), et al.

    F:\USERS\DJCNEW\peterson.assignfinancial
28

MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
[FINANCIAL INSTITUTIONS] - CASE NO. 3:08-mc-80030-JSW                                    2

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

13  DEBORAH D. PETERSON, Personal        )   CASE NO. 3:08-mc-80030-JSW
    Representative of the Estate of James C. )
    Knipple (Dec.). et al.,               )   MEMORANDUM OF POINTS AND
14                                         )   AUTHORITIES IN SUPPORT OF MOTION
           Plaintiffs,                     )   FOR ASSIGNMENT OF RIGHTS PURSUANT
15                                         )   TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
    vs.                                    )
16                                         )   **[FINANCIAL INSTITUTIONS]**
    ISLAMIC REPUBLIC OF IRAN, et al.,      )
17                                         )   Date:   June 20, 2008
           Defendants.                     )   Time:   9:00 a.m.
18  _____ )   Courtroom: 17, 16th Floor
                                               Judge: Jeffrey S. White
19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**PAGES:**

I.  INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  LOCATION OF ASSETS AND POSSIBLE RELIEF FOR THE PLAINTIFFS  . . . . . . . 1

    A.  FUNDS IN BANKS TO FINANCE WORLD WIDE TRADE  . . . . . . . . . . . . . . 1

    B.  FUNDS HELD IN VARIOUS ACCOUNTS AS UNDISBURSED FUNDS,
       LINES OF CREDIT ACCOUNT, DEPOSITS AND PREPAYMENTS  . . . . . . . . 2

III.  REACH OF AN ASSIGNMENT ORDER  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  WHICH LAW APPLIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.  MECHANISM OF AN ASSIGNMENT MOTION  . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI.  WHY THESE FINANCIAL INSTITUTIONS?  . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VII.  POTENTIAL CLAIMS OF SOVEREIGN IMMUNITY  . . . . . . . . . . . . . . . . . . . . . . 11

VIII.  WHY IS AN ASSIGNMENT DIFFERENT FROM A LEVY?  . . . . . . . . . . . . . . . . . . 14

IX.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1

# TABLE OF AUTHORITIES

2

**CASES:**                                                                                    **PAGES:**

3

*Celsa HILAO, et al.. Plaintiffs-Appellees, v. ESTATE OF Ferdinand E. MARCOS, Defendant, and
Swiss Bank Corporation and Credit Suisse, Appellants*

4

    95 F.3d 848 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

5

*Clark vs. Wilbur*

6

    913 F.Supp. 463 (S.D.W.Va. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7

*Estate of Ferdinand Marcos Human Rights Litigation*

8

    910 F. Supp. 1470 (D. Hawaii Court, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

9

*FIRST CENTRAL COAST BANK, etc. vs. CUESTA TITLE GUARANTEE COMPANY, et al.*

10

    143 Cal.App.3d 12. 191 Cal.Rptr. 433 (Cal.App.2 Dist. 1983) . . . . . . . . . . . . . . . . . 10

11

*George E. DANIELSON et al. v. UNITED STATES of America*

12

    416 F.2d 408 (9th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13

*Kracht vs. Perrin, Gartland & Doyle*

14

    219 Cal.App.3d 1019 (Cal.App.4 Dist. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13. 14

15

*Mendaro vs. The World Bank*

16

    717 F.2d 610 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

17

*Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian*

18

    218 Cal.App.3d 1058. 267 Cal.Rptr. 457 (6 Dist.1990). . . . . . . . . . . . . . . . . . . . . . . 11

19

*Price v. Forrest*

20

    173 U.S. 410 (1899) 19 S.Ct. 434. 43 L.Ed. 749 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21

*Shaffer vs. Heitner*

22

    433 U.S. 186. 97 S.Ct. 2569. 53 L. Ed. 2d 683 (1977) . . . . . . . . . . . . . . . . . . . . . . . 10

23

24

25

26

27

28

**STATUTES:**

*Federal:*

28 U.S.C.

§ 1605A ........................................................... 6

§ 1605A(g)(2) ..................................................... 13

§ 1610(a)(1) and (b)(1) ............................................ 11

§ 1963. ........................................................... 1

Federal Rules of Civil Procedure

69(a) ............................................................. 7, 8

69(a)(1) .......................................................... 7, 8

*State:*

California Code of Civil Procedure

§701.020(a) ...................................................... 13

§ 699.710 ......................................................... 3

§ 708.510(a) ............................................... 3, 4, 8, 10, 11

The Legislative Comment under C.C.P. § 708.510 ..................... 9

§ 708.530 ......................................................... 9

§ 708.540 ......................................................... 9

California Civil Code

§ 955.1 ........................................................... 9

California Commercial Code

Section 9102(42)(a) ............................................... 3

*Other:*

The Restatement of Conflicts of Laws .............................. 8

iii

# I. INTRODUCTION.

Plaintiffs have recovered judgment in the amount of $2.656,944.877.00 on 9/7/07 against THE ISLAMIC REPUBLIC OF IRAN ("Iran") based upon that certain incident described in the MEMORANDUM OPINION of 5/30/03. Plaintiffs thereafter obtained judgment on 9/7/07, and a copy of the JUDGMENT is marked *Exhibit "A."*

Plaintiffs have duly docketed this judgment pursuant to 28 U.S.C. § 1963. Plaintiffs are in the process of levy and execution in this judicial district, which includes a levy upon the Boeing Company. Bank of Tokyo Mitsubishi. Sumitomo Mitsui Banking Corporation. BNP Paribas, Mizuho Corporate Bank, among others, all of whom have addresses located in this district herein.

## II. LOCATION OF ASSETS AND POSSIBLE RELIEF FOR THE PLAINTIFFS.

### A.    FUNDS IN BANKS TO FINANCE WORLD WIDE TRADE.

Iran is a major importer of goods (and services) on a world wide basis, such as gasoline from India, Turkmenistan. Azerbijan. the Netherlands. France. Singapore, and the UAE. along with such companies as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies. This information is found in EIA Report from the Department of Energy marked *Exhibit "B,"* (Page 4) showing that Iran is the second largest purchaser of gasoline, second to the United States, importing billions of dollars of gasoline and related products. Iran necessarily must pay for the gasoline services through one or more medium. Typically. Iran would arrange for a financial institution to issue a letter of credit, enabling the seller of the gasoline to sell and ship the gasoline to Iran, and in turn, receive payment through a "draw down" based upon the letter of credit. In many cases, the banks issuing the letters of credit would be large European and Asian banks, assuring essentially their own "clientele," that in fact they would be paid predicated upon the shipment of gasoline and other refined products. Other reports confirm that Iran is also a major importer of such products as industrial and raw materials, intermediate goods, capital goods, foodstuffs, and other consumer items and goods and technical services, all of which is set forth in great detail in the Central Intelligence Agency "World Fact Book," marked *Exhibit "C."* (Page 11)

Needless to say. Iran has to pay for these goods, and the typical methodology is through a

1    letter of credit, issued by a neutral bank, or setting up a deposit account with a neutral bank and
2    instructions to wire the funds to the bank for the seller upon receipt of the goods.

3         Iran's vast import market is confirmed by the GAO "Highlights" Report of December 2007
4    marked *Exhibit "D,"* which shows (Page 30) literally billions of dollars of imports coming to Iran
5    from such countries as Germany. China, UAE, Korea, France, Italy. Russia. India, Brazil. Japan,
6    among others.  Commons sense again would dictate that these "exporting countries." to assure
7    themselves of payment. are in fact demanding and receiving letters of credit, all of which are
8    collateralized by debt bank deposits by and through the Central Bank of Iran. Bank Melli. Bank
9    Sadarat. among many others.

10         Accordingly Iran might well have on deposit significant sums of money with various
11    financial institutions ("Banks") listed on *Exhibit "E"* constitutes serving as collateral. deposits or
12    other funds to finance world wide trade. or have funds available by and through a credit facility.
13    long-term loan. line of credit, or undisbursed funds based upon a loan.

14        **B.    FUNDS HELD IN VARIOUS ACCOUNTS AS UNDISBURSED FUNDS,**
              **LINES OF CREDIT ACCOUNT, DEPOSITS AND PREPAYMENTS.**

15
16         The following financial institutions may have funds available through a line of credit.
17    undisbursed loan proceeds, loan proceeds and other financial accommodations in which Iran is
entitled to drawn down:
18

| | |
|---|---|
| 1.  Asian Development Bank<br>815 Connecticut Ave NW # 325<br>Washington. D.C. 20006<br>(202) 728-1500<br>Attn: LEGAL PROCESS DEPT. | 6.  Export Import Bank of India<br>1750 Pennsylvania Ave NW<br>Washington. DC 20006 |
| 2.  Development Bank of Japan<br>1101 17th St NW # 1001<br>Washington, DC 20036<br>(202) 331-8696 | 7.  Industrial Bank<br>4812 Georgia Ave NW<br>Washington, DC 20011<br>(202) 722-2000 |
| 3..  Export Import Bank of Korea<br>1300 L St NW # 825<br>Washington. DC 20005<br>(202) 408-8838 | 8.  International Monetary Fund<br>700 19th St NW<br>Washington. DC 20431<br>(202) 623-7000 |
| 5.  Export Import Bank of Korea<br>460 Park Avenue.<br>New York. New York 10022<br>Attn: LEGAL PROCESS DEPT. | 9.  International Finance Corporation<br>2121 Pennsylvania Ave NW<br>Washington, DC 20433<br>(202) 473-1000 |

19
20
21
22
23
24
25
26
27
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) |FINANCIAL INSTITUTIONS|
CASE NO. 3:08-mc-80030-JSW                        2

1    10.    International Bank for Reconstruction
            and Development aka THE WORLD
2            BANK
            1818 H St NW
3            Washington, DC 20433
            (202) 473-1000
4
     11.    Japan Bank for International
5            Cooperation
            1909 K St NW # 300
6            Washington, DC 20006
            (202) 785-5242
7
     12.    State Bank of India
8            2001 Pennsylvania Ave NW # 625
            Washington, DC 20006
9            (202) 223-5579

10   Funds held these bank in which Iran has the right to drawn down, receive. direct loan transfers or

11   receive the benefit, constitutes a leviable asset, and therefore subject to the reach of these

12   judgment creditors.  All property of a judgment debtor is subject to the levy and execution under

13   C.C.P. § 699.710 as follows:

14          "Except as otherwise provided by law, all property that is subject to enforcement of
            a money judgment pursuant to Article 1 (commencing with Section 695.010) of
15          Chapter 1 is subject to levy under a writ of execution to satisfy a money judgment.

16   The right to receive loan proceeds would constitute a deposit or general intangible entitling Iran to

17   receive the funds.  A general intangible is defined under C.C.P. § 680.210 as follows:

18          "General intangibles" means "general intangibles," as defined in paragraph (42) of
            subdivision (a) of Section 9102 of the Commercial Code. consisting of rights to
19          payment."

20   California Commercial Code Section 9102(42)(a) defines a general intangibles as follows:

21          "(42) "General intangible" means any personal property, including things in action. other
            than accounts. chattel paper, commercial tort claims. deposit accounts, documents, goods,
22          instruments. investment property. letter-of-credit rights. letters of credit. money. and oil.
            gas, or other minerals before extraction. The term includes payment intangibles and
23          software. "

24   An assignment motion would reach a general intangibles as a right to receive payment of money,

25   which might be conditional. due in the future. or subject to some of condition.  C.C.P. §

26   708.510(a).  Monies due Iran from its various lending institutions would be subject to levy in the

27   same manner that Iran would be entitled to payment upon demand. and the sole issue whether Iran

28   is entitled to these funds.  These Banks may well have in their hands undisbursed funds. or be

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [FINANCIAL INSTITUTIONS]
CASE NO. 3:08-mc-80030-JSW                                                           3

1 | obligated to advance to Iran funds under a long-term credit facility or commercial loan.

2 | ### III.  REACH OF AN ASSIGNMENT ORDER.

3 | Unlike a levy, which is typically tied to a branch, an assignment order reaches all

4 | obligations which may be owed by the obligor, such as a financial institution.  These obligations

5 | would include, but are not limited to, for example, all rights to payment of money, accounts, funds

6 | on hand, funds in a deposit account, or otherwise.

7 | In many of these case, the banks are international in nature and their only contact with the

8 | Untied States is that they have a branch located in the Untied States.  This is enough to justify the

9 | reach of an assignment order for funds which are located in the "home office," no matter located.

10 | Directly on point is *Estate of Ferdinand Marcos Human Rights Litigation*, 910 F. Supp. 1470

11 | (D. Hawaii Court, 1995) in which the district court was faced with an identical situation.  In

12 | *Estate of Ferdinand Marcos Human Rights Litigation, supra,* the plaintiffs were torture victims

13 | of Ferdinand Marcos, who obtained an extremely substantial judgment.  The judgment creditors

14 | levied from time to time upon various financial institutions, in which all of their efforts were for

15 | naught.  Thereafter, they proceeded under C.C.P. § 708.510(a) in reaching accounts held by Credit

16 | Suisse, in which the accounts were held in Switzerland, not California.  The court held that the

17 | accounts of Credit Suisse, even though tangentially located in Switzerland, was subject to the

18 | reach of an assignment order, in which the court stated as follows:

19 | "B. Court's Implied Power to Assign
   | First, implicit in the power to enforce a judgment is the power to use all legal
20 | means to provide relief to judgment creditors in an appropriate case. Assignment of
   | funds is one of those means.
21 | See *Chicago Pneumatic Tool Co. v. O.V. Stonestreet, et al.,* 107 F.R.D. 674
   | (S.D.W.Va.1985). In that case the plaintiff requested that the defendant be
22 | required,
   | "to convey or assign to the United States Marshal for the Southern District of West
23 | Virginia, such money, bank notes, securities, evidences of debt, other personal
   | property, chooses in action or other intangible personal property as may be ordered
24 | by the said commissioner for enforcement and payment of the judgment including
   | interest and costs, outstanding in the above matter." *Id.* at 676. [4] Despite
25 | defendant's arguments about limitations on the power of magistrate judges, not here
   | relevant, the Court concluded that in entry of any order requiring the debtor to
26 | transfer property to the creditor, the magistrate would only facilitate the District
   | Court's inherent power to enforce plaintiffs' judgment.

27 |
28 | Similarly this Court has the inherent power to order the Estate to assign its rights,
   | title and interest to the Swiss bank accounts to plaintiffs, given the uncontroverted

1  evidence that those assets belong to the debtor Estate.
   An equally compelling basis for ordering the assignment is FRCP 69(a). also relied
2  upon in *Chicago Pneumatic, supra.*

3  C. FRCP 69(a)

4  Federal Rule of Civil Procedure 69(a) provides,
   "Process to enforce a judgment for the payment of money shall be a writ of execution.
5  *unless the court directs otherwise.* The procedure on execution, in proceedings
   supplementary to and in aid of a judgment, and in proceedings on and in aid of execution
6  shall be in accordance with the practice and procedure of the state in which the district
   court is held. existing at the time the remedy is sought, except that any statute of the
7  United States governs to the extent that it is applicable." F.R.C.P. 69(a) (emphasis by the
   court)
8   In *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La, Inc.,* 1993 WL 414664, 1993
   U.S.Dist. LEXIS 14450 (E.D.La.1993), plaintiff moved the Court to enter an order
9  directing the sale of the rights and interest of the Partnership in a case where judgment had
   been entered a year earlier. The District Court looked to Louisiana law as the law of the
10 state in which the action occurred. Applying the appropriate statute [5]. the Court ordered
   judicial sale of the property by the United States Marshal. Similarly, in *Moseley Assoc. v.*
11 *Brown,* 1988 WL 68149. 1988 U.S.Dist. LEXIS 5662 (S.D.N.Y.1988), the district court
   looked to state law, then New York Debtor and Creditor Law, to order defendants to
12 satisfy plaintiffs' judgment out of funds which had been transferred to them.
   The question here is what state's law applies to enforcement mechanisms and thus to
13 whether assignment may be ordered.

14 In this case. the judgment was entered and an order was signed transferring the matter to
   other districts for the purpose of execution. The only district in which a transfer was
15 sought and the judgment registered was the Central District of California. the location of
   branches of the Swiss banks holding the money here at issue. The Swiss banks branches
16 are located in Los Angeles. plaintiffs are conducting judgment debtor discovery in
   California. and all discovery disputes are before this Court in the Central District of
17 California. Under these circumstances, California law should apply since the matter is now
   in California, solely for the purpose of executing the judgment. Moreover, Hawaii law is
18 consistent with this disposition.

19 D. California Law
   California law on assignment of right to payment in enforcement of a judgment provides.
20         "Except as otherwise provided by law, upon application of the judgment creditor on
           noticed motion, the court may order the judgment debtor to assign to the judgment
21         creditor or to a receiver appointed pursuant to Article 7 (commencing with Section
           708.610) all or part of a right to payment due or to become due. whether or not the
22         right is conditioned on future developments. ... " CAL.CIV.PROC.CODE section
           708.510 (West 1987).
23
   Case law interpreting this statute has consistently upheld a courts' power to require debtors
24 to assign their interests in debts or other property. See. e.g.. *Philippine Export and Foreign
   Loan Guarantee Corp. v. Chuidian,* 218 Cal.App.3d 1058. 267 Cal.Rptr. 457 (6
25 Dist.1990). *See generally,* 8 Witkin, Cal.Procedure (3d ed. 1985). Enforcement of
   Judgments, §§ 299 and 300: *Civil Procedure; enforcement of judgments,* 14 Pacific L.J.
26 397, 431 (1983). Similarly, here CCP 708.510 and its case law exegesis permit an order of
   assignment of the Estate's interests in the Swiss accounts for the benefit of the judgment
27 creditors. class action plaintiffs.

28 **III. CONCLUSION**

1      For all of the above reasons, the defendant Estate by Imelda Marcos and Ferdinand
Marcos. Jr. are ordered to forthwith execute an assignment of the funds in the respective
2      Swiss banks in favor of the class and individual plaintiffs. In default thereof the clerk of
the court is ordered to execute the assignment on behalf of the judgment debtor. (Page
3      1472)

4      Accordingly, to the extent of course that any of the financial institutions with offices or a

5 connection with the United States, hold any funds, no matter where located, these funds would

6 now be the subject of the reach of this assignment order.

7      This assignment order does not necessarily preadjudicate the claims by and between the

8 obligor and the judgment creditor.  Directly on point is ***Kracht vs. Perrin, Gartland & Doyle***, 219

9 Cal.App.3d 1019 (Cal.App.4 Dist. 1990), in which the court stated at footnote 1:

10      " [1]Code of Civil Procedure section 708.510 does not require that notice of the
motion to cause an assignment be given to the obligor of the judgment debtor. The
11      order of assignment does not affect the obligor's rights until notice of the order is
received by the obligor. (Code Civ.Proc., § 708.540.) The fact that the choses in
12      action were ordered assigned under Code of Civil Procedure section 708.510 does
not preclude a challenge to whether the claims were assignable ab initio, because
13      the Legislature specifically noted that section 708.510 "... does not make any
property assignable that is not already assignable." (See Legis.Com.Comment.
14      Assembly 1982 Addition. West's Ann.Code Civ.Proc., § 708.510.)

15      Plaintiffs therefore seek an order overcoming the artificial barrier raised by the financial

16 institutions, the effect of which would be to shelter bank accounts, rights to payment of money,

17 general intangibles, accounts. which are held "overseas." To the extent that any of these

18 international banks have offices or a domicile in the United States, this assignment order would

19 necessarily reach all obligations on a world-wide basis

20      Iran no longer has available the benefits of sovereign immunity under recent legislation

21 enacted as 28 U.S.C. § 1605A as follows:

22 "(a) IN GENERAL. --

23      "(1) NO IMMUNITY. – A foreign state shall not be immune from the
jurisdiction of courts of the United States or of the States in any case not otherwise
24      covered by this chapter in which money damages are sought against a foreign state
for personal injury or death that was caused by an act of torture. extrajudicial
25      killing. aircraft sabotage. hostage taking. or the provision of material support or
resources for such an act if such act or provision of material support or resources is
26      engaged in by an official. employee. or agent of such foreign state while acting
within the scope of his or her office, employment, or agency."
27
     "(g) PROPERTY IN CERTAIN ACTIONS –
28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [FINANCIAL INSTITUTIONS]
CASE NO. 3:08-mc-80030-JSW      6

"(1) IN GENERAL. – subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, upon that judgment as provided in this section, regardless of –

"(A) the level of economic control over the property by the government of a foreign state;
"(B) whether the profits of the property go to that government:
"( C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
"(D) whether that government is the sole beneficiary in interest of the property; or
"(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

"(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE. Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act."

## IV. WHICH LAW APPLIES.

Plaintiffs seek to enforce the judgment under F.R.C.P. 69(a)(1) amended as of 12/1/07, and employ the laws of the domicile, specifically being the laws of the State of California, which provides as follows:

Rule 69. Execution
(a) In General.
(1) Money Judgment; Applicable Procedure.
A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution — and in proceedings supplementary to and in aid of judgment or execution — must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

This entire issue was discussed in detail in *Clark vs. Wilbur,* 913 F.Supp. 463 (S.D.W.Va. 1996). in which the court was faced with the issue whether the laws of the original domicile applied, or the "transplanted domicile," in which the judgment was being enforced. The court answered this at 913 F.Supp. 463 at page 467, in which the court stated as follows:

"Defendants assert Florida law should be applied in determining if the assets in question are exempt from a turnover order. Plaintiff seeks application of West Virginia law. *Rule* 69(a) provides in pertinent part as follows:

The procedure on execution, in proceedings supplementary to and in aid of judgment, and in proceedings on and in aid of execution *shall be in accordance*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [FINANCIAL INSTITUTIONS] CASE NO. 3:08-mc-80030-JSW

7

*with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought . . . Id.* (emphasis added). The mandate requiring resort to the law of the state where the district court is held applies to questions relating to whether assets are exempt from collection. [8] *See, e.g., Chicago, Rock Island & Pac. Ry. Co. v. Sturm,* 174 U.S. 710, 717, 19 S.Ct. 797. 800, 43 L.Ed. 1144 (1899) (stating "[e]xemption laws are ... part of the remedy and subject to the law of the forum"); *Johns v. Rozet,* 826 F.Supp. 565, 567 (D.D.C.1993): *Pallante v. Int'l Venture Invs., Ltd.,* 622 F.Supp. 667. 668 (N.D.Ohio 1985) (stating "[g]enerally ... questions of exemption are determined solely by the laws of the forum"): *Marine Midland Bank v. Surfbelt, Inc.,* 532 F.Supp. 728. 729 (W.D.Pa.1982) (stating "the law of the forum governs questions of exemption"): 11 Thomas J. Goger et al.. *Federal Procedure* § 31:21 (1982). Defendants have cited no authority to the contrary in support of their position and the Court has located none. Accordingly. the Court concludes West Virginia law controls the question of whether the requested assets are exempt. The Court must now determine whether the requested assets are exempt under West Virginia law.¨

Traditional choice of law principles mandate, along with F.R.C.P. 69(a)(1). that the judgment creditor is entitled to exercise the rights and remedies of the forum jurisdiction. rather than the original jurisdiction. The Restatement of Conflicts of Laws rejects this claim as follows:

"The majority of courts agree with Mr. Justice McKenna and hold that in a garnishment proceeding, as elsewhere, *only the exemption laws of the forum are applicable.*¨ (Page 1617).[1] (Emphasis added)

Here. Plaintiffs seek to enforce the remedies permitted under California, as opposed to District of Columbia law.

## V. MECHANISM OF AN ASSIGNMENT MOTION.

Plaintiff seeks to employ the remedies permitted under C.C.P. § 708.510(a) which provides as follows:

"Except as otherwise provided by law, upon application of the judgment creditor on noticed motion, the court may order the judgment debtor to assign to the judgment creditor. or to a receiver appointed pursuant to Article 7 (commencing with section 708.610) all or part of a right to payment due or to become due. whether or not the right is conditional upon future developments. including but not limited to, the following types of payment:

1.    Wages due from the federal government that are not subject to withholding under an earnings withholding order.
2.    Rents.
3.    Commissions.
4.    Royalties.
5.    Payments due from a patent or copyright.
6.    Insurance policy loan value."

---

[1]  Exemptions do not travel.

1        This assignment motion would reach all accounts, accounts receivable and rights to

2    payment of money, whether owed now or owed in the future, from "account debtors" who may

3    owe money to the underlying judgment debtor.

4        The Legislative Comment under C.C.P. § 708.510 indicates that the court has great

5    flexibility in fashioning relief, which itself would enable Plaintiffs to serve the assignment order

6    and obtain payment of amounts which are due or may be due in the future. The Legislative

7    Comment provides as follows:

8        **Legislative Committee Comment – Assembly 1982 Addition**

9        Section 708.510 provides a new procedure for reaching certain forms of
property that cannot be reached by levy under a writ of execution, such as the
nonexempt loan value of an unmatured life insurance, endowment, or annuity

10    policy. See Sections 699.720(a)(6), 704.100. It also provides an optional
procedure for reaching assignable forms of property that are subject to levy, such as

11    accounts receivable, general intangibles, judgments, and instruments. This section
does not make any property assignable that is not already assignable. This remedy

12    may be used alone or in conjunction with other remedies provided in this title for
reaching rights to payment, such as execution, orders in examination proceedings,

13    creditors' suits, and receivership. The use of this remedy is subject to limitations
on the time for enforcement of judgment. See Sections 683.010-683.220.

14

    The purpose of the assignment order is the same as a contractual assignment under C.C.P.

15    § 708.530, which provides as follows:

16
    **§ 708.530.**

17    (a) Except as provided in subdivision (b), the effect and priority of an assignment
ordered pursuant to this article is governed by Section 955.1 of the Civil Code. For

18    the purpose of priority, an assignee of a right to payment pursuant to this article
shall be deemed to be a bona fide assignee for value under the terms of Section

19    955.1 of the Civil Code.
(b) An assignment of the right to future rent ordered under this article is recordable

20    as an instrument affecting real property and the priority of such an assignment is
governed by Section 1214 of the Civil Code.

21
    The effect on the obligor's rights is found under C.C.P. § 708.540, which provides as

22    follows:

23
    **§ 708.540.**

24    The rights of an obligor are not affected by an order assigning the right to payment
until notice of the order is received by the obligor. For the purpose of this section,

25    "obligor" means the person who is obligated to make payments to the judgment
debtor or who may become obligated to make payments to the judgment debtor

26    depending upon future developments.

27        Assignments are found under Civ.C. § 955.1, likewise which provides as follows:

28

§ 955.1.
(a) Except as provided in Sections 954.5 and 955 and subject to subdivisions (b) and ( c). a transfer other than one intended to create a security interest (paragraph (1) or (3) of subdivision (a) of Section 9109 of the Commercial Code) of any payment intangible (Section 9102 of the Commercial Code) and any transfer of accounts. chattel paper, payment intangibles, or promissory notes excluded from the coverage of Division 9 of the Commercial Code by paragraph (4) of subdivision (d) of Section 9109 of the Commercial Code shall be deemed perfected as against third persons upon there being executed and delivered to the transferee an assignment thereof in writing.
(b) As between bona fide assignees of the same right for value without notice. the assignee first giving notice thereof to the obligor in writing has priority.

An assignment order permits the judgment creditor to reach receivable due now. or due in the future, receivables which might be contingent, or uncertain. or receivables in which performance might still be due, as provided by the exact language of C.C.P. § 708.510(a).  On the other hand a levy would only reach accounts which are due at the time of the levy as indicated by such as cases as *FIRST CENTRAL COAST BANK, etc. vs. CUESTA TITLE GUARANTEE COMPANY, et al.*, 143 Cal.App.3d 12, 191 Cal.Rptr. 433 (Cal.App.2 Dist. 1983). the appellate court held that a premature [or late] levy did not reach the monies which were due at the time of a levy in that a levy constitutes a "snapshot" of any funds immediately due the debtor. The court stated as page 16 as follows:

"A debt which is uncertain and contingent in the sense that it may never come due and payable is not subject to garnishment. (Brunskill v. Stutman. supra. 186 Cal.App.2d 97, 8 Cal.Rptr. 910: *Clecak v. Dunn* (1928) 95 Cal.App. 537.)"

An assignment order reaches a broader range of property rights, including accounts which are contingent. or some performance which is due in the futures.  A levy, on the other hand, only reaches monies which are non contingent and in which the accounts are immediately due and payable, and without a defense.[2]

---

[2] Parenthically serving account debtors with an assignment order also reduces the cost of enforcement given a large number of actual and/or potential obligors.  With an assignment order in hand. Plaintiffs can effectively reach the multitude of obligors through the mail. personal service. or otherwise, without the burden of docketing this judgment in the local district court.  To the extent that the obligor might claim that the obligor is not subject to the U.S. jurisdiction (or the particular subsidiary), this is clearly a matter subject to the individual enforcement of the assignment order in a separate satellite proceeding.  Whether or not the particular entity is (or is not) subject to the U.S. jurisdiction in this setting need not be precisely determined and the fact of any jurisdictional defense might well be the subject of waiver, consent, variations of jurisdiction such as "in rem" jurisdiction. See. however. *Shaffer vs. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L. Ed. 2d 683 (1977). C.C.P. § 708.510 does not necessarily anticipate a full blown evidentiary

1   An assignment order permits the judgment creditor to serve the order through the mails (or

2   process servers) with the concurrent expense of individual levy and execution. An assignment

3   order reaches money which is now due or might be due in the future, or in which payment is

4   contingent (C.C.P. § 708.510(a)), while on the other hand a levy only reaches money due at the

5   time and without condition.

6                        **VI. WHY THESE FINANCIAL INSTITUTIONS?**

7       Plaintiff has a factual basis for believing that the banks at issue might have some funds or

8   property which belongs to Iran and therefore would justify the prosecution of this motion. Many

9   of the international banks have extended for Iran letters of credit, trade facilities, or other

10   accommodations to enable Iran to import products. These banks hold on account large amounts of

11   Iranian deposits to cover these trade facilities, in which the deposits are subject to this assignment.

12                       **VII. POTENTIAL CLAIMS OF SOVEREIGN IMMUNITY.**

13       Some of the financial institutions, such as The World Bank, Japanese Bank for

14   International Cooperation, Export Import Bank of Korea, Export Import Bank of India,

15   International Finance Corporation, if not others, might well claim their own sovereign immunity.

16   Foreign banks may have lost their sovereign immunity based on the doctinre of implied waiver or

17   commercial pursuant to 28 U.S.C. § 1610(a)(1) and (b)(1). Banks, such the The World Bnak,

18   International Monetary Funds and/or International Finance Corporaiton may qualified immunity

19   under cases as *Mendaro vs. The World Bank*, 717 F.2d 610 (D.C. Cir. 1983) (holding that The

20   World Bank was immune to a civil lawsuit for employment related grievances). [3]

21

22   _____

hearing whether the obligor is subject to the U.S. jurisdiction, but only that the judgment creditor
23   steps into the shoe of the judgment debtor for the sole purpose of receiving payment of any
obligation now due or due in the future. Jurisdictional defenses are typically the matter of civil
24   litigation with the total panoply of civil discovery.

25       [3] California courts declined to permit a judgment creditor to reach assets of a foreign
sovereign protected by FSIA in *Philippine Export and Foreign Loan Guarantee Corp. v.*
26   *Chuidian*, 218 Cal.App.3d 1058. 267 Cal.Rptr. 457 (6 Dist.1990). This case is distinguishable in
that FSIA protected the assets of the foreign sovereign, the judgment debtor itself, located in the
27   Philippines in which the assets consists of accounts owed by Philippine-domiciled individuals. In
this set of facts, Iran has no sovereign immunity at all, and the assignment order substituted out
28   Iran for the judgment creditors and installing these judgment creditors without altering the
relationship between the Iran and the sovereign bank.

1    The starting point is that Plaintiffs however do not seek to reach the assets of the obligors

2    (i.e., the banks owing obligation to Iran) in this setting. but a court-ordered assignment of any

3    rights to payment due Iran from the obligors. This is well-tread territory in the courts are willing

4    to permit the assignment of monies due from an entity which is subject to sovereign immunity.

5    Claims against a sovereign can be transferred involuntarily through a court order.  For example,

6    claims against the United States are not assignable, however. on the other hand, a claim against

7    the United States may be the subject of involuntary assignment through a court order.  The court

8    in *George E. DANIELSON et al. v. UNITED STATES of America,* 416 F.2d 408 (9th Cir. 1969)

9    stated at page 410 as follows:

> "The Government contends that the compromise agreement and 'purported assignment'
> does not comply with requirements of the Anti-Assignment statute, 31 U.S.C. 203. and is
> void as against the United States."
> That statute, however, is aimed at voluntary assignments and does not affect
> transfers by operation of law. Erwin v. United States, 97 U.S. 392. 24 L.Ed. 1065
> (1878). Here the 'assignment' was in response to an obligation owing to the trustees
> in bankruptcy not voluntarily assumed by the Farrells but arising by virtue of law
> from the facts upon which the trustees' claim was founded. [2] *Under these*
> *circumstances a compromise approved by court order is not voluntary and a*
> *transfer pursuant to or accomplished by such order is not such a transfer as falls*
> *within the provisions of the Anti-Assignment statute. Price v. Forrest, 173 U.S.*
> *410 19 S.Ct. 434, 43 L.Ed. 749 (1899)."*

The Supreme Court held that a claim against the United States may be subject of an

involuntary assignment, notwithstanding the Anti-Assignment Statute (at the time).  In *Price v.*

*Forrest,* 173 U.S. 410 (1899) 19 S.Ct. 434, 43 L.Ed. 749 the court stated at page 424 to 425  as

follows:

> "It only remains to say, touching this part of the case. that if section 3477 does not
> embrace the passing or transfer of claims to heirs, devisees. or assignees in
> bankruptcy. as held in *Erwin v. United States,* nor a voluntary assignment by a
> debtor of his effects for the benefit of his creditors. as held in *Goodman v. Niblack,*
> it is difficult to see how an order of a judicial tribunal having jurisdiction of the
> parties appointing a receiver of a claim against the government, and ordering the
> claimant to assign the same to such receiver to be held subject to the order of court
> for the benefit of those entitled thereto. can be regarded as prohibited by that
> section."

