**EXHIBIT "D"**



**GAO**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-08-58, a report to the Ranking Member, Subcommittee on National Security and Foreign Affairs, Committee on Oversight and Government Reform, House of Representatives

December 2007

# IRAN SANCTIONS

## Impact in Furthering U.S. Objectives Is Unclear and Should Be Reviewed

## Why GAO Did This Study

The 2006 U.S. National Security Strategy stated that the United States faces challenges from Iran, including Iran's proliferation efforts and involvement in international terrorism. To address these concerns, the United States employs a range of tools, including diplomatic pressure, a military presence in the Gulf, and sanctions. A U.S. sanction is a unilateral restriction or condition on economic activity imposed by the United States for reasons of foreign policy or national security.

We were asked to review (1) U.S. sanctions targeting Iran and their implementation, (2) reported sanction impacts, and (3) factors limiting sanctions. To conduct the review, we assessed trade and sanction data, information on Iran's economy and energy sector, and U.S. and international reports on Iran, and discussed sanctions with U.S. officials and Iran experts.

## What GAO Recommends

Congress should consider requiring the National Security Council, in collaboration with key agencies, to (1) assess data on Iran sanctions and complete an overall baseline assessment of sanctions, (2) develop a framework for ongoing assessments, and (3) periodically report the results to Congress.

The Department of the Treasury commented that it assesses the impact of financial sanctions. We now cite Treasury's assessments in our report but conclude no overall assessment of all U.S. sanctions has been conducted.

To view the full product, including the scope and methodology, click on GAO-08-58. For more information, contact Joseph A. Christoff at (202) 512-8979 or christoffj@gao.gov.

## What GAO Found

Since 1987, U.S. agencies have implemented numerous sanctions against Iran. First, Treasury oversees a ban on U.S. trade and investment with Iran and filed over 94 civil penalty cases between 2003 and 2007 against companies violating the prohibition. This ban may be circumvented by shipping U.S. goods to Iran through other countries. Second, State administers laws that sanction foreign parties engaging in proliferation or terrorism-related activities with Iran. Under one law, State has imposed sanctions in 111 instances against Chinese, North Korean, Syrian, and Russian entities. Third, Treasury or State can use financial sanctions to freeze the assets of targeted parties and reduce their access to the U.S. financial system.

U.S. officials report that U.S. sanctions have slowed foreign investment in Iran's petroleum sector, denied parties involved in Iran's proliferation and terrorism activities access to the U.S. financial system, and provided a clear statement of U.S. concerns to the rest of the world. However, other evidence raises questions about the extent of reported impacts. Since 2003, the Iranian government has signed contracts reported at about $20 billion with foreign firms to develop its energy resources. Further, sanctioned Iranian banks may fund their activities in currencies other than the dollar. Moreover, while Iran halted its nuclear weapons program in 2003, according to the November 2007 National Intelligence Estimate, it continues to enrich uranium, acquire advanced weapons technology, and support terrorism. Finally, U.S. agencies do not systematically collect or analyze data demonstrating the overall impact and results of their sanctioning and enforcement actions.

Iran's global trade ties and leading role in energy production make it difficult for the United States to isolate Iran and pressure it to reduce proliferation and support for terrorism. For example, Iran's overall trade with the world has grown since the U.S. imposed sanctions, although this trade has fluctuated. Imports rose sharply following the Iran-Iraq war in 1988 and then declined until 1995; most export growth followed the rise in oil prices beginning in 2002 (see figure). This trade included imports of weapons and nuclear technology. However, multilateral UN sanctions began in December 2006.



Iran's Total Exports and Imports, 1986-2006
Billions of 2006 dollars

Source: GAO analysis of IMF Direction of Trade Statistics, May 2007.


United States Government Accountability Office


EXHIBIT D

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 2 |
| | Background | 5 |
| | U.S. Agencies Implement Numerous Sanctions Targeting Iran | 7 |
| | U.S. Agencies Have Not Assessed the Overall Impact of Sanctions Targeting Iran | 18 |
| | Iran's Global Trade Ties Limit U.S. Sanction Influence on Iran's Behavior; UN Sanctions Have Recently Been Imposed | 26 |
| | Conclusion | 35 |
| | Matter for Congressional Consideration | 35 |
| | Agency Comments and Our Evaluation | 36 |
| Appendix I | Objectives, Scope, and Methodology | 39 |
| Appendix II | U.S. and UN Sanctions Targeting Iran | 45 |
| Appendix III | Sanctions Imposed Under the Law Currently Known as the Iran, North Korea, and Syria Nonproliferation Act | 46 |
| Appendix IV | Potential Investors in Iran's Energy Sector | 48 |
| Appendix V | Comments from the Department of the Treasury | 54 |
| | GAO Comments | 56 |
| Appendix VI | Comments from the Department of Commerce | 57 |
| | GAO Comments | 59 |
| Appendix VII | GAO Contact and Staff Acknowledgments | 60 |

