# Appendix I: Objectives, Scope, and Methodology

The Ranking Member of the House Subcommittee on National Security and Foreign Affairs of the Committee on Oversight and Governmental Reform requested that we review U.S. sanctions involving Iran. This report addresses (1) U.S. sanctions targeting Iran and their implementation, (2) the reported impact of the sanctions, and (3) factors that limit the ability of U.S. sanctions to reduce Iran's proliferation and terrorism-related activities.

To identify U.S. sanctions targeting Iran and determine the U.S. efforts to implement and assess sanctions against Iran, we first identified, reviewed, and summarized U.S. executive orders and laws that establish sanctions and are targeted at Iran. While we focused on Iran-specific sanctions, we also reviewed targeted financial sanctions that address proliferation and terrorism concerns and can be used against any party, including Iran. In addition, we discussed the sanctions with officials from the Departments of State, Treasury, Commerce, Defense, Energy, Homeland Security (DHS), and Justice, as well as the Central Intelligence Agency.

We submitted several requests for specific data to help illustrate U.S. trade ban implementation and enforcement efforts; however, in many cases agencies were not able to fully answer our requests. Due to limitations in how agencies collect and organize their information, we were unable to collect complete data on export licenses issued by Treasury, or Customs and Border Protection seizures, Federal Bureau of Investigation (FBI) or Immigration and Customs Enforcement investigations, or Justice criminal convictions related to sanctions against Iran. We could not compile comprehensive data on the number of ongoing FBI investigations because the FBI considers such data sensitive. We were able to collect data on the extent of civil penalties imposed by Treasury, which we assessed to be sufficiently reliable for our purposes of showing the number of Iran-specific sanction violations since 2003. We were also able to collect data on the number of post-shipment verification checks conducted by Commerce in the past 5 years, which GAO has previously assessed as reliable.

To determine the use of Iran-specific laws to impose sanctions, we reviewed and compiled publicly available information on the Department of State's Web site (www.state.gov/t/isn/c15231.htm), reviewed relevant *Federal Register* notices, and additional information that was declassified. We determined that such data are sufficiently reliable for our purposes. State officials explained that they do not collect data on direct sanction results, emphasizing that such data falls within the purview of the intelligence community. Regarding the targeted financial sanctions, we

were able to collect data on Iran-related designations made under the
nonproliferation sanctions, which we determined to be sufficiently
reliable. However, Treasury could not provide data on designations made
under the antiterrorism sanctions or specify the amount of assets frozen
under either set of financial sanctions.

To obtain U.S. government views on the impact of sanctions on Iran, we
collected publicly available testimonies, speeches, and other remarks
made by U.S. officials from the Departments of State, Commerce,
Treasury, and DHS from March 2006 through April 2007. We reviewed
these documents for statements regarding the U.S. government's position
on the impacts of sanctions on Iran, factors that might lessen their impact,
UN sanctions, and other issues identified as key to the U.S. foreign policy
strategy for Iran. We also interviewed U.S. officials as well as a
judgmentally selected group of experts from think tanks and universities
and reviewed numerous scholarly articles and testimonies to gain
additional perspectives on the impact of sanctions on Iran. After reviewing
the literature on Iran sanctions and conducting a Web-based search of
universities and other institutions with research projects or issue areas
focusing on U.S. policies toward Iran, we identified a large field of experts.
To balance our selection of experts to interview, we identified the
institutions with which they were affiliated. These 39 institutions
represented a wide variety of perspectives on U.S. foreign policy and,
within them, we identified 56 scholars who have written papers and given
presentations on Iran sanctions. We then selected six prominent scholars,
each from an institution having a different political perspective, and with
multiple publications on Iran sanctions. After reviewing their publications
and speeches, we interviewed them on a set of questions concerning the
impact of unilateral and UN sanctions against Iran, factors that might
hinder impact, and other issues identified as key to U.S. foreign policy
strategy for Iran.

To obtain information on the impact of sanctions in deterring investment
in Iran's energy sector, FACTS Global Energy provided us with a list of
recent major agreements between Iran and foreign firms and governments.
FACTS Global Energy explained, in response to our questions concerning
its methodology and the value of the contracts, that these are publicly
reported figures, though the actual worth of the contract may be slightly
higher or lower. While FACTS reports that some contracts are legally
binding, Iran has been involved in several instances in which these
contracts have not been fulfilled. We also substantiated many of these
reported agreements based on our review of a variety of sources. including
expert reports (Congressional Research Service [CRS], Economist

Intelligence, Global Insight, Energy Information Administration); scholarly articles; testimony of senior U.S. officials; and other experts. Based on our interviews and checks, we determine the data were sufficiently reliable for the purposes of indicating the estimated value of publicly announced binding contracts between foreign companies and Iran.

