1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12
   DEBORAH D. PETERSON, Personal      )    CASE NO. 3:08-80030-JSW (BZ)
13 Representative of the Estate of James C. )
   Knipple (Dec.). et al.,               )    NOTICE OF MOTION AND MOTION FOR
14                                        )    HEARING ON OBJECTION TO REPORT
              Plaintiffs,                 )    AND RECOMMENDATION TO DENY
15                                        )    PLAINTIFFS' EX PARTE APPLICATIONS,
   vs.                                    )    PURSUANT TO LOCAL RULE 72-3(a), AND
16                                        )    MOTION FOR DE NOVO DETERMINATION
   ISLAMIC REPUBLIC OF IRAN. et al.,     )
17                                        )    Date:  July 11, 2008
              Defendants.                 )    Time: 9:00 a.m.
18 _____ )    Courtroom: 17, 16th Floor
                                               Judge: Jeffrey S. White
19

20      TO DEFENDANTS, AND TO EACH OF THE SAME, AND TO THEIR ATTORNEYS

21 OF RECORD:

22      PLEASE TAKE NOTICE that on the 11th day of July, 2008, at the hour of 9:00 a.m., in

23 Courtroom 17. before the Honorable Jeffrey S. White. Judge of the United States District Court, at

24 the courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs

25 DEBORAH D. PETERSON. Personal Representative of the Estate of James C. Knipple (Dec.). et

26 al. ("Plaintiffs") will and do hereby move this court for an adjudication de novo on those certain ex

27 parte applications, namely. Ex Parte Application For Order Amending Writ of Execution to

28 SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND
   AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO
   C.C.P. § 680.135 - CASE NO. 3:08-80030-JSW (BZ)                                          1

1  Include Additional Names and Second Ex Parte Application for Order Amending and to Direct

2  Issuance of Second Amended and Alias Writ of Execution to Include Additional Names. as Docket

3  Nos. 6 & 9.

4      The basis thereof is that the Honorable Magistrate Judge Bernard Zimmerman entered that

5  certain REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE

6  APPLICATIONS (Docket No. 36) on May 22, 2008, that Plaintiffs have objected thereto timely.

7  and that Plaintiffs seek a hearing de novo as permitted under Local Rule 72-3(a). and a

8  determination thereof.

9      This motion is based upon this Notice, the Motion. the Memorandum of Points and

10  Authorities. the Declaration of David J. Cook, Esq.. the REPORT AND RECOMMENDATION

11  TO DENY PLAINTIFFS' EX PARTE APPLICATIONS (Docket No. 36). the OBJECTIONS filed

12  herein (Docket No. 48), the Ex Parte Application For Order Amending Writ of Execution to

13  Include Additional Names and Second Ex Parte Application for Order Amending and to Direct

14  Issuance of Second Amended and Alias Writ of Execution to Include Additional Names. as Docket

15  Nos. 6 & 9, the two Memorandum of Points and Authorities and Declarations filed with Docket

16  Nos. 6 & 9 (Docket Nos. 7. 8. 10 & 11). upon the SUPPLEMENTAL MEMORANDUM OF

17  POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION FOR

18  ODER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS

19  WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES etc. and the SUPPLEMENTAL

20  DECLARATION OF DAVID J. COOK, ESQ. in support thereof filed in *Peterson vs. Islamic*

21  *Republic of Iran*, Case No. 3:08-80030-JSW (BZ) [Docket No. 35], and upon all pleadings, papers

22  and other matters on file herein, and upon all oral evidence and argument which may be presented

23  at the hearing hereof.

24  DATED: June 2, 2008                    COOK COLLECTION ATTORNEYS

25                                         By:  /s/ David J. Cook
                                           DAVID J. COOK, ESQ. (SB# 060859)
26                                         Attorneys for Plaintiffs
                                           STEVEN M. GREENBAUM, ALAN
27                                         HAYMAN. and SHIRLEE HAYMAN

28

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13 DEBORAH D. PETERSON, Personal    )    CASE NO. 3:08-80030-JSW (BZ)
   Representative of the Estate of James C. )
   Knipple (Dec.), et al.,          )    MOTION FOR HEARING ON OBJECTION
14                                   )    TO REPORT AND RECOMMENDATION TO
                                     )    DENY PLAINTIFFS' EX PARTE
           Plaintiffs,              )    APPLICATIONS, PURSUANT TO LOCAL
15                                   )    RULE 72-3(a), AND MOTION FOR DE NOVO
   vs.                              )    DETERMINATION
16                                   )
   ISLAMIC REPUBLIC OF IRAN, et al., )
17                                   )    Date:  July 11, 2008
           Defendants.             )    Time: 9:00 a.m.
18 _____ )    Courtroom: 17, 16th Floor
                                        Judge: Jeffrey S. White
19

20         PLEASE TAKE NOTICE that on the 11th day of July, 2008, at the hour of 9:00 a.m., in

21 Courtroom 17, before the Honorable Jeffrey S. White, Judge of the United States District Court, at

22 the courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs

23 DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), et

24 al. ("Plaintiffs") will and do hereby move this court for an adjudication de novo on those certain ex

25 parte applications, namely, Ex Parte Application For Order Amending Writ of Execution to

26 Include Additional Names and Second Ex Parte Application for Order Amending and to Direct

27 Issuance of Second Amended and Alias Writ of Execution to Include Additional Names, as Docket

28

1  Nos. 6 & 9.

2       The basis thereof is that the Honorable Magistrate Judge Bernard Zimmerman entered that

3  certain REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE

4  APPLICATIONS (Docket No. 36) on May 22, 2008. that Plaintiffs have objected thereto timely.

5  and that Plaintiffs seek a hearing de novo as permitted under Local Rule 72-3(a), and a

6  determination thereof.

7       This motion is based upon this Notice, the Motion, the Memorandum of Points and

8  Authorities. the Declaration of David J. Cook, Esq., the REPORT AND RECOMMENDATION

9  TO DENY PLAINTIFFS' EX PARTE APPLICATIONS (Docket No. 36). the OBJECTIONS filed

10  herein (Docket No. 48), the Ex Parte Application For Order Amending Writ of Execution to

11  Include Additional Names and Second Ex Parte Application for Order Amending and to Direct

12  Issuance of Second Amended and Alias Writ of Execution to Include Additional Names. as Docket

13  Nos. 6 & 9. the two Memorandum of Points and Authorities and Declarations filed with Docket

14  Nos. 6 & 9 (Docket Nos. 7, 8. 10 & 11), upon the SUPPLEMENTAL MEMORANDUM OF

15  POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION FOR

16  ODER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS

17  WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES etc. and the SUPPLEMENTAL

18  DECLARATION OF DAVID J. COOK, ESQ. in support thereof filed in *Peterson vs. Islamic*

19  *Republic of Iran,* Case No. 3:08-80030-JSW (BZ) [Docket No. 35), and upon all pleadings, papers

20  and other matters on file herein. and upon all oral evidence and argument which may be presented

21  at the hearing hereof.

22  DATED:  June 2, 2008          COOK COLLECTION ATTORNEYS

23

24                         By:  /s/ David J. Cook
                       DAVID J. COOK, ESQ. (SB# 060859)

25                         Attorneys for Plaintiffs
                       STEVEN M. GREENBAUM, ALAN
                       HAYMAN, and SHIRLEE HAYMAN

26

27  F:\USERS\DJCNEW\peterson.objexs

28
   MOTION FOR HEARING ON OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS'
   EX PARTE APPLICATIONS, PURSUANT TO LOCAL RULE 72-3(a). AND MOTION FOR DE NOVO
   DETERMINATION - CASE NO. 3:08-80030-JSW (BZ)                 2

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

| | |
|---|---|
| 13  DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), et al., | CASE NO. 3:08-80030-JSW (BZ) |
| 14                     Plaintiffs, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON OBJECTION TO REPORT |
| 15  vs. | AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS, |
| 16  ISLAMIC REPUBLIC OF IRAN, et al., | PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION |
| 17                     Defendants. | |
| 18 | Date: July 11, 2008 Time: 9:00 a.m. |
| 19 | Courtroom: 17, 16th Floor Judge: Jeffrey S. White |

20                  **I. INTRODUCTION.**

21        Plaintiffs DEBORAH D. PETERSON, Personal Representative of the Estate of James C.

22  Knipple (Dec.), et al. ("Plaintiffs"), bring this action to recover based upon the 1983 bombing

23  which killed 241 Marines and servicemen, commonly known as the Marines Barracks Bombing.

24  This led to the filing of an action in the United States District Court, District of Columbia, entitled

25  *Peterson vs. Islamic Republic of Iran,* Case No. 01-2094 (RCL), leading to a judgment on 9/7/07

26  in the amount of $2,656,944,877.  Plaintiffs docketed this judgment in the United States District

27

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON
   OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS,
   PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION
   CASE NO. 3:08-80030-JSW (BZ)                                                                    1

1  Court, Northern District of California, in the above-entitled action, on 3/11/08, pursuant to 28

2  U.S.C. § 1963 herein.

3    On 3/14/08, Plaintiffs filed those certain Ex Parte Application For Order Amending Writ of

4  Execution to Include Additional Names and Second Ex Parte Application for Order Amending and

5  to Direct Issuance of Second Amended and Alias Writ of Execution to Include Additional Names,

6  as Docket Nos. 6 & 9, seeking to amend the Writ of Execution.  These ex parte applications were

7  filed under C.C.P. § 680.135, which provides as follows:

8      § 680.135.
       "Affidavit of Identity" means an affidavit or declaration executed by a judgment
9      creditor, under penalty of perjury, that is filed with the clerk of the court in which
       the judgment is entered at the time the judgment creditor files for a writ of
10     execution or an abstract of judgment. The affidavit of identity shall set forth the
       case name and number, the name of the judgment debtor stated in the judgment, the
11     additional name or names by which the judgment debtor is known, and the facts
       upon which the judgment creditor has relied in obtaining the judgment debtor's
12     additional name or names. The affidavit of identity shall not include the name or
       names of persons, including any corporations, partnerships, or any legal entities not
13     separately named in the judgment in which the judgment debtor is a partner,
       shareholder, or member, other than the judgment debtor.
14
       This matter was heard by the Honorable Bernard Zimmerman, Magistrate Judge, who
15
   heard and considered both this case and the companion case of *Greenbaum vs. Islamic Republic of*
16
   *Iran,* Case No. 3:08-mc-80024-JSW (BZ).  The court issued a REPORT AND
17
   RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS (Docket No. 14),
18
   in the *Greenbaum vs. Islamic Republic of Iran* action marked *Exhibit "A"* [1] and the REPORT
19
   AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATION in this
20
   action (Docket No. 36) is marked *Exhibit "B."*
21
                    **II. MOTION FOR HEARING DE NOVA.**
22
       Plaintiffs move this court for a hearing de novo pursuant to Local Rule of Court 72-3(a)
23
   which provides as follows:
24

25  _____

26    [1] All exhibits are incorporated by reference as though fully set forth in this Memorandum
   in their entirety and are attached to the Declaration of David J. Cook, Esq. which is filed
27  contemporaneously herein.

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON
   OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS,
   PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION
   CASE NO. 3:08-80030-JSW (BZ)                                                    2

**72-3. Objection to Dispositive Decision.**
**(a) Form of Objection and Response.** Any objection filed pursuant to FRCivP 72(b) and 28 U.S.C. § 636(b)(1)(B) must be accompanied by a motion for de novo determination. specifically identify the portions of the Magistrate Judge's findings, recommendation or report to which objection is made and the reasons and authority therefor. To the extent consistent with FRCivP 72(b) and 28 U.S.C. § 636. Civil L.R. 7-2 governs presentation and consideration of such motions and objections.
**(b) Motion for Expansion of Record or for Evidentiary Hearing.** At the time a party files an objection or response, the party may make a motion for expansion or addition to the record of the proceedings before the Magistrate Judge or for an evidentiary hearing.
**( c) Ruling on Objection Limited to Record before Magistrate Judge.** Except when the Court grants a motion for expansion or addition to the record or for an evidentiary hearing, the Court's review and determination of objections filed pursuant to Civil L.R. 72-3(a) shall be upon the record of the proceedings before the Magistrate Judge.

Plaintiffs seek a hearing de novo in that Plaintiffs have objected to the Magistrate Judge's report. as follows:

  1. The court ruled as follows:

"Because the judgment was entered in the District of Columbia, not the Northern District. Cal. Civ. Proc. Code section 680.135 does not authorize this court to grant plaintiffs' applications.'" (p. 5, ll. 2-5.)

BASIS OF OBJECTION: C.C.P. § 680.135, applicable herein under F.R.C.P. 69(a) specifically provides:

"Affidavit of Identity" means an affidavit or declaration executed by a judgment creditor, under penalty of perjury, that is filed with the clerk of the court in which the judgment is entered at the time the judgment creditor files for a writ of execution or an abstract of judgment. . . ."

While this judgment was originally rendered by the United States District Court, District of Columbia ("USDC. D.C.") (Judge Royce C. Lamberth, Chief Judge), Plaintiff has independently docketed the judgment in the USDC, N.D.Cal. under 28 U.S.C. § 1963, in which this is the sole court by which a Writ of Execution for purposes of execution could ever be issued. The USDC. D.C. could not issue a Writ of Execution, for purposes of Plaintiffs levying and executing upon assets in the USDC, N.D.Cal. Accordingly, the definition of the word "court" under C.C.P. § 680.135 is specifically defined as that specific court which in fact would issue the Writ of Execution. Otherwise, Plaintiffs would be left with the anomaly of seeking redress before the USDC, D.C., seeking relief in the issuance of a "Writ of Execution" by another court, under the auspices of another Judge. Furthermore, in many states, Writs of Execution are not routinely issued, but rather, various writs such as garnishments, citations, "writs of attachment on garnishments." and other devices of local supplemental law. Accordingly, the Magistrate Judge was in error in finding that only the USDC. D.C. Court could direct or redirect the form and format of a Writ of Execution. when in fact that Writ of Execution would be issued by another independent District Court.

The Court also states at page 6:

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS, PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION
CASE NO. 3:08-80030-JSW (BZ)                                                                        3

1    ". . . Applied in the federal system, this procedure has merit. Presumably, the judge
      who entered the judgment is in the best position to determine whether the debtor
2    uses additional names. And the proliferation of 'identity' proceedings around the
      country, such as has occurred with this judgment, with its concomitant risk of
3    inconsistent rulings, would be avoided." (P. 6, ll. 3-9)

4         While multi-district enforcement is common, in a case such as this, levies and execution,
      by their very nature are "local" in that a Judgment Creditor seeks to levy on a specific asset in a
5    specific district. If the Judgment Creditor has reason to believe, e.g., that an asset is held in a
      name other than the Judgment Debtor, the Judgment Creditor would be obligated to insure that the
6    Writ of Execution properly lists all of the names of the Judgment Debtor, to insure confluence
      between the levy process and the identity of the asset. Otherwise, the respondent (garnishee) under
7    a levy could potentially avoid paying over the asset, based upon the lack of identity or misidentity
      of the debtor.
8         The court also misconstrues the prospect that a Northern California Writ of Execution is
      only good within the prospect of levy in the State of California. Conversely, a Writ issued by the
9    USDC, D.C. similarly would be limited. Plaintiffs therefore, notwithstanding potentially some
      redress by the USDC, D.C., could not use a USDC, D.C. Writ to reach an asset in the USDC, N.D.
10   Cal.

11        2. Plaintiffs further object to the following:

12        "Nor is it clear that the relief plaintiffs seek is available under Cal. Civ. Proc. Code
           sections 680.135 and 699.510. Plaintiffs are not claiming that Iran is literally
13         known by the names of the many oil companies named in the applications. Rather,
           plaintiffs are claiming that Iran nationalized or otherwise owns a number of oil
14         companies, some of which have subsidiaries, and it wishes to execute against these
           entities. A literal reading of the California statutes suggests that they are meant to
15         address judgment debtors known by multiple names or aliases, (see Richard L.
           Enkelis, Action Guide: Enforcing Civil Money Judgments, Step. 13, p. 19 (2006))
16         rather than subsidiaries or affiliates of the judgment debtor.[2] In fact, section 680.135
           states that:
17
               [t]he affidavit of identity **shall not include** the name of names of
18             persons, including **any corporations,** partnerships, or any legal
               entities not separately named in the judgment **in which the**
19             **judgment debtor is a partner, shareholder, or member,** other
               than the judgment debtor.
20
      Cal. Civ. Proc. Code § 680.135 (emphasis added).
21
          BASIS OF OBJECTION: Many of the concerns raised by the Magistrate Judge are in fact
22   resolved by the legislation found at section 1605A, which is now part of the Foreign Sovereign
      Immunities Act ("FSIA"), as set forth by the attached enabling legislation. The effective abolition
23   of the FSIA as to Iran and other terrorist states completely vitiates the barrier between a state
      sponsor of terror, on the one hand, and its "agencies and instrumentalities." Plaintiffs have
24   demonstrated that Iran obviously owns and controls its own Ministry of Petroleum and their many
      subsidiaries, and the legislation essentially sought to "collapse" all of these entities into the
25   Judgment Debtor. Accordingly, the Court's analysis, e.g., that these are alleged "different entities"
      fails to address the fact that Congress sought to abolish "separateness" and conflate Iran and all of
26   its agencies and instrumentalities into one debtor.

