1   Timothy T. Scott (SBN 126971)
    tscott@sidley.com
2   Ryan M. Sandrock (SBN 251781)
    rsandrock@sidley.com
3   SIDLEY AUSTIN LLP
    555 California Street
4   San Francisco, California  94104
    Telephone: (415) 772-1200
5   Facsimile: (415) 772-7400

6   Mark D. Hopson
    mhopson@sidley.com
7   Griffith L. Green
    ggreen@sidley.com
8   SIDLEY AUSTIN LLP
    1501 K Street, N.W.
9   Washington, D.C. 20005
    Telephone: (202) 736-8000
10  Facsimile: (202) 736-8711

11  Attorneys For The International
    Bank for Reconstruction and Development

12

13

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                     SAN FRANCISCO DIVISION

17  DEBORAH D. PETERSON, Personal          )   Case No. 08-mc-80030-JSW
    Representative of the Estate of James C. )
18  Knipple (Dec.) et al.,                  )   Hon. Jeffrey S. White
                                            )
                                            )   Hon. Bernard Zimmerman
19             Plaintiffs,                  )
                                            )   **DECLARATION OF RYAN M. SANDROCK**
20                                          )   **IN SUPPORT OF MEMORANDUM OF**
          v.                                )   **POINTS AND AUTHORITIES IN**
21                                          )   **OPPOSITION TO MOTION FOR**
                                            )   **ASSIGNMENT**
22  ISLAMIC REPUBLIC OF IRAN, et al.        )
                                            )
23             Defendants.                  )
                                            )
24  _____)

25             I, Ryan M. Sandrock, declare as follows:

26         1.    I am an attorney with Sidley Austin LLP, counsel for the International Bank for

27  Reconstruction and Development (the "World Bank") in the above-captioned matter, and admitted to

28

    _____
    DECLARATION OF RYAN M. SANDROCK IN SUPPORT OF OPPOSITION TO MOTION FOR ASSIGNMENT – CASE NO. 08-80030

1    practice before this Court.  I make this declaration in support of the World Bank's Memorandum of

2    Points and Authorities In Opposition to Motion For Assignment.

3         2.        Attached as Exhibit A hereto is a true and correct copy of the Articles of Agreement

4    of the International Bank for Reconstruction and Development, Dec. 27, 1945, 60 Stat. 1440,

5    T.I.A.S. No. 1502, *as amended*, 16 U.S.T. 1942, T.I.A.S. No. 5929.

6         3.        Attached as Exhibit B hereto is a true and correct copy of a letter from D. Cook to P.

7    Miranda dated May 12, 2008 and its attachments.

8         4.        Attached as Exhibit C hereto is a true and correct copy of an opinion in *Trans*

9    *Commodities, Inc.* v. *Kazakhstan Trading House*, S.A., No. 96-ms-00316, slip. op. (D.D.C. Feb. 20,

10   1997).

11            I declare under penalty of perjury under the laws of the United States that the

12   foregoing is true and correct.  Executed on this 9th day of June 2008 at San Francisco, California.

13

14                                             /s/ Ryan M. Sandrock

15                                             Ryan M. Sandrock

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RYAN M. SANDROCK IN SUPPORT OF OPPOSITION TO MOTION FOR ASSIGNMENT – CASE NO. 08-80030
SF1 1473001v.1

SF1 1500256v.1

# EXHIBIT A

December 27, 1945
[T. I. A. S. 1502]

*Articles of agreement between the United States of America and other powers respecting the International Bank for Reconstruction and Development. Formulated at the United Nations Monetary and Financial Conference, Bretton Woods, New Hampshire, July 1 to July 22, 1944; signed at Washington December 27, 1945; instrument of acceptance by the United States of America deposited December 20, 1945; effective December 27, 1945.*

## ARTICLES OF AGREEMENT
## OF THE INTERNATIONAL BANK
## FOR RECONSTRUCTION AND DEVELOPMENT

59 Stat. 512.

The Governments on whose behalf the present Agreement is signed agree as follows:

### INTRODUCTORY ARTICLE

The International Bank for Reconstruction and Development is established and shall operate in accordance with the following provisions:

### ARTICLE I

### PURPOSES

The purposes of the Bank are:

  (i) To assist in the reconstruction and development of territories of members by facilitating the investment of capital for productive purposes, including the restoration of economies destroyed or disrupted by war, the reconversion of productive facilities to peacetime needs and the encouragement of the development of productive facilities and resources in less developed countries.

