1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,759

7  Attorneys for Plaintiffs
   DEBORAH D. PETERSON, Personal Representatives
8  of the Estate of James C. Knipple (Dec.), et al.

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12
   DEBORAH D. PETERSON, Personal      )    CASE NO. 3:08-mc-80030-JSW (BZ)
13 Representative of the Estate of James C.  )
   Knipple (Dec.), et al.,            )    MEMORANDUM OF POINTS AND
14                                     )    AUTHORITIES IN REPLY TO OPPOSITION
            Plaintiffs,               )    TO MOTION FOR ASSIGNMENT OF
15                                     )    RIGHTS UNDER C.C.P. § 708.510 OF:
   vs.                                )
16                                     )    1. The World Bank (International Bank of
   ISLAMIC REPUBLIC OF IRAN, et al.,  )       Reconstruction and Development ("IBRD");
17                                     )    2. International Finance Corporation ("IFC");
            Defendants.               )    3. Japan Bank of International Cooperation
18 _____    )       ("JBIC);
                                            4. Export-Import Bank of Korea ("KEXIM").
19
                                            Date:  July 2, 2008
20                                          Time:  10:00 a.m.
                                            Courtroom: G
21                                          Magistrate Judge: Bernard Zimmerman

22              **I. PRECISE ISSUE AT HAND.**

23        The precise issue at hand is whether a claim against a sovereign entity is subject to an

24 involuntary assignment, and therefore, enforcement by the assignee, trustee, subrogee, or third

25 party. This is the issue raised by virtue of this assignment motion, and by which The World Bank

26 (International Bank of Reconstruction and Development ("IBRD"), International Finance

27 Corporation ("IFC"), Japan Bank of International Cooperation ("JBIC), and Export-Import Bank

28 of Korea ("KEXIM").("Opposing Banks") conflate assignment remedies with traditional principles

1  of levy and execution.

2      Pinpointing the issue is the following: Whether an involuntary assignment is barred under

3  the doctrine of the sovereign immunity of the obligor of the assignment. The answer to this inquiry

4  requires a two-part test: 1) that the obligation owed by the sovereign to the original obligee is not

5  subject to sovereign immunity. *per se,* therefore constituting a non-immune obligation; and 2) that

6  the process of an involuntary transfer contravenes the sovereign immunity of the obligor. A review

7  of the four briefs filed by the Opposing Banks fails to address these precise issues, all of which

8  have been well-trod in the context of involuntary assignments of non-immune claims against the

9  United States ("U.S."). A survey from 1899 to date hereof indicates that a non-immune claim

10  against the U.S. may be involuntarily transferred, and that the sovereign immunity of the U.S.

11  would not serve as a bar to either the involuntary transfer or subsequent enforcement by the

12  involuntary assignee.

13          **II. NON-IMMUNE CLAIMS MAY BE INVOLUNTARILY ASSIGNED.**

14      In cases revolving around involuntary transfers of non-immune claims against the U.S.,

15  courts have permitted the involuntary assignment.

16      Pure involuntary assignments, by any means, are permissible. This is precisely the holding

17  of *United States vs. Aetna Casualty & Surety Co.*, 338 U.S. 366, 70 S.Ct. 207 (1949), in which

18  the court stated as follows:

