1 | **DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2 | **COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
3 | 165 Fell Street
San Francisco, CA 94102
4 | Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
5 | Tel: (415) 989-4730
Fax: (415) 989-0491
6 | File No. 52,759

7 | Attorneys for Plaintiffs
DEBORAH D. PETERSON, Personal Representatives
8 | of the Estate of James C. Knipple (Dec.), et al.

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | SAN FRANCISCO DIVISION

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), et al., | CASE NO. 3:08-mc-80030-JSW (BZ) |
| Plaintiffs, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AN ORDER COMPELLING ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) |
| vs. | |
| ISLAMIC REPUBLIC OF IRAN, et al., | **[HARBOR AND BUNKERED FUEL RIGHTS - MITSUI O.S.K. LINES]** |
| Defendants. | Date: September 3, 2008 Time: 10:00 a.m. Courtroom: G, 15th Floor Magistrate Judge: Bernard Zimmerman |

## I. INTRODUCTION.

Plaintiffs DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), et al. ("Plaintiffs") move this court for an order compelling and ordering Defendants ISLAMIC REPUBLIC OF IRAN ("Iran") to assign to Plaintiffs, Judgment Creditors, all of those certain contractual and related rights, described herein as follows: All rights to payment of money, accounts, accounts receivable, due and payable, or due in the future, or conditional upon future events, from and owing by the Shipping Line herein, arising out of the use of any harbor, docking, wharf, drayage, loading or unloading facilities, and other facilities provided by any dock, harbor, pier, warehouse, wharf, or other harbor-like facilities, along with

1 and including the sale of bunkered oil and/or fuel to **MITSUI O.S.K. LINES** ("Shipping Line")

2 herein, hereinafter collectively "Harbor and Bunkered Fuel Rights," provided, sold, delivered or

3 vendored by Iran. This is represented by the shipping schedule of the Shipping Line which shows

4 that the Shipping Line frequents Iranian ports, harbors and other facilities. The Shipping Line's

5 schedule is set forth by way of its website which shows its traffic, marked *Exhibit "A."* [1]

6 **Specifically, Exhibit "A" shows that the Shipping Line serves Bandar Abbas, which is a**

7 **major Iranian port as listed Exhibit "A-1." The Shipping Line services multiple American**

8 **ports as listed on Exhibit "A-2."**

9 As Plaintiffs have confirmed that the Shipping Line frequents Iranian harbors, ports,

10 wharfs, docks, and other harbor-like facilities, Plaintiffs likewise have determined that Iran has a

11 whole list of tariffs which Iran charges oceangoing freighters, carriers, tankers, and the like,

12 marked *Exhibit "B."* These tariffs show the charges imposed by Iran upon oceangoing carriers,

13 such as the Shipping Line as described herein.

14 Plaintiffs have also ascertained from a press release undertaken by the ports and shipping

15 organization of the Department of Transportation of Iran, that Iran sells bunkered oil. The press

16 release dated Sep-Oct 2007 and marked *Exhibit "C"* specifically states as follows:

17 Iran Will Earn 1 Billion USD from Bunkering.

18 According to the National Iranian Oil Products Distribution Co.'s plans Islamic
Republic of Iran set a goal to boost its income derive from ship bunkering to 1
19 billion USD annually.

20 Eng. Ahmadinezhad Vice president of National Iranian Oil Products Distribution
company stated: ". . . [a]ccording to P.S.O. statistics 3500 foreign ships and 2200
21 domestic ships of above 1000 DWT call the Iranian southern ports annually and as
a result Iran enjoys the lucrative regional market of the Persian Gulf and the Oman
22 Sea." He added; "by the end of the current year with 2000 foreign ships added to
the Iranian ships now bunkering by NIOPD Company, 2 million tons of bunker fuel
23 will be sell by the company which will generate 640 million USD of income to the
country." He continued: NIOPDC has set a goal to boost the country's income
24 from bunkering to 1 billion USD annually by 2010.

