Volume 1

Pages 1 - 62

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAGISTRATE JUDGE BERNARD ZIMMERMAN

DEBORAH D. PETERSON, Personal      )
Representative of the Estate of    )
James C. Knipple (Dec.), et al.,   )
                                   )
          Plaintiffs,              )
                                   )
  vs.                              )  NO. C 08-080030 JSW(BZ)
                                   )
ISLAMIC REPUBLIC OF IRAN, et al.,  )
                                   )  San Francisco, California
          Defendants.             )  Wednesday
                                   )  October 8, 2008
_____)  10:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**         Cook Collection Attorneys, PC
                            165 Fell Street
                            San Francisco, CA  94102-5106
                            (415) 989-4730
                            (415)989-0491 (fax)
                      BY:   **DAVID J. COOK**
                            **NATHANIEL L. DUNN**


**For Non-Parties A.P.**    Morgan Lewis & Bockius, LLP
**Moller-Maersk A/S;**      One Market, Spear Street Tower
**Mediterranean**           San Francisco, CA  94105
**Shipping Company;**       (415) 442-1000
**CMA CGM:**                (415) 442-1001 (fax)
                      BY:   **PETER BUSCEMI**
                            **MATTHEW S. WEILER**

(Appearances Continued On Next Page)

**Reported By:     Lydia Zinn, CSR #9223, RPR**
                   **Official Reporter - U.S. District Court**

```
 1   APPEARANCES (CONT'D)
     For Interested Parties   NIXON PEABODY LLP
 2   Hanjin Shipping Co.,     One Embarcadero Center
     Ltd.; Mitsui O.S.K.      18th Floor
 3   Lines, Ltd.; Compania    San Francisco, CA  94111-3600
     Sud Americana de         (415) 984-8266
 4   Vapores:                 (866) 741-1430 (fax)
                        BY:   ISABELLE ORD
 5                            PAUL J. HALL

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE CLERK:  C. 08-80030, Deborah D. Peterson versus

 2   Islamic Republic of Iran.

 3              Counsel, please step forward and state your

 4   appearances.

 5              MR. COOK:  Good morning.  For the record, David Cook,

 6   on behalf of Deborah D. Peterson, et al., plaintiffs and

 7   judgment creditors, your Honor.

 8              THE COURT:  Good morning.

 9              MR. COOK:  Thank you.

10              MR. DUNN:  Nathaniel Dunn, also on behalf of the

11   plaintiffs, your Honor.

12              THE COURT:  Mr. Dunn.

13              MR. BUSCEMI:  Good morning, your Honor.  My name is

14   Peter Buscemi, and I'm here on behalf of nonparty CMA CGM,

15   which is the shipping line mentioned in the Court's briefing --

16   order for filing the first brief in response to the motion

17   filed by the plaintiffs.

18              THE COURT:  To the line I've been calling, "The

19   French Line"?

20              MR. BUSCEMI:  Correct, your Honor.

21              MR. WEILER:  Matt Weiler, also on behalf of CMA.

22              THE COURT:  One thing I realize in preparing for this

23   morning's argument was I had not ruled on the objections to the

24   Cook declaration, so I think I've handed you each a tentative

25   ruling on those objections, but I would say this.  I don't
```

1  think that my rulings on the underlying issues turn very

2  heavily on some of the factual assertions that are contained in

3  there.  So my own thought is it's probably not worth spending

4  an awful lot of time on those, but nonetheless, the objections

5  were made, and they needed to be ruled on.

6          So I guess I will -- I guess I'll turn it over to the

7  moving party, to the plaintiffs.  You've seen my tentative

8  report and recommendation and the order that I'm prepared to

9  enter.  And I'll hear from you first.

10          **MR. COOK:**  Thank you, your Honor.

11          I, of course, have received and reviewed the order

12  granting plaintiffs' motion compelling assignment of rights.

13  And actually, I don't have much to say.  Essentially, you

14  granted my motion, pretty much consistent with -- as we

15  perceived to be Section 708.510, and that CMA, we believe, do

16  not have a right to appear, which is an interesting issue; but

17  the battleground between plaintiffs as now the assignee of Iran

18  to certain rights --

19          **THE COURT:**  Well, you're not the assignee.  Two

20  steps.  Iran has to either complete the execution, or there has

21  to be a basis for forcing the assignment.

22          **MR. COOK:**  Right.  I -- the Court corrects me

23  properly.  Okay?

24          **THE COURT:**  All right.

25          **MR. COOK:**  And somewhere down the line, through

1  various steps, there might be an action or proceeding or

2  whatever it might be between plaintiffs, through various other

3  steps within the course and scope of this order.  And then all

4  of the issues as raised by CMA CGM -- and CMA CGM, that's known

5  as "The French Line" -- are raised.

6          And that is the -- very briefly, the structure of

7  708.510, and the structure of California case law.  And so

8  that's where we are, your Honor.

9          **THE COURT:**  Well, then let me hear from Mr. Buscemi

10  or Mr. Weiler, if you wish to be heard.

11          **MR. BUSCEMI:**  Yes, your Honor.  We would like to be

12  heard, and we thank you for the opportunity.

13          Let me begin by saying that I think it's important to

14  stress at the outset the four limitations that the Court has

15  put in its tentative ruling.  Those four limitations are that

16  any assignment is limited to a right to payment that exists in

17  the United States.

18          The second one is that the right to payment must

19  arise out of Iran's commercial activities.  That one -- it's

20  our submission -- needs to be revised, because it's not in

21  keeping strictly with the language of Section 1610(a) of the

22  Foreign Sovereignty Immunities Act.

23          I'm going to come back to that, but just on the

24  narrow point of the precise language, the language is that it

25  must -- any assignment must be limited to property that had

been used for commercial activity in the United States.  It's
not enough that any right to payment arise out of Iran's
commercial activities generally; it must be property that had
been used for commercial activity in the United States,
according to the language of the statute.

The third limitation that your Honor has put in the
report and recommendation is that the assignment would be made
only by Iran, the judgment debtor and the default judgment
obtained by plaintiffs; not on behalf of anybody else; just
Iran.

And then the fourth limitation --

**THE COURT:**  Let me just stop you on that.

As I remember, there was an appeal, or at least
review sought of my ruling on that issue.  And I'm not sure,
Mr. Buscemi, you're aware of this.  This occurred perhaps six
months ago.  Has Judge White resolved that issue?

**MR. COOK:**  And I say this.  I have not seen anything
off the docket here, nor have we received anything otherwise
off the docket, so I believe the matter's still under
submission.

**THE COURT:**  All right.  So obviously, that portion of
my ruling, I suppose, is subject to whatever Judge White
ultimately decides to do on Mr. Cook's argument that various
entities are actuality instrumentalities of the State of Iran.
I have not accepted that argument, but that's before

1  Judge White right now.  I'm not sure if you're aware of that,

2  so I wanted to raise it.

3          **MR. BUSCEMI:**  Thank you, your Honor.

4          And then, finally, the fourth limitation is that the

5  Court's -- included in the Court's report and recommendation is

6  that any assignment would be limited to payment rights that

7  currently exist; not that may come into existence at some time

8  in the future.

9          Now, we -- with the -- with the one modification that

10  I suggested with respect to the second limitation to make it

11  accord with the language of the statute, we appreciate all of

12  those limitations.  And we think that, as a practical matter,

13  they mean quite clearly that nothing will happen in the real

14  world as the result of the assignment that the plaintiffs have

15  sought and that your Honor's tentative ruling grants.

16          The only thing that will happen -- and I think you've

17  just heard it from Mr. Cook -- is that there will be further

18  proceedings.  And our client, and perhaps the other shipping

19  lines as to whom Mr. Cook has made his motion, will be required

20  to spend more money and more time and more effort in responding

21  to this proposed assignment.

22          So, in light of that fact, I do want to make an

23  effort today to persuade the Court that the assignment that the

24  Court has proposed in its tentative ruling is really putting

25  the cart before the horse.  It is granting an assignment kind

 1    of on a wing and a prayer.  It says, essentially, "I'm going to

 2    grant an assignment now.  And we'll figure everything out

 3    later, when the plaintiff attempts to make -- bring further

 4    proceedings as a result of this assignment."  And it's our

 5    submission that that is a mistake for the Court to do it that

 6    way.

 7          The plaintiff bears the burden of establishing that

 8    this Court's jurisdiction can properly be invoked for this kind

 9    of assignment.  And we have demonstrated, I think, quite

10    clearly -- and I think that the papers submitted by some of the

11    other shipping lines also demonstrate -- that the

12    jurisdictional prerequisites for the kind of assignment that's

13    sought here have not been satisfied.

14          The Supreme Court has made clear that, in order to

15    proceed against a foreign state, an exception to sovereign

16    immunity must be shown as a precondition to any proceeding.

17          And, your Honor, I would call to the Court's

18    attention, in addition to the *Verlinden* case, which is a

19    leading Supreme Court case, to the *Republic of Austria versus*

20    *Altmann* case, which is another Supreme Court decision -- the

21    very good discussion by Judge Marrero in the Southern District

22    of New York, which attempts to summarize the law on this

23    point -- and the *Weininger* case.  And that case is reported at

24    462 F. Supp. 2d. 457.

25          As a prelude to the rest of what I have to say this

1   morning, I would just like to read, your Honor, from one

2   paragraph of this decision, which I think sums up the governing

3   law extremely well.  And it appears at page 477 of the reported

4   decision.  It starts at 457.  Here's what the Court says.

