**EXHIBIT "C"**

1 | **DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ. (State Bar # 62386)**
2 | **COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
3 | 165 Fell Street
San Francisco, CA 94102
4 | Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
5 | Tel: (415) 989-4730
Fax: (415) 989-0491
6 | File No. 52,759

7 | Attorneys for Plaintiffs
DEBORAH D. PETERSON, Personal Representatives
8 | of the Estate of James C. Knipple (Dec.), et al.

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 | SAN FRANCISCO DIVISION

12

13 | DEBORAH D. PETERSON, Personal ) CASE NO. 3:08-mc-80030-JSW (BZ)
Representative of the Estate of James C. )
Knipple (Dec.), et al., ) MEMORANDUM OF POINTS AND
14 | ) AUTHORITIES IN REPLY TO OPPOSITION
Plaintiffs, ) TO NON-PARTY CMA CGM TO
15 | ) PLAINTIFFS' MOTION COMPELLING
vs. ) ASSIGNMENT OF RIGHTS PURSUANT TO
16 | ) C.C.P. § 708.510 AND FRCP 69(a)
ISLAMIC REPUBLIC OF IRAN, et al., )
17 | ) Date: October 8, 2008
Defendants. ) Time: 10:00 a.m.
18 | _____ ) Courtroom: G, 15th Floor
) Magistrate Judge: Bernard Zimmerman
19

20

21

22

23

24

25

26

27

28 | EXHIBIT ___C___

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO OPPOSITION TO NON-PARTY CMA CGM
TO PLAINTIFFS' MOTION COMPELLING ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510 AND
FRCP 69(a) - CASE NO. 3:08-mc-80030-JSW (BZ)

1

# TABLE OF CONTENTS

2
**PAGES:**

3

I.     INTRODUCTION ........................................................ 1

4

II.    COURT MAY GRANT RELIEF BY EJECTING IRAN FROM THE OBLIGATION
5      AND REPLACING IRAN WITH THE JUDGMENT CREDITORS, WITHOUT
       CONTRAVENTION OF THE FOREIGN SOVEREIGNTY IMMUNITIES ACT
6      ("FSIA") ............................................................. 1

7

III.   ANALYSIS OF OPPOSITION OF NON-PARTY CMA CGM  ................... 2

8

IV.    JURISDICTIONAL CONTOURS OF AN ASSIGNMENT MOTION  .............. 2

9

V.     PROPER SERVICE UPON IRAN  ....................................... 3

10

VI.    OPPOSITION TO CMA SHOULD BE STRICKEN  ........................... 4

11

VII.   CMA SEEKS TO REACH ISSUES WHICH ARE NON-JUSTICIABLE  ........... 6

12

VIII.  STATUTORY ENACTMENT REPLACES JUDGMENT DEBTOR WITH JUDGMENT
       CREDITOR IN UNDERLYING OBLIGATION  ............................. 7

13

IX.    SCOPE OF ASSIGNMENT ORDER  ..................................... 8

14

X.     GEOGRAPHICAL REACH OF ORDER  ................................. 10

15

XI.    JUDGMENT DEBTORS INCLUDE PORTS AND SHIPPING ORGANIZATIONS OF
16     IRAN AND NATIONAL IRANIAN OIL PRODUCTS DISTRIBUTION COMPANY.
       ............................................................... 12

17

XII.   PROPER SERVICE  ............................................... 12

18

XIII.  CLAIM OF BLUNDERBUST  ......................................... 12

19

XIV.   CLAIM OF NONEXISTENT RIGHTS  .................................. 13

20

XV.    *BANCEC* ..................................................... 13

21

XVI.   ASSETS LOCATED OUTSIDE THE UNITED STATES  .................... 13

22

XVII.  CLAIM OF SOVEREIGN IMMUNITY  ................................. 14

23

XVIII. DUE PROCESS CONCERNS ......................................... 15

24

XIX.   CONCLUSION  .................................................. 15

25

26

27

28                                        i

# TABLE OF AUTHORITIES

**CASES:**                                                                    **PAGES:**

*Abbott Laboratories v. Gardner*

    387 U.S. 136 (1967) 87 S.Ct. 1507, 18 L.Ed.2d 681 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Armstrong World Industries, Inc. v. Adams*

    961 F.2d 405 (3rd Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Artway v. The Attorney General of the State of New Jersey*

    81 F.3d 1235 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Autotech Technologies LP v. Integral Research & Development*

    499 F.3d 737 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brenda KRACHT as Administratrix of the Estate of William Thomas Wacha, Deceased, v. PERRIN, GARTLAND & DOYLE, etc., et al.*

    219 Cal.App.3d 1019, 268 Cal.Rptr. 637 (Cal.App.4 Dist. 1990) . . . . . . . . . . . . . . . . . . 2, 3

*Cicippio-Puleo v. Islamic Republic of Iran*

    353 F.3d 1024 (D.C.Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*City of Los Angeles v. Lyons*

    461 U.S. 95 (1983) 103 S.Ct. 1660, 75 L.Ed.2d 675 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dickerson v. United States Steel Corporation*

    582 F.2d 827 (3rd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ernst & Young v. Depositors Economic Protection Corporation*

    45 F.3d 530 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*

    462 U.S. 611 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Flast v. Cohen*

    392 U.S. 83 (1968) 88 S.Ct. 1942, 20 L.Ed.2d 947 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Garden City Boxing Club, Inc. v. Briano*

    (2007) WL 4463264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ii

*Goldman v. Simpson*

    160 Cal.App.4th 255, B200082, 72 Cal.Rptr. 3 729 (Cal.App.2 Dist. 2008) . . . . . . . 10, 13

*Goodley vs. Wank & Wank*

    62 Cal.App.3d 389, 133 Cal.Rptr. 83 (Cal.App.2 Dist. 1976) . . . . . . . . . . . . . . . . . . . . . . . 3

*Lujan v. Defenders of Wildlife*

    504 U.S. 555 (1992) 112 S.Ct. 2130, 119 L.Ed.2d 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McInnis-Misenor v. Maine Medical Center*

    319 F.3d 63 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*People v. Ranger Ins. Co.*

    (1992) 9 Cal.App.4th 1302, 12 Cal.Rptr.2d 343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Philippine Export and Foreign Loan Guarantee Corporation vs. Chuidian etc.*

    218 Cal.App.3d 1058 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Quaestor Investments, Inc. v. State of Chiapas*

    1997 WL 34618203, at *7 (C.D. Cal. Sept. 2, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Richmark Corp. v. Timber Falling Consultants*

    959 F.2d 1468 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Roeder v. Islamic Republic of Iran*

    333 F.3d 228 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Rubin v. Islamic Republic of Iran*

    436 F.Supp.2d 938, 2006 WL 1750011 (N.D.Ill. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*Sagebrush Rebellion, Inc. v. James G. Watt*

    713 F.2d 525 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Securities and Exchange Commission v. Priscilla Ross*

    504 F.3d 1130 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*White v. Texas American Bank/Galleria*

    958 F.2d 80 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

iii

1  **<u>AUTHORITIES:</u>**

2  *Federal Statutes:*

3  28 United States Code

4  § 1605A .................................................. 14

5  § 1605A(g)(1) ........................................... 14

6  § 1609 .................................................... 7

7  § 1610(a) ............................................... 2, 14

8  § 1610(a) et seq. ......................................... 1

9  § 1610(g) ............................................... 14

10  § 1610(g)(1) ............................................ 11

11  Federal Rules of Civil Procedure

12  24(a) or (b) ............................................. 4

13  24( c) .................................................... 4

14  69(a) .................................................... 2

15  *Others:*

16  Congressional Record-Senate, January 22, 2008, P. S55 ............................. 14

17  National Defense Authorization Act of 2008 ...................................... 14

18  Section 1083 ........................................... 11, 12

19  *State Statutes:*

20  California Code of Civil Procedure

21  § 681.010(a) ............................................. 5

22  § 695.010 et seq. ........................................ 5

23  § 701.010(a) ............................................. 5

24  § 701.020( c) ............................................ 5

25  § 701.020(b) ............................................ 5

26  § 701.040(a) ............................................ 5

27  § 701.170. ............................................... 9

28

§ 708.210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

§ 708.510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

§ 708.510(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4-6, 8, 9, 12

§ 708.510(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 12

§ 708.510 through § 708.560 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

§ 708.530 and C.C.P. § 708.540. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

§ 708.540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

§ 708.610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO OPPOSITION TO NON-PARTY CMA CGM
TO PLAINTIFFS' MOTION COMPELLING ASSIGNMENT OF RIGHTS PURSUANT TO C.C.P. § 708.510 AND
FRCP 69(a) - CASE NO. 3:08-mc-80030-JSW (BZ)

# I. <u>INTRODUCTION.</u>

This is Plaintiffs' second round of assignment motions, seeking an order compelling Iran to assign obligations due from various shipping lines. Plaintiffs move this court, in summary, for an order compelling Iran to execute an assignment of rights of various "rights to payment of money, accounts, accounts receivable" presumably due and payable by international shipping companies, when they frequent the harbors, ports, and other maritime facilities of Iran, and in which from time to time they may purchase "bunker oil." The ports and shipping organization of the Department of Roads and Transportation of Iran indicate that Iran charges the international shipping companies various charges, fees, tariffs, duties, and the like, for the privilege of frequenting the harbors, wharfs and docks of Iran; that other information suggests that Iran sells bunker oil (fuel oil) due ocean-going ships. The "Tariff Sheet" provided by the ports and shipping organization (P&O) leads to the inference that Iran is owed from time to time, now and in the future, monies from international shipping companies which are charged and presumably paid as a privilege of docking ships and using the ports, harbors and wharf facilities of Iran.

## II. COURT MAY GRANT RELIEF BY EJECTING IRAN FROM THE OBLIGATION AND REPLACING IRAN WITH THE JUDGMENT CREDITORS, WITHOUT CONTRAVENTION OF THE FOREIGN SOVEREIGNTY IMMUNITIES ACT ("FSIA").

