1  case.  That was a case in which the judgment had been entered

2  in February 2006.  There was a judgment against Iran entered in

3  February 2006.  They tried to rely on 1605(A).  And the

4  District Court there said, "No, that's not pending before the

5  court.  Section 1083 of the National Defense Authorization Act

6  is not triggered.  You cannot deem it to be refiled under

7  1605(A)."

8            Okay.  So that's the argument that 1605(A) just

9  doesn't help the plaintiffs here at all.  Period.

10           But let's, for the sake of further argument, say that

11  they are covered by 1605(A).  What does 1605(A) itself have to

12  say about property disposition, which is the subtitle of

13  subsection G?

14           So we're now in 1605(A), Subsection G, property

15  disposition.

16           And it says, under sub one, in general, in every

17  action filed in the United States District Court in which

18  jurisdiction is alleged under this section, the filing of a

19  notice of pending action pursuant to this section to which is

20  attached a copy of the complaint filed in the action shall have

21  the effect of establishing a lien of *lis pendens* upon any real

22  property or tangible personal property that is, capital A,

23  subject to attachment in aid of execution or execution under

24  Section 1610.

25           So the very new provision enacted in January 2008 on

1  which plaintiffs here seek to rely tells us that the property

2  that can be attached is the same property that's referred to in

3  Section 1610(a), which is a general provision applicable across

4  the board that provides exceptions to foreign state immunity

5  from attachment or execution.

6          That brings us back to where we started.  It says the

7  property in the United States of a foreign state used for a

8  commercial activity in the United States shall not be immune

9  from attachment.

10         So there is no change of that provision.  1610(a) is

11 not amended at all by 1605(A), except to the extent that a new

12 sub 7 is added at end of the -- so if you qualify --

13             If you qualify under 1610(a), and if

14             you have property located in the

15             United States of the foreign state, and if

16             that property is used for a commercial

17             activity in the United States, then you

18             must meet one of the -- one or more of the

19             listing:  1, 2, 3, 4, 5, 6, 7 -- under

20             1610(a).

21         And you'll notice that in 7, they say the judgment

22 relates to the claim -- to a claim for which the foreign state

23 is not immune under Section 1605(A), regardless of the

24 property; whether the property is or was involved with the act

25 upon which the claim is based.

1        So the -- that allows someone who can't meet 1, 2, 3,

2   4, 5, or 6 -- and I don't understand the plaintiffs here to be

3   saying that they can -- to say, "Well, we can meet number 7";

4   but it doesn't change the preliminary language of Section

5   1610(a).  You still need property located in the United States.

6   And that property still must be used for a commercial activity

7   in the United States.  And unless you have those two criteria,

8   even if you think you could meet sub 7, you don't even get in

9   the doorway.

10        THE COURT:  Right.  This is, I guess, what I'm not

11   sure we're arguing about.  I think I agree with you.  And I

12   thought that that was the way I had drafted my proposed order.

13        MR. BUSCEMI:  Well, your Honor --

14        THE COURT:  Because it was limited to property that

15   existed in the United States that arose out of the commercial

16   activities.  What are we quibbling over?  The use -- let's see,

17   I think --

18        MR. BUSCEMI:  We're quibbling over the fact of --

19        THE COURT:  I said that it arises out of a bunch of

20   things.  And you're saying what it has to be used for --

21        MR. BUSCEMI:  Your report and recommendation.  This

22   is where we started when I was going through your four

23   restrictions.  Your second restriction says the right to

24   payment must arise out of Iran's commercial activities.

25        THE COURT:  Right.

1          **MR. BUSCEMI:**  And you have "without limitation."

2    That is not the way the language reads.  It must be property

3    that's used for a commercial activity in the United States.

4          **THE COURT:**  But how could a right to payment not --

5    which arises out of commercial activities not -- isn't that

6    almost self-defining?

7          **MR. BUSCEMI:**  Well, there is no suggestion -- I

8    haven't heard a word in all of the papers that the plaintiff

9    has filed that any alleged debt owed by our client to the

10   Government of Iran was used for commercial activity in the

11   United States.

12         **THE COURT:**  There may not be any.  I mean, this is,

13   again, part of -- I come back to what I said.  I had assumed

14   that the reason that you're -- The French Line went first was

15   because Mr. Cook had listened to what I had said last time, and

16   had chosen an obligor that it seemed fruitful to pursue.

17         So I was surprised when I got Mr. Schmidt's

18   declaration.  Now, Mr. -- I heard Mr. Cook's response, saying

19   he doesn't know exactly what that means.  And I suppose this

20   may be one of those usual situations where there has to be some

21   discovery taken.

