**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEBORAH D. PETERSON,
          *Plaintiff-Appellant,*

    v.

ISLAMIC REPUBLIC OF IRAN,
          *Defendant,*

    v.

WORLD BANK,
          *Movant,*

    v.

CMA CGM,
   *Third-party-defendant-Appellee,*

      and

JAPAN BANK FOR INTERNATIONAL
COOPERATION; A.P. MOLLER-
MAERSK A/S; MEDITERRANEAN
SHIPPING COMPANY,
          *Third-party-defendants.*

No. 08-17756

D.C. No.
3:08-mc-80030-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
December 10, 2009—San Francisco, California

Filed December 3, 2010

Before: Betty B. Fletcher, Sidney R. Thomas, and
N. Randy Smith, Circuit Judges.

19243

19244        PETERSON v. CMA CGM

Opinion by Judge B. Fletcher;
Dissent by Judge N.R. Smith

## COUNSEL

David J. Cook, Robert J. Perkiss, and Nathaniel L. Dunn, San Francisco, California, for the plaintiff-appellant.

Peter Buscemi and Matthew S. Weiler, San Fransisco, California, for appellee CMA CGM.

Joan E. Donoghue, Acting Legal Adviser, and Ron B. Katwan, Attorney Advisor, Department of State, Tony West, Assistant Attorney General, Douglas N. Letter, and Sharon Swingle, Department of Justice, Washington, District of Columbia, for amicus curiae United States.

## OPINION

B. FLETCHER, Circuit Judge:

Plaintiffs obtained a default judgment against Iran for $2,656,944,877. When it became clear that Iran was not going to comply with the judgment, plaintiffs moved the district

court to order Iran to assign to the plaintiffs, as judgment creditors, Iran's rights to payment from CMA CGM. CMA CGM is a French shipping company that allegedly frequents Iranian ports and pays Iran for use of its harbors and for providing its ships with bunkering oil. The district court raised the issue of foreign sovereign immunity even though Iran did not appear to assert that defense, and the court denied plaintiffs' assignment motion on the basis that Iran's rights to payment from CMA CGM are immune under the Foreign Sovereign Immunities Act ("FSIA"). We affirm.

## I.  Factual and Procedural Background

On October 23, 1983, Ismalal Ascari drove a truck carrying a large explosive device into the U.S. Marine barracks in Beirut, Lebanon. Ascari crashed through a wire fence and wall of sandbags, drove into the center of the compound, and detonated the explosives, killing 241 American servicemen and injuring many others. *Peterson v. Islamic Republic of Iran* (*Peterson I*), 264 F. Supp. 2d 46, 56, 58 (D.D.C. 2003). The suicide bombing was the most deadly terrorist attack against Americans prior to September 11, 2001. *Id.* at 47-48. Evidence later surfaced that Hezbollah was responsible for the attack, which it carried out with "massive material and technical support from the Iranian government." *Id.* at 58.

In 2001, family members of the deceased servicemen and injured survivors brought suit against Iran in the District Court for the District of Columbia. Their complaint included claims for wrongful death, battery, assault, and intentional infliction of emotional distress. *Id.* at 48. Despite being properly served, Iran failed to respond to the complaint. *Id.* After a two-day bench trial,[1] Judge Lamberth found that Iran pro-

---

[1] A district court generally does not have to conduct a trial before it can enter a default judgment against a defendant who fails to appear. However, the FSIA requires a plaintiff to "establish[ ] his claim or right to relief by evidence that is satisfactory to the court" before a default judgment may be entered against a foreign state defendant. 28 U.S.C. § 1608(e).

vided significant financial and logistical support to Hezbollah
in connection with the Beirut bombing and was thus liable to
the plaintiffs for compensatory damages. *Id.* at 61. Because of
the large number of plaintiffs — at that point, almost one
thousand — Judge Lamberth directed special masters to deter-
mine the amount of damages owed to each plaintiff. *Peterson
v. Islamic Republic of Iran* (*Peterson II*), 515 F. Supp. 2d 25,
37 (D.D.C. 2007). On September 7, 2007, he entered a default
judgment for the plaintiffs in the total amount of
$2,656,944,877. *Id.* at 60-66.

Plaintiffs registered their multi-billion dollar judgment in
the District Court for the Northern District of California pur-
suant to 28 U.S.C. § 1963. They then submitted fifteen assign-
ment motions to the district court, each naming a different
shipping company that allegedly owed payment to Iran. Judge
White elected to consider the motion concerning CMA CGM
first. Plaintiffs alleged that CMA CGM, a French shipping
company, frequents the Iranian port of Bandar Abbas, as evi-
denced by the shipping routes displayed on the CMA CGM
website. They presented evidence that the Ports & Shipping
Organization of Iran charges tariffs on shipping lines that use
its ports, and the National Iranian Oil Products Distribution
Company sells oil to ships that berth in Iranian ports. The
Ports & Shipping Organization and the National Iranian Oil
Products Distribution Company are, respectively, agencies
under the control of the Iranian Ministry of Roads and Trans-
portation and the Ministry of Petroleum. Plaintiffs moved the
court to order Iran to assign to the plaintiffs, as judgment
creditors, Iran's rights to payment from CMA CGM.

Though Iran did not appear to assert a sovereign immunity
defense to assignment, Judge White raised the issue of immu-
nity sua sponte. He held that the FSIA abrogated the immu-
nity of all Iranian "property in the United States," 28 U.S.C.
§ 1610(a), and that the plaintiffs had failed to identify any
such property. He held further that, even if Iran's rights to
payment from CMA CGM were considered property located

in the United States, he could not assign those rights to the plaintiffs because they had not properly served Iran with the assignment motion. Accordingly, Judge White denied the motion.

## II.  Jurisdiction

**[1]** The Foreign Sovereign Immunities Act provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also* 28 U.S.C. § 1330. Unless a specified exception to foreign sovereign immunity applies, this court lacks jurisdiction. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Corzo v. Banco Central de Reserva del Peru*, 243 F.3d 519, 522 (9th Cir. 2001) ("The [FSIA] conflates the usually distinct questions of sovereign immunity, subject matter jurisdiction, and personal jurisdiction.").