An assignment order replaces the judgment debtor with the judgment creditor as the obligee under

the obligation. in which the judgment creditor is now entitled to exercise all rights and remedies of

the judgment debtor to seek and demand payment consistent with the underlying contract. This is

1  the precise outcome of both *Kracht vs. Perrin, Gartland & Doyle, supra* and *Estate of Ferdinand*

2  *Marcos, supra.*  An assignment order permits the court to place the judgment creditor in the shoes

3  of the judgment debtor which is different from a levy in which the judgment creditor actually

4  proceeds in rem to seize the assets the obligation due and owed to the judgment debtor and

5  judicial enforce the obligation by way of direct statutory action under C.C.P. §701.020(a) (direct

6  liability of the garnishee to the judgment creditor for failure to pay the obligation to the judgment

7  creditor based on the levy).

8      Given the repeal of the sovereign immunity of both the United States and Iran under 28

9  U.S.C. § 1605A(g)(2), these banks likewise would have lost their immunity from levy and

10  execution if they are holding assets of Iran.  The qualified and limited sovereign immunity in

11  favor of these financial institutions, such as The World Bank and IFC ("International Banks"),

12  would be no greater than the sovereign immunity of the United States which was waived under 28

13  U.S.C. § 1605A(g)(2).  As a result, to the extent of any assets, or obligations due from these

14  International Banks, they would properly be the subject of this assignment.  Additionally under

15  *Mendaro vs. The World Bank, supra.*, at page 618 these International Banks only have partial

16  immunity and qualified and limited by various considerations in which the court stated as follows:

17      "The choice of terms adopted in Article VII section 3 also suggests that the Bank's

18  immunity is limited only to the extent necessary to further its objectives. Article VII
    section 3 expressly subjects the Bank to suit in territories where the Bank has an office or

19  an agent appointed to receive service of process. or has issued or guaranteed securities.
    These exceptions to its immunity were designed primarily to enhance the marketability of

20  its securities and the credibility of its activities in the lending markets. [51] The Bank is
    specifically empowered to guarantee securities in which it has invested, "for the purpose of

21  facilitating their sale." [52] This guarantee would mean little if beneficiaries of the guarantee
    could not sue to enforce the Bank's contracts. Potential investors would be much less likely

22  to acquire the Bank's own securities if they could not sue the Bank to enforce its liabilities.

23  Similarly. the commercial reliability of the Bank's direct loans and private loan guarantees
    would be significantly vitiated if its debtors and beneficiaries were required to accept the

24  Bank's obligations without recourse to judicial process.

25  These judgment creditors seek to substitute themselves as the obligee of the obligation owed by

26
    the International Banks to Iran itself.  If the policy underpinning the partial waiver of sovereign
27
    immunity is to insure that with finality (enforced through a court of law) of International Bank's
28

commitment on a worldwide basis and specifically the loan commitments would be carried out,

these International Banks would have little to complain if these judgment creditors substitute

themselves for the judgment debtor on the same obligation. assuredly to be carried out.

This court need not necessarily resolve the issue of sovereign immunity of the the foreign

and International Banks, as Plaintiffs would stand in the shoes of Iran, and would seek to enforce

Iran's rights consistent with *Kracht vs. Perrin, Gartland & Doyle. supra.*

## VIII. WHY IS AN ASSIGNMENT DIFFERENT FROM A LEVY?

Clearly. a judgment creditor can levy upon a deposit account of a judgment debtor.

Plaintiffs in fact have levied on many of these banks, all of whom stated that they hold no funds at

the branch. Specifically, focusing on a deposit account only. and no other asset. the banks are

correct in that existent Ninth Circuit case law limits a levy upon a deposit account to the branch

who holds that account only.  In *Celsa HILAO, et al., Plaintiffs-Appellees, v. ESTATE OF*

*Ferdinand E. MARCOS, Defendant, and Swiss Bank Corporation and Credit Suisse,*

*Appellants.,* 95 F.3d 848 (9th Cir. 1996), the court stated as follows:

> "The manner in which a judgment creditor can levy upon a deposit account is
> specifically set forth: "[T]o levy upon a deposit account, the levying officer shall
> personally serve a copy of the writ of execution and a notice of levy on the
> financial institution with which the deposit account is maintained." Cal.Civ.Proc. §
> 700.140(a). The general provisions of the EJL further provide that "if a writ, notice,
> order, or other paper is required to be personally served under this title" and "[i]f
> the service is on ... a financial institution," then "service shall be made at the office
> or branch that has actual possession of the property levied upon or at which a
> deposit account levied upon is carried." Cal.Civ.Proc. § 684.110(a).©. Because
> there is no dispute that the deposit accounts of the Estate are not carried at the
> Banks' Los Angeles offices. under California law the personal service of the writs
> of execution and notices of levy at those locations was ineffective to levy on the
> Estate's accounts." (P. 851)

Plaintiffs acknowledge that a bank levy upon a deposit account must be tied to a branch. An

assignment order reaches the bank on a world-wide basis. therefore justifying this relief. The

holding in the *Hilao* case specifically dealt with deposit accounts, as opposed to general intangibles, rights to payment of money, and other non-deposit account liabilities.  Plaintiffs follow in the footsteps of the *Marcos* victims in seeking a broad based assignment motion when the local levy  failed to reach the deposit accounts (only) which are statutorily tied to the branch.

## IX. <u>CONCLUSION.</u>

Plaintiffs have suffered tremendous losses at the hands of a terrorist state.  This motion, along with other process, seeks to collect this substantial judgment and start the process of recompense in which the source of payment arises from key assets of the state itself, which are revenues from the various financial institutions, wherever located. Plaintiffs are therefore entitled to such relief.

DATED:  May 1, 2008                    COOK COLLECTION ATTORNEYS

By: ___/s/ David J. Cook_____
DAVID J. COOK, ESQ. (SB# 060859)
Attorneys for Plaintiffs DEBORAH D. PETERSON,
Personal Representatives of the Estate of James C. Knipple
(Dec.), et al.

F:\USERS\DJCNEW\peterson.assignfinancialmpa

1 | **DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2 | **COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
3 | 165 Fell Street
San Francisco, CA 94102
4 | Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
5 | Tel.: (415) 989-4730
Fax: (415) 989-0491
6 | File No. 52,759

7 | Attorneys for Plaintiffs
DEBORAH D. PETERSON, Personal Representatives
8 | of the Estate of James C. Knipple (Dec.), et al.

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | SAN FRANCISCO DIVISION

12 |

13 | DEBORAH D. PETERSON, Personal     )     CASE NO. 3:08-mc-80030-JSW
Representative of the Estate of James C.  )
Knipple (Dec.), et al.,                            )     DECLARATION OF DAVID J. COOK, ESQ.
14 |                                                       )     IN SUPPORT OF MOTION FOR
                   Plaintiffs,                          )     ASSIGNMENT OF RIGHTS PURSUANT TO
15 |                                                       )     C.C.P. § 708.510(a) AND F.R.C.P. 69(a)
                                                          )
16 | vs.                                                  )     **[FINANCIAL INSTITUTIONS]**
                                                          )
17 | ISLAMIC REPUBLIC OF IRAN, et al.,     )
                                                          )     Date:  June 20, 2008
                   Defendants.                       )     Time: 9:00 a.m.
18 | _____   )     Courtroom: 17, 16th Floor
                                                                   Judge: Jeffrey S. White

19 | I, DAVID J. COOK, hereby declare and state as follows:

20 | 1. I am one of the attorneys of record for Plaintiffs in the above-entitled action, am duly

21 | authorized to practice before all courts in the State of California, and am familiar with the facts

22 | and circumstances in this action.

23 | 2. Plaintiffs have recovered judgment in the amount of $2,656,944,877.00 on 9/7/07

24 | against THE ISLAMIC REPUBLIC OF IRAN ("Iran") based upon that certain incident described

25 | in the MEMORANDUM OPINION of 5/30/03.  Plaintiffs thereafter obtained judgment on 9/7/07,

26 | and a true and correct copy of the JUDGMENT is attached hereto marked *Exhibit "A."*

27 |

28 |

DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS
PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[FINANCIAL INSTITUTIONS]**
CASE NO. 3:08-mc-80030-JSW                                                                                                      1

1      3. Plaintiffs are informed and believe that many of these financial institutions on a

2 worldwide basis do business with Iran. The basis of this information is predicated upon the EIA

3 Report from the Department of Energy, a true and correct copy attached hereto marked ***Exhibit***

4 ***"B,"*** showing that Iran is the second largest purchaser of gasoline, second to the United States,

5 importing billions of dollars. Iran necessarily must pay for the gasoline services through one or

6 more mediums. Typically, Iran would pay a financial institution to issue a letter of credit,

7 enabling the seller of the gas to ship the gas, and in turn, receive payment through a "draw down"

8 based upon the letter of credit. In many cases, the banks issuing the letters of credit would be large

9 European and Asian banks, assuring essentially their own "clientele," that in fact they would be

10 paid predicated upon the shipment of gasoline and other refined products.

11      4. Iran is also a major importer of such products as industrial and raw materials,

12 intermediate goods, capital goods, foodstuffs, and other consumer items and goods and technical

13 services, all of which is set forth in great detail in the Central Intelligence Agency "World Fact

14 Book," a true and correct copy which is attached hereto marked ***Exhibit "C."*** Needless to say,

15 Iran has to pay for these goods and services, primarily goods, and the typical methodology is

16 through a letter of credit, issued by a neutral bank.

17      5. Iran's vast import market is confirmed by the GAO "Highlights" Report of December,

18 2007, a true and correct copy attached hereto marked ***Exhibit "D,"*** which shows at page 30

19 literally billions of dollars of imports coming to Iran from such countries as Germany, China,

20 UAE, Korea, France, Italy, Russia, India, Brazil, Japan, among others. Commons sense again

21 would dictate that these "exporting countries," to assure themselves of payment, are in fact

22 demanding and receiving letters of credit, all of which

23      6. Plaintiffs seek an assignment of rights of all deposits, deposit accounts, rights to receive

24 payment of money, contingent rights, future rights, general intangibles, rights of any refund, rights

25 to direct, transfer or dispose of any account, deposit account, rights to receive any checks, drafts

26 or money orders, rights to transfer, use or control any account, regardless of the name, (all

27 hereinafter collectively "Accounts"), to and in favor of THE ISLAMIC REPUBLIC OF IRAN,

28

DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS
PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[FINANCIAL INSTITUTIONS]**
CASE NO. 3:08-mc-80030-JSW        2

1 and all of its agencies and instrumentalities, (hereinafter collectively "Iran"), in which such

2 accounts, and each of the same, are in the possession, control, dominion, custody, care, or held by

3 the following financial institutions ("Banks") as listed on the attached *Exhibit "E."*

4     I declare under penalty of perjury that the foregoing is true and correct.

5     Executed on May 1, 2008.

6

7                           /s/ David J. Cook
                         DAVID J. COOK, ESQ. (SB# 060859)

8

9 F:\USERS\DJCNEW\peterson.assignfinancial

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS
PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [FINANCIAL INSTITUTIONS]
CASE NO. 3:08-mc-80030-JSW

3

# EXHIBIT "A"

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

)
**DEBORAH D. PETERSON,** )
**Personal Representative of the** )
**Estate of James C. Knipple (Dec.),** *et al.,* )
)
      **Plaintiffs,** )
)  **Consolidated Civil Actions:**
      **v.** )  **01-2094 (RCL)**
)  **01-2684 (RCL)**
)
**ISLAMIC REPUBLIC OF IRAN,** *et al.,* )
)
      **Defendants.** )
)

## JUDGMENT

In accord with the Memorandum Opinion issued this date, it is hereby

ORDERED that Default Judgment be entered in favor of plaintiffs and against

defendants, jointly and severally, in the amount of $2,656,944,877.00, which shall be allocated

in the following manner:

1.    *Wrongful Death Claims Brought by the Personal Representatives and Estates of*

      *Deceased Servicemen*

| | |
|---|---|
| Abbott, Terry | $1,485,243.00 |
| Allman, John Robert | $545,937.00 |
| Bates, Ronny Kent | $2,991,659.00 |
| Baynard, James | $626,517.00 |
| Beamon, Jess W. | $988,897.00 |
| Belmer, Alvin Burton | $8,384,746.00 |
| Blankenship, Richard D. | $1,421,889.00 |
| Blocker, John W. | $975,621.00 |
| Boccia, Joseph John Jr. | $1,276,641.00 |
| Bohannon, Leon | $706,549.00 |

-1-

EXHIBIT ____ A

| | |
|---|---|
| Bonk, John Jr. | $904,220.00 |
| Boulos, Jeffrey Joseph | $1,154,112.00 |
| Boyett, John Norman | $2,235,375.00 |
| Burley, William | $170,847.00 |
| Callahan, Paul | $974,546.00 |
| Camara, Mecot | $1,882,308.00 |
| Campus, Bradley | $433,959.00 |
| Ceasar, Johnnie | $313,593.00 |
| Conley, Robert Allen | $962,677.00 |
| Cook, Charles Dennis | $837,147.00 |
| Copeland, Johnny Len | $541,325.00 |
| Cosner, David | $1,105,668.00 |
| Coulman, Kevin | $1,287,092.00 |
| Crudale, Rick | $1,004,731.00 |
| Cyzick, Russell | $575,554.00 |
| Devlin, Michael | $939,887.00 |
| Dorsey, Nathaniel | $638,703.00 |
| Dunnigan, Timothy | $709,232.00 |
| Earle, Bryan | $1,286,372.00 |
| Estes, Danny R. | $1,000,157.00 |
| Fluegel, Richard Andrew | $1,089,811.00 |
| Fulcher, Michael D. | $1,257,150.00 |
| Gallagher, Sean | $674,382.00 |
| Gangur, George | $1,000,935.00 |
| Garcia, Randall | $1,127,694.00 |
| Ghumm, Harold | $1,260,508.00 |
| Giblin, Timothy | $1,301,526.00 |
| Gorchinski, Michael | $1,931,668.00 |
| Gordon, Richard | $965,609.00 |
| Green, Davin M. | $1,025,050.00 |
| Hairston, Thomas | $1,489,395.00 |
| Haskell, Michael | $2,871,058.00 |
| Helms, Mark Anthony | $1,028,509.00 |
| Hester, Stanley G. | $1,493,349.00 |
| Hildreth, Donald Wayne | $1,425,177.00 |
| Holberton, Richard | $1,818,176.00 |
| Hudson, Dr. John | $4,072,010.00 |
| Hukill, Maurice Edward | $3,038,258.00 |
| Iacovino, Edward Jr. | $407,196.00 |
| Innocenzi, Paul III | $1,715,253.00 |
| Jackowski, James | $463,355.00 |
| James, Jeffrey Wilbur | $251,607.00 |
| Jenkins, Nathaniel Walter | $7,599,314 |

-2-

| | |
|---|---|
| Johnston, Edward Anthony | $1,246,535.00 |
| Jones, Steven | $801,721.00 |
| Julian, Thomas Adrian | $415,311.00 |
| Keown, Thomas | $1,013,901.00 |
| Kluck, Daniel | $922,630.00 |
| Knipple, James C. | $1,018,665.00 |
| Kreischer, Freas H. III | $1,059,185.00 |
| Laise, Keith | $447,984.00 |
| Langon, James IV | $1,066,903.00 |
| LaRiviere, Michael Scott | $1,056,282.00 |
| LaRiviere, Steven | $986,622.00 |
| Lemnah, Richard | $1,842,869.00 |
| Livingston, Joseph R. ("Joel") III | $1,762,193.00 |
| Lyon, Paul D. Jr. | $1,034,459.00 |
| Macroglou, John | $2,183,935.00 |
| Maitland, Samuel Jr. | $970,700.00 |
| Martin, Charlie Robert | $1,316,085.00 |
| Massa, David | $674,558.00 |
| McCall, John | $853,420.00 |
| McDonough, James E. | $952,847.00 |
| McMahon, Timothy R. | $984,020.00 |
| Menkins, Richard II | $850,938.00 |
| Meurer, Ronald | $1,855,272.00 |
| Milano, Joseph Peter | $674,258.00 |
| Moore, Joseph | $980,150.00 |
| Myers, Harry Douglas | $891,144.00 |
| Nairn, David | $1,562,682.00 |
| Olson, John Arne | $1,010,497.00 |
| Owens, Joseph Albert | $502,237.00 |
| Page, Connie Ray | $1,012,211.00 |
| Parker, Ulysses Gregory | $641,523.00 |
| Pearson, John L. | $1,816,369.00 |
| Perron, Thomas S. | $424,110.00 |
| Phillips, John Arthur Jr. | $1,030,308.00 |
| Pollard, William Roy | $1,111,556.00 |
| Prevatt, Victor Mark | $862,635.00 |
| Price, James | $989,921.00 |
| Prindeville, Patrick Kerry | $305,675.00 |
| Quirante, Diomedes J. | $2,178,822.00 |
| Richardson, Warren | $796,673.00 |
| Rotondo, Louis J. | $2,276,348.00 |
| Sauls, Michael Caleb | $974,601.00 |
| Schnorf, Charles Jeffrey | $2,790,541.00 |

-3-

| | |
|---|---|
| Schultz, Scott Lee | $675,361.00 |
| Scialabba, Peter | $2,462,179.00 |
| Scott, Gary Randall | $432,024.00 |
| Shipp, Thomas Alan | $738,895.00 |
| Shropshire, Jerryl | $212,061.00 |
| Simpson, Larry H. Jr. | $5,995,660.00 |
| Smith, Kirk Hall | $710,042.00 |
| Smith, Thomas Gerard | $980,543.00 |
| Smith, Vincent | $1,285,915.00 |
| Sommerhof, William Scott | $1,361,062.00 |
| Spencer, Stephen Eugene | $974,298.00 |
| Stelpflug, William | $1,094,429.00 |
| Stephens, Horace Renardo Jr. ("Ricky") | $446,107.00 |
| Stockton, Craig | $1,007,526.00 |
| Stokes, Jeffrey | $1,599,994.00 |
| Sturghill, Eric D. | $725,378.00 |
| Sundar, Devon | $1,394,608.00 |
| Thorstad, Thomas Paul | $1,921,086.00 |
| Tingley, Stephen | $1,439,655.00 |
| Vallone, Donald H. Jr. | $462,193.00 |
| Washington, Eric Glenn | $1,069,270.00 |
| Wigglesworth, Dwayne | $1,001,122.00 |
| Williams, Rodney J. | $671,206.00 |
| Williams, Scipio Jr. | $1,635,994.00 |
| Williamson, Johnny Adam | $443,409.00 |
| Winter, William Ellis | $2,534,910.00 |
| Woollett, Donald Elberan | $2,021,565.00 |
| Wyche, Craig | $1,025,860.00 |
| Young, Jeffrey D. | $618,891.00 |

2.    *Battery Claims Brought by Injured Servicemen*

| | |
|---|---|
| Albright, Marvin | $5,000,000.00 |
| Arroyo, Pablo | $5,000,000.00 |
| Banks, Anthony | $7,500,000.00 |
| Burnette, Rodney Darrell | $8,000,000.00 |
| Comes, Frank Jr. | $1,500,000.00 |
| Dolphin, Glenn | $3,000,000.00 |
| Eaves, Frederick Daniel | $1,500,000.00 |
| Frye, Charles | $2,200,000.00 |
| Garner, Truman Dale | $7,500,000.00 |
| Gerlach, Larry | $12,000,000.00 |
| Hlywiak, John | $1,500,000.00 |

-4-

| | |
|---|---|
| Hunt, Orval | $8,000,000.00 |
| Jacobs, Joseph P. | $5,000,000.00 |
| Kirkpatrick, Brian | $8,000,000.00 |
| Matthews, Burnham | $7,000,000.00 |
| Mitchell, Timothy | $4,555,099.00 |
| Moore, Lovelle "Darrell" | $8,314,513.00 |
| Nashton, Jeffrey | $11,776,632.00 |
| Oliver, John | $3,277,542.00 |
| Rivers, Paul | $7,000,000.00 |
| Russell, Stephen | $9,252,749.00 |
| Spaulding, Dana | $9,559,609.00 |
| Swinson, Craig Joseph | $1,500,000.00 |
| Toma, Michael | $7,500,000.00 |
| Wheeler, Danny | $5,000,000.00 |
| Young, Thomas D. | $1,500,000.00 |

3.    *Claims Brought by Family Members of Deceased Servicemen*

| | |
|---|---|
| Abbey, Lilla Woollett | $2,500,000.00 |
| Abbott, James | $5,000,000.00 |
| Abbott, Mary (Estate of) | $5,000,000.00 |
| Adams, Elizabeth | $2,500,000.00 |
| Ahlquist, Eileen Prindeville | $2,500,000.00 |
| Alarcon, Miralda (Judith Maitland) | $8,000,000.00 |
| Allman, Anne | $5,000,000.00 |
| Allman, Robert | $5,000,000.00 |
| Allman, Theodore (Estate of) | $2,500,000.00 |
| Allman, DiAnne Margaret ("Maggie") | $2,500,000.00 |
| Alvarez, Margaret E. | $2,500,000.00 |
| Angus, Kimberly F. | $2,500,000.00 |
| Bates, Donnie | $2,500,000.00 |
| Bates, Johnny | $2,500,000.00 |
| Bates, Laura | $5,000,000.00 |
| Bates, Margie | $5,000,000.00 |
| Bates, Monty | $2,500,000.00 |
| Bates, Thomas Jr. | $2,500,000.00 |
| Bates, Thomas C., Sr. | $5,000,000.00 |
| Baumgartner, Mary E. | $2,500,000.00 |
| Baynard, Anthony | $2,500,000.00 |
| Baynard, Barry | $2,500,000.00 |
| Baynard, Emerson | $2,500,000.00 |
| Baynard, Philip | $2,500,000.00 |
| Baynard, Thomasine | $8,000,000.00 |

| | |
|---|---|
| Baynard, Timothy | $2,500,000.00 |
| Baynard, Wayne | $2,500,000.00 |
| Baynard, Stephen | $5,000,000.00 |
| Beard, Anna | $2,500,000.00 |
| Beck, Mary Ann | $2,500,000.00 |
| Belmer, Alue | $5,000,000.00 |
| Belmer, Annette | $2,500,000.00 |
| Belmer, Clarence | $2,500,000.00 |
| Belmer, Colby Keith | $5,000,000.00 |
| Belmer, Denise | $2,500,000.00 |
| Belmer, Donna | $2,500,000.00 |
| Belmer, Faye | $8,000,000.00 |
| Belmer, Kenneth | $2,500,000.00 |
| Belmer, Luddie | $5,000,000.00 |
| Biellow, Shawn | $2,500,000.00 |
| Black, Mary Frances | $2,500,000.00 |
| Blankenship, Donald Jr. | $2,500,000.00 |
| Blankenship, Donald Sr. | $5,000,000.00 |
| Blankenship, Mary (Estate of) | $5,000,000.00 |
| Blocker, Alice | $5,000,000.00 |
| Blocker, Douglas | $2,500,000.00 |
| Blocker, John R. | $5,000,000.00 |
| Blocker, Robert | $2,500,000.00 |
| Boccia, James | $2,500,000.00 |
| Boccia, Joseph Sr. | $5,000,000.00 |
| Boccia, Patricia | $5,000,000.00 |
| Boccia, Raymond | $2,500,000.00 |
| Boccia, Richard | $2,500,000.00 |
| Boccia, Ronnie (Veronica) | $2,500,000.00 |
| Boddie, Leticia | $2,500,000.00 |
| Bohannon, Angela | $2,500,000.00 |
| Bohannon, Anthony | $2,500,000.00 |
| Bohannon, Carrie | $5,000,000.00 |
| Bohannon, David | $2,500,000.00 |
| Bohannon, Edna | $8,000,000.00 |
| Bohannon, Leon Sr. | $5,000,000.00 |
| Bohannon, Ricki | $2,500,000.00 |
| Bolinger, Billie Jean | $5,000,000.00 |
| Boulos, Joseph | $5,000,000.00 |
| Boulos, Lydia | $2,500,000.00 |
| Boulos, Marie | $5,000,000.00 |
| Bowler, Rebecca | $2,500,000.00 |
| Boyett, Lavon | $5,000,000.00 |
| Boyett, Norman E. Jr. (Estate of) | $5,000,000.00 |

| | |
|---|---|
| Boyett, Theresa U. Roth | $8,000,000.00 |
| Boyett, William A. | $2,500,000.00 |
| Breeden, Susan Schnorf | $2,500,000.00 |
| Briscoe, Damion | $2,500,000.00 |
| Brown, Christine | $5,000,000.00 |
| Brunette, Rosanne | $2,500,000.00 |
| Buckner, Mary Lynn | $8,000,000.00 |
| Burley, Claude (Estate of) | $5,000,000.00 |
| Burley, William Douglas (Estate of) | $2,500,000.00 |
| Burley, Myra | $2,500,000.00 |
| Calabro, Kathleen | $2,500,000.00 |
| Caldera, Rachel | $2,500,000.00 |
| Callahan, Avenell | $5,000,000.00 |
| Callahan, Michael | $2,500,000.00 |
| Calloway, Patricia (Patsy Ann) | $2,500,000.00 |
| Camara, Elisa Rock | $2,500,000.00 |
| Camara, Theresa Riggs | $2,500,000.00 |
| Campbell, Candace | $2,500,000.00 |
| Campus, Clare | $5,000,000.00 |
| Capobianco, Elaine | $2,500,000.00 |
| Carter, Florene Martin | $2,500,000.00 |
| Cash, Phyllis A. | $2,500,000.00 |
| Catano, Theresa | $2,500,000.00 |
| Ceasar, Bruce | $2,500,000.00 |
| Ceasar, Franklin | $2,500,000.00 |
| Ceasar, Fredrick | $2,500,000.00 |
| Ceasar, Robbie Nell | $5,000,000.00 |
| Ceasar, Sybil | $1,250,000.00 |
| Cecca, Christine Devlin | $2,500,000.00 |
| Chapman, Tammy | $2,500,000.00 |
| Cherry, James | $2,500,000.00 |
| Cherry, Sonia | $2,500,000.00 |
| Chios, Adele H. | $2,500,000.00 |
| Christian, Jana M. | $2,500,000.00 |
| Christian, Sharon Rose | $2,500,000.00 |
| Ciupaska, Susan | $2,500,000.00 |
| Clark, LeShune Stokes | $2,500,000.00 |
| Clark, Rosemary | $2,500,000.00 |
| Cobble, Mary Ann | $5,000,000.00 |
| Collard, Karen Shipp | $2,500,000.00 |
| Collier, Jennifer | $5,000,000.00 |
| Collier, Melia Winter | $8,000,000.00 |
| Coltrane, Deborah M. | $8,000,000.00 |
| Conley, James N. Jr. | $5,000,000.00 |

-7-

| | |
|---|---|
| Conley, Roberta Li | $5,000,000.00 |
| Cook, Charles F. | $5,000,000.00 |
| Cook, Elizabeth A. | $2,500,000.00 |
| Cook, Mary A. (Estate of) | $5,000,000.00 |
| Copeland, Alan Tracy | $2,500,000.00 |
| Copeland, Betty | $5,000,000.00 |
| Copeland, Donald | $5,000,000.00 |
| Corry, Blanche | $2,500,000.00 |
| Cosner, Harold | $5,000,000.00 |
| Cosner, Jeffrey | $2,500,000.00 |
| Cosner, Leanna | $5,000,000.00 |
| Cosner, Marva Lynn (Estate of) | $5,000,000.00 |
| Cossaboom, Cheryl | $2,500,000.00 |
| Coulman, Bryan Thomas | $2,500,000.00 |
| Coulman, Christopher J. | $2,500,000.00 |
| Coulman, Dennis P. | $2,500,000.00 |
| Coulman, Lorraine M. | $5,000,000.00 |
| Coulman, Robert D. | $2,500,000.00 |
| Coulman, Robert Louis | $5,000,000.00 |
| Covington, Charlita Martin | $5,000,000.00 |
| Crouch, Amanda | $5,000,000.00 |
| Crudale, Marie | $5,000,000.00 |
| Cyzick, Eugene | $2,500,000.00 |
| Dallachie, Lynn | $8,000,000.00 |
| Deal, Anne | $2,500,000.00 |
| Derbyshire, Lynn Smith | $2,500,000.00 |
| Desjardins, Theresa | $5,000,000.00 |
| Devlin, Christine | $5,000,000.00 |
| Devlin, Daniel | $2,500,000.00 |
| Devlin, Gabrielle | $2,500,000.00 |
| Devlin, Richard | $2,500,000.00 |
| Devlin, Sean | $2,500,000.00 |
| Donahue (Milano), Rosalie | $2,500,000.00 |
| Doray, Ashley | $5,000,000.00 |
| Doss, Rebecca | $2,500,000.00 |
| Dunnigan, Chester | $2,500,000.00 |
| Dunnigan, Elizabeth Ann | $2,500,000.00 |
| Dunnigan, Michael | $2,500,000.00 |
| Dunnigan, William | $2,500,000.00 |
| Dunnigan, Claudine | $5,000,000.00 |
| Edquist, Janice Thorstad | $2,500,000.00 |
| Ervin, Mary Ruth | $5,000,000.00 |
| Estes, Barbara | $5,000,000.00 |
| Estes, Charles | $5,000,000.00 |

| | |
|---|---|
| Estes, Frank | $2,500,000.00 |
| Fansler, Lori | $2,500,000.00 |
| Farthing, Angela Dawn | $2,500,000.00 |
| Ferguson, Arlington | $1,250,000.00 |
| Ferguson, Hilton | $1,250,000.00 |
| Fish, Linda Sandback | $8,000,000.00 |
| Fox, Nancy Brocksbank | $5,000,000.00 |
| Fox, Tia | $2,500,000.00 |
| Freshour, Tammy | $8,000,000.00 |
| Fulcher, Ruby | $5,000,000.00 |
| Gallagher, Barbara | $5,000,000.00 |
| Gallagher, Brian | $2,500,000.00 |
| Gallagher, James (Estate of) | $5,000,000.00 |
| Gallagher, James Jr. | $2,500,000.00 |
| Gallagher, Kevin | $2,500,000.00 |
| Gallagher, Michael | $2,500,000.00 |
| Gangur, Dimitri | $5,000,000.00 |
| Gangur, Mary | $5,000,000.00 |
| Garcia, Jess | $5,000,000.00 |
| Garcia, Ronald | $2,500,000.00 |
| Garcia, Roxanne | $2,500,000.00 |
| Garcia, Russell | $2,500,000.00 |
| Garcia, Violet | $5,000,000.00 |
| Garza, Suzanne Perron | $2,500,000.00 |
| Gattegno, Jeanne | $2,500,000.00 |
| Ghumm, Arlene | $8,000,000.00 |
| Ghumm, Ashley | $5,000,000.00 |
| Ghumm, Bill | $2,500,000.00 |
| Ghumm, Edward | $2,500,000.00 |
| Ghumm, Hildegard | $5,000,000.00 |
| Ghumm, Jedaiah (Estate of) | $5,000,000.00 |
| Ghumm, Jesse | $2,500,000.00 |
| Ghumm, Leroy | $5,000,000.00 |
| Ghumm, Moronica | $5,000,000.00 |
| Giblin, Donald | $2,500,000.00 |
| Giblin, Jeanne | $5,000,000.00 |
| Giblin, Michael | $2,500,000.00 |
| Giblin, Tiffany | $5,000,000.00 |
| Giblin, Valerie | $8,000,000.00 |
| Giblin, William | $2,500,000.00 |
| Gilford-Smith, Thad | $2,500,000.00 |
| Gintonio, Rebecca | $2,500,000.00 |
| Goff, Dawn | $2,500,000.00 |
| Gorchinski, Christina | $5,000,000.00 |