Tables

| | |
|---|---|
| Table 1: U.S. Sanction Laws Targeting Iran | 11 |
| Table 2: Iran's Top Export Markets, by Country, 1994 and 2006 | 29 |
| Table 3: Iran's Top Import Suppliers, by Country, 1994 and 2006 | 30 |
| Table 4: Top Iranian Crude Oil Export Destinations and Country Share, 2005 | 32 |
| Table 5: Imposition of Sanctions under the Iran Nonproliferation Act (INPA) and the Iran and Syria Nonproliferation Act (ISNA), 2001-2007, Iran-Related Cases | 46 |
| Table 6: List of Recent Major Agreements between Iran and Foreign Investors in Iran's Energy Sector | 48 |

Figures

| | |
|---|---|
| Figure 1: Map of Iran | 6 |
| Figure 2: Iran's Total Exports and Imports, 1986-2006 | 28 |
| Figure 3: Establishment of U.S. and UN Sanctions Targeting Iran | 45 |

**Abbreviations**

| | |
|---|---|
| BIS | Bureau of Industry and Security (Department of Commerce) |
| CBP | Customs and Border Protection (Department of Homeland Security |
| CCL | Commerce Control List |
| CRS | Congressional Research Service |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| EIA | Energy Information Administration |
| EU | European Union |
| FBI | Federal Bureau of Investigation (Department of Justice) |
| GDP | gross domestic product |
| IAEA | International Atomic Energy Agency |
| ICE | Immigrations and Customs Enforcement (Department of Homeland Security) |
| IEEPA | International Emergency Economic Powers Act |
| ILSA | Iran-Libya Sanctions Act of 1996 |
| IMF | International Monetary Fund |
| INKSNA | Iran, North Korea, and Syria Nonproliferation Act |
| INPA | Iran Nonproliferation Act of 2000 |
| ISNA | Iran and Syria Nonproliferation Act |
| IRGC | Islamic Revolutionary Guard Corps |
| ITR | Iranian Transaction Regulations |
| NSC | National Security Council |
| ODNI | Office of the Director of National Intelligence |
| OFAC | Office of Foreign Assets Control (Department of the Treasury) |
| PSV | post-shipment verification |
| UAE | United Arab Emirates |
| UN | United Nations |
| UNSC | United Nations Security Council |
| WMD | weapons of mass destruction |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



United States Government Accountability Office
Washington, DC 20548

December 18, 2007

The Honorable Christopher Shays
Ranking Member
Subcommittee on National Security and Foreign Affairs
Committee on Oversight and Government Reform
House of Representatives

Dear Mr. Shays:

The 2006 National Security Strategy stated that the challenges that Iran presents to the United States include the country's proliferation efforts, involvement in international terrorism, opposition to the Middle East peace process, and poor human rights record. To address these concerns, the United States employs a range of tools, including diplomacy, a military presence in the Gulf, and unilateral sanctions. The broad U.S. strategy is intended to deter Iran from developing weapons of mass destruction, acquiring advanced conventional weapons, and supporting terrorist activities. Sanctions have played an important role in the U.S. approach to confronting Iran. A U.S. "sanction" is any unilateral restriction or condition on economic activity with respect to a foreign country or foreign entity that is imposed by the United States for reasons of foreign policy or national security.[1]

We reviewed (1) U.S. sanctions targeting Iran and their implementation, (2) the reported impact of the sanctions, and (3) factors that affect the ability of U.S. sanctions to reduce Iran's proliferation and terrorism-related activities.

To determine implementation and assessment of U.S. sanctions involving Iran, we identified and reviewed U.S. executive orders and laws that established sanctions targeted at Iran. While we focused on Iran-specific sanctions, we also reviewed financial sanctions that address proliferation and terrorism concerns that the United States can use against any party, including Iran, as well as United Nations (UN) sanctions. We reviewed data identifying how often sanctions have been imposed. Further, to

---

[1] The House Committee on Ways and Means defined "unilateral sanctions" as such in a February 18, 1998, letter to the U.S. International Trade Commission Chairman.

review assessments and information about sanction impacts and factors influencing sanctions, we reviewed U.S. agency documents and analyzed international trade, energy, and private sector data. We interviewed experts on Iran regarding the sanctions and their impact. We further reviewed documentation from the United Nations, Department of State, and Congressional Research Service (CRS) that identifies current proliferation and terrorism-related activities by Iran. We also reviewed U.S. classified documents related to the imposition of sanctions; however, no classified information is used in this report. On the development of nuclear power and Iran's nuclear program, we reviewed information from the Department of Energy and the International Atomic Energy Agency (IAEA) and the November 2007 National Intelligence Estimate on Iran. For all objectives, we interviewed officials from the Departments of the Treasury, State, Commerce, Defense (DOD), Justice, Homeland Security (DHS), and Energy, as well as the Central Intelligence Agency. We conducted our review from November 2006 to November 2007 in accordance with generally accepted government auditing standards. Appendix I contains a more detailed description of our scope and methodology.