To determine the major factors that affect U.S. sanctions ability to influence Iran's behavior, we reviewed numerous scholarly articles, professional economists' publications, official U.S. documents. and testimonies of officials and experts. In addition, we read open-source documents, including newspaper and journal articles, both national and global. We also interviewed a selected group of experts on Iran, met with agency officials, and attended conferences on the subject. In addition, we collected and analyzed data from several widely used databases of international trade statistics, including International Monetary Fund (IMF) Direction of Trade Statistics and International Financial Statistics National Income database, the UN trade database, U.S. Department of Commerce Trade Statistics, Department of Energy statistics, and United Nations Conference on Trade and Development Foreign Direct Investment statistics. We also reviewed and analyzed proprietary private sector data from an internationally recognized consultant on Iran's energy sector. We have determined that these data are sufficiently reliable for the purposes for which they were used in this report.

To determine the effect of U.S. sanctions on U.S. trade with Iran, we used 1986 to 2006 U.S. trade statistics from the Department of Commerce, Bureau of the Census Web-based database. We converted these data from nominal dollars to 2006 dollars using Department of Commerce, Bureau of Economic Analysis U.S. export and import commodity price deflators from the online database. We also analyzed these data at the 2-digit commodity level to determine what goods the United States exported to and imported from Iran in various years and the relative importance of U.S. trade to Iran for various years encompassing the imposition of the trade bans.

We used IMF Direction of Trade Statistics (May 2007 CD ROM) to analyze trends in Iran's trade, exports and imports, as well as Iran's trade with the world by major country groupings and individual partners, from 1986 to 2006.[1] We determined that the U.S. commodity price deflators noted above

[1]According to the IMF. data are collected from Iran's trade partners as well as from Iran. IMF staff use their best judgment to determine bilateral and global trade flows.

were not appropriate deflators for the purpose of analyzing Iran's global
trade. Thus, we converted the annual export and import data, which IMF
reports in U.S. dollars, into 2006 dollars using the following methodology.
We converted annual dollar trade flows to Iranian rials using an exchange
rate conversion factor from the *World Bank's World Development
Indicators Online*. This conversion factor, known as the DEC alternative
conversion factor, is, as a rule, the official exchange rate reported in the
IMF's *International Financial Statistics*. This alternative conversion
factor differs from the official rate when the official exchange rate is
judged to diverge by an exceptionally large margin from the rate actually
applied in international transactions.[2] In such cases, it employs a method
known as the Atlas method to average exchange rates for a given year and
the two preceding years, adjusted for differenced in rates of inflation
between the country and a specified groups of major trading countries.[3]
For 1991 and 1992, for which the World Bank does not publish a DEC
alternative conversion factor for Iran, we constructed conversion rates by
applying rates of change exhibited in a purchasing power parity
conversion rate for Iran, from the *World Development Indicators Online*,
from 1990 to1993.

As Iran does not publish separate price indices for exports and imports, in
their place we use the Iranian gross domestic product (GDP) deflator from
the World Bank's *World Development Indicators Online* to convert trade
flows into 2006 rials. We then use the official 2006 exchange rate (which
happens to be the same as the DEC conversion factor) to express these
trade flows in constant 2006 dollars. This methodology preserves the real
growth rates computed in real Iranian rials. Thus, it reflects how Iran may
view its global trade when adjusted for exchange rate anomalies and price
inflation.

We obtained general information on other countries' trade in sensitive
goods (arms, aircraft, and nuclear equipment and technology) from
publicly available official sources, including State Department reports and
testimonies, Department of Justice data, the unclassified National

[2]According to the World Bank. during most of 1986 to 2006, Iran's official exchange rate did
not reflect the actual market exchange rate (the official exchange rate and the market
exchange rate do coincide beginning in 2003).

[3]These major trading countries include the G-5 countries (France. Germany, Japan, the
United Kingdom. and the United States) through 2000. From 2001, these countries include
the Euro Zone. Japan, the United Kingdom, and the United States.

Intelligence Estimate, and CRS reports and testimonies. To identify countries and the value of their exports to Iran of possibly sensitive items, we used the global shipping company DHL's online interactive product classification tool to identify Harmonized System (HS) trade codes in the export control category 0: Nuclear materials, facilities, equipment and miscellaneous items. We then used the UN trade database to identify countries and their reported value of exports to Iran for these items.