27

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON
      OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS,
      PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION
      CASE NO. 3:08-80030-JSW (BZ)                                                                    4

1    3. Plaintiffs also object to the following:

2    "Plaintiffs showing is also deficient from an evidentiary standpoint. Cal. Civ. Proc.
     Code section 680.135 requires an affidavit or declaration under penalty of perjury
3    which sets forth the factual basis for assertion that the debtor is known by other
     names. Here plaintiffs' applications are supported by declarations of counsel which
4    attaches a number of unauthenticated or poorly authenticated documents which
     purportedly establish that the government of Iran, the judgment debtor, owns one or
5    more national oil companies which in turn have a number of subsidiaries. As
     proof, plaintiffs rely principally on screen shots of various internet websites.
6    Plaintiffs have not established that the websites from which these screen shots were
     taken are owned or maintained by the companies in question, let alone that the
7    information on those websites is accurate. Wady v. Provident Life & Accident Ins.
     Co. Of Am., 216 F.Supp.2d 1060, 1064 - 65 (C.D. Cal. 2002) (court sustained
8    objection to printouts from a company's website because the affiant lacked
     'personal knowledge' of who maintains the website, who authored the documents,
9    or accuracy of their content'). See also Internet and Email Evidence, Am. Law
     Institute-Am. Bar Ass'n, Trial Evidence in the Federal Courts: Problems and
10   Solutions, 559, 562 - 64 (2008)."

11       BASIS OF OBJECTION: Plaintiffs are obviously severely hobbled by the fact that Iran is a
     sovereign state; that Iran is a state sponsor of terror; that Iran is not readily subject to any type of
12   discovery, whether by way of depositions, orders of examination under C.C.P. § 708.110(a), or
     post-judgment interrogatories, or the like. Iran has made it clear that Iran will never pay this
13   judgment, and needless to say, is not about to cooperate with the victims of its terrorist conduct,
     leading to now a $2.7 billion judgment. Plaintiffs are therefore left to whatever available resources
14   there are. Plaintiffs' evidence includes, but is not limited to, e.g., information which Iran makes
     available through its public website under the title of "Ministry of Petroleum," information
15   available from the Energy Information Administration of the Department of Energy, various
     reports and proceedings from the Iran-U.S. Claims Tribunal, and other sources. Plaintiffs do not
16   claim that the level of evidence necessarily would rise to the dignity of a successful party in a
     summary judgment proceeding, but has provided sufficient evidence or some evidence by which
17   the Court can independently determine that Plaintiffs have demonstrated that Iran operates under
     various names which include the Ministry of Petroleum, National Iranian Oil Company, National
18   Iranian Gas Export Company, and the like. Furthermore, the information which Plaintiffs have
     provided is consistent with each other, and supported by independent government reports,
19   including the EIA/DOE Report, along with and including, information from the Iran-U.S. Claims
     Tribunal. Plaintiffs have certainly provided a sufficient quantum of evidence which would
20   demonstrate to any trier of fact, that Iran owns its own Ministry of Petroleum, has multiple
     subsidiaries, sells 3 billion barrels of oil a day, constitutes the fourth largest holder of oil reserves,
21   fourth largest exporter, and under any set of facts, that Plaintiffs are entitled to redraft the Writ of
     Execution showing that Iran is the owner and holder thereof, and recasting the Writ according.

22
                              **III. FUNDAMENTAL OBJECTIONS.**
23
         Plaintiffs have a number of fundamental objections which are summarized as follows:
24
     Plaintiffs seek to amend the Writ of Execution issued by the USDC, N.D.Cal., in which this court
25
     and only this court has the power to issue the Writ and control its process, and only this court.
26
     Plaintiffs have addressed all of these issues in great detail by way of the SUPPLEMENTAL
27

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON
     OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS,
     PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION
     CASE NO. 3:08-80030-JSW (BZ)                                                                    5

1    what is available to them through the websites made available by Iran. reports from the United

2    States government, including the EIA/DOE Report, and more specifically, the findings from the

3    Iran-U.S. Claims Tribunal. The total quantum of evidence should be sufficient to permit Plaintiffs

4    to demonstrate to this court that Iran in fact does business under its nationalized oil companies.

5    No evidence is before this court to the contrary.

6        If these Plaintiffs are held to the standard of providing evidence to the satisfaction of the

7    court akin to a summary judgment. Plaintiffs like these would never be able to get a Writ amended,

8    as a Judgment Debtor could readily make itself unavailable or impossible to reach. Compelling

9    the Judgment Debtor to proceed with broad-based discovery for this type of relief would convert a

10   simplified process under California law into broad-based civil litigation, the expense of which

11   would serve as an impossible barrier. The language of C.C.P. § 680.135 permits an ex parte

12   application, not full blown civil litigation.

13                    **V.  CONFLATING AGENCIES AND INSTRUMENTALITIES.**

14       Magistrate Judge Zimmerman also indicated concern that the "agencies and

15   instrumentalities" are separate. The viewpoint of the court is a substantial concern that Plaintiffs

16   are using an incorrect or wrong remedy, and in which Plaintiffs are unable to use C.C.P. §

17   680.135. (See REPORT, p. 6, ll. 10-22.)

18       The court has incorrectly viewed both the relief sought and the entitlement of Plaintiffs to

19   reach these assets. Plaintiffs seek to amend the Writ because these entities are the property of Iran,

20   as demonstrated through the website EIA/DOE Report and the Iran-U.S. Claims Tribunal, that

21   Plaintiffs can reach these assets through the abolition of FSIA, and as a result, such names as The

22   National Iranian Oil Company etc. are names by which Iran conducts business. The purpose in the

23   abolition of FSIA was to demolish the artificial barrier or artifice between Iran and its agencies and

24   instrumentalities. making such assets available for levy and execution.

25       Prior to 1/28/08, Iran was generally protected by the Foreign Sovereignty Immunities Act

26   ("FSIA") found at 28 U.S.C. § 1601 et seq.. with a number of exceptions, principally centering

27

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON
     OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS,
     PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION
     CASE NO. 3:08-80030-JSW (BZ)                                                                    7

around assets which were "blocked" and "unblocked" and the like. However, on 1/28/08,

President Bush signed into effect legislation which effectively repealed the FSIA, in total, which is

found at (in part) 28 U.S.C. 1605A. The key parts of that new section permitting meaningful

collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1), which provides as follows:

> "(a) IN GENERAL. --
>     "(1) NO IMMUNITY. – A foreign state shall not be immune from the
> jurisdiction of courts of the United States or of the States in any case not otherwise
> covered by this chapter in which money damages are sought against a foreign state
> for personal injury or death that was caused by an act of torture, extrajudicial
> killing, aircraft sabotage, hostage taking, or the provision of material support or
> resources for such an act if such act or provision of material support or resources is
> engaged in by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency."
>
> "(g) PROPERTY IN CERTAIN ACTIONS –
>     "(1) IN GENERAL. – subject to paragraph (3), the property of a foreign
> state against which a judgment is entered under section 1605A, and the property of
> an agency or instrumentality of such a state, including property that is a separate
> juridical entity or is an interest held directly or indirectly in a separate juridical
> entity, is subject to attachment in aid of execution, and execution, upon that
> judgment as provided in this section, regardless of –
>         "(A) the level of economic control over the property by the
>         government of a foreign state;
>         "(B) whether the profits of the property go to that government;
>         "( C) the degree to which officials of that government manage the
>         property or otherwise control its daily affairs;
>         "(D) whether that government is the sole beneficiary in interest of
>         the property; or
>         "(E) whether establishing the property as a separate entity would
>         entitle the foreign state to benefits in United States courts while
>         avoiding its obligations.
>     "(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE. Any
> property of a foreign state, or agency or instrumentality of a foreign state, to which
> paragraph (1) applies shall not be immune from attachment in aid of execution, or
> execution, upon a judgement entered under section 1605A because the property is
> regulated by the United States Government by reason of action taken against that
> foreign state under the Trading With the Enemy Act or the International Emergency
> Economic Powers Act."

Accordingly, Iran no longer has the shield of the FSIA, and a Judgment Creditor is free to

proceed against Iranian assets, as any other Judgment Debtor, rendering moot detailed discussions

and analysis over concepts of whether assets are blocked or otherwise.

Congress sought to ease the burden of levy and execution by conflating all of the entities,

including agencies and instrumentalities, such as and e.g., The National Iranian Oil Company, into

1  the debtor itself, specifically to avoid the crisis faced by a debtor, in which a government entity can

2  effectively hide and shield its assets through its "corporate subsidiaries." Congress sought to

3  abolish the same, otherwise, a Judgment Creditor would never be able to collect.

### VI. CONCLUSION.

5    In the filing of a judgment in a District Court, a plaintiff has the right to have execution

6  issued, and as stated, all execution is typically local. Only this court could issue an order

7  amending its own writs.

8    In response to the court's concern over the quantum or quality of evidence, these Plaintiffs

9  are facing a unique setting in seeking redress against a sovereign nation who is not readily

10  available to respond to discovery. Plaintiffs have made out their case based upon Defendant's own

11  statements, government reports, and decisions by a tribunal established by the Algiers Accord and

12  recognized by the Supreme Court as the tribunal to resolve claims by and between citizens of the

13  United States and the United States against Iran and Iran against the United States.

14    Finally, the changes to the FSIA dismantles the barriers between a foreign sovereign and its

15  agencies and instrumentalities, entitling Plaintiffs to this relief.

16  DATED: June 2, 2008                    COOK COLLECTION ATTORNEYS

18                                         By:  /s/ David J. Cook
                                           DAVID J. COOK, ESQ. (SB# 060859)
                                           Attorneys for Plaintiffs
19                                         STEVEN M. GREENBAUM, ALAN
                                           HAYMAN, and SHIRLEE HAYMAN

21  F:\USERS\DJCNEW\peterson.objexs

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON
    OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS,
    PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION
    CASE NO. 3:08-80030-JSW (BZ)                                                            9

1 | **DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2 | **COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
3 | 165 Fell Street
San Francisco, CA 94102
4 | Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
5 | Tel.: (415) 989-4730
Fax: (415) 989-0491
6 | File No. 52,759

7 | Attorneys for Plaintiffs
DEBORAH D. PETERSON, Personal Representatives
8 | of the Estate of James C. Knipple (Dec.), et al.

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | SAN FRANCISCO DIVISION

13 | DEBORAH D. PETERSON, Personal
Representative of the Estate of James C.
Knipple (Dec.). et al.,

Plaintiffs,

vs.

ISLAMIC REPUBLIC OF IRAN. et al.,

Defendants.

CASE NO. 3:08-80030-JSW (BZ)

DECLARATION OF DAVID J. COOK, ESQ.
IN SUPPORT OF MOTION FOR HEARING
ON OBJECTION TO REPORT AND
RECOMMENDATION TO DENY
PLAINTIFFS' EX PARTE APPLICATIONS,
PURSUANT TO LOCAL RULE 72-3(a). AND
MOTION FOR DE NOVO DETERMINATION

Date: July 11, 2008
Time: 9:00 a.m.
Courtroom: 17, 16th Floor
Judge: Jeffrey S. White

20 | I. DAVID J. COOK. hereby declare and state as follows:

21 | 1. I am one of the attorneys of record for Plaintiffs in the above-entitled action, am duly

22 | authorized to practice before all courts in the State of California, and am familiar with the facts

23 | and circumstances in this action.

24 | 2. This matter was heard by the Honorable Bernard Zimmerman. Magistrate Judge. who

25 | heard and considered both this case and the companion case of *Peterson vs. Islamic Republic of*

26 | *Iran,* Case No. 3:08-mc-80030-JSW (BZ). The court issued a REPORT AND

27 | RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS in the

1  *Greenbaum vs. Islamic Republic of Iran* action (Docket No. 14), a true and correct copy which is

2  attached hereto marked *Exhibit "A."* A true and correct copy of the REPORT AND

3  RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATION (Docket No. 36)

4  in this action is attached hereto marked *Exhibit "B."*

5       3. Plaintiffs have a number of fundamental objections which are summarized as follows:

6  Plaintiffs seek to amend the Writ of Execution issued by the USDC. N.D.Cal., in which this court

7  and only this court has the power to issue the Writ and control its process, and only this court.

8  Plaintiffs have addressed all of these issues in great detail by way of the SUPPLEMENTAL

9  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE

10 APPLICATION FOR ODER AMENDING AND TO DIRECT ISSUANCE OF SECOND

11 AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES etc.

12 and the SUPPLEMENTAL DECLARATION OF DAVID J. COOK, ESQ. in support thereof filed

13 in *Peterson vs. Islamic Republic of Iran*, Case No. 3:08-80030-JSW (BZ) [Docket No. 35]. a true

14 and correct copy which is attached hereto marked *Exhibit "C."*

15       I declare under penalty of perjury that the foregoing is true and correct.

16       Executed on June 2, 2008.

17

18                              /s/ David J. Cook
                              DAVID J. COOK, ESQ. (SB# 060859)

19

20  F:\USERS\DJCNEW\peterson.objexs

21

22

23

24

25

26

27

28
    DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF EX PARTE APPLICATION FOR ORDER
    AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-80030-JSW (BZ)                                                              2

**EXHIBIT "A"**

1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                       NORTHERN DISTRICT OF CALIFORNIA

8

9   STEVEN M. GREENBAUM, et al.,)
                                )
10            Plaintiff(s),     )     No. 08-80024 MISC JSW (BZ)
                                )
11      v.                      )     **REPORT AND RECOMMENDATION TO**
                                )     **DENY PLAINTIFFS'** *EX PARTE*
12   ISLAMIC REPUBLIC OF IRAN, et)    **APPLICATIONS**
     al.,                       )
13                              )
              Defendant(s).     )
14   _____)

15       Plaintiffs' *ex parte* applications for an order amending

16   the writ of execution to include additional names of the

17   judgment debtor and for an order directing the issuance of a

18   second amended and alias writ of execution were referred to me

19   by the Honorable Judge Jeffrey S. White.  For the reasons set

20   forth in my May 22, 2008 Report and Recommendation to Deny

21   Plaintiffs' *Ex Parte* Applications in the Peterson v. Islamic

22   Republic of Iran case, case number 08-80030 MISC JSW (BZ), I

23   **RECOMMEND** that plaintiffs' applications be **DENIED**.

24   Dated:  May 22, 2008

25                        _____
                                    Bernard Zimmerman
26                          United States Magistrate Judge

27
     G:\BZALL\-REFS\GREENBAUM\R&R RE APPLICATIONS TO AMEND WRIT.wpd
28

                                   1

                                            EXHIBIT  A

# EXHIBIT "B"

1   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE

2   APPLICATION FOR ODER AMENDING AND TO DIRECT ISSUANCE OF SECOND

3   AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES etc.

4   and the SUPPLEMENTAL DECLARATION OF DAVID J. COOK, ESQ. in support thereof filed

5   in *Peterson vs. Islamic Republic of Iran*, Case No. 3:08-80030-JSW (BZ) [Docket No. 35] marked

6   as *Exhibit "C."* The USDC, D.C. does not have any power, one way or another, to issue such

7   Writs, and accordingly, Plaintiffs therefore can only seek relief through this court, and no other

8   court. For example, if Plaintiffs sought relief before Judge Lamberth in *Peterson vs. Islamic*

9   *Republic of Iran*, Case No. 01-2094 (RCL) (USDC, D.C.), Judge Lamberth would not be able to

10  adjudicate ultimately what a Writ of Execution would look like in the N.D.Cal., C.D.Cal.,

11  S.D.Tex., or otherwise. If presented to Judge Lamberth, e.g., that Plaintiffs sought to amend a

12  Northern District of California Writ, Judge Lamberth would readily state that only the Northern

13  District of California could control its Writs and related process, and would be the sole tribunal.

14      The process of docketing under 28 U.S.C. § 1963 empowers a Judgment Creditor to levy

15  and execute upon apparent assets within that judicial district, and under F.R.C.P. 69(a), a method

16  of execution is through a Writ itself. To render consistency to this process, only the issuing court

17  could modify or control its own Writ process.

18      Therefore, the analysis that this matter is best left with Judge Lamberth is in error, as Writs

19  are purely "local." Furthermore, the court's analysis that Plaintiffs would only seek relief in which

20  the Judgment was "entered" is incorrect, in that this judgment was entered in and to this District,

21  under 28 U.S.C. § 1963.

22                          **IV. QUANTUM OF PROOF.**

23      Plaintiffs obviously have great difficulty in obtaining evidence from Iran, who has been

24  extremely nonresponsive, a foreign sovereign state sponsor of terrorism, and is not likely to

25  willingly respond to a deposition notice, order of examination (debtor's exam), or post-judgment

26  interrogatories. Plaintiffs are therefore left with the resources available to them, which consist of

27

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11   DEBORAH D. PETERSON,          )
     Personal Representative of    )
12   the Estate of James C.        )    No. 08-80030 MISC JSW (BZ)
     Knipple (Dec.), et al.,       )
13                                 )    **REPORT AND RECOMMENDATION TO**
                   Plaintiff(s),   )    **DENY PLAINTIFFS'** *EX PARTE*
14                                 )    **APPLICATIONS**
          v.                       )
15                                 )
     ISLAMIC REPUBLIC OF IRAN,     )
16   et al.,                       )
                                   )
17                Defendant(s).    )
                                   )
     _____)

18

19        Plaintiffs' *ex parte* applications for an order amending

20   the writ of execution to include additional names of the

21   judgment debtor and for an order directing the issuance of a

22   second amended and alias writ of execution were referred to me

23   by the Honorable Judge Jeffrey S. White.

24        These suits are consolidated actions brought in the

25   United States District Court for the District of Columbia and

26   assigned to the Honorable Royce C. Lamberth.  (Case Nos. 01-

27   2094 (RCL) & 01-2684 (RCL).)  The plaintiffs are nearly one

28   thousand family members and estates of the 241 servicemen

                                   1

                                                    B

1   killed in the 1983 bombing of a United States Marine barracks

2   in Beirut, Lebanon.  (Sept. 7, 2007, Mem. Op. of Judge

3   Lamberth, Docket No. 229 at p. 1.)  Plaintiffs filed suit

4   against defendants, the Islamic Republic of Iran ("Iran") and

5   the Iranian Ministry of Information and Security, alleging

6   "they provided material support and assistance to Hezbollah[],

7   the terrorist organization that orchestrated and carried out

8   the bombing."  (Id. at 1 - 2.)  After conducting a trial,

9   Judge Lamberth found that the defendants were responsible for

10   the attack.  (Id. at 2.)  Judge Lamberth appointed special

11   masters to consider the damage claims of the individual

12   plaintiffs.  (Id.)  On September 7, 2007, the court issued a

13   default judgment against the defendants in the amount of

14   $2,656,944,877.00.  (J. at p. 1, Docket No. 228.)