 (ii) To promote private foreign investment by means of guarantees or participations in loans and other investments made by private investors; and when private capital is not available on reasonable terms, to supplement private investment by providing, on suitable conditions, finance for productive purposes out of its own capital, funds raised by it and its other resources.

(iii) To promote the long-range balanced growth of international trade and the maintenance of equilibrium in balances of payments by encouraging international investment for the development of the productive resources of members, thereby assisting in raising productivity, the standard of living and conditions of labor in their territories.

 (iv) To arrange the loans made or guaranteed by it in relation to international loans through other channels so that the more useful and urgent projects, large and small alike, will be dealt with first.

be subject to the prior settlement of all outstanding claims of the Bank against each member.

(g) Before any distribution of assets is made, the Executive Directors shall fix the proportionate share of each member according to the ratio of its shareholding to the total outstanding shares of the Bank.

(h) The Executive Directors shall value the assets to be distributed as at the date of distribution and then proceed to distribute in the following manner:

(i) There shall be paid to each member in its own obligations or those of its official agencies or legal entities within its territories, insofar as they are available for distribution, an amount equivalent in value to its proportionate share of the total amount to be distributed.

(ii) Any balance due to a member after payment has been made under (i) above shall be paid, in its own currency, insofar as it is held by the Bank, up to an amount equivalent in value to such balance.

(iii) Any balance due to a member after payment has been made under (i) and (ii) above shall be paid in gold or currency acceptable to the member, insofar as they are held by the Bank, up to an amount equivalent in value to such balance.

(iv) Any remaining assets held by the Bank after payments have been made to members under (i), (ii), and (iii) above shall be distributed *pro rata* among the members.

(i) Any member receiving assets distributed by the Bank in accordance with (h) above, shall enjoy the same rights with respect to such assets as the Bank enjoyed prior to their distribution.

## ARTICLE VII

### STATUS, IMMUNITIES AND PRIVILEGES

**Section 1.**  *Purposes of Article*

To enable the Bank to fulfill the functions with which it is entrusted, the status, immunities and privileges set forth in this Article shall be accorded to the Bank in the territories of each member.

**Section 2.**  *Status of the Bank*

The Bank shall possess full juridical personality, and, in particular, the capacity:

(i) to contract;

(ii) to acquire and dispose of immovable and movable property;

(iii) to institute legal proceedings.

**Section 3.**  *Position of the Bank with regard to judicial process*

Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.  No actions

shall, however, be brought by members or persons acting for or deriving claims from members.   The property and assets of the Bank shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Bank.

Section 4.   *Immunity of assets from seizure*

Property and assets of the Bank, wherever located and by whomsoever held, shall be immune from search, requisition, confiscation, expropriation or any other form of seizure by executive or legislative action.

Section 5.   *Immunity of archives*

The archives of the Bank shall be inviolable.

Section 6.   *Freedom of assets from restrictions*

To the extent necessary to carry out the operations provided for in this Agreement and subject to the provisions of this Agreement, all property and assets of the Bank shall be free from restrictions, regulations, controls and moratoria of any nature.

Section 7.   *Privilege for communications*

The official communications of the Bank shall be accorded by each member the same treatment that it accords to the official communications of other members.

Section 8.   *Immunities and privileges of officers and employees*

All governors, executive directors, alternates, officers and employees of the Bank

(i)   shall be immune from legal process with respect to acts performed by them in their official capacity except when the Bank waives this immunity;

(ii)   not being local nationals, shall be accorded the same immunities from immigration restrictions, alien registration requirements and national service obligations and the same facilities as regards exchange restrictions as are accorded by members to the representatives, officials, and employees of comparable rank of other members;

(iii)   shall be granted the same treatment in respect of travelling facilities as is accorded by members to representatives, officials and employees of comparable rank of other members.

Section 9. *Immunities from taxation*

(a)  The Bank, its assets, property, income and its operations and transactions authorized by this Agreement, shall be immune from all taxation and from all customs duties.   The Bank shall also be immune from liability for the collection or payment of any tax or duty.