19      "The rigor of this rule was very early relaxed in cases which were thought not to be
        productive of the evils which the statute was designed to obviate. And one of the
20      first such exceptions was to transfers by operation of law. In United States v. Gillis,
        95 U.S. 407 (1877), the Court held that a provision in the Act creating the Court of
21      Claims that suits on assignments may be brought in the name of the assignee did
        not mean that R.S. § 3477 was inapplicable to suits in the Court of Claims, but
22      referred to claims which were excepted from the prohibition of that statute, such as
        "devolutions of title by force of law, without any act of the parties, or involuntary
23      assignments, compelled by law." During the following term, a case was presented
        in which an assignee in bankruptcy had sued the United States on a claim of the
24      bankrupt. This Court held the suit maintainable despite R.S. § 3477, on the ground
        that The act of Congress of Feb. 26, 1853, to prevent frauds upon the treasury of the
25      United States, which was the subject of consideration in the *Gillis* case, applies
        only two cases of voluntary assignment of demands against the government. It does
26      not embrace cases where there has been a transfer of title by operation of law. The
        passing of claims to heirs, devisees, or assignees in bankruptcy are not within the
27      evil at which the statute aimed; nor does the construction given by this court deny
        to such parties a standing in the Court of Claims. Erwin v. United States. 97 U.S.
28      392, 397 (1878)." (P. 373)

1    This was likewise restated in *Insurance Co. of the West vs. United States*, 243 F.3d 1367

2  (Fed. Cir., 2001), in which the court stated as follows:

3       "It is true that the waiver of sovereign immunity under the Federal Tort Claims Act
         is particularly sweeping. See Nordic Village, Inc., 503 U.S. at 34. However, nothing
4        in Aetna suggested that its holding regarding sovereign immunity was based on the
         Federal Tort Claims Act's broad language. Instead, we think that Aetna reflects a
5        broader and more generally applicable legal principle: waivers of sovereign
         immunity applicable to the original claimant are to be construed as extending to
6        those who receive assignments, whether voluntary assignments or assignments by
         operation of law, where the statutory waiver of sovereign immunity is not expressly
7        limited to waivers for claims asserted by the original claimant." (P. 1373)

8    The Supreme Court in an earlier case of *Western Pacific Railroad Company vs. United*

9  *States*, 268 U.S. 271, 45 S.Ct. 503 (1925), stated as follows:

10      "3. The government further contends that, as to the claims for transportation
         furnished by the Western Pacific Railway and its receivers which were acquired by
11       the claimant under the special master's deed, a recovery is precluded by § 3477 of
         the Revised Statutes. This section provides, *inter alia,* that all transfers and
12       assignments of any claim against [45 S.Ct. 505] the United States shall be
         "absolutely null and void" unless made after the allowance of such claims and the
13       ascertainment of the amount due. The object of this section is to protect the
         government and prevent frauds upon the Treasury. It applies only to cases of
14       voluntary assignment of demands against the government, and does not embrace
         cases where there has been a transfer of title by operation of law. *United States v.*
15       *Gillis,* 95 U.S. 407, 4163; *Erwin v. United States,* 97 U.S. 392. 397; *Goodman v.*
         *Niblack,* 102 U.S. 556, 560; *Price v. Forrest,* 173 U.S. 410, 421. *And see Seaboard*
16       *Air Line v. United States,* 256 U.S. 655, 657. In *Price v. Forrest, supra,* p. 422. it
         was specifically held that this section did not apply to the assignment of a claim to a
17       receiver under the order of a court, this being "the act of the law." So here, the sale
         to the claimant of so much of the claims as had accrued to the receivers for
18       transportation furnished by them was clearly a transfer by operation of law, and did
         not come within the prohibition of the statute." (P. 274)

19
     This is not the first time that an aggrieved creditor has been frustrated by the defense of
20
   sovereign immunity in attempting to collect a debt against a third party, when the Opposing Banks
21
   may owe money to the third party.  This conundrum was resolved by the court in *Automatic*
22
   *Sprinkler Corporation of America vs. Darla Environmental Specialists Inc.*, 53 F.3d 181 (7th
23
   Cir. 1995), where the court suggested that the creditor's remedy was found in an involuntary
24
   bankruptcy, in which the court stated as follows:
25
26      "Automatic Sprinkler had, and still may have, an alternative means to obtain partial
         payment. It can propel Darla into an involuntary liquidation. 11 U.S.C. Sec.
27       303(b)(2). A dissolved corporation is a "person" under the Bankruptcy Code of
         1978. See 11 U.S.C. Sec. 101(33): In re Cedar Tide Corp., 859 F.2d 1127 (2d
28       Cir.1988). Most states treat dissolved corporations as continuing to exist for some
         time, so that creditors may collect outstanding debts. See Model Business
         Corporation Act Secs. 14.06, 14.07. That is how it was possible for Automatic