25 Plaintiffs accordingly seek an order compelling Iran to assign all of these rights, and each

26 of the same, to Plaintiffs, as owed by the particular Shipping Line to Iran. With a court-ordered

27 _____

28 [1] All exhibits are incorporated by reference as though fully set forth in this Memorandum
in their entirety and are attached to the Declaration of David J. Cook, Esq. which is filed
contemporaneously herein.

1   assignment in hand, Plaintiffs can commence the process of collecting the flow or stream of

2   revenue due from the Shipping Line and seek to ameliorate the losses represented by this very

3   large Judgment.

## II. THE ASSETS OF IRAN ARE NOW SUBJECT TO ENFORCEMENT OF A CIVIL JUDGMENT.

Prior to approximately January 2008, a Judgment Creditor of a foreign state such as Iran

was greatly hobbled in any attempt by which to recover, based upon the Foreign Sovereignty

Immunities Act ("FSIA") and various exceptions.  Congress, recognizing that the Marines needed

to be compensated, ultimately enacted an amendment to the FSIA designed to facilitate the

collection through enactment to 28 U.S.C. § 1605A.  The key parts of that new section permitting

meaningful collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1), as follows:

"(a) IN GENERAL. --
     "(1) NO IMMUNITY. – A foreign state shall not be immune from the
jurisdiction of courts of the United States or of the States in any case not otherwise
covered by this chapter in which money damages are sought against a foreign state
for personal injury or death that was caused by an act of torture, extrajudicial
killing, aircraft sabotage, hostage taking, or the provision of material support or
resources for such an act if such act or provision of material support or resources is
engaged in by an official, employee, or agent of such foreign state while acting
within the scope of his or her office, employment, or agency."

"(g) PROPERTY IN CERTAIN ACTIONS –
     "(1) IN GENERAL. – subject to paragraph (3), the property of a foreign
state against which a judgment is entered under section 1605A, and the property of
an agency or instrumentality of such a state, including property that is a separate
juridical entity or is an interest held directly or indirectly in a separate juridical
entity, is subject to attachment in aid of execution, and execution, upon that
judgment as provided in this section, regardless of –
          "(A) the level of economic control over the property by the
government of a foreign state;
          "(B) whether the profits of the property go to that government;
          "( C) the degree to which officials of that government manage the
property or otherwise control its daily affairs;
          "(D) whether that government is the sole beneficiary in interest of
the property; or
          "(E) whether establishing the property as a separate entity would
entitle the foreign state to benefits in United States courts while
avoiding its obligations.
     "(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE.  Any
property of a foreign state, or agency or instrumentality of a foreign state, to which
paragraph (1) applies shall not be immune from attachment in aid of execution, or
execution, upon a judgement entered under section 1605A because the property is
regulated by the United States Government by reason of action taken against that
foreign state under the Trading With the Enemy Act or the International Emergency
Economic Powers Act."

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [HARBOR AND BUNKERED FUEL
RIGHTS - MITSUI O.S.K. LINES] - CASE NO. 3:08-mc-80030-JSW (BZ)    3

1    Accordingly, the FSIA no longer serves as a bar, and the assets of Iran are now subject to

2    clear levy and execution.

3    ### III. **LOCAL DOCKETING.**

4    Plaintiffs have registered the Judgment with the United States District Court, Northern

5    District of California. Case No. 3:08-mc-80030-JSW.  The basis of registering the Judgment under

6    28 U.S.C. § 1963 is the good faith belief that in fact assets of Iran might be subject to levy and

7    execution in the Northern District of California.

8    ### IV.  **NATURE OF ASSETS SUBJECT TO LEVY AND EXECUTION - TARIFFS AND DOCKET FEES AND CHARGES.**

9    Plaintiffs have determined through a multitude of sources, which include the individual

10   shipping schedules, other websites, and other sources, that the Shipping Line transports, handles,

11   delivers, picks up, loads and offloads products, such as and including general cargo, containers,

12   bulk goods, dry goods, agricultural products, and other products which may include, but are not

13   limited to, gasoline and refined petroleum products through Iranian harbors, docks terminals and

14   off loading facilities.

15   These Shipping Lines also dock in United States harbors, ports, terminals and other locales

16   subject to United States jurisdiction.  These Shipping Lines are ostensibly subject to the United

17   States jurisdiction for an entire range of issues, such as commerce, entry in the U.S. territorial

18   waters, compliance with U.S., State and local environmental laws, and compliance with an entire

19   array of maritime laws, shipping and other laws.