5                  The Foreign Sovereignty Immunities Act

6                  is the exclusive source of subject-matter

7                  jurisdiction over all civil actions against

8                  foreign states or their agencies and

9                  instrumentalities.

10                  -- citing to the Supreme Court's decision in the

11   *Saudi Arabia* case, and the *Argentine Republic versus*

12   *Amerada Hess* case.

13                  Subject-matter jurisdiction.  Now, this is quote from

14   the *Verlinden* decision of the Supreme Court.

15                  Subject-matter jurisdiction in any such

16                  action depends on the existence of one of

17                  the specified exceptions to foreign

18                  sovereign immunity.

19                  So we start off with the assumption that the foreign

20   sovereign is immune.  And we -- in order to go forward, the

21   plaintiffs need to show that there's an exception to that

22   immunity.

23                  Continuing, the Court says,

24                  At the threshold of every District

25                  Court action against a foreign state, the

1          Court must satisfy itself that one of the

2          exceptions applies, because its

3          subject-matter jurisdiction depends on that

4          application.  Before a federal court --

5          And this is, again, citing *Verlinden*.

6               Before a federal court may apply any

7          rule of law in a case involving a foreign

8          state or instrumentality of that state, it

9          must, as a threshold matter, find an

10         exception to the FSIA's grant of sovereign

11         immunity, even if a party fails to enter an

12         appearance --

13         And, as you know, Iran is not here.

14         -- and assert its claim of immunity.

15         **THE COURT:**  But Iran has defaulted.

16         **MR. BUSCEMI:**  In the underlying action, your Honor.

17         **THE COURT:**  A judgment was entered.  This is simply

18  an effort to enforce the judgment in the underlying action.

19         **MR. BUSCEMI:**  That is correct.

20         **THE COURT:**  And I have -- I don't remember.  I've

21  read a lot of cases.  I don't remember whether *Weininger* was

22  decided before or after the more recent amendments to the FSIA.

23  Was it --

24         **MR. BUSCEMI:**  Before, your Honor.  November 2006.

25         **THE COURT:**  Before.  So what you -- but I'm dealing

1  with the recent amendments, 1605(A).  So how do I deal with

2  that?

3          MR. BUSCEMI:  Yes, your Honor.

4          THE COURT:  Why isn't it enough that they have

5  defaulted?  Another judge has already found them subject to

6  jurisdiction; has issued the judgment.  What's missing?

7          MR. BUSCEMI:  What's missing, your Honor, is --

8          THE COURT:  Are you asking me, in effect, to review

9  Judge Lamberth's decisions?

10          MR. BUSCEMI:  Not -- absolutely not.  Not at all.

11          I'm saying, very simply, that -- two points.

12          The Foreign Sovereign Immunities Act describes the

13  situations in which --

14          THE COURT:  Mm-hm.

15          MR. BUSCEMI:  -- execution or attachment may be had

16  over the property of a foreign state.

17          And, looking in particular at Section 1610, and

18  reading from Section 1610(a),

19              The property in the United States of a

20              foreign state, as defined in Section

21              1603(a) of this chapter, used for a

22              commercial activity in the United States --

23              That's the language to which I referred before --

24          THE COURT:  Mm-hm.

25          MR. BUSCEMI:  -- when I went through the four

1  limitations and your Honor's report and recommendation.

2            -- shall not be immune from attachment

3        or from execution upon a judgment entered

4        by a Court of the United States if --

5        And then you must meet one of the following seven

6  criteria.

7        So you must have property in the -- now, this is true

8  whether you have a judgment that's been fully litigated,

9  whether you have a default judgment, or any other kind of

10 judgment if you want to execute or attach the property of a

11 foreign state.

12        **THE COURT:**  Mm-hm.

13        **MR. BUSCEMI:**  You must have property in the

14 United States.  That property must be used for commercial

15 activity in the United States.  And it must meet one of the

16 seven listed criteria in Section 1610(a).

17        Now, we don't think that the plaintiffs here can get

18 past the first portion of the first sentence of Section

19 1610(a), because they have not identified property of Iran in

20 the United States, nor have they identified property of Iran

21 used for commercial activity in the United States.

22        **THE COURT:**  But isn't that the only property that my

23 order seeks to reach?

24        In other words, I guess we are getting into a cart

25 before the horse, and we're dealing with a state statute.

1            So what is your -- sounds like what your basic

2    argument is saying is that, in effect, the California

3    attachment or assignment procedures are invalid under the FSIA.

4            **MR. BUSCEMI:**  Well, I'm not saying that.  I'm saying

5    that the two have to be read together.  The California statute,

6    whatever it says -- and I don't think it's inconsistent with

7    the FSIA, but whatever it says, it cannot override the FSIA.

8    Under the supremacy clause, the FSIA would take precedence.

9    This Court could not exercise jurisdiction --

10           **THE COURT:**  Well --

11           **MR. BUSCEMI:**  -- in this matter if jurisdiction were

12   not conferred by the FSIA, because we know from *Verlinden* that

13   that's the only basis of jurisdiction over a foreign state.  So

14   the Court needs to find jurisdiction over the foreign state

15   before the Court can act on any claim, state or federal.  And

16   that jurisdiction must come from the FSIA.

17           Now, as a matter of fact -- and I was going to get

18   into this in a moment, but as a matter of fact, we think we've

19   got very good arguments with respect to the California statute

20   itself.

21           The California statute, as it's been interpreted by

22   the courts -- and I'm thinking of the *Questor Investments* case.

23   And I'm also thinking about the *Garden City Boxing Club* case.

24   There must be a specific obligation identified before -- not

25   after, but before any attachment can be ordered under the

1   California statute.

2           So even if we were focusing exclusively on the

3   California statute -- and I was going to get there, but it's

4   okay to talk about it now, even if we were focusing exclusively

5   on the California statute, and we weren't worried about

6   jurisdiction, which the Courts needs to be; but even if we

7   weren't, the requirements of the California statute haven't

8   been satisfied, because all the Court has before it is a

9   suggestion that there might be some amount owed to Iran

10  somewhere, somehow, some day.  That's not enough under the

11  California statute.

12          The California statute talks about something that is

13  specific; that is a specific obligation.  And they talk about:

14  you have to identify what that is.

15          It hasn't been done here.

16  **THE COURT:**  So you're saying that, in effect, the

17  flaw that you see with the Order is that the obligation, which

18  I have tried to identify at the top of page 2, you don't think

19  is specific enough?

20          **MR. BUSCEMI:**  No, I don't.  And, in fact --

21          **THE COURT:**  There may not be any such obligation?

22          **MR. BUSCEMI:**  Well, exactly.  And that's the point.

23  And we -- not only may there not be, but we have evidence in

24  the record that has not been controverted that there are no

25  payments made in the United States.  So, to allow this

1    proceeding to come back to where I began --

2         **THE COURT:**  Let me just stop you.  I guess

3    Mr. Cook -- maybe this is the time to join on this issue.  When

4    you were -- well, I don't know last time, but at one of the

5    last hearings, what I suggested you do is you find something

6    that was concrete involving somebody that was local, and so on,

7    and so forth.  And let's -- let's see whether we can, you know,

8    in effect, have an assignment; or if Iran doesn't assign,

9    whether we can have a Court-ordered assignment, et cetera.

10         So I guess I am a little bit troubled that in the

11   face of that, I have assumed that the reason you had picked on

12   the French first was that they were an example -- or The French

13   Line -- of the kind of obligor I was thinking of.  And I was

14   surprised, frankly, when I got the declaration from The French

15   Line saying there is no such.

16         Why are we doing this?

17         **MR. COOK:**  Well, the answer --

18         **THE COURT:**  Is it simply an effort to take discovery

19   from them?

20         **MR. COOK:**  Well, the answer is the following.

21         We identified 15 lines.  Of the 15 lines, we found

22   that they were servicing the harbors called "Bandar Abbas,"

23   B-a-n-d-a-r A-b-b-a-s, and that they were doing business in the

24   United States; in other words, that the -- from the viewpoint

25   of enforcing an assignment -- from the viewpoint of enforcing

1   an assignment, there was something there that would be

2   indicative that this entity had some general presence here --

3   "here" being the United States -- and then some commercial

4   connection with Iran.

5           Now, Iran -- it's very clear, because we have a phone

6   book of tariffs; basically, you know, their list of charges

7   that they would charge a carrier to come in there and off-load

8   their products.  So from that we said, "Well, they frequent the

9   harbor."

10          I have their schedules.  It's like a bus schedule.

11  You know, it says very clearly when they come; very clearly

12  when they go.  That looks like some money's owed here.

13          And then what we have is we have that they're here.

14          Now, reading carefully their declaration, what they

15  say is the following; that if there's money owed, we pay it or

16  presumptively pay it out of Marseilles, France, or pay it out

17  of some other place.

18          Now, that's not to say that money's not owed or

19  money's not owed at this time, or there's not an obligation

20  that doesn't exist.  They say, "We just write this check out of

21  our office there."

22          I don't make any claim to the contrary.

23          Now, one -- rolling through this record at the bitter

24  end of the order here is we're going to at that point say,

25  "Well, we think we have something."  And we can launch either

 1  69(a)(1) discovery, you know, power of subpoena out of this

 2  court --

 3          **THE COURT:**  Right.

 4          **MR. COOK:**  -- or we can launch out of this court

 5  California state discovery, that is, under California state

 6  law; either way, but the answer is obviously here in the last

 7  year, and we worked real hard to make sure that we find

 8  somebody with that type of connection.