Notwithstanding the fact that CMA has no standing and has not intervened, CMA raises a threshold issue of the jurisdiction of this court, along with the court's prior scheduling order, focusing around the scope of relief. While this Judgment Creditor is no longer constrained by the limitations under 28 U.S.C. § 1610(a) et seq., an assignment order, if granted, would specifically overcome the supposed barrier of U.S. courts permitting enforcement against assets which are located outside U.S. borders. An assignment order ousts the Judgment Debtor of the obligation, and replaces it with the Judgment Creditor. However, enforcement of the order is found only upon notice and ensuing litigation. C.C.P. § 708.530 and C.C.P. § 708.540. Therefore, while this court in granting such relief would oust Iran from the obligation, enforcement of this order against the third party constituting the execution thereof, would occur in another jurisdiction.

This analysis is consistent with ***Richmark Corp. v. Timber Falling Consultants***, 959 F.2d 1468 (9th Cir. 1992), in which the court held that a Judgment Creditor was entitled to discovery,

1   without contravening the bar against using the U.S. courts for purposes of levy. (P. 1477-1478)

2   Here, these Judgment Creditors are entitled to ejecting Iran, but enforcing the order in another

3   setting.  By this analysis, these Plaintiffs do not concede the applicability of Section 1610(a), but

4   point out that an assignment order "threads the needle" in permitting relief in this court.

5   ## III.  ANALYSIS OF OPPOSITION OF NON-PARTY CMA CGM.

6   Non-Party CMA CGM ("CMA") argues an entire potpourri of substantive defenses, as if

7   CMA was standing in the shoes of Iran and acting as nothing more than Iran's "surrogate."  Each

8   of these defenses are proffered on behalf of the Judgment Debtor, as if CMA was in fact the

9   Judgment Debtor, in which CMA is clearly not.  As set forth below, CMA has no standing for a

10  multiplicity of reasons, by which to raise any of these defenses.

11  ## IV.  JURISDICTIONAL CONTOURS OF AN ASSIGNMENT MOTION.

12  Under FRCP 69(a), the District Court employs the supplemental, post-judgment remedies

13  of the domicile state. FRCP 69(a).  Among the remedies available to a Judgment Creditor in

14  California is an assignment motion under C.C.P. § 708.510(a), which provides as follows:

15  "Except as otherwise provided by law, upon application of the judgment creditor on
    noticed motion, the court may order the judgment debtor to assign to the judgment
16  creditor, or to a receiver appointed pursuant to Article 7 (commencing with section
    708.610) all or part of a right to payment due or to become due, whether or not the
17  right is conditional upon future developments, including but not limited to, the
    following types of payment:
18  1.      Wages due from the federal government that are not subject to withholding under
            an earnings withholding order.
19  2.      Rents.
    3.      Commissions.
20  4.      Royalties.
    5.      Payments due from a patent or copyright.
21  6.      Insurance policy loan value."

22  An assignment motion (or better stated, order compelling an assignment) is a proceeding

23  compelling the Judgment Debtor to assign to the Judgment Creditor rights capable of supporting

24  an assignment in and of itself.  An assignment motion is only a "two-party process" in which the

25  obligor is not a party.  C.C.P. § 708.510(b) only mandates service upon the Judgment Debtor, and

26  not the obligor.

27  Among others, the leading California case is ***Brenda KRACHT as Administratrix of the***

28  ***Estate of William Thomas Wacha, Deceased, v. PERRIN, GARTLAND & DOYLE, etc., et al.,***

1  (hereinafter "*Kracht*") 219 Cal.App.3d 1019, 268 Cal.Rptr. 637, (Cal.App.4 Dist. 1990), in which

2  the court stated at fn. 1 and made clear that the obligor is not a party to the assignment, and that in

3  granting of the assignment order itself, the court stated as follows:

> "[1]*Code of Civil Procedure section 708.510 does not require that notice of the*
> *motion to cause an assignment be given to the obligor of the judgment debtor.*
> The order of assignment does not affect the obligor's rights until notice of the order
> is received by the obligor. (Code Civ.Proc., § 708.540.) The fact that the choses in
> action were ordered assigned under Code of Civil Procedure section 708.510 does
> not preclude a challenge to whether the claims were assignable ab initio, because
> the Legislature specifically noted that section 708.510 "... does not make any
> property assignable that is not already assignable." (See Legis.Com.Comment,
> Assembly 1982 Addition, West's Ann.Code Civ.Proc., § 708.510.) (Emphasis
> added)

9
10  CMA raises an entire host of arguments, standing in the shoes of Iran, in an attempt to

11  convince the court that the Judgment Creditor has no right to reach Iranian assets, constituting an

12  account receivable owed by CMA, or Iranian property in the hands of CMA, which is a position

13  rejected by *Kracht*, holding that an obligor has no standing because the obligor is not a party.

14  *Kracht* makes this very clear, in that the court ordered the assignment in favor of the Judgment

15  Creditor of the Judgment Debtor's malpractice claim.  Typically, malpractice claims are not

16  assignable under such cases as *Goodley vs. Wank & Wank*, 62 Cal.App.3d 389, 133 Cal.Rptr. 83

17  (Cal.App.2 Dist. 1976).  In fact, the outcome of *Kracht* is that the Judgment Creditor failed in the

18  attempt to collect based upon the "malpractice claim" in that the malpractice claim, per se, was not

19  assignable.  The fact that the claim was or was not assignable, from the viewpoint of granting the

20  motion, was not the test utilized by the court in granting the assignment in the first place.

21  The comments to C.C.P. § 708.510 likewise make that clear, as follows:

22  " . . . This section does not make any property assignable that is not already
   assignable. This remedy may be used alone or in conjunction with other remedies
   provided in this title for reaching rights to payment, such as execution, orders in
23  examination proceedings, creditors' suits, and receivership. The use of this remedy
   is subject to limitations on the time for enforcement of judgments. See Sections
24  683.010-683.220." West's Ann.Cal. C.C.P. § 708.510.

25  In short, CMA lacks standing at this setting to defeat the motion for assignment of rights.

26  Only Iran has that standing, and Iran has not appeared.

27  ## V. PROPER SERVICE UPON IRAN.

28  Plaintiffs served Iran by mail, using United States mail, priority mail, first class, as

1   indicated by the proofs of service.  Mail is proper under C.C.P. § 708.510(b).  As indicated by the

2   proofs of service, Plaintiffs identified the "responsible person" who would have in fact received

3   the mail.  Plaintiffs took great pains to notify "everybody" who might have an interest in the

4   matter.  Plaintiffs proceeded with the notice provisions mandated by C.C.P. § 708.510(b) (mail)

5   which is the overall statutory structure to enforce a money judgment.  C.C.P. § 681.010(a).

## VI.  OPPOSITION TO CMA SHOULD BE STRICKEN.

7          CMA seeks to insert itself in these proceedings as a party.  Under C.C.P. § 708.510(a),

8   CMA is not a party, and CMA has not moved this court to intervene under FRCP 24(a) or (b).

9   CMA has not complied with the basic requirements set forth by way of FRCP 24( c), which

10  provides as follows:

11          "( c) Notice and Pleading Required.
            A motion to intervene must be served on the parties as provided in Rule 5. The
12          motion must state the grounds for intervention and be accompanied by a pleading
            that sets out the claim or defense for which intervention is sought.
13
            Without the court permitting intervention, CMA is a stranger to these proceedings, and is
14
    not entitled to be heard.  *See White v. Texas American Bank/Galleria,* 958 F.2d 80 (5th Cir. 1992),
15
    in which the court stated at page 83, as follows:
16
            " . . . Nevertheless, until the Appellants received leave to intervene, they were not
17          parties to the suit and, consequently, had no standing to be served or to respond to
            NCNB's summary judgment motion."
18
            Even in cases dealing with Iran, the U.S. was compelled to file a motion to intervene.  *See*
19
    *Roeder v. Islamic Republic of Iran,* 333 F.3d 228 (D.C. Cir. 2003) at page 233.  CMA is not
20
    entitled to "equitable intervention."  CMA is required to comply with FRCP 24( c).  Courts have
21
    routinely rejected the concept of "equitable intervention," no matter how compelling the status of
22
    the party.  *See Dickerson v. United States Steel Corporation,* 582 F.2d 827 (3rd Cir. 1978) at page
23
    832.
24
            Intervention is a multi-step process, in which the party seeking to intervene must make out
25
    its burden of proof showing an entitlement thereto.  *See Sagebrush Rebellion, Inc. v. James G.*
26
    *Watt,* 713 F.2d 525 (9th Cir. 1983) at page 527.  Intervention, of course, may lead to "unintended
27
    consequences" in which, e.g., a party seeking to intervene might lead to consent to the jurisdiction
28
    of the court, for all purposes.  *See* for purposes of illustration, *Securities and Exchange*

1 | *Commission v. Priscilla Ross*, 504 F.3d 1130 (9th Cir. 2007) at page 1148.

2 |     California supplemental proceedings are set forth by way of the Enforcement of Judgments

3 | Act, commencing at C.C.P. § 695.010 et seq.; C.C.P. § 681.010(a). Specifically, in viewing

4 | C.C.P. § 708.510(a), the structure does not provide the court with an opportunity by which to

5 | engage in an evidentiary hearing, much less any other contest by and between the Judgment

6 | Creditor and the obligor, specifically when the obligor raises a whole host of putative defenses to

7 | enforcement of the underlying obligation. For example, this court cannot *sua sponte* convene a

8 | trial in which the court would consider whether or not the obligor is or is not indebted to Iran,

9 | whether the obligor might have a whole host of defenses, or whether or not the obligor might or

10 | might not be subject to the jurisdiction of the court which, per se, might be a factual matter

11 | entitling the Judgment Creditor to the benefits of discovery. If the rule were to the contrary, every

12 | assignment motion would lead to a contest between the Judgment Creditor and the obligor, even

13 | before the Judgment Creditor chose to enforce the rights owed by the obligor.