22         Again, we're getting very much into a -- you know,

23   where does the cart begin?  Does it begin with the horse?  Does

24   it begin with the person leading the horse?  Does it begin with

25   the call to the stable to get the horse saddled to the cart?

```
 1  I've got to start somewhere.
 2           MR. BUSCEMI:  Your Honor --
 3           THE COURT:  The way I understand, you're -- let's put
 4  aside 1605.  The way I understand, you're saying that unless
 5  and until the plaintiff can identify the specific piece of
 6  property that he wants assigned, I don't even have jurisdiction
 7  to proceed.
 8           MR. BUSCEMI:  That's right.  That's right,
 9  your Honor.
10           THE COURT:  Because -- and I just -- I understand
11  what you're saying --
12           MR. BUSCEMI:  And that's true.
13           THE COURT:  -- but that would, in effect, mean that
14  the -- the California procedures are nugatory, because I don't
15  have jurisdiction to proceed.  I don't even have jurisdiction
16  to permit discovery.  And if I don't have jurisdiction to
17  permit discovery, as I say, we can't even call the stable to
18  saddle the cart to the horse.
19           MR. BUSCEMI:  Well, your Honor, I don't think that
20  that's --
21           THE COURT:  And I think that's going to require -- I
22  mean, you may be right.  Obviously, there isn't a lot of law on
23  exactly what this state statute means --
24           MR. BUSCEMI:  Well --
25           THE COURT:  -- and how Rule 69, you know, applies,
```

1  but I think that's probably going to require, if not

2  Judge White, then the Ninth Circuit, I think, to sort out.

3       It seems to me that I've sort of got to start

4  somewhere.  And I have tried to craft my order to be consistent

5  with 1610, and the cases that I understand that construe 1610

6  to have limited to commercial activities.

7       Now, as I say, it may turn out there is no such

8  property, and Mr. Cook will have wasted a lot of his time and a

9  lot of your client's time pursuing it.  And that part, as I

10 say, does trouble me.  That's why I've tried to stagger the 30

11 or 40 motions that have been filed in this case to sort one of

12 them out; but I think in that respect, unless there's a

13 particular -- you know, unless we're getting into wordsmithing,

14 I am not prepared to accept your argument that until he

15 identifies a specific piece of property more specifically than

16 he has, that I don't have jurisdiction to proceed under Rule 69

17 and Section 780.510 of the California Code of Civil Procedure.

18       MR. BUSCEMI:  Your Honor, let me say that, first of

19 all, we're here, quote, "going first," at least as far as our

20 client --

21       And, by the way, our client's name, for the record,

22 is "CMA CGM."  It is not "The French Line."  It's not "CMA CGM

23 S.A." both of which have been alleged by plaintiffs; both of

24 which Mr. Schmidt has expressly denied.  There is no such

25 entity as CMA CGM, S.A.  And there is no --

```
 1              THE COURT:  I'm not making any findings in any other
 2   fashion.
 3              MR. BUSCEMI:  Okay.  That's fine.
 4              THE COURT:  I think what I said in here is that this
 5   is what the plaintiff says -- the plaintiffs say they are known
 6   as.  They are identified as CMA CGM, The French Line.
 7              If you object to my using the term "French Line," I
 8   will gladly amend the order to simply refer to CMA CGM.  I
 9   don't know.  Mr. Cook, do you have any objection?
10              MR. COOK:  No.
11              THE COURT:  You haven't been told exactly who they
12   are.
13              MR. COOK:  No, sir.
14              THE COURT:  All right.
15              MR. BUSCEMI:  Your Honor, a preliminary second point
16   that I would like to make is that we're here -- at least, as
17   far as we know, we're here proceeding first because we were
18   invited to do so by the Court's briefing order.  There is
19   nothing --
20              THE COURT:  No.  You're proceeding first because you
21   were the first motion that was filed.
22              MR. BUSCEMI:  That may be the reason for the Court's
23   briefing order.
24              THE COURT:  And I assume, as again, that's consistent
25   with what I have told Mr. Cook at the last hearing or one of
```

1  the last hearings -- that, you know, yours was one of the more

2  concrete cases.  So, as I said earlier, I was struck by the

3  fact that, you know, perhaps Mr. Cook has struck out.

4          MR. BUSCEMI:  No.  There's nothing concrete about

5  this case at all.  This is a totally abstract assignment.  It's

6  an assignment that should not be ordered in this context.

7          We know that Iran isn't here.  They can't speak for

8  themselves.

9          We've been invited to submit a memorandum.  That's

10  why we submitted it.  The Court invited us to do it.

11          Now we get criticized by the plaintiff for having the

12  temerity to follow the Court's order.

13          THE COURT:  I'm not paying any attention to that.

14  And I've tried to take your objections.  I've paid attention to

15  them.  And that's why I issued my limiting order.  I thought

16  that I had dealt with most of your objections.

17          It seemed to me that the sovereign-immunity

18  objections would probably be better raised by Iran, and

19  possibly at the next hearing, because I understand that Iran

20  has strategically appeared from time to time in these

21  proceedings.

22          MR. COOK:  The answer to that, your Honor, is Iran is

23  vigorously opposing -- the *Rubin* plaintiffs' efforts to seize

24  the cuneiform tablets in the Northern District matter before

25  Judge Manning, and vigorously -- is vigorously -- in fact,

1   there's vigorous post-judgment discovery going on.