**[2]** Under the terrorist act exception, a foreign state shall not be immune from suit in any case "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1) (original version at 28 U.S.C. § 1605(a)(7) (2000)).**²** The foreign state defendant must have been desig-

---

**²**Section 1083 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44, repealed the original terrorist act exception, 28 U.S.C. § 1605(a)(7) (2000), and replaced it with a new and nearly identical exception, 28 U.S.C. § 1605A. The Authorization Act also expanded the category of foreign sovereign property that can be attached; judgment creditors can now reach any U.S. property in which Iran has any interest, 28 U.S.C. § 1610(g), whereas before they could reach only property belonging to Iran, 28 U.S.C. § 1610(a)(7). Plaintiffs in this case failed to re-file their actions under the new § 1605A terrorism exception and cannot take advantage of new § 1610(g). *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 67 (D.D.C. 2009). The 2008 changes do not impact this case because plaintiffs rely entirely on § 1605(a)(7).

nated a state sponsor of terrorism by the State Department either at the time the terrorist act occurred or as a result of that act, the claimant or the victim must be a U.S. national, and the foreign state must have been given an opportunity to arbitrate if the terrorist act occurred in its own territory. 28 U.S.C. § 1605A(a)(2) (original version at 28 U.S.C. § 1605(a)(7)(A)-(B) (2000)).

[3] All four jurisdictional requirements are met here. First, like the action that established Iran's liability, this follow-on suit to enforce the judgment is an action in which money damages are sought against a foreign state. *See Peterson v. Islamic Republic of Iran* (*Peterson III*), 563 F. Supp. 2d 268, 272 (D.D.C. 2008) (citing *Flatow v. Islamic Republic of Iran*, 74 F. Supp. 2d 18, 20 (D.D.C. 1999)). Second, plaintiffs seek damages for personal injury and death resulting from Iran's provision of material support to Hezbollah in connection with the Marine barracks bombing. *See Peterson I*, 264 F. Supp. 2d at 58. Third, Iran was designated a state sponsor of terrorism January 19, 1984, largely because of that attack. *See id.* at 51 n.7; 50 U.S.C. app. 2405(j)(3); 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (notice from George P. Shultz, Secretary of State, designating Iran a state sponsor of terrorism); Kenneth Katzman, Congressional Research Service, *Iran: Current Developments and U.S. Policy* 6 (Jan. 14, 2000). Fourth, District Judge Lamberth established that each of the victims of the Beirut bombing was a U.S. national before awarding the plaintiffs over $2.6 billion in damages. *See Peterson II*, 515 F. Supp. 2d at 40 n.4. Finally, the bombing took place in Lebanon, not Iran, therefore the plaintiffs were not required to arbitrate their claims before bringing suit in federal court. Jurisdiction exists under FSIA's terrorist act exception.

[4] Though the District Court for the Northern District of California did not enter the default judgment against Iran, it had jurisdiction to enforce that judgment. A judgment creditor may bring an action to enforce a judgment in any district court. *See, e.g.*, *Hilao v. Estate of Marcos*, 536 F.3d 980, 983

(9th Cir. 2008). When a final judgment from one district court
is registered with another district court pursuant to § 1963, the
registered judgment must be treated like any other judgment
entered by the registering court. 28 U.S.C. § 1963.

## III.   Discussion

### A.   *Sua Sponte* Consideration of Immunity from Execution

   **[5]** Plaintiffs contend that foreign sovereign immunity
from execution is an affirmative defense that should have
been pleaded and proved by Iran; therefore, the district court
erred by raising the issue of immunity *sua sponte* and denying
the CMA CGM assignment motion on that basis. Few courts
have squarely addressed the question of who may raise the
issue of immunity from execution, and those that have are
divided. One district court has held that immunity is an affir-
mative defense that can only be asserted by a foreign state
defendant. *Rubin v. Islamic Republic of Iran*, 436 F. Supp. 2d
938, 941 (N.D. Ill. 2006), *appeal docketed*, No. 08-2805 (7th
Cir. July 21, 2008). The Fifth Circuit has disagreed and held
that, when a court is asked to attach the property of a foreign
state, it must raise and decide the issue of immunity from exe-
cution on its own initiative. *See FG Hemisphere Assocs., LLC
v. Republique du Congo*, 455 F.3d 575, 590-91 (5th Cir.
2006); *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395
F.3d 229, 233 (5th Cir. 2004) ("Neither 28 U.S.C. § 1610(a)
nor (b) requires the presence of the foreign sovereign . . . .");
*see also Letelier v. Republic of Chile*, 748 F.2d 790, 792-93
(2d Cir. 1984) (deciding whether New York assets of Chilean
national airline were immune from attachment even though
Chile had steadfastly refused to participate in the liability and
enforcement proceedings); *Rubin v. Islamic Republic of Iran*,
456 F. Supp. 2d 228, 232-33 & nn.3-4 (D. Mass. 2006), *on
reconsideration in part*, 541 F. Supp. 2d 416 (D. Mass. 2008).
We agree with the Fifth Circuit and, accordingly, affirm the

district court's order denying the plaintiffs' assignment motion.

The Foreign Sovereign Immunities Act has two major components. The first establishes the general rule that "a foreign state shall be immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, and carves out several exceptions to immunity from suit, *id.* §§ 1605-1605A. The second establishes that "property in the United States of a foreign state shall be immune from attachment[,] arrest and execution," *id.* § 1609, and carves out several exceptions to immunity from execution, *id.* §§ 1610-1611. The pertinent exception, for our purposes, provides that commercial property belonging to a foreign state that is located in the United States may be attached in aid of execution of a judgment that "relates to a claim for which the foreign state is not immune from suit under section 1605A." 28 U.S.C. § 1610(a)(7). Section 1605A, which was previously codified at 18 U.S.C. § 1605(a)(7) (2000), is the terrorist act exception to immunity from suit.

**[6]** Sections 1609 & 1610 state that immunity from execution and certain exceptions to that immunity exist. They are silent as to who has the burden of pleading and proving immunity from execution, or whether a court may decide immunity *sua sponte*. *See* Joseph W. Dellapenna, *Suing Foreign Governments* 753 (2d ed. 2003) ("Significantly lacking from section 1610(c) is any mention of who has the burdens of pleading and proving an exception to the presumed immunity from execution or its lack."). We must look to the structure, history, and purpose of the FSIA for guidance. *See generally Samantar v. Yousuf*, 130 S. Ct. 2278 (2010) (considering the history and purpose of the FSIA in determining whether defendant qualified as a foreign state).