| | |
|---|---|
| Gorchinski, Judy | $8,000,000.00 |
| Gorchinski, Kevin | $5,000,000.00 |
| Gorchinski, Valerie | $5,000,000.00 |
| Gordon, Alice | $5,000,000.00 |
| Gordon, Joseph | $2,500,000.00 |
| Gordon, Linda | $2,500,000.00 |
| Gordon, Norris (Estate of) | $5,000,000.00 |
| Gordon, Paul | $2,500,000.00 |
| Grant, Andrea | $2,500,000.00 |
| Graves, Deborah | $2,500,000.00 |
| Green, Deborah | $8,000,000.00 |
| Gregg, Liberty Quirante | $2,500,000.00 |
| Griffin, Alex | $2,500,000.00 |
| Grimsley, Catherine E. | $2,500,000.00 |
| Gummer, Megan | $2,500,000.00 |
| Guz, Lyda Woollett | $2,500,000.00 |
| Hairston, Darlene | $8,000,000.00 |
| Hanrahan, Tara | $2,500,000.00 |
| Hart, Mary Clyde | $2,500,000.00 |
| Haskill, Brenda | $2,500,000.00 |
| Haskell, Jeffrey | $2,500,000.00 |
| Hedge, Kathleen S. | $8,000,000.00 |
| Helms, Christopher Todd | $2,500,000.00 |
| Helms, Marvin R. | $5,000,000.00 |
| Hester, Doris | $8,000,000.00 |
| Hildreth, Clifton | $5,000,000.00 |
| Hildreth, Julia | $5,000,000.00 |
| Hildreth, Mary Ann | $8,000,000.00 |
| Hildreth, Michael Wayne | $5,000,000.00 |
| Hilton, Sharon A. | $2,500,000.00 |
| Holberton, Donald | $2,500,000.00 |
| Holberton, Patricia Lee | $5,000,000.00 |
| Holberton, Thomas | $2,500,000.00 |
| Hollifield, Tangie | $2,500,000.00 |
| Horner, Debra | $8,000,000.00 |
| House, Elizabeth | $2,500,000.00 |
| Houston, Joyce A. | $5,000,000.00 |
| Howell, Tammy Camara | $8,000,000.00 |
| Hudson, Lisa H. | $8,000,000.00 |
| Hudson, Lorenzo | $2,500,000.00 |
| Hudson, Lucy | $5,000,000.00 |
| Hudson, Ruth | $2,500,000.00 |
| Hudson, Samuel (Estate of) | $5,000,000.00 |
| Hudson, William J. | $5,000,000.00 |

| | |
|---|---|
| Hugis, Susan Thorstad (Estate of) | $2,500,000.00 |
| Hurlburt, Nancy Tingley | $2,500,000.00 |
| Hurston, Cynthia Perron | $2,500,000.00 |
| Iacovino, Edward Sr. (Estate of) | $5,000,000.00 |
| Iacovino, Elizabeth | $5,000,000.00 |
| Innocenzi, Deborah | $8,000,000.00 |
| Innocenzi, Kristin | $5,000,000.00 |
| Innocenzi, Mark | $2,500,000.00 |
| Innocenzi, Paul IV | $5,000,000.00 |
| Jaccom, Bernadette | $2,500,000.00 |
| Jackowski, John Jr. | $2,500,000.00 |
| Jackowski, John Sr. | $5,000,000.00 |
| Jacobus, Victoria | $2,500,000.00 |
| James, Elaine | $5,000,000.00 |
| Jenkins, Nathalie C. | $5,000,000.00 |
| Jenkins, Stephen | $2,500,000.00 |
| Jewett, Rebecca | $2,500,000.00 |
| Johnson, Linda Martin | $2,500,000.00 |
| Johnson, Ray | $2,500,000.00 |
| Johnson, Rennitta Stokes | $2,500,000.00 |
| Johnson, Sherry | $5,000,000.00 |
| Johnston, Charles | $2,500,000.00 |
| Johnston, Edwin | $5,000,000.00 |
| Johnston, Mary Ann | $5,000,000.00 |
| Johnston, Zandra LaRiviere | $2,500,000.00 |
| Jones, Alicia | $2,500,000.00 |
| Jones, Corene Martin | $2,500,000.00 |
| Jones, Kia Briscoe | $2,500,000.00 |
| Jones, Mark | $2,500,000.00 |
| Jones, Ollie | $5,000,000.00 |
| Jones, Sandra D. | $5,000,000.00 |
| Jones, Synovure (Estate of) | $2,500,000.00 |
| Jordan, Robin Copeland | $2,500,000.00 |
| Jordan, Susan Scott | $2,500,000.00 |
| Julian, Joyce | $5,000,000.00 |
| Julian, Karl | $5,000,000.00 |
| Jurist, Nada | $2,500,000.00 |
| Keown, Adam | $2,500,000.00 |
| Keown, Bobby Jr. | $2,500,000.00 |
| Keown, Bobby Sr. | $5,000,000.00 |
| Keown, Darren | $2,500,000.00 |
| Keown, William | $2,500,000.00 |
| Kirker, Mary Joe | $2,500,000.00 |
| Kluck, Kelly | $2,500,000.00 |

| | |
|---|---|
| Kluck, Michael | $2,500,000.00 |
| Knipple, John D. (Estate of) | $5,000,000.00 |
| Knipple, John R. | $2,500,000.00 |
| Knipple, Pauline (Estate of) | $5,000,000.00 |
| Knox, Shirley L. | $2,500,000.00 |
| Kreischer, Doreen | $5,000,000.00 |
| Kreischer, Freas H. Jr. | $5,000,000.00 |
| Lake, Cynthia D. | $2,500,000.00 |
| Lange, Wendy L. | $2,500,000.00 |
| Langon, James III | $5,000,000.00 |
| LaRiviere, Eugene | $2,500,000.00 |
| LaRiviere, Janet | $5,000,000.00 |
| LaRiviere, John M. | $2,500,000.00 |
| LaRiviere, Lesley | $2,500,000.00 |
| LaRiviere, Michael | $2,500,000.00 |
| LaRiviere, Nancy | $2,500,000.00 |
| LaRiviere, Richard | $2,500,000.00 |
| LaRiviere, Richard G. (Estate of) | $5,000,000.00 |
| LaRiviere, Robert | $2,500,000.00 |
| LaRiviere, William | $2,500,000.00 |
| Lawton, Cathy L. | $2,500,000.00 |
| LeGault, Heidi Crudale | $8,000,000.00 |
| Lemnah, Clarence (Estate of) | $5,000,000.00 |
| Lemnah, Etta | $5,000,000.00 |
| Lemnah, Fay | $2,500,000.00 |
| Lemnah, Harold | $2,500,000.00 |
| Lemnah, Marlys | $8,000,000.00 |
| Lemnah, Robert | $2,500,000.00 |
| Lemnah, Ronald | $2,500,000.00 |
| Livingston, Annette R. | $8,000,000.00 |
| Livingston, Joseph R. IV | $5,000,000.00 |
| Livingston, Joseph R. Jr. (Estate of) | $5,000,000.00 |
| Lynch, Robin M. | $2,500,000.00 |
| Lyon, Earl | $2,500,000.00 |
| Lyon, Francisco | $2,500,000.00 |
| Lyon, June | $2,500,000.00 |
| Lyon, Maria | $5,000,000.00 |
| Lyon, Paul D. Sr. | $5,000,000.00 |
| Lyon, Valerie | $2,500,000.00 |
| Macroglou, Heather | $5,000,000.00 |
| Mahoney, Kathleen Devlin | $2,500,000.00 |
| Maitland, Kenty | $2,500,000.00 |
| Maitland, Leysnal | $5,000,000.00 |
| Maitland, Samuel Sr. | $5,000,000.00 |

| | |
|---|---|
| Maitland, Shirla | $2,500,000.00 |
| Marshall, Virginia Boccia | $2,500,000.00 |
| Martin, John | $2,500,000.00 |
| Martin, Pacita | $8,000,000.00 |
| Martin, Renerio | $5,000,000.00 |
| Martin, Ruby | $5,000,000.00 |
| Martin, Shirley | $5,000,000.00 |
| Mason, Mary | $5,000,000.00 |
| Massa, Cristina | $5,000,000.00 |
| Massa, Edmund | $2,500,000.00 |
| Massa, Joao ("John") | $2,500,000.00 |
| Massa, Jose ("Joe") | $2,500,000.00 |
| Massa, Manuel Jr. | $2,500,000.00 |
| Massa, Ramiro | $2,500,000.00 |
| McCall, Mary | $5,000,000.00 |
| McCall, Thomas (Estate of) | $5,000,000.00 |
| McCall, Valerie | $2,500,000.00 |
| McDermott, Gail | $2,500,000.00 |
| McFarlin, Julia A. | $2,500,000.00 |
| McMahon, George | $2,500,000.00 |
| McMahon, Michael | $2,500,000.00 |
| McPhee, Patty | $5,000,000.00 |
| Menkins, Darren | $2,500,000.00 |
| Menkins, Gregory | $2,500,000.00 |
| Menkins, Margaret | $5,000,000.00 |
| Menkins, Richard H. | $5,000,000.00 |
| Meurer, Jay T. | $2,500,000.00 |
| Meurer, John | $5,000,000.00 |
| Meurer, John Thomas | $2,500,000.00 |
| Meurer, Mary Lou | $5,000,000.00 |
| Meurer, Michael | $2,500,000.00 |
| Meyer, Penny | $2,500,000.00 |
| Milano, Angela | $5,000,000.00 |
| Milano, Peter Jr. | $5,000,000.00 |
| Miller, Earline | $5,000,000.00 |
| Miller, Henry | $2,500,000.00 |
| Miller, Patricia | $2,500,000.00 |
| Montgomery, Helen | $2,500,000.00 |
| Moore, Betty | $5,000,000.00 |
| Moore, Harry | $5,000,000.00 |
| Moore, Kimberly | $2,500,000.00 |
| Moore, Mary | $8,000,000.00 |
| Moore, Melissa Lea | $2,500,000.00 |
| Moore, Michael (Estate of) | $2,500,000.00 |

-13-

| | |
|---|---|
| Moy, Elizabeth Phillips | $2,500,000.00 |
| Myers, Debra | $2,500,000.00 |
| Myers, Geneva | $5,000,000.00 |
| Myers, Harry A. | $5,000,000.00 |
| Nairn, Billie Ann | $5,000,000.00 |
| Nairn, Campbell J. III | $2,500,000.00 |
| Nairn, Campbell J. Jr. (Estate of) | $5,000,000.00 |
| Nairn, William P. | $2,500,000.00 |
| Norfleet, Richard | $5,000,000.00 |
| O'Connor, Deborah | $2,500,000.00 |
| Olaniji, Pearl | $5,000,000.00 |
| Olson, Bertha (Estate of) | $5,000,000.00 |
| Olson, Karen L. | $2,500,000.00 |
| Olson, Randal D. | $2,500,000.00 |
| Olson, Roger S. | $2,500,000.00 |
| Olson, Ronald J. | $2,500,000.00 |
| Olson, Sigurd (Estate of) | $5,000,000.00 |
| Owens, David | $2,500,000.00 |
| Owens, Deanna | $2,500,000.00 |
| Owens, Frances | $5,000,000.00 |
| Owens, James (Estate of) | $5,000,000.00 |
| Owens, Steven | $2,500,000.00 |
| Page, Connie Mack | $5,000,000.00 |
| Page, Judith K. | $5,000,000.00 |
| Palmer, Lisa Menkins | $2,500,000.00 |
| Paolozzi, Geraldine | $2,500,000.00 |
| Pare, Maureen | $2,500,000.00 |
| Parker, Henry James | $2,500,000.00 |
| Parker, Sharon | $2,500,000.00 |
| Pearson, Helen M. | $5,000,000.00 |
| Pearson, John L. Jr. | $5,000,000.00 |
| Pearson, Sonia | $8,000,000.00 |
| Perron, Brett | $2,500,000.00 |
| Perron, Deborah Jean | $2,500,000.00 |
| Perron, Michelle | $2,500,000.00 |
| Perron, Ronald R. | $5,000,000.00 |
| Persky, Muriel | $5,000,000.00 |
| Peterson, Deborah D. | $2,500,000.00 |
| Petry, Sharon Conley | $2,500,000.00 |
| Petrick, Sandra | $2,500,000.00 |
| Phelps, Donna Vallone | $5,000,000.00 |
| Phillips, Harold | $2,500,000.00 |
| Phillips, John Arthur Sr. | $5,000,000.00 |
| Plickys, Donna Tingley | $2,500,000.00 |

| | |
|---|---|
| Pollard, Margaret Aileen | $8,000,000.00 |
| Pollard, Stacey Yvonne | $5,000,000.00 |
| Prevatt, Lee Hollan | $2,500,000.00 |
| Prevatt, Victor Thornton | $5,000,000.00 |
| Price, John | $5,000,000.00 |
| Price, Joseph | $2,500,000.00 |
| Prindeville, Barbara D. (Estate of) | $5,000,000.00 |
| Prindeville, Kathleen Tara | $2,500,000.00 |
| Prindeville, Michael | $2,500,000.00 |
| Prindeville, Paul | $5,000,000.00 |
| Prindeville, Sean | $2,500,000.00 |
| Quirante, Belinda J. | $5,000,000.00 |
| Quirante, Edgar | $2,500,000.00 |
| Quirante, Godofredo (Estate of) | $5,000,000.00 |
| Quirante, Milton | $2,500,000.00 |
| Quirante, Sabrina | $2,500,000.00 |
| Ray, Susan | $2,500,000.00 |
| Reininger, Laura M. | $2,500,000.00 |
| Richardson, Alan | $2,500,000.00 |
| Richardson, Beatrice | $5,000,000.00 |
| Richardson, Clarence | $5,000,000.00 |
| Richardson, Eric | $2,500,000.00 |
| Richardson, Lynette | $2,500,000.00 |
| Richardson, Vanessa | $2,500,000.00 |
| Richardson-Mills, Philiece | $5,000,000.00 |
| Ricks, Melrose | $5,000,000.00 |
| Riva, Belinda Quirante | $2,500,000.00 |
| Rockwell, Barbara | $5,000,000.00 |
| Rooney, Linda | $2,500,000.00 |
| Rose, Tara Smith | $2,500,000.00 |
| Ruark, Tammi | $2,500,000.00 |
| Rudkowski, Juliana | $2,500,000.00 |
| Russell, Marie McMahon | $2,500,000.00 |
| Sanchez, Alicia Lynn | $5,000,000.00 |
| Sauls, Andrew | $2,500,000.00 |
| Sauls, Henry Caleb | $2,500,000.00 |
| Sauls, Riley A. | $2,500,000.00 |
| Schnorf, Margaret Medler | $5,000,000.00 |
| Schnorf, Richard (brother) | $2,500,000.00 |
| Schnorf, Richard (father) | $5,000,000.00 |
| Schnorf, Robert | $2,500,000.00 |
| Schultz, Beverly | $5,000,000.00 |
| Schultz, Dennis James | $2,500,000.00 |
| Schultz, Dennis Ray | $5,000,000.00 |

| | |
|---|---|
| Scialabba, Frank | $5,000,000.00 |
| Scialabba, Jacqueline | $8,000,000.00 |
| Scialabba, Samuel Scott | $5,000,000.00 |
| Scott, Jon Christopher | $2,500,000.00 |
| Scott, Kevin James | $2,500,000.00 |
| Scott, Larry L. (Estate of) | $5,000,000.00 |
| Scott, Mary Ann | $5,000,000.00 |
| Scott, Sheria | $2,500,000.00 |
| Scott, Stephen Allen | $2,500,000.00 |
| Seguerra, Jacklyn | $2,500,000.00 |
| Shipp, Bryan Richard | $5,000,000.00 |
| Shipp, James David | $2,500,000.00 |
| Shipp, Janice | $2,500,000.00 |
| Shipp, Maurice | $2,500,000.00 |
| Shipp, Pauline | $8,000,000.00 |
| Shipp, Raymond Dennis | $2,500,000.00 |
| Shipp, Russell | $2,500,000.00 |
| Sinsioco, Susan J. | $2,500,000.00 |
| Smith-Ward, Ana | $8,000,000.00 |
| Smith, Angela Josephine (Estate of) | $5,000,000.00 |
| Smith, Bobbie Ann | $5,000,000.00 |
| Smith, Cynthia | $2,500,000.00 |
| Smith, Donna Marie | $2,500,000.00 |
| Smith, Erma | $2,500,000.00 |
| Smith, Holly | $2,500,000.00 |
| Smith, Ian | $5,000,000.00 |
| Smith, Janet | $2,500,000.00 |
| Smith, Joseph K. III | $2,500,000.00 |
| Smith, Joseph K. Jr. | $5,000,000.00 |
| Smith, Keith | $5,000,000.00 |
| Smith, Kelly B. | $2,500,000.00 |
| Smith, Shirley L. | $5,000,000.00 |
| Smith, Tadgh | $2,500,000.00 |
| Smith, Terrence | $2,500,000.00 |
| Smith, Timothy B. | $2,500,000.00 |
| Sommerhof, Jocelyn J. | $5,000,000.00 |
| Sommerhof, John | $2,500,000.00 |
| Sommerhof, William J. | $5,000,000.00 |
| Spencer, Douglas | $2,500,000.00 |
| Stelpflug, Christy Williford | $2,500,000.00 |
| Stelpflug, Joseph | $2,500,000.00 |
| Stelpflug, Kathy Nathan | $2,500,000.00 |
| Stelpflug, Laura Barfield | $2,500,000.00 |
| Stelpflug, Peggy | $5,000,000.00 |

| | |
|---|---|
| Stelpflug, William | $5,000,000.00 |
| Stephens, Horace Sr. | $5,000,000.00 |
| Stephens, Joyce | $5,000,000.00 |
| Stephens, Keith | $2,500,000.00 |
| Stockton, Dona | $5,000,000.00 |
| Stockton, Donald (Estate of) | $5,000,000.00 |
| Stockton, Richard | $2,500,000.00 |
| Stokes, Irene | $5,000,000.00 |
| Stokes, Nelson Jr. | $2,500,000.00 |
| Stokes, Nelson Sr. (Estate of) | $5,000,000.00 |
| Stokes, Robert | $2,500,000.00 |
| Stokes-Graham, Gwenn | $2,500,000.00 |
| Sturghill, Marcus D. | $2,500,000.00 |
| Sturghill, Marcus L. Jr. | $5,000,000.00 |
| Sturghill, NaKeisha Lynn | $2,500,000.00 |
| Sundar, Doreen | $8,000,000.00 |
| Tella, Margaret | $2,500,000.00 |
| Terlson, Susan L. | $2,500,000.00 |
| Thompson, Mary Ellen | $2,500,000.00 |
| Thorstad, Adam | $5,000,000.00 |
| Thorstad, Barbara | $5,000,000.00 |
| Thorstad, James Jr. | $2,500,000.00 |
| Thorstad, James Sr. | $5,000,000.00 |
| Thorstad, John | $2,500,000.00 |
| Thorstad, Ryan | $5,000,000.00 |
| Thurman, Betty Ann | $2,500,000.00 |
| Tingley, Barbara | $5,000,000.00 |
| Tingley, Richard L. | $5,000,000.00 |
| Tingley, Russell | $2,500,000.00 |
| Tolliver, Keysha | $5,000,000.00 |
| Turek, Mary Ann | $5,000,000.00 |
| Valenti, Karen | $5,000,000.00 |
| Vallone, Anthony | $2,500,000.00 |
| Vallone, Donald H. | $5,000,000.00 |
| Vallone, Timothy | $2,500,000.00 |
| Vargas, Leona Mae | $2,500,000.00 |
| Voyles, Denise | $2,500,000.00 |
| Wallace, Ila | $5,000,000.00 |
| Wallace, Kathryn Thorstad | $2,500,000.00 |
| Wallace, Richard J. | $2,500,000.00 |
| Warwick, Barbara Thorstad | $2,500,000.00 |
| Washington, Linda | $2,500,000.00 |
| Washington, Vancine | $2,500,000.00 |
| Watson, Kenneth | $2,500,000.00 |

| | |
|---|---|
| Whitener, Diane | $2,500,000.00 |
| Wigglesworth, Daryl | $2,500,000.00 |
| Wigglesworth, Darrin A. | $2,500,000.00 |
| Wigglesworth, Henry | $5,000,000.00 |
| Wigglesworth, Mark | $2,500,000.00 |
| Wigglesworth, Robyn | $2,500,000.00 |
| Wigglesworth, Sandra | $5,000,000.00 |
| Wigglesworth, Shawn | $2,500,000.00 |
| Williams, Dianne Stokes | $2,500,000.00 |
| Williams, Gussie Martin | $2,500,000.00 |
| Williams, Janet | $5,000,000.00 |
| Williams, Johnny | $2,500,000.00 |
| Williams, Rhonda | $2,500,000.00 |
| Williams, Ronald | $2,500,000.00 |
| Williams, Ruth | $5,000,000.00 |
| Williams, Scipio J. | $5,000,000.00 |
| Williams, Wesley | $5,000,000.00 |
| Williams-Edwards, Delma | $2,500,000.00 |
| Williamson, Tony | $2,500,000.00 |
| Williamson, Jewelene | $5,000,000.00 |
| Winter, Michael | $5,000,000.00 |
| Wiseman, Barbara | $8,000,000.00 |
| Woodford, Phyllis | $2,500,000.00 |
| Woodle, Joyce | $2,500,000.00 |
| Woollett, Beverly | $5,000,000.00 |
| Woollett, Paul | $5,000,000.00 |
| Wright, Melvina Stokes | $2,500,000.00 |
| Wright, Patricia | $5,000,000.00 |
| Wyche, Glenn | $2,500,000.00 |
| Wyche, John | $2,500,000.00 |
| Young, John F. | $5,000,000.00 |
| Young, John W. | $2,500,000.00 |
| Young, Judith Carol | $5,000,000.00 |
| Young, Sandra Rhodes | $5,000,000.00 |
| Zimmerman, Joanne | $2,500,000.00 |
| Zone, Stephen Thomas | $2,500,000.00 |
| Zosso, Patricia Thorstad | $2,500,000.00 |

4.    *Claims Brought by Family Members of Injured Servicemen*

| | |
|---|---|
| Ali, Jamaal Muata | $1,250,000.00 |
| Angeloni, Margaret | $1,250,000.00 |
| Arroyo, Jesus | $1,250,000.00 |
| Arroyo, Milagros | $1,250,000.00 |

| | |
|---|---|
| Carletta, Olympia | $2,500,000.00 |
| Carpenter, Kimberly | $4,000,000.00 |
| Comes, Joan | $2,500,000.00 |
| Comes, Patrick | $1,250,000.00 |
| Comes, Christopher | $1,250,000.00 |
| Comes, Frank Sr. | $2,500,000.00 |
| Crawford, Deborah | $1,250,000.00 |
| Davis, Barbara | $4,000,000.00 |
| Franklin, Alice Warren | $1,250,000.00 |
| Gerlach, Patricia | $4,000,000.00 |
| Gerlach, Travis | $2,500,000.00 |
| Gerlach, Megan | $2,500,000.00 |
| Hernandez, Arminda | $1,250,000.00 |
| Hlywiak, Margaret | $2,500,000.00 |
| Hlywiak, Peter Jr. | $1,250,000.00 |
| Hlywiak, Peter Sr. | $2,500,000.00 |
| Hlywiak, Paul | $1,250,000.00 |
| Hlywiak, Joseph | $1,250,000.00 |
| Hunt, Cynthia Lou | $4,000,000.00 |
| Ibarro, Rosa | $2,500,000.00 |
| Jacobs, Andrew Scott | $2,500,000.00 |
| Jacobs, Daniel Joseph | $2,500,000.00 |
| Jacobs, Danita | $4,000,000.00 |
| Kirkpatrick, Kathleen | $4,000,000.00 |
| Lewis, Grace | $2,500,000.00 |
| Magnotti, Lisa | $1,250,000.00 |
| Mitchell, Wendy | $4,000,000.00 |
| Moore, James Otis (Estate of) | $1,250,000.00 |
| Moore, Johnney S. (Estate of) | $2,500,000.00 |
| Moore, Marvin S. | $1,250,000.00 |
| Moore, Alie Mae | $2,500,000.00 |
| Moore-Jones, Jonnie Mae | $1,250,000.00 |
| Nashton, Alex W. (Estate of) | $2,500,000.00 |
| Oliver, Paul | $2,500,000.00 |
| Oliver, Riley | $2,500,000.00 |
| Oliver, Michael John | $2,500,000.00 |
| Oliver, Ashley E. | $2,500,000.00 |
| Oliver, Patrick S. | $2,500,000.00. |
| Oliver, Kayley | $2,500,000.00 |
| Russell, Tanya | $2,500,000.00 |
| Russell, Wanda | $4,000,000.00 |
| Russell, Jason | $2,500,000.00 |
| Shaver, Clydia | $1,250,000.00 |
| Spaulding, Scott | $1,250,000.00 |

| | |
|---|---|
| Stanley, Cecilia | $2,500,000.00 |
| Stilpen, Mary | $1,250,000.00 |
| Swank, Kelly | $1,250,000.00 |
| Swinson, Kenneth J. (Estate of) | $2,500,000.00 |
| Swinson, Ingrid M. (Estate of) | $2,500,000.00 |
| Swinson, Daniel | $1,250,000.00 |
| Swinson, William | $1,250,000.00 |
| Swinson, Dawn | $1,250,000.00 |
| Swinson, Teresa | $1,250,000.00 |
| Warren, Bronzell | $1,250,000.00 |
| Watson, Jessica | $1,250,000.00 |
| Webb, Audrey | $1,250,000.00 |
| Wheeler, Jonathan | $2,500,000.00 |
| Wheeler, Benjamin | $2,500,000.00 |
| Wheeler, Marlis "Molly" (Estate of) | $2,500,000.00 |
| Wheeler, Kerry | $1,250,000.00 |
| Wheeler, Andrew | $2,500,000.00 |
| Wheeler, Brenda June | $4,000,000.00 |
| Wold, Jill | $1,250,000.00 |
| Young, Nora (Estate of) | $2,500,000.00 |
| Young, James | $1,250,000.00 |
| Young, Robert (Estate of) | $2,500,000.00 |

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are

hereby DISMISSED WITHOUT PREJUDICE:

Albright, Marvin Jr.
Albright, Mirequrn
Albright, Shertara
Banks, Anthony (son)
Banks, Michael
Banks, Taiarra
Berry, Lori
Burnette, Christopher
Burnette, Gwen
Camara, Mecot Jr.
Comes, Dale
Comes, Tommy
Crop, Kimberly
Decker, Connie
Dolphin, Erin
Douglass, Frederick (Estate of)
Eaves, Christopher

Eaves, India
Eaves, Sylvia Jean
Foister, Gerald
Frye, Charles Jr.
Frye, Gina
Frye, Lialani
Frye, Lincoln
Frye, Randall
Garner, Joseph
Garner, Justina
Garner, Penny
Garner, Reva
Goodman, Karl
Haskell, Barbara
Haskell, Richard
Hlywiak, Jordan
Hlywiak, Taylor
Hunt, Jack Darrell
Hunt, Marcy Elizabeth
Hunt, Mendy Leigh
Hunt, Molly Faye
Livingston, Carol
Massa, Manuel Sr. (Estate of)
Matthews, Chadwick
Matthews, Debra
Matthews, Drew
Meurer, Deborah
Miller, Shirley D.
Mitchell, Elvera
Mitchell, Robert
Price, Betty Lou (Estate of)
Price, Timothy
Rivers, Jeremy
Rivers, Paul (son)
Rivers, Sandra
Schak, Carol
Schak, George
Spencer, Lynne M.
Washington, Patrice
Williams, Kevin Coker
Williams, George Robinson
Williams, Dorothy (Estate of)
Williamson, Bill
Wise, Debra

Woodcock, Gwen

IT IS FURTHER ORDERED that the claims brought by the following plaintiffs are

hereby DISMISSED WITH PREJUDICE:

Beamon, Ashley Tutwiler
Beresford, Michael
Beresford, Susan
Beresford, William
Bianco, Sandra Karen
Bianco, Sandra
Bonk, Catherine
Bonk, John Sr.
Bonk, Kevin
Bonk, Thomas
Calloway, Donald
Clark, Michael Jr.
Corry, Charles
DiGiovanni, Lisa
DiGiovanni, Marion
DiGiovanni, Robert
DiGiovanni, Danielle
Fiedler, Sherry Lynn
Fluegel, Robert
Fluegel, Thomas A.
Fluegel, Marilou
Green, Rebecca Iverson
Hairston, Evans
Hairston, Felicia
Hairston, Julia Bell
Hukill, Henry Durban
Hukill, Mark Andrew
Hukill, Matthew Scott
Hukill, Melissa
Hukill, Meredith Anne
Hukill, Mitchell Charles
Hukill, Monte
Hukill, Virginia Ellen
Jackowski, Mary
Jones, Storm
Joyce, Penni
Kirkwood, Carl Sr.
Kirkwood, Jeff

Kirkwood, Shirley
Kirkwood, Carl Arnold Jr.
Kronenbitter, Patricia
Laise, Kris
Laise, Bill
Laise, Betty
Lewis, Natalie
Macroglou, James
Macroglou, Lorraine
Macroglou, Bill
Mason, Richard
McDonald, Kathy
McDonough, Edward W.
McDonough, Sean
McDonough, Edward Joseph
Morgan, Geraldine
Nashton, Pamela J.
Persky, Herbert
Phelps, Charles Jr.
Phelps, Charles Sr.
Prevatt-Wood, Victoria
Rhosto, Deborah Spencer
Rochwell, Natalie
Rockwell, Donald
Rotondo, Rose (Estate of)
Rotondo, Luis (Estate of) (father)
Santoserre, Phyllis (Estate of)
Simpson, Robert
Simpson, Renee Eileen
Simpson, Larry H. Sr.
Simpson, Anna Marie
Vallone, Donna Beresford
Wallace, Bobby L.
Watkins, Lula Mae (Estate of)
Watkins, Simon
Wirick, Sally Jo

IT IS FURTHER ORDERED that plaintiffs, at their own cost and consistent with the

requirements of 28 U.S.C. § 1608(e), send a copy of this Judgment and the Findings of Fact and

Conclusions of Law issued this date to defendants.

IT IS FURTHER ORDERED that the Clerk of this Court shall terminate this case from

-23-

the dockets of this Court.

SO ORDERED.

Signed by Royce C. Lamberth, United States District Judge, September 7, 2007.

**EXHIBIT "B"**



# Energy Information Administration
## Official Energy Statistics from the U.S. Government

search

Glossary

## Iran



COUNTRY ANALYSIS BRIEFS

### Oil

*Iran is OPEC's second-largest oil producer and the fourth-largest crude oil exporter in the world.*

According to *Oil and Gas Journal*, Iran has 136 billion barrels of proven oil reserves, or roughly 10 percent of the world's total proven petroleum reserves as of January 1, 2007. Iran has 40 producing fields, 27 onshore and 13 offshore, with the majority of crude oil reserves located in the southwestern Khuzestan region near the Iraqi border. Iran's crude oil is generally medium in sulfur content and in the 28°-35° API range.

October 2007

| Background |
|---|
| Oil |
| Natural Gas |
| Electricity |
| Quick Facts |
| Links |
| Sources |

Full Report
HTML
PDF

Contact Info
cabs@eia.doe.gov
(202)586-8800
[more contacts]



Top Proven World Oil Reserves, January 1, 2007

Source: Oil & Gas Journal, Jan. 1, 2007    **Billion Barrels**

Iran is OPEC's second-largest producer after Saudi Arabia. In 2006, Iran produced an estimated 4.2 million barrels per day (bbl/d) of total liquids, of which 3.8 million bbl/d was crude oil, equal to 5 percent of global production.



OPEC Total Crude Oil Production in 2006E

Source: EIA Short-Term Energy Outlook (May 2007)    **Million Barrels Per Day**

Iran's oil consumption totaled 1.6 million bbl/d in 2006. The Iranian government heavily subsidizes the price of refined oil products which has contributed to increased domestic demand. Iran has limited refinery capacity to produce light fuels, and imports much of its gasoline supply. Iranian domestic oil demand is mainly for gasoline and automotive gasoils, but domestic demand for other oil products are declining due to the substitution of natural gas. However, it is an overall net petroleum products exporter due to large exports of residual fuel oil. Oil export revenues represent the majority of Iran's total exports earnings, but the country suffers from budget deficits due to a growing population and large government

subsidies on gasoline and food products. In 2005, the International Monetary Fund (IMF) estimated that energy subsidies accounted for 12 percent of Iran's GDP, the highest rate in the world according to an International Energy Agency (IEA) study.

### Major Iranian Oil Field Production and Reserves, 2006

| Field | Production Capacity Thousand (bbl/d) | Reserves Millions of Barrels |
|---|---|---|
| Ahwaz-Asmari | 700 | 10,100 |
| Marun | 520 | 9,500 |
| Gachsaran | 480 | 8,500 |
| Karanj-Parsi | 250 | 4,650 |
| Agha Jari | 200 | 8,700 |
| Nowrooz and Soroosh | 200 | 6,000 |
| Doroud 1 & 2 | 200 | 600 |
| Rag-e-Safid | 180 | 2,400 |
| Bangestan | 158 | 6,500 |
| Abu Zar | 140 | 50 |
| Sirri A & E/C & D | 130 | 1,200 |
| Salman | 100 | 800 |
| **Major Field Total:** | **3,258** | **59,000** |

Source: Global Insight

Iran produced 6 million bbl/d of crude oil in 1974, but has been unable to produce at that level since the 1979 revolution due to a combination of war, limited investment, sanctions, and a high rate of natural decline in Iran's mature oil fields. Iran's oil fields need structural upgrades including enhanced oil recovery (EOR) efforts such as natural gas injection. Iran's fields have a natural annual decline rate estimated at 8 percent onshore and 10 percent offshore, while current Iranian recovery rates are 24-27 percent, 10 percent less than the world average. It is estimated that 400,000-500,000 bbl/d of crude production is lost annually due to reservoir damage and decreases in existing oil deposits.