## Results in Brief

Since 1987, U.S. agencies have been implementing numerous sanctions against Iran that fall into three categories. First, Treasury leads efforts to implement a comprehensive U.S. trade and investment ban against Iran.[2] Between 2003 and 2007, Treasury filed 94 civil penalty cases against companies violating the ban. However, the ban may be circumvented by exporters who ship U.S. goods to Iran through other countries. Second, State administers sanction laws against foreign parties that engage in proliferation or terrorism-related activities with Iran. State has imposed sanctions under these laws to varying degrees. For example, under one law, sanctions have been imposed in 111 instances. Almost one-half of these cases involved Chinese entities selling sensitive goods to Iran, and over 30 percent of all sanction cases under this law involved parties that were sanctioned multiple times. According to a State official, entities engaged in conventional arms transfers were the most widely sanctioned, followed by those involved in chemical-biological, missile, and nuclear activities. Under another law, sanctions have never been imposed. Third, Treasury or State can designate parties that engage in proliferation or terrorism-related activities involving Iran as subject to financial sanctions

---

[2]Exec. Order No. 13059, 62 *Fed. Reg.* 44,531 (Aug. 19, 1997).

that freeze their assets and reduce their access to the U.S. financial system.[3]

U.S. officials and experts report that U.S. sanctions have specific impacts on Iran; however, the extent of such impacts is difficult to determine. First, according to U.S. officials and experts, U.S. sanctions may have slowed foreign investment in Iran's petroleum sector, which hinders Iran's ability to fund its acquisition of prohibited items and terrorism-related activities. Second, U.S. officials state that financial sanctions deny parties involved in Iran's proliferation and terrorism activities access to the U.S. financial system and complicate their support for such activities. For example, in January 2007, the U.S. government sanctioned Bank Sepah as a supporter of the proliferation of weapons of mass destruction, thereby eliminating its access to the U.S. financial system and reducing its ability to conduct dollar transactions. Third, U.S. officials have identified broad impacts of sanctions, such as providing a clear statement of U.S. concerns about Iran. However, other evidence raises questions about the extent of reported economic impacts. Since 2003, the Iranian government has signed contracts reported at approximately $20 billion with foreign firms to develop its energy resources, though it is uncertain whether these contracts will ultimately be carried out. In addition, sanctioned Iranian banks may be able to turn to other financial institutions or fund their activities in currencies other than the U.S. dollar. Moreover, while Iran halted its nuclear weapons program in 2003, according to the November 2007 U.S. National Intelligence Estimate, it continues to acquire advanced weapons components, enrich uranium, and support terrorism. Finally, U.S. agencies do not assess the overall impact of sanctions. Except for Treasury, the agencies, do not collect data demonstrating the direct results of their sanctioning and enforcement actions, such as the types of goods seized under the trade ban or the subsequent actions of sanctioned entities.

Iran's global trade ties and leading role in energy production make it difficult for the United States to isolate Iran and pressure it to reduce proliferation activities and support for terrorism; however, multilateral efforts to target Iran have recently begun. From 1987 through 2006, Iran's exports grew from $8.5 billion to $70 billion, while Iran's imports grew

---

[3] See Exec. Order No. 13224, 66 *Fed. Reg.* 49,079 (Sept. 23, 2001); Exec. Order No. 13382, 70 *Fed. Reg.* 38,567 (June 28, 2005).

from $7 billion to $46 billion.[4] During that period, the annual real growth rate of Iran's exports was nearly 9 percent and about 7 percent for Iran's imports. Both exports and imports fluctuated during this period. For example, imports rose sharply following the Iran-Iraq war in 1988, and most of Iran's export growth has occurred since 2002, coinciding with sharp increases in oil prices. Iran's trade included imports of weapons and nuclear technology. Second, global interest in purchasing and developing Iran's substantial petroleum reserves has kept Iran active in global commerce. The growing worldwide demand for oil, coupled with high oil prices and Iran's extensive reserves, enabled Iran to generate more than $50 billion in oil revenues in 2006. However, multilateral efforts targeting Iran have recently begun. Beginning in December 2006, and again in March 2007, the UN Security Council (UNSC) adopted sanctions against Iran.[5] Among other things, these sanctions prohibit UN member states from supplying Iran with specific nuclear materials or technology, require them to freeze the financial assets of certain Iranian individuals and companies with ties to Iran's nuclear or ballistic programs, and ban the import of all Iranian conventional arms.