The Department of Energy's Energy Information Administration (EIA) provided data on Iran's position in world oil and gas reserves and production, gasoline consumption, and export earnings.[4] We calculated Iran's oil export revenue as a percent of Iran's GDP using reporting countries' crude oil import statistics from Iran[5] and GDP data from the most currently available IMF International Financial Statistics CD ROM (December 2006). To determine top Iranian crude oil export destinations and respective country shares, we used UN trade statistics at the 2-digit commodity level (HS2709), for the period 1989 to 2005, and ranked countries by dollar value and country share of crude oil exports from Iran. For the top recipients of Iran's crude oil, we also calculated each country's crude oil imports from Iran as a percent of that country's total crude oil imports to demonstrate the relative importance of Iranian crude oil to these countries. We also used 2-digit commodity level (HS2710 and HS2711) UN trade statistics to determine the major suppliers of refined petroleum products to Iran.

We based our assessment of Iran's near-term growth prospects on a review of economists' reports on Iran, including IMF's 2007 Article IV consultation with Iran and country reports on Iran from Economists Intelligence Unit and Global Insight. We also utilized proprietary information obtained from FACTS Global Energy regarding current developments in Iran's energy sector. We supplemented our review with reports on Iran from other official sources, including CRS and the Department of Energy's EIA.

---

[4]EIA calculates net export revenues as the weighted average spot price of Iranian crude oil multiplied by Iran's' net oil exports multiplied by number of days in the year. EIA calculates Iran's net oil exports as Iran's total liquids production (production of crude oil and condensates, natural gas plant liquids, and refinery processing gain or loss) less Iran's total petroleum consumption.

[5]EIA provided the reporting countries import statistics of their petroleum imports from Iran. These data are comparable to UN trade statistics data for the same 2-digit petroleum commodity breakdown, 2709.

To determine the development and current status of Iran's nuclear
program, we reviewed documents from the International Atomic Energy
Agency, an independent agency affiliated with the United Nations. We also
reviewed reports by the CRS specific to Iran's nuclear program and
proliferation concerns. Finally, we reviewed the November 2007
unclassified National Intelligence Estimate on Iran. We also reviewed State
and other documents to examine Iran's broad proliferation efforts. To
identify continued behavior by the government of Iran that establishes
continued support for terrorism, we reviewed the Department of State's
2006 Country Report on Terrorism, other unclassified documentation
(such as Department of State testimonies and CRS reports) as well as
classified information.

To trace the development of UN sanctions against Iran for its efforts to
enrich uranium and possibly develop nuclear weapon capability, we
reviewed UN Security Council (UNSC) resolutions 1696 (2006), 1737
(2006), and 1747 (2007) and reports and documents from the UNSC 1737
Sanctions Committee. We also reviewed documentation from the
Department of State and CRS. The State Department's Bureau for
International Organization Affairs declined to meet with us, which
precluded direct contact with the United Nations. The Bureau stated that
negotiations in the UNSC were ongoing at the time.

We conducted our review from November 2006 to November 2007 in
accordance with generally accepted government auditing standards.