15         Plaintiffs registered the judgment in the Northern

16   District of California on March 11, 2008 and obtained a writ

17   of execution.  These applications followed.  Plaintiffs' first

18   application is for an order to amend the identity of the

19   judgement debtor from "The Islamic Republic of Iran" to "The

20   Islamic Republic of Iran aka The Ministry of Petroleum on

21   Behalf of the Islamic Republic of Iran, Ministry of Oil on

22   Behalf of the Islamic Republic of Iran, and The National

23   Iranian Oil Company on Behalf of the Islamic Republic of Iran,

24   and its subsidiaries:" plaintiffs then list twenty-five

25   companies they contend are subsidiaries.  Plaintiffs' second

26   application seeks an order issuing a second amended and alias

27   writ of execution in which the true name and identity of the

28   judgment debtor is charged from "The Islamic Republic of Iran"

1   to "The Islamic Republic of Iran aka The Ministry of Petroleum

2   on Behalf of the Islamic Republic of Iran, Ministry of Oil on

3   Behalf of the Islamic Republic of Iran, and The National

4   Iranian Oil Company on Behalf of the Islamic Republic of Iran,

5   on behalf of the following: [plaintiffs then list three

6   companies] and all subsidiaries subdivisions, affiliates, and

7   related entities."  Plaintiffs contend these other companies

8   are instrumentalities and agencies of Iran and wish to levy

9   against their assets, as permitted by the recent amendments to

10  the Foreign Sovereignty Immunities Act.  28 U.S.C. § 1605A

11  (allowing plaintiffs to seek recourse against certain foreign

12  states for "personal injury or death that was caused by an act

13  of torture, extrajudicial killing, aircraft sabotage, hostage

14  taking or the provision of material support or resources for

15  such an act"); and 28 U.S.C. § 1610(g) (permitting "attachment

16  in aid of execution" for "property of an agency or

17  instrumentality of such a state, including property that is a

18  separate juridical entity or is an interest held directly or

19  indirectly in a separate juridical entity....")[1]

20      Following a review of the applications, I requested

21  additional briefing on this court's authority to issue what

22  amounts to an amendment of the judgment entered by the

23  District Court in the District of Columbia changing the name

24  of the judgment debtor.  Plaintiffs' response is that they are

25  merely seeking to "retitle" the judgment debtor by adding

26

27      [1]     Plaintiffs do not contend that 28 U.S.C. sections
    1605A and 1610 are federal statutes that trump state collection
    procedures under Federal Rule of Civil Procedure (Fed. R. Civ.
28  P.) 69(a)(1).

3

1   various "agencies and instrumentalities" of Iran, as permitted
2   by California Code of Civil Procedure (Cal. Civ. Proc. Code)
3   section 680.135 (West 2008). During argument, plaintiffs
4   conceded that they had not applied for such relief from Judge
5   Lamberth. Plaintiffs also stated that they had filed similar
6   applications in perhaps a half a dozen other districts around
7   the country where they believe Iranian assets may be located.

8        Fed. R. of Civ. P. 69(a)(1) provides that a writ of
9   execution for the enforcement of a monetary judgment "must
10  accord with the procedure of the state where the court is
11  located." In California, when a judgment debtor is known by
12  names other than what is listed on the judgment, the judgment
13  creditor can file, prior to issuance of the writ of
14  execution, an "affidavit of identity" pursuant to Cal. Civ.
15  Proc. Code section 699.510(c)(1)(West 2008). As defined in
16  Cal. Civ. Proc. Code section 680.135; "'Affidavit of
17  Identity' means an affidavit or declaration executed by a
18  judgment creditor, under penalty of perjury, that is filed
19  **with the clerk of the court in which the judgment is entered**
20  at the time the judgment creditor files for a writ of
21  execution" which sets forth "the additional name or names by
22  which the judgment debtor is known." Cal. Civ. Proc. Code §
23  680.135 (*emphasis* added). If the court finds that the
24  affidavit of identity is sufficient, it "shall authorize the
25  issuance of the writ of execution with the additional name or
26  ///
27  ///
28  ///

4

1   names." Cal. Civ. Proc. § 699.510(c)(1).[2]

2   Because the judgment was entered in the District of

3   Columbia, not the Northern District, Cal. Civ. Proc. Code

4   section 680.135 does not authorize this court to grant

5   plaintiffs' applications.[3]   As noted earlier, Fed. R. Civ. P.

6   69(a)(1) requires this court to permit execution in accordance

7   with the "procedure of the state where the court is located."

8   During argument, counsel for plaintiffs suggested that this

9   requirement be ignored.   Essentially, counsel argued that the

10  requirement made sense in California, where writs of execution

11  are obtained from the state court that enters the judgment and

12  can be served throughout the state, but does not make sense in

13  federal practice because the District of Columbia cannot issue

14  a writ of execution which can be enforced in California.

15  While there is some appeal to this argument, it does not alter

16

17      [2]   Since a writ of execution has issued, questions exist
        as to the timelines of plaintiffs' applications.   Presumably,
18  that is one reason plaintiffs seek an amended writ of
        execution.   In view of the disposition herein, I have assumed,
19  without deciding, that the applications were timely.

20      [3]   Plaintiffs suggest that the issues presented in their
        applications have already been resolved in their favor by
21  decisions of the Iran-U.S. Claims Tribunal created in 1981 to
        resolve claims that arose following the Iranian hostage crisis,
22  and that this court should give collateral estoppel effect to
        these decisions.   Whether collateral estoppel applies to these
23  issues can be decided by the District Court in the District of
        Columbia.   Even assuming that the decisions of the Tribunal can
24  be given collateral estoppel effect, an issue on which
        plaintiffs provided no direct authority, it is not clear that
25  the issue of whether the various entities are agents and
        instrumentalities of Iran in 2008 is identical to the issue of
26  whether those entities were agents of instrumentalities of Iran
        in the mid-1980's, when the decisions upon which plaintiffs
27  rely were made.   Collins v. D.R. Horton, Inc., 505 F.3d 874,
        882 fn. 8 (9th Cir. 2007) (issue in both actions must be
28  identical for collateral estoppel to apply).

5

1   the fact that the California statute clearly requires that the
2   "affidavit of identity" be filed with the court that entered
3   judgment.  Cal. Civ. Proc. Code § 680.135.  Applied in the
4   federal system, this procedure has merit.  Presumably, the
5   judge who entered the judgment is in the best position to
6   determine whether the debtor uses additional names.  And the
7   proliferation of "identity" proceedings around the country,
8   such as has occurred with this judgment, with its concomitant
9   risk of inconsistent rulings, would be avoided.

10      Nor is it clear that the relief plaintiffs seek is
11  available under Cal. Civ. Proc. Code sections 680.135 and
12  699.510.  Plaintiffs are not claiming that Iran is literally
13  known by the names of the many oil companies named in the
14  applications.  Rather, plaintiffs are claiming that Iran
15  nationalized or otherwise owns a number of oil companies, some
16  of which have subsidiaries, and it wishes to execute against
17  these entities.  A literal reading of the California statutes
18  suggests that they are meant to address judgment debtors known
19  by multiple names or aliases, (see Richard L. Enkelis, <u>Action</u>
20  <u>Guide: Enforcing Civil Money Judgments</u>, Step 13, p.19 (2006))
21  rather than subsidiaries or affiliates of the judgment
22  debtor.[4]  In fact, section 680.135 states that:

23  _____

24      [4]     It is not clear that plaintiffs would be entitled to
        amend the judgment under California law.  Although a court has
25      authority to amend a judgment when "a judgment debtor changes
        his or her name after a judgment is entered," plaintiffs do not
26      contend that Iran changed its name after the judgment was
        entered.  Alan M. Ahart, <u>California Practice Guide: Enforcing</u>
27      <u>Judgments & Debts</u>, ¶ 6:1563 (The Rutter Group 2007).   A
        plaintiff may also amend a judgment to include a corporation's
28      alter ego, but only if the alter ego controlled the underlying
                                                    (continued...)

1

2

3

4

> [t]he affidavit of identity **shall not include**
> the name of names of persons, including **any**
> **corporations,** partnerships, or any legal
> entities not separately named in the judgment
> **in which the judgment debtor is a partner,**
> **shareholder, or member,** other than the judgment
> debtor.

5    Cal. Civ. Proc. Code § 680.135 (emphasis added).

6        Plaintiffs showing is also deficient from an evidentiary

7    standpoint.  Cal. Civ. Proc. Code section 680.135 requires an

8    affidavit or declaration under penalty of perjury which sets

9    forth the factual basis for assertion that the debtor is known

10   by other names.  Here plaintiffs' applications are supported

11   by declarations of counsel which attaches a number of

12   unauthenticated or poorly authenticated documents which

13   purportedly establish that the government of Iran, the

14   judgment debtor, owns one or more national oil companies which

15   in turn have a number of subsidiaries.  As proof, plaintiffs

16   rely principally on screen shots of various internet websites.

17   Plaintiffs have not established that the websites from which

18   these screen shots were taken are owned or maintained by the

19   companies in question, let alone that the information on those

20   websites is accurate.  <u>Wady v. Provident Life & Accident Ins.</u>

21   <u>Co. of Am.</u>, 216 F.Supp.2d 1060, 1064 - 65 (C.D. Cal. 2002)

22   (court sustained objection to printouts from a company's

23   website because the affiant lacked "personal knowledge of who

24   maintains the website, who authored the documents, or accuracy

25

26        [4](...continued)
     litigation, which does not appear to be the case here.
27   <u>Katzir's Floor and Home Design, Inc. v. M-MLS.com</u>, 394 F.3d
     1143, 1148 (9th Cir. 2004); <u>Jines v. Abarbanel</u>, 77 Cal.App.3d
28   702, 717 (1978).

1  of their content").  See also Internet and Email Evidence, Am.

2  Law Institute-Am. Bar Ass'n, Trial Evidence in the Federal

3  Courts: Problems and Solutions, 559, 562 - 64 (2008).

4        For the reasons set forth above, I **RECOMMEND** that

5  plaintiffs' applications be **DENIED**.

6  Dated: May 22, 2008

7                              _____

8                              Bernard Zimmerman
                               United States Magistrate Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

g:\bzall\-refs\Peterson v. Islamic Republic of Iran\Tentative report and r&r re ex parte apps.
to amend writ of exec.bz version          8

**EXHIBIT "C"**

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12
   DEBORAH D. PETERSON, Personal      )    CASE NO. 3:08-80030-JSW (BZ)
13 Representative of the Estate of James C.  )
   Knipple (Dec.), et al.,            )    SUPPLEMENTAL MEMORANDUM OF
14                                     )    POINTS AND AUTHORITIES IN SUPPORT
              Plaintiffs,              )    OF SECOND EX PARTE APPLICATION FOR
15                                     )    ORDER AMENDING AND TO DIRECT
   vs.                                 )    ISSUANCE OF SECOND AMENDED AND
16                                     )    ALIAS WRIT OF EXECUTION TO INCLUDE
   ISLAMIC REPUBLIC OF IRAN, et al.,   )    ADDITIONAL NAMES PURSUANT TO
17                                     )    C.C.P. § 680.135
              Defendants.              )
18 _____ )

19                  **I. INTRODUCTION.**

20         Plaintiffs DEBORAH D. PETERSON, Personal Representative of the Estate of James C.

21  Knipple (Dec.), et al. ("Plaintiffs"), Judgment Creditors for and on behalf of The Islamic Republic

22  of Iran ("Iran") have recovered approximately a $2,700,000,000 judgment against THE ISLAMIC

23  REPUBLIC OF IRAN ("Iran") in the action entitled Peterson vs. Islamic Republic of Iran, pending

24  in the United States District Court, District of Columbia, Case No. 01-2094 (RCL) and related

25  matters, before the Honorable Royce C. Lamberth, Chief Judge of the United States District Court.

26

27

1    Iran has been unresponsive to the judgment, and Plaintiffs are presently proceeding with

2    levy and execution on a nationwide basis. Plaintiffs have identified Bank of Tokyo-Mitsubishi,

3    UFJ, Sumitomo Mitsui Banking Corporation, and Mizuho Corporate Bank, all Japanese banks,

4    and all with branches located in the Northern District as potentially holding Iranian funds on a

5    world-wide basis. The method of holding such funds is by way of a deposit, collateral for the

6    issuance of a letter of credit, holding funds as part of being a conduit to pay Iran for the sale and

7    delivery of crude oil products, or otherwise in any other manner. Plaintiffs have levied upon all of

8    these banks, and moreover has levied upon a series of other banks, such as and including, BNP

9    Paribas, Credit Suisse, among others, which likewise may hold Iranian deposits, or funds held as

10   collateral to issue a letter of credit. Plaintiffs therefore have met the threshold for properly

11   docketing this judgment under 28 U.S.C. § 1963, which only requires a good faith belief that

12   assets exist within this district.

13               **II. AVAILABILITY OF BROAD-BASED LEVY AND EXECUTION.**

14   Plaintiffs proceed with "broad-based" levy and execution. As part of that process,

15   Plaintiffs proceed with an order under C.C.P. § 680.135, for purposes of amending the Writ of

16   Execution to add the additional names. To dispel any uncertainty, Plaintiffs do not seek to add

17   additional "parties," but rather add additional names by which Iran does business. This is

18   demonstrated as set forth below:

19       1.    National Iranian Gas Export Company
               Website: www.nigec.ir
20             Email: info@nigec.ir

21       2.    National Iranian South Oil Company
               Website: www.nisoc.com
22             Email: info@nisoc.com

23       3.    National Iranian Offshore Oil Company
               Website: www.iooc.co.ir
24             Email: webmaster@iooc.co.ir

25       4.    National Iranian Central Oil Fields Co.
               Website: www.icofc.ir
26             Email: info@icofc.ir

27

28   SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE
     APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND
     ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
     CASE NO. 3:08-80030-JSW (BZ)                                                              2

1

2

3

    5.    Khazar Exploration & Production Co.
            Tehran HQ.
            No.19 – 11th Alley - Vozara Ave. - Arjantin sq.
            Tel: +98-21-88722430, 3
            Fax: +98-21-88711386

4

5

    6.    Petroleum Engineering & Development Co.
            Website: www.pedec.ir
            Email: info@pedec.net

6

7

    7.    Pars Oil and Gas Company
            Website: www.pogc.org
            Email: info@pogc.ir

8

9

    8.    Pars Special Economic energy Zone Co.
            Website: www.pseez.com
            Email: info@pseez.com

10

11

    9.    National Iranian Oil Terminals Company
            Website: www.nioc-otc.com
            Email: info@nioc-otc.com

12

13

    10.    National Iranian Drilling Company
            Website: www.nidc.ir
            Email: webmaster@nidc.ir

14

15

    11.    North Drilling Company
            Website: www.northdrilling.com
            Email: info@northdrilling.com

16

17

    12.    PetroIran Development Company
            Website: petroiran.com
            Email: info@petroiran.com

18

19

    13.    Ahwaz Pipe Mills Company
            Website: www.apm-ir.com
            Email: tabibi@apm-ir.com

20

21

    14.    Petropars
            Website: www.petropars.com
            Email: webadmin@ppars.com

22

23

    15.    Fuel Consumption Optimization Co.
            Website: www.ifco.ir
            Email: info@ifco.ir

24

25

    16.    National Iranian Tanker Co.
            Website: www.nitc.co.ir
            Email: administrator@nitc.co.ir

26

27

28

17. Exploration Service Company (ESC)
Website: www.oeoc.ir
Email: info@oeoc.ir

18. Kala Naft London Ltd.
Website: www.kalaltd.com
Email: admin@kalaltd.com

19. Kala Naft Canada Ltd.
Website: www.kalanaftcanada.com
Email: info@kalanaftcanada.com

20. Arvandan Oil and Gas Company
Website: www.arvandan.org
Email: info@arvandan.org

21. National Iranian Gas Company
Website: www.nigc.org
Email: webmaster@nigc.org

22. National Iranian Petrochemical Company
Website: www.nipc.net
Email: webmaster@nipc.net

23. National Iranian Oil Refining and Distribution Co.
Website: www.niordc.ir
Email: info@niordc.ir

and all subsidiaries, subdivisions, affiliates, and related entities.

In response to the inquiry whether or not Plaintiffs necessarily should have added these "names" to the judgment, Plaintiffs' case, as originally filed, was against the ISLAMIC REPUBLIC OF IRAN arising out of the 1983 Marines Barracks bombing. The fact that Iran might buy and sell oil products, or conduct other commercial activities by and through its agencies and instrumentalities would not necessarily have been included under any sense of either res judicata or collateral estoppel within the context of the underlying wrongful death action.