(b)  No tax shall be levied on or in respect of salaries and emoluments paid by the Bank to executive directors, alternates, officials or employees of the Bank who are not local citizens, local subjects, or other local nationals.

(c) No taxation of any kind shall be levied on any obligation or security issued by the Bank (including any dividend or interest thereon) by whomsoever held—

(i) which discriminates against such obligation or security solely because it is issued by the Bank; or

(ii) if the sole jurisdictional basis for such taxation is the place or currency in which it is issued, made payable or paid, or the location of any office or place of business maintained by the Bank.

(d) No taxation of any kind shall be levied on any obligation or security guaranteed by the Bank (including any dividend or interest thereon) by whomsoever held—

(i) which discriminates against such obligation or security solely because it is guaranteed by the Bank; or

(ii) if the sole jurisdictional basis for such taxation is the location of any office or place of business maintained by the Bank.

Section 10.  *Application of Article*

Each member shall take such action as is necessary in its own territories for the purpose of making effective in terms of its own law the principles set forth in this Article and shall inform the Bank of the detailed action which it has taken.

## ARTICLE VIII

### AMENDMENTS

(a) Any proposal to introduce modifications in this Agreement, whether emanating from a member, a governor or the Executive Directors, shall be communicated to the Chairman of the Board of Governors who shall bring the proposal before the Board.  If the proposed amendment is approved by the Board the Bank shall, by circular letter or telegram, ask all members whether they accept the proposed amendment.  When three-fifths of the members, having four-fifths of the total voting power, have accepted the proposed amendment, the Bank shall certify the fact by a formal communication addressed to all members.

(b) Notwithstanding (a) above, acceptance by all members is required in the case of any amendment modifying

(i) the right to withdraw from the Bank provided in Article VI, Section 1;    *Ante,* p. 1454.

(ii) the right secured by Article II, Section 3 (c);    *Ante,* p. 1441.

(iii) the limitation on liability provided in Article II, Section 6.    *Ante,* p. 1442.

(c) Amendments shall enter into force for all members three months after the date of the formal communication unless a shorter period is specified in the circular letter or telegram.

# EXHIBIT B



COOK℠ COLLECTION ATTORNEYS®, PLC
ATTORNEYS AT LAW

NORTHERN CALIFORNIA OFFICE:
165 FELL STREET
SAN FRANCISCO, CA 94102-5106
MAIL:
P.O. BOX 270
SAN FRANCISCO, CA 94104-0270

TEL: (415) 989-4730
FAX: (415) 989-0491

LOS ANGELES:
TEL: 213-620-8600
FAX: 213-620-1399

ORANGE COUNTY:
TEL: 714-241-1880
FAX: 714-241-1879

May 12, 2008

THE WORLD BANK
International Bank for Reconstruction and Development
International Development Association
1818 H Street N.W.
Washington, D.C. 20433
Attn:   Patricia Miranda, Institutional Administration
        Legal Department

Re:   Deborah D. Peterson vs. Islamic Republic of Iran
      Our File No. 52,759

Dear Ms. Miranda:

As indicated, this office represents the Plaintiff in the above-entitled matter, and this letter will
confirm our telephone conversation of this date. The starting point is that THE WORLD BANK
International Bank for Reconstruction and Development) indicated that The World Bank has
made various commitments for and on behalf of The Islamic Republic of Iran ("Iran"), including
various loans and loan commitments, lines of credit, and/or holds "undisbursed funds." While
Iran might be a debtor under these obligations, conversely, The World Bank has made
commensurate obligations by which to advance and make funds available. Accordingly, Iran is
owed "credits" in that Iran has the right to "draw down" on the loans, or the right to receive
absolutely various disbursements and have directed unremitted loan funds. This is no different
than a homeowner drawing down on a secured line of credit, where the homeowner need only
write a check to receive the benefit thereof.