Sprinkler to sue Darla on the subcontract; it could as easily have put Darla into bankruptcy. The trustee appointed under Chapter 7 steps into the debtor's shoes and may collect the $450,000 on the same terms as Darla itself. Bankruptcy provides an orderly method of satisfying all creditors' claims (as the Rule 69 proceeding does not), of reducing the claims if all cannot be satisfied, and of protecting the United States from multiple or inconsistent claims to the same pot. At oral argument, Automatic Sprinkler could not explain why it had not followed this route to orderly collection and distribution. Instead it sought to depict this as a case in which the United States would be unjustly enriched. The bankruptcy forum makes that an unlikely outcome. But if we are wrong, this would not be the first time sovereign immunity frustrated the vindication of just claims. Whether and how to mitigate that effect is a question for the political branches of government. Through the Miller Act and the Bankruptcy Code, they have specified particular mechanisms, which must be followed." (P. 183)

In *Automatic Sprinkler, supra*, the court clearly anticipated the fact that a direct suit against the Opposing Banks surely would fail, including a levy, but on the other hand, that a trustee in bankruptcy might well be able to reach the same assets.

See also, *Quarles Petroleum Company Inc. vs. The United States,* 551 F.2d 1201 (Court of Claims, 1977) ("*Quarles*"). The test is first whether the sovereign entity has a liability to the judgment debtor (original obligee), and whether that particular obligation is barred under principles of sovereign immunity, and second, whether the transfer replaces the original obligee with a substitute. The court in *Quarles* was faced with identical issues. In that case, corporate truck owners brought an action against the U.S. for recovery of damages under the Federal Water Pollution Control Act in which the trial court found that the action was brought on behalf of the insurer carrier. The court was initially faced with the issue whether the U.S. had sovereign immunity against a claim brought by the corporate trucking company, in which the court, after a detailed review, held that the U.S. was not entitled to sovereign immunity. (Page 1206). The next and relevant question was whether the insurer had standing by which to pursue the claim against the U.S. based upon the fact that the insurer was an "involuntary transferee." The court ruled adversely to the U.S. and stated as follows:

"Neither the subrogation to the insurance carrier of the injured person's rights under the FTCA nor *the doctrine of sovereign immunity* has prevented the maintenance by the subrogated insurance company of suit against the United States under the FTCA." (Page 1206) (Emphasis added)

The court also stated as follows:

"There would be no extension of liability of additional waiver of sovereign immunity against the United States by allowing a subrogee to recover through its

1    insured owner-operator under Section 1321." (Page 1207)

2   This language resolves the tension between an involuntary assignment and sovereign immunity in

3   which the court clearly held that sovereign immunity is not a bar to an involuntary assignment.

4   *Quarles* stands for the proposition that sovereign immunity is not extended, nor enhanced when

5   the party seeking to enforce those rights stands in the shoes of the original obligee, and that the

6   transfer is involuntary. In that case, the transfer arose from an insurance contract. In this setting,

7   the facts are even stronger, in that the successor to the rights of Iran are receivers (or assignees)

8   who acquire their rights through the creation of a receivership estate.

9        *Price v. Forrest*, 173 U.S. 410, 421 clearly held that an assignment to a receiver,

10   constituting a transfer by operation of law, is valid against the United States.

11        In summary, the Opposing Banks cannot invoke sovereign immunity as a bar to an

12   involuntary transfer, even if the involuntary transferee may seek to invoke the underlying right.

13              ### III. OPPOSING BANKS FAIL TO ADDRESS ISSUE WHETHER
14              ### THEIR OBLIGATION DUE IRAN IS NON-IMMUNE.