20   The Ministry of Roads and Transportation generally oversees the PORTS & SHIPPING

21   ORGANIZATION ("P.S.O.") of Iran who manage the docks, harbors and related facilities, which

22   is confirmed by the website the P.S.O. marked *Exhibit "D."* "The history of Ports & Shipping

23   Organization" states as follows:

24   
25   "On May 28, 1952, a decree comprising 18 articles for registration and utilization of vessels was approved by the Cabinet. Based on these regulations, using vessels in domestic and coastal waters was depended on their registration and issuance of

26   their certificate of registration in one of the Iranian ports. In 1959, following an agreement reached between the Ministry of Roads and Ministry of Customs &

27   Monopolies, "General Agency of Ports and Shipping" was transferred from the Ministry of Roads and Transportation to the Ministry of Customs & Monopolies.

28   On May 25th, 1960, the title of the "General Directorate of Ports and Shipping" was changed to "Ports and Shipping Organization" and its responsibilities and functions

1   were expanded. Based on these developments, the organization was assigned the
2   task of exercising the authority of the Government to control all ports and maritime
    affairs, implementation of port and coastal shipping regulations, promoting
3   shipping and commerce, collecting port duties and taxes and registering Iranian
    vessels.

4   On Oct. 31st, 1964, the maritime law of Iran including 914 articles was put into
    effects, and on Jul. 3rd, 1966, the present ports and shipping organization together
5   with its staff, budget and properties was separated from the Ministry of Economy
    and Finance. On Feb. 2nd, 196, the organization gained the status of a legal entity
6   and its functions, rights, and organizational chart were formally declared. Internal
    regulations on financials transactions and on the employment of staff of the
7   organization were approved respectively on 14 Jul, 1970. The organization was
    separate again from the Ministry of Finance and was transferred to the Ministry of
8   Roads and transportation in 1974."

9   The website of the P.S.O. marked *Exhibit "D"* "TERMS OF REFERENCE" at page 2 of

10  2, states as follows:

11  "The Supreme Council consists of the following Ministers:
    1-Ministry of Financial and Economic Affairs
12  2-Ministry of Roads and Transportation
    3-Ministry of Defence
13  4-Deputy president and Head of Planning and Budget Organization "PBO"
    5-Commander of the Navy"
14
    Iran charges these Shipping Lines an entire array of charges for the privilege of utilizing
15
    Iranian docks, harbors, terminals and other maritime facilities. This label is illustrative as seen by,
16
    e.g., the entire range of charges imposed by Iran through its Manual of Tariffs Applicable to
17
    Vessels and Cargo in the Ports of the Islamic Republic of Iran, marked *Exhibit "B."* For purposes
18
    of illustration, these fees cover an entire array of services: duties, pilotage charges, charges for
19
    garbage collection, dredging charges, wharfage charges, charges for towage, charges for bilge
20
    water, overtime charges, entry duties, unloading and loading charges, towage charges, light duties,
21
    duties and port charges for non-container cargo's, stevedoring charges, storage charges, charges
22
    for containers, repositioning the container on the vessel, moving, loading and unloading the
23
    containers, crane standby, label removing, flat rocking of the container, tarpaulin covering of the
24
    open top container, administrative and current charges, plumbing charges, time renting of
25
    equipment, lashing and unlashing charges, quarantine service charges, communications charges,
26
    diving charges, collecting and cleaning oil charges, registry duties of a vessel registry of
27
    transactions on ships and vessels, and many others.
28
    To offload or load products of any type in the docks and harbors of Iran would require

1  payment of fees and charges imposed by P.S.O. and therefore constitute an account, account

2  receivable, right to payment of money or general intangible in favor of Iran and therefore subject to

3  levy and execution. Any one or all of these Shipping Lines (or their agents, representatives, or

4  others on their behalf as their agents) would be indebted to Iran for payment for these related

5  services. Iran is no longer protected by the FSIA, and therefore any amounts due from these

6  Shipping Lines are subject to an order compelling an assignment under C.C.P. § 708.510(a).

7      These Shipping Lines service U.S. ports, have local agents and representatives, transport

8  products from the U.S. to foreign countries, transport products from foreign countries to the

9  United States.  These ships are seen lining up in local ports clearly displaying their name on the

10  side of large container ships such as EVERGREEN, HAPAG LLOYD, OOCL, YANG MING, etc.