 9          **THE COURT:**  I guess what it boils down to is this.  I

10  mean, let's assume that there -- that Mr. Schmidt's declaration

11  wasn't what it said.  And I have no idea how this is going to

12  distill itself down.  Maybe discovery needs to follow.  And I

13  suppose it will depend a lot on what, if anything, Judge White

14  ultimately rules; but it seems to me that your essential

15  quarrel, I mean, is with the nature of the California statute

16  and the way it's constructed, and the fact, I suppose, that if

17  I have accepted Mr. Cook's argument literally -- it does seem

18  to have some support in the law -- you wouldn't have even had

19  notice of this proceeding.

20          I don't know why the California Legislature

21  contemplated that it would work this way, but it seems to have

22  done so.

23          And a number of courts seem to have provided some

24  support for Mr. Cook's notions that the objections that you're

25  sort of talking about -- and I have put -- I admit I have put

1   this cart, you know, a little bit on -- turned the cart a

2   little bit on its side, so -- don't get resolved until kind of

3   we know exactly what we're talking about, but the statute does

4   seem to contemplate assignments which are somehow later more

5   finely tuned or honed.

6           And isn't that what Judge Feess just ruled in

7   southern California about two or three months ago?

8           **MR. COOK:**  Yes.  The -- we had the companion case,

9   which was not -- which is the *Greenbaum* case, where the --

10  where -- it was just -- same cycle here.  We named a whole

11  bunch of oil companies.  And two of them -- Repsol and Nippon,

12  and maybe a third one -- came in.  Same arguments.  Identical.

13          And his Honor said, "This is all very interesting,

14  and I'll give you whatever Iran has."  We don't know.  Whatever

15  it is.  And the order -- and that order is virtually identical,

16  other than the fine-tuning, which says, "We'll deal with it

17  later."

18          **THE COURT:**  Well --

19          **MR. COOK:**  That's what -- same order.

20          **THE COURT:**  Mr. Buscemi, have you seen Judge Feess'

21  order?

22          **MR. BUSCEMI:**  I don't believe that I have,

23  your Honor.

24          **THE COURT:**  Well, I'm not sure if it's in place in

25  the record, or we simply -- I was aware of a companion case.

1   And we have occasionally -- there are several cases which

2   present some of these issues.  There's that one, and there's

3   one in Illinois.  And so my clerk occasionally checks ECF, and

4   they have pulled it off of ECF; but I'm aware that there's

5   been -- now I think Judge Feess' ruling, if I remember it, is a

6   little even broader than mine; but it seems to me that that's

7   the ultimate question that it turns on.

8            I'm mindful of the fact that it's of some

9   inconvenience to you, unfortunately.  Every time I get involved

10  in a situation in which somebody's trying to collect a judgment

11  from a third party, it's always some inconvenience to the third

12  party.

13           And the way our laws set up some of that is

14  unavoidable.  I've tried to minimize it by the way in which

15  I've proceeded, but I think that really what it boils down to

16  is, under your view, it would almost be impossible -- an awful

17  lot of work, I guess, would have to be done up front.  And I

18  don't even know.  You'd probably argue there's no jurisdiction

19  even to take discovery, unless he first identifies the asset

20  that you contend would be -- excuse him from -- from the FSIA.

21           Excuse me.

22           Rose, who's dealing with the TRO?  Is the plaintiff

23  still here?

24           **THE CLERK:**  Yes.  He's in the -- he's waiting.

25           **THE COURT:**  Well, he'll just have to wait, then.

 1  Tell him we'll deal with it as soon as this matter's over.

 2          A TRO just came in.

 3          I guess the problem I had with your argument is that

 4  it would almost seem that if I accepted it, literally, there

 5  would never be a proceeding under this California statute,

 6  because the plaintiff would have no way of -- in some cases, of

 7  knowing exactly what the asset was.  And under your theory of

 8  the case, there is no jurisdiction unless the plaintiff first

 9  identifies a specific asset.

10          And I'm not sure that the law is quite written that

11  restrictively.

12          MR. BUSCEMI:  Your Honor, let me say for --

13          THE COURT:  I mean, clearly, the Congress intended

14  that something be done under 1605(A).

15          MR. BUSCEMI:  All right.  Let me -- I haven't even

16  gotten to 1605(A) yet.  Let me get to that, but I don't think

17  the Court needs to get to 1605(A).  That's the amendment that

18  was enacted in January of 2008.

19          THE COURT:  All right.

20          MR. BUSCEMI:  Now let me talk about 1605(A), even

21  though I don't think the Court needs to get there.

22          Sixteen -- we have explained this in our papers, I

23  think, in considerable detail.  And I think it's also been

24  reviewed in considerable detail in papers filed by the other

25  shipping lines.

1      **THE COURT:**  Let me just say I haven't really spent

2   that much time worrying about papers filed by the other

3   shipping lines.  Their turn will come.

4      **MR. BUSCEMI:**  Okay.  Well, that's fine.  That's fine.

5   It may be that if they said something better than we've said

6   it, your Honor will be persuaded by them, and not by us.  We'd

7   only ask to get the benefit of their greater wisdom.

8      **THE COURT:**  Is there some particular paper that you

9   have in mind?

10      **MR. BUSCEMI:**  Yes.  We filed an opposition to the

11   motion.

12      **THE COURT:**  Oh, I've read your opposition.

13      **MR. BUSCEMI:**  And several other shipping lines

14   represented by the Nixon Peabody firm wanted to have their

15   papers on file before today's hearing, so your Honor -- they

16   are subject to the same sort of motion.  And, presumably, your

17   Honor's tentative ruling would be very similar with respect to

18   them.

19      And they, like we, have reviewed 1605(A).  And they

20   have explained, as we've tried to explain, precisely why it has

21   no application here.

22      Section 1605(A) was not enacted until January of

23   2008.  The final judgment entered in the District of Columbia

24   was entered in September 2007.  The action that was brought in

25   the District of Columbia was filed in October 2001, almost

1    seven years before 1605(A) was passed.  So, clearly, that

2    action was not filed under 1605(A), nor was it refiled under

3    Section 1605(A).  And if it's not filed under 1605(A) and it's

4    not refiled under 1605(A), after the statute was amended in

5    January '08, that statute simply has no application.

6              **THE COURT:**  Where does that limitation -- I remember

7    your argument.  Where does that limitation appear in the

8    statute?

9              **MR. BUSCEMI:**  I think, your Honor, that --

10             **THE COURT:**  Because by its nature, almost, 1605(A)

11   talks about executing a judgment, which would tend to sort of

12   suggest that it's -- you know, might have some application to

13   judgments that are out there.

14             **MR. BUSCEMI:**  Well, we've quoted the language of the

15   statute.  If your Honor will let me get my memorandum for just

16   a moment --

17             **THE COURT:**  In other words, I think -- well, I'd

18   better let Mr. Cook speak.  I'm sure he can state his position

19   probably better than I can.  Why don't you go ahead and make

20   your argument?  I think it's going to be more helpful if we

21   focus on a particular issue, and then have some give and take

22   on that, rather than just sort of, you know, going on and

23   having a lot of issues.

24             So let's focus on 1605(A), and whether it's

25   applicable, because if I accept your argument -- okay? --

1  because this judgment was entered prior to the enactment of

2  that statute, then, in effect, there is no waiver of sovereign

3  immunity with respect to Iran.  And that changes some of the

4  terrain.

5          MR. BUSCEMI:  Yes, your Honor.  Let's look at 28 U.S.

6  C. 1605(A)(a)(2)(A)(i), and then I, and big 2 I.  I'm sorry.

7  That's --

8          THE COURT:  Unfortunately, did not bring my code book

9  on the bench.  Is this -- let's see.  Is the precise language

10  set forth in your papers?

11          MR. BUSCEMI:  We've quoted bits and pieces at the top

12  of page 15 of our papers.

13          THE COURT:  All right.  Ah, okay.  Thank you.  Okay.

14  So I have 1605(a)(1).  Keep going.

15          MR. BUSCEMI:  Little a, little 2, where it says,

16  "Claim Heard."  Caption:  Claim Heard.

17          THE COURT:  Right.  Mm-hm.

18          MR. BUSCEMI:  And then it -- and then it says big A,

19  little i, capital I.

20          THE COURT:  Mm-hm.

21          MR. BUSCEMI:  And it says,

22          The Court shall hear a claim under this

23          section if the foreign state was designated

24          as a state sponsor of terrorism at the time

25          the Act described in paragraph one occurred

```
 1                    or was so designated as a result of such

 2                    act, and subject to subclause two; either

 3                    remains so designated when the claim is

 4                    filed under this section, or was so

 5                    designated within the six-month period

 6                    before the claim is filed under this

 7                    section.
```

 8          **THE COURT:**  Mm-hm.

 9          **MR. BUSCEMI:**  So before we get to Roman numeral two,

10   we're still in Roman numeral one.  That applies to claims filed

11   under this section.  This claim could not have been filed under

12   this section, so Roman numeral one cannot help the plaintiffs.

13          **THE COURT:**  Why do you say it couldn't?  Well, let's

14   find out.

15          Mr. Cook, how do you read that section?

16          **MR. COOK:**  The -- this goes back to a little trip

17   through history here.

18          *Flatow* -- F-l-a-t-o-w -- amendment was enacted.  The

19   primary court hearing the Iranian cases was the District Court

20   for the District of Columbia.  And the belief was that *Flatow*,

21   and then other amendments, created a federal cause of action in

22   favor of the victim; you know, of a plaintiff, so to speak.