14 |     An assignment motion is different from a direct levy and execution, in which the

15 | battleground consists between two players: the Judgment Creditor and the garnishee. In a strict

16 | garnishment setting, e.g., the Judgment Creditor seeks directly to compel the garnishee to pay the

17 | obligation otherwise due the Judgment Debtor, directly to the Judgment Creditor. C.C.P. §

18 | 701.010(a) obligates the third party to directly pay the Judgment Creditor, as follows:

19 |     "(a) If a third person is required by this article to deliver property to the levying officer or to make payments to the levying officer and the third person fails or

20 | refuses without good cause to do so, the third person is liable to the judgment creditor for whichever of the following is the lesser amount:

21 | (1) The value of the judgment debtor's interest in the property or the amount of the payments required to be made.

22 | (2) The amount required to satisfy the judgment pursuant to which the levy is made.

23 | The liability is direct and owed to the Judgment Creditor by the garnishee under C.C.P. §

24 | 701.020(b). The garnishee might even be liable for attorneys fees in favor of the Judgment

25 | Creditor under C.C.P. § 701.020( c). The court may issue a restraining order under C.C.P. §

26 | 701.040(a). An assignment motion differs in which the court ousts the Judgment Debtor from the

27 | obligation and places the Judgment Creditor in the position of the obligee.

28 |

## VII. CMA SEEKS TO REACH ISSUES WHICH ARE NON-JUSTICIABLE.

All of the defenses raised by CMA are non-justiciable. As a Constitutional matter, this court can only adjudicate a "case or controversy." *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) 103 S.Ct. 1660, 75 L.Ed.2d 675, in which the court stated as follows:

> "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshhold requirement imposed by Article III of the Constitution by alleging an actual case or controversy. (Citations Omitted). Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. (Citation omitted). Abstract injury is not enough. The plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." (Citations omitted)

The party must have some type of "standing" which could be adjudicated. *See Flast v. Cohen*, 392 U.S. 83 (1968) 88 S.Ct. 1942, 20 L.Ed.2d 947, in which the court held that standing is an aspect of justiciability, and that courts will not give advisory opinions.

Under C.C.P. § 708.510(a), the statutory enactment specifically precludes the adjudication between the Judgment Creditor and the potential obligor and therefore renders any "pre-assignment" adjudication, per se, non-justiciable and beyond the jurisdiction of the court to adjudicate. The remedy, in favor of the Judgment Creditor, would be a creditor's suit under C.C.P. § 708.210, which provides as follows:

> **§ 708.210.**
> If a third person has possession or control of property in which the judgment debtor has an interest or is indebted to the judgment debtor, the judgment creditor may bring an action against the third person to have the interest or debt applied to the satisfaction of the money judgment.

Therefore, this court, as a matter of statutory interpretation, would never accept or assume a contest between the Judgment Creditor and the obligor, as ultimately it would be deemed, per se, non-justiciable. Accordingly, CMA would not have any statutory standing to raise any of the putative defense. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) 112 S.Ct. 2130, 119 L.Ed.2d 351, in which the court clearly held that plaintiff must have suffered an "injury in fact" constituting an invasion of a legally protected interest which is concrete and particularized, and that the loss would be "actual and imminent," and not conjectural or hypothetical. (At p. 560).

1    The battle between the Judgment Creditor and the obligor is not ripe, which per se is a

2  condition of any controversy in this court. *See, e.g., Abbott Laboratories v. Gardner*, 387 U.S.

3  136 (1967) 87 S.Ct. 1507, 18 L.Ed.2d 681, at page 140. *See also, e.g., Artway v. The Attorney*

4  *General of the State of New Jersey*, 81 F.3d 1235 (3rd Cir. 1996), defining ripeness at page 1246.

5    The claims or defenses of CMA are "not ripe" because C.C.P. § 708.510 clearly holds that

6  they can never be ripe, and in which the battleground might arise in a creditor's suit. Also in line

7  are such cases as *McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63 (1st Cir. 2003), in

8  which the court held that a non-pregnant woman does not have standing to test the premises of the

9  Main Medical Center, on the basis that the physical premises failed to comply with Title 3 of the

10  American Disabilities Act (ADA).

11    Other cases are clearly in accord. *See Armstrong World Industries, Inc. v. Adams*, 961

12  F.2d 405 (3rd Cir. 1992) at pages 412-413; and *Ernst & Young v. Depositors Economic*

13  *Protection Corporation*, 45 F.3d 530 (1st Cir. 1995), in which the court made it clear that the court

14  does not have the jurisdiction to issue opinions based upon speculative facts or a hypothetical

15  record. The court specifically indicated that a matter must be "fit" for adjudication. (P. 537)

16    This is not the first time in the Iran bibliography of cases that the court has swept away the

17  claims of third parties, and clearly placed the onus upon Iran by which to appear and oppose any

18  type of post-judgment remedies. This is specifically the outcome in *Rubin v. Islamic Republic of*

19  *Iran*, 436 F.Supp.2d 938, 2006 WL 1750011 (N.D.Ill. 2006), in which under a similar setting,

20  Judge Blanche Manning likewise swept away the objections of third parties on the basis that only

21  Iran could invoke the defense of sovereign immunity. The court clearly held that Iran only needed

22  to assert its immunity in order to protect its rights. Juror, the court held that foreign sovereign

23  immunity under 28 U.S.C. § 1609 is an affirmative defense that must be asserted, and that the third

24  parties (the U.S. and the University of Chicago, along with the Field Museum) are not entitled to

25  assert immunity on Iran's behalf.

26  **VIII. STATUTORY ENACTMENT REPLACES JUDGMENT DEBTOR WITH**
**JUDGMENT CREDITOR IN UNDERLYING OBLIGATION.**

27

28    C.C.P. § 708.510 through C.C.P. § 708.560 serve to eject the Judgment Debtor from the

obligation and replace the Judgment Debtor with the Judgment Creditor. This is the precise

1    intention of the drafters of the legislation as found under C.C.P. § 708.530(a), as follows:

2        **§ 708.530.**
         (a) Except as provided in subdivision (b), the effect and priority of an assignment
3        ordered pursuant to this article is governed by Section 955.1 of the Civil Code. For
         the purpose of priority, an assignee of a right to payment pursuant to this article
4        shall be deemed to be a bona fide assignee for value under the terms of Section
         955.1 of the Civil Code."

5
         The obligor's rights are no greater nor different than owed to the Judgment Debtor under
6
     C.C.P. § 708.540, which provides as follows:
7
         **§ 708.540.**
8        The rights of an obligor are not affected by an order assigning the right to payment
         until notice of the order is received by the obligor. For the purpose of this section,
9        "obligor" means the person who is obligated to make payments to the judgment
         debtor or who may become obligated to make payments to the judgment debtor
10       depending upon future developments.

11       Under C.C.P. § 708.540, the legislature sought specifically to avoid satellite litigation

12   between the Judgment Creditor and the obligor, and that the granting of the motion did not either

13   enhance nor detract from the rights of the obligor.  Prompting a premature adjudication of the

14   rights of the Judgment Creditor owed by the obligor without the benefit of a statutory authorized

15   trial, discovery, law and motion practice, would be inconsistent with the fact that the obligor is not

16   even a party to an assignment motion and not even entitled to notice, and lead to an absurd result.

17   The canon legal interpretation is the rule prescribing the common sense construction of statutes so

18   as to avoid absurd results. (*See, e.g., People v. Ranger Ins. Co.* (1992) 9 Cal.App.4th 1302, 1307,

19   12 Cal.Rptr.2d 343 [construction leads to the conclusion that a court, in adjudicating a motion

20   under C.C.P. § 708.510(a) should avoid an adjudication, at this stage, of the rights or defenses of

21   the underlying obligor. . .].)

22                                **IX. SCOPE OF ASSIGNMENT ORDER.**

23       Pursuant to the court's order of 7/25/08, the inquiry of the court is multifold.  Each one is

24   addressed as follows:

25       A.     Where rights to payment which are currently not in existence, whether such
                inchoate rights are subject to an assignment as opposed to a right of payment which
26              is presently in existence but become due based upon future developments?

27       A court may order an assignment of "all or part of a right to payment due or to become due,

28   whether or not the right is conditional on future developments, including but not limited to, the

1  following types of payments . . ." C.C.P. 708.610. This language generally tracks the concept of

2  assignability, in which an obligee may assign to an obligor a right to payment of money, a right to

3  payment which may arise in the future, or even a conditional expectancy. C.C.P. 708.610.

4  Plaintiffs specifically seek an assignment of all rights, within the confines of the laws of the State

5  of California, even an expectancy, which is precisely anticipated by the language of the statute

6  which permit an assignment of rights "whether or not the right is conditional on future

7  developments." Here, CMA, while a non-party and without a voice in these proceedings, has

8  been less than clear in failing to dispel any inference that in fact monies are due and owing to Iran.

9         The secondary inquiry is whether Plaintiffs have identified such rights. To that end,

10  Plaintiffs have provided this court with evidence that CMA frequents the ports, harbors and other

11  maritime facility of Iran, and based on the Tariff sheet CMA would presumably pay Iran an entire

12  assortment of maritime Tariff charges, fees and expenses. While a non-party, CMA has not

13  proffered any evidence to contradict that CMA can dock its fleet for free or be excused from

14  paying such Tariffs. Once Plaintiffs have made out its case that CMA docks ships at Iranian

15  maritime facilities, and Iran charges CMA, among others, for those privileges, Plaintiffs have

16  made out a sufficient set of facts by which the court can reasonably infer that such obligations (i.e.,

17  payment of Tariff charges, fees and expenses) do exist. To the extent that such rights actually

18  exist, they in fact would be assignable. The test, therefore, is not within the confines of this

19  proceeding, but in a secondary proceeding, when and if the Judgment Creditor seeks to enforce

20  those rights. If, e.g., no rights (obligations) are due Iran in the filing of a secondary action against

21  CMA (or anybody else), Plaintiffs theoretically would have nothing to enforce. Accordingly, as

22  Plaintiffs have provided the court with "information and belief that such rights may exist," the

23  course and the scope is that the rights would be assigned.