2           There has been in -- they have appeared in the

3   District of Columbia, I believe, in the *McKesson* action, if my

4   memory serves me.  They have not appeared -- they have not

5   appeared at the trial court in any of my actions.  And we're --

6   they might have appeared -- I think they have appeared in the

7   Seventh Circuit in one of the appeals in my cases before

8   Judge Manning.

9           I have a lot of matters, so -- but at a trial level,

10  the answer is no.

11          **THE COURT:**  So I don't know whether Iran will appear;

12  whether it will sign the assignment; if there will be a

13  show-cause hearing thereafter, whether they will appear at

14  that.

15          By the way, if we -- if we wind up getting to that

16  point -- I don't want to get distracted by -- I have a few

17  things I wanted to talk about.  One of the things that I'm

18  going to expect plaintiffs to pay particular attention to is

19  whether there's been adequate service on whoever it is that

20  will be the subject of the show-cause hearing, but it seemed to

21  me that, you know, I mean, I agree with you that I need

22  jurisdiction.

23          It seemed to me for the purposes of these

24  proceedings, I thought I had jurisdiction.  And I think that if

25  I accept your reading of the statutes and how they fit

1  together, there would never be a collection proceeding, almost;

2  you know, unless somehow, the plaintiff knew of precisely what

3  it was they wanted to attach, and it was evident from the

4  outside that it, you know, met all the requirements you've met.

5  And again, I'm just not sure that the state law is that

6  restrictive.  And I don't know that I'm prepared to find that

7  the federal law is as much of an obstacle as you think it is.

8           **MR. BUSCEMI:**  Your Honor, let me just make a couple

9  of additional points.

10          **THE COURT:**  But I do not want you to think that I've

11  ignored your arguments.  I thought I was responding to a number

12  of them.

13          **MR. BUSCEMI:**  As I said at the beginning, we

14  appreciate the limitations.  I think that the limitations are

15  helpful.  And I think that, as a consequence of the

16  limitations, the real-world impact of the assignment that

17  your Honor has tentatively issued would be merely the extension

18  of these proceedings, some measure of activity by the

19  plaintiffs which may require some greater expense and effort on

20  our part; but I think at the end of the day, there won't be

21  anything there.

22          I want to say a couple of additional points, though,

23  because first of all, if we put aside the jurisdictional point,

24  and we say for the sake of argument that the plaintiff can come

25  in and -- essentially what your Honor is saying, I think, is

1  that if you want to seek relief under -- in the form of an

2  attachment invoking this California state statute, and I want

3  to find jurisdiction under the Foreign Sovereign Immunities

4  Act, because that's the -- everybody agrees that's the

5  exclusive source of jurisdiction.  You don't get jurisdiction

6  over the foreign state any other way.  So if you want to do

7  that, all you have to do is come to court and say, "We think

8  there may be something here.  We're -- we've established

9  jurisdiction.  There may be, because we can't identify

10  anything, but there might be."

11          THE COURT:  I think it's a little more than that.

12          I mean, I suppose you haven't denied that -- that you

13  do business with Iran.

14          I think your claim is that the business you do moves

15  in and out of Marseilles, and therefore, there may not be any

16  property that is in the United States that's reachable.

17          I don't think that the plaintiffs are simply pulling

18  out any, you know, sort of red herring that they can.  One of

19  the difficulties they have with this case is that, you know,

20  the collection-action statutes are meant to deal with fairly

21  straightforward types of collection situations.

22          For example, if you look at an example of the rights

23  enumerated under the California statute that are typically

24  assigned, you know, like wages and things like that, well,

25  this, folks -- this is not your typical case.  And Iran is not

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

1   your typical judgment debtor.

2            And so I'm trying to figure out my way through this

3   with those kinds of concepts in mind.

4            **MR. BUSCEMI:**  I don't disagree that this is not a

5   typical case, and that Iran is not a typical judgment debtor.

6   I think that's exactly right, but I do think that the case law

7   that deals with the California statute -- and, as I say,

8   putting -- you know, I think what -- Mr. Cook's comments were

9   very telling.  He said -- and I wrote them down.  He said that

10  CMA CGM has, quote, "some presence here."  Those were his exact

11  words; and, quote, "some connection with Iran."

12           So those are his jurisdictional allegations:  that

13  our client has some presence here, and they have some

14  connection with Iran.

15           Now that, in our view, isn't adequate; but let's say

16  it is.  Let's say it is, and that the Court has jurisdiction.

17  Then we go to the California statute.  And the California

18  statute, as it's been interpreted by the courts, talks about a

19  specific item that has to be assigned.  So even under -- the

20  California statute contemplates specificity in identifying what

21  the property is.