Although the Ninth Circuit has not previously decided who may raise the defense of immunity from execution, we have addressed that question in the context of immunity from suit.

Section 1604 creates a "statutory presumption that a foreign state is immune from suit." *Randolph v. Budget Rent-A-Car*, 97 F.3d 319, 324 (9th Cir. 1996). To trigger this presumption, the defendant must make a prima facie case that it is a foreign state. *See Phaneuf v. Republic of Indon.*, 106 F.3d 302, 305 (9th Cir. 1997), *cert. denied*, 535 U.S. 987 (2002); *see also In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008), *abrogated on other grounds by Samantar*, 130 S. Ct. at 2284 & n.4. The presumption also applies if it is apparent from the pleadings or uncontested that the defendant is a foreign state, as in this case. *See Phaneuf*, 106 F.3d at 306; *see also Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 n.8 (11th Cir. 2009); *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1189 (10th Cir. 2008); *Robinson v. Gov't of Malay.*, 269 F.3d 133, 141 n.7 (2d Cir. 2001). Once the court has determined that the defendant is a foreign state, "the burden of production shifts to the plaintiff to offer evidence that an exception applies." *Phaneuf*, 106 F.3d at 307 (citing *Randolph*, 97 F.3d at 324); *In re Terrorist Attacks*, 538 F.3d at 80 (citing *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)); H.R. Rep. No. 94-1487, at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6616 ("Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity."). If the plaintiff satisfies her burden of production, jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply. *Phaneuf*, 106 F.3d at 307; *Butler*, 579 F.3d at 1313.

[7] This burden-shifting scheme, which puts most of the weight on the plaintiff, is partly motivated by the fact that federal jurisdiction does not exist unless one of the exceptions to immunity from suit applies. *See* 28 U.S.C. § 1330; *Corzo v. Banco Central de Reserva del Peru*, 243 F.3d 519, 522 (9th Cir. 2001). A court has a duty to assure itself of its own jurisdiction, regardless of whether jurisdiction is contested by the

parties. *Rosson v. Fitzgerald*, 545 F.3d 764, 769 n.5 (9th Cir. 2008). Therefore, "even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494 n.20 (1983); *see also Rep. of Austria v. Altmann*, 541 U.S. 677, 691 (2004). We cannot require a defendant to affirmatively plead foreign sovereign immunity from suit, since a court must decide immunity even if a defendant does not appear. It must fall to the plaintiff to prove that immunity does not exist.

[8] Federal sovereign immunity from execution does not defeat a court's jurisdiction, therefore it is less obvious that a court must consider immunity from execution *sua sponte*. However, there are other reasons why courts have used a burden-shifting approach to immunity from suit that apply equally well to immunity from execution. The structure of the FSIA — which codifies the background rule that foreign states are immune from suit and execution, and then creates narrow exceptions — suggest that courts must begin with the presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies. *See, e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies . . . .); *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1470 (9th Cir. 1995). So does the history of foreign sovereign immunity in U.S. courts.

At common law, foreign states were absolutely immune from suit and execution. In *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), Chief Justice Marshall concluded that a federal court lacked jurisdiction over "a national armed vessel . . . of the emperor of France." *Id.* at 146. The opinion was read as extending absolute immunity to foreign sovereigns as "a matter of grace and comity." *Verlinden*, 461 U.S. at 486. "Following *Schooner Exchange*, a two-step procedure developed for resolving a foreign state's claim of sov-

eign immunity . . . ." *Samantar*, 130 S. Ct. at 2284 (citing *Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-36 (1945); *Ex parte Peru*, 318 U.S. 578, 587-89 (1943); *Compania Espanola de Navegacion Maritima, S. A. v. The Navemar*, 303 U.S. 68, 74-75 (1938)). First, the State Department could file a formal suggestion of immunity with the court on behalf of the foreign state. *See Samantar*, 130 S. Ct. at 2284; *Ex parte Peru*, 318 U.S. at 581. If the request was granted, the district court dismissed the case for lack of jurisdiction. *See Samantar*, 130 S. Ct. at 2284; *Hoffman*, 324 U.S. at 34; *Ex parte Peru*, 318 U.S. at 588. Second, if the State Department said nothing, a district court " 'had authority to decide for itself whether all the requisites for such immunity existed.' " *Samantar*, 130 S. Ct. at 2284 (quoting *Ex parte Peru*, 318 U.S. at 587); *see also Hoffman*, 324 U.S. at 34-35; *Puente v. Spanish Nat'l State*, 116 F.2d 43 (2d Cir. 1940). In making that determination, the district court considered "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize." *Hoffman*, 324 U.S. at 36. In this early era, courts used this two-step analysis most often in cases where a plaintiff sought to seize a ship belonging to a foreign state, *Samantar*, 130 S. Ct. at 2284, cases which primarily implicated immunity from execution.

In 1952, the State Department adopted the "restrictive" theory of foreign sovereign immunity, according to which immunity does not apply to "cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U.S. at 487. Courts continued to defer to suggestions of immunity from the State Department and, in the absence of any such suggestion, to make immunity determinations themselves. *See, e.g.*, *Isbrandtsen Tankers, Inc v. President of India*, 446 F.2d 1198, 1199 (2d Cir. 1971) (deferring to State Department); *Heaney v. Gov't of Spain*, 445 F.2d 501, 503 n.2 (2d Cir. 1971) (deciding immunity *sua sponte*); *Victory Transp., Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 358-359 (2d Cir. 1964) ("Where, as here, the court has received no communication from the State Department con-

cerning the immunity of the Comisaria General, the court must decide for itself whether it is the established policy of the State Department to recognize claims of immunity of this type.").