#### *Upstream Projects*
The Azadegan project phases I and II represent the greatest potential increase in Iranian crude oil production. Azadegan contains 26 billion barrels of proven crude oil reserves, but is geologically complex and difficult to extract. Iran and Venezuela have agreed on a $4 billion investment in the Ayacucho 7 block, where there are an estimated 31 billion barrels of oil. Iran's Northern Drilling Company (NDC) has also worked with Russia's Lukoil on oil field development in the Caspian Sea. (See Caspian Sea Analysis Brief)

### New Major Iranian Upstream Projects through 2012

| Field | Company | Thousand bbl/d | Online |
|---|---|---|---|
| Salman, Foroozan, Daroud | Total, Petro Iran | 200 | 2007 |
| Darkhovin, Phase II & III | ENI | 100 | 2007 |
| South Pars (Ahwaz) | NOIC | 150 | 2008 |
| Azadegan Phase I (south) | NIOC | 100 | 2009 |
| Kushk-Hosseinieh | NOIC | 300 | 2010 |
| Yadavaran | NIOC & Chinese Partners | 300 | 2011 |
| Azadegan Phase II (north) | NOIC | 110 | 2012 |
| **New Potential Total:** | | **1,260** | |

Source: OPEC, *Global Insight*

Iran plans to increase oil production to over 5 million bbl/d by 2010, but it will need foreign help. According to *Global Insight,* an estimated $25-35 billion is required to meet the government's 5.8 million bbl/d target by 2015. Investment in Iran's energy sector has been tempered due to the election of the conservative government of President Mahmoud Ahmadinejad in 2005, the international controversy surrounding the Iranian uranium enrichment and nuclear program, and economic sanctions. According to the IEA 2007 Medium-Term Oil Market Report, Iran will not be able to increase its net expansion capacity through 2012.

### U.S. Sanctions
U.S. sanctions against Iran due to Iran's historic support for international terrorism and its actions against non-belligerent shipping in the Persian Gulf impact the development of its petroleum sector. According to the Iran Transactions Regulations, administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), U.S. persons may not directly or indirectly trade, finance, or facilitate any goods, services or technology going to or from Iran, including goods, services or technology that would benefit the Iranian oil industry. U.S. persons are also prohibited from entering into or approving any contract that includes the supervision, management or financing of the development of petroleum resources located in Iran.

### Sector Organization
The state-owned National Iranian Oil Company (NIOC) is responsible for oil and gas production and exploration. The National Iranian South Oil Company (NISOC), a subsidiary of NIOC, accounts for 80

percent of local oil production covering the provinces of Khuzestan, Bushehr, Fars, and Kohkiluyeh va Boyer Ahamd. Though private ownership of upstream functions is prohibited under the Iranian constitution, the government has allowed for buyback contracts which allow international oil companies (IOCs) to enter exploration and development through an Iranian affiliate. The contractor receives a remuneration fee, usually an entitlement to oil or gas from the developed operation. In August 2007, President Mahmoud Ahmadinejad appointed NIOC executive Gholamhossein Nozari to serve as Acting Oil Minister, replacing Vaziri Hamaneh and creating controversy over President Ahmadinejad's role in the energy sector.

### Exports

According to International Energy Agency's Monthly Oil Data Service and Global Trade Atlas, Iran's net crude and product exports in 2006 averaged 2.5 million bbl/d, primarily to Japan, China, India, South Korea, Italy, and other Organization for Economic Co-operation and Development (OECD) nations, making it the fourth-largest exporter of crude oil in the world. In 2006, Iran's oil export revenues amounted to $54 billion.

| Top Iranian Crude Oil Exports, 2006 | |
| --- | --- |
| Country | Thousand (bbl/d) |
| Japan | 448 |
| China | 335 |
| India* | 302 |
| South Korea | 204 |
| Italy | 191 |
| Turkey | 179 |
| France | 135 |
| South Africa | 127 |
| Taiwan | 117 |
| Greece | 117 |
| Other | 345 |
| **Total Exports:** | **2,500** |

*India's imports only reported for April-August 2006
Source: IEA Monthly Oil Data Service, March 2007;
Global Trade Atlas

### Iran's Oil Production and Consumption, 1976-2006E



Source: EIA *International Petroleum Monthly*
Short-Term Energy Outlook (July 2007)

*Export Terminals*
Iran has the largest oil tanker fleet in the Middle East, the National Iranian Tanker Company, which holds 29 ships including Very Large Crude Carriers. Kharg Island is the country's largest terminal with a holding capacity of 16 million barrels of oil and a loading capacity of 5 million bbl/d, followed by Lavan Island with capacity to store 5 million barrels and loading capacity of 200,000 bbl/d. Other important terminals include Kish Island, Abadan and Bandar Mahshar, and Neka, which helps facilitate imports from the Caspian region. The Strait of Hormuz, on the southeastern coast of Iran, is an important route for oil exports from Iran and other Persian Gulf countries. (See Persian Gulf Analysis Brief) At its narrowest point the Strait of Hormuz is 34 miles wide, yet an estimated 17 million barrels, or roughly two-fifths of all seaborne traded oil, flows through the Strait daily. Iranian Heavy Crude Oil is Iran's largest crude export at 1.6 million bbl/d followed by Iranian Light at 1 million bbl/d.

| National Iranian Oil Company (NIOC) Crude Exports by Blend | | | |
|---|---|---|---|
| Name | API Gravity | Sulfur content | Exports (bbl/d) |
| Iranian Heavy | 31° | 1.70% | 1.6 million |
| Iranian Light | 34.6° | 1.40% | 1 million |
| Foroozan Blend and Sirri | 29-31° | n/a | 165,000 |
| Lavan Blend | 34-35° | 1.8-2% | 75,000 |

### Refining

Iran's total refinery capacity is 1.5 million bbl/d from nine refineries operated by the National Iranian Oil Refining and Distribution Company (NIORDC), a NIOC subsidiary. Iranian refineries are unable to keep pace with domestic demand, and face major infrastructure problems. The country plans to add around 985,000 bbl/d of refining capacity by 2012, mostly through expansions and upgrades for gasoline yields at the Bandar Abbas, Bushehr, and the 90-year-old Abadan refineries. Large expansion projects at Bandar Abbas, including new catalytic reformers, distillation units, and condensate splitters will help supply the domestic demand, but it will probably not eliminate all gasoline imports. Iran has also discussed joint ventures in Asia, including China, Indonesia, Malaysia, and Singapore to expand refining activity.

| IRAN REFINERY PROJECTS (through 2012) | | | | |
|---|---|---|---|---|
| Refinery | Project Type | Online | Additional Production Capacity (thousand bbl/d) | Notes |
| Bandar Abbas | Upgrade & Expansion | 2012 | 300 | heavy crude processing |
| Bushehr | New Refinery | TBD | 170 | |
| Abadan | Upgrade | 2009 | 140 | |
| Abadan | New Refinery | 2012 | 80 | gasoline production |
| Arak | Expansion | 2009 | 80 | |
| Bandar Assaluyeh | New Refinery | TBD | 80 | |
| Bandar Abbas | Expansion | 2009 | 60 | |
| Tehran | Expansion | 2012 | 50 | gasoline production |
| Tabriz | Expansion | 2012 | 25 | gasoline production |
| Total New Refinery Capacity: | | | 985 | |

Source: PFC Energy, *Global Insight*

### Pipelines

Iran has an expansive domestic oil network including 5 pipelines, and multiple international pipeline projects under consideration. Recently, an expansion of the 150 mile pipeline from the port of Neka on the Caspian coast to Rey, Tabriz, and Tehran refineries has reached a capacity of 300,000 bbl/d according to *Global Insight*. Iran has invested in its import capacity at the Caspian port to handle increased product shipments from Russia and Azerbaijan, and enable crude swaps with Turkmenistan and Kazakhstan. In the case of crude swaps, the oil from the Caspian is consumed domestically in Iran, and an equivalent amount of oil is produced for export through the Persian Gulf with a Swiss-trading arm of NIOC for a swap fee.

*In 2006, Iran imported over 192,000 bbl/d of gasoline and relied upon imports to meet almost half of its fuel needs costing $5 billion.*

### Gasoline

Iran is the second biggest gasoline importer in the world after the United States, consuming over 400,000 bbl/d. According to FACTS Global Energy, Iran imported over 192,000 bbl/d of gasoline in 2006 costing $5 billion. The gasoline consumption growth rate has averaged ten percent annually over the past six years, and the cost of imports is expected to reach $6 billion in 2007, up from $2.8 billion in 2005. Gasoline prices are heavily subsidized, and sold below the market price at around 42 cents per gallon, which has encouraged increased consumption. An increase in vehicle sales in recent years has also contributed to the problem. According to PFC Energy, car ownership in Iran grew 250 percent between 1990 and 2006, and a majority of these vehicles are older models. Gasoline powered vehicles in Iran are expected to reach 14.9 million by the end of 2007. Iran does not have sufficient refining capacity to meets its domestic gasoline and other light fuel needs. Therefore Iran imports gasoline from India, Turkmenistan, Azerbaijan, the Netherlands, France, Singapore, and the United Arab Emirates. Iran also imports from large, multinational wholesalers such as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies.

#### *New Gasoline Rationing System*

In June 2007, the Iranian government instituted a gasoline rationing system. The decision followed a 25 percent price increase to 42 cents per gallon in May. NIORDC is responsible for the program which allows private cars to purchase 26 gallons per month and taxis to buy 211 gallons per month. The rations and increased costs are politically unpopular in Iran. Customers are allowed to purchase their ration six months in advance. Part-time taxis, commercial vehicles, and government vehicles also have special

allowances. Records are maintained on smart cards, and later this year the government is expected to announce the price for gasoline bought beyond quota levels.

Iran's gasoline consumption dropped 30 percent immediately after the rationing scheme was adopted. NIOC executive, Hojjatollah Ghanimifard, stated that Iranian gasoline imports for August 2007 dropped 14 percent, although an additional $1.5 billion was requested by the Iranian Oil Ministry to increase gasoline imports through March 2008. The International Energy Agency reported in its August 2007 Oil Market Update that gasoline consumption will likely increase again due to the fact that Iran allows advance purchase of gasoline at a subsidized rate. The combination of rationing, price hikes, increased refining capacity, as well as compressed natural gas (CNG) production, will reduce Iranian gasoline import demand by an estimated 30,000 bbl/d in the next three years according to FACTS Global Energy.

Contact Us □ Feedback □ Privacy/Security □ Jobs □ About Us

**EXHIBIT "C"**



CENTRAL INTELLIGENCE AGENCY

# THE WORLD FACTBOOK

CIA Home / About CIA / Careers / Offices of CIA / News & Information / Library / Kids' Page / Contact CIA

Select a Country or Location   ▼

**Iran**

Click to enlarge

**CATEGORIES**
**Introduction**
**Geography**
**People**
**Government**
**Economy**
**Communications**
**Transportation**
**Military**
**Transnational Issues**

**Home  Reference Maps  Appendixes  Print-Friendly Page**

This page was last updated on 15 April, 2008



**Legend:** 🔲 Definition  📰 Field Listing  📊 Rank Order

**Introduction**      **Iran**                                      Top of Page

**Background:**  📖  📑

Known as Persia until 1935, Iran became an Islamic republic in 1979 after the
ruling monarchy was overthrown and the shah was forced into exile.
Conservative clerical forces established a theocratic system of government with

EXHIBIT __C__

ultimate political authority vested in a learned religious scholar referred to commonly as the Supreme Leader who, according to the constitution, is accountable only to the Assembly of Experts. US-Iranian relations have been strained since a group of Iranian students seized the US Embassy in Tehran on 4 November 1979 and held it until 20 January 1981. During 1980-88, Iran fought a bloody, indecisive war with Iraq that eventually expanded into the Persian Gulf and led to clashes between US Navy and Iranian military forces between 1987 and 1988. Iran has been designated a state sponsor of terrorism for its activities in Lebanon and elsewhere in the world and remains subject to US and UN economic sanctions and export controls because of its continued involvement in terrorism and conventional weapons proliferation. Following the election of reformer Hojjat ol-Eslam Mohammad KHATAMI as president in 1997 and similarly a reformer Majles (parliament) in 2000. a campaign to foster political reform in response to popular dissatisfaction was initiated. The movement floundered as conservative politicians, through the control of unelected institutions, prevented reform measures from being enacted and increased repressive measures. Starting with nationwide municipal elections in 2003 and continuing through Majles elections in 2004. conservatives reestablished control over Iran's elected government institutions, which culminated with the August 2005 inauguration of hardliner Mahmud AHMADI-NEJAD as president. In December 2006 and March 2007. the international community passed resolutions 1737 and 1747 respectively after Iran failed to comply with UN demands to halt the enrichment of uranium or to agree to full IAEA oversight of its nuclear program. In October 2007. Iranian entities were also subject to US sanctions under EO 13382 designations for proliferation activities and EO 13224 designations for providing material support to the Taliban and other terrorist organizations.

## Geography        Iran                                              Top of Page

**Location:**

Middle East. bordering the Gulf of Oman, the Persian Gulf, and the Caspian Sea. between Iraq and Pakistan

**Geographic coordinates:**

32 00 N. 53 00 E

**Map references:**

Middle East

**Area:**

*total:* 1.648 million sq km
*land:* 1.636 million sq km
*water:* 12,000 sq km

**Area - comparative:**

slightly larger than Alaska

**Land boundaries:**

*total:* 5,440 km
*border countries:* Afghanistan 936 km. Armenia 35 km. Azerbaijan-proper 432 km. Azerbaijan-Naxcivan exclave 179 km, Iraq 1.458 km. Pakistan 909 km. Turkey 499 km. Turkmenistan 992 km

**Coastline:** 

2,440 km; note - Iran also borders the Caspian Sea (740 km)

**Maritime claims:** 

*territorial sea:* 12 nm
*contiguous zone:* 24 nm
*exclusive economic zone:* bilateral agreements or median lines in the Persian Gulf
*continental shelf:* natural prolongation

**Climate:** 

mostly arid or semiarid, subtropical along Caspian coast

**Terrain:** 

rugged, mountainous rim; high, central basin with deserts, mountains; small, discontinuous plains along both coasts

**Elevation extremes:** 

*lowest point:* Caspian Sea -28 m
*highest point:* Kuh-e Damavand 5,671 m

**Natural resources:** 

petroleum, natural gas, coal, chromium, copper, iron ore, lead, manganese, zinc, sulfur

**Land use:** 

*arable land:* 9.78%
*permanent crops:* 1.29%
*other:* 88.93% (2005)

**Irrigated land:** 

76,500 sq km (2003)

**Total renewable water resources:** 

137.5 cu km (1997)

**Freshwater withdrawal (domestic/industrial/agricultural):** 

*total:* 72.88 cu km/yr (7%/2%/91%)
*per capita:* 1,048 cu m/yr (2000)

**Natural hazards:** 

periodic droughts, floods; dust storms, sandstorms; earthquakes

**Environment - current issues:** 

air pollution, especially in urban areas, from vehicle emissions, refinery operations, and industrial effluents; deforestation; overgrazing; desertification; oil pollution in the Persian Gulf; wetland losses from drought; soil degradation (salination); inadequate supplies of potable water; water pollution from raw sewage and industrial waste; urbanization

**Environment - international agreements:** 

*party to:* Biodiversity, Climate Change, Climate Change-Kyoto Protocol, Desertification, Endangered Species, Hazardous Wastes,

Marine Dumping. Ozone Layer Protection. Ship Pollution. Wetlands
*signed. but not ratified:* Environmental Modification. Law of the Sea, Marine Life Conservation

**Geography - note:**

strategic location on the Persian Gulf and Strait of Hormuz, which are vital maritime pathways for crude oil transport

## People          Iran          Top of Page

**Population:**

65.875.223 (July 2008 est.)

**Age structure:**

*0-14 years:* 22.3% (male 7.548.116/female 7.164.921)
*15-64 years:* 72.3% (male 24.090.976/female 23.522.861)
*65 years and over:* 5.4% (male 1.713,533/female 1.834.816) (2008 est.)

**Median age:**

*total:* 26.4 years
*male:* 26.2 years
*female:* 26.7 years (2008 est.)

**Population growth rate:**

0.792% (2008 est.)

**Birth rate:**

16.89 births/1.000 population (2008 est.)

**Death rate:**

5.69 deaths/1,000 population (2008 est.)

**Net migration rate:**

-3.28 migrant(s)/1.000 population (2008 est.)

**Sex ratio:**

*at birth:* 1.05 male(s)/female
*under 15 years:* 1.05 male(s)/female
*15-64 years:* 1.02 male(s)/female
*65 years and over:* 0.93 male(s)/female
*total population:* 1.03 male(s)/female (2008 est.)

**Infant mortality rate:**

*total:* 36.93 deaths/1.000 live births
*male:* 37.12 deaths/1.000 live births
*female:* 36.73 deaths/1.000 live births (2008 est.)

**Life expectancy at birth:**

*total population:* 70.86 years
*male:* 69.39 years
*female:* 72.4 years (2008 est.)

**Total fertility rate:**

1.71 children born/woman (2008 est.)

**HIV/AIDS - adult prevalence rate:**

0.2% (2005 est.)

**HIV/AIDS - people living with HIV/AIDS:**

66.000 (2005 est.)

**HIV/AIDS - deaths:**

1.600 (2005 est.)

**Major infectious diseases:**

*degree of risk:* intermediate
*food or waterborne diseases:* bacterial diarrhea and hepatitis A
*vectorborne diseases:* Crimean Congo hemorrhagic fever and malaria
*note:* highly pathogenic H5N1 avian influenza has been identified in this country: it poses a negligible risk with extremely rare cases possible among US citizens who have close contact with birds (2008)

**Nationality:**

*noun:* Iranian(s)
*adjective:* Iranian

**Ethnic groups:**

Persian 51%. Azeri 24%, Gilaki and Mazandarani 8%. Kurd 7%, Arab 3%, Lur 2%. Baloch 2%. Turkmen 2%, other 1%

**Religions:**

Muslim 98% (Shi'a 89%, Sunni 9%). other (includes Zoroastrian. Jewish. Christian. and Baha'i) 2%

**Languages:**

Persian and Persian dialects 58%. Turkic and Turkic dialects 26%. Kurdish 9%. Luri 2%. Balochi 1%, Arabic 1%. Turkish 1%. other 2%

**Literacy:**

*definition:* age 15 and over can read and write
*total population:* 77%
*male:* 83.5%
*female:* 70.4% (2002 est.)

## Government    Iran

Top of Page

**Country name:**

*conventional long form:* Islamic Republic of Iran
*conventional short form:* Iran
*local long form:* Jomhuri-ye Eslami-ye Iran
*local short form:* Iran
*former:* Persia

**Government type:**

theocratic republic

**Capital:**

*name:* Tehran
*geographic coordinates:* 35 40 N, 51 25 E
*time difference:* UTC+3.5 (8.5 hours ahead of Washington, DC during Standard Time)

**Administrative divisions:**

30 provinces (ostanha, singular - ostan): Ardabil, Azarbayjan-e Gharbi, Azarbayjan-e Sharqi, Bushehr, Chahar Mahall va Bakhtiari, Esfahan, Fars, Gilan, Golestan, Hamadan, Hormozgan, Ilam, Kerman, Kermanshah, Khorasan-e Janubi, Khorasan-e Razavi, Khorasan-e Shemali, Khuzestan, Kohgiluyeh va Buyer Ahmad, Kordestan, Lorestan, Markazi, Mazandaran, Qazvin, Qom, Semnan, Sistan va Baluchestan, Tehran, Yazd, Zanjan

**Independence:**

1 April 1979 (Islamic Republic of Iran proclaimed)

**National holiday:**

Republic Day, 1 April (1979)

**Constitution:**

2-3 December 1979; revised 1989 to expand powers of the presidency and eliminate the prime ministership

**Legal system:**

based on Sharia law system; has not accepted compulsory ICJ jurisdiction

**Suffrage:**

16 years of age; universal

**Executive branch:**

*chief of state:* Supreme Leader Ali Hoseini-KHAMENEI (since 4 June 1989)
*head of government:* President Mahmud AHMADI-NEJAD (since 3 August 2005); First Vice President Parviz DAVUDI (since 11 September 2005)
*cabinet:* Council of Ministers selected by the president with legislative approval; the Supreme Leader has some control over appointments to the more sensitive ministries
*note:* also considered part of the Executive branch of government are three oversight bodies: 1) Assembly of Experts (Majles-Khebregan), a popularly elected body of 86 religious scholars constitutionally charged with determining the succession of the Supreme Leader (based on his qualifications in the field of jurisprudence and commitment to the principles of the revolution), reviewing his performance, and deposing him if deemed necessary; 2) Expediency Council or the Council for the Discernment of Expediency (Majma-e-Tashkise-Maslahat-e-Nezam), is a policy advisory and implementation board consisting of over 40 permanent members representing all major government factions and includes the heads of the three branches of government, and the clerical members of the Council of Guardians (see next): permanent members are appointed by the Supreme Leader for five-year terms; temporary members, including Cabinet members and Majles committee chairmen, are selected when issues under their jurisdiction come before the Expediency Council; the Expediency Council exerts supervisory authority over the executive, judicial, and legislative branches and resolves legislative issues on which the Majles and the Council of Guardians disagree and since 1989 has been used to advise national religious leaders on matters of national policy; in 2005 the Council's powers were expanded, at least

on paper, to act as a supervisory body for the government: 3) Council of Guardians of the Constitution or Council of Guardians or Guardians Council (Shora-ye Negaban-e Qanun-e Assassi) is a 12-member board made up of six clerics chosen by the Supreme Leader and six jurists recommended by the judiciary (which is controlled by the Supreme Leader) and approved by the Majles from a list of candidates recommended by the judiciary (which in turn is controlled by the Supreme Leader) for six-year terms: this Council determines whether proposed legislation is both constitutional and faithful to Islamic law. vets candidates for suitability. and supervises national elections

*elections:* Supreme Leader appointed for life by the Assembly of Experts: Assembly of Experts elected by popular vote for an eight-year term: last election held 15 December 2006 concurrently with municipal elections; Hojjat ol-Eslam Ali Akbar RAFSANJANI was elected Speaker in September 2007. following the July death of former Speaker Ayatollah Ali Akbar Meshkini-Qomi: president elected by popular vote for a four-year term (eligible for a second term and third nonconsecutive term): last held 17 June 2005 with a two-candidate runoff on 24 June 2005 (next presidential election slated for 2009)

*election results:* Mahmud AHMADI-NEJAD elected president: percent of vote - Mahmud AHMADI-NEJAD 62%. Ali Akbar Hashemi-RAFSANJANI 36%

**Legislative branch:** 

unicameral Islamic Consultative Assembly or Majles-e-Shura-ye-Eslami or Majles (290 seats: members elected by popular vote to serve four-year terms) *elections:* last held 20 February 2004 with a runoff held 7 May 2004 (next to be held in March 2008)

*election results:* percent of vote - NA: seats by party - conservatives/Islamists 190. reformers 50. independents 45, religious minorities 5

**Judicial branch:** 

The Supreme Court (Qeveh Qazaieh) and the four-member High Council of the Judiciary have a single head and overlapping responsibilities; together they supervise the enforcement of all laws and establish judicial and legal policies: lower courts include a special clerical court, a revolutionary court. and a special administrative court

**Political parties and leaders:** 

formal political parties are a relatively new phenomenon in Iran and most conservatives still prefer to work through political pressure groups rather than parties. and often political parties or coalitions are formed prior to elections and disbanded soon thereafter: a loose pro-reform coalition called the 2nd Khordad Front, which includes political parties as well as less formal groups and organizations. achieved considerable success at elections to the sixth Majles in early 2000; groups in the coalition include: Islamic Iran Participation Front (IIPF), Executives of Construction Party (Kargozaran), Solidarity Party. Islamic Labor Party. Mardom Salari, Mojahedin of the Islamic Revolution Organization (MIRO), and Militant Clerics Society (Ruhaniyun); the coalition participated in the seventh Majles elections in early 2004; following his defeat in the 2005 presidential elections, former MCS Secretary General and sixth Majles Speaker Mehdi KARUBI formed the National Trust Party; a new conservative group, Islamic Iran Developers Coalition (Abadgaran), took a leading position in the new Majles after winning a majority of the seats in February 2004: following the 2004 Majles elections. traditional and hardline conservatives have attempted to close ranks under the United Front of Principlists: the IIPF has repeatedly

complained that the overwhelming majority of its candidates have been unfairly disqualified from the 2008 elections

**Political pressure groups and leaders:**  the Islamic Republic Party (IRP) was Iran's sole political party until its dissolution in 1987: Iran now has a variety of groups engaged in political activity; some are oriented along political lines or based on an identity group; others are more akin to professional political parties seeking members and recommending candidates for office: some are active participants in the Revolution's political life while others reject the state; political pressure groups conduct most of Iran's political activities; groups that generally support the Islamic Republic include Ansar-e Hizballah, Followers of the Line of the Imam and the Leader. Islamic Coalition Party (Motalefeh). Islamic Engineers Society, and Tehran Militant Clergy Association (Ruhaniyat); active pro-reform student groups include the Office of Strengthening Unity (OSU); opposition groups include Freedom Movement of Iran, the National Front. Marz-e Por Gohar, Baluchistan People's Party (BPP). and various ethnic and Monarchist organizations; armed political groups that have been repressed by the government include Democratic Party of Iranian Kurdistan (KDPI). Komala. Mujahidin-e Khalq Organization (MEK or MKO). People's Fedayeen, Jundallah, and the People's Free Life Party of Kurdistan (PJAK)

**International organization participation:**  ABEDA, CP. ECO, FAO. G-24. G-77. IAEA. IBRD. ICAO. ICC. ICCt (signatory). ICRM. IDA. IDB. IFAD. IFC, IFRCS. IHO, ILO. IMF. IMO. IMSO. Interpol. IOC. IOM. IPU, ISO. ITSO. ITU, MIGA. NAM, OIC, OPCW. OPEC. PCA. SAARC. SCO (observer). UN, UNCTAD. UNESCO. UNHCR. UNIDO, UNMEE. UNWTO. UPU, WCL. WCO. WFTU. WHO, WIPO. WMO, WTO (observer)

**Diplomatic representation in the US:**  none: note - Iran has an Interests Section in the Pakistani Embassy: address: Iranian Interests Section. Pakistani Embassy. 2209 Wisconsin Avenue NW. Washington. DC 20007: telephone: [1] (202) 965-4990; FAX [1] (202) 965-1073

**Diplomatic representation from the US:**  none: note - the American Interests Section is located in the Swiss Embassy compound at Africa Avenue, West Farzan Street, number 59. Tehran. Iran; telephone 021 8878 2964 or 021 8879 2364: FAX 021 8877 3265

**Flag description:**  three equal horizontal bands of green (top), white. and red: the national emblem (a stylized representation of the word Allah in the shape of a tulip. a symbol of martyrdom) in red is centered in the white band: ALLAH AKBAR (God is Great) in white Arabic script is repeated 11 times along the bottom edge of the green band and 11 times along the top edge of the red band

# Economy    Iran    Top of Page

**Economy - overview:**  Iran's economy is marked by an inefficient state sector. reliance on the oil sector (which provides 85% of government revenues). and statist policies that create major distortions throughout. Most economic activity is controlled by the state. Private sector activity is typically small-scale workshops. farming, and services.

President Mahmud AHMADI-NEJAD failed to make any notable progress in fulfilling the goals of the nation's latest five-year plan. A combination of price controls and subsidies, particularly on food and energy, continue to weigh down the economy, and administrative controls, widespread corruption, and other rigidities undermine the potential for private-sector-led growth. As a result of these inefficiencies, significant informal market activity flourishes and shortages are common. High oil prices in recent years have enabled Iran to amass nearly $70 billion in foreign exchange reserves. Yet this increased revenue has not eased economic hardships, which include double-digit unemployment and inflation. The economy has seen only moderate growth. Iran's educated population, economic inefficiency and insufficient investment - both foreign and domestic - have prompted an increasing number of Iranians to seek employment overseas, resulting in significant "brain drain."

**GDP (purchasing power parity):**

$852.6 billion (2007 est.)

**GDP (official exchange rate):**

$278.1 billion (2007 est.)

**GDP - real growth rate:**

4.3% (2007 est.)

**GDP - per capita (PPP):**

$12,300 (2007 est.)

**GDP - composition by sector:**

*agriculture:* 11%
*industry:* 45.3%
*services:* 43.7% (2007 est.)

**Labor force:**

28.7 million
*note:* shortage of skilled labor (2006 est.)

**Labor force - by occupation:**

*agriculture:* 25%
*industry:* 31%
*services:* 45% (June 2007)

**Unemployment rate:**

11% according to the Iranian government (June 2007)

**Population below poverty line:**

18% (2007 est.)

**Household income or consumption by percentage share:**

*lowest 10%:* 2%
*highest 10%:* 33.7% (1998)

**Distribution of family income - Gini index:**

43 (1998)

**Inflation rate (consumer prices):**

17% (July 2007 est.)

**Investment (gross fixed):** 

17% of GDP (2007 est.)

**Budget:** 

*revenues:* $64 billion
*expenditures:* $64 billion (2007 est.)

**Public debt:** 

23.2% of GDP (2007 est.)

**Agriculture - products:** 

wheat, rice, other grains, sugar beets, sugar cane, fruits, nuts, cotton; dairy products, wool; caviar

**Industries:** 

petroleum, petrochemicals, fertilizers, caustic soda, textiles, cement and other construction materials, food processing (particularly sugar refining and vegetable oil production), ferrous and non-ferrous metal fabrication, armaments

**Industrial production growth rate:** 4.8% excluding oil (2007 est.)

**Electricity - production:** 

170.4 billion kWh (2005)

**Electricity - consumption:** 

136.2 billion kWh (2005)

**Electricity - exports:** 

2.761 billion kWh (2005)

**Electricity - imports:** 

2.074 billion kWh (2005)

**Oil - production:** 

4.15 million bbl/day (2006 est.)

**Oil - consumption:** 

1.63 million bbl/day (2006 est.)

**Oil - exports:** 

2.52 million bbl/day (2006 est.)

**Oil - imports:** 

153,600 bbl/day (2004)

**Oil - proved reserves:** 

132.5 billion bbl based on Iranian claims (1 January 2006 est.)

**Natural gas - production:** 

101 billion cu m (2005 est.)

**Natural gas -**

**consumption:** 98.19 billion cu m (2005 est.)

**Natural gas - exports:** 📖 📑 📊

4.33 billion cu m (2005 est.)

**Natural gas - imports:** 📖 📑 📊

5.8 billion cu m (2005)

**Natural gas - proved reserves:** 📖 📑 📊

26.37 trillion cu m (1 January 2006 est.)

**Current account balance:** 📖 📑 📊

$19 billion (2007 est.)

**Exports:** 📖 📑 📊

$76.5 billion f.o.b. (2007 est.)

**Exports - commodities:** 📖 📑

petroleum 80%, chemical and petrochemical products, fruits and nuts, carpets

**Exports - partners:** 📖 📑

Japan 14%, China 12.8%, Turkey 7.2%, Italy 6.3%, South Korea 6%, Netherlands 4.6% (2006)

**Imports:** 📖 📑 📊

$61.3 billion f.o.b. (2007 est.)

**Imports - commodities:** 📖 📑

industrial raw materials and intermediate goods, capital goods, foodstuffs and other consumer goods, technical services

**Imports - partners:** 📖 📑

Germany 12.2%, China 10.5%, UAE 9.3%, France 5.6%, Italy 5.4%, South Korea 5.4%, Russia 4.4% (2006)

**Economic aid - recipient:** 📖 📑

$104 million (2005 est.)

**Reserves of foreign exchange and gold:** 📖 📑 📊

$69.2 billion (2007 est.)

**Debt - external:** 📖 📑 📊

$13.8 billion (31 December 2007 est.)

**Stock of direct foreign investment - at home:** 📖 📑 📊

$4.345 billion (2006 est.)

**Stock of direct foreign investment - abroad:** 📖 📑 📊

$138 million (2006 est.)