We recommend that the Congress consider requiring the National Security Council (NSC), in collaboration with the Departments of State, the Treasury, Energy, and Commerce; the intelligence community; and U.S. enforcement agencies to (1) collect, analyze, and improve data on Iran sanctions and conduct a baseline assessment of the impact and use of the sanctions; (2) develop a framework for assessing the ongoing impact of U.S. sanctions, taking into consideration the contribution of multilateral sanctions; and (3) report periodically to the Congress on the sanctions' impact.

We provided a draft of this report to the Departments of State, the Treasury, Commerce, Defense, Energy, Justice, and Homeland Security. We also provided a draft to the NSC and the Office of the Director of National Intelligence (ODNI). The Department of the Treasury provided a formal response emphasizing that, as a result of financial pressure, Iran is experiencing increasing isolation from the global community. The

---

[4] We are reporting global trade data in constant 2006 dollars. This reflects the real value of Iran's trade. (See app. I for further explanation regarding the method used to adjust the nominal trade figures reported by the International Monetary Fund [IMF] into 2006 dollars).

[5] S.C. Res. 1737, U.N. SCOR, 61ˢᵗ Sess., U.N. Doc. S/RES/1737 (2006); S.C. Res. 1747, U.N. SCOR, 62ⁿᵈ Sess., U.N. Doc. S/RES/1747 (2007).

department also states that Iran continues to pursue nuclear capabilities and ballistic missile technology and to fund terrorism. This comment reinforces our finding that the overall impact of sanctions is unclear. In addition, Treasury noted its assessments of the effectiveness of financial sanctions. We revised the report to recognize that Treasury assesses the impact of financial sanctions but maintain that an overall impact assessment of all U.S. sanctions has not been undertaken. Treasury's letter can be found in appendix V.

The Departments of State, the Treasury, Commerce, and Energy provided written technical comments. We incorporated these comments into the report as appropriate. The Department of Commerce submitted its technical comments in a letter that is included in appendix VI. The NSC provided brief oral comments and ODNI provided a classified response; we considered this information and revised the report as appropriate. The Departments of Defense, Justice, and Homeland Security provided no comments on the draft report, though Homeland Security supported the part of our Matter for Congressional Consideration that specifically involves the department.

## Background

Iran is a nation of strategic importance due to its central geographic location and huge reserves of fossil fuels. Iran's neighbors include Iraq and Afghanistan, two countries with ongoing U.S. and coalition military operations, and Pakistan and Turkey, key U.S. allies in the global war on terrorism (see fig. 1). Furthermore, Iran borders both the Persian Gulf and the Strait of Hormuz, through which roughly one-fifth of the global oil supply is exported. According to the Department of Energy, Iran has the third largest proven oil reserves in the world. Iran's oil export revenues constitute about 80 percent of its total export revenue, and accounted for nearly one-fifth of its gross domestic product (GDP) in 2004. High oil prices in recent years have further boosted Iran's oil export revenues.



Figure 1: Map of Iran

Source: GAO.

U.S.-Iranian relations have often been strained since the early years of the Cold War. Following the U.S.-supported overthrow of Iran's prime minister in 1953, the United States and others backed the regime of Shah Mohammed Reza Pahlavi for a quarter century. Although it did much to develop the country economically, the Shah's government repressed political dissent. In 1978, domestic turmoil swept the country as a result of religious and political opposition to the Shah's rule, culminating in the collapse of the Shah's government in February 1979 and the establishment of an Islamic republic led by Supreme Leader Ayatollah Khomeini. In November 1979, militant Iranian students occupied the American embassy in Tehran with the support of Khomeini. Shortly thereafter, the United

States broke diplomatic relations with Iran, which remain suspended to this day.

## U.S. Agencies Implement Numerous Sanctions Targeting Iran

U.S. sanctions to deter Iran's proliferation and support for terrorism fall into three categories. First, Treasury leads U.S. government efforts to implement a comprehensive trade and investment ban against Iran. Second, State is responsible for implementing several laws that sanction foreign parties engaging in proliferation or terrorism-related transactions with Iran. Third, Treasury or State can impose financial sanctions, including a freeze on assets and a prohibition on access to U.S. financial institutions, against parties who engage in proliferation or terrorism-related activities with any party, including Iran. (See app. II for more information regarding the timing and nature of U.S. and UN sanctions.)