# Appendix II: U.S. and UN Sanctions Targeting Iran

**Figure 3: Establishment of U.S. and UN Sanctions Targeting Iran**

| U.S. government sanctions | | International Atomic Energy Agency (IAEA) and UN Security Council (UNSC) actions |
|---|---|---|
| • Iran designated "state sponsor of terrorism." | 1984 | |
| | 1985 | |
| | 1986 | |
| • Executive Order 12613 – U.S. imports of Iranian goods banned. | 1987 | |
| | 1988 | |
| | 1989 | |
| | 1990 | |
| | 1991 | |
| • Iran - Iraq Arms Nonproliferation Act of 1992 – sanctions against foreign parties engaging in proliferation activities (advanced conventional weapons) that contribute to Iran's efforts in this area. | 1992 | |
| | 1993 | |
| | 1994 | |
| • Executive Order 12957 – restrictions on U.S. involvement with the development of Iran's petroleum resources.<br>• Executive Order 12959 – ban on U.S. imports of Iranian goods, U.S. exports to Iran, and U.S. investment in Iran. | 1995 | |
| • Iran-Libya Sanctions Act of 1996 (ILSA) – sanctions against parties that invest $40 million or more in the development of Iran's petroleum resources. After the first year, sanctions shall be applied to nationals of nonwaiver countries who invest $20 million or more. | 1996 | |
| • Executive Order 13059 – consolidation of prior executive orders, prohibition on trade and investment activities with Iran. | 1997 | |
| | 1998 | |
| | 1999 | |
| • Iran Nonproliferation Act of 2000 – sanctions against foreign persons transferring controlled goods  (nuclear, biological, or chemical weapons, or ballistic or cruise missile systems) to Iran.<br>• Lifting of restrictions on certain (1) U.S. imports of Iranian goods such as carpets, dried fruits, and nuts; and (2) U.S. exports to Iran such as food, agricultural commodities and medical products. | 2000 | |
| | 2001 | |
| | 2002 | |
| | 2003 | • June: IAEA states that Iran failed to report certain nuclear materials and activities and requests cooperation from Iran. |
| | 2004 | • November: under the Paris Agreement with the European Union-3 (Britain, France, and Germany), Iran agrees to suspend enrichment in exchange for renewed trade talks and other aid. |
| • Iran Nonproliferation Amendments Act of 2005 – amended Iran Nonproliferation Act of 2000 to include Syria (renamed Iran and Syria Nonproliferation Act). | 2005 | • August: Iran breaks the seals on its uranium conversion facility at Isfahan; IAEA calls on Iran to suspend enrichment-related activities. |
| • Iran Freedom Support Act – amended ILSA to (1) add nuclear, chemical, biological, advanced conventional weapons as sanctionable, (2) remove Libya from ILSA (renamed Iran Sanctions Act).<br>• North Korea Nonproliferation Act of 2006 – amended Iran and Syria Nonproliferation Act to include North Korea (renamed Iran, North Korea, Syria Nonproliferation Act). | 2006 | • January: Iran resumes enrichment activities.<br>• February: IAEA votes for a resolution to report Iran to the UNSC.<br>• July: UNSC resolution 1696 calls for Iran to suspend all uranium enrichment related and reprocessing activities.<br>• December: UNSC resolution 1737 requires Iran to suspend its uranium enrichment and reprocessing activities as requested under resolution 1696 and decides that all states take measures to prevent the supply, sales or transfer of all items, goods and technology, which could contribute to Iran's enrichment-related activities or the development of nuclear weapon delivery systems. |
| | 2007 | • March: UNSC resolution 1747 requires Iran to suspend enrichment by May 2007.  This resolution widened the scope of the previous resolution by banning Iran's arms exports and freezing the assets and restricting travel of additional individuals engaged in the country's proliferation-sensitive nuclear activities.<br>• May: IAEA reports that Iran has not suspended its uranium enrichment activities and has continued operation of its pilot fuel enrichment plant. |

Source: GAO analysis of U.S. laws and executive orders, as well as UN documents, including UN Security Council resolutions.

# Appendix III: Sanctions Imposed Under the Law Currently Known as the Iran, North Korea, and Syria Nonproliferation Act

**Table 5: Imposition of Sanctions under the Iran Nonproliferation Act (INPA) and the Iran and Syria Nonproliferation Act (ISNA), 2001-2007, Iran-Related Cases[a]**

| Country of sanctioned parties | Number of sanctioned parties |
|---|---|
| *Iran Nonproliferation Act of 2000* | |
| Sanctions imposed against foreign parties from 2001 to 2006 | |
| China | 46[b] |
| North Korea | 9 |
| India | 6 |
| Russia | 5 |
| Armenia | 2 |
| Moldova | 2 |
| Macedonia | 2 |
| Belarus | 2 |
| Taiwan | 2 |
| All others | 5 |
| Total | 81 |
| *Iran and Syria Nonproliferation Act* | |
| Sanctions imposed against foreign parties in 2006 to 2007 | |
| Syria | 8 |
| China | 6 |
| Sudan | 3 |
| Malaysia | 3 |
| Russia | 2 |
| Iraq | 2 |
| Mexico | 2 |
| Pakistan | 2 |
| All others | 2 |
| Total | 30 |
| *Both Acts Combined* | |
| Sanctions imposed against foreign parties, 2001 to 2007 | |
| China | 52 |
| North Korea | 9 |
| Syria | 8 |
| Russia | 7 |
| India | 6 |
| Malaysia | 3 |

Appendix III: Sanctions Imposed Under the
Law Currently Known as the Iran, North
Korea, and Syria Nonproliferation Act

| Country of sanctioned parties | Number of sanctioned parties |
|---|---|
| Sudan | 3 |
| All others | 23 |
| Total | 111 |

Sources: http://www.state.gov/t/isn/c15231.htm, *Federal Register*.