The fact of agency or instrumentality is relevant in the context of enforcement proceedings, which was necessarily considered by Congress. On 1/28/08, President Bush signed into effect legislation which effectively repealed the FSIA, in total, which is found at (in part) 28 U.S.C. 1605A. The key parts of that new section permitting meaningful collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1), which provides as follows:

"(a) IN GENERAL. --

"(1) NO IMMUNITY. – A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

"(g) PROPERTY IN CERTAIN ACTIONS –

"(1) IN GENERAL. – subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of –

"(A) the level of economic control over the property by the government of a foreign state;

"(B) whether the profits of the property go to that government;

"( C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

"(D) whether that government is the sole beneficiary in interest of the property; or

"(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

"(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE. Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgement entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act." (Emphasis added)

Paramount is the fact that Congress sought to demolish the distinction between "agencies and instrumentalities" and the foreign state itself. This effectively seeks to render moot the holding of the *Supreme Court in First Nat'l City Bank v. Banco Para El Comercio Enterior de Cuba*, 462 U.S. 611, 629, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), reducing the barrier faced by a Judgment Creditor in reaching assets of the foreign entity, while in the name of an "agency or instrumentality." The last case of note is *Flatow vs. The Islamic Republic of Iran*, 308 F.3d 1065 (9th Cir. 2002), in which the court denied relief in favor of the Flatow victims in holding that they had not made the burden of proof under Bancec, in showing that Bank Sadaret, Iran, was in fact

1    part of the country, making it vulnerable to levy and execution.

2        Accordingly, recrafting the Writ of Execution would serve the interest of this creditor in

3    reaching assets, housed in the name of the "agency and/or instrumentality." The amendment to

4    FSIA by virtue of Section 1605 sought to avoid the barriers and obstacles confronted by Judgment

5    Creditors in reaching assets in the hands of a sovereign state's "agencies and instrumentalities."

6    ## III. WHY THIS MATTER IS BEST RESOLVED BY THIS COURT,

7    ## AND NOT JUDGE LAMBERTH.

8        Plaintiffs proceed to levy and execute from the United States District Court, Northern

9    District of California, and have issued (and already had issued) a Writ of Execution. The use of

10    the Writ of Execution would enable this creditor to levy upon all assets, and each of the same, in

11    this judicial district, or for that matter, throughout the State of California. Conversely, Plaintiffs

12    would have an enormously difficult time (but not necessarily impossible) in seeking to levy upon

13    California-domiciled assets through the issuance of a Writ by and through the District of

14    Columbia. In fact, the process of the District of Columbia is proceeding on what is called a WRIT

15    OF ATTACHMENT ON JUDGMENT, which under local law, provides as follows:

16        § 16-546. Attachments of credits.
         An attachment shall be levied upon credits of the defendant, in the hands of a
17        garnishee, by serving the garnishee with a copy of the writ of attachment and of the
         interrogatories accompanying the writ, and a notice that any property or credits of
18        the defendant in his hands are seized by virtue of the attachment.

19        (Dec. 23, 1963, 77 Stat. 552, Pub. L. 88-241, § 1; 1973 Ed., § 16-546; 1981 Ed., § 16-546.)

20    Needless to say, a California-domiciled "garnishee" would have great resistance, claiming all sorts

21    of jurisdictional issues, in responding to service upon a District of Columbia issued WRIT OF

22    ATTACHMENT ON JUDGMENT. The better practice always is to docket the judgment and

23    serve the garnishee with a Writ of Execution pursuant to local process under F.R.C.P. 69(a)(1).

24    Better practice dictates docketed the judgment in the probable district in which the judgment

25    creditor would be able to reach assets.

26    ## IV. IRAN-U.S. CLAIMS TRIBUNAL.

27

28    SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE
     APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND
     ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
     CASE NO. 3:08-80030-JSW (BZ)                                                         6

The Iran-U.S. Claims Tribunal was established by the Declaration of the Government of the Democratic and Popular Republic of Algeria, a copy marked *Exhibit "A."*[1] The Declaration provides for the settlement of disputes at paragraph 17, as follows:

> "17. If any other dispute arises between the parties as to the interpretation or performance of any provision of this Declaration, either party may submit the dispute to binding arbitration by the tribunal established by, and in accordance with the provisions of, the Claims Settlement Agreement. Any decision of the tribunal with respect to such dispute. including any award of damages to compensate for a loss resulting from a breach of this Declaration or the Claims Settlement Agreement, may be enforced by the prevailing party in the courts of any nation in accordance with its laws."

The Declaration established a Tribunal. This is known as the Iran-U.S. Claims Tribunal, which obviously renders decisions from time to time, the subject matter of the previously filed Declaration of David J. Cook, Esq.

## V. COLLATERAL ESTOPPEL.

The Iran-U.S. Claims Tribunal has rendered multiple decisions, adjudicating that The National Iranian Oil Company and related entities are in fact "part of Iran." The Iran-U.S. Claims Tribunal is a tribunal established by mutual agreement by and between the U.S. and Iran. A tribunal, arbitration panel, or administrative agency, under the laws of the State of California, is entitled to collateral estoppel. This is seen in such cases as *People vs. Sims*, 32 Cal.3d 486 (1982), in which the court held that administrative agency decisions will support collateral estoppel, by and among the parties. Clearly, the Iran-U.S. Claims Tribunal was enacted to enable the governments to litigate their respective claims in which the jurisdictional prerequisite is whether an agency or instrumentality was in fact part of the country, and therefore subject to the jurisdiction of the Tribunal.

The Supreme Court has had a number of occasions to adjudicate matters relating to the Iran-U.S. Claims Tribunal in *Supreme Court of the United States, United States, Appellant, vs.*

---

[1] All exhibits are incorporated by reference as though fully set forth in this Memorandum in their entirety and are attached to the Declaration of David J. Cook, Esq. which is filed contemporaneously herein.

1   *Sperry Corporation et al.*, 493 U.S. 52, at pages 55 to 56, 110 S.Ct. 387, 107 L.Ed.2d 290, 58

2   USLW 4018 (Decided Nov. 28, 1989), which the court noted that the U.S. and Iran entered into an

3   agreement embodied in two declarations of the government of Algeria commonly known as The

4   Algiers Accord, providing for the establishment in The Hague of an international arbitral tribunal

5   known as the Iran-U.S. Claims Tribunal, to hear claims brought by Americans against the

6   government of Iran. *In Dames & Moore vs. Donald T. Regan*, 453 U.S. 654, at page 664 to

7   665,101 S.Ct. 2972, 6 L.Ed.2d 918 (Decided July 2, 1981), the court at page 665 stated that the

8   Algiers Accord called for the establishment of a tribunal arbitrating any claim, in which the awards

9   are final and binding and enforceable in the courts of any nation in accordance with its laws. The

10  court stated as follows:

11  "On December 19, 1979, petitioner Dames & Moore filed suit in the United States
    District Court for the Central District of California against the Government of Iran,
12  the Atomic Energy Organization of Iran, and a number of Iranian banks. In its
    complaint, petitioner alleged that its wholly owned subsidiary, Dames & Moore
13  International, S.R.L., was a party to a written contract with the Atomic Energy
    Organization, and that the subsidiary's entire interest in the contract had been
14  assigned to petitioner. Under the contract, the subsidiary was to conduct site studies
    for a proposed nuclear power plant in Iran. As provided in the terms of the contract,
15  the Atomic Energy Organization terminated the agreement for its own convenience
    on June 30, 1979. Petitioner contended, however, that it was owed $3,436,694.30
16  plus interest for services performed under the contract prior to the date of
    termination.[4] The District Court issued orders of [101 S.Ct. 2979] attachment
17  directed against property of the defendants, and the property of certain Iranian
    banks was then attached to secure any judgment that might be entered against them.
18  *On January 20, 1981, the Americans held hostage were released by Iran*
    *pursuant to an Agreement entered into the day before and embodied in two*
19  *Declarations of the Democratic and Popular Republic of Algeria. Declaration of*
    *the Government of the Democratic and Popular Republic of Algeria (App. to Pet.*
20  *for Cert. 21-29), and Declaration of the Government of the Democratic and*
    *Popular Republic of Algeria Concerning the Settlement of Claims by the*
21  *Government of the United States of America and the Government of the Islamic*
    *Republic of Iran (id. at 335).* **The Agreement stated that [i]t is the purpose of**
22  **[the United States and Iran] . . . to terminate all litigation as between the**
    **Government of each party and the nationals of the other, and to bring about**
23  **the settlement and termination of all such claims through binding arbitration.**
    **Id. at 21-22. In furtherance of this goal, the Agreement called for the**
24  **establishment of an Iran-United States Claims Tribunal which would arbitrate**
    **any claims not settled within six months. Awards of the Claims Tribunal are to**
25  **be "final and binding," and "enforceable . . . in the courts of any nation in**
    **accordance with its laws."** *Id.* **at 32. . . .**

26

27

1   Whether under the doctrine of collateral estoppel or judicial notice, Plaintiff has proffered before

2   this court sufficient evidence to demonstrate that in fact the National Iranian Oil Company (and

3   related entities) are agencies and instrumentalities. From the viewpoint of classic collateral

4   estoppel the court can readily apply these principals under the leading California case of ***Bernhard***

5   ***vs. Bank of America,*** 19 Cal.2d807 at page 813 (1942) which permits a stranger to invoke

6   collateral estoppel. Plaintiffs can invoke classic collateral estoppel in that Iran was a party to the

7   proceedings; that the issue of "agency and instrumentality" was in fact an issue; and that the

8   matters were decided. For the parties to obtain relief for conduct arising out of, or relating to, for

9   example, the National Iranian Oil Company, the Tribunal must have necessary found that the

10  NICO was in fact an agency and instrumentality, which is precisely the finding in the relevant Iran

11  US Claims Tribunal cases.

12                      **VI.  PROOF OF AGENCIES AND INSTRUMENTALITIES.**

13          The fact that Iran has multiple agencies and instrumentalities is seen from the download of

14  The Ministry of Petroleum of Iran. The information therein is established by way of ***Exhibits "B"***

15  ***"C" "D" & "E."*** This proceeding is clearly not a summary judgment, and Iran is not subject to

16  ready discovery, as any civil litigant would be. Iran is a sovereign state and has not indicated the

17  slightest inclination in payment or resolution of this matter, much less cooperation with the

18  Plaintiffs in the collection of this judgment. Plaintiffs have ascertained this information, which

19  Plaintiffs believe is readily reliable. This is confirmed in part by information from The Energy

20  Information Administration, whose report is marked ***Exhibit "F,"*** specifically at pages 2, bottom

21  paragraph, page 3, bottom paragraph, through page four, top paragraph. This information for

22  purposes of amending the writ of execution should be sufficient in that Plaintiff has demonstrated

23  some evidence in support.

24                      **VII.  PLAINTIFFS ARE LEFT WITH THE LIMITED OPTIONS**

25          Plaintiffs of course are left with the options as they present themselves. Iran has been

26  extremely uncooperative, to say the least, will not be readily subject to information obtained by

27

28  SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE
    APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND
    ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-80030-JSW (BZ)                                                              9

1  way of subpoena, legal process, or otherwise, and has indicated its refusal to compensate these

2  Plaintiffs, much less accept responsibility from one of the most significant events, reshaping the

3  landscape in the Middle East.  While the court has indicated its concern over many of these issues

4  in this case, the fact remains that Plaintiffs have a judgment against Iran, that Plaintiffs are

5  properly levying and executing against the assets of Iran in this district, that Plaintiffs have

6  demonstrate sufficient evidence to indicate and identify the agencies and instrumentalities, and that

7  Plaintiffs are entitled to levy and execute, for purposes of satisfaction of this judgment within this

8  district.

9  ### VIII.  INCORPORATION INTO THE U.S. CODE.

10  Section 1605A has been incorporated into the U.S. Code, and the legislation , and

11  specifically the conforming amendments, are marked *Exhibit "G,"* in which the conforming

12  amendments start at page 848.  *Exhibit "G"* traces Section 1605A into current United States Code

13  with the amendment tracking the changes.

14  DATED:  May 20, 2008                           COOK COLLECTION ATTORNEYS

15

16                                        By:  __/s/ David J. Cook_____
                                          DAVID J. COOK, ESQ. (SB# 060859)
17                                        Attorneys for Plaintiffs DEBORAH D. PETERSON,
                                          Personal Repr. of the Estate of James C. Knipple.

18

19  F:\USERS\DJCNEW\peterson.sfamendwritmpa

20

21

22

23

24

25

26

27

28  SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE
APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND
ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
CASE NO. 3:08-80030-JSW (BZ)                                                              10

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12
   DEBORAH D. PETERSON, Personal    )    CASE NO. 3:08-80030-JSW (BZ)
13 Representative of the Estate of James C. )
   Knipple (Dec.), et al.,           )    SUPPLEMENTAL DECLARATION OF
14                                    )    DAVID J. COOK, ESQ. IN SUPPORT OF
              Plaintiffs,            )    SECOND EX PARTE APPLICATION FOR
15                                    )    ORDER AMENDING AND TO DIRECT
   vs.                               )    ISSUANCE OF SECOND AMENDED AND
16                                    )    ALIAS WRIT OF EXECUTION TO INCLUDE
   ISLAMIC REPUBLIC OF IRAN, et al., )    ADDITIONAL NAMES PURSUANT TO
17                                    )    C.C.P. § 680.135
              Defendants.           )
18 _____  )

19       I, DAVID J. COOK, hereby declare and state as follows:

20       1. I am one of the attorneys of record for Plaintiffs in the above-entitled action, am duly

21 authorized to practice before all courts in the State of California, and am familiar with the facts

22 and circumstances in this action.

23       2. The Iran-U.S. Claims Tribunal was established by the DECLARATION OF THE

24 GOVERNMENT OF THE DEMOCRATIC AND POPULAR REPUBLIC OF ALGERIA, a true

25 and correct copy of which is attached hereto marked *Exhibit "A."* Declarant has personally

26 confirmed this is an accurate document from multiple other versions. Declarant has filed multiple

27

28 SUPPLEMENTAL DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE
   APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND
   ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
   CASE NO. 3:08-80030-JSW (BZ)                                                        1

1 | other motions in multiple districts in which the Algiers Accords are a key issue.

2 |     3. The fact that Iran has multiple agencies and instrumentalities is seen from the download

3 | of The Ministry of Petroleum of Iran. The information therein is established by way of the true

4 | and correct copies thereof which are attached hereto marked *Exhibits "B" "C" "D" & "E."*

5 | Declarant obtained this information from the website maintained by The Ministry of Petroleum.

6 | The information relating to the subsidiaries of The Ministry of Petroleum is consistent with the

7 | EIA/DOE Report. as set forth below.

8 |     4. Plaintiffs have ascertained this information, which Plaintiffs believe is readily reliable.

9 | This is confirmed in part by information from the Energy Information Administration (EIA/DOE

10 | Report). a true and correct copy of the report which is attached hereto marked *Exhibit "F."*

11 |     5. Section 1605A has been incorporated into the U.S. Code, and the legislation , and

12 | specifically the conforming amendments, true and correct copies which are attached hereto marked

13 | *Exhibit "G,"* in which the conforming amendments start at page 848.

14 |     I declare under penalty of perjury that the foregoing is true and correct.

15 |     Executed on May 20, 2008.

16 |

17 |                  /s/ David J. Cook

                 DAVID J. COOK, ESQ. (SB# 060859)

18 |

19 | F:\USERS\DJCNEW\peterson.sfamendwritmpa

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 | SUPPLEMENTAL DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135 CASE NO. 3:08-80030-JSW (BZ)         2

# EXHIBIT "A"

## ALGIERS ACCORDS
January 19, 1981

## DECLARATION OF THE GOVERNMENT OF THE DEMOCRATIC AND POPULAR REPUBLIC OF ALGERIA

The Government of the Democratic and Popular Republic of Algeria, having been requested by the Governments of the Islamic Republic of Iran and the United States of America to serve as an intermediary in seeking a mutually acceptable resolution of the crisis in their relations arising out of the detention of the 52 United States nationals in Iran, has consulted extensively with the two governments as to the commitments which each is willing to make in order to resolve the crisis within the framework of the four points stated in the resolution of November 2, 1980, of the Islamic Consultative Assembly of Iran. On the basis of formal adherences received from Iran and the United States, the Government of Algeria now declares that the following interdependent commitments have been made by the two governments:

### General Principles

The undertakings reflected in this Declaration are based on the following general principles:

A. Within the framework of and pursuant to the provisions of the two Declarations of the Government of the Democratic and Popular Republic of Algeria, the United States will restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979.In this context, the United States commits itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction, as set forth in Paragraphs 4-9.

B. It is the purpose of both parties, within the framework of and pursuant to the provisions of the two Declarations of the Government of the Democratic and Popular Republic of Algeria, to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration. Through the procedures provided in the Declaration, relating to the Claims Settlement Agreement. the United States agrees to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration.

*Point I: Non-Intervention in Iranian Affairs*

1. The United States pledges that it is and from now on will be the policy of the United States not to intervene, directly or indirectly, politically or militarily, in Iran's internal affairs.

*Points II and III: Return of Iranian Assets and Settlement of U.S. Claims*

2. Iran and the United States (hereinafter "the parties") will immediately select a mutually agreeable central bank (hereinafter "the Central Bank") to act, under the instructions of the Government of Algeria and the Central Bank of Algeria (hereinafter "The Algerian Central Bank") as depositary of the escrow and security funds hereinafter prescribed and will promptly enter into depositary arrangements with the Central Bank in accordance with the terms of this declaration. All funds placed in escrow with the Central Bank pursuant to this declaration shall be held in an account in the name of the Algerian Central Bank. Certain procedures for implementing the obligations set forth in this Declaration and in the Declaration of the Democratic and Popular Republic of Algeria concerning the settlement of claims by the Government of the United States and the Government of the Islamic Republic of Iran (hereinafter "the Claims Settlement Agreement") are separately set forth in certain Undertakings of the Government of the United States of America and the Government of the Islamic Republic of Iran with respect to the Declaration of the Democratic and Popular Republic of Algeria.

3. The depositary arrangements shall provide that, in the event that the Government of Algeria certifies to the Algerian Central Bank that the 52 U.S. nationals have safely departed from Iran, the Algerian Central Bank will thereupon instruct the Central Bank to transfer immediately all monies or other assets in escrow with the Central Bank pursuant to this declaration, provided that at any time prior to the making of such certification by the Government of Algeria, each of the two parties, Iran and the United States, shall have the right on seventy-two hours notice to terminate its commitments under this declaration.