You indicate the prospect of sovereign immunity. We have read and reviewed all of the
applicable case law, and The World Bank certainly does not have sovereign immunity
absolutely, but only qualified sovereign immunity. We cite to you Article VII, Section 3 of the
Articles of Agreement, which provide as follows:

> SECTION 3. Position of the bank with regard to judicial Process
>
> Actions may be brought against the Bank only in a court of competent jurisdiction
> in the territories of a member in which the Bank has an office, has appointed an
> agent for the purpose of accepting service or notice of process, or has issued or
> guaranteed securities. No actions shall, however, be brought by members or
> persons acting for or deriving claims from members. The property and assets of
> the Bank shall, wheresoever located and by whomsoever held, by immune from
> all forms of seizure, attachment or execution before the delivery of final judgment
> against the Bank.

THE WORLD BANK
International Bank for Reconstruction and Development
International Development Association
Attn:  Patricia Miranda, Institutional Administration
       Legal Department
Re:    Deborah D. Peterson vs. Islamic Republic of Iran
       Our File No. 52.759
May 12, 2008
Page 2

We also advise you that outstanding case law holds that the sovereign immunity, if any, of The World Bank, is limited, and the court is entitled to engage in a "weighing test" to determine whether the sovereign immunity would apply in one transaction or another. In this case, The World Bank is obligated to undertake the transaction(s) which are the subject matter thereof, which are the core of the operation and integrity of The World Bank. All borrowers would depend upon the absolute obligation to make the loan, which such obligations would be readily enforceable in a court of law.

On a large issue, we also advise you that The World Bank is obligated to respond fully, fairly and completely with the interrogatories which are attached, in which The World Bank has failed to do so.

We look forward to the proper execution of the interrogatories in attachment, and a response to this letter. We also advise you, in the event that The World Bank fails to respond to the garnishment within 10 days, that it is our intention to seek redress before the United States District Court, District of Columbia.

If you have any questions, please do not hesitate to give me a call.

Very truly yours,

David J. Cook
DJC:kj
T:\djcnew\letter\world.1

FAQs - Iran

**The World Bank**

Home ● Site Map ● Index ● FAQs ● Contact Us

| About | Countries | Data & Research | Learning | News | Projects & Operations | Publications | Topics |

## FAQs

Search  FAQs ▼ [            ]  GO

✉ Email 🖨 Print

Home > FAQs > Iran

● عربى   ● Español
● Русский   ● Français
● 中文

## Iran

Available in: Русский, Español, 中文, Français, عربى

**Does the World Bank Group Follow UN Sanctions on Iran?**

**What is the Multilateral Investment Guarantee Agency's (MIGA) involvement in Iran?**

**What is the Status of World Bank Group Lending to Iran?**

**Why were World Bank Group payments in respect of the loans to Iran recently delayed?**

Related Links
Iran
Projects Database: Iran

### Does the World Bank Group Follow UN Sanctions on Iran?

Yes. As an independent United Nations specialized agency and a multilateral development bank, **the World Bank Group fully complies with UN sanctions on Iran\*** and reviews payments under World Bank Group financed projects to ensure compliance.

**Security Council resolutions on Iran exempt humanitarian and development activities conducted by international financial institutions.** The Bank's General Counsel wrote a letter to the UN Legal Counsel in September and then met with the UN to ensure the Bank is in compliance and acts consistently with the sanctions framework, which prohibits financing items on the sanctions list or that benefit listed individuals and entities.

(\* **Note:** UN Sanctions on Iran were passed in December 2006, and expanded in March 2007, and March 2008. The March 2007 Security Council Resolution calls upon all states and international financial institutions to refrain from making new commitments for grants, financial assistance, and concessional loans to the "Government of the Islamic Republic of Iran, except for humanitarian and developmental purposes.")

### What is the Multilateral Investment Guarantee Agency's (MIGA) involvement in Iran?

**In 2005, the Multilateral Investment Guarantee Agency (MIGA) provided US $127 million in guarantees for two projects. No MIGA funding has been disbursed to Iran.**

MIGA guarantees provide political risk insurance for foreign investment. **MIGA does not provide or infuse cash.** It is the insured party - the foreign company - that pays MIGA a premium for the guarantee, and it is to the insured party that MIGA would make payment in the event of a valid claim.

### What is the Status of World Bank Group Lending to Iran?

**The World Bank Group has no plans to approve any new loans to Iran.**

Nine IBRD loans to Iran for projects **designed to help Iran's poorest people and meet basic humanitarian needs** were approved between 2000 and 2005 by the

Board of Executive Directors of the World Bank, which represents 185 member countries.