15        The Opposing Banks have failed to address whether their obligations are immune or non-

16   immune, creating a studied ambiguity in their oppositions. While the Opposing Banks are clear,

17   but in which these Plaintiffs do not concede, that they are free from direct levy and execution, they

18   fail to provide this court with any information or authority, one way or another, whether or not

19   their obligations to Iran are non-immune. This is not a clerical or scrivener's error, but rather, an

20   attempt at opaqueness.

21        Plaintiffs are entitled to the assignment order in that a third party obligor has no standing to

22   object. Directly on point is *Kracht vs. Perrin, Gartland & Doyle*, 219 Cal.App.3d 1019, 268

23   Cal.Rptr. 637 (Cal.App.4 Dist. 1990), in which the California Appellate Court held that,

24   notwithstanding the actual granting of an assignment, that the obligor (attorneys facing a

25   malpractice action) had the right to defend against the enforcement. The court made it clear that

26   the underlying court, in the granting of the motion, was not obligated to make a finding, one way

27   or another, whether the subject matter thereof was assignable or otherwise. The court stated at

28   page 1021 and the ensuing footnote, as follows:

"In September of 1988 Kracht (as judgment creditor of Hogue from the prior action) sought and obtained a court order, pursuant to Code of Civil Procedure sections 708.510 and 708.520, compelling Hogue to assign all choses in action which he held against Attorneys. The order was obtained without notice to or opposition by Attorneys. [1] Kracht thereafter filed a complaint for legal malpractice against Attorneys as assignee of the claims."

[1] Code of Civil Procedure section 708.510 does not require that notice of the motion to cause an assignment be given to the obligor of the judgment debtor. The order of assignment does not affect the obligor's rights until notice of the order is received by the obligor. (Code Civ.Proc., § 708.540.) The fact that the choses in action were ordered assigned under Code of Civil Procedure section 708.510 does not preclude a challenge to whether the claims were assignable ab initio, because the Legislature specifically noted that **section 708.510 "... does not make any property assignable that is not already assignable."** (See Legis.Com.Comment, Assembly 1982 Addition. West's Ann.Code Civ.Proc., § 708.510.) (Emphasis added)

This proposition is likewise consistent with the structure of C.C.P. § 708.510, in which the purpose is to permit a Judgment Creditor to reach a Judgment Debtor's contractual obligations, whatever they may be. As stated in *Debt Collection Practice in California*, 2d Edition, CEB, the author stated at page 1129, as follows:

"An obligor's rights are not affected by an order assigning the rights to payment until the obligor receives notice of the order. C.C.P. § 708.540."

Under C.C.P. § 708.540, an obligor is a person who is or may be obligated to make payment to the Judgment Debtor. Under C.C.P. § 708.510(b), Plaintiffs are not even obligated to serve the third party obligors.

The purpose of the assignment statute serves to eject the judgment debtor as the original obligee and replace the judgment creditor as the substitute, all of which is consistent with C.C.P. § 708.540, in which the judgment creditor's rights are the same as the judgment debtor's rights. Therefore, the test of whether or not this judgment creditor can enforce the judgment debtor's rights against the Opposing Banks rises and falls upon the nature of the non-immune obligation, a matter not before this court, and a matter to be tested at another date and in another tribunal.

C.C.P. § 708.510(a) specifically anticipates a later proceeding in permitting a judgment creditor to reach accounts through an assignment which are due at a later date, or even conditional upon a later event. This section even anticipates reaching obligations which by their very nature are immune from direct levy under C.C.P. § 708.510(a), subsection 1., which provides as follows:

"Except as otherwise provided by law, upon application of the judgment creditor on noticed motion, the court may order the judgment debtor to assign to the judgment creditor, or to a receiver appointed pursuant to Article 7 (commencing with section 708.610) all or part of a right to payment due or to become due. whether or not the right is conditional upon future developments. including but not limited to, the following types of payment:

1.  Wages due from the federal government that are not subject to withholding under an earnings withholding order.
2.  Rents.
3.  Commissions.
4.  Royalties.
5.  Payments due from a patent or copyright.
6.  Insurance policy loan value."