11  **V. ADDITIONAL ASSETS SUBJECT TO LEVY AND EXECUTION: BUNKERED FUEL.**

12      The National Iran Oil Products Distribution Co., which is a subsidiary of the Ministry of

13  Petroleum of the Islamic Republic of Iran, sells approximately two million tons of bunkered fuel to

14  approximately 3,500 foreign ships which visit various harbors, docks, off loading, terminals,

15  wharfs, and other marine facilities of Iran, in which some or all of these ships are owned and

16  operated by the Shipping Line, which is the subject of this motion.  This information comes from

17  P.S.O. News, dated Sept. October, 2007, No 2, at page 12, marked *Exhibit "C"* as stated above.

18  The National Iranian Oil Products Distribution Company is a subsidiary of the National Iranian Oil

19  Refining and Distribution Co., which is part of the Ministry of Petroleum of the Islamic Republic

20  of Iran per the attached download, marked *Exhibit "E."* [2]  Plaintiffs therefore have provided

21  sufficient evidence which would indicate that monies due for the acquisition of the bunkered oil

22  are in fact payable for the benefit of the Judgment Debtors.

23      Common experience would suggest that some (or all) of the Shipping Lines make up some

24  part or all of the "foreign ships," who purchase bunkered fuel from the National Iranian Oil

25  Distribution Co., and accordingly any monies which would be due or owed to Iran for the purchase

26  of the bunkered fuel under this assignment order would now be due to the Plaintiffs.  The revenue

27

28      [2] Bunkered fuel is technically any type of fuel oil used aboard ships. It gets its name from the containers (known as Bunkered Tanks) on ships and in ports that it is stored in, called bunkers.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [HARBOR AND BUNKERED FUEL RIGHTS - MITSUI O.S.K. LINES] - CASE NO. 3:08-mc-80030-JSW (BZ)        6

1  stream of $640.000.000. turned over to Plaintiffs, would start the process of ameliorating

2  Plaintiffs' terrible losses, and moreover, commence the process of financial restitution.

### VI. THIS IS THE MOST EFFECTIVE REMEDY.

4  An order compelling Iran to execute an assignment would ultimately lead to the assignment

5  itself. assuming that Iran defaults or refuses to execute the contractual assignment. With

6  assignment order in hand, presumably obtained after post-order process, Plaintiffs could serve the

7  Shipping Line with the assignment order and redirect the flow or stream of revenue away from

8  Iran. and to Plaintiffs.[3]

### VII. WHICH LAW APPLIES.

10  Plaintiffs seek to enforce the judgment under FRCP 69(a)(1) amended as of 12/1/07, and

11  employ the laws of the domicile, specifically being the laws of the State of California, which

12  provides as follows:

13  Rule 69. Execution
    (a) In General.

14  (1) Money Judgment; Applicable Procedure.
    A money judgment is enforced by a writ of execution, unless the court directs

15  otherwise. The procedure on execution — and in proceedings supplementary to and
    in aid of judgment or execution — must accord with the procedure of the state

16  where the court is located. but a federal statute governs to the extent it applies.

17  *Cigna Property & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 421 (9th Cir.1998)

18  (quoting *Peacock v. Thomas*, 516 U.S. 349, 359 n. 7, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996))

### VIII. MECHANISM OF AN ASSIGNMENT MOTION.

20  Plaintiffs seek to obtain an order compelling an assignment permitted under C.C.P. §

21  708.510(a) which provides as follows:

22  "Except as otherwise provided by law, upon application of the judgment creditor on
    noticed motion. the court may order the judgment debtor to assign to the judgment

23  creditor, or to a receiver appointed pursuant to Article 7 (commencing with section
    708.610) all or part of a right to payment due or to become due, whether or not the

24  right is conditional upon future developments, including but not limited to. the

25  ─────────────────────

26  [3] On July 2. 2008, Plaintiffs sought virtually identical relief, in which the court denied
    relief essentially on the basis that Plaintiffs sought an assignment order which itself lacked the
    intermediate step of an order compelling the debtor to make an assignment in the first instance.