23          And there are many a number of judgments, you know,

24   provided.  One of them was a case which ultimately went up

25   called *Cicippio* -- we call it "*Cicippio-Puleo*," C-i-c-i-p-p-i-o

1  P-u-l-e-o, *"versus Islamic Republic of Iran*," cited 353 F. 3d.

2  1024 -- 1024.  D.C. Circuit, 2004.  And the Court said, you

3  know, *Flatow* dealt with the abolition of immunity for

4  certain -- pardon me -- certain types of conduct; but it didn't

5  create a federal cause of action.  A victim had a state cause

6  of action, whatever that might or might not be, but not a

7  federal cause of action.

8            The section cited by nonparty CMA CGM deals with

9  claims.  And we call these the pre-*Cicippio*, pre-*Puleo* phantom

10  claims.  Now, "phantom" is not to denigrate system or anybody

11  around here; but claims that they thought existed.

12           So the -- again, lack of better expression -- in

13  reading 1605 capital A, little a, 2 A, little i, capital I,

14  capital I, the court is talking about claims.  And the reading

15  of the statute -- it says that if, in reading through the --

16  the -- one of the requirements is a claim that doesn't exist.

17  In other words, a creditor or a plaintiff who thought they had

18  a claim, but was prejudiced by *Cicippio*, has the right to

19  refile the lawsuit; literally serve Iran and say, "I now have

20  this nice, new federal cause of action.  That's what I have."

21           Now Iran can say, because it deals with claims, not

22  judgments.  And so a creditor could walk in or Iran can say,

23  "Well, gee.  Now that we know there's a claim against us, we're

24  going to appear."  That's what it says:  claims.

25           **THE COURT:**  So you're saying that the way you read

1  this statute, it has nothing to do with lawsuits?

2       **MR. COOK:**  Well, we have a -- we're sitting on a

3  judgment here.  And the -- and we take issue with the fact that

4  CMA is appearing here, which is another issue we're raising in

5  the reply; but in their analysis under 1605(A) little A -- and

6  the rest, you know, zipping through the rest, we're not bound

7  by that.

8       We're -- we -- we're not claiming, nor are they

9  saying, because they have not developed the record here --

10  they're not saying that the claims I have, you know, in the --

11  you know, the claims represented by the 2001 lawsuit -- you

12  know, Marines' barracks bombing -- nobody there is claiming

13  under any set of of facts that those are *Cicippio-Puleo* phantom

14  federal claims that don't exist.

15       In fact, Judge Lamberth -- Judge Lamberth, when he

16  adjudicated in September, knocked out some of the Pennsylvania

17  claims and the Louisiana claims -- those types of claims --

18  because those states did not have an independent state cause of

19  action.

20       **THE COURT:**  If I understand correctly, what you're

21  saying -- you don't see Section 1605(a) -- you think that A 11

22  applies to you, because you have a judgment against Iran, and

23  Iran has been named as a state that encourages terrorism, or

24  whatever the -- you don't think that A 2 applies to this,

25  because we're not in the process of hearing a claim under A 2,

1  and, of course, A 2 goes on and on and on.

2          **MR. COOK:**  Yes.

3          **THE COURT:**  All we're simply doing is we're trying to

4  execute a judgment which you think is subject to A 1?

5          **MR. COOK:**  That's exactly what Senator

6  Frank Lautenberg said on the floor.  And he was a sponsor of

7  this bill.  And we provided the Court with the floor statement,

8  because the Court, in interpreting the statute, can read the

9  floor -- you know, your Honor can read the floor statement.

10         **THE COURT:**  So --

11         **MR. COOK:**  And I'll, of course, let Counsel continue,

12  but we take great issue that he's here, or any of these folks

13  are here.

14         **THE COURT:**  So that's basically, I guess, you know,

15  sort of the distinction.

16         Mr. Buscemi, I'll sort of turn it back to you.

17         If you're basically correct in what you're telling

18  me, it is that the Congress did not intend to waive Iran's

19  sovereign immunity or make it more possible to collect all --

20  whatever judgments already exist against it.

21         In other words, it would have to only work sort of

22  prospectively, to claims, so to speak, that are filed in the

23  future.  Do you have any support for that concept?

24         **MR. BUSCEMI:**  Yes, your Honor.  There were two -- let

25  me try to give our argument in its logical sequence.

1          THE COURT:  All right.

2          MR. BUSCEMI:  And I'm focusing -- as I say, I'm

3   focusing on 1605 big A, capital A, for the moment, so that they

4   can deal with this issue, but I want to go back to 1610 little

5   a, which is specifically referred to in 1605 big A G 1.

6          THE COURT:  Let me see if I have 1610 in front of me.

7   I don't think I do.  Could we have 1610?

8          MR. BUSCEMI:  Since you have 1605 big A.  Right

9   there.  Let me finish.

10          THE COURT:  I now have 1610.  So if you want to go in

11   order, go in order.  The order is your order.

12          MR. BUSCEMI:  Let me finish with where we are at

13   1605(A).  I tried listen carefully to what Mr. Cook just said,

14   but I come back to the plain language of the statute, which

15   refers to only two kinds of cases; cases that were filed under

16   this section.

17          THE COURT:  Now you're now under 1610, or 1605(A)?

18          MR. BUSCEMI:  I'm still on 1605 big A --

19          THE COURT:  All right.

20          MR. BUSCEMI:  -- little a 2 A -- 2 capital A little i

21   Roman Numeral I.

22          THE COURT:  Right.

23          MR. BUSCEMI:  That deals with actions filed under

24   this section.

25          THE COURT:  It doesn't say "actions."  It says, "a

1    claim under this section."

2         I suppose one argument we could talk about is what "a

3    claim under this section" means, but go ahead.

4         **MR. BUSCEMI:**  Okay.  That's fine.  That's fine.  I'm

5    going to refer your Honor on that point to the District Court's

6    decision in the District of Columbia, in the *Holland against*

7    *Iran* case, 545 F. Supp. 2d. 120.  And we've cited that at page

8    15 of our memorandum.

9         Now, if you're not covered by Roman Numeral I, you

10   could go -- you could try to go to Roman Numeral II.  Roman

11   Numeral II says -- and it does use the word "action."  I don't

12   think this distinction between "claim" and "action" is going to

13   stand up, but it does use the word "action."

14        It says, "In the case of an action that is refiled

15   under this section by reason of Section 1083(c)(2)(A) of the

16   National Defense Authorization Act for fiscal year 2008, or as

17   filed under this section by reason of Section 1083 (c)(3) of

18   that Act."  Nobody's claiming that that was invoked here or

19   could have been.

20        The foreign state was designated as a state sponsor

21   of terrorism when the original action or the related action

22   under 1605(a)(7) was filed.

23        Now, there was no effort to refile in this case under

24   Section 1083 of the National Defense Authorization Act of 2008,

25   nor could there have been.

1  **THE COURT:** And what needs to be refiled, in your

2  view? Could you start all over again?

3  **MR. BUSCEMI:** No, no. You just need -- as I

4  understand the way the statute works, if you fulfill the

5  statutory requirements --

6  **THE COURT:** Mm-hm.

7  **MR. BUSCEMI:** -- you can designate an existing action

8  as an action that is refiled under this provision, so you can

9  have the benefits of this provision. So if you have a pending

10 action -- that was the very issue before the Court in the

11 *Holland* case. We've discussed this at page 15. You have our

12 memo.

13  Section 1083 talks about actions that are pending

14 before the Court to be deemed refiled under Section 1605(A), so

15 that they can have the benefit of that new statute in

16 January 2008, if they are pending before the Court and are

17 refiled within 60 days of the enactment of the statute. So in

18 that window, from January 2008 to March of 2008, if you wanted

19 to get the benefit, if you had an action pending before the

20 Court, you could have it refiled within that time.

21  But here, the judgment was already entered. It was a

22 September 2007 judgment. It had been entered four months

23 before the enactment of this statute. The action was no longer

24 pending before the Court, so Roman Numeral II was never

25 triggered. That's why -- that's why we've cited the *Holland*

1    case.  That was a case in which the judgment had been entered

2    in February 2006.  There was a judgment against Iran entered in

3    February 2006.  They tried to rely on 1605(A).  And the

4    District Court there said, "No, that's not pending before the

5    court.  Section 1083 of the National Defense Authorization Act

6    is not triggered.  You cannot deem it to be refiled under

7    1605(A)."

8            Okay.  So that's the argument that 1605(A) just

9    doesn't help the plaintiffs here at all.  Period.

10            But let's, for the sake of further argument, say that

11   they are covered by 1605(A).  What does 1605(A) itself have to

12   say about property disposition, which is the subtitle of

13   subsection G?

14            So we're now in 1605(A), Subsection G, property

15   disposition.

16            And it says, under sub one, in general, in every

17   action filed in the United States District Court in which

18   jurisdiction is alleged under this section, the filing of a

19   notice of pending action pursuant to this section to which is

20   attached a copy of the complaint filed in the action shall have

21   the effect of establishing a lien of *lis pendens* upon any real

22   property or tangible personal property that is, capital A,

23   subject to attachment in aid of execution or execution under

24   Section 1610.

25            So the very new provision enacted in January 2008 on

which plaintiffs here seek to rely tells us that the property

that can be attached is the same property that's referred to in

Section 1610(a), which is a general provision applicable across

the board that provides exceptions to foreign state immunity

from attachment or execution.

That brings us back to where we started.  It says the

property in the United States of a foreign state used for a

commercial activity in the United States shall not be immune

from attachment.