24         Reaching a level of specificity in demonstrating that the obligation be in existence goes

25  beyond both the statutory language of C.C.P. § 708.510(a), which on its face does not condition

26  relief upon any pre-motion fact finding, and goes beyond the scope of post judgment enforcement

27  in which a creditor is entitled to levy through a garnishment without any proof that the garnishee

28  might be indebted to the Judgment Creditor. C.C.P. § 701.170. Compelling a Judgment Creditor

1    to prove up an obligation subject to an assignment would make an assignment motion less

2    accessible than a common levy which has no such requirement.

3    ## X.  GEOGRAPHICAL REACH OF ORDER.

4         The court has jurisdiction over Iran, regardless of Iran's location. *See Goldman v.*

5    *Simpson*, 160 Cal.App.4th 255, B200082, 72 Cal.Rptr. 3 729 (Cal.App.2 Dist. 2008), in which the

6    California Court of Appeals held that the underlying trial court always maintains jurisdiction over

7    the Judgment Debtor, wheresoever located. The court highlighted the following:

8         1.    Payments made outside the U.S..
          2.    Payments made outside the U.S. on a contract entered outside the U.S..
9         3.    Payments made outside the U.S. on a contract entered outside the U.S. which has
                no connection with the U.S..

10        These issues were raised in the case of *Philippine Export and Foreign Loan Guarantee*

11   *Corporation vs. Chuidian etc.* ("*Chuidian*"), 218 Cal.App.3d 1058 (1990), in which the

12   California Court of Appeal limited the range of an assignment order to "obligations" in the U.S.,

13   and precluded the reach of an assignment order to an obligation arising from an "obligor" in the

14   Philippines. *See* pages 1105-1107. *Chiudian* is not applicable in this setting because Iran has not

15   made an appearance and has not asserted sovereign immunity for these obligations, which would

16   be due from CMA. CMA does not have the standing to advocate sovereign immunity as a non-

17   party. Moreover, *Goldman v. Simpson* gives the court plenary power over a Judgment Debtor, a

18   matter not fully expressed in Chiudian. Finally, unlike the obligors in *Chiudian*, this record is

19   unclear as to the jurisdictional reach over CMA, a matter clearly left ambiguous.

20        CMA cites *Quaestor Investments, Inc. v. State of Chiapas,* 1997 WL 34618203 (C.D.

21   Cal. Sept. 2, 1997) for the proposition that sovereign immunity prohibits the seizure of a bank

22   account of the sovereign located in a sovereign country, through an assignment order. This case is

23   distinguishable as Plaintiffs seek through an assignment order to eject Iran as the obligee in a

24   contractual setting and replacing it with the Judgment Creditors as an obligor, in which the

25   obligations, although potentially arising outside the U.S., are not tied to a financial institution.

26   Moreover, the State of Chiapas was an independent sovereign asserting its own sovereign

27   immunity, a matter not present here.

28        This setting, however, is different. First, under *Goldman v. Simpson*, the court clearly

1   enunciated that the underlying trial court always retains jurisdiction for purposes of enforcement,

2   over the Judgment Debtor, no matter howsoever located, in which the adjudication might

3   ultimately impact the outcome in *Chiudian*. However, in *Chiudian*, the issue was not the physical

4   location of the assets, as much as the fact of the assets would be deemed inaccessible, given the

5   jurisdictional confines imposed upon the court by FSIA.

6        In this setting, however, this Judgment Creditor is not bound by FSIA in that the reach of

7   the property goes well beyond the borders of the U.S. FSIA was recently overhauled, leading to a

8   far greater reach of property under 28 U.S.C. § 1610(g)(1), which provides as follows:

9        "(g) PROPERTY IN CERTAIN ACTIONS –
              "(1) IN GENERAL. – subject to paragraph (3), the property of a foreign
10      state against which a judgment is entered under section 1605A, and the property of
         an agency or instrumentality of such a state, including property that is a separate
11      juridical entity or is an interest held directly or indirectly in a separate juridical
         entity, is subject to attachment in aid of execution, and execution, upon that
12      judgment as provided in this section, regardless of –
              "(A) the level of economic control over the property by the
13      government of a foreign state;
              "(B) whether the profits of the property go to that government;
14      "( C) the degree to which officials of that government manage the
         property or otherwise control its daily affairs;
15      "(D) whether that government is the sole beneficiary in interest of
         the property; or
16      "(E) whether establishing the property as a separate entity would
         entitle the foreign state to benefits in United States courts while
17      avoiding its obligations.

18       CMA as the non-third party suggests that this creditor was obligated to "refile" the action,

19   and moreover, that the refiling would have been impossible, because the action was "not pending"

20   within the 60-day window, starting on 1/28/08 to the expiration on 3/28/08.

21       CMA's analysis is incorrect. The recent changes to FSIA, commonly found under Section

22   1083 (National Defense Authorization Act of 2008 "NDAA") mandated the "recycling" of such

23   judgments to insure that the judgment would be revitalized, based upon *Cicippio-Puleo v. Islamic*

24   *Republic of Iran,* 353 F.3d 1024, 1031 (D.C.Cir. 2004), which ultimately held that a claimant,

25   suffering from an act of terrorism, is not entitled to litigate a federal cause of action, and relegated

26   to its domicile state law rights. To the extent that a pre-*Cippio-Puleo* claim was "pending" and

27   flawed, the fact that he pled a "federal cause of action" was deficient, had the right to "recycle" the

28   entirety of the complaint or judgment, for the purpose of converting a nonexistent "claim" to a

valid federal cause of action. *See* Section 1083(a) (NDAA). In this case, CMA does not point out nor claim that any of the underlying claims of the Marine families were defective, e.g., by being based upon a nonexistent "federal cause of action" which was foreclosed by the court in ***Cippio-Puleo.***

## XI. JUDGMENT DEBTORS INCLUDE PORTS AND SHIPPING ORGANIZATIONS OF IRAN AND NATIONAL IRANIAN OIL PRODUCTS DISTRIBUTION COMPANY.

Without any standing, CMA questions whether the ports and shipping organizations of Iran and the National Iranian Oil Products Distribution is in fact part of Iran, and therefore, subject to the scope of the order. Plaintiffs have provided sufficient information which would demonstrate a reasonable belief. Under C.C.P. § 708.510(a), a Judgment Creditor is only obligated to identify the asset which would be the subject of the assignment, placing the Judgment Creditor in the place of the Judgment Debtor. Whether or not the obligation may or may not exist, and/or might generate funds, would be a matter of a second lawsuit.

## XII. PROPER SERVICE.

Service has been properly effectuated by mail consistent with C.C.P. § 708.510(b) and properly addressed.

## XIII. CLAIM OF BLUNDERBUST.

CMA claims that Plaintiffs are using a "blunderbust assignment" and has not presented any direct evidence that CMA owes any funds to the Judgment Debtor. Again, CMA seeks to "prelitigate" whether or not the obligor might or might not owe any money, the amount thereof, or whether or not the amount is due. Attempting to answer that inquiry necessarily would prompt "fact finding" and ultimately a trial, which is outside the parameters of the entire assignment mechanism.

CMA cites ***Quaestor Investments, Inc. v. State of Chiapas, supra*** at *7, in which the court denied the assignment order based upon the concept of sovereign immunity. In ***Garden City Boxing Club, Inc. v. Briano*** (2007) WL 4463264, the court denied any relief for the failure to specify any rights in that the judgment creditor did not identify with any specificity the obligor or precise nature of the obligations. In this case, Plaintiffs have identified the obligor, and has reasonably defined the rights in such a manner that the Judgment Debtor (and not the obligor)

1 | would have fair notice.

2 | The case of *Autotech Technologies LP v. Integral Research & Development*, 499 F.3d

3 | 737, 750 (7th Cir. 2007) deals with the requirement to specify what property may or may not be

4 | exempt or immune from levy and execution. Here, Plaintiffs have reasonably identified the

5 | property, by way of the obligor and type of obligation itself.

6 | ### XIV.  CLAIM OF NONEXISTENT RIGHTS.

7 | CMA claims that the rights are "nonexistent." However, this is to be seen, by way of

8 | discovery or otherwise. Clearly, Iran has not taken that position, as Iran has not opposed this

9 | motion. To the extent that such rights exist or don't exist, would be subject to further discovery.

10 | ### XV. *BANCEC.*

11 | Again, without the slightest standing, CMA, now standing in the shoes and acting as Iran's

12 | surrogate, claims that the obligations due from the ports and shipping organization of Iran or the

13 | National Iranian Oil Products Distribution Company, are subject to the protections of *Bancec*, a

14 | doctrine outlined in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462

15 | U.S. 611 (1983) (hereinafter "*Bancec*"). *Bancec*, in summary, places the burden of proof upon the

16 | levying creditor to demonstrate that the obligor, being the subject of the levy, is in fact the

17 | sovereign, rather than an independent corporate structure. To the extent of any issues relating to

18 | *Bancec* (inapplicable based upon the changes of the law), the party to raise this defense would be

19 | Iran, and not CMA. However, in *Bancec,* a Judgment Creditor would be entitled to jurisdictional

20 | discovery which in this case would be impossible in that Iran has not appeared.

21 | ### XVI. ASSETS LOCATED OUTSIDE THE UNITED STATES.

22 | This is an additional standing issue. Iran has not opposed the motion in and of itself, and

23 | CMA does not have the standing to raise this issue. *See Rubin vs. Islamic Republic of Iran,*

24 | *supra*. Moreover, to the extent that the assignment order is limited by the "borders of the United

25 | States," this is a matter which truly would be raised by an independent action, in which CMA

26 | would be a party.