22           So even if we pass the jurisdictional hurdle, we're

23  still -- we still have a problem.  And similarly now,

24  your Honor, again, your Honor has -- I want to be quick to

25  acknowledge that your Honor has said -- subject to whatever's

1 happening before Judge White, as your Honor said a moment ago,

2 your Honor has said that the only assignment here would be by

3 Iran.

4        Now, if you look at the papers that the plaintiff has

5 filed, the plaintiff has not even claimed that our client has

6 ever done anything with Iran.  They say that they've had some

7 dealings with the ports and shipping organization, and the

8 National Iranian Oil Products Distribution Company.

9        Now, Iran is not the ports and shipping organization.

10 It's not the National Iranian Oil Products Distribution

11 Company.  There's no showing here that's been made that these

12 are alter egos.

13        And we have case law.  The very case that Mr. Cook

14 mentioned a moment ago, the *Flatow* case, talks about a

15 presumption of independent status, which hasn't been overcome.

16        The Supreme Court's decision 25 years ago in the

17 *First National City Bank against Bancec* case established the

18 criteria that must be met in order to treat a foreign state and

19 some connected entity as one and the same.  Those requirements

20 haven't been satisfied here, either.

21        So we appreciate very much the opportunity to be

22 heard.  And we would urge the Court to think about this again

23 in light of what has been said here not only by me, but

24 especially by Mr. Cook, because we can tell that we're going to

25 be dealing with this at length, with lots and lots of requests,

1  and coming back before this Court.

2          And, at the end of the day, we have an uncontroverted

3  statement in the record from Mr. Schmidt that there is no

4  payment made in the United States; no payment owed in the

5  United States.  It just doesn't exist.

6          THE COURT:  I think I need to hear from Mr. Cook.

7          MR. COOK:  Thank you.

8          THE COURT:  I think this is a good place to start --

9          MR. BUSCEMI:  Thank you, your Honor.

10         MR. COOK:  Thank you.

11         THE COURT:  -- which is:  why am I doing this?

12         You know, there is an old -- I'm really not sitting

13  as a court of equity, but there is an old adage that says that

14  equity does not order an idle act.

15         And I guess I'm especially troubled by the notion

16  that we're, I think, lining up a potential contempt proceeding

17  against a foreign sovereign for what everyone assures me is an

18  idle act.  And I haven't heard you dispute that.

19         MR. COOK:  Well --

20         THE COURT:  And I realize that there is a little bit

21  of, you know, cart and horse; but wouldn't it be more prudent

22  for the plaintiff to find out whether Mr. Schmidt is not

23  telling the truth, before we spend a lot of time pursuing this?

24         MR. COOK:  Let me deal with that issue head on.

25         Until -- an assignment order, in and of itself, has

1  the effect of -- and we have hit this already, but just bear

2  with me for a second -- has the effect of substituting out the

3  judgment debtor for the judgment creditor.  It's just a -- it's

4  just a two-person battle here.

5          And the *Kracht* case CMA CGM has not resolved is

6  really dispositive.  It says the only task before your Honor

7  is:  can I eject the debtor, and replace the creditor?

8          And --

9          THE COURT:  I don't read the *Kracht* case quite as

10 broadly as I think you do.

11         I think the *Kracht* case says that if you don't serve

12 the obligor, in effect, you haven't cut off, you know, any

13 rights to object.

14         I don't think it says that you can't sever the

15 obligor, or that it's not necessary.

16         MR. COOK:  That's correct.

17         THE COURT:  I guess you might argue it's not

18 necessary.  It's not mandatory to serve him.  You can say a lot

19 of things about *Kracht*, but I don't think *Kracht* goes so far as

20 to say that a court's supposed to stick its head in the sand

21 when it starts issuing these orders, and just foment future

22 litigation, especially if it doesn't have the sense that it's

23 doing anything of any purpose.

24         And this is a sensitive situation.  This is a little

25 more sensitive than trying to figure out whether a lawyer is

1    going to be subjected to a debt-collection proceeding; if an

2    Oregon lawyer's going to be subjected to a debt-collection

3    proceeding in California.

4          MR. COOK:  I certainly appreciate that.  I

5    respectfully disagree with the Court's analysis in *Kracht*,

6    because *Kracht* obviously -- the -- the facts are undisputed.

7    The underlying account was not assignable at all under

8    California law.  And everybody started to raise heck.

9          And the Court, in footnote -- in the first footnote

10   said, yeah, but the fact it is or isn't assignable is a

11   battleground faced by the judgment creditor when they seek to

12   pursue --

13         THE COURT:  And the Court immediately ruled it was

14   not assignable.

15         MR. COOK:  Absolutely.  It was -- it was -- yes, it

16   was -- it ruled it was not assignable.

17         THE COURT:  What is the point?  I mean, I don't --

18   obviously, that case came up in a slightly different posture

19   than this one did; but what is the point of my saying, "Okay.

20   The judgment -- the obligor says there are no obligations

21   subject to this assignment order, but nonetheless, I'm going to

22   launch a thousand ships just because Mr. Cook feels like

23   launching a thousand ships today.  In fact, he wants me to

24   launch them 30 or 40 times."

25         MR. COOK:  Let's talk a little bit about due process

1  and fairness here.  I filed my motion.  And I have a nonparty

2  who appears and makes lots and lots of claims.