The continuing practice of district courts deciding issues of immunity *sua sponte* was not limited to immunity from suit. Courts also independently resolved questions of immunity from execution. *See, e.g.*, *Loomis v. Rogers*, 254 F.2d 941 (D.C. Cir. 1958). *In Loomis*, the D.C. Circuit refused to permit the attachment of a fund which contained proceeds from the sale of oil owned by Italy. *Id.* at 942. The court relied on the "well-established rule of international law that the public property of a foreign sovereign is immune from legal process without the consent of that sovereign," which is "based upon principles of international comity, each sovereign yielding a portion of that absolute territorial jurisdiction which is the attribute of every nation." *Id.* at 943. There was no formal suggestion of immunity from the State Department or the Government of Italy, but the court explained that the "requirement that there be a formal suggestion of immunity applies only in those cases where there is a question of fact as to whether the property proceeded against is the public property of a foreign sovereign." *Id.* at 944. Because there was no question that the fund belonged to Italy, it could not be attached. *See id.*

Congress enacted the Foreign Sovereign Immunities Act in 1976 because, in part, "political considerations sometimes led the Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory." *Altmann*, 541 U.S. at 690 (quotation omitted). The FSIA made it the responsibility of the courts, not the State Department, to decide issues of immunity in the first instance. Congress essentially did away with the first step — a suggestion from the State Department — in what used to be a two-step immunity analysis. It did not, however, disturb the default presumption of foreign sovereign immunity or the

practice of courts deciding issues of immunity *sua sponte* in cases where immunity is not raised by the State Department or a foreign state even though it is clear that the defendant was a foreign state or the property at issue belongs to a foreign state. This practice has clearly continued with respect to immunity from suit, *Verlinden*, 461 U.S. at 493 n.20, and, somewhat less clearly, with respect to immunity from execution. *See, e.g.*, *Letelier v. Republic of Chile*, 748 F.2d 790, 792-93 (2d Cir. 1984) (deciding whether New York assets of Chilean national airline were immune from attachment even though Chile had steadfastly refused to participate in the liability and enforcement proceedings).

**[9]** Allowing courts to independently raise and decide the question of immunity from execution is not only consistent with historical practice, but also with the purposes underlying the FSIA. A burden-shifting approach, unlike one that places the burden on the foreign state to plead and prove that its property is immune, is appropriately respectful of the "perfect equality and absolute independence of sovereigns, and th[e] common interest impelling them to mutual intercourse." *The Schoooner Exchange*, 11 U.S. at 137; *see also Nat'l City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 362 (1955) (explaining that the doctrine of foreign sovereign immunity is based on "reciprocal self-interest[ ] and respect for the 'power and dignity' of the foreign sovereign"). The FSIA was meant to spare foreign states not only from liability on the merits but also from the cost and inconvenience of trial. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990) ("[S]overeign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." (quotation omitted)). Requiring the plaintiff to prove that immunity does not exist, rather than placing the burden on the defendant foreign state, best accomplishes that goal.

**[10]** These policy considerations apply more strongly in the context of immunity from execution. "[T]he judicial sei-

zure of the property of a friendly state may be regarded as an affront to its dignity and may . . . affect our relations with it." *See Philippines v. Pimentel*, 128 S. Ct. 2180, 2190 (2008) (quotation and alteration omitted). Congress was aware that, although the restrictive theory of sovereign immunity from suit had become an accepted principle of international law by the time of the FSIA's enactment, "the enforcement of judgments against foreign state property remain[ed] a somewhat controversial subject." H.R. Rep. No. 94-1487, at 6626; *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 255 (5th Cir. 2002). Accordingly, the exceptions to immunity from execution are more narrow than the exceptions from immunity from suit. Congress fully intended to create rights without remedies, aware that plaintiffs would often have to rely on foreign states to voluntarily comply with U.S. court judgments. *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 749 (7th Cir. 2007); *Letelier*, 748 F.2d at 799. In light of the special sensitivities implicated by executing against foreign state property, courts should proceed carefully in enforcement actions against foreign states and consider the issue of immunity from execution *sua sponte*.

Our decision in *Wilmington Trust v. U.S. District Court*, 934 F.2d 1026 (9th Cir. 1991), is not to the contrary. In that case, a U.S. bank tried to foreclose on a ship owned by a private Finnish corporation. *Id.* at 1027. The foreign corporation argued that FSIA applied because the lawsuit implicated a letter of credit issued by Finland's national bank. *Id.* at 1032. We disagreed, holding that "Congress intended requests for protection under the FSIA to originate from the foreign state party." *Id.* at 1033. Based on that language, plaintiffs argue that the district court erred by not requiring Iran to raise the issue of immunity.

However, in *Wilmington Trust*, Finland was not a party to the suit and it was not clear that the ship belonged to Finland. *Id.* at 1032 n.9. When a court is not certain that the property

PETERSON v. CMA CGM

in question is covered by the FSIA, a foreign state must make a *prima facie* case of ownership in order for the presumption of immunity to apply. Third parties cannot invoke immunity on behalf of a foreign state. *See Republic of Philippines v. Marcos*, 806 F.2d 344, 360 (2d Cir. 1986) (holding that defendant-appellant New York corporations who held property on behalf of defendants Ferdinand and Imelda Marcos could not assert foreign sovereign immunity). When it is clear that the plaintiff seeks to execute against property owned by a foreign state, as in this case, the presumption of immunity is automatically triggered.[3] *See, e.g.*, *Letelier*, 748 F.2d at 792-93. This is also the rule for immunity from suit; we require the defendant to make a *prima facie* case that it is a foreign state only when that fact is not obvious or uncontested. *See supra* pages 19254-55. Therefore, *Wilmington* Trust supports our holding that the burden-shifting approach to foreign sovereign immunity from suit also applies to immunity from execution, and that it is the plaintiff's burden to prove that an exception to immunity applies if it is readily apparent that the property at issue belongs to a foreign state. Because plaintiffs themselves contend that the rights to payment from CMA CGM belong to Iran, the district court did not err by raising the issue of immunity *sua sponte*.

---

[3]This practice was also followed prior to the enactment of the FSIA. *See Loomis*, 254 F.2d at 944 ("The requirement that there be a formal suggestion of immunity applies only in those cases where there is a question of fact as to whether the property proceeded against is the public property of a foreign sovereign."); *Puente*, 116 F.2d at 45 (explaining that a foreign state must file a formal suggestion of immunity when it is not apparent that it owns the property that plaintiff seeks to attach); *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 300 F. 891, 893-894 (D.N.Y. 1924) ("But when the party before the court as claimant or as defendant is neither the sovereign nor his ambassador, it is now the established rule that the claim will not be recognized, unless by diplomatic intervention.").

## B.   The FSIA Notice Requirements

[11]  CMA CGM and the United States argue that plaintiffs did not properly serve the default judgment on Iran. The FSIA provides that a court may not order enforcement of a default judgment until a copy of that judgment is "sent to the foreign state or political subdivision in the manner prescribed for service in this section." 28 U.S.C. § 1610(c), § 1608(e). The FSIA provides for four different methods of service, the third of which is applicable here.[4] *Id.* § 1608(a)(1)-(4). This third method requires "sending a copy of the [default judgment], together with a translation [of the default judgment] into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). Service is complete when the foreign state sends back a "signed and returned postal receipt." *Id.* § 1608(c)(2).