**Market value of publicly traded shares:** 📖 📑 📊

$45.2 billion (December 2007)

**Currency (code):** 📖 📑

Iranian rial (IRR)

**Exchange rates:**

rials per US dollar - 9.407.5 (2007). 9,227.1 (2006). 8.964 (2005). 8.614 (2004). 8.193.9 (2003)
*note:* Iran has been using a managed floating exchange rate regime since unifying multiple exchange rates in March 2002

**Fiscal year:**

21 March - 20 March

## Communications    Iran

Top of Page

**Telephones - main lines in use:**

21.981 million (2006)

**Telephones - mobile cellular:**

13.659 million (2006)

**Telephone system:**

*general assessment:* currently being modernized and expanded with the goal of not only improving the efficiency and increasing the volume of the urban service but also bringing telephone service to several thousand villages. not presently connected
*domestic:* the addition of new fiber cables and modern switching and exchange systems installed by Iran's state-owned telecom company have improved and expanded the main line network greatly; main line availability has more than doubled to 22 million lines since 2000: additionally. mobile service has increased dramatically serving nearly 13.7 million subscribers in 2006
*international:* country code - 98: submarine fiber-optic cable to UAE with access to Fiber-Optic Link Around the Globe (FLAG); Trans-Asia-Europe (TAE) fiber-optic line runs from Azerbaijan through the northern portion of Iran to Turkmenistan with expansion to Georgia and Azerbaijan: HF radio and microwave radio relay to Turkey, Azerbaijan, Pakistan. Afghanistan. Turkmenistan, Syria, Kuwait, Tajikistan. and Uzbekistan; satellite earth stations - 13 (9 Intelsat and 4 Inmarsat) (2006)

**Radio broadcast stations:**

AM 72. FM 5. shortwave 5 (1998)

**Television broadcast stations:**

28 (plus 450 repeaters) (1997)

**Internet country code:**

.ir

**Internet hosts:**

6.111 (2007)

**Internet users:**

18 million (2006)

## Transportation    Iran

Top of Page

**Airports:**

331 (2007)

**Airports - with paved runways:**

*total:* 129
*over 3,047 m:* 40
*2,438 to 3,047 m:* 28
*1,524 to 2,437 m:* 24
*914 to 1,523 m:* 32
*under 914 m:* 5 (2007)

**Airports - with unpaved runways:**

*total:* 202
*over 3,047 m:* 1
*1,524 to 2,437 m:* 10
*914 to 1,523 m:* 145
*under 914 m:* 46 (2007)

**Heliports:**

14 (2007)

**Pipelines:**

condensate 7 km; condensate/gas 397 km; gas 19,161 km; liquid petroleum gas 570 km; oil 8,438 km; refined products 7,936 km (2007)

**Railways:**

*total:* 8,367 km
*broad gauge:* 94 km 1.676-m gauge
*standard gauge:* 8,273 km 1.435-m gauge (146 km electrified) (2006)

**Roadways:**

*total:* 179,388 km
*paved:* 120,782 km (includes 878 km of expressways)
*unpaved:* 58,606 km (2003)

**Waterways:**

850 km (on Karun River; additional service on Lake Urmia) (2006)

**Merchant marine:**

*total:* 131 ships (1000 GRT or over) 4,721,202 GRT/8,309,580 DWT
*by type:* bulk carrier 35, cargo 45, chemical tanker 4, container 9, liquefied gas 1, passenger/cargo 4, petroleum tanker 29, roll on/roll off 4
*foreign-owned:* 1 (UAE 1)
*registered in other countries:* 33 (Bolivia 1, Cyprus 2, Malta 24, Panama 4, St Kitts and Nevis 1, St Vincent and The Grenadines 1) (2007)

**Ports and terminals:**

Assaluyeh, Bandar Abbas, Bandar-e-Eman Khomeyni

# Military    Iran    Top of Page

**Military branches:**

Islamic Republic of Iran Regular Forces (Artesh): Ground Forces, Navy, Air Force of the Military of the Islamic Republic of Iran (Niru-ye Hava'i-ye Artesh-e

Jomhuri-ye Eslami-ye Iran: includes air defense): Islamic Revolutionary Guard Corps (Sepah-e Pasdaran-e Enqelab-e Eslami. IRGC): Ground Forces, Navy. Air Force. Qods Force (special operations). and Basij Force (Popular Mobilization Army); Law Enforcement Forces (2008)

**Military service age and obligation:**
19 years of age for compulsory military service: 16 years of age for volunteers: 17 years of age for Law Enforcement Forces: 15 years of age for Basij Forces (Popular Mobilization Army): conscript military service obligation - 18 months: women exempt from military service (2008)

**Manpower available for military service:**
*males age 18-49:* 18.319.545
*females age 18-49:* 17.541.037 (2005 est.)

**Manpower fit for military service:**
*males age 18-49:* 15.665,725
*females age 18-49:* 15.005.597 (2005 est.)

**Manpower reaching military service age annually:**
*males age 18-49:* 862.056
*females age 18-49:* 808.044 (2005 est.)

**Military expenditures - percent of GDP:**
2.5% (2006)

## Transnational Issues

**Iran**                                    Top of Page

**Disputes - international:**
Iran protests Afghanistan's limiting flow of dammed tributaries to the Helmand River in periods of drought; Iraq's lack of a maritime boundary with Iran prompts jurisdiction disputes beyond the mouth of the Shatt al Arab in the Persian Gulf: Iran and UAE dispute Tunb Islands and Abu Musa Island. which are occupied by Iran; Iran stands alone among littoral states in insisting upon a division of the Caspian Sea into five equal sectors

**Refugees and internally displaced persons:**
*refugees (country of origin):* 662,355 (Afghanistan). 54.000 (Iraq) (2006)

**Trafficking in persons:**
*current situation:* Iran is a source. transit. and destination country for women and girls trafficked for the purposes of sexual exploitation and involuntary servitude; according to foreign observers, women and girls are trafficked to Pakistan, Turkey. the Persian Gulf, and Europe for sexual exploitation, while boys from Bangladesh. Pakistan, and Afghanistan are trafficked through Iran en route to Persian Gulf states where they are ultimately forced to work as camel jockeys, beggars. or laborers; Afghan women and girls are trafficked to the country for forced marriages and sexual exploitation: women and children are also trafficked internally for the purposes of forced marriage. sexual exploitation, and involuntary servitude
*tier rating:* Tier 3 - Iran is downgraded to Tier 3 after persistent. credible reports of Iranian authorities punishing victims of trafficking with beatings. imprisonment, and execution

**Illicit drugs:**

despite substantial interdiction efforts, Iran remains a key transshipment point for Southwest Asian heroin to Europe: highest percentage of the population in the world using opiates; lacks anti-money-laundering laws

This page was last updated on 15 April, 2008

# EXHIBIT "D"



**December 2007**

# IRAN SANCTIONS

## Impact in Furthering U.S. Objectives Is Unclear and Should Be Reviewed

Highlights of GAO-08-58, a report to the Ranking Member, Subcommittee on National Security and Foreign Affairs, Committee on Oversight and Government Reform, House of Representatives

## Why GAO Did This Study

The 2006 U.S. National Security Strategy stated that the United States faces challenges from Iran, including Iran's proliferation efforts and involvement in international terrorism. To address these concerns, the United States employs a range of tools, including diplomatic pressure, a military presence in the Gulf, and sanctions. A U.S. sanction is a unilateral restriction or condition on economic activity imposed by the United States for reasons of foreign policy or national security.

We were asked to review (1) U.S. sanctions targeting Iran and their implementation, (2) reported sanction impacts, and (3) factors limiting sanctions. To conduct the review, we assessed trade and sanction data, information on Iran's economy and energy sector, and U.S. and international reports on Iran, and discussed sanctions with U.S. officials and Iran experts.

## What GAO Recommends

Congress should consider requiring the National Security Council, in collaboration with key agencies, to (1) assess data on Iran sanctions and complete an overall baseline assessment of sanctions, (2) develop a framework for ongoing assessments, and (3) periodically report the results to Congress.

The Department of the Treasury commented that it assesses the impact of financial sanctions. We now cite Treasury's assessments in our report but conclude no overall assessment of all U.S. sanctions has been conducted.

To view the full product, including the scope and methodology, click on GAO-08-58. For more information, contact Joseph A. Christoff at (202) 512-8979 or christoffj@gao.gov.

## What GAO Found

Since 1987, U.S. agencies have implemented numerous sanctions against Iran. First, Treasury oversees a ban on U.S. trade and investment with Iran and filed over 94 civil penalty cases between 2003 and 2007 against companies violating the prohibition. This ban may be circumvented by shipping U.S. goods to Iran through other countries. Second, State administers laws that sanction foreign parties engaging in proliferation or terrorism-related activities with Iran. Under one law, State has imposed sanctions in 111 instances against Chinese, North Korean, Syrian, and Russian entities. Third, Treasury or State can use financial sanctions to freeze the assets of targeted parties and reduce their access to the U.S. financial system.

U.S. officials report that U.S. sanctions have slowed foreign investment in Iran's petroleum sector, denied parties involved in Iran's proliferation and terrorism activities access to the U.S. financial system, and provided a clear statement of U.S. concerns to the rest of the world. However, other evidence raises questions about the extent of reported impacts. Since 2003, the Iranian government has signed contracts reported at about $20 billion with foreign firms to develop its energy resources. Further, sanctioned Iranian banks may fund their activities in currencies other than the dollar. Moreover, while Iran halted its nuclear weapons program in 2003, according to the November 2007 National Intelligence Estimate, it continues to enrich uranium, acquire advanced weapons technology, and support terrorism. Finally, U.S. agencies do not systematically collect or analyze data demonstrating the overall impact and results of their sanctioning and enforcement actions.

Iran's global trade ties and leading role in energy production make it difficult for the United States to isolate Iran and pressure it to reduce proliferation and support for terrorism. For example, Iran's overall trade with the world has grown since the U.S. imposed sanctions, although this trade has fluctuated. Imports rose sharply following the Iran-Iraq war in 1988 and then declined until 1995; most export growth followed the rise in oil prices beginning in 2002 (see figure). This trade included imports of weapons and nuclear technology. However, multilateral UN sanctions began in December 2006.



Iran's Total Exports and Imports, 1986-2006
Billions of 2006 dollars

Source: GAO analysis of IMF Direction of Trade Statistics, May 2007.

United States Government Accountability Office



# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 2 |
| | Background | 5 |
| | U.S. Agencies Implement Numerous Sanctions Targeting Iran | 7 |
| | U.S. Agencies Have Not Assessed the Overall Impact of Sanctions Targeting Iran | 18 |
| | Iran's Global Trade Ties Limit U.S. Sanction Influence on Iran's Behavior; UN Sanctions Have Recently Been Imposed | 26 |
| | Conclusion | 35 |
| | Matter for Congressional Consideration | 35 |
| | Agency Comments and Our Evaluation | 36 |
| **Appendix I** | **Objectives, Scope, and Methodology** | 39 |
| **Appendix II** | **U.S. and UN Sanctions Targeting Iran** | 45 |
| **Appendix III** | **Sanctions Imposed Under the Law Currently Known as the Iran, North Korea, and Syria Nonproliferation Act** | 46 |
| **Appendix IV** | **Potential Investors in Iran's Energy Sector** | 48 |
| **Appendix V** | **Comments from the Department of the Treasury** | 54 |
| | GAO Comments | 56 |
| **Appendix VI** | **Comments from the Department of Commerce** | 57 |
| | GAO Comments | 59 |
| **Appendix VII** | **GAO Contact and Staff Acknowledgments** | 60 |

## Tables

| | |
|---|---|
| Table 1: U.S. Sanction Laws Targeting Iran | 11 |
| Table 2: Iran's Top Export Markets, by Country, 1994 and 2006 | 29 |
| Table 3: Iran's Top Import Suppliers, by Country, 1994 and 2006 | 30 |
| Table 4: Top Iranian Crude Oil Export Destinations and Country Share, 2005 | 32 |
| Table 5: Imposition of Sanctions under the Iran Nonproliferation Act (INPA) and the Iran and Syria Nonproliferation Act (ISNA), 2001-2007, Iran-Related Cases | 46 |
| Table 6: List of Recent Major Agreements between Iran and Foreign Investors in Iran's Energy Sector | 48 |

## Figures

| | |
|---|---|
| Figure 1: Map of Iran | 6 |
| Figure 2: Iran's Total Exports and Imports, 1986-2006 | 28 |
| Figure 3: Establishment of U.S. and UN Sanctions Targeting Iran | 45 |

## Abbreviations

| | |
|---|---|
| BIS | Bureau of Industry and Security (Department of Commerce) |
| CBP | Customs and Border Protection (Department of Homeland Security |
| CCL | Commerce Control List |
| CRS | Congressional Research Service |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| EIA | Energy Information Administration |
| EU | European Union |
| FBI | Federal Bureau of Investigation (Department of Justice) |
| GDP | gross domestic product |
| IAEA | International Atomic Energy Agency |
| ICE | Immigrations and Customs Enforcement (Department of Homeland Security) |
| IEEPA | International Emergency Economic Powers Act |
| ILSA | Iran-Libya Sanctions Act of 1996 |
| IMF | International Monetary Fund |
| INKSNA | Iran, North Korea, and Syria Nonproliferation Act |
| INPA | Iran Nonproliferation Act of 2000 |
| ISNA | Iran and Syria Nonproliferation Act |
| IRGC | Islamic Revolutionary Guard Corps |
| ITR | Iranian Transaction Regulations |
| NSC | National Security Council |
| ODNI | Office of the Director of National Intelligence |
| OFAC | Office of Foreign Assets Control (Department of the Treasury) |
| PSV | post-shipment verification |
| UAE | United Arab Emirates |
| UN | United Nations |
| UNSC | United Nations Security Council |
| WMD | weapons of mass destruction |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
Washington, DC 20548

December 18, 2007

The Honorable Christopher Shays
Ranking Member
Subcommittee on National Security and Foreign Affairs
Committee on Oversight and Government Reform
House of Representatives

Dear Mr. Shays:

The 2006 National Security Strategy stated that the challenges that Iran presents to the United States include the country's proliferation efforts, involvement in international terrorism, opposition to the Middle East peace process, and poor human rights record. To address these concerns, the United States employs a range of tools, including diplomacy, a military presence in the Gulf, and unilateral sanctions. The broad U.S. strategy is intended to deter Iran from developing weapons of mass destruction, acquiring advanced conventional weapons, and supporting terrorist activities. Sanctions have played an important role in the U.S. approach to confronting Iran. A U.S. "sanction" is any unilateral restriction or condition on economic activity with respect to a foreign country or foreign entity that is imposed by the United States for reasons of foreign policy or national security.[1]

We reviewed (1) U.S. sanctions targeting Iran and their implementation, (2) the reported impact of the sanctions, and (3) factors that affect the ability of U.S. sanctions to reduce Iran's proliferation and terrorism-related activities.

To determine implementation and assessment of U.S. sanctions involving Iran, we identified and reviewed U.S. executive orders and laws that established sanctions targeted at Iran. While we focused on Iran-specific sanctions, we also reviewed financial sanctions that address proliferation and terrorism concerns that the United States can use against any party, including Iran, as well as United Nations (UN) sanctions. We reviewed data identifying how often sanctions have been imposed. Further, to

---

[1]The House Committee on Ways and Means defined "unilateral sanctions" as such in a February 18, 1998, letter to the U.S. International Trade Commission Chairman.

review assessments and information about sanction impacts and factors influencing sanctions, we reviewed U.S. agency documents and analyzed international trade, energy, and private sector data. We interviewed experts on Iran regarding the sanctions and their impact. We further reviewed documentation from the United Nations, Department of State, and Congressional Research Service (CRS) that identifies current proliferation and terrorism-related activities by Iran. We also reviewed U.S. classified documents related to the imposition of sanctions; however, no classified information is used in this report. On the development of nuclear power and Iran's nuclear program, we reviewed information from the Department of Energy and the International Atomic Energy Agency (IAEA) and the November 2007 National Intelligence Estimate on Iran. For all objectives, we interviewed officials from the Departments of the Treasury, State, Commerce, Defense (DOD), Justice, Homeland Security (DHS), and Energy, as well as the Central Intelligence Agency. We conducted our review from November 2006 to November 2007 in accordance with generally accepted government auditing standards. Appendix I contains a more detailed description of our scope and methodology.

## Results in Brief

Since 1987, U.S. agencies have been implementing numerous sanctions against Iran that fall into three categories. First, Treasury leads efforts to implement a comprehensive U.S. trade and investment ban against Iran.[2] Between 2003 and 2007, Treasury filed 94 civil penalty cases against companies violating the ban. However, the ban may be circumvented by exporters who ship U.S. goods to Iran through other countries. Second, State administers sanction laws against foreign parties that engage in proliferation or terrorism-related activities with Iran. State has imposed sanctions under these laws to varying degrees. For example, under one law, sanctions have been imposed in 111 instances. Almost one-half of these cases involved Chinese entities selling sensitive goods to Iran. and over 30 percent of all sanction cases under this law involved parties that were sanctioned multiple times. According to a State official, entities engaged in conventional arms transfers were the most widely sanctioned, followed by those involved in chemical-biological, missile, and nuclear activities. Under another law, sanctions have never been imposed. Third, Treasury or State can designate parties that engage in proliferation or terrorism-related activities involving Iran as subject to financial sanctions

---

[2]Exec. Order No. 13059, 62 *Fed. Reg.* 44,531 (Aug. 19, 1997).

that freeze their assets and reduce their access to the U.S. financial system.[3]

U.S. officials and experts report that U.S. sanctions have specific impacts on Iran; however, the extent of such impacts is difficult to determine. First, according to U.S. officials and experts, U.S. sanctions may have slowed foreign investment in Iran's petroleum sector, which hinders Iran's ability to fund its acquisition of prohibited items and terrorism-related activities. Second, U.S. officials state that financial sanctions deny parties involved in Iran's proliferation and terrorism activities access to the U.S. financial system and complicate their support for such activities. For example. in January 2007, the U.S. government sanctioned Bank Sepah as a supporter of the proliferation of weapons of mass destruction, thereby eliminating its access to the U.S. financial system and reducing its ability to conduct dollar transactions. Third, U.S. officials have identified broad impacts of sanctions, such as providing a clear statement of U.S. concerns about Iran. However, other evidence raises questions about the extent of reported economic impacts. Since 2003, the Iranian government has signed contracts reported at approximately $20 billion with foreign firms to develop its energy resources, though it is uncertain whether these contracts will ultimately be carried out. In addition, sanctioned Iranian banks may be able to turn to other financial institutions or fund their activities in currencies other than the U.S. dollar. Moreover, while Iran halted its nuclear weapons program in 2003, according to the November 2007 U.S. National Intelligence Estimate, it continues to acquire advanced weapons components, enrich uranium, and support terrorism. Finally, U.S. agencies do not assess the overall impact of sanctions. Except for Treasury, the agencies, do not collect data demonstrating the direct results of their sanctioning and enforcement actions, such as the types of goods seized under the trade ban or the subsequent actions of sanctioned entities.

Iran's global trade ties and leading role in energy production make it difficult for the United States to isolate Iran and pressure it to reduce proliferation activities and support for terrorism; however, multilateral efforts to target Iran have recently begun. From 1987 through 2006, Iran's exports grew from $8.5 billion to $70 billion, while Iran's imports grew

---

[3]See Exec. Order No. 13224. 66 *Fed. Reg.* 49.079 (Sept. 23. 2001); Exec. Order No. 13382. 70 *Fed. Reg.* 38,567 (June 28, 2005).

from $7 billion to $46 billion.[4] During that period, the annual real growth rate of Iran's exports was nearly 9 percent and about 7 percent for Iran's imports. Both exports and imports fluctuated during this period. For example, imports rose sharply following the Iran-Iraq war in 1988, and most of Iran's export growth has occurred since 2002, coinciding with sharp increases in oil prices. Iran's trade included imports of weapons and nuclear technology. Second, global interest in purchasing and developing Iran's substantial petroleum reserves has kept Iran active in global commerce. The growing worldwide demand for oil, coupled with high oil prices and Iran's extensive reserves, enabled Iran to generate more than $50 billion in oil revenues in 2006. However, multilateral efforts targeting Iran have recently begun. Beginning in December 2006, and again in March 2007, the UN Security Council (UNSC) adopted sanctions against Iran.[5] Among other things, these sanctions prohibit UN member states from supplying Iran with specific nuclear materials or technology, require them to freeze the financial assets of certain Iranian individuals and companies with ties to Iran's nuclear or ballistic programs, and ban the import of all Iranian conventional arms.

We recommend that the Congress consider requiring the National Security Council (NSC), in collaboration with the Departments of State, the Treasury, Energy, and Commerce; the intelligence community; and U.S. enforcement agencies to (1) collect, analyze, and improve data on Iran sanctions and conduct a baseline assessment of the impact and use of the sanctions; (2) develop a framework for assessing the ongoing impact of U.S. sanctions, taking into consideration the contribution of multilateral sanctions; and (3) report periodically to the Congress on the sanctions' impact.

We provided a draft of this report to the Departments of State, the Treasury, Commerce, Defense, Energy, Justice, and Homeland Security. We also provided a draft to the NSC and the Office of the Director of National Intelligence (ODNI). The Department of the Treasury provided a formal response emphasizing that, as a result of financial pressure, Iran is experiencing increasing isolation from the global community. The

---

[4]We are reporting global trade data in constant 2006 dollars. This reflects the real value of Iran's trade. (See app. I for further explanation regarding the method used to adjust the nominal trade figures reported by the International Monetary Fund [IMF] into 2006 dollars).

[5]S.C. Res. 1737, U.N. SCOR, 61st Sess., U.N. Doc. S/RES/1737 (2006); S.C. Res. 1747, U.N. SCOR, 62nd Sess., U.N. Doc. S/RES/1747 (2007).

department also states that Iran continues to pursue nuclear capabilities and ballistic missile technology and to fund terrorism. This comment reinforces our finding that the overall impact of sanctions is unclear. In addition, Treasury noted its assessments of the effectiveness of financial sanctions. We revised the report to recognize that Treasury assesses the impact of financial sanctions but maintain that an overall impact assessment of all U.S. sanctions has not been undertaken. Treasury's letter can be found in appendix V.

The Departments of State, the Treasury, Commerce, and Energy provided written technical comments. We incorporated these comments into the report as appropriate. The Department of Commerce submitted its technical comments in a letter that is included in appendix VI. The NSC provided brief oral comments and ODNI provided a classified response; we considered this information and revised the report as appropriate. The Departments of Defense, Justice, and Homeland Security provided no comments on the draft report, though Homeland Security supported the part of our Matter for Congressional Consideration that specifically involves the department.

## Background

Iran is a nation of strategic importance due to its central geographic location and huge reserves of fossil fuels. Iran's neighbors include Iraq and Afghanistan, two countries with ongoing U.S. and coalition military operations, and Pakistan and Turkey, key U.S. allies in the global war on terrorism (see fig. 1). Furthermore, Iran borders both the Persian Gulf and the Strait of Hormuz, through which roughly one-fifth of the global oil supply is exported. According to the Department of Energy, Iran has the third largest proven oil reserves in the world. Iran's oil export revenues constitute about 80 percent of its total export revenue, and accounted for nearly one-fifth of its gross domestic product (GDP) in 2004. High oil prices in recent years have further boosted Iran's oil export revenues.

**Figure 1: Map of Iran**



Source: GAO.

U.S.-Iranian relations have often been strained since the early years of the Cold War. Following the U.S.-supported overthrow of Iran's prime minister in 1953, the United States and others backed the regime of Shah Mohammed Reza Pahlavi for a quarter century. Although it did much to develop the country economically, the Shah's government repressed political dissent. In 1978, domestic turmoil swept the country as a result of religious and political opposition to the Shah's rule, culminating in the collapse of the Shah's government in February 1979 and the establishment of an Islamic republic led by Supreme Leader Ayatollah Khomeini. In November 1979, militant Iranian students occupied the American embassy in Tehran with the support of Khomeini. Shortly thereafter, the United

States broke diplomatic relations with Iran, which remain suspended to this day.

## U.S. Agencies Implement Numerous Sanctions Targeting Iran

U.S. sanctions to deter Iran's proliferation and support for terrorism fall into three categories. First, Treasury leads U.S. government efforts to implement a comprehensive trade and investment ban against Iran. Second, State is responsible for implementing several laws that sanction foreign parties engaging in proliferation or terrorism-related transactions with Iran. Third, Treasury or State can impose financial sanctions, including a freeze on assets and a prohibition on access to U.S. financial institutions, against parties who engage in proliferation or terrorism-related activities with any party, including Iran. (See app. II for more information regarding the timing and nature of U.S. and UN sanctions.)

**Treasury's Trade and Investment Ban Prohibits Virtually All U.S. Commercial Ties with Iran, but Transshipments May Circumvent Ban**

Treasury administers a ban on almost all U.S. trade or investment activity involving Iran.[6] The prohibitions of the trade and investment ban began with a 1987 ban on Iranian imports and were followed by a 1995 ban on U.S. exports to and investment in Iran. These prohibitions apply to U.S. persons, including U.S. companies and their foreign branches, wherever located.[7] U.S. officials stated that the ban does not apply to independent foreign subsidiaries of U.S. companies.[8] Non-U.S. persons are generally exempt from the provisions of the ban.[9] Trade sanctions against Iran were eased in 2000 to allow for the purchase and import from Iran of carpets and food products.[10] Further, the Trade Sanctions Reform and Export Enhancement Act of 2000 lifted, subject to certain exceptions, U.S. sanctions on commercial sales of food, agricultural commodities, and medical products to several sanctioned countries, including Iran.[11] The ban also prohibits U.S. financial institutions from having direct banking

[6]A ban on imports of Iranian goods and services was enacted in October 1987 via Executive Order 12613, 52 *Fed. Reg.* 41940 (Oct. 29, 1987). In March 1995, the President issued Executive Order 12957, 60 *Fed. Reg.* 14615 (Mar. 15, 1995) prohibiting U.S. involvement with petroleum development in Iran. Executive Order 12959, 60 *Fed. Reg.* 24757 (May 6, 1995) was issued 2 months later, banning specified exports and investment. Finally, on August 19, 1997, the President signed Executive Order 13059, 62 *Fed. Reg.* 44531 (Aug. 19, 1997) which consolidated prior executive orders and prohibits virtually all trade and investment activities with Iran by U.S. persons, wherever located.

[7]Executive Order 13059 defines "U.S. persons" as "…any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States."

[8]Some U.S. companies have come under scrutiny for dealings by their foreign subsidiaries with Iran. For example, the U.S. company Halliburton announced in 2005 after criticism of a subsidiary's involvement with Iran that its subsidiaries had completed all contractual commitments with Iran and that it would no longer operate there.

[9]With some exceptions, the ban does prohibit foreign persons from reexporting sensitive U.S.-origin goods, technology, or services to Iran. Executive Order No. 13059, § 2(b). Sanctions were recently extended by the Department of Commerce's July 12, 2007, addition of five Iranian entities to the Entity List. All reexports of any item subject to the Export Administration Regulations now require an export license, with a presumption of denial, to the listed entities.

[10]See Iranian Transaction Regulations: Licensing of Imports of, and Dealings in, Certain Iranian-Origin Foodstuffs and Carpets. 65 *Fed. Reg.* 25,642 (May 3, 2000).

[11]Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2001, Pub. L. No. 106-387, Title IX, § 906, 114 Stat. 1549, 1549A-69 (2000). This law enacted as U.S. policy the principle that commercial sales of food, other agricultural products, medicine, and other medical products shall not be used as a tool to conduct foreign policy or to address national security objectives.

relationships with banks in Iran and banks owned or controlled by the government of Iran.[12]

According to a Treasury official, the trade and investment ban is aimed at making it more difficult for Iran to procure U.S. goods, services, and technology, including those that could be used for terrorism or proliferation. The official further stated that, as with all U.S. economic sanctions programs, the premise of the sanctions is to exact a price on the sanctioned entity, which serves as an inducement to change the behavior that threatens U.S. national security and foreign policy goals. Sanctions also serve to make it more difficult for a sanctioned entity to pursue its threatening conduct.

Treasury's Office of Foreign Assets Control (OFAC) administers the trade and investment ban and is responsible for reviewing and licensing requests to export or re-export goods to Iran, with most items subject to a general policy of denial. OFAC is also responsible for conducting civil investigations of sanctions violations, which can result in warning letters, cease and desist orders, and civil penalties of up to $250,000 (or an amount that is twice the amount of the transaction that is the basis for the violation) imposed administratively. We found that Iran sanctions were involved in 94 out of 425 civil penalty cases that OFAC assessed or settled as a result of sanction violations between 2003 and 2007. In cases where OFAC finds evidence of willful violations of the trade and investment ban, it may refer those cases to other federal law enforcement agencies for criminal investigation. Investigations of potential criminal violations can be conducted by the Department of Commerce's Bureau of Industry and Security (BIS), DHS's Immigration and Customs Enforcement (ICE), and the Department of Justice's Federal Bureau of Investigation (FBI), sometimes acting jointly. Criminal prosecutions are pursued by the Department of Justice. Under recently enacted legislation, criminal penalties for violations of the trade and investment ban can range up to $1,000,000 and (for natural persons) 20 years in jail.[13]

[12]Our previous work noted that sanctions can increase the costs of trade and finance to the sanctioning nation (in this case, the United States) because it loses commercial transactions and profits with the target nation. See GAO *Economic Sanctions: Effectiveness as Tools of Foreign Policy*, GAO/NSIAD-92-106 (Washington, D.C. Feb. 19, 1992).

[13]International Emergency Economic Powers Enhancement Act, Pub. L. No. 110-96, § 2, 121 Stat. 1011 (2007) (codified at 50 U.S.C. § 1705).

According to officials at key U.S. export enforcement agencies, the trade ban may be circumvented by the transshipment of U.S. exports through third countries. Officials identified several locations that serve as common transshipment points for goods destined for Iran. These locations include Germany, Malaysia, Singapore, the United Kingdom, and, according to Commerce officials, the United Arab Emirates (UAE) in particular.

Two trends underscore the possibility that U.S. goods are being shipped to Iran through the UAE. First is the considerable growth in U.S. trade flows through the UAE. The United States has become the number one supplier of imports to the UAE and Iran is the UAE's largest trade partner. Moreover, although trade statistics do not specify the portion of UAE exports to Iran that are of U.S.-origin, the UAE transships a higher proportion of its U.S. imports than other countries do. According to Commerce officials transshipments have been a considerable problem in terms of the effectiveness of sanctions in place against Iran. The second trend is the high rate of unfavorable end-use checks for U.S. items exported to the UAE. The Department of Commerce relies on post-shipment verification (PSV) checks as its primary method of detecting and preventing illegal transfers, including transshipments, of U.S.-origin exports to Iran. However, according to Commerce officials, in August 2007, the UAE enacted a comprehensive export, reexport, and transshipment control law to better enable the UAE to control transshipment of sensitive goods through its ports. The law is too new to assess its effectiveness. (Further information is classified.)

## State Sanctions Foreign Entities under Iran-Specific Laws

Congress has taken steps to discourage trade by third-country parties with Iran by enacting sanction laws that have a "secondary boycott" effect. Three U.S. sanction laws discourage foreign parties from engaging in proliferation or terrorism-related activities with Iran (see table 1). State leads efforts to implement these laws and has imposed sanctions under these laws to varying degrees.

**Table 1: U.S. Sanction Laws Targeting Iran**

| U.S. law | Sanctionable activities | Sanctions imposed against foreign parties | Use of sanctions |
|---|---|---|---|
| Iran, North Korea, and Syria Nonproliferation Act[a] | Transfer to Iran of goods, services, or technology listed in various multilateral export control arrangements or that contribute to weapons of mass destruction or missile programs. | Among other things, no U.S. government procurement, no U.S. assistance, no licenses for exports from the United States to the foreign party of defense or dual-use items. *Sanctions are discretionary and State has typically imposed sanctions for a 2-year period.* | Sanctions imposed 111 times since 2000 in Iran-related cases, including: <br> • 52 instances against Chinese parties, <br> • 9 instances against North Korean parties, <br> • 8 instances against Syrian parties, and <br> • 7 instances against Russian parties. |
| Iran-Iraq Arms Nonproliferation Act of 1992[b] | Transfer to Iran of controlled goods or technology so as to contribute "knowingly and materially" to Iran's efforts to acquire destabilizing numbers and types of advanced conventional weapons. | *Against persons:* No U.S. government procurement or export licenses. *Against foreign countries:* Among other things, no U.S. government assistance or support for multilateral development bank assistance. *Sanctions are mandatory and are imposed for a 2-year period against persons and for a 1-year period against foreign countries. The President also has the authority to impose an additional discretionary sanction against foreign countries.* | Sanctions imposed 12 times in 2002 and 2003. |

| U.S. law | Sanctionable activities | Sanctions imposed against foreign parties | Use of sanctions |
|---|---|---|---|
| Iran Sanctions Act[c] | Investment of $20 million or more within a 12-month period that directly and significantly contributed to the enhancement of Iran's ability to develop its petroleum resources.<br><br>Exports. transfers, or other provision to Iran of any goods, services, technology or other items knowing that the provision of such items would contribute materially to Iran's ability to acquire or develop chemical, biological, or nuclear weapons or related technologies; or destabilizing numbers and types of advanced conventional weapons. | Two of the following options:<br><br>• no Export-Import Bank assistance,<br><br>• no export licenses to export certain goods to sanctioned parties,<br><br>• no loans or credits totaling more than $5 million in a 12-month period from U.S. financial institutions,<br><br>• no U.S. government procurement,<br><br>• for sanctioned financial institutions, no designation as a primary dealer in U.S. government debt instruments, and may not serve as an agent of the U.S. government or as repository for U.S. government funds, or<br><br>• additional sanctions, as appropriate, to restrict imports regarding the sanctioned party.<br><br>*Sanctions are mandatory and are imposed for a period of not less than 2 years.* | Sanctions never imposed, though State officials note that the law has been used as a tool in diplomatic efforts. |

Source: U.S. public laws, http://www.state.gov/t/isn/c15231.htm, *Federal Register.*

[a]This law was enacted as the Iran Nonproliferation Act of 2000; Restriction on Extraordinary Payments in Connection with the International Space Station, Pub. L. No. 106-178, 114 Stat. 38; Syria was added to the act in 2005 by the Iran Nonproliferation Amendments Act of 2005, Pub. L. No. 109-112, §4, 119 Stat. 2366, 2369; and North Korea was added in 2006 by the North Korea Nonproliferation Act of 2006, Pub. L. No. 109-2353, 120 Stat. 2015.

[b]Enacted by the National Defense Authorization Act for fiscal year 1993, Pub. L. No. 102-484, Title XVI, 106 Stat. 2315, 2571-75 (1992). We are unable to distinguish between Iran and Iraq sanction cases, as this information is classified.