## Treasury's Trade and Investment Ban Prohibits Virtually All U.S. Commercial Ties with Iran, but Transshipments May Circumvent Ban

Treasury administers a ban on almost all U.S. trade or investment activity involving Iran.[6] The prohibitions of the trade and investment ban began with a 1987 ban on Iranian imports and were followed by a 1995 ban on U.S. exports to and investment in Iran. These prohibitions apply to U.S. persons, including U.S. companies and their foreign branches, wherever located.[7] U.S. officials stated that the ban does not apply to independent foreign subsidiaries of U.S. companies.[8] Non-U.S. persons are generally exempt from the provisions of the ban.[9] Trade sanctions against Iran were eased in 2000 to allow for the purchase and import from Iran of carpets and food products.[10] Further, the Trade Sanctions Reform and Export Enhancement Act of 2000 lifted, subject to certain exceptions, U.S. sanctions on commercial sales of food, agricultural commodities, and medical products to several sanctioned countries, including Iran.[11] The ban also prohibits U.S. financial institutions from having direct banking

---

[6] A ban on imports of Iranian goods and services was enacted in October 1987 via Executive Order 12613, 52 *Fed. Reg.* 41940 (Oct. 29, 1987). In March 1995, the President issued Executive Order 12957, 60 *Fed. Reg.* 14615 (Mar. 15, 1995) prohibiting U.S. involvement with petroleum development in Iran. Executive Order 12959, 60 *Fed. Reg.* 24757 (May 6, 1995) was issued 2 months later, banning specified exports and investment. Finally, on August 19, 1997, the President signed Executive Order 13059, 62 *Fed. Reg.* 44531 (Aug. 19, 1997) which consolidated prior executive orders and prohibits virtually all trade and investment activities with Iran by U.S. persons, wherever located.

[7] Executive Order 13059 defines "U.S. persons" as "...any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States."

[8] Some U.S. companies have come under scrutiny for dealings by their foreign subsidiaries with Iran. For example, the U.S. company Halliburton announced in 2005 after criticism of a subsidiary's involvement with Iran that its subsidiaries had completed all contractual commitments with Iran and that it would no longer operate there.

[9] With some exceptions, the ban does prohibit foreign persons from reexporting sensitive U.S.-origin goods, technology, or services to Iran. Executive Order No. 13059, § 2(b). Sanctions were recently extended by the Department of Commerce's July 12, 2007, addition of five Iranian entities to the Entity List. All reexports of any item subject to the Export Administration Regulations now require an export license, with a presumption of denial, to the listed entities.

[10] See Iranian Transaction Regulations: Licensing of Imports of, and Dealings in, Certain Iranian-Origin Foodstuffs and Carpets. 65 *Fed. Reg.* 25,642 (May 3, 2000).

[11] Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2001, Pub. L. No. 106-387, Title IX, § 906, 114 Stat. 1549, 1549A-69 (2000). This law enacted as U.S. policy the principle that commercial sales of food, other agricultural products, medicine, and other medical products shall not be used as a tool to conduct foreign policy or to address national security objectives.

relationships with banks in Iran and banks owned or controlled by the government of Iran.[12]

According to a Treasury official, the trade and investment ban is aimed at making it more difficult for Iran to procure U.S. goods, services, and technology, including those that could be used for terrorism or proliferation. The official further stated that, as with all U.S. economic sanctions programs, the premise of the sanctions is to exact a price on the sanctioned entity, which serves as an inducement to change the behavior that threatens U.S. national security and foreign policy goals. Sanctions also serve to make it more difficult for a sanctioned entity to pursue its threatening conduct.

Treasury's Office of Foreign Assets Control (OFAC) administers the trade and investment ban and is responsible for reviewing and licensing requests to export or re-export goods to Iran, with most items subject to a general policy of denial. OFAC is also responsible for conducting civil investigations of sanctions violations, which can result in warning letters, cease and desist orders, and civil penalties of up to $250,000 (or an amount that is twice the amount of the transaction that is the basis for the violation) imposed administratively. We found that Iran sanctions were involved in 94 out of 425 civil penalty cases that OFAC assessed or settled as a result of sanction violations between 2003 and 2007. In cases where OFAC finds evidence of willful violations of the trade and investment ban, it may refer those cases to other federal law enforcement agencies for criminal investigation. Investigations of potential criminal violations can be conducted by the Department of Commerce's Bureau of Industry and Security (BIS), DHS's Immigration and Customs Enforcement (ICE), and the Department of Justice's Federal Bureau of Investigation (FBI), sometimes acting jointly. Criminal prosecutions are pursued by the Department of Justice. Under recently enacted legislation, criminal penalties for violations of the trade and investment ban can range up to $1,000,000 and (for natural persons) 20 years in jail.[13]

---

[12]Our previous work noted that sanctions can increase the costs of trade and finance to the sanctioning nation (in this case, the United States) because it loses commercial transactions and profits with the target nation. See GAO *Economic Sanctions: Effectiveness as Tools of Foreign Policy*, GAO/NSIAD-92-106 (Washington, D.C. Feb. 19, 1992).