[*]The Iran Nonproliferation Act of 2000 (INPA) was amended to include Syria in 2005 (the Iran and Syria Nonproliferation Act, or ISNA), and North Korea in 2006, and is now known as the Iran, North Korea, and Syria Nonproliferation Act (INKSNA).

[†]For the total number of sanctions involving parties from specific countries, in particular China, the total number of sanction cases includes multiple instances of sanctions that were imposed against the same party.

# Appendix IV: Potential Investors in Iran's Energy Sector

The following table illustrates various major agreements between Iran and foreign firms and governments in Iran's energy sector.[1] The table is not intended to imply a complete or thorough listing of foreign deals. Because several of these deals are in progress, we are making the conservative assumption that these agreements, at a minimum, express commercial interest between Iran and the foreign party to trade, finance or underwrite a project in Iran's energy sector.

**Table 6: List of Recent Major Agreements between Iran and Foreign Investors in Iran's Energy Sector**

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|---|---|---|---|---|---|
| March 2003 | Binding Contract | France, Technip-Collexip | Construction of an ethylene cracker on Kharg Island. (Petrochemical) | $232 million | Completed |
| May 2003 | Binding Contract | South Korea, Daelim | Engineering, Procurement and Construction (EPC) contract for 645,000 ton/year (t/y) capacity ethyl-benzene plant in Assaluyeh. (Petrochemical) | $600 million | To be completed in 2008 |
| January 2004 | Binding Contract | Japan, INPEX | Development of the Azadegan oil field. (Oil) | $4.45 billion | INPEX withdrew in 2006 from the project due to the political environment in Iran. National Iran Oil Company (NIOC) has since offered this project to domestic companies |
| April 2004 | Binding Contract | Japan, consortium consisting of Japan's Toyo Engineering Corp. and Chiyoda Corp | Construction of a 670,000 t/y ammonia and urea plant in Assaluyeh. (Petrochemical) | $220 million | To be completed in late 2007 |

[1] All contracts are partner arrangements between Iran and the foreign party. However, we have not listed the Iranian partner. For example, both the first and second contracts are with National Iranian Petrochemical Company (NIPC). For the remaining contracts, other Iranian partners include, for example, National Iran Oil Company (NIOC), National Iranian Gas Company (NIGC), National Iranian Oil Refining and Distribution Company (NIORDC), among others. Also, consortiums are partnerships with Iranian companies.

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| August 2004 | Binding Contract | Brazil, Petrobras | Exploration and Development Contract for the Tusan block. If commercial volumes of hydrocarbons are found, Petrobras will be awarded the contract for the development of the field(s). (Oil) | $34 million | Near completion |
| January 2005 | Binding Contract | Consortium: South Korea, Daelim; UK's SembCorp Simon-Carves | EPC Contract for a 300,000 t/y LDPE at the Amir Kabir petrochemical plant. (Petrochemical) | $242 million | To be completed in 2008 |
| March 2005 | Binding Contract | Thailand, PTT Exploration and Production (PTTEP) | Exploration and development contract for the Saveh block. If commercial volumes of hydrocarbons are found, PTTEP will invest up to $39 million for further appraisals of the block. Upon completion of exploration for commercial hydrocarbon reserves, PTTEP will be awarded the contract for the development of the field(s). (Oil) | $5.4 million (Minimum exploration contract) | In progress |
| May 2005 | Binding Contract | China, China National Petroleum Corporation (CNPC) | Exploration and development contract for the Kuhdasht Block. If commercial volumes of hydrocarbons are found, CNPC will invest up to $51 million for further appraisals of the block. Upon completion of exploration for commercial hydrocarbon reserves, CNPC will be awarded the contract for the development of the field(s). (Oil/Gas) | $18 million (Minimum exploration contract) | In progress |
| July 2005 | Binding Contract | Consortium: UK, Costain Oil, UK, Gas and Process; Spain, Dragados | EPC of Bid Blonad 2 gas processing plant. (Gas) | $1.42 billion | To be completed sometime in 2010-2011 |