If such notice is given by the United States and the foregoing certification is made by the Government of Algeria within the seventy-two hour period of notice, the Algerian Central Bank will thereupon instruct the Central Bank to transfer such monies and assets. If the seventy-two hour period of notice by the United States expires without such a certification having been made, or if the notice of termination is delivered by Iran, the Algerian Central Bank will thereupon instruct the Central Bank to return all such monies and assets to the United States, and thereafter the commitments reflected in this declaration shall be of no further force and effect.

### Assets in the Federal Reserve Bank

4 Commencing upon completion of the requisite escrow arrangements with the Central Bank, the United States will bring about the transfer to the Central Bank of all gold bullion which is owned by Iran and which is in the custody of the Federal Reserve Bank of New York, together with all other Iranian assets (or the cash equivalent thereof) in the custody of the Federal Reserve Bank of New York, to be held by the Central Bank in escrow until such time as their transfer or return is required by Paragraph 3 above.

### Assets in Foreign Branches of U.S. Banks

5. Commencing upon the completion of the requisite escrow arrangements with the

Central Bank, the United States will bring about the transfer to the Central Bank, to the account of the Algerian Central Bank, of all Iranian deposits and securities which on or after November 14, 1979, stood upon the books of overseas banking offices of U.S. banks, together with interest thereon through December 31, 1980, to be held by the Central Bank, to the account of the Algerian Central Bank, in escrow until such time as their transfer or return is required in accordance with Paragraph 3 of this Declaration.

### Assets in U.S. Branches of U.S. Banks

6. Commencing with the adherence by Iran and the United States to this declaration and the claims settlement agreement attached hereto, and following the conclusion of arrangements with the Central Bank for the establishment of the interest-bearing security account specified in that agreement and Paragraph 7 below, which arrangements will be concluded within 30 days from the date of this Declaration, the United States will act to bring about the transfer to the Central Bank, within six months from such date, of all Iranian deposits and securities in U.S. banking institutions in the United States, together with interest thereon, to be held by the Central Bank in escrow until such time as their transfer or return is required by Paragraph 3.

7. As funds are received by the Central Bank pursuant to Paragraph 6 above, the Algerian Central Bank shall direct the Central Bank to (1) transfer one- half of each such receipt to Iran and (2) place the other half in a special interest-bearing security account in the Central Bank, until the balance in the security account has reached the level of $1 billion. After the $1 billion balance has been achieved, the Algerian Central Bank shall direct all funds received pursuant to Paragraph 6 to be transferred to Iran. All funds in the security account are to be used for the sole purpose of securing the payment of, and paying, claims against Iran in accordance with the claims settlement agreement. Whenever the Central Bank shall thereafter notify Iran that the balance in the security account has fallen below $500 million, Iran shall promptly make new deposits sufficient to maintain a minimum balance of $500 million in the account. The account shall be so maintained until the President of the Arbitral Tribunal established pursuant to the claims settlement agreement has certified to the Central Bank of Algeria that all arbitral awards against Iran have been satisfied in accordance with the claims settlement agreement, at which point any amount remaining in the security account shall be transferred to Iran.

### Other Assets in the U.S. and Abroad

8. Commencing with the adherence of Iran and the United States to this declaration and the attached claims settlement agreement and the conclusion of arrangements for the establishment of the security account, which arrangements will be concluded within 30 days from the date of this Declaration, the United States will act to bring about the transfer to the Central Bank of all Iranian financial assets (meaning funds or securities) which are located in the United States and abroad, apart from those assets referred to in Paragraph 5 and 6 above, to be held by the Central Bank in escrow until their transfer or return is required by Paragraph 3 above.

9. Commencing with the adherence by Iran and the United States to this declaration and the attached claims settlement agreement and the making by the Government of Algeria of the certification described in Paragraph 3 above, the United States will arrange, subject to the provisions of U.S. law applicable prior to November 14, 1979, for the transfer to Iran of all Iranian properties which are located in the United States and abroad and which are not within the scope of the preceding paragraphs.

### Nullification of Sanctions and Claims

10. Upon the making by the Government of Algeria of the certification described in Paragraph 3 above, the United States will revoke all trade sanctions which were directed against Iran in the period November 4, 1979, to date.

11. Upon the making by the Government of Algeria of the certification described in Paragraph 3 above, the United States will promptly withdraw all claims now pending against Iran before the International Court of Justice and will thereafter bar and preclude the prosecution against Iran of any pending or future claim of the United States or a United States national arising out of events occurring before the date of this declaration related to (A) the seizure of the 52 United States nationals on November 4, 1979, (B) their subsequent detention, (C) injury to United States property or property of the United States nationals within the United States Embassy compound in Tehran after November 3, 1979, and (D) injury to the United States nationals or their property as a result of popular movements in the course of the Islamic Revolution in Iran which were not an act of the Government of Iran. The United States will also bar and preclude the prosecution against Iran in the courts of the United States of any pending or future claim asserted by persons other than the United States nationals arising out of the events specified in the preceding sentence.

*Point IV: Return of the Assets of the Family of the Former Shah*

12. Upon the making by the Government of Algeria of the certification described in Paragraph 3 above, the United States will freeze, and prohibit any transfer of, property and assets in the United States within the control of the estate of the former Shah or of any close relative of the former Shah served as a defendant in U.S. litigation brought by Iran to recover such property and assets as belonging to Iran. As to any such defendant, including the estate of the former Shah, the freeze order will remain in effect until such litigation is finally terminated. Violation of the freeze order shall be subject to the civil and criminal penalties prescribed by U.S. law.

13. Upon the making by the Government of Algeria of the certification described in Paragraph 3 above, the United States will order all persons within U.S. jurisdiction to report to the U.S. Treasury within 30 days, for transmission to Iran, all information known to them, as of November 3, 1979, and as of the date of the order, with respect to the property and assets referred to in Paragraph 12. Violation of the requirement will be subject to the civil and criminal penalties prescribed by U.S. law.

14. Upon the making by the Government of Algeria of the certification described in Paragraph 3 above, the United States will make known, to all appropriate U.S. courts, that in any litigation of the kind described in Paragraph 12 above the claims of Iran should not be considered legally barred either by sovereign immunity principles or by the act of state doctrine and that Iranian decrees and judgments relating to such assets should be enforced by such courts in accordance with United States law.

15. As to any judgment of a U.S. court which calls for the transfer of any property or assets to Iran, the United States hereby guarantees the enforcement of the final judgment to the extent that the property or assets exist within the United States.

16. If any dispute arises between the parties as to whether the United States has fulfilled any obligation imposed upon it by Paragraphs 12-15, inclusive, Iran may submit the dispute to binding arbitration by the tribunal established by, and in accordance with the provisions of, the claims settlement agreement. If the tribunal determines that Iran has suffered a loss as a result of a failure by the United States to fulfill such obligation, it shall make an appropriate award in favor of Iran which may be enforced by Iran in the courts of any nation in accordance with its laws.

### Settlement of Disputes

17. If any other dispute arises between the parties as to the interpretation or performance of any provision of this declaration, either party may submit the dispute to binding arbitration by the tribunal established by, and in accordance with the provisions of, the claims settlement agreement. Any decision of the tribunal with respect to such dispute, including any award of damages to compensate for a loss resulting from a breach of this declaration or the claims settlement agreement, may be enforced by the prevailing party in the courts of any nation in accordance with its laws.

**UNDERTAKINGS OF THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN WITH RESPECT
TO THE DECLARATION OF THE GOVERNMENT OF THE DEMOCRATIC AND
POPULAR REPUBLIC OF ALGERIA**

1. At such time as the Algerian Central Bank notifies the Governments of Algeria, Iran, and the United States that it has been notified by the Central Bank that the Central Bank has received for deposit in dollar, gold bullion, and securities accounts in the name of the Algerian Central Bank, as escrow agent, cash and other funds, 1,632,917.779 ounces of gold (valued by the parties for this purpose at $0.9397 billion), and securities (at face value) in the aggregate amount of $7.955 billion. Iran shall immediately bring about the safe departure of the 52 U.S. nationals detained in Iran. Upon the making by the Government of Algeria of the certification described in Paragraph 3 of the Declaration, the Algerian Central Bank will issue the instructions required by the following paragraph.

2. Iran having affirmed its intention to pay all its debts and those of its controlled institutions, the Algerian Central Bank acting pursuant to Paragraph 1 above will issue the following instructions to the Central Bank:

(A) To transfer $3.667 billion to the Federal Reserve Bank of New York to pay the unpaid principal of and interest through December 31, 1980 on

(1) all loans and credits made by a syndicate of banking institutions, of which a U.S. banking institution is a member, to the Government of Iran, its agencies, instrumentalities or controlled entities, and

(2) all loans and credits made by such a syndicate which are guaranteed by the Government of Iran or any of its agencies, instrumentalities or controlled entities.

(B) To retain $1.418 billion in the escrow account for the purpose of paying the unpaid principal of the interest owing, if any, on the loans and credits referred to in Paragraph (A) after application of the $3.667 billion and on all other indebtedness held by United States banking institutions of, or guaranteed by, the Government of Iran, its agencies, instrumentalities or controlled entities not previously paid and for the purpose of paying disputed amounts of deposits, assets, and interests, if any, owing on Iranian deposits in U.S. banking institutions. Bank Markazi and the appropriate United States banking institutions shall promptly meet in an effort to agree upon the amounts owing.

In the event of such agreement, the Bank Markazi and the appropriate banking institution shall certify the amount owing to the Central Bank of Algeria which shall instruct the Bank of England to credit such amount to the account, as appropriate, of the Bank Markazi or of the Federal Reserve Bank of New York in order to permit payment to the appropriate banking institution. In the event that within 30 days any U.S. banking institution and the Bank Markazi are unable to agree upon the amounts owed, either party may refer such dispute to binding

arbitration by such international arbitration panel as the parties may agree, or failing such agreement within 30 additional days after such reference, by the Iran-United States Claims Tribunal. The presiding officer of such panel or tribunal shall certify to the Central Bank of Algeria the amount, if any, determined by it to be owed, whereupon the Central Bank of Algeria shall instruct the Bank of England to credit such amount to the account of the Bank Markazi or of the Federal Reserve Bank of New York in order to permit payment to the appropriate banking institution. After all disputes are resolved either by agreement or by arbitration award and appropriate payment has been made, the balance of the funds referred to in this Paragraph (B) shall be paid to Bank Markazi.

(C) To transfer immediately to, or upon the order of, the Bank Markazi all assets in the escrow account in excess of the amounts referred to in Paragraphs (A) and (B).

### DECLARATION OF THE GOVERNMENT OF THE DEMOCRATIC AND POPULAR REPUBLIC OF ALGERIA
### CONCERNING THE SETTLEMENT OF CLAIMS BY THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN

The Government of the Democratic and Popular Republic of Algeria, on the basis of formal notice of adherence received from the Government of the Islamic Republic of Iran and the Government of the United States of America, now declares that Iran and the United States have agreed as follows:

*Article I*

Iran and the United States will promote the settlement of the claims described in Article II by the parties directly concerned. Any such claims not settled within six months from the date of entry into force of this agreement shall be submitted to binding third-party arbitration in accordance with the terms of this agreement. The aforementioned six months' period may be extended once by three months at the request of either party.

*Article II*

1. An International Arbitral Tribunal (the Iran-United States Claims Tribunal) is hereby established for the purpose of deciding claims of nationals of the United States against Iran and claims of nationals of Iran against the United States, and any counterclaim which arises out of the same contract, transaction or occurrence that constitutes the subject matter of that national's claim, if such claims and counterclaims are outstanding on the date of this agreement, whether or not filed with any court, and arise out of debts, contracts (including transactions which are the subject of letters of credit or bank guarantees), expropriations or other measures affecting property rights, excluding claims described in Paragraph 11 of the Declaration of the Government of Algeria of January 19, 1981, and claims arising out of the actions of the United States in response to the conduct described in such paragraph, and excluding claims arising under a binding contract between the parties specifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts in response to the Majlis position.

2. The Tribunal shall also have jurisdiction over official claims of the United States and Iran against each other arising out of contractual arrangements between them for the purchase and sale of goods and services.

3. The Tribunal shall have jurisdiction, as specified in Paragraphs 16-17 of the Declaration of the Government of Algeria of January 19, 1981, over any dispute as to the interpretation or performance of any provision of that declaration.

*Article III*

1. The Tribunal shall consist of nine members or such larger multiple of three as Iran and the United States may agree are necessary to conduct its business expeditiously. Within ninety days after the entry into force of this agreement, each government shall appoint one-third of the members. Within thirty days after their appointment, the members so appointed shall by mutual agreement select the remaining third of the members and appoint one of the remaining third President of the Tribunal. Claims may be decided by the full Tribunal or by a panel of three members of the Tribunal as the President shall determine. Each such panel shall be composed by the President and shall consist of one member appointed by each of the three methods set forth above.

2. Members of the Tribunal shall be appointed and the Tribunal shall conduct its business in accordance with the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL) except to the extent modified by the parties or by the Tribunal to ensure that this agreement can be carried out. The UNCITRAL rules for appointing members of three-member Tribunals shall apply mutatis mutandis to the appointment of the Tribunal.

3. Claims of nationals of the United States and Iran that are within the scope of this agreement shall be presented to the Tribunal either by claimants themselves, or, in the case of claims of less than $250,000, by the Government of such national.

4. No claim may be filed with the Tribunal more than one year after the entry into force of this agreement or six months after the date the President is appointed, whichever is later. These deadlines do not apply to the procedures contemplated by Paragraphs 16 and 17 of the Declaration of the Government of Algeria of January 19, 1981.

*Article IV*

1. All decisions and awards of the Tribunal shall be final and binding.

2. The President of the Tribunal shall certify, as prescribed in Paragraph 7 of the Declaration of the Government of Algeria of January 19, 1981, when all arbitral awards under this agreement have been satisfied.

3. Any award which the Tribunal may render against either government shall be enforceable against such government in the courts of any nation in accordance with its laws.

*Article V*

The Tribunal shall decide all cases on the basis of respect for law, applying such choice of law rules and principles of commercial and international law as the Tribunal determines to be applicable, taking into account relevant usages of the trade, contract provisions and changed circumstances.

**EXHIBIT "B"**





**Companies Affiliated To NIOC**

⌂ Home > Subsidiaries





### Ministry of Petroleum of IRAN Subsidiaries:

- National Iranian Oil Company
- National Iranian Gas Company
- National Iranian Petrochemical Company
- National Iranian Oil Refining and Distribution Company



#### Preface:

The National Iranian Oil Company (NIOC) was established in February 1948 with the objective of exploration, development, production, marketing of crude oil and natural gas. Having in possession huge hydrocarbon reserves, NIOC is the fourth largest state oil firm in the world.

NIOC's oil and gas in place reserves are 137 bn barrels and 28.17 trillion cubic meters, respectively which gives it a unique status on the global energy supply map. In fact, in recent years, NIOC has been invariably ranked as the world's fourth largest oil company.

Current NIOC production capacities include over 4 million barrels of crude oil and in excess of 437 million cubic meters of natural gas per day. On the export side, the company benefits from its modern extensive facilities on the three islands of Kharg, Lavan and Siri consisting of 17 jetties capable of berthing tankers of all sizes to lift and export its crude oil.


**National Iranian Gas Export Company**
- Website: www.nigec.ir
- email: info@nigec.ir


**National Iranian South Oil Company**
- Website: www.nisoc.com
- email: info@nisoc.com


**National Iranian Offshore Oil Company**
- Website: www.iooc.co.ir
- email: webmaster@iooc.co.ir


**National Iranian Central Oil Fields Co.**
- Website: www.icofc.ir
- email: info@icofc.ir


**Khazar Exploration & Production Co.**


**Petroleum Engineering & Development Co.**
- Website: www.pedec.ir
- email: info@pedec.net

**Pars Oil and Gas Company**
- Website: www.pogc.org
- email: info@pogc.ir



**Pars Special Economic Energy Zone Co.**
- Website: www.pseez.com
- email: Info@pseez.com

**National Iranian Oil Terminals Company**
- Website: www.nioc-otc.com
- email: Info@nioc-otc.com


**National Iranian Drilling Company**
- Website: www.nidc.ir
- email: webmaster@nidc.ir


**North Drilling Company**

**Organizational Structure:**

**NIOC's** General Assembly (consisting of the President, Vice President, Director General of the Management and Planning Organization, Ministers of Oil, Energy, Industries and Mines, Labor and Social Affairs, Economy and Finance) is its highest decision marking body. It determines the company's general policy guidelines, and approves annual budgets, operations, financial statements and balance sheets. The company's Board of Directors has the authority and major responsibilities to approve operational schemes within the general framework ratified by the General Assembly. It approves transactions and contracts, and prepares budgets and Board reports and annual balance sheets for presentation to the General Assembly. The Board supervises the implementation of general policy guidelines defined by the General Assembly, and pursues executive operations via the company's Managing Director.

**Subsidiary Companies:**

**W**ith appropriate division of tasks and delegation of responsibilities to subsidiaries-affiliates, NIOC has been able to establish acceptable degrees of coordination within its organizational set up. In fact, NIOC's "Directors" act primarily in policy making and supervision while subsidiaries act as their executive arm in coordinating an array of operations such as exploration, drilling, production and delivery of crude oil and natural gas, for export and domestic consumption.