**These loans to help the poor were in response to earthquake disasters and also address environmental issues, such as water supply and sanitation.** The balance is for health care and nutrition. **Funding for these loans is raised on the capital markets.**

**Some payments on these loans had been delayed.** Undisbursed funds for IBRD projects in Iran totaled US $ 698.77 million as of February 29, 2008.

**The International Finance Corporation's (IFC)** program in Iran is focused on helping small businesses to create jobs and spur economic growth. IFC has US $28 million invested in four projects, approved between 2002 and 2005, supporting small and medium businesses.

**Why were World Bank Group payments in respect of the loans to Iran recently delayed?**

Disbursement requests received on World Bank projects in Iran were temporarily delayed in the final months of 2007 because of difficulties in executing through the normal channels as a result of certain banks being placed on sanctions lists. Arrangements have been put in place to ensure disbursements under project agreements are utilizing banking channels that are not subject to sanctions lists.

Additionally, the World Bank strengthened screening mechanisms to ensure that project disbursements are screened in advance to prevent proceeds being paid to sanctioned entities or individuals. These procedures are being applied to all contracts.

Updated as of April 2, 2008

Permanent URL for this page: http://go.worldbank.org/9W8JXI6S10

© 2008 The World Bank Group, All Rights Reserved.

Home | Site Map | Index | FAQs | Contact Us | Search | RSS



FAQs - Iran

**The World Bank**

Home • Site Map • Index • FAQs • Contact Us

| About | Countries | Data & Research | Learning | News | Projects & Operations | Publications | Topics |

Search [FAQs ▼] [            ] **GO**

**FAQs**

Home > FAQs > Iran

• عربى          • Español
• Русский      • Français
• 中文

[ Home ]

## Iran

Available in: русский, Español, 中文, Français, عربى

Does the World Bank Group Follow UN Sanctions on Iran?

What is the Multilateral Investment Guarantee Agency's (MIGA) involvement in Iran?

What is the Status of World Bank Group Lending to Iran?

Why were World Bank Group payments in respect of the loans to Iran recently delayed?

**Related Links**
Iran
Projects Database: Iran

---

### Does the World Bank Group Follow UN Sanctions on Iran?

Yes. As an independent United Nations specialized agency and a multilateral development bank, **the World Bank Group fully complies with UN sanctions on Iran\*** and reviews payments under World Bank Group financed projects to ensure compliance.

**Security Council resolutions on Iran exempt humanitarian and development activities conducted by international financial institutions.** The Bank's General Counsel wrote a letter to the UN Legal Counsel in September and then met with the UN to ensure the Bank is in compliance and acts consistently with the sanctions framework, which prohibits financing items on the sanctions list or that benefit listed individuals and entities.

(\* Note: UN Sanctions on Iran were passed in December 2006, and expanded in March 2007, and March 2008. The March 2007 Security Council Resolution calls upon all states and international financial institutions to refrain from making new commitments for grants, financial assistance, and concessional loans to the "Government of the Islamic Republic of Iran, except for humanitarian and developmental purposes.")

### What is the Multilateral Investment Guarantee Agency's (MIGA) involvement in Iran?

**In 2005, the Multilateral Investment Guarantee Agency (MIGA) provided US $127 million in guarantees for two projects. No MIGA funding has been disbursed to Iran.**

MIGA guarantees provide political risk insurance for foreign investment. **MIGA does not provide or infuse cash.** It is the insured party - the foreign company - that pays MIGA a premium for the guarantee, and it is to the insured party that MIGA would make payment in the event of a valid claim.

### What is the Status of World Bank Group Lending to Iran?

**The World Bank Group has no plans to approve any new loans to Iran.**

Nine IBRD loans to Iran for projects **designed to help Iran's poorest people and meet basic humanitarian needs** were approved between 2000 and 2005 by the

Board of Executive Directors of the World Bank, which represents 185 member countries.

**These loans to help the poor were in response to earthquake disasters and also address environmental issues, such as water supply and sanitation.** The balance is for health care and nutrition. **Funding for these loans is raised on the capital markets.**

**Some payments on these loans had been delayed.** Undisbursed funds for IBRD projects in Iran totaled US $ 698.77 million as of February 29, 2008.