The California Legislature, by its descriptive list, understood that receivables subject to an assignment would include rights independently enforced and outside the context of the court in which the judgment was rendered.  A judgment creditor, e.g., sitting in the shoes of the judgment debtor, would be filing independent lawsuits to collect rents, commissions, royalties, patent or copyright, payments, or other similar rights. Therefore, this court may conclude that the sole purpose of this proceeding is to determine whether the rights of the judgment debtor be assigned to the judgment creditor.

### IV.  ASSIGNMENT OF RIGHTS PER SE DOES NOT VIOLATE SOVEREIGN IMMUNITY OF OPPOSING BANKS.

The Opposing Banks assert that payments by the Opposing Banks to these Plaintiffs violates sovereign immunity.  This is an incorrect statement in that the Opposing Banks would be paying Plaintiffs standing in the shoes of Iran. which would be no different than the Opposing Banks paying a bankruptcy trustee, who likewise would be standing in the shoes of the creditors. or an insurance subrogee standing in the shoes of the insured, or paying a receiver on behalf of the aggrieved creditor. As the Opposing Banks have not reconciled *Price v. Forrest* and its progeny. the fact of payment to an assignee of an obligor of a sovereign holding a non-immune liability, does not contravene sovereign immunity.

### V.  INTERNATIONAL BANKS.

IBRD and IFC argue a whole host of additional immunities, including immunities by way of their own Articles. and immunities under 28 U.S.C. § 1611(a). For purposes of this motion. these international banks might well be immune from traditional enforcement, subject to various

1   exceptions not relevant here. The issue, however, is not the direct immunity in favor of these

2   international banks, but solely whether the non-immune claims in favor of Iran can be

3   involuntarily transferred to the judgment creditors. The international banks analogize an

4   involuntary assignment as a form of direct enforcement on the basis that the object of such

5   proceedings are identical, i.e., collecting a judgment. The international banks specifically state that

6   they are free of any judicial process, including service of a writ, levy and execution, or other

7   proceedings, a matter for these proceedings not in dispute. However, these international banks do

8   not dispute, and therefore concede, that claims against a sovereign can be involuntarily assigned,

9   and do not raise the issue whether Iran can exercise its apparent non-immune contractual rights, an

10  issue left unresolved.

11          The international banks cite *Philippine Export & Foreign Loan Guarantee Corp. v.*

12  *Chuidian*, 218 Cal.App.3d 1058, 1099-1100 (1990) ("*Chuidian*"), for the proposition that an

13  assignment order may not be issued with respect to assets which are immune. They also cite

14  *Quaestor Investments, Inc. v. The State of Chiapas*, 1997 WL 34618203, at *7 (C.D. Cal. 1997)

15  for the same proposition. This analysis is inapposite because the assignable assets are obligations

16  in favor of Iran against these international organizations, in which the international banks fail to

17  address whether those obligations are immune. In both *Quaestor* and *Chuidian* the judgment

18  debtors were entitled to sovereign immunity themselves, and therefore the total of their assets were

19  free of levy and execution. The converse is true here, in which the judgment debtor is a non-

20  immune entity and the obligations owed to it are presumably non-immune, while being potentially

21  immune to direct levy.

22          The international banks cite *Mendaro v. The World Bank*, 717 F.2d 610 ("*Mendaro*"), for

23  the proposition that internally, the international banks are immune, and that sovereign immunity is

24  tested on a case-by-case basis, using the corresponding benefits standard, and that sovereign

25  immunity is deemed not waived unless furthering the international bank's objectives. *Mendaro*, of

26  course, has no bearing in this case in that *Mendaro* dealt with a direct action (a labor dispute)

27  brought by an aggrieved employee and in which the court held that labor disputes do not generate

28  sufficient benefits to justify a waiver of sovereign immunity. In this case, the putative "claimant"

1  would be Iran. and not these Plaintiffs, as the doctrine of sovereign immunity as set forth in

2  *Quarles* is not expanded to preclude an involuntary assignment of the non-immune claim to a third

3  party by way of an involuntary transfer. Nowhere in any of the responding papers is this issue

4  effectively raised. and virtually all of the cases as cited dealt with a direct suit for levy.