27  and in the event of default, Plaintiffs seeking additional supplemental relief. the effect of which
    would be to facilitate the assignment through the power of contempt, the equitable powers of the

28  court, or alternatively. the appointment of a judicial officer, such as a clerk, to sign the contractual
    assignment in favor of Plaintiffs.

1    following types of payment:

2        1.    Wages due from the federal government that are not subject to withholding under
              an earnings withholding order.
3        2.    Rents.
         3.    Commissions.
4        4.    Royalties.
         5.    Payments due from a patent or copyright.
5        6.    Insurance policy loan value."

6    This order compelling assignment would reach all accounts, accounts receivable and rights

7    to payment of money, whether owed now or owed in the future, from "account debtors" who may

8    owe money to the underlying judgment debtor.

9        The Legislative Comment under C.C.P. § 708.510 indicates that the court has great

10   flexibility in fashioning relief, which itself would enable Plaintiffs to serve the assignment order

11   and obtain payment of amounts which are due or may be due in the future.  The Legislative

12   Comment provides as follows:

13       **Legislative Committee Comment – Assembly 1982 Addition**
                 Section 708.510 provides a new procedure for reaching certain forms of
14       property that cannot be reached by levy under a writ of execution, such as the
         nonexempt loan value of an unmatured life insurance, endowment, or annuity
15       policy.  See Sections 699.720(a)(6), 704.100.  It also provides an optional
         procedure for reaching assignable forms of property that are subject to levy, such as
16       accounts receivable, general intangibles, judgments, and instruments.  This section
         does not make any property assignable that is not already assignable.  This remedy
17       may be used alone or in conjunction with other remedies provided in this title for
         reaching rights to payment, such as execution, orders in examination proceedings,
18       creditors' suits, and receivership.  The use of this remedy is subject to limitations
         on the time for enforcement of judgment.  See Sections 683.010-683.220.
19
         The purpose of the assignment order is the same as a contractual assignment under C.C.P.
20
     § 708.530, which provides as follows:
21
         **§ 708.530.**
22       (a) Except as provided in subdivision (b), the effect and priority of an assignment
         ordered pursuant to this article is governed by Section 955.1 of the Civil Code.  For
23       the purpose of priority, an assignee of a right to payment pursuant to this article
         shall be deemed to be a bona fide assignee for value under the terms of Section
24       955.1 of the Civil Code.
         (b) An assignment of the right to future rent ordered under this article is recordable
25       as an instrument affecting real property and the priority of such an assignment is
         governed by Section 1214 of the Civil Code.
26
         The effect on the obligor's rights is found under C.C.P. § 708.540, which provides as
27
     follows:
28
         **§ 708.540.**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [HARBOR AND BUNKERED FUEL
RIGHTS - MITSUI O.S.K. LINES] - CASE NO. 3:08-mc-80030-JSW (BZ)        8

The rights of an obligor are not affected by an order assigning the right to payment until notice of the order is received by the obligor. For the purpose of this section, "obligor" means the person who is obligated to make payments to the judgment debtor or who may become obligated to make payments to the judgment debtor depending upon future developments.

Assignments are found under Civ.C. § 955.1, likewise which provides as follows:

**§ 955.1.**
(a) Except as provided in Sections 954.5 and 955 and subject to subdivisions (b) and ( c). a transfer other than one intended to create a security interest (paragraph (1) or (3) of subdivision (a) of Section 9109 of the Commercial Code) of any payment intangible (Section 9102 of the Commercial Code) and any transfer of accounts, chattel paper, payment intangibles, or promissory notes excluded from the coverage of Division 9 of the Commercial Code by paragraph (4) of subdivision (d) of Section 9109 of the Commercial Code shall be deemed perfected as against third persons upon there being executed and delivered to the transferee an assignment thereof in writing.
(b) As between bona fide assignees of the same right for value without notice, the assignee first giving notice thereof to the obligor in writing has priority.