So there is no change of that provision.  1610(a) is

not amended at all by 1605(A), except to the extent that a new

sub 7 is added at end of the -- so if you qualify --

If you qualify under 1610(a), and if

you have property located in the

United States of the foreign state, and if

that property is used for a commercial

activity in the United States, then you

must meet one of the -- one or more of the

listing:  1, 2, 3, 4, 5, 6, 7 -- under

1610(a).

And you'll notice that in 7, they say the judgment

relates to the claim -- to a claim for which the foreign state

is not immune under Section 1605(A), regardless of the

property; whether the property is or was involved with the act

upon which the claim is based.

1          So the -- that allows someone who can't meet 1, 2, 3,

2     4, 5, or 6 -- and I don't understand the plaintiffs here to be

3     saying that they can -- to say, "Well, we can meet number 7";

4     but it doesn't change the preliminary language of Section

5     1610(a).  You still need property located in the United States.

6     And that property still must be used for a commercial activity

7     in the United States.  And unless you have those two criteria,

8     even if you think you could meet sub 7, you don't even get in

9     the doorway.

10          **THE COURT:**  Right.  This is, I guess, what I'm not

11     sure we're arguing about.  I think I agree with you.  And I

12     thought that that was the way I had drafted my proposed order.

13          **MR. BUSCEMI:**  Well, your Honor --

14          **THE COURT:**  Because it was limited to property that

15     existed in the United States that arose out of the commercial

16     activities.  What are we quibbling over?  The use -- let's see,

17     I think --

18          **MR. BUSCEMI:**  We're quibbling over the fact of --

19          **THE COURT:**  I said that it arises out of a bunch of

20     things.  And you're saying what it has to be used for --

21          **MR. BUSCEMI:**  Your report and recommendation.  This

22     is where we started when I was going through your four

23     restrictions.  Your second restriction says the right to

24     payment must arise out of Iran's commercial activities.

25          **THE COURT:**  Right.

```
 1          MR. BUSCEMI:  And you have "without limitation."

 2    That is not the way the language reads.  It must be property

 3    that's used for a commercial activity in the United States.

 4          THE COURT:  But how could a right to payment not --

 5    which arises out of commercial activities not -- isn't that

 6    almost self-defining?

 7          MR. BUSCEMI:  Well, there is no suggestion -- I

 8    haven't heard a word in all of the papers that the plaintiff

 9    has filed that any alleged debt owed by our client to the

10    Government of Iran was used for commercial activity in the

11    United States.

12          THE COURT:  There may not be any.  I mean, this is,

13    again, part of -- I come back to what I said.  I had assumed

14    that the reason that you're -- The French Line went first was

15    because Mr. Cook had listened to what I had said last time, and

16    had chosen an obligor that it seemed fruitful to pursue.

17          So I was surprised when I got Mr. Schmidt's

18    declaration.  Now, Mr. -- I heard Mr. Cook's response, saying

19    he doesn't know exactly what that means.  And I suppose this

20    may be one of those usual situations where there has to be some

21    discovery taken.

22          Again, we're getting very much into a -- you know,

23    where does the cart begin?  Does it begin with the horse?  Does

24    it begin with the person leading the horse?  Does it begin with

25    the call to the stable to get the horse saddled to the cart?
```

```
 1   I've got to start somewhere.

 2            MR. BUSCEMI:  Your Honor --

 3            THE COURT:  The way I understand, you're -- let's put

 4   aside 1605.  The way I understand, you're saying that unless

 5   and until the plaintiff can identify the specific piece of

 6   property that he wants assigned, I don't even have jurisdiction

 7   to proceed.

 8            MR. BUSCEMI:  That's right.  That's right,

 9   your Honor.

10            THE COURT:  Because -- and I just -- I understand

11   what you're saying --

12            MR. BUSCEMI:  And that's true.

13            THE COURT:  -- but that would, in effect, mean that

14   the -- the California procedures are nugatory, because I don't

15   have jurisdiction to proceed.  I don't even have jurisdiction

16   to permit discovery.  And if I don't have jurisdiction to

17   permit discovery, as I say, we can't even call the stable to

18   saddle the cart to the horse.

19            MR. BUSCEMI:  Well, your Honor, I don't think that

20   that's --

21            THE COURT:  And I think that's going to require -- I

22   mean, you may be right.  Obviously, there isn't a lot of law on

23   exactly what this state statute means --

24            MR. BUSCEMI:  Well --

25            THE COURT:  -- and how Rule 69, you know, applies,
```

1  but I think that's probably going to require, if not

2  Judge White, then the Ninth Circuit, I think, to sort out.

3          It seems to me that I've sort of got to start

4  somewhere.  And I have tried to craft my order to be consistent

5  with 1610, and the cases that I understand that construe 1610

6  to have limited to commercial activities.

7          Now, as I say, it may turn out there is no such

8  property, and Mr. Cook will have wasted a lot of his time and a

9  lot of your client's time pursuing it.  And that part, as I

10  say, does trouble me.  That's why I've tried to stagger the 30

11  or 40 motions that have been filed in this case to sort one of

12  them out; but I think in that respect, unless there's a

13  particular -- you know, unless we're getting into wordsmithing,

14  I am not prepared to accept your argument that until he

15  identifies a specific piece of property more specifically than

16  he has, that I don't have jurisdiction to proceed under Rule 69

17  and Section 780.510 of the California Code of Civil Procedure.

18          **MR. BUSCEMI:**  Your Honor, let me say that, first of

19  all, we're here, quote, "going first," at least as far as our

20  client --

21          And, by the way, our client's name, for the record,

22  is "CMA CGM."  It is not "The French Line."  It's not "CMA CGM

23  S.A." both of which have been alleged by plaintiffs; both of

24  which Mr. Schmidt has expressly denied.  There is no such

25  entity as CMA CGM, S.A.  And there is no --

1           THE COURT:  I'm not making any findings in any other

2   fashion.

3           MR. BUSCEMI:  Okay.  That's fine.

4           THE COURT:  I think what I said in here is that this

5   is what the plaintiff says -- the plaintiffs say they are known

6   as.  They are identified as CMA CGM, The French Line.

7           If you object to my using the term "French Line," I

8   will gladly amend the order to simply refer to CMA CGM.  I

9   don't know.  Mr. Cook, do you have any objection?

10          MR. COOK:  No.

11          THE COURT:  You haven't been told exactly who they

12  are.

13          MR. COOK:  No, sir.

14          THE COURT:  All right.

15          MR. BUSCEMI:  Your Honor, a preliminary second point

16  that I would like to make is that we're here -- at least, as

17  far as we know, we're here proceeding first because we were

18  invited to do so by the Court's briefing order.  There is

19  nothing --

20          THE COURT:  No.  You're proceeding first because you

21  were the first motion that was filed.

22          MR. BUSCEMI:  That may be the reason for the Court's

23  briefing order.

24          THE COURT:  And I assume, as again, that's consistent

25  with what I have told Mr. Cook at the last hearing or one of

1   the last hearings -- that, you know, yours was one of the more

2   concrete cases.  So, as I said earlier, I was struck by the

3   fact that, you know, perhaps Mr. Cook has struck out.

4           **MR. BUSCEMI:**  No.  There's nothing concrete about

5   this case at all.  This is a totally abstract assignment.  It's

6   an assignment that should not be ordered in this context.

7           We know that Iran isn't here.  They can't speak for

8   themselves.

9           We've been invited to submit a memorandum.  That's

10  why we submitted it.  The Court invited us to do it.

11          Now we get criticized by the plaintiff for having the

12  temerity to follow the Court's order.

13          **THE COURT:**  I'm not paying any attention to that.

14  And I've tried to take your objections.  I've paid attention to

15  them.  And that's why I issued my limiting order.  I thought

16  that I had dealt with most of your objections.

17          It seemed to me that the sovereign-immunity

18  objections would probably be better raised by Iran, and

19  possibly at the next hearing, because I understand that Iran

20  has strategically appeared from time to time in these

21  proceedings.

22          **MR. COOK:**  The answer to that, your Honor, is Iran is

23  vigorously opposing -- the *Rubin* plaintiffs' efforts to seize

24  the cuneiform tablets in the Northern District matter before

25  Judge Manning, and vigorously -- is vigorously -- in fact,

1   there's vigorous post-judgment discovery going on.

2            There has been in -- they have appeared in the

3   District of Columbia, I believe, in the *McKesson* action, if my

4   memory serves me.  They have not appeared -- they have not

5   appeared at the trial court in any of my actions.  And we're --

6   they might have appeared -- I think they have appeared in the

7   Seventh Circuit in one of the appeals in my cases before

8   Judge Manning.

9            I have a lot of matters, so -- but at a trial level,

10  the answer is no.

11           **THE COURT:**  So I don't know whether Iran will appear;

12  whether it will sign the assignment; if there will be a

13  show-cause hearing thereafter, whether they will appear at

14  that.

15           By the way, if we -- if we wind up getting to that

16  point -- I don't want to get distracted by -- I have a few

17  things I wanted to talk about.  One of the things that I'm

18  going to expect plaintiffs to pay particular attention to is

19  whether there's been adequate service on whoever it is that

20  will be the subject of the show-cause hearing, but it seemed to

21  me that, you know, I mean, I agree with you that I need

22  jurisdiction.