27 | Under *Goldman vs. Simpson, supra*, this court has jurisdiction over Iran and therefore

28 | could compel Iran to assign any monies due Iran as owed by CMA. With a final assignment in

1  hand, and the ensuing civil litigation which might follow, the parties would join these issues in

2  such a matter that they would be justiciable and "fit" for adjudication. Moreover, in the face of

3  Section 1605A(g)(1), Plaintiffs would be able to reach those assets, as they constitute property of

4  Iran. The amended provisions of FSIA enable a Judgment Creditor to reach all of the assets of the

5  Judgment Debtor.

6  ## XVII.  CLAIM OF SOVEREIGN IMMUNITY.

7  In summary, CMA, a non-party, claims that Plaintiffs are barred by the sovereign immunity

8  due and in favor of Iran. However, an analysis of the recent changes of the FSIA, and specifically

9  the enactment by the NDAA, indicate that the entire purpose was to permit these specific families

10  by which to effectuate collection of the judgment. Senator Frank Lausenberg in the floor

11  statement, stated as follows:

12  "I also want to make special mention of the inspiration for this new legislation. On
October 23, 1983, the Battalion Landing Team headquarters building in the Marine
13  Amphibious Unit compound at the Beirut International Airport was destroyed b a
terrorist bomb killing 241 marines, sailors, and soldiers who were present in
14  Lebanon on the peace-keeping mission. In a case known as Peterson v. the Islamic
Republic of Iran, filed on behalf of may of the marine victims and their families, the
15  U.S. District Court ruled in 2003 that the terrorist organizations Hezbollah was
funded by, directed, by, and relied upon the Islamic Republic of Iran and its
16  Ministry of Information and Security to carry out theat heinous attack. The judge
presiding over this case, Judge Royce Lamberth, referred to this as 'the most deadly
17  state sponsored terrorist attack made against United States citizens before
September 11, 2001.' In September of this year Judge Lamberth found that Iran not
18  only is responsible for this attack but also owes the families of the victims a total of
more than \$2.6 billion for the attack. Congress's support of my provision will now
19  empower these victims to pursue Iranian assets to obtain this just compensation for
their suffering. This is true justice through American rule of law."
20  (Congressional Record-Senate, January 22, 2008, P. S55, marked *Exhibit "A"* attached
hereto.)

21  Section 1605A(g)(1) does not limit the scope of assets to the U.S. only, as opposed to

22  Section 1610(a), which limits the scope of levy and execution to property in the U.S. used for a

23  commercial purpose, along with other exceptions. Section 1605A(g)(1) does not bear that

24  limitation, and for good reason, in expanding the scope of enforcement and enabling these specific

25  Plaintiffs to recover on this historic judgment.

26  CMA suggests that the scope of Section 1605A is limited to property in the U.S., and uses

27  the device of the lis pendens as the basis for such a limitation. This analysis is in error in that the

28  lis pendens provision of Section 1610(g) is obviously limited to property within the district of the

1    court, and provides the creditor with the opportunity to encumber the assets within very precise

2    rules. Nothing in the language of Section 1610(g) creating a lis pendens sought to limit the reach

3    of the Judgment Creditor, and CMA's analysis is therefore faulty, if only on the basis that the

4    drafters of the statute, if in making co-extensive assets subject to a lis pendens, as assets subject to

5    enforcement, would clearly have said so. The fact that assets are located in the particular district

6    does not limit the fact that other assets might be available elsewhere.

### XVIII. DUE PROCESS CONCERNS.

8    CMA, as a final gesture, raises a whole potpourri of issues, including ability to enforce, due

9    process concerns, and the like. All of these issues as raised are non-justiciable, and ultimately

10    would sort themselves out when and if this creditor ultimately takes the order and independently

11    files suit on the matter. CMA misunderstands the scope of an assignment order, claiming that

12    CMA would be bound by virtue of this order to make payment, as if the assignment order

13    constituted a judgment against CMA. CMA clearly misunderstands that the total purpose of an

14    assignment motion is to eject the Judgment Debtor from the obligation, as opposed to reducing the

15    obligation to a judgment itself.

### XIX. CONCLUSION.

17    CMA raises an entire host of defenses, in which all of these defenses, and each of the same,

18    would or could be raised at a later proceeding. The sole issue here is whether or not Plaintiffs

19    have made out the parameters for an order compelling Iran to assign its rights to payment of

20    money due from a third party, and if so, granting the order and proceeding with ongoing litigation

21    against Iran to actually compel the assignment, receive the assignment, and thereafter proceed.

22    The next battle would be the independent action by and between the Judgment Creditor and CMA

23    (or others) to enforce the same, in which the parties would be entitled to litigate all of these issues.

24    This is neither the place, time, nor date to litigate any of these underlying issues.

25    DATED: October 1, 2008        COOK COLLECTION ATTORNEYS

26                             By:    /s/ David J. Cook
                               DAVID J. COOK, ESQ. (SB# 060859)

27                                Attorneys for Plaintiffs
                               DEBORAH D. PETERSON, Personal Representative

28                                of the Estate of James C. Knipple (Dec.), et al.

F:\USERS\DJCNEW\petersonsf.replycma2.wpd

# EXHIBIT "A"

committed by the Saddam Hussein regime that cannot be addressed in the U.S. courts due to a Presidential waiver.

We expect that the Department of State will actively pursue such compensation from Iraq.

As one of the authors of the new section 1083, I want to assure the Senate that the new language authorizes the waiver of section 1083, only as it applies to Iraq. The new subsection (d), which we have added to the bill, specifies that the President may waive any provision of section 1083 "with respect to Iraq" and not with regard to any other country. We explicitly reaffirm in this bill that other cases against state sponsors of terrorism, including both Iran and Libya, may proceed to judgment and collection under section 1083, unaffected by any Presidential waiver.

Over the last 2 weeks, concerns have been expressed about the possible impact of this provision on innocent third parties entering joint ventures with Libya or Iran. The concern was that these companies would find their own property seized to satisfy judgments against those countries. Our language does not allow for that result, because that is not our intent. This is not a new issue; the question has been raised by the language of the Lautenberg amendment ever since it was first approved by the Senate last fall.

We specifically addressed the problem of joint ventures in our conference on the Defense authorization bill, previously approved by the Congress. We added language to the bill making it clear that the courts are authorized to compensate victim of state-sponsored terrorism out of Libya's—or other states'—assets, while separating and shielding the assets of companies engaged in joint ventures with those States. In the accompanying statement of managers, we specifically urged the courts to make use of this authority. This language was the strongest action that we could take to protect innocent third parties without also shielding the offending governments from liability for their own actions.

We have included a provision to ensure that the statement of managers on our previous conference report will apply to this new bill in this and all regards.

Outside of the modification of section 1083, the bill remains virtually unchanged. We have, however, taken steps to ensure our men and women in uniform will not lose a penny as a result of the delayed enactment of this bill. Toward that end, we have revised a number of provisions in the bill to make pay increases and bonus provisions retroactive to January 1 and avoid any gap in these authorities. These changes have been worked out with the Department of Defense and agreed to by the two Armed Services Committees on a bipartisan basis.

Other than these few changes, the bill before us today is identical to the conference report that the Senate overwhelmingly passed last month. It is my hope that the bill will receive similar support when we vote on it again later today.

---

## NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2008

The PRESIDING OFFICER. The clerk will state the bill by title.

The legislative clerk read as follows:

A bill (H.R. 4986) to provide for the enactment of the National Defense Authorization Act for fiscal year 2008, and for other purposes.

Mr. FEINGOLD. Mr. President, I oppose the fiscal year 2008 Defense authorization bill because it authorizes $189.5 billion for the war in Iraq but does nothing to end the President's misguided, open-ended Iraq policy. That policy has overburdened our military, weakened our national security, diminished our international credibility, and cost the lives of thousands of brave American soldiers.

There are certain provisions of the bill that I support strongly, including a pay raise for military personnel, Senator WEBB's amendment creating a Commission on Wartime Contracting to examine waste, fraud, and abuse in Iraq and Afghanistan, and Senator LAUTENBERG's amendment to create a Special Investigator General for Afghanistan Reconstruction.

But on balance, I cannot vote to support a bill that defies the will of so many Wisconsinites—and so many Americans—by allowing the President to continue one of the worst foreign policy mistakes in the history of our Nation.

Mr. LAUTENBERG. Mr. President, I rise to applaud the chairman and ranking members of the Senate Armed Services Committee, Senators LEVIN and MCCAIN, respectively, on passage of the National Defense Authorization Act for fiscal year 2008.

Specifically, I would like to express my gratitude to the bill conferees for their inclusion of four amendments that I authored and which were unanimously approved by the Senate during its initial consideration of this bill. These provisions will increase oversight of our country's economic and security assistance to Afghanistan by creating a Special Inspector General for Afghanistan Reconstruction, section 1229; help victims of state sponsored terrorism to achieve justice through the U.S. courts, section 1083; prevent military health care fees through the TRICARE program from rising, sections 701 and 702; and increase accountability and planning for safety and security at the Warren Grove Gunnery Range in New Jersey, section 359.

First, I was proud to be joined by my cosponsors, Senators COBURN, DODD, HAGEL, FEINGOLD, WEBB, and MCCASKILL, in creating a Special Inspector General for Afghanistan Reconstruction. I wrote this legislation because I believe that while a democratic, stable, and prosperous Afghanistan is important to the national security of the United States and to combating international terrorism, I am concerned that we are not achieving all of our goals there. The United States has provided Afghanistan with over $20 billion in reconstruction and security assistance. However, repeated and documented incidents of waste, fraud, and abuse in the utilization of these funds have undermined reconstruction efforts. I therefore believe that there is a critical need for vigorous oversight of spending by the United States on reconstruction programs and projects in Afghanistan.

I would like to emphasize that the Government Accountability Office and the departmental Inspectors general have provided valuable information on these activities. However, I believe that the congressional oversight process requires more timely oversight and reporting of reconstruction activities in Afghanistan. Oversight by this new Special Inspector General would encompass the activities of the Department of State, the Department of Defense, and the U.S. Agency for International Development, as well as other relevant agencies. It would highlight specific acts of waste, fraud, and abuse, as well as other managerial failures in our assistance programs that need to be addressed.