3          Now I'm sitting here.  I don't have in this immediate

4  context here -- I don't have the power of discovery.

5          THE COURT:  Why not?

6          MR. COOK:  Well, I could --

7          THE COURT:  I had always assumed that you could take

8  discovery from -- some discovery from a nonparty.

9          MR. COOK:  I have clearly the power of discovery here

10 in the context of 69(a)(1), which is the independent power of

11 discovery under the federal rules.

12          THE COURT:  Well, let's first find out.  Let me hear

13 what you know the obligor says.  Does the obligor believe --

14 you may have answered this earlier.  Does the obligor believe

15 that it's subject to discovery, or is this going to get us back

16 to your point that since I don't have jurisdiction -- under

17 your theory of the case, if I have no jurisdiction to issue an

18 order of assignment, I have no jurisdiction to issue a

19 discovery order?  How do you read the law?

20          MR. BUSCEMI:  Yes, your Honor.  I think we would say

21 that the Court's jurisdiction has not been properly invoked.

22 We read Rule 69 to talk about discovery -- Federal Rule of

23 Civil Procedure 69 to talk about discovery in aid of execution

24 in the context of a matter that's properly before the Court.

25          And, of course, there are provisions in the Foreign

 1  Sovereign Immunities Act that limit discovery. And we would
 2  urge that if there were any discovery, further to what I said a
 3  moment ago, it not be a complete fishing expedition, which I
 4  think is what Mr. Cook has in mind.
 5          Unless there is showing that there is property in the
 6  United States and that it's used for commercial activities in
 7  the United States, the door to the federal courtroom hasn't
 8  been opened.
 9          MR. COOK: Your Honor --
10          THE COURT: Do I have any such showing in front of
11  me? Because, as Mr. Buscemi -- excuse me -- points out --
12          I'm sorry if I lose my voice a little bit today. I'm
13  at the way back end of a case of the flu. You've got me
14  talking too much. It's coming back.
15          MR. COOK: That's all right.
16          THE COURT: I come back to the point you made, that
17  much of your showing with respect to his client involves
18  entities which I am not prepared to recognize as being agents
19  of the Government of Iran for purposes of strictly allowing you
20  to proceed against them. And that seems to be an issue that
21  Judge White has not yet issued a further ruling on.
22          So the question, I guess, really is: what showing do
23  I have in front of me that there are any dealings between Iran,
24  the judgment debtor, and this particular nonparty, the CMA CGM,
25  that would suggest that there's anything there?

1           MR. COOK:  Your Honor, I -- the -- talking -- this is
2    a classic case of the cart and the horse.  And to compel a
3    judgment creditor to -- and what I'm hearing -- to
4    prelitigate -- prelitigate the showing of the existence of
5    these rights as demanded by the obligor, not the debtor --
6    demanded by the obligor -- places a judgment creditor in a
7    position of a mandatory multi-step process of litigating to the
8    satisfaction of the trier of the facts that such a right
9    exists.

10          And then the Court is saying, "Okay.  You've proven
11   that such a right exists.  I find that as a factual matter, and
12   therefore, I'm going to assign it to you."

13          708.510, first off, doesn't require the
14   prelitigation, the depositions, or the motion practice.
15   There's nothing in the context of 708.510.

16          And, worse, what that does is it -- it contravenes
17   708.510(b), which specifically excludes the obligor from this
18   process.

19          The California Legislature did not anticipate --
20          Bear with me.

21          THE COURT:  I don't think the California Legislature
22   anticipated that the Government of Iran would be a judgment
23   debtor, and we would have -- we'd be proceeding by way of
24   default on a judgment entered across country with developing or
25   expanding foreign sovereign immunity --

1      MR. COOK:  Well, I certainly appreciate the law in

2   question here was enacted effective July 1, 1983.  The Foreign

3   Sovereignty Immunities Act, in its many incarnations, was 1976,

4   and codified the existing federal common law.

5      I mean, so, you know, certainly that -- this is a

6   little bit off the beaten path; but still, understanding that I

7   have for my benefit or otherwise 708.510, I should not be bound

8   with what amounts to a trial.

9      And I'm listening very carefully and reading very

10  carefully here the opposition in Footnote Number 1, where the

11  following, to the extent --

12      THE COURT:  Where are you reading from?  Your

13  position memorandum?

14      MR. COOK:  Page 1, sir.

15      THE COURT:  Mm-hm.

16      MR. COOK:  Okay.

17      And -- which says, for the record,

18          To the extent relief is sought from

19          CMA CGM either now or in the future,

20          CMA CGM does not waive and expressly

21          reserves the right to assert any applicable

22          defense, including lack of personal

23          jurisdiction or improper service.