Counsel for plaintiffs submitted an affidavit to the District Court for the District of Columbia informing the court that he had mailed Manouchehr Mottaki, the Iranian Foreign Minister, copies of the default judgment, accompanying memorandum opinion, and Farsi translations on November 19, 2008, by DHL Express. He further attested that he had received an acknowledgment of receipt signed by Manouchehr Mottaki on January 10, 2008. *See* Affidavit of Service of Process of Judgment Pursuant to 28 U.S.C. § 1608(e), *Peterson v. Islamic Republic of Iran*, No. 1:01-cv-2094 (D.D.C. July 19, 2006). On the basis of this affidavit, Judge Lambert entered an order holding that plaintiffs had satisfied the service requirements

---

[4]The four forms of service are listed in descending order of preference. The first two are inapplicable because there is no "special arrangement for service" between the U.S. and Iran, § 1608(a)(1), and Iran is not a party to any "international convention on service of judicial documents," § 1608(a)(2). *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008).

of § 1608(e). *See* Order Permitting Execution of Judgment Pursuant to 28 U.S.C. § 1610(c), *Peterson v. Islamic Republic of Iran*, 1:01-cv-2094 (D.D.C. June 26, 2008).

**[12]** It is true that plaintiffs' counsel erred by mailing a copy of the default judgment to the Iranian Foreign Affairs Minister himself, rather than asking the clerk of the court to mail the papers. 28 U.S.C. § 1608(a)(3). This mistake is not fatal. The Ninth Circuit has adopted a substantial compliance test for the FSIA's notice requirements; a plaintiff's failure to properly serve a foreign state defendant will not result in dismissal if the plaintiff substantially complied with the FSIA's notice requirements and the defendant had actual notice. *See Straub v. A P Green, Inc.*, 38 F. 3d 448, 453 (9th Cir. 1994). In *Straub*, the Ninth Circuit excused the plaintiff's "failure to dispatch the complaint by the clerk of the court" because the foreign state had "received actual notice of the lawsuit." *Id.* at 453-54. By the same token, the FSIA's service requirements have been substantially complied with in this case.

CGM CMA and the United States go further and argue that Iran should have been served with the registration of judgment with the Northern District of California and the subsequent motion for assignment of Iran's rights to payment from CMA CGM. Plaintiffs' counsel did mail their various assignment motions by regular U.S. mail, apparently without delivery confirmation, to a variety of high-level Iranian officials, including the Minister of Foreign Affairs. These papers do not appear to have been translated into Farsi.

**[13]** The FSIA is quite clear what a plaintiff must serve on a foreign state before a court may enforce a default judgment against that state: the default judgment. Service of post-judgment motions is not required. "Section 1608 sets forth the *exclusive procedures* with respect to service on . . . a foreign state." H.R. Rep. 94-1487, at 6622 (emphasis added). We may not add to those requirements. *But see Autotech Technologies LP v. Integral Research & Development Corp.*, 499 F.3d 737,

747-49 (7th Cir. 2007) (holding that the FSIA's service provisions do not cover post-judgment motions and applying the federal rules for service instead); *Rubin v. Islamic Republic of Iran*, 2008 WL 192321 (N.D. Ill. 2008) (same).[5] If Congress had intended for foreign states to receive notice of every post-judgment motion, it would have said so. The district court erred in concluding that it could not enforce the plaintiffs' assignment motion because they had not complied with FSIA's service requirements.

## C. Immunity of Iran's Rights to Payment from CMA CGM

**[14]** Having held that the district court did not err by considering Iran's immunity from execution *sua sponte*, and that the assignment motions were properly served on Iran, we must now decide whether Iran's rights to payment from CMA CGM constitute "property in the United States." 28 U.S.C. § 1610(a). We hold that they do not and are, therefore, immune from execution. We affirm the district court's denial of plaintiffs' assignment motion.

**[15]** Enforcement proceedings in federal district court are governed by the law of the state in which the court sits, "but a federal statute governs to the extent that it is applicable."

---

[5]Even if the federal service rules applied, the plaintiffs would not have been required to serve Iran with the CMA CGM assignment motion. Federal Rule of Civil Procedure 5(a) typically requires service of an assignment motion to enforce a judgment. But Federal Rule 5(a)(2) waives that requirement for motions against a party, like Iran, who is in default for failing to appear. Even parties who fail to appear must be served with pleadings with new claims, Fed. R. Civ. P. 5(a)(2), but an assignment motion is not a pleading (i.e. a complaint or an answer) nor does it contain a new claim (but rather is an attempt to enforce an old claim). Even if the assignment motion is construed as raising a new claim, Rule 5(a)(2) would require service of that motion pursuant to Rule 4, and Rule 4 requires service on foreign states pursuant to the FSIA. Fed. R. Civ. P. 4(j)(1). As explained above, the FSIA does not require service of post-judgment motions.

Fed. R. Civ. P. 69(a)(1). The FSIA does not provide methods for the enforcement of judgments against foreign states, only that those judgments may not be enforced by resort to immune property. *See* 28 U.S.C. §§ 1609-1610. Therefore, California law on the enforcement of judgments applies to this suit insofar as it does not conflict with the FSIA. *See, e.g.*, *Walker Int'l Holdings, Ltd. v. Republic of Congo*, 415 F.3d 413, 415-16 (5th Cir. 2005) (applying Texas enforcement law in a FSIA case); *Hegna v. Islamic Republic of Iran*, 380 F.3d 1000, 1006-07 (7th Cir. 2004) (applying Illinois law); *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002) (applying New York law).

California enforcement law authorizes a court to "order the judgment debtor to assign to the judgment creditor . . . all or part of a right to payment due or to become due, whether or not the right is conditioned on future developments." Cal. Civ. Proc. Code § 708.510(a). The FSIA abrogates the immunity of all Iranian commercial property in the United States. 28 U.S.C. § 1610(a)(7). Therefore, a right to payment belonging to Iran is assignable only if that right is located in the United States.