[c]This act was originally enacted as the Iran-Libya Sanctions Act of 1996, Pub. L. No. 104-172, 110 Stat. 1541; Libya was removed from the law in 2006 by the Iran Freedom Support Act, Pub. L. No. 109-293, 120 Stat. 1344. Proliferation-related sanctionable activities were added to the law in 2006.

As table 1 shows, State has imposed sanctions against foreign parties, including bans on U.S. government procurement opportunities and sales of defense-related items, in 111 Iran-specific cases since 2000 under a law currently known as the Iran, North Korea, and Syria Nonproliferation Act

(INKSNA).[14] This law targets foreign persons that have transferred goods, services, or technology to Iran that are listed on various multilateral export control lists.[15] According to a State official, entities engaged in conventional arms transfers were the most widely sanctioned, followed by those involved in chemical-biological, missile, and nuclear activities. Since 2000, almost half of the cases (52) involved Chinese parties, with North Korean and Russian parties accounting for 9 and 7 cases, respectively. In 2007, Syrian parties were sanctioned in 8 cases. According to State officials, in most cases, the full range of sanctions authorized under INKSNA is imposed, and sanctions have been typically imposed for a 2-year period. Over 30 percent of all sanction cases involve parties that were sanctioned multiple times under the law—some, primarily Chinese firms, 3 or more times. According to a State official, such instances were the result of new proliferation activities by these firms. Because the law establishes the sanctions that are available, the practical effect of continuing to impose sanctions against the same parties is to extend the length of time the sanctions are imposed and make the public aware of the firms facilitating proliferation with Iran. State officials said that generally no consideration of additional penalties or measures is given to parties who have been sanctioned multiple times, although some of these entities have been sanctioned under other sanction tools. However, State officials emphasized that they raise concerns about the activities of such entities with foreign governments as appropriate.

In deciding to sanction an entity under INKSNA, State officials reported that every 6 months they assess as many as 60,000 intelligence reports to identify transfer cases that should be submitted to agencies for review. State decides, on a discretionary basis, which parties to sanction following a meeting chaired by the NSC that solicits input from DOD, Energy, and Treasury and other agencies regarding the disposition of each case. According to a State official, the Deputy Assistant Secretary-level interagency group reviews cases to recommend whether the foreign persons were reportable under the act, and if so, (1) whether there was information establishing that a case was exempt from sanctions under the

---

[14]The Iran Nonproliferation Act of 2000 (INPA) was amended to include Syria in 2005 (the Iran and Syria Nonproliferation Act, or ISNA), and North Korea in 2006, and is now known as the Iran, North Korea, and Syria Nonproliferation Act of 2006 (INKSNA), Pub. L. No. 106-178, 114 Stat. 38 (codified as amended at 50 U.S.C. § 1701 note).

[15]The act refers to controls established under numerous multilateral export control lists, including under the Australia Group, Chemical Weapons Convention, Missile Technology Control Regime, Nuclear Suppliers Group, and the Wassenaar Arrangement.

act, (2) whether to seek from the foreign person additional information concerning the transfer or acquisition as provided for in the act, and (3) whether sanctions under the act should be applied. The final decision regarding the disposition of each case is made by the Deputy Secretary of State. One State official noted that there have been several cases in which State decided not to impose sanctions because of positive nonproliferation actions taken by the foreign government responsible for the firm engaging in the proliferation transfer. A foreign government punishing or prosecuting the firm responsible for the transfer is one example of the type of positive action that has resulted in a decision not to impose penalties. Another reason why State may decide not to impose sanctions is a concern that such an action, which is made public, may compromise the intelligence "sources and methods" used to collect information on a particular proliferation case. Once final decisions are made, State then submits a classified report to Congress identifying parties that have engaged in sanctionable activities and parties that will be sanctioned, and ultimately publishes the names of sanctioned entities in the *Federal Register*.[16] (See appendix III for a detailed listing of these sanction cases.)

Under a second law, the Iran-Iraq Arms Nonproliferation Act of 1992[17] (also shown in table 1), State has imposed sanctions 12 times. Under this act, mandatory sanctions include prohibiting the export to Iran of all goods specified on the Commerce Control List (CCL).[18] State also can impose sanctions against foreign parties, such as a ban on U.S. government procurement opportunities or export licenses that knowingly and materially contribute to Iran's efforts to acquire destabilizing numbers and types of advanced conventional weapons. As with the Iran, North

---

[16]The Department of State's International Security and Nonproliferation (ISN) Bureau was in charge of this effort until 2007 when the department's Verification, Compliance, and Implementation (VCI) Bureau took over this responsibility.

[17]Pub. L. No. 102-484 (codified as amended at 50 U.S.C. § 1701 note).

[18]The Iran-Iraq Arms Nonproliferation Act applies to Iran specific sanctions against Iraq as established in section 586G of the Iraq Sanctions Act of 1990, as contained in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1991, Pub. L. No. 101-513, §§ 586-586J, 104 Stat. 1979, 2047-55 (1990). These sanctions include a prohibition on exports of items on the CCL, which falls within the Export Administration Regulations and establishes all items that are determined to have a potential "dual use" – that is, a use that has both a commercial and military or other strategic application. See 50 App. U.S.C. §§ 2401-2420; 15 C.F.R. Pt. 774, Supp. 1. Such exports to Iran can only be allowed if a presidential waiver is granted citing that a waiver is essential to the national interest of the United States. See Pub. L. No. 102-484. § 1606. State officials in the Economic, Energy and Business Bureau (EEB), the bureau responsible for coordinating this waiver process, report that such waivers are granted infrequently.

Korea, and Syria Nonproliferation Act, decisions under this act include interagency input from Commerce, Energy, and DOD, with State in the lead and responsible for deciding which cases warrant imposition of sanctions. In 2002, State imposed sanctions in 10 instances, 9 of which were against Chinese parties.[19] In 2003, sanctions were imposed against two parties, one Jordanian and one Indian. No sanctions have been imposed since 2003 primarily because, according to State officials, it is difficult to establish that transfers were made by parties who knowingly and materially contributed to Iran's proliferation.

Table 1 shows that State has not imposed sanctions against any party under a third law—the Iran Sanctions Act—though State officials noted that the law has been useful in raising U.S. concerns over Iran. The goal of the Iran Sanctions Act (previously known as the Iran-Libya Sanctions Act of 1996,[20] or ILSA) has been to deny Iran the financial resources to support international terrorism or the development of weapons of mass destruction (WMD) by limiting Iran's ability to find, extract, refine, or transport its oil resources. State considered sanctions on one occasion in 1998; however, the U.S. government granted waivers to the parties involved.[21] In that instance, the U.S. government determined that the investments of three foreign companies—Total (France), Gazprom (Russia), and Petronas (Malaysia)–in the development of Iran's South Pars gas field were sanctionable under ILSA. However, the Secretary of State determined that it was important to the U.S. national interest to waive the imposition of sanctions against these firms. In making this determination, the Secretary considered factors such as the desire to build an effective multilateral regime to deny Iran the ability to acquire WMD and support acts of international terrorism. Further, the European Union (EU) had concerns that the use of the act to impose sanctions would constitute extraterritorial application of U.S. law. The possibility that the EU might take this issue to the World Trade Organization for resolution played a role in convincing the U.S. government to waive sanctions. In addition, a report on the use of ILSA prepared by State and cleared by the NSC noted that

[19]For sanctions imposed under this act, we are unable to provide information that specifies which sanctions were due to proliferation activities with Iran and which were due to proliferation activities with Iraq. Such information is classified.

[20]Pub. L. No. 104-172. Libya was removed from the act in 2006 by the Iran Freedom Support Act, Pub. L. No. 109-293, and the act is now known as the Iran Sanctions Act.

[21]Waivers are available under this act if the President determines that a waiver is important to the U.S. national interest.

the sanctions that could be imposed were unlikely to induce the three companies to abandon their investments because the companies were insulated from any practical negative impact of the sanctions.[22]

## Targeted Financial Sanctions Freeze Assets of Parties Involved in Proliferation and Terrorism-Related Activities

The U.S. government has taken actions against Iran using targeted financial sanctions that can be used against any party that engages in certain proliferation or terrorism activities.[23] In June 2005, the President issued Executive Order 13382 to freeze the assets of persons engaged in proliferation of WMD and members of their support networks.[24] This action followed the issuance in September 2001 of Executive Order 13224 to freeze the assets of persons who commit, threaten to commit, or support terrorism.[25] Executive Orders 13382 and 13224 were both issued under the authority of the International Economic Emergency Powers Act (IEEPA).[26] Persons targeted under these financial sanctions are said to be "designated" as either WMD proliferators or global terrorists, depending on which set of sanctions is employed, and any transactions with them by U.S. persons are prohibited.[27] According to Treasury, the goal of this action is to deny sanctioned parties' access to the U.S. financial and

---

[22]For example, the report stated that Petronas had only limited connections to the United States and Total had divested many of its U.S. assets prior to entering into the South Pars contract.

[23]In addition to these financial sanctions, other broad sanction tools available for use against any violating party, including Iran, include Executive Order 12938, which targets proliferation of WMD. Exec. Order No. 12938, 59 *Fed. Reg.* 58,099 (Nov. 14, 1994). Since 1998, this order has been used to impose sanctions against multiple parties that have engaged in proliferation activities related to Iran's nuclear or missile programs.

[24]Exec. Order No. 13382, 70 *Fed. Reg.* 38,567 (June 28, 2005).

[25]Exec. Order No. 13224, 66 *Fed. Reg.* 49,079 (Sept. 23, 2001).

[26]Pub. L. No. 95-233, Title II, 91 Stat. 1625 (1977) (codified at 50 U.S.C. § 1701 et seq). IEEPA grants certain authorities to the President to deal with unusual and extraordinary threats if the President declares a national emergency with respect to such threat. For example, under IEEPA, the President may prohibit transactions involving any property in which a foreign country or national thereof has any interest by any person subject to the jurisdiction of the United States.

[27]A U.S. person is defined as any United States citizen or national or permanent resident alien anywhere in the world; entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches); or any person in the United States.

commercial systems. Treasury or State can make designations under these financial sanctions, which are published in the *Federal Register*.[28]

As of October 25, 2007, 53 of the 70 parties designated under the nonproliferation financial sanctions were tied to Iranian proliferation activities. Of these 53 parties, 48 were either Iranian entities or overseas subsidiaries of Iranian banks, 4 were Chinese, and 1 was American. Several designations have been made in recent months. For example, in June 2007, Treasury designated four Iranian companies for their role in Iran's proliferation of WMD.[29] On October 25, 2007, State and Treasury designated 27 entities or individuals under Executive Order 13382, including the Islamic Revolutionary Guard Corps (IRGC)[30] and other companies or individuals affiliated with the IRGC, the Ministry of Defense and Armed Forces Logistics, and two Iranian banks, including Bank Melli—Iran's largest bank.

With regard to the antiterrorism financial sanctions, Treasury was unable to provide us with data on the number of Iran-related designations because it does not compile information about the country or countries with which the designated entities are involved. We were, however, able to identify instances where antiterrorism financial sanctions were imposed. For example, on October 25, 2007, under Executive Order 13224, Treasury designated the IRGC's Qods Force a supporter of terrorism. According to Treasury, the Qods Force provides material support to the Taliban, Lebanese Hizbollah, Hamas, and other terrorist groups. Treasury also designated Iran's Bank Saderat, which is already subject to financial restrictions under the trade ban, as a terrorism financier.

---

[28]Treasury also posts information on its Web site and publishes designations in its Specially Designated Nationals (SDN) list. Treasury officials note that U.S. financial institutions use the SDN list to identify and freeze assets of sanctioned parties.

[29]The designated entities are Pars Tarash, Farayand Technique, Fajr Industries Group, and Mizan Machine Manufacturing Group.

[30]The IRGC is a component of Iran's military, focusing on national security, internal and border security, and law enforcement.

## U.S. Agencies Have Not Assessed the Overall Impact of Sanctions Targeting Iran

U.S. officials and experts report that U.S. sanctions are having specific impacts on Iran; however, the extent of such impacts is difficult to determine, and agencies have not assessed the overall impact of sanctions. First, U.S. officials report that U.S. sanctions have slowed foreign investment in Iran's petroleum sector, which hinders Iran's ability to fund proliferation and terrorism-related activities. Second, financial sanctions deny parties involved in Iran's proliferation and terrorism activities access to the U.S. financial system and complicate their support for such activities. Third, U.S. officials have identified broad impacts of sanctions, such as providing a clear statement of U.S. concerns about Iran. However, other evidence raises questions about the extent of reported economic impacts. Since 2003, the Iranian government has signed contracts reported at approximately $20 billion with foreign firms to develop its energy resources, though it is uncertain whether these contracts will ultimately be carried out. In addition, sanctioned Iranian banks may be able to turn to other financial sources or fund their activities in currencies other than the U.S. dollar. U.S. and international reports also find that Iran continues proliferation activities and support for terrorism. Finally, U.S. agencies, except for Treasury's assessments of its financial sanctions under Executive Orders 13382 and 13224, do not assess the impact of sanctions in helping achieve U.S. objectives nor collect data demonstrating the direct results of their sanctioning and enforcement actions.

## Agencies Report that Sanctions Have Delayed Investment in Iran's Petroleum Sector and Had Other Impacts

State and Treasury officials report that sanctions have had specific impacts such as delaying foreign investment in Iran's petroleum sector and reducing Iran's access to the U.S. financial system. In addition, broad impacts of sanctions, such as their symbolic value, also have been recognized.

### U.S. Officials State that Iran Sanctions Has Contributed to Delays in Foreign Investment in Iran's Petroleum Sector

U.S. officials and experts have stated that U.S. sanctions have played a role in slowing Iran's progress in developing its oil and gas resources. The Iran Sanctions Act is intended to limit investment in Iran's petroleum sector, with an expectation that curbing such investment would disrupt the revenue generated by new oil and gas investments and reduce Iran's ability to pursue policies that the United States deemed unacceptable. A 2004 State Department report noted that the law had, among other things, helped delay investment in Iran's petroleum sector.[31] According to State

---

[31]While official data on U.S. investment in Iran are incomplete, available figures indicate negligible U.S. investment in Iran, even prior to the adoption of the investment ban in 1995.

Department officials, there have been no new final oil and gas investment deals in Iran since 2004. Other experts have similarly noted a slowdown in investment in Iran's oil and gas sectors and have cited statements that Iranian oil officials had made to that effect. U.S. officials and experts have also noted that, while the existence of the Iran Sanctions Act and its use as a tool for dialogue with foreign parties may be a contributing factor to a slowdown in foreign investment in Iran, Iran's own investment policies[32] may be contributing to a reduced flow of investment.

On the other hand, the Department of State has raised concerns about possible energy deals between Iran and potential foreign investors, including the reported $16 billion China National Offshore Oil Corporation deal for the development of Iran's North Pars gas field. Further, the United States has expressed concerns about the estimated $4.3 billion preliminary agreement that Royal Dutch Shell, along with Spain's Repsol, concluded with the Iranian regime for the construction of a liquefied natural gas plant at South Pars, the world's largest natural gas field. Also, Indian firms have entered into contracts in recent years for the purchase of Iranian gas and oil. The proposed construction of a pipeline to deliver Iranian natural gas to India through Pakistan is a project about which the United States has expressed concerns.

We also found that since 2003 the Iranian government has signed contracts reported at approximately $20 billion with foreign firms to develop Iran's energy resources. It is uncertain whether these contracts will ultimately be carried out, and at least one has already been withdrawn. However, these agreements demonstrate foreign firms' significant interest in financing or underwriting projects in Iran's energy sector. (See app. IV for a listing of

---

[32]For example, according to the Department of Energy's Energy Information Administration (EIA), Iran utilizes buyback contracts, which are arrangements in which the contractor funds all investments, receives remuneration from the Iranian government in the form of an allocated production share, then transfers operation of the field to Iran after a set number of years, at which time the contract is completed. However, according to U.S. Iran country report, the buyback of 5 to 7 years has not given contractors sufficient time to recoup their investment costs. Also, according to a State Department report, a number of other negative elements in addition to the relative difficulty of reaching satisfactory arrangements affect foreign investment in Iran: prohibitions on foreign ownership of natural resources, sometimes unappealing financial and other contractual terms, alleged corruption, and political uncertainty are among the other negative elements.

recent major agreements between Iran and foreign investors in Iran's energy sector.)[33]

**U.S. Officials Report that Financial Sanctions Deny Entities Involved in Proliferation and Terrorism Access to U.S. Financial System**

State and Treasury officials have testified that financial sanctions deny designated individuals and entities access to the funds needed to sustain Iran's proliferation.[34] For example, in January 2007, the U.S. government designated Bank Sepah under Executive Order 13382 as a supporter of WMD proliferation, thereby eliminating its access to the U.S. financial system and reducing its ability to conduct dollar transactions.[35] Further, U.S. financial sanctions also have reportedly disrupted Iran's support for terrorism. U.S. officials report that the United States has disrupted Hizbollah's financial support network by reducing the ability of Iranian banks to interact with the U.S. financial system. For example, in September 2006, Treasury altered the trade ban regulations to cut off Bank Saderat, Iran's second largest state-owned bank, from dollar transactions due to its support for terrorism.[36] Treasury officials reported that Iran used Bank Saderat to move millions of dollars to terrorist organizations such as Hizbollah, Hamas, and the Palestinian Islamic Jihad. This action complicated the bank's financial transactions and alerted the world's financial community to Bank Saderat's role in funding terrorism.

However, Iran may be able to find alternative financial sources or fund its activities in currencies other than the dollar. Treasury officials have noted that sanctioned parties often find "workarounds" to lessen the sanctions impact, and other financial options can be used.[37] For example, sanctioned Iranian banks may turn to euro or other currency transactions to support

---

[33]A recent project by the American Enterprise Institute (AEI) cites 300 companies from 38 countries that, as of May 2007, have, at a minimum, expressed commercial interest to trade, finance, or underwrite a project in one of Iran's economic sectors.

[34]According to Department of Treasury sources, targeted financial measures are "directed specifically at individuals, key regime members, front companies, and financial institutions." Targeted financial measures are aimed at "conduct" not a country. Some of these targeted measures require financial institutions to freeze funds and close the accounts of designated actors, effectively denying these actors access to the traditional financial system.

[35]Additional Designation of Entities Pursuant to Executive Order 13382, 72 *Fed. Reg.* 7,919 (Feb. 21, 2007).

[36]Iranian Transaction Regulations, 71 *Fed. Reg.* 53,569 (Sept. 12, 2006).

[37]According to Treasury officials, states engaged in sanctionable activities have been subject to sanctions and export control restrictions for decades and have adopted a variety of evasive techniques.

Iranian government activities. Further, in 2006, a Treasury official testified that stopping money flows to Iran is particularly challenging because the Iranian government draws upon a large network of state-owned banks and parastatal companies that is difficult to penetrate.

State and Treasury officials further reported that the effects of U.S. financial sanctions have been augmented because several large European banks, responding to U.S. diplomatic efforts, have curtailed their business with sanctioned Iranian entities and are refraining from conducting dollar transactions with Iran. At least 7 of the banks that have limited or ended their dealings with sanctioned Iranian entities rank among the 20 largest European banks.[38] U.S officials also report that a number of governments, including France, Germany, Italy, and Japan, are beginning to reduce their export credits[39] for goods shipped to Iran.[40] U.S. officials have contended that such developments have made it increasingly difficult for Iran to execute important financial transactions necessary for Iran's domestic energy and other projects. U.S. agency officials and experts also have cited the increased costs[41] to Iran of obtaining finance and goods, sometimes resulting in inferior component parts. State officials assert that as more countries limit their financial interactions with Iranian entities and individuals engaging in suspect activities, these parties have been denied access to major financial and commercial systems.

**Experts and Officials Recognize that Sanctions Have Other Broad Impacts**

U.S. officials and sanction experts state that sanctions have other broad impacts. For example, State officials stressed that U.S. sanctions serve as a clear symbolic statement to the rest of the world of U.S. concerns

---

[38]These seven banks are HSBC (UK), UBS (Switzerland), Barclays (UK), Société Général (France), ABN (Netherlands), Standard Chartered (UK), Deutsche Bank (Germany).

[39]An export credit is a loan to the buyer of an export, extended by the exporting firm when shipping the good prior to payment, or by a facility of the exporting country's government. In the latter case, by setting a low interest rate on such loans, a country can indirectly subsidize exports. An export credit guarantee is a government-sponsored credit guarantee for commercial financing of exports, often to protect a country's exporters against potential loss due to nonpayment by foreign buyers.

[40]According to a Treasury official, "Iran is one of the largest beneficiaries of official export credits and guarantees, with $22.3 billion in exposure reported by OECD countries as of the end of 2005." Exposure means that the countries that provided export credit guarantees are now vulnerable, or responsible, for the payment should something go amiss with the exports, such as the foreign buyer not paying.

[41]In early 2006, the OECD raised Iran's risk rating, and the IMF reported in its 2007 Article IV consultation with Iran that Iran's sovereign debt was downgraded by Fitch due to perceived increase in country risk.

regarding Iran's proliferation and terrorism-related activities. State officials also noted that sanction laws can be used as a vehicle for dialogue with foreign companies or countries, and the prospect of sanctions can encourage foreign parties to end their interactions with Iran. Finally, U.S. officials have stated that publicly identifying entities and listing them in the *Federal Register* may deter other firms from engaging in business with sanctioned entities.[42]

## Iran Halted Its Nuclear Weapons Program but Continues to Enrich Uranium, Acquire Advanced Weapons, and Support Terrorism

The extent of the sanctions' impact in deterring Iran from proliferation activities, acquiring advanced weapons technology, and support for terrorism is unclear. Although Iran halted its nuclear weapons program, it continues to enrich uranium, acquire advanced weapons, and support terrorism. According to the November 2007 U.S. National Intelligence Estimate, Iran halted its nuclear weapons program in the fall of 2003. According to the estimate, Iranian military entities were working under government direction to develop nuclear weapons. However, Iran halted the program because of international scrutiny and pressure resulting from exposure of Iran's previously undeclared nuclear activities. (See app. II for a timeline of UN and international actions with regard to Iran's enrichment activities.)

Although it has halted its nuclear weapons program, Iran continues its uranium enrichment program. While enriched uranium can be used for nuclear weapons, Iran has stated that its program is for peaceful civilian purposes. The Director General of the International Atomic Energy Agency[43] (IAEA) stated on September 17, 2007, that Iran had not suspended its enrichment activities and continued to build its heavy water reactor at Arak. This announcement followed a series of IAEA discoveries about Iran's nuclear program. In 2002, the IAEA was informed of a previously undeclared nuclear enrichment plant in Natanz and a heavy

---

[42]Treasury also posts information on its Web site and publishes designations in its Specially Designated Nations list.

[43]The International Atomic Energy Agency (IAEA) is an independent agency affiliated with the UN established in 1957 to control and promote the use of atomic energy. Currently, the IAEA has safeguard agreements through the Treaty of the Non-Proliferation of Nuclear Weapons with more than 150 member states.

water plant in Arak.[44]  Subsequent IAEA inspections revealed that Iran had made significant progress toward mastering the technology to make enriched uranium.

Iran also continues to acquire advanced weapons technology, including ballistic missile technology, according to Treasury.  According to State officials, Chinese entities supply certain dual-use items to Iran, including some that U.S. officials believe could be used in support of Iran's WMD, ballistic and cruise missiles, or advanced conventional weapons programs.

The U.S. government also reports that Iran continues to support terrorism. We have reported that Iran is one of several countries from which Islamic extremism is currently being propagated.[45] In addition, according to State's 2006 *Country Report on Terrorism*, Iran continues to be an active state sponsor of terrorism.[46] The report states that the IRGC and Ministry of Intelligence and Security influence Palestinian groups in Syria and the Lebanese Hizbollah to use terrorism in pursuit of their goals. The report also noted that Iran provided guidance and training to select Iraqi Shi'a political groups and weapons and training to Shi'a militant groups to enable anticoalition attacks. In July 2007, officials of U.S. intelligence agencies testified that Iran regards its ability to conduct terrorism operations as a key element of its national security strategy.

## U.S. Agencies Do Not Assess the Overall Impact of Sanctions and Lack Data on Sanction Results

U.S. agencies do not assess the overall impact of sanctions in deterring Iran's proliferation, acquisition of advanced weapons technology, or terrorism-related activities, noting the difficulty of isolating the impact of sanctions from all other factors that influence Iran's behavior. In addition, except for Treasury assessments of financial sanctions, agencies do not possess data on the direct results of sanctions, such as the types of goods

---

[44]In the Arak heavy water plant, heavy water is extracted from regular water by replacing the hydrogen atom with the deuterium isotope. It is used in certain types of nuclear reactors where plutonium is bred from natural uranium. Plutonium is used in nuclear weapons and for nuclear power production.

[45]GAO, *International Affairs: Information on U.S. Agencies' Efforts to Address Islamic Extremism*, GAO-05-852 (Washington, D.C.: Sept. 16, 2005).

[46]In 1984, the Secretary of State designated Iran as a state sponsor of terrorism for its repeated support for acts of international terrorism. The effects of this designation include restrictions on U.S. foreign assistance, a ban on defense exports and sales, certain controls over exports of dual-use items, and various financial restrictions.

seized that violate the trade ban or the subsequent behavior of parties that sell prohibited goods to Iran.

**Agency Officials Cite Difficulties Measuring the Overall Impact of Sanctions on Iran**

State, Treasury, and Commerce officials said that they do not measure the overall impact of sanctions they implement. For example, both State and Treasury officials emphasized that, with one exception regarding one sanction law, they have not attempted to measure the ability of U.S. sanctions to deter Iran's proliferation or terrorism-related activities. State officials stated it is not possible to isolate the impact of sanctions from all other factors that influence Iran's behavior, such as the actions of other countries. Further, State officials reported that sanctions are just one component of U.S. efforts to influence Iran's behavior.

Treasury officials conduct classified assessments of entities designated under Executive Orders 13382 and 13224, but report that they do not assess the overall impact of sanctions, stating it can be difficult to differentiate the impact of various U.S. efforts. For example, it is difficult to know where the effects of U.S. diplomacy end and the effects of U.S. sanctions begin. State and Treasury officials noted that, while the goal of sanctions is to change Iran's behavior, such changes take time, and it is not possible to track how sanctions imposed today might affect overall behavior in the future. Such an exercise would be extremely difficult due to the challenges associated with establishing any causal linkage between U.S. sanctions and Iran's subsequent behavior. In addition, agency officials noted that the sanctions targeting Iran do not constitute a separate program or line of effort; thus, these activities are not monitored or assessed separately. However, according to Treasury officials, sanctions implemented by OFAC constitute a separate program with its own set of regulations (the Iranian Transaction Regulations) and OFAC does focus specific effort on Iran sanctions. Finally, Treasury and Commerce officials stated that it would be difficult to measure either the deterrent impact of sanctions or, conversely, the extent to which illegal or sanctionable activities continue undetected.

In 2004, State completed a review of the Iran Sanctions Act (then known as the Iran-Libya Sanctions Act). The ILSA Extension Act of 2001 required the President to provide Congress with a report describing the extent to which the act had been effective in denying Iran the ability to support acts of international terrorism and fund the acquisition of WMD by limiting Iran's ability to develop its petroleum resources.[47] This report stated that

---

[47] ILSA Extension Act of 2001, Pub. L. No. 107-24, § 3, 115 Stat. 199.

actions taken pursuant to the act had a "modest positive impact." The 2004 report is the only formal assessment U.S. agencies have completed on the broad impact of sanctions against Iran.

**Agencies Lack Data on Direct Sanction Results**

In addition, agency officials do not possess data on the direct results of sanctions. For example, regarding the trade ban, officials from DHS's Customs and Border Protection reported that inspectors are not required to document whether or not a given seizure is related to the ban. As a result, they are unable to provide complete data on the volume or nature of goods seized that violate this ban. Further, although Treasury posts on the Internet its OFAC administrative penalties, it does not compile information regarding the number of cases that involve violations of Iran sanctions (we were able to identify such cases after reviewing more than 400 detailed case descriptions) and the nature of such violations. FBI officials said that, within their counterintelligence division, they classify investigations by country of origin but would not be able to distinguish cases involving Iran sanctions from other Iran-related cases because the bureau's automated data systems do not include such information. In addition, complete DHS/ICE data on Iran sanctions cases are not available because ICE agents are not required to document the country of destination when opening a case, nor is this information always subsequently added as the case progresses. Further, a Justice official stated that the department prosecutes and organizes its cases by statute and does not classify its cases by the specific country or nationality of the individual involved in its data system. It is thus not possible to identify cases specific to the trade and investment ban with Iran. In addition, although agencies cite transshipment as a key means of evading the trade ban, they do not collect data that would help illustrate the magnitude of the problem.

Further, State does not review whether sanctions imposed under the law currently known as the Iran, North Korea, and Syria Nonproliferation Act—the law used most frequently to sanction foreign parties—stop sanctioned parties from engaging in proliferation activities with Iran or are relevant for these parties. The law does not require such a review. State officials said that, while they are aware of instances where proliferation activities ended following the imposition of sanctions on particular firms, such information is primarily collected on an anecdotal basis. There has been no overall or systematic review of whether sanctioned entities ended their proliferation activities, though State officials indicated that they monitor the activities of sanctioned parties as part of their daily responsibilities. Further, these officials emphasized that State must apply the sanctions established by law, such as a prohibition on participating in

U.S. government procurement opportunities, regardless of their relevance or potential impact. State officials acknowledged the likelihood that the sanctions established by law may have limited relevance for sanctioned parties, which may be illustrated in cases where the same parties are sanctioned repeatedly for proliferation activities with Iran.

In addition, OFAC does not compile data on the value of assets frozen pursuant to targeted financial sanctions. OFAC tracks information on assets frozen in the aggregate, not by the amount of assets frozen for each particular party that is sanctioned. OFAC also did not have information regarding the number of parties sanctioned under Iran-related antiterrorism financial sanctions. According to OFAC, systematically tracking these data and information is not a useful measure of the efficacy of sanctions.

## Iran's Global Trade Ties Limit U.S. Sanction Influence on Iran's Behavior; UN Sanctions Have Recently Been Imposed

Iran's global trade ties and leading role in energy production make it difficult for the United States to isolate Iran and deter its acquisition of advanced weapons technology and support for terrorism. First, Iran's trade with the world—both imports and exports—has grown since the U.S. trade ban began in 1987. Although trade has fluctuated from year to year, most of the growth has occurred since 2002, coinciding with the rise in oil prices. This trade includes imports of weapons and nuclear technology. Second, global interest in purchasing and developing Iran's substantial petroleum reserves has kept Iran active in global commerce. Iran's integration in the world economy has complicated U.S. efforts to encourage other countries to isolate Iran; however, multilateral efforts targeting Iran have recently begun. Beginning in December 2006, the UNSC adopted sanctions against Iran in response to Iran's noncompliance with its international obligations. These sanctions are still being implemented.

## Iran's Strong Global Trade Makes It Difficult for U.S. Sanctions to Pressure Iran

Over the past 20 years, U.S. trade with Iran has decreased, but Iran's trade with the rest of the world has increased, in large part due to increases in oil prices between 2002 and 2006. Asian countries, particularly China, are increasing their trade with Iran. Countries such as China and Russia continue to provide Iran with sensitive goods.

### Iran's Trade with the United States Decreased Substantially Following the Imposition of the Trade Ban

U.S. trade with Iran declined sharply immediately following the adoption of both the 1987 U.S. ban on imports from Iran and the 1995 ban on U.S. exports to and investment in Iran. However, U.S exports to Iran rebounded to some degree when the sanctions were eased in 2000. Before

the 1987 U.S. import ban, 16 percent of Iran's total exports, primarily oil, were shipped to the United States. Following the ban, this share dropped to about .1 percent. According to our analysis of U.S. trade data, Iran exported $2 billion in goods to the United States in 1987, about $10 million in 1988, and less than $1 million annually for most of the 1990s.[48] Further, 2 percent of Iran's imports were from the United States before the export ban in 1995; this dropped to almost zero after the ban. Total U.S. exports to Iran declined from about $282 million in 1995 to less than $400,000 in 1996. By 2000, however, total U.S.-Iran trade had increased to about $218 million, largely as a result of the relaxation of the sanctions in that year to allow for the purchase and import of Iranian carpets. In 2006, total U.S.-Iran trade was $247 million.

Our analysis of U.S. trade data indicates that both the export and import declines coincided with significant changes in the types of goods traded. For example, the top U.S. exports to Iran prior to the 1995 export ban were in the UN trade category "nuclear reactors, boilers, and machinery," while the top exports immediately following the ban were in the category "printed books and other informational materials." In 2006, the top U.S. exports to Iran were pharmaceuticals and tobacco products. The top U.S. import from Iran before the 1987 import ban was oil, whereas the top import immediately following the ban—and also in 2006—was carpets and other textile floor coverings.

**Iran's Overall Trade Has Grown Since 1987, and Its Trading Partners Are Diverse**

Despite the ban of Iranian imports to the United States in 1987 and the ban on U.S. exports to Iran in 1995, Iran's overall trade has grown.[49] From 1987 through 2006, Iran's exports grew from $8.5 billion to $70 billion, while Iran's imports grew from $7 billion to $46 billion (see fig. 2).[50] The annual real growth in Iran's exports between 1987 and 2006 was nearly 9 percent; however, the export growth rate between 2002 and 2006 was 19 percent, reflecting the steep rise in oil prices since 2002 (see fig. 2).[51] Iran's imports

---

[48]We are reporting U.S. trade statistics from the Department of Commerce in 2006 dollars.