[13]International Emergency Economic Powers Enhancement Act, Pub. L. No. 110-96, § 2, 121 Stat. 1011 (2007) (codified at 50 U.S.C. § 1705).

According to officials at key U.S. export enforcement agencies, the trade ban may be circumvented by the transshipment of U.S. exports through third countries. Officials identified several locations that serve as common transshipment points for goods destined for Iran. These locations include Germany, Malaysia, Singapore, the United Kingdom, and, according to Commerce officials, the United Arab Emirates (UAE) in particular.

Two trends underscore the possibility that U.S. goods are being shipped to Iran through the UAE. First is the considerable growth in U.S. trade flows through the UAE. The United States has become the number one supplier of imports to the UAE and Iran is the UAE's largest trade partner. Moreover, although trade statistics do not specify the portion of UAE exports to Iran that are of U.S.-origin, the UAE transships a higher proportion of its U.S. imports than other countries do. According to Commerce officials transshipments have been a considerable problem in terms of the effectiveness of sanctions in place against Iran. The second trend is the high rate of unfavorable end-use checks for U.S. items exported to the UAE. The Department of Commerce relies on post-shipment verification (PSV) checks as its primary method of detecting and preventing illegal transfers, including transshipments, of U.S.-origin exports to Iran. However, according to Commerce officials, in August 2007, the UAE enacted a comprehensive export, reexport, and transshipment control law to better enable the UAE to control transshipment of sensitive goods through its ports. The law is too new to assess its effectiveness. (Further information is classified.)

## State Sanctions Foreign Entities under Iran-Specific Laws

Congress has taken steps to discourage trade by third-country parties with Iran by enacting sanction laws that have a "secondary boycott" effect. Three U.S. sanction laws discourage foreign parties from engaging in proliferation or terrorism-related activities with Iran (see table 1). State leads efforts to implement these laws and has imposed sanctions under these laws to varying degrees.

Table 1: U.S. Sanction Laws Targeting Iran

| U.S. law | Sanctionable activities | Sanctions imposed against foreign parties | Use of sanctions |
|---|---|---|---|
| Iran, North Korea, and Syria Nonproliferation Act[a] | Transfer to Iran of goods, services, or technology listed in various multilateral export control arrangements or that contribute to weapons of mass destruction or missile programs. | Among other things, no U.S. government procurement, no U.S. assistance, no licenses for exports from the United States to the foreign party of defense or dual-use items. *Sanctions are discretionary and State has typically imposed sanctions for a 2-year period.* | Sanctions imposed 111 times since 2000 in Iran-related cases, including:<br>• 52 instances against Chinese parties,<br>• 9 instances against North Korean parties,<br>• 8 instances against Syrian parties, and<br>• 7 instances against Russian parties. |
| Iran-Iraq Arms Nonproliferation Act of 1992[b] | Transfer to Iran of controlled goods or technology so as to contribute "knowingly and materially" to Iran's efforts to acquire destabilizing numbers and types of advanced conventional weapons. | *Against persons:* No U.S. government procurement or export licenses. *Against foreign countries:* Among other things, no U.S. government assistance or support for multilateral development bank assistance. *Sanctions are mandatory and are imposed for a 2-year period against persons and for a 1-year period against foreign countries. The President also has the authority to impose an additional discretionary sanction against foreign countries.* | Sanctions imposed 12 times in 2002 and 2003. |

| U.S. law | Sanctionable activities | Sanctions imposed against foreign parties | Use of sanctions |
|---|---|---|---|
| Iran Sanctions Act[c] | Investment of $20 million or more within a 12-month period that directly and significantly contributed to the enhancement of Iran's ability to develop its petroleum resources.<br><br>Exports, transfers, or other provision to Iran of any goods, services, technology or other items knowing that the provision of such items would contribute materially to Iran's ability to acquire or develop chemical, biological, or nuclear weapons or related technologies; or destabilizing numbers and types of advanced conventional weapons. | Two of the following options:<br>• no Export-Import Bank assistance,<br>• no export licenses to export certain goods to sanctioned parties,<br>• no loans or credits totaling more than $5 million in a 12-month period from U.S. financial institutions,<br>• no U.S. government procurement,<br>• for sanctioned financial institutions, no designation as a primary dealer in U.S. government debt instruments, and may not serve as an agent of the U.S. government or as repository for U.S. government funds, or<br>• additional sanctions, as appropriate, to restrict imports regarding the sanctioned party.<br><br>*Sanctions are mandatory and are imposed for a period of not less than 2 years.* | Sanctions never imposed, though State officials note that the law has been used as a tool in diplomatic efforts. |