GAO-08-58 Iran Sanctions

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| July 2005 | Binding Contract | Consortium: South Korea, Hyundai Engineering and Construction Co; German, Linde | EPC of a 1.2 million t/y ethylene plant. (Petrochemical) | $1.3 billion | To be completed sometime in 2009-2010 |
| August 2005 | Binding Contract | Italy, Tecnimont | Construction of a 300,000 t/y LDPE plant at Sanadaj (Kordestan). (Petrochemical) | $292 million | To be completed sometime in 2009-2010 |
| November 2005 | Binding Contract | Italy, Tecnimont | Construction of 300,000 t/y LLDPE/HDPE plant (Petrochemical). | Total contracts worth: $536 million | To be completed in 2010 |
| | Binding Contract | Italy, Tecnimont | Construction of 30,000 t/y Butene-1 plant at Khorramabad (Lorestan). (Petrochemical) | | |
| November 2005 | Binding Contract | Japan, Mitsui Engineering & Shipbuilding Co. (MES) | EPC contract for 300,000 t/y HDPE petrochemical plant in Ilam province. (Petrochemical) | $288 million | To be completed in 2010 |
| May 2006 | Binding Contract | German ABB Lummus | EPC contract for the expansion of Abadan oil refinery to increase gasoline production. (Oil refining) | $478 million | To be completed sometime in 2009-2010 |
| June 2006 | Binding Contract | China, China Petroleum & Chemical Corporation (Sinopec) | Exploration and development contract for the Garmsar Block. If commercial volumes of hydrocarbons are found, Sinopec will be awarded the contract for the development of field(s). | $19.6 million (Minimum investment) | In progress |
| August 2006 | Binding Contract | China, China Petroleum & Chemical Corporation (Sinopec) | Upgrade 8 existing units of the Arak refinery in the Markazi province and add 14 more units to increase gasoline production. | $1.6 billion | To be completed in 2010 |

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|---|---|---|---|---|---|
| September 2006 | Binding Contract | Norway, Norsk Hydro ASA | Exploration and development contract for the Khorramabad Block. If commercial volumes of hydrocarbons are found, Norsk Hydro will invest up to $58 million for further appraisals of the block. Upon completion of exploration for commercial hydrocarbons reserves Norsk Hydro will be awarded the contract for the development of the field(s). (Oil) | $49 million (Minimum exploration contract) | In progress |
| October 2006 | Binding Contract | Italy, IRASCO s.r.l, subsidiary of Iran International Engineering Company (IRITEC) | Kharg and Bahregansar associated gas gathering & Natural Gas Liquids (NGL) recovery project. (Kharg NGL project) (Natural Gas) | $1.6 billion | To be completed in 2010 |
| November 2006 | Nonbinding Memorandum of Understanding (MOU) | Australia, Liquefied Natural Gas Limited (LNG Ltd) | Development of Salkh (Qeshm 4) and Southern Gashu gas fields and the construction of a 3.4 mtpa LNG plant (Qeshm LNG) on Qeshm Island. (Natural gas) | This is a preliminary agreement, no details available. | Under negotiations |
| November 2006 | Binding Contract | Consortium: German, ABB Lummus | EPC Contract for increasing of gasoline production in Bandar Abbas oil refinery. (Oil refining) | $442 million | To be completed in 2010 |
| December 2006 | Nonbinding MOU | China, China National Offshore Oil Corporation (CNOOC) | Development of the North Pars gas field for LNG Exports. (Natural Gas) | $16 billion | Under negotiations |
| December 2006 | Binding contract | China, Sinopec | EPC contract for gasoline production unit at Tabriz refinery. (Oil refining) | $ 144.7 million . | To be completed in 2009 |

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|------|-------------------|------------------|--------------------|--------|--------|
| December 2006 | Nonbinding MOU | Iran and Belarus (Inter government agreements) | Development of the Jofeir oil field. (Oil) | NIOC announced negotiations with Belarusian party is near completion and the contract is expected to be signed in July 2007. | Under negotiations |
| January 2007 | Nonbinding MOU | Malaysia, SKS Ventures | Development of the Golshan and the Ferdos gas fields for LNG exports. (Natural Gas) | $16 billion | Under negotiations |
| February 2007 | Nonbinding contract | Netherlands, Shell; Spain, Repsol | Development of Phases 13 and 14 (Persian LNG). Shell (25%), Repsol (25%). (Natural Gas) | $4.3 billion | Contract effectiveness is subject to Persian LNG final investment decision (FID). Start-up depends on project FID |
| February 2007 | Binding contract | Korea, Daelim | Agreement on the construction of LNG and LPG storage tanks for the Iran LNG plant and the construction of port and dock facilities. (Natural Gas) | $500 million | To be completed in 2014-2015 |
| March 2007 | Binding contract | Consortium: South Korea, Daelim; German, Lurgi and UHDE | EPC contract for upgrading the Isfahan oil refinery. (Oil refining) | $1.72 billion | To be completed in 2012 |
| April 2007 | Binding contract | Indonesia, Star Petrogas | EPC contract for Bandar Abbas condensate splitter. (Oil refining) | Approximate worth of contract at $2 billion | To be completed in 2010 |
| May 2007 | Nonbinding Heads of Agreement (HOA) | Austria, OMV | OMV has 20% share in the development of South Pars Phase 12 and holds 10% share in Iran LNG Project. OMV also agreed to buy 2.2 mt LNG from Iran LNG Project. (Natural Gas) | Early planning stages, no details | Under negotiations |
| May 2007 | Nonbinding MOU | Iran and Oman (inter government agreement) | Construction of a 670,000 t/y ammonia and urea plant in Assaluyeh. (Petrochemical) | This is a preliminary agreement, no details available. | Under negotiations |