•Website: www.northdrilling.com
•email:info@northdrilling.com

**PetroIran Development Company**
•Website: www.petroiran.com
•email:info@petroiran.com

**Ahwaz Pipe Mills Company**
•Website: www.apm-ir.com
•email: tabibi@apm-ir.com

**Petropars**
•Website: www.petropars.com
•email:webadmin@ppars.com

**Fuel Consumption Optimization Co.**
•Website: www.ifco.ir
•email:info@ifco.ir

**National Iranian Tanker Co.**
•Website: www.nitc.co.ir
•email:administrator@nitc.co.ir

**Exploration Service Company (ESC)**
•Website: www.oeoc.ir
•email: info@oeoc.ir

**Kala Naft London Ltd.**
•Website: www.kalaltd.com
•email:admin@kalaltd.com

**MSP Kala Naft Co. Tehran**
•Website: www.kalanaft.com
•email:info@kalanaft.com

**Arvandan Oil and Gas Company**
•Website: www.arvandan.org
•email:info@arvandan.org

**NIOC Today**
National Iranian Oil Company Today.
.wmv Format
4.37 MB

|Home| Subsidiaries| Tenders| Auctions|
|Seminars| News| Organization Chart| Contact|

© 2003, NIOC - National Iranian Oil Company. All Rights Reserved. email: webmaster@nioc.ir

**EXHIBIT "C"**





**Home    About    Subsidiaries    Main Links    Contact Us**

Home > Subsidiaries



## The Ministry Of Petroleum



#### Ministry of Petroleum of IRAN Subsidiaries:

- National Iranian Oil Company
- National Iranian Gas Company
- National Iranian Petrochemical Company
- National Iranian Oil Refining and Distribution Company



#### Preface:

National Gas company of Iran as one of the four principal Co.'s affiliated to oil ministry of Islamic Republic of Iran with 25 billions Ris.initial capital has established in1344 A.H.or 1965 AD.
This company, from the beginning of establishment up to now, appropriate to socioeconomical development growth and utilizing natural gas as one of the important sources in supplying fuel and energy production and obtaining some part of the required exchange, has gradually achieved various capabilities, competences and resources and possibilities including specialized and efficient man power with theoretical and actual insight and knowledge as well as numerous and various advanced and modern workshops, machinery, equipment, and tools for performing of the Co.'s operations, so that, today, it is able to do all affairs concerning calculation, designing and engineering, supplying the project goods from different sources, execution, manufacture and establishment , starting, utilization, and maintenance of refineries, high voltage transfer

#### The most important capabilities of the company for jointcooperation with organizations and companies.

#### Advisory, engineering and studies services.

- Technical and economical studies and presenting expertise advice on technical and economical justifications and the survey of fundamental projects.
- Engineering studies and the survey and assessment of great projects.
- Designing and engineering services and preparation of maps and determination of the Projects requirement list and or presenting advice required for construction and installations, pipelines and transfer networks, pumping and pressure reinforcement stations, dissociation and remoistening centres and gas refinery, supplying gas to industries and residential compounds and fuel transformation, cathodic protection systems, power systems, precision tools and control and measurement equipment, communication 1 dispatching and telephone centre installation systems, mechanical systems and storing installations,
- Performing technical studies and comprehensive surveys for determination or change in industrial standards of the items and engineering, investigations and research on mechanical and chemical fields, chemicals and parts and laboratory services for physical and chemical tests and experiments chemicals, parts and metal and plastic items, different kinds of valves and appliances and gas burner instruments.
- Performing studies and surveying and presenting advisories for the security of installations and Buildings and technical inspection and quality control and instalment, construction and

pipeline, gas pressure increasing and decreasing stations, supply and in city networks, cathodic protection systems, dispatching and remote control, precision tools and control equipment systems provisional, financial, administrative, organizational and man power systems, by its own, complying with authentic international and acceptable standards.

From the start of its establishment in various circumstances specially in emergency and unusual conditions, for maintaining and continuation of the operations, by its strong and loyal supports of specialized and faithful forces and finding scientific, experimental and rational solutions the company has overcome the troubles and problems resulted from development of investment and continuation of the current operations, and provided, by changing, transforming and modifying and making use of Experimental, scientific sources, and engineering know ledges, techniques and technologies, and productivity and entrepreneurship and innovation, sufficient guarantees for continuation of operations in normal and optimum conditions, where attaining to such abilities in less than 30 yrs. for gas industry being so complicated, is much more like a miracle than reality.

establishment of preventive systems and instruments and or guarding against accidents specially explosion combustion and holocaust.

- Performing studies and surveying and presenting organizational and institutional advice.
- Performing studies and surveying and presenting advice for provision and supply of goods, store keeping systems and methods, and mechanization
- Performing studies and surveying and presenting advice for the method of prediction and installation and establishment of installation protection systems.
- Performing studies, surveying, designing and suggesting contractual, engineering, commercial, financial, and administrative methods and systems.

---

© 2003, NIOC - National Iranian
Oil Company. All Rights Reserved.
email: webmaster@nioc.ir

**EXHIBIT "D"**





### Companies Affiliated To NIOC

Home > Subsidiaries



Home   About   Subsidiaries   Main Links   Contact Us

 



### Companies Affiliated To The Ministry Of Petroleum

**Ministry of Petroleum of IRAN Subsidiaries:**

- National Iranian Oil Company
- National Iranian Gas Company
- National Iranian Petrochemical Company
- National Iranian Oil Refining and Distribution Company

### NIPC Subsidiary Companies

**Preface:**

The National Iranian Petrochemical Company (NIPC), a subsidiary to the Iranian Petroleum Ministry, is owned by the government of the Islamic Republic of Iran. It is responsible for the development and operation of the country's petrochemical sector.

Founded in 1964, NIPC began its activities by operating a small fertilizer plant. Today, NIPC is the second largest producer and exporter of petrochemicals in the Middle East. Over these years, it has not only expanded the range and volume of its products, but it has also taken steps in areas such as R&D to achieve more self-sufficiency.

Two special economic zones on the northern coast of the Persian Gulf have been developed to be home to the NIPC's new project. These two zones enjoy a good access to feedstock, infrastructural facilities, local and international markets and skilled manpower.

NIPC's major activities are production, sale, distribution and export of chemicals and petrochemicals. Currently allied with more than

 **Pars Petrochemical Company**
- Website: www.parspc.net
- email: ppcs@parspc.net

 **Shiraz Petrochemical Company**
- Website: www.spc-ir.com
- email: info@spc-ir.com

 **Kharg Petrochemical Company**
- Website: www.khargpetrochemical.com
- email: kpc@khipc.com

 **Razi Petrochemical Company**
- Website: www.razip.com
- email: info@razip.com

 **Esfahan Petrochemical Company**
- Website: www.epciran.com
- email: info@epciran.com

 **Bandar Emam Petrochemical Company**
- Website: www.bipc.org
- email: arpc@arpc-ir.net

 **Arak Petrochemical Company**
- Website: www.arpc-ir.net
- email: info@pogc.ir

**Tabriz Petrochemical Company**
- Website: www.tpco.ir
- email: info@tpco.ir

 **Khorasan Petrochemical Company**
- Website: www.khtpc.com
- email: khbpc@nipc.net

 **Urmia Petrochemical Company**
- Website: www.upciran.ir
- email: Info@upciran.ir

  **Petrochemical Industries Developement Management Co.**
- Website: www.pidmco.net
- email: info@pidmco.net

50 subsidiaries, including 9 production complexes and 18 project implementing companies, NIPC operates as a mother company handling policy-making, planning, directing and overseeing the activities of its subsidiaries and affiliates.



**Iran Petrochemical Commercial Co.**
- Website: www.petrochem-ir.net
- email:pcc@petrochem-ir.net

**Petrochemical Operation Services Co.**
- Website: www.posc.ir
- email:

**Petzon Org.**
- Website: www.nipc.net
- email:petzon@nipc.net

**International Petrochemical Commercial Co.**
- Website: www.pccint.com
- email:pccint@pccint.com

|Home| Subsidiaries| Tenders| Auctions|
|Seminars| News| Organization Chart| Contact|

© 2003, NIOC - National Iranian Oil Company. All Rights Reserved.
email: webmaster@nioc.ir

# EXHIBIT "E"





**Companies Affiliated To NIOC**

Home   About   Subsidiaries   Main Links   Contact Us

‡ Home > Subsidiaries





## Ministry of Petroleum of IRAN Subsidiaries:

- National Iranian Oil Company
- National Iranian Gas Company
- National Iranian Petrochemical Company
- National Iranian Oil Refining and Distribution Company



### History:

Although National Iranian Oil Refining and Distribution Company ( NIORDC ) is formed nearly in the past decade and began its activities within a new framework, the company is actually inherited 90 years of Iran's Oil Industries experiences in the fields of refining, transferring and distributing of oil products, as well as, engineering and construction of installations of oil industries.
NIORDC and its subordinate companies has been established to separate oil upstream activities from downstream activities. NIORDC was established on March 08 / 1992 and undertook to perform all the operations related to refining crude oil and transfer and distribution of oil products.

### Task & Goals
### Responsibilities and Duties of NIORDC:

- Refining crude oil and producing variety of oil products in the refineries.

### Installations and capabilities of NIORDC:

- Nine crude oil refineries in Tehran , Tabriz , Isfahan , Abadan , Kermanshah , Shiraz , Bandar Abbas , Arak and Lavan Island .
- Fourteen thousand kilometers of crude oil and oil product transfer pipelines.
- 150 pumping stations.
- Oil industry telecommunication network.
- Operational zones for pipelines and telecommunication.
- 35 operational zones for NIOPDC.
- 194 operational areas for NIOPDC.
- Storage tank installations with 8 milliard litre capacity.

### NIORDC Subsidiaries:

 **National Iranian Oil Products Distribution Co.**
- Website: www.niopdc.ir
- email: info@niopdc.ir

**Iranian Oil Pipeline and Telecommunication Co.**
- Website: www.ioptc.com
- email:

**National Iranian Oil Engineering & Construction Co.**
- Website: www.nioec.org
- email: info@nioec.org

**Abadan Oil Refining Company**
- Website: www.abadan-ref.ir
- email: info@abadan-ref.ir

**Isfahan Oil Refining Company**

- Transferring crude oil from production bases and "Khazar Terminal" to the refineries and also transferring oil products from refineries and import bases to distribution procurement depots and distribution centres.
- Main provider of energy and distributor of oil products.
- Performing all refining projects and schemes, transfer and storing.
- Production, transfer and distribution of 250 million litres of oil products per day.
- Daily export of around 60 million litres of oil products abroad via oil terminals.
- Providing different sectors – industry, agriculture and power plants – with fuel and feed regularly e.g. petrochemical complexes to help them continue production in the country.
- Providing consuming fuel in residential sector, business sector in urban and the peasantry communities all over the country.
- Providing more than 4 million vehicles – heavy and light – existing in the transportation cycle with their required daily fuel.

- Website: www.esfahan-refinery.ir
- email: info@esfahan-refinery.ir

**Arak Oil Refining Company**
- Website: www.saorc-ir.com
- email: public@saorc-ir.com

**Bandar Abbas Oil Refining Company**
- Website: www.baorco.ir
- email:

**Tehran Oil Refining Company**
- Website: www.tehranrefinery.ir
- email: info@tehranrefinery.ir

**Tabriz Oil Refining Company**
- Website: www.tbzrefinery.co.ir
- email: info@tbzrefinery.co.ir

**Shiraz Oil Refining Company**
- Website: www.sorc.ir
- email:

**Kermanshah Oil Refining Company**
- Website: www.korc.ir
- email: webmaster@korc.ir

**Lavan Oil Refining Company**
- Website: www.lorc.ir
- email: Info@lorc.ir

---

© 2003, NIOC - National Iranian Oil Company. All Rights Reserved.
email: webmaster@nioc.ir

# EXHIBIT "F"



# Energy Information Administration
## Official Energy Statistics from the U.S. Government

e > International > Country Analysis Briefs > Iran



**an**

## Oil

*Iran is OPEC's second-largest oil producer and the fourth-largest crude oil exporter in the world.*

According to *Oil and Gas Journal*, Iran has 136 billion barrels of proven oil reserves, or roughly 10 percent of the world's total proven petroleum reserves as of January 1, 2007. Iran has 40 producing fields, 27 onshore and 13 offshore, with the majority of crude oil reserves located in the southwestern Khuzestan region near the Iraqi border. Iran's crude oil is generally medium in sulfur content and in the 28°-35° API range.



October 2007

Background
Oil
Natural Gas
Electricity
Quick Facts
Links
Sources

**Full Report**
HTML
PDF

**Contact Info**
cabs@eia.doe.gov
(202)586-8800
[more contacts]

### Top Proven World Oil Reserves, January 1, 2007



| | Billion Barrels |
|---|---|
| Saudi Arabia | 259.8 |
| Canada | 179.2 |
| Iran | 136.3 |
| Iraq | 115.0 |
| Kuwait | 99.0 |
| UAE | 97.6 |
| Venezuela | 80.0 |
| Russia | 60.0 |
| Libya | 41.5 |
| Nigeria | 36.2 |
| Kazakhstan | 30.0 |

Source: Oil & Gas Journal, Jan. 1, 2007

Iran is OPEC's second-largest producer after Saudi Arabia. In 2006, Iran produced an estimated 4.2 million barrels per day (bbl/d) of total liquids, of which 3.8 million bbl/d was crude oil, equal to 5 percent of global production.

### OPEC Total Crude Oil Production in 2006E



| | Million Barrels Per Day |
|---|---|
| Saudi Arabia | 9.2 |
| Iran | 3.8 |
| Kuwait | 2.5 |
| Venezuela | 2.5 |
| United Arab Emirates | 2.5 |
| Nigeria | 2.2 |
| Iraq | 2.0 |
| Libya | 1.7 |
| Algeria | 1.4 |
| Indonesia | 0.9 |
| Qatar | 0.8 |

Source: EIA Short-Term Energy Outlook (May 2007)

Iran's oil consumption totaled 1.6 million bbl/d in 2006. The Iranian government heavily subsidizes the price of refined oil products which has contributed to increased domestic demand. Iran has limited refinery capacity to produce light fuels, and imports much of its gasoline supply. Iranian domestic oil demand is mainly for gasoline and automotive gasoils, but domestic demand for other oil products are declining due to the substitution of natural gas. However, it is an overall net petroleum products exporter due to large exports of residual fuel oil. Oil export revenues represent the majority of Iran's total exports earnings, but the country suffers from budget deficits due to a growing population and large government

subsidies on gasoline and food products. In 2005, the International Monetary Fund (IMF) estimated that energy subsidies accounted for 12 percent of Iran's GDP, the highest rate in the world according to an International Energy Agency (IEA) study.

| Major Iranian Oil Field Production and Reserves, 2006 | | |
|---|---|---|
| Field | Production (Thousand bbl/d) | Reserves (Million Barrels) |
| Ahwaz-Asmari | 700 | 10,100 |
| Marun | 520 | 9,500 |
| Gachsaran | 480 | 8,500 |
| Karanj-Parsi | 250 | 4,650 |
| Agha Jari | 200 | 8,700 |
| Nowrooz and Soroosh | 200 | 6,000 |
| Doroud 1 & 2 | 200 | 600 |
| Rag-e-Safid | 180 | 2,400 |
| Bangestan | 158 | 6,500 |
| Abu Zar | 140 | 50 |
| Sirri A & E/C & D | 130 | 1,200 |
| Salman | 100 | 800 |
| Major Field Total: | 3,258 | 59,000 |

Source: Global Insight

Iran produced 6 million bbl/d of crude oil in 1974, but has been unable to produce at that level since the 1979 revolution due to a combination of war, limited investment, sanctions, and a high rate of natural decline in Iran's mature oil fields. Iran's oil fields need structural upgrades including enhanced oil recovery (EOR) efforts such as natural gas injection. Iran's fields have a natural annual decline rate estimated at 8 percent onshore and 10 percent offshore, while current Iranian recovery rates are 24-27 percent, 10 percent less than the world average. It is estimated that 400,000-500,000 bbl/d of crude production is lost annually due to reservoir damage and decreases in existing oil deposits.

*Upstream Projects*
The Azadegan project phases I and II represent the greatest potential increase in Iranian crude oil production. Azadegan contains 26 billion barrels of proven crude oil reserves, but is geologically complex and difficult to extract. Iran and Venezuela have agreed on a $4 billion investment in the Ayacucho 7 block, where there are an estimated 31 billion barrels of oil. Iran's Northern Drilling Company (NDC) has also worked with Russia's Lukoil on oil field development in the Caspian Sea. (See Caspian Sea Analysis Brief)

| New Major Iranian Upstream Projects through 2012 | | | |
|---|---|---|---|
| Field | Company | Thousand bbl/d | Online |
| Salman, Foroozan, Daroud | Total, Petro Iran | 200 | 2007 |
| Darkhovin, Phase II & III | ENI | 100 | 2007 |
| South Pars (Ahwaz) | NOIC | 150 | 2008 |
| Azadegan Phase I (south) | NIOC | 100 | 2009 |
| Kushk-Hosseinieh | NOIC | 300 | 2010 |
| Yadavaran | NIOC & Chinese Partners | 300 | 2011 |
| Azadegan Phase II (north) | NOIC | 110 | 2012 |
| New Potential Total: | | 1,260 | |

Source: OPEC, *Global Insight*

Iran plans to increase oil production to over 5 million bbl/d by 2010, but it will need foreign help. According to *Global Insight*, an estimated $25-35 billion is required to meet the government's 5.8 million bbl/d target by 2015. Investment in Iran's energy sector has been tempered due to the election of the conservative government of President Mahmoud Ahmadinejad in 2005, the international controversy surrounding the Iranian uranium enrichment and nuclear program, and economic sanctions. According to the IEA 2007 Medium-Term Oil Market Report, Iran will not be able to increase its net expansion capacity through 2012.

### U.S. Sanctions
U.S. sanctions against Iran due to Iran's historic support for international terrorism and its actions against non-belligerent shipping in the Persian Gulf impact the development of its petroleum sector. According to the Iran Transactions Regulations, administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), U.S. persons may not directly or indirectly trade, finance, or facilitate any goods, services or technology going to or from Iran, including goods, services or technology that would benefit the Iranian oil industry. U.S. persons are also prohibited from entering into or approving any contract that includes the supervision, management or financing of the development of petroleum resources located in Iran.