**The International Finance Corporation's (IFC)** program in Iran is focused on helping small businesses to create jobs and spur economic growth. IFC has US $28 million invested in four projects, approved between 2002 and 2005, supporting small and medium businesses.

Why were World Bank Group payments in respect of the loans to Iran recently delayed?

Disbursement requests received on World Bank projects in Iran were temporarily delayed in the final months of 2007 because of difficulties in executing through the normal channels as a result of certain banks being placed on sanctions lists. Arrangements have been put in place to ensure disbursements under project agreements are utilizing banking channels that are not subject to sanctions lists.

Additionally, the World Bank strengthened screening mechanisms to ensure that project disbursements are screened in advance to prevent proceeds being paid to sanctioned entities or individuals. These procedures are being applied to all contracts.

Updated as of April 2, 2008

Permanent URL for this page: http://go.worldbank.org/9W8JXI6S10

© 2008 The World Bank Group, All Rights Reserved

Home | Site Map | Index | FAQ | Contact Us | Search | RSS



About Us - IBRD Article VII

Home ● Site Map ● Index ● FAQs ● Contact Us

| About | Countries | Data & Research | Learning | News | Projects & Operations | Publications | Topics |

## About Us

Search [About Us ▼] [          ]   GO

✉ Email  🖨 Print

Home > About Us > IBRD Article VII

**Challenge**

**Organization**

**Members**

**Operations**

**Projects**

**Partners**

**Staff**

**History**

**Contacts**

**Speakers Bureau**

## IBRD Article VII

## ARTICLE VII

**Status, Immunities and Privileges**

- SECTION 1. Purposes of the Article
- SECTION 2. Status of the Bank
- SECTION 3. Position of the Bank with Regard to Judicial Process
- SECTION 4. Immunity of Assets from Seizure
- SECTION 5. Immunity of Archives
- SECTION 6. Freedom of Assets from Restrictions
- SECTION 7. Privilege for Communications
- SECTION 8. Immunities and Privileges of Officers and Employees
- SECTION 9. Immunities from Taxation
- SECTION 10. Application of Article

## SECTION 1. Purposes of the Article

To enable the Bank to fulfill the functions with which it is entrusted, the status, immunities and privileges set forth in this Article shall be accorded to the Bank in the territories of each member.

## SECTION 2. Status of the Bank

The Bank shall possess full juridical personality, and, in particular, the capacity:

(i) to contract;

(ii) to acquire and dispose of immovable and movable property;

(iii) to institute legal proceedings.

## SECTION 3. Position of the Bank with Regard to Judicial Process

Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. No actions shall, however, be brought by members or persons acting for or deriving claims from members. The property and assets of the Bank shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Bank.

## SECTION 4. Immunity of Assets from Seizure

Property and assets of the Bank, wherever located and by whomsoever held, shall be immune from search, requisition, confiscation, expropriation or any other form of seizure by executive or legislative action.

## SECTION 5. Immunity of Archives

The archives of the Bank shall be inviolable.

## SECTION 6. Freedom of Assets from Restrictions

To the extent necessary to carry out the operations provided for in this Agreement and subject to the provisions of this Agreement, all property and assets of the Bank shall be free from restrictions, regulations, controls and moratoria of any nature.

## SECTION 7. Privilege for Communications

The official communications of the Bank shall be accorded by each member the same treatment that it accords to the official communications of other members.

## SECTION 8. Immunities and Privileges of Officers and Employees

All governors, executive directors, alternates, officers and employees of the Bank

(i) shall be immune from legal process with respect to acts performed by them in their official capacity except when the Bank waives this immunity;

(ii) not being local nationals, shall be accorded the same immunities from immigration restrictions, alien registration requirements and national service obligations and the same facilities as regards exchange restrictions as are accorded by members to the representatives, officials, and employees of comparable rank of other members;

(iii) shall be granted the same treatment in respect of travelling facilities as is accorded by members to representatives, officials and employees of comparable rank of other members.

## SECTION 9. Immunities from Taxation

(a) The Bank, its assets, property, income and its operations and transactions authorized by this Agreement, shall be immune from all taxation and from all customs duties. The Bank shall also be immune from liability for the collection or payment of any tax or duty.