5  

### VI. **REQUEST FOR STAY.**

6      The international banks are seeking the stay of this proceeding. on the basis that the

7  District Court (DC) has before it closely connected issues based upon the appointment of a

8  receiver and suggests that this matter be stayed, pending the outcome of the receivership motion.

9  The motion for appointment of receiver has yet to be calendared for hearing and remains still

10  pending. Plaintiffs concede that the issue of an involuntary transfer raised in the receivership

11  motion may have a similar bearing to an involuntary assignment being the subject matter of this

12  action. To the extent, of course, that the District Court (DC) adjudicates one way or another. that

13  non-immune claims against a sovereign are involuntarily transferable, would necessarily have an

14  impact on these proceedings.

15      However, the issue of a stay is left to the court's discretion in which Plaintiffs urge that the

16  court refrain from exercising its discretion in that the District Court (DC) has yet to calendar the

17  matter for a hearing. and accordingly. Plaintiffs are left in a position of waiting for a judicial

18  determination without a firm date at hand.

19  

### VII. **FOREIGN BANKS.**

20      JBIC and KEXIM both argue their own sovereign immunity, a matter which is not in

21  dispute. and in which they cite multiple and undisputed cases. that they are free from direct suit,

22  and levy and execution. For purposes of this response, and subject to various exceptions and

23  discovery issues. the fact that JBIC and KEXIM are sovereign entities in any direct action taken by

24  a judgment creditor, fails to resolve the issue of an involuntary transfer. The same issue pervades

25  in their opposition in which they fail to address the ability of the courts to assign non-immune

26  claims against a sovereign.  Using the cases dealing with U.S. sovereign immunity. the fact that a

27  judgment debtor may have a claim against the U.S. might well bar a direct levy by the judgment

28  creditor, but not the involuntary transfer.

1    The foreign banks also argue that the court may not issue an assignment order to reach

2    property located outside the U.S., citing *Richmark Corp. v. Timber Falling Consultants*, 959

3    F.2d 1468, 1477 (9th Cir. 1992) for the proposition that 28 U.S.C. § 1610 does not empower the

4    U.S. courts to levy on assets located outside the U.S.  This matter is besides the point and fails to

5    address whether these judgment creditors, standing in the shoes of Iran, can enforce Iran's claims

6    against these foreign banks, which itself would be the subject of subsequent litigation. *Chuidian*,

7    *supra* likewise does not help, in that *Chuidian* dealt with the judgment debtor as the foreign

8    sovereign, in which the court held that the assignment could not reach non-immune assets and in

9    which FSIA held that overseas assets were not subject to levy and execution. The foreign banks

10   misapply Chuidian, in that the analysis is of Iran's claims against the foreign banks, and not a

11   "sovereign's claims" against third parties, which by their nature are unreachable under FSIA. The

12   foreign banks fail to address the nature and scope of Iran's claims against the foreign banks.

### VIII.  <u>ASSIGNMENT ORDER GOES BEYOND BANK DEPOSIT.</u>

14   The assignment order goes well beyond "bank deposits" and reaches a whole host of

15   obligations due from the international and foreign banks, in which the sole issue becomes

16   enforcement. This is not the instant proceeding to determine the nature and scope of Iran's non-

17   immune claims against these banks, which is precisely the holding in *Kracht, supra.*  Therefore,

18   attempting to pre-litigate the scope of the non-immune relationship has the de facto effect of

19   precluding Plaintiffs from reaching these assets in which the test of their enforceability is for

20   another day.