Plaintiffs seek an order compelling Iran to assign the Harbor and Bunkered Fuel Rights to Plaintiffs, and in default, proceed with additional supplemental remedies. Assuming that Iran executes an assignment or the rendition of supplemental relief, an assignment order permit the Judgment Creditor to reach receivables due now, or due in the future, receivables which might be contingent. or uncertain, or receivables in which performance might still be due, as provided by the exact language of C.C.P. § 708.510(a). The value of an assignment would be to permit Plaintiffs to reach funds now due and due in the future, and amounts which are even conditional, which is a more advantageous remedy than a levy. For example, in *FIRST CENTRAL COAST BANK, etc. vs. CUESTA TITLE GUARANTEE COMPANY, et al.,* 143 Cal.App.3d 12, 191 Cal.Rptr. 433 (Cal.App.2 Dist. 1983), the appellate court held that a premature [or late] levy did not reach the monies which were due at the time of a levy in that a levy constitutes a "snapshot" of any funds immediately due the debtor. The court stated as page 16 as follows:

"A debt which is uncertain and contingent in the sense that it may never come due and payable is not subject to garnishment. (Brunskill v. Stutman, supra, 186 Cal.App.2d 97, 8 Cal.Rptr. 910: *Clecak v. Dunn* (1928) 95 Cal.App. 537.)"

## IX.  THREE-STEP PROCESS.

An assignment motion might necessarily envision a three-step process:

1.  An order compelling the Judgment Debtor to assign the rights to the Judgment Creditor.

2.  In the event of noncompliance, supplemental process to appoint a third party or judicial

1   official to actually execute the assignment in favor of the Judgment Creditor.

2        3. An independent action or proceeding, if any, which might be brought by the Judgment

3   Creditor in the enforcement of the rights of the Judgment Debtor against the obligor.

4        An motion compelling an assignment does not adjudicate the underlying obligation owed

5   by the obligor, nor makes such an obligation assignable, other than as allowed by prevailing law.

6   An order compelling an assignment does not preadjudicate the obligor's defenses, whatever they

7   might be, but only ousts the Judgment Debtor, and places the Judgment Creditor in its stead. See

8   *KRACHT v. PERRIN, GARTLAND & DOYLE, etc., et al.,* 219 Cal.App.3d 1019, 268 Cal.Rptr.

9   637 (Cal.App.4 Dist. 1990) in which the court stated at footnote 1, as follows:

10       "[1] Code of Civil Procedure section 708.510 does not require that notice of the
     motion to cause an assignment be given to the obligor of the judgment debtor. The

11   order of assignment does not affect the obligor's rights until notice of the order is
     received by the obligor. (Code Civ.Proc., § 708.540.) The fact that the choses in

12   action were ordered assigned under Code of Civil Procedure section 708.510 does
     not preclude a challenge to whether the claims were assignable ab initio, because

13   the Legislature specifically noted that section 708.510 "... does not make any
     property assignable that is not already assignable." (See Legis.Com.Comment,

14   Assembly 1982 Addition, West's Ann.Code Civ.Proc., § 708.510.)

15   ## X. CONCLUSION.

16        The relief sought is limited to a surgical and precise order compelling Iran to assign to

17   Plaintiffs a discrete bundle of apparent contractual rights. Any other relief in the enforcement of

18   this order would be for another day.

19   DATED: July 16, 2008            COOK COLLECTION ATTORNEYS

20   By: ___/s/ David J. Cook_____
          DAVID J. COOK, ESQ. (SB# 060859)

21        Attorneys for Plaintiffs
          DEBORAH D. PETERSON, Personal

22        Representatives of the Estate of James C. Knipple

23   F:\USERS\DJCNEW\petersonsf.assignmitsuimpa

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ASSIGNMENT OF
RIGHTS PURSUANT TO C.C.P. § 708.510(a) AND F.R.C.P. 69(a) [HARBOR AND BUNKERED FUEL
RIGHTS - MITSUI O.S.K. LINES] - CASE NO. 3:08-mc-80030-JSW (BZ)      10