23           It seemed to me for the purposes of these

24  proceedings, I thought I had jurisdiction.  And I think that if

25  I accept your reading of the statutes and how they fit

1   together, there would never be a collection proceeding, almost;

2   you know, unless somehow, the plaintiff knew of precisely what

3   it was they wanted to attach, and it was evident from the

4   outside that it, you know, met all the requirements you've met.

5   And again, I'm just not sure that the state law is that

6   restrictive.  And I don't know that I'm prepared to find that

7   the federal law is as much of an obstacle as you think it is.

8        **MR. BUSCEMI:**  Your Honor, let me just make a couple

9   of additional points.

10       **THE COURT:**  But I do not want you to think that I've

11  ignored your arguments.  I thought I was responding to a number

12  of them.

13       **MR. BUSCEMI:**  As I said at the beginning, we

14  appreciate the limitations.  I think that the limitations are

15  helpful.  And I think that, as a consequence of the

16  limitations, the real-world impact of the assignment that

17  your Honor has tentatively issued would be merely the extension

18  of these proceedings, some measure of activity by the

19  plaintiffs which may require some greater expense and effort on

20  our part; but I think at the end of the day, there won't be

21  anything there.

22       I want to say a couple of additional points, though,

23  because first of all, if we put aside the jurisdictional point,

24  and we say for the sake of argument that the plaintiff can come

25  in and -- essentially what your Honor is saying, I think, is

that if you want to seek relief under -- in the form of an

attachment invoking this California state statute, and I want

to find jurisdiction under the Foreign Sovereign Immunities

Act, because that's the -- everybody agrees that's the

exclusive source of jurisdiction.  You don't get jurisdiction

over the foreign state any other way.  So if you want to do

that, all you have to do is come to court and say, "We think

there may be something here.  We're -- we've established

jurisdiction.  There may be, because we can't identify

anything, but there might be."

**THE COURT:**  I think it's a little more than that.

I mean, I suppose you haven't denied that -- that you

do business with Iran.

I think your claim is that the business you do moves

in and out of Marseilles, and therefore, there may not be any

property that is in the United States that's reachable.

I don't think that the plaintiffs are simply pulling

out any, you know, sort of red herring that they can.  One of

the difficulties they have with this case is that, you know,

the collection-action statutes are meant to deal with fairly

straightforward types of collection situations.

For example, if you look at an example of the rights

enumerated under the California statute that are typically

assigned, you know, like wages and things like that, well,

this, folks -- this is not your typical case.  And Iran is not

1  your typical judgment debtor.

2          And so I'm trying to figure out my way through this

3  with those kinds of concepts in mind.

4          **MR. BUSCEMI:**  I don't disagree that this is not a

5  typical case, and that Iran is not a typical judgment debtor.

6  I think that's exactly right, but I do think that the case law

7  that deals with the California statute -- and, as I say,

8  putting -- you know, I think what -- Mr. Cook's comments were

9  very telling.  He said -- and I wrote them down.  He said that

10  CMA CGM has, quote, "some presence here."  Those were his exact

11  words; and, quote, "some connection with Iran."

12          So those are his jurisdictional allegations:  that

13  our client has some presence here, and they have some

14  connection with Iran.

15          Now that, in our view, isn't adequate; but let's say

16  it is.  Let's say it is, and that the Court has jurisdiction.

17  Then we go to the California statute.  And the California

18  statute, as it's been interpreted by the courts, talks about a

19  specific item that has to be assigned.  So even under -- the

20  California statute contemplates specificity in identifying what

21  the property is.

22          So even if we pass the jurisdictional hurdle, we're

23  still -- we still have a problem.  And similarly now,

24  your Honor, again, your Honor has -- I want to be quick to

25  acknowledge that your Honor has said -- subject to whatever's

1  happening before Judge White, as your Honor said a moment ago,

2  your Honor has said that the only assignment here would be by

3  Iran.

4          Now, if you look at the papers that the plaintiff has

5  filed, the plaintiff has not even claimed that our client has

6  ever done anything with Iran.  They say that they've had some

7  dealings with the ports and shipping organization, and the

8  National Iranian Oil Products Distribution Company.

9          Now, Iran is not the ports and shipping organization.

10 It's not the National Iranian Oil Products Distribution

11 Company.  There's no showing here that's been made that these

12 are alter egos.

13         And we have case law.  The very case that Mr. Cook

14 mentioned a moment ago, the *Flatow* case, talks about a

15 presumption of independent status, which hasn't been overcome.

16         The Supreme Court's decision 25 years ago in the

17 *First National City Bank against Bancec* case established the

18 criteria that must be met in order to treat a foreign state and

19 some connected entity as one and the same.  Those requirements

20 haven't been satisfied here, either.

21         So we appreciate very much the opportunity to be

22 heard.  And we would urge the Court to think about this again

23 in light of what has been said here not only by me, but

24 especially by Mr. Cook, because we can tell that we're going to

25 be dealing with this at length, with lots and lots of requests,

1    and coming back before this Court.

2            And, at the end of the day, we have an uncontroverted

3    statement in the record from Mr. Schmidt that there is no

4    payment made in the United States; no payment owed in the

5    United States.  It just doesn't exist.

6            **THE COURT:**  I think I need to hear from Mr. Cook.

7            **MR. COOK:**  Thank you.

8            **THE COURT:**  I think this is a good place to start --

9            **MR. BUSCEMI:**  Thank you, your Honor.

10           **MR. COOK:**  Thank you.

11           **THE COURT:**  -- which is:  why am I doing this?

12           You know, there is an old -- I'm really not sitting

13   as a court of equity, but there is an old adage that says that

14   equity does not order an idle act.

15           And I guess I'm especially troubled by the notion

16   that we're, I think, lining up a potential contempt proceeding

17   against a foreign sovereign for what everyone assures me is an

18   idle act.  And I haven't heard you dispute that.

19           **MR. COOK:**  Well --

20           **THE COURT:**  And I realize that there is a little bit

21   of, you know, cart and horse; but wouldn't it be more prudent

22   for the plaintiff to find out whether Mr. Schmidt is not

23   telling the truth, before we spend a lot of time pursuing this?

24           **MR. COOK:**  Let me deal with that issue head on.

25           Until -- an assignment order, in and of itself, has

```
 1  the effect of -- and we have hit this already, but just bear
 2  with me for a second -- has the effect of substituting out the
 3  judgment debtor for the judgment creditor.  It's just a -- it's
 4  just a two-person battle here.
 5          And the Kracht case CMA CGM has not resolved is
 6  really dispositive.  It says the only task before your Honor
 7  is:  can I eject the debtor, and replace the creditor?
 8          And --
 9          THE COURT:  I don't read the Kracht case quite as
10  broadly as I think you do.
11          I think the Kracht case says that if you don't serve
12  the obligor, in effect, you haven't cut off, you know, any
13  rights to object.
14          I don't think it says that you can't sever the
15  obligor, or that it's not necessary.
16          MR. COOK:  That's correct.
17          THE COURT:  I guess you might argue it's not
18  necessary.  It's not mandatory to serve him.  You can say a lot
19  of things about Kracht, but I don't think Kracht goes so far as
20  to say that a court's supposed to stick its head in the sand
21  when it starts issuing these orders, and just foment future
22  litigation, especially if it doesn't have the sense that it's
23  doing anything of any purpose.
24          And this is a sensitive situation.  This is a little
25  more sensitive than trying to figure out whether a lawyer is
```

1  going to be subjected to a debt-collection proceeding; if an

2  Oregon lawyer's going to be subjected to a debt-collection

3  proceeding in California.

4  　　　　　**MR. COOK:**  I certainly appreciate that.  I

5  respectfully disagree with the Court's analysis in *Kracht*,

6  because *Kracht* obviously -- the -- the facts are undisputed.

7  The underlying account was not assignable at all under

8  California law.  And everybody started to raise heck.

9  　　　　　And the Court, in footnote -- in the first footnote

10 said, yeah, but the fact it is or isn't assignable is a

11 battleground faced by the judgment creditor when they seek to

12 pursue --

13 　　　　　**THE COURT:**  And the Court immediately ruled it was

14 not assignable.

15 　　　　　**MR. COOK:**  Absolutely.  It was -- it was -- yes, it

16 was -- it ruled it was not assignable.

17 　　　　　**THE COURT:**  What is the point?  I mean, I don't --

18 obviously, that case came up in a slightly different posture

19 than this one did; but what is the point of my saying, "Okay.

20 The judgment -- the obligor says there are no obligations

21 subject to this assignment order, but nonetheless, I'm going to

22 launch a thousand ships just because Mr. Cook feels like

23 launching a thousand ships today.  In fact, he wants me to

24 launch them 30 or 40 times."

25 　　　　　**MR. COOK:**  Let's talk a little bit about due process

1   and fairness here.  I filed my motion.  And I have a nonparty

2   who appears and makes lots and lots of claims.

3           Now I'm sitting here.  I don't have in this immediate

4   context here -- I don't have the power of discovery.

5           **THE COURT:**  Why not?

6           **MR. COOK:**  Well, I could --

7           **THE COURT:**  I had always assumed that you could take

8   discovery from -- some discovery from a nonparty.

9           **MR. COOK:**  I have clearly the power of discovery here

10  in the context of 69(a)(1), which is the independent power of

11  discovery under the federal rules.

12          **THE COURT:**  Well, let's first find out.  Let me hear

13  what you know the obligor says.  Does the obligor believe --

14  you may have answered this earlier.  Does the obligor believe

15  that it's subject to discovery, or is this going to get us back

16  to your point that since I don't have jurisdiction -- under

17  your theory of the case, if I have no jurisdiction to issue an

18  order of assignment, I have no jurisdiction to issue a

19  discovery order?  How do you read the law?