This new position will monitor U.S. assistance to Afghanistan in the civilian and security sectors, as well as in the counternarcotics arena, and will help both Congress and the American people better understand the challenges facing U.S. programs and projects in that country. I am pleased that this provision has been included in this final bill.

Second, this bill includes my legislation to provide justice for victims of state-sponsored terrorism, which has strong bipartisan support. I believe this legislation is essential to providing justice to those who have suffered at the hands of terrorists and is an important tool designed to deter future state-sponsored terrorism. The existing law passed by Congress in 1996 has been weakened by recent judicial decisions. This legislation fixes these problems.

In 1996, Congress created the "state sponsored terrorism exception" to the Foreign Sovereign Immunities Act, FSIA. This exception allows victims of terrorism to sue those nations designated as state sponsors of terrorism by the Department of State for terrorist acts they commit or for which they provide material support. Congress subsequently passed the Flatow Amendment to the FSIA, which allows victims of terrorism to seek meaningful damages, such as punitive damages, from state sponsors of terrorism for the horrific acts of terrorist murder and injury committed or supported by them.

Congress's original intent behind the 1996 legislation has been muddied by

numerous court decisions. For example, the courts decided in Cicippio-Puleo v. Islamic Republic of Iran that there is no private right of action against foreign governments—as opposed to individuals—under the Flatow Amendment. Since this decision, judges have been prevented from applying a uniform damages standard to all victims in a single case because a victim's right to pursue an action against a foreign government depends upon State law. My provision in this bill fixes this problem by reaffirming the private right of action under the Flatow Amendment against the foreign state sponsors of terrorism themselves.

My provision in this bill also addresses a part of the law which until now has granted foreign states an unusual procedural advantage. As a general rule, interim court orders cannot be appealed until the court has reached a final disposition on the case as a whole. However, foreign states have abused a narrow exception to this bar on interim appeals—the collateral order doctrine—to delay justice for, and the resolution of, victim's suits. In Beccham v. Socialist People's Libyan Arab Jamahiriya, Libya has delayed the claims of dead and injured U.S. service personnel who were off duty when attacked by Libyan agents at the Labelle Discothèque in Berlin in 1986. These delays have lasted for many years, as the Libyans have taken or threatened to take frivolous collateral order doctrine appeals whenever possible. My provision will eliminate the ability of state sponsors of terrorism to utilize the collateral order doctrine. My legislation sends a clear and unequivocal message to Libya. Its refusal to act in good faith will no longer be tolerated by Congress.

Another purpose of my provision is to facilitate victims' collection of their damages from state sponsors of terrorism. The misapplication of the "Bancec doctrine," named for the Supreme Court's decision in First National City Bank v. Banco Para El Comercio Exterior de Cuba, has in the past erroneously protected the assets of terrorist states from attachment or collection. For example, in Flatow v. Bank Saderat Iran, the Flatow family attempted to attach an asset owned by Iran through the Bank Saderat Iran. Although Iran owned the Bank Saderat Iran, the court, relying on the State Department's application of the Bancec doctrine, held that the Flatows could not attach the asset because they could not show that Iran exercised day-to-day managerial control over Bank Saderat Iran. My provision will remedy this issue by allowing attachment of the assets of a state sponsor of terrorism to be made upon the satisfaction of a "simple ownership" test.

Another problem is that courts have mistakenly interpreted the statute of limitations provision that Congress created in 1996. In cases such as Vine v. Republic of Iraq and later Buonocore v. Socialist People's Libyan Arab

Jamahiriya, the court interpreted the statute to begin to run at the time of the attack, contrary to our intent. It was our intent to provide a 10-year period from the date of enactment of the legislation for all acts that had occurred at anytime prior to its passage in 1996. We also intended to provide a period of 10 years from the time of any attack which might occur after 1996. My provision clarifies this intent.

My provision also addresses the problems that arose from overly mechanistic interpretations of the 1996 legislation. For example, in several cases, such as Certain Underwriters v. Socialist People's Libyan Arab Jamahiriya, courts have prevented victims from pursuing claims for collateral property damage sustained in terrorist attacks directed against U.S. citizens. My new provision fixes this problem by creating an explicit cause of action for these kinds of property owners, or their insurers, against state sponsors of terrorism.

Finally, in several cases the courts have prevented non-U.S. nationals who work for the U.S. Government and were injured in a terrorist attack during their official duties from pursuing claims for their personal injuries. My provision fixes this inequity by creating an explicit cause of action for non-U.S. nationals who were either working as an employee of the U.S. Government or working pursuant to a U.S. Government contract.

I also want to make special mention of the inspiration for this new legislation. On October 23, 1983, the Battalion Landing Team headquarters building in the Marine Amphibious Unit compound at the Beirut International Airport was destroyed by a terrorist bomb killing 241 marines, sailors, and soldiers who were present in Lebanon on a peacekeeping mission. In a case known as Peterson v. the Islamic Republic of Iran, filed on behalf of many of the marine victims and their families, the U.S. District Court ruled in 2003 that the terrorist organization Hezbollah was funded by, directed by, and relied upon the Islamic Republic of Iran and its Ministry of Information and Security to carry out that heinous attack. The judge presiding over this case, Judge Royce Lamberth, referred to this as "the most deadly state sponsored terrorist attack made against United States citizens before September 11, 2001." In September of this year Judge Lamberth found that Iran not only is responsible for this attack but also owes the families of the victims a total of more than $2.6 billion for the attack. Congress's support of my provision will now empower these victims to pursue Iranian assets to obtain this just compensation for their suffering. This is true justice through American rule of law.

However, President Bush's veto of the initial version of the National Defense Authorization Act for fiscal year 2008, H.R. 1585, on New Year's Eve required that my provision to provide

justice for victims of state-sponsored terrorism be amended. The President chose to take this extraordinary action without warning after asserting that he had not been aware of the provision's potential impact on the Government of Iraq. The President contended that this provision would hinder Iraqi reconstruction by exposing the current Iraqi government to liability for terrorist acts committed by Saddam Hussein's government and vetoed the entire Defense Authorization bill on that basis.

To address the President's concerns that the Government of Iraq could be made liable, the revised provision grants the President the authority to waive the terror victim's provision only for cases in which Iraq or the agencies, instrumentalities, or governmental actors are named defendants. The provision does not give the President the authority to waive any part of the provision for any case in which a government, its agencies, instrumentalities, or governmental actors are named defendants other than Iraq.

By insisting on being given the power to waive application of this new law to Iraq, the President seeks to prevent victims of past Iraqi terrorism—for acts committed by Saddam Hussein—from achieving the same justice as victims of other countries. Fortunately, the President will not have authority to waive the provision's application to terrorist acts committed by Iran and Libya, among others.

In addition, my new provision includes a Sense of the Congress that the Secretary of State should work with Iraq, on a state-to-state basis, to resolve the meritorious claims made against Iraq by terror victims. It is crucial that the victims of these terrorist acts be included in such discussions. Their approval of agreements made between the two governments on their behalf is critical to ensuring that justice is served.

Third, this Defense authorization bill includes my provision to prevent proposed increases in enrollment fees, premiums, and pharmacy copayments for TRICARE, the military community's health plan. The principal coauthor of this provision is Senator HAGEL.

Both career members of the uniformed services and their families endure unique and extraordinary demands and make extraordinary sacrifices over the course of 20-year to 30-year careers in protecting freedom for all Americans. I believe they deserve the best retirement benefits that a grateful nation can provide. Proposals to compare cash fees paid by retired military members and their families to fees paid by civilians fails to adequately recognize the sacrifice of military members. We must be mindful that military members prepay the equivalent of very large advance premiums for health care in retirement through their extended service and sacrifice.

The Department of Defense and our Nation have a committed obligation to

　　　　　　　　　　　CONGRESSIONAL RECORD — SENATE　　　　　　　　　　*January 22, 2008*

provide health care benefits to Active Duty, National Guard, Reserve, and retired members of the uniformed services, their families, and survivors, that considerably exceed the obligation of corporate employers to provide health care benefits to their employees. Ultimately, the Department of Defense has options to constrain the growth of health care spending in ways that do not disadvantage current and retired members of the uniformed services, and it should pursue any and all such options as a first priority. Raising fees excessively on TRICARE beneficiaries is not the way to achieve this objective.

Finally, I thank the conferees for including my amendment to require increased oversight and accountability, as well as improved safety measures, at the Warren Grove Gunnery Range in New Jersey. I wrote this provision with Senator MENENDEZ because a number of dangerous safety incidents caused by the Air National Guard have repeatedly impacted the residents living nearby the range.

On May 15, 2007, a fire ignited during an Air National Guard practice mission at Warren Grove Gunnery Range, scorching 17,250 acres of New Jersey's Pinelands, destroying 5 houses, significantly damaging 13 others, and temporarily displacing approximately 6,000 people from their homes in sections of Ocean and Burlington Counties in New Jersey.

My provision will require that an annual report on safety measures taken at the range be produced by the Secretary of the Air Force. The first report will be due no later than March 1, 2008, and two more will be due annually thereafter. My provision will also require that a master plan for the range be drafted that includes measures to mitigate encroachment issues surrounding the range, taking into consideration military mission requirements, land use plans, the surrounding community, the economy of the region, and the protection of the environment and public health, safety, and welfare. I believe that these studies will provide the type of information that we need to ensure that there is long-term safety at the range, both for the military and the surrounding communities.

Mr. SPECTER. Mr. President, I have sought recognition to address the pay raise given to members of the U.S. military. On December 28, 2007, President Bush vetoed the National Defense Authorization Act for Fiscal Year 2008 because of a disagreement over a provision in the Justice for Victims of State Sponsored Terrorism Act of 2007.

The disagreement over language in the Justice for Victims of State Sponsored Terrorism Act has affected far more individuals than the legislation itself addresses. By holding up the signing of the National Defense Authorization Act for Fiscal Year 2008, it jeopardized the pay raise which was promised to our Nation's servicemen and servicewomen.