24      Okay.  I get it.  Well, this is -- that's their

25  prerogative.

```
 1              I would suggest, by the way, that -- and the Court's
 2    ruling that if you are to consider their arguments, then you
 3    may issue a tentative ruling that CMA CGM has waived all
 4    jurisdictional defenses, because this is a de facto
 5    intervention under Rule 24(a), and that they're present before
 6    the Court.
 7              I'm -- I'm -- we argued -- and I haven't heard one
 8    justification in Counsel's argument entitling them to have the
 9    slightest status of being here.
10              And there is the ability Under 24(a) to intervene.
11    They have not moved to intervene, ex parte or otherwise.  And
12    they haven't shown the slightest status.  And their status
13    is -- is paramount, so far --
14              THE COURT:  I don't want to go over that again.  You
15    and I just have different view of what 708.510 means.
16              I just simply view it as meaning -- I don't see that
17    it rules out service on the obligor or considering the
18    obligor's argument.  I don't think they have to intervene.
19              Clearly, they're going to be impacted by the ruling.
20    If nothing else, you've already forced them to expend a
21    substantial amount of attorneys' fees in a situation where, as
22    they point out, I don't even have any evidence in front of me
23    right now that I'm not being asked to just do an idle act.
24              MR. COOK:  Well, on the other hand --
25              THE COURT:  I know you keep telling me you don't have
```

```
 1  any burden, but I'm just having a hard time accepting that.
 2           MR. COOK:  Well, the answer is the following.
 3  Between Iran and the judgment creditor -- creditors -- I'm
 4  sorry -- that Iran, who we did properly serve -- and we papered
 5  them to death -- has not opposed this motion.  And Iran is
 6  quite capable.  Iran is quite capable here of appearing in a
 7  United States court.  They're actively litigating in front of
 8  Judge Manning.
 9           And Judge Manning's case specifically --
10           THE COURT:  Is that the one in --
11           MR. COOK:  Northern District.  The cuneiform tablets.
12           And Judge Manning, when faced with a similar setting,
13  where the Rubin family, represented by David Strachman, had
14  levied under local law the cuneiform tablets, both the
15  University of Chicago and the United States were advocating
16  Iran's sovereign immunity.
17           And Judge Manning, at the end, which we cite -- 462
18  F. 3d., whatever, said very clearly, "Neither of you folks have
19  standing."  And she ruled that on June 22nd, 2006.
20           And approximately on July 10th, 2006, Iran appeared.
21  Through both local counsel and D.C. counsel, they appeared.
22           Now, in granting this relief, we're going to serve
23  Iran with an order to show cause.  And we'll see what Iran has
24  to say.
25           Maybe they object.  Maybe they will appear here.
```

1   It's our battle with Iran, clearly.

2            Now, I do obviously have the power of post-judgment

3   discovery.  And -- but I don't have the power to litigate

4   CMA CGM's claim.  By "litigate," I don't -- there's no

5   California statutory format here which permits me to make fit

6   for -- for consideration --

7            THE COURT:  Well, I do tend to agree with the notion

8   that I think that the sovereign-immunity issues would be more

9   readily and better resolved if they were litigated by some

10  combination of Iran and the State Department.

11           MR. COOK:  That's correct.

12           THE COURT:  I know my clerk has been clearly

13  contacted by the State Department, saying they were going to

14  appear; but they still haven't appeared.  I take that -- I'm

15  not making a legal finding, but they seem to be of the view

16  that it's not yet ripe for them to appear and assert immunity.

17           MR. COOK:  And, for the Court's --

18           THE COURT:  And that was, in part, why it seemed to

19  me, as I think I said in my order, that that was one of the

20  issues that perhaps is best deferred to a further hearing.

21           MR. COOK:  All of this -- all -- first of all, based

22  on the Court's ruling -- tentative ruling -- and the form of

23  order we submitted, which reads -- you know, which -- the

24  Court's ruling tracks with ours -- is we're not -- we're not

25  sitting here today.  If -- if the Court enters a tentative

54

1  ruling, we're not an assignee.  We have to go through multiple

2  steps, at which time Iran, when faced with whatever redress,

3  will or will not appear.

4         If Iran does not appear, whatever the case, and I

5  obtain the order, then I'm sitting here with an assignment

6  order.  And at that point, sitting here with an assignment

7  order, then we -- then, as a contractual assignee, we move

8  forward or don't move forward.

9         THE COURT:  There is, again -- I know this puts some

10 burden on the nonparty, but there is some benefit to finding

11 out whether Iran is going to appear or -- or whether they will

12 simply sign the assignment, or what they'll do.  And so to some

13 degree, I think the nonparties' concerns are partly a function

14 of the way -- I wouldn't call it "haphazard," but somewhat

15 peripatetic way in which the Government of Iran is defending

16 these cases.

17        What do you make about the 1605 argument?  I mean,

18 you know, it's easy to say, "Well, this is sovereign immunity."

19 And this is probably better raised by some combination of the

20 Government of Iran and/or the State Department, but CMA makes a

21 very simple argument.  Just -- unless I get by that hurdle, do

22 I have jurisdiction to do anything?

23        And how do you react to -- I mean, the 1605 argument

24 obviously -- I would like to know exactly what the State

25 Department thinks 1605 means, but I think there may be a

1 problem there.