A right to payment is intangible. It is difficult to assign a location to property that by definition "lacks a physical existence." *See* Black's Law Dictionary 1233 (7th ed. 1999); *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 371 (5th Cir. 2004). "The situs of intangibles is in truth a legal fiction, but there are times when justice or convenience requires that a legal situs be ascribed to them." *Severnoe Sec. Corp. v. London & Lancashire Ins. Co.*, 174 N.E. 299, 300 (N.Y. 1931) (Cardozo, J.).[6] This is one of those times. To determine the location of an intangible right to payment, we must look to

---

[6] *But see Berkey v. Third Ave. Ry. Co.*, 155 N.E. 58, 61 (N.Y. 1926) (Cardozo, J.) ("Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it.").

California state law. *See GP Credit Co., LLC v. Orlando Residence, Ltd.*, 349 F.3d 976, 979-81 (7th Cir. 2003) (applying Wisconsin law to determine the location of a 'chose in action,' an intangible form of property); *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 249 (2d Cir. 2002) (reasoning that contractual obligations are "intangible property" and applying New York law to determine situs).

[16] In *Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian*, 267 Cal. Rptr. 457 (Ct. App. 1990), the Court of Appeal of California[7] squarely held that the location of a right to payment, at least for the purpose of applying section 708.510(a) in a suit against a foreign state defendant, is the location of the debtor.[8] Accordingly, a foreign state defendant's rights to payment from third-party debtors are assignable only if those "debtors [ ] reside in the United States." *Id.* at 481. The Court of Appeal instructed the trial court to enter an "order compelling Philguarantee," an agency of the Philippines, "to assign to Chuidian all debts owing or to become

---

[7]The California Court of Appeal's interpretation of California Code of Civil Procedure section 708.510(a) is binding on the panel. *See Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007) ("[W]hen (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision . . . .").

[8]Other states agree that the situs of a debt obligation is the location of the debtor. *See Rush v. Savchuk*, 444 U.S. 320, 328 (1980) (acknowledging the "legal fiction that assigns a situs to a debt, for garnishment purposes, wherever the debtor is found"); *Af-Cap Inc.*, 383 F.3d at 373 ("[C]ourts consistently hold that the situs of a debt obligation is the situs of the debtor."); *Alliance Bond Fund v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 25 n.9 (2d Cir. 1999) (interpreting New York law); *Great Falls Transfer & Storage Co. v. Pan Am. Petroleum Corp.*, 353 F.2d 348, 349 (10th Cir. 1965) (interpreting Montana and Wyoming law); *State v. W. Union Fin. Servs., Inc.*, 208 P.3d 218, 229 n.10 (Ariz. 2009); *Levi Strauss & Co. v. Crockett Motor Sales, Inc.*, 739 S.W.2d 157, 158 (Ark. 1987); *Hotel 71 Mezz Lender LLC v. Falor*, 926 N.E.2d 1202, 1210 (N.Y. 2010).

owing to Philguarantee from individuals or entities located in the United States." *Id.*

**[17]** CMA CGM is a French corporation, therefore the debt obligation it owes to Iran is located in France. Iran's rights to payment from CMA CGM are not "property in the United States" and are immune from execution. 28 U.S.C. § 1610(a)(7). We affirm the district court's denial of plaintiffs' motion to assign Iran's rights to payment from CMA CGM.

## IV.   Conclusion

This case turns on the question of whether immunity from execution is an affirmative defense that must be raised by a foreign state. The statutory text, structure, legislative history, and case law suggest that *sua sponte* consideration is appropriate and serves the dual goals of the FSIA: affording American plaintiffs with a means for bringing suit against foreign states and ensuring that their disputes will not be resolved based on political considerations, and also demonstrating a proper respect for foreign states and sparing them the inconvenience of litigation. We affirm the district court order on the basis that Iran's rights to payment from CMA CGM are not "property in the United States" that are amenable to attachment.

---

N.R. SMITH, Circuit Judge, dissenting:

Immunity from execution is an affirmative defense. Neither the history of sovereign immunity nor the purpose of the FSIA permit or require the court to address immunity from execution *sua sponte*. I must therefore dissent from today's holding.

As a general rule, a claim of immunity is an affirmative defense. As such, it must be affirmatively pleaded by the

defendant. Even though immunity "is an entitlement not to stand trial or face the other burdens of litigation," *Saucier v. Katz*, 533 U.S. 194, 200 (2001) *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808 (2009), the burden of asserting it "rests with the [party] seeking it." *al-Kidd v. Ashcroft*, 580 F.3d 949, 958 (9th Cir. 2009) *cert. granted* __ S. Ct. __, 2010 WL 2812283 (Oct. 18, 2010). This is true of many forms of immunity. *See* 5 Wright & Miller, Federal Practice and Procedure, § 1271, n. 57 (discussing which issues must be raised as affirmative defenses under Fed. R. Civ. P. 8(c)); *Murphy v. Waterfront Comm'n of New York*, 378 U.S. 52, (1964) (noting that when a witness receives a promise of immunity from prosecution, the witness must "plead and prove, as an affirmative defense, that he has received immunity . . . ."); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant."); *Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, (9th Cir. 2007) ("Eleventh Amendment immunity is an affirmative defense that must be raised early in the proceedings to provide fair warning to the plaintiff." (internal quotation marks and citation omitted)).

The plain language of the FSIA makes it clear that sovereign immunity from execution must be raised as an affirmative defense. The majority acknowledges that nothing in the language of the FSIA provides that sovereign immunity from suit or execution may be raised *sua sponte*. Maj. Op. 19253. In its entirety, § 1604 reads: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Similarly, § 1609 makes no mention that it may be raised *sua sponte*. It simply states: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune

Peterson v. CMA CGM

from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609. Thus, the plain language of the statute does not provide a means for the court to address the issue *sua sponte*.

The legislative history is consistent with the plain language of the FSIA. The Supreme Court recognized that "[t]he House Report on the Act states that 'sovereign immunity is an affirmative defense which must be specially pleaded.' " *Verlinden*, 461 U.S. 476, 493 n.20 (1983) (quoting H.R. Rep. No. 94-1487, at 17 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6616). The House Report continues: "the burden will remain on the foreign state to produce evidence in support of its claim of immunity. Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit and that the plaintiff's claim relates to a public act of the foreign state —that is, an act *not* within the exceptions in sections 1605-1607." H.R. Rep. No. 94-1487 at 17, U.S.C.C.A.N. at 6616 (emphasis added). Congress thus required the foreign state to assert the defense of sovereign immunity.