[49]Oil-related exports average approximately 80 percent of Iran's total exports.

[50]We are reporting global trade data in constant 2006 dollars. This reflects the real value of Iran's trade. (See app. I for further explanation regarding the method used to adjust the nominal trade figures reported by the IMF into 2006 dollars).

[51]Growth rates are calculated using ordinary least square, which takes into account the value of trade for each year over the designated time period, calculates the slope of the best fitting regression line, and ensures that extreme changes in a single year do not give a distorted average growth rate for the period.

grew at an average annual rate of about 7 percent between 1987 and 2006. Iran's exports and imports both fluctuated during this period. For example, Iran's imports increased significantly following the end of the Iran-Iraq war in 1988, followed by steep declines from 1993 to 1994, following Iran's major currency devaluation (over 1,800 percent). Likewise, Iran's exports fluctuated. The growth in Iran's exports from 1989 to 1993 was followed by a general decline through 1998. Exports grew dramatically from 2002 to 2006, coinciding with the rise in the price of oil from $25 to $65 a barrel. The overall growth in Iran's trade from 1986 to 2006 demonstrates the limits of the U.S. trade ban to isolate Iran and pressure it to reduce its proliferation activities and support for terrorism.

**Figure 2: Iran's Total Exports and Imports, 1986-2006**




Source: GAO analysis of IMF Direction of Trade Statistics, May 2007.

Note: Iran's trade figures are provided in constant 2006 dollars using an alternative exchange rate developed by the World Bank (see app. I).

Figure 2 shows that in the year following the 1987 U.S. ban on Iranian imports, Iran's exports to the world did not decline. In fact, Iran's exports began growing dramatically in 1989. In the 2 years following the 1995 ban on U.S. exports to Iran, Iran's imports from the world grew, and have generally continued to grow. Iran has been able to readily replace the loss in U.S. trade through trade with other countries, and the total value of Iranian imports and exports has continued to grow largely uninterrupted.

In addition to the overall growth of Iran's trade since 1987, Iran has extensive global trade ties with Europe and the developing world. In particular, trade with Asian countries has nearly doubled since 1994.[52] Asian countries accounted for 30 percent of Iran's exports in 2006, up from about 16 percent in 1994. Iran's exports to China increased from about 1 percent in 1994 to about 13 percent in 2006. Japan and China were the top two recipients of exports from Iran, together accounting for more than one-quarter of Iran's exports in 2006 (see table 2).

**Table 2: Iran's Top Export Markets, by Country, 1994 and 2006**

Millions of 2006 dollars

| | 1994 | | | 2006 | |
|---|---|---|---|---|---|
| Country | Dollar amount | Share of Iran's total exports | Country | Dollar amount | Share of Iran's total exports |
| Japan | $5,632 | 15.1% | Japan | $9,941 | 14.2% |
| United States | 5,184 | 13.9 | China | 9,194 | 13.1 |
| United Kingdom | 3,427 | 9.2 | Turkey | 5,112 | 7.3 |
| Germany | 2,303 | 6.2 | Italy | 4,451 | 6.3 |
| Korea | 1,776 | 4.8 | Korea | 4,040 | 5.8 |
| Turkey | 1,656 | 4.4 | Netherlands | 3,263 | 4.6 |
| UAE | 1,493 | 4.0 | South Africa | 2,710 | 3.9 |
| Italy | 1,452 | 3.9 | France | 2,710 | 3.9 |
| Greece | 1,349 | 3.6 | Spain | 2,275 | 3.2 |
| Singapore | 1,344 | 3.6 | Greece | 2,066 | 2.9 |
| All other | 11,600 | 31.2 | All other | 24,420 | 34.8 |
| Total | $37,217 | 100.0 | Total | $70,181 | 100.0 |

Source: GAO analysis of IMF Direction of Trade Statistics, May 2007.

Note: Percentages may not add to 100 due to rounding.

Iran's growing trade with China has played a large role in replacing the declining share of EU countries' trade with Iran over the past decade and contributing to Iran's growing trade with Asian countries. In 2006, the EU

---

[52]In 1994, EU countries received one-third of Iran's exports and provided 50 percent of Iran's imports. At the same time, developing countries' share of trade with Iran has increased from 32 percent of Iran's exports in 1994 to 47 percent in 2006, and from 34 percent to 60 percent of Iran's imports over the same period, due in large part to growth of trade with China, India, Korea, and other Asian countries.

accounted for nearly one-quarter of Iran's exports to the world, down from 33 percent in 1994. Germany and the United Kingdom were part of this decline. From 1994 to 2006, Iran's exports to Germany declined from about 6 percent to less than 1 percent and from about 9 percent to less than 1 percent for the United Kingdom.

In 2006, Germany and China were Iran's largest providers of imports, accounting for 23 percent of Iran's imports. Although Germany has remained the largest supplier of imports to Iran for over a decade, its share of Iran's imports has declined from about 19 percent in 1994 to 12 percent in 2006, while Iran's imports from China increased from about 1 percent in 1994 to about 11 percent in 2006 (see table 3). Iran increased its imports from Middle East countries from about 8 percent to 13 percent, with UAE's share increasing from over 5 percent in 1994 to about 9 percent in 2006.

**Table 3: Iran's Top Import Suppliers, by Country, 1994 and 2006**

Millions of 2006 dollars

| | 1994 | | | 2006 | |
|---|---|---|---|---|---|
| Country | Dollar amount | Share of Iran's total imports | Country | Dollar amount | Share of Iran's total imports |
| Germany | $4,231 | 18.7% | Germany | $5,631 | 12.3% |
| Italy | 1,931 | 8.5 | China | 5,020 | 11.0 |
| Japan | 1,712 | 7.6 | UAE | 3,972 | 8.7 |
| Belguim-Luxembourg | 1,246 | 5.5 | Korea | 2,908 | 6.4 |
| UAE | 1,239 | 5.5 | France | 2,615 | 5.7 |
| United Kingdom | 1,041 | 4.6 | Italy | 2,537 | 5.6 |
| France | 917 | 4.1 | Russia | 1,680 | 3.7 |
| Azerbaijan | 751 | 3.3 | India | 1,616 | 3.5 |
| United States | 665 | 2.9 | Brazil | 1,315 | 2.9 |
| Korea | 612 | 2.7 | Japan | 1,287 | 2.8 |
| All other | 8,243 | 36.5 | All other | 17,041 | 37.4 |
| **Total** | **$22,588** | **100.0** | **Total** | **$45,624** | **100.0** |

Source: GAO analysis of IMF Direction of Trade Statistics, May 2007.

Note: Percentages may not add to 100 due to rounding.

A regional shift in Iran's import suppliers also took place between 1994 and 2006. The EU's share of Iran's imports from the world declined from 50.5 percent in 1994 to slightly over one-third of Iran's imports in 2006, while Asian countries' share has tripled, from 9 percent to 27 percent.

## Other Countries Continue to Provide Weapons and Nuclear Technology to Iran

Other countries' exports to Iran include dual-use or sensitive goods, such as arms, aircraft, and nuclear equipment and technology–goods that the U.S. statutorily prohibits from export to Iran. For example, according to UN trade data, Russia and Spain exported \$28.9 million of nuclear reactor parts from 2004 to 2005, over 89 percent from Russia. Iran also acquired spare parts to U.S.-made fighter jets, parts that were sold to other countries as surplus.[53] According to State officials, Chinese entities supply certain dual-use items to Iran, including some that U.S. officials believe could be used in support of Iran's WMD, ballistic missile, cruise missiles, or advanced conventional weapons programs. According to a CRS report[54] and the testimony from U.S. intelligence agencies, Iran is becoming self-sufficient in the production of ballistic missiles, largely with foreign help. Iran is also an important customer for Russia's weapons and civil nuclear technology. Additional information detailing Iran's purchases of weapons and nuclear technology is classified.

## Iran's Prominent Oil-Producing and Exporting Role Limits the Impact of Sanctions

Demand for Iranian crude oil, coupled with high oil prices, helps support Iran's economy and limits the effects of the U.S. trade ban. Iran is a prominent world oil producer, and its economy relies heavily on oil export revenues. Iran ranked fourth in terms of world oil production and exports in 2005, exporting about 2.6 million barrels of oil per day. Iran has the third largest proven oil reserves and the second largest reserves of natural gas worldwide,[55] according to the Oil and Gas Journal. Oil export revenues represent nearly 80 percent of Iran's total merchandise export earnings and accounted for about 19 percent of Iran's GDP in 2004.

---

[53]GAO, *Sales of Sensitive Military Property to the Public*, GAO-07-929R (Washington, D.C.: July 6, 2007).

[54]CRS, *Iran: U.S. Concerns and Policy Responses*, RL32048, Ken Katzman (Washington, D.C.: June 2007).

[55]According to the *Oil and Gas Journal*, Russia has the largest reserves of natural gas in the world.

In 2005, Japan and China accounted for 27 and 14 percent of Iran's crude oil exports, respectively, as shown in table 4.[56]

**Table 4: Top Iranian Crude Oil Export Destinations and Country Share, 2005**

| Country | Share of Iran's crude oil exports |
|---|---|
| Japan | 27.3% |
| China | 14.4 |
| Italy | 9.0 |
| South Korea | 8.9 |
| France | 7.0 |
| Turkey | 6.5 |
| South Africa | 6.1 |
| Greece | 5.0 |
| Spain | 4.7 |
| Philippines | 2.8 |
| All other countries | 8.2 |
| Total | 100.0 |

Source: GAO analysis of UN Trade Statistics, Iran's exports of oil (commodity grouping, HS2709), other countries reporting, 1989-2005.

Note: Percentages may not add to 100 due to rounding.

Given the strong demand for Iranian crude oil, bolstered by continuing support for Iran's non-oil exports, several private sector and U.S. economic experts stated that Iran's near-term growth prospects look favorable. However, a sharp drop in oil prices is a risk, and, according to the IMF, a further escalation of tensions associated with nuclear issues would adversely affect investment and growth.[57] Another concern is Iran's growing gasoline consumption, which is heavily subsidized by the government. According to the Department of Energy, Iran is the second largest importer of gasoline in the world after the United States and has a

---

[56]Japan's and China's Iranian crude oil imports comprised 12.6 and 11.1 percent, respectively, of these countries' total crude oil imports in 2005. Also of note, Turkey, South Africa, Greece, and the Philippines obtained more than 25 percent of their crude oil imports from Iran.

[57]To assess the impact of future oil prices on the Iranian economy, the IMF and Iranian officials constructed a medium term budget and economic model. Assuming the agreed upon budget reforms will be implemented, the economy can achieve an annual average growth rate of 4.5 percent over the 2007-2008 to 2011-2012 period and a fully financed budget if average long-term oil prices are $65 per barrel. If long-term oil prices fall below $55 per barrel, the budget and implied growth rates would not be sustainable.

shortage of refining capacity to produce gasoline.[58] In 2006, as part of the Iranian government's effort to reduce the subsidy on gasoline, the government raised the price of gasoline 25 percent and introduced "smart cards" in an effort to deter gas smuggling, reduce gasoline shortages, and improve the budget situation.[59] In addition, according to economic experts, Iran has benefited from strong growth in non-oil exports in recent years.[60] Non-oil exports increase the resiliency of Iran's economy and mitigate its vulnerability to falling oil prices, as well as provide jobs. As part of the government's policy to move away from crude oil exports, Iran is expanding its petrochemical production capacity and moving toward export of petrochemical products.[61]

## UN Established Multilateral Sanctions against Iran in 2006

Multilateral efforts targeting Iran resulted in the imposition of UN sanctions in 2006 as a result of concerns that Iran's nuclear program might contain a weapons-related component. In July 2006, UNSC resolution 1696 demanded that Iran suspend its uranium enrichment program by August 2006 or face possible sanctions.[62] Iran did not suspend these activities, and in December 2006, the UNSC unanimously approved UNSC resolution 1737.[63] This resolution prohibits UN member states from supplying Iran

---

[58]According to one energy expert, Iran is in the midst of a major country-wide refinery expansion and upgrade program, and there is also a push to process more of its expected condensate supplies and at least partially reduce its gasoline dependence.

[59]Smart cards were introduced as a means to limit drivers' consumption of subsidized gasoline.

[60]According to economic experts and Iranian country authorities, Iran has experienced a rapid increase in non-oil exports in the last decade. More recently, however, Iran has taken steps to diversify and promote non-oil exports. According to academic researchers, non-oil exports as a percentage of total exports were just over 3 percent in 1979. In 2000, the last year for which data are available, non-oil exports stood at almost 27 percent of total exports. In addition to petrochemicals, non-oil exports includes carpets, fresh and dried fruits, detergents and soaps, chemical products, ready-made clothes, metallic mineral ores, iron, and steel.

[61]Petrochemicals are a large group of chemicals derived from petroleum and natural gas, which are used for a variety of commercial purposes. The term petrochemicals refers to feedstocks—the chemicals used in petrochemical plants and the finished products made from feedstocks. Petrochemical products include common items such as plastics, soaps and detergents, solvents, fertilizers, rubbers, paints, drugs, rocket propellants, and synthetic fibers. Petrochemicals are also found in products as diverse as aspirin, luggage, surfboards, carpets, and phonograph records.

[62]S.C. Res. 1696, U.N. SCOR, 61st Sess., U.N. Doc. S/RES/1696 (2006).

[63]U.N. Doc. S/RES/1737.

with the nuclear and missile-related materials or technology specified in the resolution, as well as any other items that would contribute to proliferation-sensitive nuclear activities or the development of nuclear weapon delivery systems. In addition, UN member states are required to freeze the financial assets and other economic resources of individuals and entities designated by the UNSC as having ties to Iran's nuclear or ballistic missile programs. Further, the resolution provides for a ban on the provision of financial services related to the supply, sale, manufacture, transfer or use of prohibited items specified in the resolution. Iran was required to suspend its enrichment-related, reprocessing, and heavy water-related activities and cooperate fully with the IAEA by February 2007 or face possible additional sanctions.

The UNSC imposed further sanctions on Iran after the IAEA found that it did not suspend its enrichment or heavy water-related activities. In March 2007, the UNSC passed resolution 1747,[64] which banned arms exports from Iran; called upon all UN member states to exercise restraint in sales to Iran of certain categories of heavy conventional arms; designated additional individuals and entities, including Bank Sepah and those affiliated with the IRGC, as subject to the asset freeze requirement; and urged UN member states and international financial institutions not to enter into new commitments for financial assistance to the government of Iran, except for humanitarian and developmental purposes. Resolution 1747 reaffirmed Iran's obligation to suspend its enrichment, reprocessing, and heavy water-related activities and affirmed UNSC intentions to consider additional sanctions should Iran fail to comply by May 2007. The IAEA Director General confirmed Iran's failure to comply in its report of May 2007. State officials noted that this report triggered ongoing consultations among six countries regarding next steps, including the possible adoption of additional sanctions.[65]

UNSC resolution 1737 established a sanctions committee charged with monitoring implementation by UN member states of the measures imposed under the resolution, including by reviewing required country compliance reports. The State Department reported that, as of August 2007, the UNSC 1737 Sanctions Committee had received reports from 82

---

[64]U.N. Doc. S/RES/1747.

[65]These six countries are the United States, the United Kingdom, France, China, Russia, and Germany.

UN member countries (43 percent) on resolution 1737 and reports from 64 UN member countries (33 percent) on resolution 1747.

U.S. officials have stated that UN sanctions enhance the international credibility of U.S. sanctions and provide leverage to increase pressure on Iran. State officials have noted that multilateral sanctions enhance the potential effectiveness of U.S. sanctions. Since UN sanctions have been in place for about a year, it is difficult to assess their impact.

## Conclusion

For the past 20 years, U.S. sanctions against Iran have been an important element of U.S. policy to deter Iran from weapons proliferation and support for terrorism. Congress is considering additional sanctions targeting Iran. UN sanctions may also play an important role in pressuring Iran, but these sanctions have not yet been fully implemented. However, the overall impact of sanctions, and the extent to which these sanctions further U.S. objectives, is unclear. On the other hand, some evidence, such as foreign firms signing contracts to invest in Iran's energy sector and Iran's continued proliferation efforts, raise questions about the extent of the sanctions' impact. Moreover, U.S. agencies do not systematically collect information on the direct results of the multiple sanctions they implement, or their data do not provide specific information on Iran sanctions. These agencies have not conducted a baseline assessment of the impact of the sanctions. Collecting data on the results of multiple sanctions against Iran and conducting an overall baseline assessment is challenging, given all the agencies involved and the complexities of collecting some of the necessary information. However, without an overall assessment of the sanctions' impact and subsequent reviews on a periodic basis, the Congress and the Administration will continue to lack important information for developing effective strategies to influence Iran's behavior.

## Matter for Congressional Consideration

Congress and the Administration need a better understanding of the impact of U.S. sanctions against Iran and the extent to which sanctions are achieving U.S. foreign policy objectives. The Administration needs to take a series of actions to first improve the disparate data collected on Iran sanctions and then establish baseline information for the continuous monitoring and periodic reporting on what U.S. sanctions have achieved. Accordingly, we recommend that Congress consider requiring the NSC, in collaboration with the Departments of State, the Treasury, Energy, and Commerce; the intelligence community; and U.S. enforcement agencies to take the following actions:

(1) collect, analyze, and improve data on U.S. agencies' actions to enforce sanctions against Iran and complete an overall baseline assessment of the impact and use of U.S. sanctions, including factors that impair or strengthen them. This assessment should collect information, to the extent feasible, from various U.S. agencies and consider factors such as, but not limited to, the following:

- the number of goods seized, penalties imposed, and convictions obtained under the trade ban (Homeland Security, Treasury, Commerce, Justice);

- sensitive items diverted to Iran through transshipment points (Commerce and the intelligence community);

- the extent to which repeat foreign violators of Iran-specific sanctions laws have ended their sales of sensitive items to Iran (State and intelligence community);

- the amount of assets frozen resulting from financial sanctions (Treasury and the intelligence community); and

- the extent of delays in foreign investment in Iran's energy sector (State, Energy, and the intelligence community).

(2) develop a framework for assessing the ongoing impact of U.S. sanctions, taking into account any data gaps that were identified as part of the baseline assessment , and the contribution of multilateral sanctions.

(3) report periodically to the Congress on the impact of sanctions against Iran in achieving U.S. foreign policy objectives.

## Agency Comments and Our Evaluation

We provided a draft of this report to the Departments of State, the Treasury, Commerce, Defense, Energy, Justice, and Homeland Security. We also provided a draft to the NSC and the Office of the Director of National Intelligence (ODNI). The Department of the Treasury provided a formal response emphasizing that, as a result of financial pressure, Iran is experiencing increasing isolation from the global community. The department's response also states that Iran continues to pursue nuclear capabilities and ballistic missile technology and to fund terrorism. This comment reinforces our finding that the overall impact of sanctions is unclear. In addition, the Treasury noted its assessments of the effectiveness of financial sanctions. We revised the report to recognize that Treasury assesses the impact of financial sanctions but maintain that

an overall impact assessment of all U.S. sanctions has not been undertaken. Finally, Treasury commented that the amount of assets blocked under available financial sanctions is not a measure of the program's value. The department also noted that other sanction effects, such as the inability of designated parties to use the U.S. financial system or the reputational harm that stems from a designation, can often be the primary way sanctions have an international impact. We have noted the broad positive benefits of sanctions in our report. Treasury also told us in an earlier communication that it did not disagree with the part of our Matter for Congressional Consideration calling for an assessment of assets frozen using these financial tools. Treasury's letter can be found in appendix V.

The Departments of State, the Treasury, Commerce, and Energy provided written technical comments. We incorporated these comments into the report as appropriate. The Department of Commerce submitted its technical comments in a letter that is included in appendix VI. The NSC provided brief oral comments and ODNI provided a classified response; we considered this information and revised the report as appropriate. The Departments of Defense, Justice, and Homeland Security provided no comments on the draft report, though Homeland Security supported the part of our Matter for Congressional Consideration that specifically involves the department.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to other congressional offices as well as the Departments of State, the Treasury, Commerce, Defense, Energy, Justice, and Homeland Security. Further, we will provide copies to the NSC and the Office of the Director of National Intelligence. We will also make copies available to others on request. In addition, this report will be available on GAO's Web site at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8979 or at christoffj@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Other contacts and major contributors are listed in appendix VII.

Sincerely yours,

Joseph A. Christoff
Director, International Affairs and Trade

# Appendix I: Objectives, Scope, and Methodology

The Ranking Member of the House Subcommittee on National Security and Foreign Affairs of the Committee on Oversight and Governmental Reform requested that we review U.S. sanctions involving Iran. This report addresses (1) U.S. sanctions targeting Iran and their implementation, (2) the reported impact of the sanctions, and (3) factors that limit the ability of U.S. sanctions to reduce Iran's proliferation and terrorism-related activities.

To identify U.S. sanctions targeting Iran and determine the U.S. efforts to implement and assess sanctions against Iran, we first identified, reviewed, and summarized U.S. executive orders and laws that establish sanctions and are targeted at Iran. While we focused on Iran-specific sanctions, we also reviewed targeted financial sanctions that address proliferation and terrorism concerns and can be used against any party, including Iran. In addition, we discussed the sanctions with officials from the Departments of State, Treasury, Commerce, Defense, Energy, Homeland Security (DHS), and Justice, as well as the Central Intelligence Agency.

We submitted several requests for specific data to help illustrate U.S. trade ban implementation and enforcement efforts; however, in many cases agencies were not able to fully answer our requests. Due to limitations in how agencies collect and organize their information, we were unable to collect complete data on export licenses issued by Treasury, or Customs and Border Protection seizures, Federal Bureau of Investigation (FBI) or Immigration and Customs Enforcement investigations, or Justice criminal convictions related to sanctions against Iran. We could not compile comprehensive data on the number of ongoing FBI investigations because the FBI considers such data sensitive. We were able to collect data on the extent of civil penalties imposed by Treasury, which we assessed to be sufficiently reliable for our purposes of showing the number of Iran-specific sanction violations since 2003. We were also able to collect data on the number of post-shipment verification checks conducted by Commerce in the past 5 years, which GAO has previously assessed as reliable.

To determine the use of Iran-specific laws to impose sanctions, we reviewed and compiled publicly available information on the Department of State's Web site (www.state.gov/t/isn/c15231.htm), reviewed relevant *Federal Register* notices, and additional information that was declassified. We determined that such data are sufficiently reliable for our purposes. State officials explained that they do not collect data on direct sanction results, emphasizing that such data falls within the purview of the intelligence community. Regarding the targeted financial sanctions, we

were able to collect data on Iran-related designations made under the
nonproliferation sanctions, which we determined to be sufficiently
reliable. However, Treasury could not provide data on designations made
under the antiterrorism sanctions or specify the amount of assets frozen
under either set of financial sanctions.

To obtain U.S. government views on the impact of sanctions on Iran, we
collected publicly available testimonies, speeches, and other remarks
made by U.S. officials from the Departments of State, Commerce,
Treasury, and DHS from March 2006 through April 2007. We reviewed
these documents for statements regarding the U.S. government's position
on the impacts of sanctions on Iran, factors that might lessen their impact,
UN sanctions, and other issues identified as key to the U.S. foreign policy
strategy for Iran. We also interviewed U.S. officials as well as a
judgmentally selected group of experts from think tanks and universities
and reviewed numerous scholarly articles and testimonies to gain
additional perspectives on the impact of sanctions on Iran. After reviewing
the literature on Iran sanctions and conducting a Web-based search of
universities and other institutions with research projects or issue areas
focusing on U.S. policies toward Iran, we identified a large field of experts.
To balance our selection of experts to interview, we identified the
institutions with which they were affiliated. These 39 institutions
represented a wide variety of perspectives on U.S. foreign policy and,
within them, we identified 56 scholars who have written papers and given
presentations on Iran sanctions. We then selected six prominent scholars,
each from an institution having a different political perspective, and with
multiple publications on Iran sanctions. After reviewing their publications
and speeches, we interviewed them on a set of questions concerning the
impact of unilateral and UN sanctions against Iran, factors that might
hinder impact, and other issues identified as key to U.S. foreign policy
strategy for Iran.

To obtain information on the impact of sanctions in deterring investment
in Iran's energy sector, FACTS Global Energy provided us with a list of
recent major agreements between Iran and foreign firms and governments.
FACTS Global Energy explained, in response to our questions concerning
its methodology and the value of the contracts, that these are publicly
reported figures, though the actual worth of the contract may be slightly
higher or lower. While FACTS reports that some contracts are legally
binding, Iran has been involved in several instances in which these
contracts have not been fulfilled. We also substantiated many of these
reported agreements based on our review of a variety of sources, including
expert reports (Congressional Research Service [CRS], Economist

Intelligence, Global Insight, Energy Information Administration); scholarly articles; testimony of senior U.S. officials; and other experts. Based on our interviews and checks, we determine the data were sufficiently reliable for the purposes of indicating the estimated value of publicly announced binding contracts between foreign companies and Iran.

To determine the major factors that affect U.S. sanctions ability to influence Iran's behavior, we reviewed numerous scholarly articles, professional economists' publications, official U.S. documents, and testimonies of officials and experts. In addition, we read open-source documents, including newspaper and journal articles, both national and global. We also interviewed a selected group of experts on Iran, met with agency officials, and attended conferences on the subject. In addition, we collected and analyzed data from several widely used databases of international trade statistics, including International Monetary Fund (IMF) Direction of Trade Statistics and International Financial Statistics National Income database, the UN trade database, U.S. Department of Commerce Trade Statistics, Department of Energy statistics, and United Nations Conference on Trade and Development Foreign Direct Investment statistics. We also reviewed and analyzed proprietary private sector data from an internationally recognized consultant on Iran's energy sector. We have determined that these data are sufficiently reliable for the purposes for which they were used in this report.

To determine the effect of U.S. sanctions on U.S. trade with Iran, we used 1986 to 2006 U.S. trade statistics from the Department of Commerce, Bureau of the Census Web-based database. We converted these data from nominal dollars to 2006 dollars using Department of Commerce, Bureau of Economic Analysis U.S. export and import commodity price deflators from the online database. We also analyzed these data at the 2-digit commodity level to determine what goods the United States exported to and imported from Iran in various years and the relative importance of U.S. trade to Iran for various years encompassing the imposition of the trade bans.

We used IMF Direction of Trade Statistics (May 2007 CD ROM) to analyze trends in Iran's trade, exports and imports, as well as Iran's trade with the world by major country groupings and individual partners, from 1986 to 2006.[1] We determined that the U.S. commodity price deflators noted above

[1]According to the IMF, data are collected from Iran's trade partners as well as from Iran. IMF staff use their best judgment to determine bilateral and global trade flows.

were not appropriate deflators for the purpose of analyzing Iran's global
trade. Thus, we converted the annual export and import data, which IMF
reports in U.S. dollars, into 2006 dollars using the following methodology.
We converted annual dollar trade flows to Iranian rials using an exchange
rate conversion factor from the *World Bank's World Development
Indicators Online.* This conversion factor, known as the DEC alternative
conversion factor, is, as a rule, the official exchange rate reported in the
IMF's *International Financial Statistics.* This alternative conversion
factor differs from the official rate when the official exchange rate is
judged to diverge by an exceptionally large margin from the rate actually
applied in international transactions.[2] In such cases, it employs a method
known as the Atlas method to average exchange rates for a given year and
the two preceding years, adjusted for differenced in rates of inflation
between the country and a specified groups of major trading countries.[3]
For 1991 and 1992, for which the World Bank does not publish a DEC
alternative conversion factor for Iran, we constructed conversion rates by
applying rates of change exhibited in a purchasing power parity
conversion rate for Iran, from the *World Development Indicators Online,*
from 1990 to1993.

As Iran does not publish separate price indices for exports and imports, in
their place we use the Iranian gross domestic product (GDP) deflator from
the World Bank's *World Development Indicators Online* to convert trade
flows into 2006 rials. We then use the official 2006 exchange rate (which
happens to be the same as the DEC conversion factor) to express these
trade flows in constant 2006 dollars. This methodology preserves the real
growth rates computed in real Iranian rials. Thus, it reflects how Iran may
view its global trade when adjusted for exchange rate anomalies and price
inflation.

We obtained general information on other countries' trade in sensitive
goods (arms, aircraft, and nuclear equipment and technology) from
publicly available official sources, including State Department reports and
testimonies, Department of Justice data, the unclassified National

---

[2]According to the World Bank, during most of 1986 to 2006, Iran's official exchange rate did
not reflect the actual market exchange rate (the official exchange rate and the market
exchange rate do coincide beginning in 2003).

[3]These major trading countries include the G-5 countries (France, Germany, Japan, the
United Kingdom, and the United States) through 2000. From 2001, these countries include
the Euro Zone, Japan, the United Kingdom, and the United States.

Intelligence Estimate, and CRS reports and testimonies. To identify
countries and the value of their exports to Iran of possibly sensitive items,
we used the global shipping company DHL's online interactive product
classification tool to identify Harmonized System (HS) trade codes in the
export control category 0: Nuclear materials, facilities, equipment and
miscellaneous items. We then used the UN trade database to identify
countries and their reported value of exports to Iran for these items.

The Department of Energy's Energy Information Administration (EIA)
provided data on Iran's position in world oil and gas reserves and
production, gasoline consumption, and export earnings.[4] We calculated
Iran's oil export revenue as a percent of Iran's GDP using reporting
countries' crude oil import statistics from Iran[5] and GDP data from the
most currently available IMF International Financial Statistics CD ROM
(December 2006). To determine top Iranian crude oil export destinations
and respective country shares, we used UN trade statistics at the 2-digit
commodity level (HS2709), for the period 1989 to 2005, and ranked
countries by dollar value and country share of crude oil exports from Iran.
For the top recipients of Iran's crude oil, we also calculated each country's
crude oil imports from Iran as a percent of that country's total crude oil
imports to demonstrate the relative importance of Iranian crude oil to
these countries. We also used 2-digit commodity level (HS2710 and
HS2711) UN trade statistics to determine the major suppliers of refined
petroleum products to Iran.

We based our assessment of Iran's near-term growth prospects on a
review of economists' reports on Iran, including IMF's 2007 Article IV
consultation with Iran and country reports on Iran from Economists
Intelligence Unit and Global Insight. We also utilized proprietary
information obtained from FACTS Global Energy regarding current
developments in Iran's energy sector. We supplemented our review with
reports on Iran from other official sources, including CRS and the
Department of Energy's EIA.

---

[4]EIA calculates net export revenues as the weighted average spot price of Iranian crude oil
multiplied by Iran's' net oil exports multiplied by number of days in the year. EIA calculates
Iran's net oil exports as Iran's total liquids production (production of crude oil and
condensates. natural gas plant liquids. and refinery processing gain or loss) less Iran's total
petroleum consumption.

[5]EIA provided the reporting countries import statistics of their petroleum imports from
Iran. These data are comparable to UN trade statistics data for the same 2-digit petroleum
commodity breakdown. 2709.

To determine the development and current status of Iran's nuclear
program, we reviewed documents from the International Atomic Energy
Agency, an independent agency affiliated with the United Nations. We also
reviewed reports by the CRS specific to Iran's nuclear program and
proliferation concerns. Finally, we reviewed the November 2007
unclassified National Intelligence Estimate on Iran. We also reviewed State
and other documents to examine Iran's broad proliferation efforts. To
identify continued behavior by the government of Iran that establishes
continued support for terrorism, we reviewed the Department of State's
2006 Country Report on Terrorism, other unclassified documentation
(such as Department of State testimonies and CRS reports) as well as
classified information.

To trace the development of UN sanctions against Iran for its efforts to
enrich uranium and possibly develop nuclear weapon capability, we
reviewed UN Security Council (UNSC) resolutions 1696 (2006), 1737
(2006), and 1747 (2007) and reports and documents from the UNSC 1737
Sanctions Committee. We also reviewed documentation from the
Department of State and CRS. The State Department's Bureau for
International Organization Affairs declined to meet with us, which
precluded direct contact with the United Nations. The Bureau stated that
negotiations in the UNSC were ongoing at the time.

We conducted our review from November 2006 to November 2007 in
accordance with generally accepted government auditing standards.