Source: U.S. public laws, http://www.state.gov/t/isn/c15231.htm, *Federal Register.*

[a]This law was enacted as the Iran Nonproliferation Act of 2000; Restriction on Extraordinary Payments in Connection with the International Space Station, Pub. L. No. 106-178, 114 Stat. 38; Syria was added to the act in 2005 by the Iran Nonproliferation Amendments Act of 2005, Pub. L. No. 109-112, §4, 119 Stat. 2366, 2369; and North Korea was added in 2006 by the North Korea Nonproliferation Act of 2006, Pub. L. No. 109-2353, 120 Stat. 2015.

[b]Enacted by the National Defense Authorization Act for fiscal year 1993, Pub. L. No. 102-484, Title XVI, 106 Stat. 2315, 2571-75 (1992). We are unable to distinguish between Iran and Iraq sanction cases, as this information is classified.

[c]This act was originally enacted as the Iran-Libya Sanctions Act of 1996, Pub. L. No. 104-172, 110 Stat. 1541; Libya was removed from the law in 2006 by the Iran Freedom Support Act, Pub. L. No. 109-293, 120 Stat. 1344. Proliferation-related sanctionable activities were added to the law in 2006.

As table 1 shows, State has imposed sanctions against foreign parties, including bans on U.S. government procurement opportunities and sales of defense-related items, in 111 Iran-specific cases since 2000 under a law currently known as the Iran, North Korea, and Syria Nonproliferation Act

(INKSNA).[14] This law targets foreign persons that have transferred goods, services, or technology to Iran that are listed on various multilateral export control lists.[15] According to a State official, entities engaged in conventional arms transfers were the most widely sanctioned, followed by those involved in chemical-biological, missile, and nuclear activities. Since 2000, almost half of the cases (52) involved Chinese parties, with North Korean and Russian parties accounting for 9 and 7 cases, respectively. In 2007, Syrian parties were sanctioned in 8 cases. According to State officials, in most cases, the full range of sanctions authorized under INKSNA is imposed, and sanctions have been typically imposed for a 2-year period. Over 30 percent of all sanction cases involve parties that were sanctioned multiple times under the law—some, primarily Chinese firms, 3 or more times. According to a State official, such instances were the result of new proliferation activities by these firms. Because the law establishes the sanctions that are available, the practical effect of continuing to impose sanctions against the same parties is to extend the length of time the sanctions are imposed and make the public aware of the firms facilitating proliferation with Iran. State officials said that generally no consideration of additional penalties or measures is given to parties who have been sanctioned multiple times, although some of these entities have been sanctioned under other sanction tools. However, State officials emphasized that they raise concerns about the activities of such entities with foreign governments as appropriate.

In deciding to sanction an entity under INKSNA, State officials reported that every 6 months they assess as many as 60,000 intelligence reports to identify transfer cases that should be submitted to agencies for review. State decides, on a discretionary basis, which parties to sanction following a meeting chaired by the NSC that solicits input from DOD, Energy, and Treasury and other agencies regarding the disposition of each case. According to a State official, the Deputy Assistant Secretary-level interagency group reviews cases to recommend whether the foreign persons were reportable under the act, and if so, (1) whether there was information establishing that a case was exempt from sanctions under the

---

[14]The Iran Nonproliferation Act of 2000 (INPA) was amended to include Syria in 2005 (the Iran and Syria Nonproliferation Act, or ISNA), and North Korea in 2006, and is now known as the Iran, North Korea, and Syria Nonproliferation Act of 2006 (INKSNA), Pub. L. No. 106-178, 114 Stat. 38 (codified as amended at 50 U.S.C. § 1701 note).