GAO-08-58  Iran Sanctions

Appendix IV: Potential Investors in Iran's
Energy Sector

| Date | Type of agreement | Country/Investor | Type of investment | Amount | Status |
|---|---|---|---|---|---|
| May 2007 | Nonbinding MOU | Iran and Oman (inter government agreement) | Construction of a gas pipeline from Iran to Oman and the cooperation in LNG production and development of Hengam gas field. (Natural gas) | This is a preliminary agreement, no details available. | Under negotiations |
| May 2007 | Nonbinding MOU | Iran and Iraq (inter government agreement) | Construction of an oil pipeline. (Oil infrastructure) | This is a preliminary agreement, no details available. | Under negotiations |

Source: FACTS Global Energy

Note: Contract worth stated in this list only constitutes those contracts signed with foreign companies. For exploration and development contracts, the contract value (minimum-maximum range applies only for exploration activities. Should oil and gas reserves be found, new contracts for field development are required to be signed. Heads of Agreement (HOA) and Memoranda of Understanding (MOU) are not normally binding or completed deals. These are typically preliminary stage agreements with the intention to create a legally binding contract and are used to identify the principal elements of the deal. In general, typical preliminary stages can include Letter of Indication or Letter of Interest, MOU, Letter of Intent, HOA, and Confirmation of Intent. In the table, a binding contract means that it is a done deal and is legally binding. Nonbinding deals such as MOUs and HOAs and preliminary agreements and are generally beyond the stage of a Letter of Interest (i.e., expressed commercial interest to trade, finance or underwrite the project). We did not independently review the contracts.

GAO-08-58  Iran Sanctions

# Appendix V: Comments from the Department of the Treasury

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

December 6, 2007

Mr. Joseph Christoff
Director, International Affairs and Trade
Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Christoff:

Thank you for the opportunity to review the draft Government Accountability Office (GAO) report entitled, *Iran Sanctions — Impact in Furthering U.S. Objectives Is Unclear and Should Be Reviewed* (GAO-08-58). Please find attached recommended clarifications to the draft report.

As a result of the collective efforts of the international community and financial leaders to apply financial pressure on Iran, the country is experiencing increasing economic, financial, and political isolation from the global community.

Iran remains a danger to the security of people worldwide. Iran continues to pursue nuclear capabilities and ballistic missile technology and sends hundreds of millions of dollars each year to deadly terrorist groups — all the while attempting to mask these activities through deceptive financial practices. In additional to the comprehensive country sanctions maintained against Iran, the Treasury Department, in cooperation with its partners in the interagency community, has implemented targeted financial measures aimed at altering this illicit conduct emanating from Iran. The U.S. Government's efforts have been reinforced by two unanimous United Nations Security Council Resolutions, 1737 and 1747, targeting Iran's nuclear and ballistic missile pursuits.

A key component in our efforts to sustain the pressure on Iran has been the voluntary response we have seen from the private sector, thereby reinforcing governmental actions. We have shared information with the private sector about how Iran employs deceptive financial practices to send money to terrorist groups and pursue nuclear capabilities and missile programs. Further, we have notified private financial institutions about Iran's attempts to lure reputable banks unwittingly into those activities. As they become aware of this misconduct, financial institutions across the globe are refusing to deal with Iran in any currency, determining the business is too risky.