### Sector Organization
The state-owned National Iranian Oil Company (NIOC) is responsible for oil and gas production and exploration. The National Iranian South Oil Company (NISOC), a subsidiary of NIOC, accounts for 80

percent of local oil production covering the provinces of Khuzestan, Bushehr, Fars, and Kohkiluyeh va Boyer Ahamd. Though private ownership of upstream functions is prohibited under the Iranian constitution, the government has allowed for buyback contracts which allow international oil companies (IOCs) to enter exploration and development through an Iranian affiliate. The contractor receives a remuneration fee, usually an entitlement to oil or gas from the developed operation. In August 2007, President Mahmoud Ahmadinejad appointed NIOC executive Gholamhossein Nozari to serve as Acting Oil Minister, replacing Vaziri Hamaneh and creating controversy over President Ahmadinejad's role in the energy sector.

## Exports
According to International Energy Agency's Monthly Oil Data Service and Global Trade Atlas, Iran's net crude and product exports in 2006 averaged 2.5 million bbl/d, primarily to Japan, China, India, South Korea, Italy, and other Organization for Economic Co-operation and Development (OECD) nations, making it the fourth-largest exporter of crude oil in the world. In 2006, Iran's oil export revenues amounted to $54 billion.

| Top Iranian Crude Oil Exports, 2006 | |
|---|---|
| Country | Thousand (bbl/d) |
| Japan | 448 |
| China | 335 |
| India* | 302 |
| South Korea | 204 |
| Italy | 191 |
| Turkey | 179 |
| France | 135 |
| South Africa | 127 |
| Taiwan | 117 |
| Greece | 117 |
| Other | 345 |
| **Total Exports:** | **2,500** |

*India's imports only reported for April-August 2006

Source: IEA Monthly Oil Data Service, March 2007; Global Trade Atlas

### Iran's Oil Production and Consumption, 1976-2006E



Source: EIA *International Petroleum Monthly*
Short-Term Energy Outlook (July 2007)

### Export Terminals
Iran has the largest oil tanker fleet in the Middle East, the National Iranian Tanker Company, which holds 29 ships including Very Large Crude Carriers. Kharg Island is the country's largest terminal with a holding capacity of 16 million barrels of oil and a loading capacity of 5 million bbl/d, followed by Lavan Island with capacity to store 5 million barrels and loading capacity of 200,000 bbl/d. Other important terminals include Kish Island, Abadan and Bandar Mahshar, and Neka, which helps facilitate imports from the Caspian region. The Strait of Hormuz, on the southeastern coast of Iran, is an important route for oil exports from Iran and other Persian Gulf countries. (See Persian Gulf Analysis Brief) At its narrowest point the Strait of Hormuz is 34 miles wide, yet an estimated 17 million barrels, or roughly two-fifths of all seaborne traded oil, flows through the Strait daily. Iranian Heavy Crude Oil is Iran's largest crude export at 1.6 million bbl/d followed by Iranian Light at 1 million bbl/d.

| National Iranian Oil Company (NIOC) Crude Exports by Blend | | | |
|---|---|---|---|
| | API Gravity | Sulfur Content | Exports (bbl/d) |
| Iranian Heavy | 31° | 1.70% | 1.6 million |
| Iranian Light | 34.6° | 1.40% | 1 million |
| Foroozan Blend and Sirri | 29-31° | n/a | 165,000 |
| Lavan Blend | 34-35° | 1.8-2% | 75,000 |

### Refining

Iran's total refinery capacity is 1.5 million bbl/d from nine refineries operated by the National Iranian Oil Refining and Distribution Company (NIORDC), a NIOC subsidiary. Iranian refineries are unable to keep pace with domestic demand, and face major infrastructure problems. The country plans to add around 985,000 bbl/d of refining capacity by 2012, mostly through expansions and upgrades for gasoline yields at the Bandar Abbas, Bushehr, and the 90-year-old Abadan refineries. Large expansion projects at Bandar Abbas, including new catalytic reformers, distillation units, and condensate splitters will help supply the domestic demand, but it will probably not eliminate all gasoline imports. Iran has also discussed joint ventures in Asia, including China, Indonesia, Malaysia, and Singapore to expand refining activity.

| IRAN REFINERY PROJECTS (through 2012) | | | | |
|---|---|---|---|---|
| Refinery | Project Type | Online | Additional Production Capacity (thousands bbl/d) | Notes |
| Bandar Abbas | Upgrade & Expansion | 2012 | 300 | heavy crude processing |
| Bushehr | New Refinery | TBD | 170 | |
| Abadan | Upgrade | 2009 | 140 | |
| Abadan | New Refinery | 2012 | 80 | gasoline production |
| Arak | Expansion | 2009 | 80 | |
| Bandar Assaluyeh | New Refinery | TBD | 80 | |
| Bandar Abbas | Expansion | 2009 | 60 | |
| Tehran | Expansion | 2012 | 50 | gasoline production |
| Tabriz | Expansion | 2012 | 25 | gasoline production |
| Total New Refinery Capacity: | | | 985 | |

Source: PFC Energy, *Global Insight*

### Pipelines

Iran has an expansive domestic oil network including 5 pipelines, and multiple international pipeline projects under consideration. Recently, an expansion of the 150 mile pipeline from the port of Neka on the Caspian coast to Rey, Tabriz, and Tehran refineries has reached a capacity of 300,000 bbl/d according to *Global Insight*. Iran has invested in its import capacity at the Caspian port to handle increased product shipments from Russia and Azerbaijan, and enable crude swaps with Turkmenistan and Kazakhstan. In the case of crude swaps, the oil from the Caspian is consumed domestically in Iran, and an equivalent amount of oil is produced for export through the Persian Gulf with a Swiss-trading arm of NIOC for a swap fee.

*In 2006, Iran imported over 192,000 bbl/d of gasoline and relied upon imports to meet almost half of its fuel needs costing $5 billion.*

### Gasoline

Iran is the second biggest gasoline importer in the world after the United States, consuming over 400,000 bbl/d. According to FACTS Global Energy, Iran imported over 192,000 bbl/d of gasoline in 2006 costing $5 billion. The gasoline consumption growth rate has averaged ten percent annually over the past six years, and the cost of imports is expected to reach $6 billion in 2007, up from $2.8 billion in 2005. Gasoline prices are heavily subsidized, and sold below the market price at around 42 cents per gallon, which has encouraged increased consumption. An increase in vehicle sales in recent years has also contributed to the problem. According to PFC Energy, car ownership in Iran grew 250 percent between 1990 and 2006, and a majority of these vehicles are older models. Gasoline powered vehicles in Iran are expected to reach 14.9 million by the end of 2007. Iran does not have sufficient refining capacity to meets its domestic gasoline and other light fuel needs. Therefore Iran imports gasoline from India, Turkmenistan, Azerbaijan, the Netherlands, France, Singapore, and the United Arab Emirates. Iran also imports from large, multinational wholesalers such as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies.

### New Gasoline Rationing System

In June 2007, the Iranian government instituted a gasoline rationing system. The decision followed a 25 percent price increase to 42 cents per gallon in May. NIORDC is responsible for the program which allows private cars to purchase 26 gallons per month and taxis to buy 211 gallons per month. The rations and increased costs are politically unpopular in Iran. Customers are allowed to purchase their ration six months in advance. Part-time taxis, commercial vehicles, and government vehicles also have special

allowances. Records are maintained on smart cards, and later this year the government is expected to announce the price for gasoline bought beyond quota levels.

Iran's gasoline consumption dropped 30 percent immediately after the rationing scheme was adopted. NIOC executive, Hojjatollah Ghanimifard, stated that Iranian gasoline imports for August 2007 dropped 14 percent, although an additional $1.5 billion was requested by the Iranian Oil Ministry to increase gasoline imports through March 2008. The International Energy Agency reported in its August 2007 Oil Market Update that gasoline consumption will likely increase again due to the fact that Iran allows advance purchase of gasoline at a subsidized rate. The combination of rationing, price hikes, increased refining capacity, as well as compressed natural gas (CNG) production, will reduce Iranian gasoline import demand by an estimated 30,000 bbl/d in the next three years according to FACTS Global Energy.

Contact Us □ Feedback □ Privacy/Security □ Jobs □ About Us

**EXHIBIT "G"**

841

1         (2) such other findings, conclusions, and rec-

2     ommendations for improving the capabilities of the

3     Department for homeland defense as the advisory

4     panel considers appropriate.

5   **SEC. 1083. TERRORISM EXCEPTION TO IMMUNITY.**

6     (a) TERRORISM EXCEPTION TO IMMUNITY.—

7         (1) IN GENERAL.—Chapter 97 of title 28,

8     United States Code, is amended by inserting after

9     section 1605 the following:

10   **"§ 1605A. Terrorism exception to the jurisdictional**

11            **immunity of a foreign state**

12     "(a) IN GENERAL.—

13         "(1) NO IMMUNITY.—A foreign state shall not

14     be immune from the jurisdiction of courts of the

15     United States or of the States in any case not other-

16     wise covered by this chapter in which money dam-

17     ages are sought against a foreign state for personal

18     injury or death that was caused by an act of torture,

19     extrajudicial killing, aircraft sabotage, hostage tak-

20     ing, or the provision of material support or resources

21     for such an act if such act or provision of material

22     support or resources is engaged in by an official,

23     employee, or agent of such foreign state while acting

24     within the scope of his or her office, employment, or

25     agency.

F:\V10\011608\011608.044
January 16, 2008 (11:12 AM)

F:\GMK\ASCR08\REINTRO.002

842

| | |
|---|---|
| 1 | "(2) CLAIM HEARD.—The court shall hear a |
| 2 | claim under this section if— |
| 3 | "(A)(i)(I) the foreign state was designated |
| 4 | as a state sponsor of terrorism at the time the |
| 5 | act described in paragraph (1) occurred, or was |
| 6 | so designated as a result of such act, and, sub- |
| 7 | ject to subclause (II), either remains so des- |
| 8 | ignated when the claim is filed under this sec- |
| 9 | tion or was so designated within the 6-month |
| 10 | period before the claim is filed under this sec- |
| 11 | tion; or |
| 12 | "(II) in the case of an action that is refiled |
| 13 | under this section by reason of section |
| 14 | 1083(c)(2)(A) of the National Defense Author- |
| 15 | ization Act for Fiscal Year 2008 or is filed |
| 16 | under this section by reason of section |
| 17 | 1083(c)(3) of that Act, the foreign state was |
| 18 | designated as a state sponsor of terrorism when |
| 19 | the original action or the related action under |
| 20 | section 1605(a)(7) (as in effect before the en- |
| 21 | actment of this section) or section 589 of the |
| 22 | Foreign Operations, Export Financing, and Re- |
| 23 | lated Programs Appropriations Act, 1997 (as |
| 24 | contained in section 101(c) of division A of |
| 25 | Public Law 104–208) was filed; |

843

1    "(ii) the claimant or the victim was, at the

2    time the act described in paragraph (1)

3    occurred—

4        "(I) a national of the United States;

5        "(II) a member of the armed forces;

6    or

7        "(III) otherwise an employee of the

8    Government of the United States, or of an

9    individual performing a contract awarded

10    by the United States Government, acting

11    within the scope of the employee's employ-

12    ment; and

13        "(iii) in a case in which the act occurred

14    in the foreign state against which the claim has

15    been brought, the claimant has afforded the

16    foreign state a reasonable opportunity to arbi-

17    trate the claim in accordance with the accepted

18    international rules of arbitration; or

19        "(B) the act described in paragraph (1) is

20    related to Case Number 1:00CV03110 (EGS)

21    in the United States District Court for the Dis-

22    trict of Columbia.

23    "(b) LIMITATIONS.—An action may be brought or

24    maintained under this section if the action is commenced,

25    or a related action was commenced under section



844

1    1605(a)(7) (before the date of the enactment of this sec-

2    tion) or section 589 of the Foreign Operations, Export Fi-

3    nancing, and Related Programs Appropriations Act, 1997

4    (as contained in section 101(c) of division A of Public Law

5    104–208) not later than the latter of—

6              "(1) 10 years after April 24, 1996; or

7              "(2) 10 years after the date on which the cause

8         of action arose.

9         "(c) PRIVATE RIGHT OF ACTION.—A foreign state

10   that is or was a state sponsor of terrorism as described

11   in subsection (a)(2)(A)(i), and any official, employee, or

12   agent of that foreign state while acting within the scope

13   of his or her office, employment, or agency, shall be liable

14   to—

15             "(1) a national of the United States,

16             "(2) a member of the armed forces,

17             "(3) an employee of the Government of the

18        United States, or of an individual performing a con-

19        tract awarded by the United States Government,

20        acting within the scope of the employee's employ-

21        ment, or

22             "(4) the legal representative of a person de-

23        scribed in paragraph (1), (2), or (3),

24   for personal injury or death caused by acts described in

25   subsection (a)(1) of that foreign state, or of an official,

1 employee, or agent of that foreign state, for which the

2 courts of the United States may maintain jurisdiction

3 under this section for money damages. In any such action,

4 damages may include economic damages, solatium, pain

5 and suffering, and punitive damages. In any such action,

6 a foreign state shall be vicariously liable for the acts of

7 its officials, employees, or agents.

8    "(d) ADDITIONAL DAMAGES.—After an action has

9 been brought under subsection (c), actions may also be

10 brought for reasonably foreseeable property loss, whether

11 insured or uninsured, third party liability, and loss claims

12 under life and property insurance policies, by reason of

13 the same acts on which the action under subsection (c)

14 is based.

15    "(e) SPECIAL MASTERS.—

16       "(1) IN GENERAL.—The courts of the United

17    States may appoint special masters to hear damage

18    claims brought under this section.

19       "(2) TRANSFER OF FUNDS.—The Attorney

20    General shall transfer, from funds available for the

21    program under section 1404C of the Victims of

22    Crime Act of 1984 (42 U.S.C. 10603c), to the Ad-

23    ministrator of the United States district court in

24    which any case is pending which has been brought

25    or maintained under this section such funds as may

F:\V10\01160801\1608.044

846

1  be required to cover the costs of special masters ap-
2  pointed under paragraph (1). Any amount paid in
3  compensation to any such special master shall con-
4  stitute an item of court costs.
5  "(f) APPEAL.—In an action brought under this sec-
6  tion, appeals from orders not conclusively ending the liti-
7  gation may only be taken pursuant to section 1292(b) of
8  this title.
9  "(g) PROPERTY DISPOSITION.—
10  "(1) IN GENERAL.—In every action filed in a
11  United States district court in which jurisdiction is
12  alleged under this section, the filing of a notice of
13  pending action pursuant to this section, to which is
14  attached a copy of the complaint filed in the action,
15  shall have the effect of establishing a lien of lis
16  pendens upon any real property or tangible personal
17  property that is—
18  "(A) subject to attachment in aid of execu-
19  tion, or execution, under section 1610;
20  "(B) located within that judicial district;
21  and
22  "(C) titled in the name of any defendant,
23  or titled in the name of any entity controlled by
24  any defendant if such notice contains a state-
25  ment listing such controlled entity.

January 16, 2008 (11:12 AM)
F:\V10\011608\011608.044

847

1    ''(2) NOTICE.—A notice of pending action pur-
2    suant to this section shall be filed by the clerk of the
3    district court in the same manner as any pending
4    action and shall be indexed by listing as defendants
5    all named defendants and all entities listed as con-
6    trolled by any defendant.
7    ''(3) ENFORCEABILITY.—Liens established by
8    reason of this subsection shall be enforceable as pro-
9    vided in chapter 111 of this title.
10   ''(h) DEFINITIONS.—For purposes of this section—
11   ''(1) the term 'aircraft sabotage' has the mean-
12   ing given that term in Article 1 of the Convention
13   for the Suppression of Unlawful Acts Against the
14   Safety of Civil Aviation;
15   ''(2) the term 'hostage taking' has the meaning
16   given that term in Article 1 of the International
17   Convention Against the Taking of Hostages;
18   ''(3) the term 'material support or resources'
19   has the meaning given that term in section 2339A
20   of title 18;
21   ''(4) the term 'armed forces' has the meaning
22   given that term in section 101 of title 10;
23   ''(5) the term 'national of the United States'
24   has the meaning given that term in section

H.L.C.

848

1     101(a)(22) of the Immigration and Nationality Act

2     (8 U.S.C. 1101(a)(22));

3          "(6) the term 'state sponsor of terrorism'

4     means a country the government of which the Sec-

5     retary of State has determined, for purposes of sec-

6     tion 6(j) of the Export Administration Act of 1979

7     (50 U.S.C. App. 2405(j)), section 620A of the For-

8     eign Assistance Act of 1961 (22 U.S.C. 2371), sec-

9     tion 40 of the Arms Export Control Act (22 U.S.C.

10    2780), or any other provision of law, is a govern-

11    ment that has repeatedly provided support for acts

12    of international terrorism; and

13         "(7) the terms 'torture' and 'extrajudicial kill-

14    ing' have the meaning given those terms in section

15    3 of the Torture Victim Protection Act of 1991 (28

16    U.S.C. 1350 note).".

17         (2) AMENDMENT TO CHAPTER ANALYSIS.—The

18    table of sections at the beginning of chapter 97 of

19    title 28, United States Code, is amended by insert-

20    ing after the item relating to section 1605 the fol-

21    lowing:

"1605A. Terrorism exception to the jurisdictional immunity of a foreign state.".

22    (b) CONFORMING AMENDMENTS.—

23         (1) GENERAL EXCEPTION.—Section 1605 of

24    title 28, United States Code, is amended—

25              (A) in subsection (a)—

January 16, 2008 (11:12 AM)
F:\V10\011608\011608.044

849

1         (i) in paragraph (5)(B), by inserting

2   "or" after the semicolon;

3         (ii) in paragraph (6)(D), by striking

4   ";, or" and inserting a period; and

5         (iii) by striking paragraph (7);

6     (B) by repealing subsections (e) and (f);

7   and

8     (C) in subsection (g)(1)(A), by striking

9   "but for subsection (a)(7)" and inserting "but

10   for section 1605A".