(b) No tax shall be levied on or in respect of salaries and emoluments paid by the Bank to executive directors, alternates, officials or employees of the Bank who are not local citizens, local subjects, or other local nationals.

(c) No taxation of any kind shall be levied on any obligation or security issued by the Bank (including any dividend or interest thereon) by whomsoever held:

(i) which discriminates against such obligation or security solely because it is issued by the Bank; or

(ii) if the sole jurisdictional basis for such taxation is the place or currency in which it is issued, made payable or paid, or the location of any office or place of business maintained by the Bank.

(d) No taxation of any kind shall be levied on any obligation or security guaranteed by the Bank (including any dividend or interest thereon) by whomsoever held:

(i) which discriminates against such obligation or security solely because it is guaranteed by the Bank; or

(ii) if the sole jurisdictional basis for such taxation is the location of any office or place of business maintained by the Bank.

## SECTION 10. Application of Article

Each member shall take such action as is necessary in its own territories for the purpose of making effective in terms of its own law the principles set forth in this Article and shall inform the Bank of the detailed action which it has taken.

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRANS COMMODITIES, INC.,

Plaintiff,

v.

KAZAKHSTAN TRADING HOUSE, S.A.,
and REPUBLIC OF KAZAKHSTAN,

Defendants.

Civil Action Misc. No. 96-316  (NHJ)

**FILED**

FEB 20 1997

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM ORDER

Presently before the Court is the motion of defendant Republic of Kazakhstan (hereafter "the Republic") to quash two writs of attachment issued by the Superior Court of the District of Columbia.[1]  As the facts in this miscellaneous action were set out in detail in a February 5, 1997, Memorandum Order, the case is briefly summarized as follows.

On December 21, 1995, the New York Supreme Court entered a default judgment in favor of Trans Commodities, Inc. (hereafter "Trans Commodities") and against Kazakhstan Trading House, S.A. and the Republic.  The judgment totaled $768,834, representing $383,000 in actual damages, $250,000 in punitive damages, $57,796 in pre-judgment interest, and $78,038 in attorneys' fees.  On July 30, 1996, plaintiff docketed the New York judgment in the Superior

---

[1]    In view of the Republic's request for an immediate decision regarding the writs of attachment and the representation of counsel at a February 11, 1997, hearing that the parties are currently litigating a third writ of attachment in United States District Court for the Southern District of New York, the Court does not address the validity of the default judgment entered by the New York Supreme Court.

Court of the District of Columbia. On September 18, 1996, and again on October 2, 1996, the

Superior Court issued writs of attachment commanding Riggs Bank (hereafter "Riggs") to hold

any property of the Republic it had in its possession. On September 27, 1996, Riggs moved in

the Superior Court to quash the writ, arguing that Trans Commodities had not complied with the

requirements of the Foreign Sovereign Immunities Act. On October 10, 1996, the Superior

Court issued an Order requiring Riggs to hold $563,112.02 pending a decision on the writ of

attachment. The case was removed to federal court on November 7, 1996.

The Republic has provided evidence that it has two categories of funds in bank accounts

at Riggs: (1) embassy funds used for diplomatic and consular operations and (2) funds provided

by the World Bank for designated projects in Kazakhstan. Embassy funds are used to pay only

those expenses directly related to the functioning of the embassy, including payment of salaries

for embassy personnel, telephone and electricity expenses, and expenses for hosting diplomatic

functions. Proceeds from World Bank loans and credits, the second category of funds held at

Riggs, are maintained in separate bank accounts. There is no commingling of funds among the

various World Bank projects nor may the funds be disbursed for other purposes. Disbursement

of funds provided by the World Bank is administered and controlled by the Ministry of Finance

in Almaty, Kazakhstan. Republic's Mot. to Quash at Ex. C.

I.     Embassy Funds

Under the Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 (1991), embassy

bank accounts used or intended to be used for the purposes of the diplomatic mission are

absolutely immune from attachment to satisfy a civil judgment. *See, e.g.,* Liberian Eastern

Timber Corp. v. Government of the Republic of Liberia, 659 F. Supp. 606, 608 (D.D.C. 1987)

2

(citing Art. 24, Art. 31, and the preamble to the Vienna Convention).  Moreover, the Foreign

Sovereign Immunities Act creates a presumption that property in the United States of a foreign

state is immune from attachment.[2]  28 U.S.C. § 1609 (1994).  Although there are certain limited

exceptions for funds used for commercial activity in the United States, *see* 28 U.S.C.