### IX.  <u>CONCLUSION.</u>

22   Plaintiffs are entitled to the relief as set forth herein in that these four banks fail to address

23   the issue of an involuntary transfer of a non-immune asset.

24   DATED: June 17, 2008              COOK COLLECTION ATTORNEYS

25

26              By:   /s/ David J. Cook
                DAVID J. COOK, ESQ. (SB# 060859)
                Attorneys for Plaintiffs DEBORAH D. PETERSON.
27              Personal Representatives of the Estate of James C.
                Knipple (Dec.), et al.

28   F:\USERS\DJCNEW\petersonsf.replybankassign

1                                **PROOF OF SERVICE**

2    HIS EXCELLENCY MAHMOUD                JAMES H. HULME
AHMADINEJAD THE PRESIDENT        ARENT FOX PLLC
3    Palestine Avenue                             1050 Connecticut Avenue, N.W.
Azerbaijan Intersection                      Washington, D.C. 20036-5339
4    Tehran, Islamic Republic of Iran
Fax: +98 21 6 649 5880                    JAY ROBERT HENNEBERRY
5                                            CHADBOURNE & PARKE
ISLAMIC REPUBLIC OF IRAN         350 S. Grand Avenue, Suite 3300
6    Pasadaran Avenue                           Los Angeles, CA 90071
Golestan Yekom
7    Teheran, Iran
ATTN: President Mahmoud Ahmadinjad or    MATTHEW PAUL LEWIS
8    Responsible Officer or Agent for Service of    WHITE & CASE LLP
Process                                    633 West Fifth Street, Suite 1900
9                                           Los Angeles, CA 90071-2007
ISLAMIC REPUBLIC OF IRAN         NOEL ANDREW LEIBNITZ
10   Khomeini Avenue                           FARELLA BRAUN & MARTEL LLP
United Nations Street                   235 Montgomery Street, 17th Floor
11   Teheran, Iran                              San Francisco, CA 94104
ATTN: President Mahmoud Ahmadinjad or
12   Responsible Officer or Agent for Service of    WILLIAM LEWIS STERN
Process                                    MORRISON & FOERSTER LLP
13                                           425 Market Street
RYAN SANDROCK                           San Francisco, CA 94105
14   SIDLEY AUSTIN LLP
555 California Street                        MARK FREDRICK LAMBERT
15   San Francisco, CA 94104-1715            WHITE & CASE LLP
                                           3000 El Camino Real
16   MARK D. HOPSON                         5 Palo Alto Square, 9th Floor
SIDLEY AUSTIN LLP                     Palo Alto, CA 94306
17   1501 K Street, N.W.
Washington, D.C. 20005                 FRANCIS A. VASQUEZ, JR.
18                                            WHITE & CASE LLP
JERROLD EVAN ABELES            701 Thirteenth Street, N.W.
19   ARENT FOX LLP                        Washington, D.C. 20005-3807
555 W. Fifth Street, 48th Floor
20   Los Angeles, CA 90013

21       I declare:

22          I am employed in the County of San Francisco, California. I am over the age of eighteen
(18) years and not a party to the within cause. My business address is 165 Fell Street, San
23   Francisco, CA 94102. On the date set forth below, I served the attached:

24          MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO OPPOSITION TO
MOTION FOR ASSIGNMENT OF RIGHTS UNDER C.C.P. § 708.510 OF:
25        1.The World Bank (International Bank of
          Reconstruction and Development ("IBRD");
26       2. International Finance Corporation ("IFC");
       3. Japan Bank of International Cooperation ("JBIC):
27       4. Export-Import Bank of Korea ("KEXIM").

28

1   on the above-named person(s) by:

2   __XXX__   (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
3   person(s) served above.

4       I declare under penalty of perjury that the foregoing is true and correct.

5       Executed on June 17, 2008.

6
7                                              /s/   Karene Jen
                                                     Karene Jen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28