20          **MR. BUSCEMI:**  Yes, your Honor.  I think we would say

21  that the Court's jurisdiction has not been properly invoked.

22  We read Rule 69 to talk about discovery -- Federal Rule of

23  Civil Procedure 69 to talk about discovery in aid of execution

24  in the context of a matter that's properly before the Court.

25          And, of course, there are provisions in the Foreign

1  Sovereign Immunities Act that limit discovery.  And we would

2  urge that if there were any discovery, further to what I said a

3  moment ago, it not be a complete fishing expedition, which I

4  think is what Mr. Cook has in mind.

5          Unless there is showing that there is property in the

6  United States and that it's used for commercial activities in

7  the United States, the door to the federal courtroom hasn't

8  been opened.

9          **MR. COOK:**  Your Honor --

10         **THE COURT:**  Do I have any such showing in front of

11 me?  Because, as Mr. Buscemi -- excuse me -- points out --

12         I'm sorry if I lose my voice a little bit today.  I'm

13 at the way back end of a case of the flu.  You've got me

14 talking too much.  It's coming back.

15         **MR. COOK:**  That's all right.

16         **THE COURT:**  I come back to the point you made, that

17 much of your showing with respect to his client involves

18 entities which I am not prepared to recognize as being agents

19 of the Government of Iran for purposes of strictly allowing you

20 to proceed against them.  And that seems to be an issue that

21 Judge White has not yet issued a further ruling on.

22         So the question, I guess, really is:  what showing do

23 I have in front of me that there are any dealings between Iran,

24 the judgment debtor, and this particular nonparty, the CMA CGM,

25 that would suggest that there's anything there?

1           **MR. COOK:**   Your Honor, I -- the -- talking -- this is

2     a classic case of the cart and the horse.   And to compel a

3     judgment creditor to -- and what I'm hearing -- to

4     prelitigate -- prelitigate the showing of the existence of

5     these rights as demanded by the obligor, not the debtor --

6     demanded by the obligor -- places a judgment creditor in a

7     position of a mandatory multi-step process of litigating to the

8     satisfaction of the trier of the facts that such a right

9     exists.

10          And then the Court is saying, "Okay.   You've proven

11    that such a right exists.   I find that as a factual matter, and

12    therefore, I'm going to assign it to you."

13          708.510, first off, doesn't require the

14    prelitigation, the depositions, or the motion practice.

15    There's nothing in the context of 708.510.

16          And, worse, what that does is it -- it contravenes

17    708.510(b), which specifically excludes the obligor from this

18    process.

19          The California Legislature did not anticipate --

20          Bear with me.

21          **THE COURT:**   I don't think the California Legislature

22    anticipated that the Government of Iran would be a judgment

23    debtor, and we would have -- we'd be proceeding by way of

24    default on a judgment entered across country with developing or

25    expanding foreign sovereign immunity --

1          **MR. COOK:**  Well, I certainly appreciate the law in

2    question here was enacted effective July 1, 1983.  The Foreign

3    Sovereignty Immunities Act, in its many incarnations, was 1976,

4    and codified the existing federal common law.

5          I mean, so, you know, certainly that -- this is a

6    little bit off the beaten path; but still, understanding that I

7    have for my benefit or otherwise 708.510, I should not be bound

8    with what amounts to a trial.

9          And I'm listening very carefully and reading very

10   carefully here the opposition in Footnote Number 1, where the

11   following, to the extent --

12          **THE COURT:**  Where are you reading from?  Your

13   position memorandum?

14          **MR. COOK:**  Page 1, sir.

15          **THE COURT:**  Mm-hm.

16          **MR. COOK:**  Okay.

17          And -- which says, for the record,

18               To the extent relief is sought from

19          CMA CGM either now or in the future,

20          CMA CGM does not waive and expressly

21          reserves the right to assert any applicable

22          defense, including lack of personal

23          jurisdiction or improper service.

24          Okay.  I get it.  Well, this is -- that's their

25   prerogative.

1          I would suggest, by the way, that -- and the Court's

2    ruling that if you are to consider their arguments, then you

3    may issue a tentative ruling that CMA CGM has waived all

4    jurisdictional defenses, because this is a de facto

5    intervention under Rule 24(a), and that they're present before

6    the Court.

7          I'm -- I'm -- we argued -- and I haven't heard one

8    justification in Counsel's argument entitling them to have the

9    slightest status of being here.

10         And there is the ability Under 24(a) to intervene.

11   They have not moved to intervene, *ex parte* or otherwise.  And

12   they haven't shown the slightest status.  And their status

13   is -- is paramount, so far --

14         **THE COURT:**  I don't want to go over that again.  You

15   and I just have different view of what 708.510 means.

16         I just simply view it as meaning -- I don't see that

17   it rules out service on the obligor or considering the

18   obligor's argument.  I don't think they have to intervene.

19         Clearly, they're going to be impacted by the ruling.

20   If nothing else, you've already forced them to expend a

21   substantial amount of attorneys' fees in a situation where, as

22   they point out, I don't even have any evidence in front of me

23   right now that I'm not being asked to just do an idle act.

24         **MR. COOK:**  Well, on the other hand --

25         **THE COURT:**  I know you keep telling me you don't have

1    any burden, but I'm just having a hard time accepting that.

2             **MR. COOK:**  Well, the answer is the following.

3    Between Iran and the judgment creditor -- creditors -- I'm

4    sorry -- that Iran, who we did properly serve -- and we papered

5    them to death -- has not opposed this motion.  And Iran is

6    quite capable.  Iran is quite capable here of appearing in a

7    United States court.  They're actively litigating in front of

8    Judge Manning.

9             And Judge Manning's case specifically --

10            **THE COURT:**  Is that the one in --

11            **MR. COOK:**  Northern District.  The cuneiform tablets.

12            And Judge Manning, when faced with a similar setting,

13   where the Rubin family, represented by David Strachman, had

14   levied under local law the cuneiform tablets, both the

15   University of Chicago and the United States were advocating

16   Iran's sovereign immunity.

17            And Judge Manning, at the end, which we cite -- 462

18   F. 3d., whatever, said very clearly, "Neither of you folks have

19   standing."  And she ruled that on June 22nd, 2006.

20            And approximately on July 10th, 2006, Iran appeared.

21   Through both local counsel and D.C. counsel, they appeared.

22            Now, in granting this relief, we're going to serve

23   Iran with an order to show cause.  And we'll see what Iran has

24   to say.

25            Maybe they object.  Maybe they will appear here.

1   It's our battle with Iran, clearly.

2          Now, I do obviously have the power of post-judgment

3   discovery.  And -- but I don't have the power to litigate

4   CMA CGM's claim.  By "litigate," I don't -- there's no

5   California statutory format here which permits me to make fit

6   for -- for consideration --

7          **THE COURT:**  Well, I do tend to agree with the notion

8   that I think that the sovereign-immunity issues would be more

9   readily and better resolved if they were litigated by some

10  combination of Iran and the State Department.

11         **MR. COOK:**  That's correct.

12         **THE COURT:**  I know my clerk has been clearly

13  contacted by the State Department, saying they were going to

14  appear; but they still haven't appeared.  I take that -- I'm

15  not making a legal finding, but they seem to be of the view

16  that it's not yet ripe for them to appear and assert immunity.

17         **MR. COOK:**  And, for the Court's --

18         **THE COURT:**  And that was, in part, why it seemed to

19  me, as I think I said in my order, that that was one of the

20  issues that perhaps is best deferred to a further hearing.

21         **MR. COOK:**  All of this -- all -- first of all, based

22  on the Court's ruling -- tentative ruling -- and the form of

23  order we submitted, which reads -- you know, which -- the

24  Court's ruling tracks with ours -- is we're not -- we're not

25  sitting here today.  If -- if the Court enters a tentative

1    ruling, we're not an assignee.  We have to go through multiple

2    steps, at which time Iran, when faced with whatever redress,

3    will or will not appear.

4          If Iran does not appear, whatever the case, and I

5    obtain the order, then I'm sitting here with an assignment

6    order.  And at that point, sitting here with an assignment

7    order, then we -- then, as a contractual assignee, we move

8    forward or don't move forward.

9          **THE COURT:**  There is, again -- I know this puts some

10   burden on the nonparty, but there is some benefit to finding

11   out whether Iran is going to appear or -- or whether they will

12   simply sign the assignment, or what they'll do.  And so to some

13   degree, I think the nonparties' concerns are partly a function

14   of the way -- I wouldn't call it "haphazard," but somewhat

15   peripatetic way in which the Government of Iran is defending

16   these cases.

17         What do you make about the 1605 argument?  I mean,

18   you know, it's easy to say, "Well, this is sovereign immunity."

19   And this is probably better raised by some combination of the

20   Government of Iran and/or the State Department, but CMA makes a

21   very simple argument.  Just -- unless I get by that hurdle, do

22   I have jurisdiction to do anything?

23         And how do you react to -- I mean, the 1605 argument

24   obviously -- I would like to know exactly what the State

25   Department thinks 1605 means, but I think there may be a

1   problem there.

2          **MR. COOK:**  Yeah.  You know, your Honor, I -- I -- it

3   is briefed, and CMA briefed it.  We have our point of view

4   here.  The answer is this -- the revisions to the Foreign

5   Sovereignty Immunity Act were enacted in response to this

6   particular judgment.  This was an historic judgment here, and

7   brought to culmination events now just about 25 years ago --

8   the anniversary.