On January 4, 2008, the President issued Executive Order 13454, which gave all members of the military a 3-percent pay raise effective January 1, 2008. I commend the House for its January 16, 2008, decision to make retroactive to January 1, 2008, a 3.5-percent pay raise for members of the uniformed services. This was the number that the House and the Senate agreed upon before we sent the bill to President Bush in December; I think it is only fair this be the number we return to when we again submit the bill to the President. The men and women of the military should not be made to suffer for disagreements between the Congress and the White House.

Mr. REID. Mr. President, in a few minutes, I am going to ask unanimous consent to take up the authorization bill for the Department of Defense for fiscal year 2008. But before we proceed to consider and pass this important legislation, I want to take just a moment to advise my colleagues of the unfortunate and troubling path that this legislation has taken since the Senate last voted to pass it on December 14.

On December 19, the same day the other body adjourned its first session, the Congress sent to the President legislation, H.R. 1585, that was identical to the bill we are about to take up and pass, with one substantive difference regarding section 1083 and several associated technical corrections necessary due to the delay of the bill's enactment.

What I want to focus on today is the manner in which the President chose to exercise his veto prerogative. As the Chair and our colleagues are well aware, the Framers of our Constitution deliberately gave the President only a limited or qualified veto power, one that could be overridden by Congress if it could muster a two-third vote in both Houses—a formidable challenge. But President Bush was not satisfied simply to veto the bill and risk an override, as contemplated under our constitutional process.

Rather, on December 28, the President issued a memorandum of disapproval stating that, because the other body had adjourned its first session, while the Senate remained in session to protect its advise-and-consent prerogative, he considered the bill pocket vetoed, relying upon the constitutional provision that protects against the Congress's adjourning in order to prevent the President from exercising his veto power. But the President did not actually pocket the bill. Instead, using the mechanism provided in the rules of the other body for such periods as the December holidays, the White House returned the bill, with the President's veto message, to the Clerk of the House, for transmission to the full body when it reconvened last week. The President said that he was returning the bill "to avoid unnecessary litigation" and "to leave no doubt" that he was vetoing the bill.

The Constitution does not provide for double vetoes: A bill is vetoed either by being returned or, if return is prevented by Congress's adjournment, by being pocketed. Here, the President returned the bill to the other body through delivery to the Clerk. Obviously, the adjournment did not prevent the bill's return. Accordingly, the bill was not subject to a pocket veto. Had the President not returned the bill within the 10 days—excluding Sunday—prescribed by the Constitution, the bill would have become law without his signature. That fact explains why the President returned the bill.

Indeed, in 1983, President Reagan attempted to pocket veto a military aid appropriations measure during an analogous adjournment—the break between the first and second sessions of the 98th Congress. On a bipartisan basis, the Senate joined a group of Members of the other body to challenge that attempted misuse of the pocket veto in a Federal court case called Barnes v. Kline. Although the decision was subsequently vacated because the fiscal year for the military aid bill had expired in the meantime, thereby mooting the case, the Court of Appeals for the District of Columbia Circuit rejected the Executive's attempt to pocket veto the bill and held that, because it could have been returned to the House, under the Constitution the bill had become law. The court held that three factors, when taken together, establish that adjournment of the first session of a Congress does not prevent the President from returning a bill under the Constitution: First, "[t]he existence of an authorized receiver of veto messages"; second, "the rules providing for carryover of unfinished business" in the second session of a Congress; and third, "the duration of modern intersession adjournments."

In that decision, the court of appeals built upon the foundation laid by our colleague, the senior Senator from Massachusetts, who, a decade earlier personally had argued and won the case Kennedy v. Sampson in the same court, thereby establishing the President's duty to return bills to Congress, through its appointed officers, during intrasession adjournments. As the court made clear, during both types of adjournments, the application of the pocket veto clause has necessarily been guided from the beginning by its "manifest purpose." And that purpose is solely to ensure that the Congress cannot deprive the President of his right to exercise the qualified veto, not to permit the President to accomplish what the Framers of our Constitution denied him—by transforming the qualified veto into an absolute veto.

I have gone into some detail in explicating the background and history of the pocket veto controversy because of its importance to our constitutional system of separation of powers and checks and balances between the branches. The President should abandon the strange and unseemly practice

*January 22, 2008*   CONGRESSIONAL RECORD — SENATE   **S57**

of maintaining that he cannot return a bill to Congress, while simultaneously returning the bill. Such game-playing is unworthy of the Office of the President and breaks faith with the brilliant, carefully crafted system that the Founders bequeathed to us and future generations.

However, much as part of me would like to see Congress take the opportunity provided by the President's action here to establish definitively the Congress's constitutional power to override a veto exercised during its adjournment, the Nation's security and the care of our troops and wounded warriors demands that we get this bill signed into law as soon as possible. This bill provides important congressional authorizations and guidance for the Nation's defense budget, a 3.5-percent 9 pay raise and key bonuses for the troops, legislation to improve the system of care for our wounded warriors, and authorization to establish a war profiteering commission. The President's veto of this bill in December has already delayed these provisions for too long.

I also want to reiterate that it is my belief that the Government of Iraq should take responsibility for what has taken place there in years past, including the brutal torture of American POWs. Congress has gone on record repeatedly—most recently, in overwhelmingly passing section 1083 of the conference report to H.R. 1585 last year in both the House and Senate and sending it to the President—to support the efforts of these Americans who have suffered so much for their country to hold their torturers accountable. This administration has been fighting for years to oppose efforts to win compensation for these American soldiers, which is, frankly, a disgrace.

In light of the President's veto over this issue, I call on him and his administration to work with the POWs and their family members to facilitate negotiations with the Government of Iraq. It is my understanding that the administration has been working with Iraq to settle gulf war commercial debts with foreign corporations such as Mitsubishi of Japan and Hyundai of Korea through issuance of Iraqi bonds. This mechanism takes no funds from the reconstruction of Iraq. It is beyond me why the administration would refuse to do at least that for the POWs. The administration needs to make this right.

The bill (H.R. 4986) was ordered to a third reading and was read the third time.

Mr. LEVIN. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There is a sufficient second.

The question is on passage of the bill.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New York (Mrs. CLINTON), the Senator from New Jersey (Mr.

MENENDEZ), and the Senator from Illinois (Mr. OBAMA) are necessarily absent.

I further announce that, if present and voting, the Senator from New Jersey (Mr. MENENDEZ) would vote "yea."

Mr. KYL. The following Senators are necessarily absent: the Senator from Arizona (Mr. MCCAIN), the Senator from South Dakota (Mr. THUNE), and the Senator from Virginia (Mr. WARNER).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 91, nays 3, as follows:

[Rollcall Vote No. 1 Leg.]

YEAS—91

| | | |
|---|---|---|
| Akaka | Dole | McCaskill |
| Alexander | Domenici | McConnell |
| Allard | Dorgan | Mikulski |
| Barrasso | Durbin | Murkowski |
| Baucus | Ensign | Murray |
| Bayh | Enzi | Nelson (FL) |
| Bennett | Feinstein | Nelson (NE) |
| Biden | Graham | Pryor |
| Bingaman | Grassley | Reed |
| Bond | Gregg | Reid |
| Boxer | Hagel | Roberts |
| Brown | Harkin | Rockefeller |
| Brownback | Hatch | Salazar |
| Bunning | Hutchison | Schumer |
| Burr | Inhofe | Sessions |
| Cantwell | Inouye | Shelby |
| Cardin | Isakson | Smith |
| Carper | Johnson | Snowe |
| Casey | Kennedy | Specter |
| Chambliss | Kerry | Stabenow |
| Coburn | Klobuchar | Stevens |
| Cochran | Kohl | Sununu |
| Coleman | Kyl | Tester |
| Collins | Landrieu | Vitter |
| Conrad | Lautenberg | Voinovich |
| Corker | Leahy | Webb |
| Cornyn | Levin | Whitehouse |
| Craig | Lieberman | Wicker |
| Crapo | Lincoln | Wyden |
| DeMint | Lugar | |
| Dodd | Martinez | |

NAYS—3

| | | |
|---|---|---|
| Byrd | Feingold | Sanders |

NOT VOTING—6

| | | |
|---|---|---|
| Clinton | Menendez | Thune |
| McCain | Obama | Warner |

The bill (H.R. 4986) was passed.

The PRESIDING OFFICER. The motion to reconsider is considered made and laid on the table.

The majority leader is recognized.

---

## UNANIMOUS CONSENT REQUEST—S. 2541

Mr. REID. Mr. President, I am glad we have a large number of Senators here today. I want to go over the schedule for this week.

First of all, I am going to ask unanimous consent, and I will do that now, that the Senate proceed to the consideration of S. 2541, which is a 30-day extension of the Foreign Intelligence Surveillance Act we are going to be dealing with; that the bill be read three times, passed, the motion to reconsider be laid upon the table, with no intervening action or debate.

The reason I ask consent on this legislation is that this bill expires on February 1. The House has not acted on this bill yet, so when we pass this bill, the House has to pass their bill, and

there has to be a conference. I hope we could have this extension. I need not belabor the point. I asked this consent before we left; I ask it again.

The PRESIDING OFFICER. Is there objection? The Republican leader.

Mr. MCCONNELL. Mr. President, reserving the right to object, and I will be objecting, let me say, my good friend, the majority leader, and I have discussed this issue. There is a significant amount of time left this month to pass this bill in the Senate. A conference may or may not be necessary. Back in August, when we did an extension of the FISA bill, the House simply took up the Senate-passed bill and passed it, and it went down to the President for signature. So I think the discussion of extension, particularly when, hopefully, we will turn to this bill in the very near future in the Senate, is not timely and, therefore, I object.

The PRESIDING OFFICER. Objection is heard.

The majority leader.

Mr. REID. Mr. President, for all Members here, we are on the Indian health bill now. I hope we can complete that bill tomorrow. The Republicans are having a retreat. They are having theirs tomorrow; we are going to have ours in 10 days or so. There will be activities on the Senate floor tomorrow, but there will be no votes. If there are any votes tomorrow, it will be after they finish their retreat, after 6 o'clock tomorrow night.