2      MR. COOK:  Yeah.  You know, your Honor, I -- I -- it

3 is briefed, and CMA briefed it.  We have our point of view

4 here.  The answer is this -- the revisions to the Foreign

5 Sovereignty Immunity Act were enacted in response to this

6 particular judgment.  This was an historic judgment here, and

7 brought to culmination events now just about 25 years ago --

8 the anniversary.

9      THE COURT:  I guess their answer is that you should

10 have refiled.

11      MR. COOK:  Well, we take a different view of that,

12 but that precise issue is not made ripe in the classic federal

13 view of ripeness.  It can only be made ripe as to the

14 enforceability either vis-a-vis Iran responding to an order to

15 show cause, and their response, or assuming that we -- for lack

16 of a better expression, barrel through that, barrel through

17 whatever we do before we seek to enforce this.

18      Ultimately, if I project this to January 1, if you

19 work with me, and I'm sitting with this assignment, what do we

20 do with it?  Ultimately, we need to enforce it.  Yes, I have

21 lots of powers available to me for discovery before I seek to

22 enforce it, but at least we'd make that decision before we do

23 or do not file an action.

24      But when -- when you go through everything else, what

25 CMA as a nonparty seeks to do is really demand a trial.  That's

1    what they want.  And 708.510 doesn't have the provisions of a

2    trial.  It could have been the levy provisions, by the way, in

3    a levy setting.  This is not a levy.

4         There's enormous confusion here by CMA between

5    assignment and a levy.  They think this is a levy.  This is not

6    a levy.  If this was a levy, when I served them with a writ of

7    execution notice of levy through the United States Marshal, we

8    would go to trial.  Those issue would be ripe, because the

9    Court would have general plenary jurisdiction over the

10   garnishee, and then the Court would make a ruling on that

11   proceeding as a creditor suit.

12        This is not creditor suit.  And this was exactly the

13   issue which was raised in before Judge Feess when we had

14   Repsol.  And ultimately, Judge Feess says you're not here.  You

15   need to intervene, you know.  What are you guise doing here?

16        But thank you, your Honor.

17        THE COURT:  Let me ask you this question.

18        I've got to think more about these issues.  And I

19   want to reread one or two of the cases, now that I better

20   understand how this all fits together.

21        What do you propose?  I forget what the current

22   situation is now.  I think I have another round of hearings

23   coming up in about maybe a month.

24        MR. COOK:  November.

25        THE COURT:  And I'm mindful of that.  I wonder

1  whether I shouldn't just simply stay all the rest of the

2  proceedings to allow this one to carry its course, so we can

3  find out what, if anything, Iran will do.

4          MR. COOK:  I have no problem with that.

5          And -- and --

6          THE COURT:  Or somebody may want to go to

7  Judge White, too, or he may rule on this underlying matter.

8          It just seems to me that there are -- I'm really

9  mindful of the fact -- I have a feeling that some of the folks

10 sitting in the back are not interns from other chambers, and

11 they actually have an interest in some of these proceedings.

12 In fact, I think I may recognize one or two of them from one of

13 the prior hearings.

14         MR. COOK:  Yes.

15         THE COURT:  And I am mind of the fact that, again, as

16 I say, you have not only launched a thousand ships, but you

17 want to relaunch them -- I happen to be reading The Iliad

18 again, so these things come to mind -- 30 or 40 times.

19         MR. COOK:  I have no problem, and I would certainly

20 concur that the CMA CGM has.  And we disagree with lots of

21 issues.  It has brought before the Court some of these issues.

22 We reserve the right vis-a-vis they don't have any standing,

23 but to the extent that other shipping companies are similarly

24 situated to defer their briefing until --

25         THE COURT:  All right.

```
 1          MR. COOK:  -- whatever it would be, 60 days or 90
 2  days, until January or February, I --
 3          THE COURT:  Well, I will keep that in mind.  Let me
 4  take this matter under submission.  I want to thank you all for
 5  a very interesting argument and some interesting briefing.  And
 6  I need to think through some of the points that have been made
 7  today.  All right.  I'll take this matter under submission.
 8          MR. BUSCEMI:  Your Honor, I think someone wants to be
 9  heard, I think, in response to your last comment.  If I could
10  just --
11          THE COURT:  Judge Breyer's intern back there.  I'm
12  trying to --
13          MR. BUSCEMI:  If I could just make one comment.  I
14  know that because of the correspondence that's already been
15  sent to your Honor, there are some of the shipping lines who
16  have the feeling that, you know, we're going first because this
17  motion was the first one that was filed; but they wanted to
18  be -- to be before your Honor so that they could state their
19  position in case I don't do it adequately or they do it better.
20  So that may be one thing that your Honor would like to take
21  into account before you enter a stay of the kind that you
22  suggested.
23          I -- and if your Honor would grant me one more
24  moment, I did find while Mr. --
25          THE COURT:  Look.  Before I grant you the moment, who
```

1  is the gentleman who wished to be heard?