Congress has, however, outlined an exception to this general rule. As the Supreme Court noted in *Verlinden*, the exception is detailed in 28 U.S.C. § 1330. 461 U.S. at 493 n.20.

28 U.S.C. § 1330(a) states:

> The district courts shall have original jurisdiction without regard to amount in controversy of any non-jury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

Thus in § 1330, Congress explicitly linked the question of whether a foreign state has sovereign immunity (under 28 U.S.C. §§ 1603, 1605-07), to the question of whether the federal court would have subject matter jurisdiction. Applying § 1330, if a court found a foreign state was not entitled to sovereign immunity (under one of the enumerated sections) then it necessarily had subject matter jurisdiction over the action. And, because it is clearly established that courts may address matters of subject matter jurisdiction *sua sponte*, *Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002), courts would then also have the power to consider *sua sponte* sovereign immunity from suit.

28 U.S.C. § 1330(a) does not, however, mention determinations of immunity from execution under 28 U.S.C. § 1609. Therefore, such immunity remains an affirmative defense that must be pleaded and proved by the defendant. Of course, had Congress wished to include § 1609 in § 1330(a), it certainly knew how to do so. *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000). "The incorporation of one statutory provision to the exclusion of another must be presumed intentional under the statutory canon of *expressio unius*. . . . Congress obviously knew how to adopt provisions of [the FSIA] because it expressly adopted [sections 1603, 1605-07] and it is unlikely that Congress would absentmindedly forget to adopt a provision that appears a mere two [sections] below the [ ]section it adopted." *Id.* (internal quotation marks, alterations, and citations omitted). This omission is significant, because the failure to include § 1609 in 28 U.S.C. § 1330 requires that sovereign immunity from execution, just like other immunities, must be pleaded as an affirmative defense. Therefore, the plain language of the FSIA allows courts to address the issue of sovereign immunity from suit, but not immunity from execution, as a jurisdictional question that can be raised *sua sponte* by courts.

The majority argues that there are nonetheless good reasons for allowing courts to address this issue *sua sponte*. First, it

cites cases wherein it alleges that courts addressed sovereign immunity *sua sponte* even before the enactment of the FSIA, arguing that to allow courts to do so now would be consistent with historical practice. Maj. Op. 19255. Second, it argues that allowing courts to resolve issues of sovereign immunity from execution *sua sponte* would be consistent with the underlying purposes of the FSIA. Maj. Op. 19258. However, there is no basis for these propositions; no historical reasons or underlying purposes can trump the plain language of the statute. Moreover, the majority's premises for those arguments are also questionable.

First, the cited cases are not controlling precedent (or even strong evidence) for this alleged historical practice. None of the cited cases were decided in our court. Further, the holdings in the three Second Circuit cases do not support the premise. In *Victory*, the court did not raise the issue of sovereign immunity *sua sponte*. 336 F.2d 354. Instead, the Spanish government specifically argued that its Ministry of Commerce was entitled to sovereign immunity. The court noted that "[a] claim of sovereign immunity may be presented to the court by either of two procedures." *Id.* at 358. The first involves a request from the State Department and the second involves a direct request from the foreign sovereign. *Id.* In that case, the State Department had not made such a request, and therefore the court had to "decide for itself whether it is the established policy of the State Department to recognize claims of immunity of this type." *Id.* at 359. But, because the foreign state *had* asserted sovereign immunity on its own behalf, the court was not required to resolve the issue *sua sponte*.[1]

---

[1] *Victory*, incidentally, took a very limited view of sovereign immunity. "Sovereign immunity is a derogation from the normal exercise of jurisdiction by the courts and should be accorded only in clear cases." 336 F.2d at 360. Therefore, "the courts should deny immunity where the State Department has indicated, either directly or indirectly, that immunity need not be accorded." *Id.* at 358. Similarly, since Congress delegated the decision making in this area to the courts by statute, the courts should deny immunity where Congress has indicated it should be denied—including actions falling under § 1605(a)(7) and § 1610(a)(7).

*Heaney* similarly did not involve a court addressing sovereign immunity *sua sponte*. 445 F.2d 501. There again, the foreign sovereign did in fact assert immunity. *Id.* at 502 ("The [Government of Spain] moved for dismissal of the complaint on the grounds, insofar as here relevant, that the court lacked jurisdiction by virtue of the sovereign immunity of the Spanish Government and the consular immunity of Gomero."). In the third case, *Isbrandtsen Tankers*, the State Department made the request for sovereign immunity for the foreign state, which, as the opinion notes, was the practice before the enactment of the FSIA. 446 F.2d 1198. None of these cases therefore address whether the court may consider sovereign immunity *sua sponte*.

Only in *Loomis* did the D.C. Circuit address *sua sponte* the issue of immunity from execution.[2] 254 F.2d 941. Even if one could construe this one case as establishing a historical practice, that practice was abrogated by the FSIA. Under the plain language of the FSIA, determinations of immunity from execution (unlike determinations of immunity from suit) are not linked to the question of subject matter jurisdiction and therefore cannot be addressed *sua sponte*.

Second, allowing courts to *sua sponte* address immunity from execution would not be consistent with the underlying purposes of the FSIA. The legislative history of the FSIA does not in any way indicate that courts should address sovereign immunity *sua sponte*. Instead, one purpose of the FSIA was to establish procedures that would allow successful plaintiffs to enforce their judgments. The FSIA "would remedy, in part, the present predicament of a plaintiff who has obtained

---

[2]Although *Loomis* did involve the seizure of assets, the context appears to be distinguishable from the present case. Loomis was not attaching assets in order to satisfy a judgment, but possibly to obtain jurisdiction over the foreign state. 254 F.2d at 942. One purpose of the FSIA was to "render unnecessary the practice of seizing and attaching the property of a foreign government for the purpose of obtaining jurisdiction." H.R. Rep. No. 94-1487 at 8, U.S.C.C.A.N. at 6606.

a judgment against a foreign state. Under existing law, a foreign state in our courts enjoys absolute immunity from execution, even in ordinary commercial litigation where commercial assets are available for the satisfaction of a judgment. [The FSIA] seeks to restrict this broad immunity from execution." H.R. Rep. No. 94-1487 at 8, U.S.C.C.A.N. at 6606. This purpose was strengthened in 1996 when the terrorism exception was added to the FSIA. The terrorism exception created both an exception to immunity from suit for acts of terrorism and a coextensive exception to immunity from execution. Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214 (codified at 28 U.S.C. § 1605(a)(7) and § 1610(a)(7)). Even if, as the majority argues, "exceptions to immunity from execution are more narrow than the exceptions from immunity from suit"[3] and "Congress fully intended to create rights without remedies,"[4] Maj. Op. 19259, Congress clearly did not embrace those arguments for victims of terrorism. Of course, such policy considerations, even if true, would not outweigh the plain language of the statute.