# Appendix II: U.S. and UN Sanctions Targeting Iran

**Figure 3: Establishment of U.S. and UN Sanctions Targeting Iran**

| U.S. government sanctions | | International Atomic Energy Agency (IAEA) and UN Security Council (UNSC) actions |
|---|---|---|
| • Iran designated "state sponsor of terrorism." | 1984 | |
| | 1985 | |
| | 1986 | |
| • Executive Order 12613 – U.S. imports of Iranian goods banned. | 1987 | |
| | 1988 | |
| | 1989 | |
| | 1990 | |
| | 1991 | |
| • Iran - Iraq Arms Nonproliferation Act of 1992 – sanctions against foreign parties engaging in proliferation activities (advanced conventional weapons) that contribute to Iran's efforts in this area. | 1992 | |
| | 1993 | |
| | 1994 | |
| • Executive Order 12957 – restrictions on U.S. involvement with the development of Iran's petroleum resources.<br>• Executive Order 12959 – ban on U.S. imports of Iranian goods, U.S. exports to Iran, and U.S. investment in Iran. | 1995 | |
| • Iran-Libya Sanctions Act of 1996 (ILSA) – sanctions against parties that invest $40 million or more in the development of Iran's petroleum resources. After the first year, sanctions shall be applied to nationals of nonwaiver countries who invest $20 million or more. | 1996 | |
| • Executive Order 13059 – consolidation of prior executive orders, prohibition on trade and investment activities with Iran. | 1997 | |
| | 1998 | |
| | 1999 | |
| • Iran Nonproliferation Act of 2000 – sanctions against foreign persons transferring controlled goods (nuclear, biological, or chemical weapons, or ballistic or cruise missile systems) to Iran.<br>• Lifting of restrictions on certain (1) U.S. imports of Iranian goods such as carpets, dried fruits, and nuts; and (2) U.S. exports to Iran such as food, agricultural commodities and medical products. | 2000 | |
| | 2001 | |
| | 2002 | |
| | 2003 | • June: IAEA states that Iran failed to report certain nuclear materials and activities and requests cooperation from Iran. |
| | 2004 | • November: under the Paris Agreement with the European Union-3 (Britain, France, and Germany), Iran agrees to suspend enrichment in exchange for renewed trade talks and other aid. |
| • Iran Nonproliferation Amendments Act of 2005 – amended Iran Nonproliferation Act of 2000 to include Syria (renamed Iran and Syria Nonproliferation Act). | 2005 | • August: Iran breaks the seals on its uranium conversion facility at Isfahan; IAEA calls on Iran to suspend enrichment-related activities. |
| • Iran Freedom Support Act – amended ILSA to (1) add nuclear, chemical, biological, advanced conventional weapons as sanctionable, (2) remove Libya from ILSA (renamed Iran Sanctions Act).<br>• North Korea Nonproliferation Act of 2006 – amended Iran and Syria Nonproliferation Act to include North Korea (renamed Iran, North Korea, Syria Nonproliferation Act). | 2006 | • January: Iran resumes enrichment activities.<br>• February: IAEA votes for a resolution to report Iran to the UNSC.<br>• July: UNSC resolution 1696 calls for Iran to suspend all uranium enrichment related and reprocessing activities.<br>• December: UNSC resolution 1737 requires Iran to suspend its uranium enrichment and reprocessing activities as requested under resolution 1696 and decides that all states take measures to prevent the supply, sales or transfer of all items, goods and technology, which could contribute to Iran's enrichment-related activities or the development of nuclear weapon delivery systems. |
| | 2007 | • March: UNSC resolution 1747 requires Iran to suspend enrichment by May 2007. This resolution widened the scope of the previous resolution by banning Iran's arms exports and freezing the assets and restricting travel of additional individuals engaged in the country's proliferation-sensitive nuclear activities.<br>• May: IAEA reports that Iran has not suspended its uranium enrichment activities and has continued operation of its pilot fuel enrichment plant. |

Source: GAO analysis of U.S. laws and executive orders, as well as UN documents, including UN Security Council resolutions.

# Appendix III: Sanctions Imposed Under the Law Currently Known as the Iran, North Korea, and Syria Nonproliferation Act

**Table 5: Imposition of Sanctions under the Iran Nonproliferation Act (INPA) and the Iran and Syria Nonproliferation Act (ISNA), 2001-2007, Iran-Related Cases[a]**

| Country of sanctioned parties | Number of sanctioned parties |
|---|---|
| *Iran Nonproliferation Act of 2000* | |
| Sanctions imposed against foreign parties from 2001 to 2006 | |
| China | 46[b] |
| North Korea | 9 |
| India | 6 |
| Russia | 5 |
| Armenia | 2 |
| Moldova | 2 |
| Macedonia | 2 |
| Belarus | 2 |
| Taiwan | 2 |
| All others | 5 |
| Total | 81 |
| *Iran and Syria Nonproliferation Act* | |
| Sanctions imposed against foreign parties in 2006 to 2007 | |
| Syria | 8 |
| China | 6 |
| Sudan | 3 |
| Malaysia | 3 |
| Russia | 2 |
| Iraq | 2 |
| Mexico | 2 |
| Pakistan | 2 |
| All others | 2 |
| Total | 30 |
| *Both Acts Combined* | |
| Sanctions imposed against foreign parties, 2001 to 2007 | |
| China | 52 |
| North Korea | 9 |
| Syria | 8 |
| Russia | 7 |
| India | 6 |
| Malaysia | 3 |

**Appendix III: Sanctions Imposed Under the Law Currently Known as the Iran, North Korea, and Syria Nonproliferation Act**

| Country of sanctioned parties | Number of sanctioned parties |
|---|---:|
| Sudan | 3 |
| All others | 23 |
| Total | 111 |

Sources: http://www.state.gov/t/isn/c15231.htm, *Federal Register*.

*The Iran Nonproliferation Act of 2000 (INPA) was amended to include Syria in 2005 (the Iran and Syria Nonproliferation Act, or ISNA), and North Korea in 2006, and is now known as the Iran, North Korea, and Syria Nonproliferation Act (INKSNA).

†For the total number of sanctions involving parties from specific countries, in particular China, the total number of sanction cases includes multiple instances of sanctions that were imposed against the same party.

# Appendix IV: Potential Investors in Iran's Energy Sector

The following table illustrates various major agreements between Iran and foreign firms and governments in Iran's energy sector.[1] The table is not intended to imply a complete or thorough listing of foreign deals. Because several of these deals are in progress, we are making the conservative assumption that these agreements, at a minimum, express commercial interest between Iran and the foreign party to trade, finance or underwrite a project in Iran's energy sector.

**Table 6: List of Recent Major Agreements between Iran and Foreign Investors in Iran's Energy Sector**

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| March 2003 | Binding Contract | France, Technip-Collexip | Construction of an ethylene cracker on Kharg Island. (Petrochemical) | $232 million | Completed |
| May 2003 | Binding Contract | South Korea, Daelim | Engineering, Procurement and Construction (EPC) contract for 645,000 ton/year (t/y) capacity ethyl-benzene plant in Assaluyeh. (Petrochemical) | $600 million | To be completed in 2008 |
| January 2004 | Binding Contract | Japan, INPEX | Development of the Azadegan oil field. (Oil) | $4.45 billion | INPEX withdrew in 2006 from the project due to the political environment in Iran. National Iran Oil Company (NIOC) has since offered this project to domestic companies |
| April 2004 | Binding Contract | Japan, consortium consisting of Japan's Toyo Engineering Corp. and Chiyoda Corp | Construction of a 670,000 t/y ammonia and urea plant in Assaluyeh. (Petrochemical) | $220 million | To be completed in late 2007 |

[1]All contracts are partner arrangements between Iran and the foreign party. However, we have not listed the Iranian partner. For example, both the first and second contracts are with National Iranian Petrochemical Company (NIPC). For the remaining contracts, other Iranian partners include, for example, National Iran Oil Company (NIOC), National Iranian Gas Company (NIGC), National Iranian Oil Refining and Distribution Company (NIORDC), among others. Also, consortiums are partnerships with Iranian companies.

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| August 2004 | Binding Contract | Brazil, Petrobras | Exploration and Development Contract for the Tusan block. If commercial volumes of hydrocarbons are found, Petrobras will be awarded the contract for the development of the field(s). (Oil) | $34 million | Near completion |
| January 2005 | Binding Contract | Consortium: South Korea, Daelim; UK's SembCorp Simon-Carves | EPC Contract for a 300,000 t/y LDPE at the Amir Kabir petrochemical plant. (Petrochemical) | $242 million | To be completed in 2008 |
| March 2005 | Binding Contract | Thailand, PTT Exploration and Production (PTTEP) | Exploration and development contract for the Saveh block. If commercial volumes of hydrocarbons are found, PTTEP will invest up to $39 million for further appraisals of the block. Upon completion of exploration for commercial hydrocarbon reserves, PTTEP will be awarded the contract for the development of the field(s). (Oil) | $5.4 million (Minimum exploration contract) | In progress |
| May 2005 | Binding Contract | China, China National Petroleum Corporation (CNPC) | Exploration and development contract for the Kuhdasht Block. If commercial volumes of hydrocarbons are found, CNPC will invest up to $51 million for further appraisals of the block. Upon completion of exploration for commercial hydrocarbon reserves, CNPC will be awarded the contract for the development of the field(s). (Oil/Gas) | $18 million (Minimum exploration contract) | In progress |
| July 2005 | Binding Contract | Consortium: UK, Costain Oil, UK, Gas and Process; Spain, Dragados | EPC of Bid Blonad 2 gas processing plant. (Gas) | $1.42 billion | To be completed sometime in 2010-2011 |

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| July 2005 | Binding Contract | Consortium: South Korea, Hyundai Engineering and Construction Co; German, Linde | EPC of a 1.2 million t/y ethylene plant. (Petrochemical) | $1.3 billion | To be completed sometime in 2009-2010 |
| August 2005 | Binding Contract | Italy, Tecnimont | Construction of a 300,000 t/y LDPE plant at Sanadaj (Kordestan). (Petrochemical) | $292 million | To be completed sometime in 2009-2010 |
| November 2005 | Binding Contract | Italy, Tecnimont | Construction of 300,000 t/y LLDPE/HDPE plant (Petrochemical). | Total contracts worth: $536 million | To be completed in 2010 |
|  | Binding Contract | Italy, Tecnimont | Construction of 30,000 t/y Butene-1 plant at Khorramabad (Lorestan). (Petrochemical) |  |  |
| November 2005 | Binding Contract | Japan, Mitsui Engineering & Shipbuilding Co. (MES) | EPC contract for 300,000 t/y HDPE petrochemical plant in Ilam province. (Petrochemical) | $288 million | To be completed in 2010 |
| May 2006 | Binding Contract | German ABB Lummus | EPC contract for the expansion of Abadan oil refinery to increase gasoline production. (Oil refining) | $478 million | To be completed sometime in 2009-2010 |
| June 2006 | Binding Contract | China, China Petroleum & Chemical Corporation (Sinopec) | Exploration and development contract for the Garmsar Block. If commercial volumes of hydrocarbons are found, Sinopec will be awarded the contract for the development of field(s). | $19.6 million (Minimum investment) | In progress |
| August 2006 | Binding Contract | China, China Petroleum & Chemical Corporation (Sinopec) | Upgrade 8 existing units of the Arak refinery in the Markazi province and add 14 more units to increase gasoline production. | $1.6 billion | To be completed in 2010 |

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| September 2006 | Binding Contract | Norway, Norsk Hydro ASA | Exploration and development contract for the Khorramabad Block. If commercial volumes of hydrocarbons are found, Norsk Hydro will invest up to $58 million for further appraisals of the block. Upon completion of exploration for commercial hydrocarbons reserves Norsk Hydro will be awarded the contract for the development of the field(s). (Oil) | $49 million (Minimum exploration contract) | In progress |
| October 2006 | Binding Contract | Italy, IRASCO s.r.l, subsidiary of Iran International Engineering Company (IRITEC) | Kharg and Bahregansar associated gas gathering & Natural Gas Liquids (NGL) recovery project. (Kharg NGL project) (Natural Gas) | $1.6 billion | To be completed in 2010 |
| November 2006 | Nonbinding Memorandum of Understanding (MOU) | Australia, Liquefied Natural Gas Limited (LNG Ltd) | Development of Salkh (Qeshm 4) and Southern Gashu gas fields and the construction of a 3.4 mtpa LNG plant (Qeshm LNG) on Qeshm Island. (Natural gas) | This is a preliminary agreement, no details available. | Under negotiations |
| November 2006 | Binding Contract | Consortium: German, ABB Lummus | EPC Contract for increasing of gasoline production in Bandar Abbas oil refinery. (Oil refining) | $442 million | To be completed in 2010 |
| December 2006 | Nonbinding MOU | China, China National Offshore Oil Corporation (CNOOC) | Development of the North Pars gas field for LNG Exports. (Natural Gas) | $16 billion | Under negotiations |
| December 2006 | Binding contract | China, Sinopec | EPC contract for gasoline production unit at Tabriz refinery. (Oil refining) | $ 144.7 million . | To be completed in 2009 |

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|---|---|---|---|---|---|
| December 2006 | Nonbinding MOU | Iran and Belarus (Inter government agreements) | Development of the Jofeir oil field. (Oil) | NIOC announced negotiations with Belarusian party is near completion and the contract is expected to be signed in July 2007. | Under negotiations |
| January 2007 | Nonbinding MOU | Malaysia, SKS Ventures | Development of the Golshan and the Ferdos gas fields for LNG exports. (Natural Gas) | $16 billion | Under negotiations |
| February 2007 | Nonbinding contract | Netherlands, Shell; Spain, Repsol | Development of Phases 13 and 14 (Persian LNG). Shell (25%), Repsol (25%). (Natural Gas) | $4.3 billion | Contract effectiveness is subject to Persian LNG final investment decision (FID). Start-up depends on project FID |
| February 2007 | Binding contract | Korea, Daelim | Agreement on the construction of LNG and LPG storage tanks for the Iran LNG plant and the construction of port and dock facilities. (Natural Gas) | $500 million | To be completed in 2014-2015 |
| March 2007 | Binding contract | Consortium: South Korea, Daelim; German, Lurgi and UHDE | EPC contract for upgrading the Isfahan oil refinery. (Oil refining) | $1.72 billion | To be completed in 2012 |
| April 2007 | Binding contract | Indonesia, Star Petrogas | EPC contract for Bandar Abbas condensate splitter. (Oil refining) | Approximate worth of contract at $2 billion | To be completed in 2010 |
| May 2007 | Nonbinding Heads of Agreement (HOA) | Austria, OMV | OMV has 20% share in the development of South Pars Phase 12 and holds 10% share in Iran LNG Project. OMV also agreed to buy 2.2 mt LNG from Iran LNG Project. (Natural Gas) | Early planning stages, no details | Under negotiations |
| May 2007 | Nonbinding MOU | Iran and Oman (inter government agreement) | Construction of a 670,000 t/y ammonia and urea plant in Assaluyeh. (Petrochemical) | This is a preliminary agreement, no details available. | Under negotiations |

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| May 2007 | Nonbinding MOU | Iran and Oman (inter government agreement) | Construction of a gas pipeline from Iran to Oman and the cooperation in LNG production and development of Hengam gas field. (Natural gas) | This is a preliminary agreement, no details available. | Under negotiations |
| May 2007 | Nonbinding MOU | Iran and Iraq (inter government agreement) | Construction of an oil pipeline. (Oil infrastructure) | This is a preliminary agreement, no details available. | Under negotiations |

Source: FACTS Global Energy

Note: Contract worth stated in this list only constitutes those contracts signed with foreign companies. For exploration and development contracts, the contract value (minimum-maximum range applies only for exploration activities. Should oil and gas reserves be found, new contracts for field development are required to be signed. Heads of Agreement (HOA) and Memoranda of Understanding (MOU) are not normally binding or completed deals. These are typically preliminary stage agreements with the intention to create a legally binding contract and are used to identify the principal elements of the deal. In general, typical preliminary stages can include Letter of Indication or Letter of Interest, MOU, Letter of Intent, HOA, and Confirmation of Intent. In the table, a binding contract means that it is a done deal and is legally binding. Nonbinding deals such as MOUs and HOAs and preliminary agreements and are generally beyond the stage of a Letter of Interest (i.e., expressed commercial interest to trade, finance or underwrite the project). We did not independently review the contracts.

# Appendix V: Comments from the Department of the Treasury

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



DEPARTMENT OF THE TREASURY
WASHINGTON D.C.

December 6, 2007

Mr. Joseph Christoff
Director, International Affairs and Trade
Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Christoff:

Thank you for the opportunity to review the draft Government Accountability Office (GAO) report entitled, *Iran Sanctions — Impact in Furthering U.S. Objectives Is Unclear and Should Be Reviewed* (GAO-08-58). Please find attached recommended clarifications to the draft report.

As a result of the collective efforts of the international community and financial leaders to apply financial pressure on Iran, the country is experiencing increasing economic, financial, and political isolation from the global community.

Iran remains a danger to the security of people worldwide. Iran continues to pursue nuclear capabilities and ballistic missile technology and sends hundreds of millions of dollars each year to deadly terrorist groups — all the while attempting to mask these activities through deceptive financial practices. In additional to the comprehensive country sanctions maintained against Iran, the Treasury Department, in cooperation with its partners in the interagency community, has implemented targeted financial measures aimed at altering this illicit conduct emanating from Iran. The U.S. Government's efforts have been reinforced by two unanimous United Nations Security Council Resolutions, 1737 and 1747, targeting Iran's nuclear and ballistic missile pursuits.

A key component in our efforts to sustain the pressure on Iran has been the voluntary response we have seen from the private sector, thereby reinforcing governmental actions. We have shared information with the private sector about how Iran employs deceptive financial practices to send money to terrorist groups and pursue nuclear capabilities and missile programs. Further, we have notified private financial institutions about Iran's attempts to lure reputable banks unwittingly into those activities. As they become aware of this misconduct, financial institutions across the globe are refusing to deal with Iran in any currency, determining the business is too risky.

As a further result of this international pressure, foreign-based branches and subsidiaries of Iran's state-owned banks are increasingly isolated, threatening their viability. The OECD has

Appendix V: Comments from the Department of the Treasury

also taken notice and increased Iran's risk classification for the likelihood that the country will pay its external debts to its second-worst rating, thereby increasing the cost of financing for Iranian companies and invoking a devastating reduction in the foreign investment Iran needs to develop its vast oil reserves.

The report drafted by the GAO specifically recommends that the National Security Council, in collaboration with the Departments of State, Treasury, Energy and Commerce, the intelligence community, and U.S. enforcement agencies collect, analyze, and improve data on U.S. agencies' actions to enforce sanctions against Iran and develop a baseline assessment of their impact. The Treasury Department continues to assess the effectiveness of its authorities that have been used against Iranian entities or Iranian interests. These assessments, which are not publicly available, are designed to determine the specific impact of Treasury actions and their success in meeting policy goals.

As a part of this larger recommendation, the GAO also recommends the Treasury Department consider the amount of Iranian assets frozen pursuant to Treasury's terrorism and WMD proliferation sanctions programs as a component of this assessment. The Iranian sanctions program is primarily a rejection-based program, with over 25,000 rejected transactions valued at over $5 billion since 1997. While some terrorism and proliferation-based designations of foreign entities involve an Iranian nexus, the amount of assets that are blocked as a result of these designations is typically peripheral to their objective, and not a measure of the Iran program's value. These frozen assets do not reflect the inability of designated parties to use the U.S. financial system or transact business with U.S. persons, the international isolation that designated parties face due to the use by international financial institutions of the Office of Foreign Assets Control's Specially Designated Nationals (SDN) list, or reputational and diplomatic harm that stems from a designation. These broader effects can be severe and are often the primary way in which sanctions deliver impact internationally.

Thank you for your efforts and should you have any additional questions please do not hesitate to contact me or my staff.

Sincerely,

Stuart A. Levey

Attachment
Comments Matrix

See comment 1.

See comment 2.

See comment 3.

Appendix V: Comments from the
Department of the Treasury

The following are GAO's comments on the Department of the Treasury's letter dated December 6, 2007.

**GAO Comments**

1. GAO has acknowledged Treasury's efforts to identify the impact of financial sanctions as appropriate in the report. While Treasury assesses such impact, we maintain that a larger impact assessment of all U.S. sanctions has never been undertaken.

2. Our report acknowledges various broad positive impacts of sanctions.

3. Treasury's letter included an attachment with numerous technical comments that we incorporated into the report as appropriate.

# Appendix VI: Comments from the Department of Commerce

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**THE SECRETARY OF COMMERCE**
Washington, D.C. 20230

November 1, 2007

Mr. Joseph Christoff
Director, International Affairs and Trade
Government Accountability Office
Washington, DC  20548

Dear Mr. Christoff:

Thank you for the opportunity to comment on GAO's draft report *Iran Sanctions: Impact in Furthering U.S. Objectives is Unclear and Should be Reviewed, GAO-08-58.*

See comment 1.

The Department of Commerce has two technical comments on the report.  One comment is enclosed and the other comment is classified and will be provided separately.

Sincerely,

Carlos M. Gutierrez

Enclosure

Appendix VI: Comments from the Department
of Commerce

U.S. Department of Commerce
Comments on
Iran Sanctions: Impact in Furthering U.S. Objectives
is Unclear and Should Be Reviewed, GAO-08-58

See comment 2.

p. 10, footnote 8.  Add:  Sanctions were recently extended by the Department of
Commerce's July 12, 2007, addition of five Iranian entities to the Entity List.
All reexports of any item subject to the Export Administration Regulations now
require an export license, with a presumption of denial, to the listed entities.

Appendix VI: Comments from the Department
of Commerce

The following are GAO's comments on the Department of Commerce's
letter dated November 1, 2007.

## GAO Comments

1. We reviewed Commerce's classified technical comment and
   considered it in revising our report.

2. We incorporated this information into the report.

# Appendix VII: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Joseph Christoff, (202) 512-8979 or christoffj@gao.gov |
| **Staff Acknowledgments** | In addition to the person named above, Tet Miyabara, Assistant Director; Kathryn Bernet; Lynn Cothern; Aniruddha Dasgupta; Martin De Alteriis; Leslie Holen; Bruce Kutnick; Grace Lui; Roberta Steinman; Anne Stevens; and Eddie Uyekawa made key contributions to this report. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates." |

### Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, DC 20548

To order by Phone:  Voice:    (202) 512-6000
                    TDD:      (202) 512-2537
                    Fax:      (202) 512-6061

| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470 |
|---|---|
| Congressional Relations | Gloria Jarmon, Managing Director, jarmong@gao.gov, (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, DC 20548 |
| Public Affairs | Chuck Young, Manager, youngc@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548 |

PRINTED ON RECYCLED PAPER

**EXHIBIT "E"**

## *EXHIBIT "E"*

ABN Amro
101 California Street, Suite 4300
San Francisco, CA 94111
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Abu Dhabi International Bank
1020 19th St NW # 500
Washington, DC 20036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Asian Development Bank
815 Connecticut Ave NW # 325
Washington, DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

AUSTRIAN NATIONAL BANK
745 5TH Ave. Suite 2005
New York, New York 10151
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Bank of Tokyo Mitsubishi-UFJ
Suite 350
1909 K St NW,
Washington, DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Bank of Tokyo Mitsubishi-UFJ
400 California Street
San Francisco, CA 94104
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Bank of Tokyo Mitsubishi UFJ
777 South Figueroa Street #600
Los Angeles, CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

BNP Paribas
One Front Street
San Francisco, CA 94111
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

BNP Paribas
725 Figueroa Street, Suite 2090
Los Angeles, CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Commercial Bank of Kuwait
1120 Avenue of the Americas
New York, New York 10036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Commerzbank
633 West Fifth Street, Suite 6600
Los Angeles, CA 90071
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Commerzbank AG
2 World Financial Center
New York, New York 10281
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Credit Suisse Group
1201 F St NW # 450
Washington, DC 20004
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Credit Suisse AG
1801 Avenue of the Starts, Suite 311
Los Angeles, CA 90067
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

-1-

CALYON [BANK] fka CREDIT
LYONNAIS and FKA CREDIT
AGRICOLE
515 South Flower Street, Suite 2200
Los Angeles, CA 90071
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

CALYON [BANK] fka CREDIT
LYONNAIS and FKA CREDIT
AGRICOLE
1301 Avenue of the Americas
New York, New York 10019
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

CALYON [BANK] fka CREDIT
LYONNAIS and FKA CREDIT
AGRICOLE care of
CT CORPORATION SYSTEM
818 West 7th Street
Los Angeles, California 90017

Credit Suisse AG
2121 Avenue of the Stars
Los Angeles, CA 90067
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Credit Suisse AG
1201 F St NW # 450
Washington, DC 20004
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Deutsche Bank
300 South Grand Ave.
Los Angeles, CA 90071
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Deutsche Bank AG
1399 New York Ave NW # 500
Washington, DC 20005
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Deutsche Bank AG
101 California Street
San Francisco, California 94111
Attn: PRESIDEN TOR AGENT FOR
SERVICE OF PROCESS

Development Bank of Japan
1101 17th St NW # 1001
Washington, DC 20036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

DZ BANK
609 5th Avenue, Suite 601
New York, New York 10017
Attn:  PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Export Import Bank of Korea
1300 L St NW # 825
Washington, DC 20005
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Export Import Bank of Korea
460 Park Avenue.
New York, New York 10022
Attn:  PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Export Import Bank of India
1750 Pennsylvania Ave NW
Washington, DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

-2-

Industrial Bank
4812 Georgia Ave NW
Washington, DC 20011
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

International Monetary Fund
700 19th St NW
Washington. DC 20431
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

International Finance Corporation
2121 Pennsylvania Ave NW
Washington, DC 20433
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

INTERNATIONAL BANK FOR
RECONSTRUCTION AND
DEVELOPMENT (aka THE WOLRD
BANK)
1818 H St NW
Washington. DC 20433
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Japan Bank for International Cooperation
1909 K St NW # 300
Washington. DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Mitsubishi Trust and Banking
520 Madison Ave., Suite 2501
New York. New York 10022
Attn:  PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Mizuho Corporate Bank ( Japan )
350 South Grand Avenue.. Suite 1500
Los Angeles, CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Natexis Banques Populaires
1901 Avenue of the Stars. Suite 1901
Los Angeles, CA 90067
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Natexis Banques Populaires
1251 - 6TH Avenue
New York, NY 10020
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

NATIONAL BANK OF PAKISTAN
100 Wall Street
New York. New York 10005 Attn:
PRESIDENT OR AGENT FOR SERVICE
OF PROCESS
Attn: LEGAL PROCESSING DEPT.

Rabobank International
1825 I St NW # 400
Washington. DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Raiffeisen Zentral Bank
1133 Avenue of the Americas
New York, NY  10036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS.

Societe Generale
1221 Avenue of the Americas
New York, NY 10020
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

State Bank of India
2001 Pennsylvania Ave NW # 625
Washington. DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Sumitomo Mitsui Banking Corporation
555 California Street. Suite 3350
San Francisco. CA 94104
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Sumitomo Mitsui Banking Corporation
777 South Figueroa. Suite 2600
Los Angeles. CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

UBS AG
101 California Street. Suite 2770
San Francisco. CA 94111
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

UBS AG
633 West Fifth Street
Los Angeles. CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

UBS AG
1501 K St NW
Washington. DC 20005
(202) 585-4000
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

F:\USERS\DJCNEW\PETERSON.banksa

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA 94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA 94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON. Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12
    DEBORAH D. PETERSON, Personal        )    CASE NO. 3:08-mc-80030-JSW
13  Representative of the Estate of James C.  )
    Knipple (Dec.). et al.,               )
14                                         )    PROOF OF SERVICE
              Plaintiffs,                  )
15                                         )
    vs.                                    )
16                                         )
    ISLAMIC REPUBLIC OF IRAN, et al..     )
17                                         )
              Defendants.                  )
18  _____       )

19
    *Via Email dr-ahmadinejad@president.ir*        SEE ***EXHIBIT "E"*** ATTACHED HERETO
20  PRESIDENT DR. AHMADINEJAD                      AND INCORPORATED BY REFERENCE.

21  ISLAMIC REPUBLIC OF IRAN
    Pasadaran Avenue
22  Golestan Yekom
    Teheran, Iran
23  ATTN: Responsible Officer

24  ISLAMIC REPUBLIC OF IRAN
    Khomeini Avenue
25  United Nations Street
    Teheran, Iran
26  ATTN: Responsible Officer

27

28

    PROOF OF SERVICE - CASE NO. 3:08-mc-80024-JSW                                    1

1    I declare:

2    I am employed in the County of San Francisco, California. I am over the age of eighteen (18) years and not a party to the within cause. My business address is 165 Fell Street. San

3    Francisco. CA 94102. On the date set forth below, I served the attached:

4    NOTICE OF MOTION AND MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[FINANCIAL INSTITUTIONS]**

5

6    MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) **[FINANCIAL INSTITUTIONS]**

7    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)

8    **[FINANCIAL INSTITUTIONS]**

9    DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a)

10   **[FINANCIAL INSTITUTIONS]**

11   on the above-named person(s) by:

12   __XXX__  (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the

13   person(s) served above.

14   __XXX__  (BY EMAIL) Emailing addressed to the person's/company's email address listed above.

15

16   I declare under penalty of perjury that the foregoing is true and correct.

17   Executed on May 1, 2008.

18                              __/s/__ __Karene Jen_____
                                           Karene Jen

19

20

21

22

23

24

25

26

27

28

## *EXHIBIT "E"*

ABN Amro
101 California Street, Suite 4300
San Francisco, CA 94111
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Abu Dhabi International Bank
1020 19th St NW # 500
Washington, DC 20036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Asian Development Bank
815 Connecticut Ave NW # 325
Washington, DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

AUSTRIAN NATIONAL BANK
745 5TH Ave. Suite 2005
New York, New York 10151
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Bank of Tokyo Mitsubishi-UFJ
Suite 350
1909 K St NW.
Washington, DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Bank of Tokyo Mitsubishi-UFJ
400 California Street
San Francisco, CA 94104
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Bank of Tokyo Mitsubishi UFJ
777 South Figueroa Street #600
Los Angeles, CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

BNP Paribas
One Front Street
San Francisco, CA 94111
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

BNP Paribas
725 Figueroa Street, Suite 2090
Los Angeles, CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Commercial Bank of Kuwait
1120 Avenue of the Americas
New York, New York 10036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Commerzbank
633 West Fifth Street, Suite 6600
Los Angeles, CA 90071
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Commerzbank AG
2 World Financial Center
New York, New York 10281
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Credit Suisse Group
1201 F St NW # 450
Washington, DC 20004
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Credit Suisse AG
1801 Avenue of the Starts, Suite 311
Los Angeles, CA 90067
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

CALYON [BANK] fka CREDIT
LYONNAIS and FKA CREDIT
AGRICOLE
515 South Flower Street, Suite 2200
Los Angeles. CA 90071
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

CALYON [BANK] fka CREDIT
LYONNAIS and FKA CREDIT
AGRICOLE
1301 Avenue of the Americas
New York. New York 10019
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

CALYON [BANK] fka CREDIT
LYONNAIS and FKA CREDIT
AGRICOLE care of
CT CORPORATION SYSTEM
818 West 7th Street
Los Angeles. California 90017

Credit Suisse AG
2121 Avenue of the Stars
Los Angeles. CA 90067
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Credit Suisse AG
1201 F St NW # 450
Washington. DC 20004
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Deutsche Bank
300 South Grand Ave.
Los Angeles. CA 90071
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Deutsche Bank AG
1399 New York Ave NW # 500
Washington. DC 20005
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Deutsche Bank AG
101 California Street
San Francisco, California 94111
Attn: PRESIDEN TOR AGENT FOR
SERVICE OF PROCESS

Development Bank of Japan
1101 17th St NW # 1001
Washington, DC 20036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

DZ BANK
609 5th Avenue, Suite 601
New York, New York 10017
Attn:  PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Export Import Bank of Korea
1300 L St NW # 825
Washington. DC 20005
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Export Import Bank of Korea
460 Park Avenue.
New York, New York 10022
Attn:  PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Export Import Bank of India
1750 Pennsylvania Ave NW
Washington. DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Industrial Bank
4812 Georgia Ave NW
Washington, DC 20011
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

International Monetary Fund
700 19th St NW
Washington, DC 20431
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

International Finance Corporation
2121 Pennsylvania Ave NW
Washington, DC 20433
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

INTERNATIONAL BANK FOR
RECONSTRUCTION AND
DEVELOPMENT (aka THE WOLRD
BANK)
1818 H St NW
Washington, DC 20433
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Japan Bank for International Cooperation
1909 K St NW # 300
Washington, DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Mitsubishi Trust and Banking
520 Madison Ave.. Suite 2501
New York, New York 10022
Attn:  PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Mizuho Corporate Bank ( Japan )
350 South Grand Avenue.. Suite 1500
Los Angeles. CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Natexis Banques Populaires
1901 Avenue of the Stars. Suite 1901
Los Angeles, CA 90067
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Natexis Banques Populaires
1251 - 6TH Avenue
New York. NY 10020
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

NATIONAL BANK OF PAKISTAN
100 Wall Street
New York. New York 10005 Attn:
PRESIDENT OR AGENT FOR SERVICE
OF PROCESS
Attn: LEGAL PROCESSING DEPT.

Rabobank International
1825 I St NW # 400
Washington. DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Raiffeisen Zentral Bank
1133 Avenue of the Americas
New York, NY  10036
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS.

Societe Generale
1221 Avenue of the Americas
New York, NY 10020
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

State Bank of India
2001 Pennsylvania Ave NW # 625
Washington, DC 20006
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

-3-

Sumitomo Mitsui Banking Corporation
555 California Street, Suite 3350
San Francisco, CA 94104
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

Sumitomo Mitsui Banking Corporation
777 South Figueroa, Suite 2600
Los Angeles, CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

UBS AG
101 California Street, Suite 2770
San Francisco, CA 94111
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

UBS AG
633 West Fifth Street
Los Angeles, CA 90017
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

UBS AG
1501 K St NW
Washington, DC 20005
(202) 585-4000
Attn: PRESIDENT OR AGENT FOR
SERVICE OF PROCESS

F:\USERS\DJCNEW\PETERSON.banksa

-4-