[15]The act refers to controls established under numerous multilateral export control lists, including under the Australia Group, Chemical Weapons Convention, Missile Technology Control Regime, Nuclear Suppliers Group, and the Wassenaar Arrangement.

act, (2) whether to seek from the foreign person additional information concerning the transfer or acquisition as provided for in the act, and (3) whether sanctions under the act should be applied. The final decision regarding the disposition of each case is made by the Deputy Secretary of State. One State official noted that there have been several cases in which State decided not to impose sanctions because of positive nonproliferation actions taken by the foreign government responsible for the firm engaging in the proliferation transfer. A foreign government punishing or prosecuting the firm responsible for the transfer is one example of the type of positive action that has resulted in a decision not to impose penalties. Another reason why State may decide not to impose sanctions is a concern that such an action, which is made public, may compromise the intelligence "sources and methods" used to collect information on a particular proliferation case. Once final decisions are made, State then submits a classified report to Congress identifying parties that have engaged in sanctionable activities and parties that will be sanctioned, and ultimately publishes the names of sanctioned entities in the *Federal Register*.[16] (See appendix III for a detailed listing of these sanction cases.)

Under a second law, the Iran-Iraq Arms Nonproliferation Act of 1992[17] (also shown in table 1), State has imposed sanctions 12 times. Under this act, mandatory sanctions include prohibiting the export to Iran of all goods specified on the Commerce Control List (CCL).[18] State also can impose sanctions against foreign parties, such as a ban on U.S. government procurement opportunities or export licenses that knowingly and materially contribute to Iran's efforts to acquire destabilizing numbers and types of advanced conventional weapons. As with the Iran, North

---

[16]The Department of State's International Security and Nonproliferation (ISN) Bureau was in charge of this effort until 2007 when the department's Verification, Compliance, and Implementation (VCI) Bureau took over this responsibility.

[17]Pub. L. No. 102-484 (codified as amended at 50 U.S.C. § 1701 note).

[18]The Iran-Iraq Arms Nonproliferation Act applies to Iran specific sanctions against Iraq as established in section 586G of the Iraq Sanctions Act of 1990, as contained in the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1991, Pub. L. No. 101-513, §§ 586-586J, 104 Stat. 1979, 2047-55 (1990). These sanctions include a prohibition on exports of items on the CCL, which falls within the Export Administration Regulations and establishes all items that are determined to have a potential "dual use" – that is, a use that has both a commercial and military or other strategic application. See 50 App. U.S.C. §§ 2401-2420; 15 C.F.R. Pt. 774, Supp. 1. Such exports to Iran can only be allowed if a presidential waiver is granted citing that a waiver is essential to the national interest of the United States. See Pub. L. No. 102-484, § 1606. State officials in the Economic, Energy and Business Bureau (EEB), the bureau responsible for coordinating this waiver process, report that such waivers are granted infrequently.

Korea, and Syria Nonproliferation Act, decisions under this act include interagency input from Commerce, Energy, and DOD, with State in the lead and responsible for deciding which cases warrant imposition of sanctions. In 2002, State imposed sanctions in 10 instances, 9 of which were against Chinese parties.[19] In 2003, sanctions were imposed against two parties, one Jordanian and one Indian. No sanctions have been imposed since 2003 primarily because, according to State officials, it is difficult to establish that transfers were made by parties who knowingly and materially contributed to Iran's proliferation.

Table 1 shows that State has not imposed sanctions against any party under a third law—the Iran Sanctions Act—though State officials noted that the law has been useful in raising U.S. concerns over Iran. The goal of the Iran Sanctions Act (previously known as the Iran-Libya Sanctions Act of 1996,[20] or ILSA) has been to deny Iran the financial resources to support international terrorism or the development of weapons of mass destruction (WMD) by limiting Iran's ability to find, extract, refine, or transport its oil resources. State considered sanctions on one occasion in 1998; however, the U.S. government granted waivers to the parties involved.[21] In that instance, the U.S. government determined that the investments of three foreign companies—Total (France), Gazprom (Russia), and Petronas (Malaysia)–in the development of Iran's South Pars gas field were sanctionable under ILSA. However, the Secretary of State determined that it was important to the U.S. national interest to waive the imposition of sanctions against these firms. In making this determination, the Secretary considered factors such as the desire to build an effective multilateral regime to deny Iran the ability to acquire WMD and support acts of international terrorism. Further, the European Union (EU) had concerns that the use of the act to impose sanctions would constitute extraterritorial application of U.S. law. The possibility that the EU might take this issue to the World Trade Organization for resolution played a role in convincing the U.S. government to waive sanctions. In addition, a report on the use of ILSA prepared by State and cleared by the NSC noted that

---

[19]For sanctions imposed under this act, we are unable to provide information that specifies which sanctions were due to proliferation activities with Iran and which were due to proliferation activities with Iraq. Such information is classified.

[20]Pub. L. No. 104-172. Libya was removed from the act in 2006 by the Iran Freedom Support Act, Pub. L. No. 109-293, and the act is now known as the Iran Sanctions Act.

[21]Waivers are available under this act if the President determines that a waiver is important to the U.S. national interest.