As a further result of this international pressure, foreign-based branches and subsidiaries of Iran's state-owned banks are increasingly isolated, threatening their viability. The OECD has

Appendix V: Comments from the Department of the Treasury

also taken notice and increased Iran's risk classification for the likelihood that the country will pay its external debts to its second-worst rating, thereby increasing the cost of financing for Iranian companies and invoking a devastating reduction in the foreign investment Iran needs to develop its vast oil reserves.

The report drafted by the GAO specifically recommends that the National Security Council, in collaboration with the Departments of State, Treasury, Energy and Commerce, the intelligence community, and U.S enforcement agencies collect, analyze, and improve data on U.S. agencies' actions to enforce sanctions against Iran and develop a baseline assessment of their impact. The Treasury Department continues to assess the effectiveness of its authorities that have been used against Iranian entities or Iranian interests. These assessments, which are not publicly available, are designed to determine the specific impact of Treasury actions and their success in meeting policy goals.

**See comment 1.**

As a part of this larger recommendation, the GAO also recommends the Treasury Department consider the amount of Iranian assets frozen pursuant to Treasury's terrorism and WMD proliferation sanctions programs as a component of this assessment. The Iranian sanctions program is primarily a rejection-based program, with over 25,000 rejected transactions valued at over $5 billion since 1997. While some terrorism and proliferation-based designations of foreign entities involve an Iranian nexus, the amount of assets that are blocked as a result of these designations is typically peripheral to their objective, and not a measure of the Iran program's value. These frozen assets do not reflect the inability of designated parties to use the U.S. financial system or transact business with U.S. persons, the international isolation that designated parties face due to the use by international financial institutions of the Office of Foreign Assets Control's Specially Designated Nationals (SDN) list, or reputational and diplomatic harm that stems from a designation. These broader effects can be severe and are often the primary way in which sanctions deliver impact internationally.

**See comment 2.**

Thank you for your efforts and should you have any additional questions please do not hesitate to contact me or my staff.

Sincerely,

Stuart A. Levy

**See comment 3.**

Attachment
Comments Matrix

Appendix V: Comments from the
Department of the Treasury

The following are GAO's comments on the Department of the Treasury's letter dated December 6, 2007.

## GAO Comments

1. GAO has acknowledged Treasury's efforts to identify the impact of financial sanctions as appropriate in the report. While Treasury assesses such impact, we maintain that a larger impact assessment of all U.S. sanctions has never been undertaken.

2. Our report acknowledges various broad positive impacts of sanctions.

3. Treasury's letter included an attachment with numerous technical comments that we incorporated into the report as appropriate.

# Appendix VI: Comments from the Department of Commerce

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**THE SECRETARY OF COMMERCE**
Washington, D.C. 20230

November 1, 2007

Mr. Joseph Christoff
Director, International Affairs and Trade
Government Accountability Office
Washington, DC  20548

Dear Mr. Christoff:

Thank you for the opportunity to comment on GAO's draft report *Iran Sanctions: Impact in Furthering U.S. Objectives is Unclear and Should be Reviewed, GAO-08-58.*

See comment 1.

The Department of Commerce has two technical comments on the report. One comment is enclosed and the other comment is classified and will be provided separately.

Sincerely,

Carlos M. Gutierrez

Enclosure

Appendix VI: Comments from the Department
of Commerce

U.S. Department of Commerce
Comments on
Iran Sanctions: Impact in Furthering U.S. Objectives
is Unclear and Should Be Reviewed, GAO-08-58

See comment 2.

p. 10, footnote 8. Add:  Sanctions were recently extended by the Department of
Commerce's July 12, 2007, addition of five Iranian entities to the Entity List.
All reexports of any item subject to the Export Administration Regulations now
require an export license, with a presumption of denial, to the listed entities.

The following are GAO's comments on the Department of Commerce's letter dated November 1, 2007.

## GAO Comments

1. We reviewed Commerce's classified technical comment and considered it in revising our report.

2. We incorporated this information into the report.

# Appendix VII: GAO Contact and Staff Acknowledgments

| GAO Contact | Joseph Christoff, (202) 512-8979 or christoffj@gao.gov |
| --- | --- |
| **Staff Acknowledgments** | In addition to the person named above, Tet Miyabara, Assistant Director; Kathryn Bernet; Lynn Cothern; Aniruddha Dasgupta; Martin De Alteriis; Leslie Holen; Bruce Kutnick; Grace Lui; Roberta Steinman; Anne Stevens; and Eddie Uyekawa made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, DC 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>  TDD:  (202) 512-2537<br>  Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, jarmong@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Manager, youngc@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |

PRINTED ON RECYCLED PAPER