11     (2) COUNTERCLAIMS.—Section 1607(a) of title

12   28, United States Code, is amended by inserting "or

13   1605A" after "1605".

14     (3) PROPERTY.—Section 1610 of title 28,

15   United States Code, is amended—

16         (A) in subsection (a)(7), by striking

17   "1605(a)(7)" and inserting "1605A";

18         (B) in subsection (b)(2), by striking "(5),

19   or (7), or 1605(b)" and inserting "or (5),

20   1605A(b), or 1605A";

21         (C) in subsection (f), in paragraphs (1)(A)

22   and (2)(A), by inserting "(as in effect before

23   the enactment of section 1605A) or section

24   1605A" after "1605(a)(7)"; and

25         (D) by adding at the end the following:

850

1   ''(g) PROPERTY IN CERTAIN ACTIONS.—

2   ''(1) IN GENERAL.—Subject to paragraph (3),

3  the property of a foreign state against which a judge-

4  ment is entered under section 1605A, and the prop-

5  erty of an agency or instrumentality of such a state,

6  including property that is a separate juridical entity

7  or is an interest held directly or indirectly in a sepa-

8  rate juridical entity, is subject to attachment in aid

9  of execution, and execution, upon that judgment as

10  provided in this section, regardless of—

11   ''(A) the level of economic control over the

12  property by the government of the foreign state;

13   ''(B) whether the profits of the property go

14  to that government;

15   ''(C) the degree to which officials of that

16  government manage the property or otherwise

17  control its daily affairs;

18   ''(D) whether that government is the sole

19  beneficiary in interest of the property; or

20   ''(E) whether establishing the property as

21  a separate entity would entitle the foreign state

22  to benefits in United States courts while avoid-

23  ing its obligations.

24   ''(2) UNITED STATES SOVEREIGN IMMUNITY IN-

25  APPLICABLE.—Any property of a foreign state, or

851

1    agency or instrumentality of a foreign state, to

2    which paragraph (1) applies shall not be immune

3    from attachment in aid of execution, or execution,

4    upon a judgment entered under section 1605A be-

5    cause the property is regulated by the United States

6    Government by reason of action taken against that

7    foreign state under the Trading With the Enemy

8    Act or the International Emergency Economic Pow-

9    ers Act.

10    "(3) THIRD-PARTY JOINT PROPERTY HOLD-

11    ERS.—Nothing in this subsection shall be construed

12    to supersede the authority of a court to prevent ap-

13    propriately the impairment of an interest held by a

14    person who is not liable in the action giving rise to

15    a judgment in property subject to attachment in aid

16    of execution, or execution, upon such judgment.".

17    (4) VICTIMS OF CRIME ACT.—Section

18    1404C(a)(3) of the Victims of Crime Act of 1984

19    (42 U.S.C. 10603c(a)(3)) is amended by striking

20    "December 21, 1988 with respect to which an inves-

21    tigation or" and inserting "October 23, 1983, with

22    respect to which an investigation or civil or crimi-

23    nal".

24    (e) APPLICATION TO PENDING CASES.—

F:\GMK\ASCR08\REINTRO.002 H.L.C.

852

(1) IN GENERAL.—The amendments made by
this section shall apply to any claim arising under
section 1605A of title 28, United States Code.

(2) PRIOR ACTIONS.—

(A) IN GENERAL.—With respect to any ac-
tion that—

(i) was brought under section
1605(a)(7) of title 28, United States Code,
or section 589 of the Foreign Operations,
Export Financing, and Related Programs
Appropriations Act, 1997 (as contained in
section 101(c) of division A of Public Law
104–208), before the date of the enact-
ment of this Act,

(ii) relied upon either such provision
as creating a cause of action,

(iii) has been adversely affected on the
grounds that either or both of these provi-
sions fail to create a cause of action
against the state, and

(iv) as of such date of enactment, is
before the courts in any form, including on
appeal or motion under rule 60(b) of the
Federal Rules of Civil Procedure,



853

1    that action, and any judgment in the action

2    shall, on motion made by plaintiffs to the

3    United States district court where the action

4    was initially brought, or judgment in the action

5    was initially entered, be given effect as if the

6    action had originally been filed under section

7    1605A(c) of title 28, United States Code.

8        (B) DEFENSES WAIVED.—The defenses of

9    res judicata, collateral estoppel, and limitation

10   period are waived—

11       (i) in any action with respect to which

12       a motion is made under subparagraph (A),

13       or

14       (ii) in any action that was originally

15       brought, before the date of the enactment

16       of this Act, under section 1605(a)(7) of

17       title 28, United States Code, or section

18       589 of the Foreign Operations, Export Fi-

19       nancing, and Related Programs Appropria-

20       tions Act, 1997 (as contained in section

21       101(c) of division A of Public Law 104–

22       208), and is refiled under section 1605A(c)

23       of title 28, United States Code,

24   to the extent such defenses are based on the

25   claim in the action.

854

1          (C) TIME LIMITATIONS.—A motion may be

2      made or an action may be refiled under sub-

3      paragraph (A) only—

4              (i) if the original action was com-

5          menced not later than the latter of—

6                  (I) 10 years after April 24, 1996;

7              or

8                  (II) 10 years after the cause of

9              action arose; and

10             (ii) within the 60-day period begin-

11         ning on the date of the enactment of this

12         Act.

13     (3) RELATED ACTIONS.—If an action arising

14 out of an act or incident has been timely commenced

15 under section 1605(a)(7) of title 28, United States

16 Code, or section 589 of the Foreign Operations, Ex-

17 port Financing, and Related Programs Appropria-

18 tions Act, 1997 (as contained in section 101(c) of

19 division A of Public Law 104–208), any other action

20 arising out of the same act or incident may be

21 brought under section 1605A of title 28, United

22 States Code, if the action is commenced not later

23 than the latter of 60 days after—

24         (A) the date of the entry of judgment in

25     the original action; or



855

1           (B) the date of the enactment of this Act.

2           (4) PRESERVING THE JURISDICTION OF THE

3    COURTS.—Nothing in section 1503 of the Emer-

4    gency Wartime Supplemental Appropriations Act,

5    2003 (Public Law 108–11, 117 Stat. 579) has ever

6    authorized, directly or indirectly, the making inappli-

7    cable of any provision of chapter 97 of title 28,

8    United States Code, or the removal of the jurisdic-

9    tion of any court of the United States.

10   (d) APPLICABILITY TO IRAQ.—

11          (1) APPLICABILITY.—The President may waive

12   any provision of this section with respect to Iraq, in-

13   sofar as that provision may, in the President's deter-

14   mination, affect Iraq or any agency or instrumen-

15   tality thereof, if the President determines that—

16               (A) the waiver is in the national security

17          interest of the United States;

18               (B) the waiver will promote the reconstruc-

19          tion of, the consolidation of democracy in, and

20          the relations of the United States with, Iraq;

21          and

22               (C) Iraq continues to be a reliable ally of

23          the United States and partner in combating

24          acts of international terrorism.



856

1    (2) TEMPORAL SCOPE.—The authority under

2    paragraph (1) shall apply—

3        (A) with respect to any conduct or event

4        occurring before or on the date of the enact-

5        ment of this Act;

6        (B) with respect to any conduct or event

7        occurring before or on the date of the exercise

8        of that authority; and

9        (C) regardless of whether, or the extent to

10       which, the exercise of that authority affects any

11       action filed before, on, or after the date of the

12       exercise of that authority or of the enactment

13       of this Act.

14   (3) NOTIFICATION TO CONGRESS.—A waiver by

15   the President under paragraph (1) shall cease to be

16   effective 30 days after it is made unless the Presi-

17   dent has notified Congress in writing of the basis for

18   the waiver as determined by the President under

19   paragraph (1).

20   (4) SENSE OF CONGRESS.—It is the sense of

21   the Congress that the President, acting through the

22   Secretary of State, should work with the Govern-

23   ment of Iraq on a state-to-state basis to ensure com-

24   pensation for any meritorious claims based on ter-

25   rorist acts committed by the Saddam Hussein re-



857

1     gime against individuals who were United States na-

2     tionals or members of the United States Armed

3     Forces at the time of those terrorist acts and whose

4     claims cannot be addressed in courts in the United

5     States due to the exercise of the waiver authority

6     under paragraph (1).

7     (e) SEVERABILITY.—If any provision of this section

8 or the amendments made by this section, or the applica-

9 tion of such provision to any person or circumstance, is

10 held invalid, the remainder of this section and such

11 amendments, and the application of such provision to

12 other persons not similarly situated or to other cir-

13 cumstances, shall not be affected by such invalidation.

# 14 TITLE XI—CIVILIAN PERSONNEL
# 15 MATTERS

Sec. 1101. Extension of authority to waive annual limitation on total compensation paid to Federal civilian employees working overseas under areas of United States Central Command.

Sec. 1102. Continuation of life insurance coverage for Federal employees called to active duty.

Sec. 1103. Transportation of dependents, household effects, and personal property to former home following death of Federal employee where death resulted from disease or injury incurred in the Central Command area of responsibility.

Sec. 1104. Special benefits for civilian employees assigned on deployment temporary change of station.

Sec. 1105. Death gratuity authorized for Federal employees.

Sec. 1106. Modifications to the National Security Personnel System.

Sec. 1107. Requirement for full implementation of personnel demonstration project.

Sec. 1108. Authority for inclusion of certain Office of Defense Research and Engineering positions in experimental personnel program for scientific and technical personnel.

Sec. 1109. Pilot program for the temporary assignment of information technology personnel to private sector organizations.

Sec. 1110. Compensation for Federal wage system employees for certain travel hours.



1   **DAVID J. COOK, ESQ. (State Bar # 060859)**
    **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2   **COOK COLLECTION ATTORNEYS**
    **A PROFESSIONAL LAW CORPORATION**
3   165 Fell Street
    San Francisco, CA 94102
4   Mailing Address: P.O. Box 270
    San Francisco, CA 94104-0270
5   Tel.: (415) 989-4730
    Fax: (415) 989-0491
6   File No. 52,759

7   Attorneys for Plaintiffs
    DEBORAH D. PETERSON, Personal Representatives
8   of the Estate of James C. Knipple (Dec.), et al.

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12
    DEBORAH D. PETERSON, Personal     )   CASE NO. 3:08-80030-JSW (BZ)
13  Representative of the Estate of James C.  )
    Knipple (Dec.), et al.,           )
14                                     )   PROOF OF SERVICE
            Plaintiffs,                )
15                                     )
    vs.                                )
16                                     )
    ISLAMIC REPUBLIC OF IRAN, et al.,  )
17                                     )
            Defendants.                )
18  _____   )

19  *Via Email dr-ahmadinejad@president.ir*      ISLAMIC REPUBLIC OF IRAN
    PRESIDENT DR. AHMADINEJAD                    Khomeini Avenue
20                                               United Nations Street
    ISLAMIC REPUBLIC OF IRAN                     Teheran, Iran
21  acting through its                           ATTN: Responsible Officer
    MINISTRY OF DEFENSE AND
22  SUPPORT FOR ARMED FORCES
    No. 1 Shahid Kaboli Street
23  Beginning of Resalat Highway
    Seyyed Khandan Bridge
24  P.O. Box 16765-1479
    Tehran, Iran
25  Attn: Responsible Officer

26  ISLAMIC REPUBLIC OF IRAN
    Pasadaran Avenue
27  Golestan Yekom
    Teheran, Iran
28  ATTN: Responsible Officer

1. National Iranian Gas Export Company
Website: www.nigec.ir
Email: info@nigec.ir

2. National Iranian South Oil Company
Website: www.nisoc.com
Email: info@nisoc.com

3. National Iranian Offshore Oil Company
Website: www.iooc.co.ir
Email: webmaster@iooc.co.ir

4. National Iranian Central Oil Fields Co.
Website: www.icofc.ir
Email: info@icofc.ir

5. Khazar Exploration & Production Co.
Tehran HQ.
No.19 – 11th Alley - Vozara Ave. - Arjantin sq.
Tehran. Iran
Tel: +98-21-88722430, 3
Fax: +98-21-88711386

6. Petroleum Engineering & Development Co.
Website: www.pedec.ir
Email: info@pedec.net

7. Pars Oil and Gas Company
Website: www.pogc.org
Email: info@pogc.ir

8. Pars Special Economic energy Zone Co.
Website: www.pseez.com
Email: info@pseez.com

9. National Iranian Oil Terminals Company
Website: www.nioc-otc.com
Email: info@nioc-otc.com

10. National Iranian Drilling Company
Website: www.nidc.ir
Email: webmaster@nidc.ir

11. North Drilling Company
Website: www.northdrilling.com
Email: info@northdrilling.com

12. PetroIran Development Company
Website: petroiran.com
Email: info@petroiran.com

13. Ahwaz Pipe Mills Company
Website: www.apm-ir.com
Email: tabibi@apm-ir.com

14. Petropars
Website: www.petropars.com
Email: webadmin@ppars.com

15. Fuel Consumption Optimization Co.
Website: www.ifco.ir
Email: info@ifco.ir

16. National Iranian Tanker Co.
Website: www.nitc.co.ir
Email: administrator@nitc.co.ir

17. Exploration Service Company (ESC)
Website: www.oeoc.ir
Email: info@oeoc.ir

18. Kala Naft London Ltd.
Website: www.kalaltd.com
Email: admin@kalaltd.com

19. Kala Naft Canada Ltd.
Website: www.kalanaftcanada.com
Email: info@kalanaftcanada.com

20. Arvandan Oil and Gas Company
Website: www.arvandan.org
Email: info@arvandan.org

21. National Iranian Gas Company
Website: www.nigc.org
Email: webmaster@nigc.org

22. National Iranian Petrochemical Company
Website: www.nipc.net
Email: webmaster@nipc.net

23. National Iranian Oil Refining and Distribution Co.
Website: www.niordc.ir
Email: info@niordc.ir

I declare:

1    I am employed in the County of San Francisco, California. I am over the age of eighteen
(18) years and not a party to the within cause. My business address is 165 Fell Street, San
2    Francisco, CA 94102. On the date set forth below, I served the attached:

3        SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT
4        ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO
INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
5
        SUPPLEMENTAL DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF
6        SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT
ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO
7        INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135

8    on the above-named person(s) by:

9    __XXX__ (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage
thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
10    person(s) served above.

11    __XXX__ (BY EMAIL) Emailing addressed to the person's/company's email address listed above
on May 20, 2008.
12
        I declare under penalty of perjury that the foregoing is true and correct.
13
        Executed on May 20, 2008.
14

15                                    _____/s/ David J. Cook_____
                                            David J. Cook
16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE - CASE NO. 3:08-80030-JSW (BZ)                              3

1   **DAVID J. COOK, ESQ. (State Bar # 060859)**
    **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2   **COOK COLLECTION ATTORNEYS**
    **A PROFESSIONAL LAW CORPORATION**
3   165 Fell Street
    San Francisco. CA  94102
4   Mailing Address: P.O. Box 270
    San Francisco. CA  94104-0270
5   Tel.: (415) 989-4730
    Fax: (415) 989-0491
6   File No. 52,759

7   Attorneys for Plaintiffs
    DEBORAH D. PETERSON. Personal Representatives
8   of the Estate of James C. Knipple (Dec.), et al.

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12
    DEBORAH D. PETERSON, Personal          )    CASE NO. 3:08-80030-JSW (BZ)
13  Representative of the Estate of James C. )
    Knipple (Dec.). et al.,                 )
14                                          )    PROOF OF SERVICE
                   Plaintiffs,              )
15                                          )
    vs.                                     )
16                                          )
    ISLAMIC REPUBLIC OF IRAN. et al.,       )
17                                          )
                   Defendants.              )
18  _____    )

19
    *Via Email dr-ahmadinejad@president.ir*   ISLAMIC REPUBLIC OF IRAN
20  PRESIDENT DR. AHMADINEJAD                 Pasadaran Avenue
                                              Golestan Yekom
21  ISLAMIC REPUBLIC OF IRAN                  Teheran, Iran
    acting through its                        ATTN: Responsible Officer
22  MINISTRY OF DEFENSE AND
    SUPPORT FOR ARMED FORCES                  ISLAMIC REPUBLIC OF IRAN
23  No. 1 Shahid Kaboli Street               Khomeini Avenue
    Beginning of Resalat Highway              United Nations Street
24  Seyyed Khandan Bridge                     Teheran. Iran
    P.O. Box 16765-1479                       ATTN: Responsible Officer
25  Tehran. Iran
    Attn: Responsible Officer

26

27

28

1     I declare:

2     I am employed in the County of San Francisco, California. I am over the age of eighteen (18) years and not a party to the within cause. My business address is 165 Fell Street, San Francisco, CA 94102. On the date set forth below, I served the attached:

4     NOTICE OF MOTION AND MOTION FOR HEARING ON OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS, PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION

5

6

7     MOTION FOR HEARING ON OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS, PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION

8     MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR HEARING ON OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS, PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION

9

10

11     DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF MOTION FOR HEARING ON OBJECTION TO REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' EX PARTE APPLICATIONS, PURSUANT TO LOCAL RULE 72-3(a), AND MOTION FOR DE NOVO DETERMINATION

12

13

14     on the above-named person(s) by:

15     __XXX__ (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the person(s) served above.

16

17     __XXX__ (BY EMAIL) Emailing addressed to the person's/company's email address listed above.

18     I declare under penalty of perjury that the foregoing is true and correct.

19     Executed on June 2, 2008.

20

21     _____/s/ Karene Jen_____
                    Karene Jen

22

23

24

25

26

27

28