§ 1610(a)(1) - (a)(6), there is no indication that the embassy funds on deposit at Riggs Bank are

used for anything other than consular and diplomatic purposes.[3]

In its opposition to the motion to quash, Trans Commodities argues that it should be

granted discovery to determine whether any embassy funds are used for commercial activity in

the United States.  Allowing discovery to go forward, however, would ignore the mandate of the

Vienna Convention and eviscerate one of the purposes of immunity:  deference to the

governmental affairs of foreign states.  *See* 767 Third Avenue Associates v. Permanent Mission

of the Republic of Zaire, 988 F.2d 295, 297 (2d Cir. 1993) (finding that FSIA exceptions to

immunity are subject to the Vienna Convention).  In light of evidence offered by the Republic

---

[2]     Section 1609 of the FSIA provides that:

> [s]ubject to existing international agreements to which the United States is a party
> at the time of enactment of this Act, the property in the United States of a foreign
> state shall be immune from attachment arrest and execution except as provided in
> sections 1610 and 1611 of this chapter.

28 U.S.C. § 1609 (1994).

[3]     Under section 1610, property of a foreign state in the United States "used for
commercial activity in the United States" is not immune from attachment if any of six
enumerated circumstances apply.  28 U.S.C. § 1610(a) (1994).  Although Trans Commodities
argues that the exception listed in section 1610(a)(1), waiver of immunity from attachment,
applies in this case, it has not met the threshold requirement:  showing that the property is used
for commercial activity in the United States.

that its embassy bank accounts are used exclusively in the performance of the embassy's
diplomatic and consular functions, and in the absence of any indication to the contrary, discovery
is not warranted and would frustrate the purpose of entitlement to immunity. *See* El-Fadl v.
Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996). The Court finds that the funds held
on deposit at Riggs for embassy use are immune from attachment.

      II.    Proceeds from the World Bank

    As mentioned earlier, the Republic maintains separate bank accounts for loan proceeds
received from the World Bank and disburses the proceeds from its bank accounts directly to
World Bank-funded projects in Kazakhstan. Because project funds are received incrementally,
the World Bank replenishes the bank accounts as needed. At a February 11, 1997, hearing,
counsel for Riggs informed the Court that, because Riggs is holding funds in these accounts
pursuant to the writs of attachment, the World Bank has ceased replenishing the bank accounts.

    Under section 1611(a) of the FSIA, funds that are the property of "an organization
designated by the President to enjoy the . . . immunities provided by the International
Organization Immunities Act" are absolutely immune from attachment. 28 U.S.C. § 1611(a)
(1994). The World Bank is an organization protected by the International Organization
Immunities Act. *See* 22 U.S.C. §§ 288-288i (1994); Exec. Order No. 9751, 11 Fed. Reg. 7713
(July 11, 1946). To allow World Bank loan proceeds to become subject to attachment while
awaiting disbursement to World Bank-funded projects is untenable and contrary to the purpose
of section 1611(a) immunity. *See* H.R. Rep. 94-1487, § 1611 (1976) ("Purpose of [section 1611]
is to permit international organizations . . . to carry out their functions . . . without hindrance by
private claimants seeking to attach the payment of funds to a foreign state."). The Court finds

that the funds held by the Republic as proceeds from loans and credits advanced by the World

Bank to finance projects in Kazakhstan are immune from attachment.

Accordingly, it is this _20th_ day of February 1997,

ORDERED that the motion to quash writ of attachment [# 2] be, and hereby is, granted; it

is further

ORDERED that the September 18, 1996, and October 2, 1996, writs of attachment issued

by the Superior Court of the District of Columbia be, and hereby are, quashed; it is further

ORDERED that Riggs Bank shall immediately make available to the Republic of

Kazakhstan any funds held pursuant to an October 10, 1996, Order of the Superior Court of the

District of Columbia (Salzman, J.); and it is further

ORDERED that this miscellaneous case be, and hereby is, closed.

_Norma Holloway Johnson_
NORMA HOLLOWAY JOHNSON
UNITED STATES DISTRICT JUDGE

5