9          **THE COURT:**  I guess their answer is that you should

10  have refiled.

11         **MR. COOK:**  Well, we take a different view of that,

12  but that precise issue is not made ripe in the classic federal

13  view of ripeness.  It can only be made ripe as to the

14  enforceability either vis-a-vis Iran responding to an order to

15  show cause, and their response, or assuming that we -- for lack

16  of a better expression, barrel through that, barrel through

17  whatever we do before we seek to enforce this.

18         Ultimately, if I project this to January 1, if you

19  work with me, and I'm sitting with this assignment, what do we

20  do with it?  Ultimately, we need to enforce it.  Yes, I have

21  lots of powers available to me for discovery before I seek to

22  enforce it, but at least we'd make that decision before we do

23  or do not file an action.

24         But when -- when you go through everything else, what

25  CMA as a nonparty seeks to do is really demand a trial.  That's

```
 1   what they want.  And 708.510 doesn't have the provisions of a

 2   trial.  It could have been the levy provisions, by the way, in

 3   a levy setting.  This is not a levy.

 4          There's enormous confusion here by CMA between

 5   assignment and a levy.  They think this is a levy.  This is not

 6   a levy.  If this was a levy, when I served them with a writ of

 7   execution notice of levy through the United States Marshal, we

 8   would go to trial.  Those issue would be ripe, because the

 9   Court would have general plenary jurisdiction over the

10   garnishee, and then the Court would make a ruling on that

11   proceeding as a creditor suit.

12          This is not creditor suit.  And this was exactly the

13   issue which was raised in before Judge Feess when we had

14   Repsol.  And ultimately, Judge Feess says you're not here.  You

15   need to intervene, you know.  What are you guise doing here?

16          But thank you, your Honor.

17          THE COURT:  Let me ask you this question.

18          I've got to think more about these issues.  And I

19   want to reread one or two of the cases, now that I better

20   understand how this all fits together.

21          What do you propose?  I forget what the current

22   situation is now.  I think I have another round of hearings

23   coming up in about maybe a month.

24          MR. COOK:  November.

25          THE COURT:  And I'm mindful of that.  I wonder
```

1  whether I shouldn't just simply stay all the rest of the

2  proceedings to allow this one to carry its course, so we can

3  find out what, if anything, Iran will do.

4       **MR. COOK:**  I have no problem with that.

5       And -- and --

6       **THE COURT:**  Or somebody may want to go to

7  Judge White, too, or he may rule on this underlying matter.

8       It just seems to me that there are -- I'm really

9  mindful of the fact -- I have a feeling that some of the folks

10 sitting in the back are not interns from other chambers, and

11 they actually have an interest in some of these proceedings.

12 In fact, I think I may recognize one or two of them from one of

13 the prior hearings.

14      **MR. COOK:**  Yes.

15      **THE COURT:**  And I am mind of the fact that, again, as

16 I say, you have not only launched a thousand ships, but you

17 want to relaunch them -- I happen to be reading The Iliad

18 again, so these things come to mind -- 30 or 40 times.

19      **MR. COOK:**  I have no problem, and I would certainly

20 concur that the CMA CGM has.  And we disagree with lots of

21 issues.  It has brought before the Court some of these issues.

22 We reserve the right vis-a-vis they don't have any standing,

23 but to the extent that other shipping companies are similarly

24 situated to defer their briefing until --

25      **THE COURT:**  All right.

1          **MR. COOK:**  -- whatever it would be, 60 days or 90

2    days, until January or February, I --

3          **THE COURT:**  Well, I will keep that in mind.  Let me

4    take this matter under submission.  I want to thank you all for

5    a very interesting argument and some interesting briefing.  And

6    I need to think through some of the points that have been made

7    today.  All right.  I'll take this matter under submission.

8          **MR. BUSCEMI:**  Your Honor, I think someone wants to be

9    heard, I think, in response to your last comment.  If I could

10   just --

11         **THE COURT:**  Judge Breyer's intern back there.  I'm

12   trying to --

13         **MR. BUSCEMI:**  If I could just make one comment.  I

14   know that because of the correspondence that's already been

15   sent to your Honor, there are some of the shipping lines who

16   have the feeling that, you know, we're going first because this

17   motion was the first one that was filed; but they wanted to

18   be -- to be before your Honor so that they could state their

19   position in case I don't do it adequately or they do it better.

20   So that may be one thing that your Honor would like to take

21   into account before you enter a stay of the kind that you

22   suggested.

23         I -- and if your Honor would grant me one more

24   moment, I did find while Mr. --

25         **THE COURT:**  Look.  Before I grant you the moment, who

1  is the gentleman who wished to be heard?

2          **MR. HALL:**  Thank you, your Honor.  Paul Hall, of

3  Nixon Peabody, LLP.

4          We represent Compania Sud Americana De Vapores,

5  Hanjin Shipping Company, and Mitsui O.S.K. Lines.

6          **THE COURT:**  All right.  You filed some papers which

7  I've just glanced at, but as I say, you're not on for hearing,

8  I think, until November 26th and November 19th.  No.  It is

9  November 26.  And then, as I say, I'm not sure what I'll do

10  with it.  Did you want to be heard this morning?

11          **MR. HALL:**  Just very briefly, your Honor.

12          **THE COURT:**  All right.  Well, let me hear out counsel

13  for CMG -- CMA CGA [sic], and then I'll give you a minute.

14          Go ahead, Mr. Buscemi.

15          **MR. BUSCEMI:**  I don't think I'll even take a minute.

16          Mr. Cook was talking about how I don't understand.

17  It's a frequently used expression these days.  People don't

18  understand; that I don't understand what Section 708.510 is all

19  about, but let me read to you from Judge Davies down in the

20  Central District of California.  In the *Questor* case, he says,

21                Apart from potential difficulties

22                relating to sovereign immunity, apart from

23                those difficulties, *Questor* has failed to

24                show that any tangible asset is in the

25                United States.

1            The abstract right to payment in the absence of

2    conjunction with some physical or at least specific asset

3    located within the boundaries of the United States upon which

4    that right might be exercised is insufficient standing alone to

5    be amenable to assignment under California Civil Procedure

6    Section 708.510.

7            It is this Court's impression, based on independent

8    scrutiny of Section 708.510, that the general power to withdraw

9    money from one's bank as a generic right to payment is not the

10   sort of right contemplated by 708.510, and thus, amenable to

11   assignment pursuant to statute.  Though the list presented in

12   the statute is merely illustrative, the items listed -- wages,

13   rents, commissions, royalties, payments due from a patent or

14   copyright, an insurance policy, loan value -- are in a crucial

15   respect sums, certain predictable amounts owed to the debtor by

16   a third party capable of specific and relatively precise

17   determination.  Such income constitutes a concrete amount in

18   the hand of a third-party debtor.

19           It is not this (indicating).

20           **THE COURT:**  I don't disagree with that, but I think

21   that a -- funds owing by The French Line arising out of the use

22   of a harbor, dock, wharf, drayage, et cetera, can be all those

23   things that you said.

24           Now, plaintiffs may not know precisely, you know,

25   what the amounts are, and so on and so forth; but this is -- in

1    my mind, what I have ordered here is different from simply

2    saying, "Well, you may have a right to withdraw money across

3    the board."

4           So I understand your point.  And again, I -- you

5    know, this is not a case, as I say, which is going to be

6    resolved by -- I don't think you're going to find a case that's

7    directly on point with the kinds of issues we're talking about

8    here, but I -- I am mindful of that issue, but you don't have

9    to.

10          **MR. BUSCEMI:**  Thank you, your Honor.

11          **THE COURT:**  Unless you had something else to say.

12          **MR. COOK:**  No, no.  That was a bank-account case.

13          **THE COURT:**  I don't have banks in front of me yet.  I

14   expect --

15          **MR. COOK:**  That's *sui generis*, anyway.

16          **THE COURT:**  All right.  Mr. Hall, is it?

17          **MR. HALL:**  Yes, your Honor.  Thank you.

18          We have just a very small point to make, which is:

19   in colloquy with counsel, the Court has raised the idea of

20   perhaps staying the actions that are up for hearing in

21   November.

22          We would respectfully request that the Court not stay

23   the November hearing as to our three clients.  And our reason

24   is very simple.  In our papers we have given the Court both a

25   somewhat more detailed legal elaboration, but more

1   importantly -- more importantly, a more detailed factual

2   elaboration.

3          And in this proceeding this morning, the Court has

4   many times appropriately expressed concern that plaintiffs are

5   asking the Court to do an idle act.

6          In our papers, we have given the Court more detailed

7   declarations which we believe will make it crystal clear how

8   the business operates; crystal clear what the answers are to

9   the Court -- to the Court's questions; and crystal clear -- and

10  I don't think Mr. Cook will even make an offer of proof to the

11  contrary.

12         So we would therefore respectfully request that the

13  Court not stay our hearings, and do hear our cases in November.

14         It isn't necessary to replow all the ground.  We

15  think that our factual showing will be directly responsive to

16  the Court's concern about being asked to do an idle act.

17         **THE COURT:**  All right.  I will keep that in mind.

18  I'm going to take this matter under submission.  Thank you all

19  very much again.  We're adjourned.

20         (At 11:33 a.m. the proceedings were adjourned.)

21                        -  -  -  -

22

23

24

25

### CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C.08-80030 JSW(BZ), Deborah D. Peterson v. Islamic Republic of Iran, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Tuesday, October 14, 2008