So we hope some work can be done on this bill tomorrow. We know the Republicans will be absent, so that makes it very difficult.

We have to finish FISA this week. Everyone should be aware of that point. We have to finish it this week. I know there are important trips people want to take. We have the very important economic conference in Davos that Democrats and Republicans alike would like to go to.

I say, unless we finish the bill Thursday—and we will not be able to get to it until tomorrow night—unless we finish the bill on Thursday, then we are going to have to continue working this week until we finish this bill. We have to finish this bill. It is not fair to the House to jam them so that they have 1 day to act on this legislation. If we finish it this week, I have spoken to the Speaker today and they will work to complete this matter next week. It would be to everyone's advantage if we had more time to do this.

I respect what the Republican leader has said, but everyone here should understand all weekend activities have to be put on hold until we finish this bill. Now, it is possible we could finish it fairly quickly. We are going to work from the intelligence bill, and if amendments are offered that people don't like, I would suggest they move to table those amendments. Because if people think they are going to talk this to death, we are going to be in here all night. This is not something

1

## PROOF OF SERVICE

2

HIS EXCELLENCY AYATOLLAH SAYED
'ALI KHAMENEI

3

THE OFFICE OF THE SUPREME
LEADER

4

Islamic Republic Street
Shahid Keshvar Doust Street

5

Tehran, Islamic Republic of Iran

6

HIS EXCELLENCY MAHMOUD
AHMADINEJAD THE PRESIDENT

7

Palestine Avenue
Azerbaijan Intersection

8

Tehran, Islamic Republic of Iran

9

ISLAMIC REPUBLIC OF IRAN
Pasadaran Avenue

10

Golestan Yekom
Teheran, Iran

11

ATTN: President Mahmoud Ahmadinejad or
Responsible Officer or Agent for Service of

12

Process

13

ISLAMIC REPUBLIC OF IRAN
acting through its MINISTRY OF DEFENSE

14

AND SUPPORT FOR ARMED FORCES
No. 1 Shahid Kaboli Street

15

Beginning of Resalat Highway
Seyyed Khandan Bridge

16

P.O. Box 16765-1479
Tehran, Iran

17

Attn: President Mahmoud Ahmadinejad or
Responsible Officer or Agent for Service of

18

Process

19

ISLAMIC REPUBLIC OF IRAN
Khomeini Avenue

20

United Nations Street
Teheran, Iran

21

ATTN: President Mahmoud Ahmadinejad or
Responsible Officer or Agent for Service of

22

Process

23

Director, Human Rights Headquarters of Iran
HIS EXCELLENCY MOHAMMAD

24

JAVAD LARIJANI
c/o Office of the Deputy for International

25

Affairs
Ministry of Justice

26

Ministry of Justice Building
Panzdah-Khordad (Ark) Square

27

Tehran, Islamic Republic of Iran

28

Minister of Intelligence
GHOLAM HOSSEIN MOHSENI EJEIE
MINISTRY OF INTELLIGENCE
Second Negarestan Street
Pasdaran Avenue
Tehran, Islamic Republic of Iran

Head of the Judiciary
AYATOLLAH MAHMOUD HASHEMI
SHAHROUDI
Howzeh Riyasat-e Qoveh Qazaiyeh
Office of the Head of the Judiciary
Pasteur Street, Vali Asr Avenue
South of Serah-e Jomhouri
Tehran 1316814737
Islamic Republic of Iran

MINISTRY OF ROADS AND
TRANSPORTATION
Attn: MOHAMMED RAHMATI
MINISTER OF ROAD AND
TRANSPORTATION
Taleghani Avenue
Tehran, Iran

ALI TAHERI
DEPUTY MINISTER AND MANAGING
DIRECTOR
PORT & SHIPPING ORGANIZATION OF
THE ISLAMIC REPUBLIC OF IRAN
Building No. 2
South Didar Street
Shahid Hagnai Expressway,Vanak Square
Tehran, Iran

NATIONAL IRANIAN OIL REFINING
AND DISTRIBUTION COMPANY
Opposite of Arak Alley Ostad Nejatollahi
Ave.
Zip Code 15989
P.O. Box 15815/3499
Tehran, Iran
ATTN: Responsible Officer or Agent for
Service of Process

MINISTRY OF PETROLEUM OF THE
ISLAMIC REPUBLIC OF IRAN
HAFEZ CROSSING
Taleghani Avenue
Tehran, Iran
ATTN: Responsible Officer or Agent for
Service of Process

1 | NATIONAL IRANIAN OIL PRODUCTS
DISTRIBUTION COMPANY
2 | Bahar St, Somaya Corner
Tehran 15617/ 33315
3 | P.O .Box 6165
Tehran
4 | ATTN: Responsible Officer or Agent for
Service of Process
5
NATIONAL IRANIAN OIL COMPANY
6 | Hafez Crossing
Taleghani Avenue
7 | Tehran, Iran
ATTN: Responsible Officer or Agent for
8 | Service of Process

9 | MATTHEW S. WEILER, ESQ.
MORGAN LEWIS & BOCKIUS, LLP
10 | One Market, Spear Street Tower
San Francisco, CA 94105

11

        I declare:

12

        I am employed in the County of San Francisco, California. I am over the age of eighteen
13 | (18) years and not a party to the within cause. My business address is 165 Fell Street, San
Francisco, CA 94102. On the date set forth below, I served the attached:

14

        MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO OPPOSITION TO
15 |    NON-PARTY CMA CGM TO PLAINTIFFS' MOTION COMPELLING ASSIGNMENT
        OF RIGHTS PURSUANT TO C.C.P. § 708.510 AND FRCP 69(a)

16

on the above-named person(s) by:

17

    XXX   (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage
18 | thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
person(s) served above.

19

        I declare under penalty of perjury that the foregoing is true and correct.

20

        Executed on October 1, 2008.

21

22                                    /s/ Karene Jen
                                          Karene Jen
23

24

25

26

27

28

## Responses and Replies
3:08-mc-80030-JSW Peterson v. Islamic Republic of Iran **CASE CLOSED on 05/07/2008**
REFR&R-BZ

<br>

### U.S. District Court
### Northern District of California
### Notice of Electronic Filing or Other Case Activity

NOTE: Please read this entire notice before calling the Help Desk. If you have questions, please email the Help Desk by replying to this message; include your question or comment along with the original text.

Please note that these Notices are sent for all cases in the system when any case activity occurs, regardless of whether the case is designated for e-filing or not, or whether the activity is the filing of an electronic document or not.

If there are **two** hyperlinks below, the first will lead to the docket and the second will lead to an e-filed document.
*If there is no second hyperlink, there is no electronic document available* .
See the FAQ posting 'I have a Notice of Electronic Filing that was e-mailed to me but there's no hyperlink...' on the ECF home page at https://ecf.cand.uscourts.gov for more information.

<br>

The following transaction was received from by Cook, David entered on 10/1/2008 6:43 PM and filed on 10/1/2008
**Case Name:**        Peterson v. Islamic Republic of Iran
**Case Number:**      3:08-mc-80030
**Filer:**            Deborah D. Peterson
**WARNING: CASE CLOSED on 05/07/2008**
**Document Number:** 174

**Docket Text:**
**Reply to Opposition *to Non-Party CMA CGM to Plaintiffs' Motion Compelling Assignment of Rights* filed byDeborah D. Peterson. (Cook, David) (Filed on 10/1/2008)**

<br>

**3:08-mc-80030 Notice has been electronically mailed to:**

Deutsche Bank Trust Company Americas    mlewis@whitecase.com

International Finance Corporation    fvasquez@whitecase.com

Mitsui O.S.K. Lines, Ltd.    iord@nixonpeabody.com

Alan Nakazawa    email@cnc-law.com, alan.nakazawa@cnc-law.com, daghabeg@cnc-law.com

David Farrell Smith    dsmith@sherblackwell.com

David J. Cook    Cook@SqueezeBloodFromTurnip.com

Dena Susann Aghabeg    email@cnc-law.com

Francis Anthony Vasquez , Jr    fvasquez@whitecase.com, dmartinko@whitecase.com, fpanopoulos@whitecase.com, julrich@whitecase.com

Isabelle Louise Ord    iord@nixonpeabody.com, sf.managing.clerk@nixonpeabody.com

Jay Robert Henneberry    jhenneberry@chadbourne.com, rcabatbat@chadbourne.com

Jerrold Evan Abeles    abeles.jerry@arentfox.com, labarreda.vivian@arentfox.com

Mark Frederick Lambert    mlambert@whitecase.com, mkenny@whitecase.com

Matthew Paul Lewis    mlewis@whitecase.com

Matthew S. Weiler    mweiler@morganlewis.com, lwalker@morganlewis.com, mbravin@morganlewis.com, pbuscemi@morganlewis.com

Mitchell S. Griffin    mgriffin@cwghp.com, mssargent@cwghp.com

Nicole Bussi   & nbsp nicole.bussi@kyl.com

Noel Andrew Leibnitz    aleibnitz@fbm.com, calendar@fbm.com, dwilliams@fbm.com

Robert Joseph Perkiss    cookdavidj@aol.com

Roger Brian Coven    roger.coven@hklaw.com

Ryan Sandrock    rsandrock@sidley.com

William Lewis Stern    wstern@mofo.com, jfogel@mofo.com

**3:08-mc-80030 Notice has been delivered by other means to:**

Frank Panopoulos
White & Case LLP
701 - Thirteenth Street, N.W.
Washington, DC 20005

Tianjing Zhang
Holland & Knight LLP
633 West Fifth Street
21st Floor
Los Angeles, CA 90071-2040

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Documents and Settings\kay\My Documents\Scan Folder\20081001183522.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=10/1/2008] [FileNumber=4734494-0]
[3006925ca08e54d1fbc261ca845fd60cb4c1dbae95bdbbc075edd03df93d8f2f4be22
fcd9c57b58ca89b95758937d6995dd359e141305cb0c55f1f9ee2561fe8]]