2              MR. HALL:   Thank you, your Honor.  Paul Hall, of

3  Nixon Peabody, LLP.

4              We represent Compania Sud Americana De Vapores,

5  Hanjin Shipping Company, and Mitsui O.S.K. Lines.

6              THE COURT:   All right.  You filed some papers which

7  I've just glanced at, but as I say, you're not on for hearing,

8  I think, until November 26th and November 19th.  No.  It is

9  November 26.  And then, as I say, I'm not sure what I'll do

10 with it.  Did you want to be heard this morning?

11             MR. HALL:   Just very briefly, your Honor.

12             THE COURT:   All right.  Well, let me hear out counsel

13 for CMG -- CMA CGA [sic], and then I'll give you a minute.

14             Go ahead, Mr. Buscemi.

15             MR. BUSCEMI:   I don't think I'll even take a minute.

16             Mr. Cook was talking about how I don't understand.

17 It's a frequently used expression these days.  People don't

18 understand; that I don't understand what Section 708.510 is all

19 about, but let me read to you from Judge Davies down in the

20 Central District of California.  In the *Questor* case, he says,

21                  Apart from potential difficulties

22              relating to sovereign immunity, apart from

23              those difficulties, *Questor* has failed to

24              show that any tangible asset is in the

25              United States.

1        The abstract right to payment in the absence of

2   conjunction with some physical or at least specific asset

3   located within the boundaries of the United States upon which

4   that right might be exercised is insufficient standing alone to

5   be amenable to assignment under California Civil Procedure

6   Section 708.510.

7        It is this Court's impression, based on independent

8   scrutiny of Section 708.510, that the general power to withdraw

9   money from one's bank as a generic right to payment is not the

10  sort of right contemplated by 708.510, and thus, amenable to

11  assignment pursuant to statute.  Though the list presented in

12  the statute is merely illustrative, the items listed -- wages,

13  rents, commissions, royalties, payments due from a patent or

14  copyright, an insurance policy, loan value -- are in a crucial

15  respect sums, certain predictable amounts owed to the debtor by

16  a third party capable of specific and relatively precise

17  determination.  Such income constitutes a concrete amount in

18  the hand of a third-party debtor.

19        It is not this (indicating).

20        THE COURT:  I don't disagree with that, but I think

21  that a -- funds owing by The French Line arising out of the use

22  of a harbor, dock, wharf, drayage, et cetera, can be all those

23  things that you said.

24        Now, plaintiffs may not know precisely, you know,

25  what the amounts are, and so on and so forth; but this is -- in

1  my mind, what I have ordered here is different from simply
2  saying, "Well, you may have a right to withdraw money across
3  the board."
4          So I understand your point.  And again, I -- you
5  know, this is not a case, as I say, which is going to be
6  resolved by -- I don't think you're going to find a case that's
7  directly on point with the kinds of issues we're talking about
8  here, but I -- I am mindful of that issue, but you don't have
9  to.
10         MR. BUSCEMI:  Thank you, your Honor.
11         THE COURT:  Unless you had something else to say.
12         MR. COOK:  No, no.  That was a bank-account case.
13         THE COURT:  I don't have banks in front of me yet.  I
14  expect --
15         MR. COOK:  That's *sui generis*, anyway.
16         THE COURT:  All right.  Mr. Hall, is it?
17         MR. HALL:  Yes, your Honor.  Thank you.
18         We have just a very small point to make, which is:
19  in colloquy with counsel, the Court has raised the idea of
20  perhaps staying the actions that are up for hearing in
21  November.
22         We would respectfully request that the Court not stay
23  the November hearing as to our three clients.  And our reason
24  is very simple.  In our papers we have given the Court both a
25  somewhat more detailed legal elaboration, but more

1   importantly -- more importantly, a more detailed factual
2   elaboration.

3           And in this proceeding this morning, the Court has
4   many times appropriately expressed concern that plaintiffs are
5   asking the Court to do an idle act.

6           In our papers, we have given the Court more detailed
7   declarations which we believe will make it crystal clear how
8   the business operates; crystal clear what the answers are to
9   the Court -- to the Court's questions; and crystal clear -- and
10  I don't think Mr. Cook will even make an offer of proof to the
11  contrary.

12          So we would therefore respectfully request that the
13  Court not stay our hearings, and do hear our cases in November.

14          It isn't necessary to replow all the ground.  We
15  think that our factual showing will be directly responsive to
16  the Court's concern about being asked to do an idle act.

17          THE COURT:  All right.  I will keep that in mind.
18  I'm going to take this matter under submission.  Thank you all
19  very much again.  We're adjourned.

20          (At 11:33 a.m. the proceedings were adjourned.)

21                         -   -   -   -

22

23

24

25

### CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C.08-80030 JSW(BZ), Deborah D. Peterson v. Islamic Republic of Iran, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

———————————————

/s/ Lydia Zinn, CSR 9223, RPR

Tuesday, October 14, 2008