---

[3]The majority opinion cites *Letelier*, 748 F.2d at 799 for this proposition. Although Letelier was unable to execute against the Chilean assets at the time of his suit, under the current version of the FSIA it appears that he would be able to do so, because the basis of his claim was a terrorist act (an extra-judicial killing).

[4]In considering the FSIA, Congress noted several situations in which U.S. citizens may be injured by foreign states, for example, disputes about the purchase price or terms of a sale of goods or real estate or when a citizen is struck by an automobile owned by a foreign embassy. H.R. Rep. 94-1486 at 6-7, U.S.C.C.A.N. at 6605. An examination of the FSIA reveals that exceptions were tailored to address those exact situations. See §§ 1605(a)(2), 1610(a)(2), (b)(2) (relating to commercial disputes), §§ 1605(a)(4), 1610(a)(4) (relating to property disputes), and §§ 1605(a)(5), 1610(a)(5) (relating to tort claims). While Congress could not, without abrogating sovereign immunity entirely, provide that property would be available on which to execute a judgment, it does not seem that Congress actually "intended to create rights without remedies."

Furthermore, contrary to the majority's assertion, there is less reason to raise immunity *sua sponte* regarding execution than there is regarding a suit. The purpose of immunity is generally to spare the defendant "the cost and inconvenience of trial."[5] *Foremost-McKesson*, 905 F.2d at 443. However, after a court has determined that the sovereign is not immune from suit and enters a judgment on the merits, only the enforcement action remains. Now, having been judged liable, the foreign state has a concrete interest in participating to protect its interests, unlike a trial on the merits, where any liability is still speculative.

There is no support for the majority's assertion that the burden of proving an exception to immunity from execution should be placed on the plaintiff. The statute creates no such burden. Contrary to the majority's interpretation of the statute, the FSIA does not establish one presumption, but actually establishes two mutually exclusive presumptions. The majority correctly states that there is a general presumption that the property of foreign states is not subject to execution. 28 U.S.C. § 1609. However, the FSIA also presumes that "property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution upon a judgment . . . if— the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7)." § 1610(a)(7). Commercial property, executed upon based on a judgment obtained under § 1605(a)(7), is therefore *presumptively* subject to execution, unless the defendant proves otherwise. As

---

[5]This says nothing about whether the foreign country will choose to assert that defense, even though our statutes make it available. Indeed, it seems that addressing a defense that the foreign state has itself not chosen to assert would undermine, not protect, the independence of the foreign sovereign.

In a different context, the Confrontation Clause seeks to improve (among other things) the reliability of the trial process. Yet, if the defendant is not interested in invoking its protections, we certainly do not impose it on that defendant.

19274          PETERSON v. CMA CGM

reflected in the legislative history of the FSIA, "evidence must be produced to establish that a foreign state . . . is the defendant in the suit and that the plaintiff's claim relates to . . . an act not within the exceptions in sections 1605-1607." H.R. Rep. 94-1487 at 17, U.S.C.C.A.N. at 6616.

The majority recognizes that, in the context of immunity from suit, the burden shifts between the parties. Maj. Op. 19253-54. However, it fails to acknowledge the clear precedent in this and other circuits that the *ultimate* burden of proving immunity belongs to the foreign state defendant. Where the plaintiff alleges that his claim is based on an exception to immunity, the defendant must establish a prima facie case that an exception does not apply. *Meadows v. Dominican Republic*, 817 F.2d 517, 522-23 (9th Cir. 1987). The plaintiff must then offer proof that one of the FSIA exemptions applies. *Id.* at 523. Then, "the defendant must prove its entitlement to immunity by a preponderance of the evidence." *Id. See also Wilmington Trust*, 934 F.2d at 1032 n.9 ("The FSIA places the burden of proof on the entity attempting to place itself within the act . . . ."); *Princz v. Fed. Rep. of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994) ("It is the burden of the foreign sovereign in each case to establish its immunity by demonstrating that none of the exceptions is applicable."); *Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 397 (7th Cir. 2002) ("The ultimate burden of proving immunity would rest with the foreign state."). If the plaintiff *merely alleges* that an exception applies, that is sufficient proof to establish lack of immunity unless contested by the defendant. Given that the ultimate proof rests with the defendant, it is not unreasonable to require the defendant to raise the defense of immunity from execution in the first instance.

Finally, our decision in *Wilmington Trust v. U.S. District Court*, 934 F.2d 1026 (9th Cir. 1991) cannot be so easily distinguished. In addressing whether an international organization could assert sovereign immunity from execution, even

where the foreign state was not a party to the action, we
stated:

> Congress intended the FSIA to supplant the earlier
> practice whereby a foreign sovereign would appeal
> to the State Department "to make a formal sugges-
> tion of immunity to the court." Congress transferred
> this decision to the courts. We hold that, based on
> the language of the statute and its legislative history,
> Congress intended requests for protection under the
> FSIA to originate from the foreign state party.

*Id.* at 1032-33 (internal citation omitted). Because Finland
was not a party to the action, this holding strikes more at the
question of whether the FSIA applies even where a foreign
state is not a party, and is therefore somewhat inapposite to
the case at hand. Nevertheless, we certainly seem to imply
that, under the FSIA (as opposed to the historical practice pre-
dating its enactment) requests for sovereign immunity from
execution must come from the foreign country itself and
nowhere else—including from the courts.

For these reasons, I disagree with the majority's holding
that courts can *sua sponte* adjudicate issues of sovereign
immunity from execution under 28 U.S.C. § 1609. Because
there is no reason here to violate the general rule against third
party standing, I would hold that CMA CGM cannot assert
sovereign immunity on Iran's behalf. I would therefore
remand this issue to the district court to consider in the first
instance whether Iran's right to payment was assignable under
California law without reference to the FSIA.